**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| MIGUEL COCA, ALEJANDRO RANGEL-LOPEZ, | Civil Action No.: |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| CITY OF DODGE CITY, a municipal corporation, the DODGE CITY COMMISSION, E. KENT SMOLL, in his official capacity as Mayor of Dodge City, MICHAEL BURNS, in his official capacity as Vice-Mayor of Dodge City, RICK SOWERS, in his official capacity as a member of the Dodge City Commission, CHUCK TAYLOR, in his official capacity as a member of the Dodge City Commission, and JOSEPH NUCI, in his official capacity as a member of the Dodge City Commission, | DESIGNATION PLACE OF TRIAL: WICHITA, KANSAS |
| Defendants. | |

Come Now, Plaintiffs Miguel Coca and Alejandro Rangel-Lopez (together, "Plaintiffs"), by and through their undersigned counsel, and hereby file this complaint against the City of Dodge City ("Dodge City" or the "City") as a municipal corporation; the Dodge City Commission (the "Commission"); and E. Kent Smoll, Michael Burns, Rick Sowers, Chuck Taylor, and Joseph Nuci (together, "Defendants Commissioners"), in their official capacities as members of the Dodge City Commission (together with Dodge City and the Commission, "Defendants"). Under 42 U.S.C. § 1983 and 52 U.S.C. § 10301, Plaintiffs allege as follows:

## I.      INTRODUCTION

1.      The at-large election system used by Dodge City to elect commissioners to the Commission impermissibly denies Latine[1] citizens in Dodge City an equal opportunity to participate in the political process and to elect candidates of their choice.

2.      The Commission plays a central role in the City's government. The Commission sets the tax rates, approves the City's budget, appoints members to various boards and commissions, enacts municipal ordinances, and appoints the City Manager.

3.      Over the past twenty years, the Latine population in Dodge City has grown significantly. As of the 2021 American Community Survey 5-Year Estimates ("ACS"), Dodge City's Hispanic or Latino population comprises 65 percent of the total population, 59 percent of the Voting Age Population ("VAP"), and 46 percent of the Citizen Voting Age Population ("CVAP"). The Latine population greatly increased around the turn of the 20th Century, when many Latine individuals began migrating from Mexico to work on the Santa Fe Railroad. More recently, the Latine community has continued to grow to support Dodge City's meatpacking plants—a dominant local industry. The Dodge City Latine community is vibrant and growing. Latine residents purchase homes, go to church, and send their children to City schools in increasingly large numbers.

4.      Despite the significant size of the Latine population in Dodge City and their extensive participation in the community, there are no Latine elected officials serving on the Commission.

---

[1]      Unless otherwise indicated, this complaint uses the terms "Latine" and "Hispanic" interchangeably to refer to individuals who self-identify as Latine or Hispanic. Latine is the gender neutral of Latino and Latina. When referring to certain population data, the terms "Hispanic" or "Hispanic or Latino" mean non-white persons of "Hispanic" or "Hispanic or Latino" origin as defined by the United States Census Bureau and U.S. Office of Management and Budget ("OMB").

5.      No Latine candidates of choice have been elected to the Commission in at least the past twenty-two years.[2] There was a Latina commissioner who was appointed—not elected—in 2021, but she failed to win election to the Commission in the following election cycle.[3]

6.      Latine citizens in Dodge City vote cohesively to attempt to elect their preferred candidates. However, due to the dilutive effect of the Commission's at-large election system and the related discriminatory factors set forth herein, Latine voters' cohesive voting is insufficient to overcome the non-Latine majority, who cohesively vote together for their preferred candidates and consistently defeat Latine voters' preferred choice.

7.      Under the election system for the Dodge City Commission, some commissioners serve two-year terms while others serve four-year terms, depending on the number of votes they receive. This system of vote-dependent term lengths further decreases the opportunity for the City's Latine community to elect their candidates of choice.

8.      The current at-large election system denies Latine citizens an equal opportunity to have a voice in the future of their City. The combination of the at-large election system, racially polarized bloc voting, and several other factors—including the lack of polling locations serving the City's Latine population, a history of voting-related discrimination, and severe socioeconomic disparities between the non-Latine and Latine population in the City—has prevented Latine-preferred candidates from winning any elections for Commissioner in at least the past two decades.

---

[2]      It is likely that only two Latine candidates have ever been elected to the Dodge City Commission. However, the lack of election results dating back past the 2000s limits the information available regarding Latine candidates of choice.

[3]      *See* David Condos, *Even in the most Hispanic cities in Kansas, getting elected as a Latina is an uphill battle*, HIGH PLAINS PUBLIC RADIO (Nov. 22, 2021), https://www.hppr.org/hppr-news/2021-11-22/even-in-the-most-hispanic-cities-in-kansas-getting-elected-as-a-latina-is-an-uphill-battle.

9.      Based on the totality of the circumstances, the inequality of voting opportunity for the City's Latine voters constitutes a violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and of the Fourteenth and Fifteenth Amendments to the United States Constitution. Absent relief from this Court, Defendants will continue to engage in the dilution of Plaintiffs' right to vote by depriving them of an equal opportunity to elect their candidates of choice.

