IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ, ) ) ) | |
| Plaintiffs, ) ) | Case No. 6:22-cv-01274-EFM-RES |
| vs. ) ) | |
| CITY OF DODGE CITY, a municipal corporation, the DODGE CITY COMMISSION, E. KENT SMOLL, in his official capacity as Mayor of Dodge City, MICHAEL BURNS, in his official capacity as Vice-Mayor of Dodge City, RICK SOWERS, in his official capacity as a member of the Dodge City Commission, CHUCK TAYLOR, in his official capacity as a member of the Dodge City Commission, and JOSEPH NUCI, in his official capacity as a member of the Dodge City Commission, ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Dodge City has been governed by a commission-manager form of government for more than 50 years. This form of government is explicitly permitted under Kansas law as one of the six types from which a city may choose, K.S.A. 12-184b, and is currently utilized by many First- and Second-Class cities across the State, including Arkansas City, Atchison, Emporia, Garden City, Hays, Junction City, Lawrence, Manhattan, Newton, Liberal, Pittsburg, Salina, and Ulysses.

Plaintiffs make no allegation that they or other residents of Dodge City have made the form of government an issue in any election campaign as part of the normal democratic process. They do not allege that a majority of Latine[1] voters in Dodge City have sought to change the form of

---

[1] It appears the term "Latine" is not part of the federal-government lexicon. Further, defense counsel has not found a single federal case in using the term. Because Plaintiffs' amended complaint utilizes the terminology and

government. Plaintiffs do not seek to strike down K.S.A. 12-184b or to invalidate the commission-manager form of government in other Kansas cities employing that form of government. Plaintiffs do not allege that Dodge City harbored some invidious form of discrimination when it adopted the commission-manager model on January 13, 1970, nor do they allege that Dodge City's citizens have elected not to revisit the issue based on some sort of discriminatory intent. Instead, Plaintiffs rely on threadbare allegations that Dodge City's facially-neutral form of government dilutes the vote of Latines by reducing the Latine community's ability to elect its candidate of choice.

The two individual Plaintiffs seek extraordinary relief. They ask this Court to disenfranchise all Dodge City voters by enjoining Dodge City from "calling, holding, supervising, or certifying any elections" for the City Commission under the at-large method for elections authorized by Kansas law. (Doc. 30, p. 26). They ask the Court to declare that the at-large method employed by many cities is unconstitutional in Dodge City, and they ask the Court to impose the will of two individuals as to the form of government in Dodge City without permitting the City's residents to weigh in on this issue. (*Id.* at 25-26). Moreover, they ask the Court to extend the terms of current City Commission members so that elections can be held in even-numbered years, (*id.* at 26), even as K.S.A. 25-21a01 requires such elections to be held in odd-numbered years.

At bottom, Plaintiffs effectively ask this court to sort voters on the basis of race. Yet, the United States Supreme Court in *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245, 1249 (2022), recently stated, "[u]nder the Equal Protection Clause, districting maps that sort voters on the basis of race 'are by their very nature odious.'" (Citation omitted). Such relief is not warranted here. First, section 2 of the Voting Rights Act ("VRA") does not create a private right of action, and even if it did, Plaintiffs have failed to plead the *Gingles* factors and thus have not

---

this is a motion to dismiss, Defendants use the term here, despite "Hispanic" or "Latino" being more consistent with federal law and common usage.

alleged a plausible claim thereunder. Second, Plaintiffs have not established any constitutional violation because they have not alleged discriminatory intent or effect under the Fourteenth Amendment, and the Fifteenth Amendment does not recognize a vote-dilution theory.

## BACKGROUND

The citizens of Dodge City adopted the commission-manager model on January 13, 1970. *See* Charter Ordinance 40 of the Dodge City Code, *attached hereto as* Ex. A.[2] Dodge City's Commission ("the Commission") is comprised of five members who are elected using an at-large method of election. (Doc. 30, ¶ 49). Every two years, three of the Commission's five members are up for election. (*Id.* at ¶ 50). Elections for the Commission's members are non-partisan and are held in November of odd-numbered years. (*Id.* at ¶¶ 51-52).

