# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

MIGUEL COCA, et. al.,

           Plaintiffs,

     v.

CITY OF DODGE CITY, et. al.,

           Defendants.

Case No. 6:22-cv-01274-EFM-RES

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

The Amended Complaint more than satisfies Plaintiffs' pleading burden. Doc. 30 ("Am. Compl.").[1] As Plaintiffs allege, Dodge City's Latino/a/e population has grown both in absolute and relative terms in the past two decades; however, Dodge City has not elected a Latine-preferred candidate to the Dodge City Commission in at least 22 years. Plaintiffs contend that Latine voters could elect candidates of their choice but for Dodge City's at-large method of election and that the continued maintenance of that at-large system despite such inequities constitutes discrimination against Latine voters. Defendants claim that Plaintiffs seek "to disenfranchise all Dodge City voters" and "intrud[e] on local political processes," *see* Doc. 38 ("MTD") at 2, 6, but the very purpose of Section 2 of the Voting Rights Act of 1965 ("VRA") and the Fourteenth and Fifteenth Amendments is to protect the fundamental right to vote free from racial discrimination. Because the Amended Complaint plausibly alleges violations of Plaintiffs' voting rights, Defendants' motion to dismiss should be denied.

---

[1] Terms defined in the Amended Complaint retain their meanings. Internal citations and quotations are omitted throughout this brief, except where otherwise indicated.

Case 6:22-cv-01274-EFM   Document 48   Filed 02/01/23   Page 2 of 17

**STANDARD OF REVIEW**

When considering a motion to dismiss, the Court must "assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009). The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), such that it "raise[s] a reasonable expectation that discovery will reveal evidence" to support the claim, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias*, 567 F.3d at 1178.

**ARGUMENT**

**I.    Plaintiffs Have Sufficiently Pleaded Their Section 2 And Constitutional Claims.**

Voting rights cases are typically inappropriate for resolution at the motion-to-dismiss stage. *See, e.g.*, *Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) (en banc) ("It is no accident that most cases under section 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss."). That is because "[v]oting rights cases are inherently fact-intensive, particularly those . . . alleging that, due to the operation of a challenged voting scheme, minority voters are denied an equal opportunity to participate in the political process and to elect representatives of their choice." *Nipper v. Smith*, 39 F.3d 1494, 1498 (11th Cir. 1994); *see also Rose v. Raffensperger*, 511 F. Supp. 3d 1340, 1358, 1360 (N.D. Ga. 2021) (denying motion to dismiss because the factual nature of the Section 2 results inquiry "makes it particularly inappropriate to foreclose at the pleading stage Plaintiffs' opportunity to prove their claims"); *Anderson v. Mallamad*, 1997 WL 35024766, at *7, 12 (S.D. Ind. Mar. 28, 1997) (Section 2

"cases are inherently fact-intensive" and the inquiry into intentional discrimination is "particularly ill-suited" to be resolved even on *summary judgment*).

### A.  Plaintiffs Have Alleged Facts Sufficient To Plead A Violation Of Section 2.

Plaintiffs have plausibly alleged a Section 2 discriminatory effects claim. To state a claim under Section 2's results test, plaintiffs must allege that (1) the "minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group is "politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986) (together, the "*Gingles* preconditions"). Once the *Gingles* preconditions are established, the court must then determine whether the totality of the circumstances "reveal that the political processes leading to nomination or election . . . are not equally open to participation by members of a protected class . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at 43 (citing 52 U.S.C. § 10301(b)). This analysis is guided by a list of several non-exhaustive factors laid out in the seminal Senate Judiciary Committee Report accompanying the 1982 amendments to the VRA. *Id.* at 44–45.

***Gingles I.*** Plaintiffs have plausibly alleged that the Latine population in Dodge City "is sufficiently large and geographically compact to constitute a majority in a single-member district" (*Gingles* I). *Id.* at 50. In *League of United Latin Am. Citizens v. Abbott* ("*LULAC II*"), the court indicated that plaintiffs can sufficiently allege *Gingles* I by pleading "facts that would allow the Court to conclude a majority-minority district *can be drawn*." 2022 WL 1631301, at *17 (W.D. Tex. May 23, 2022) (emphasis added); *see also Huot v. City of Lowell*, 280 F. Supp. 3d 228, 237 (D. Mass. 2017) (determining plaintiffs adequately alleged *Gingles* I because they

3

"offer[ed] an idea of what the proposed district would look like by describing the possible neighborhoods that could create the district").

