IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MIGUEL COCA, ALEJANDRO RANGEL-LOPEZ,

    Plaintiffs,

  v.

CITY OF DODGE CITY, et al.,

    Defendants.

Civil Action No. 22-cv-01274-EFM-RES

**STATEMENT OF INTEREST OF THE UNITED STATES**

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States." This case presents important questions regarding enforcement of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. Congress has vested the Attorney General with authority to enforce Section 2 on behalf of the United States. *See* 52 U.S.C. § 10308(d). Accordingly, the United States has a substantial interest in ensuring Section 2's proper interpretation. The United States submits this Statement of Interest to address the availability of a private right of action to enforce Section 2 and the proper standard for evaluating a motion to dismiss a vote dilution claim under Section 2. The United States expresses no views on any other issue in this case.

## BACKGROUND

Plaintiffs challenge the at-large method of electing Dodge City's five City Commissioners, alleging that it unlawfully dilutes the voting strength of the City's minority Latino population, in violation of Section 2, among other claims. Am. Compl., ECF No. 30. Defendants filed a motion to dismiss the Amended Complaint on January 11, 2023, ECF No. 38, and Plaintiffs filed a memorandum in opposition on February 1, 2023, ECF No. 48.

Section 2 of the Voting Rights Act (VRA), 52 U.S.C. § 10301, imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013). Section 2(a) prohibits any state or political subdivision from imposing or applying a "voting qualification," a "prerequisite to voting," or a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group. 52 U.S.C. § 10301(a); *see also* 52 U.S.C. § 10303(f)(2). A violation of Section 2 "is established if, based on the totality

of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). A violation of Section 2 can "be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991).

## ARGUMENT

**I.     Private Plaintiffs May Sue to Enforce Section 2.**

Courts have heard hundreds of Section 2 cases brought by private parties through decades of litigation under the VRA. *See, e.g.,* Ellen D. Katz et al., *To Participate and Elect: Section 2 of the Voting Rights Act* at 40, Univ. Mich. L. Sch. Voting Rights Initiative (2022), https://voting.law.umich.edu (estimating that private plaintiffs have brought over 350 Section 2 cases since 1982). Where the question has arisen, courts have held with near-unanimity that Section 2 can be enforced by private plaintiffs. *See infra* note 2. Defendants' motion to dismiss relies upon a single outlier ruling, the reasoning of which has already been explicitly rejected by at least two other courts. *See* Defs.' Mot. to Dismiss 8, ECF No. 38 ("MTD"); *compare Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 586 F. Supp. 3d. 893 (E.D. Ark. 2022), *on appeal* No. 22-1395 (8th Cir.), *with Robinson v. Ardoin*, 2022 WL 2012389, at *33-34 (M.D. La. June 6, 2022) (rejecting *Arkansas State Conf. NAACP*), *cert. granted*, 142 S. Ct. 2892 (mem.); *Alpha Phi Alpha Fraternity, Inc v. Raffensperger*, 587 F. Supp 3d. 1222, 1243, n.10 (N.D. Ga. 2022) (same).[1]

---

[1] The United States has discussed at length why the district court decision in *Arkansas State Conf.* is incorrect in its amicus brief filed in that case. *See* US Brief as Amicus filed April 22, 2022 in No. 22-1395 (8th Cir), available at https://www.justice.gov/crt/case-document/arkansas-state-conference-naacp-v-arkansas-board-apportionment-brief-amicus.

Supreme Court precedent, congressional ratification, and the structure of the VRA make clear that Section 2 can be enforced by private plaintiffs.  The rights-creating language in Section 2 is fully consistent with congressional intent to create a private right of action.  And even if one were to conclude—against the near-unanimous weight of authority—that Section 2 contains no private right of action, the statute would nevertheless be enforceable through 42 U.S.C. § 1983.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002).

