**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

MIGUEL COCA and
ALEJANDRO RANGEL-LOPEZ,

*Plaintiffs,*

vs.

Case No. 22-1274-EFM

CITY OF DODGE CITY, a municipal corporation, the DODGE CITY COMMISSION, E. KENT SMOLL, in his official capacity as Mayor of Dodge City, MICHAEL BURNS, in his official capacity as Vice-Mayor of Dodge City, RICK SOWERS, in his official capacity as a member of the Dodge City Commission, CHUCK TAYLOR, in his official capacity as a member of the Dodge City Commission, and JOSEPH NUCI, in his official capacity as a member of the Dodge City Commission,

*Defendants.*

**MEMORANDUM AND ORDER**

Before the Court is Defendants' Motion to Dismiss (Doc. 37) Plaintiffs Miguel Coca and Alejandro Rangel-Lopez's claims under Section 2 of the Voting Rights Act ("VRA"), the Fourteenth Amendment's Equal Protection Clause, and the Fifteenth Amendment pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs have brought these claims based on Dodge City's at-large voting scheme by which members of its governing body are elected. In Plaintiffs'

view, this election system has resulted in Latino voters being unable to elect their preferred candidates because it unconstitutionally dilutes the Latino vote. For the reasons state below, the Court grants Defendants' Motion as to Plaintiffs' Fifteenth Amendment claim while denying it as to Plaintiffs' other claims.

## I. Factual and Procedural Background[1]

Both Plaintiffs are Latino U.S. citizens of legal voting age who reside in Dodge City (the "City"). The Defendants are the City itself and members of the Dodge City Commission: E. Kent Smoll, who also serves as the City's Mayor; Michael Burns, the City's Vice-Mayor; Rick Sowers; Chuck Taylor; and Joseph Nuci. It is this Commission, specifically the voting scheme by which members are elected, that forms the basis of Plaintiffs' claims.

The City utilizes a commission-manager form of government as contemplated by K.S.A. § 12-184b(b)(3). Five members comprise the Commission, each serving either two-year terms or four-year terms depending on how many votes they receive. The City's citizens elect these members under an at-large voting system. In other words, the City is not divided into multiple districts—rather each member of the Commission receives votes from citizens all over the City.

Plaintiffs allege that this election method dilutes the votes of the Latino community in Dodge City. Specifically, Plaintiffs allege that no Latino-preferred candidates have been elected to the Commission since at least before 2000.[2] In 2000, 2006, 2014, 2017, and 2021, Latino candidates ran for a spot on the Commission, receiving large numbers of votes in Latino-dominant

[1] The facts taken from Plaintiffs' Complaint and are considered true from the purposes of this Order.

[2] Plaintiffs allege that data regarding Latino-preferred candidates running for seats on the Commission prior to 2000 does not exist.

precincts within Dodge City. However, because these candidates received little or no support in the white-dominant precincts, they could not obtain seats on the Commission.

Considering how the Latino population has grown significantly in the past twenty years, Plaintiffs allege that the inability of Latino-preferred candidates to obtain a single seat on the Commission is evidence of vote dilution. In 2000, Latinos comprised 42.3% of the Dodge City's overall population. That number grew to 63.9% by 2020. Similarly, the number of Latino citizens of voting age ("CVAP") increased from 19.53% in 2000 to 46.13% in 2021.




Plaintiffs included the following demographic heat map in their Complaint, purporting to show the population density of Latinos around the Dodge City area.

According to Plaintiff's interpretation of the map, the south and southeastern areas of Dodge City are home to a Latino majority, while the north and northwestern areas consist mainly of white citizens. Plaintiffs allege that it is possible to draw five distinct districts, one for each Commission member, so as to make Latino voters the majority in at least one of those districts. This districting would then allow Latino voters to elect candidates of their choice to the Commission. However, Plaintiffs do not offer any suggested redistricting map to show where their proposed districts would lie.

Plaintiffs initiated the present lawsuit on December 15, 2022, asserting claims for violation of Section 2 of the VRA, the Fourteenth Amendment's Equal Protection Clause, and the Fifteenth Amendment. Defendants waited less than a month to bring the present Motion to Dismiss. On February 10, 2023, the United States filed an amicus brief in this matter, advocating on behalf of Plaintiffs' right to bring a private claim for Defendants' alleged violation of Section 2 and arguing against a higher pleading standard for vote dilution claims.

