## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MIGUEL COCA, et al.,

     Plaintiffs,

     v.

CITY OF DODGE CITY, KANSAS, a
municipal corporation, et al.,

     Defendants.

Case No. 22-1274-EFM-RES

## PRETRIAL ORDER

On August 29, 2023, U.S. Magistrate Judge Rachel E. Schwartz conducted a pretrial conference in this case by phone.  Plaintiffs Miguel Coca and Alejandro Rangel-Lopez appeared through counsel Sharon Brett, Jonathan Topaz, Sonni Waknin, Abena Mainoo, Jonathan I. Blackman, Elizabeth Baggott and JD Colavecchio.  Defendants City of Dodge City, Kansas, the Dodge City Commission, E. Kent Smoll in his official capacity, Rick Sowers in his official capacity, Chuck Taylor in his official capacity, and Joseph Nuci in his official capacity appeared through counsel Anthony Rupp and Tara Eberline.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

## 1.     PRELIMINARY MATTERS.

    **a.     Subject-Matter Jurisdiction.** Defendants preserve for appeal the argument that subject matter jurisdiction does not exist because the Voting Rights Act does not afford a private right of action enforceable under section 2 or section 1983. (ECF No. 37 and Overruled at ECF No. 71). Subject-matter jurisdiction is invoked under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1357,

and 52 U.S.C. § 10301 *et seq.* to hear the claims for legal and equitable relief arising under the United States Constitution and the Voting Rights Act.

    **b.**    **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

    **c.**    **Venue.**  Venue in this court is not disputed.

    **d.**    **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law:

    1.  Count 1: Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

    2.  Count 2: The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983.

## 2.   STIPULATIONS.

    **a.**   The following facts are stipulated for purposes of summary judgment and trial.

    1.   The City of Dodge City Commission ("the Commission") is the governing body for the City of Dodge City ("Dodge City" or the "City").

    2.   The Commission plays a central role in the City's government. The Commission sets the tax rates, approves the City's budget, appoints members to various boards and commissions, enacts municipal ordinances, and appoints the City Manager.

    3.   Plaintiff Miguel Coca is Hispanic,[1] a citizen of the United States, and over the age of eighteen.

    4.   Mr. Coca lives within the city limits of Dodge City, Kansas.

    5.   Mr. Coca lives in the southern half of Dodge City.

---

[1]     Unless otherwise indicated, the terms "Latine," "Latino," and "Hispanic" are used interchangeably to refer to individuals who self-identify as Latine or Hispanic. Latine is the gender-neutral form of Latino and Latina. When referring to certain population data, the terms "Hispanic" or "Hispanic or Latino" mean non-white persons of "Hispanic" or "Hispanic or Latino" origin as defined by the United States Census Bureau and U.S. Office of Management and Budget ("OMB").

6.      Mr. Coca is registered to vote in Dodge City.

7.      Mr. Coca has voted in Commission elections and plans to vote in future elections.

8.      Plaintiff Alejandro Rangel-Lopez is Hispanic, a citizen of the United States, and over the age of eighteen.

9.      Mr. Rangel-Lopez is registered to vote in Dodge City.

10.     Mr. Rangel-Lopez has voted in Commission elections and plans to vote in future elections.

11.     Mr. Rangel-Lopez lives within the city limits of Dodge City, Kansas.

12.     Mr. Rangel-Lopez lives in the western half of Dodge City.

13.     Dodge City is located in Ford County, Kansas.

14.     Dodge City is a political subdivision within the meaning of, and subject to the requirements of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301.

15.     Dodge City, Kansas operates under a commission-manager form of government.

16.     The Commission is made up of five Dodge City residents who are elected using an at-large method of election.

17.     Every election cycle, three seats on the Commission are up for election. Commissioners serve either four- or two-year terms based on the number of votes that the top three finishers in an election receive. The lowest vote-getter serves a two-year term, while the top two finishers serve four-year terms.

18.     Pursuant to Kansas law, Commission elections are conducted by secret ballot.

19.     Pursuant to K.S.A. 25-2107, Dodge City elects its Commissioners in November of odd-numbered years.

20.     Following a 2015 change to Kansas state law, Dodge City changed the Commission election schedule from April of even-numbered years to November of odd-numbered years. The first election pursuant to the new schedule occurred in 2017.

21.     The elections for the Commission are non-partisan.

22.     There are primary elections for the Commission when 10 or more candidates run for office.

23.     The mayor and vice-mayor of Dodge City are selected by the Commissioners at the first meeting the Commission holds in January of each year.

24.     As of the date of the pretrial order, E. Kent Smoll, Michael Burns, Rick Sowers, Chuck Taylor, and Joseph Nuci are Dodge City Commissioners who reside in and perform their official duties in Dodge City, Kansas.

25.     Commissioner Joseph Nuci, who was elected in 2019 and re-elected in 2021, and continues to serve as a Commissioner, identifies as Latino.

26.     In February 2021, Blanca Soto was appointed to the Commission after an elected Commission member resigned.

27.     Blanca Soto identifies her ethnicity as Latina.

28.     Blanca Soto ran for election to the Commission in November 2021 and lost.

29.     From 2002 until the 2018 election, one polling location existed for Dodge City. After the 2018 election, Ford County began operating two polling locations in Dodge City.

30.     The location and number of polling locations in Dodge City is determined by the Board of County Commissioners of Ford County, Kansas, which administers elections in Ford County.

31.     Over the past twenty years, the Hispanic population in Dodge City has grown significantly. According to the 2021 American Community Survey ("ACS") 5-Year Estimates, Dodge City's Hispanic or Latino population comprises 65% of the total population, 59% of the Voting Age Population ("VAP"), and 46% of the Citizen Voting Age Population ("CVAP").

32.     According to the 2000 and 2020 Census, the total population of Dodge City increased from 25,065 to 27,788 between 2000 and 2020.

33.     According to the 2000 Census, the total Hispanic or Latino population was 10,614, comprising 42.3% of the City's total population.

34.     According to the 2020 Census, the total Hispanic or Latino population in the City was 17,759, comprising 63.9% of the City's total population.

35.    According to the 2000 Census, the white[2] alone, not Hispanic or Latino population was 13,060, comprising 52.1% of the City's total population.

36.    According to the 2020 Census, the white alone, not Hispanic or Latino population in the City was 8,129, comprising 29.3% of the City's total population.

37.    From 2000 to 2020, the Hispanic or Latino population in Dodge City grew about 67.3%, while the white alone, not Hispanic or Latino population decreased by 37.8%.

38.    According to the 2000 Census, the Hispanic or Latino VAP was 36.78% of the City's total voting age population, or 6,330 residents of voting age, while the white alone, not Hispanic or Latino VAP was 57.76%, or 9,940 residents of voting age.

