**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

MIGUEL COCA and                                     )
ALEJANDRO RANGEL-LOPEZ,                  )
                                                             )
                          Plaintiffs,               )              Case No. 6:22-cv-01274-EFM-RES
                                                             )
vs.                                                          )
                                                             )
CITY OF DODGE CITY, *et al.*                 )
                                                             )
                          Defendants.            )
_____ )

**BRIEF IN SUPPORT OF DEFENDANTS'**
**MOTION TO EXCLUDE EXPERT WITNESS MATT BARRETO**

The report of one of Plaintiffs' experts, Dr. Matt Barreto, is scientifically unreliable and should be excluded under Fed. R. Evid. 702.

The Plaintiffs have identified Dr. Barreto to offer the opinion that "ecological inference models point to a clear pattern of racially polarized voting that satisfies both *Gingles* II, minority cohesion, and *Gingles* III, white bloc voting." Ex. A, Barreto Expert Report ¶ 34. Dr. Barreto states that his opinions are based on "homogenous precinct analysis," *Id.* at ¶¶ 35–44, and "ecological inference analysis," *Id.* at ¶¶ 45–54. As is shown below, Dr. Barreto's scientific analysis is unreliable and should be excluded.

***Statement of the Specific Relief Sought***

Dr. Barreto's testimony should be excluded for the following reasons:

1.        Dr. Barreto's homogenous precinct analysis is unreliable because there are no homogenous precincts in Dodge City and his own report omits any evidence of homogenous precincts.

2.        Dr. Barreto's ecological inference analysis is unreliable because there is insufficient data to draw reliable conclusions and his own report omits any "confidence intervals" to demonstrate the scientific reliability of his conclusions.

3.      Dr. Barreto is biased to the extent that his opinions in this case must be seen as lacking in credibility.

## Nature of the Matter Before the Court

Plaintiffs challenge the at-large method of elections for City Commission in Dodge City under the Voting Rights Act and the Fourteenth Amendment. Plaintiffs bear the burden of proof to establish that the minority group is politically cohesive and that the majority is voting as a bloc against minority-preferred candidates, thereby preventing minority voters from electing their candidates of choice. *See Thornburg v. Gingles*, 478 U.S. 30, 33 (1986); Ex. A, Barreto Expert Report ¶ 12.

## Statement of Facts

Using the numbers identified in Dr. Barreto's expert report, as of the November 2022 general election, there were 11,743 registered voters in nine precincts in Dodge City. *Id.* at ¶ 18. Dr. Barreto does not identify the number of Latino voters in any precinct, but states that 4,037 voters reside in what he calls the "three majority-Latino precincts." *Id.* Dr. Barreto does not quantify the number of Latino voters in any of the three "majority-Latino" precincts and does not identify when Latinos became a majority of voters in any of those precincts. Dr. Barreto's report does not identify the number of Latino voters in any precinct in Dodge City in any year.

To determine the percentage of Latino voters by precinct in Dodge City Commission elections from 2014 to 2021, one needs to look to the expert witness report of defense expert Jonathan Katz. Ex. B, Katz Expert Report 4. Dr. Katz sets forth these numbers in his Table 1:

Table 1: Percentage of Latino Voters by Precinct in Dodge City Commission Elections 2014–2021

| Precinct | Latino Voters (%) | | | |
|---|---|---|---|---|
| | 2021 | 2019 | 2017 | 2014 |
| 1 | 39.1 | 38.9 | 30.1 | 20.4 |
| 2 | 54.5 | 49.0 | 44.5 | 39.7 |
| 3 | 59.9 | 49.4 | 45.4 | 53.7 |
| 4 | 31.4 | 29.8 | 27.8 | 31.8 |
| 5 | 18.7 | 17.0 | 15.6 | 12.2 |
| 6 | 12.6 | 12.2 | 11.3 | 4.1 |
| 7 | 8.8 | 9.4 | 9.5 | 1.9 |
| 8 | – | – | – | 6.5 |
| 9 | 20.8 | 8.4 | – | – |

The numbers show that Latino voters were a minority in each of Dodge City's precincts prior to the 2021 election. Latino voters for the first time accounted for 59.9% of voters in Precinct 3, and 54.5% of voters in Precinct 2 in 2021. There was not a third precinct in which Latino voters were a majority as of 2021. There has never been a precinct in which Latino voters have accounted for 60% or more of the electorate in any City Commission election. As of 2019, there were no majority Latino precincts. By 2021, there were two. By 2022, there were three.

