EXHIBIT A

Expert Report Submitted on Behalf of Plaintiffs

in Coca, et al. v. City of Dodge City, et al.


Matt A. Barreto, Ph.D.

University of California, Los Angeles

May 19, 2023

1. Pursuant to 28 U.S.C. section 1746, I, Matt Barreto, declare as follows:

2. My name is Dr. Matt Barreto, and I am currently Professor of Political Science and Chicana/o Studies at the University of California, Los Angeles. I was appointed Full Professor with tenure at UCLA in 2015. Prior to that I was a tenured professor of Political Science at the University of Washington from 2005 to 2014. I earned my Ph.D. in Political Science at the University of California, Irvine. I was raised in Topeka, Kansas and graduated from Washburn Rural High School. Kansas was my home residence from 1978 until 1998.

3. At UCLA I am the faculty director of the Voting Rights Project in the Luskin School of Public Affairs and I teach a year-long course on the Voting Rights Act of 1965 (VRA), focusing specifically on social science statistical analysis, demographics and voting patterns, and mapping analysis that are relevant in political science expert reports in VRA cases. I have written expert reports and been qualified as an expert witness more than four dozen times in federal and state voting rights and civil rights cases, including in the state of Kansas. I have published peer-reviewed social science articles specifically about minority voting patterns and racially polarized voting, and have co-authored a software package (eiCompare) specifically for use in understanding racial voting patterns in VRA cases. I have been retained as an expert consultant by cities and counties across the country to advise them on racial voting patterns as they relate to VRA compliance during redistricting. As an expert witness in VRA lawsuits, I have testified dozens of times and my testimony has been relied on by courts to find in favor of both plaintiffs and defendants.

4. I have published books and articles specifically about the intersection of politics, ideology, and racially polarized voting. My 2013 book, *Change They Can't Believe In*, was published by Princeton University Press and was about the inherent connectedness between politics and racial attitudes in America today. The book won the American Political Science Association award for best book on the topic of racial and ethnic politics.

5. I have submitted dozens of expert reports in federal and state courts, and numerous courts have relied on my testimony as credible. In 2018, I submitted an expert report and testified in the United States District Court for the District of Kansas in *Fish v. Kobach*. The court found my methodology reliable and that I applied it reliably, and the court relied on my testimony in finding in favor of *Fish* plaintiffs.

6. My full professional qualifications and activities are set forth in my curriculum vitae. A true and correct copy has been attached hereto as Appendix F. I am being compensated by Plaintiffs at a rate of $400 per hour for my report and $500 an hour for any oral testimony in this case. My compensation is strictly for work performed and is not dependent on my opinions or conclusions.

7. I was retained in this case to assess voting patterns in Dodge City, Kansas to determine if Hispanic/Latino[1] and white voters exhibit racially polarized voting. I also reviewed illustrative

---

[1] I use the terms "Latino" and "Hispanic" interchangeably throughout this report to refer to individuals who self-identify as Latino or Hispanic. Additionally, the terms "Latino" and "Hispanic" mean persons of Hispanic Origin as defined by the United States Census Bureau and U.S. Office of Management and Budget (OMB).

maps offered by Plaintiffs to assess their effectiveness as Latino opportunity districts. Mr. Michael Rios assisted me with data collection and analysis.

8. I also reviewed population demographics for Dodge City, Kansas from the 2010 and 2020 decennial Census and the 2021 American Community Survey (ACS), for purposes of understanding population characteristics by racial/ethnic group.

9. We obtained data from the State of Kansas and Ford County, Kansas for statewide election results by county and obtained the registered voter file with election vote history from the Kansas Secretary of State and from the Ford County Clerk. We obtained race and ethnicity data for voting precincts from the U.S. Census and from the U.S. Census Surname list, using both sources in a process called Bayesian Improved Surname Geocoding (BISG) to identify the racial/ethnic composition of each voting precinct. While Ford County contains many election results disaggregated by voting precinct on their website,[2] for some years the County did not upload such data to their website. We downloaded precinct-level election results from the Ford County website to the extent those results were available.[3] For data which Ford County does not make available, Plaintiffs' attorneys subpoenaed additional election data from Ford County. In some instances, Ford County indicated they could not find precinct-level election data for some years. Race and population data were obtained from the U.S. Census 2020 PL-94 Redistricting files, U.S. Census and ACS datasets.

## I.      Summary Conclusions

10. Dodge City racial and ethnic population demographics have changed significantly over the last two decades. The population of non-Hispanic whites has declined over this time, from constituting 51.5% of the City's population in 2000 to 29.3% in 2020. In contrast, the Latino population has increased from 42.9% in 2000 to 63.9% in 2020, driving the entire population growth of Dodge City over this period.

11. Despite Latinos constituting a majority of the total population in the city, they are a minority of eligible voters, and due to historic discrimination and inequality, they exhibit lower voter registration and turnout rates so that whites are still a clear majority of voters citywide.

12. In 24 elections analyzed across nine election cycles from 2014 to 2022, a strong and consistent pattern of racially polarized voting is found in Dodge City, Kansas. My original analysis has been confirmed by the Harvard Law School Election Law Clinic, which reports statistically significant racially polarized voting in Ford County for the 2016–2020 elections it analyzed.[4] My analysis was conducted across more than two dozen elections for local, state, and federal office, using court-approved ecological inference techniques and relying on Census Citizen Voting Age Population (CVAP) data and BISG race estimates of vote history. The result was

---

[2]      "Election Office." Ford County. http://www.fordcounty.net/227/Election-Office.

[3]      "Ford County Historical Election Results for website." Ford County. http://www.fordcounty.net/DocumentCenter/View/22724/Ford-County-Historical-Election-Results-for-website.

[4]      Harvard Law School Election Law Clinic. "Ecological inference estimates – Kansas 2020." RPV Near Me. https://www.rpvnearme.org/analyses/KS_2020.html.

more than 140 ecological inference models. In these elections, Latino voters are cohesive in their support for Latino-preferred candidates. In contrast, the analysis finds that non-Hispanic whites consistently bloc vote against Latino candidates of choice in Dodge City. Thus, the second *Gingles*[5] precondition requiring that the minority group vote cohesively, and the third *Gingles* precondition requiring that whites vote as a bloc to typically defeat the minority group's candidate of choice, are both easily met in Dodge City.

13. The at-large voting system in place in Dodge City dilutes the Latino vote by providing for citywide elections in which the majority of voters are white and can overwhelm Latino voting preferences. Dodge City's electoral system further dilutes the Latino vote by providing for elections in off-cycle, low-turnout elections, when there is an even greater disparity in the relative turnout rates of whites and Latinos.


**II.     Dodge City Population Growth Characteristics**

14. To situate the discussion about voting patterns and minority representation, I begin with a broader view of Dodge City, Kansas and how its population has changed and shifted over the past two decades. Overall, Dodge City's total population has increased by 2,636 since 2000. However, these gains were uneven by geography and race/ethnicity. Specifically, the white population experienced a decline of 4,834 in population from 2000 to 2020, dropping their percentage of the city's population from 51.5% in 2000 to just 29.3% today. In contrast, the Latino population grew by over 60% in those 20 years, growing from 10,784 to 17,759. These gains were mostly seen in the central and southeast corridors of the city, which contain a large Latino community.

15. Dodge City's demographics continue to change, and the city continues to become increasingly non-white. However, the City Commission still regularly elects 5 white-preferred candidates of choice. Today, there are more than twice as many Latinos as whites in Dodge City, and there are large Hispanic communities settled and established in various parts of the city. According to the 2021 ACS, the Hispanic population has grown by nearly an additional percentage point in one year and is now 64.6% as of 2021, up from 63.9% in 2020.

16. Although Latinos have a much larger population than whites in terms of total population— 17,759 versus 8,129—the Latino population is much younger on average and has many members of its population under the age of 18, while the white population is comparatively older. Data from the ACS 5-year 2021 dataset reveal the median age of Latinos in Dodge City is 24, while the median age for whites is 44. That means that exactly half of all Latinos in Dodge City are younger than 24 years, and a substantial portion are under the age of 18 and not eligible to vote. 2021 ACS Census data show that in Dodge City, 80% of the non-Hispanic, white population is 18 and older. By contrast, only 62% of Latinos in Dodge City are 18 and older, with 38% under age 18. This age dynamic limits Latinos' ability to influence citywide at-large elections, as they make up a minority of eligible voters.

---

[5]     *See Thornburg v. Gingles*, 478 U.S. 30 (1986).

**Table 1: Dodge City, KS Population Change 2000 to 2020 by race/ethnicity**

|  | 2000 | 2010 | 2020 | 00-20 Change | 00-20 % Change | 10-20 Change | 10-20 % Change |
|---|---|---|---|---|---|---|---|
| Dodge City Total | 25,152 | 27,340 | 27,788 | 2,636 | 10.4% | 448 | 1.6% |
| White, non-Hispanic | 12,963 (51.5%) | 10,173 (37.2%) | 8,129 (29.3%) | -4,834 | -37.2% | -2,044 | -20.1% |
| Hispanic | 10,784 (42.9%) | 15,730 (57.5%) | 17,759 (63.9%) | 6,975 | 64.6% | 2,029 | 12.9% |
| Black | 429 (1.7%) | 566 (2.1%) | 857 (3.1%) | 428 | 99.7% | 291 | 51.4% |
| Asian | 584 (2.3%) | 416 (1.5%) | 361 (1.3%) | -223 | -38.1% | -55 | -15.2% |
| All other/ multi-racial | 392 (1.6%) | 455 (1.7%) | 682 (2.5%) | 290 | 74% | 227 | 49.9% |

**Table 2: Dodge City, KS Voting Age Population Change 2000 to 2020 by race/ethnicity**

|  | 2000 | 2010 | 2020 | 00-20 Change | 00-20 % Change | 10-20 Change | 10-20 % Change |
|---|---|---|---|---|---|---|---|
| Dodge City Total | 17,299 | 18,658 | 18,990 | 1,691 | 9.8% | 332 | 1.8% |
| White, non-Hispanic | 9,934 (57.4%) | 8,333 (44.7%) | 6,662 (35.1%) | -3,272 | -32.9% | -1,671 | -20.1% |
| Hispanic | 6,488 (37.5%) | 9,330 (50.0%) | 10,996 (57.9%) | 4,508 | 69.4% | 1,666 | 17.9% |
| Black | 271 (1.6%) | 433 (2.3%) | 650 (3.4%) | 379 | 140% | 217 | 50.1% |
| Asian | 400 (2.3%) | 313 (1.7%) | 288 (1.5%) | -112 | -28.0% | -25 | -8.0% |
| All other/ multi-racial | 206 (1.2%) | 249 (1.3%) | 394 (2.1%) | 188 | 91.3% | 145 | 58.2% |

17. ACS 2021 5-year estimates show that even though the Latino population is a clear majority in terms of total population, they make up a minority of eligible voters at 46.1% CVAP citywide. This relatively lower CVAP percentage is due to the young age of Latinos in the city, as well as

the fact that the Latino population has a disproportionate number of noncitizens. Whites comprise 47.2% of the city's eligible voter population.[6]

18. According to the November 2022 Statement of Votes Cast from the Ford County website,[7] there were a total of 11,743 registered voters across Dodge City precincts 1–9. 4,037 registered voters, or 34% of all registered voters, reside in the three majority-Latino precincts. 7,706 registered voters, or 66% of all registered voters, reside in the city's majority-white precincts. The official voter history turnout statistics from the Kansas Secretary of State reveal that Dodge City had 4,009 total votes cast[8] in the November 2022 general election—an estimated 1,183 Latino voters, 2,570 white voters, and 256 all others. Thus, Latinos accounted for 30% of all voters in Dodge City while whites accounted for 64%—indicating the large advantage in voting strength white residents have in citywide elections.

19. While Latino *eligible voters* do not constitute a majority of the city as a whole, when dividing the city into five equal size population districts, Latinos can easily become a majority of eligible voters—in part because of how geographically compact Latinos are in Dodge City. According to data from the 2020 Decennial Census and 2021 ACS, the Latino population is large enough in size and geographically compact so as to meet the *Gingles* I standard, and *at least* one performing district can be drawn that is majority Hispanic citizen adult (*see* Figure 1).

20. For example, with a total citywide population of 27,690 (2021 ACS), if Dodge City creates five single-member districts, each district would contain an average of 5,261–5,815 people. Looking in central and southeast Dodge City, Census Block Group 1,[9] Tract 9618.01 is 96.1% Latino. Numerous other census block groups are directly adjacent that could theoretically be combined to create a district that is majority Latino.

---

[6]    As per the 2021 ACS 5-year data reported by the Census Bureau (data.census.gov), Dodge City has a total CVAP of 13,871, a Latino CVAP of 6,398, and a white, non-Hispanic CVAP of 6,552. All other racial groups account for 921 CVAP.

[7]    Ford County. "Statement of Votes Cast: General Election, Ford, KS." November 8, 2022. http://www.fordcounty.net/DocumentCenter/View/22659/Official-Results-11-8-22-Election.

[8]    Ford County website totals 3,992, 17 votes lower than the Kansas Secretary of State total of 4,009 votes cast. This small disparity could be due to ballots improperly cast that were not counted as valid votes by Ford County in their official statistics.

[9]    Most likely, a demographer will draw districts on a lower level of geography such as census blocks. However, for illustrative purposes we tallied population by larger block groups from Social Explorer using 2021 ACS 5-year data.

