EXHIBIT

B

EXPERT REPORT FOR Coca, et al. v. City of Dodge City, et al.

Jonathan N. Katz

June 29, 2023

I was asked by counsel for the defendant to examine elections for City Commission in Dodge City to determine if they are characterized by racially polarized voting. I was also asked to evaluate the analysis of Dr. Matt Barreto in his expert report. In making my findings, I have applied standard statistical methods, which I regularly employ in my research and which have been published in peer-reviewed journals.

A summary of my report and basic findings is as follows:

- The relatively small number of voting precincts in the city and the lack of any homogenous Latino precincts severely limits the statistically valid inferences that can be made about how individuals of different racial and ethnic groups voted in local elections.

- Given the caveat above, I found no evidence of statistically significant racially polarized voting in Dodge City Commission elections.

- Dr. Barreto's analysis is seriously flawed. Most importantly, he fails to provide complete results nor to present any measure of statistical uncertainty for his estimates. It is not possible to make scientifically valid inferences without accounting for statistical uncertainty.

In the next section of my report, I review my qualifications. The following section discusses the problem of identifying and making ecological inferences in Dodge City given the available data. The next section presents a re-analysis of the Dodge City Commission elections. The final section raises several other concerns with Dr. Barreto's analysis.

## 1. QUALIFICATIONS

I am currently the Kay Sugahara Professor of Social Sciences and Statistics at the California Institute of Technology. I previously served for seven years as the Chair of the Division of the Humanities and Social Sciences at Caltech (which is akin to being a dean at other universities). Furthermore, I was also formerly on the faculty at the University of Chicago and a visiting professor at the University of Konstanz (Germany). A complete copy of my curriculum vitae is in Appendix A.

I received my Bachelor of Science degree from the Massachusetts Institute of Technology and my Masters of Arts and Doctor of Philosophy degrees, both in political science, from the University of California, San Diego. I have also done post-doctoral work at Harvard University and the Harvard-MIT Data Center. In addition, I am an elected fellow of both the American Academy of Arts and Sciences and an inaugural fellow of the Society for Political Methodology. I am a former fellow of the Center for Advanced Study in the Behavioral Sciences.

I have written numerous articles published in the leading journals as outlined in my curriculum vitae. Currently, I am the Deputy Editor for Social Sciences of *Science Advances*, the open-access

journal of the American Association for the Advancement of Science, where I also serve on the journal's executive committee. I previously served as co-editor of *Political Analysis*, the journal of the Society for Political Methodology, and I was a co-founding editor of the Political Science Network (a collection of online journals). I have also previously served on the editorial boards of *Electoral Studies*, *Political Research Quarterly* and the *American Journal of Political Science*. I have frequently served as a referee of manuscripts for most of the major journals in my fields of research and the National Science Foundation.

I have done extensive research on American elections and on statistical methods for analyzing social science data. In addition, I am a member of the Caltech/MIT Voting Technology Project, serving as the co-director of the project from October 1, 2005 to September 30, 2010.

Over the past two decades, I have been involved in numerous elections cases for both Democratic and Republican clients involving the Federal Voting Rights Act, the evaluation of voting systems, or the statistical evaluation of electoral data. I have testified or consulted in court cases in both state and Federal courts in the states of Arizona, California, Florida, Georgia, Indiana, Illinois, Maryland, Michigan, Missouri, New Mexico, Nevada, Oklahoma, Texas, Virginia, and Washington.

In the past four years, I have testified either in deposition or at trial in the following cases:

1. *Casey v. Garner* (2020, U.S. District Court for the District of New Hampshire)

2. *Miller v. Huges* (2020, U.S. District Court for the Western District of Texas)

3. *Bruni v. Huges* (2020, U.S. District Court for the Southern District of Texas)

4. *Clarno et al. v. Fagan* (2021, Circuit Court for the State of Oregon, County of Marion)

5. *Harkenrider et al. v. Hochul et al* (2022, Supreme Court of the State of New York, County of Steuben)

6. *Public Interest Legal Foundation v. Benson* (2023, U.S. District Court for the Western District of Michigan)

My rate for expert witness work in this case is $700.00 per hour.

## 2. IDENTIFYING ECOLOGICAL ESTIMATES

The fundamental problem with Dr. Barreto's analysis in his report in this case is a lack of statistical identification. In non-technical terms, statistical identification asks whether a given data set can lead to sensible estimates of some quantity of interest. In this case, the quantity of interest is an estimate of how individuals of different ethnic or racial groups voted given only aggregate data on election results in the county. As I will show, the estimates that Dr. Barreto, or any other

analysis, could produce are not well identified and, therefore, no valid statistical claims can be made regarding the presence of racially polarized voting with his analysis.

In order to see how Dr. Barreto's statistical estimates of voting behavior are not well identified, I will first review the various methods for ecological inference – the technical term for inferring individual voting behavior from aggregate election results. I will show that in this case, his identification comes from an implausible assumption that underlies ecological regression that has been soundly rejected in the statistical literature.

