EXHIBIT F

# A NOVEL METHOD FOR SHOWING RACIALLY POLARIZED VOTING: BAYESIAN IMPROVED SURNAME GEOCODING

MATTHEW BARRETO, MICHAEL COHEN, LOREN COLLINGWOOD, CHAD W. DUNN, & SONNI WAKNIN[∞]

UCLA VOTING RIGHTS PROJECT

ABSTRACT

*Section 2 of the Voting Rights Act is one of the most important tools for litigants challenging discriminatory voting procedures. The Supreme Court outlined the test governing vote dilution claims—which are claims that an electoral system, process, or procedure weakens a minority group's ability to elect candidates of their choice—under Section 2 of the Voting Rights Act in* Thornburg v. Gingles. *The Court held, in part, that Section 2 requires plaintiffs to prove that voting patterns within the challenged jurisdiction are polarized by race, which is called racially polarized voting. Put simply, racially polarized voting means that voters of different races vote cohesively with voters of their race and have opposite electoral preferences of other races. Because vote choice is private and most states do not track the race of voters, social scientists have developed statistical methods to make the evidentiary showing that* Gingles *requires. These methods are decades old and are often the subject of intense scrutiny in vote dilution trials. In some cases, the size of the jurisdiction and the quality of the voter file and voting records prevent plaintiffs from meeting their burden of proof. Analyzing the presence of racially polarized voting will be one of the most important issues during and after the redistricting cycle currently underway following the 2020 Census. Within the last year, an innovative method adapted from other fields of study called Bayesian Improved Surname Geocoding (BISG) has been applied to racially polarized voting analysis in vote dilution cases and has been approved by a federal district court in New York and the U.S. Court of Appeals for the Second Circuit. BISG has*

---

[∞] Author names presented in alphabetical order. Authorship is equal. Initial research was supported with funding from the New York Civil Liberties Union (NYCLU). Matthew Barreto is a Professor of Political Science and Chicana/o & Central American Studies at University of California, Los Angeles (UCLA) and co-founder and Director of the UCLA Voting Rights Project (VRP). Michael Cohen is an Associate at Renne Public Law Group and a former Legal Fellow at the UCLA VRP. Loren Collingwood is an Associate Professor in the Department of Political Science at University of New Mexico. Chad W. Dunn is an instructor at the UCLA Luskin School of Public Affairs and the UCLA School of Law and is co-founder and Legal Director of the UCLA VRP. Sonni Waknin is Program Manager and Voting Rights Counsel at the UCLA VRP. The authors would like to thank Michael Pernick, Redistricting Counsel at NAACP Legal Defense & Education Fund, for his feedback, and the editors of the *N.Y.U. Review of Law & Social Change* for their editorial assistance.



of factual circumstances, meaning the test hardly lends itself to bright-line rules.[104] Beyond uncertainty as to *how much* evidence needs to be presented, there is also uncertainty about *what kind* of evidence is required. As noted above, the courts have never articulated a requirement as to the type of data that a plaintiff can depend upon or the kind of statistical models that can be used to interpret this data[105]—the uniqueness of each case necessarily requires a flexible approach. While both qualitative and quantitative information is often considered,[106] the courts have articulated a preference for certain types of quantitative data over others, including qualitative. While the test must remain flexible in the face of differing circumstances, plaintiffs often cannot predict the type of evidence a fact-finder might find most persuasive. This suggests that new and better social science methods should be offered to bolster voting rights plaintiffs' cases.

Historically, the process of showing racially polarized voting has depended on making inferences via statistical models using voter turnout statistics, demographic data, and election results in the relevant jurisdiction.[107] Individual-level vote choice, which in large statewide elections may be captured through exit polls, is often unknown in local elections.[108] Given the ubiquity of the secret ballot format,[109] specific information about which candidate(s) each individual voter actually cast a ballot for is not publicly available.[110] The only information

---

104. *See* Cottier v. City of Martin, No. 02-5021-KES, 2005 WL 6949764, at *22 (W.D.S.D. Mar. 22, 2005) ("[N]o mathematical formula or simple doctrinal test is available to determine whether plaintiffs satisfied the third factor.").

105. *See, e.g.*, Rodriguez v. Harris County, 964 F. Supp. 2d 686, 757–58 (S.D. Tex. 2013), *aff'd sub nom.* Gonzalez v. Harris County, 601 F. App'x 255 (5th Cir. 2015) ("Courts have relied on various statistical methods." (*See, e.g.,* Houston [v. Lafayette County], 56 F.3d [606,] 611 [(5th Cir. 1995)] (use of bivariate ecological regression and extreme case analysis); Clark [v. Calhoun County], 88 F.3d [1393,] 1397 [(5th Cir. 1996)] (expert employed regression and homogeneous precinct analysis); Benavidez [v. City of Irving], 638 F. Supp. 2d [709,] 723–24 [(N.D. Tex. 2009)] (ecological inference).").

