# ARTICLES, ECOLOGICAL INFERENCE IN VOTING RIGHTS ACT DISPUTES: WHERE ARE WE NOW, AND WHERE DO WE WANT TO BE?

Winter, 2007

**Reporter**

47 Jurimetrics J. 115 *

**Length:** 28734 words

```
EXHIBIT
I
```

**Author:** D. James Greiner *

* Ph.D. candidate, Department of Statistics, Harvard University. The author also holds a J.D. from the University of Michigan. The author thanks Stephanos Bibas, Don Greiner, Ellen Greiner, Melissa Hart, Sam Hirsch, Daniel Ho, Jennifer Lewis, Liza Lewis, Kevin Quinn, Shira Pinnas, Matthew Stephenson, and Norman Williams for helpful comments and suggestions on current and previous versions of this paper. The author also thanks Gary King for several sessions that helped in clarifying his methods, as well as Micah Altman for assistance with computing concepts. No one listed above necessarily endorses the statements in this paper, and all mistakes are the author's.

## Highlight

ABSTRACT: Recent developments in law and in quantitative methods have combined to place greater emphasis on coherent and accurate techniques of drawing *inferences* about racial *voting* patterns in *Voting* Rights Act litigation. In this article, I examine the challenge the secret ballot poses for such *inferences*; I then discuss four so-called "*ecological inference*" methods designed to address the issue. I argue that the two techniques that have dominated this field for more than 20 years should be abandoned; that a third, well-publicized method should be used only when no other is feasible; and that a fourth, while representing the state of the art at present, has shortcomings that researchers should address. To aid in understanding, I apply each technique outlined to a concrete data set. I conclude with a discussion of what makes a good method.

CITATION: D. James Greiner, *Ecological Inference* in *Voting* Rights Act Disputes: Where Are We Now, and Where Do We Want to Be?, *47 Jurimetrics J. 115-167 (2007).*

```
EXHIBIT 74
6-23-23
Bancto
```

## Text

[*116] At least since the 1982 amendments to section 2 of the *Voting* Rights Act, [1] racially polarized *voting* has been central to redistricting law. [2] Practically, a plaintiff must prove that citizens in an area of interest *vote* along racial lines to win a section

[1] *Voting* Rights Act of 1965, Pub. L. No. 89-110, *79 Stat. 437 (1965)* (codified as amended at *42 U.S.C. §§ 1973* to 1973aa-6 (2000)). Section 2 of the *Voting* Rights Act, which unlike section 5 applies to the entire nation, makes unlawful any *voting* standard, practice, or procedure that has the effect of making members of a racial or ethnic minority group less able to participate in the political process and to elect candidates of their choice. In the redistricting context, section 2 prohibits dilution of minority *voting* strength, and a plaintiff who prevails in a *vote* dilution lawsuit is ordinarily entitled to a court order requiring the adoption of a new districting scheme. *See* Heather K. Gerken, *Understanding the Right to an Undiluted Vote,* *114 HARV. L. REV. 1663, 1713-14 (2001).*

47 Jurimetrics J. 115, *116

2 lawsuit. [3] Theoretically, persistent patterns of racial bloc *voting*, together with our country's racial history, distinguish an inability of racial minorities to elect candidates of choice from a similar inability on the part of other identifiable socioeconomic groups. Thus, such patterns constitute a critical part of the normative justification for a reluctant judiciary's intervention in the political process. [4]

The central role of racial bloc *voting* in redistricting disputes, as well as the importance of such disputes to United States politics, might lead one to expect that courts and academics have paid substantial attention to the methods used to assess *voting* patterns. Instead, courts have essentially ignored the area. After *Thornburg v. Gingles* noted a district court finding that two particular techniques (commonly called bivariate *ecological* regression and homogeneous precincts) were "standard in the literature for the analysis of racially polarized *voting*," [5] judicial discussion of the issue largely ceased, with the overwhelming majority of courts referencing only these two methods. [6] **[*117]** Meanwhile, from roughly 1990 to roughly 1993, the academy witnessed an explosion of discussion between largely pro-plaintiff and largely pro-defendant experts over the merits of the two *Gingles* techniques, [7] after which the debate stagnated.

Much has changed since *Gingles* and this academic debate, and it has changed in ways that increase the importance of methods of assessing racial *voting* patterns. According to some scholars, the patterns themselves have shifted in that a certain percentage of white citizens in some jurisdictions have become willing to *vote* for minority-preferred candidates. [8] This shift suggests that the days in which "documenting racially polarized *voting* is generally . . . just beating the obvious" [9] may be gone. Racial bloc *voting*, often a hotly contested issue in an "ordinary" redistricting dispute, may now become even more so, and as a result, using the best methodology is more critical.

---

[2] Richard H. Pildes, *Is Voting-Rights Law Now at War with Itself?: Social Science and Voting Rights in the 2000s,* 80 N.C. L. REV. 1517, 1518 (2002). Throughout this paper, "race" is used as shorthand for both race and ethnicity.

[3] *Thornburg v. Gingles, 478 U.S. 30, 49 (1986).*

[4] *See* Samuel Issacharoff, *Polarized Voting and the Political Process: The Transformation of Voting Rights Jurisprudence,* 90 MICH. L. REV. 1833, 1871-91 (1992).

[5] *478 U.S. at 53 n.20.*

[6] Appendix A lists cases relying on these two techniques including the Supreme Court's recent decision in *League of United Latin American Citizens v. Perry, 126 S. Ct. 2594 (2006)* [hereinafter *LULAC*]. Occasionally, an appellate court or judge has taken a potshot at the regression method. *See, e.g.,* *Holder v. Hall, 512 U.S. 874, 904 n.13 (1994)* (Thomas, J., concurring in the judgment) (complaining that "bivariate regression analysis . . . does not directly control for . . . factors" other than race); *Lewis v. Alamance County, 99 F.3d 600, 604 n.3 (4th Cir. 1996)* (observing that the critical assumption of regression "runs counter" to "common sense"); *Overton v. City of Austin, 871 F.2d 529, 539 n.12 (5th Cir. 1989).* As these appellate pronouncements have been unhelpful in terms of how to decide cases without using regression, district courts have ignored them. *See, e.g.,* **United States v. Charleston County, 318 F. Supp. 2d 302, 311 (D.S.C. 2002)** (dismissing a defendant's attack, based on *Lewis v. Alamance County,* on a plaintiff's regression results), aff'd, *365 F.3d 341 (4th Cir. 2004);* **Barnett v. City of Chicago, 969 F. Supp. 1359, 1414 (N.D. Ill. 1997),** *rev'd in part and remanded,* *141 F.3d 699 (7th Cir. 1998).* The Supreme Court at least recognizes what the district courts are doing. *See LULAC 126 S. Ct. at 2657.* (Roberts, C.J., concurring in part and dissenting in part) ("At trials, assumptions and assertions give way to facts. In *voting* rights cases, that is typically done through regression analyses of past *voting* records.").

[7] Appendix E lists publications representative of this debate.

[8] *See, e.g.,* Charles S. Bullock, III & Richard E. Dunn, *The Demise of Racial Districting and the Future of Black Representation,* 48 EMORY L.J. 1209 (1999); Tim R. Sass & Stephen L. Mehay, *The Voting Rights Act, District Elections, and the Success of Black Candidates in Municipal Elections,* 38 J.L. & ECON. 367 (1995); *see also* Note, *The Future of Majority-Minority Districts in Light of Declining Racially Polarized Voting,* 116 HARV. L. REV. 2208 (2003). *But see* Bernard Grofman et al., *Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence,* 79 N.C. L. REV. 1383, 1400-01 (2001) (finding little evidence that racial *voting* patterns have shifted in congressional elections).

[9] Richard L. Engstrom, *Getting the Numbers Right: A Response to Wildgen,* 22 URB. LAW. 495, 495 (1990).

47 Jurimetrics J. 115, *117

Even more interestingly, the above-noted factual trend has dovetailed with legal developments that focus greater attention on the potential for minorities in coalition districts to elect their candidates of choice. [10] *Shaw v. Reno* [11] and its progeny raise the question of whether coalition districts might be constitutionally required as a means less divisive than majority-minority districts for remedying actual or nascent section 2 violations. [12] In the section 5 setting, *Georgia v. Ashcroft* [13] compels new attention to coalition districts, as that case held that such districts (along with the kitchen sink) must be considered in **[*118]** assessing the retrogressiveness of a proposed districting plan. [14] Drawing effective coalition districts presupposes a great degree of confidence in the measurement of racial ***voting*** patterns in the jurisdiction of interest and in honest assessments of the uncertainty in those estimates.

If the two techniques *Gingles* referenced had few defects, the absence of attention to methods would be little cause for concern. In fact, both leave much to be desired. ***Ecological*** regression can and regularly does produce impossible estimates, for example, that --400% of Hispanic voters in a particular jurisdiction supported a particular candidate. [15] Homogeneous precincts analysis depends on the fanciful assumption that, for example, whites living in all-white areas have exactly the same ***voting*** propensities as whites living in racially mixed areas. [16] Both methods (at least as traditionally used) are too blunt to handle subtle patterns

---

[10] Coalition districts are those in which a minority constitutes less than 50% of the population but, because of a modest level of white-crossover ***voting***, nevertheless has a fair chance of electing candidates of choice. A minority might do so by controlling the Democratic primary in a predominantly but not uniformly Democratic district. *See LULAC, 126 S. Ct. at 2648-49* (Souter, J., concurring in part and dissenting in part) (articulating this theory); Pildes, *supra* note 2, at 1539-40. On the renewed focus on coalition districts, see Luke P. McLoughlin, *Gingles in Limbo: Coalition Districts, Party Primaries, and Manageable **Vote** Dilution Claims, 80 N.Y.U. L. REV. 312 (2005)*; Note, *The Implications of Coalitional and Influence Districts for **Vote** Dilution Litigation, 117 HARV. L. REV. 2598 (2004).*

[11] *509 U.S. 630 (1993).*

[12] Pildes, *supra* note 2, at 1543; *see also LULAC, 126 S. Ct. at 2667* (Scalia, J., concurring) (stating that any intentional creation of a majority-minority district triggers strict scrutiny).

[13] *539 U.S. 461 (2003)* (interpreting section 5 of the ***Voting*** Rights Act, *42 U.S.C. § 1973c* (2000)). Section 5, which applies only to certain areas of the United States, effectively prohibits covered jurisdictions from altering their laws and procedures relating to ***voting*** without approval from the Attorney General or the United States District Court for the District of Columbia.

[14] *See* Note, *The Ties That Bind: Coalitions and Governance Under Section 2 of the **Voting** Rights Act, 117 HARV. L. REV. 2621, 2632 (2004).* The "diminish[ed] ability to elect" standard included in the recent reauthorization of section 5 is, in my view, unlikely to reduce the importance of coalition districts in the retrogression context. *See* Fannie Lou Hamer, Rosa Parks, and Coretta Scott King ***Voting*** Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-408, § 5(3), *120 Stat. 577, 580-81 (2006)* (codified as amended at *42 U.S.C.A. § 1973c* (2006)).

[15] *See infra* note 59 and accompanying text.

[16] n16 To criticize these techniques is not necessarily to denigrate the experts who used them or the courts that relied on those experts. Few would dispute that dismantling ***voting*** systems that had resulted in the submergence of minority ***voting*** preferences was among the most powerful moral, political, social, and legal imperatives of an era. The imperative remains extant today. *See, e.g., LULAC, 126 S. Ct. at 2643* (Stevens, J., concurring in part and dissenting in part) (stating that complying with section 5 is a compelling state interest); *id. at 2667* (Scalia, J., concurring in part and dissenting in part (also stating that complying with section 5 is a compelling state interest); *Bush v. Vera, 517 U.S. 952, 990 (1996)* (O'Connor, J., concurring) (stating that complying with section 2's results test is a compelling government interest); *id. at 1033* (Stevens, J., dissenting) (also stating that complying with section 2's results test is a compelling government interest); *id.* at 1065 (Souter, J., dissenting) (also stating that complying with section 2's results test is a compelling government interest). Courts had to have estimates of racial ***voting*** patterns, even if the methods used were not for the fastidious:

> In countless areas of the law weighty legal conclusions frequently rest on methodologies that would make scientists blush. The use of such blunt instruments in examining complex phenomena and corresponding reliance on ***inference*** owes not so much to a lack of technical sophistication among judges, although this is often true, but to an awareness that greater certitude frequently may be purchased only at the expense of other values.

*League of United Am. Citizens v. Clements, 999 F.2d 831, 860 (5th Cir. 1993)* (en banc).

47 Jurimetrics J. 115, *118

such as *voting* polarized in the western but not the eastern portion of a jurisdiction. Ignoring such subtleties raises the possibility of, for instance, drawing a "remedial" district in an area without polarized *voting*. [17]

Given these defects as well as the increasing importance of the best possible estimates of racial *voting* patterns and of honest assessments of uncertainty, [18] it is surprising that courts and expert witnesses continue to cling **[*119]** to old techniques decades after *Gingles,* particularly when from a quantitative point of view, the earth has moved. To understand the magnitude of the change in the quantitative environment during the past two decades, consider that four years after *Gingles,* a veteran expert witness criticized bivariate *ecological* regression with the bitter comment that it "requires, in all but the smallest of jurisdictions, reliance on computers to perform the calculations." [19]

These developments suggest that a reexamination of the methods used to assess racial *voting* patterns is long overdue. Where are we now, and where do we want to be? This article begins the reexamination. Among other things, I argue for the complete abandonment of the two techniques *Gingles* referenced; I also argue that analysts should use a third technique, called "King's EI," only when no other option is available. Finally, I discuss a fourth method that represents the state of the art as of the time of this writing, but demonstrate that it has shortcomings that researchers should attempt to address. Part I briefly summarizes the quantitative question, Part II examines some of the methods currently available to address it, and Part III discusses factors courts, litigators, and expert witnesses should use in assessing techniques, as well as goals researchers in this area should have in mind as they continue the search for more apt models.

**[*120] I. RACIAL BLOC *VOTING* AND THE *ECOLOGICAL INFERENCE* PROBLEM**

Even before *Gingles,* and certainly since, almost all evidence introduced regarding racial *voting* patterns in section 2 cases has consisted of the application of *ecological inference* techniques. Occasionally, the odd litigant has offered lay testimony from community leaders or politicians about *voting* patterns; courts have generally reacted favorably to such proffers. [20] This source of evidence has obvious (although not fatal) difficulties, among them political biases and lack of personal knowledge of witnesses, and it may be particularly problematic in larger jurisdictions where a potential witness's "knowledge" of political activity must necessarily rely more on hearsay. Similarly, surveys (usually exit polls) have been proffered on occasion, and judicial reaction again has been mostly favorable. [21] The proper role of surveys in *Voting* Rights Act disputes is complex and,

---

[17] *See* Gerken, *supra* note 1, at 1713-14.

[18] As discussed in *infra* note 68-72 and accompanying text, an unexpected problem in this area is false precision, or the tendency of certain quantitative methods to provide uncertainty estimates that are too small, meaning that courts and expert witnesses think they know more than they really do.

[19] John K. Wildgen, *Adding* Thornburg *to the Thicket: The *Ecological* Fallacy and Parameter Control in *Vote* Dilution Cases,* 20 URB. LAW. 155; 160 (1988); *see also* BERNARD GROFMAN ET AL., MINORITY REPRESENTATION AND THE QUEST FOR *VOTING* EQUALITY 90 (1992) (noting that to require regression "to prove *vote* dilution might place an undue and unnecessary burden on minority plaintiffs").

[20] *See, e.g., Westwego Citizens for a Better Gov't v. City of Westwego, 946 F.2d 1109, 1119 n.15 (5th Cir. 1991); Sanchez v. Bond, 875 F.2d 1488, 1493-96 (10th Cir. 1989); Carrollton Branch NAACP v. Stallings, 829 F.2d 1547, 1558 (11th Cir. 1987); Shirt v. Hazeltine, 336 F. Supp. 2d 976, 1006-08 (D.S.D. 2004); Cuthair v. Montezuma-Cortez, 7 F. Supp. 2d 1152 (D. Colo. 1998); Cofield v. City of LaGrange, 969 F. Supp. 749, 775-76 (N.D. Ga. 1997); King v. State Bd. of Elections, 979 F. Supp. 582, 613 (N.D. Ill. 1996),* vacated, **519 U.S. 978 (1996),** readopted, *979 F. Supp. 619 (1997),* aff'd, **522 U.S. 1087 (1998);** *Arizonans for Fair Representation v. Symington, 828 F. Supp. 684, 689 (D. Ariz. 1992); Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 780 F. Supp. 221, 230-31 (D. Del. 1991),* rev'd on other grounds, *4 F.3d 1103 (3d Cir. 1993); McDaniels v. Mehfoud, 702 F. Supp. 588, 593-94 & n.3 (E.D. Va. 1988); Martin v. Allain, 658 F. Supp. 1183, 1194 (S.D. Miss. 1987); Jackson v. Edgefield, 650 F. Supp. 1176, 1198 (D.S.C. 1986).* But see *Mallory v. Ohio, 173 F.3d 377, 383-84 (6th Cir. 1999); Monroe v. City of Woodville, 897 F.2d 763 (5th Cir. 1990); Brewer v. Ham, 876 F.2d 448, 453-54 (5th Cir. 1989);* **United States v. Charleston County, 318 F. Supp. 2d 302, 310 (D.S.C. 2002),** aff'd, *365 F.3d 341 (4th Cir. 2004); Johnson v. Hamrick, 155 F. Supp. 2d 1355, 1369-70 (N.D. Ga. 2001).*

[21] *See, e.g., Ruiz v. City of Santa Maria, 160 F.3d 543, 546 n.3 (9th Cir. 1998); League of United Latin Am. Citizens v. Roscoe Ind. Sch. Dist., 123 F.3d 843, 846-47 & n.1 (5th Cir. 1997); Aldasoro v. Kennerson, 922 F. Supp. 339, 344, 352-53, 359 (S.D. Ca. 1995); NAACP v.*

47 Jurimetrics J. 115, *120

to my knowledge, has received no scholarly attention to date. But whatever else may be true of them, surveys and exit polls cannot retrospectively provide evidence regarding racial *voting* patterns going back six or ten or more years, which appears to be what courts often require to support a finding that *voting* is racially polarized. [22]

***Ecological inference*** can be understood as the attempt to predict the internal cell values of a set of contingency tables, such as Table 1, when only the column and row totals are observed. There is one such table for each precinct in the jurisdiction. Officially collected *vote* counts provide the column **[*121]** totals; the same source may also provide the row totals, or at worst, experts may fall back on (citizen, probably) *voting* age population figures from the Census. [23] The secret ballot prevents observation of the internal cell counts. If we successfully predict the internal cell counts for every precinct's table, we can calculate any jurisdiction-wide quantity of interest with simple arithmetic. For example, the Democratic support rate among African-American voters would involve dividing the sum of the top left cell values in all precinct tables by the sum of the top left and top middle cell values in all precincts.

| Table 1: 3 x 3 Table of *Voting* By Race: Counts of *Voting*-Age Population | | | |
|---|---|---|---|
| | **Dem** | **Rep** | **No *Vote*** | **[SIGMA] row** |
| Black | | | | # BLACKS |
| White | | | | # WHITES |
| Hispanic | | | | # HISPANICS |
| [SIGMA] column | # DEM *VOTES* | # REP *VOTES* | # NO *VOTE* | TOTAL PRECINCT POP |

The extraordinary hazards of ***ecological inference*** have been explored elsewhere. [24] Briefly, the primary difficulty is that for all but the most racially uniform precincts, radically different internal cell counts can produce identical row and column totals. Consider the precincts represented by the two tables below. In Table 2, black voters support the Democrat, while in Table 3, they support the Republican. We cannot tell the two cases apart based on the observed data. Because we would observe the same row and column totals in both settings, and because all we get to observe are the row and column totals, the observed data do not distinguish between the two cases. We might believe, based on how we think the world works, that one or another of the two sets of filled-in internal cell counts is more plausible, but such a belief stems from a source other than the data. The

---

[22] *Starke, 712 F. Supp. 1523, 1534 (M.D. Fla. 1989); Romero v. City of Pomona, 665 F. Supp. 853, 860 (C.D. Cal. 1987),* aff'd, *883 F.2d 1418 (9th Cir. 1989).* But see *Mallory v. Ohio, 38 F. Supp. 2d 525, 540 (S.D. Ohio 1997),* aff'd, *173 F.3d 377 (6th Cir. 1999).*

[22] *See, e.g., Lewis v. Alamance County, 99 F.3d 600 (4th Cir. 1996); Vecinos de Barrio Uno v. City of Holyoke, 72 F.3d 973, 985 (1st Cir. 1995); Baird v. Consol. City of Indianapolis, 976 F.2d 357, 359 (7th Cir. 1992).* But see Dillard v. *Baldwin, 686* F. Supp. 1459, 1465 (M.D. Ala. 1988); *see also Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1130 (3d Cir. 1993); Citizens for a Better Gretna v. City of Gretna, 834 F.2d 496, 502 (5th Cir. 1987).*

[23] Aggregated figures for elections up to the year 2004 are available online from the U.S. Census Bureau. *See*U.S. Census Bureau Elections: *Voting*-Age Population and Voter Participation, *http://www.census.gov/compendia/statab/elections/votingage_population_and_voter_participation* (last visited Jan. 15, 2007). Note that implementing an ***ecological inference*** technique requires numbers that are more detailed.

