## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MIGUEL COCA and⠀⠀⠀⠀⠀⠀)
ALEJANDRO RANGEL-LOPEZ,⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiffs,⠀⠀⠀)⠀⠀⠀Case No. 6:22-cv-01274-EFM-RES
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
CITY OF DODGE CITY, *et al.*⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Defendants.⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

## DEFENDANTS' BRIEF IN SUPPORT OF SUMMARY JUDGMENT

⠀⠀⠀⠀Defendants jointly ask the Court to grant summary judgment in their favor and dismiss all of Plaintiffs' claims with prejudice. By separate motion, Defendants have shown that the report of Plaintiffs' sole expert on *Gingles* factors two and three, Dr. Matt Barreto, must be excluded because it is not scientifically reliable. If Dr. Barreto is excluded, Plaintiffs cannot establish the elements of a section 2 Voting Rights Act ("VRA") claim or 42 U.S.C. § 1983 as a matter of law. In addition, Plaintiffs' claims under the Fourteenth Amendment fail because the Plaintiffs cannot establish discriminatory intent. Accordingly, Defendants' requested relief should be granted, and this case be dismissed.

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

**I.⠀⠀⠀Adoption and operation of at-large elections in Dodge City**

⠀⠀⠀⠀1.⠀⠀⠀In 1971, Dodge City ("the City") enacted Charter Ordinance No. 7, which first adopted the at-large system of election for City Commissioners. Charter Ordinance 7, *attached hereto as* Exhibit A-1.

⠀⠀⠀⠀2.⠀⠀⠀Charter Ordinance No. 7 is facially neutral and does not show any intent to discriminate against the Dodge City Latino population. Charter Ord. 7.

3.      The legislative history of Charter Ordinance No. 7 is facially neutral and does not show any intent to discriminate against the Dodge City Latino population. March 29, 1971 Minutes, *attached hereto as* Exhibit A-2.

4.      Dodge City has elected its City Commissioners through at-large elections since 1971. Hernandez Dep. 123:24-124:19, *attached hereto as* Exhibit B.

5.      The at-large election system used by Dodge City is consistent with the at-large election systems in other Kansas cities, like Manhattan and Hays. Rangel-Lopez Dep. 86:16-87:9, *attached hereto as* Exhibit C.

6.      City Commission elections are nonpartisan. Pretrial Order, at 3 ¶ 21, Doc. 140.[1]

7.      Latino candidates have recently served on the City Commission, including current Commissioner Nuci, a defendant in this case. Nuci Dep. 12:1-6, *attached hereto as* Exhibit D; Rangel-Lopez Dep. 12:2-11.

8.      The City does not campaign on behalf of or endorse candidates. De La Rosa Dep. 67:17-68:12, *attached hereto as* Exhibit E; Hernandez Declaration ¶ 4, *attached hereto as* Exhibit A.

9.      The City does not engage in voter intimidation tactics to discourage Latino residents from voting. Hernandez Declaration ¶ 5.

10.      The City does not operate or administer City Commission elections—Ford County does. Doc. 140, at 4, ¶ 30; Seibel Dep. 21:6-7, *attached hereto as* Exhibit F; De La Rosa Dep. 50:7-9, 80:16-24.

11.      Ford County determines the location of election polling locations in Dodge City. Doc 140, at 4 ¶ 30; Hernandez Dep. 147:9-12.

---

[1]      Throughout this brief, filings made in CM/ECF for this case are referred to as "Doc. #."

12.     Dodge City respects the role and duties of the Ford County Clerk's Office and does not intervene in the County's administration of elections. Seibel Dep. 21:6-7, De La Rosa Dep. 60:20-23, 61:20-62:8, 64:7-11.

13.     The City shares election information received from the Ford County Clerk in both English and Spanish through its media platforms and encourages all members of the community to vote. De La Rosa Dep. 64:12-24, 65:22-66:9; *see* Election Flyers (combined exhibit), *attached hereto as Exhibit* A-3.

14.     Since at least 2018, the City has provided free door-to-door rides for its residents to election polls for early voting and on election day. De La Rosa Dep. 60:20-61:2, 76:21-77:11, 78:14-18; Election Flyers.

15.     The City helps Ford County translate election documents regarding polling location, dates, and logistical information into Spanish. De La Rosa Dep. 60:23-61:5.

16.     The City offers its bilingual staff the opportunity to assist Ford County at the polls on election day without taking a vacation day and while being paid by the City. De La Rosa Dep. 94:4-23; Hernandez Dep. 220:18-221:8; June 19, 2020 email, *attached hereto as* Exhibit A-5.

17.     City employees are encouraged to vote and are permitted to do so during work time on election day. De La Rosa Dep. 61:10-16.

18.     The City Clerk makes available applications for City Commission candidates and voter registration forms in English and Spanish. Pogue Dep. 20:22-21:3, *attached hereto as* Exhibit G; De La Rosa Dep. 63:15-18.

19.     The City works with Ford County to provide voter registration opportunities at citizenship naturalization ceremonies to encourage newly naturalized citizens to register to vote. De La Rosa Dep. 63:7-14.

20.     No resident has told City Managers Nick Hernandez or Cherise Tieben that they have encountered issues figuring out how to vote in a Commission election. Hernandez Dep. 220:5-9; Tieben Dep. 46:15-19, *attached hereto as* Exhibit H.

## II.     Welcoming Initiatives for Latino Immigrants

21.     The City has participated in numerous initiatives to welcome Latino immigrants to the City and to encourage their civic involvement, such as: the Cultural Relations Advisory Board, the Welcoming Dodge City Strategic Plan, the International Festival, the New Americans Dinner, the Engage Dodge Program, and providing free public transportation to vote. The City has also hosted United State Citizenship and Immigration Services (USCIS) Mobile Services, US Naturalization Ceremonies, Mexican Consulate Mobile Services, and Guatemalan Consulate Services. *See* Hernandez Declaration ¶ 8; Dodge City Civic Engagement Efforts, *attached hereto as* Exhibit A-4; *see* De La Rosa Dep. 161:19-162:5; Rangel-Lopez Dep. 111:23-112:2.

22.     The City has been recognized as one that goes above and beyond to integrate immigrants into the community. De La Rosa Dep. 227:24-228:11.

23.     The City developed a Cultural Relations Advisory Board, comprised of city and community volunteers, to advise the City Commission on matters related to or affecting communities of color. De La Rosa Dep. 161:19-162:5; Coca Dep. 38:22-25, *attached hereto as* Exhibit I; Rangel-Lopez Dep. 32:11-24; Strategic Plan, at 10, *attached hereto as* Exhibit A-6.

24.     The Cultural Relations Advisory Board organizes events and community partnerships, including the International Festival. Rangel-Lopez Dep. 32:13-24.

25.     The Board partnered with the Mexican Consulate to provide customer services and with Genesis Family Health to bring basic health services to the community. De La Rosa Dep. 161:19-162:5, 163:17-165:3.

26.     In 2021, the Cultural Relations Advisory Board developed a Strategic Plan for Welcoming and Integration ("Strategic Plan") to help welcome and integrate newcomers into Dodge City community and civic life. De La Rosa Dep. 162:15-18, 166:1-5; Rangel-Lopez Dep. 111:23-112:2; *see generally* Strategic Plan.