10.      Plaintiffs seek to enjoin Defendants from administering, implementing, or conducting any future elections for the Commission under the existing at-large method of election, and to compel Defendants to implement a single-member district election system that would provide Latine voters an opportunity to elect their candidates of choice to the Commission.

## II.      JURISDICTION

11.      Plaintiffs bring this action under 52 U.S.C. § 10301 and 42 U.S.C. §§ 1983, 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution and the Voting Rights Act.

12.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1357, and 52 U.S.C. § 10301 *et seq.* to hear the claims for legal and equitable relief arising under the United States Constitution and the Voting Rights Act.

13.      Jurisdiction for Plaintiffs' claim for costs and attorneys' fees is based upon Federal Rule of Civil Procedure 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e).

14.      This Court has personal jurisdiction over all Defendants. Defendants E. Kent Smoll, Michael Burns, Rick Sowers, Chuck Taylor, and Joseph Nuci are Dodge City Commissioners who reside in and perform their official duties in Dodge City, Kansas. Defendant

Dodge City is a municipal corporation of Kansas, and Defendant Dodge City Commission is a Kansas entity.

15.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as by Federal Rules of Civil Procedure 57 and 65.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred, and will occur, in this judicial district.

### III.     PARTIES

17.     Plaintiff Miguel Coca is Latino, a citizen of the United States, and over eighteen years of age.

18.     Plaintiff Coca is registered to vote in Dodge City, Kansas.

19.     Plaintiff Coca has voted in Commission elections and plans to vote in future elections.

20.     Plaintiff Coca lives in the southern area of Dodge City, and within a majority Latine area which could be drawn into a single-member Commission district that would give Plaintiff Coca an opportunity to elect a candidate of his choice.

21.     Due to the City's use of an at-large method of election in violation of Section 2 of the Voting Rights Act and the U.S. Constitution, as alleged in this complaint, Plaintiff Coca and other Latine voters in Dodge City have had, and will continue to have, their voting power diminished and diluted.

22.     Plaintiff Alejandro Rangel-Lopez is Latino, a citizen of the United States, and over eighteen years of age.

23.     Plaintiff Rangel-Lopez is registered to vote in Dodge City, Kansas.

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**                5

24. Plaintiff Rangel-Lopez has voted in Commission elections and plans to vote in future elections.

25. Plaintiff Rangel-Lopez lives in the western area of Dodge City, and within a majority Latine area which could be drawn into a single-member Commission district that would give Plaintiff Rangel-Lopez an opportunity to elect a candidate of his choice.

26. Due to the City's use of an at-large method of election in violation of Section 2 of the Voting Rights Act and the U.S. Constitution as alleged in this complaint, Plaintiff Rangel-Lopez and other Latine voters in Dodge City have had, and will continue to have, their voting power diminished and diluted.

27. Defendant Dodge City is located in Ford County, Kansas, and is a political subdivision within the meaning of, and subject to the requirements of, the Voting Rights Act of 1965, 52 U.S.C. §10301; *see also* Kan. Stat. Ann. § 12-101.

28. Defendant Dodge City Commission is the governing body of Dodge City. Kan. Stat. Ann. § 12-104; Dodge City Mun. Code 1-201.

29. Defendants Commissioners are current members of the Dodge City Commission. Defendants Commissioners are each sued in their official capacity only.

30. Defendants Commissioners and the Commission have the authority to change the County's electoral system to remedy violations of the United States Constitution and the Voting Rights Act.

31. During all times mentioned in this complaint, Defendants and their agents were acting under color of law: under color of the statutes, laws, charters, ordinances, rules, regulations, customs, and usages of Dodge City and the State of Kansas.

## IV.    STATEMENT OF FACTS

### A.  Demographic Changes in Dodge City, Kansas

32.     Dodge City is located in southwest Kansas and is within the state's "Meatpacking Triangle," which refers to the grouping of counties and cities in southwest Kansas where many meatpacking plants and companies are located.

33.     Over the past two decades, Dodge City's large Latine population has continued to grow. By contrast, the City's white, non-Latine population has shrunk.

34.     According to the 2000 and 2020 Census, the total population of Dodge City increased from 25,065 to 27,788 between 2000 and 2020. This general increase in population largely resulted from the growth of the Hispanic or Latino population, while the white alone, not Hispanic or Latino population declined during the same period.

35.     According to the 2000 Census, the total Hispanic or Latino population was 10,614, comprising 42.3 percent of the City's total population. According to the 2020 Census, the total Hispanic or Latino population in the City had increased to 17,759, comprising 63.9 percent of the City's total population.

36.     According to the 2000 Census, the white alone, not Hispanic or Latino population was 13,060, comprising 52.1 percent of the City's total population. According to the 2020 Census, the total white alone, not Hispanic or Latino population in the City had decreased to 8,129, comprising only 29.3 percent of the City's total population.

37.     Accordingly, from 2000 to 2020, the Hispanic or Latino population in Dodge City grew about 67.3 percent, while the white alone, not Hispanic or Latino population decreased by 37.8 percent.