Plaintiffs do not and cannot allege that no Latine candidates have been elected to the City Commission. Rather, the Amended Complaint alleges that "no Latine-preferred candidates have been elected to the Commission" since at least 2000. (*Id.* at ¶ 55). However, Plaintiffs' self-proclaimed "Latine-preferred candidates" appear to be based solely on allegations that candidates that they identify as having Latine surnames have been unsuccessful in several elections.

The Amended Complaint is silent as to Plaintiffs' methodology for determining which candidates qualify as Latine-preferred. Plaintiffs are careful to avoid saying that a Latine candidate has not been elected. In fact, Plaintiffs amended their initial complaint to remove naked references to "Latine" candidates and to replace those references with the phrase "Latine preferred" candidates. (*Compare* Doc. 1, ¶ 4 & n.2 *with* Doc. 30, ¶ 4 & n.2). Plaintiffs do allege that the four candidates they designate as being preferred "were [the] top vote-getters in high Latine population

---

[2] This Court can take judicial notice of municipal ordinances and other facts that can be accurately and readily determined without converting Defendants' motion to dismiss into a motion for summary judgment. *See, e.g.*, *Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1504 (10th Cir. 1997).

precincts, but lost in low Latine population precincts." (Doc. 30, ¶ 62). The Amended Complaint says nothing though regarding which Dodge City precincts Plaintiffs believe are high Latine-population precincts and which ones are low Latine-population precincts. No precinct results for any of the races are alleged, and, thus, there is no way for the Court to know if the so-called "Latine preferred candidate" enjoyed broad and significant Latine support in "high Latine population precincts" or merely received one more vote than the next highest candidate. In short, Plaintiffs' process for deciding Latine preference lacks plausibility.

Plaintiffs' allegations purporting to address the *Gingles* factors amount to nothing more than a bare recital of the requisite elements. For instance, Plaintiffs claim that Latine and non-Latine voters in Dodge City are "politically cohesive," "vote as a bloc," and are "racially polarized," (*id.* at ¶¶ 9 & 60-61), but provide nothing more than conclusory allegations. Likewise, Plaintiffs claim that they live "within a majority Latine area which could be drawn into a single-member Commission district" and that "[i]t is possible to draw a map of five single-member districts for the Dodge City Commission," (*id.* at ¶¶ 21, 26 & 70), but Plaintiffs provide no details regarding how their theoretical districts would be drawn, what the racial composition in the districts would be, and how traditional districting principles would be respected.

The Amended Complaint alleges that Latines constitute a majority of Dodge City's total population (63.9%) and voting age population ("VAP") (59.02%), (*id.* at ¶¶ 35-44), but that Latines do not constitute a majority of the citizens of voting age ("CVAP") (46.1%), (*id.* at ¶¶ 45-47). It is unclear from the Amended Complaint where Latine citizens of voting age allegedly live in Dodge City, as Plaintiffs make no precinct- or proposed-district- level allegations. Plaintiffs do cite a so-called "heat map" (*id.* at ¶ 48), but it is a hot mess. Although Plaintiffs do not explain this, it appears that the thicker blue lines in the map signify Dodge City's city limits. Beyond the thicker

blue lines, though, the only other potential boundaries in the map Plaintiffs dub "Hispanic or Latino Population in Dodge City by Precinct" are the white lines that crisscross the page. However, these lines look nothing like the lines in the precincts map maintained by Ford County. *Compare with* Dodge City Voting Precincts Map, *available at* http://www.fordcounty.net/DocumentCenter/View/21967/Dodge-City-Voting-Precincts-, *attached hereto as* Ex. B. Additionally, it is unclear what the various shades of orange represent, as the map's key seems to contemplate only blue-green colors being used to depict the strength of the Latine population in an area. Finally, the map does not say if it is based on total population, VAP, or CVAP numbers. Collectively, these deficiencies render the "heat map" useless.