Plaintiffs easily meet this standard. The Amended Complaint alleges that Latine residents comprise 46.1 percent of Dodge City's Citizen Voting Age Population ("CVAP"), Am. Compl. ¶¶ 3, 44, 46–47, and identifies the southern and western portions of Dodge City as "majority Latine area[s]" that "could be drawn into . . . single-member Commission district[s] that would give [each Plaintiff] an opportunity to elect a candidate of his choice," *id.* ¶¶ 21, 26, 70. These allegations are further buttressed by a heat map of Dodge City derived from a public website that draws on data from the 2020 Census. *Id.* ¶ 48. As explained in the Amended Complaint, "[p]recincts with blue colors indicate a higher percentage of Hispanic or Latino residents," and "[p]recincts with orange colors depict a lower percentage of Hispanic or Latino residents and are comprised primarily of white alone, not Hispanic or Latino residents." *Id.* The heat map shows that Latine residents are concentrated in compact, contiguous areas (the blue-shaded areas) at percentages well above 50% (per the map's scale), including in the south and west, *id.* ¶ 48, where Plaintiffs allege two majority-Latine districts can be drawn, *id.* ¶¶ 21, 26, 70. Plaintiffs' allegations regarding the geographic and numeric concentration of Latine residents in Dodge City are therefore sufficient to support an inference that Dodge City is able to draw compact, contiguous, majority-Latine districts, as measured by both CVAP and Voting Age Population ("VAP").[2]

---

[2] Defendants point to no binding authority holding that CVAP, as opposed to VAP, is the only relevant metric for purposes of the *Gingles* I analysis. MTD at 9–10 & 9 n.6. Defendants' position that plaintiffs cannot maintain a Section 2 action where they are currently in the majority using VAP is "a minority view," *Perez v. Abbott*, 253 F. Supp. 3d 864, 879 (W.D. Tex. 2017), rejected by most, if not all, circuit courts to address the issue, including the Eighth Circuit after *Jeffers v. Beebe*—the case on which Defendants rely—was decided, *see Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 934 (8th Cir. 2018) (holding "minority voters do not lose VRA protection simply because they represent a bare numerical majority within that district," and collecting cases from Second, Fifth, Eleventh, and D.C. Circuits holding same). Regardless, Plaintiffs plausibly allege that Latines

In arguing that Plaintiffs have not satisfied *Gingles* I, *see* MTD at 9–11, Defendants rely principally on *LULAC II*. There, however, the court found that plaintiffs failed to meet *Gingles* I because they largely failed to "allege *anything* about the size of the population of Hispanic voters[.]" 2022 WL 1631301, at *17 (emphasis in original). Thus, the court concluded, plaintiffs had failed "to provide the Court with information to plausibly infer that enough Hispanic voters reside in the area in which the district would be created." *Id.* at *17 n.29. Here, by contrast, Plaintiffs have alleged in detail the demographics of the Latine population in Dodge City and where their proposed districts would be drawn, Am. Compl. ¶¶ 3, 21, 26, 34–48, and have demonstrated, through their heat map and otherwise, that the Latine population in these proposed districts is sufficiently numerous and "geographical[ly] compact[,]" *LULAC II*, 2022 WL 1631301, at *18. In other words, Plaintiffs have addressed exactly the concerns raised in the cases cited by Defendants. *See* MTD at 9–11.

In effect, Defendants ask this Court to impose a pleading standard that would require Plaintiffs to complete expert reports with finalized data and design illustrative maps of "theoretical districts" in conjunction with their complaint. *See* MTD at 4 ("Plaintiffs provide no details regarding how their theoretical districts would be drawn, what the racial composition in the districts would be, and how traditional districting principles would be respected."). Such a standard would upend Rule 12(b)(6) and its application in Section 2 cases. *See, e.g.*, *Johnson v. Ardoin*, 2019 WL 2329319, at *4 (M.D. La. May 31, 2019) ("[T]he motion to dismiss stage . . . does not require submitting as evidence hypothetical redistricting schemes."); *Luna v. Cnty. of Kern*, 2016 WL 4679723, at *5 (E.D. Cal. Sept. 6, 2016) ("Forcing plaintiffs to develop an unobjectionable map, before discovery even begins, would be putting the cart before the

---

can make up a numerical majority in two districts based on both CVAP and VAP, and that those districts, unlike the current at-large method of election, will allow Latines the opportunity to elect Latine-preferred candidates.

horse."); *Pledger v. Lynch*, 5 F.4th 511, 520 (4th Cir. 2021) ("Plaintiffs need not gather any expert evidence or serve it on defendants for a claim to be plausible.").