**A.  Supreme Court precedent and the VRA's text establish a private right of action to enforce Section 2.**

The Supreme Court recognized more than 25 years ago that although Section 2 "provides no right to sue on its face, 'the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965.'" *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (opinion of Stevens, J., joined by Ginsburg, J.) (alteration in original) (quoting S. Rep. No. 417, 97th Cong., 2d Sess. (1982) (1982 Senate Report)); *accord id.* at 240 (opinion of Breyer, J., concurring in the judgment, joined by O'Connor & Souter, JJ.).  Twice the Court has confronted the question of whether certain sections of the VRA contains implied rights of action, and both times the Court answered yes.  In *Allen v. State Board of Elections*, the Court found a private right of action to enforce Section 5 of the VRA, 52 U.S.C. § 10304(a), which required covered jurisdictions to obtain preclearance before subjecting any "person" to a new voting qualification or procedure.  *Allen*, 393 U.S. 544, 556-57 (1969).  Decades later, in *Morse*, the Court found an implied private right of action to enforce Section 10 of the VRA, 517 U.S. at 232-234, which prohibits jurisdictions from conditioning the right to vote on payment of a poll tax, *see* 52 U.S.C. § 10306(a).  The Court recognized the presence of a private right of action in these cases because "[t]he achievement of the [VRA's] laudable goal" to "make the guarantees of the Fifteenth Amendment finally a reality for all citizens . . . could be severely hampered . . . if

3

each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General." *Allen*, 393 U.S. at 556; *see also Morse*, 517 U.S. at 231.

*Morse*'s conclusion that private plaintiffs can enforce Section 10 flowed directly from its recognition that Congress intended the same for Section 2. The *Morse* Court held that private plaintiffs must be able to enforce Section 10 because "[i]t would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language." 517 U.S. at 232; *id*. at 240 (Breyer, J., concurring) (stating that *Allen*'s rationale "applies with similar force not only to § 2 but also to § 10"). Because private plaintiffs' ability to enforce Section 2 was foundational to *Morse*'s holding, it would be illogical to conclude that Section 2—unlike Sections 5 and 10—lacks a private right of action. Accordingly, over the last 25 years, a vast body of lower court decisions have held that Section 2 can be enforced by private plaintiffs.[2]

Congress has ratified the consensus view that Section 2 is privately enforceable. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard* v. *Pons*, 434 U.S. 575, 580 (1978); *cf. Tex. Dep't of Hous. & Cmty. Affs.* v. *Inclusive Cmtys. Project, Inc.*, 576

---

[2] *See, e.g.*, *Mixon* v. *Ohio*, 193 F.3d 389, 406 & n.12 (6th Cir. 1999) ("An individual may bring a private cause of action under Section 2 of the [VRA]."); *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) (recognizing that individual voters have standing to bring a Section 2 claim); *Singleton* v. *Merrill*, 2022 WL 265001, at *79 (N.D. Ala. Jan. 24, 2022) (three-judge court) (stating that to hold otherwise "would badly undermine the rationale offered by the Court in *Morse*" and that "[e]ven if the Supreme Court's statements in *Morse* about Section Two are technically dicta, they deserve greater respect than Defendants would have us give"), *appeal docketed sub nom. Allen v. Milligan*, No. 21-1086 (U.S. Feb. 7, 2022); *League of United Latin Am. Citizens* v. *Abbott*, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court) (denying a motion to dismiss arguing that Section 2 lacks a private right of action); *Georgia State Conf. of NAACP* v. *Georgia*, 269 F. Supp. 3d 1266, 1275 (N.D. Ga. 2017) (three-judge court) ("Section 2 contains an implied private right of action." (citing *Morse*, 517 U.S. at 232)); *Veasey* v. *Perry*, 29 F. Supp. 3d 896, 906 (S.D. Tex. 2014) (holding that "individual voter[s]" and organizations have the "power to enforce" Section 2); *Perry-Bey* v. *City of Norfolk*, 678 F. Supp. 2d 348, 362 (E.D. Va. 2009) ("The [VRA] creates a private cause of action."). Although Justice Gorsuch recently suggested that "[l]ower courts have treated this as an open question," his concurring opinion relied solely on a case that predated *Morse* and "[a]ssum[ed] without deciding" that Section 2 is privately enforceable. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring) (citing *Washington v. Finlay*, 664 F.2d 913, 926 (4th Cir. 1981)).