## II. Legal Standard

Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[3] Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.' "[4] A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[5] The plausibility standard

[3] Fed. R. Civ. P. 12(b)(6).

[4] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[6] Under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[7] Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[8] If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.' "[9]

## III. Analysis

Although Defendants move to dismiss each of Plaintiffs' claims, they spend most of their memorandum in support attacking Plaintiffs' Section 2 claim. After arguing against the availability of a Section 2 and asserting that Plaintiffs' claim would fail on the merits anyway, Defendants contend that Plaintiffs' constitutional causes of action fail to state a claim. The Court will discuss each of Defendants' arguments in turn below.

### A. Plaintiffs may bring a private claim violation of Section 2 of the VRA.

Plaintiffs' first count is violation of Section 2 of the VRA. Before addressing the merits of this claim, Defendants raise a monumental issue sure to find its ultimate conclusion beyond this Court—whether private plaintiffs may sue for violation of Section 2 of the VRA. In essence, this

---

[6] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[7] *Iqbal*, 556 U.S. at 678–79.

[8] *See id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

[9] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

issue presents two questions: (1) does Section 2 provide a private right of action and (2) does it create private rights such that a private plaintiff could bring a claim under § 1983?

*1. Does Section 2 create a private right of action?*

Relying primarily on Justice Gorsuch's concurrence in *Brnovich v. Democratic National Committee*[10] and the district court's ruling in *Arkansas State Conf. NAACP v. Arkansas Board of Apportionment*,[11] Defendants argue that Section 2 fails to provide a private right of action based on the express statutory language. Defendants admit that for decades and throughout hundreds of cases a private right of action has been assumed. Justice Gorsuch's concurrence in *Brnovich*, however, upends that distinct line of precedent, labeling Section 2's private right of action as "an open question" in lower courts.[12] Taking Justice Gorsuch up on his invitation to address the "open question," the *Arkansas State* court determined that Section 2 does *not* provide a private right of action.[13] In a "thorough and well-reasoned—though admittedly, controversial—order,"[14] the court determined that neither the text of Section 2 nor precedent required it to recognized a private right of action within Section 2.[15]

To summarize, the court relied upon the recent string of Supreme Court cases beginning with *Alexander v. Sandoval*[16] where the Supreme Court "made quite clear that judicially implied

[10] 141 S. Ct. 2321 (2021).

[11] 586 F. Supp. 3d 893 (E.D. Ark. 2022).

[12] *Brnovich*, 141 S. Ct. at 2350 (J. Gorsuch, concurring). Only Justice Thomas joined in this concurrence.

[13] *Arkansas State,* 586 F. Supp. 3d at 915–16.

[14] *Turtle Mountain Band of Chippewa Indians v. Jaeger*, 2022 WL 2528256, at *3 (D.N.D. 2022) (referring to *Arkansas State Conf. NAACP* opinion).

[15] *Arkansas State*, 586 F. Supp. 3d at 907–16.

[16] 532 U.S. 275 (2001); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008); *Ziglar v. Abbasi*, 582 U.S. 120 (2017).

private rights of action are now extremely disfavored."[17] Under the *Sandoval* test, the statute must: (1) contain create a private right and (2) provide for a private remedy before a private party can enforce it.[18] This test requires an in-depth analysis of the statutory text "to determine whether it displays an intent to create . . . a private remedy."[19]

The *Arkansas State* court went on to analyze the text and structure of the VRA, naturally emphasizing the language of Section 2.[20] In its entirety, Section 2 of the VRA states:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.[21]

---

[17] *Arkansas State*, 586 F. Supp. 3d at 906.

[18] *See Sandavol*, 532 U.S. at 286–88.

[19] *Id.* at 286.

[20] *Arkansas State*, 586 F. Supp. 3d at 906.

[21] 52 U.S.C. § 10301 (emphasis in original).