39.    According to the 2021 ACS, the Hispanic or Latino VAP was 59.02%  of the City's total voting age population, or 11,160 residents of voting age, while the white alone, not Hispanic or Latino VAP was 34.83% percent, or 6,586 residents of voting age.

40.    According to the 2000 Census, the Hispanic or Latino CVAP was about 19.53% of the City's total citizen voting age population, or 2,560 citizens of voting age, while the white alone, not Hispanic or Latino CVAP was 75.6%, or 9,905 citizens of voting age.

41.    According to the 2021 ACS, the Hispanic or Latino CVAP was 46.13% of the City's total citizen voting age population, or 6,398 citizens of voting age, while the white alone, not Hispanic or Latino CVAP was 47.24%, or 6,552 citizens of voting age.

**b.**    The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and Daubert motions only:

1.    All Expert Reports and the documents cited within those reports.

**c.**    The parties agree that 30 days before trial, the parties will meet and confer regarding a revised stipulation of facts and exhibits, and 14 days before trial, the parties will file an updated stipulation of facts and exhibits to streamline the presentation of evidence at trial.

---

[2]    Unless otherwise indicated, the term "white" refers to individuals who self-identify as white alone, not Hispanic or Latino.

3.      **FACTUAL CONTENTIONS.**

   a.      **Plaintiffs' Factual Contentions.**

Plaintiffs Coca and Rangel-Lopez are registered to vote in Dodge City, Kansas. They have voted in Commission elections and plan to vote in future elections.

<strong>SECTION 2 VOTE DILUTION CLAIM</strong>

A.   *Gingles* **I: Minority population is sufficiently large and geographically compact**

As of the 2021 ACS 5-Year Estimates, Hispanics comprised 65% of Dodge City's total population and 46% of Dodge City's CVAP. Dodge City is largely separated by a single road, Comanche Street, with a majority-Hispanic population located to the south and a majority-white population located to the north.

Based on Plaintiffs' expert Dr. Oskooii's analyses of 14 demonstrative maps of Dodge City that comply with traditional redistricting principles and consist of five (5) single-member commissioner districts, the Hispanic population in Dodge City is sufficiently numerous and geographically compact to comprise a majority of the CVAP in three districts. Dr. Oskooii considered traditional districting criteria when drawing the demonstrative maps, including ensuring equal population, drawing districts that are reasonably shaped and (where possible) compact and contiguous, and taking into account communities of interest.

B.   *Gingles* **II & III: Minority and majority both vote in blocs**

A strong and consistent pattern of racially polarized voting is evident from 24 elections for local, state, and federal offices analyzed across nine election cycles from 2014 to 2022. Hispanic voters are cohesive in their support for Hispanic-preferred candidates, voting for candidates of choice by a roughly 2-to-1 or greater margin. White voters consistently bloc vote against Hispanic-preferred candidates in Dodge City.

Plaintiffs' expert Dr. Matt Barreto provided extensive data and analyses to come to the foregoing conclusions and document how Hispanic-preferred candidates have run for seats on the Dodge City Commission since at least 2000, but few have been elected. The following Hispanic-preferred candidates ran for the Dodge City Commission, receiving large numbers of votes in Hispanic-dominant precincts: Liliana Zuniga in 2014 and 2017, Jan Scoggins in 2014 and 2021, and Blanca Soto[3] in 2021. Yet, because they received low support in white-dominant precincts, only one of these candidates was elected to the Commission: Ms. Scoggins in 2014. When Ms. Scoggins ran for re-election in 2021, she emerged strongly as a Hispanic candidate of choice, yet Ms. Scoggin's support from white voters plummeted, demonstrating strong bloc voting by white voters. In the elections analyzed, Hispanic voters sided for the same candidates of choice with clear support in the 65% to 75% range, while white voters had consistent bloc voting with rates as high as 85% opposition to Hispanic-preferred candidates. Additionally, Mr. Coca testified that, based on his lived experiences in the political process in Dodge City, Hispanics are a politically cohesive group.

In his report, Dr. Barreto made clear that his opinions are based on ecological inference ("EI")—a method widely accepted by federal courts in evaluating racially polarized voting—and, specifically, the central point estimates produced by EI, which indicate the most likely outcome for each election analyzed. As to any potential uncertainty, he explained in his report that central point estimates have the "highest probability of being correct" and, while a confidence interval analysis could shed additional light if needed, his homogenous precinct analysis "also adds

---

[3]    Blanca Soto was appointed to the Dodge City Commission in February 2021, but was subsequently defeated in a campaign for election.

confidence to the point estimates because it provides actual election results that are quite consistent with the point estimates."

### C.  Totality of the Circumstances

####   a.  Senate Factor 1: History of official voting-related discrimination in the state or political subdivision

Dodge City has an extensive history of discrimination against Hispanics and other racial minorities that has hindered Hispanics' ability to become integrated into the City's political system. For much of Dodge City's history, Hispanics were denied access to public accommodations due to segregation. Dodge City also had a history of racially restrictive covenants in housing sales, which prohibited the sale of houses in certain areas of Dodge City to Hispanics. As Plaintiffs' expert Dr. Rubén Martinez detailed in his report, discrimination against Hispanics historically has been commonplace in Dodge City and neighboring municipalities. Segregation in housing, education, and public spaces initially aimed at African Americans spread to Mexicans who arrived in Kansas, including Dodge City, in the early 20th Century. The at-large method of election was adopted in Dodge City in the early 20th Century at a time when it was gaining popularity because it prevented working class and racial minority voters, who tended to be concentrated in particular neighborhoods, from electing candidates of their choice. This longstanding discrimination has made it harder for Hispanics to participate politically in the City, including by preventing them from generating wealth commensurate with their white counterparts, making their costs of voting higher.

There are also several instances of voting policies and practices that have discriminated against Hispanics in Dodge City and Kansas more broadly. In 2002, all Dodge City polling locations other than the Civic Center were closed, leaving just one location to serve over 13,000 voters in Dodge City, despite most polling locations in Kansas serving an average of about 1,000

voters per location. From around 1998 to 2018, the Civic Center remained the only polling location for Dodge City voters. In 2018, Ford County moved the single polling location to the Expo Center, which is located miles outside of Dodge City limits.  No regularly scheduled public transit stops at the Expo Center. After the filing of the lawsuit challenging the changed polling location, the City provided some transportation to the Expo Center for voters, through a request-based ride service that required voters to choose their time to vote in advance, and then call and request a ride from a set location. According to a report from the U.S. House of Representatives Committee on Oversight and Reform, the decision to move the polling site was made without consulting the local community and without taking steps to reduce the impact on thousands of voters. Constituents criticized  Ford County's and Dodge City's actions on social media and voiced concerns of voter suppression. Ford County, Kansas has been designated by the Federal Government as a political subdivision that is covered under Section 203 of the VRA.