Ford County administers elections for Dodge City Commission. Dodge City operates under a commission-manager form of government, including at-large elections of Commissioners, as authorized by Kan. Stat. Ann. §§ 21-1039 and 21-1040. Pretrial Order 3, ¶ 15, ECF No. 140. The Commission is made up of five Dodge City residents. *Id.* at 3, ¶ 16. Every election cycle, three seats on the Commission are up for election. Commissioners serve either four- or two-year terms based on the number of votes that the top three finishers in an election receive. *Id.* at 3, ¶ 17. The lowest vote-getter serves a two-year term, while the top two finishers serve four-year terms. *Id.* As required by Kansas law, Commission elections are conducted by secret ballot. *Id.* at 3, ¶ 18.

Pursuant to Kan. Stat. Ann. § 25-2107, Dodge City elects its Commissioners in November of odd-numbered years. Pretrial Order 3, ¶ 19. Following a 2015 change to Kansas state law, Dodge City changed the Commission election schedule from April of even-numbered years to November of odd-numbered years. *Id.* at 3, ¶ 20. The first election under the new schedule occurred in 2017. *Id.* The elections for the Commission are nonpartisan. *Id.* at 3, ¶ 21. There are primary elections for the Commission when ten or more candidates run for office. *Id.* at 3, ¶ 22. Voters do not identify their most preferred candidate on the ballot. Rather, each selects up to three candidates. Dr. Barreto does not rely on any exit polling or public opinion political polling. Ex. C, Barreto Dep. 20:16–21:3. Commissioner Joseph Nuci, who was elected in 2019 and re-elected in 2021, and continues

to serve as a Commissioner, identifies as Latino. Pretrial Order 4, ¶ 25. In 2021, the estimated total City-wide

population was 27,690. Ex. A, Barreto Expert Report ¶ 20.

Dr. Barreto is a professor of Political Science and Chicana/o Studies at the University of California, Los

Angeles ("UCLA"). Ex. D, Barreto Curriculum Vitae. He is a Co-Founder of the UCLA Voting Rights Project

(the "VRP"). *Id.* The VRP has "a research and teaching mission" that involves both UCLA undergraduate and

graduate students. Ex. C, Barreto Dep. 112:4–12. The VRP also participates in litigation. *Id.* at 112:20–23.

Counsel from the VRP represents Plaintiffs. *Id.* at 7:19–8:7; 168:9–11. This lawsuit stems from a student project

turned in for a grade where one of the UCLA students in Dr. Barreto's teaching clinic had researched Dodge

City and brought this potential case to Dr. Barreto's attention. *Id.* at 9:1–10:11. His colleague, Chad Dunn, a co-

founder with Dr. Barreto of the VRP, serves as counsel for the Plaintiffs. *Id.* at 7:20–25; 8:1–7; 168:6–12. The

VRP seeks an award of attorneys' fees. Pretrial Order 34.

Plaintiffs' Complaint was filed on December 15, 2022. ECF No. 1. Dr. Barreto was engaged as an

expert on behalf of the Plaintiffs by four entities, including the UCLA Voting Rights Project, on March 30, 2023.

Ex. J, Barreto Expert Witness Engagement Letter.

### *Argument*

Rule 702 imposes a special gatekeeping obligation on this Court to ensure that expert testimony is not

admitted at trial unless it is both relevant and reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141

(1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). The issue here is reliability. Three

of the Daubert factors are at issue. These are (a) whether the testimony is based on sufficient facts or data; (b)

whether the testimony is the product of reliable principles and methods; and (c) whether the expert has reliably

applied the principles and methods to the facts of the case. *See Daubert*, 509 U.S. at 590–91. Defendants do not

challenge whether Dr. Barreto is qualified by knowledge, skill, experience, training, or education to render an

opinion. Upon a motion to exclude an expert's testimony, the party submitting the expert testimony has the

burden to show by a preponderance of the evidence that the testimony is admissible. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001).