**Table 3: Latino Population by Census Block Groups in Dodge City, Kansas**

| Block Group | Total | Latino | % Latino |
|---|---|---|---|
| Block Group 1, Track 9618.01 | 1,129 | 1,085 | 96.1% |
| Block Group 1, Track 9621.01 | 1,571 | 1,355 | 86.9% |
| Block Group 2, Track 9621.01 | 636 | 489 | 76.9% |
| Block Group 2, Track 9619.01 | 1,486 | 949 | 63.9% |
| Block Group 4, Track 9618.01 | 898 | 542 | 60.4% |
| Total | 5,720 | 4,420 | 77.3% |

**Figure 1: Racial Heat Map of Dodge City, KS 2020**
**Census Block Groups Shaded by Percent Hispanic/Latino (Green)**



### III.    Racially Polarized Voting Analysis

21. I next examine whether voters of different racial/ethnic backgrounds tend to prefer different or similar candidates in a wide range of electoral settings. The phenomenon called *racially polarized voting* (RPV) is defined as voters of different racial or ethnic groups exhibiting different candidate preferences in an election. It means simply that voters of different groups are voting in polar opposite directions, rather than in a multi-racial or multi-ethnic coalition. If some groups of voters are voting in coalition, RPV analysis will identify such a trend. Voters may vote for their candidates of choice for a variety of reasons, and RPV analysis is agnostic as to why voters make decisions. RPV simply reports *how* voters are voting. It measures the outcomes of voting patterns and determines whether patterns track with the race/ethnicity demographics of neighborhoods, cities, and voting precincts.

22. Issues related to minority vote dilution are especially consequential in the face of racially polarized voting. In 1986, the Supreme Court issued a ruling in *Thornburg v. Gingles* that redistricting plans cannot dilute minority voting strength by cracking their population into multiple districts, nor can they pack the population into too few districts. This logic applies equally to at-large voting systems in which minority voters are too small in number, jurisdiction-wide, for their preferred candidate to win. It means simply that voters of different groups the Court established specific tests to determine if a redistricting plan or electoral system violated the VRA, in particular drawing on a statistical analysis of voting patterns by race and ethnicity. The *Gingles* test concerns how minorities and whites vote, and whether they prefer the same, or different, candidates. Specifically, the Court asks if minority voters are cohesive (*Gingles* II); that is, if they generally tend to vote for a "candidate of choice." And next, the Court examines who the larger majority (or white) voters prefer as their candidate, and, if that candidate is different than the minority candidate of choice, whether they regularly vote as a bloc to defeat the minority candidate of choice (*Gingles* III). Courts refer to evidence of this phenomenon—voters of one racial group are voting in one direction, while voters of the other racial group are voting in the opposite direction—as "racially polarized voting."

23. Several methods are available to assess the *Gingles* preconditions of minority cohesion and white bloc voting.[10] Ecological Inference (EI) "has been the benchmark method courts use in evaluating racial polarization in voting rights lawsuits and has been used widely in comparative politics research on group and ethnic voting patterns."[11] Two variations of EI that have

---

[10]    For an approachable overview of this material, *see* Bruce M. Clarke and Robert Timothy Reagan, "Redistricting Litigation: An Overview Of Legal, Statistical, and Case-Management Issues," *Federal Judicial Center* (2002).

[11]    Loren Collingwood, Kassra Oskooii, Sergio Garcia-Rios, and Matt Barreto, "eiCompare Comparing Ecological Inference Estimates across EI and EI:R x C," *The R Journal* 8, no. 2 (2016): 92–101 at 93; *see also* Marisa A. Abrajano, Christopher S. Elmendorf, and Kevin M. Quinn, "Using Experiments to Estimate Racially Polarized Voting," *UC Davis Legal Studies Research Paper Series* no. 419 (February 2015) at 1 ("ecological inference (EI) [is] the standard statistical tool of vote-dilution litigation). Despite the method's prominence, researchers have identified certain limitations on EI's ability to reveal race-correlated voting patterns in jurisdictions with more than two racial groups and non-trivial residential integration. *See* D. James Greiner, "Re-Solidifying Racial Bloc Voting: Empirics and Legal Doctrine in the Melting Pot," *Indiana Law Journal* 86, no. 2 (Spring 2011): 447–498; D. James Greiner and Kevin M Quinn, "Exit Polling and Racial Bloc Voting: Combining Individual Level and R x C Ecological Data," The Annals of Applied Statistics 4, no. 4 (2010): 1774–1796. Strategic calculations by potential candidates as well as interest groups and donors also skew EI data. Christopher S. Elmendorf, Kevin M. Quinn, and Marisa A. Abrajano, "Racially Polarized Voting," *The University of*

emerged are referred to as King's EI and EI: RxC. The two methods are closely related, and Professor Gary King, the creator of King's EI,[12] was a co-author and collaborator on the RxC method.[13] Generally speaking, both methods take ecological data in the aggregate—such as precinct vote totals and racial demographics—and use Bayesian statistical methods to find voting patterns by regressing candidate choice against racial demographics within the aggregate precinct. King's EI is sometimes referred to as the iterative approach, in that it runs an analysis of each candidate and each racial group in iterations, whereas the RxC method allows multiple rows (candidates) and multiple columns (racial groups) to be estimated simultaneously in one model. In essence, both versions of EI operate as described above: by compiling data on the percentage of each racial group in a precinct and merging that with precinct-level vote choice from relevant election results.

24. One popular software program that has been relied on by federal courts[14] is *eiCompare*, which imports data, runs both King's EI and RxC models, and offers comparison diagnostics.[15] Collingwood, et al. have concluded that both EI and RxC produce similarly reliable regression estimates of vote choice. The EI models are agnostic on what type of input data political scientists use for racial demographics. It can be Voting Age Population (VAP) or CVAP data from the U.S. Census, it can be a Spanish surname analysis of registered voters, or it can be a BISG estimate of race of the voter file.[16] If the analyst is well-trained and uses the software properly, the models will perform the same statistical analysis and produce reliable estimates about voter preference by race.

25. To conduct an analysis for Ford County, Kansas, we relied on official election results and voter file data provided by the State of Kansas and Ford County. For each election, we used the voter file with vote history to estimate the race and ethnicity of voters consolidated to each voting precinct in Dodge City using BISG. This information was merged with precinct level election results, to be used in an ecological inference (EI) analysis.

26. BISG has been developed by demographic experts[17] and has been widely published and applied in the domain of political science to understand voting trends by race and ethnicity. It has been

---

*Chicago Law Review* 83, no. 2 (Spring 2016): 587–692; D. James Greiner, "Causal Inference in Civil Rights Litigation," Harvard Law Review 122, no. 2 (December 2008): 533–598 at 533.

[12]     *See* Gary King, *A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data*. (Princeton University Press, 1997).

[13]     *See* Ori Rosen, Wenxin Jiang, Gary King, and Martin A. Tanner, "Bayesian and Frequentist Inference for Ecological Inference: The R x C Case," *Statistica Neerlandica* 55, no. 2 (2001): 134–156 at 134-146.

[14]     Decision and Order, ECF No. 568 at ¶ 22, *NAACP v. E. Ramapo Cent. Sch. Dist.*, No. 17-CV-8943-CS-JCM (S.D.N.Y. May 25, 2020); *see also* Memorandum and Opinion, ECF No. 80 at 8–9, Baltimore County NAACP v. Baltimore County, MD et al., No. 1:21-cv-03232-LKG (D. Md. March 25, 2022).

[15]     Collingwood et al., "eiCompare," 94.

[16]     The full R script (code) with examples is available at the public repository: https://github.com/RPVote/eiCompare and includes instructions on how to run EI compare with BISG/WRU.

[17]     *See* Kevin Fiscella and Allen M. Fremont, "Use of Geocoding and Surname Analysis to Estimate Race and Ethnicity,""*Health Services Research* 41, no. 4 (August 2006): 1482–1500.

used by experts in Section 2 voting rights trials and found reliable by a federal district court[18] and the Second Circuit Court of Appeals.[19] It has been published in peer-reviewed political science, social science methodology, and law review journals as an appropriate technique for understanding voter race or ethnicity.[20] The method relies on a combination of Census surname analysis and Census block-level racial demographics to provide an overall probability assessment of the voter's race or ethnicity.[21] Demographers and social scientists already utilize both of these methods separately; matching Census data to geographic units is widely used for understanding racial demographics and density of an area,[22] and surname analysis is regularly used against the voter file to understand race and ethnicity.[23] Using both data sources makes it possible to gain a more precise understanding of voter demographics—two pieces of evidence, instead of just one, provides far more reliable estimates.[24]

27. The first step of BISG relies on the address of the voter from the voter file.[25] Using a procedure known as geocoding,[26] this address information can be cross-referenced with the data from the decennial Census at the block level using portals such as Geocodio[27]. The Census data contains the self-reported race of residents, aggregated to the Census block level. Using Census statistics for the racial and ethnic composition of the block in which a voter resides, the block's racial demographic percentages can be used in combination with the surname estimate to refine the overall estimate of voter race.[28] By using a smaller level of aggregation (*e.g.* Census block), researchers have more precision in their racial estimates.

---

[18]     ECF No. 568, *NAACP v. E. Ramapo Cent. Sch. Dist.*

[19]     *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021).

[20]     Jesse T. Clark, John A. Curiel and Tyler S. Steelman, "Minmaxing of Bayesian Improved Surname Geocoding and Geography Level Ups in Predicting Race," *Political Analysis* 30 (November 2021): 456–462; Kevin DeLuca and John A. Curiel, "Validating the Applicability of Bayesian Inference with Surname and Geocoding to Congressional Redistricting," *Political Analysis* (2022); Matthew Barreto, Michael Cohen, Loren Collingwood, Chad W. Dunn, and Sonni Waknin, "A Novel Method for Showing Racially Polarized Voting: Bayesian Improved Surname Geocoding," *New York University Review of Law & Social Change* 46, no. 1 (2022): 1–42.

[21]     Kosuke Imai and Kabir Khanna, "Improving Ecological inference by Predicting Individual Ethnicity from Voter Registration Records," *Political Analysis* 24, no. 2 (2016): 263–272.

[22]     Jorge Chapa, Ana Henderson, Aggie Jooyoon Noah, Werner Schink, and Robert Kengle, "Redistricting: Estimating Citizen Voting Age Population," *The Chief Justice Earl Warren Institute on Law and Social Policy* (July 2011).

[23]     Bernard Grofman and Jennifer R. Garcia, "Using Spanish Surname to Estimate Hispanic Voting Population in Voting Rights Litigation: A Model of Context Effects Using Bayes' Theorem," *Election Law Journal* 13, no. 3 (September 2014): 375–393.

[24]     Barreto et al., "A Novel Methodfor Showing Racially Polarized Voting."

[25]     Brian Amos and Michael P. McDonald, "A Method to Audit the Assignment of Registered Voters to Districts and Precincts," *Political Analysis* 28 (2020): 356–371.

[26]     Geocoding is possible using the tidycensus R package, with full replication scripts available at their public repository: https://github.com/cran/tidycensus.

[27]     Users can upload a voter file to be geocoded at their website: https://www.geocod.io/

[28]     Barreto et al., "A Novel Method for Showing Racially Polarized Voting."

28. BISG analysis then draws on surname analysis, a method that federal courts have found reliable. Surname analysis in BISG starts by taking each last name in the voter file and checking it against the published directories created by the Census Bureau.[29] This list, assembled based on research by demographers at the Census Bureau, has created a racial/ethnic probability for each last name in the United States based on the official Census records.[30] When a person fills out the Census form, they record their last name and their self-reported race and ethnicity. The resulting probability estimate for each name can then be cross-referenced with the voter file. So, a surname database can assign a probability for nearly every last name found on a voter file.

29. BISG uses the two proxy sources of voter race information—a voter's name and where they live—to generate an estimate of their race. By employing the Who Are You (WRU) package in R[31] to estimate the probability that a voter is of a certain race, a more detailed analysis can be inferred from the combination of surname and geolocation data—as opposed to using just one or the other.

30. Using the voter file provided by Ford County and the Kansas Secretary of State, we used the software package WRU to perform BISG to estimate voters by race across each precinct and then feed this information into eiCompare to run racially polarized voting analysis.[32] Full replication instructions are publicly available at tidycensus, WRU, and eiCompare portals, which explain the procedure in-depth with tutorials and sample R script.

---

[29]    Marc N. Elliott, Allen Fremont, Peter A. Morrison, Philip Pantoja, and Nicole Lurie, "A New Method for Estimating Race/Ethnicity and Associated Disparities Where Administrative Records Lack Self-Reported Race/Ethnicity," *Health Services Research* 43, no. 5 (October 2008): 17242–1736.

[30]    "Decennial Census Surname Files (2010, 2000)." Perma.cc. https://perma.cc/9JLV-7NQJ.

[31]    "wru: Who Are You? Bayesian Prediction of Racial Category Using Surname and Geolocation." Github. 2019. https://github.com/kosukeimai/wru ("This R package implements the methods proposed in Imai, K. and Khanna, K. (2016). "Improving Ecological Inference by Predicting Individual Ethnicity from Voter Registration Record." Political Analysis, Vol. 24, No. 2 (Spring), pp. 263–272.").