### 2.1. *Homogenous Precincts and the Method of Bounds*

A common starting point for ecological inference is to consider only homogeneous precincts. That is, we could examine the election results from precincts that are closest to racially homogeneous. For example, if a precinct were completely racially homogeneous, say with a population that was 100% Latino, then we know what fraction of Latinos voted for a given candidate in the precinct: it is just the share the given candidate got in the precinct. While this might be a useful starting point, as a statistical procedure it is problematic since it throws out most of the data unless most of the precincts are homogeneous.

However, we can use the intuition from the homogeneous precincts to place bounds on the level of support each group gives a candidate (see Duncan and Davis 1953). Consider the following equation, which is true by definition, that relates the vote share of the given candidate to the voting behavior of Latinos and Whites:

$$V_i = \lambda_i^L X_i + \lambda^W (1 - X_i),$$ (1)

where $V_i$ is the share of the vote a given candidate received in precinct $i$, $X_i$ is the fraction of Latinos in the precinct and therefore $(1 - X_i)$ is the fraction of White (or more correctly non-Latino) voters, assuming for the moment that there are only two groups in the electorate. $\lambda_i^L$ is the fraction of Latinos voting for the given candidate and similarly $\lambda_i^W$ is the fraction of Whites voting for the given candidate. In other words, the equation states the fact that the total vote share for a candidate must equal the proportion of Latino voters who support them multiplied by the proportion of the electorate that is Latino plus the proportion of the White voters who support the candidate multiplied by the proportion of the electorate which is White.

Now consider homogeneous Latino precincts again. In these precincts, $X_i = 1$, so that the equation simplifies to $V_i = \lambda_i^L$ as we stated above. However, from these precincts, we can not say anything about the voting behavior of Whites because any proportion of Whites voting for a given candidate is consistent with the observed vote shares in these precincts. We can generalize this idea using Equation 1. Consider, for example, a precinct where $X_i = 0.6$, that is sixty percent of

3

voters are Latino (and, therefore, 40% are White), and the candidate's vote share, $V_i$, is 0.5.

Since 60% of the voters are Latino and the given candidate got 50% of the vote, then at most $\frac{5}{6}$ths of the Latino voters could have voted for the candidate. If it were higher than this bound then the vote share in the precinct would have to be higher. On the other hand, even if all the Whites voted for the candidate then at least $\frac{1}{6}$th of the Latinos would have had to vote for the candidate as well, otherwise the vote share would have been less than 0.5. Thus, we know that the proportion of Latinos voting for the candidate, $\lambda_i^L$, must be greater than 1/6 and less than 5/6 and $\lambda_i^W$ can take on any value between zero and one. We actually know more than this: we know that the feasible values for this district must lie on the line segment, called a constraint line, defined by the bounds $(\frac{1}{6}, 1)$ and $(\frac{5}{6}, 0)$. Using standard algebra by plugging in $X_i = 0.6$ and $V_i = 0.5$, we find that $\lambda_i^W = -\frac{3}{2}\lambda_i^H + \frac{5}{4}$.

Duncan and Davis (1953) fully developed the method of bounds outlined above to analyze ecological data. The advantage of their method of bounds is that it does not rely on any untestable assumptions. The problem, however, is that it can only be used in cases where there bounds are informative. This happens only when there are sufficient homogenous precincts. In many cases, including in Dodge City, this is not the case.

Table 1: Percentage of Latino Voters by Precinct in Dodge City Commission Elections 2014–2021

| | Latino Voters (%) | | | |
|---|---|---|---|---|
| Precinct | 2021 | 2019 | 2017 | 2014 |
| 1 | 39.1 | 38.9 | 30.1 | 20.4 |
| 2 | 54.5 | 49.0 | 44.5 | 39.7 |
| 3 | 59.9 | 49.4 | 45.4 | 53.7 |
| 4 | 31.4 | 29.8 | 27.8 | 31.8 |
| 5 | 18.7 | 17.0 | 15.6 | 12.2 |
| 6 | 12.6 | 12.2 | 11.3 | 4.1 |
| 7 | 8.8 | 9.4 | 9.5 | 1.9 |
| 8 | – | – | – | 6.5 |
| 9 | 20.8 | 8.4 | – | – |

Table 1 gives the percentage of voters who are Latino in each precinct for all the City Commission elections from 2014 to 2021. To see why this distribution of Latino voters is problematic for Dr. Barreto's homogenous precinct analysis, let us look at the City Commission race in 2021. He claims that Soto is the likely preferred candidate of Latino voters (see Table 5 of his report) Let us look a Precinct 3 in 2021, which has the most Latino electorate at 59.9% of all the precincts in any year analyzed.[1] However, if we calculate the deterministic bounds of Duncan and Davis (1953) for Latinos voting for Soto in this precinct, we find that the lower bound is 0.0% and the upper bound

---

[1] This based on estimating race and ethnicity by name matching the voter file, which is what he used.