106. *See* Cottier v. City of Martin, 445 F.3d 1113, 1118 (8th Cir. 2006) ("Proving political cohesiveness requires evaluating elections through statistical and non-statistical evidence."); *see also* Sanchez v. Bond, 875 F.2d 1488, 1494 (10th Cir. 1989) ("The experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive. This testimony would seem to be required if the court is to identify the presence or absence of distinctive minority group interests.").

107. Klein, Sacks, & Freedman, *supra* note 30, at 396.

108. *See* Eric A. Hanushek & John M. Quigley, *Citizen Turnout and Self-Interested Voting: Inferring Preferences from Secret Ballots* 1 (Inst. of Bus. & Econ. Rsch., Working Paper No. 84-79, 1981).

109. *See* James D'Angelo & Brent Ranalli, *How the Secret Ballot Ended the Gilded Age*, CONG. RSCH. INST. (Aug. 9, 2020), https://www.congressionalresearch.org/SecretBallot.html [https://perma.cc/A6TU-THX8] ("Beginning in the 1830s, the iconic symbol of democracy . . . was the transparent, glass globe, ballot box. But, in the late 1800s with partisanship, campaign finance and inequality soaring to all-time highs, the United States began to roll out the secret ballot."); Burson v. Freeman, 504 U.S. 191, 206 (1992) ("After an unsuccessful experiment with an unofficial ballot system, all 50 States, together with numerous other Western democracies, settled on the same solution: a secret ballot secured in part by a restricted zone around the voting compartments.").

110. James D. Greiner & Kevin M. Quinn, *Exit Polling and Racial Bloc Voting: Combining Individual-Level and RxC Ecological Data*, 4 ANNALS APPLIED STAT. 1774, 1774 (2010).

available about an individual voter's behavior in a given election is whether or not they voted.[111] At an aggregate level, voting patterns, where they can be discovered, can be aligned with demographic information.

The main source of both voting age population data and citizenship data by race published by the Census Bureau now comes from the American Community Survey ("ACS").[112] The ACS is an annual, nationwide survey that collects demographic information, including age, race, ethnicity, and citizenship, from a sample of roughly two to three million households.[113] With this data, the Census Bureau is then able to estimate both the voting age population ("VAP") and citizen, voting-age population ("CVAP") of states, counties, census tracts, and census block groups.[114] VAP is also available from the decennial Census's PL-94-171 file and is used for redistricting. At the state level, the Census Bureau also implements the Current Population Survey ("CPS") monthly for labor force statistics, and every two years implements a November supplement for voting and registration data.[115] The total sample size of the CPS and supplemental data nationwide is only about 60,000 households, which allows for statistically sound state-level estimates, but can present sample size challenges for smaller jurisdictions.[116] In contrast, the ACS typically contains interviews of approximately 2 million households. The Census Bureau aggregates ACS data over five-year periods in order to provide more estimates for small areas, such as census tracts and block groups.[117] Currently, about 3–3.5 million households are

---

111. *See* Drew DeSilver, *Voter Files: What Are They, How Are They Used and Are They Accurate*, PEW RSCH. CTR. (Feb. 15, 2018), https://www.pewresearch.org/fact-tank/2018/02/15/voter-files-study-qa/ [https://perma.cc/NS23-6CWX].

112. *See About the ACS*, U.S. CENSUS BUREAU (Jan. 14, 2021), https://www.census.gov/programs-surveys/acs/about.html [https://perma.cc/ETT5-DVSU]; *Citizenship*, CENSUS REP. (Aug. 29, 2021), https://censusreporter.org/topics/citizenship/ [https://perma.cc/P66S-G4VR]; *see generally American Community Survey Information Guide*, U.S. CENSUS BUREAU (Oct. 2017), https://www.census.gov/content/dam/Census/programs-surveys/acs/about/ACS_Information_Guide.pdf [https://perma.cc/GSH7-AY8N] (providing overview of ACS survey and data collection).

113. *See American Community Survey Sample Size*, U.S. CENSUS BUREAU (last visited Dec. 18, 2021), https://www.census.gov/acs/www/methodology/sample-size-and-data-quality/sample-size [https://perma.cc/QT4Y-96HD]; *American Community Survey Information Guide*, *supra* note 112, at 6, 10.

114. *See American Community Survey Information Guide*, *supra* note 112, at 11; *Citizenship*, *supra* note 112.

115. *See Current Population Survey*, NOVEMBER 2020 VOTING AND REGISTRATION SUPPLEMENT, U.S. CENSUS BUREAU 2-2, 3-1 (Nov. 2020), https://www2.census.gov/programs-surveys/cps/techdocs/cpsnov20.pdf [https://perma.cc/E4XP-6AM9].

116. *See Methodology*, U.S. CENSUS BUREAU (Oct. 8, 2021), https://www.census.gov/programs-surveys/cps/technical-documentation/methodology.html [https://perma.cc/M2CZ-J5RE].

117. *See* U.S. CENSUS BUREAU, A COMPASS FOR UNDERSTANDING AND USING AMERICAN COMMUNITY SURVEY DATA: WHAT GENERAL DATA USERS NEED TO KNOW 24 (2009), https://www.census.gov/content/dam/Census/library/publications/2009/acs/ACSResearch.pdf [https://perma.cc/EY27-G56T].