[24] *See, e.g.,* David A. Freedman et al., ***Ecological*** *Regression and **Voting** Rights,* 15 EVALUATION REV. 673 (1991); Stephen P. Klein et al., ***Ecological*** *Regressions Versus the Secret Ballot,* 31 JURIMETRICS J. 393 (1991); W. S. Robinson, ***Ecological*** *Correlations and the Behavior of Individuals,* 15 AM. SOC. REV. 351 (1950).

47 Jurimetrics J. 115, *121

additional "information" necessary to distinguish among the competing numbers must come from assumptions, not from observation. **[*122]**

| Table 2:3 x 3 Table of _Voting_ By Race: | | | |
|---|---|---|---|
| **A First Possible Set of Internal Cell Counts** | | | |
| | **Dem** | **Rep** | **No _Vote_** | **[SIGMA] row** |
| Black | 75 | 0 | 25 | 100 |
| White | 0 | 75 | 25 | 100 |
| Hispanic | 0 | 0 | 100 | 100 |
| [SIGMA] column | 75 | 75 | 150 | 300 |

| Table 3: 3 x 3 Table of _Voting_ By Race: | | | |
|---|---|---|---|
| **A Second Possible Set of Internal Cell Counts** | | | |
| | **Dem** | **Rep** | **No _Vote_** | **[SIGMA] row** |
| Black | 0 | 75 | 25 | 100 |
| White | 75 | 0 | 25 | 100 |
| Hispanic | 0 | 0 | 100 | 100 |
| [SIGMA] column | 75 | 75 | 150 | 300 |

The attempt to draw _inferences_ about individual (potential voter) behavior from observations at the group (precinct) level, sometimes called "cross-level _inference_," [25] takes place after the process of aggregating internal cell counts to row and column totals has caused a massive loss of information. How much information is lost depends on, among other things, how many individuals we aggregate (generally, the more aggregated the greater the loss), how homogeneous the aggregation groups are (the less homogeneous the greater the loss), and how similarly Member A of a racial group behaves as compared to Member B of the same racial group (the less similarly, the greater the loss). [26] In almost all real world cases, the loss of information is large enough to prevent us from making useful _inferences_ without unverifiable assumptions. [27]

The _ecological inference_ problem has a long history in quantitative social science. [28] The peculiar difficulties that arise in the _Voting_ Rights Act context have, however, received comparatively little attention. For example, almost all research into the

---

[25] See, e.g., CHRISTOPHER H. ACHEN & W. PHILLIPS SHIVELY, CROSS-LEVEL _INFERENCE_ (1995).

[26] See, e.g., D. Stephen Voss, Using _Ecological Inference_ for Contextual Research, in _ECOLOGICAL INFERENCE_: NEW METHODOLOGICAL STRATEGIES 69; 76 (Gary King et al. eds., 2004) [hereinafter EINMS].

[27] Jon Wakefield, _Ecological Inference_ for 2 x 2 Tables, 167 J. ROYAL STAT. SOC'Y A 385, 398 (2004); Andrew Gelman et al., Models, Assumptions, and Model Checking in _Ecological_ Regressions, 164 J. ROYAL STAT. SOC'Y A, 101, 105 (2001).

[28] See GARY KING, A SOLUTION TO THE _ECOLOGICAL INFERENCE_ PROBLEM 3-6 (1997) [hereinafter A SOLUTION].

anthony rupp

47 Jurimetrics J. 115, *122

*ecological* *inference* problem has focused on drawing *inferences* about sets of tables with only two rows and two columns. [29] In the legal context, however, the smallest relevant table has two rows (say, African-American **[\*123]** and Caucasian) and three columns (Democrat, Republican, and Not *Voting*). The growing Hispanic population in the United States [30] and its emergence as a moderately cohesive sociopolitical group suggest that in an increasing number of jurisdictions, the relevant precinct tables will be at least three by three. Special difficulties emerge when dealing with larger tables, difficulties discussed later in this article.

Another unusual aspect of the legal setting is the imperative of an answer in an area with immediate, visible consequences. For better or for worse, the central role that racial bloc *voting* plays in redistricting disputes is now entrenched in the law. [31] Less disfavored techniques of gathering individual-level information (such as surveys) cannot provide the evidence the law deems necessary. Political careers, and in a few instances the partisan tilt of legislative bodies, turn on the answers expert witnesses provide. In few other areas of study is *ecological* *inference* the only viable option in a setting where one must have an answer and the answer matters now. These facts render debates about the advisability of *ecological* *inference* largely academic, [32] while in turn demanding greater focus on improving those techniques as much as possible.

## II. METHODS CURRENTLY AVAILABLE TO ASSESS *VOTING* PATTERNS BY RACE

In this part, I review and assess some of the *ecological* *inference* methods currently available to determine whether *voting* in a jurisdiction is racially polarized. I begin with the two methods *Gingles* mentioned before exploring the cutting edge in the quantitative literature. I call for courts and experts to abandon reliance on the first two methods, and to use a third only when no other method is feasible.

A word on notation: I use the symbol $N$[row COLUMN i] to refer to the (unobserved) count in a particular cell of the ith precinct, where rows represent races (and ethnicities) and columns represent political parties (and nonvotes). I italicize unobserved counts. Thus, Table 1 may be represented as shown in Table 4, below. In each precinct, each row must add to its row total (that is, $N$[hDi] + $N$[hRi] + $N$[hNi] = $N$[hi]) and each column must add to its column total (that is, $N$[bRi] + $N$[wRi] + $N$[hRi] = $N$[Ri]). In the discussion that follows, I use the case of three-by-three tables such as Table 4 in most illustrations.
**[\*124]**

| | Dem | Rep | No *Vote* | [SIGMA] row |
|---|---|---|---|---|
| **Table 4: 3 x 3 Table of *Voting* by Race:** | | | | |
| **Fill-in Counts of *Voting*-Age Population** | | | | |
| Black | N[bDi] | N[bRi] | N[bNi] | N[bi] |
| White | N[wDi] | N[wRi] | N[wNi] | N[wi] |
| Hispanic | N[hDi] | N[hRi] | N[hNi] | N[hi] |
| [SIGMA] column | N[Di] | N[Ri] | N[Ni] | N[i] |

[29] For example, see the sources listed in Appendix E.

[30] *See e.g., Hispanic Population Boons in United States: Census Figures Show Growth in Minority Groups,* CNN, Mar. 13, 2001, *http://cnnstudentnews.cnn.com/2001/fyi/news/03/13/hispanic.census/index.html* (reporting on data from the 2000 Decennial census).

[31] *See* Pildes, *supra* note 2, at 1518.

[32] Such a debate took place in, for example, *Garza v. County of Los Angeles, 756 F. Supp. 1298, 1332 (C.D. Cal. 1990),* aff'd, *918 F.2d 763 (9th Cir. 1990),* where the defendant's experts unsuccessfully attempted to discredit *ecological* *inference* techniques entirely. A methods journal subsequently devoted an entire issue to the statistical and demographic issues that arose in the case. *See* Freedman, *supra* note 24.

47 Jurimetrics J. 115, *124

Some of the methods discussed in this paper begin by dividing each cell by its row total to produce a quantity that, by definition, must lie between zero and one. In such instances, I refer to an internal fraction as [beta] [row COLUMN i] and the ratio of a column total to the precinct total as T[COLUMN i]. Thus, Table 4 may be transformed into Table 5. I refer to the ith precinct's (observed) fraction of persons of a particular row (race) with the symbol X[row i]; for example, the fraction of persons in the ith precinct who are non-Hispanic black is denoted by X[bi] = N[bi]/N[i].

**Table 5: 3 x 3 Table of _Voting_ By Race:**

**Filled-In Fractions of _Voting_-Age Population**

|  | Dem | Rep |
|---|---|---|
| Black | $[\beta][bDi] = N[bDi]/N[bi]$ | $[\beta][bRi] = N[bRi]/N[bi]$ |
| White | $[\beta][wDi] = N[wDi]/N[wi]$ | $[\beta][wRi] = N[wRi]/N[wi]$ |
| Hispanic | $[\beta][hDi] = N[hDi]/N[hi]$ | $[\beta][hRi] = N[hRi]/N[hi]$ |
|  | $T[Di] = N[Di]/N[i]$ | $T[Ri] = N[Ri]/N[i]$ |

**Table 5: 3 x 3 Table of _Voting_ By Race:**

**Filled-In Fractions of _Voting_-Age Population**

|  | No _Vote_ |  |
|---|---|---|
| Black | $[\beta][bNi] = N[bNi]/N[bi]$ | $N[bi]/N[bi] = 1$ |
| White | $[\beta][wNi] = N[wNi]/N[wi]$ | $N[wi]/N[wi] = 1$ |
| Hispanic | $[\beta][hNi] = N[hNi]/N[hi]$ | $N[hi]/N[hi] = 1$ |
|  | $T[Ni] = N[Ni]/N[i]$ | $N[i]/N[i] = 1$ |

Finally, some concepts are best illustrated on two-by-two tables. As noted above, the two-by-two case is of no substantive interest in the _Voting_ Rights Act context. For illustrative purposes, however, I will refer on occasion to a hypothetical in which all potential voters in a jurisdiction are either African-American or Caucasian, and in which we are interested in knowing only who **_voted_** (not which candidate voters supported), leading to precinct tables such as Table 6. The two-by-two table of fractions is analogous to Table 5. For example, [beta] [bVi] represents the unobserved fraction in the top left cell of the ith precinct.

**Table 6: 2 x 2 Table of _Voting_ By Race:**

**Filled-in Counts of _Voting_-Age Population**

|  | _Vote_ | No _Vote_ | [SIGMA] row |
|---|---|---|---|
| Black | N[bVi] | N[bNi] | N[bi] |
| White | N[wVi] | N[wNi] | N[wi] |

bered

47 Jurimetrics J. 115, *126

precinct. In these cases, the bounds are informative **[*127]** as to that majority racial group or majority party but not for the other racial groups or parties in the precinct. [35]

The method of bounds consists of calculating the bounds for a quantity of interest in each precinct, then using them to draw a heuristic *__inference__* about the range of plausible values for that quantity in the jurisdiction as a whole. The heuristic *__inference__* requires assuming that the quantity of interest is constant in all precincts. [36] Thus, for example, if one is interested in the jurisdiction-wide support rate for the Democrat among African-American voters, that is ([SIGMA][i] $N$[bDi])/([SIGMA][i] $N$[bDi] + $N$[bRi]), one assumes that the precinct support rate $N$[bDi]/($N$[bDi] + $N$[bRi]) is the same for all i, calculates the bounds on this quantity in all precincts, and attempts to find a single plausible value.

In practice, one of two problems typically occurs. In jurisdictions with many precincts, often no single value is within every set of precinct bounds. [37] In jurisdictions with few precincts or with races representing a low percentage of the jurisdiction's population, a wide range of numbers is often permissible, and indeed the permissible range may be so wide that no useful *__inferences__* can be drawn about a plausible set of values. [38] One way of attempting to deal with these twin problems has become so popular among quantitative analysts in *__Voting__* Rights Act cases that it has received its own titles, namely, "homogeneous precincts" or "extreme case" analysis. This method discards the precincts that usually have uninformative bounds about the quantity of interest. If, for example, one is interested in the support rate for the Republican among white voters, one isolates all precincts in which whites make up the **[*128]** overwhelming majority (say, 90% or more) [39] of potential voters (mathematically, one finds [i: X[wi] > 0.9]). One then finds the bounds on the quantity of interest in these precincts, which are usually tighter, [40] and again attempts some sort of heuristic *__inference__*. In practice, limiting consideration of the data in this

---

[35] Bernard Grofman, *A Primer on Racial Bloc __Voting__ Analysis, in* THE REAL Y2K PROBLEM: CENSUS 2000 DATA AND REDISTRICTING TECHNOLOGY 43, 49-51 (Nathaniel Persily ed., 2000); Bernard Grofman & Samuel Merrill, *__Ecological__ Regression And __Ecological__ __Inference__, in* EINMS, *supra* note 26, at 123, 127.

[36] LAURA IRWIN LANGBEIN & ALLAN J. LICHTMAN, *__ECOLOGICAL__ __INFERENCE__* 42-46 (1978). The phrase "constancy assumption" is often used by detractors of regression to describe the essential assumption of that technique. *See, e.g.,* Freedman et al., *supra* note 24, at 686. In fact, regression requires "only" the absence of a certain kind of correlation to produce point estimates, but because homogeneous precinct analysis makes no distributional assumption, it really does require constancy.

[37] Grofman, *supra* note 35, at 51.

[38] LANGBEIN & LICHTMAN, *supra* note 36, at 42; Wendy K. Tam Cho, *Iff the Assumption Fits . . .: A Comment on the King __Ecological__ __Inference__ Solution,* 7 POL. ANALYSIS 143, 144 (1998).

[39] GROFMAN ET AL., *supra* note 19, at 85 ("90 or 95 percent"); Richard L. Engstrom & Michael D. McDonald, *Quantitative Evidence in __Vote__ Dilution Litigation: Political Participation and Polarized __Voting__,* 17 URB. LAW. 369, 371 (1985) (90%); James W. Loewen & Bernard Grofman, *Recent Developments in Methods Used in __Vote__ Dilution Litigation,* 21 URB. LAW. 589, 600 (1989) ("90 percent"). This 90% threshold sometimes slips when a jurisdiction inconveniently lacks precincts in which a particular race predominates. *See, e.g., Houston v. Lafayette County, 56 F.3d 606, 609 & n.1 (5th Cir. 1995)* ("80-90%-plus"); Loewen & Grofman, *supra,* at 600 (75%).

Some courts have downweighted evidence from extreme case analysis relying on "homogeneous" precincts that are less than 90% of one race. *Rollins v. Fort Bend Indep. Sch. Dist., 89 F.3d 1205, 1215-16 (5th Cir. 1996); Romero v. City of Pomona, 665 F. Supp. 853, 859 (C.D. Cal. 1987),* aff'd, *883 F.2d 1418 (9th Cir. 1989). But see Teague v. Attala County, 92 F.3d 283, 288 (5th Cir. 1996).* Other courts, to the extent they noticed the problem, have appeared either less troubled or not troubled at all. *Rodriguez v. Bexar County, 385 F.3d 853, 866 n.14 (5th Cir. 2004); Johnson v. Hamrick, 155 F. Supp. 2d 1355, 1371 n.12 (N.D. Ga. 2001),* aff'd, *296 F.3d 1065 (11th Cir. 2002); Paige v. Bartels, 144 F. Supp. 2d 346, 359 n.11 (D.N.J. 2001); Reed v. Town of Babylon, 914 F. Supp. 843, 852-53 (E.D.N.Y. 1996); Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 780 F. Supp. 221, 230 (D. Del. 1991),* rev'd on other grounds, *4 F.3d 1103 (3d Cir. 1993); Ewing v. Monroe County, 740 F. Supp. 417, 420-21 (N.D. Miss. 1990); McNeil v. City of Springfield, 658 F. Supp. 1015, 1028-29 (C.D. Ill. 1987).* In my view, if one insists on using the method of bounds, the proper way to handle jurisdictions that lack precincts in which a particular race predominates is to let the evidence downweight itself by insisting that the expert calculate actual bounds for all precincts, which will usually be wide. *Cf.* BERNARD GROFMAN ET AL., *supra* note 19, at 85.

47 Jurimetrics J. 115, *128

manner will often not prevent one or the other of the two problems identified above from occurring, and if the literature in this area includes a principled proposal for how to proceed when the bounds are either too strict or not strict enough, I have not discovered it.

The method of bounds, or more accurately the homogeneous precincts variant, has a legal pedigree rivaled only by *ecological* regression, [41] and it is easy to implement. Homogeneous precincts analysis has, however, little else to recommend it. As noted above, the bounds are often either too wide to provide any useful *inference* or too narrow in the sense that they eliminate all permissible values. In the latter case, one confronts the irony that homogeneous precincts analysis, a subset of the method of bounds, can only produce estimates that violate the bounds.

Homogeneous precincts analysis has another fatal flaw: it provides no method of quantifying the uncertainty in the estimates it produces. [42] This defect stems from the fact that the method uses no distributional model. Some courts and commentators have distorted the lack of a distributional assumption by claiming that homogeneous precincts analysis requires "no statistical [*129] *inference*." [43] In fact, a great deal must be inferred, and the *inferences* depend on implausible assumptions, among them the assumptions that valid conclusions about (say) black voters can be drawn by examining only overwhelmingly black precincts, and that quantities of interest do not vary from precinct to precinct.