27.     The Strategic Plan focuses on the five pillars of: (1) equitable access to community life, (2) civic engagement, (3) refugee and immigrant integration, (4) safe and health community, and (5) economic opportunity and education. Strategic Plan, at 3-4.

28.     The City implemented the Engage Dodge Program, where residents can learn what city services are available, what programs the city offers, and get to meet city employees. Rangel-Lopez Dep. 105:13-24; *see* https://www.dodgecity.org/1016/Engage-Dodge.

29.     The Engage Dodge Program provides civic engagement education for newcomers or the general public. Sessions in the Program discuss elections, the City Commission, and the City Manager's Office. The Program includes Spanish-speaking groups and translation services. De La Rosa Dep. 68:21-69:25; Dodge City Civic Engagement Efforts, at 2.

## III.    2011 Department of Justice Inquiry of Ford County

30.     On June 20, 2011, the U.S. Department of Justice ("DOJ"), Civil Rights Division sought information on elections from Ford County. Seibel Dep. 80:21-81:4; June 2011 DOJ Letter, *attached hereto as* Exhibit A-10.

31.     On October 20, 2011, the DOJ advised then-Ford County Clerk Sharon Seibel of the newly promulgated bilingual election requirements under Section 203 of the Voting Rights Act. October 2011 DOJ Letter, *attached hereto as* Exhibit A-11.

32.     The DOJ never subpoenaed or otherwise requested documents from the City of Dodge City. Hernandez Dep. 136:23-137:7, 138:2-11, 142:3-9.

33.     The DOJ never made any findings of wrongdoing by Dodge City, and the matter was closed without any action required or recommended by the City of Dodge City. Seibel Dep. 111:8-25.

## IV.     Commissioner Scoggins's 2019 inquiry

34.     On February 25, 2019, Jan Scoggins emailed then-City Manager Cherise Tieben and asked her to add to the Commission agenda a request to consider a combination of districts and at-large seats for City Commission elections. She indicated the request was coming from a "community group," but she did not identify that community group. De La Rosa Dep. 142:14-143:15; Jan Scoggins Email, *attached hereto as* Exhibit A-7.

35.     City Manager Tieben asked Commissioner Scoggins to raise the request during Commission reports at the next Commission meeting, and she encouraged the community group to attend and bring the issue forth during the visitors' section of the meeting. *See* Jan Scoggins Email.

36.     On March 4, 2019, at Commissioner Jan Scoggins's request during a City Commission meeting, the Commission directed City staff to gather information for further discussion about a change to Commission elections to have three Commissioners elected by districts and two elected at large, and to consider term limits. Hernandez Dep. 127:4-128:4; March 4, 2019 Meeting Minutes, *attached hereto as* Exhibit A-8.

37.     Neither Ms. Scoggins's email nor the Commission minutes indicate the reason Commissioner Scoggins desired to investigate a possible change. *See* Jan Scoggins Email and March 4, 2019 Meeting Minutes.

38.     No community members spoke at the Commission meeting. Hernandez Dep. 128:20-22.; March 4, 2019 Meeting Minutes.

39.     On April 15, 2019, at a City Commission meeting, the Commissioners received a report from City Attorney Brad Ralph regarding the matter of moving from at-large elections to a combination of districts and at-large positions. April 15, 2019 Meeting Minutes, *attached hereto as* Exhibit A-9.

40.     A majority of the commissioners did not request further investigation of the matter, so the Commission took no additional action. The minutes do not reflect the reasoning behind any Commissioners' position. *See* April 15, 2019 Meeting Minutes; Hernandez Dep. 234:25-236:6.

**V.     The Commission is responsive to Dodge City citizens.**

41.     Other than March 19, 2019, and April 15, 2019, no City Commission minutes indicate that the issue of at-large versus district elections has been raised with the Commission or by any commissioner. Hernandez Dep. 81:10-25; Tieben Dep. 71:17-24.

42.      There has been no protest and no petitions presented to the City Commission requesting a change to at-large elections. Hernandez Dep. 24:1-25; 126:9-127:2.

43.     At-large elections have not been an election issue in City Commission races. Hernandez Declaration ¶ 13.

44.     There have been no significant efforts by the public to ask the City to change the form of government. Hernandez Dep. 81:10-25; Rangel-Lopez Dep. 54:6-20.

45.     Plaintiffs are not aware of any widespread community movement in Dodge City to change the method of electing Commissioners, and they are not aware of any community groups that have called for a change in the way Commissioners are elected. Rangel-Lopez Dep. 54:6-20; Hernandez Dep. 81:10-25.

46.     Prior to filing this lawsuit, neither Plaintiff asked the City to change the method of electing City Commissioners. Coca Dep. 23:11-19; Rangel-Lopez Dep. 54:22-56:4.

47.     Plaintiff Rangel-Lopez interned for the City Manager's office in 2022, and, in doing so, he worked with the City Manager and City Commission. Rangel-Lopez Dep. 26:25-3; 29:16-30:5; 43:4-11.

48.     Rangel-Lopez was planning to sue the City about at-large elections while he was an intern, but he did not speak to the City Manager or any City staff about the idea of moving to district elections. Rangel-Lopez Dep. 66:22-67:16.

49.     Prior to filing this lawsuit, no interest groups asked the City to change the method of electing City Commissioners. Hernandez Dep. 81:10-25; Rangel-Lopez Dep. 54:6-20.

50.     The Plaintiffs did not make any effort to change the form of government in Dodge City through the democratic process. Coca Dep. 23:11-19; Rangel-Lopez Dep. 54:22-56:4.

51.     No members of the current City Commission have voted for or against the current form of government at any City Commission meeting. Hernandez Dep. 82:2-4.

52.     Following the filing of this lawsuit, the City consulted with trusted leaders in the Dodge City Latino community regarding the at-large city council election system. The feedback the City received was that the Latino leaders believed the at-large system united Dodge City, and they did not see a need to change to district-based elections. Hernandez Dep. 23:17-25:11, 26:1-5.

## VI.     Relevant Election and Precinct Information

53.     The percentage of Latino voters by Precinct in Dodge City Commission Elections from 2014 to 2021 was:

| Precinct | Latino Voters (%) | | | |
|---|---|---|---|---|
| | 2021 | 2019 | 2017 | 2014 |
| 1 | 39.1 | 38.9 | 30.1 | 20.4 |
| 2 | 54.5 | 49.0 | 44.5 | 39.7 |
| 3 | 59.9 | 49.4 | 45.4 | 53.7 |
| 4 | 31.4 | 29.8 | 27.8 | 31.8 |
| 5 | 18.7 | 17.0 | 15.6 | 12.2 |
| 6 | 12.6 | 12.2 | 11.3 | 4.1 |
| 7 | 8.8 | 9.4 | 9.5 | 1.9 |
| 8 | — | — | — | 6.5 |
| 9 | 20.8 | 8.4 | — | — |

Table 1, Dr. Katz Expert Report at 4, *attached hereto as* Exhibit J.