38.    The Census demographics for the Hispanic or Latino and the white, non-Latino populations in Dodge City since 2000 are as follows:

### Figure 1—Dodge City Total Population (2020, 2010, and 2000)

| Year | Hispanic or Latino Population | Percent of Total Dodge City Population | White Alone, not Hispanic or Latino Population | Percent of Total Dodge City Population |
|------|------|------|------|------|
| 2000 | 10,614 | 42.3% | 13,060 | 52.1% |
| 2010 | 15,730 | 57.5% | 10,173 | 37.2% |
| 2020 | 17,759 | 63.9% | 8,129 | 29.3% |

Source: Social Explorer Tables (SE), Census (2000). U.S. Census Bureau and Social Explorer
U.S. Census Bureau (2010). PL94-717 Redistricting Data [https://data.census.gov/]
U.S. Census Bureau (2020). PL94-717 Redistricting Data [https://data.census.gov/]
https://data.census.gov/table?q=dodge+city+hispanic+or+latino&tid=DECENNIALPL2020.P2
https://data.census.gov/table?q=dodge+city+hispanic+or+latino&tid=DECENNIALPL2010.P2

39.    The increase in the total Latine population in Dodge City is also reflected in the increase between 2000 and 2021 in the Hispanic or Latino VAP by about 22 percentage points and the Hispanic or Latino CVAP by about 27 percentage points.

40.    In contrast, during the same period, there were decreases in the white alone, not Hispanic or Latino VAP by about 23 percentage points and the white alone, not Hispanic or Latino CVAP by about 28 percentage points.

41.    According to the 2000 Census, the Hispanic or Latino VAP was 36.8 percent of the City's total voting age population, or 6,330 residents of voting age, while the white alone, not Hispanic or Latino VAP was 57.8 percent, or 9,940 residents of voting age.

42.    According to the 2021 ACS, the Hispanic or Latino VAP was 59 percent of the City's total voting age population, or 11,160 residents of voting age, while the white alone, not Hispanic or Latino VAP was 34.8 percent, or 6,586 residents of voting age.

43.     The VAP data for the Hispanic or Latino and the white alone, not Hispanic or Latino residents in Dodge City since 2000 are as follows:

**Figure 2—Dodge City VAP Estimates (2021, 2010, and 2000)**

| Year | Hispanic or Latino VAP | Percent of Total Dodge City VAP | White Alone, not Hispanic or Latino VAP | Percent of Total Dodge City VAP |
|---|---|---|---|---|
| 2000 | 6,330 | 36.78% | 9,940 | 57.76% |
| 2010 | 8,623 | 47.59% | 8,525 | 47.04% |
| 2021 | 11,160 | 59.02% | 6,586 | 34.83% |

Source: Social Explorer Tables (SE), Citizen Voting Age Population Special Tabulation (Census 2000), Social Explorer; U.S. Census Bureau.
ACS (2010-5 Year Estimates) Subject Tables [https://data.census.gov/]
https://data.census.gov/table?q=dodge+city+sex+by+age+by+citizenship&tid=ACSDT5Y2010.B05003H
https://data.census.gov/table?q=dodge+city+hispanic+or+latino&tid=ACSDT5Y2010.B05003I
https://data.census.gov/table?q=dodge+city+sex+by+age+by+citizenship&tid=ACSDT5Y2010.B05003
ACS (2021-5 Year Estimates) Subject Tables [https://data.census.gov/]
https://data.census.gov/table?q=dodge+city+sex+by+age+by+citizenship&tid=ACSDT5Y2021.B05003H
https://data.census.gov/table?q=dodge+city+hispanic+or+latino&tid=ACSDT5Y2021.B05003I
https://data.census.gov/table?q=dodge+city+sex+by+age+by+citizenship&tid=ACSDT5Y2021.B05003

44.     According to the 2000 Census, the Hispanic or Latino CVAP was about 19.5 percent of the City's total citizen voting age population, or 2,560 citizens of voting age, while the white alone, not Hispanic or Latino CVAP was 75.6 percent, or 9,905 citizens of voting age.

45.     According to the 2021 ACS, the Hispanic or Latino CVAP was 46.1 percent of the City's total citizen voting age population, or 6,398 citizens of voting age, while the white alone, not Hispanic or Latino CVAP was 47.2 percent, or 6,552 citizens of voting age.