## STANDARD OF REVIEW

A claim must be plausible to survive a motion to dismiss under Rule 12(b)(6). This means that it must contain enough factual content to enable the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Speculation and supposition are not enough. *Id.* at 678-79. Courts must accept a complaint's well-pleaded allegations as true and construe them in the light most favorable to the plaintiff. *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002). However, "[c]ourts do not assume as true allegations that are legal conclusions, formulaic recitations of elements, or naked assertions devoid of further factual enhancement." *Crane v. Utah*, 15 F.4th 1296, 1303 (10th Cir. 2021). In other words, "the era where vague generalizations can serve as placeholders for a claim that may or may not exist has passed." *Snyder Ins. Servs. v. Sohn*, 2017 WL 2839755, at *4 (D. Kan. July 3, 2017). This appears especially true in the VRA section 2 context, which, as recently noted by the Supreme Court in *Wisconsin Elections Comm'n*, 142 S. Ct. at 1250, courts are not to "rel[y] on generalizations to reach the conclusion that [section 2's] preconditions were satisfied."

**ARGUMENT**

At-large elections are not per se violations of the Constitution or the VRA. *See Rogers v. Lodge*, 458 U.S. 613, 617 (1982); *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986). It is well established that "[f]ederal-court review of districting represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). Accordingly, "[c]ourts only take the extraordinary step of intruding on [local] political process[es] when there is clear evidence that constitutional [or statutory] rights are being violated." *Dean v. City of Charlotte*, 2022 WL 1698644, at *6 (W.D.N.C. May 26, 2022) (dismissing section 2 claim). Plaintiffs have failed to make the requisite showing to justify the intrusion and compulsion they seek in this case.

**I.    Plaintiffs have not stated a plausible claim under section 2 of the VRA.**

The VRA has historically served as a valuable tool for protecting racial and ethnic minorities' right to vote. Perhaps in light of this laudable fact, for many decades, parties and courts overlooked textual limitations in the VRA and applied it in contexts that neither Congress had authorized nor the law permitted. In the late 2000s, though, the Supreme Court began subjecting the VRA to a more searching review. Recognizing that the VRA "represents an 'extraordinary departure from the traditional course of relations between the States and Federal Government'" and "constitutes extraordinary legislation otherwise unfamiliar to our federal system," *Shelby Cnty. Ala. v. Holder*, 570 U.S. 529, 545 (2013) (citation omitted), the Court began questioning assumptions that many had been reflexively accepted for years, even decades. *See, e.g.*, *Wisconsin Legislature.*, 142 S. Ct. at 1249 (reversing a state supreme court's race-based districting decision because the state supreme court's decision was based on the belief that the VRA "might" require such a decision versus the VRA mandated it); *Shelby Cnty.*, 570 U.S. at 551 (striking down Congress's 2006 reauthorization of the VRA's coverage formula because it was "based on

6

decades-old data and eradicated policies"). Applying that same rigor here, it is clear that a section 2 claims does not exist.

      **A.**      **Section 2 does not create a private right of action.**

As Plaintiffs must concede, "§ 2 . . . provides no right to sue on its face" and "lack[s] . . . express authorizing language" for private suits. *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (Stevens, J., plurality op.). Recently, Justice Gorsuch "flagg[ed]" the fact that the Supreme Court has not decided whether the VRA "furnishes an implied cause of action under § 2." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (Gorsuch, J., concurring). Historically, there was a time in which the Supreme Court often "assumed it to be a proper judicial function to provide such remedies as [thought] necessary to make effective a statute's purpose." *Comcast v. Nat'l Assoc. of African Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020). However, "[w]ith the passage of time, [the Court has] come to appreciate that, "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress' and '[r]aising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Id.* (citation omitted). Accordingly, federal courts deciding if a statute provides a private right of action now consider "whether [the statute] displays an intent to create not just a private right but also a private remedy." *Safe Streets v. Hickenlooper*, 859 F.3d 865, 902 (10th Cir. 2017). Only when this intent is "clear and unambiguous" is a private right found. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). Section 2 does not fit that bill.