      ***Gingles II and III.*** Plaintiffs have also plausibly alleged that Latines in Dodge City vote together cohesively (*Gingles* II) and that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" (*Gingles* III). *Gingles*, 478 U.S. at 51. Plaintiffs allege that no Latine candidates of choice have been elected since at least 2000, Am. Compl. ¶¶ 4–6, 55–59, 62, that this is because voting is racially polarized in Dodge City, *id*. ¶¶ 7, 9, 60–64, 69, and that Latines vote cohesively, as does the white majority, which votes as a bloc to prevent Latines from electing candidates of their choice, *id*. Defendants' only argument to the contrary is that the allegations in support of these factors are "conclusory." MTD at 4, 11–13. Yet, Plaintiffs point to five different Commission election cycles in which Latine-preferred candidates lost, including one in which an incumbent previously appointed to the Commission lost in the subsequent election.[3] Am. Compl. ¶¶ 56–57, 62. As Plaintiffs explain, these candidates lost their respective elections despite being top vote-getters in high Latine population precincts because they obtained fewer votes in low Latine population precincts. *Id.* ¶¶ 60–63. This is a quintessential example of racially polarized voting, sustained over many years and election cycles. *See generally Gingles*, 478 U.S. at 48, 56–57.

      Plaintiffs' factual allegations related to *Gingles* II and III are similar to, or more detailed than, what other courts across the country have required at the motion-to-dismiss stage. *See, e.g.*, *Ala. State Conf. of NAACP v. City of Pleasant Grove*, 372 F. Supp. 3d 1333, 1340 (N.D. Ala.

---

[3] Defendants complain that Plaintiffs cite "only five . . . Latine-preferred candidates." MTD at 13. Plaintiffs note that those Latine-preferred candidates listed in the Amended Complaint are by no means an exhaustive list. Yet, if anything, any lack of Latine-preferred candidates is evidence that the dilutive effects of the at-large system are preventing candidates of choice from running. *Cf. McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1045 (5th Cir. 1984) ("[T]he lack of black candidates is a likely result of a racially discriminatory system.").

2019) (concluding that plaintiffs adequately pled *Gingles* II and III by alleging that voting was racially polarized and citing the results of two election cycles); *Luna*, 2016 WL 4679723, at *6 (not requiring plaintiffs at the pleading stage to "identif[y] . . . specific Latino-preferred candidates and whether those candidates were defeated by a bloc-voting majority"); *Hall v. Louisiana*, 974 F. Supp. 2d 978, 992 (M.D. La. 2013) (denying motion to dismiss where plaintiffs alleged white voters "vote sufficiently as a bloc to enable them . . . to defeat the [minority's] preferred candidates"); *Tigrett v. Cooper*, 855 F. Supp. 2d 733, 762-63 (W.D. Tenn. 2012) (denying motion to dismiss where plaintiffs provided no specifics on racially polarized voting and the court "had to stretch to find . . . factual support" for each of the *Gingles* factors). Plaintiffs' allegations are more than sufficient to satisfy the accepted pleading standard for *Gingles* II and III.

      ***Totality of the Circumstances.*** Defendants have forfeited any argument contesting the totality of the circumstances inquiry by failing to raise it in their opening brief. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived[.]"). And for good reason—Plaintiffs pled extensive factual allegations addressing many of the 1982 Senate Report factors. *See* Am. Compl. ¶¶ 7–10, 51, 55–107.

### B. Plaintiffs Have Alleged Facts Sufficient To Plead Intentional Discrimination Claims Under The Fourteenth And Fifteenth Amendments.

      Dodge City's at-large method of election impermissibly "operate[s] as [a] purposeful device[] to further racial discrimination by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population." *Rogers v. Lodge*, 458 U.S. 613, 617 (1982). Though not "per se" unconstitutional, "[a]t-large voting schemes . . . tend to minimize the voting

strength of minority groups by permitting the political majority to elect *all* representatives of the district." *Id.* at 616–17 (holding at-large method of election was unconstitutional).