U.S. 519, 536 (2015) (concluding that Congress had "ratified the unanimous holdings of the Courts of Appeals" that plaintiffs can bring disparate impact claims under the Fair Housing Act because it was "aware of [the] unanimous precedent" and "made a considered judgment to retain the relevant statutory text"). In repeatedly amending the VRA, Congress never questioned the uniform view that Section 2 is privately enforceable. Pub. L. No. 91-285, 84 Stat. 14 (1970); Pub. L. No. 94-73, 89 Stat. 400 (1975); Pub. L. No. 97-205, 96 Stat. 131 (1982); Pub. L. No. 109-246, 120 Stat. 577 (2006). And Congress cited *Allen* approvingly. *See, e.g.*, S. Rep. No. 295, 94th Cong., 1st Sess. 16 (1975) (1975 Senate Report); H.R. Rep. No. 196, 94th Cong., 1st Sess. 9 (1975); H.R. Rep. No. 397, 91st Cong., 1st Sess. 4, 8 (1969). Moreover, in the 1982 Senate Report that the Supreme Court called the "authoritative source for legislative intent" behind amended Section 2, *Thornburg* v. *Gingles*, 478 U.S. 30, 43 n.7 (1986), Congress "reiterate[d] the existence of the private right of action under section 2." 1982 Senate Report 30.

Neither the holding nor the logic of the U.S. Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), upsets the longstanding consensus view that Section 2 confers a private right of action. The *Sandoval* framework reinforces the conclusion that Congress intended to create a private right of action to enforce Section 2, *see* 532 U.S. at 288-89. Section 2 indisputably contains the "rights-creating language" that, under *Sandoval*, is so "critical" to finding a private right of action. *Id.* at 288. The statute provides:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of *the right of any citizen of the United States to vote* on account of race or color, or [membership in a language minority group].

52 U.S.C. § 10301(a) (emphasis added). Thus, Section 2 "grants" individual citizens "a right to be free from" discriminatory voting practices. *Chisom v. Roemer*, 501 U.S. 380, 392 (1991) (quoting H.R. Rep. No. 439, 89th Cong., 1st Sess. 23 (1965)). "It is difficult to imagine more

5

explicit or clear rights creating language. It cannot be seriously questioned that Section 2 confers a right on a particular class of people." *Turtle Mountain Band of Chippewa Indians v. Jaeger*, 2022 WL 2528256, at *5 (D.N.D. July 7, 2022).[3]

The text and structure of the entire VRA also reveal Congress's "intent to create a private remedy" to enforce Section 2. *Sandoval*, 532 U.S. at 289. For example, Section 12(f) gives federal courts subject-matter jurisdiction over suits brought by "*a person asserting rights* under the provisions of [the VRA]." 52 U.S.C. § 10308(f) (emphasis added); *see also Allen*, 393 U.S. at 555 n.18 (finding "force" to the argument that Section 12(f) "necessarily implies that private parties may bring suit under the [VRA]"). Section 3 provides for certain remedies in actions brought by "the Attorney General *or an aggrieved person* . . . under *any* statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a), (c) (emphases added); *see also Roberts v. Wamser*, 883 F.2d 617, 621, 624 (8th Cir. 1989) (recognizing that Section 3 provides "aggrieved" voters standing to bring a Section 2 claim). Congress added the term "aggrieved person" to Section 3 when it amended the VRA in 1975, Pub. L. No. 94-73, § 401, 89 Stat. 404, knowing full well that *Allen* had construed the VRA as permitting private suits, 393 U.S. at 556-557; 1975 Senate Report 40 (stating that an "aggrieved person" includes "an individual or an organization representing the interests of injured persons"). Similarly, Section 14(e), which Congress also added in 1975, allows "the prevailing party, *other than the United States*" to seek attorney's fees "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10310(e) (emphasis added). The availability of fees presupposes that a private cause of action is available to enforce

---

[3] *Allen* relied on similar language to infer Congress's intent to create a private right of action to enforce Section 5. 393 U.S. at 555; *see* 52 U.S.C. § 10304 (providing that "no person shall be denied the right to vote for failure to comply with [a] qualification, prerequisite, standard, practice, or procedure" covered by, but not approved under, Section 5).

the core provisions of the VRA.  *See Shelby Cnty. v. Lynch*, 799 F.3d 1173, 1185 (D.C. Cir. 2015) ("Congress intended for courts to award fees under the [VRA] . . . when prevailing parties helped secure compliance with the statute.").  The Supreme Court construed a nearly identical fees provision in Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(b), as allowing private plaintiffs to recover attorney's fees whenever they secure a legal victory.  *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968) (per curiam).