As readily admitted by the Supreme Court, "§ 2 . . . provides no right to sue on its face" and "lack[s] . . . express authorizing language."[22] In fact, nothing in the entire statute explicitly references a private remedy.[23]

Furthermore, Section 12 constitutes the remedial portion of the VRA, offering both civil and criminal sanctions—even imprisonment—for violation of Section 2.[24] Section 12(d) also "affirmatively authorizes the Attorney General of the United States to seek a preliminary or permanent injunction to prevent the violation."[25] Likewise, Section 14 allows the "prevailing party, other than the United States" to receive attorneys' fees, expert fees, and costs in "action[s] or proceeding[s] to enforce the voting guarantees of the fourteenth or fifteenth amendment."[26] Notably, Section 14 facially applies only to actions brought to enforce the Fourteenth or Fifteenth Amendments—not the VRA itself.[27] The court, therefore, found that the text of the VRA did not impliedly support finding that Section 2 created a private right of action.[28] Relying on the lack of language supporting a private right of action and the Supreme Court's recent trend toward disavowing judicially recognized rights of action, the court determined that Section 2 did not create a private right of action.[29] However, it did not address whether Section 2 creates private rights such that it could be enforced under § 1983.

---

[22] *Morse*, 517 U.S. at 232.

[23] *See Arkansas State*, 586 F. Supp. 3d at 907.

[24] *Id.* at 908 (citing 52 U.S.C. § 10308(d)).

[25] *Id.* (citing 52 U.S.C. § 10308(d)).

[26] *Id.* at 911 (quoting 52 U.S.C. § 10310(e)).

[27] *See id.*

[28] *Id.* at 911–12.

[29] *Id.* at 915–16.

In contrast, both Plaintiffs and the United States point to the vast sea of cases recognizing and affirming the private right of action within Section 2, usually without question. At the core of them all lies *Morse v. Republican Party of Virginia,*[30] where the Supreme Court, albeit in a plurality opinion,[31] held that "the existence of the private right of action under Section 2 has been clearly intended by Congress since 1965."[32] Since then, scores if not hundreds of cases have proceeded under the assumption that Section 2 provides a private right of action. All the while, Congress has consistently reenacted the VRA without making substantive changes, impliedly affirming the previously unanimous interpretation of Section 2 as creating a private right of action.[33] In particular, Plaintiffs cite to *Robinson v. Ardoin*[34]—decided in the wake of *Brnovich*—which recognized the court's holding in *Arkansas State* while disagreeing with its outcome.[35] Ultimately, the *Robinson* court concluded that "[w]hile this issue has been flagged, it is undisputed that the Supreme Court and federal district courts have repeatedly heard cases brought by private

---

[30] 517 U.S. 186 (1996).

[31] Justice Stevens wrote the main opinion, in which Justice Ginsburg joined. Justices Breyer, O'Connor, and Souter concurred without reaching the Section 2 issue. *Morse* also contains three dissents by Justices Thomas, Kennedy, and Scalia, respectively.

[32] *Id.* at 232 (quoting S. Rep. No. 97–417, at 30) (ellipses omitted). The parties debate whether this statement is dicta or actually part of the holding. This dispute, however, is largely irrelevant in that the Court is "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings." *United States v. Nixon*, 919 F.3d 1265, 1273 (10th Cir. 2019).

[33] *See, e.g.*, *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *cf Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536 (2015) ("When it amended the FHA, Congress was aware of this unanimous precedent [interpreting the FHA]. And with that understanding, it made a considered judgment to retain the relevant statutory text.").

[34] 605 F. Supp. 3d 759 (M.D. La. 2022), *cert. granted before judgment*, 142 S. Ct. 2892 (2022).

[35] *See id.* at 819.

plaintiffs under Section 2. *Morse* has not been overruled, and this Court will apply Supreme Court precedent."[36]

In the end, the Court concludes that it has a choice before it. Option one—adhere to the extensive history, binding precedent, and implied Congressional approval of Section 2's private right of action. Option two—conduct a searchingly thorough examination of Section 2's text, legislative history, and the *Sandoval* analysis in an attempt to predict the Supreme Court's future decisions. The Court chooses the former. The simple fact is that the Supreme Court explicitly recognized a private right of action under Section 2 in *Morse*. While that private right has been called into question by two Supreme Court justices, the Supreme Court has yet to overrule itself on that precise issue. Accordingly, until the Supreme Court or Tenth Circuit provide otherwise, the Court holds that Section 2 contains an implied private right of action.