In 2018, Ford County Clerk Debbie Cox sent out incorrect polling location information to voters in Dodge City, in violation of Kansas law. As a result, Dodge City voters received registration cards with erroneous information about their polling location for the 2018 midterm election.

During a primary election in 2020, the ACLU of Kansas's nonpartisan voter protection hotline fielded several calls from community members complaining of a large and seemingly unnecessary police presence in and around voting locations. After receiving a letter from the ACLU notifying Ford County of the issue, Ford County permitted the Dodge City police to continue to patrol polling locations, so long as they did so in unmarked cars.

In 2011, the Kansas legislature passed a law requiring documentary proof of citizenship for voter registration based on the unsubstantiated and erroneous claim that large numbers of non-

citizens were registering and voting illegally. The legislation led to the disenfranchisement of over 31,000 Kansas voters in just three years, including a large number of Hispanic Kansans. The law was permanently enjoined as a violation of federal law.

> **b. Senate Factor 2: Extent to which voting in the elections of the state or political subdivision is racially polarized**

Senate Factor 2 is satisfied for the same reasons, noted *supra*, that *Gingles* II and III are satisfied.

> **c. Senate Factor 3: Extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group**

> i. <u>Dodge City's at-large method of election</u>

Dodge City's use of at-large elections enhances the opportunity for discrimination against Hispanics because at-large elections tend to reduce Hispanics' descriptive representation (the extent to which Hispanics are elected to office) and substantive representation (the extent to which the elected body represents Hispanics well and is responsive to their preferences). At-large elections are particularly dilutive for Hispanics here because Dodge City has a large and residentially segregated Hispanic population. The at-large system creates a substantial obstacle to minority representation because minority candidates often lack the resources to conduct city-wide campaigns. Substantive representation is most common in at-large systems for the wealthiest and most well-connected in the community.

The potential for racially polarized voting – in which fear of minority candidates leads white voters to vote for white candidates, even if it requires crossing party lines – is alleviated where certain single-member districts are comprised of a sizable minority population. Single-member district systems also allow elected members to focus on the needs of a localized constituency. Hispanics who live in a majority-minority, single-member district typically have

greater interest, higher levels of turnout, and more satisfaction with their representatives. Moreover, the presence of minority elected officials is linked to more responsive policies and increased minority political participation.

### ii.   Dodge City's odd-numbered year election cycle

The Commission's elections are "off-cycle," meaning they take place in odd-numbered years and thus do not coincide with the national and state elections that occur in even-numbered years. Off-cycle elections are associated with depressed voter turnouts; crucially, the drop off in turnout from on-cycle to off-cycle elections is more pronounced for Hispanics and other racial and ethnic minorities than for white voters. Dodge City voter turnout was 55.1% in the on-cycle national and state elections of 2020, compared with just 18.7% turnout in the 2021 off-cycle election.

In 2015, Dodge City adopted a resolution opposing the Kansas state legislature's consideration of moving elections to even-numbered years. The stated bases for its position were that it "would unnecessarily interfere with local elections," "local issues would be lost or ignored by voters during the course of large scale federal and state partisan elections," and City issues "would be relegated to the bottom of the ballot . . . leading to voter apathy with regards to said local issues." Dodge City continues to oppose moving elections to even-numbered years for the same reasons today. These rationales were not based on any research or any consultation with the community.

### iii.   Dodge City's varying term lengths for Commissioners

In 2016, Dodge City began using differing term lengths for Commissioners. Commissioners are given either a two- or four-year term depending on the number of votes received in the general election. The lowest vote getter receives the shortest term of office, likely

compounding the challenges faced by Hispanic-preferred candidates, who are less likely to receive the required number of votes to receive a longer term in office.

### d.   Senate Factor 4: Exclusion of members of the minority group from candidate slating

Potential candidates for the Commission are unsuccessful in running, or are deterred from running, because current Commissioners informally slate candidates for the Commission. In the 2021 Dodge City Commission election, there were advertisements for the "Republican Slate" for both the Dodge City Commission and Dodge City School Board, which featured Commissioner Nuci and Commissioner Taylor. Current Commissioners line up potential candidates they would like to run, and those candidates have not been Hispanic or Hispanic-preferred.

### e.   Senate Factor 5: Extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process

The Hispanic population in Dodge City is impacted by significant socio-demographic inequalities compared to the white population. There is no dispute that there are disparities between the Hispanic and non-Hispanic population in Dodge City. Defendants in their Answer, ECF No. 79, admitted that there are disparities in which Hispanics in Dodge City are more likely to live below the poverty level (ECF No. 78 at ¶¶ 73-74), are less likely to be employed than white, non-Hispanic residents in Dodge City (*id.* at ¶¶ 76-77); Hispanics in Dodge City are less likely to have health insurance than their white counterparts (*id.* at ¶¶ 78-79); and that Hispanic are less likely to graduate from high school or attend higher education than white residents in Dodge City (*id.* at ¶¶ 83-85). These disparities in economic resources, educational attainment, housing, employment, and health indicators demonstrate that Hispanics in Dodge City bear the effects of discrimination. As a result, Hispanics have fewer political resources, often lacking the necessary time, money, and skills to engage civically at the same rate as whites. The Hispanic population in Dodge City

exhibits lower voter registration and turnout rates than the white population. Hispanics also have lower voter registration and turnout rates in Kansas more broadly. As of 2020, 51.5% of Hispanic citizens in Kansas were registered to vote and 45.5% of Hispanic citizens in Kansas voted, while 75.3% of white citizens in Kansas were registered to vote and 70.7% voted.

i.    <u>Income and employment</u>

From 2010 to 2021, the Hispanic median household income in Dodge City consistently reflected a much lower median income than that of white households, with disparities ranging between $9,000 and $11,000. In 2021, Hispanic households in Dodge City had a median income of $54,133, while white households had a median income of $64,250. Hispanics in Dodge City have a poverty rate of 17.9%, compared to the 6.8% poverty rate for whites. The Hispanic population in Dodge City has a 9% rate of child poverty, compared to a rate of 0.3% for whites. Hispanics in Dodge City also have a high rate of unemployment, most recently at 4.5%, compared to the white unemployment rate of 2.8% and the overall rate of 2.9% in the state of Kansas.[4]

The Hispanic population's lower median household income, higher rates of poverty and child poverty, and higher rates of unemployment create barriers to participating in politics.

ii.    <u>Education</u>

Hispanics in Dodge City have lower rates of educational attainment compared to whites. 44% of Hispanics in Dodge City lack a high school or college degree, compared to just 4.5% of whites. 55.8% of Hispanic adults in Dodge City have graduated from high school, compared to 95.5% of whites. Only 5.8% of Hispanic adults in Dodge City have attained a bachelor's degree or higher, compared to 40.5% of whites.

---

[4] In 2000, 8.8% of Hispanic residents in Dodge City were unemployed, compared to the white unemployment rate of 3%. In 2010, 5.0% of Hispanic residents in Dodge City were unemployed, compared to 3.4% of white residents.