In the Federal Judicial Center's Reference Manual on Scientific Evidence, Third Edition, the authors set forth eight guidelines for experts to follow in presenting database information and analytical procedures. Ex. E, Committee on the Development of the Third Edition of the Reference Manuel on Scientific Evidence, Federal Judicial Center, *Reference Manual on Scientific Evidence*, 331–32 (3d ed. 2011). These include identifying any missing data (Guideline 5), providing a good faith effort to provide an estimate of a sampling error (Guideline 7), and reporting the set of procedures that was used to minimize sampling errors (Guideline 8). Dr. Barreto's Report is conspicuous for its missing data and lack of estimates of sampling error (confidence intervals) and its lack of evidence of procedures used to minimize sampling errors.

A. **Dr. Barreto's homogenous precinct analysis is scientifically unreliable because there are no homogenous precincts in Dodge City and Barreto's own report omits any evidence to demonstrate homogenous precincts.**

The concept behind homogenous precinct analysis is that one might infer the conduct of individual voters in a precinct based on the aggregate votes of the precinct if nearly all of the voters in the precinct are of the same race or ethnicity. For example, if 90% of the voters in Precinct A are black and 70% of the precinct's voters voted for a specific candidate, one might infer that the preferred candidate of black voters in that precinct was that specific candidate. "Homogeneous precinct analysis ("HPA"), also known as extreme case analysis, examines voting behavior in precincts where the population is close to being racially or ethnically homogenous, typically where upwards of 90 percent of the population is of the same race or ethnicity." *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1118 (E.D. Cal. 2018); *United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 597 n.2 (E.D. Mich. 2019). When "none of the individual precincts have a VAP [Voting Age Population] that is more than 90%" of an ethnicity, the "method cannot be applied." *City of Eastpointe*, 378 F. Supp. 3d at 597 n.2. In other words, one cannot reliably determine whether there is racially polarized voting based on comparing the election results of two separate precincts unless those precincts are homogenous.

5

Dr. Barreto states in his report that homogenous precinct analysis is the "most obvious and perhaps most conclusive" of the analyses he performed related to Dodge City. Ex. A, Barreto Expert Report ¶ 34. This is telling because his report is missing key data—there is no data to establish that there are homogenous precincts in Dodge City. Nowhere in his report does Dr. Barreto identify the VAP on a precinct-by-precinct basis. He merely states that, as of November of 2022, there are three precincts with a "majority" of Latino voters. *Id.* at ¶ 18. He doesn't quantify those majorities. Nor does he provide any history of when those precincts became populated by a majority of Latino voters. He doesn't quantify the number of whites in any precinct.

Dr. Barreto's homogenous precinct analysis fails under *Daubert* and Rule 702 because (a) the testimony is based on insufficient data, (b) the testimony is not the product of reliable principles and methods, and (c) the expert has not reliably applied the principles and methods to the facts of this case. Accordingly, the inquiry should stop there, and Dr. Barreto's homogenous precinct analysis should be excluded.

Digging deeper, the actual numbers contradict the purported foundation for Dr. Barreto's opinions. No voting precinct for a City Commission election comes close to reaching the 90% threshold for a homogenous precinct. Only two precincts in the 2021 City Commission election even had a majority of Latino voters. Ex. B, Katz Expert Report 4. Prior to the 2021 City Commission election, no precinct had a majority of Latino voters. *Id.* Dr. Barreto identifies Precinct 3 as the precinct with the highest number of Latino voters, Ex. A, Barreto Expert Report ¶ 36, but he does not identify what those numbers are. In fact, that precinct in 2021 was 59.9% Latino. Ex. B, Katz Expert Report 4. Dr. Barreto identifies Precincts 5 and 6 as having the lowest Latino vote shares. Ex. A, Barreto Expert Report ¶ 36. Had he identified the missing data, the numbers would have shown that those precincts had 18.7% Latino voters and 12.6% Latino voters respectively in 2021. Ex. B, Katz Expert Report 4. Dr. Barreto also claims Precinct 2 is "majority-Latino;" the missing data shows that majority was slim in 2021, with 54.5% Latino voters. *Id.*; Ex. A, Barreto Expert Report ¶ 37 and Table 5.