[32]    RPVote. "RPVOTE/eiCompare: Comparing Ecological Inference Techniques." GitHub. https://github.com/RPVote/eiCompare.

## A. RPV Results

31. Across all elections analyzed, there is a clear, consistent, and statistically significant finding of racially polarized voting in Dodge City, Kansas. Time and again, Latino voters are cohesive and vote for candidates of choice by roughly a 2-to-1 margin or greater, and in contrast to white voters who usually vote as a bloc against Latino candidates of choice. Indeed, these voting patterns have been widely reported by other national organizations, including the Harvard Law School Election Law Clinic,[33] which provided a voting analysis in Ford County, Kansas and concluded statistically significant racially polarized voting exists in Dodge City and Ford County (*see* Appendix C). The data presented in this report are entirely consistent with this prior analysis, and also extend this analysis through the most recent elections in 2022.

32. What's more, this information is has been known to county and city elections officials, demographers, and expert consultants serving Dodge City and Ford County. In June 2011, the city received a request for information from the U.S. Department of Justice (DOJ) related to elections in Dodge City (*see* Appendix E-1). Two months later in August 2011, Mr. Bruce Adelson, a former attorney in the DOJ Voting Section, responded to an inquiry from Ford County to advise about "potential liability issues for Dodge City pursuant to Section 2 of the Voting Rights Act (VRA)." Mr. Adelson stated that as of 2011 Dodge City was known to have a "burgeoning Hispanic population and the lack of Hispanic representation on the Commission," and went on to explain that "[i]t is the combination of the City's at-large method of election and high minority population percentage that raise the red flags for DOJ investigations" (*see* Appendix E-2).

33. In the more than 140 ecological inference statistical models performed for this report, based on well-established social science published methodology, I conclude that, across the 24 elections and 9 election cycles, elections in Dodge City are defined by racially polarized voting (*see* Appendix A for a table of racially polarized voting).

34. In elections across Dodge City and Ford County, ecological inference models point to a clear pattern of racially polarized voting that satisfies both *Gingles* II, minority cohesion, and *Gingles* III, white bloc voting. In elections analyzed, Latino voters demonstrate unified and cohesive voting, siding for the same candidates of choice with clear support in the 65% to 75% range. In contrast, white voters strongly bloc vote against Latino candidates of choice. White bloc voting appears to be consistent across elections from 2014 to 2022, with rates as high as 85% opposition to minority-preferred candidates in some instances. White voters demonstrate considerable bloc voting against Latino candidates of choice, regularly voting in the exact opposite pattern of Latino voters in Dodge City. Taken as a whole, the full set of elections analyzed easily clear the political science threshold for the existence of racially polarized voting that is consistent with what I have observed in the more than 50 jurisdictions I have analyzed in my career.

### i. Homogenous Precinct Analysis

---

[33]     Harvard Law School Election Law Clinic. "Ecological inference estimates."

35. Before I summarize the full statistical analysis, I begin with the most obvious and perhaps most conclusive direct evidence of RPV, which does not require any statistical models: an accounting of City Commission election results in recent years. One method often presented by political scientists[34] in voting rights litigation[35] is to examine voting patterns in the highest density Latino and highest density white precincts, known as *homogenous precinct analysis* (HPA). While statistical models are also often presented in a *Gingles* II and III analysis, political scientist Peyton McCrary explains that in numerous cases, "examining homogenous precincts leaves a clear impression of racially polarized voting."[36] Indeed, racially polarized voting evidence presented by political scientist Dr. Bernard Grofman in the seminal *Gingles* case included both statistical models and homogenous precinct analysis. [37]

36. In Dodge City, Precinct 3 has the highest Latino vote share, while Precinct 5 and Precinct 6 have the highest white vote shares. Precinct 2 is also majority-Latino, but is not as highly concentrated Latino as Precinct 3.

37. Looking at homogenous precincts in the 2021 City Commission election, Latina candidate Blanca Soto had her best showing in majority-Latino Precinct 3, winning 40.0% of all votes cast. She had her worst showing in majority-white Precinct 6, winning just 26.7% of all votes cast. Soto was ranked in the top three winning candidates in Precinct 3 and ranked all the way down in *sixth* in Precinct 6. In contrast, Michael Burns—who came in first place citywide—had his worst showing in Precinct 3, winning 29.4% of votes and ranking fifth, compared to his best showing in Precinct 6, winning 52.8% of all votes and finishing in the top three. These patterns of candidate support are mirror opposites in Latino versus white precincts.

38. Like Soto, Latina candidate Michelle Salinas received very few votes in the two large majority-white precincts; indeed, both Latina candidates placed near the very bottom of the pack when looking at the combined results in Precincts 5 and 6 in the 2021 election. The result for Salinas is even more remarkable because she ran on a Republican slate with two candidates who both won election to the City Commission (*see* Appendix D). Despite being slated alongside two candidates that ultimately won, Salinas placed second-to-last (seventh place) in majority-white Precincts 5 and 6.

39. Because these two precincts command such a large share of the overall city votes, they are able to effectively prevent Latino-preferred candidates from winning a seat on the citywide at-large Commission. In 2021, there were 5,518 votes cast for City Commission, and 3,779 votes came from just two majority-white precincts, constituting 68% of all votes cast.

---

[34]     Yishaiya Absoch, Matt A. Barreto, and Nathan D. Woods, "An Assessment of Racially Polarized Voting For and Against Latino Candidates in California," in *Voting Rights Act Reauthorization of 2006*, ed. Ana Henderson (Berkeley Public Policy Press, 2007).

[35]     Peyton McCrary, "Racially Polarized Voting in the South: Quantitative Evidence from the Courtroom," Social Science History 14, no. 4 (Winter 1990): 507–531 at 514.

[36]     *Id.*

[37]     *See* James W. Loewen and Bernard Grofman, "Recent Developments in Methods Used in Vote Dilution Litigation," *The Urban Lawyer* 21, no. 3 (Summer 1989): 589–604.

**Table 4: 2021 Dodge City Election Results for Precincts 5 and 6**

| Candidate | Prec 5 votes | Prec 6 votes | Pr 5+6 total | place |
|---|---|---|---|---|
| Burns | 238 | 463 | 701 | 1st |
| Nuci | 227 | 370 | 597 | 2nd |
| Taylor | 242 | 346 | 588 | 3rd |
| Reinert | 210 | 349 | 559 | 4th |
| Scoggins | 154 | 251 | 405 | 5th |
| **Soto** | **154** | **234** | **388** | **6th** |
| **Salinas** | **154** | **207** | **361** | **7th** |
| Rhoten | 74 | 106 | 180 | 8th |

40. In another clear example of bloc voting against Latino-preferred candidates in the November 2021 election, Carmen Valverde, a Latina candidate for USD 443 School Board, received her lowest vote totals in the highest density white precincts—just 5.6% support in Precinct 5 and just 5.2% in Precinct 6. Out of ten candidates, she was ranked ninth in these two heavily white precincts. In contrast, in majority-Latino Precinct 3, she placed in the top four and would have been elected if only the heavily-Latino precincts were considered, in an election where four school board seats were open.

41. Looking to individual precincts in the 2014 City Commission election, a similar pattern of racially polarized voting emerges once again. Latina candidate Liliana Zuniga was the top vote getter out of seven candidates in both majority-Latino voting districts—in both Precinct 2 and Precinct 3, Zuniga finished in *first place*. However, in the two most heavily white voting districts, Precincts 5 and 6, Zuniga landed in a distant fifth place. Rick Sowers, who won the most votes citywide, was the top ranked candidate in the two white precincts (5 and 6), but had very low support in the two Latino precincts (2 and 3), in which he placed outside the top 3 candidates. Sowers would not have been elected if only the heavily Latino precincts were considered. Once again, we see polar opposite voting outcomes when comparing the most heavily Latino versus most heavily white precincts in Dodge City.

42. These same patterns of opposite patterns in the Latino precincts and white precincts are common across multiple elections in Dodge City, including for Ford County offices, state legislature, Governor, or even President. Table 5 summarizes a sample of homogenous precinct analysis and shows clearly divergent voting patterns and divergent candidates of choice among Latino and white voters in Dodge City. Figures 2–4 present this data graphically.

**Table 5: Summary of Latino and White Homogenous Precinct Analysis in Dodge City**

| Year | Election | Precinct | Racial majority | Latino-preferred candidate | White-preferred candidate |
|---|---|---|---|---|---|
| Nov-22 | US House | Dodge City Precinct 3 H119B | Latino | Beard - 58% | Mann - 42% |
| Nov-22 | US House | Dodge City Precinct 6 H115A | White | Beard - 27% | Mann - 73% |
| Nov-22 | Governor | Dodge City Precinct 3 H119B | Latino | Kelly - 67% | Schmidt - 28% |
| Nov-22 | Governor | Dodge City Precinct 6 H115A | White | Kelly - 40% | Schmidt - 57% |
| Nov-22 | State Senate | Dodge City Precinct 3 H119B | Latino | Lara - 61% | Ryckman - 39% |
| Nov-22 | State Senate | Dodge City Precinct 6 H115A | White | Lara - 27% | Ryckman - 73% |
| | | | | | |
| Nov-21 | City Commission | Dodge City Precinct 3 | Latino | Soto - Top 3 (vote for 3) | Burns - 5th position |
| Nov-21 | City Commission | Dodge City Precinct 5 | White | Soto - 6th position | Burns - Top 3 (vote for 3) |
| Nov-21 | City Commission | Dodge City Precinct 6 | White | Soto - 6th position | Burns - Top 3 (vote for 3) |
| Nov-21 | School Board | Dodge City Precinct 3 | Latino | Valverde - Top 4 (vote for 4) | Goertzen - 5th position |
| Nov-21 | School Board | Dodge City Precinct 5 | White | Valverde - 9th position | Goertzen - Top 4 (vote for 4) |
| Nov-21 | School Board | Dodge City Precinct 6 | White | Valverde - 9th position | Goertzen - Top 4 (vote for 4) |
| | | | | | |
| Nov-20 | President | Dodge City, Precinct 3 | Latino | Biden - 60.1% | Trump - 37.6% |
| Nov-20 | President | Dodge City, Precinct 6 | White | Biden - 31.1% | Trump - 67.4% |
| Nov-20 | US Senate | Dodge City, Precinct 3 | Latino | Bollier - 60.3% | Marhsall - 34.4% |
| Nov-20 | US Senate | Dodge City, Precinct 6 | White | Bollier - 32.9% | Marshall - 63.5% |
| Nov-20 | State Senate | Dodge City, Precinct 3 | Latino | Pando - 62.1% | Estes - 37.9% |
| Nov-20 | State Senate | Dodge City, Precinct 6 | White | Pando - 33.7% | Estes - 66.3% |
| Nov-20 | County Clerk | Dodge City, Precinct 3 | Latino | Gonzalez - 61.7% | Cox - 38.3% |
| Nov-20 | County Clerk | Dodge City, Precinct 6 | White | Gonzalez - 30.5% | Cox - 67.5% |
| | | | | | |
| Nov-18 | US House | Dodge City Precinct 3 | Latino | LaPolice - 70.1% | Marshall - 29.9% |
| Nov-18 | US House | Dodge City Precinct 6 | White | LaPolice - 31.7% | Marshall - 68.4% |
| Nov-18 | Governor | Dodge City Precinct 3 | Latino | Kelly - 66.5% | Kobach - 21.1% |
| Nov-18 | Governor | Dodge City Precinct 6 | White | Kelly - 33.0% | Kobach - 52.6% |
| Nov-18 | Sec State | Dodge City Precinct 3 | Latino | McClendon - 67.1% | Schwab - 28.4% |
| Nov-18 | Sec State | Dodge City Precinct 6 | White | McClendon - 34.1% | Schwab - 63.5% |
| | | | | | |
| Apr-14 | City Commission | Dodge City Precinct 3 | Latino | Zuniga - Top 3 (vote for 3) | Sowers - 5th position |
| Apr-14 | City Commission | Dodge City Precinct 5 | White | Zuniga - 5th position | Sowers - Top 3 (vote for 3) |
| Apr-14 | City Commission | Dodge City Precinct 6 | White | Zuniga - 5th position | Sowers - Top 3 (vote for 3) |



**Figure 2: Homogenous Precinct Analysis: 2022**



**Figure 3: Homogenous Precinct Analysis: 2020**



**Figure 4: Homogenous Precinct Analysis: 2018**

43. Dodge City Commission elections differ in the way votes are cast than in more common winner-take-all elections, such as those for County Clerk, or single-member districts such as those for U.S. Congress. Dodge City Commission elections allow voters to cast three votes each election, not just one vote. Thus, three candidates are being picked by voters, which can make it more difficult to discern patterns and candidates of choice. Especially in elections where there may only be four candidates for three spots, sometimes voters end up casting votes for candidates that may not be their most preferred, because they believe they need to select three candidates out of four. In other instances, voters may not have strong preferences one way or another. However, by looking at candidate positioning in these multi-candidate elections, we can still infer patterns of vote choice sorted by race and ethnicity of the voters themselves. In particular, the results that show larger differences between Latino and white voters tell us the most about whether or not voting patterns are racially polarized.