4

is 29.9%. This is hardly informative of Latino voting behavior in the precinct. If we look at the deterministic bounds for Latino support of Burns in this precinct, who Dr. Baretto claims is the White preferred candidate, they are 0.0% and 22.0% respectively. Since these two bounds overlap substantially, we can not tell from this bounds analysis if more Latinos voted for Burn or Soto in Precinct 3. What about White voters in Precincts 5 and 6, which contains the largest fraction of White voters? The bounds on the White support for Soto are 0.0% and 14.2% in Precinct 5 and 0.0% and 12.0% in Precinct 6. These bounds are tighter than for Latinos in Precinct 3 because Whites make up a far larger fraction of the electorate in these precincts, but they are still not that informative.

This is why as a general rule of thumb, analysts only consider precincts that are at least 90% of a given racial or ethnic group as homogenous, and it is much better if closer to 100%. The bounds will just be too large otherwise. As can be seen from Table 1, there are no elections for the Dodge City Commission that Dr. Barreto analyzed with anything close to homogenous Latino precincts. Given this, Dr. Barreto's homogenous precinct analysis provides no statistically valid information about racial voting patterns in Dodge City.

## 2.2. *Ecological or Goodman's Regression*

An alternative approach that examines all precincts simultaneously was developed by Goodman (1959) and is perhaps the most commonly used procedure. It is referred to in the literature as ecological regression or Goodman's regression.

Like the method of bounds, it is based on the identity in Equation 1. It identifies the estimate by making the strong assumption that voting behavior does not vary across individuals or precincts. That is, the fraction of support for a given candidate for both Whites and Latinos was the same across all precincts and individuals in the district. A bit more formally, suppose that $\lambda_i^L = \lambda^L$ and $\lambda_i^W = \lambda^W$ for every precinct $i$. Then we could estimate these fractions by choosing the best fitting line to the precinct-level data. This is just a standard linear regression.

However, there is no free lunch, ecological regression allows one to identify the estimate across all districts and in any data set by making the heroic assumption of no variability in voting behavior across precincts and individuals, which is usually referred to as the *constancy assumption*. In fact, Goodman himself was extremely cautious in recommending the use of ecological regression to infer individual relationships given this required assumption. He stressed that only "under very special circumstances" should ecological be relied upon to produce reasonable estimates (Goodman 1953: 664).

A more technical critique of ecological regression and its constancy assumption was made by Freedman et al. (1991). They develop an alternative model that they called the "neighborhood model". The full argument is highly technical, and it is beyond the scope of this report. In

brief, they show in aggregate election results this model is equivalent to Goodman's ecological regression level but has dramatic differences at the individual (or group level). That is, the aggregate data can not identify individual behavior except under untestable assumptions and different such assumptions lead to dramatically different estimates of individual behavior. Finally, King (1997) showed ecological regression can produce widely inaccurate estimates of group voting behavior. Thus, the consensus of the statistical literature is to reject analysis based on ecological regression (see, for example, Schuessler 1991 or Flanigan and Zingale 1985).

## 2.3. *Ecological Inference/EI*

King (1997) has developed an alternative approach called Ecological Inference or EI. While the technical details are complex, its advantage is that it uses all available information to generate more accurate estimates of voting behavior from aggregate data. EI is a way to combine the regression approach of Goodman (1959) with the bounds from Duncan and Davis (1953). Further, it allows the estimates to vary (systematically) across precincts. The idea is we calculate the constraint lines for every precinct. We then choose as our estimate for a given precinct a point on its constraint line near the center of the intersection of all the other lines. The actual point chosen is based on a standard statistical model. We can then use these precinct estimates to calculate quantities of interest such as the average support level across the district.

It is important to note that since King's method relies heavily on the bounds information, it works well only when these bounds are informative — i.e., narrower than the entire range from 0 to 1. This will happen when more precincts have large proportions of each of the groups whose voting behavior we want to estimate. In other words, we will need a substantial number of precincts that are relatively homogenous for each ethnic group we want to study. When this is not the case, EI can go wildly wrong as noted by King himself (1997, see chapter 9).

The EI estimates are not well identified when the bounds are not informative because EI is then just a slight generalization of ecological regression in this case. It, therefore, relies on the same constancy assumption for identification that has been rejected in the statistical literature when bound data is unavailable.

The other problem with using EI to analyze elections in Dodge City is the very small number of precincts. In the off-year Commission elections, there are only seven or eight precincts. Further, there are between four and seven candidates per election and three groups (Latinos, Whites, and Others). This means we need to estimate between 12 and 21 parameters — i.e., how each group voted for each candidate. Given that we have fewer data points than parameters to estimate, identification is coming solely from the strong parametric assumptions of the model. This will also be seen by the very large confidence intervals of our estimates, which Dr. Barreto does not report in his analysis.