The lack of a distributional assumption carries costs other than an inability to quantify uncertainty. One cannot incorporate information from surveys or exit polls in any principled way. Covariates, by which I mean information not represented in the precinct-level contingency tables (such as the average age of a precinct, or the percentage of owner-occupied housing units in it), cannot be included in the analysis. Similarly, one cannot attempt to model spatial relationships. One cannot describe the relationships among different electoral contests within the same jurisdiction. [44] These drawbacks are such that courts should abandon reliance on this method.

What is the right way to think about the bounds? To begin, one must realize that in an important sense, the bounds are all the information the data have. All we really know with certainty about the internal cell counts of precinct-level tables is that they respect their mathematical bounds. Other information must be "added" via assumptions, such as that the precincts are in some sense exchangeable. [45] With this in mind, one can see that the right way to use the bounds is to incorporate them deterministically into a stochastic model, taking advantage of the restrictions for all precincts, not just those in racially homogeneous ones. This concept is perhaps the most critical advance in Harvard Professor Gary King's much-publicized 1997 book. [46] The stochastic model allows us to produce point estimates and to quantify uncertainty, while the assumptions of various models can be assessed and, one hopes, relaxed as much as possible.

---

[40] For example, in precincts in which whites predominate and in which a fair number of potential voters cast no ballot (the latter is usually the case in most U.S. elections), the support rate for the Republican candidate among white voters will ordinarily respect the following inequalities: $(N[wi]-N[Di]-N[Ni])/(N[Di] + N[Ri]) < N[wRi]/(N[wDi] + N[wRi]) < N[Ri]/(N[wi]-N[Ni])$.

[41] *See* Appendix A.

[42] Wakefield, *supra* note 27, at 399.

[43] GROFMAN ET AL., *supra* note 19, at 88; *see also* Cuthair v. Montezuma-Cortez, 7 F. Supp. 2d 1152, 1168 (D. Colo. 1998); JAMES W. LOEWEN, SOCIAL SCIENCE IN THE COURTROOM 185-86 (1982).

[44] *See, e.g.,* Jeffrey B. Lewis, *Extending King's **Ecological** Inference Model to Multiple Elections Using Markov Chain Monte Carlo, in* EINMS, *supra* note 26, at 97, 103 (proposing a model that uses information from multiple elections). To be clear, the loss of information due to aggregation is so great that some data sets may not permit a model addressing covariates, spatial relationships, and multiple electoral contests all at once, or even one at a time. Homogeneous precincts analysis is, however, so wooden a method that one cannot even make the attempt.

[45] This is the fundamental problem of *ecological inference*, discussed in Part I, *supra*.

[46] *See generally* A SOLUTION, *supra* note 28; *see* Grofman & Merrill, *supra* note 35, at 127 ("seminal idea"); Kosuke Imai & Ying Lu, *Parametric and Nonparametric Bayesian Models for **Ecological** Inference in 2 x 2 Tables* 5 (Princeton University, Working Paper, 2004), *available at* http://imai.princeton.edu/research/files/einonpar.pdf (last visited July 22, 2006).

47 Jurimetrics J. 115, *129

I illustrate the method of bounds by applying it to the election in Georgia's Fourth Congressional District in the year 2000. I assume that the quantity of interest is the fraction of each race's voters that supports the Democratic candidate.

An excellent method of visualizing the application of the method is through floating bar graphs. [47] The x-axis represents different precincts. On the **[*130]** y-axis, which runs from zero to one, one places a line segment starting at the upper bound for that precinct of the quantity of interest and running vertically down to stop at the lower bound for that precinct. The method of bounds, or the homogeneous precincts analysis variant, consists of attempting to find a horizontal line or horizontal region that crosses all of the line segments.

Figure 2 provides the floating bar charts for whites and Hispanics in the District Four 2000 election. The graph demonstrates that both of the problems identified above, namely, bounds that are too narrow and bounds that are too wide, occur in this data set. With respect to white voters, the upper bound for many precincts is below the lower bound for many others. No single value is possible for all precincts, nor is this a case in which one could find a plausible value by excluding one or two precincts. [48] With respect to Hispanic voters, the problem is the opposite. Because the data set includes no heavily Hispanic precincts, I graphed the bounds for the fifteen most Hispanic (by percentage VAP). But the interval defined by the bounds for all fifteen was [0, 1]. Thus, the bounds tell us only that somewhere between 0% and 100% of Hispanic voters supported the Democrat.

**[*131] B. _Ecological_ Regression**

The most popular technique used to assess racial _**voting**_ patterns in _**Voting**_ Rights Act cases is regression, [49] often called "Goodman regression" or "bivariate _**ecological**_ regression analysis." [50] Like homogeneous precincts analysis, _**ecological**_ regression enjoys a truly extraordinary legal pedigree, [51] and modern computers and software have made it easy to implement. But like homogeneous precincts analysis, _**ecological**_ regression has little else to recommend it. It frequently produces nonsensical results (that is, estimates that violate the bounds), and the assumptions it depends on are so strong that they can mask the uncertainty in aggregated data. I begin by unpackaging the method, then explain why courts should abandon reliance on it.

Referring to Table 5, note that the following relationships hold exactly by definition. [52]

(1) $T[Di] = [beta][bDi] X[bi] + [beta][wDi] X[wi] + [beta][hDi] X[hi]$

(2) $T[Ri] = [beta][bRi] X[bi] + [beta][wRi] X[wi] + [beta][hRi] X[hi]$

(3) $T[Ni] = [beta][bNi] X[bi] + [beta][wNi] X[wi] + [beta][hNi] X[hi]$

(4) $1 = [beta][bDi] + [beta][bRi] + [beta][bNi]$

(5) $1 = [beta][wDi] + [beta][wRi] + [beta][wNi]$

---

[47] _See_ Grofman, _supra_ note 35, at 49–53.

[48] The bounds for black voters, not shown, also exclude any single value, but a range of roughly (0.92, 0.94) is plausible for all but one precinct.

[49] As the discussion in Appendix A demonstrates, courts have relied on this method more than any other.

[50] The term "bivariate" refers to a situation in which there are only two relevant races (for example, Caucasian and African-American), meaning that the corresponding precinct tables have only two rows. The term is thus a misnomer when applied to jurisdictions such as Georgia Congressional District 4, where there are three racial groups.

[51] _See_ Appendix A. Regression was the method of choice of the experts in the recent Supreme Court Texas reredistricting case. _See_ _League of United Latin Am. Citizens v. Perry, 126 S. Ct. 2594, 2657_ (Roberts, C.J., concurring in part and dissenting in part).

[52] _See, e.g.,_ A SOLUTION, _supra_ note 28, at 39 & n.1. These derivations come from simple algebra. For example, $T[Di] = N[Di]/N[i] = (N[bDi] + N[wDi] + N[hDi])/N[i] = N[bDi]/N[i] + N[wDi]/N[i] + N[hDi]/N[i] = (N[bDi]/N[bi])*(N[bi]/N[i]) + N[wDi]/N[wi])*(N[wi]/N[i]) + (N[hDi]/N[hi])*(N[hi]/N[i]) = [beta]bDi X[bi] + [beta]wDi X[wi] + [beta]hDi X[hi].$

(6) $1 = \beta[hDi] + \beta[hRi] + \beta[hNi]$

All nine of the *beta*'s are unobserved. For each precinct, then, we have six equations and nine unknowns. [53] In the regression method, one assumes that each of the *beta*'s is constant in all precincts. [54] Because we now have *beta*[bD] instead of *beta*[bDi], *beta*[wR] instead of *beta*[wRi], and so forth, the first three equalities no longer hold exactly, so we add error terms (*epsilon*) to produce the following.

$T[Di] = \beta[bD] \, X[bi] + \beta[wD] \, X[wi] + \beta[hD] \, X[hi] + \epsilon[Di]$

$T[Ri] = \beta[bR] \, X[bi] + \beta[wR] \, X[wi] + \beta[hR] \, X[hi] + \epsilon[Ri]$

$T[Ni] = \beta[bN] \, X[bi] + \beta[wN] \, X[wi] + \beta[hN] \, X[hi] + \epsilon[Ni]$

$1 = \beta[bD] + \beta[bR] + \beta[bN]$

$1 = \beta[wD] + \beta[wR] + \beta[wN]$

$1 = \beta[hD] + \beta[hR] + \beta[hN]$

The first three equations are now in a classical regression format, with each $T[i]$ as the response, each $X[i]$ as the predictor, and no intercept term. Typically, one **[*132]** assumes either that the means of the *epsilon*[i]'s are 0 and that there exists an unknown (race-specific) constant [sigma]<2>, or that (for example) the *epsilon*[Di]'s are independent and identically distributed (i.i.d.) $N(0, [sigma][D]<2>)$, where "N" means "normal." Either way, point estimates and standard errors for the *beta*'s come directly from classical regression theory. To proceed, one runs any two of the three regressions represented by the first three equations above (that is, a regression of the T's on the X's without an intercept), then uses the last three equations to estimate the remaining *beta*'s. [55] Using this model in the ***ecological inference*** context would be unpleasant enough if interest were limited to the *beta*'s. In fact, however, courts and experts in ***Voting*** Rights Act cases typically want to compare, say, the support rate for the Democrat among African-American voters to the same rate among Caucasian voters to the same rate among Hispanic voters. Thus, what ***Voting*** Rights Act expert witnesses need to produce are point estimates and standard deviations for the quantities $\beta[bD]/(\beta[bD] + \beta[bR])$, $\beta[wD]/(\beta[wD] + \beta[wR])$, and $\beta[hD]/(\beta[hD] + \beta[hR])$.

With this in mind, what can go wrong is fairly obvious. By definition, the *beta*'s must lie between zero and one, as must the three quantities listed immediately above, but parameter estimates from classical regression may lie anywhere on the real line. If the estimates for *beta*[bD] and *beta*[bR] are not constrained to lie between zero and one, anything might happen with respect to the quantity $\beta[bD]/(\beta[bD] + \beta[bR])$. [56] For this reason, with "annoying frequency," [57] an expert is

---

[53] In fact, we really only have five equations. Because $T[Di] + T[Ri] + T[Ni] = 1$, by definition, any one of these six equations is determined by the other five.

[54] The literature on ***ecological*** regression includes some debate on whether the assumption that the *beta*'s are constant may be relaxed in favor of an assumption that they are uncorrelated with the X's. *See supra* note 36. In fact, the uncorrelatedness assumption is enough to generate valid point estimates but not variances or standard deviations (that is, uncertainty estimates). *See, e.g.,* A SOLUTION, *supra* note 28, at 39 & n.2. The former are, of course, of little use without the latter.

[55] For the two-by-two case, the equalities corresponding to equations 1-6 are as follows.

$T[vi] = \beta[bVi] \, X[bi] + \beta[wVi] \, X[wi]$

[56] Despite the fact that this ratio estimator has been used in ***Voting*** Rights Act litigation for decades, I am unaware of any attempt to investigate its statistical properties. For example, is the estimator unbiased? Consistent? Asymptotically efficient? I do not attempt such an investigation here because I recommend abandoning this model altogether, but were the inquiry undertaken it would probably produce unpleasant results. For example, if one specifies (as is often done in regression) that the [epsilon]s are i.i.d. normal; then (for example) *beta*[bD] + *beta*[bR] has positive probability mass in any small region around zero. Because this term appears in the denominator, the ratio *beta*[bD]/(*beta*[bD] + *beta*[bR]) has no expected value and thus it cannot be unbiased.

47 Jurimetrics J. 115, *132

faced with the decision of whether to tell a judge that, for example, 115% of Hispanic voters supported the Democrat, and thus that --15% supported the Republican. Apparently, many analysts find themselves unable to do so; they resort instead to blaming the impossible estimate on sampling variability and asserting, without supporting reasoning (much less empirical evidence), that the illogical figure must have occurred because ***voting*** patterns [**133] in the jurisdiction are highly polarized. [58] There appears to be no estimate too bizarre for some analysts; the literature reports one expert witness's adjustment of an estimate of --400% to zero. [59]

Judicial reaction to impossible estimates has been surprisingly muted. Some courts have downweighted evidence consisting of impossible predictions from regression, recognizing the implications of such figures. In *Aldasoro v. Kennerson,* [60] for example, the court stated that a "physically impossible estimate mean[t] that the key assumption of ***ecological*** regression was violated" and largely ignored an expert's attempt to set an estimate to zero. [61] Other courts have not been so discriminating, either explicitly accepting the fiction that impossible predictions indicate extreme polarization (as opposed to model failure) or constructing some other explanation. [62] Most often, however, courts have accepted without comment estimates that included either overtly impossible predictions or a conspicuous number of zero percents and one hundred percents that could only have come from fudging the numbers. [63]

[**134]  Courts should be more discerning here. Logically impossible estimates mean one thing only: model failure, that is, the model does not fit the data set being analyzed. [64] When a model does not fit the data, the proper response is to change the model, not to adjust the output.

---

[57] John K. Wildgen, ***Vote*** *Dilution Litigation and Cold Fusion Technology,* 22 URB. LAW. 487, 488 (1990);  *see also* ACHEN & SHIVELY, *supra* note 25, at 73; Charles S. Bullock, III, *Misinformation and Misperceptions: A Little Knowledge Can Be Dangerous,* 72 SOC. SCI. Q. 834, 838 n.6 (1991). Impossible estimates occur often enough when ***inference*** is attempted with two-by-two tables, which are rarely of interest in the law, but they occur even more often with two-by-three, three-by-three, and larger tables, the sizes of interest in section 2 litigation. Stephen P. Klein & David A. Freedman, ***Ecological*** *Regression in* ***Voting*** *Rights Cases,* 6 CHANCE 38, 42 (1993); *see also* A.G. Hawkes, *An Approach to the Analysis of Electoral Swing,* 132 J. ROYAL STAT. SOC'Y A 68, 73 (1969).

[58] *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 780 F. Supp. 221, 227 (D. Del. 1991),* rev'd on other grounds, *4 F.3d 1103 (3d Cir. 1993);* Bernard Grofman, *Throwing Darts at Double Regression--and Missing the Target,* 74 SOC. SCI. Q. 480, 484 (1993); J. Morgan Kousser, ***Ecological*** *Regression and Analysis of Past Politics,* 4 J. INTERDISC. HIST. 237, 252 (1973); Allan Lichtman, *Passing the Test:* ***Ecological*** *Regression Analysis in the Los Angeles County Case and Beyond,* 15 EVALUATION REV. 770, 776 (1991).

[59] *See* Bullock, *supra* note 57, at 838 n.6; Bernard Grofman, *Straw Men and Stray Bullets: A Reply to Bullock,* 72 SOC. SCI. Q. 840, 840 n.1 (1991).

[60] *922 F. Supp. 339 (S.D. Cal. 1995).*

[61] *Id. at 351, 359; see also Overton v. City of Austin, 871 F.2d 529 (5th Cir. 1989); Black Political Task Force v. Galvin, 300 F. Supp. 2d 291, 305-07 (D. Mass. 2004); Collins v. City of Norfolk, 679 F. Supp. 557, 571 (E.D. Va. 1988),* rev'd on other grounds, *883 F.2d 1232 (4th Cir. 1989).*

[62] *See, e.g., Jenkins, 780 F. Supp. at 227; Shirt v. Hazeltine, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004).*

[63] *Ruiz v. City of Santa Maria, 160 F.3d 543, 558 (9th Cir. 1998); Perez v. Pasadena Indep. Sch. Dist., 958 F. Supp. 1196, 1217, 1220 (S.D. Tex. 1997); Cousin v. McWherter, 904 F. Supp. 686, 699-700 (E.D. Tenn. 1995),* rev'd, *145 F.3d 818 (6th Cir. 1998); NAACP v. City of Niagara Falls, 913 F. Supp. 722, 730-40 (W.D.N.Y. 1994),* aff'd, *65 F.3d 1002 (2d Cir. 1995); Garza v. County of Los Angeles, 756 F. Supp. 1298, 1333 (C.D. Cal. 1990); Gunn v. Chickasaw County, 705 F. Supp. 315, 319, 324-26 (N.D. Miss. 1989); NAACP v. Starke, 712 F. Supp. 1523, 1530 (M.D. Fla. 1989); Buchanan v. City of Jackson, 683 F. Supp. 1515, 1528 (W.D. Tenn. 1988); Campos v. City of Baytown, 696 F. Supp. 1128, 1130 (S.D. Tex. 1987),* aff'd in relevant part, *840 F.2d 1240 (5th Cir. 1988); McNeil v. City of Springfield, 658 F. Supp. 1015, 1028 (C.D. Ill. 1987); Jackson v. Edgefield, 650 F. Supp. 1176, 1197 (D.S.C. 1986).* Note that in many of these cases, the impossible estimates corresponded to regression runs with very high $R<2>$ values. For instance, in Buchanan, the lowest $R<2>$ value was 0.89. *See also* Figure 3, *infra,* and accompanying text; ACHEN & SHIVELY, *supra* note 25, at 74 ("What is particularly odd about the Goodman anomalies is that they coexist with wonderful regression fits.").

47 Jurimetrics J. 115, *134

A second, equally fatal problem with estimators for *[beta]*[bD]/(*[beta]*[bD] + *[beta]*[bR]) is difficulty in honestly quantifying uncertainty. To begin, the only proposal for calculating a variance for this ratio estimator results from a misapplication of the delta method. [65] This is not to say that no method of estimating uncertainty exists. The easiest course of action is probably to specify a distribution on the [epsilon]'s, such as the normal, choose a prior distribution for the *[beta]*'s and the [sigma]<2>'s, and use familiar Bayesian simulation techniques. [66]

No method of attempting to calculate variances or standard errors is likely to work very well, however, because the assumptions of *ecological* regression are so strong that often the method will understate the uncertainty in the data. To see why, consider a jurisdiction with five precincts, made up solely of blacks and whites, and suppose we care only about who *voted*, not which party voters of each race supported. We thus have the simplest possible *ecological inference* challenge, a set of two-by-two precinct tables. [67] Suppose the five X[wi] **[*135]** values are (0.40, 0.43, 0.50, 0.55, 0.62), and the five observed T[Vi] values are (0.37, 0.36, 0.47, 0.55, 0.68). A plot of the data appears in Figure 3. Several commentators have pointed out that in this two-by-two setting, the point estimate for *[beta]*[bV], that is, the fraction of African-Americans who *voted*, is the location at which the regression line intersects x = 0. [68] Similarly, the point estimate for *[beta]*[wV] is the location at which the regression line intersects x = 1. Visually, then, it is easy to see that the point estimates for this data set (*[beta]*[bV] = --0.25, *[beta]*[wV] = 1.22) are outside the possible interval of [0, 1]. [69]

---

[64] A SOLUTION, *supra* note 28, at 57 n.1; William H. Flanigan & Nancy H. Zingale, *Alchemist's Gold: Inferring Individual Relationships from Aggregate Data,* 9 SOC. SCI. HIST. 71, 77 (1985); Gelman et al., *supra* note 27, at 114-16. At an absolute bare minimum, the analyst confronted with an impossible estimate should test whether "sampling variability"--in this context, the randomness attendant to any data-generating process--could have been the culprit, rather than assume that this is the case. David A. Freedman et al., *Rejoinder,* 15 EVALUATION REV. 800, 807-08, 810-11 (1991); Klein et al., *supra* note 24, at 399 & n.19.