54.     The results for the 2021 Dodge City Commission General Election were:

| 2021 | Precinct 1 | Precinct 2 | Precinct 3 | Precinct 4 | Precinct 5 | Precinct 6 | Precinct 7 | Precinct 8 | Precinct 9 | Precinct 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Michelle L. Salinas | 47 | 19 | 23 | 70 | 154 | 207 | 18 | 0 | 0 | 0 | 538 |
| Joseph Nuci | 66 | 30 | 40 | 99 | 227 | 370 | 38 | 0 | 0 | 0 | 870 |
| Chuck Taylor | 83 | 39 | 39 | 108 | 242 | 346 | 21 | 0 | 2 | 0 | 880 |
| Blanca Ilean Soto | 50 | 31 | 38 | 87 | 154 | 234 | 25 | 0 | 1 | 0 | 620 |
| Dayton Rhoten | 16 | 9 | 6 | 40 | 74 | 106 | 6 | 0 | 1 | 0 | 258 |
| Jan Scoggins | 50 | 28 | 37 | 70 | 154 | 251 | 17 | 0 | 1 | 0 | 608 |
| Michael Burns | 59 | 43 | 28 | 96 | 238 | 463 | 37 | 0 | 2 | 0 | 966 |
| Jeffrey J. Reinert | 45 | 22 | 33 | 84 | 210 | 349 | 34 | 0 | 1 | 0 | 778 |

2021 Election Results, *attached hereto as* Exhibit A-12.

55.     The results for the 2017 Dodge City Commission General Election were:

| 2017 | Precinct 1 | Precinct 2 | Precinct 3 | Precinct 4 | Precinct 5 | Precinct 6 | Precinct 7 | Precinct 8 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Brian Delzeit | 72 | 11 | 15 | 163 | 330 | 519 | 18 | 1 | 1129 |
| Kevin D. Gwaltney | 56 | 21 | 16 | 109 | 235 | 394 | 11 | 0 | 842 |
| Charles J. Sellens | 18 | 22 | 14 | 70 | 358 | 223 | 7 | 1 | 529 |
| E. Kent Smoll | 56 | 27 | 23 | 131 | 255 | 358 | 1 | 0 | 851 |
| Joyce Warshaw | 42 | 22 | 41 | 186 | 295 | 411 | 13 | 1 | 1011 |
| Liliana Zuniga | 31 | 14 | 24 | 56 | 98 | 167 | 8 | 0 | 398 |
| Written-Ins | 1 | 0 | 0 | | 3 | 2 | 0 | 0 | |
| | | | | | | | | | |

2017 Election Results, *attached hereto as* Exhibit A-13.

56.     The results for the 2014 Dodge City Commission General Election were:

| 2014 | Precinct 1 | Precinct 2 | Precinct 3 | Precinct 4 | Precinct 5 | Precinct 6 | Precinct 7 | Precinct 8 | Precinct 9 | Total |
|------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|-------|
| Russ McBee | 33 | 10 | 5 | 47 | 72 | 85 | 1 | 0 | 0 | 253 |
| Joe Peters | 43 | 11 | 19 | 61 | 124 | 159 | 5 | 2 | 0 | 424 |
| Jan Scoggins | 41 | 13 | 29 | 82 | 97 | 172 | 2 | 0 | 0 | 436 |
| E. Kent Smoll - 2yr term | 30 | 9 | 15 | 51 | 116 | 200 | 2 | 1 | 0 | 424 |
| Rick Smowers | 30 | 12 | 14 | 55 | 128 | 201 | 1 | 0 | 0 | 441 |
| Jeffrey A. Turner | 23 | 15 | 9 | 44 | 123 | 139 | 4 | 2 | 0 | 359 |
| Liliana Zunlga | 37 | 21 | 29 | 59 | 99 | 145 | 2 | 1 | 0 | 393 |
| | | | | | | | | | | |

2014 Election Results, *attached hereto as* Exhibit A-14.

57.     The results for the 2006 Dodge City Commission Primary Election were[2]:

| 2006 | Precinct 1 | Precinct 2 | Precinct 3 | Precinct 4 | Precinct 5 | Precinct 6 | Advance | | Total |
|------|-----------|-----------|-----------|-----------|-----------|-----------|---------|---|-------|
| Mike Boettcher | 103 | 46 | 45 | 171 | 207 | 267 | 104 | | 943 |
| Ed Kimminay | 100 | 48 | 44 | 159 | 197 | 248 | 109 | | 905 |
| Jim Lembright | 41 | 24 | 27 | 124 | 207 | 301 | 68 | | 792 |
| Mike Nelson | 43 | 22 | 24 | 83 | 146 | 220 | 57 | | 595 |
| Connie Penick | 99 | 29 | 41 | 123 | 120 | 167 | 78 | | 657 |
| Mark Pingsterhaus | 41 | 23 | 21 | 56 | 70 | 63 | 38 | | 312 |
| E. Kent Smoll | 53 | 36 | 42 | 139 | 240 | 387 | 81 | | 978 |
| Rick Sowers | 80 | 35 | 49 | 162 | 247 | 396 | 82 | | 1051 |
| Jose Vargas | 39 | 32 | 29 | 84 | 104 | 134 | 54 | | 476 |
| | | | | | | | | | |

2006 Election Results, *attached hereto as* Exhibit A-15.

58.     The results for the 2000 Dodge City Commission General Election were:

| 2000 | Precinct 1 | Precinct 5 | Precinct 8 | Precinct 11 | Provisional | Advance | | | Total |
|------|-----------|-----------|-----------|------------|-------------|---------|---|---|-------|
| Fernando Junedo | 64 | 86 | 164 | 201 | 9 | 52 | | | 576 |
| Jim Lembright | 85 | 106 | 245 | 274 | 9 | 96 | | | 815 |
| Tom Martin | 59 | 87 | 193 | 223 | 8 | 83 | | | 653 |
| Billy Weber | 85 | 108 | 142 | 164 | 10 | 66 | | | 575 |

2000 Election Results, *attached hereto as* Exhibit A-16.

59.     While Mr. Coca stated during his deposition that Liliana Zuniga and Blanca Soto were the preferred candidates of Latinos, Coca Dep. 42:5-10, he had no colorable basis for why that was the case. For instance, for Ms. Zuniga, Mr. Coca's basis for saying that she was the preferred candidate was "her interaction with the community." Coca Dep. 42:16-43:6.

---

[2]     Defendants have included the primary election results for 2006 because Plaintiffs previously identified Latino candidate of choice was not in the general election.

60.     However, when pressed about Ms. Zuniga, Mr. Coca knew nothing about who actually voted for Ms. Zuniga, how Ms. Zuniga had run her campaign, what issues Ms. Zuniga campaigned on, how Ms. Zuniga fared in any of Dodge City's precincts, or even whether he had voted for Ms. Zuniga. Coca Dep. 43:7-22.

61.     As for Ms. Soto, Mr. Coca confirmed that she campaigned as a Latino candidate, but he admitted that he was unaware of any "data," "documents," or "evidence" that would confirm whether Ms. Soto was indeed the candidate of choice. Coca Dep. 29:3-31-10.

62.     Regarding bloc voting, Mr. Coca admitted that, other than how the election ended up, he had no "evidence" of it. Coca Dep. 20:13-24.

63.     Defendants have filed a motion to exclude the testimony of Dr. Matt Barreto, the plaintiffs' sole expert on *Gingles* factors II and III. *See generally* Doc. 144.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The threshold inquiry of summary judgment is "'determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Harris v. Progressive Direct Ins. Co.*, 740 F. App'x 900, 907 (10th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000). Then the non-moving party "may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those

dispositive matters for which it carries the burden of proof." *Id.* To accomplish this, sufficient evidence pertinent to a material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy L. Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Summary judgment is not a "disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## ARGUMENT

At this point, Plaintiffs have two remaining claims in the case: (1) an alleged violation of section 2 of the VRA, and (2) intentional discrimination under the Fourteenth Amendment. Doc. 140, at 31-32. As shown below, both claims fail as a matter of law and judgment should be entered against Plaintiffs on them.