46.     The CVAP data for the Hispanic or Latino and the white, non-Latino residents in

Dodge City since 2000 are as follows:

### Figure 3—Dodge City CVAP Estimates (2021, 2010, and 2000)

| Year | Hispanic or Latino CVAP | Percent of Total Dodge City CVAP | White Alone, not Hispanic or Latino CVAP | Percent of Total Dodge City CVAP |
|---|---|---|---|---|
| 2000 | 2,560 | 19.53% | 9,905 | 75.58% |
| 2010 | 3,938 | 30.15% | 8,504 | 65.11% |
| 2021 | 6,398 | 46.13% | 6,552 | 47.24% |

Source: Social Explorer Tables (SE), Citizen Voting Age Population Special Tabulation (Census 2000), Social Explorer; U.S. Census Bureau.
ACS (2010-5 Year Estimates) Subject Tables [https://data.census.gov/]
https://data.census.gov/table?q=dodge+city+sex+by+age+by+citizenship&tid=ACSDT5Y2010.B05003H
https://data.census.gov/table?q=dodge+city+hispanic+or+latino&tid=ACSDT5Y2010.B05003I
https://data.census.gov/table?q=dodge+city+sex+by+age+by+citizenship&tid=ACSDT5Y2010.B05003
ACS (2021-5 Year Estimates) Subject Tables [https://data.census.gov/]
https://data.census.gov/table?q=dodge+city+sex+by+age+by+citizenship&tid=ACSDT5Y2021.B05003H
https://data.census.gov/table?q=dodge+city+hispanic+or+latino&tid=ACSDT5Y2021.B05003I
https://data.census.gov/table?q=dodge+city+sex+by+age+by+citizenship&tid=ACSDT5Y2021.B05003

47.     Figure 4 is a heat map, depicting the geographic concentration of the total

Hispanic or Latino population in Dodge City by precinct, according to the 2020 Census.

Precincts with blue colors indicate a higher percentage of Hispanic or Latino residents. Precincts

with orange colors depict a lower percentage of Hispanic or Latino residents and are comprised

primarily of white alone, not Hispanic or Latino residents.

**Figure 4—Hispanic or Latino Population in Dodge City by Precinct (2020)**



Source: Social Explorer

## B. Dodge City Commission At-Large Method of Election

48.     The Dodge City Commission is comprised of five elected positions that are elected using an at-large method of election.

49.     Every election cycle, three seats on the Commission are up for election. Commissioners serve either four or two-year terms based on the number of votes that the top three finishers in an election receive. The lowest vote-getter serves a two-year term, while the top two finishers serve four-year terms.

50.     Elections for Dodge City are now held in November of odd-numbered years. *See* Kan. Stat. Ann. § 25-21a01. Prior to 2021, elections were held during May of odd-numbered years. It is well established in political science that off-cycle elections, or those held during odd-

numbered years, are generally correlated with lower voter turnout, especially in lower-income communities and communities of color.

51.     The elections for the Commission are non-partisan, and there are no primary elections for the Commission.

52.     The mayor and vice-mayor of Dodge City are selected by the commissioners at the first meeting the Commission holds in January.

### C.  Dodge City Commission Election History

53.     The at-large method of electing Dodge City commissioners impermissibly dilutes the voting strength of the Latine community.

54.     Since at least 2000, no Latine-preferred candidates have been elected to the Commission.

55.     In February 2021, Blanca Soto, a Latina, was *appointed* to the Commission after Commission member and Mayor Joyse Warshaw resigned, but when Ms. Soto, the Latine candidate of choice, later ran for election to the Commission, she was defeated.

56.     The candidate that defeated Ms. Soto was not the Latine-preferred candidate.

57.     Indeed, Latine-preferred candidates have consistently run for seats on the Commission since 2000 but have not succeeded in being elected.

58.     The lack of electoral success for Latine-preferred candidates in Dodge City reflects a larger trend in Ford County. Currently, there are no Latine-preferred officials elected to county-wide positions.[4]

---

[4]     Plaintiffs are not aware of any Latine candidates of choice ever being elected to county-wide positions in Ford County. However, the lack of election results dating back past the 2000s limits the information available regarding this topic.

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**                    12

59.     Latine voters in Dodge City are politically cohesive and vote together for their candidates of choice.

60.     White, non-Latine voters in Dodge City are also politically cohesive, overwhelmingly prefer different candidates than Latine voters in Dodge City, and vote as a bloc. This bloc voting repeatedly results in the defeat of Latine voters' candidates of choice.

61.     The following Latine-preferred candidates have unsuccessfully run for the Dodge City Commission: Fernando Jurado in 2000, Jose Vargas in 2006, Liliana Zuniga in 2014 and 2017, and Blanca Soto in 2021. These candidates were top vote-getters in high Latine population precincts, but lost in low Latine population precincts.

62.     This split, in which candidates win a majority of the vote in high-density Latine voting precincts but receive low support in high-density non-Latine precincts, is emblematic of racially polarized voting.

63.     The repeated losses of Latine-preferred candidates under the Commission's at-large method of election is due to racial polarization in elections in Dodge City and Ford County.

64.     Additionally, Latine individuals in Dodge City and Ford County have been subjected to suppressive election administrative practices, including the limiting of polling locations by Ford County and the moving of the County's single polling location during the 2018 election.

65.     As explained *infra*, there has been a series of polling location closures by Ford County, which has caused voters in Dodge City to have only two polling locations for over 13,000 registered voters, and before that, only one location for those voters from 2002 until

2018. The closure of polling locations, or increased distance to polling locations, is known in social science research to depress voter turnout of communities of color.[5]

66.    Further, in 2018, the Ford County Clerk, Debbie Cox, sent out incorrect polling location information to voters in Dodge City, in violation of Kansas Law. *See* K.S.A. 25-2701(d)(1); *see also Rangel-Lopez v. Cox*, 344 F. Supp. 3d 1285 (D. Kan. 2018). As a result, voters in Dodge City received registration cards with erroneous information about their polling location for the 2018 midterm election.