A statute does not create a private right when it "focus[es] on the person regulated rather than the individuals protected." *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001). Section 2 focuses on the state actors that could "den[y] or abridge[] the right of any citizen," 52 U.S.C. § 10301(a), and not the individual citizens that are to benefit. Moreover, violations of section 2 have

7

an "'aggregate' focus" and "are not concerned with 'whether the needs of any particular person have been satisfied.'" *Gonzaga*, 536 U.S. at 288 (citation omitted). For instance, if a single plaintiff believes that their ability to elect their candidate of choice has been diluted, section 2 provides no relief unless they can also show that they, along with "a significant number of [other] minority group members, usually vote for the same candidates." *Gingles*, 478 U.S. at 56.

In addition, section 2 does not create a private remedy for the reasons set forth in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 586 F. Supp. 3d 893 (E.D. Ark. 2022).[3] There, the district court "conclude[d] that the text and structure of the [VRA] does not 'manifest an intent to create a private remedy' for § 2 violations." 586 F. Supp. 3d at 911 (alterations in original & citation omitted). In reaching its conclusion, the court walked through "[t]he Supreme Court's current jurisprudence on implied private rights of action[, which, unlike in earlier cases,] is notoriously tight-fisted," *id.* at 906, and discussed how section 2's "text and structure strongly suggests that exclusive enforcement authority resides in the Attorney General of the United States," *id.* at 911; *accord id.* at 907-10. The court also dismantled the "precedent" cited by the plaintiff's legal team, some of whom have entered appearances in this case, on the ground that it was "dicta" and had "been seriously 'enfeebled' by *Sandoval* and later Supreme Court cases." *Id.* at 912-16. The rationale in *Arkansas State* is compelling and should be followed here.

### B.     Plaintiffs have failed to allege a plausible section 2 claim.

There are two steps in evaluating a section 2 discriminatory-effects claim.[4] In the first, courts apply the three-factor test set forth in *Gingles*, 478 U.S. at 50-51, which consider: (1)

---

[3]     This case is currently pending on appeal. It is fully briefed and oral arguments are scheduled to be heard on Wednesday, January 11, 2023, by Eighth Circuit Judges L. Smith, Gruender, and Stras.

[4]     At least conceptually, a plaintiff could bring a section 2 discriminatory-intent claim. The analytical framework of such a claim, though, is far from clear. *See Ga. State Conf. of NAACP v. State*, 269 F. Supp. 3d 1266, 1277 (N.D. Ga. 2017) (three-judge panel). Here, Plaintiffs have not brought a discriminatory-intent claim.

whether the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) whether the minority group is "politically cohesive"; and (3) whether the "white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." "Only when a party has established the *Gingles* requirements does a court proceed to [the second step to] analyze whether a violation has occurred based on the totality of the circumstances." *Bartlett v. Strickland*, 556 U.S. 1, 11-12 (Kennedy, J., plurality op.).[5] Here, Plaintiffs have failed to adequately allege all of the *Gingles* factors.

### 1.     Plaintiffs have not adequately alleged the first *Gingles* factor.

Plaintiffs fail to meet the first *Gingles* factor for at least two reasons. First, while Plaintiffs allege "[i]t is possible to draw a map of five-single-member districts . . . that gives the Latine population an *opportunity* to elect their candidates of choice in at least two such districts," (Doc. 30, ¶70 (emphasis added)), they have not alleged that Latines would make up a majority of the citizen voting age population ("CVAP") in any of their theoretical districts. This is fatal. In *Strickland*, the Supreme Court explicitly rejected the notion that the mere *opportunity* to elect a candidate of choice is not enough; rather, "[o]nly when a geographically compact group of minority voters could form a majority in a single-member district has the first *Gingles* requirement been met." 556 U.S. at 26. Thus, if a plaintiff fails to allege that their minority group will make up at least a *numerical majority* in their proposed districts, their section 2 claim must be dismissed.[6] *NAACP v. Snyder*, 879 F. Supp. 2d 662, 671 (E.D. Mich. 2012) (three-judge panel).