To prove constitutional voting rights claims, plaintiffs need not show that "the challenged action rested solely on racially discriminatory purposes[,]" but rather that race was "a motivating factor" in the operation of the dilutive at-large method of election. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Factors include: (1) "'impact,' i.e. whether the challenged activity 'bears more heavily on one race than another,'" (2) "historical background of the decision," (3) "the specific sequence of events leading up to the challenged decision," (4) "departures from the normal procedural sequence," (5) "legislative or administrative history[,]" (6) "foreseeability of discriminatory impact," (7) "knowledge of discriminatory impact," and (8) "the availability of less discriminatory alternatives[.]" *Jean v. Nelson*, 711 F.2d 1455, 1485–86 (11th Cir. 1983) (quoting *Arlington Heights*, 429 U.S. at 266).

Intentional discrimination claims are "inherently complex" and "require the trial court to perform a sensitive inquiry," *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999), such that it is typically inappropriate to resolve them prior to discovery. At the motion-to-dismiss stage, Plaintiffs are "only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant." *McNeal v. Lnu*, 2016 WL 7210714, at *2 (D. Kan. Dec. 13, 2016) ("At [the motion to dismiss] juncture, a plaintiff need not come forward with evidence to prove his claims. Rather, a plaintiff need only allege facts that, if proven true later, could support a prima facie case of discrimination."). Just as Plaintiffs

need not prove every *Arlington Heights* factor, they need not allege facts supporting each factor at the pleading stage. *See Jean*, 711 F.2d at 1485 (describing the *Arlington Heights* factors as "some examples" of evidence for an intentional discrimination claim); *LULAC v. Abbott*, 2022 WL 4545757, at *19 (W.D. Tex. Sept. 28, 2022) ("These factors are not exhaustive, and courts balance the factors holistically rather than mechanically . . .").

Plaintiffs meet that standard here. The Amended Complaint alleges numerous facts tending to show that the City's continued use of the at-large method of election raises an inference of discrimination. As noted *supra*, Defendants have been on notice for years that: the Latine population in Dodge City has substantially grown, no Latine candidates of choice have been elected to the Commission since at least 2000, and voting in Dodge City Commission elections is starkly polarized along racial lines. These allegations are probative of disparate impact, foreseeability of discriminatory impact, and knowledge of discriminatory impact. *See Jean*, 711 F.2d at 1485–86. Further, Plaintiffs allege "the availability of less discriminatory alternatives," *id.*—namely, the institution of single-member districts that would give Latines the opportunity to elect candidates of choice in two out of five such districts.

Additionally, Plaintiffs detail how the "City has engaged in discriminatory voting practices and procedures." Am. Compl. ¶ 93. For example, after a Latine-preferred candidate for the Commission nearly won her election, the City closed "all but one polling location," which hampered the ability of Latines to vote. *Id.* ¶¶ 94–95. In 2018, the City moved its sole polling location to a venue "outside of the Dodge City limits and 1.3 miles away from the nearest public transportation stop," which disproportionately affected Latine residents, who "more often rely on public transportation," *id.* ¶¶ 98–99, and face higher voter costs due to longstanding socioeconomic disparities, *id.* ¶¶ 72–91. According to a 2020 Congressional report, the 2018

polling location was moved "without conducting appropriate due diligence, without consulting the local community, and without taking simple steps to reduce the impact of the move on thousands of voters." *Id.* ¶¶ 101–102. Plaintiffs also allege that the two current polling locations serve over 13,000 voters, which is "far above the average across the state of 1,200 voters per polling location." *Id.* ¶¶ 103–04. These allegations address many of the *Arlington Heights* factors, including the historical background of discrimination and the foreseeability of discriminatory impact. *See Jean*, 711 F.2d at 1485–86.