### B. Private plaintiffs can enforce rights conferred by Section 2 through Section 1983.

Even if Section 2 did not confer a private right of action—and it does—the statute would be presumptively enforceable against Defendants through 42 U.S.C. § 1983, which provides a general remedy for private plaintiffs to redress violations of federal rights committed by state actors.  *See Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (holding that "the plain language" of Section 1983 "undoubtedly embraces" suits by private plaintiffs to enforce federal statutory rights); *Jaeger*, 2022 WL 2528256, at *6 ("Section 2 may be enforced through § 1983").  To determine whether private plaintiffs can enforce a federal statute through Section 1983, a court must first "determine whether Congress intended to create a federal right" in the statute that a plaintiff seeks to enforce.  *Gonzaga Univ.*, 536 U.S. at 283 (emphasis omitted).  If it does, that "right is presumptively enforceable by § 1983," and a plaintiff "do[es] not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Id.* at 284.  Although defendants can rebut the presumption that a federal right is enforceable through Section 1983, they can do so only by "demonstrat[ing] that Congress shut the door to private enforcement either [1] expressly, through specific evidence from the statute itself" or "[2] impliedly, by creating a comprehensive

7

enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 284 n.4 (citations and internal quotation marks omitted).

Section 2 unquestionably is a rights-creating statute. *See supra*, Part I.A. Defendants therefore bear the burden to rebut the presumption that Section 2 is enforceable through Section 1983. *Gonzaga Univ.*, 536 U.S. at 284. They cannot. Congress clearly did not "shut the door to private enforcement" of Section 2, *id.* at 284 n.4, because "there is certainly no specific exclusion of private actions" in the VRA, *Allen*, 393 U.S. at 555 n.18. *Cf. Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003) (holding that a voting provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101, is enforceable by private plaintiffs through Section 1983). Nor is there "a more restrictive private remedy," *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005), provided for in the VRA than in Section 1983. While the VRA permits the United States to enforce Section 2, these public remedies do not constitute "a comprehensive enforcement scheme" and are "[]compatible with individual enforcement under § 1983," *Gonzaga Univ.*, 536 U.S. at 284 n.4; *see also Jaeger*, 2022 WL 2528256, at \*6 ( "[P]rivate enforcement actions have co-existed with collective enforcement brought by the United States for decades."). Accordingly, Section 2 is also enforceable under Section 1983.

II.     **There Is No Heightened Standard to Plead a Vote Dilution Claim Under Section 2.**

Section 2 prohibits vote dilution through, among other things, the use of "at-large voting schemes [that] minimize or cancel out the voting strength of racial [minorities in] the voting population." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (citations and internal quotation marks omitted). In *Gingles*, the Supreme Court set out three preconditions to a vote dilution claim. *Id.* at 50-51. At the pleading stage, plaintiffs need only allege "enough facts to raise a reasonable expectation that discovery will reveal" that the preconditions are met. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also Pueblo of Jemez v. United States*, 790 F.3d 1143,

8

1172 (10th Cir. 2015) ("[T]he 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint.") (alteration in original); *Chestnut v. Merrill*, 377 F. Supp. 3d 1308, 1313 (N.D. Ala. 2019) (distinguishing what is "necessary at the pleading stage" and what must be proved at trial in a Section 2 case).

### A. *Gingles* 1

The first precondition, "whether the minority group is 'sufficiently large and geographically compact to constitute a majority in a single-member district,' simply asks whether any remedy is possible in the first instance." *Sanchez v. State of Colo.*, 97 F.3d 1303, 1311 (10th Cir. 1996). "Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles*, 478 U.S. at 50 n.17. "Because *Gingles* advances a functional evaluation of whether the minority population is large enough to form a district in the first instance, the Circuits have been flexible in assessing the showing made for this precondition." *State of Colo.*, 97 F.3d at 1311.

Defendants argue that the complaint must provide "details regarding how [Plaintiffs'] theoretical districts would be drawn, what the racial composition in the districts would be, and how traditional districting principles would be respected." *See* MTD 4, 10. This argument would effectively require Plaintiffs to present an illustrative plan, which is not the standard for stating a claim under the first *Gingles* precondition. "The ultimate end of the first *Gingles* precondition is to prove that a solution is possible, not necessarily to present the ultimate solution to the problem." *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 746 (S.D. Tex. 2013). At the pleading stage, courts have held that plaintiffs need not present a map outlining proposed districts; they must only show that "such a plan plausibly exists." *Chestnut*, 377 F. Supp. 3d at