*2. Even if Section 2 did not create a private right of action, could Plaintiffs sue under § 1983 for a violation of Section 2?*

In general, "[o]nce a plaintiff demonstrates that a [federal] statute confers an individual right, the right is presumptively enforceable by § 1983."[37] For a statute to create a private right, the statutory language must show that it " 'confer[s] rights on a particular class of persons.' "[38] If so, then a party "may rebut this presumption by showing that Congress specifically foreclosed a remedy under § 1983."[39] The party must show that "Congress shut the door to private enforcement

---

[36] *Id.* (citations omitted); *accord Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022), *order clarified*, 2022 WL 272637 (N.D. Ala. 2022), *and appeal dismissed sub nom. Milligan v. Sec'y of State for Alabama*, 2022 WL 2915522 (11th Cir. 2022). Defendants point out that *Robinson* is currently on appeal before the Supreme Court. However, the Supreme Court did not grant certiorari on the Section 2 issue. *See Ardoin v. Robinson*, 142 S. Ct. 2892 (2022) (granting certiorari).

[37] *Gonzaga Univ.*, 536 U.S. at 284.

[38] *Id.* at 285 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981).

[39] *Id.* at 284 n.4 (further citation and quotations omitted).

either expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983."[40]

In *Turtle Mountain Band of Chippewa Indians v. Jaeger*,[41] the court examined *Arkansas State*, concluding that the *Arkansas State* court had written a "thorough and well-reasoned—though admittedly, controversial—order."[42] However, the court reached a very different outcome than *Arkansas State* because it went on to analyze whether the plaintiff could assert a claim for violation of Section 2 under § 1983.[43] Even though the court agreed with *Arkansas State*'s conclusion that Section 2 did not itself provide a private remedy, it went on to find that "[t]he plain language of Section 2 mandates that no government may restrict a citizen's right to vote based on an individual's race or color."[44] In the court's opinion, "[i]t is difficult to imagine more explicit or clear rights creating language."[45] As such, the court held that there was a rebuttable presumption that Section 2 was enforceable under § 1983.[46]

Accordingly, the court turned to whether the Congress intended to foreclose § 1983 actions to enforce rights under the VRA.[47] This intention may be found either by the statute itself providing a private remedy or through a "comprehensive enforcement scheme that is incompatible

[40] *Id.* (further citations and quotations omitted).

[41] 2022 WL 2528256 (D.N.D. 2022).

[42] *Id.* at *3.

[43] *Id.* at *5.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

with individual enforcement."[48] Addressing the first method, the court once again recognized that "Section 2 does not contain any language creating a private remedy."[49] As to the second, the court found that Section 12, which authorizes the Attorney General to seek injunctions, fines, and imprisonment for violation of the VRA, was not incompatible with individual enforcement.[50] Indeed, "there has been private enforcement of Section 2 since the VRA's inception."[51]

The Court finds the reasoning in *Turtle Mountain Band* highly persuasive and applicable to this case. Not only does Section 2 contain clear rights-creating language—a legal position thus far unquestioned by any members of the Supreme Court—but it also does not contain a comprehensive enforcement scheme incompatible with individual enforcement. The extensive history of Section 2 enforcement by individuals, combined with Congress's silence on the issue when reenacting the VRA, establishes this fact for the purposes of this Order. Accordingly, the Court finds that Plaintiffs may alternatively assert a Section 2 claim under § 1983.

**B. Plaintiffs have plausibly alleged a Section 2 claim.**

In analyzing a motion to dismiss a Section 2 claim, court must perform a two-step analysis. First, courts must analyze the "necessary preconditions" set out in *Thornburg v. Gingles*.[52] Namely, plaintiffs must allege facts plausibly showing that: (1) "the minority group [can] demonstrate that it is sufficiently large and geographically compact to constitute a majority in a

---

[48] *Id.* at *6 (quoting *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 120 (2005)); *see also Blessing v. Freestone*, 520 U.S. 329, 347 (1997) ("Only twice have we found a remedial scheme sufficiently comprehensive to supplant § 1983.").

[49] *Turtle Mountain Band*, 2022 WL 2528256, at *6.

[50] *Id.*

[51] *Id.* (citing, among others, *Allen v. State Bd. of Elections*, 393 U.S. 544, 555 (1969)) (further citation omitted).