A disproportionate number of white children in Dodge City attend private school, while a disproportionate number of Hispanic children attend Dodge City's public school district (USD 443). Hispanic students have disproportionately low rates of participation in the school district's gifted/talented programs and SAT/ACT preparation. Hispanics are also subject to disproportionately high levels of school discipline, representing 80% of in-school suspensions and 90% of expulsions. Hispanic academic achievement indicators under the National Every Student Succeeds Act are lower than those of whites in the school district, with an achievement gap of 15.02% for overall proficiency for the academic indicators. Commissioner Nuci wrote in a text message, "I know several classes that kids don't speak English and other kids have to translate for them . . . Kids translate because not enough paras that speak Spanish." Education is an important source of political resources that are directly linked to political participation levels. Educational attainment provides greater political knowledge, communication skills, and sense of civic duty. Hispanics with higher education attainment are more likely to be registered to vote and to vote regularly.

iii.   Housing

Hispanics in Dodge City have a homeownership rate of 57.9%, compared to the white homeownership rate of 69.1%. Hispanic homeownership rates also decreased between 2006 and 2021. Moreover, there is a $30,000 gap between the median home value for white homeowners and Hispanic homeowners.[5] Lack of affordable housing may create more housing insecurity and higher residential mobility, which has been found to depress Hispanic political participation.

---

[5]   In 2009, the median home value for Hispanic residents in Dodge City was $67,300, while the median home value for white residents was $103,400.

Homeownership is both a measure of wealth and a source of stability that is linked to a higher likelihood of participating in politics.

    iv.   <u>Healthcare</u>

Hispanics have experienced barriers to accessing quality health care in the U.S., leading to higher mortality rates from diabetes, homicide, chronic liver disease, childhood asthma, obesity, and HIV infection when compared to whites. In Dodge City, 19.4% of Hispanics lack health insurance coverage, compared to 6.6% of whites. Health is a powerful predictor of voter turnout. Poor health discourages political participation by directing attention away from political matters and inhibiting cognitive abilities required for participation.

**f.   Senate Factor 6: Use of overt or subtle racial appeals in political campaigns**

Commissioners have publicly taken anti-immigrant positions, including by supporting laws that would increase policing and deportations of Hispanics.

**g.   Senate Factor 7: Extent to which members of the minority group have been elected to public office in the jurisdiction**

Hispanics are severely underrepresented at all levels of government—municipal, county, state, and federal. Hispanics are significantly underrepresented on the Dodge City Commission. Hispanics comprise 64.6% of the total population in Dodge City and 46.1% of eligible voters. From 2002 to 2020, the Dodge City Commission did not have any Hispanic Commissioners. Presently, Mr. Nuci is the only Hispanic Commissioner serving on the five-member Commission. Moreover, Dodge City's submissions to the Equal Employment Opportunity Commission indicate that a disproportionate number of City employees are white. Hispanics are underrepresented throughout the City government. Hispanics in Dodge City are significantly underrepresented on the Dodge City school board and in judicial and law enforcement positions, and Hispanics in Ford County are underrepresented in county positions.

Further, Hispanics are underrepresented in elected offices in Kansas at the municipal level. Hispanics represent less than 1% of the proportion of total municipal offices across the state of Kansas, compared to their 12.7% share of the state population. From 1996 to 2021, the total share of Hispanics in the state legislature has ranged from 1.2% to 3.6%, compared to their 12.7% share of the state population. Hispanics have never been elected to statewide executive or federal office in Kansas.

### h.   Senate Factor 8: Lack of responsiveness on the part of elected officials to the particularized needs of minority group members

Elected officials in Dodge City and at the state level have demonstrated a lack of responsiveness to the particularized needs of the Hispanic community with respect to voter access, health, discrimination, and immigration enforcement. Several Hispanic residents who have spoken during Commission meetings have described the Commissioners' responses as perfunctory and have noted that the Commissioners appear to be bored and skeptical of issues raised that affect the Hispanic community. The Cultural Relations Advisory Board ("CRAB") omitted from its Strategic Plan for Welcoming and Integration certain issues – including changing the method of elections – raised by stakeholders who work with the Hispanic community.

Commissioners do not make efforts to reach out to the Hispanic community or Hispanic organizations. Dodge City consists of two towns: the white community that has a hold on formal systems in the city and the Hispanic community that has their own informal structures and support networks.

Dodge City also did not provide Spanish translations of materials for businesses. Prior to Mr. Rangel-Lopez translating certain business forms regarding regulations for food trucks during his internship with the City in the summer of 2022, those forms were not available in Spanish, despite the significant percentage of food truck owners that are Spanish-speaking.

16

i.   <u>Voter access</u>

In 2011, Kansas passed the SAFE Act, which required proof of U.S. citizenship for voter registration, photo identification for in-person voting, and signature verification and a Kansas ID number for mail-in voting. As noted *supra*, a federal court struck down the proof of citizenship requirement, which disproportionately impacted Hispanics. However, the voter ID requirements of the SAFE Act are still in effect and are among the strictest in the nation.

At a public meeting in 2019, residents from south Dodge City raised concerns regarding Dodge City's use of at-large elections. Mayor Brian Delzeit and Commissioner Jan Scoggins were present. The residents voiced their perception that it was intimidating to run for the Commission, as they would need to campaign in north Dodge. One resident stated that many people in his neighborhood found fault with the use of at-large elections as they knew that running for local election would be a waste of time and result in losing to residents from the north part of Dodge. In response, the Commission held discussions regarding changing the electoral system. However, residents expressed concern that only 20 minutes were spent discussing the topic over the course of two meetings and that there was no input from residents.

In an email thread in February 2019, Commissioner Scoggins requested adding an agenda item for a Commission meeting to consider districts and term limits for Commission elections, noting that she had volunteered to bring the issue to the Commission on behalf of a community group. Commission meeting minutes reflect that, on March 19, 2019, Commissioner Scoggins asked City staff to look into changing the at-large election system and adding term limits. The April 15, 2019 meeting minutes reflect that Commissioners Delzeit and Warshaw voiced their opposition to City staff further evaluating the possibility of changing to single-member districts.

ii.    <u>Health</u>

The COVID-19 virus disproportionately affected racial and ethnic groups in Kansas. Before the availability of vaccines, the rate of reported cases was twice as high among Hispanic residents as white residents, and the rate of deaths was 27% higher among Hispanic residents. The largest source of COVID-19 outbreaks in Kansas were meatpacking plants, where Hispanics comprise a large proportion of the workforce. There were numerous COVID-19 outbreaks at Dodge City meatpacking plants in particular. The United Food and Commercial Workers Union, which represents many of the Dodge City meatpacking plant employees, urged the Governor and the White House to take action to protect meatpacking workers from the rapid spread of the virus. Despite these requests, complaints to the Occupational Safety and Health Administration, and massive outbreaks, state officials played a role in keeping meatpacking plants open, prioritizing the food supply chain rather than the health and safety of the plant workers.

iii.    <u>Discrimination</u>

In 2010, Hispanic residents demanded an open meeting with City officials to discuss anti-Hispanic bias in policing, including racial profiling of Hispanics by the Dodge City Police Department. Despite the concerns repeatedly expressed by Hispanics and assurances from the City that they would address the concerns, it is unclear what efforts, if any, were taken to address these concerns. The City Manager, Commissioners, and other offices of City government do not monitor the demographics of policing data. Nor does the City acknowledge disparate policing, although policing data shows that Hispanics experienced a higher number of total citations and total arrests compared to their percentage of the total population in Dodge City.