Dr. Barreto cites no cases or scientific treatises establishing the scientific validity of HPA in the absence of homogenous precincts. This is not the first time that Dr. Barreto has failed to "show his work." In *League of United Latin American Citizens v. Abbott,* 601 F. Supp. 3d 147, 168 (W.D. Tex., 2022), the District Court in Texas, dealing with Dr. Barreto's conclusions in a redistricting case, stated, "But Dr. Barreto did not show the work he used to infer . . . [his conclusions]." The Court went on to state that "[t]he Court should not engage in *sua sponte* econometric modeling, and Dr. Barreto's bare conclusion is inadequate, his impressive credentials notwithstanding." *Id.*

No valid conclusions can be drawn regarding bloc voting or the preferred candidate of whites or Latinos from the one election in 2021 in which there were two precincts with Latino majorities. One can conclude, however, that three candidates were elected and one of those three identifies as Latino. One can draw no conclusions about bloc voting or racially preferred candidates in elections before 2021 because there were no Latino majorities in even a single precinct, much less any homogenous precincts.

B.      **Dr. Barreto's ecological inference analysis is unreliable because there is insufficient data to draw reliable conclusions, and his own report omits any "confidence intervals" to demonstrate the scientific reliability of his conclusions.**

Dr. Barreto has written, "Individual-level vote choice, which in large statewide elections may be captured through exit polls, is often unknown in local elections. Given the ubiquity of the secret ballot format, specific information about which candidate(s) each individual voter actually cast a ballot for is not publicly available. The only information available about an individual voter's behavior in a given election is whether or not they voted."  Ex. F, Barreto, Matthew, et al., *A Novel Method for Showing Racially Polarized Voting: Bayesian Improved Surname Geocoding*, 46 N.Y.U. Rev. of L. & Soc. Change 1, 18–19 (2022). Ecological inference is the process of using aggregate ("ecological") data to draw conclusions about individual-level behavior when no individual-level data is available. Ex. G, Gary King, *A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data*, Preface (1997).

The validity of ecological inference in the social sciences is a matter of debate. In an article written by Dr. Barreto and several others, the authors write that "Ecological inference has come under fire for being unreliable, especially in the fields of biological sciences, ecology, epidemiology, public health and many social sciences." Ex. H, Collingwood, Loren, et al., *eiCompare: Comparing Ecological Inference Estimates across EI and EI: RxC*, 8 The R J. 2, 92 (2016), https://journal.r-project.org/archive/2016/RJ-2016-035/RJ-2016-035.pdf. The authors then go on to write, "However, within the narrow subfield of racial voting patterns in American elections ecological inference is regularly used." *Id.* Notably, the authors did not say that the use of ecological inference is reliable in American elections, only that it is "regularly used."

The use of ecological inference in Voting Rights cases can be particularly complicated when there are few voters, few precincts, incomplete data about racial turnout, and when, as here, voters are not voting for one preferred candidate, but three. In Dr. Barreto's report, he acknowledges, "Thus, three candidates are being picked by voters, which can make it more difficult to discern patterns and candidates of choice." Ex. A, Barreto Expert Report ¶ 43.

Dr. Barreto's report speaks to his conclusions about prior City Commission elections at paragraphs 48–54. In political science, elections for the same political office (City Commission here) are referred to as endogenous elections. Dr. Barreto also looks at statewide elections in Kansas. *Id.* at ¶ 42, Table 5, ¶ 52, and App. A. These are called "exogenous elections." Dr. Barreto does not base his conclusions—nor can he—on these exogenous elections. He merely states that these elections "can tell us something important about voting trends and patterns in the jurisdictions we are studying." *Id.* at ¶ 44. Significantly, the exogenous elections do not and cannot form the basis for his opinions related to the City Commission elections in Dodge City.

1.     <u>Dr. Barreto fails to show his work in that he does not identify a confidence interval (which may otherwise be referred to as a "margin of error.")</u>

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 594, the Supreme Court stated that "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of

error." Dr. Barreto testified that he provided no confidence interval or margin of error in his report, and his report bears this out. Ex. C, Barreto Dep. 30:19; 31:18. As described in the Reference Manual on Scientific Evidence, a confidence interval is "An estimate, expressed as a range, for a parameter. For estimates such as averages or rates computed from large samples, a 95% confidence interval is the range from about two standard errors below to two standard errors above the estimate. Intervals obtained this way cover the true value about 95% of the time." Ex. E, *Reference Manual on Scientific Evidence*, *supra*, at 284–85. The description of how to perform such an analysis is shown in the Manual at page 342. The Reference Manual states that "Reporting the p-value or a confidence interval should be encouraged because it conveys useful information to the court, whether or not a null hypothesis is rejected." *Id.* at 321.