44. Other exogenous elections—that is, elections for offices other than City Commissioner—may include two-candidate partisan elections, which are more common and well-known to voters and casual election observers. These elections can also tell us something important about voting trends and patterns in the jurisdiction we are studying because they can reveal a larger, and perhaps deeper, pattern of racially polarized voting if these additional elections seem to corroborate the local elections. Indeed, because of the typical two-candidate "horse race" feature, it may be easier to observe whether or not voting patterns are racially polarized in a community by examining exogenous elections. In this particular setting, exogenous elections are quite informative and important to consider and offer additional evidence about how Latino and white communities vote. Thus, I include county, state, and federal elections in my analysis.

In these instances, many exogenous elections are partisan, and are often understood by voters through a racial/ethnic lens. Indeed, political science research has proven conclusively that attitudes about racial public policy issues, views on immigration, and even racial animus influence partisanship among white voters.[38] Thus, it is voters' views on matters of race that often push voters today into voting for the Democratic or Republican candidates in the first place, providing a clear link to racially polarized voting even when one considers partisan exogenous elections.[39]

## ii. Ecological Inference Analysis

45. The summary results of the ecological inference analysis can be found in Appendix A, which reports both types of regression analysis, King's EI and EI RxC. For each type of analysis, I report candidate support estimates for white voters and Latino voters. Looking at nearly every one of the 24 elections reported in Appendix A, Table 1 reveals clear evidence of racially polarized voting.

46. In Dodge City, Kansas, the EI models confirm the HPA above and show that Latinos vote cohesively, for like candidates of choice. In particular, the analysis reveals that Latino voters are cohesive in local elections for City Commission. In addition, local elections for county and school board offices further reveal Latino cohesive voting behavior.

47. In contrast to Latinos, whites in Dodge City who make up the majority of voters demonstrate bloc-voting against Latino candidates of choice in local elections for City Commission. When Latino candidates of preference emerge, they typically receive very low rates of support from white voters, who effectively bloc these candidates from winning office in the at-large voting system.

48. In City Commission elections, Latino voters typically demonstrate distinct candidate preference as compared to white voters. To illustrate this we, can examine the columns "White – EI" and "Latino – EI" in Appendix A, Table 1. Looking to the 2021 City Commission election, Latino voters rank Scoggins, Soto, and Taylor as the top three candidates who they would elect to city council. In contrast, white voters give their highest preference to Nuci, Burns, and Reinert. To properly assess how polarized or different the voting patterns of whites and Latinos are, it is important to look at the difference—or gap—in support between the two groups. For example,

[38]    Marc Hooghe and Ruth Dassonneville, "Explaining the Trump Vote: The Effect of Racist Resentment and Anti-Immigrant Sentiments," *Political Science & Politics* 51, no. 3 (July 2018): 528–534; Ashley Jardina, "In-Group Love and Out-Group Hate: White Racial Attitudes in Contemporary U.S. Elections," *Political Behavior* 43 (2021): 1535–1559.

[39]    Michael Tesler and David O. Sears. 2010. "President Obama and the Growing Polarization of Partisan Attachments by Racial Attitudes and Race." Paper presented at *Annual Meeting of the American Political Science Association: Washington, D.C., September 2010*; Michael Tesler, "The Spillover of Racialization into Health Care: How President Obama Polarized Public Opinion by Racial Attitudes and Race," *American Journal of Political Science* 56, no. 3 (July 2012): 690–704; Michael Tesler, "The Return of Old-Fashioned Racism to White Americans' Partisan Preferences in the Early Obama Era," *The Journal of Politics* 75, no. 1 (January 2013): 110–123; Caroline J. Tolbert, David P. Redlawsk and Kellen J. Gracey, "Racial Attitudes and Emotional Responses to the 2016 Republican Candidates," *Journal of Elections, Public Opinion and Parties* 28, no. 2 (2018): 245–262.

white voters demonstrate very low levels of support for Latino-preferred candidates Scoggins and Soto, with just 6.3% each. The differential between how whites and Latinos supported these two candidates in 2021 was stark; Scoggins demonstrated a gap of 22.9 and Soto demonstrated a gap of 14.3 percentage points. These two candidates registered the highest degree of polarization in this election. The next three highest amounts of polarization are found in high white support and low Latino support for Reinert (gap of 13.8), Burns (gap of 12.4), and Nuci (gap of 11.6). Three other candidates in this election had differences, but they demonstrated smaller gaps and did not register as much polarization when looking to the first set of EI models.

49. In the 2019 City Commission election, only five candidates ran for three spots, making it mathematically problematic to identify unique "top three" candidates, because with only five candidates present it is not possible that two subgroups of voters could have entirely different sets of unique "top three" candidates. Nevertheless, this election still demonstrates patterns of differential vote preference between Latino and white voters. Latino voters showed their strongest preference for Hessman, who was the last place vote getter among whites. In other words, as in 2021, Latinos' first-ranked candidate finished as white voters' last-ranked candidate. In addition, Nuci was ranked in the top three by white voters, but was ranked outside the top three among Latino voters. Other candidates such as Smoll received similar rates from whites and Latinos, in an unusual instance of a candidate in this jurisdiction not registering polarized voting. However, both Hessman and Nuci register as candidates that one community strongly supported while the other community strongly opposed—notable particularly given the fact that, as noted above, this election likely produced more overlap than usual because just five candidates vied for three spots.

50. The 2017 City Commission election also demonstrates patterns of racial polarization with the top preferred candidate among white voters, Delzeit, being the second-least preferred candidate by Latinos, according to the EI analysis. In contrast, two candidates received high support among Latino voters but very low support from white voters—Sellens and Zuniga. Again, this election contains candidates who registered racially polarized voting between whites and Latinos.

51. In the 2014 City Commission election, similar patterns of racial polarization emerge once again. Among Latinos, Zuniga was the top vote getter and Scoggins was second. Latinos' top-ranked candidate, Zuniga, failed to win a seat on the City Commission because she was ranked second-to-last among white voters, receiving only 7.2% support. This striking gap of 26.1 points between Latino and white support is the largest recorded for any City Commission candidate from 2014 to 2021.

52. Beyond the City Commission elections—which, as discussed above, show clear patterns of racial bloc voting—the additional elections analyzed provide further evidence of how divergent white and Latino voter preferences are in Dodge City.[40] In more traditional two-person contests

---

[40] The point estimates in the EI models represent the most likely outcome, called the center point of the estimate. Statistically, the central point estimate has the highest probability of being correct. Each point estimate contains a confidence interval surrounding it that contains precise probabilities of other percent estimates being returned. In some instances, lower and upper bounds of confidence intervals can overlap, and it is possible to consider the exact probability of

where only one candidate can get elected, these are consistent patterns of Latino cohesion. In the 17 contests in which there are only two candidates, the EI models report an average Latino cohesion of 75.6% support for Latino-preferred candidates, while the RxC models report an average cohesion of 65.5%. These high rates of political cohesion are consistent with political science and legal scholarship on the *Gingles II* precondition.

53. Among white voters, we see the polar opposite. White voters demonstrate bloc-voting against Latino-preferred candidates across every single exogenous election analyzed for state legislature, Ford County offices, and statewide elections for U.S. Senate, Governor, President and more. In these exogenous elections, 79.3% of whites bloc-voted against Latino candidates of choice according to the EI models, and 76.3% of whites bloc-voted against Latino candidates of choice in the RxC models. These high rates of white bloc voting—which have been effective in defeating Latinos' candidates of choice—are consistent with political science and legal scholarship on the *Gingles* II precondition.

54. Hispanic communities in Dodge City are considerably younger and have lower rates of citizenship, resulting in a smaller pool of eligible voters as compared to whites. Due to a long history of discrimination and institutional policies related to voter registration, voter identification laws, access to early voting, and absentee-mail voting, Latinos in Dodge City have lower rates of voter registration and lower rates of voter turnout. The result is that citywide at-large voting systems undermine Latinos' ability to influence elections in a meaningful way.

## IV.    Evaluations of Plaintiffs' Illustrative Districts

55. As a result of the increase of nearly 7,000 Latinos in Dodge City over the last two decades, the Latino community is easily large enough in size and geographically compact to form at least one majority-Latino performing electoral district for the City Commission. In order to evaluate whether the Latino electorate is large enough in size to form a district that creates an opportunity to elect a candidate of its choice, we reviewed the various maps drawn by the Plaintiffs' demographer, Dr. Kassra Oskooii.

56. Dr. Oskooii drew 14 different map options as illustrative examples of how majority-Latino CVAP districts could potentially be configured. In the analysis below, I present two models to assess the potential performance of each map option. These models use CVAP as a starting point for understanding the relative Latino voting strength of any given district, in any given map.

---

overlap, rather than simply rejecting a point estimate altogether. In instances where there are a very small number of datapoints, confidence intervals can appear larger; however, this does not mean that point estimates are invalid, but rather simply that there is less data to rely on in creating the average. Probability analysis of confidence intervals provides one way to further examine the degree to which some confidence intervals might overlap, if that question arises. In addition, the HPA also adds confidence to the point estimates because it provides actual election results that are quite consistent with the point estimates. In this specific jurisdiction, we have a clear and consistent pattern of racially polarized voting across 24 different elections in 9 different election cycles, which provides strong evidence that our point estimates are consistent and stable.

57. Building on CVAP, I next estimate the number or percentage of actual voters in each district that are Latino or white, given each group's turnout rate. Given that we have the full voter files with vote history for Dodge City, as supplied by the Kansas Secretary of State, we can estimate the share of each district's voters that will be Latino, white, or other based on looking at historic turnout patterns. The first set of models I present assumes the standard or typical voter turnout rate that Dodge City has historically witnessed in either odd-years or even-years. Current City Commission elections are held in odd years, which tend to have the lowest rate of Latino voter turnout. Even years have historically seen an increase in the number of Latino voters in Dodge City.

58. The existing political science literature has found that there is strong evidence that—because newly created minority-opportunity districts create historic openings for the minority community to elect their candidate of choice for the first time—minority voter turnout often increases over the standard, or previous rates.[41] This example has played out in the real world when cities have converted from at-large to by-district elections. For example, in Yakima, Washington, after a federal court ordered the creation of single-member districts,[42] Latino voter turnout dramatically increased in the first district-based election, with three Latino-preferred candidates of choice elected out of seven, after having no Latino-preferred candidates elected to the city council for the three decades prior.[43]

59. Thus, my second set of estimates considers the very real potential for heightened Latino voter turnout once single-member districts are created and minority voters feel a sense of empowerment.[44] I apply a mid-level turnout increase where Latinos still turn out at lower rates than whites, but higher than in the current Dodge City Commission elections where they don't believe their candidates can get elected. This mid-level turnout increase employed in my second set of estimates is both similar to what the academic literature has observed and what took place in Yakima, WA. This second set of models is presented directly underneath the first, and is labeled "Based on Elevated Turnout," and provides an estimate for both odd-year and even-year elections.

60. Finally, based on the ecological inference analysis and racially polarized voting results, we can apply expected Latino cohesion and white cross-over or white bloc-voting within each district. Latino cohesion rates can be multiplied by the number of expected Latino voters, and the same calculation can be made for whites and voters of other races. For each map, I outline the expected outcomes in a two-candidate contest with a winner-take-all system, which is typical of single-member city council elections. This basic calculation, based on the Census CVAP data,

---

[41]    Matt A. Barreto, "¡Sí Se Puede! Latino Candidates and the Mobilization of Latino Voters," *American Political Science Review* 101, no. 3 (August 2007); Matt A. Barreto, Gary M. Segura and Nathan D. Woods, "The Mobilizing Effect of Majority-Minority Districts on Latino Turnout," *American Political Science Review* 98, no. 1 (February 2004): 65–75.

[42]    Montes v. City of Yakima, 40 F. Supp. 3d 1377 (E.D. Wash. 2014).

[43]    Yakima County. "General Election Results." November 24, 2015.
https://www.yakimacounty.us/DocumentCenter/View/30742/2015-General-Election-Results?bidId=.

[44]    Lawrence Bobo and Franklin D. Gilliam, Jr., "Race, Sociopolitical Participation, and Black Empowerment," *American Political Science Review* 84, no. 2 (June 1990): 377–393.

official vote history data, and racially polarized voting results, allows us to determine if Latino voters have an opportunity to elect candidates of choice in each district across all 14 maps.

61. The results of my map evaluation analysis for all 14 versions of the illustrative maps drawn on behalf of Plaintiffs can be found in Appendix B. My conclusion is that the maps presented by Dr. Oskooii each create at least one majority-Latino CVAP district that can be defined as a Latino opportunity-to-elect district. In many cases, it is likely there are two opportunity districts for Latino voters. Even in the most conservative model—in which the election date remains in November of odd-numbered years, and turnout rates remain at the traditional off-year rates, such that no turnout boost applies—the maps all have a large enough Latino CVAP majority, and strong enough Latino voter cohesion, for at least one Latino opportunity-district.

62. If turnout increases, as is often the case with newly created minority opportunity districts, most of the maps drawn by Dr. Oskooii result in two districts in which Latino voters can elect candidates of choice. If elections are moved to November of even-numbered years, when Latino turnout has traditionally been higher, the districts are likely to perform even better for Latino-preferred candidates. Across the board, the illustrative maps show that Plaintiffs have met all possible conditions in showing that Latino opportunity districts can be drawn in Dodge City.