### 3. ANALYSIS OF DODGE CITY ELECTIONS

As noted the central question in this case is whether there is racially polarized voting in the elections for the Dodge City Commission. This happens when statistical estimates show that there is a clear preferred candidate of the minority group and that the majority group is also cohesive in preferring another candidate. Of course, as already mentioned, we need to account for statistical uncertainty in making this determination of voting behavior

Clearly, the most relevant data are for the actual elections for Dodge City Commission. These are referred to as endogenous elections in redistricting litigation. We have data for 2014, 2017, 2019, and 2021 elections. Dr. Barreto also examines several other elections for statewide office, which are referred to as exogenous in redistricting litigation.[2] However, these are only relevant to the question at hand if voting behavior is similar between the endogenous and endogenous elections. These statewide races differ in several important ways that call into question their similarity. First, the statewide elections take place in even-numbered years with substantially higher voter turnout. Further, these are high-profile, partisan races with typically only two candidates. Given the increase in political polarization, voters are more likely to vote for the candidate of their preferred party's candidate. In Dodge City, there are racial differences in party registration. For example, among the 2021 voters, 76.2% of Whites versus 51.4% of Latins are registered as Republican. Similarly, 31.0% of Latinos are registered as Democrat, but only 15.6% of Whites. This means that the statewide elections are not comparable to the local elections for the Commission.

Dr. Barreto uses EI to analyze the results of these elections, but he does not present the full results. Given the caveats about the data discussed above, we can look at the estimated voting behavior using the generalization of EI by Rosen et al. (2001).

My re-analysis of the 2021 Dodge City Commission election is presented in Table 2. The rows of the table correspond to the eight vote options in the election, where a voter could choose up to three. The columns correspond to each of the three groups in the electorate: Latinos, Whites, and Others (which is any registered voter whose surname does not match either as Latino/Hispanic or White in origin). The single number in each row is the point estimate of the fraction of that group who voted for a given candidate. For example, it is estimated that 12.6% of Latinos voted for Burns. The two numbers below each point estimate represent the 95% confidence interval for this estimate. Since we are statistically estimating the fraction of each group voting for each choice, this interval reflects our estimation uncertainty. This means that all we can say is that the true fraction is likely in this interval. This interval is very large, almost 20 percentage points, because of the limited number of precincts and the lack of homogeneous Latino precincts.

These confidence intervals are an easy way to construct hypothesis tests, which is the only way to statistically ascertain whether there is evidence of racially polarized voting. Recall, that racially

---

[2]I note this is not how the words exogenous and endogenous are used in statistics.

Table 2: EI Results for November 2021 for Dodge City Commission

|  | Latinos | Whites | Other |
|---|---|---|---|
| Burns | 12.6 | 19.3 | 12.3 |
|  | ( 3.8, 24.7) | (15.7, 22.5) | ( 2.4, 27.5) |
| Nuci | 13.6 | 16.5 | 13.8 |
|  | ( 4.4, 25.6) | (12.8, 19.6) | ( 3.1, 30.5) |
| Reinert | 10.7 | 15.2 | 13.3 |
|  | ( 2.5, 21.2) | (11.7, 18.1) | ( 2.9, 30.2) |
| Rhoten | 5.8 | 3.9 | 11.6 |
|  | ( 1.3, 12.7) | ( 1.7, 5.7) | ( 1.9, 26.1) |
| Salinas | 10.9 | 9.3 | 12.1 |
|  | ( 2.9, 20.6) | ( 6.0, 12.0) | ( 2.3, 27.6) |
| Scoggins | 14.1 | 10.0 | 12.0 |
|  | ( 5.1, 24.4) | ( 6.9, 12.8) | ( 1.9, 28.0) |
| Soto | 14.9 | 10.1 | 11.5 |
|  | ( 5.9, 26.2) | ( 6.5, 13.2) | ( 1.6, 28.1) |
| Taylor | 17.4 | 15.6 | 13.3 |
|  | ( 6.9, 30.1) | (11.6, 19.1) | ( 2.8, 29.1) |

polarized voting requires us to compare two or more estimates. The formal statistical test requires us to compare the difference between the point estimates, but we only know if this difference is statistically significant if it is larger than their joint statistical uncertainty. If the confidence intervals for any two estimates overlaps then their difference is not statistically different.

Table 3: EI Results for November 2019 for Dodge City Commission

|  | Latinos | Whites | Other |
|---|---|---|---|
| Nuci | 19.4 | 18.4 | 20.5 |
|  | ( 6.8, 36.3) | (13.2, 22.5) | ( 3.7, 45.8) |
| Sowers | 22.4 | 25.5 | 19.7 |
|  | ( 7.6, 39.3) | (20.9, 30.1) | ( 4.3, 43.5) |
| Hessman | 23.4 | 15.4 | 21.4 |
|  | ( 8.9, 40.2) | (10.4, 19.8) | ( 4.9, 46.6) |
| Smoll | 19.3 | 25.1 | 19.0 |
|  | ( 5.8, 35.7) | (20.4, 29.2) | ( 3.6, 43.7) |
| Reeves | 15.5 | 15.6 | 19.3 |
|  | ( 3.7, 32.1) | (10.6, 19.5) | ( 4.1, 41.5) |

If we first look at Latinos, we cannot statistically rank the candidates. All the confidence

intervals for all the candidates overlap. This means that we cannot say that any candidate is preferred by Latinos. Looking at the White voters, most of the confidence intervals also overlap. The only definitive ranking is that Rhoten was the last choice of White voters. More importantly, we cannot say that any candidate is most preferred by White voters. This means that we cannot say that there is racially polarized voting in the 2021 Dodge City Commission election as the statistical estimates do not show cohesive voting behavior for either Whites or Latinos above our level of estimation uncertainty.