[65] Grofman and Migalski proposed a formula corresponding to a delta method approximation as applied to a function of the form X/Y. Bernard Grofman & Michael Migalski, *Estimating the Extent of Racially Polarized Voting in Multicandidate Elections,* 16 SOC. METHODS & RES. 427, 451 n.6 (1988). Because the relevant ratio is, in their notation, P[WW]/(P[WW] + P[WB]), the delta method should be applied to the functional form X/(X+Y). Switching back to my notation, the correct approximation formula for the variance of the quantity *[beta]*[bD]/(*[beta]*[bD] + *[beta]*[bR]) is 1/(*[beta]*[bD] + *[beta]*[bR])<4>*[*[beta]*[bR]<2>var(*[beta]*[bD]) + *[beta]*[bD]<2>var(*[beta]*[bR]) -- 2 *[beta]*[bD] *[beta]*[bR]cov (*[beta]*[bD], *[beta]*[bR])], where all *[beta]* symbols actually refer to their point estimates. If (as is typical, although not necessary) the regressions for each party are estimated separately, the last term inside the square brackets is zero. For a further discussion of the difficulty of reasonable estimates in this context, see Jeffrey S. Zax, *Comment on "Estimating the Extent of Racially Polarized Voting in Multicandidate Contests" by Bernard Grofman and Michael Migalski,* 31 SOC. METHODS & RES. 75 (2002).

[66] The term "Bayesian" refers to a paradigm in statistics in which a researcher's first task is to express his or her initial knowledge about a quantity of interest by specifying a "prior" distribution for that quantity. The Bayesian combines the data from a study with the prior to identify a "posterior" distribution for the quantity of interest; learning about the posterior is, usually, the goal of Bayesian *inference*. The Bayesian paradigm may be distinguished from the more traditional "frequentist" worldview, in which the goal of *inference* is to learn what would happen if a researcher conducted a study over and over again. For further explanation of these concepts, and for an explanation of the Bayesian regression techniques discussed in the text, see ANDREW GELMAN ET AL., BAYESIAN DATA ANALYSIS 3-4, 353-85 (2d ed. 2004), as well as David H. Kaye, *What is Bayesianism?: A Guide for the Perplexed,* 28 JURIMETRICS J. 161 (1988).

[67] Refer to the equations *supra* note 55.

[68] *See, e.g.,* Engstrom & McDonald, *supra* note 39, at 376; Loewen & Grofman, *supra* note 39, at 593. The idea here is that T[Vi] = *[beta]*[bV]X[bi] + *[beta]*[wV]X[wi] + [epsilon][i], and we assume that [epsilon][i] is 0 "in expectation" (meaning, essentially, on average). Further, remember that "x" here corresponds to X[wi] and that (in this two-race hypothetical) X[wi] + X[bi] = 1, so when x = 0, X[wi] = 0, and X[bi] = 1. Substituting these values into the equation immediately above shows that on average T[Vi] = *[beta]*[bV] (1) + *[beta]*[wV] (0) + 0, that is, T[vi] = *[beta]*[bV]. T[Vi] is, of course, what is graphed on the y-axis of Figure 3.

[69] Figure 3 also demonstrates the flaw in the assertion that *ecological* regression and homogeneous precincts are "complementary" techniques that check one another or that "compensate" for each other's flaws. One finds this assertion with disturbing frequency in the literature and the case law. *See, e.g.,* Bernard Grofman et al., *The "Totality of Circumstances Test" in Section 2 of the 1982 Extension of the Voting Rights Act: A Social Science Perspective,* 7 LAW & POL'Y 199, 209 (1985); *see also* Reed v. Town of Babylon, 914 F. Supp. 843, 852 (E.D.N.Y. 1996); NAACP v. City of Niagara Falls, 913 F. Supp. 722, 729 (W.D.N.Y. 1994) (discussing use of "double-checks"), *aff'd,* 65 F.3d 1002 (2d Cir. 1995); LOEWEN, *supra* note 43, at 185-87; Peyton McCrary, *Racially Polarized Voting in the South: Quantitative Evidence from the*

47 Jurimetrics J. 115, *135

[*136]  Equally disturbing in this toy example are the standard error estimates. The estimated residual standard error is 0.0268, which results in an estimated standard error of (for instance) *[beta]*[bV] of 0.076. The point estimates are thus about three estimated standard deviations from a physically possible number. The uncertainty estimates thus do not quantify well the extent of our (lack of) knowledge. What happened? Part of the explanation is that we are extrapolating beyond the range of the data: we want point estimates corresponding to X[wi] = 0 and X[wi] = 1, but our observed X[wi] values range from 0.40 to 0.62. Extrapolation beyond the range of the data is, of course, a statistical no-no. [70]

But focusing on extrapolation obscures a different problem, which is unique to ***ecological inference***. The concept of extrapolation tells us that, in this toy example, we have little information about what ***voting*** patterns would be in racially uniform precincts in the hypothetical jurisdiction. But it would be a mistake to think that these data have much information about ***voting*** patterns in racially mixed precincts, even though all five data points present are within this category. We have too few precincts. Moreover, recall the discussion in Section II.A, *supra,* about the fact that the only information the data really provide in an ***ecological inference*** problem comes from the bounds, and that the bounds in racially mixed precincts are usually wide (as they are **[*137]** here). When the bounds for every precinct are wide, and when there are so few precincts, the data tell us virtually nothing. Thus, the fact is that these data do not tell us much about black ***voting*** patterns or about white ***voting*** patterns, even in racially mixed precincts. That is what distinguishes ***ecological*** regression from standard regression. [71]

If a model produces precise estimates even when the data provide very little information, as regression does in the toy data set above, something is wrong with the model. For regression, the culprit is not hard to find. The assumption that the data follow a linear pattern is so strong that it overwhelms almost any amount of uncertainty in the data. Indeed, it is so strong that it overwhelms common sense (by telling us that, for example, --25% of African-Americans ***voted***).

I have already discussed the imperative of an answer in the legal context. That discussion should make clear that I do not mean to criticize those who have used ***ecological*** regression as the basis for testimony in redistricting cases in the past. After all, the only alternative was to adopt a rule that the party with the burden of proof always loses in cases in which racial bloc ***voting*** is at issue. I do suggest, however, that in light of the development of superior techniques over the past decade, the time has come to jettison ***ecological*** regression.

I illustrate ***ecological*** regression by applying it to the election in Georgia's Fourth Congressional District in the year 2000. Again, I assume that the quantity of interest is the fraction of each race's voters supporting the Democratic candidate. The following are the point estimates and standard errors (obtained from a delta method approximation) [72] for the fraction of each race's voters supporting the Democrat: 0.95 (0.027) for blacks; 0.31 (0.018) for whites; and 0.37 (0.077) for Hispanics.

One might think from these numbers that all is well, or at least that ***ecological*** regression has managed to produce a set of physically possible estimates in this data set. That would be a mistake. Recall that the estimate for the fraction of Hispanic voters supporting the Democrat is a ratio of estimated regression coefficients, *[beta]*[hD]/(*[beta]*[hD] + *[beta]*[hR]), and that

---

*Courtroom,* 14 SOC. SCI. HIST. 507, 514 (1990); Appendix A (collecting more cases). I know from experience that it is virtually impossible to simulate a data set in which the two methods give different results without violently departing from the linearity assumption of regression. The reason is that homogeneous precincts analysis uses only the data points with values of the X[wi] predictor that are the most extreme. But these are the data points that have the greatest leverage in determining the slope of the line that is the backbone of the regression technique. *See* Freedman et al., *Rejoinder, supra* note 64, at 803 ("Homogeneous precincts analysis amounts to checking that the regression line goes through the precincts at the left or the right edge of the scatter diagram--as must be the case if the trend in the data is reasonably linear."); *see also* FRED L. RAMSEY & DANIEL W. SCHAFER, THE STATISTICAL SLEUTH: A COURSE IN METHODS OF DATA ANALYSIS 318-19 (2d ed. 2002) (discussing leverage and Cook's distance).

[70] *Compare, e.g.,* Wildgen, *supra* note 19, at 163 & Fig. 1, *with, e.g.,* Loewen & Grofman, *supra* note 39, at 592-95 & Figs. 1-3.

[71] Although the concept is difficult to quantify, the lesson probably applies in any ***ecological-inference*** context. If a racial group of interest has low concentrations in all precincts, then all else (including the number of precincts) being equal, we should at a minimum expect wider confidence or credible intervals for the estimates of its ***voting*** behavior. Depending on the structure of the data, it may not be possible in some cases to draw useful ***inferences*** about the behavior of this racial group.

[72] *See supra* note 66. Although I prefer Bayesian simulation to the delta method in this context (if I am forced to use ***ecological*** regression at all), I employ the latter here because it may be more familiar to many readers.

47 Jurimetrics J. 115, *137

these regression coefficients themselves must logically lie between zero and one because they represent the fraction of Hispanic *potential* voters supporting the Democrat (in the case of *[beta]*[hD]) or the Republican (in the case of *[beta]*[hR]). In fact, in this data set, the estimate for *[beta]*[hD] is --0.15 with an estimated standard error of 0.038, while the estimate for *[beta]*[hR] is --0.25 with an estimated standard error of 0.05. The ratio of two **[*138]** negative numbers is positive and, in this case, happens to lie between zero and one. Thus, two physically impossible "intermediate" estimates for *[beta]*[hD] and *[beta]*[hR] produce a physically possible final estimate (0.37). As stated above, the physically impossible intermediate estimates mean one thing, namely, model failure. Moreover, the physically impossible figures for *[beta]*[hD] and *[beta]*[hR] are unlikely to be the result of "sampling variability" or some other random process; the point estimates are at least four estimated standard deviations away from zero.

**C. King's EI**

Professor Gary King proposed the ***ecological inference*** method known as "King's EI" [73] in his 1997 book. [74] The majority of Professor King's book as well as most applications of the method it introduces deal with two-by-two tables. Were King's EI useful only for the two-by-two case, I would not discuss it, but Professor King has proposed extensions for larger tables. I discuss King's EI with two-by-two tables before considering how, and how far, the model may be extended to situations of interest to courts and litigators.

Recall that in precinct-level tables of size two by two, the following equality holds by definition for each precinct: T[Vi] = *[beta]*[bVi] X[bi] + *[beta]*[wVi] X[wi]. [75] The fundamental assumption of King's EI is as follows: ([beta][bVi] [beta][wVi])<T> [approximately] TN([mu], [SIGMA]) where TN stands for truncated normal, and the parameters refer to the corresponding untruncated bivariate normal. [76] One can fit this model with either maximum likelihood or Bayesian methods; Professor King recommends the latter [77] after placing prior distributions on transformations of the parameters.

**[*139]** At least for the case of two-by-two tables, King's EI enjoys advantages over the two methods discussed previously. The truncated distribution assures that all predictions in each precinct respect their mathematical bounds. Bayesian simulation methods allow estimation of uncertainty. Covariates may be included by, for example, replacing [mu][bV] with Z[bVi]<T> [delta][bV], where Z[bVi] is the covariate vector characterizing the African-American population in the ith precinct, and [delta][bV] is a vector of parameters (akin to regression coefficients). [78] Scholars have extended King's EI to incorporate information from different elections in the same election cycle. [79] Professors King and Kenneth Benoit have written software to implement the model and generously made it available for free to persons wishing to use it. [80] Finally, King's EI has an

---

[73] *See, e.g., Lewis, supra* note 44, at 98.

[74] A SOLUTION, *supra* note 28. I clarify a point that should (but alas, may not) go without saying: by recommending that courts, experts, and litigators avoid reliance on this method when possible, I do not intend to minimize the contribution King's EI made to this field. I note that Professor King is one of the scholars who developed the MD method discussed *infra* Part D. *See supra* note 16.

[75] *See supra* note 55 and accompanying text.

[76] The superscript T refers to "transpose" (it is traditional in this business to work with column vectors), and the symbol "[approximately]" translates as "follows the distribution." Thus, [mu]= ([mu][bV] [mu][bN])<T> is a vector in the two-dimensional Euclidean space of real numbers, and [SIGMA] is a variance-covariance matrix with correlation parameter [rho]. Appendix B provides a brief explanation of truncated distributions in general and of the truncated bivariate normal in particular.

[77] There appears to be some confusion on this point in the literature. *Compare, e.g.,* BRUCE M. CLARKE & ROBERT TIMOTHY REAGAN, REDISTRICTING LITIGATION: AN OVERVIEW OF LEGAL, STATISTICAL, AND CASE-MANAGEMENT ISSUES 63-64 (2002), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/redistri.pdf/

[78] Professor King articulates a way to incorporate race itself as a covariate, although he cautions against its indiscriminate use. A SOLUTION, *supra* note 28, at 179. Reaction in the literature has been mixed. *See, e.g.,* Douglas Rivers, Book Review, 92 AM. POL. SCI. REV. 442-43 (1998) (reviewing GARY KING, A SOLUTION TO THE ***ECOLOGICAL INFERENCE*** PROBLEM: RECONSTRUCTING INDIVIDUAL BEHAVIOR FROM AGGREGATE DATA (1997)).

[79] *Lewis, supra* note 44, at 101-03.

47 Jurimetrics J. 115, *139

additional advantage: speed. [81] In part because of the relative simplicity of the model and in part because of the accompanying software, King's EI is capable of handling with dispatch large data sets from jurisdictions in which two races predominate.

As noted above, the two-by-two case of *__ecological inference__* is of little interest in the *__Voting__* Rights Act context, and the application of King's EI to higher dimensional R x C tables carries some difficulty. There are basically two choices. The first is to expand the model to write down C -- 1 equations and posit an R-dimensional truncated normal distribution for the parameters of each. For example, the assumptions corresponding to Equations 1-6, above, might be ([beta][bDi] [beta][bRi] [beta][bNi])<T> [approximately] TN([mu][b], [SIGMA][b]), and ([beta][wDi] [beta][wRi] [beta][wNi])<T> [approximately] TN([mu][w], [SIGMA][w]). One difficulty here is deciding whether and, if so, how to model the relationship between these two distributions for a particular precinct. The fitting process might also be challenging. Professor King did not include an application of this model for larger tables in his book; indeed, he wrote that he did "not yet have an extensive range of experience" [82] with this expanded model, and I personally have never seen it used.

Another option is to collapse the set of R x C tables into a series of sets of two-by-two subtables. One can then successively apply King's EI, or in fact any two-by-two method, to the subtables. As of the time of this writing, Professor King's website recommends this procedure, [83] and his software has a built-in option to handle tables of size two by three by collapsing to a series of two-by-two estimation procedures, an option Professor King labels "EI2."

There are costs to following this recommendation, depending on how one implements it. Professor King proposes two methods: "An Approach Related **[*140]** to Double Regression" and "A Multiple Imputation Approach." [84] The first of these methods should not be used if possible (the EI2 software does not use it). The reason is that the approach related to double regression does not respect the bounds. Appendix C has the details, but briefly, the problem is that the analyst needs to run King's EI twice to obtain estimates for a set of two-by-three precinct tables, but in the approach related to double regression, the analyst does not condition on the estimates from the first run when implementing the second. That means that the estimates from the two runs together may produce logically impossible results even though each run alone does not.

One can solve the problem of logically impossible estimates by conditioning on the estimates from the first run before proceeding to the second; that is the essence of what Professor King calls a "Multiple Imputation Approach." This latter method, however, may carry different costs. For example, this Multiple Imputation Approach (at least as implemented in the King's EI software) does not appear to use the combining rules that make multiple imputation a statistically valid procedure. [85]

---

[80] Gary King--Software, *http://gking.harvard.edu/stats.shtml* (last visited Jan. 19, 2007).

[81] *See infra* note 134 and accompanying text.

[82] A SOLUTION, *supra* note 28, at 264.

[83] Gary King--How Do I Make *__Inferences__* in Larger Tables?, *http://gking.harvard.edu/ei/node78.html* (last visited Jan. 19, 2007).

[84] A SOLUTION, *supra* note 28, at 151-57.

[85] Multiple imputation, because of a 1978 article by Professor Donald Rubin, is a way of addressing a data set that has missing values in which one uses a model to fill in those values multiple times to create several "complete" (really meaning "completed") data sets, estimates a quantity of interest from each complete data set, then combines these estimates pursuant to certain specified rules. Donald B. Rubin, *Multiple Imputations in Sample Surveys--A Phenomenological Bayesian Approach to Nonresponse, in* PROCEEDINGS OF THE SURVEY RESEARCH METHODS SECTION OF THE AMERICAN STATISTICAL ASSOCIATION 20-27 (1978), *available at* http://www.amstat.org/sections/srms/Proceedings; *see also* RODERICK J.A. LITTLE & DONALD B. RUBIN, STATISTICAL ANALYSIS WITH MISSING DATA 85 (2d ed. 2002); DONALD B. RUBIN, MULTIPLE IMPUTATION FOR NONRESPONSE IN SURVEYS (Wiley-Interscience 2004) (1987); J. L. SCHAFER, ANALYSIS OF INCOMPLETE MULTIVARIATE DATA 104 (1999). The combining rules are necessary to reflect the fact that one fills in missing values, that is, to give honest estimates of uncertainty; if they are ignored, estimated standard deviations and variances will typically be too small. By "statistically valid procedure," I mean a method producing intervals that have nominal coverage; for instance, a 95% interval will include the true value 95% of the time. My thanks to Professor Rubin for helping me to clarify the application of these principles to the present context, as well as to the successive collapsing procedure discussed below.