### I.  Plaintiffs' Section 2 claim fails as a matter of law.

Summary judgment should be granted on Plaintiffs' VRA claim because Plaintiffs cannot prevail on *Gingles* factors two and three—political cohesion and bloc voting, respectively. *See Thornburg v. Gingles*, 478 U.S. 30 (1986). As noted by the Court in its Order on Defendants' motion to dismiss, Plaintiffs were going to "have to prove [*Gingles* factors two and three at] some [later] time, at which point specified data regarding voting numbers, results, etc. w[ould] be important." Doc. 71, at 17. That time is now. Unfortunately for Plaintiffs, though, their evidence is insufficient to create a triable issue as to whether "Latinos in Dodge City vote cohesively as a group" or whether the "white majority votes as a bloc sufficient to defeat the Latino-preferred candidate," which are both necessary for Plaintiffs to proceed to trial on a VRA theory. *Id.* at 16. Accordingly, summary judgment is proper on Plaintiffs' section two claim.

At bottom, *Gingles* factors two and three boil down to whether racially polarized voting exists in Dodge City and whether White voters sufficiently vote as a bloc to prevent the preferred minority candidate from being elected. Generally speaking, "[t]o determine the degree of racially polarized voting, one must conduct a statistical or other empirical analyses of the election results for each election at issue." *Mallory v. Ohio*, 38 F. Supp. 2d 525, 537 (S.D. Ohio 1997), *aff'd*, 173 F.3d 377 (6th Cir. 1999). Here, Plaintiffs principally rely upon Dr. Matt Barreto to perform such analyses. *See* Doc 140, at 6-8. Specifically, Plaintiffs claim that Dr. Barreto performed a "homogenous precinct analysis" and an "ecological inference analysis"—both of which purportedly support their position. *Id.* at 7-8. However, as shown in Defendants' jointly filed motion to exclude, Dr. Barreto's analyses are insufficient as a matter of law and should not be considered. *See generally* Doc. 144. Regarding the homogenous precinct analysis, it fails because there are no homogenous precincts in Dodge City. *Id.* at 5-7. As for the ecological inference analysis, it is unreliable because Dr. Barreto provides no confidence interval for his conclusions. *Id.* at 7-13. As a result, Dr. Barreto's opinions fail to satisfy *Daubert* and should be excluded.

If Defendants' motion to exclude Dr. Barreto's testimony is granted, this will be fatal to Plaintiffs' ability to prove factors two and three of *Gingles*. This is so because there is no way for a reasonable factfinder to conclude which candidate, if any, Latinos preferred in any particular City Commission race or, assuming that a preferred candidate did exist, that White voters voted sufficiently as a bloc to block the Latinos' preferred candidate. *See, e.g.*, *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 935 (E.D. Ark. 2012) (three judge panel) (granting judgment to the defendants because, "[i]n the absence of persuasive expert testimony, [the court was] left with the results of a hodgepodge of elections of various sorts in the general vicinity of Senate District 24, along

with the lay testimony regarding voting patterns in the Delta," which the court found was "not sufficiently conclusive to meet the plaintiffs' burden of proof"); *Al-Hakim v. State of Fla.*, 892 F. Supp. 1464, 1475 (M.D. Fla. 1995), *aff'd*, 99 F.3d 1154 (11th Cir. 1996) (stating that statistical "evidence is essential to a plaintiff attempting to establish political cohesiveness among minority voters" and granting summary judgment in a case where plaintiff had failed to provide such evidence from an expert); *see also Growe v. Emison*, 507 U.S. 25, 41 (1993) (concluding that the *Gingles* preconditions "were unattainable" because "the record simply contain[ed] no statistical evidence of minority political cohesion . . . or of majority bloc voting [a]nd even anecdotal evidence [wa]s lacking." (internal citation and quotation marks omitted)).

For instance, who did Dodge City Latinos vote for the most in the most recent City Commission election? Who did Latinos vote for the least? Who did Whites vote for the most in the most recent Dodge City City Commission? Who did Whites vote for the least? These are fundamental questions that, at a minimum, a plaintiff must answer if they are to have any chance in prevailing on a section 2 claim. *See, e.g.*, *Sanchez v. State of Colo.*, 97 F.3d 1303, 1320 (10th Cir. 1996) ("Certainly, key to examining racial polarization in the challenged electoral mechanism is determining for whom voters vote. . . . Only then can the district court determine whether whites vote sufficiently as a bloc usually to defeat the minority's choice."). Since Plaintiffs cannot make this elemental showing, Plaintiffs' VRA claim necessarily fails.

In response, it appears likely that Plaintiffs are primed to argue that they can make up for their lack of reliable expert opinion with lay testimony. They cannot. "[W]hile lay testimony is relevant to determine who is the candidate of choice, it is not alone dispositive." *Sanchez*, 97 F.3d at 1320; *see also Perez v. Abbott*, 250 F. Supp. 3d 123, 165 (W.D. Tex. 2017) (three judge panel) ("The NAACP Plaintiffs offered only lay testimony concerning minority cohesion in Fort

Bend County. While lay testimony is relevant, statistical data is essential when asserting cohesion among three different minority groups."); *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 503 (E.D. Tex. 2020) (stating that lay testimony may be used, "provided that such testimony is reinforced with other evidence or is not otherwise rebutted"). Put slightly differently, when accessing racial polarizations, courts are to "judge political cohesiveness by looking at the voting preferences expressed in actual elections," not what a particular person purportedly perceives. *Sanchez*, 97 F.3d at 1321; *accord Hinds Cnty. Republican Party v. Hinds Cnty., Miss.*, 432 F. Supp. 3d 684, 699-700 (S.D. Miss. 2020) (stating that "statistical evidence is critical to a successful showing" and noting the distinction between lay and expert testimony on the matter).

Here, in the Pretrial Report, Plaintiffs cite to Mr. Miguel Coca's belief that, "based on his lived experiences in the political process in Dodge City, Hispanics are a politically cohesive group." Doc 140, at 7. There are multiple reasons why this is insufficient to get Plaintiffs past summary judgment on *Gingles* factors two and three. First, as noted above, Mr. Coca's personal beliefs are not an adequate substitute for a reliable statistical analysis. Second, Mr. Coca's statements relating to "political cohesion" in Dodge City are conclusory and are based on mere "speculation, conjecture, [and] surmise," which should not be credited as this point. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *accord Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020) ("Thus, unsupported and conclusory statements, even from experts, are insufficient to defeat summary judgment, and summary judgment may be granted if the evidence is merely colorable or is not significantly probative." (internal citation, quotation marks, and alterations in original omitted)). While Mr. Coca did state during his deposition that Liliana Zuniga and Blanca Soto were the preferred

candidates of Latinos, he had no colorable basis for why that was the case. SOF, ¶ 59. For instance, for Ms. Zuniga, Mr. Coca's basis for saying that she was the preferred candidate was "her interaction with the community." SOF, ¶ 59. However, when pressed, Mr. Coca knew nothing about who actually voted for Ms. Zuniga, how she had run her campaign, what issues she campaigned on, how she fared in any of Dodge City's precincts, or even whether he had voted for her. SOF, ¶ 60. As for Ms. Soto, Mr. Coca confirmed that she campaigned as a Latino candidate, but he admitted that he was unaware of any "data," "documents," or "evidence" that would confirm whether Ms. Soto was indeed the candidate of choice. SOF, ¶ 61. Regarding bloc voting, Mr. Coca had this to say in response to Defendants' questioning:

> 13    Q.  Are you making an allegation in this case
> 14  that white voters are voting as a bloc in city
> 15  commission races?
> 16    A.  I am.
> 17    Q.  And what is your -- what is your evidence
> 18  that supports that allegation?
> 19    A.  Just on how the elections have already
> 20  turned out already, with the history of who has
> 21  been on the commission previously.
> 22    Q.  Any other evidence?
> 23    A.  None -- none that come to mind at this
> 24  moment.