67.    The polling location closures and Cox's error disproportionately impacted Latine voters in Dodge City, who rely on public transportation at higher rates than the City's non-Latine voters, *see infra* ¶¶ 93-103, and hindered Latine voters' opportunity to participate equally in the political process.

68.    The existence of racially polarized voting, the use of an at-large election system, and suppressive election administration procedures have resulted in the failure of Latine-preferred candidates to be elected to the Dodge City Commission.

69.    It is possible to draw a map of five single-member districts for the Dodge City Commission that—while respecting traditional districting principles such as compactness, contiguity, and preserving communities of interest—gives the Latine population an opportunity to elect their candidates of choice in at least two such districts.

---

[5]    *See, e.g.*, Enrico Cantoni, *A Precinct Too Far: Turnout and Voter Costs*, AMERICAN ECONOMIC JOURNAL: APPLIED ECONOMICS 12(1), 61-85 (2020); Brennan Center for Justice, *The Impact of Voter Suppression on Communities of Color* (Jan. 10, 2022), https://www.brennancenter.org/our-work/research-reports/impact-voter-suppression-communities-color.

**D. The Totality of the Circumstances Demonstrates That Latine Voters in Dodge City Have Less Opportunity Than Others To Participate in the Political Process and Elect Their Candidates of Choice**

70.     The totality of the circumstances demonstrates that Latine voters in Dodge City have less opportunity than other members of the electorate to participate in the political process and elect their candidates of choice. *See* 52 U.S.C. § 10301.

*a. Continuing Socioeconomic Effects of Discrimination*

71.     Latine individuals in Dodge City have borne and continue to bear the effects of discrimination in a wide range of areas, including employment, income, education, and access to health care. Such discrimination hinders Latine voters' ability to effectively participate in the political process by increasing voting costs and limiting access, information, and opportunity.

72.     Based on the 2021 ACS, in Dodge City 17.9 percent of Hispanic or Latino residents are below the poverty level while only 6.9 percent of white alone, not Hispanic or Latino residents are below the poverty level.

73.     The following chart depicts the poverty rates for Hispanic or Latino and white alone, not Hispanic or Latino residents since 2000:

**Figure 5—Dodge City Percent Income Below Poverty Level (2000-2021)**

| Year | White Alone, Not Hispanic or Latino | Hispanic or Latino |
|------|------------------------------------:|-------------------:|
| 2000 | 6.3% | 21.7% |
| 2010 | 11.2% | 24.2% |
| 2021 | 6.9% | 17.9% |

Source: U.S. Census Bureau (2000) [https://data.census.gov/];
ACS (2010-5 Year Estimates) Subject Tables [https://data.census.gov/];
ACS (2021-5 Year Estimates) Subject Tables [https://data.census.gov/]

74.     Latine residents in Dodge City are less likely to be employed than white, non-Latine residents.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          15

75.     Based on the 2021 ACS, in Dodge City 4.5 percent of Hispanic or Latino residents are unemployed while only 2.8 percent of white alone, not Hispanic or Latino residents are unemployed.

76.     Figure 6 depicts the unemployment rates for Hispanic or Latino and white alone, not Hispanic or Latino residents since 2000:

**Figure 6—Dodge City Percent Unemployed (16 Years and Older) (2000-2021)**

| Year | White Alone, Not Hispanic or Latino | Hispanic or Latino |
|------|-------------------------------------|--------------------|
| 2000 | 3.0% | 8.8% |
| 2010 | 3.4% | 5.0% |
| 2021 | 2.8% | 4.5% |

Source: U.S. Census Bureau (2000) [https://data.census.gov/]
ACS (2010-5 Year Estimates) Subject Tables [https://data.census.gov/]
ACS (2021-5 Year Estimates) Subject Tables [https://data.census.gov/]

77.     Latine residents in Dodge City are less likely to have health insurance than their white, non-Latine counterparts.

78.     Based on the 2020 ACS, 17.3 percent of Hispanic or Latino residents in Dodge City are uninsured, while only 6.1 percent of white alone, not Hispanic or Latino residents are uninsured.

79.     Latine residents in Dodge City are less likely to own a home than white, non-Latine residents.

80.     Based on the 2021 ACS, in Dodge City 69.1 percent of white alone, not Hispanic or Latino residents own (rather than rent) a home; while only 57.9 percent of Hispanic or Latino residents own (rather than rent) a home.