---

[5]     Three justices signed on to Justice Kennedy's plurality opinion (Roberts, Kennedy, and Alito), and the two other justices in the majority would have found that section 2 does not authorize a vote-dilution claim at all, the *Strickland* plurality opinion is viewed as the controlling opinion under *Marks v. United States*, 430 U.S. 188, 193 (1977), since it is the narrowest. *See, e.g.*, *Backus v. South Carolina*, 857 F. Supp. 2d 553, 566 n.2 (D.S.C. 2012) (three-judge panel), *aff'd*, 568 U.S. 801 (2012).

[6]     In *Snyder*, the three-judge panel referred to voting age population ("VAP"), as opposed to citizen voting age population ("CVAP"), because the case did not involve a significant noncitizen population. However, in cases where there is a significant noncitizen population, circuit courts appear to have uniformly looked to CVAP when deciding

Here, Plaintiffs have not alleged that Latines would make up a numerical majority of the voters in any of their five-theoretical districts. While it does appear from the Amended Complaint that Latines make up a significant portion of the electorate in Dodge City, this is not enough to satisfy the first *Gingles* factor because an alleged district must have at least a numerical majority. *See, e.g.*, *League of United Latin Am. Citizens v. Abbott [LULAC II]*, --- F. Supp. 3d -----, 2022 WL 1631301, at *17 (W.D. Tex. May 23, 2022) (three-judge panel) (dismissing claim because a Latine CVAP of 45.5% did not meet the first *Gingles* factor as it is "not a majority"); *Snyder*, 879 F. Supp. 2d at 671 (42.74% is not enough); *see also Backus*, 857 F. Supp. 2d at 567 (concluding that plaintiffs had failed to prove a section 2 violation because they "have not shown that . . . African-Americans could form a majority of voters in another potential district").

Second, Plaintiffs have not actually alleged how their theoretical districts would be drawn; rather, they have merely averred that "it is possible" to draw such districts. (Doc. 30, ¶70). This is not enough under *Iqbal*, much less section 2. "Because the very concept of vote dilution implies—and, indeed, necessitates—the existence of an 'undiluted' practice against which the fact of dilution may be measured, a § 2 plaintiff must also postulate a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 480 (1997) (citation omitted). To satisfy this requirement, and survive a motion to dismiss, a complaint must do two things: (1) allege where its "proposed districts [will] be drawn," and (2) "that there are enough Hispanic voters 'in [its] reasonably configured hypothetical district'

---

the first *Gingle*'s factor. *See, e.g.*, *Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019, 1023 n.12 (5th 2009) (collecting cases). This position makes sense as section 2 is intended to preclude the "denial or abridgment of the right of any citizen of the United States to vote," 52 U.S.C. § 10301(a), and "only eligible voters affect a group's opportunity to elect candidates," *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428-429 (2006). Even if use of the VAP numbers is more appropriate, though, the outcome would likely be the same because, using VAP numbers Plaintiffs are in the in the majority, and a plaintiff can "not establish[] a claim for vote dilution under § 2 [where they live in an area that] is *already* a majority-minority district," a proposition that would seem all the more true in an at-large voting case like this. *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 932 (E.D. Ark. 2012) (three-judge panel).

10

to constitute a majority." *LULAC II*, 2022 WL 1631301, at *17 (alterations in original & citation omitted). Failing to meet these requirements warrants dismissal. *See id.*; *League of United Latin Am. Citizens v. Abbott*, 369 F. Supp. 3d 768, 786-87 (W.D. Tex. 2019), *aff'd*, 951 F.3d 311 (5th Cir. 2020); *Lowery v. Deal*, 850 F. Supp. 2d 1326, 1335-36 (N.D. Ga. 2012), *aff'd on other grounds*, 506 F. App'x 885 (11th Cir. 2013).