Defendants do not even try to argue that these allegations fail to demonstrate discriminatory intent, but instead offer two purported reasons why Plaintiffs' constitutional claims supposedly should fail as a matter of law. *First*, Defendants argue that Plaintiffs must allege that the at-large method of election was initially adopted in 1970 with discriminatory intent. MTD at 13–14.[4] Not so. Electoral devices "conceived *or operated*" with racially discriminatory intent violate the Constitution. *Rogers*, 458 U.S. at 616–17 (emphasis added) (affirming finding that "while the present method of electing County Commissioners was racially neutral when adopted, it [was] being maintained for invidious purposes in violation of appellees' Fourteenth and Fifteenth Amendment rights").[5] And contrary to what Defendants—relying on a case not involving any voting rights claims—suggest, Plaintiffs need not allege discriminatory "sentiments of [the Dodge City] electorate." *See* MTD at 14. It is Defendants' knowing and

---

[4] Defendants mischaracterize Plaintiffs' allegations as also challenging the "commission-manager form of government." MTD at 13–14. Plaintiffs challenge only the Commission's at-large method of election. *See, e.g.*, Am. Compl. ¶¶ 1, 7, 9, 11, 22, 27, 49, 54, 69, 116, 119, 112.

[5] Defendants cite *Ga. State Conf. of NAACP*, 269 F. Supp. 3d 1266, 1277 (N.D. Ga. 2017), for the proposition that only a method of election *adopted* for a discriminatory purpose is unconstitutional, MTD at 13–14, but in that case plaintiffs' only argument was that the challenged apportionment plan had been adopted with discriminatory purpose, and the court in no way suggested that plaintiffs generally cannot challenge the *continued operation* of dilutive devices, *see Ga. State Conf. of NAACP*, 269 F. Supp. 3d at 1276–77.

continued maintenance of the discriminatory at-large election system that is the source of Plaintiffs' claims.

*Second*, Defendants assert that the constitutional claims must be dismissed if the Section 2 claim is dismissed. MTD at 14–15. But Defendants do not identify, and Plaintiffs are unaware of, any court that has held that a constitutional claim must, as a matter of law, fail if a Section 2 claim fails. The cases that Defendants cite did not decide that issue. MTD at 14–15 (citing *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1344–45 (11th Cir. 2000) (determining that it "need not resolve this question today"); *Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1366 (N.D. Ga. 2018) ("[T]he Eleventh Circuit expressly reserved the question of whether a case that was insufficient under the [VRA] would necessarily be insufficient under the Constitution."). By contrast, courts have allowed constitutional claims to proceed while at the same time dismissing a Section 2 results claim. *LULAC v. Abbott*, 2022 WL 2922522, at *6 (W.D. Tex. July 25, 2022); *see also Holder v. Hall*, 512 U.S. 874, 885 (1994) (concluding plaintiffs could not maintain a Section 2 results claim but remanding for consideration of constitutional claim of intentional vote dilution).

Further, *Gingles* sets out a framework for Section 2 results claims that is different than the framework set out in *Arlington Heights* for constitutional intentional discrimination claims. If courts imposed the *Gingles* results-based legal standard on the intentional discrimination claims permitted under the Constitution, "there would be little point in allowing [plaintiffs] to alternatively pursue intentional discrimination claims, as Congress stated its intent to do in the [1982] Senate Report." *Perez v. Abbott*, 253 F. Supp. 3d 864, 944 (W.D. Tex. 2017); *see also Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 769 (9th Cir. 1990) ("We hold that, to the extent

that *Gingles* does require a majority showing, it does so only in a case where there has been no proof of intentional dilution of minority voting strength.").

Finally, although the Supreme Court "has not decided whether the Fifteenth Amendment applies to vote-dilution claims," *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993), the Tenth Circuit has not foreclosed such an application, and indeed "circuits are split" on the issue, *Backus v. South Carolina*, 857 F. Supp. 2d 553, 569 (D.S.C. 2012). In any event, because intentional vote dilution claims under the Fifteenth Amendment "are essentially congruent" with those under the Fourteenth Amendment—"[b]oth require proof of discriminatory purpose and discriminatory, or dilutive, effect"—the Court need not decide this question at this juncture. *Id.*

## II.   Section 2 Provides A Private Right Of Action.

As the Supreme Court has recognized, "the existence of the private right of action under Section 2 [of the VRA] . . . has been clearly intended by Congress since 1965." *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (quoting S. Rep. No. 97-417, at 30 (1982)); *see id.* at 240 (Breyer, J., concurring). In *Morse*, the Court reasoned that Section 10 of the VRA contains an implied private right of action principally because Sections 2 and 5 of the VRA imply such a right and "[i]t would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not." 517 U.S. at 232; *id.* at 240 (Breyer, J., concurring) (similar). This reasoning from a majority of the Court was "necessary to reach the judgment" in *Morse* and is thus binding on this Court. *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1031 (N.D. Ala. 2022); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").[6]

---

[6] Even if this discussion regarding Section 2 in *Morse* were dicta, this Court is "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings." *United States v. Nixon*, 919 F.3d 1265, 1273 (10th Cir. 2019).