9

1314; *see also Johnson v. Ardoin*, 2019 WL 2329319, at *4 (M.D. La. May 31, 2019) (rejecting argument that a complaint must include an alternative redistricting plan); *Luna v. Cnty. of Kern*, 2016 WL 4679723, at *5 (E.D. Cal. Sept. 6, 2016) ("Forcing plaintiffs to develop an unobjectionable map, before discovery even begins, would be putting the cart before the horse."). While an illustrative plan is one way to allege that a majority-minority district could be drawn, it is not required at this stage of the proceedings.[4]

A complaint can state a claim simply by alleging facts plausibly showing that a majority-minority district could be drawn. Here, relevant facts include that the Dodge City Commission is comprised of five members, Am. Compl. ¶ 49, and Latino residents constitute over 46% of the city's citizen voting age population. *Id.* ¶ 46 & Figure 3. The Complaint also alleges that each named plaintiff resides in a majority-Latino area that could be drawn into a single-member Commissioner district: one in the southern part of the city, and a second in the western part of the city. *Id.* ¶¶ 21, 26. While it is conceivable that in a "substantially integrated" jurisdiction, the minority population may not be sufficiently compact to constitute a majority in two of five single-member districts, *Gingles*, 478 U.S. at 50, the map presented in Figure 4 reveals

---

[4] The United States is aware of only one case in which a district court would have required plaintiffs to present an illustrative map with their complaint. *See Broward Citizens for Fair Dists. v. Broward Cnty.*, 2012 WL 1110053 (S.D. Fla. Apr. 3, 2012). There, the court granted a motion to dismiss because the facts alleged in the complaint established that the relevant minority population was too small to constitute a majority in a single-member district. *Id.* at *5 ("[T]he Court does not believe that a voting age population in both districts of less than 30% can constitute a majority-minority population sufficient to support a Section 2 claim."). In a footnote, the court found that the plaintiffs' failure to present an illustrative plan was "an additional pleading deficiency." *Id.* at *5 n.6. Other courts have explicitly rejected this requirement. *Chestnut*, 377 F. Supp. 3d at 1313; *Luna*, 2016 WL 4679723, at *5.

*Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471 (1997), cited by Defendants, does not establish that a benchmark *map* is required to show an alternative undiluted voting practice. First, *Bossier Parish* was a decision under Section 5 of the VRA in which appellants suggested that preclearance must be denied whenever a redistricting plan violated Section 2. The Supreme Court rejected that argument. *Id.* at 480. Second, in a case like this Section 2 challenge to a method of election, there is clearly an undiluted benchmark *practice* available: single-member districts, as opposed to the current at-large multimember district. *See* Am. Compl. ¶ 11 (alleging that a single-member district election system could provide Latino voters an opportunity to elect candidates of choice).

significant residential segregation in Dodge City, which provides additional support for the proposition that a majority-Latino district or districts could be drawn. Am. Compl. ¶ 48.

Similar allegations routinely survive motions to dismiss in Section 2 vote dilution cases. For example, in a case challenging a county redistricting plan, the court held that "[a]ssuming the Latino population . . . is sufficiently compact, it can reasonably be inferred that a minority group comprising nearly one-third of the county's total voting population could comprise majorities in each of at least two county supervisorial districts." *Luna*, 2016 WL 4679723, at *4. Allegations that the challenged plan "fractured a significant portion of the Latino citizen voting age population between two contiguous supervisorial districts" were, in turn, "sufficient to plausibly suggest the existence of a geographically compact minority population." *Id.* From these facts, the court could plausibly infer that "a sufficiently large and geographically compact Latino population exist[ed] to constitute a majority of voters in a single-member district." *Id.* at 5; *see also Chestnut*, 377 F. Supp. 3d at 1314 (court could reasonably infer a plausible majority-minority district from allegations). Similarly, in a case challenging an at-large method of election for city council, the court held that the plaintiffs adequately pled the first *Gingles* precondition because the complaint alleged that the relevant minority group was 40% of the total population and "describe[d] the possible neighborhoods that could create [a majority-minority] district." *Huot v. City of Lowell*, 280 F. Supp. 3d 228, 236–37 (D. Mass. 2017).