[52] 478 U.S. 30, 50 (1986).

single-member district"; (2) the minority group "is politically cohesive"; and (3) the minority group can "demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate."[53] If the plaintiff satisfies this first step, courts must proceed to the second step—that is, determining under the totality of the circumstances whether "the political processes leading to nomination or election are not equally open to participation by members of a protected class in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[54]

*1.* Gingles*—first precondition.*

The Court begins by addressing whether Plaintiffs have sufficiently pleaded facts to establish the first *Gingles* precondition. "The first question, whether the minority group is 'sufficiently large and geographically compact to constitute a majority in a single-member district,' simply asks whether any remedy is possible in the first instance."[55] Thus, "a § 2 plaintiff must also postulate a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice."[56] Addressing this issue in *Sanchez v. State of Colorado*,[57] the Tenth Circuit borrowed Justice Kennedy's definition of "compactness" to hold "[t]he first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district."[58] It also considered a Hispanic population of 48.82% to be sufficiently large to satisfy this precondition.[59]

---

[53] *Id.* at 50–51.

[54] *Id.* at 43.

[55] *Sanchez v. State of Colo.*, 97 F.3d 1303, 1311 (10th Cir. 1996) (quoting *Gingles*, 478 U.S. at 50).

[56] *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 480 (1997).

[57] 97 F.3d 1303 (10th Cir. 1996).

[58] *Id.* at 1312 (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996) (Kennedy, J. concurring)).

[59] *Id.* at 1314.

Because the plaintiffs had proposed a feasible redistricting map where the Hispanic population could constitute a majority, the court held they had met the first precondition's requirements.[60]

Defendants rely on *League of United Latin American Citizens v. Abbott* (*LULAC II*)[61] for the proposition that Plaintiffs must submit a proposed districting map detailing their "five theoretical districts" to survive a motion to dismiss.[62] After all, if a plaintiff cannot "establish that the minority has the potential to elect a representative of its own choice,"[63] then he cannot show that a remedy is possible.[64] Accordingly, the *LULAC II* court held that the plaintiff "must also allege that there are enough Hispanic voters in some reasonably configured hypothetical district to constitute a majority."[65] Based on this language, Defendants argue that Plaintiffs must identify within their Complaint how they propose to draw the districts to show that Latinos would comprise a CVAP majority within a district.

In response, Plaintiffs and the United States argue that proposed districts are not required at this stage in the case. Rather, they interpret Defendants' argument as demanding a higher pleading standard for Section 2 plaintiffs than Rule 8—as interpreted by *Twombly* and *Iqbal*—requires. Given that the main dispute between the parties is what Plaintiffs must factually allege at this stage, whether Plaintiffs have established the first *Gingles* precondition comes down to how the Court interprets Rule 8's pleading requirements for a Section 2 claim.

---

[60] *Id.* at 1315.

[61] 604 F. Supp. 3d 463 (W.D. Tex. 2022).

[62] *See id.* at 497–98.

[63] *Growe v. Emison*, 507 U.S. 25, 40 (1993).

[64] *LULAC II*, 604 F. Supp. 3d at 495.

[65] *Id.* at 498 (cleaned up).

Despite the lack of authority reaching this issue, the Court agrees with Plaintiffs—there is no demanding standard of factual specificity which they must meet to survive Defendants' Motion. Under the Supreme Court's holdings in *Twombly* and *Iqbal*, Rule 8 only requires a short and plain statement plausibly showing that Plaintiffs are entitled to relief. Thus, as recognized by the *LULAC II* court, all they need to plead to survive a motion to dismiss are "facts that would allow the Court to conclude a majority-minority district *can be drawn*."[66] After all, in *LULAC II*, the court did not dismiss the plaintiffs' claims for failure to submit drawn districts within the complaint.[67] Rather, the plaintiffs had not alleged any "specific facts," such as the size of the Hispanic population, from which the court could plausibly infer that majority districts could be drawn.[68]

Here, Plaintiffs allege that the Latino population as of 2021 comprises 59.02% of the overall population and 46.13% of the CVAP. This meets the sufficiently large standard under the Tenth Circuit's holding in *Sanchez*. Furthermore, Plaintiffs' population heat map shows that the Latino population resides primarily in the southeast part of Dodge City. Between the alleged CVAP estimates and the population heat map, the Court can reasonably infer that the Latino population is geographically compact such that a district could be drawn with a Latino majority.