Dodge City passed a resolution creating the CRAB (Cultural Relations Advisory Board) in 2013 to advise the governing body of Dodge City with regard to issues affecting minority

populations, but there is little documentation explaining the impact of the CRAB on quelling the racial tension in Dodge City. The City Manager is not closely involved with the CRAB. City employees make recommendations to the Commission on which applicants to select for service on the CRAB, and the Commission has ultimate approval over CRAB members. The CRAB is solely advisory in nature and possesses no power to enact, create, or enforce any City policy.

Widespread U.S. Immigration and Custom Enforcement (ICE) raids have targeted Hispanic communities in Kansas, including in Dodge City. Dodge City police provided assistance to ICE in a 2017 immigration raid by providing location information for specific Hispanic individuals. One Dodge City police official stated that ICE "raids have hurt the goodwill" that the official "built with the local Hispanic community" and that the raids "could deter any undocumented residents from reporting crimes out of fear that they may be targeted next." The official further stated that she is  "not sure how she'll earn back their trust."

>    **i.   Senate Factor 9: Policy underlying the state or political subdivision's use of the challenged standard, practice, or procedure is tenuous**

Historically, at-large elections have been used in the U.S. to limit the electoral influence of ethnic and racial minorities and members of the working class. Dodge City's only stated basis for maintaining the at-large election system is to promote "unity."

### FOURTEENTH AMENDMENT CLAIM

Dodge City has maintained its at-large method of election despite knowing that the at-large system impermissibly dilutes Hispanics' voting power. In 2011, the Department of Justice ("DOJ") investigated Dodge City's at-large system for Commission elections for a potential violation of the anti-dilution provision of Section 2 of the VRA. The DOJ contacted Ford County for information regarding Dodge City's at-large election system on June 29, 2011. To assist in its response, Ford County retained an external investigator to assess whether Dodge City had violated

Section 2. The investigator concluded that "Dodge seems to possess the initial criteria that may indicate a VRA Section 2 violation" and recommended that "the Dodge City Commission engage in a self-assessment of its possible Section 2 liability." The results of that investigation were shared with Dodge City and the Dodge City mayor. Dodge City nevertheless continued to maintain its at-large method of election.

In February 2019, at the request of members of the community, Commissioner Scoggins asked that the topic of adopting district-based elections be put on the agenda for the Commission. During a March 4, 2019 Commission meeting, Commissioner Scoggins proposed that the City consider adopting a district-based election system. During the April 15, 2019 Commission meeting, the Commission decided not to give any further consideration to the issue of whether the City should adopt district-based elections.

### b. Defendants' Factual Contentions.

This lawsuit does not arise out of dissatisfaction within the City of Dodge City over its method of electing City Commissioners or any claims brought before the City Commission by Latinos or groups representing Latinos. The at-large election of City Commissioners has been in place for more than 50 years, and no member of the current City Commission has voted for or against this method of electing members of the Commission.

The Defendants deny Plaintiffs' allegations related to the Section 2 Vote Dilution Claim. With respect to *Gingles* **I**, Defendants deny that the minority population in Dodge City is sufficiently large and geographically compact to comprise a majority of the CVAP in three districts. Additionally, Defendants deny that Plaintiffs' expert Dr. Oskooii's 14 demonstrative maps comply with traditional redistricting principles because, as Defendants' expert Sean Trende shows, the districts in Dr. Oskooii's demonstrative maps do not encompass a compact minority

population and/or unnecessarily split precinct lines. The City of Dodge City is integrated geographically, and Hispanic residents live and work throughout the Dodge City community.

Defendants agree there is a large Hispanic population in the City of Dodge City. In fact, the Hispanic population is sufficiently large to effectively elect Latino-preferred candidates under the current at-large system, and there is no competent evidence that the candidates elected to the City Commission are not Latino-preferred. Latino population is distributed in every precinct in Dodge City, and there are neither homogenous white precincts nor homogenous Latino precincts in Dodge City.

Plaintiffs have submitted the testimony of one expert, Dr. Oskooii, to provide Demonstration Maps to purportedly show that one or more single-member districts could be created to pack Latinos into one or more single-member districts and pack whites into other single-member districts. These proposed maps cluster together geographically distant pockets of the Hispanic population and split more precinct lines than is appropriate to comport with traditional redistricting principles.

There is no evidence provided by any of the Plaintiffs' experts that would demonstrate that the Plaintiffs' proposed maps would result in the election of more Latino-preferred candidates to the City Commission. If one were to assume that Latinos vote as a bloc and whites vote as a bloc in City Commission elections (an unsupported assumption), packing voters by ethnicity into geographically disparate districts is unlikely to result in the election of Latino-preferred candidates.

In response to *Gingles* **II and III**, Defendants deny Plaintiffs' allegations and contend that there is no credible evidence of minority or majority voting blocs in Dodge City. There are no homogeneous voting precincts within Dodge City. Plaintiffs are unable to describe in any credible

way their definition of a "Latino-preferred candidate," nor have they established a consistent pattern of lack of success by any such candidates.

The totality of the circumstances, as evidenced by the Senate Factors, fares no better for Plaintiffs. Consideration of the 1982 Senate Factors does not support the Plaintiffs' claims, as there is no history of discrimination in City elections, the adoption of the at-large election process long-predates the increase in Latino population, Latinos have not been denied access to the slating process, Latinos do not have a greater burden than non-Latinos in participating in City elections, there are no racial appeals in City election campaigns, Latinos have won elections to City Commissioner, and there is no evidence that the City has not been responsive to Latinos' needs in Dodge City.

In response to **Senate Factor 1**, Plaintiffs have not identified any evidence of official voting-related discrimination within Dodge City or the State of Kansas. And while restrictive covenants in housing were used historically throughout much of the United States, no such housing covenants have existed or been enforced in Dodge City for many years. Plaintiffs have uncovered no evidence of the City government discriminating against Latinos or preventing Latinos from participating in the political or law-making process. In fact, one of the five current members of the City Commission is Latino. The City Manager is Latino. Latinos have held other important and prominent positions in City government. And the City has undertaken extraordinary efforts to support and welcome the Hispanic community, including creating of the Cultural Relations Advisory Board, the CRAB's Strategic Plan for Welcoming, the Engage Dodge program, facilitating coordination with the USCIS Mobile Services and Mexican and Guatemalan Consulate Services, co-hosting of naturalization clinics, and many others.