Courts, including the Tenth Circuit, have taken seriously the need for confidence intervals. In *Ho v. Michelin North America, Inc.,* 520 Fed. App'x 658, 666 (10th Cir. 2013), the Tenth Circuit upheld an order excluding a highly credentialed expert when, among other things, the test he employed "lacked a measured error rate." In *United States v. Shea*, 957 F. Supp. 331, 343 n.40 (D.N.H. 1997), the court described that confidence intervals "qualify a conclusion in an effort to account for the effect of random error by describing a range of possible results that is expected to contain the true result a given percentage of the time." The creator of ecological inference himself was aware of the risks of fallacies associated with such data and recognized the importance of the reporting of confidence intervals. Ecological inference is a theory created by Dr. Gary King and utilized here by Dr. Barreto. Dr. King's role is recognized in an article that Dr. Barreto co-authored, stating, "Ecological inference is King's (1997) solution to the ecological fallacy problem inherent in aggregate data, and since the late 1990s has been the benchmark method courts use in evaluating racial polarization in voting rights lawsuits . . . ." Ex. H, Collingwood, *supra*, at 93. Dr. King writes that "any method should include accurate assessments of the uncertainty of all ecological inferences drawn." Ex. G, King, *supra*, at 73. Despite Dr. King's direction, Dr. Barreto fails to show his work. This is consistent with the National Research Council's 2009 report on

forensic science, which stated that "[a]ll results for every forensic science method [should]…indicate the uncertainty in the measurements that are made." Ex. K, Nat'l Research Council, Strengthening Forensic Science in the United States: A Path Forward, at 184 (2009).

Dr. Barreto has failed to show any accurate assessments of the uncertainty of the ecological inferences he has drawn. Dr. Barreto's failure to show his work is not unique to this case. In *League of United Latin American Citizens*, the court stated, "Dr. Barreto claimed that he had generated 'quite different' results . . . , but Dr. Barreto never explained his own results." 601 F. Supp. 3d at 165, 168 ("But Dr. Barreto did not show the work he used . . . and [his] bare conclusion is inadequate.").

### 2. There is not enough relevant data to lead to conclusions using ecological inference analysis of endogenous elections in Dodge City.

Based on the small size of Dodge City, limited number of voters, limited number of precincts, low voter turnout, and the multiple candidates being selected on each ballot, there are few data points from which conclusions may be drawn about endogenous elections in Dodge City. There has been only one City Commission election in which Latinos have held even a simple majority of voters in any precinct. One cannot possibly draw a conclusion that white voters have voted as a bloc to deny the racially preferred candidates of Latinos based on a single election. In *Cisneros v. Pasadena Independent School District*, No. 4:12-CV-2579, 2014 WL 1668500 (S.D. Tex. Apr. 25, 2014), Dr. Barreto testified as the *Gingles II* and *Gingles III* expert in an unsuccessful Voting Rights Act case challenging at-large elections. In addressing two elections with insufficient evidence of racially polarized voting, Dr. Barreto warned against drawing broad conclusions from only two elections as they "are not frequent or numeric enough to draw conclusions about the current state of the environment in Pasadena." *Id.* at *12.

In *Cisneros*, Dr. Barreto testified that "'the very small number of voting precincts makes it more difficult to analyze voting patterns and make determinations of racial bloc voting. The limited polling places provide few data points for the statistical analyses.'" *Id.* (internal citation omitted). Interestingly, the Pasadena school district

had 58 precincts; *id.* at \*16; Dodge City has nine. In dealing with such a small sample size in Pasadena, Dr. Barreto testified that "'if you only have a group of 10 people, and you miscalculate two of them, that's a 20 percent error rate.'" *Id.* at \*12. By contrast with Dodge City, however, the Pasadena Independent School District is huge. The Pasadena school district had a total population of 240,506 and a total voting age population of 164,845—more than eight times Dodge City's 2021 total population 27,690 and fourteen times the 11,743 VAP in Dodge City. *Id.*

Dr. Barreto cannot draw conclusions from Dodge City elections prior to 2021 because no election prior to 2021 even had a Latino majority in a single precinct. Ex. B, Katz Report 4, Table 1. Clearly, the demographics—including eligible voters—are changing in Dodge City, and it is likely that there will be three precincts with a majority of Latino voters for the November of 2023 City Commission election.[1]