63. Finally, while not required by the *Gingles* preconditions, we are also able to consider voter registration numbers by race and ethnicity for all 14 maps. The December 30, 2022 voter file supplied to me by Ford County contains the name and address of all voters in the entire county. Limiting this to only voters in Dodge City, we used the same BISG procedure to geocode the file and estimate the race or ethnicity of all voters. Given that the file had the address and was geocoded, we could also overlay the maps drawn by Dr. Oskooii onto the voter file using QGIS, which provides district boundaries for each map. In reviewing the voter registration data, I find that all 14 maps contain city Commission districts in which a clear majority of registered voters are Latino, further solidifying that each map creates at least one majority-Latino district that provides Latinos with an opportunity to elect candidates of choice.

64. In preparing this report, there were some data that was not yet produced, or made readily available by Defendants, and as more data does become available, or new elections results are posted, I reserve the right to provide additional data and analysis of population statistics and election results to supplement this report.

65. I declare under penalty of perjury that the foregoing is true to the best of my personal knowledge.


May 19, 2023

Dr. Matt A. Barreto

Agoura Hills, California

## Appendix A: Racially Polarized Voting Tables

## Table 1: Dodge City Ecological Inference (EI) Candidate Choice Estimates

| Year | Office | Candidate | White - EI | Latino - EI | Diff | White - RxC | Latino - RxC | Diff |
|---|---|---|---|---|---|---|---|---|
| 2022 | Attorney General | Kobach* | 65.7 | 31.9 | 33.8 | 69.8 | 32.0 | 37.8 |
| | | Mann | 34.4 | 68.8 | -34.4 | 30.2 | 68.0 | -37.8 |
| | Governor / Lt. Governor | Schmidt / Sawyer | 64.0 | 24.4 | 39.6 | 64.1 | 25.9 | 38.2 |
| | | Kelly / Toland* | 36.2 | 75.6 | -39.4 | 35.9 | 74.1 | -38.2 |
| | Kansas Senate | Ryckman* | 78.5 | 42.4 | 36.1 | 81.4 | 31.7 | 49.7 |
| | | Lara | 21.0 | 58.6 | -37.6 | 18.6 | 68.3 | -49.7 |
| | Secretary of State | Schwab* | 77.3 | 25.2 | 52.1 | 81.5 | 33.8 | 47.7 |
| | | Repass | 22.6 | 74.6 | -52.0 | 18.5 | 66.2 | -47.7 |
| | U.S. Senate | Moran* | 79.0 | 26.6 | 52.4 | 84.8 | 37.2 | 47.6 |
| | | Holland | 21.0 | 73.2 | -52.2 | 15.2 | 62.8 | -47.6 |
| 2021 | City Commission | Nuci* | 21.5 | 9.9 | 11.6 | 16.4 | 12.6 | 3.8 |
| | | Burns* | 21.3 | 8.9 | 12.4 | 19.2 | 13.6 | 5.6 |
| | | Reinert | 17.0 | 3.2 | 13.8 | 15.2 | 10.7 | 4.5 |
| | | Salinas | 12.7 | 4.5 | 8.2 | 9.4 | 10.6 | -1.2 |
| | | Taylor* | 13.1 | 18.1 | -5.0 | 15.7 | 17.1 | -1.4 |
| | | Scoggins | 6.3 | 29.2 | -22.9 | 10.0 | 14.2 | -4.2 |
| | | Soto | 6.3 | 20.6 | -14.3 | 10.2 | 15.1 | -4.9 |
| | | Rhoten | 3.5 | 4.7 | -1.2 | 3.9 | 6.1 | -2.2 |
| | School Board | Hiers | 19.3 | 7.2 | 12.1 | 19.1 | 8.8 | 10.3 |
| | | West | 16.4 | 4.8 | 11.6 | 12.2 | 9.9 | 2.3 |
| | | Goertzen | 14.5 | 6.1 | 8.4 | 13.6 | 9.8 | 3.8 |
| | | Killion | 14.1 | 4.9 | 9.2 | 13.1 | 10.2 | 2.9 |
| | | Zortman | 12.9 | 4.4 | 8.5 | 9.4 | 10.1 | -0.7 |
| | | Preseton | 10.4 | 5.1 | 5.3 | 10.0 | 8.5 | 1.5 |
| | | Hall | 6.9 | 17.8 | -10.9 | 7.1 | 11.2 | -4.1 |
| | | Nagel | 5.3 | 19.8 | -14.5 | 7.3 | 13.1 | -5.8 |
| | | Valverde | 4.8 | 9.4 | -4.6 | 4.5 | 10.5 | -6.0 |
| | | Roths | 2.9 | 11.2 | -8.3 | 3.7 | 7.9 | -4.2 |

| Year | Office | Candidate | White - EI | Latino - EI | Diff | White - RxC | Latino - RxC | Diff |
|------|--------|-----------|-----------|-------------|------|-------------|--------------|------|
| 2020 | County Clerk | Cox* | 86.4 | 26.3 | 60.1 | 77.2 | 35.8 | 41.4 |
| | | Gonzalez | 13.7 | 75.7 | -62.0 | 22.8 | 64.2 | -41.4 |
| | | | | | | | | |
| | Kansas Senate | Estes* | 75.8 | 29.5 | 46.3 | 73.2 | 36.2 | 37.0 |
| | | Pando | 23.7 | 70.6 | -46.9 | 26.8 | 63.8 | -37.0 |
| | | | | | | | | |
| | President | Trump* | 83.0 | 24.9 | 58.1 | 77.0 | 35.2 | 41.8 |
| | | Biden | 17.1 | 76.1 | -59.0 | 23.0 | 64.8 | -41.8 |
| | | | | | | | | |
| | U.S. Senate | Marshall* | 80.6 | 22.1 | 58.5 | 74.8 | 34.3 | 40.5 |
| | | Bollier | 19.3 | 77.9 | -58.6 | 25.2 | 65.7 | -40.5 |
| | | | | | | | | |
| 2019 | City Commission | Sowers* | 33.2 | 18.2 | 15.0 | 26.0 | 20.6 | 5.4 |
| | | Smoll* | 23.7 | 25.9 | -2.2 | 24.4 | 21.1 | 3.3 |
| | | Nuci* | 19.8 | 12.7 | 7.1 | 18.7 | 18.7 | 0.0 |
| | | Reeves | 18.3 | 11.5 | 6.8 | 15.4 | 16.0 | -0.6 |
| | | Hessman | 10.7 | 32.1 | -21.4 | 15.4 | 23.5 | -8.1 |
| | | | | | | | | |
| | DCCC Trustees | Turley* | 20.5 | 24.2 | -3.7 | 18.8 | 13.4 | 5.4 |
| | | Henrichs* | 20.5 | 21.2 | -0.7 | 21.8 | 15.3 | 6.5 |
| | | Lewis* | 19.3 | 15.6 | 3.7 | 21.5 | 14.8 | 6.7 |
| | | Malone | 12.3 | 8.3 | 4.0 | 11.1 | 12.5 | -1.4 |
| | | Hampton | 8.0 | 4.2 | 3.8 | 9.8 | 13.5 | -3.7 |
| | | Wells | 6.3 | 5.1 | 1.2 | 8.3 | 12.3 | -4.0 |
| | | Garcia | 5.9 | 29.5 | -23.6 | 8.6 | 18.2 | -9.6 |
| | | | | | | | | |
| 2018 | Attorney General | Schmidt* | 89.9 | 10.1 | 79.8 | 79.5 | 31.4 | 48.1 |
| | | Swain | 10.1 | 89.9 | -79.8 | 20.5 | 68.6 | -48.1 |
| | Governor / Lt. Governor | Kobach / Hartman | 72.6 | 12.6 | 60.0 | 68.6 | 21.8 | 46.8 |
| | | Kelly / Rogers* | 28.0 | 87.3 | -59.3 | 31.4 | 78.2 | -46.8 |
| | | | | | | | | |
| | Secretary of State | Schwab* | 80.3 | 20.0 | 60.3 | 73.3 | 25.6 | 47.7 |
| | | McClendon | 19.6 | 80.3 | -60.7 | 26.7 | 74.4 | -47.7 |
| | | | | | | | | |
| 2017 | City Commission | Delzeit* | 26.2 | 9.4 | 16.8 | 25.7 | 17.6 | 8.1 |
| | | Gwaltney | 19.0 | 8.1 | 10.9 | 18.4 | 11.2 | 7.2 |
| | | Warshaw* | 19.7 | 22.3 | -2.6 | 21.9 | 19.2 | 2.7 |
| | | Smoll* | 19.2 | 16.0 | 3.2 | 18.2 | 16.9 | 1.3 |
| | | Zuniga | 6.4 | 17.5 | -11.1 | 6.6 | 18.2 | -11.6 |
| | | Sellens | 7.9 | 25.8 | -17.9 | 9.3 | 17.0 | -7.7 |
| | | | | | | | | |

| Year | Office | Candidate | White - EI | Latino - EI | Diff | White - RxC | Latino - RxC | Diff |
|------|--------|-----------|-----------|------------|------|------------|-------------|------|
| 2016 | Kansas Senate | Estes* | 89.6 | 25.7 | 63.9 | 83.8 | 39.6 | 44.2 |
| | | Rodriguez | 10.5 | 75.1 | -64.6 | 16.2 | 60.4 | -44.2 |
| | | | | | | | | |
| | President | Trump* | 89.0 | 13.9 | 75.1 | 83.2 | 29.2 | 54.0 |
| | | Clinton | 10.5 | 86.3 | -75.8 | 16.8 | 70.8 | -54.0 |
| | | | | | | | | |
| | U.S. Senate | Moran* | 91.0 | 27.7 | 63.3 | 85.4 | 37.6 | 47.8 |
| | | Wiesner | 8.0 | 61.5 | -53.5 | 12.0 | 54.9 | -42.9 |
| | | Garrand | 0.6 | 15.2 | -14.6 | 2.5 | 7.5 | -5.0 |
| | | | | | | | | |
| 2014 | Attorney General | Schimdt* | 89.5 | 20.1 | 69.4 | 84.9 | 44.8 | 40.1 |
| | | Kotich | 10.5 | 79.9 | -69.4 | 15.2 | 55.2 | -40.0 |
| | | | | | | | | |
| | City Commission | Peters | 19.3 | 16.3 | 3.0 | 16.0 | 13.8 | 2.2 |
| | | Sowers* | 19.1 | 5.1 | 14.0 | 17.2 | 12.9 | 4.3 |
| | | Smoll* | 17.8 | 10.6 | 7.2 | 16.6 | 12.1 | 4.5 |
| | | Turner | 17.3 | 8.2 | 9.1 | 14.0 | 9.6 | 4.4 |
| | | Scoggins* | 11.3 | 31.6 | -20.3 | 15.0 | 20.0 | -5.0 |
| | | Zuniga | 7.2 | 33.3 | -26.1 | 12.8 | 20.0 | -7.2 |
| | | McBee | 3.5 | 7.7 | -4.2 | 8.5 | 11.6 | -3.1 |
| | | | | | | | | |
| | Governor / Lt. Governor | Brownback / Colyer* | 64.4 | 41.7 | 22.7 | 65.5 | 44.8 | 20.7 |
| | | Davis / Docking | 35.6 | 58.3 | -22.7 | 34.5 | 55.2 | -20.7 |
| | | | | | | | | |
| | Secretary of State | Kobach* | 82.8 | 22.7 | 60.1 | 75.0 | 47.0 | 28.0 |
| | | Schodorf | 17.2 | 77.3 | -60.1 | 25.0 | 53.0 | -28.0 |

## Appendix B: Evaluation of Plaintiffs' Illustrative Maps

### Table 1: Evaluation of Oskooii Map 1

Based on Current Turnout

| Map 1 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.1% | 55.6% | 0.7% | 7.5% | 53% | 41% | 1% | 6% | 43% | 50% | 1% | 6% | 54.8% | 45.2% | 49.6% | **50.4%** |
| D2 | 28.2% | 60.7% | 9.4% | 1.8% | 42% | 46% | 11% | 1% | 34% | 55% | 10% | 1% | 46.7% | **53.3%** | 42.2% | **57.8%** |
| D3 | 36.2% | 60.0% | 1.9% | 2.0% | 53% | 44% | 2% | 1% | 43% | 54% | 2% | 1% | 53.9% | 46.1% | 48.6% | **51.4%** |
| D4 | 60.9% | 29.7% | 4.3% | 5.2% | 75% | 18% | 4% | 3% | 68% | 25% | 4% | 4% | 65.9% | 34.1% | 62.0% | 38.0% |
| D5 | 73.8% | 18.1% | 6.3% | 1.9% | 83% | 10% | 5% | 1% | 78% | 14% | 6% | 1% | 70.1% | 29.9% | 67.4% | 32.6% |

Based on Elevated Turnout

| Map 1 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.1% | 55.6% | 0.7% | 7.5% | 40% | 53% | 1% | 6% | 38% | 54% | 1% | 7% | 47.7% | **52.3%** | 46.9% | **53.1%** |
| D2 | 28.2% | 60.7% | 9.4% | 1.8% | 31% | 58% | 9% | 1% | 30% | 59% | 9% | 2% | 40.7% | **59.3%** | 40.0% | **60.0%** |
| D3 | 36.2% | 60.0% | 1.9% | 2.0% | 40% | 57% | 2% | 2% | 38% | 58% | 2% | 2% | 46.7% | **53.3%** | 45.9% | **54.1%** |
| D4 | 60.9% | 29.7% | 4.3% | 5.2% | 65% | 27% | 4% | 4% | 63% | 28% | 4% | 5% | 60.4% | 39.6% | 59.6% | 40.4% |
| D5 | 73.8% | 18.1% | 6.3% | 1.9% | 76% | 16% | 6% | 1% | 75% | 17% | 6% | 2% | 66.2% | 33.8% | 65.6% | 34.4% |