The EI results for the 2019 Dodge City Commission election are in Table 3. The results are similar to the 2021 election, except that the confidence intervals for Latinos are even larger. We can not say who their preferred candidate was in this election. For Whites all we can conclusively say is Reeves was likely ranked behind Sowers and Smoll. We do not see any evidence of cohesive voting on their part given the large amount of statistical uncertainty. Therefore, this election shows no signs of statistically significant racially polarized voting.

Table 4: EI Results for November 2017 for Dodge City Commission

|          | Latinos        | Whites         | Other         |
|----------|----------------|----------------|---------------|
| Delzeit  | 16.1           | 26.0           | 17.4          |
|          | ( 4.8, 31.7)   | (21.8, 29.7)   | ( 3.5, 36.3)  |
| Gwaltney | 15.0           | 18.5           | 16.1          |
|          | ( 3.6, 29.3)   | (14.6, 21.8)   | ( 3.1, 35.9)  |
| Sellens  | 16.5           | 9.4            | 16.2          |
|          | ( 5.0, 30.7)   | ( 5.9, 12.5)   | ( 3.0, 35.4)  |
| Smoll    | 16.9           | 18.2           | 16.4          |
|          | ( 4.5, 33.2)   | (14.1, 21.8)   | ( 3.6, 33.7)  |
| Warshaw  | 21.4           | 21.4           | 17.4          |
|          | ( 6.3, 38.5)   | (17.0, 25.6)   | ( 3.2, 36.3)  |
| Zuniga   | 14.0           | 6.4            | 16.4          |
|          | ( 3.9, 27.8)   | ( 3.0, 9.2)    | ( 3.4, 36.4)  |

The results of the 2017 Dodge City Commission election are in Table 4 and the story continues. Given the small number of precincts and lack of homogenous precincts, we cannot say anything about the voting behavior of Latinos. For Whites, we can say that Zuniga and Sellens were the least preferred candidates. We cannot say anything else about the voting behavior of Whites. Therefore, this election shows no signs of statistically significant racially polarized voting.

Finally, the results for the 2014 Dodge City Commission election are in Table 5. The results are similar to the other Commission elections. Once again statistical uncertainty prevents us from determining who, if any, of the candidates was preferred by Latinos. And for Whites, all we can say was that McBee was the least preferred.

Table 5: EI Results for November 2014 for Dodge City Commission

|          | Latinos       | Whites         | Other         |
|----------|---------------|----------------|---------------|
| McBee    | 10.5          | 8.9            | 14.3          |
|          | ( 1.8, 22.4)  | ( 6.3, 11.0)   | ( 3.0, 31.8)  |
| Peters   | 12.7          | 16.1           | 13.8          |
|          | ( 3.3, 24.4)  | (13.6, 18.7)   | ( 2.9, 30.9)  |
| Scoggins | 21.1          | 15.0           | 14.6          |
|          | ( 8.1, 34.9)  | (12.0, 17.9)   | ( 2.8, 33.1)  |
| Smoll    | 12.5          | 16.3           | 13.5          |
|          | ( 3.4, 24.8)  | (13.5, 18.7)   | ( 2.7, 29.1)  |
| Sowers   | 12.6          | 17.0           | 14.4          |
|          | ( 2.8, 25.6)  | (14.2, 19.5)   | ( 2.9, 29.8)  |
| Turner   | 10.0          | 13.7           | 15.2          |
|          | ( 1.9, 20.7)  | (11.3, 16.0)   | ( 3.0, 34.3)  |
| Zuniga   | 20.6          | 13.1           | 14.2          |
|          | ( 8.0, 35.4)  | (10.1, 16.0)   | ( 3.0, 31.4)  |

We see across all the last four Dodge City Commission elections that there is no evidence of racially polarized voting. There is just too little data to make any inferences about the voting behavior of Latinos. And for Whites, we can only say that in two of the four elections, there was a candidate that was least preferred.

## 4. OTHER PROBLEMS WITH DR. BARRETO'S REPORT

The most striking problem with Dr. Barreto's report is that he fails to present any measure of statistical uncertainty. To be honest, this is a striking omission and one I have never seen in a published article that does quantitive social science analysis. It is covered in every basic statistics and methodology textbook in the social sciences (in the see, for example, Imai 2017, chapter 7). Further, the software that he uses to produce his estimates by default produces measures of statistical uncertainty. These measures are critical for making scientifically valid inferences. Without them, we cannot say anything about the statistical significance of his estimates. To quote a recently published paper in the *American Political Science Review* co-authored by Gary King, who developed EI, "[v]alid inferences require methods with known statistical properties (such as identification, along with unbiasedness, and consistency) and honest assessments of uncertainty (e.g., standard errors)" (Evans et al. 2023:2).

The second most serious problem with Dr. Barreto's report is that he claims to conduct homogeneous precinct analysis, when in fact there are no such precincts. This lack of homogenous

precincts also means that EI will not be well identified as discussed above. This would have been apparent in Dr. Barreto's analysis if he had reported standard errors or other measures of statistical uncertainty as I have in this report.