47 Jurimetrics J. 115, *140

Problems with the collapsing procedure increase if one moves from two-by-three tables to three-by-three, the size of increasing importance in the law. In a recently published paper, Professor Karen Ferree has described how collapsing races (rows, in the precinct tables) causes King's EI to produce biased estimates and to rest on inappropriate modeling assumptions (such as unimodality) even if the original, uncollapsed precinct numbers were well behaved. [86] Professor Ferree lists assumptions necessary to make the collapsing method produce unbiased estimates. I will not regurgitate these assumptions here; instead, I return to the example of a jurisdiction such as Georgia **[*141]** Congressional District Four, one with blacks, whites, and Hispanics in which we wish to know the Democratic fraction of the two-party _**vote**_ for each race (that is, we are working with precinct-level tables in the form of Table 1, above). In such circumstances, Professor Ferree examines a process of collapsing, say, whites and Hispanics into a single group to obtain estimates for blacks, then collapsing, say, blacks and Hispanics into a single group to obtain estimates for whites, then calculating estimates for Hispanics from the numbers the first two steps generated. [87]

Professor Ferree demonstrates that the first step of this procedure, the collapsing of whites and Hispanics into a single group, produces biased estimates unless the following three conditions (stated in nontechnical terms, with a corresponding lack of mathematical precision) hold: (1) whites and Hispanics have the same _**voting**_ patterns; (2) the white fraction of the nonblack precinct population is the same in every precinct; and (3) blacks and Hispanics tend to live in the same areas. But an analogous set of conditions must also hold for the second step of the collapsing procedure (the combination of Hispanics and blacks). Theoretically, then, the collapsing procedure as a whole depends on the following two overall assumptions: (1) whites, Hispanics, and blacks have the same _**voting**_ patterns; and (2) the fraction white, fraction black, and fraction Hispanic do not vary from precinct to precinct. [88] Finally, note that because the collapsing procedure (at least as Professor Ferree outlines it) does not condition on the estimates produced in the first step before proceeding to the second, the procedure does not respect the bounds. [89]

If one departs from Professor Ferree's proposal by conditioning on the estimates from early stages of collapsing when implementing later stages, per the "Multiple Imputation Approach" mentioned above, some problems remain and others arise. The first stage of collapsing still requires the assumptions Professor Ferree outlines. In addition, the use of the multiple imputation combining rules becomes more important, and conversely, estimation without them is more likely to understate variability. Essentially, successive rounds of collapsing and uncollapsing require a nested form of multiple imputation, a method that has been used in the past when certain portions of a data set are particularly hard to impute. The procedure can be statistically valid if implemented properly (using special combining rules), but otherwise, the more collapsing that is done, the greater the underestimate of uncertainty. [90]

Both King's EI and the book that introduced it have generated controversy in the community of quantitative analysts interested in racial _**voting**_ patterns in **[*142]** particular and the _**ecological inference**_ problem in general. [91] Much of this controversy consists of a rehashing of the broader debate about whether making _**ecological inferences**_ is ever sound statistical practice, given the enormous loss of information due to aggregation. As discussed previously, this debate is of little interest to lawyers

---

[86] Karen E. Ferree, *Iterative Approaches to* R x C _**Ecological Inference**_ *Problems: Where They Can Go Wrong and One Quick Fix,* 12 POL. ANALYSIS 143, 146-47 (2004). Professor Ferree's paper may understate the dangers of collapsing because she appears to study untruncated distributions in order to make the concepts she wishes to explore tractable. Moreover, Professor Ferree is interested only in estimating turnout figures, not party _**vote**_ shares by race. Thus, she does not consider precinct-level tables with more than two columns. *Id.* at 145.

[87] *See id.* at 144.

[88] Appendix D has the "proof," as well as a more technical statement of Professor Ferree's three conditions listed above.

[89] *See supra* note 85 and accompanying text, Appendix C, and the discussion *infra* of this paper's running example.

[90] *See, e.g.,* Donald B. Rubin, *Nested Multiple Imputation of NMES Via Partially Incompatible MCMC,* 57 STATISTICA NEERLANDICA 3 (2003).

[91] Cho, *supra* note 38; Voss, *supra* note 26, at 69-80, 90-93; David A. Freedman et al., Book Review, 93 J. AM. STAT. ASS'N 1518 (1998) (reviewing GARY KING, A SOLUTION TO THE _**ECOLOGICAL INFERENCE**_ PROBLEM (1997)); Rivers, *supra* note 78, at 442-43; David A. Freedman et al., Letter to the Editor, *Response to King's Comment,* 94 J. AM. STAT. ASS'N 355 (1999); Gary King, Letter to the Editor, *The Future of _**Ecological Inference**_ Research: A Comment on Freedman et al.,* 94 J. AM. STAT. ASS'N 352 (1999).

and judges, who must litigate and adjudicate ***Voting*** Rights Act cases. In addition, some commentators have argued that King's EI rarely gives estimates different from those of regression. [92] Even this latter group of commentators acknowledges, however, that King's EI estimates for two-by-two tables are qualitatively different from those of regression because the former respect the bounds deterministically. Meanwhile, judicial reaction to King's EI has been generally favorable. [93]

There is little question that the proposal of King's EI in 1997 was a step forward in the endeavor to produce coherent and accurate evaluations of racial ***voting*** patterns, and corresponding assessments of uncertainty, in ***Voting*** Rights Act cases. As suggested above, the primary innovation was to incorporate precinct-level bounds into a stochastic model. The drawbacks of applying King's EI to precinct tables of size greater than two by two (the situation one encounters in the law) make clear that it should not be used in redistricting cases if a coherent model is available and feasible for the data set at hand. [94] The next section discusses a coherent (if imperfect) approach for tables of any size and shape.

To illustrate the application of King's EI to Georgia Congressional District Four in 2000, I collapse to a series of two-by-two tables. [95] Because the precinct tables are three by three, a tedious collapsing procedure is necessary. Very briefly, I first collapse whites and Hispanics together to form a black versus nonblack data set, then run King's EI twice on these newly created data, once to estimate black turnout, the second time to estimate Democratic ***vote*** share among black voters. Next, I collapse Hispanics and blacks together to form a white versus nonwhite data set, then again run King's EI twice, once to estimate white turnout, the second time to estimate Democratic ***vote*** share among white voters. Finally, I calculate the relevant figures for Hispanics from the estimates the first two steps produced. [96]

[*143]  The results [97] for the fraction of each racial group's voters supporting the Democrat are as follows: for blacks, a mean of 0.91, a standard deviation of 0.0024, and a 95% posterior interval of (0.910, 0.919); for whites, a mean of 0.296, a standard deviation of 0.0039, and a 95% posterior interval of (0.289, 0.305); and for Hispanics, a mean of 0.558, a standard deviation of 3.62, and a 95% posterior interval of (--4.56, 3.74). The point estimates for blacks and whites are fairly similar to those of regression. The standard deviations of the posterior draws from King's EI for these two groups were an order of magnitude smaller than the approximate standard errors produced by the delta method in the regression context, an unsettling result, given that we have reason to believe that the uncertainty estimates from regression are often too small. The results for the Hispanics are nonsensical. The collapsing method has resulted in a great many precinct-level estimates of Hispanic ***voting*** outside the bounds, and the overall results for Hispanics are logically impossible. [98] On the whole, then, an analyst applying King's EI to this data set in isolation might conclude that black voters appear to have different ***voting*** patterns from white voters, but that the level of white support for the black preferred candidate might raise a question as to whether whites ***vote*** sufficiently as a bloc as

---

[92] *See, e.g.,* Cho, *supra* note 38, at 156 n.8.

[93] *See* Appendix A.

[94] "The optimal way for dealing with these problems is to avoid them entirely by estimating all cells of the *R x C* table simultaneously . . . ." Ferree, *supra* note 86, at 144.

[95] *See supra* note 83 and accompanying text; *see also* Ferree, *supra* note 86, at 144.

[96] I implemented this procedure using the Windows version of Professor King's software, called "EZI." Specifically, I created the two data sets (black versus nonblack and white versus nonwhite) myself and used EZI's EI2 procedure. This is not the best way to implement collapsing; conditioning on the estimates from the black versus nonblack step before proceeding to the white versus nonwhite step is better. I believe, however, that most analysts would do as I did when confronted with this data set because of the computational challenge such conditioning poses.

[97] These results come from using the defaults from EZI, except I requested 120 posterior simulations instead of the default value of 100 because of a quirk in the output for the data set.

[98] *See* the discussion in the previous section, as well as Appendix C.

to frustrate the preferences of blacks.[99] The analyst would conclude that no estimates are available for Hispanic voters, at least via the collapsing method that is easiest to use.

**D. The MD Method**

In 2001, Rosen et al. proposed what I label here the Multinomial-Dirichlet (the "MD") method.[100] To my knowledge, no expert witness has used this model in _**Voting**_ Rights Act litigation. I discuss it here for two reasons: first, it is one of the few attempts to produce a model that applies naturally to precinct-level tables of any size and shape (other than _**ecological**_ regression, which is discussed and rejected above); second, it is one of the few proposals existing at present that works at least partially with counts as opposed to fractions.[101] In my view, the MD method represents the kind of model courts and experts should at present be employing in redistricting litigation, and as of the time of this writing, it represents the state of the art. The method has shortcomings, however, suggesting that researchers should continue to look for better options.

**[*144]**  An explanation of the MD method requires an introduction to two advances in statistics that, because of the emergence of fast computers, have revolutionized the field in the past two decades: hierarchical modeling and Markov chain Monte Carlo ("MCMC"). With respect to the first, an example of hierarchical modeling (one used over and over again among statisticians) is the analysis of student performance on a standardized test in a school with several classrooms. In the first layer of the model, one might assume that, within each classroom, student test scores follow a particular distribution governed by some parameters. In the second layer, the parameters of each classroom follow a distribution characteristic of the school governed by "hyperparameters." At the third level, schools vary within a particular county, so the hyperparameters themselves follow a third distribution. Counties are within states, states are within countries, countries are within the planet earth, and there we might give up, but the idea is clear.

The key to understanding a hierarchical model is to realize how units at the lowest level provide information about each other's behavior: in the standardized test example, how the scores of students in classroom A provide information about the parameters governing classroom B. Recall that we assume that a set of parameters governs the test scores of students in classroom A. If we knew the classroom A parameters for certain (that is, observed them as we do the test scores), we might consider these parameters our "data," but the fact is that these numbers have to be estimated, and moreover, such estimation must be accomplished for classroom B as well. Because we assume that the classroom parameters follow a pattern, each student's performance contributes information about the classroom, and through the classroom, the school. Thus, the test scores in classroom A provide information (through the classroom parameters) about the hyperparameters that characterize the school, which in turn provide information about the parameters that characterize classroom B. Quantitative analysts refer to this kind of information exchange as "borrowing strength."[102] Used properly, hierarchical modeling can provide flexibility and allow an analyst to relax potentially unrealistic assumptions.[103]

The second concept that has revolutionized statistics in the past two decades is MCMC. MCMC can be understood as a way of using computers to proceed when math becomes too hard.[104] For instance, suppose we want to know the shape of the

---

[99] _See_ _Thornbury v. Gingles, 478 U.S. 30, 55-56 (1986)._ Deciding whether such frustration is actually occurring would require additional analysis.

[100] Ori Rosen et al., _Bayesian and Frequentist **Inference** for **Ecological Inference**: The_ R x C _Case,_ 55 STATISTICA NEERLANDICA 134 (2001). The label is my own.

[101] _See supra_ Tables 1-3.

[102] _E.g.,_ Gary King et al., _Binomial-Beta Hierarchical Models for **Ecological Inference**,_ 28 SOC. METHODS & RES. 61, 68 (1999).

[103] _See, e.g.,_ Jonathan Wakefield, _Prior and Likelihood Choices in the Analysis of **Ecological** Data, in_ EINMS, _supra_ note 26, at 13, 19 (praising King's use of a hierarchical structure in a particular model as providing greater flexibility).

[104] _See generally_ GELMAN ET AL., _supra_ note 66, at 285-307. The "Markov" part of "Markov chain Monte Carlo" refers to a method of obtaining these draws in which the tth draw depends on the (t--1)th draw but not the (t--2)th, the (t--3)th, or earlier draws. Bayesian statisticians often use MCMC to draw _**inferences**_ about posterior distributions. _See supra_ note 66.

47 Jurimetrics J. 115, *144

distribution, under a model, of possible values for the percentage of black voters who support the Democrat in a particular election. The model we use, while potentially providing a close match to the *__voting__* **[*145]** process, results in expressions that we cannot solve mathematically to get a picture of the distribution. Unable to obtain a mathematical description, we use a computer to provide 10,000 (or 100,000 or 1,000,000) "draws" (random values) from the distribution and examine them. The hope is that these draws from the distribution will give a good idea of what it looks like as a whole. [105]

The MD model is hierarchical. At the bottom level, a precinct's number of *__votes__* for each candidate and the number not *__voting__*, that is, the precinct table's column totals, are assumed to follow a particular (multinomial) distribution, the parameters (probabilities) of which represent a mixture of unobserved precinct-level fractional parameters (the *[beta]*[i]'s, in the notation of this paper) weighted by the precinct's racial composition (the X[i]'s). At the second level, the unobserved fractional parameters follow another distribution (mutually independent Dirichlets). A frequentist stops there; a Bayesian puts a prior on the hyperparameters (of the Dirichlets).

More specifically, using technical symbols and supposing we have a set of three-by-three precinct tables as per Tables 1-5, the model is as follows.

Level 1

(N[Di], N[Ri], N[Ni])<T> [approximately] Multi(N[i], *[beta]*[bDi]X[bi] + *[beta]*[wDi]X[wi] + *[beta]*[hDi]X[hi], *[beta]*[bRi]X[bi] + *[beta]*[wRi]X[wi] + *[beta]*[hRi]X[hi], *[beta]*[bRi]X[bi] + *[beta]*[wRi]X[wi] + *[beta]*[hRi]X[hi])

Level 2

(*[beta]*[bDi], *[beta]*[bRi], *[beta]*[bNi])<T> [approximately] Diri([alpha][b]) mutually independent of

(*[beta]*[wDi], *[beta]*[wRi], *[beta]*[bNi])<T> [approximately] Diri([alpha][w]) mutually independent of

(*[beta]*[hDi], *[beta]*[hRi], *[beta]*[hNi])<T> [approximately] Diri([alpha][h])

Level 3: For Bayesians

[alpha][rc] [approximately] [GAMMA] ([lambda][1], [lambda][2]) for r = 1 to R, c = 1 to C

[lambda][1] and [lambda][2] must, of course, be set in advance. [106]

Using this model requires some fairly fancy tools, either MCMC (for the Bayesian) or nonlinear least squares (for the frequentist). In the former category, Rosen et al. recommend embedding Metropolis-Hastings steps **[*146]** within an overall Gibbs sampler. [107] These methods are computationally intensive and, particularly for large data sets, can be slow. These

---

[105] *Id.*

[106] The symbols "Multi," "Diri," and "[GAMMA]" refer to particular distributions for random variables or vectors, the "Multinomial," "Dirichlet," and "Gamma" distributions, respectively. Each is defined and discussed in GELMAN ET AL., *supra* note 66, at 573-84. As far as intuition, one can conceptualize the multinomial in terms of the number of balls that fall into each point category in a game of Skeeball. One might use the Dirichlet to model something like the fractional composition of different kinds of rock (for example, igneous, sedimentary, or volcanic) in a series of samples, where the sum of the fractions must equal one. The Gamma is often used to model scalar quantities that must be positive, such as rainfall.

Returning to the MD Model, Rosen et al. use an alternative parameterization for the [alpha] s that, among other things, eases the incorporation of covariates into the model. Specifically, let Z[bDi] be a vector of covariates that might help predict *N*[bDi], and similarly for Z[bRi], Z[wDi], etc. Then, in the example above, (*[beta]*[bDi], *[beta]*[bRi], *[beta]*[bNi]) [approximately] Diri(d[b] *exp*(Z[bDi]<T> [delta][bD]), d[b] *exp*(Z[bRi]<T> [delta][bR]), d[b]). Similarly, parameters ([delta][wD], [delta][wD], d[w]) govern the distribution of (*[beta]*[wDi], *[beta]*[wRi], *[beta]*[wNi]), while ([delta][hD], [delta][hD], d[h]) govern (*[beta]*[hDi], *[beta]*[hRi], *[beta]*[hNi]). Rosen et al. suggest improper priors for the [delta]'s and a gamma prior for the d's. Rosen et al., *supra* note 100, at 137-38.

characteristics spur Rosen et al. to detail the frequentist approximation for this model using nonlinear least squares, which they describe as faster. [108]

Because of its relatively recent emergence, and because there are few studies in the literature (and no reported court cases) that have used it, the MD model is difficult to assess, and the comments that follow are necessarily preliminary. The most important advantage is that noted earlier, namely, the MD model is a transparently coherent approach for precinct tables larger than two by three. This is a significant advantage, one not shared by any of the **_ecological inference_** techniques previously used in **_Voting_** Rights Act litigation. The statistical properties of the MD model are complicated. The model respects the bounds "asymptotically," meaning that as the number of voters inside a precinct gets larger (that is, approaches infinity), the probability that the model will predict a value for one of the *[beta][i]*'s outside its bounds decreases, but that probability remains above zero for any finite precinct population. [109] In other words, the model does not always respect the bounds, but it can be expected to do so more and more as precinct populations increase. Covariates may be included in the model.

The MD model has certain drawbacks. Its level of statistical sophistication is fairly high, both in theory and in implementation. When dealing with such complicated concepts, it might be helpful to have a framework at the level of the individual voter, a story of how a "typical" voter behaves under the model's assumptions, to assist judges and litigators in understanding what the method means practically. Rosen et al., however, do not propose such a framework, and I have been unable to construct one. [110] The MD model's statistical sophistication and the absence of an individual-level story suggest that it will be difficult to explain to a court, as few judges will be familiar with terms like "multinomial," "Dirichlet," and "Markov chain Monte Carlo."

**[*147]** The MD model has other drawbacks. Partly because the model works with fractions at the second level of its hierarchy, it is not immediately obvious how to incorporate information from surveys or exit polls into the model. The Bayesian version of the MD method is computationally intense, although recently, three students at Harvard University have written software in the increasingly popular R statistical computing environment that purports to fit the model, [111] and one expects the continued march of advancement in computer technology to reduce the computational burden. Finally, because of the particular, technical characteristics of the distributions it uses, the MD method does not allow for much freedom in the relationships among the internal cell quantities. In particular, the use of independent Dirichlet distributions for each row's vector of fractions (*[beta]*'s) means that the model has no parameters to describe the relationship of the fractions in one row to the fractions in another (that is, nothing like the [rho] parameter in King's EI). Within each row, the Dirichlet distribution is not rich: for instance, correlations between row quantities must be negative. [112] As an example of how to conceptualize the cost of

---

[107] For an explanation of the terms "frequentist" and "Bayesian," see *supra* note 66. A "Gibbs sampler" is an MCMC method of exploring a multivariate distribution (often a Bayesian posterior). Conceptually, suppose a researcher needs random draws from the distribution for the random vector (X[1], X[2]). Generating draws of both X[1] and X[2] simultaneously is too difficult, so the researcher alternates between drawing X[1] "given" X[2] and drawing X[2] "given" X[1]. The "Metropolis-Hastings" algorithm is a related MCMC method. If a researcher needs random draws from the distribution of a random variable X but cannot figure out how to get them directly, he or she generates a series of "proposals" and uses a mathematical formula to decide whether to "accept" these proposals. *See* GELMAN ET AL., *supra* note 66, at 285-305.

[108] Rosen et al., *supra* note 100, at 142-47.

[109] Essentially the same group of authors demonstrated this fact in an earlier paper. King et al., *supra* note 102. Although it is difficult to make general statements on this point, one would expect that when most precincts are of reasonable size, when voters in the jurisdiction generally follow well-behaved patterns, and when the counts for each precinct's column totals are reasonably large in most precincts (as will ordinarily be true, for example, in a general election), the MD model will produce few impossible predictions for the jurisdiction as a whole. Impossible values for individual precincts remain likely, but these may be of less interest.