SOF, ¶ 62. In short, Mr. Coca's testimony offers Plaintiffs no assistance, only conclusions, and should not be credited.

As a result, what Plaintiffs are left with are the unadorned election results for just a handful of elections over the past fifty years that Plaintiffs cherry picked presumably based on the belief that they best support their claim. Plaintiffs' chosen elections do no such thing. Initially, in their First Amended Complaint, Plaintiffs alleged that five Latino-preferred candidates—(1) Fernando Jurado in 2000, (2) Jose Vargas in 2006, (3) Liliana Zuniga in 2014 and 2017, and (5) Blanca Soto in 2021—had unsuccessfully ran for Dodge City Commission.

Doc. 30, at ¶ 62. Plaintiffs went on to say that each of the aforementioned candidates was the "top vote-getters in high Latine population precincts, but lost in low Latine population precincts." *Id.* Based on these allegations, the Court denied Defendants' motion to dismiss. Doc. 71. The Court recognized that Plaintiffs' allegations were "general in nature," but nevertheless concluded that they were sufficient "at th[e motion to dismiss] stage to show political cohesion." *Id.* at 16.

Following discovery and recognizing that there is absolutely no colorable argument that Mr. Jurado and Mr. Vargas were the Latino preferred candidates in 2000 and 2006, respectively,[3] Plaintiffs abandoned their initial position and are now arguing that there have been four Latino-preferred candidates that received large numbers of votes in Latino-dominant precincts, but low support in white-dominant precincts: Blanca Soto in 2021, Jan Scoggins in 2021 and 2017, and Liliana Zuniga in 2017 and 2014. Doc. 140, at 7. As discussed in the next two sections, there is no clear Latino preferred candidate for the 2021, 2017, and 2014 elections. As a result, based on

---

[3]     Plaintiffs have offered nothing regarding the racial makeup for any of the precincts during the 2000 and 2006 election cycles. The furthest back anything in the record goes is 2014, which is Table 1 in Dr. Katz's report. SOF, ¶ 53. As Table 1 indicates, though, the racial composition for most of Dodge City's precincts has not been static, even within a 5-year period. Thus, there is no basis (other than rank speculation) to say which of Dodge City's precincts had the highest and lowest Latino populations in 2000 and 2006. Even if a factfinder could reasonably make such an inferential leap, it still would not help Plaintiffs because Mr. Jurado and Mr. Vargas were not the top "vote getters" in any of the reported precincts. In 2000, there were only four candidates and Mr. Jurado finished third or fourth in every precinct that reported a vote. SOF, ¶ 58. In 2006, there were nine candidates in the primary election and Mr. Vargas failed to finish better than fifth in any reported precinct. SOF, ¶ 57. There is nothing else in the record that remotely suggests (much less creates a reasonable inference) that Messrs. Vargas and Jurado were the Latinos' preferred candidates in the 2000 and 2006 election. Rather, it appears that Plaintiffs chose these candidates based solely on their Latino-sounding last names, as opposed to any actual preference that Latino voters had showed them. As a result, even if Plaintiffs had maintained their initial position, the 2000 and 2006 elections could not be relied upon to show that a significant number of minority voters had voted for Mr. Jurado or Mr. Vargas. *See, e.g.*, *Clay*, 90 F.3d at 1361 ("Inferences based solely on race are insufficient to establish which candidate is minority-preferred.").

        Plaintiffs' reliance on the 2000 and 2006 elections was also misplaced because there was no discernable difference between how Mr. Jurado and Mr. Vargas performed across Dodge City's precincts, irrespective of any particular precinct's racial composition. For instance, two of the three other candidates in the 2000 race beat Mr. Juredo in every reported precinct. SOF, ¶ 58. Likewise, in 2006, four out of the eight other candidates in the primary race beat Mr. Vargas in every reported precinct. SOF, ¶ 57. The same would have been true of a fifth candidate (E. Kent Smoll), but Mr. Smoll lost by three votes to Mr. Vargas in one precinct. SOF, ¶ 57. Thus, across the precincts, there was no discernable distinction between the voters therein voted.

the existing record, Plaintiffs cannot make the requisite showing with regard to *Gingles* factors two and three and summary judgment is warranted on Plaintiffs' section 2 VRA claim.

### 1.  Plaintiffs' evidence is insufficient to create a triable issue on political cohesion.

To prevail on the second *Gingles* factor, Plaintiffs must "show that voters in the minority group have a candidate, regardless of that candidate's race, that the group would prefer to elect." *Mallory v. Ohio*, 173 F.3d 377, 383 (6th Cir. 1999). While the Supreme Court has "not set out a precise mathematical formula to determine when a minority group is cohesive, it [has] indicated that a showing that 'a significant number' of minority voters 'usually' vote for the same candidate would satisfy the plaintiff's burden." *Id.* (quoting *Gingles*, 478 U.S. at 56). At the summary judgment stage, it is no longer sufficient to merely claim that a candidate is a minority group's preferred candidate or the top vote getter in minority-heavy precincts; no, Plaintiffs must produce sufficient evidence to permit a reasonable factfinder to conclude that those asserted facts are indeed true. Specifically, Plaintiffs "must prove, on an election-by-election basis, which candidates are minority-preferred." *Clay v. Bd. of Educ. of City of St. Louis*, 90 F.3d 1357, 1361 (8th Cir. 1996).

Starting with the 2021 City Commissioner election, Plaintiffs' alleged candidates of choice, Blanca Soto and Jan Scoggins, did not finish better than third in any of the three precincts with the largest share of Latino voters (Precincts 3, 2, and 1). SOF, ¶¶ 53-54. Furthermore, the three precincts with the greatest percentage of Latino voters had three different winners—Chuck Taylor in Precinct 1, Michael Burns in Precinct 2, and Joseph Nuci, a Latino, in Precinct 3. SOF, ¶ 54. In a case such as this where the alleged Latino candidates of choice finished, at best, third in the precincts with the highest percentage of Latino voters in a race in which three others candidates won the popular vote in those precincts, no reasonable inference

can be drawn from these results that the alleged Latino candidates of choice were indeed the Latino candidates of choice. Thus, the 2021 election results do not lend any support to Plaintiffs' claim that Dodge City Latinos had preferred candidates in the 2021 election and that Mses. Soto and Scoggins were those candidates. *Cf., e.g., Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 503 (E.D. Tex. 2020) ("Imagine a town. In that town, White citizens only vote for candidates that are of type A. Minority citizens, on the other hand, split their support among candidates of types B, C, and D. In this hypothetical community, RPV clearly exists, but there is no evidence of minority political cohesiveness. This is because minorities do not coalesce around one particular type of candidate—they are split, not cohesive."); *Nash v. Blunt*, 797 F. Supp. 1488, 1504 (W.D. Mo. 1992) (three judge panel) ("[T]he black vote was split almost evenly for two candidates, thus there was no minority preferred candidate.").