81.    The following chart depicts the home ownership rates among Hispanic or Latino and white alone, not Hispanic or Latino residents who rent or own a home since 2000:

**Figure 7—Dodge City Percent of Occupants Owning Homes (2000-2021)**

| Year | White Alone, not Hispanic or Latino | Hispanic or Latino |
|------|-------------------------------------|--------------------|
| 2000 | 67.6% | 44.9% |
| 2010 | 69.6% | 61.1% |
| 2021 | 69.1% | 57.9% |

Source: U.S. Census Bureau (2000) [https://data.census.gov/]
ACS (2010-5 Year Estimates) Subject Tables [https://data.census.gov/]
ACS (2021-5 Year Estimates) Subject Tables [https://data.census.gov/]

82.    Latine residents in Dodge City are less likely to graduate from high school than the City's white, non-Latine residents.

83.    Despite there being more than double the number of Hispanic or Latino residents in Dodge City than white alone, not Hispanic or Latino residents, more white alone, not Hispanic or Latino residents graduate from high school than the City's Hispanic or Latino residents. Based on the 2021 ACS, 95.5 percent of white alone, not Hispanic or Latino residents (or 5,791 residents) graduated from high school, whereas only 55.8 percent of Hispanic or Latino residents (or 4,931 residents) graduated from high school.

84.    Despite there being more than double the number of Hispanic or Latino residents in Dodge City than white alone, not Hispanic or Latino residents, Hispanic or Latino residents in Dodge City are also less likely to obtain a college degree than the City's white alone, not Hispanic or Latino residents. Based on the 2021 ACS, 40.5 percent of white alone, not Hispanic or Latino residents (or 2,454 residents) received their bachelor's degree or higher compared to only 5.8 percent of Hispanic or Latino residents (or 516 residents).

85.     These educational disparities reflect the City's historical socioeconomic discrimination against Latine residents and correlate with decreased voting opportunities, as further set forth in paragraph 90, *infra*.  Social science consistently demonstrates that political participation is highly correlated with educational achievement.

86.     Early in the COVID-19 pandemic, in 2020, employees of the meatpacking plant in Dodge City, many of whom are Latine, had to work in close quarters and unsanitary conditions, disproportionately increasing their risk of contracting the COVID-19 virus.[6]

87.     There continues to be a need for affordable housing in Dodge City, particularly for Latine residents, who are more likely to be living in poverty and less likely to own a home. The City's housing assessment studies show that in the next five years, the City will lack nearly 1,600 homes for families in need.[7]

88.     Latine individuals in Dodge City have historically been less likely to have access to stable housing, and more likely to utilize temporary housing.[8] For example, in the past, meatpacking plant employees, many of whom are Latine, had to stay at hotels because of the lack of available and affordable housing.[9]

---

[6]      Corinne Boyer, *Despite Meatpacking Plants' Efforts, Kansas Workers Say 'We're Right Next To Each Other,'* NPR (May 4, 2020), https://www.kcur.org/news/2020-05-04/despite-meatpacking-plants-efforts-kansas-workers-say-were-right-next-to-each-other.

[7]      Kaisha Batman, *Dodge City: Making strides to build affordable housing as demands grow*, KSN (Feb. 18, 2021), https://www.ksn.com/news/kansas/dodge-city-making-strides-to-build-affordable-housing-with-growing-demands/.

[8]      JAMES G. GIMPEL, SEPARATE DESTINATIONS: MIGRATION, IMMIGRATION, AND THE POLITICS OF PLACES, 121 (1999).

[9]      Jim McLean, *Kansas Cattle Town Dodge City Bucks A Rural Trend With Growth Driven By Immigrants*, KCUR (Nov. 23, 2019), https://www.kcur.org/economy/2019-11-23/kansas-cattle-town-dodge-city-bucks-a-rural-trend-with-growth-driven-by-immigrants.

89.     The City has also historically been unresponsive to the Latine community's needs, including, but not limited to, the needs of recent or undocumented Latine immigrants.[10]

90.     A large body of political science research has found that there is a wide array of "voter costs," any of which can make it disproportionately more difficult for particular individuals or communities to vote. Voter costs include lower educational achievement, lower income levels, higher poverty rates, lower health outcomes and/or access to health care, and worse housing access. As described above, all of these voter costs disproportionately impact Latine voters in Dodge City.

### b. Dodge City's Discriminatory Voting Practices and Procedures

91.     The effects of historical and contemporaneous discrimination in Kansas, and in Dodge City in particular, have translated into lower levels of political participation and involvement. Latine individuals in Dodge City tend to have lower rates of voter turnout than the City's non-Latine, white residents.

92.     The City has engaged in discriminatory voting practices and procedures that limit the ability of Latine voters to engage in the political process.

93.     In 2002, Dodge City closed all but one polling location, baselessly claiming that compliance with the Americans with Disabilities Act required the City to move that single polling location to a more rural part of Ford County.[11]

---

[10]     Santiago Khan, *Dodge City Police Helped ICE in Raid Last Week*, (Feb 13, 2017) https://www.ksn.com/news/local/dodge-city-police-helped-ice-in-last-week/.
[11]     Roxana Hegeman, *Iconic Dodge City Moves Its Only Polling Place Outside of Town*, Ass. Press (Oct. 8, 2018), https://apnews.com/article/78f02d14245043aab005046ef4063c10; *see also* The Leadership Conference Fund, *Democracy Diverted: Polling Place Closures and the Right to Vote* (Sep. 2019), http://civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf (finding an "alarming trend" and "widespread practice" across the country of election officials "blaming polling location place closures" on the Americans with Disabilities Act).