### 2.     Plaintiff have not adequately alleged "political cohesion."

Courts "may not assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (citation omitted). Thus, courts "may not presume bloc voting within . . . a single minority group." *Growe v. Emison*, 507 U.S. 25, 41 (1993). Accordingly, to satisfy the second *Gingles* factor, a plaintiff must allege facts sufficient to show that bloc voting is occurring and that it is occurring at such a level "that a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56.

Plaintiffs have failed to meet the standard for the second *Gingles* factor. For this factor, Plaintiffs have only alleged that (1) Latines "vote cohesively" and are "politically cohesive," (Doc. 30, ¶¶ 7 & 60), (2) "racially polarized voting" exists, (*id.* at ¶¶ 63 & 69), and (3) "no Latine-preferred candidates have been elected to the Commission" since 2000, (*id.* at ¶ 55; *accord* ¶¶ 4-5, 56-59 & 61-63). However, each one of three categories of allegations was recently rejected by a third-judge panel in Texas. Starting with category 1, the court stated that "it isn't worth anything" because it "is a threadbare recital of an element of a cause of action." *LULAC II*, 2022 WL 1631301, at *18. As for category 2, it "can't be used to state a claim," as it is merely "a legal conclusion showing that the second precondition has been met." *Id.* Finally, with respect to category 3, while it is at least factual in nature, it "doesn't say anything about how unified Hispanic

11

voters [we]re in supporting those candidates," thus, there is no way for the court to conclude that "the large majority typically required to show political cohesion" plausibly exists.[7] *Id.*

The position taken by the *LULAC II* panel is in-step with the conclusion reached by other three-judge panels. *See Snyder*, 879 F. Supp. 2d at 674 (stating that allegations asserting that the minority group in question is "politically cohesive," has "a common and distinct history, culture, and language," and has "organized themselves collectively for political activity" are merely "unadorned, conclusory statements"). This Court should not deviate from the existing precedent.

### 3. Plaintiffs have not adequately alleged "racially polarized voting."

Regarding the third *Gingles* factor, Plaintiffs make just the following three allegations: (1) "[w]hite, non-Latine voters in Dodge City are also politically cohesive, overwhelmingly prefer different candidates than Latine voters in Dodge City, and vote as a bloc[, which] repeatedly results in the defeat of Latine voters' candidates of choice," (Doc. 30, ¶ 61), (2) Latine-preferred candidates ran unsuccessfully in 2000, 2006, 2014, 2017, and 2021, despite being the alleged "top vote-getters in high Latine population precincts, but lost in low Latine population precincts," (*id.* at ¶ 62), and (3) the split "in which candidates in the majority of the vote in high-density Latine voting precincts but receive low support in high-density non-Latine precincts[] is emblematic of racially polarized voting," (*id.* at ¶ 63). Essentially the same class of allegations was rejected in *League of United Latin American Citizens v. Abbott [LULAC III]*, --- F. Supp. 3d ----, 2022 WL 2922522, at *4 (W.D. Tex. July 25, 2022).

---

[7] It is worth pointing out that, while the lack of success of a minority candidate can be a factor tending to show vote dilution, *see Sanchez v. Bond*, 875 F.2d 1488, 1496 (10th Cir. 1989), Plaintiffs have not actually alleged that Latine candidates have not been elected to the Commission, rather, they have merely asserted that the "Latine-preferred candidates" has struck out since 2000, which is significant because the former is a factual statement that the Court could possibly credit and rely upon and the latter is merely a legal conclusion that is a threadbare recital of the *Gingles* factors. Tellingly, Plaintiffs amended their initial complaint to remove any allegation that could potentially be construed as indicating that Latine candidates have not been elected to the Commission.