Strikingly, Defendants do not address this aspect of *Morse*, and instead rely on the two-part framework in *Alexander v. Sandoval*, 532 U.S. 275 (2001). *Sandoval* has no bearing on *Morse*—it does not discuss the VRA and never mentions *Morse*, let alone overrules it. *See Robinson v. Ardoin*, 2022 WL 2012389, at *34 (M.D. La. June 6, 2022) ("*Morse* has not been overruled, and this Court will apply Supreme Court precedent."), *cert. granted before judgment*, 142 S. Ct. 2892 (2022); *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) (where Supreme Court precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," the court "should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions").

In any event, Section 2 is entirely consistent with *Sandoval*'s two-step analysis, which evaluates whether the statute creates a (1) private right of action and (2) private remedy. *First*, Section 2 confers a private right through clear rights-creating language, protecting the "*right* of any citizen . . . to vote." 52 U.S.C. § 10301(a) (emphasis added). "It is difficult to imagine more explicit or clear rights creating language." *Turtle Mountain Band of Chippewa Indians v. Jaeger*, 2022 WL 2528256, at *5 (D.N.D. July 7, 2022); *see also LULAC v. Abbott*, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (noting that the statutory language the *Sandoval* court "held up . . . as paradigmatic rights-creating language . . . seems to mirror [VRA] Section 2's"). And Section 2 protects this right with an "unmistakable focus on the benefited class": racial minorities. *Cf. Serna v. Denver Police Dep't*, 2023 WL 366977 at *3 (10th Cir. Jan. 24, 2023). Furthermore, Defendants' group-rights argument, MTD at 7–8, fails because the Supreme Court has made clear that Section 2 provides an *individual* right, not a group right, *LULAC v. Perry*, 548 U.S. 399, 437 (2006) ("[T]he right to an undiluted vote does not belong to the minority as a group, but

[] to its individual members."); *Shaw v. Hunt*, 517 U.S. 899, 917 (1996) ("[A] misconception of the vote-dilution claim" is that the "right to an undiluted vote . . . belongs to the minority as a group and not to its individual members.").

*Second*, the VRA unambiguously contemplates private remedies for Section 2 violations. Section 3 of the VRA permits private suits for a "proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302. The VRA, and Section 2 in particular, is the core statute that enforces the voting guarantees of the Reconstruction Amendments. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2331 (2021) (Section 2 "was adopted to enforce" the Fifteenth Amendment); *id.* at 2333 (Congress amended Section 2 to add results test to remedy "Fifteenth Amendment violations that called out for legislative redress"). Additionally, Section 14(e) provides a fee-shifting mechanism whereby a "prevailing party, other than the United States" may recover attorney's fees in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10310(e). "Obviously, a private litigant is not the United States, and the Attorney General does not collect attorney's fees." *Morse*, 517 U.S. at 234. Numerous courts have concluded that the attorney's fees provided for under Section 14(e) are available for actions to enforce Section 2. *See, e.g.*, *Large v. Fremont Cnty., Wyo.*, 2013 WL 12342417, at *1 (D. Wyo. Sept. 20, 2013).

Even if there were any doubt from the text of the statute about Congress' intent, Congress' own words are clear: "It is intended that citizens have a private cause of action to enforce their rights under Section 2." H.R. Rep. No. 97-227, at 30 (1981); *see also* S. Rep. No. 97-417, at 30 (1982).[7] Dozens of federal courts, including the Tenth Circuit, have collectively heard hundreds of Section 2 actions brought by private plaintiffs both since Section 2 was

---

[7] The Supreme Court has recognized that these congressional reports are "the authoritative source for legislative intent" for the VRA. *Gingles*, 478 U.S. at 43 n.7.