**B.  *Gingles* 2 & 3**

To demonstrate the second and third *Gingles* preconditions at the pleading stage, a plaintiff must plausibly allege that the minority group is "politically cohesive," and that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *State of Colo.*, 97 F.3d at 1310 (quoting *Gingles*, 478 U.S. at 56). When

11

evaluating political cohesiveness, "the inquiry is essentially whether the minority group has expressed clear political preferences that are distinct from those of the majority." *Id.* at 1312 (quoting *Gomez v. City of Watsonville*, 863 F.2d 1407, 1415 (9th Cir. 1988)) (alteration omitted). Showing that "a significant number of minority group members usually vote for the same candidates is one way of proving . . . political cohesiveness." *Gingles*, 478 U.S. at 56. Majority bloc voting can also be established through historic election results showing that majority voters "vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *State of Colo.*, 97 F.3d at 1312. Accordingly, Section 2 vote dilution complaints have survived motions to dismiss where, for example, they allege that Black-preferred candidates were unsuccessful in two city council elections due to racially polarized voting, *Alabama State Conf. of NAACP v. City of Pleasant Grove*, 372 F. Supp. 3d 1333, 1340 (N.D. Ala. 2019); that bloc voting repeatedly defeated Latino-preferred candidates in past contested elections, *Lopez v. Abbott*, 2017 WL 1209846, at *6 (S.D. Tex. Apr. 3, 2017)[5]; and that Latino candidates of choice were consistently elected in a county's lone Latino-majority district and never elected in other districts, *Luna*, 2016 WL 4679723, at *5-6.

Defendants argue that Plaintiffs failed to adequately allege the second *Gingles* precondition because they do not describe "how unified Hispanic voters were in supporting" the five Latino-preferred candidates identified in the complaint. *See* MTD 11-12 (quoting *League of United Latin Am. Citizens v. Abbott (LULAC II)*, 2022 WL 1631301 (W.D. Tex. May 23, 2022) (three-judge court)). Defendants do not elaborate on what the complaint would need to allege in order to meet this standard. To the extent they are suggesting that Plaintiffs must set forth a

---

[5] The court's discussion of the allegations of political cohesion and bloc voting in *Lopez* at the motion to dismiss stage, *Lopez*, 2017 WL 1209846, at *6, can be compared with the expert and statistical evidence ultimately offered at trial, *see Lopez v. Abbott*, 339 F. Supp. 3d 589, 608-10 (S.D. Tex. 2018).

statistical analysis of racial bloc voting in Dodge City elections, they overstate what is required "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555; *see also Chestnut*, 377 F. Supp. 3d at 1313 ("Courts hesitate to require a plaintiff to prove the elements of a claim at the motion to dismiss stage."). Such a requirement is inconsistent with Tenth Circuit precedent, which holds that lay witness testimony can be relevant to the determination of political cohesiveness. *See Sanchez v. Bond*, 875 F.2d 1488, 1493-94 (10th Cir. 1989); *State of Colo.*, 97 F.3d at 1320; *see also Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1118 n.12 (5th Cir. 1991) ("[A]lthough it is quite commonly employed, statistical evidence of racial polarization is not necessary to establish that minority voters vote cohesively."); *cf. Gingles*, 478 U.S. at 57 n.25 (recognizing that if the "minority group has never been able to sponsor a candidate" for election, courts must look to evidence other than election results to "prove unequal access to the electoral process").

Defendants also suggest that Plaintiffs must allege "specifics of the electoral results or vote breakdown," for commission seat contests since 2000. *See* MTD 13. But there is no such pleading requirement. Even after trial, "[t]he number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances." *Gingles*, 478 U.S. at 57 n.25. Not all elections will be equally probative. "One important circumstance is the number of elections in which the minority group has sponsored candidates." *Id*. Evidence from past elections, particularly elections without a minority candidate, "is useful only so long as one of the Anglo candidates can be considered a preferred candidate of the minority group," *State of Colo.*, 97 F.3d at 1320 (quoting *Bond*, 875 F.2d at 1495); *see also Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1128 (3d Cir. 1993) (rejecting the argument that plaintiffs must analyze all elections); *Old Person v. Cooney*, 230 F.3d 1113, 1123-24 (9th Cir.

13

2000) ("Elections between white and minority candidates are the most probative in determining the existence of legally significant white bloc voting."); *Westwego*, 946 F.2d at 1119 n.15 (same).  Courts may also conclude that recent elections are more probative than "those that occurred long before the litigation began." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1227 (11th Cir. 2000) (en banc).  The heart of the inquiry is whether minority-preferred candidates are usually defeated by majority bloc voting.  To the extent Defendants contend that Plaintiffs have not accurately identified the universe of Latino-preferred candidates, they dispute facts that cannot be resolved on a motion to dismiss, where the Court must accept well-pled allegations as true.  *See*, *e.g.*, *State of Colo.*, 97 F.3d at 1320-21 (describing the "searching evaluation" that may be required to determine which candidates are minority preferred).