It seems a step too far to require Plaintiffs to submit an actual proposed district plan at this stage. While that will be necessary should their claim reach summary judgment, nothing more is required now. Accordingly, Plaintiffs have alleged facts plausibly establishing the first *Gingles* precondition.

---

[66] *Id.* (emphasis added).

[67] *See id.*

[68] *Id.* (quoting *Shaw v. Villanueva*, 918 F.3d 414, 418 (5th Cir. 2019)).

*2.* Gingles—*second precondition.*

To establish the second *Gingles* precondition, Plaintiffs must plausibly allege that Latinos in Dodge City vote cohesively as a group. Obviously, courts "may not assume from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls."[69] And courts may not accept the mere recitation of a claim's elements as true under a motion to dismiss standard.[70] Defendants argue that Plaintiff's claim must fail because they rely entirely on bare legal conclusions without factual support.

Plaintiffs, however, do more than merely recite threadbare conclusions. Instead, Plaintiffs factually allege that five Latino-preferred candidates have run for office since 2000, reaping a majority vote in high-density Latino precincts while receiving low support in non-Latino precincts. From these facts, Plaintiffs have plausibly alleged that the Latino population votes cohesively. Contrary to the thrust of Defendants' argument, Plaintiffs need not prove their entire case within their Complaint. Indeed, Defendants fail to cite to any cases requiring more in a complaint than Plaintiffs have alleged here. Plaintiffs' alleged facts, while general in nature, nevertheless suffice at this stage to show political cohesion. Plaintiffs, therefore, have established the second *Gingles* precondition for the purpose of this Order.

*3.* Gingles—*third precondition.*

Finally, Plaintiffs must establish that the white majority votes as a bloc sufficient to defeat the Latino-preferred candidates. Once again, Plaintiffs point to the elections in 2000, 2006, 2014, 2017, and 2021 where specified candidates who received many votes in Latino-dense precincts

---

[69] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (further citation, quotations, and brackets omitted).

[70] *See Iqbal*, 556 U.S. at 678; *see also LULAC II*, 604 F. Supp. 3d at 499.

were nevertheless defeated because of their consistently low support in white-majority precincts. Once again, Defendants argue that these allegations are insufficient to state a Section 2 claim. And once again, the Court reminds Defendants that the standard at this stage in the litigation is not as high as they think. By alleging facts showing that the Latino-preferred candidates were defeated by white voters despite receiving high numbers of vote from Latino-dense precincts, Plaintiffs have plausibly alleged that white voters voted as a bloc to defeat the Latino-preferred candidates. Naturally, they will have to prove this element some other time, at which point specified data regarding voting numbers, results, etc. will become important. But for now, Plaintiffs have met each of the *Gingles* preconditions.

*4.* Gingles—*second step, i.e., totality of the circumstances analysis.*

Because each of the preconditions have been met, the Court must address *Gingles*' second step—whether the totality of the circumstances show "the political processes leading to nomination or election are not equally open to participation by members of a protected class in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[71] Defendants fail to make any argument on this subject at all. Plaintiffs even point out the lack of argument on this issue in their Response, with Defendants' Reply remaining similarly silent. Accordingly, the Court considers Defendants to have waived any argument regarding the *Gingles* second step for the purposes of this Order.[72] Thus, Plaintiffs have established both *Gingles* steps necessary to survive a motion to dismiss. Defendants' Motion as to Plaintiff's Section 2 claim is therefore denied.

---

[71] *Gingles*, 478 U.S. at 43.

[72] *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").

**C. Plaintiffs have plausibly alleged a claim for violation of the Equal Protection Clause.**

Defendants also move to dismiss Plaintiffs' claims under § 1983 for violation of the Fourteenth Amendment's Equal Protection Clause. To show a violation of the Equal Protection Clause, "[p]roof of racially discriminatory intent or purpose is required."[73] Defendants restrict their brief to arguing whether Plaintiffs have sufficiently alleged discriminatory intent necessary to support an Equal Protection claim. They begin by recognizing that K.S.A. § 12-184b(b) and K.S.A. § 12-184(a)–(b) provide that ultimately the City's citizens decide whether to abandon the commission-manager form of government. Defendants argue that Plaintiffs must allege facts showing that Dodge City private citizens discriminatorily intended to dilute the Latino vote by maintaining the current voting scheme. In Defendants' view, only the citizenry's intent is relevant because only they have the power to change Dodge City's commission-manager form of government.