With respect to elections, the City has, for many years, encouraged voter turnout and provided free public transportation to both early voting and election-day voting. As City Manager Nick Hernandez and former Assistant City Manager Ernestor de la Rosa testified, the City offers its bilingual employees to Ford County to serve as election-day workers at the polls and publishes social media voting reminders in English and Spanish.

The 2018 change in polling location identified by the Plaintiffs was a decision made by Ford County, Kansas, which is not a party to this lawsuit. Plaintiffs have provided no evidence that having one or two polling locations has impacted in any way the number of Latino voters or overall voters within Dodge City. In 2018, construction around the prior polling site within the City resulted in that space being unavailable. Ford County elected to move the polling location to a site that was accessible to all voters and was just a short drive from the prior location. There has never been a finding that moving the polling location was motivated by discrimination against Latinos or that the new polling location made it more difficult for Latinos to vote. Nor is there evidence suggesting excessively long wait times at the polls.

To ensure every interested citizen was able to vote, the City provided transportation to voters through the City's public transportation system. This consisted of busing citizens from the old voting site to the new voting site and providing citizens door-to-door transportation between voter's homes and the polling location upon their request. The City also posted bilingual City staff at the new and old polling locations to ensure that every interested voter was able to vote at the new polling location. Free door-to-door transportation was also provided for citizens who wished to participate in advance voting at the Ford County Government Center. Moreover, Ford County responded to the concerns about the polling location and has since opened a second polling location within the City limits to ensure that voting is readily accessible.

The identified forms of free transportation were not provided in response to litigation; the City has provided similar free public transportation options for elections before and after 2018 to ensure that every voter who wishes to vote is provided free public transportation upon request. Between advanced voting options, absentee voting options, and free transportation, the City has taken significant steps to minimize or eliminate any barriers to voting for interested citizens.

Plaintiffs' allegations of a police presence at the polls in 2020 is unsupported and was only shared with the City of Dodge City after the election in which the ACLU allegedly received reports of concerns. Dodge City respects and supports the voting process and it does not maintain any unnecessary police presence in or around voting locations.

With respect to **Senate Factor 2**, there is no valid basis to conclude that there is racially polarized voting in City Commission elections in Dodge City. The relatively small number of voting precincts in the City and the lack of any homogenous Latino precincts severely limits the statistically valid inferences that can be made about how individuals of different racial and ethnic groups voted in local elections. The Plaintiffs cannot meet their burden to show statistically significant racially polarized voting in City Commission elections in the City of Dodge City. The only evidence that Plaintiffs submit is that of one retained expert, Matt Barreto. Dr. Barreto purports to use "Ecological Inference" to support his opinions, but neither his report nor his deposition testimony presents the full results upon which his conclusions are based, and neither accounts for statistical uncertainty in making this determination of voting behavior. It is fundamental to EI analysis that the expert demonstrate the confidence intervals to statistically ascertain whether there is evidence of racially polarized voting. Given the small number of precincts and the lack of homogenous precincts, there is no statistically significant data to demonstrate racially polarized voting. Because of this statistical uncertainty, it is not possible for

the Plaintiffs to demonstrate the preferred candidate of Latinos. The failure of Dr. Barreto to present any measure of statistical uncertainty is striking, as basic statistics and methodology textbooks in the social sciences require it. Without it, we cannot say anything about the statistical significance of his estimates. To quote a recently published paper in the American Political Science Review co-authored by Gary King, who developed EI, "[v]alid inferences require methods with known statistical properties (such as identification, along with unbiasedness, and consistency) and honest assessments of uncertainty (e.g., standard errors)" (Evans et al. 2023:2).

Moreover, Dr. Barreto is not an unbiased expert. This lawsuit is the result of a student project at the UCLA Voting Rights Project in California. Dr. Barreto is the co-director of the UCLA Voting Rights Project and the professor who assigned the project. His colleague and co-founder of the UCLA Voting Rights Project serves as counsel for the Plaintiffs.

In response to **Senate Factor 3**, the City's use of at-large elections is neither intended to, nor does it act in such a way as to discriminate against Hispanics. At-large elections are facially neutral, authorized by Kansas law, and used by many mid-sized cities across the state of Kansas. Many Kansas cities with commission-manager or council-manager forms of government elect their council members through at-large elections, much like Dodge City. In fact, the City utilizes the most common form of municipal government in the United States and in the State of Kansas. This form of government is associated with better performance outcomes than the mayor-council form of government and was implemented across many municipalities across Kansas and the United States to dilute the power of political parties in municipal government. There is no evidence that Dodge City's use of at-large elections enhances the opportunity for discrimination against Latinos.

Furthermore, the Plaintiffs have provided no evidence of any issue that has come before the Commission that has divided Hispanic and white citizens.

Dodge City's move from having municipal elections in the spring of even-numbered years to the fall of to odd-numbered years occurred as a result of a change in state law in which all municipal elections moved to the fall of odd-numbered years. This was a decision of the state legislature; not Dodge City, and it is consistent across the State of Kansas. Further, elections are administered by Ford County, not Dodge City. No defendant in this lawsuit has the authority to administer elections in Ford County. The state-wide decision to move elections to the fall of odd-numbered years was supported by many Kansas municipalities based on a belief there is no partisan way to maintain streets, and local government is best served if divisive national politics are avoided. The City does not control when its elections occur.

The varying term lengths for Commissioners is facially-neutral and is neither intended to, nor does it act in such a way as to discriminate against Latinos or Latino-preferred candidates. There is no competent evidence to the contrary.

In response to **Senate Factor 4**, Defendants deny Plaintiffs' allegations and state that there is no informal slating of candidates by the City Commission or any individual Commissioners. Plaintiffs draw broad and inaccurate conclusions from one single flier from a Political Action Committee in one City Commission election that advertised a purported "Republican" slate of candidates. Rather than supporting the argument that "slating" is disadvantageous to Latinos, that particular flier promoted three candidates, two of whom were Latino. There is no evidence of broad slating of City Commission candidates by any interest group or political party in Dodge City, and no evidence of the exclusion of Latinos. Similarly, there is no evidence of formal or informal slating by current Commissioners.

In response to **Senate Factor 5**, Defendants deny Plaintiffs' allegations as stated. Plaintiffs have failed to establish that the socio-demographic disparities alleged are the result of past

discrimination or that they hinder the ability of the Latino population to participate effectively in the political process. The causal connections alleged and the extent of any disparities that may exist are not supported by reliable data and methods. Plaintiffs' proffered expert for Senate Factor 5, Dr. Bejarano, did not analyze the data cited regarding alleged income, health, and educational disparities for statistical significance.

Plaintiffs have provided no evidence that demographic differences hinder the ability of Latinos to participate in the political process. The City Manager and, until recently, Assistant City Manager, are Latino. There is a Latino on the City Commission. There is no evidence that changing the method of election in Dodge City for the City Commission would result in higher income, better education, different housing, or improved healthcare for Latinos. Plaintiff Rangel-Lopez, who recently interned in the City Manager's office, has described City Manager Hernandez and Assistant City Manager de la Rosa as welcoming to the Latino community. The City developed a Cultural Relation Board to support the City's multicultural community and is implementing the CRAB's Strategic Plan for Welcoming.

In response to **Senate Factor 6**, Defendants deny Plaintiffs' conclusory statement and assert that there is no evidence of racial appeals in political campaigns in Dodge City. While there are diverging views on immigration issues within the Latino community in Dodge City and throughout the nation, Plaintiffs Rangel-Lopez and Coca testified that there have been no issues that have come before the City Commission that have divided the Latino and white communities. The City has adopted a Strategic Plan for Welcoming that emphasizes (1) Equitable Access and Communication, (2) Civic Engagement, and (3) Refugee and Immigrant Integration. The City's efforts to welcome Latinos include an "Engage Dodge" program, a New Americans Dinner, working with the United State Citizen and Immigration Services Mobile Services, hosting

Naturalization ceremonies, working with the Mexican and Guatemalan Consulate Services, providing a Naturalization Scholarship, working with other community groups on a Naturalization Clinic, working with other community groups on a DACA Clinic, providing a bilingual pay increase for City employees, and working on bilingual media posts and media relations. The City provides translation services and City documents in both English and Spanish. Commission candidates in Dodge City are not campaigning based on racial appeals, and Plaintiffs have provided no evidence to the contrary.

In response to **Senate Factor 7**, Defendants acknowledge some underrepresentation of Hispanics in elected positions, but Defendants contend that the at-large election system is not the cause of that underrepresentation. There have been very few Hispanic candidates for elected office in Dodge City, and the representation levels of Hispanics in other jurisdictions with different election systems does not suggest the election system is the reason for any such underrepresentation.

Joe Nuci is a Latino who is currently serving as one of five members of the City Commission. There is a City Commission election in November of 2023, and the only person who identifies as Latino who is running for City Commission in 2023 is Mr. Nuci. Defendants are aware of no efforts by the Plaintiffs or any of the groups they are associated with to recruit City Commission candidates for the 2023 election. There are no structural or other barriers that make it difficult for a Latino to place one's name into the candidate pool.

In response to **Senate Factor 8**, Defendants disagree that the Dodge City Commission has been unresponsive. Neither plaintiff has identified any lack of responsiveness by elected officials to the needs of Latinos in Dodge City as part of their deposition testimony. As noted in response to Senate Factor 6, the City recognizes the value of the City's Latino community, and the City

actively encourages Latino participation in all aspects of community life. The Plaintiffs have identified one instance in 2019 in which one individual raised a question at one City Commission meeting regarding the use of at-large elections. Following an inquiry into the topic, the Commission concluded there was not adequate interest in the change and opted not to proceed. The issue has not been raised at a Commission meeting since then. Plaintiffs' other allegations related to Senate Factor 8 are unsupported and denied.

With respect to **Senate Factor 9**, Defendants deny there is any evidence that the policy underlying the City's use of at-large elections is in any way discriminatory. Dodge City is one of a number of cities in Kansas that operates with at-large elections as part of a commission-manager form of government. Lawrence, Manhattan, Hays, Garden City, and Atchison are among the many other Kansas communities that have the same form of government. Pursuant to state law, such at-large elections occur in November of odd-numbered years. Advantages of the current form of government cited by its proponents include that (1) there doesn't need to be a controversial redistricting process after each census; (2) each elected member of the commission is responsible to the city as a whole and not a narrow constituency; (3) mayors rotate among the commissioners and no one commissioner takes on greater powers than the rest of the commissioners.

The City and its commissioners recognize that there are other forms of government authorized by Kansas law, each with its own perceived strengths and weaknesses, including various forms of single-member districts, yet they have opted to stick with the form of government that has been in place for over half a century. There has never been any groundswell of support for changing the method of election in Dodge City, and the Plaintiffs' lawsuit reflects only the preferences of the two plaintiffs and some outside special interests.

In response to Plaintiffs' **Fourteenth Amendment** claim, the City denies Plaintiffs' allegations and states that following the Department of Justice's inquiry of Ford County in 2011, the DOJ took no action and made no findings of any wrongdoing whatsoever in Dodge City.

Dodge City adopted its current form of government, including at-large elections, in 1970, and there has been no turmoil about this form of government in the 53 years Dodge City has operated with at-large elections. There has been no protest, no petitions presented to the City Commission, and it has not been an election issue in City Commission races. There have been no significant efforts by the public to ask the City to change the form of government. The Plaintiffs here did not make any significant effort to change the form of government in Dodge City through the democratic process. No members of the current City Commission have voted for or against the current form of government at any City Commission meeting.

The Plaintiffs are two residents of Dodge City who challenge the at-large selection process that is inherent in the commission-manager form of government under Kansas law. Plaintiff Rangel-Lopez, who obtained his degree from the University of Kansas in August of 2022 in public administration and political science, served as an intern in the Office of the City Manager for Dodge City during the summer of 2022, having first interviewed with City Manager Nick Hernandez, a Latino, and Assistant City Manager Ernestor De La Rosa, a Latino. Plaintiff Rangel-Lopez testified in his deposition that even though he was already contemplating filing this lawsuit during his internship, he did not raise the issue of at-large elections with the City Manager or the City Commission at any time during his internship. In fact, no one did. He is not aware of any widespread community movement in Dodge City to change the method of electing Commissioners, and he is not aware of any community groups that have called for a change in the manner in which Commissioners are elected.

Miguel Coca is a friend of Mr. Rangel-Lopez, an online student at Southern New Hampshire University, and an employee of the Boot Hill Museum in Dodge City. Other than Mr. Rangel-Lopez, he did not talk to other voters in Dodge City about at-large elections in Dodge City prior to filing this lawsuit. His information about at-large elections came from Mr. Rangel-Lopez. Mr. Coca did not speak to the City Manager or City Commission before filing this lawsuit. He acknowledges that the City has engaged in significant efforts to engage the Latino community. He is unaware of any City Commission issues in Dodge City in which the white voters' interests have been different from those of Latino voters.

In short, the preconditions necessary to maintain a Section 2 lawsuit are not present in this case, nor do the totality of the circumstances indicate that any right under the Voting Rights Act has been violated. Likewise, the Plaintiffs have no evidence of intentional discrimination committed by the Defendants or the City of Dodge City. And they provide no evidence that a move to single-member districts would be an appropriate remedy. Accordingly, judgment should be entered in the Defendants' favor in this case.

## 4. LEGAL CLAIMS AND DEFENSES.

### a. Plaintiffs' Claims.[6]

Plaintiffs assert that they are entitled to recover upon the following theories:

i.    Section 2 of the Voting Rights Act (Count I).  Defendants' maintenance of an at-large election system for the Dodge City Commission elections that does not afford Plaintiffs an equal opportunity to participate in the political process has the effect of diluting the voting strength of the Hispanic community, thereby denying or abridging Plaintiffs' right to vote on account of their race, color, or ethnicity in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

ii.    42 U.S.C. § 1983, Fourteenth Amendment Claim (Count II).  Defendants' maintenance of an at-large election system for the Dodge City Commission

---

[6]    The Court granted Defendants' motion to dismiss Plaintiffs' Fifteenth Amendment Claim (Count III). Plaintiffs reserve their right to appeal the dismissal of this claim.

discriminates against Plaintiffs on the basis of race and national origin in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

**b.      Defendants' Defenses.**

Defendants assert the following defenses:

i.      Plaintiffs have not stated a claim upon which relief may be granted under Section 2 of the Voting Rights Act. Plaintiffs cannot establish the required elements of a Section 2 claim, and the Senate Factors weigh against a finding in Plaintiffs' favor. There is also no evidence suggesting the remedy Plaintiffs request is appropriate or would resolve any actual concern.

ii.      Section 2 of the Voting Rights Act does not create a private right of action (overruled at ECF No. 71 but preserved here for appeal).

iii.      Violations of Section 2 of the Voting Rights Act are not enforceable under 42 U.S.C. § 1983 (overruled at ECF No. 71 but preserved here for appeal).

iv.      Plaintiffs have not stated a claim for relief under the Equal Protection Clause of the Fourteenth Amendment. In particular, Plaintiffs cannot establish any discriminatory intent or effect  od the current at-large election system.

v.      Plaintiffs seek injunctive relief to hold elections in even-numbered years, but this injunctive relief is unauthorized by Kansas law and would require action by non-parties Ford County and the State of Kansas, neither of which is under the control of Dodge City. Kansas law dictates that all municipal elections occur in November of odd-numbered years.  Furthermore, pursuant to Kansas state law, elections in Dodge City are run by Ford County, not the City of Dodge City.

vi.      Plaintiffs seek injunctive relief to permanently enjoin Defendants from calling, holding, supervising, or certifying any future elections for the Commission under the existing at-large method of election, but this injunctive relief is unauthorized by Kansas law and would require action by non-parties Ford County and the State of Kansas, which are not under the control of Dodge City. Kansas law dictates that Ford County, not the City of Dodge City, conducts and certifies elections for the Commission.

vii.      The remedy Plaintiffs request of conversion to at-large elections will likely have no effect on Latino representation. Conversion to single member

district elections for members of the Dodge City commission is unlikely to result in a significant increase in Latino representation.

**5.      DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

**Relief Requested by Plaintiffs:**

**Declaratory Relief**

Plaintiffs' claim for declaratory relief is authorized by 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57. Specifically, Plaintiffs seek a declaratory judgment finding that the at-large method of election for the Dodge City Commission:

- Illegally and unconstitutionally dilutes the voting strength of Hispanic voters in Dodge City;

- Violates Section 2 of the Voting Rights Act;

- Violates the Fourteenth Amendment to the U.S. Constitution; and

- Is unlawful, null, and void.

**Injunctive Relief**

Plaintiffs' claims for injunctive relief are authorized by 28 U.S.C. § 2202, as well as by Federal Rule of Civil Procedure 65. Specifically, Plaintiffs seek injunctive relief:

- Permanently enjoining Defendants from calling, holding, supervising, or certifying any future elections for the Commission under the existing at-large method of election;

- Requiring Defendants to adopt a district-based method of election for the Dodge City Commission;

- Setting a reasonable deadline for Defendants to enact or adopt a redistricting plan for the Dodge City Commission with at least two districts in which Hispanic residents constitute a majority of the CVAP;

- If Defendants fail to enact or adopt a valid redistricting plan by the Court's deadline, ordering a new redistricting plan for the Dodge City Commission with at least two districts in which Hispanic residents constitute a majority of the CVAP;

- Requiring Defendants to adopt a charter ordinance pursuant to Article 5, Section 12 of the Kansas Constitution to hold elections for the Dodge City Commission during even-numbered years; and

- Granting any other relief that the Court may deem just and proper, and as may be necessary to afford Plaintiffs the full relief to which they are entitled under the United States Constitution and the Voting Rights Act.

**Costs**

Plaintiffs seek all reasonable costs and fees allowable under the Federal Rules of Civil Procedure, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e) from Defendants, including attorneys' fees.

**Relief Requested by Defendants:**

Defendants request judgment in their favor and against the Plaintiffs on all issues, for their costs and attorneys' fees incurred pursuant to 42 U.S.C. § 1988(b), 52 U.S.C. § 10310(e), and for such other and further relief as the Court deems equitable.

**AMENDMENTS TO PLEADINGS:**

None.

6. **DISCOVERY:**

Under the scheduling order and any amendments, all discovery was to have been completed by July 31, 2023.  Discovery is complete.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations.  Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

7. **MOTIONS.**

a. **Pending Motions: None.**

b. **Additional Pretrial Motions.**

i. **Plaintiffs' Pretrial Motions:**

Plaintiffs may file the following motions:

- Motions *in limine* (if needed);

- A motion for summary judgment; and

- Daubert motions.

### ii.  Defendants' Pretrial Motions:

Defendants presently intend to file the following motions:

- Motions in limine (if needed);

- A Motion for summary judgment; and

- Daubert motions.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **September 22, 2023**.  The parties should follow the summary-judgment guidelines on the court's website:

*http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages.  *See* D. KAN. RULE 7.1(d)(2).  Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline.  *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

**c.**    **Motions Regarding Expert Testimony.**  All motions to exclude the testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed in accordance with the dispositive-motion deadline stated above.

## 8.    TRIAL.

The trial docket setting, as established in the scheduling order and any amendments, is **February 27, 2024, at 9:00 a.m., in Wichita, Kansas**.  This case will be tried by the court sitting without a jury.  Trial is expected to take approximately 4-6 days.  The court will attempt to decide

any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

9.      **ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The status of settlement negotiations is as follows: The parties engaged in an unsuccessful mediation on February 8, 2023. The parties currently believe the prospects for settlement of this case are poor, and they do not believe that further court-ordered ADR would be helpful.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties.  Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

**IT IS SO ORDERED.**

Dated: September 15, 2023, at Topeka, Kansas.

/s/ Rachel E. Schwartz
Rachel E. Schwartz
United States Magistrate Judge