Dr. Barreto described the "ecological inference problem" in his deposition: "The ecological inference problem, sort of just generally, is something that was discussed by sociology scholar named Goodman in the 1950's that attempting to infer from ecological units can be problematic, can lead you to wrong conclusions unless you use the proper regression techniques and statistical analysis." Ex. C, Barreto Dep. 47:12–19. A political scientist cited by Dr. Barreto at footnote eleven of his report, Dr. James Greiner, wrote that, "Ecological regression can and regularly does produce impossible estimates, for example, that –400% of Hispanic voters in a particular jurisdiction supported a particular candidate." Ex. I, D. James Greiner, *Ecological Inference in Voting Rights Act Disputes: Where Are We Now, and Where Do We Want to Be?*, 47 Jurimetrics J. 115, 117 (2007).

In sum, the limited data in endogenous elections in Dodge City is insufficient to draw conclusions about racially polarized voting and bloc voting.

---

[1] There will be limited data coming out of that election as there is only one candidate running who identifies as Latino.

**3.**      **Dr. Barreto's conclusions about exogenous partisan statewide elections provide no reliable information about endogenous City Commission elections in Dodge City.**

While Dr. Barreto focuses primarily on endogenous elections in the ecological inference section of his report, he does draw on statewide elections to provide purported further support for his opinions. Stating (inaccurately) that there are "white" precincts and "Latino" precincts in Dodge City for past statewide elections, he generally draws the conclusion that there is racial polarization in that white voters tend to vote Republican and Latino voters tend to vote Democrat. As noted above, these conclusions are not reliable, as there are not homogenous precincts, not many voters, and not many precincts. Moreover, as pointed out in Dr. Katz's report, a majority of Latinos in Dodge City are registered as Republicans, which casts into doubt the validity of Dr. Barreto's conclusions. Ex. B, Katz Expert Report 7.

The exogenous statewide elections cited by Dr. Barreto differ from local nonpartisan elections dealing with local issues and courts recognize "the limited probative value" of exogenous elections. *Fairley v. Hattiesburg Miss.*, 662 Fed. App'x 291, 297 (5th Cir. 2016). Moreover, in none of the statewide elections identified by Dr. Barreto, does he identify any candidates who identify as Latino. In the exogenous statewide elections cited by Dr. Barreto, voters are casting a ballot for one candidate per office, whereas in City Commission elections, voters are casting a ballot for three candidates. Despite few Latino candidates and no majority Latino precincts prior to 2021, current commissioner Joe Nuci, who identifies as Latino, has twice been elected in City Commission elections. One purpose of requiring reliable statistical analysis is to avoid prohibited racial assumptions that all voters of the same race or ethnicity "think alike, share the same political interests, and will prefer the same candidates at the polls." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006).

In a recent case, a federal court did not consider Dr. Barreto's testimony on exogenous statewide elections to have benefit—even in partisan Congressional redistricting. The Court stated:

> We give little weight to Dr. Barreto's ultimate conclusions. He maintained . . .
> that the only relevant factor in determining whether Black and Hispanic citizens
> vote as a cohesive group is how they vote in general elections. Although that
> may be a defensible position in political science, whether general elections are
> sufficient to satisfy the legal criterion of voter cohesion is outside of Dr.
> Barreto's state field of expertise. . . . [D]efining voter cohesion is ultimately a
> legal question reserved to the Court.

*League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d at 164–65. Here, the exogenous races are even

less useful. In Congressional redistricting, one is at least considering partisan races. City Commission races are

nonpartisan.

In truth, Dr. Barreto's own report establishes that there is no scientific conclusion that he can reach based

on his analysis of exogenous elections. He merely states that these elections "can tell us something important

about voting trends and patterns in the jurisdictions we are studying." Ex. A, Barreto Expert Report ¶ 44. A mere

observation is not a scientifically validated result, and it should be excluded here.

**4.      Dr. Barreto is biased to the extent that his opinions in this case must be seen as lacking in credibility.**

This case stems from a UCLA class project under the supervision of Dr. Barreto. The UCLA Voting

Rights Project serves as the attorney advocates for the Plaintiffs and seeks attorney fees if Plaintiffs are

successful. Dr. Barreto is an advocate for the cause. Typically, an expert witness's bias goes to the weight.

However, Judge Crow has recognized:

> On the other hand, there is a line of cases which have held that "'where an expert
> becomes an advocate for a cause, he therefore departs from the ranks of an objective
> expert witness, and any resulting testimony would be unfairly prejudicial and
> misleading.'" *Conde v. Velsicol Chem[.] Corp.*, 804 F. Supp. 972, 984 (S.D. Ohio
> 1992) (quoting *Viterbo v. Dow Chem[.] Co.*, 646 F. Supp. 1420, 1425–26 (E.D. Tex.
> 1986) (citing *Johnston v. United States*, 597 F. Supp. 374 (D. Kan. 1984)), *aff'd*, 826
> F.2d 420 (5th Cir. 1987)), *aff'd*, 24 F.2d 809 (6th Cir. 1994); *see also In re Air Crash
> at Detroit Airport*, 737 F. Supp. 427, 430 (E.D. Mich. 1989), *aff'd*, 917 F.2d 24 (6th
> Cir. 1990) (Table). In these cases, the critical facts were that the experts had
> affirmatively sought employment from the plaintiffs and that the experts had
> preconceived notions before the litigation commenced.

*United States v. Kelley*, 6 F. Supp. 2d 1168, 1183 (D. Kan. 1998).

Defendants submit that Dr. Barreto's bias here goes to the unreliability of the scientific analysis. Dr. Barreto's bias manifests itself in his notable failure to include essential information in his report, including the identification of homogenous precincts and the confidence intervals for his analysis. Although the UCLA VRP and others filed this lawsuit on December 15, 2022, Dr. Barreto was not retained as an expert until March 30, 2023. This suggests that the VRP drew its conclusion first, and Dr. Barreto's conclusions are improperly results-driven. *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Prac. & Prod. Liab. Litig.*, 145 F. Supp. 3d 573, 587 (D.S.C. 2015). Dr. Barreto's bias in this case is such that he should be excluded as a witness.

### Conclusion

For the foregoing reasons, Dr. Barreto should be excluded from testifying under Rule 702.

Respectfully submitted,

**FOULSTON SIEFKIN LLP**

By: */s/ Anthony F. Rupp*
    Anthony F. Rupp, KS #11590
    Tara Eberline, KS #22576
    Sarah E. Stula, KS #27156
    7500 College Boulevard, Suite 1400
    Overland Park, Kansas  66210
    T (913) 498-2100 | F (913) 498-2101
    trupp@foulston.com
    teberline@foulston.com
    sstula@foulston.com

    - and-

    Clayton J. Kaiser, KS #24066
    FOULSTON SIEFKIN, LLP
    1551 North Waterfront Parkway, Suite 100
    Wichita, Kansas 67206
    T (316) 267-6371 | F (316) 267-6345
    ckaiser@foulston.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that on the 23rd day of September 2023, the foregoing was electronically filed with the Clerk of the Court by using the Court's e-Filing system which will send notification of electronic filing to counsel for all parties of record, and a true and correct copy was served by electronic mail upon:

Sharon Brett, KS #28696
**AMERICAN CIVIL LIBERTIES UNION OF KANSAS**
sbrett@aclukansas.org

Chad W. Dunn *(Pro Hac Vice)*
Sonni Waknin *(Pro Hac Vice)*
Bernadette Reyes *(Pro Hac Vice)*
**UCLA VOTING RIGHTS PROJECT**
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org

Jonathan Topaz *(Pro Hac Vice)*
Sophia Lin Lakin *(Pro Hac Vice)*
Luis M. R. Roman *(Pro Hac Vice)*
**AMERICAN CIVIL LIBERTIES UNION, INC.**
jtopaz@aclu.org
slakin@aclu.org
lroman@aclu.org

Abena Mainoo *(Pro Hac Vice)*
Jonathan I. Blackman *(Pro Hac Vice)*
JD Colavecchio *(Pro Hac Vice)*
Mijin Kang *(Pro Hac Vice)*
Elizabeth R. Baggott *(Pro Hac Vice)*
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
amainoo@cgsh.com
jblackman@cgsh.com
jdcolavecchio@cgsh.com
mkang@cgsh.com
ebaggott@cgsh.com

Scott Fuqua *(Pro Hac Vice)*
**FUQUA LAW & POLICY, P.C.**
scott@fuqualawpolicy.com

*ATTORNEYS FOR PLAINTIFFS*

*/s/ Anthony F. Rupp*