## Appendix B: Evaluation of Plaintiffs' Illustrative Maps

### Table 2: Evaluation of Oskooii Map 2

Based on Current Turnout

| Map 2 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.23% | 55.45% | 0.75% | 8.6% | 52% | 41% | 1% | 6% | 43% | 50% | 1% | 6% | 54.4% | 45.6% | 49.2% | **50.8%** |
| D2 | 28.87% | 59.38% | 8.61% | 3.1% | 43% | 45% | 10% | 2% | 35% | 54% | 9% | 2% | 47.6% | **52.4%** | 43.0% | **57.0%** |
| D3 | 36.85% | 59.66% | 1.73% | 1.8% | 54% | 43% | 2% | 1% | 44% | 53% | 2% | 1% | 54.3% | 45.7% | 49.0% | **51.0%** |
| D4 | 62.52% | 28.98% | 4.54% | 4.0% | 76% | 18% | 4% | 2% | 69% | 24% | 4% | 3% | 66.4% | 33.6% | 62.6% | 37.4% |
| D5 | 74.77% | 16.80% | 6.45% | 2.0% | 84% | 9% | 5% | 1% | 79% | 13% | 6% | 1% | 70.5% | 29.5% | 67.8% | 32.2% |

Based on Elevated Turnout

| Map 2 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.23% | 55.45% | 0.75% | 8.6% | 39% | 53% | 1% | 7% | 37% | 54% | 1% | 8% | 47.4% | **52.6%** | 46.5% | **53.5%** |
| D2 | 28.87% | 59.38% | 8.61% | 3.1% | 32% | 57% | 9% | 3% | 31% | 58% | 9% | 3% | 41.4% | **58.6%** | 40.8% | **59.2%** |
| D3 | 36.85% | 59.66% | 1.73% | 1.8% | 40% | 57% | 2% | 1% | 39% | 58% | 2% | 2% | 47.1% | **52.9%** | 46.2% | **53.8%** |
| D4 | 62.52% | 28.98% | 4.54% | 4.0% | 66% | 27% | 4% | 3% | 64% | 28% | 4% | 4% | 61.0% | 39.0% | 60.2% | 39.8% |
| D5 | 74.77% | 16.80% | 6.45% | 2.0% | 77% | 15% | 6% | 2% | 76% | 16% | 6% | 2% | 66.7% | 33.3% | 66.1% | 33.9% |

# Appendix B: Evaluation of Plaintiffs' Illustrative Maps

## Table 3: Evaluation of Oskooii Map 3

Based on Current Turnout

| Map 3 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.32% | 55.41% | 0.75% | 8.5% | 52% | 41% | 1% | 6% | 43% | 50% | 1% | 6% | 54.4% | 45.6% | 49.3% | 50.7% |
| D2 | 28.74% | 59.43% | 8.62% | 3.2% | 43% | 45% | 10% | 2% | 35% | 54% | 9% | 2% | 47.5% | 52.5% | 42.9% | 57.1% |
| D3 | 33.57% | 61.22% | 2.20% | 3.0% | 50% | 45% | 2% | 2% | 40% | 55% | 2% | 2% | 52.3% | 47.7% | 47.1% | 52.9% |
| D4 | 65.43% | 27.37% | 4.20% | 3.0% | 78% | 16% | 4% | 2% | 72% | 22% | 4% | 2% | 67.6% | 32.4% | 64.0% | 36.0% |
| D5 | 73.78% | 18.12% | 6.25% | 1.9% | 83% | 10% | 5% | 1% | 78% | 14% | 6% | 1% | 70.1% | 29.9% | 67.4% | 32.6% |

Based on Elevated Turnout

| Map 3 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.32% | 55.41% | 0.75% | 8.5% | 39% | 53% | 1% | 7% | 37% | 54% | 1% | 8% | 47.4% | 52.6% | 46.6% | 53.4% |
| D2 | 28.74% | 59.43% | 8.62% | 3.2% | 32% | 57% | 9% | 3% | 30% | 58% | 9% | 3% | 41.4% | 58.6% | 40.7% | 59.3% |
| D3 | 33.57% | 61.22% | 2.20% | 3.0% | 37% | 58% | 2% | 2% | 35% | 60% | 2% | 3% | 45.3% | 54.7% | 44.5% | 55.5% |
| D4 | 65.43% | 27.37% | 4.20% | 3.0% | 69% | 25% | 4% | 2% | 67% | 26% | 4% | 3% | 62.4% | 37.6% | 61.7% | 38.3% |
| D5 | 73.78% | 18.12% | 6.25% | 1.9% | 76% | 16% | 6% | 1% | 75% | 17% | 6% | 2% | 66.2% | 33.8% | 65.6% | 34.4% |

# Appendix B: Evaluation of Plaintiffs' Illustrative Maps

## Table 4: Evaluation of Oskooii Map 4

Based on Current Turnout

| Map 4 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.29% | 55.59% | 0.72% | 7.4% | 53% | 41% | 1% | 5% | 44% | 50% | 1% | 6% | 54.9% | 45.1% | 49.7% | 50.3% |
| D2 | 27.60% | 60.99% | 9.50% | 1.9% | 42% | 46% | 11% | 1% | 33% | 55% | 10% | 1% | 46.3% | 53.7% | 41.8% | 58.2% |
| D3 | 31.03% | 59.44% | 5.28% | 4.2% | 46% | 44% | 6% | 3% | 37% | 54% | 6% | 3% | 50.0% | 50.0% | 45.1% | 54.9% |
| D4 | 66.44% | 28.88% | 1.35% | 3.3% | 80% | 17% | 1% | 2% | 73% | 24% | 1% | 2% | 68.8% | 31.2% | 65.1% | 34.9% |
| D5 | 73.78% | 18.12% | 6.25% | 1.9% | 83% | 10% | 5% | 1% | 78% | 14% | 6% | 1% | 70.1% | 29.9% | 67.4% | 32.6% |

Based on Elevated Turnout

| Map 4 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.29% | 55.59% | 0.72% | 7.4% | 40% | 53% | 1% | 6% | 38% | 54% | 1% | 7% | 47.8% | 52.2% | 46.9% | 53.1% |
| D2 | 27.60% | 60.99% | 9.50% | 1.9% | 30% | 58% | 10% | 2% | 29% | 60% | 9% | 2% | 40.4% | 59.6% | 39.7% | 60.3% |
| D3 | 31.03% | 59.44% | 5.28% | 4.2% | 34% | 57% | 5% | 4% | 33% | 58% | 5% | 4% | 43.5% | 56.5% | 42.7% | 57.3% |
| D4 | 66.44% | 28.88% | 1.35% | 3.3% | 70% | 26% | 1% | 3% | 68% | 27% | 1% | 3% | 63.6% | 36.4% | 62.8% | 37.2% |
| D5 | 73.78% | 18.12% | 6.25% | 1.9% | 76% | 16% | 6% | 1% | 75% | 17% | 6% | 2% | 66.2% | 33.8% | 65.6% | 34.4% |

# Appendix B: Evaluation of Plaintiffs' Illustrative Maps

## Table 5: Evaluation of Oskooii Map 5

Based on Current Turnout

| Map 5 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.29% | 55.59% | 0.72% | 7.4% | 53% | 41% | 1% | 5% | 44% | 50% | 1% | 6% | 54.9% | 45.1% | 49.7% | 50.3% |
| D2 | 27.60% | 60.99% | 9.50% | 1.9% | 42% | 46% | 11% | 1% | 33% | 55% | 10% | 1% | 46.3% | 53.7% | 41.8% | 58.2% |
| D3 | 31.83% | 60.88% | 5.07% | 2.2% | 47% | 45% | 6% | 2% | 38% | 55% | 5% | 2% | 50.3% | 49.7% | 45.4% | 54.6% |
| D4 | 67.04% | 26.33% | 1.40% | 5.2% | 80% | 16% | 1% | 3% | 73% | 22% | 1% | 4% | 69.2% | 30.8% | 65.7% | 34.3% |
| D5 | 73.78% | 18.12% | 6.25% | 1.9% | 83% | 10% | 5% | 1% | 78% | 14% | 6% | 1% | 70.1% | 29.9% | 67.4% | 32.6% |

Based on Elevated Turnout

| Map 5 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.29% | 55.59% | 0.72% | 7.4% | 40% | 53% | 1% | 6% | 38% | 54% | 1% | 7% | 47.8% | 52.2% | 46.9% | 53.1% |
| D2 | 27.60% | 60.99% | 9.50% | 1.9% | 30% | 58% | 10% | 2% | 29% | 60% | 9% | 2% | 40.4% | 59.6% | 39.7% | 60.3% |
| D3 | 31.83% | 60.88% | 5.07% | 2.2% | 35% | 58% | 5% | 2% | 34% | 59% | 5% | 2% | 43.7% | 56.3% | 42.9% | 57.1% |
| D4 | 67.04% | 26.33% | 1.40% | 5.2% | 71% | 24% | 1% | 4% | 69% | 25% | 1% | 5% | 64.2% | 35.8% | 63.4% | 36.6% |
| D5 | 73.78% | 18.12% | 6.25% | 1.9% | 76% | 16% | 6% | 1% | 75% | 17% | 6% | 2% | 66.2% | 33.8% | 65.6% | 34.4% |

# Appendix B: Evaluation of Plaintiffs' Illustrative Maps

## Table 6: Evaluation of Oskooii Map 6

Based on Current Turnout

| Map 6 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.67% | 55.51% | 1.13% | 7.7% | 52% | 41% | 1% | 6% | 43% | 50% | 1% | 6% | 54.4% | 45.6% | 49.3% | 50.7% |
| D2 | 29.64% | 58.69% | 8.28% | 3.4% | 44% | 44% | 9% | 3% | 36% | 53% | 9% | 3% | 48.2% | 51.8% | 43.5% | 56.5% |
| D3 | 36.40% | 59.55% | 1.77% | 2.3% | 53% | 43% | 2% | 2% | 43% | 53% | 2% | 2% | 54.1% | 45.9% | 48.8% | 51.2% |
| D4 | 64.94% | 26.99% | 4.45% | 3.6% | 78% | 16% | 4% | 2% | 71% | 22% | 4% | 2% | 67.4% | 32.6% | 63.8% | 36.2% |
| D5 | 74.77% | 16.60% | 6.58% | 2.1% | 84% | 9% | 6% | 1% | 79% | 13% | 6% | 1% | 70.4% | 29.6% | 67.8% | 32.2% |

Based on Elevated Turnout

| Map 6 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.67% | 55.51% | 1.13% | 7.7% | 39% | 53% | 1% | 6% | 38% | 54% | 1% | 7% | 47.4% | 52.6% | 46.6% | 53.4% |
| D2 | 29.64% | 58.69% | 8.28% | 3.4% | 33% | 56% | 8% | 3% | 31% | 57% | 8% | 3% | 42.0% | 58.0% | 41.3% | 58.7% |
| D3 | 36.40% | 59.55% | 1.77% | 2.3% | 40% | 57% | 2% | 2% | 38% | 58% | 2% | 2% | 46.9% | 53.1% | 46.1% | 53.9% |
| D4 | 64.94% | 26.99% | 4.45% | 3.6% | 68% | 25% | 4% | 3% | 67% | 26% | 4% | 3% | 62.2% | 37.8% | 61.5% | 38.5% |
| D5 | 74.77% | 16.60% | 6.58% | 2.1% | 77% | 15% | 6% | 2% | 76% | 16% | 6% | 2% | 66.7% | 33.3% | 66.1% | 33.9% |

## Appendix B: Evaluation of Plaintiffs' Illustrative Maps

### Table 7: Evaluation of Oskooii Map 7

Based on Current Turnout

| Map 7 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.67% | 55.51% | 1.13% | 7.7% | 52% | 41% | 1% | 6% | 43% | 50% | 1% | 6% | 54.4% | 45.6% | 49.3% | 50.7% |
| D2 | 29.64% | 58.69% | 8.28% | 3.4% | 44% | 44% | 9% | 3% | 36% | 53% | 9% | 3% | 48.2% | 51.8% | 43.5% | 56.5% |
| D3 | 37.32% | 59.04% | 1.54% | 2.1% | 54% | 43% | 2% | 2% | 44% | 53% | 2% | 2% | 54.7% | 45.3% | 49.3% | 50.7% |
| D4 | 66.41% | 24.92% | 4.78% | 3.9% | 79% | 15% | 4% | 2% | 72% | 20% | 5% | 3% | 67.9% | 32.1% | 64.4% | 35.6% |
| D5 | 70.91% | 20.92% | 6.28% | 1.9% | 81% | 12% | 5% | 1% | 76% | 17% | 6% | 1% | 69.1% | 30.9% | 66.0% | 34.0% |

Based on Elevated Turnout

| Map 7 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.67% | 55.51% | 1.13% | 7.7% | 39% | 53% | 1% | 6% | 38% | 54% | 1% | 7% | 47.4% | 52.6% | 46.6% | 53.4% |
| D2 | 29.64% | 58.69% | 8.28% | 3.4% | 33% | 56% | 8% | 3% | 31% | 57% | 8% | 3% | 42.0% | 58.0% | 41.3% | 58.7% |
| D3 | 37.32% | 59.04% | 1.54% | 2.1% | 41% | 56% | 2% | 2% | 39% | 57% | 2% | 2% | 47.4% | 52.6% | 46.6% | 53.4% |
| D4 | 66.41% | 24.92% | 4.78% | 3.9% | 70% | 23% | 5% | 3% | 68% | 24% | 5% | 3% | 63.0% | 37.0% | 62.3% | 37.7% |
| D5 | 70.91% | 20.92% | 6.28% | 1.9% | 74% | 19% | 6% | 1% | 73% | 20% | 6% | 2% | 64.7% | 35.3% | 64.1% | 35.9% |

# Appendix B: Evaluation of Plaintiffs' Illustrative Maps

## Table 8: Evaluation of Oskooii Map 8

Based on Current Turnout

| Map 8 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.69% | 56.30% | 0.77% | 6.2% | 54% | 41% | 1% | 5% | 44% | 51% | 1% | 5% | 55.0% | 45.0% | 49.7% | 50.3% |
| D2 | 28.15% | 60.68% | 9.37% | 1.8% | 42% | 46% | 11% | 1% | 34% | 55% | 10% | 1% | 46.7% | 53.3% | 42.2% | 57.8% |
| D3 | 33.61% | 58.01% | 1.77% | 6.6% | 50% | 43% | 2% | 5% | 41% | 53% | 2% | 5% | 52.9% | 47.1% | 47.8% | 52.2% |
| D4 | 66.39% | 26.66% | 4.40% | 2.6% | 79% | 16% | 4% | 2% | 72% | 22% | 4% | 2% | 67.9% | 32.1% | 64.3% | 35.7% |
| D5 | 70.83% | 21.50% | 6.27% | 1.4% | 81% | 12% | 5% | 1% | 76% | 17% | 6% | 1% | 69.0% | 31.0% | 65.9% | 34.1% |

Based on Elevated Turnout

| Map 8 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.69% | 56.30% | 0.77% | 6.2% | 40% | 54% | 1% | 5% | 39% | 55% | 1% | 6% | 47.8% | 52.2% | 47.0% | 53.0% |
| D2 | 28.15% | 60.68% | 9.37% | 1.8% | 31% | 58% | 9% | 1% | 30% | 59% | 9% | 2% | 40.7% | 59.3% | 40.0% | 60.0% |
| D3 | 33.61% | 58.01% | 1.77% | 6.6% | 37% | 56% | 2% | 5% | 35% | 57% | 2% | 6% | 46.0% | 54.0% | 45.1% | 54.9% |
| D4 | 66.39% | 26.66% | 4.40% | 2.6% | 70% | 24% | 4% | 2% | 68% | 25% | 4% | 2% | 62.8% | 37.2% | 62.1% | 37.9% |
| D5 | 70.83% | 21.50% | 6.27% | 1.4% | 74% | 19% | 6% | 1% | 72% | 20% | 6% | 1% | 64.6% | 35.4% | 64.0% | 36.0% |

# Appendix B: Evaluation of Plaintiffs' Illustrative Maps

## Table 9: Evaluation of Oskooii Map 9

Based on Current Turnout

| Map 9 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D1 | 35.23% | 55.70% | 0.75% | 8.3% | 52% | 41% | 1% | 6% | 43% | 50% | 1% | 6% | 54.4% | 45.6% | 49.2% | **50.8%** |
| D2 | 32.84% | 56.69% | 10.14% | 0.3% | 48% | 41% | 11% | 0% | 39% | 50% | 11% | 0% | 49.4% | **50.6%** | 44.6% | **55.4%** |
| D3 | 31.00% | 65.13% | 1.89% | 2.0% | 47% | 49% | 2% | 2% | 37% | 59% | 2% | 1% | 50.7% | 49.3% | 45.5% | **54.5%** |
| D4 | 66.51% | 25.87% | 1.42% | 6.2% | 80% | 15% | 1% | 4% | 73% | 21% | 1% | 4% | 69.1% | 30.9% | 65.6% | 34.4% |
| D5 | 74.77% | 16.80% | 6.45% | 2.0% | 84% | 9% | 5% | 1% | 79% | 13% | 6% | 1% | 70.5% | 29.5% | 67.8% | 32.2% |

Based on Elevated Turnout

| Map 9 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D1 | 35.23% | 55.70% | 0.75% | 8.3% | 39% | 53% | 1% | 7% | 37% | 54% | 1% | 8% | 47.3% | **52.7%** | 46.5% | **53.5%** |
| D2 | 32.84% | 56.69% | 10.14% | 0.3% | 36% | 54% | 10% | 0% | 35% | 55% | 10% | 0% | 43.1% | **56.9%** | 42.3% | **57.7%** |
| D3 | 31.00% | 65.13% | 1.89% | 2.0% | 34% | 62% | 2% | 2% | 33% | 64% | 2% | 2% | 43.7% | **56.3%** | 43.0% | **57.0%** |
| D4 | 66.51% | 25.87% | 1.42% | 6.2% | 70% | 24% | 1% | 5% | 68% | 25% | 1% | 6% | 64.1% | 35.9% | 63.2% | 36.8% |
| D5 | 74.77% | 16.80% | 6.45% | 2.0% | 77% | 15% | 6% | 2% | 76% | 16% | 6% | 2% | 66.7% | 33.3% | 66.1% | 33.9% |

# Appendix B: Evaluation of Plaintiffs' Illustrative Maps

## Table 10: Evaluation of Oskooii Map 10

Based on Current Turnout

| Map 10 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.23% | 55.70% | 0.75% | 8.3% | 52% | 41% | 1% | 6% | 43% | 50% | 1% | 6% | 54.4% | 45.6% | 49.2% | 50.8% |
| D2 | 32.54% | 56.64% | 10.28% | 0.5% | 47% | 41% | 11% | 0% | 39% | 50% | 11% | 0% | 49.2% | 50.8% | 44.5% | 55.5% |
| D3 | 36.27% | 60.99% | 1.48% | 1.3% | 53% | 45% | 2% | 1% | 43% | 54% | 2% | 1% | 54.0% | 46.0% | 48.6% | 51.4% |
| D4 | 64.33% | 27.81% | 1.45% | 6.4% | 78% | 17% | 1% | 4% | 71% | 23% | 1% | 4% | 68.2% | 31.8% | 64.5% | 35.5% |
| D5 | 74.68% | 16.51% | 6.59% | 2.2% | 84% | 9% | 6% | 1% | 79% | 13% | 6% | 1% | 70.4% | 29.6% | 67.8% | 32.2% |

Based on Elevated Turnout

| Map 10 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.23% | 55.70% | 0.75% | 8.3% | 39% | 53% | 1% | 7% | 37% | 54% | 1% | 8% | 47.3% | 52.7% | 46.5% | 53.5% |
| D2 | 32.54% | 56.64% | 10.28% | 0.5% | 36% | 54% | 10% | 0% | 34% | 55% | 10% | 0% | 42.9% | 57.1% | 42.2% | 57.8% |
| D3 | 36.27% | 60.99% | 1.48% | 1.3% | 40% | 58% | 1% | 1% | 38% | 59% | 1% | 1% | 46.7% | 53.3% | 45.9% | 54.1% |
| D4 | 64.33% | 27.81% | 1.45% | 6.4% | 68% | 25% | 1% | 5% | 66% | 27% | 1% | 6% | 62.9% | 37.1% | 62.1% | 37.9% |
| D5 | 74.68% | 16.51% | 6.59% | 2.2% | 77% | 15% | 6% | 2% | 76% | 16% | 6% | 2% | 66.7% | 33.3% | 66.1% | 33.9% |

# Appendix B: Evaluation of Plaintiffs' Illustrative Maps

## Table 11: Evaluation of Oskooii Map 11

Based on Current Turnout

| Map 11 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.33% | 55.90% | 0.77% | 8.0% | 52% | 41% | 1% | 6% | 43% | 51% | 1% | 6% | 54.4% | 45.6% | 49.2% | **50.8%** |
| D2 | 32.94% | 55.15% | 9.51% | 2.4% | 48% | 40% | 10% | 2% | 39% | 49% | 10% | 2% | 49.8% | **50.2%** | 45.1% | **54.9%** |
| D3 | 29.00% | 66.14% | 2.20% | 2.7% | 45% | 51% | 3% | 2% | 35% | 60% | 2% | 2% | 49.4% | **50.6%** | 44.3% | **55.7%** |
| D4 | 67.37% | 26.73% | 1.43% | 4.5% | 80% | 16% | 1% | 3% | 74% | 22% | 1% | 3% | 69.3% | 30.7% | 65.7% | 34.3% |
| D5 | 73.78% | 18.12% | 6.25% | 1.9% | 83% | 10% | 5% | 1% | 78% | 14% | 6% | 1% | 70.1% | 29.9% | 67.4% | 32.6% |

Based on Elevated Turnout

| Map 11 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 35.33% | 55.90% | 0.77% | 8.0% | 39% | 54% | 1% | 7% | 37% | 55% | 1% | 7% | 47.3% | **52.7%** | 46.5% | **53.5%** |
| D2 | 32.94% | 55.15% | 9.51% | 2.4% | 36% | 52% | 10% | 2% | 35% | 54% | 9% | 2% | 43.5% | **56.5%** | 42.8% | **57.2%** |
| D3 | 29.00% | 66.14% | 2.20% | 2.7% | 32% | 63% | 2% | 2% | 31% | 65% | 2% | 2% | 42.6% | **57.4%** | 41.9% | **58.1%** |
| D4 | 67.37% | 26.73% | 1.43% | 4.5% | 71% | 24% | 1% | 4% | 69% | 25% | 1% | 4% | 64.2% | 35.8% | 63.4% | 36.6% |
| D5 | 73.78% | 18.12% | 6.25% | 1.9% | 76% | 16% | 6% | 1% | 75% | 17% | 6% | 2% | 66.2% | 33.8% | 65.6% | 34.4% |

**Appendix B: Evaluation of Plaintiffs' Illustrative Maps**

**Table 12: Evaluation of Oskooii Map 12**

Based on Current Turnout

| Map 12 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.47% | 55.46% | 0.72% | 7.4% | 53% | 41% | 1% | 5% | 44% | 50% | 1% | 6% | 55.0% | 45.0% | 49.8% | **50.2%** |
| D2 | 30.96% | 55.29% | 9.83% | 3.9% | 46% | 41% | 11% | 3% | 37% | 50% | 10% | 3% | 48.7% | **51.3%** | 44.1% | **55.9%** |
| D3 | 28.47% | 66.62% | 2.41% | 2.5% | 44% | 51% | 3% | 2% | 35% | 61% | 3% | 2% | 49.0% | **51.0%** | 43.9% | **56.1%** |
| D4 | 67.28% | 27.85% | 1.39% | 3.5% | 80% | 17% | 1% | 2% | 73% | 23% | 1% | 2% | 69.2% | 30.8% | 65.5% | 34.5% |
| D5 | 73.78% | 18.12% | 6.25% | 1.9% | 83% | 10% | 5% | 1% | 78% | 14% | 6% | 1% | 70.1% | 29.9% | 67.4% | 32.6% |

Based on Elevated Turnout

| Map 12 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.47% | 55.46% | 0.72% | 7.4% | 40% | 53% | 1% | 6% | 38% | 54% | 1% | 7% | 47.9% | **52.1%** | 47.0% | **53.0%** |
| D2 | 30.96% | 55.29% | 9.83% | 3.9% | 34% | 53% | 10% | 3% | 33% | 54% | 10% | 4% | 42.5% | **57.5%** | 41.9% | **58.1%** |
| D3 | 28.47% | 66.62% | 2.41% | 2.5% | 32% | 64% | 2% | 2% | 30% | 65% | 2% | 2% | 42.2% | **57.8%** | 41.5% | **58.5%** |
| D4 | 67.28% | 27.85% | 1.39% | 3.5% | 71% | 25% | 1% | 3% | 69% | 26% | 1% | 3% | 64.0% | 36.0% | 63.2% | 36.8% |
| D5 | 73.78% | 18.12% | 6.25% | 1.9% | 76% | 16% | 6% | 1% | 75% | 17% | 6% | 2% | 66.2% | 33.8% | 65.6% | 34.4% |

# Appendix B: Evaluation of Plaintiffs' Illustrative Maps

## Table 13: Evaluation of Oskooii Map 13

Based on Current Turnout

| Map 13 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.36% | 55.63% | 0.73% | 7.3% | 53% | 41% | 1% | 5% | 44% | 50% | 1% | 5% | 54.9% | 45.1% | 49.7% | **50.3%** |
| D2 | 24.36% | 64.76% | 9.66% | 1.2% | 38% | 50% | 11% | 1% | 30% | 59% | 10% | 1% | 44.0% | **56.0%** | 39.7% | **60.3%** |
| D3 | 34.13% | 55.49% | 4.60% | 5.8% | 50% | 41% | 5% | 4% | 41% | 50% | 5% | 4% | 52.3% | 47.7% | 47.3% | **52.7%** |
| D4 | 69.63% | 25.38% | 2.62% | 2.4% | 81% | 15% | 2% | 1% | 75% | 21% | 2% | 2% | 69.6% | 30.4% | 66.2% | 33.8% |
| D5 | 71.49% | 21.33% | 5.34% | 1.8% | 82% | 12% | 5% | 1% | 77% | 17% | 5% | 1% | 69.5% | 30.5% | 66.5% | 33.5% |

Based on Elevated Turnout

| Map 13 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.36% | 55.63% | 0.73% | 7.3% | 40% | 53% | 1% | 6% | 38% | 54% | 1% | 7% | 47.8% | **52.2%** | 47.0% | **53.0%** |
| D2 | 24.36% | 64.76% | 9.66% | 1.2% | 27% | 62% | 10% | 1% | 26% | 63% | 10% | 1% | 38.3% | **61.7%** | 37.7% | **62.3%** |
| D3 | 34.13% | 55.49% | 4.60% | 5.8% | 38% | 53% | 5% | 5% | 36% | 54% | 5% | 5% | 45.6% | **54.4%** | 44.8% | **55.2%** |
| D4 | 69.63% | 25.38% | 2.62% | 2.4% | 73% | 23% | 3% | 2% | 71% | 24% | 3% | 2% | 64.8% | 35.2% | 64.1% | 35.9% |
| D5 | 71.49% | 21.33% | 5.34% | 1.8% | 74% | 19% | 5% | 1% | 73% | 20% | 5% | 2% | 65.2% | 34.8% | 64.6% | 35.4% |

# Appendix B: Evaluation of Plaintiffs' Illustrative Maps

## Table 14: Evaluation of Oskooii Map 14

Based on Current Turnout

| Map 14 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.27% | 55.69% | 0.73% | 7.3% | 53% | 41% | 1% | 5% | 44% | 50% | 1% | 5% | 54.9% | 45.1% | 49.7% | 50.3% |
| D2 | 23.07% | 70.49% | 3.89% | 2.6% | 37% | 56% | 5% | 2% | 29% | 65% | 4% | 2% | 44.8% | 55.2% | 40.3% | 59.7% |
| D3 | 38.59% | 52.18% | 4.01% | 5.2% | 55% | 37% | 4% | 4% | 46% | 46% | 4% | 4% | 55.0% | 45.0% | 50.0% | 50.0% |
| D4 | 73.33% | 19.57% | 4.12% | 3.0% | 84% | 11% | 4% | 2% | 78% | 16% | 4% | 2% | 70.6% | 29.4% | 67.8% | 32.2% |
| D5 | 64.80% | 26.79% | 8.02% | 0.4% | 77% | 16% | 7% | 0% | 70% | 22% | 8% | 0% | 66.0% | 34.0% | 62.4% | 37.6% |

Based on Elevated Turnout

| Map 14 | WCVAP | HCVAP | BCVAP | OCVAP | November - Odd Years | | | | November - Even Years | | | | Nov - Odd | | Nov - Even | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | WVOTE | LVOTE | BVOTE | OVOTE | WVOTE | LVOTE | BVOTE | OVOTE | WCAND | LCAND | WCAND | LCAND |
| D1 | 36.27% | 55.69% | 0.73% | 7.3% | 40% | 53% | 1% | 6% | 38% | 54% | 1% | 7% | 47.8% | 52.2% | 46.9% | 53.1% |
| D2 | 23.07% | 70.49% | 3.89% | 2.6% | 26% | 68% | 4% | 2% | 25% | 69% | 4% | 2% | 38.8% | 61.2% | 38.2% | 61.8% |
| D3 | 38.59% | 52.18% | 4.01% | 5.2% | 42% | 49% | 4% | 4% | 41% | 51% | 4% | 5% | 48.2% | 51.8% | 47.3% | 52.7% |
| D4 | 73.33% | 19.57% | 4.12% | 3.0% | 76% | 18% | 4% | 2% | 75% | 18% | 4% | 3% | 66.6% | 33.4% | 65.9% | 34.1% |
| D5 | 64.80% | 26.79% | 8.02% | 0.4% | 68% | 24% | 8% | 0% | 67% | 25% | 8% | 0% | 61.0% | 39.0% | 60.3% | 39.7% |

**Appendix C**: Harvard Law School Election Law Clinic EI Estimates for Ford County

# Kansas 2020

Ecological inference estimates by county for KS State.



hlselectionlaw.org

# Ecological Inference Estimates

On this page
Ecological Inference
Estimates
2020 Kansas county



Each point indicates the estimated mean for that race or ethnicity's estimated support for the Democratic candidate. The extent of the bar indicates a 95% confidence interval.

**Appendix D**: 2021 City Commission Republican Slate Advertisement



## Appendix E: Materials Related to 2011 DOJ Request for Information

## E-1 Letter from DOJ to Ford County (FC_000208)



**U.S. Department of Justice**

Civil Rights Division

*Voting Section - NWB*
*950 Pennsylvania Ave, NW*
*Washington, DC  20530*

June 29, 2011

<u>**VIA FACISMILE AND FIRST-CLASS MAIL**</u>

Sharon Seibel
County Clerk & Election Officer
Ford County Government Center
100 Gunsmoke, 4th Floor
Dodge City, Kansas  67801

   RE: <u>Request for Election Information</u>

Dear Ms. Seibel:

   I write to request certain election information regarding the City of Dodge City, Kansas. Please provide the following information, in electronic format, within 30 days:

  (1) Maps.  A SHAPE or other digital file of all precinct and district boundaries used in Dodge City since January 2000.  Please also include a list of all precinct and boundary changes or consolidations during that time.

  (2) Voter Lists.  An electronic list of registered voters by precinct at the time of each election in which one or more precincts in Dodge City participated since January 2000.  Please produce the list in a .dbf, .xls, or delimited-text file format.  Please specify what delimiter is used for the electronic lists, if applicable, or provide a file layout.

  (3) Turnout Data.  An electronic list of actual voters in each precinct who turned out to vote at each election in which one or more precincts in Dodge City participated since January 2000.  Again, please produce the list in a .dbf, .xls, or delimited-text file format, and specify the delimiter, if applicable, or provide a file layout.  If electronic lists of actual voters are not available, please provide copies of any poll books/sign-in lists retained from those elections.  Please indicate whether voters are designated as voting absentee/early/or in-precinct.

  (4) Election Data.  Precinct level election results showing the votes cast for each candidate, in electronic format, for each election in which one or more precincts in Dodge City participated since January 2000.  Please indicate whether early voting/absentee votes are allocated back to the precinct-level results.

**E-1 Letter from DOJ to Ford County (FC_000209)**

-2-

You may direct your response via email to catherine.meza@usdoj.gov. You may also send the documents via Federal Express to the following address:

> Catherine Meza
> Civil Rights Division, Voting Section
> U.S. Department of Justice
> Room 7151 NWB
> 1800 G Street, NW
> Washington, DC 20006

If you have any questions or concerns about this request, feel free to contact me at (202) 305-0132 or Meredith Bell-Platts at (202) 305-8051. Thank you in advance for your cooperation.

Sincerely,

Catherine Meza
Attorney, Voting Section

**Appendix E: Materials Related to 2011 DOJ Request for Information**

**E-2 Letter from Mr. Bruce Adelson to Ford County (FC_000210)**

# Federal Compliance Consulting LLC
## 11808 Becket Street
## Potomac, Maryland 20854
## 301-762-5272
## 240-536-9192 fax

Bruce L. Adelson
CEO/Attorney at Law
badelson1@comcast.net

Licensed in:
DC, MD, MI, VA

August 26, 2011

Sharon Seibel
Ford County Clerk and Election Officer
100 Gunsmoke, 4th Floor
Government Center
Dodge City, KS 67801

Dear Ms. Seibel:

For your information, this letter addresses potential liability issues for Dodge City pursuant to Section 2 of the Voting Rights Act (VRA). The opinion contained in this letter reflects expertise obtained during my career with the United States Department of Justice (DOJ), Civil Rights Division, Voting Section.

As you indicated, DOJ recently requested election returns and geographic data to conduct a Section 2 compliance analysis of Dodge City. DOJ will use this data to determine whether the City Commission's at-large method of election violates Section 2 of the VRA.

In my experience, DOJ will use this data to complete an analysis of whether Dodge voters vote primarily on the basis of race. If they do so vote, the next inquiry concerns whether these voting patterns effectively prohibit minority voters from participating equally in the electoral process. If DOJ determines that the electoral structure for the City Commission violates the VRA, DOJ will seek a remedy, either via Consent Decree or contested litigation, which normally involves eliminating the at-large structure and constructing smaller election districts.

The Dodge City Commission can avoid expensive and protracted litigation, however, if it attempts to address the issue that attracted DOJ, namely, the City's burgeoning Hispanic population and the lack of Hispanic representation on the Commission.

According to the 2000 Census, Dodge City is approximately 42.9% Hispanic. However, Dodge City has not recently elected a Hispanic or other minority to the City Commission. It is

1

## E-2 Letter from Mr. Bruce Adelson to Ford County (FC_000211)

the combination of the City's at-large method of election and high minority population percentage that raise the red flags for DOJ investigations.

Unfortunately, Dodge seems to possess the initial criteria that may indicate a VRA Section 2 violation. Nonetheless, DOJ must complete a Section 2 investigation that not only includes the requested political and geographic data, but also community essentials, such as prominent minority leaders, former minority candidates, and historical information.

In determining whether Section 2 has been violated, courts conduct a "comprehensive, not limited, canvassing of relevant facts."[1] Under Section 2, challenged voting practices are not per se illegal; instead "[t]hose challenging an electoral device must prove that... the device 'result[s] in unequal access to the electoral process.'"[2] Moreover, the allegedly dilutive voting practice and the lack of proportional representation for the minority community, are not alone sufficient to make out a violation of Section 2.

The U.S. Supreme Court established the framework for vote dilution claims under Section 2 in *Thornburg v. Gingles,* 478 U.S. 30 (1986), which continues to serve as the seminal case for Section 2 determinations. The *Gingles* Court established certain preconditions, which are as follows:

1. the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district,

2. the minority group must be able to show that it is politically cohesive, and

3. the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, such as the minority candidate running unopposed . . . usually to defeat the minority's preferred candidate.[3]

In assessing whether an election method, such as at-large elections, potentially violates Section 2, local officials should first inquire whether minority voters in the affected area have the potential to elect representative of their choice should the challenged system be replaced by an alternative, such as a single member district plan. As the *Gingles* Court explained:

---

[1] Thornburg v. Gingles. 478 U.S. 30, 48 (1986).

[2] Id. at 48 n. 14 (citations and internal quotations omitted). Johnson v. De Grandy, 512 U.S. 997, 1011 (1994). Brooks. 158 F.3d at 1238 (quoting Gingles. 478 U.S. at *46}. Gingles. 478 U.S. at 46.

[3] *Gingles*, 478 U.S. at 50-51.

2

### E-2 Letter from Mr. Bruce Adelson to Ford County (FC_000212)

The reason that a minority group making [a vote dilution] challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the <u>potential</u> to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. . .. Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure. Id.

Once a determination is made regarding whether the minority population could constitute a majority in a single member district, officials must determine whether the minority group is politically cohesive and whether white voters generally vote as a bloc to preclude the minority's candidate of choice. The basis for such a finding results from a studied and thorough analysis of election returns, candidate information, and voting patterns over at least a ten year period.

If successful in satisfying the three *Gingles* preconditions, courts are then required to consider the totality of the circumstances and to determine, based upon an evaluation of past and present election and voting reality, whether the political process is equally open to minority voters. In *Gingles*, the Supreme Court adopted several factors that the U.S. Senate Judiciary Committee suggested should be considered in determining the totality of circumstances analysis, among them:

1. the history of voting-related discrimination in the State or political subdivision;

2. the extent to which voting in the elections of the State or political subdivision is racially polarized;

3. the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

4. the exclusion of members of the minority group from candidate slating processes;

5. the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

6. the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

3

### E-2 Letter from Mr. Bruce Adelson to Ford County (FC_000213)

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

8. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. [4]

Anyone challenging the current method of election, however, is not limited to proving the matters referred to as the Senate factors, which include demonstrating a history of discrimination in housing and education, racial appeals and lack of access to the slating process, but can demonstrate circumstances beyond those factors.

While we have not yet conducted our own investigation, we assume, at this point, that with a more than 42% Hispanic population, Dodge City's Hispanic community could comprise a majority in at least one single member district. If this is the case, the first of the three *Gingles* preconditions could easily be satisfied and lead to the studied examination of the remaining two *Gingles* prongs. It is difficult to establish the application of the remaining two preconditions to Dodge City without an analysis of election returns, voter registration, and other data. Nonetheless, should DOJ's review of the requested data prove the existence of the remaining *Gingles* preconditions, DOJ would be well on its way to finding that the current configuration of the City Commission violates Section 2 of the VRA. Moreover, should DOJ find any combination of the Senate factors to apply to Dodge City, it could also maintain that the City Commission's at-large method of electing discriminates against minority voters.

In sum, it is our recommendation that the Dodge City Commission engage in a self-assessment of its possible Section 2 liability. Ignoring the reality of the City's changing demographics and the looming DOJ investigation, could invite potential litigation plus substantial cost and liability on a matter that could be addressed without DOJ intervention.

Please feel free to contact us if you wish any additional information.

Sincerely,


Bruce L. Adelson

---

[4] *Gingles*, 478 U.S. at 44-45.

4

**Appendix F: Barreto CV**