Also, as discussed above, Dr. Barreto includes analysis of elections that do not seem similar to those for Dodge City Commission. He does not even provide any justification for their inclusion.

Finally, I note that Dr. Barreto did not provide complete replication materials for his analysis. The code he shared only included the analysis of the general election in 2022 for Governor and Lt.Governor, but not for any of the other races he analyzed nor the homogeneous precinct analysis. This is the accepted norm in quantitative social science research (see, for example, the American Political Science Association's "Guide to Professional Ethics in Political Science", Third Edition, Revised 2022). In fact, most leading journals in political science require making a complete replication package available as a condition of publication.

## 5. DECLARATION AND SIGNATURE

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief. Executed on 29 June 2023 in Pasadena, California.

Jonathan N. Katz

# 6. REFERENCES

Duncan, Dudley and Beverly Davis. 1953. "An Alternative to Ecological Correlation." *American Sociological Review* 64:610–625

Evans, Georgina, Gary King, Margaret Schwenzfeier, and Abhradeep Thakurta. 2023. "Statistically Valid Inferences from Privacy-Protected Data." *American Political Science Review* (2023): 1–16. doi:10.1017/S0003055422001411

Flanigan, William H. and Nancy H. Zingale. 1985. "Alchemist's Gold: Inferring Individual Relationships from Aggregate Data." *Social Science History* 9(1): 71–91.

Freedman, David, Stephen P. Klein, Jerome Sacks, Charles A. Smyth, Charles G. Everett. 1991. "Ecological Regression and Voting Rights. " *Evaluation Review* 15(6): 673–711.

Goodman, Leo 1959. "Some Alternatives to Ecological Correlation." *American Journal of Sociology* 64:610–625.

Goodman, Leo 19553. "Ecological Regressions and the Behavior of Individuals." *American Sociological Review* 19:663–664.

Imai, Kosuke. 2017. *Quantitative Social Science: An Introduction.* Princeton, NJ: Princeton University Press.

King, Gary. 1997. *A Solution to the Ecological Inference Problem.* Princeton, NJ: Princeton University Press.

Rosen, Ori, Wenxin Jiang; Gary King; and Martin A. Tanner. 2001 "Bayesian and frequentist inference for ecological inference: The RxC case." *Statistica Neerlandica*, 55(2):134-156.

Schuessler, Alexander A. 1999. "Ecological Inference." *PNAS* 96(19): 10578–10581.

# A. CURRICULUM VITAE

# Jonathan N. Katz

D.H.S.S. (228-77)
California Institute of Technology
Pasadena, CA 91125
(626)395-4191
e-mail: `jkatz@caltech.edu`

**Education**

Ph.D.       University of California, San Diego.  Political Science, June 1995.

M.A.        University of California, San Diego.  Political Science, June 1992.

S.B.        Massachusetts Institute of Technology.  Applied Mathematics
            June 1990.

**Academic Appointments**

Kay Sugahara Professor of Social Sciences and Statistics, California Institute of
        Technology,
        January 2012 – Present.

Professor of Social Sciences and Statistics, California Institute of Technology,
        June 2009 – December 2011.

Professor of Political Science, California Institute of Technology,
        November 2003 – May 2009.

Gastprofessur in der Rechts-, Wirtschafts- und Verwaltungswissenschaftlichen Sektion,
        Universität Konstanz,
        April 2003 – July 2003.

Associate Professor of Political Science, California Institute of Technology,
        April 1998 – August 1998 and July 2000 – October 2003.

Assistant Professor of Political Science, University of Chicago,
        September 1998 – June 2000.

Assistant Professor of Political Science, California Institute of Technology,
        July 1995 – March 1998.

Post-Doctoral Fellow in Positive Political Economy, Harvard University,
        July 1994 – June 1995.

**Administrative Appointments**

Chair, Division of the Humanities and Social Sciences,
    California Institute of Technology
    August 2007 – June 2014.

Director, Ronald and Maxine Linde Institute of Economic and Management Sciences,
    California Institute of Technology
    January 2013 – March 2014.

Executive Officer for the Social Sciences, California Institute of Technology,
    January 2007 – July 2007.

Director of Graduate Studies, Division of the Humanities and Social Sciences, California
    Institute of Technology,
    July 2001 – December 2006.

**Honors and Awards**

Elected Fellow of the American Academy of Arts and Sciences, 2011.

Elected Inaugural Fellow of the Society for Political Methodology, 2008.

Center for the Advanced Study in the Behavioral Sciences Fellowship, 2005–2006.

John M. Olin Foundation Faculty Fellow, 1999–2000.

Pi Sigma Alpha award for Best Paper Presented at the 1998 Midwest Political Science
    Association Meetings.

CQ Press Award for Best Paper in Legislative Politics Presented at the 1996 Annual
    Meeting of the American Political Science Association.

National Science Foundation Graduate Research Fellow, 1991–1994.

Brooke/Cole Award for Best Graduate Student Paper Presented at the 1993 Midwest
    Political Science Association Meetings.

University of California Regents Fellow, 1990–1991.

**Publications**

*Books*

*Elbridge Gerry's Salamander: The Electoral Consequences of the Reapportionment Revolution.* (with G. Cox). New York: Cambridge University Press. 2002.

*Articles in Refereed Journals*

Government Partisanship, Labor Organization and Macroeconomic Performance: A Corrigendum (with N. Beck, R.M. Alvarez, G. Garrett, and P. Lange). *American Political Science Review.* 87(4):945–949. 1993.

What To Do (and Not To Do) with Times-Series–Cross-Section Data in Comparative Politics (with N. Beck). *American Political Science Review.* 89(3):634–647. 1995.

Careerism, Committee Assignments and the Electoral Connection (with B. Sala). *American Political Science Review.* 90(1):21–33. 1996.

Why Did the Incumbency Advantage in U.S. House Elections Grow? (with G. Cox). *American Journal of Political Science.* 40(2):478–497. 1996.

Nuisance vs. Substance: Specifying and Estimating Time-Series–Cross-Section Models (with N. Beck). *Political Analysis.* 6:1–36. 1996.

Taking Time Seriously: Time-Series–Cross-Section Analysis with a Binary Dependent Variable (with N. Beck and R. Tucker). *American Journal of Political Science.* 42(4):1260–1288. 1998.

A Statistical Model for Multiparty Electoral Data (with G. King). *American Political Science Review.* 93(1):15–32. 1999.

The Reapportionment Revolution and Bias in U.S. Congressional Elections (with G.Cox). *American Journal of Political Science.* 43(3):812-840. 1999.

Post-stratification without population level information on the post-stratifying variable, with application to political polling (with C. Reilly and A. Gelman). *Journal of the American Statistical Association.* 96(453):1–11. 2001.

Throwing Out the Baby With the Bath Water: A Comment on Green, Yoon and Kim (with N. Beck). *International Organization.* 55(2):487–498. 2001.

A Fast, Easy, and Efficient Estimator for Multiparty Electoral Data (with J. Honaker and G. King). *Political Analysis.* 10(1):84–100. 2002.

The Mathematics and Statistics of Voting Power (with A. Gelman and F. Tuerlinckx). *Statistical Science*. 17(4): 420–435. 2002.

Standard Voting Power Indexes Don't Work: An Empirical Analysis (with A. Gelman and J. Bafumi). *British Journal of Political Science*. 34: 657–674. 2004.

Indecision Theory: Quality of Information and Voting Behavior (with P. Ghirardato). *Journal of Public Economic Theory*. 8(3): 379–399. 2006

Comment on 'What To Do (and Not To Do) with Times-Series–Cross-Section Data in Comparative Politics' (with N. Beck). *American Political Science Review*. 100(1):676–677.

Gerrymandering Roll-Calls in Congress, 1879-2000 (with G.W. Cox). *American Journal of Political Science*. 51(1):108-119. 2007.

Random Coefficient Models for Time-Series-Cross-Section Data: Monte Carlo Experiments (with N. Beck). *Political Analysis*. 15(2):182–195. 2007.

Comment on 'Estimating incumbency advantage and its variation, as an example of a before-after study'. *Journal of the American Statistical Association*. 103(482):446–448. 2008.

Correcting for Survey Misreports using Auxiliary Information with an Application to Estimating Turnout (with G. Katz). *American Journal of Political Science*. 54(3):815–835. 2010.

An Empirical Bayes Approach to Estimating Ordinal Treatment Effects (with R.M. Alvarez and D. Bailey). *Political Analysis*. 19(1):20–31. 2011.

Implementing Panel Corrected Standard Errors in R: The pcse Package (with D. Bailey). *Journal of Statistical Software*. 42(1):1–11. 2011.

Modeling Dynamics in Time-Series-Cross-Section Political Economy Data (with N. Beck). *Annual Review of Political Science*. 14:331–352. 2011.

Estimating Partisan Bias of the Electoral College Under Proposed Changes in Elector Apportionment (with A.C. Thomas, A. Gelman, and G. King). *Statistics, Politics and Policy*. 0:1–13. 2012.

Of Nickell Bias and Its Cures: Comment on Gaibulloev, Sandler and Su (with N. Beck and U. Mignozzetti ). *Political Analysis*. 22:274–278. 2014.

An Audit of Political Behavior Research (with J. Robison, R.T. Stevenson, J.N. Druckman, S. Jackman, L. Vavreck). *SAGE Open*. 2018:1–14. 2018.

Constitutions of Exception: The Constitutional Foundations of the Interruption of Executive and Legislative Function (with M. McCubbins). *Journal of Institutional and Theoretical Economics.* 174(1):77–98. 2018.

How to Evaluate Measures of Partisan Fairness for Legislative Redistricting (with G. King and E. Rosenblatt). *American Political Science Review.* 114(1): 164–178. 2020. `https://doi.org/10.1017/S000305541900056X`

Hidden Donors: Analyzing the Censoring Problem in U.S. Federal Campaign Finance Data (with R.M. Alvarez and S. Kim). *Election Law Journal.* 19(1):. 2020. `https://doi.org/10.1089/elj.2019.0593`

The Essential Role of Statistical Inference in Evaluating Electoral Systems (with G. King and E. Rosenblatt). *Political Analysis.* Forthcoming

*Other Articles*

Empirically Evaluating the Electoral College (with A. Gelman and G. King) in A. Crigler, et al (editors), *Rethinking the Vote: The Politics and Prospects of American Election Reform.* New York: Oxford University Press. 2004.

Detecting Electoral Fraud: The Case of 2002 General Election in Georgia (with R.M. Alvarez) in R.M. Alvarez, T.E. Hall, and S.D. Hyde (editors), *Election Fraud: Detecting and Deterring Electoral Manipulation.* Washington, DC: Brookings. 2008.

Fraud or Failure? What Incident Reports Reveal about Election Anomalies and Irregularities (with D.R. Kiewiet, T.E. Hall, R.M.Alvarez )in R.M. Alvarez, T.E. Hall, and S.D. Hyde (editors), *Election Fraud: Detecting and Deterring Electoral Manipulation.* Washington, DC: Brookings. 2008.

Machines Versus Humans: The Counting and Recounting of Pre-scored Punchcard Ballots (with R.M. Alvarez, E.K. Hartman, and S. Hill) in R.M. Alvarez, L. Atkeson, and T.E. Hall (editors), *Confirming Elections: Creating Confidence and Integrity through Election Auditing.* Palgrave Macmillan. 2012.

What's Age Got to Do with It? Supreme Court Appointees and the Long Run Location of the Supreme Court Median Justice (with M. Spitzer). *Arizona State Law Journal.* 46(1):41 – 88. 2014.

**Work in Progress and Conference Papers**

If a Regression Model Predicts Common Events will occur only once in 10,000 Elections, Maybe it's the Wrong Model (with D. Ebanks and G. King)

The Post-Earnings Announcement Drift: An Anomalous Anomaly (with M. McCubbins and J. McMullin). Submitted.

Estimating Models of Elections for Small Legislatures An Analysis of Incumbency Advantage in the U.S. Senate (with S. Kim)

Measuring Democracy and the Rule of Law via Statistical Learning (with M. McCubbins and J. Lehner)

Estimating the Effect of Corporate Governance (with M. McCubbins and J. McMullin)

Auctioning off the Agenda: Bargaining in Legislatures with Endogenous Scheduling Control (with J. Copic). Caltech Social Science Working Paper No. 1266.

The Effect of Voter Identification Laws on Turnout (with R.M. Alvarez and D. Bailey). Caltech Social Science Working Paper No. 1267R.

Scheduling Auctions and Proto-Parties in Legislatures (with J. Copic). Caltech Social Science Working Paper No. 1387 Under review.

**Grants**

The Ronald and Maxine Linde Institute of Economic and Management Sciences at Caltech, Principal investigator, Project title: "Estimating The Effect of Corporate Governance on Firm Value", 2016–2017

John Randolph Haynes and Dora Haynes Foundation Faculty Fellowship, 2005–2006.

National Science Foundation Grant (SES-0213549), Co-Principal investigator, Project title: "Modeling Issues with Time-Series–Cross-Section Data", 2002–2004.

DAAD (German Academic Exchange Service) *Learn German in Germany* fellowship, Summer, 1998.

National Science Foundation Grant (SBR-9729899), Co-Principal investigator, Project title: "Strategic Redistricting and Its Political Consequences", 1998–1999.

IBM University Equipment Grants Program, Co-principal investigator. Project title: "Individuals and Aggregates: New Computational Techniques for Testing Models of Politics", 1996–1997.

John Randolph Haynes and Dora Haynes Foundation Faculty Fellowship, 1996–1997.

**Editorial Board Service**

Deputy Editor for Social Sciences, *Science Advances*
   March 2018 – Present.

Co-Editor, *Political Analysis*
   January 2010 – December 2017.

Member, Editorial Board of *Electoral Studies*
   January 2002 – December 2019.

Guest Manuscript Editor, *Proceedings of the National Academy of Sciences*,
   January 2014.

Member, Editorial Board of *American Journal of Political Science*,
   January 2006 – January 2010.

Member, Editorial Board of *Political Analysis*
   July 2001 – December 2009.

Member, Editorial Board of *Political Research Quarterly*
   June 2000 – July 2006.

**Other Professional Activities**

Member, Advisory Board of Daegu Gyeongbuk Institute of Science and Technology
   (Republic of Korea),
   August 2012 – Present.

Member, University Advisory Council of the Pohang University of Science and
   Technology (Republic of Korea),
   October 2008 – October 2012.

Founding Co-editor, Political Science Network (PSN),
   January 2007 – June 2016.

Member, Caltech/MIT Voting Technology Project,
   October 2003 – Present.

Member, Expert Panel on Measles Mortality Estimates, World Health Organization,
   2004.

**Other Employment**

Principal, Katz Statistical Consulting,
    January 2000 – Present.

Co-Founder and Chief Data Scientist, Adaptivo Inc,
    June 2017 – December 2018.

Scientific Advisor, Global Consequences Inc.,
    October 2014 – January 2016.

Statistical Advisor, Dispute Resolution Data, LLC.,
    August 2015 – September 2016.