[110] *See infra* Part III, for further discussion.

[111] The package is called "eiPack." *See* The Comprehensive R Archive Network, *http://mirrors.ibiblio.org/pub/mirrors/CRAN/* (last visited Jan. 21, 2007). As of the time of this writing, the explanatory documentation is undergoing revision, and the software has not been validated statistically. *See* Samantha R. Cook et al., *Validation of Software for Bayesian Models Using Posterior Quantiles* 15, J. COMPUTATIONAL & GRAPHICAL STAT. 675 (2006). If these two issues were solved, the burden of fitting the model would be eased greatly.

47 Jurimetrics J. 115, *147

the independent Dirichlets, suppose we knew that a great many whites in a precinct were *voting* Democrat; under the MD Model, that fact would tell us nothing about how blacks or Hispanics in the same precinct were *voting*.

Application of the MD Model to Georgia Congressional District Four in 2000 demonstrates some of the strengths and the *weaknesses* of the technique. Assuming once again that the quantity of interest is the fraction of each race's voters supporting the Democrat, the results are as follows: for blacks, a point estimate of 0.90, a standard deviation of 0.011, and a 95% posterior interval of (0.88, 0.92); for whites, a point estimate of 0.33, a standard deviation of 0.015, and a 95% posterior interval of (0.30, 0.36); and for Hispanics, a point estimate of 0.53, a standard deviation of 0.09, and a 95% interval of (0.35, 0.69). Immediately, one can see a principal benefit of employing a coherent model capable of handling precinct tables of any size and shape: it produces estimates of Hispanic *voting* behavior, something the three techniques discussed previously (at least as I employed them) are unable to do. Moreover, the wide interval for Hispanics the model produces here (0.35, 0.69) is comforting in that the MD Model appears to reflect the fact that the data contain less information on Hispanics. Notice also that the interval, though wide, is not utterly uninformative; it suggests that neither party is dominating the Hispanic *vote*.

 [*148] My application of the MD Model to this data set also demonstrates some of the technique's drawbacks. Analysis of this relatively small but somewhat difficult set of precincts takes time. [113] Furthermore, not all of the diagnostics for the computer runs are perfect, suggesting that even more time might be necessary for complete confidence in the analysis. [114]

Stepping back from the MD Model, Table 7 summarizes the results of all four techniques this paper discusses pertinent to the Georgia Fourth Congressional District in 2000 data. For the estimates that each model was able to produce, a fair amount of consistency exists, although one should not read too much into this fact. [115]

 [*149] Table 7: Estimates of the fraction of each race's voters supporting the Democrat from the application of four *ecological inference* techniques to Georgia's Fourth Congressional District in 2000. The rows, in order, show the results of Homogeneous Precincts, *ecological* regression, King's EI, and the MD Model. "p.e." stands for "point estimate," "s.e." for "standard error," and "95% Int." for "95% interval."

| Black | White | Hispanic |
| --- | --- | --- |

---

[112] GELMAN ET AL., *supra* note 66, at 577; *see also* J. AITCHISON, THE STATISTICAL ANALYSIS OF COMPOSITIONAL DATA 59 (2003).

[113] I programmed the MD Model in the R statistical package mentioned above, *see* The R Project for Statistical Computing, *http://www.R-project.org* (last visited Jan. 21, 2007), and ran five chains in series for 1,000,000 iterations on an Opteron computer, saving every 1000th draw. With my R coding, the program took two weeks to complete. I also experimented with eiPack. Because eiPack's MCMC backbone is written in C, a much faster language than R, five chains of 10,000,000 iterations per chain took about three days to run. Substantively, the eiPack results were similar to those from my coding (the largest change was in the 97.5th percentile for Hispanic voters supporting the Democrat, which was 0.57 in the former).

[114] MCMC methods are probabilistic and depend on a fancy kind of convergence of statistical distributions. *See generally* MARTIN A. TANNER, TOOLS FOR STATISTICAL *INFERENCE*: METHODS FOR THE EXPLORATION OF POSTERIOR DISTRIBUTIONS AND LIKELIHOOD FUNCTIONS (3d ed. 1996). To assess whether the necessary convergence has occurred, quantitative analysts use diagnostics. I examine various such diagnostics. For the most part, the diagnostics are unremarkable, but unsurprisingly, for Hispanic *voting*, there are warning signs. For example, with my R code and one million iterations per chain, the R-hat, *see* GELMAN ET AL., *supra* note 66, at 297, for the [alpha] corresponding to Hispanics *voting* Republican is 1.19, and the lag 50 autocorrelation is 0.24. These diagnostic figures, particularly the latter, make reliance on the substantive results somewhat marginal. eiPack's convergence diagnostics were better but still mildly disturbing; most worrisome were surprisingly high- and low-acceptance fractions for the package's Metropolis-Hastings steps.

As mentioned above, the data set is small, but the absence of Hispanic-dominated precincts means that there is less information about Hispanic *voting* behavior in the data, requiring the millions of iterations (which still might not have been enough) that I used. Not all data sets will require this quantity of iterations.

[115] Each of the four techniques, after all, makes a key assumption, which is that a racial group's *voting* patterns follow the same patterns across precincts and, in particular, are unaffected by the precinct's racial composition. In other words, all four techniques assume no aggregation bias.

47 Jurimetrics J. 115, *149

| | p.e. (s.e.) | 95% Int. | p.e. (s.e.) | 95% Int. | p.e. (s.e.) | 95% Int. |
|---|---|---|---|---|---|---|
| Hm. Prc. | 0.93 (NA) | NA | NA (NA) | NA | NA (NA) | NA |
| Ec. Reg. | 0.95 (0.027) | (0.90, 1.0) | 0.31 (0.018) | (0.27, 0.35) | NA (NA) | NA |
| K.'s EI | 0.91 (0.002) | (0.91, 0.92) | 0.30 (0.004) | (0.29, 0.31) | NA (NA) | NA |
| MD | 0.90 (0.01) | (0.88, 0.92) | 0.33 (0.015) | (0.30, 0.36) | 0.53 (0.09) | (0.35, 0.69) |

## E. Other Methods

The past decade has seen a great deal of research into the *ecological inference* problem, a field that has long been richer and more nuanced than one would guess from a review of judicial opinions or the limited discussion that has taken place on racial bloc *voting* in quantitative journals. Accordingly, I clarify that the previous discussion has omitted important contributions to the thinking in this area, including new models that might one day be used in court. By way of example, one group of authors has recently proposed using moment conditions and information theoretics to avoid distributional assumptions and allow for possible measurement error in both the row and the column totals.[116] Another pair of authors, including Professor Grofman, has proposed three distance-minimizing algorithms akin to regression with bounds.[117] Almost two decades ago, two authors proposed a technique using imagined multinomial cell counts for each row of each precinct's table and studied asymptotic approximations to fit the model.[118]

Aside from these different general approaches, scholars have begun studying specific aspects and extensions of existing models. Some of these, for example those addressing modeling over time, have already been mentioned. Additional examples include a proposal for incorporating information from sources other than election data and precinct-level covariates into modeling[119] and methods for model checking (an all-too-frequently ignored aspect of this [*150] field).[120] Finally, in perhaps the most important recent trend in this literature, scholars have begun to explore ways to address the fundamental problem of *ecological inference*, that is, lack of information in the data, by incorporating the results of surveys.[121]

---

[116] George C. Judge et al., *An Information Theoretic Approach to Ecological Estimation and Inference, in* EINMS, *supra* note 26, at 162, 162.

[117] Grofman & Merrill, *supra* note 35, at 123.

[118] Philip J. Brown & Clive D. Payne, *Aggregate Data, Ecological Regression, and Voting Transitions,* 81 J. AM. STAT. ASS'N 452, 452 (1986).

[119] J. Kevin Corder & Christina Wolbrecht, *Using Prior Information To Aid Ecological Inference: A Bayesian Approach, in* EINMS, *supra* note 26, at 144.

[120] Gelman et al., *supra* note 27.

[121] *See, e.g.,* Christopher Jackson et al., *Improving Ecological Inference Using Individual-Level Data,* 25 STAT. MED. 2136 (2006); Wakefield, *supra* note 27, at 418-21; Adam Glynn et al., *Alleviating Linear Ecological Bias and Optimal Design with Subsample Data* (Ctr. for Stat. & Soc. Sci., U. Wash., Working Paper No. 51, 2005), *available at* http://www.csss.washington.edu/Papers/wp51.pdf.

anthony rupp

47 Jurimetrics J. 115, *150

Courts may cling to the tried and "true" methods, homogeneous precincts and regression, only at substantial cost. While no method of *ecological inference* is what a fastidious analyst would call "reliable," these two methods are much less so than others that have been developed in the past decades. The challenges posed by advances in this area constitute a fascinating case study of the interaction between the court system and a rapidly evolving technical field, one made particularly interesting by the fact that Congress is unlikely to create a federal agency to buffer courts from rapid change. That case study will have to wait for another paper.

## III. WHERE DO WE WANT TO BE?

In the previous two parts, I introduced the *ecological inference* problem as it relates to the issue of racial bloc *voting* under the *Voting* Rights Act and described several methods currently available to attack the problem. In this part, I offer some thoughts and recommendations for courts, litigators, expert witnesses, and future researchers in this area. Some of the content here applies to any study of the *ecological inference* problem generally or to any use of statistics in the legal context. Other thoughts are more specific to the particular problems of *Voting* Rights Act litigation. Overall, this part seeks to answer the following question: What do we want from a model for evaluating racial bloc *voting* in the redistricting context?

To begin, a good method should have good fundamentals, recognizing that *ecological inference* will always be fraught with peril. On this front, three points in particular stand out. First, a good method must coherently address precinct tables of any reasonable size and shape. In the two previous parts, I used tables of size three by three for illustrative purposes, but *voting* data come in other shapes. Primary elections, [122] for example, often involve more than two candidates (columns), and in pluralistic jurisdictions, accounting for the behavior of three races or ethnicities (rows) may not be sufficient. Second, a good method must produce honest estimates of uncertainty, estimates that recognize the unique challenges of the *ecological inference* problem. Precincts with counts more or less evenly dispersed among row and column totals have less information about *voting* patterns, at least without covariates or some other adjustment to the model. Thus, jurisdictions that lack precincts in which **[*151]** racial groups of interest predominate, and that have very few precincts, resist precise *ecological inferences*. Good methods will reflect this fact by providing wide confidence or credible intervals (as the MD method did in the Georgia Fourth Congressional District example, above), allowing users of these methods to react appropriately by, perhaps, seeking other forms of evidence of racial bloc *voting*. Third, a good method should respect the precinct-level bounds deterministically. "The bounds . . . provide valuable deterministic information." [123] Indeed, they represent all the information the data provide in and of themselves. Methods that discard this information, such as *ecological* regression and homogeneous precincts, should be avoided. Techniques such as the MD model that respect the bounds asymptotically are better than those that fail to respect them at all. But respecting the bounds asymptotically is different from respecting the bounds deterministically. Will the asymptotics provide sufficient safety in data sets with small numbers of voters in each precinct, such as may occur in party primaries? [124]

Next, a good method should be flexible enough to incorporate information from surveys or exit polls. As explained above, the fundamental problem of *ecological inference* is a lack of information in the data in that substantively different internal cell counts can give rise to the same observed row and column totals. Incorporating survey results adds information to this underdetermined system.

Furthermore, a good model should be able to explore a variety of relationships within and among precinct contingency tables. To illustrate what I mean here, consider a jurisdiction made up entirely of African-Americans and Caucasians, and suppose one is interested in a primary in which four candidates, two black and two white, seek the nomination. The precinct tables thus look like Table 8.

**Table 8: 2 x 5 Table of *Voting* By Race:**

**Counts of *Voting*-Age Population**

---

[122] *See supra* note 10 and accompanying text.

[123] A SOLUTION, *supra* note 28, at 77.

[124] *See supra* note 10 for a discussion of the importance of party primaries to coalition districts.

47 Jurimetrics J. 115, *151

| | B1 | B2 | W1 | W2 | No _Vote_ | [SIGMA] row |
|---|---|---|---|---|---|---|
| Black | N[bB1i] | N[bB2i] | N[bW1i] | N[bW2i] | N[bNi] | N[bi] |
| White | N[wB1i] | N[wB2i] | N[wW1i] | N[wW2i] | N[wNi] | N[wi] |
| [SIGMA] column | N[B1i] | N[B2i] | N[W1i] | N[W2i] | N[Ni] | N[i] |

One can think of at least three kinds of relationships that almost certainly characterize the process that generates the data. The first is within-race (intra-row) correlation. For example, the data might suggest that if the count among black potential voters in a particular precinct for candidate B1 is "high," then the _**vote**_ count for black voters in the same precinct for candidate B2 is [*152] probably also "high." [125] Suppose a model were able to tell us that, in a particular jurisdiction, such a relationship exists among black potential voters, while (1) among white potential voters, the correlation (on some scale) of the _**vote**_ for candidates W1 and W2 is also positive, and (2) negative correlations exist for both races between the _**votes**_ for candidates B1 and W1, for B1 and W2, for B2 and W1, and for B2 and W2. Such a pattern could constitute evidence that voters in this jurisdiction were using the race of a candidate as a cue for how to _**vote**_, suggesting that _**voting**_ is racially polarized.

A second type of relationship that may be worth studying is between-race (interow) correlation. Continuing with the example represented by Table 8, there might be positive correlation between the white _**vote**_ for candidate W1 and the black _**vote**_ for candidate B1. Again, such correlations might tell us something about the nature of racial politics in the jurisdiction. [126]

A third type of relationship worthy of investigation is spatial correlation. Almost all _**ecological inference**_ models assume away spatial relationships. Meanwhile, it is virtually certain that precincts located near one another _**vote**_ more similarly than do precincts located on opposite ends of a jurisdiction. One can attempt to account for this kind of correlation by using covariates (see below), but this is rarely done. Models that allow for the inclusion of spatial information are generally preferable to models that do not. [127]

Next, a good _**ecological inference**_ model should be flexible enough to incorporate covariate information. The Supreme Court's recent decision in _LULAC v. Perry_ [128] has made investigation into covariates all the more critical. In _LULAC,_ Justice Kennedy's controlling opinion for the court held that (1) the then-extant version of Texas Congressional District 25 was not reasonably compact under the first of the three _Gingles_ prerequisites to a section 2 claim [*153] because the district combined Latinos in Austin with Latinos along the Mexican border, when the two groups had different levels of education, employment,

[125] I put "high" in quotation marks because one must identify a scale here. Does "high" mean high in an absolute sense, or high relative to the number of blacks in the precinct (that is, N[bBli]/N[bi] is high)? Perhaps what we really mean is that if the probability that a black potential voter in a precinct _**votes**_ for candidate B1 is high, the probability that a black potential voter in the same precinct _**votes**_ for candidate B2 is also high. Here, we must remember that if we model probabilities for each row, we are working with compositional data, so we must again be careful with concepts such as correlation. _See generally_ AITCHISON, _supra_ note 112.

[126] There is reason to question whether _**ecological**_ data contain much information about interrow relationships. One can see how data sets with numerous racially homogeneous precincts might have information about within-row correlations. But what kind of precincts have information about between-row relationships? _See_ A SOLUTION, _supra_ note 28, at 101.

[127] Only a few scholars thus far have attempted to include spatial information in _**ecological inference**_. _See, e.g.,_ Sebastien Heneuse and Jonathan Wakefield, _**Ecological Inference** Incorporating Spatial Dependence, in_ EINMS, _supra_ note 26, at 266; Luc Anselin & Wendy K. Tam Cho, _Spatial Effects And_ _**Ecological Inference**_. 10 POL. ANALYSIS 276 (2002); Luc Anselin, _The Alchemy of Statistics, or Creating Data Where No Data Exist,_ 90 ANNALS ASS'N OF AM. GEOGRAPHERS 586 (2000).

As was the case with interrow correlation, _**ecological**_ data may lack sufficient information allow modeling of spatial correlation. Some scholars have reported difficulty in fitting models that include such a component, at least when the jurisdiction has relatively few "precincts." _See, e.g.,_ Heneuse & Wakefield, _supra,_ at 283-84 (analyzing a data set in which the "precincts" were Louisiana parishes).

[128] _League of United Latin Am. Citizens v. Perry, 126 S. Ct. 2594 (2006)._

health, and other socioeconomic characteristics, even though (2) a lower court properly found that *voting* in south and west Texas was racially polarized. [129] There is some tension in these two holdings: if *voting* in the relevant areas is racially polarized, then the socioeconomic factors Justice Kennedy highlighted do not appear to prevent the Austin and Mexican-border Latinos from adopting similar *voting* patterns. [130] At a minimum, Justice Kennedy's formulation injects a new question into many section 2 cases: when will differences in socioeconomic and demographic factors between groups divided by geography but united by race be sufficient to defeat a finding of compactness under section 2? One way to answer this question is to examine the issue empirically by including the factors thought to be relevant as covariates in an *ecological inference* model to see whether they make a difference. If the covariates are of little relevance in predicting *voting* patterns, then differences in them should have little relevance to a compactness inquiry. On this subject, however, the following point is critical: one includes covariates in an *ecological inference* model to improve prediction of the unobserved internal cell counts, not in an attempt to "account" or "control" for them in some sense. One does not isolate the "effect" of a particular variable, such as race, and above all, there is nothing causal in *ecological inference*. [131]

Next, a good *ecological inference* model should be able to analyze the data-generating process over multiple elections. By multiple elections, I mean multiple contests both in the same year and over a span of years. As the *Voting* Rights Act is currently interpreted, racial bloc *voting* is something one must analyze over a period of years. [132] Scholars have only recently begun to attempt to link *ecological inferences* across space and time, [133] but I expect that the increasing popularity of hierarchical modeling techniques and advancement in high-speed computing will encourage such research to continue.

Next, an ideal model should run quickly. During the relatively short time period between the release of decennial census data to states and municipalities [134] and the next round of elections, an explosion of redistricting litigation is inevitable. Courts, litigators, and experts need speedy analyses of racial *voting* patterns during this time period. This consideration suggests that state of the art *ecological inference* methods, such as the MD Model, may not be feasible to use in all data sets in all cases.

**[*154]** Finally, a good *ecological inference* technique should correspond to an understandable story or model of individual *voting* behavior. In the quantitative community, there is some debate as to whether a story at the individual level is necessary to make an aggregate level model coherent. [135] But a *Voting* Rights Act courtroom is not an academic setting. Those assessing *ecological inference* models for use in the former context must realize that courts will rarely find credible an expert who testifies, in effect, "I ran some numbers. Trust me. They show *voting* is (is not) racially polarized in the jurisdiction." For better or for worse, judges and litigators want to feel as though they have some understanding of the methods an expert has used. Relating a precinct-level model to a theory of individual behavior can go a long way toward making something technically

---

[129] *Id. at 2613, 2615.*

[130] *See* id. at 2656-57 (Roberts, C.J., concurring).

[131] *Compare, e.g.,* Grofman, *supra* note 59, at 840, *and* McCrary, *supra* note 69, at 520, *with* Gelman et al., *supra* note 27, at 102-03, *and* Bernard Grofman, *New Methods for Valid Ecological Inference, in* SPATIAL AND CONTEXTUAL MODELS IN POLITICAL RESEARCH 127, 131 (Munrow Eagles ed., 1995).

[132] *See supra* note 22 and accompanying text.

[133] *See, e.g.,* Kevin M. Quinn, *Ecological Inference in the Presence of Temporal Dependence, in* EINMS, *supra* note 26, at 207; *Lewis, supra* note 44.

[134] *See 13 U.S.C. § 141*(c) (2000).

[135] *Compare, e.g.,* ACHEN & SHIVELY, *supra* note 25, at 3 ("[W]e are virtually always forced to explicitly derive macrolevel models from their microlevel counterparts before statistical work can begin."), *and* LANGBEIN & LICHTMAN, *supra* note 36, at 12 ("The investigator using aggregate level data to infer the behavior of individuals must set forth both a model of individual level behavior and its surrogate at the aggregate level."), *with* A Solution, *supra* note 28, at 49 ("[W]hatever is generating the individual-level data can be ignored, so long as the precinct boundaries do not induce a correlation" between precinct composition and *voting* behavior.), *and id.* at 119-22.

47 Jurimetrics J. 115, *154

sophisticated, such as a hierarchical model, more accessible and understandable, and thus more persuasive. Moreover, it is hard to see how to incorporate information from surveys and exit polls without a model at the individual level. [136]

The previous discussion demonstrates that drawing *inferences* about racial bloc *voting* in a system of secret ballots is a difficult and perilous thing to do. In closing, I reiterate that, unless the law changes, we have no real alternative to the continued use of *ecological inference* methods, which are by their nature fragile. But this fragility should not suggest that anything goes. Particularly in light of the development of recent law, courts, expert witnesses, and litigators must begin to be more discerning about such *inferences*, and must focus on how the quantitative techniques used can answer the questions the law poses.

## [*155] APPENDIX A. LEGAL PEDIGREES OF SELECTED *ECOLOGICAL INFERENCE* METHODS

In this Appendix, I recount the federal judiciary's reaction to the first three *ecological inference* methods featured in the main text.

As discussed in the main text, *Thornburg v. Gingles* [137] noted a district court finding that homogeneous precincts and *ecological* regression were "standard in the literature for the analysis of racially polarized *voting*." [138] From subsequent case law, however, one would have great difficulty discerning that "[t]he [*Gingles*] Court did not mandate any particular statistical method for evaluating *vote* dilution claims. It merely accepted the methods presented, noting them to be standard in the literature." [139] Thus, in the following cases, courts relied on expert testimony resting on both homogeneous precinct analysis and regression: *Rodriguez v. Bexar County, 385 F.3d 853, 865-66 (5th Cir. 2004);United States v. Blaine County, 363 F.3d 897, 915 n.27 (9th Cir. 2004);*Rural West Tennessee *African American Affairs Council v. Sundquist, 209 F.3d 835, 839 (6th Cir. 2000);Ruiz v. City of Santa Maria, 160 F.3d 543, 546 n.3 (9th Cir. 1998);Askew v. City of Rome, 127 F.3d 1355, 1367 n.2 (11th Cir. 1997);Clark v. Calhoun County, 88 F.3d 1393, 1397 (5th Cir. 1996);Sanchez v. Colorado, 97 F.3d 1303, 1316-22 (10th Cir. 1996);Teague v. Attala County, 92 F.3d 283, 285 (5th Cir. 1996);Houston v. Lafayette County, 56 F.3d 606, 609 & n.1, 612 (5th Cir. 1995),*remanded to,*20 F. Supp. 2d 996, 1000-03 & n.3 (N.D. Miss. 1998);Solomon v. Liberty County, 899 F.2d 1012, 1019 (11th Cir. 1990)* (en banc) (Kravitch, J., concurring); *Citizens for a Better Gretna v. City of Gretna, 832 F.2d 496, 500 (5th Cir. 1987);Black Political Task Force v. Galvin, 300 F. Supp. 291, 303 (D. Mass. 2004);Shirt v. Hazeltine, 336 F. Supp. 2d 976, 995-1004 (D.S.D. 2004);*Rodriguez v. Pataki, 308 F. Supp. 2d 346, 387 (S.D.N.Y. 2004); *Montano v. Suffolk County Legislature, 268 F. Supp. 2d 243, 254 (E.D.N.Y. 2003);*Colleton County Council v. McConnell, 201 F. Supp. 2d 618, 641 & n.18 (D.S.C. 2002); *Georgia v. Ashcroft, 195 F. Supp. 2d 25, 698 inn.34-35 (D.D.C. 2002)* (section 5 case), aff'd, King v. Georgia, 537 U.S. 1100 (2003),vacated, *Georgia v. Ashcroft, 539 U.S. 461 (2003);Old Person v. Cooney, 182 F. Supp. 2d 1002, 1012 (D. Mont. 2002),*aff'd,*312 F.3d 1036 (9th Cir. 2002);*United States v. Charleston County, 318 F. Supp. 2d 302, 311 (D.S.C. 2002); *United States v. Charleston County, 316 F. Supp. 2d 268 (D.S.C. 2003),*aff'd,*365 F.3d 341 (4th Cir. 2004);Paige v. Bartels, 144 F. Supp. 2d 346, 359 n.11 (D.N.J. 2001);Goosby v. Town Board of Hempstead, 956 F. Supp. 326, 334-36 & n.9,* (E.D.N.Y. 1997), aff'd,*180 F.3d 476 (2d Cir. 1999);African-American Voting Rights Legal Defense Fund, Inc. v. Missouri, 994 F. Supp. 1105, 1117-18 (E.D. Mo. 1997);*Barnett v. City of Chicago, 969 F. Supp. 1359, 1425-26 (N.D. Ill. 1997),aff'd in part,*141 F.3d 699 (7th Cir. 1998);* [*156] *Cuthair v. Montezuma-Cortez, 7 F. Supp. 2d 1152, 1168 (D. Colo. 1998);Cofield v. Cox, 969 F. Supp. 749, 760 (N.D. Ga. 1997);Perez v. Pasadena Independent School District, 958 F. Supp. 1196, 1215 (S.D. Tex. 1997),*aff'd,*165 F.3d 368 (5th Cir. 1999);King v. State Board of Elections, 979 F. Supp. 582, 613-14 (N.D. Ill. 1996),*vacated,519 U.S. 978 (1996),readopted,*979 F. Supp. 619 (1997),*aff'd,522 U.S. 1087 (1998);*Reed v. Town of Babylon, 914 F. Supp. 843, 851-52 (E.D.N.Y. 1996);Rollins v. Fort Bend Independent School District, 89 F.3d 1205, 1209-10 & n.5 (5th Cir. 1996);Aldasoro v. Kennerson, 922 F. Supp. 339, 345 (S.D. Ca. 1995);*Clay v. Board of Education of St. Louis, 896 F.

---

[136] With Kevin Quinn, I have developed a method of *ecological inference* for R x C tables that meets many of the goals articulated in this Part. As of the time of this writing, the paper introducing the model is undergoing scholarly review. D. James Greiner & Kevin Quinn, *R x C*Ecological *Inference* in *Voting* Rights Litigation (July 25, 2006) (unpublished manuscript, available at http://www.people.fas.harvard.edu/kquinn/papers/GQdraftcurrent.pdf).

[137] *478 U.S. 30 (1986).*

[138] *Id. at 53 n.20.*

[139] *Citizens for a Better Gretna v. City of Gretna, 834 F.2d 496, 499 (5th Cir. 1987).*

47 Jurimetrics J. 115, *156

*Supp. 929, 934-935, 938 (E.D. Mo. 1995),aff'd,90 F.3d 1357 (8th Cir. 1996);Cousin v. McWherter, 904 F. Supp. 686, 691-700, 706-07 (E.D. Tenn. 1995),rev'd,145 F.3d 818 (6th Cir. 1998);Cane v. Worcester County, 840 F. Supp. 1081, 1087-1090 (D. Md. 1994),aff'd in relevant part,35 F.3d 921 (4th Cir. 1994);NAACP v. City of Niagara Falls, 913 F. Supp. 711, 729 (W.D.N.Y. 1994),aff'd,65 F.3d 1002 (2d Cir. 1995);White v. Alabama, 867 F. Supp. 1519, 1551 & n.104 (M.D. Ala. 1994);Harper v. City of Chicago Heights, 824 F. Supp. 786, 789-90 (N.D. Ill. 1993),subsequent consent decree vacated,47 F.3d 212 (7th Cir. 1995);NAACP v. City of Columbia, 850 F. Supp. 404, 414 (D.S.C. 1993),aff'd,Nos. 93-2255, 93-2319, 1994 U.S. App. LEXIS 22726 (4th Cir. Aug. 22, 1994); Burton v. Sheheen, 793 F. Supp. 1329, 1357 (D.S.C. 1992),vacated,508 U.S. 968 (1993);Magnolia Bar Ass'n v. Lee, 793 F. Supp. 1386, 1404 (S.D. Miss. 1992),aff'd,994 F.2d 1143 (5th Cir. 1993);Meek v. Metropolitan Dade County, 805 F. Supp. 967, 976-78 (S.D. Fla. 1992),aff'd in relevant part,985 F.2d 1471 (11th Cir. 1993);Nipper v. Chiles, 795 F. Supp. 1525, 1533 (M.D. Fla. 1992);Smith v. Board of Supervisors of Brunswick County, 801 F. Supp. 1513, 1522 (E.D. Va. 1992),rev'd on other grounds,984 F.2d 1393 (4th Cir. 1993);Williams v. Orange County, 783 F. Supp. 1348, 1352-53, 1359 (M.D. Fla. 1992),aff'd,979 F.2d 1504 (11th Cir. 1992);Armour v. Ohio, 775 F. Supp. 1044, 1057 (N.D. Ohio 1991);Ewing v. Monroe County, 740 F. Supp. 417, 420 (N.D. Miss. 1990);Garza v. County of Los Angeles, 756 F. Supp. 1298, 1332 (C.D. Cal. 1990),aff'd on other grounds,918 F.2d 763 (9th Cir. 1990);Gunn v. Chickasaw County, 705 F. Supp. 315, 319 (N.D. Miss. 1989);Jeffers v. Clinton, 730 F. Supp. 196, 208 (E.D. Ark. 1989);Mallory v. Eyrich, 707 F. Supp. 947, 952-53 & n.5 (S.D. Ohio 1989);NAACP v. Starke, 712 F. Supp. 1523, 1529 n.9 (M.D. Fla. 1989);Warren v. City of Tampa, 693 F. Supp. 1051 (M.D. Fla. 1988),aff'd,893 F.2d 347 (11th Cir. 1989);Buchanan v. City of Jackson, 683 F. Supp. 1515, 1528 & n.11 (W.D. Tenn. 1988);Collins v. City of Norfolk, 679 F. Supp. 557, 571 (E.D. Va. 1988);East Jefferson Coalition for Leadership and Development v. Parish of Jefferson, 691 F. Supp. 991, 1001 (E.D. La. 1988),aff'd,926 F.2d 487 (5th Cir. 1991);Whitfield v. Democratic Party of Arkansas, 686 F. Supp. 1365, 1383 (E.D. Ark. 1988),aff'd,902 F.2d 15 (8th Cir. 1990) (en banc) (equally divided court); Smith v. Clinton, 687 F. Supp. 1310, 1315-16 (E.D. Ark. 1988);Martin v. Allain, 658 F. Supp. 1183, 1193 (S.D. Miss. 1987);McNeil v. City of Springfield, 658 F. Supp. 1015, 1028 (C.D. Ill. 1987);Romero v. City of Pomona, 665 F. Supp. 853, 859 (C.D. Cal. 1987),aff'd,883 F.2d 1418 (9th Cir. 1989);Jackson v. Edgefield, 650 F. Supp. 1176, 1194-95 (D.S.C. 1986).*

In addition to the cases listed immediately above, which used both regression and extreme case analysis, the following decisions mention regression alone. *League of United Latin American Citizens v. Perry, 126 S. Ct. 2594 (2006);Old Person v. Cooney, 230 F.3d 1113, 1122-27 (9th Cir. 2000);Bridgeport Coalition for Fair Representation v. City of Bridgeport, 26 F.3d 271, 276 (2d Cir. 1994),vacated,512 U.S. 1283 (1994);Westwego Citizens for a Better Government v. City of Westwego, 946 F.2d 1109, 1114 (5th Cir. 1991);NAACP v. Stallings, 829 F.2d 1547, 1557 (11th Cir. 1987);Campuzano v. Illinois State Board of Elections, 200 F. Supp. 2d 905, 912 & n.17 (N.D. Ill. 2002);Martinez v. Bush, 234 F. Supp. 2d 1275, 1304 (S.D. Fla. 2002);League of United Latin American Citizens v. North East Independent School District, 903 F. Supp. 1071, 1076-1083 (W.D. Tex. 1995);Hastert v. State Board of Elections, 777 F. Supp. 634, 650 (N.D. Ill. 1991);Brown v. Board of Commissioners of Chattanooga, 722 F. Supp. 380, 391 (E.D. Tenn. 1989);McDaniels v. Mehfoud, 702 F. Supp. 588, 593-94 & n.3 (E.D. Va. 1988);Campos v. City of Baytown, 696 F. Supp. 1128, 1130 (S.D. Tex. 1987)* (single regression), *aff'd in relevant part,840 F.2d 1240 (5th Cir. 1988);Dillard v. Baldwin County Board of Education, 686 F. Supp. 1459, 1465 (M.D. Ala. 1988).*

As discussed in the main text, **_ecological_** regression is especially problematic when applied to precinct tables of size larger than two by two. For the most part, however, courts have accepted the method in such situations, or have accepted expert testimony based on the collapsing of a heterogeneous mixture of racial groups into an "other" category. In the following cases, my best reading of the court's opinion suggests that the analyst used regression to tackle three-by-three or larger precinct tables: *Rollins v. Fort Bend Independent School District, 89 F.3d 1205, 1215 (5th Cir. 1996)* (highlighting methodological issues that arise when one "combine[s] Hispanics and blacks to create minority statistics"); *Bridgeport Coalition for Fair Representation v. City of Bridgeport, 26 F.3d 271, 276 (2d Cir. 1994),vacated,512 U.S. 1283 (1994);Brewer v. Ham, 876 F.2d 448, 454 (5th Cir. 1989);Montano v. Suffolk County Legislature, 268 F. Supp. 2d 243, 254 (E.D.N.Y. 2003);Martinez v. Bush, 234 F. Supp. 2d 1275, 1304 (S.D. Fla. 2002);Barnett v. City of Chicago, 969 F. Supp. 1359, 1425-26, 1433 (N.D. Ill. 1997),rev'd in part,141 F.3d 699 (7th Cir. 1998);Aldasoro v. Kennerson, 922 F. Supp. 339, 345 (S.D. Ca. 1995);League of United Latin American Citizens v. North East Independent School District, 903 F. Supp. 1071, 1076-83 (W.D. Tex. 1995);Nixon v. Kent County, 790 F. Supp. 738, 747-49 (W.D. Mich. 1992),denial of preliminary injunction aff'd,76 F.3d 1381 (6th Cir. 1996);Hastert v. State Board of Elections, 777 F. Supp. 634, 650-51 (N.D. Ill. 1991).* In the following cases, it appears that an analyst collapsed two or more races constituting a nontrivial portion of the population together so as to reduce the number of rows in the precinct tables, then ran double regression: *Meek v. Metropolitan Dade County, 805 F. Supp. 967, 976-78 (S.D. Fla. 1992),aff'd in relevant part,985 F.2d 1471 (11th Cir. 1993);Campos v. City of Baytown, 696 F. Supp. 1128, 1131 (S.D. Tex. 1987),aff'd in relevant*

part,*840 F.2d 1240 (5th Cir. 1988).* In *Garza v. County of Los Angeles, 756 F. Supp. 1298, 1337 (C.D. Cal. 1990),*aff'd on other grounds,*918 F.2d 763 (9th Cir. 1990),* the district court approved the plaintiffs' decision to collapse whites, blacks, and Asians into a non-Hispanic bloc, holding that "[t]he potential distorting effect of this construct is lessened by the fact that for most of the elections analyzed, the Black and Asian percentage of the electorate was not significant." The court made this finding despite quoting figures demonstrating that about 20% of the relevant jurisdiction's population was either black or "Asian-Other."

The main text rebutted the frequent assertion in both the literature [140] and the *Voting* Rights Act case law that bivariate *ecological* regression and homogeneous precincts are "complementary" techniques, and that they check each other in some way. One finds this assertion in the following cases. *Gingles, 478 U.S. at 52;Citizens for a Better Gretna v. City of Gretna, 832 F.2d 496, 499 n.7 (5th Cir. 1987);*United States v. Charleston County, 318 F. Supp. 2d 302, 311 (D.S.C. 2002) ("complementary"); *United States v. Charleston County, 316 F. Supp. 2d 268 (D.S.C. 2003)* (judgment for the plaintiff), aff'd,*365 F.3d 341 (4th Cir. 2004);East Jefferson Coalition for Leadership and Development v. Parish of Jefferson, 691 F. Supp. 991, 1001 (E.D. La. 1988)* ("complementary"), aff'd,*926 F.2d 487 (5th Cir. 1991);Sanchez v. Colorado, 97 F.3d 1303, 1317 (10th Cir. 1996);Teague v. Attala County, 92 F.3d 283, 285-86 (5th Cir. 1996);*Barnett v. City of Chicago, 969 F. Supp. 1359, 1414, 1434 (N.D. Ill. 1997) ("verified by"), rev'd in part, *Barnett v. City of Chicago, 141 F.3d 699 (7th Cir. 1998);Goosby v. Town Board of Hempstead, 956 F. Supp. 326, 334-35 & n.10,* (E.D.N.Y. 1997) ("consistent estimates"), aff'd,*180 F.3d 476 (2d Cir. 1999);Reed v. Town of Babylon, 914 F. Supp. 843, 852 (E.D.N.Y. 1996)* ("It is therefore recommended that results [from extreme case] be compared to those from *ecological* regression."); *Cousin v. McWherter, 904 F. Supp. 686, 707 (E.D. Tenn. 1995),*rev'd,145 F.3d 818 (6th Cir. 1998);*NAACP v. City of Niagara Falls, 913 F. Supp. 711, 729 (W.D.N.Y. 1994)* ("double-checks"), aff'd,*65 F.3d 1002 (2d Cir. 1995);Meek v. Metropolitan Dade County, 805 F. Supp. 967, 977 n.16 (S.D. Fla. 1992)* ("differ slightly"), aff'd in relevant part,*985 F.2d 1471 (11th Cir. 1993);Ewing v. Monroe County, 740 F. Supp. 417, 421 (N.D. Miss. 1990);Gunn v. Chickasaw County, 705 F. Supp. 315, 319 (N.D. Miss. 1989);NAACP v. Starke, 712 F. Supp. 1523, 1530 (M.D. Fla. 1989)* ("corroborate the accuracy"); *Warren v. City of Tampa, 693 F. Supp. 1051 (M.D. Fla. 1988)* ("confirmed"), aff'd,893 F.2d 347 (11th Cir. 1989);*Jackson v. Edgefield, 650 F. Supp. 1176, 1194-95 (D.S.C. 1986).*

As noted in the main text, judicial reaction to King's EI has generally been favorable. *See, e.g.,Mallory v. Ohio, 38 F. Supp. 2d 525, 537 (S.D. Ohio 1997),*aff'd,*173 F.3d 377 (6th Cir. 1999);Shirt v. Hazeltine, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004);United States v. Alamosa County, 306 F. Supp. 2d 1016, 1023 (D. Colo. 2004);Montano v. Suffolk County Legislature, 268 F. Supp. 2d 243, 254 (E.D.N.Y. 2003);Parker v. Ohio, 263 F. Supp. 2d 1100, 1114 n.5 (S.D. Ohio 2003)* (Gwin, J., concurring in the judgment), aff'd,540 U.S. 1013 (2003);*Houston v. Lafayette County, 20 F. Supp. 2d 996, 10002 & n.4 (N.D. Miss. 1998).* Only one court has been less enthusiastic. *Rodriguez v. Pataki, 308 F. Supp. 2d 346, 387-88 (S.D.N.Y. 2004);see also*Black Political Task Force v. Galvin, 300 F. Supp. 291, 303 (D. Mass. 2004).* In *Mallory,* the district court stated, "Dr. King's methodology does not yield statistically impossible results as does 'Goodman's regression' and is the best method currently available to measure racial bloc *voting*." *38 F. Supp. at 537.* As discussed in the main text, the former statement is true in data sets of interest in the law only if one is careful to condition on estimates from previous applications of King's EI before proceeding to the next application, a task that is computationally challenging when the jurisdiction has more than two races.

## [*160] APPENDIX B. THE TRUNCATED BIVARIATE NORMAL

A statistical distribution for a single quantity, such as the error term in a regression model, can often be represented via a graph with possible values on the x-axis and a measure of the probability of observing these values on the y-axis. [141] Many standard distributions, such as the normal (what most people mean when they think of a bell curve), allow the quantity being modeled to take on any possible value. For instance, if one is modeling the amount of rain in inches the city of Boston receives yearly with the normal, one has to understand that rainfall greater than 1,000,000 inches, or even less than zero inches, is theoretically possible (under the model). In many instances, the probabilities associated with absurd quantities are so low as to be irrelevant, but as we have seen with *ecological* regression, such is not the case in racial bloc *voting* analysis. Here, impossible values do

---

[140] *See supra* note 69 and accompanying text.

[141] I refer here to a plot of the density function, finessing the measure theory. My apologies to the purists.

47 Jurimetrics J. 115, *160

crop up, and they suggest that the chosen model is a poor one for the data. One way to address this problem is to "truncate" the distribution, to provide by definition that certain values will have probability 0 (that is, will never happen). Figure 4 demonstrates graphically how truncation works.

A joint distribution is a way of thinking about two variables, such as height and weight, simultaneously. Often, the idea is to capture a relationship among variables, such as that taller people tend to be heavier. For a picture of what a joint distribution looks like, consider the left graph of Figure 5. Joint distributions can also be truncated, as the graph on the right in Figure 5 demonstrates. [142]

## [*162] APPENDIX C. HOW ONE METHOD OF APPLYING KING'S EI CAN RESULT IN LOGICALLY IMPOSSIBLE ESTIMATES

This Appendix provides a short conceptual summary of how Professor King's approach related to double regression [143] can lead to logically impossible estimates. Suppose a jurisdiction of interest consists solely of African-Americans and Caucasians, so we have two-by-three precinct tables. According to Professor King, one should first collapse the two-by-three tables as follows:

|  | Dem | Rep | No *Vote* | [SIGMA] row |
|---|---|---|---|---|
| Black |  |  |  | N[bi] |
| White |  |  |  | N[wi] |
| [SIGMA] column | N[Di] | N[Ri] | N[Ni] | N[i] |

|  | Dem | Rep + No *Vote* | [SIGMA] row |
|---|---|---|---|
| Black |  |  | N[bi] |
| White |  |  | N[wi] |
| [SIGMA] column | N[Di] | N[Ri] + N[Ni] | N[i] |

One applies King's EI, in its two-by-two form, to the set of collapsed tables. One then reforms the original two-by-three tables and collapses in a different way, as follows:

|  | Dem | Rep | No *Vote* | [SIGMA] row |
|---|---|---|---|---|
| Black |  |  |  | N[bi] |
| White |  |  |  | N[wi] |
| [SIGMA] column | N[Di] | N[Ri] | N[Ni] | N[i] |

|  | Dem + Rep | No *Vote* | [SIGMA] row |
|---|---|---|---|

---

[142] The slant of the ovals in Figure 5 suggests that the first and second variables are related to one another. If we know that the first variable's value is 0.1, we know that the second variable is very likely to be between 0 and 0.7, as represented by left line segment. In contrast, if we know the first variable's value is 0.9, we know the second variable's value is likely to be between 0.3 and 1, as represented by the right line segment. This property might be useful in thinking about the fraction of blacks who *voted* and the fraction of whites who *voted* in the same precinct; if we knew that blacks turned out at a rate of 90%, we might expect whites in that precinct to turn out at a high rate as well.

[143] A SOLUTION, *supra* note 28, at 153-57.

47 Jurimetrics J. 115, *162

| | Dem + Rep | No *Vote* | [SIGMA] row |
|---|---|---|---|
| Black | | | N[bi] |
| White | | | N[wi] |
| [SIGMA] column | N[Di] + N[Ri] | N[Ni] | N[i] |

One then applies King's EI in its two-by-two form again. In essence, the first step provides estimates of the cells in the left-most (Democratic) column. The second step provided estimates of the right-most (No *Vote*) column. The middle column is determined by the other two.

To see how this procedure can result in estimates outside the bounds, focus on a single precinct, and suppose the first step produces an estimate for the top-left cell (the number of blacks *voting* Democrat) near the upper end of **[*163]** its permissible range. Suppose for this precinct the second step also produces an estimate for the top-right cell (the number of blacks not *voting*) near the upper end of its permissible range. Because both estimates are "high," together they may exceed the number of blacks in the precinct, meaning that the estimate for the top-middle cell (the number of blacks *voting* Republican) would have to be negative to make the row sum to its total. [144] A negative cell count is, obviously, outside the bounds.

I illustrate these concepts using the figures from Precinct 1 of Georgia Congressional District Four in the 2000 contest. [145] Note that, as stated repeatedly in the main text, the precinct tables here are three by three in shape. In Precinct 1, the first application of EI2 for blacks versus nonblacks resulted in the following predictions:

**Table 9: Ga. Cong. Dist. 4, Precinct 1:**

**Counts of *Voting*-Age Population**

| | Dem | Rep | No *Vote* | [SIGMA] row |
|---|---|---|---|---|
| Blacks | 798.4 | 58.5 | 933.1 | 1790 |
| Whites | | | | 751 |
| Hispanics | | | | 65 |
| [SIGMA] column | 1038 | 393 | 1175 | |

In the same precinct, the first application of EI2 for whites versus nonwhites resulted in the following predictions:

**Table 10: Ga. Cong. Dist. 4, Precinct 1:**

**Counts of *Voting*-Age Population**

| | Dem | Rep | No *Vote* | [SIGMA] row |
|---|---|---|---|---|
| Blacks | | | | 1790 |

---

[144] Professor King states in his book that successive applications of his two-by-two EI method can result in what he calls "internally inconsistent results." A SOLUTION, *supra* note 28, at 267.

[145] See the text for a discussion of the method used to generate these figures.

47 Jurimetrics J. 115, *163

| Table 10: Ga. Cong. Dist. 4, Precinct 1: | | | | |
|---|---|---|---|---|
| Counts of *Voting*-Age Population | | | | |
| | **Dem** | **Rep** | **No *Vote*** | **[SIGMA] row** |
| Whites | 193.0 | 465.3 | 92.7 | 751 |
| Hispanics | | | | 65 |
| [SIGMA] column | 1038 | 393 | 1175 | |

Putting these two sets of figures together allows one to calculate the Hispanic row deterministically (numbers do not add exactly due to rounding). Note that two of the three Hispanic predictions are logically impossible.

| Table 11: Ga. Cong. Dist. 4, Precinct 1: | | | | |
|---|---|---|---|---|
| Counts of *Voting*-Age Population | | | | |
| | **Dem** | **Rep** | **No *Vote*** | **[SIGMA] row** |
| Blacks | 798.4 | 58.5 | 933.1 | 1790 |
| Whites | 193.0 | 465.3 | 92.7 | 751 |
| Hispanics | 46.7 | -130.8 | 149.1 | 65 |
| [SIGMA] column | 1038 | 393 | 1175 | |

**[*164] APPENDIX D. THE ASSUMPTIONS NECESSARY FOR ONE COLLAPSING METHOD TO PRODUCE UNBIASED ESTIMATES**

In the main text, I asserted that the method studied by Professor Karen Ferree of collapsing cells of the precinct tables and using successive applications of King's EI [146] induces aggregation bias (even if such bias was not present in the original data) unless the following two assumptions were met: (1) whites, Hispanics, and blacks have the same *voting* patterns; and (2) the fraction white, fraction black, and fraction Hispanic do not vary from precinct to precinct. Using the notation outlined in the beginning of Part II, I propose the following proof, a trivial extension of the principles in Professor Ferree's paper.

Suppose one begins (as I did in the Georgia Fourth Congressional District data set) by collapsing whites and Hispanics together to form a black versus nonblack data set. Set $K[i]<wh> = X[wi]/(1-X[bi])$. Professor Ferree demonstrates that this first collapsing step will result in aggregation bias (even if the original data was free of it) unless (1) $K[i]<wh> = K[j]<wh>$ for any precincts i and j (call this constant value $K<wh>$), and (2) white and Hispanic *voting* patterns are the same. [147] Although Professor Ferree does not say so, logically, a similar set of conditions must also be required to prevent the introduction of aggregation bias in the second collapsing step, the combination of blacks and Hispanics to form a white versus nonwhite data

---

[146] *See supra* note 87 and accompanying text.

[147] Ferree, *supra* note 86, at 146-47.

set. Thus, setting K[i]<bh> = X[bi]/(1-X[wi]), avoiding aggregation bias requires K[i]<bh> = K[j]<bh> for any precincts i and j (call this value K<bh>) as well as that blacks and Hispanics have the same *voting* patterns.

If whites and Hispanics must have the same *voting* patterns, and if simultaneously, blacks and Hispanics must have the same *voting* patterns, then all three races must have the same *voting* patterns. This completes the first part of the proof. For the second part, the assumptions above demonstrate that K<wh>-K<wh> X[bi] = X[wi] and that K<bh>-K<bh> X[wi] = X[bi], that is, two equations and two unknowns. Solving this system demonstrates that both X[bi] and X[wi] are simple functions of the two constant K terms. Recalling that X[bi] + X[wi] + X[hi] = 1 completes the proof. [148]

[*165] As explained in the main text, one can avoid some of these assumptions by conditioning on the estimates of the first round of collapsing before proceeding to the second. But one would still have to assume that two of the races of interest had the same *voting* patterns to avoid introducing aggregation bias, and such conditioning would greatly increase the computational complexity of the algorithm.

### [*166] APPENDIX E. THE DEBATE IN THE LITERATURE IN THE EARLY 1990s

The main text [149] referred to a debate in the literature that took place in substantial part between 1990 and 1993. The following are some of the corresponding publications: Glenn Firebaugh, *Are Bad Estimates Good Enough for the Courts?,* 74 SOC. SCI. Q. 488 (1993); Bernard Grofman, *Throwing Darts at Double Regression--and Missing the Target,* 74 SOC. SCI. Q. 480 (1993); Bernard Grofman, *The Use of __Ecological__ Regression to Estimate Racial Bloc __Voting__,* 27 U.S.F.L. REV. 593 (1993); Bernard Grofman, ***Voting*** *Rights in a Multi-Ethnic World,* 13 CHICANO--LATINO L. REV. 15 (1993); Stephen P. Klein and David A. Freedman, ***Ecological*** *Regression in __Voting__ Rights Cases,* 6 CHANCE 38 (1993); James W. Loewen et al., *It Ain't Broke, So Don't Fix It: The Legal And Factual Importance of Recent Attacks on Methods Used in __Vote__ Dilution Litigation,* 27 U.S.F.L. REV. 737 (1993); J.K. Wildgen, *Social Alchemy in the Courtroom: The "Double Regression" Hoax,* 74 SOC. SCI. Q. 471 (1993); Bernard Grofman, *An Expert Witness Perspective on Continuing And Emerging __Voting__ Rights Controversies: From One Person, One __Vote__ to Partisan Gerrymandering,* 21 STETSON L. REV. 785 (1992); Bernard Grofman, *Expert Witness Testimony and the Evolution of __Voting__ Rights Case Law, in,* CONTROVERSIES IN MINORITY ***VOTING*** RIGHTS: THE ***VOTING*** RIGHTS ACT IN PERSPECTIVE (Bernard Grofman & Chandler Davidson eds., 1992); BERNARD GROFMAN ET AL., MINORITY REPRESENTATION AND THE QUEST FOR ***VOTING*** EQUALITY 90 (1992); Charles S. Bullock, III, *Misinformation And Misperceptions: A Little Knowledge Can Be Dangerous,* 72 SOC. SCI. Q. 834 (1991); William A.V. Clark & Peter A. Morrison, *Demographic Paradoxes in the Los Angeles __Voting__ Rights Case,* 15 EVALUATION REV. 712 (1991); William A.V. Clark & Peter A. Morrison, *Postscript: Should the Court Rely on Postcensal Estimates for Redistricting,* 15 EVALUATION REV. 727 (1991); David A. Freedman et al., ***Ecological*** *Regression and __Voting__ Rights,* 15 EVALUATION REV. 673 (1991); David A. Freedman et al., *Rejoinder,* 15 EVALUATION REV. 800 (1991); Bernard Grofman, *Multivariate Methods and the Analysis of Racial Polarized __Voting__: Pitfalls in the Use of Social Science by the Courts,* 72 SOC. SCI. Q. 826 (1991); Bernard Grofman, *Statistics Without Substance: A Critique of Freedman et al. and of Clark and Morrison,* 125 EVALUATION REV. 746 (1991); Bernard Grofman, *Straw Men and Stray Bullets: A Reply to Bullock,* 72 SOC. SCI. Q. 840 (1991); Stephen P. Klein et al., ***Ecological*** *Regressions Versus the Secret Ballot,* 31 JURIMETRICS J. 393 (1991); Allan Lichtman, *Passing the Test: __Ecological__ Regression Analysis in the Los Angeles County Case and Beyond,* 15 EVALUATION REV. 770 (1991); William O'Hare, *The Use of Demographic Data in __Voting__ Rights Litigation,* 15 EVALUATION REV. 729 (1991); Daniel L. Rubinfeld, *Statistical and Demographic Issues Underlying __Voting__ Rights [*167] Cases,* 15 EVALUATION REV. 659 (1991); Richard L. Engstrom, *Comment: Getting the Numbers Right: A Response to Wildgen,* 22 URB. LAW. 495 (1990); James W. Loewen, *Comment: Sand in the Bearings: Mistaken Criticisms of*

---

[148] Professor Ferree suggests that a "quick fix" may be available in some data sets in the form of using the vector of K[i] terms as a covariate at each collapsing step, although she recognizes that in some situations "this fix is not likely to work." Ferree, *supra* note 86, at 155-58. Professor Ferree considered precinct tables of size three by two. But in legal cases, precinct tables have three columns, requiring the use of King's EI2 procedure. For Professor Ferree's quick fix to work with EI2, one must calculate two sets of K[i] terms for each collapsing step. The first, a deterministic calculation from the formulas above, is used in the first half of EI2. But the second varies from iteration to iteration depending on the estimates (in each precinct) of turnout figures from the first half of EI2. Calculating and keeping track of these figures is a nontrivial programming challenge.

[149] *See supra* note 7 and accompanying text.

47 Jurimetrics J. 115, *167

*Ecological* Regression, 22 URB. LAW. 503 (1990); Arthur Lupia & Kenneth McCue, *Why the 1980s Measures of Racially Polarized **Voting** Are Inadequate for the 1990s,* 12 LAW & POL'Y 353 (1990); Peyton McCrary, *Racially Polarized **Voting** in the South: Quantitative Evidence from the Courtroom,* 14 SOC. SCI. HIST. 507 (1990); John K. Wildgen, *Vote Dilution Litigation and Cold Fusion Technology,* 22 URB. LAW. 487 (1990).

I do not mean to imply that there was no writing on methods of assessing racial bloc *voting* before 1990 or after 1993--just that except during this time period, there was less disagreement among writers, or the arguments that came later largely rehearsed those from before.

## Graphic

**Figure 1: Data for Georgia Congressional District 4, 2000.** On the x-axis is the fraction of a particular race in each precinct. On the y-axis is the fraction of voters in the precinct supporting the Democrat. To make the graph readable, only one in four precincts is pictured. Note, however, that because there are three races, each included precinct appears three times on this plot; **Figure 2: What can go wrong with the method of bounds:** Each vertical line segment shows the range in a particular precinct of possible values for the fraction of a race's voters who supported the Democrat in Georgia's Fourth Congressional District in the year 2000. In the left graph, no horizontal line can be drawn that intersects all (or even most) segments, indicating that homogeneous precincts analysis can produce no useful estimate for white voters. The bounds are too narrow. In the right graph, any horizontal line intersects all segments, meaning that the method of bounds cannot produce a useful range of plausible values for Hispanic voters. The bounds are too wide; **Figure 3: What can go wrong with regression.** The tight fit of the data around the line produces small estimated standard errors (and a high $R^2$), but in fact, the point estimates for the quantities of interest are outside the [0, 1] range of plausibility; **Figure 4: Two Possible Distributions for a Single Quantity.** The distribution on the left is a run-of-the-mill normal distribution. It is centered at 0.5; negative values and values greater than one are possible. The distribution on the right has been truncated. It is still centered at 0.5 and has roughly the same amount of spread as the figure on the left, but values less than zero and greater than one have zero probability. The distribution on the right might be useful for modeling fractions such as $N[bVi]/N[bi]$, which by definition must remain between zero and one; **Figure 5: Examples of Joint Distributions, Untruncated and Truncated.** In both graphs, the x- and y- axes represent possible values for a first and a second quantity of interest, respectively. The measure of probability comes out of the paper. Circles or ovals that are closer together are "higher" and represent regions of greater probability. The right graph shows a truncated distribution. The square that surrounds the ovals indicates that negative values and values greater than one (for either variable) have zero probability.

Jurimetrics
Copyright (c) 2023 American Bar Association

**End of Document**