The same is true for the 2017 City Commissioner election. While the so-called candidate of choice, Liliana Zuniga, took second in Precinct 3 (which had the highest percentage of Latino voters at just 45.4%), she finished second to last or last in the three other precincts with the next highest percentages of Latino populations (Precincts 2, 1, and 4, respectively). SOF, ¶¶ 55. Furthermore, the four precincts with the greatest percentage of Latino voters had three different winners—Brian Delzeit in Precinct 1, E. Kent Smoll in Precinct 2, and Joyce Warshaw in Precincts 3 and 4. SOF, ¶ 55. Again, this is a situation in which no reasonable inference can be drawn from the recorded results that Plaintiffs' alleged Latino candidate of choice was indeed the Latino candidate of choice.

Regarding the 2014 City Commission election, Mses. Zuniga and Scoggins seemingly finished better than Plaintiffs' other so-called Latino preferred candidates, but the results in the 2014 election are misleading due to the extremely tight clustering of votes. SOF, ¶ 56. For

instance, Ms. Zuniga finished tied for first in Precinct 3, in first in Precinct 2, and in third in Precinct 1. SOF, ¶ 56. However, only twenty-four votes separated Ms. Zuniga from the last place vote getter in Precinct 3, twelve votes separated her and the last place vote getter in Precinct 2, and 14 votes separated her and the last place vote getter in Precinct 1. SOF, ¶ 56. A similar narrative is true for Ms. Scoggins, who tied for first in Precinct 3 and took second in Precincts 1 and 2. SOF, ¶ 56. For Ms. Scoggins, only twenty-four votes separated her from the last place vote getter in Precinct 3, eighteen votes separated her and the last place vote getter in Precinct 2, and 4 votes separated her from the last place vote getter in Precinct 2. SOF, ¶ 56. Thus, had only a few dozen votes been changed, the results in the precincts with the highest percentage of Latinos would have been dramatically different. This fact strips Mses. Zuniga and Scoggin's 2014 performance of any practical significance and/or probative value in this case. *See, e.g.*, *Apsley v. Boeing Co.*, 722 F. Supp. 2d 1218, 1247 (D. Kan. 2010), *aff'd*, 691 F.3d 1184 (10th Cir. 2012) (granting summary judgment on plaintiffs' ADEA disparate impact claim, despite plaintiffs' evidence showing a statistically significant disparity, since plaintiffs' statistical evidence "lack[ed] practical significance" because had forty-eight decisions out of a pool of thousands had been made differently plaintiffs' statistical evidence would be stripped of its meaning).

In short, Plaintiffs' evidence fails to deliver on what Plaintiffs have promised in this case. Of the dozens of Dodge City City Commission elections that have been held since the at-large method of voting was adopted over fifty years ago, Plaintiffs can point to only one election (2014) in which their so-called preferred candidate was actually one of the top vote getters in precincts with the largest population of Latinos. As discussed in the previous paragraphs, though, in the 2014 election, only a couple of dozen votes separated the alleged preferred candidate and

the candidate that finished last in those precincts with the greatest percentage of Latinos. No reasonable factfinder could find based on such results that a "significant number of minority voters usually vote for the same candidate" in Dodge City Commission elections. As a result, Plaintiffs have failed to satisfy the second *Gingles* factor and summary judgment is warranted on Plaintiffs' section 2 claim. *See, e.g.*, *Al-Hakim*, 892 F. Supp. at 1474 ("Plaintiff's inability to meet the first of the three necessary preconditions identified in Gingles is dispositive of his § 2 claim.").

### 2. Plaintiffs' evidence is insufficient to create a triable issue on racial bloc voting.

For the third *Gingles* factor, Plaintiffs "must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (internal citation omitted). Again, as noted above and in Defendants' motion to exclude, Dr. Barreto's opinions should be excluded and thus should provide no assistance to Plaintiffs with regard to this factor. Rather, Plaintiffs are relegated to the unadorned elections results, which still cannot shoulder the weight of this case.

Starting with the 2021 election, there were three different winners in the three precincts with the greatest percentage of Latino voters—none of which was Plaintiffs' professed candidates of choice, Blanca Soto and Jan Scoggins (Chuck Taylor in Precinct 1, Michael Burns in Precinct 2, and Joseph Nuci in Precinct 3). SOF, ¶¶ 53-54. What's more, one of three aforementioned winners also won one of the remaining precincts that, as a percentage, had less Latino voters and more White voters (Chuck Taylor won Precincts 4, 5, 9; Michael Burns won Precincts 6 and 9; and Joseph Nuci won Precinct 7).[4] SOF, ¶¶ 53-54. Thus, there is no

---

[4]      Precinct 8 had no reportable vote count in 2021.

discernable way to say that White voters were voting differently than Latino voters in 2021 based solely on the election results from that year.

The same is true for 2017. As was the case in 2021, the three precincts with the greatest percentage of Latino voters had three different winners—none of which was Plaintiffs' claimed candidate of choice, Liliana Zuniga (Brian Delzeit in Precinct 1, E. Kent Smoll in Precinct 2, and Joyce Warshaw in Precinct 3). SOF, ¶¶ 53, 55. What's more, with one exception, Mr. Delzeit and Ms. Warshaw won each of the remaining precincts that, as a percentage, had less Latino voters and more White voters (Delzeit winning Precincts 6 and 7 and Warshaw winning Precinct 4).[5] SOF, ¶¶ 53, 55. Thus, there is no discernable way to say that White voters voted differently than Latino voters in the 2017 City Commission election.

As for the 2014 election, it too is insufficient to show racial bloc voting. While Plaintiffs' alleged candidates of choice, Lilliana Zuniga and Jan Scoggins, were the top vote getters in two of the three precincts with the largest percentage of Latinos, their margin of victory was incredibly small. SOF, ¶ 56. Furthermore, outside of the precincts with the largest percentage of Latinos, Ms. Zuniga placed third in one precinct (Precinct 4) and did no worse than fifth out of seventh in the remaining precincts. SOF, ¶ 56. As for Ms. Scoggins, she won one of the White majority precincts (Precinct 4) and placed third in another one (Precinct 6). SOF, ¶ 56. Additionally, Ms. Scoggins was elected, despite Latinos making up a minority of voters of the electorate that year. SOF, ¶ 56. In other words, the Plaintiffs' so-called candidate of choice actually won. *See, e.g.*, *Levy v. Lexington Cnty., S.C. Sch. Dist. Three Bd. of Trustees*, 2012 WL 1229511, at *13 (D.S.C. Apr. 12, 2012) (finding that "the majority [had not] voted sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate" in those years that the minority's preferred candidate actually was elected). These results do not show a clear difference

---

[5]     The one exception is that Charles Sellens won Precinct 5.

between how Latino and White voters voted in 2014, much less that Whites voted in a way to block the alleged Latinos' candidate of choice.

With that said, even if this Court were to find that there was a triable issue as to whether Latinos had a preferred candidate in the 2014 election, and that candidate was defeated by racial bloc voting (which it should not), summary judgment would still be in order because "[o]ne election cannot establish cohesion among ethnic blocs." *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 444 (S.D.N.Y.) (three judge panel), *aff'd*, 543 U.S. 997 (2004); *accord Radogno v. Ill. State Bd. of Elections*, 836 F. Supp. 2d 759, 773 (N.D. Ill. 2011) (three judge panel) ("[T]he most plaintiffs are left with is evidence that a white candidate defeated a Latino candidate in one election. This is insufficient to meet the third prong of *Gingles*."), *aff'd sub nom.* 568 U.S. 801 (2012). Thus, even if the requisite cohesion was found in the 2014 election, it would be insufficient to satisfy *Gingles* factors three because section 2 is concerned with "larger trends," not "the results of any [one] individual election." *Johnson v. Hamrick*, 296 F.3d 1065 (11th Cir. 2002) (affirming district court's finding that *Gingles* factor three was not met); *accord Anthony v. Michigan*, 35 F. Supp. 2d 989, 1007 (E.D. Mich. 1999) (granting summary judgment to defendant because "it [could]not be said that the preferred non-incumbent candidates of the African-American community for the Wayne County Circuit bench are 'usually' defeated within the meaning of *Gingles* and its progeny"). Accordingly, summary judgment is warranted on Plaintiffs' section 2 VRA claim.

## II.   Plaintiffs' § 1983 claim based on the VRA fails as a matter of law.[6]

Summary judgment is also warranted on Plaintiffs' novel § 1983 clam. As of today, only one other Court has recognized a § 1983 claim based on an alleged violation of section 2. Thus, needless to say, the exact legal contours of a § 1983 claim based on section 2 of the VRA are not fully defined. With that said, it is well established that, to prevail on a § 1983 claim, a plaintiff must show that a legal right that they have been afforded has been violated by the defendant. *See, e.g.*, *Laventure v. Aramark Corr. Servs., Inc.*, 76 F. App'x 870, 873 (10th Cir. 2003). Pursuant to section 2 of the VRA, to show a violation of one's right free from restraint based on race or color, a plaintiff must meet all three of the *Gingles* preconditions. As shown above, Plaintiffs have failed to create a triable issue as to *Gingles* factors two and three. As a result, Plaintiffs have failed to create a triable issue as to whether they can prevail on their § 1983 claim, and summary judgment should be granted on their § 1983 claim as well.

## III.   Plaintiffs' Fourteenth Amendment Equal Protection claim fails as a matter of law because Plaintiffs cannot prove that the City engaged in intentional discrimination.

Summary judgment is appropriate on Plaintiffs' Equal Protection claim because Plaintiffs cannot establish that the at-large method of Dodge City Commission elections was conceived of or is being maintained or operated with the intent to racially discriminate against the City's Latino population. On the contrary, the at-large election system was enacted in 1971 without discriminatory intent, Ford County (not Dodge City) operates city elections, and the City has actively promoted the inclusion and engagement of its Latino population in civic life. Prior to this litigation, there were no significant efforts made to change the form of election in Dodge City, SOF, ¶ 44, and there is no evidence to support Plaintiffs' arguments to the contrary.

---

[6]     Based on the Pretrial Order, it appears that Plaintiffs have waived their § 1983 claim to the extent that it is based on section 2 of the VRA. *See* Doc. 140, at 1 ¶ 1(d)(1) (not listing § 1983 as applying to Count 1 but listing it as applying to Count 2); 31 ¶ 4(a) (not listing § 1983 as applying to Count 1 but listing it as applying to Count 2). Despite Plaintiffs waiving this theory, Defendants briefly address it out of an abundance of caution.

At-large election systems are not per se violations of the Constitution or the VRA. *See Rogers v. Lodge*, 458 U.S. 613, 617 (1982); *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986). To establish an Equal Protection violation, Plaintiffs must prove that the at-large election method for the Dodge City Commission was conceived of or operated as a purposeful device to further racial discrimination. *See Rogers*, 458 U.S. at 618-19. Plaintiffs must prove that "invidious discriminatory purpose was a motivating factor," *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977), a showing that cannot be made here as a matter of law.

The Supreme Court has "rejected the notion that a law is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another." *Rogers*, 458 U.S. at 618. Absent a stark pattern of discrimination, the impact of official action alone is not determinative of intent. *Id*. Proving racial discrimination requires "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights*, 429 U.S. at 266. To this end, courts may consider: (1) "the historical background of the decision," (2) "[t]he specific sequence of events leading up to the challenged decision," (3) "[d]epartures from the normal procedural sequence," and (4) "legislative or administrative history." *Vill. of Arlington*, 429 U.S. at 267; *see Navajo Nation v. State of N.M.*, 975 F.2d 741, 744 (10th Cir. 1992).

In the Pretrial Order, Plaintiffs do not allege that the at-large election system in Dodge City was originally conceived with discriminatory intent, and as a result, any such argument now should be excluded. *See, e.g.*, *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 817-18 (10th Cir. 1979) (noting that pretrial order represents "a complete statement of all the contentions of the parties" and holding that trial court has discretion to exclude facts and contentions not included in pretrial

order); *D'Souza-Klamath v. Cloud Cty. Health Ctr., Inc.*, No. 07-4031, 2009 WL 902377, at *10 (D. Kan. Mar. 31, 2009*), aff'd sub nom.*, 363 F. App'x 658 (10th Cir. 2010).

The City Commission first adopted its at-large election system in 1971 by Charter Ordinance. SOF, ¶ 1. This Ordinance bears no marks of discriminatory intent. SOF, ¶ 2. It is facially neutral and adopted a common election format shared by other cities in Kansas. SOF, ¶¶ 3, 5. There is no legislative history suggesting that the Ordinance was conceived with a discriminatory intent. SOF, ¶ 3. There was simply no intent with the Charter Ordinance to discriminate against the City's Latino population—Plaintiffs have identified no evidence to the contrary. Latino candidates have served on the City Commission in recent years, including current Commissioner Nuci, a defendant in this case. SOF, ¶ 7.

Instead, Plaintiffs allege that the at-large system has been "maintained" in violation of the Equal Protection Clause, and they point to two events in support of this claim—(1) a 2011 DOJ "investigat[ion into] whether Dodge City's at-large system for Commission elections [was a] violation of the anti-dilution provision of Section 2 of the VRA," and (2) the fact that the "Commission decided not to give any further consideration to the issue of whether the City should adopt district-based elections" after Commissioner Scoggins raised the issue in 2019. Doc. 140, at 19-20.[7] Neither event constitutes evidence on which a reasonable factfinder could find discriminatory intent.

Starting with Plaintiffs' first alleged event, the DOJ contacted Ford County in 2011— over ten years ago—and requested election data. SOF, ¶ 30. The DOJ's only follow-up with Ford County was an October 20, 2011 letter informing the Ford County Clerk that the County is subject to new bilingual election requirements of the Voting Rights Act. SOF, ¶ 31. The DOJ

---

[7]      Plaintiffs initially argued that the location of polling places also showed the City's discriminatory intent, Doc. 30, at 19-21 ¶¶ 94-104, but no longer assert such a theory as it is uncontroverted that Ford County, and not the City, that determines polling sites, SOF, ¶ 11.

made no findings of wrongdoing by the City of Dodge City, and the investigation was closed without the DOJ requiring or recommending any action by Ford County or Dodge City. SOF, ¶ 33. Failing to change a process that the DOJ examined and apparently made no adverse finding regarding cannot constitute evidence of discriminatory intent. To the contrary, the lack of any findings or recommendations by the DOJ only affirms that the City's at-large election method was lawful.

Second, Plaintiffs infer discriminatory intent from the fact that the Commission did not take action in response to Commissioner Scoggins's discussion agenda item in the spring of 2019. This, too, is wholly inadequate.

In February 2019, Commissioner Scoggins asked the City Manager to place on the Commission agenda a request that the Commission consider moving to a combination of at-large and district-based seats for Commission elections. SOF, ¶ 34. She claimed the request came from a community group, but she did not identify the group. SOF, ¶ 34. At the March 4, 2019, Commission meeting, the Commissioners discussed the topic and directed City staff to investigate. SOF, ¶ 36. Then, at the April 15, 2019 meeting, the Commission Minutes reflect that City Attorney Brad Ralph provided information to the Commissioners on at-large and district elections, and a majority of the Commissioners did not request taking further action. SOF, ¶ 39.

There is no evidence in the meeting minutes reflecting any discriminatory motive behind the Commission's inaction. SOF, ¶ 40. The minutes reflect that only Commissioner Scoggins vocalized any support for the idea of changing the Commission's election method, and no members of the community spoke on the topic at either the March 5 or April 15 meetings. SOF, ¶¶ 37-38.

The fact that one commissioner vocalized support for switching to district-based elections is insufficient to prove that the continuation of the City's at-large election method thereafter was intentionally discriminatory. *See Milwaukee Branch of N.A.A.C.P. v. Thompson*, 929 F. Supp. 1150, 1155 (E.D. Wis. 1996) (finding no evidence of discriminatory intent based on a proposal by one committee member to create subdistricts for the election of appellate judges); *Williams v. Orange Cnty., Fla.*, 783 F. Supp. 1348, 1355 (M.D. Fla.) (finding no evidence of discriminatory intent based on letter sent by chairman of the county executive committee to a newspaper, which described the at-large system proposal as unfair), *aff'd sub nom.*, 979 F.2d 1504 (11th Cir. 1992). Absent evidence suggesting a discriminatory motive behind the decision not to act, a facially neutral decision not to proceed with the suggestion of one Commissioner cannot establish discriminatory intent.

Contrary to the picture Plaintiffs attempt to paint, the evidence reveals that Dodge City has been recognized as a city that goes above and beyond to integrate immigrants into the community. SOF, ¶ 22. The City has made extraordinary efforts to welcome immigrants to its community and engage its Latino population in civic life. *See* SOF, ¶ 21. The City has participated in numerous initiatives to welcome Latino immigrants to the City and to encourage their civic involvement and pioneered a Cultural Relations Advisory Board. This Board launched a Strategic Plan for Welcoming and Integration to help welcome and integrate newcomers into Dodge City community and civic life, before this lawsuit even occurred. SOF, ¶ 26.

Notably, the City does not conduct Commission elections, control polling locations, or certify the results. SOF, ¶¶ 10-11. Ford County (a non-party) operates the Dodge City Commission election, as required by Kansas state law. SOF, ¶ 12; *see* K.S.A. 25-2110(e) ("All city elections shall be conducted by the county election officer of the county in which such city

is located[.]"). Thus, the City does not run elections or intervene with Ford County's election operations.

The City shares City Commission election information in both English and Spanish through its media platforms and encourages all members of the community to vote on election day. SOF, ¶ 13. The City asks its bilingual staff to assist the Ford County Clerk at the polls. SOF, ¶ 16. And the City provides free rides to the polling location on election day for its residents. SOF, ¶ 14. While the City helps to make election day more accessible for its Latino citizens, non-party Ford County is the one responsible in law and in practice for administering the city elections.

Plaintiffs cannot demonstrate that any of the *Arlington* factors have been met, as the record is devoid of any indication that the historical background, legislative history, sequence of events leading to the adoption of the at-large system, and procedure used reflect any discriminatory intent. Further, Plaintiffs cannot prove that that the at-large system was conceived, maintained, or operated with the intent to discriminate against the Latino population. The DOJ's investigation of Ford County in 2011—which did not involve the City and resulted in no adverse findings against the City—does not evidence discriminatory intent for the continuation of the at-large system. Similarly, the fact that one Commissioner put the City Commission election method on the agenda at two meetings, and no residents spoke against the at-large system at those meetings, does not create any plausible inference of discrimination.

Plaintiffs simply cannot prove that the City conceived, operated, or maintained the at-large election system as a purposeful device to further racial discrimination. Plaintiffs are grasping at straws to draw inferences of discriminatory intent where there are none. As a result, summary judgment should be granted on Plaintiffs' Equal Protection Claim.

## CONCLUSION

For the reasons stated herein, Defendants' summary judgment motion should be granted.

Respectfully submitted,

**FOULSTON SIEFKIN LLP**

By: */s/ Anthony F. Rupp*
    Anthony F. Rupp, KS #11590
    Tara Eberline, KS #22576
    Sarah E. Stula, KS #27156
    7500 College Boulevard, Suite 1400
    Overland Park, Kansas  66210
    T (913) 498-2100 | F (913) 498-2101
    trupp@foulston.com
    teberline@foulston.com
    sstula@foulston.com

    - and-

    Clayton J. Kaiser, KS #24066
    FOULSTON SIEFKIN, LLP
    1551 North Waterfront Parkway, Suite 100
    Wichita, Kansas 67206
    T (316) 267-6371 | F (316) 267-6345
    ckaiser@foulston.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that on the 22nd of September 2023, the foregoing was electronically filed with the Clerk of the Court by using the Court's e-Filing system which will send notification of electronic filing to counsel for all parties of record, and a true and correct copy was served by electronic mail upon:

Sharon Brett, KS #28696
**AMERICAN CIVIL LIBERTIES UNION OF KANSAS**
sbrett@aclukansas.org

Chad W. Dunn *(Pro Hac Vice)*
Sonni Waknin *(Pro Hac Vice)*
Bernadette Reyes *(Pro Hac Vice)*
**UCLA VOTING RIGHTS PROJECT**
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org

Jonathan Topaz *(Pro Hac Vice)*
Sophia Lin Lakin *(Pro Hac Vice)*
Luis M. R. Roman *(Pro Hac Vice)*
**AMERICAN CIVIL LIBERTIES UNION, INC.**
jtopaz@aclu.org
slakin@aclu.org
lroman@aclu.org

Abena Mainoo *(Pro Hac Vice)*
Jonathan I. Blackman *(Pro Hac Vice)*
JD Colavecchio *(Pro Hac Vice)*
Mijin Kang *(Pro Hac Vice)*
Elizabeth R. Baggott *(Pro Hac Vice)*
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
amainoo@cgsh.com
jblackman@cgsh.com
jdcolavecchio@cgsh.com
mkang@cgsh.com
ebaggott@cgsh.com

Scott Fuqua *(Pro Hac Vice)*
**FUQUA LAW & POLICY, P.C.**
scott@fuqualawpolicy.com

***ATTORNEYS FOR PLAINTIFFS***

*/s/ Anthony F. Rupp*