94.     The polling place closures followed the 2000 election, in which Fernando Jurado had narrowly lost being elected to a position on the Dodge City Commission. *See supra* ¶ 61.

95.     During the 2000 election, there was a recount for the Dodge City Commission election in which one of the three top vote getters was a Latine-preferred candidate. At first, Jim Lembright (815 votes), Tom Martin (653 votes), and Fernando Jurado (576 votes) won; however, candidate Bill Weber (575 votes) requested a recount. When election officials conducted the recount, Jurado, the Latine-preferred candidate, lost by two votes.

96.     After the 2002 closure of the City's other polling locations, the single remaining location (at the Civic Center) served over 13,000 voters in the Dodge City area, compared to the state's average of 1,200 voters per polling location.[12]

97.     In 2018, City officials moved the City's single polling location from the Civic Center to the Expo Center.[13] The Expo Center is two miles outside of the Dodge City limits and 1.3 miles away from the nearest public transportation stop.

98.     Latine individuals in Dodge City, who are more likely to be living in poverty than other residents, more often rely on public transportation or group transportation compared to the City's white, non-Latine residents.[14]  As a result, the move of the polling location over a mile away from a public transportation stop made it extremely difficult for many Latine residents to vote.

---

[12]     Roxana Hegeman, *Iconic Dodge City Moves Its Only Polling Place Outside of Town*, ASS. PRESS (Oct. 8, 2018), https://apnews.com/article/78f02d14245043aab005046ef4063c10.

[13]     *Id.*

[14]     In 2016, Dodge City's public transportation department estimated that 36 percent of the county had a potential need for public transportation. *See also* Amelie Ramirez, *Research: Latinos Face Big Public Transportation Challenges*, Salud America! (May 10, 2019), https://salud-america.org/research-latinos-face-big-public-transportation-challenges/.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**                    20

99.    In 2018, the League of United Latin American Citizens and a Dodge City voter sued Ford County for moving Dodge City's sole polling place to the Expo Center.

100.    The U.S. House of Representatives Committee on Oversight and Reform (the "Committee") examined the decision to move the lone polling site to a location less accessible by public transportation and outside Dodge City limits, and found that it was moved "without conducting due diligence, without consulting the local community, and without taking simple steps to reduce the impact of the move on thousands of voters until after a public outcry forced them to take action."[15]

101.    The Committee found that Ford County Clerk Cox did not consult with community groups or other residents about their concerns regarding the change in location of the polling place, nor did she take steps to remedy the impact of the move.[16]

102.    Ultimately, in 2018, the County was forced to open a second polling location to serve all 13,000 residents of Dodge City.

103.    Even with two polling locations, Dodge City is still far above the average across the state of 1,200 voters per polling location. The small number of polling locations continues to impose significant difficulties that disproportionately affect Dodge City's Latine residents, as described above.

104.    Latine Kansans have also experienced discrimination in voting at the state level. For example, in 2013, the Kansas legislature passed a law requiring individuals registering to

---

[15]    Memorandum to Members of the Committee on Oversight and Reform: *Hearing on "Voter Suppression in Minority Communities: Learning from the Past to Protect Our Future"*, 116th Cong. 11-13 (Feb. 25, 2020).
[16]    *Id.*

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**                    21

vote at the Division of Motor Vehicles to provide documentary proof of citizenship, such as a birth certificate or U.S. passport, in order to register to vote. *See* Kan. Stat. Ann. § 25-2309.

105.    This new law led to the disenfranchisement of over 35,000 Kansan citizens in just three years, including a large number of Latine Kansans.

106.    Civil rights organizations secured a permanent injunction against the discriminatory state law, on grounds that it violated the National Voter Registration Act, 52 U.S.C. §§ 20501-20511. Despite this clear violation of federal law, the State of Kansas—under the leadership of then-Secretary of State and current Attorney General Elect Kris Kobach— unsuccessfully attempted to defend the law all the way to the U.S. Supreme Court.

107.    The above facts and other factors described herein demonstrate, based on the totality of the circumstances, that Latine voters have less opportunity than other voters to participate in the political process and elect their candidates of choice.

## CAUSES OF ACTION

### Count I

*Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301; 42 U.S.C. § 1983*

108.    Plaintiffs incorporate by reference all the preceding paragraphs as if fully set forth herein.

109.    Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), reads as follows:

(a)    No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b)    A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State

or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

110.     A Section 2 violation may be based on an electoral regime that dilutes the voting strength of a minority community so as to deprive the members of that community of their right to an equal opportunity to elect representatives of their choice.

111.     A claim for vote dilution under Section 2 requires that: (1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group must be politically cohesive; and (3) the majority must vote sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

112.     In addition to these necessary preconditions, Section 2 requires an assessment whether, under the totality of the circumstances, members of the racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Supreme Court has directed courts to consider the non-exhaustive list of factors found in the Senate Report on the 1982 amendments to the Voting Rights Act in determining whether, under the totality of the circumstances, the challenged electoral device results in a violation of Section 2.

113.     The Senate Factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination

against the minority group; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which members of the minority group bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

114.    Courts also consider whether there is a lack of responsiveness on the part of elected officials to the particularized needs of the minority community, and whether the policy underlying the state or political subdivision's use of the challenged standard, practice, or procedure is tenuous.

115.    The at-large method of election for the Dodge City Commission results in a denial or abridgement of Plaintiffs' right to vote on account of their race, color, or ethnicity, by having the effect of diluting the voting strength of the Latine community in Dodge City and Kansas. The at-large method of election for the Dodge City Commission does not afford Plaintiffs an equal opportunity to participate in the political process and to elect representatives of their choice, and it denies Plaintiffs the right to vote in elections without distinction of race or color under 52 U.S.C. § 10301.

## Count II

*Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution,*

*42 U.S.C. § 1983*

116.    Plaintiffs incorporate by reference all the preceding paragraphs as if fully set forth herein.

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**                24

117.    The Fourteenth Amendment to the United States Constitution prohibits intentional racial discrimination. Discriminatory intent can be established by proof that defendants used race and national origin as a motivating factor in their decisions.

118.    The at-large method of election used by Dodge City for the Dodge City Commission discriminates against Plaintiffs on the basis of race and national origin in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

### Count III

*Fifteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983*

119.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

120.    The Fifteenth Amendment to the United States Constitution prohibits intentional racial discrimination. Discriminatory intent can be established by proof that defendants used race as a motivating factor in their decisions.

121.    The at-large method of election for Dodge City Commission discriminates against Plaintiffs on the basis of race and national origin in violation of the Fifteenth Amendment to the U.S. Constitution.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a.  Assume jurisdiction of this action;

b.  Issue a declaratory judgment finding that the at-large method of election for the Dodge City Commission illegally and unconstitutionally dilutes the voting strength of Latine voters in Dodge City, violates Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and is unlawful, null, and void;

c.  Permanently enjoin Defendants from calling, holding, supervising, or certifying any elections for the Commission under the at-large method of election;

d.  Issue an order requiring Dodge City to adopt a district-based method of election for the Dodge City Commission and hold elections for the Dodge City Commission during even-numbered years;

e.  Set a reasonable deadline for Defendants to enact or adopt a redistricting plan for Dodge City Commission that does not dilute, cancel out, or minimize the voting strength of Latine voters;

f.  If Defendants fail to enact or adopt a valid redistricting plan by the Court's deadline, order a new redistricting plan for Dodge City Commission that does not dilute, cancel out or minimize the voting strength of Latine voters;

g.  Adjudge all costs against Defendants, including reasonable attorneys' fees and costs;

h.  Retain jurisdiction to render any and all further orders that this Court may deem appropriate;

i.  Grant any other relief that the Court may deem just and proper, and as may be necessary to afford Plaintiffs the full relief to which they are entitled under the United States Constitution and the Voting Rights Act.

## DESIGNATION PLACE OF TRIAL

122.  Plaintiffs designate Wichita, Kansas as the place of trial for this action.

Dated this 15th day of December, 2022.      Respectfully submitted,

By: */s/ Sharon Brett*
Sharon Brett   KS 28696
**AMERICAN CIVIL LIBERTIES UNION
OF KANSAS**
P.O. Box 917
Mission, KS 66201
sbrett@aclukansas.org
913-490-4100

Chad W. Dunn*
Sonni Waknin*
Bernadette Reyes*
**UCLA VOTING RIGHTS PROJECT**
3250 Public Affairs Building
Los Angeles, CA 90065
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org
310-400-6019

Jonathan Topaz*
Sophia Lin Lakin*
**AMERICAN CIVIL LIBERTIES
UNION, INC.**
125 Broad Street, 18th Floor
New York, NY 10004
jtopaz@aclu.org
slakin@aclu.org
212-549-2500

Abena Mainoo*
Jonathan I. Blackman*
JD Colavecchio*
Mijin Kang*
Elizabeth R. Baggott*
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
One Liberty Plaza
New York, NY 10006
amainoo@cgsh.com
jblackman@cgsh.com
jdcolavecchio@cgsh.com

mkang@cgsh.com
ebaggott@cgsh.com
212-225-2000

Scott Fuqua*
**FUQUA LAW & POLICY, P.C.**
P.O. Box 32015
Santa Fe, NM 87594
scott@fuqualawpolicy.com
505-982-0961


*Attorneys for Plaintiffs*

* Pro Hac Vice Motion Forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of December 2022, a true and correct copy of the

foregoing Plaintiffs' Complaint for Declaratory and Injunctive Relief, submitted herewith, was

served via the United State District Court's CM/ECF system on all parties or persons requiring

notice.

By: _____/s/ Sharon Brett
Sharon Brett
KS 28696
**AMERICAN CIVIL LIBERTIES**
**UNION OF KANSAS**
P.O. Box 917
Mission, KS 66201
sbrett@aclukansas.org
913-490-4100