There are at least two fundamental problems with allegations like Plaintiffs'. First, they are premised upon legal conclusions—Latine voters are "politically cohesive," "bloc voting" is occurring, Latine voters have a defined "candidate of choice," and voting in Dodge City is "racially polarized"—that cannot be credited at this point. Second, the complaint is devoid of the "further factual enhancement" necessary to carry the other "naked assertion[s]"—white voters "overwhelming prefer different candidates than Latine voters" and Latine-preferred candidates are "top vote-getters in high Latine population precincts but lost in low Latine population precincts"—to get across the plausibility threshold. *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Simply put, "[w]e know no specifics of the electoral results or vote breakdown" in Dodge City. *LULAC III*, 2022 WL 2922522, at *4 (dismissing section 2 claim). For instance, how can Plaintiffs claim that white voters "overwhelming prefer different candidates than Latine voters" when there have allegedly been only five so-called Latine-preferred candidates for the 30 Commission seats that have been voted on over the past 20 years? Even crediting for the moment Plaintiffs' naked and conclusory assertion that the five candidates they have listed in their complaint were indeed Latine-preferred, how did whites and Latines vote on the other 25 seats, *i.e.*, the other 83% of seats, that have been voted on since 2000? Without such basic information, there is no plausible basis for this Court to conclude that any bloc of white voters is "sufficiently" large enough or occurs frequently enough to usually beat the candidate that Latines' prefer. *See Abrams v. Johnson*, 521 U.S. 74, 90-92 (1997) (stating that "chronic bloc voting" must be shown).

## II. Plaintiffs do not plausibly allege Fourteenth or Fifteenth Amendments claims.

### A. The Fourteenth Amendment offers no basis for relief to Plaintiffs.

To assert a viable Fourteenth Amendment claim, Plaintiffs must adequately allege that at-large voting was adopted for a discriminatory purpose and it has had a discriminatory effect. *See,*

13

*e.g.*, *Ga. State Conf. of NAACP*, 269 F. Supp. 3d at 1277 (citing *Burton v. City of Belle Glade*, 178 F. 3d 1175, 1188-89 (11th Cir. 1999)). Plaintiffs fail to do either. The Amended Complaint alleges nothing regarding why the commission-form of government was adopted by Dodge City's citizens in 1970, much less that it was adopted "'invidiously to minimize or cancel out the voting potential of [a group that did not even exist at the time it was adopted],'" which is what must be shown. *Id.* at 1276-77 (citation omitted). While Plaintiffs do allege a handful of events that have occurred since 2000 that they presumably believe circumstantially show discriminatory intent, (Doc. 30, ¶¶ 94-107), these events are not probative of discriminatory intent in the context of this case. Pursuant to K.S.A. 12-184b(b) and K.S.A. 12-184(a)-(b), it is the citizens of Dodge City, not the Commission (or any other elected official for that matter), who gets to determine whether to abandon the commission-manager form of government. While it appears theoretically possible that the sentiments of an electorate regarding a facially neutral issue such as the commission-manager form of government could possibly support an equal protection claim if it was sufficiently clear, *see City of Cuyahoga Falls v. Buckeye Cmnty. Hope Found.*, 538 U.S. 188, 195-96 (2003), here there are no allegations regarding the views of Dodge City voters, much less that such views are nefarious. As a result, there is no basis to permit Plaintiffs' Fourteenth Amendment claim to continue. *See, e.g.*, *Snyder*, 879 F. Supp. 2d at 675 (dismissing a Fourteenth Amendment claim because "Plaintiffs' unadorned allegations of discriminatory motivation are insufficient").

Additionally, because Plaintiffs failed to allege a section 2 violation, their Fourteenth Amendment claim fails on that basis as well. *See Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1366 (N.D. Ga. 2018) (three-judge panel). To be sure, some district courts have disagreed with this conclusion, but they have done so without recognizing or wrestling with the fact that "the Supreme Court, historically, has articulated the same general standard, governing the proof of injury, in both

14

section 2 and constitutional vote dilution cases." *Johnson v. DeSoto Cnty. Bd. of Com'rs*, 204 F.3d 1335, 1344 (11th Cir. 2000). Counsel is unaware of any "case in which a circuit court has concluded that an at-large or multi-member district electoral system, although not in violation of section 2, unconstitutionally dilutes minority voting strength." *Id.* This case should not be the first.

### B. The Fifteenth Amendment offers no basis for relief to Plaintiffs.

Plaintiffs' Fifteenth Amendment claim is similarly deficient. First, a "vote dilution such as that Plaintiffs claim has never been recognized by the Supreme Court to violate the Fifteenth Amendment." *Citizens Equal Rights. Alliance, Inc. v. Johnson*, 2007 WL 9710087, at *4 (D. Mont. Nov. 5, 2007); *see also Backus*, 857 F. Supp. 2d at 569 ("[T]he Supreme Court has emphasized that it has never recognized such a claim."). This fact alone warrants dismissal of Plaintiffs' Count III. *See, e.g.*, *Lowery*, 850 F. Supp. 2d at 1331.

Additionally, a Fifteenth Amendment claims "is subsumed in the analysis required under the Fourteenth Amendment's equal protection clause." *League of United Latin Am. Citizens v. N. E. Indep. Sch. Dist.*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995); *accord N.A.A.C.P, Inc. v. Austin*, 857 F. Supp. 560, 572 (E.D Mich. 1994) (three-judge panel). Therefore, because Plaintiffs' Fourteenth Amendment claim fails, so does the Fifteenth Amendment one as well. *See, e.g.*, *Turner v. State of Ark.*, 784 F. Supp. 553, 578-80 (E.D. Ark. 1991) (three-judge panel).

### CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons stated above, Plaintiffs' complaint should be dismissed and the form of government that the citizens of Dodge City democratically adopted free of any discriminatory intent in 1970, and has been in place for over fifty years without challenge, should be left intact.

Respectfully submitted,

FOULSTON SIEFKIN LLP

By: */s/ Anthony F. Rupp*
    Anthony F. Rupp, KS #11590
    Tara Eberline, KS #22576
    Sarah E. Stula, KS #27156
    7500 College Boulevard, Suite 1400
    Overland Park, Kansas  66210
    (913) 498-2100
    (913) 498-2101 (fax)
    trupp@foulston.com
    teberline@foulston.com
    sstula@foulston.com

    -and-

    Clayton Kaiser, KS #24066
    FOULSTON SIEFKIN, LLP
    1551 North Waterfront Parkway, Suite 100
    Wichita, Kansas 67206
    (316) 267-6371
    (316) 267-6345 (fax)
    ckaiser@foulston.com

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I certify that on the 11th day of January 2023, the foregoing was electronically filed with the Clerk of the Court by using the Court's e-Filing system which will send notification of electronic filing to counsel for all parties of record, and a true and correct copy was served by electronic mail upon:

Sharon Brett
AMERICAN CIVIL LIBERTIES
UNION OF KANSAS
P.O. Box 917
Mission, Kansas 66201
sbrett@aclukansas.org
(913) 490-4100

Chad W. Dunn
Sonni Waknin
Bernadette Reyes
UCLA VOTING RIGHTS PROJECT
3250 Public Affairs Building
Los Angeles, California 90065
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org
(310) 400-6019

Jonathan Topaz
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES
UNION, INC.
125 Broad Street, 18th Floor
New York, New York 10004
jtopaz@aclu.org
slakin@aclu.org
(212) 549-2500

Abena Mainoo
Jonathan I. Blackman
JD Colavecchio
Mijin Kang
Elizabeth R. Baggott
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
amainoo@cgsh.com
jblackman@cgsh.com
jdcolavecchio@cgsh.com
mkang@cgsh.com
ebaggott@cgsh.com
(212) 225-2000

Scott Fuqua
FUQUA LAW & POLICY, P.C.
P.O. Box 32015
Santa Fe, New Mexico 87594
scott@fuqualawpolicy.com
(505) 982-0961

*/s/ Anthony F. Rupp*