amended in 1982, and since the VRA was last reauthorized in 2006, which occurred after the Supreme Court's decision in *Morse*. *See, e.g.*, *Large v. Fremont Cnty., Wyo.*, 670 F.3d 1133, 1148–49 (10th Cir. 2012) (upholding district court's single-member districting plan as remedy for Section 2 violation); *Sanchez v. State of Colo.*, 97 F.3d 1303, 1329 (10th Cir. 1996) (reversing district court's ruling in Section 2 case and remanding for implementation of a remedial redistricting plan); *Sanchez v. Bond*, 875 F.2d 1488, 1495–97 (10th Cir. 1989) (analyzing district court's *Gingles* findings and affirming no Section 2 violation). Further, every circuit court to address the issue has found that Section 2 contains a private right of action,[8] and prior to last year, no court—including the Supreme Court, which has heard at least ten Section 2 cases brought by private plaintiffs since 1982—dismissed a Section 2 claim on grounds that private plaintiffs had no right to sue.

Regardless, in the alternative, Plaintiffs have a right of action under 42 U.S.C. § 1983, which the Amended Complaint alleges as an alternative cause of action for the Section 2 claim. Am. Compl. ¶¶ 109–116. As Section 2 contains paradigmatic rights-creating language, as described above, that "right is presumptively enforceable by § 1983." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). This presumption can be rebutted only in "exceptional cases," *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994)—not a textbook Section 2 action like this one—and Defendants have forfeited any argument to the contrary by failing to even acknowledge Plaintiffs' inclusion of § 1983 as an alternative cause of action. *See Adler*, 144 F.3d at 679.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

---

[8] *See Mixon v. Ohio*, 193 F.3d 389, 406 (6th Cir. 1999) ("An individual may bring a private cause of action under Section 2 of the Voting Rights Act."); *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 652 (11th Cir. 2020) (similar), *rev'd on other grounds and vacated as moot by* 141 S. Ct. 2618 (2021).

Dated: February 1, 2023
Chad W. Dunn*
Sonni Waknin*
Bernadette Reyes*
**UCLA VOTING RIGHTS PROJECT**
3250 Public Affairs Building
Los Angeles, CA 90065
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org
310-400-6019

Jonathan Topaz*
Sophia Lin Lakin*
**AMERICAN CIVIL
LIBERTIES UNION, INC.**
125 Broad Street, 18th Floor
New York, NY 10004
jtopaz@aclu.org
slakin@aclu.org
212-549-2500

Scott Fuqua*
**FUQUA LAW & POLICY, P.C.**
P.O. Box 32015
Santa Fe, NM 87594
scott@fuqualawpolicy.com
505-982-0961

By: *Sharon Brett*
Sharon Brett   KS 28696
**AMERICAN CIVIL
LIBERTIES UNION OF KANSAS**
P.O. Box 917
Mission, KS 66201
sbrett@aclukansas.org
913-490-4100

Abena Mainoo*
Jonathan I. Blackman*
JD Colavecchio*
Mijin Kang*
Elizabeth R. Baggott*
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
One Liberty Plaza
New York, NY 10006
amainoo@cgsh.com
jblackman@cgsh.com
jdcolavecchio@cgsh.com
mkang@cgsh.com
ebaggott@cgsh.com
212-225-2000

*Attorneys for Plaintiffs*

* Admitted Pro Hac Vice

16

## CERTIFICATE OF SERVICE

Pursuant to D. Kans. Loc. R. 5.1(f), I hereby certify that on this 1st day of February 2023,

a true and correct copy of the foregoing was served via the United State District Court's

CM/ECF system on all parties or persons requiring notice, including upon attorneys for

defendants:

FOULSTON SIEFKIN LLP
Anthony F. Rupp, KS #11590
Tara Eberline, KS #22576
Sarah E. Stula, KS #27156
7500 College Boulevard, Suite 1400
Overland Park, Kansas 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com
sstula@foulston.com

FOULSTON SIEFKIN, LLP
Clayton Kaiser, KS #24066
1551 North Waterfront Parkway,
Suite 100
Wichita, Kansas 67206
(316) 267-6371
(316) 267-6345 (fax)
ckaiser@foulston.com

By: *Sharon Brett*
Sharon Brett    KS 28696
**AMERICAN CIVIL LIBERTIES**
**UNION OF KANSAS**
P.O. Box 917
Mission, KS 66201
sbrett@aclukansas.org
913-490-4100