Furthermore, context matters when pleading a Section 2 claim.  *See Pueblo of Jemez*, 790 F.3d at 1172 ("[T]he nature and specificity of the allegations required to state a plausible claim will vary based on the context.").  Defendants' arguments regarding racially polarized voting rely heavily on two decisions in ongoing challenges to Texas's congressional and legislative redistricting plans.  *See* MTD 11-13 (citing *LULAC II*, 2022 WL 1631301 & *League of United Latin Am. Citizens v. Abbott (LULAC III)*, 2022 WL 2922522 (W.D. Tex. July 25, 2022) (three-judge court)).  The factual circumstances of the Texas cases, in which plaintiffs challenge the boundaries of existing single-member districts statewide, are meaningfully different from the facts of this challenge to Dodge City's at-large method of election, which limits the utility here of the *LULAC* decisions.  Here, unlike in *LULAC*, it is the overall method of election, not the placement of district lines, that is alleged to dilute minority voting strength.  *Compare LULAC II*, 2022 WL 1631301, at *15 (concluding that "each of [the *Gingles*] preconditions must be shown on a district-by-district basis"), *with City of Pleasant Grove*, 372 F. Supp. 3d. at 1340

14

(allegations challenging at-large method of election stated a claim under the *Gingles* preconditions) *and Huot*, 280 F. Supp. 3d. at 237 (same).  The tendency of white bloc voting to minimize or cancel out minority voting strength is *necessarily* pleaded at the citywide level in this case, as opposed to the district level, as required by the *LULAC* court.

To the extent the *LULAC* decisions are read to require plaintiffs to present statistical analysis of racial bloc voting in a complaint, they reflect a heightened pleading standard that is inconsistent with Rule 8.  Racial bloc voting analysis is typically conducted by an expert during the discovery period, after plaintiffs have acquired precinct-level election results for the jurisdiction in question.  *See, e.g.*, *State of Colo.*, 97 F.3d at 1313 (describing bivariate ecological regression analysis and homogeneous precinct analysis).  Requiring such an analysis at the pleading stage would contravene the spirit of the VRA and the Federal Rules by precluding all but the most well-resourced and savvy plaintiffs—those with access to the relevant data and expert know-how to conduct complex statistical analysis before discovery even begins—from bringing Section 2 vote dilution claims.  This court should not close the door to these cases by adopting the heightened pleading standard Defendants promote.

## CONCLUSION

For the foregoing reasons, private plaintiffs have a private right of action under Section 2, and the Court should not adopt Defendants' heightened pleading requirements.

Date:  February 10, 2023

| | |
|---|---|
| DUSTON SLINKARD<br>United States Attorney<br>District of Kansas<br><br>*s/ Wendy A. Lynn*<br>Wendy A. Lynn<br>Kan. Supreme Court No. 23594<br>Assistant United States Attorney<br>500 State Avenue, Suite 360<br>Kansas City, Kansas 66101<br>T: (913) 551-6737<br>F: (913) 551-6541<br>wendy.lynn@usdoj.gov | KRISTEN CLARKE<br>Assistant Attorney General<br><br>ELISE C. BODDIE<br>Principal Deputy Assistant Attorney General<br>Civil Rights Division<br><br>*s/ Michael E. Stewart*<br>T. CHRISTIAN HERREN, JR.<br>TIMOTHY F. MELLETT<br>ELIZABETH M. RYAN<br>MICHAEL E. STEWART<br>Attorneys, Voting Section<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Ave. NW<br>Washington, DC 20530<br>(202) 353-5447<br>Michael.Stewart3@usdoj.gov |

**CERTIFICATE OF SERVICE**

      I hereby certify that on February 10, 2023, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

                                      *s/ Michael E. Stewart*
                                      Michael E. Stewart
                                      Attorney, Civil Rights Division
                                      U.S. Department of Justice
                                      950 Pennsylvania Ave. NW
                                      Washington, DC 20530
                                      (202) 353-5447
                                      Michael.Stewart3@usdoj.gov