But theses statutes deal only with the form of government—not the method of electing officers within that government. Defendants do not attempt to explain how the City's at-large election system is inseparable from its chosen form of government. Plaintiffs' Complaint does not appear to challenge the commissioner-manager form of government but rather how commissioners are elected to the Commission. As such, the Court finds Defendants' argument about Dodge City citizenry's discriminatory intent irrelevant.

Citing a district court case, *Georgia State Conf. of NAACP v. Georgia*,[74] Defendants also argue that Plaintiffs must show both that the at-large election scheme was originally adopted with

---

[73] *Blum*, 457 U.S. at 1004.

[74] 269 F. Supp. 3d 1266 (N.D. Ga. 2017).

a discriminatory purpose and that is has a discriminatory effect. In contrast, Plaintiffs quote the Supreme Court's holding in *Rogers v. Lodge*[75] "that multimember districts violate the Fourteenth Amendment if conceived *or operated* as purposeful devices to further racial discrimination."[76] Defendants offer no response to this language and appear to concede the point in their Reply. Thus, the Court holds that Plaintiffs need not offer factual allegations of the Commission's discriminatory intent at the time the at-large election scheme was adopted.

Finally, the Court may reach the primary issue here—whether Defendants had the requisite intent in operating the at-large election scheme to further racial discrimination. In *Village of Arlington Heights v. Metro. Housing Development Corp.*,[77] the Supreme Court recognized that proving racial discrimination necessitates "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."[78] With that in mind, the Supreme Court articulated several factors for courts to consider in determining whether a plaintiff has established discriminatory intent.[79]

However, the Court need not analyze these factors simply because Defendants do not address Plaintiffs' argument that they have established an inference of discriminatory intent on the part of Defendants. As such, Defendants have waived any argument regarding this issue for the purposes of this Order. Defendants give no other reason besides those discussed above as to why

---

[75] 458 U.S. 613 (1982).

[76] *Id.* at 617 (emphasis added) (further citation and quotation omitted).

[77] 429 U.S. 252 (1977).

[78] *Id.* at 266.

[79] *Id.* at 267–68.

Plaintiffs' Equal Protection claim should be dismissed. Accordingly, Defendants' Motion as to this claim is denied.

**D. Plaintiffs' Fifteenth Amendment must be dismissed.**

Finally, Defendants move to dismiss Plaintiffs' Fifteenth Amendment claim. Defendants contend that a voting dilution claim under the Fifteenth Amendment has never been recognized by either the Supreme Court or the Tenth Circuit.[80] Plaintiffs do not dispute this fact, instead arguing that this silence does not foreclose such claims. Regardless, the parties recognize in the few circuits that do recognize a Fifteenth Amendment vote dilution claim, it is "essentially congruent with vote-dilution claims under the Fourteenth Amendment."[81]

The Court sees no reason to recognize a claim which neither the Tenth Circuit nor the Supreme Court have recognized up to this point. Even if it did, the parties agree there is no practical legal difference between Plaintiffs' Fourteenth Amendment claim and their Fifteenth Amendment claim. Likewise, Plaintiff's remedy would remain the same whether or not its succeeded on its Fifteenth Amendment claim as well as its Fourteenth Amendment claim. Thus, Plaintiff obtains no benefit by asserting a Fifteenth Amendment claim in this case and will suffer no detriment by the Court dismissing it now. Accordingly, the Court grants Defendants' Motion as to Plaintiffs' Fifteenth Amendment claim.

---

[80] *See, e.g.*, *Reno*, 528 U.S. at 334 n.3 ("[W]e have never held that vote dilution violates the Fifteenth Amendment.").

[81] *Backus v. South Carolina*, 857 F. Supp. 2d 553, 569 (D.S.C. 2012), *aff'd*, 568 U.S. 801 (2012) (citing *Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981).

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss (Doc. 37) is **GRANTED in part** and **DENIED in part.**

**IT IS SO ORDERED.**

Dated this 18th day of April, 2023.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE