Page 1

```
 1 .
 2        IN THE UNITED STATES DISTRICT COURT
 3          FOR THE DISTRICT OF KANSAS
 4 .
 5 .
 6 MIGUEL COCA and
 7 ALEJANDRO RANGEL-LOPEZ,
 8       Plaintiffs,
 9    vs.     Case No. 6:22-cv-01274-EFM-RES
10 CITY OF DODGE CITY, et al.,
11       Defendants.
12 .
13 .
14 .
15      VIDEOTAPED DEPOSITION OF
16        ALEJANDRO RANGEL-LOPEZ,
17 taken on behalf of the Defendants, pursuant to
18 Notice to Take Videotaped Deposition, beginning at
19 9:28 a.m. on the 24th day of April, 2023, at the
20 Dodge City City Hall, 806 North Second Avenue, in
21 the City of Dodge City, County of Ford, and State
22 of Kansas, before Lee Ann Bates, CSR, RPR, CRR.
23 .
24 .
25 .
```

Page 2

```
 1       APPEARANCES:
 2 .
 3 .
 4 ON BEHALF OF THE PLAINTIFFS:
 5 .
 6    Ms. Sonni Waknin
 7    UCLA Voting Rights Project
 8    3250 Public Affairs Building
 9    Los Angeles, California  90065
10    (310) 400-6019
11    sonni@uclavrp.org
12 .
13    Mr. JD Colavecchio
14    Cleary Gottlieb Steen & Hamilton LLP
15    One Liberty Plaza
16    New York, NY 10006
17    212-225-2000
18    jdcolavecchio@cgsh.com
19 .
20 .
21 .
22 .
23 .
24 .
25 .
```

Page 3

```
 1 ON BEHALF OF THE DEFENDANTS:
 2 .
 3    Mr. Anthony F. Rupp
 4    Ms. Tara Eberline
 5    Foulston Siefkin LLP
 6    7500 College Boulevard, Suite 1400
 7    Overland Park, Kansas  66210
 8    (913) 498-2100
 9    trupp@foulston.com
10    teberline@foulston.com
11 .
12 .
13 ALSO PRESENT:
14 .
15    Kate MacAdam (via Zoom)
16    Hannah Colter (via Zoom)
17    Nick Hernandez
18    Brad Ralph
19    Tim Faulhaber, Videographer
20 .
21 .
22 .
23 .
24 .
25 .
```

Page 4

```
 1          INDEX
 2 .
 3 .
 4 Certificate ----------------------------- 133
 5 .
 6 .
 7          WITNESS
 8 ON BEHALF OF DEFENDANTS:            PAGE
 9 ALEJANDRO RANGEL-LOPEZ
10 Direct-Examination by Mr. Rupp       7
11 Cross-Examination by Ms. Waknin     127
12 .
13 .
14          EXHIBITS
15 RANGEL-LOPEZ DEPO EXHIBIT NO.:     MARKED
16 No 1  Amended Complaint for Declaratory
17       and Injunctive Relief       67
18 No 2  La Voz Del Pueblo Report     76
19 No 3  Social Media Post           93
20 No 4  Social Media Post           96
21 No 5  6/23/20 Statement from
22       City of Dodge City          97
23 No 6  Chat History                99
24 No 7  Dodge City Welcoming Plan -
25       Spring, 2022               103
```

EXHIBIT
C

# ALEJANDRO RANGEL-LOPEZ

Page 5

1  No 8  City of Dodge City Engagement
2      Efforts            104
3  No 9  Strategic Plan for Welcoming
4      and Integration        111
5  No 10  Plaintiffs' Supplemental Initial
6      Disclosures Pursuant to FRCP 26(a)(1)  118
7  .
8  .
9  .
10 .
11 .
12 .
13 .
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 .
25 .

Page 6

1      THE VIDEOGRAPHER:  Today is the 24th day
2  of April, 2023, and the time is approximately 9:28
3  a.m.  We are at Dodge City City Hall to take the
4  deposition of Alejandro Rangel-Lopez in the matter
5  of Miguel Coca and Alejandro Rangel-Lopez versus
6  the City of Dodge City, et al., Case Number 6:22-
7  CV-01274-EFM-RES.
8      Would counsel please state your appearances
9  for the record.
10     MS. WAKNIN:  Sonni Waknin on behalf of
11  the UCLA Voting Rights Project and on behalf of
12  plaintiffs.
13     MR. RUPP:  Tony Rupp and Tara Eberline on
14  behalf of the defendants, City of Dodge City, or
15  all of the defendants.  Also present, we've got
16  Nick Hernandez, City Manager, and Brad Ralph, City
17  Attorney.
18     Before we get started and the witness is
19  sworn in, opposing counsel and I have reached a --
20  a stipulation.  The local rules in the District of
21  Kansas prohibit consultations between the witness
22  and the witness's attorney during -- during breaks
23  in depositions and we have agreed mutually, with
24  regard to the depositions of both plaintiffs and
25  defendants, that -- that -- that that direction

Page 7

1  from the district court of -- district court will
2  not be enforced.  We will not -- we will not
3  complain about your consult- -- consultations and
4  you will not complain about ours.  Is that
5  correct?
6      MS. WAKNIN:  That is correct.
7      MR. RUPP:  All right.  Thank you very
8  much.
9          ALEJANDRO RANGEL-LOPEZ,
10  having been first duly sworn or affirmed to
11  testify to the truth, the whole truth, and nothing
12  but the truth, took the stand and testified as
13  follows:
14  DIRECT-EXAMINATION
15  BY MR. RUPP:
16  Q.  Would you please state your name.
17  A.  My name is Alejandro Rangel-Lopez.
18  Q.  And, Mr. Lopez, by whom are you employed?
19  A.  I'm employed by Loud Light.
20  Q.  And where is Loud Light -- what's its
21  full name, to the best of your knowledge?
22      A.  Loud Light.  It's Loud -- it's a -- it
23  depends on which one you're asking for, but Loud
24  Light, Inc. is its -- it's the name of the (c)(3),
25  which is what I work mainly under.

Page 8

1  Q.  And where is it located?
2  A.  It's based out of Topeka.
3  Q.  And what is your position with Loud
4  Light?
5  A.  I am project coordinator for New
6  Frontiers.
7  Q.  And what is New Frontiers?
8  A.  New Frontiers is a civic engagement
9  nonprofit based in southwest Kansas here in Dodge
10  City.
11  Q.  And where do you live?
12  A.  Here in Dodge City.
13  Q.  And what is your address?
14  A.  825 LaSalle Street.
15  Q.  And how long have you lived there?
16  A.  My family moved there in 2004, I believe,
17  so since 2004.
18  Q.  And are there any other persons living at
19  that address?
20  A.  Yes.
21  Q.  And who else lives at that address?
22  A.  My parents, so Lucia Rangel and Martin
23  Rangel, as well as my two younger siblings, Martin
24  Rangel-Lopez and Angelica Rangel-Lopez.
25  Q.  During the course of this deposition, I'm

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 9

1 going to ask you a number of questions. If you
2 do not understand a question or you need to have
3 it repeated, will you agree to ask me to do that?
4    A. Yes.
5    Q. Likewise, if I ask you any questions that
6 involve the attorney-client privilege, you're free
7 to speak with your counsel, you know, to determine
8 whether to assert a privilege. Otherwise, unless
9 your counsel directs you not to answer a question,
10 would you agree to answer any questions?
11    A. Yes.
12    Q. You are the named plaintiff in this
13 lawsuit; correct?
14    A. Yes.
15    Q. One of two named plaintiffs?
16    A. Yes.
17    Q. In that regard, I understand you are
18 alleging that the minority group of Latinos in
19 Dodge City is sufficiently large and
20 geographically compact to constitute a majority in
21 a single member district.
22    A. Correct.
23    Q. And are -- are you alleging that the
24 minority group Latinos in Dodge City is
25 politically cohesive?

Page 10

1    A. Yes.
2    Q. And are you alleging that the minority
3 group of Latinos can demonstrate that white --
4 that the white majority votes sufficiently as a
5 bloc to defeat the minority's preferred
6 candidates?
7    A. Can you restate that question, please?
8    Q. Sure. Is it part of your allegation that
9 the minority group of Latinos can demonstrate that
10 the white majority votes sufficiently as a bloc to
11 defeat the minority's preferred candidates?
12    A. Yes.
13    Q. Let's talk a little bit about Dodge City
14 and its elections. You would agree that Ford
15 County administers the elections for Dodge City
16 City Commission?
17    A. Yes.
18    Q. Okay. And you would agree that voters in
19 the Dodge -- for Dodge City City Commission cast
20 their ballots in secret?
21    A. Yes.
22    Q. Okay. In that regard, you don't know
23 from any personal knowledge how any voter other
24 than yourself, in any city commission election,
25 voted; is that correct?

Page 11

1    A. Yes.
2    Q. And you are not aware of any exit polling
3 associated with any Dodge City City Commission
4 elections; is that correct?
5    A. Yes.
6    Q. You are not aware of any statistical
7 surveys of how voters voted in any city commission
8 elections in Dodge City; is that correct?
9    A. Yes.
10    Q. And you would agree that elections for
11 city commission in Dodge City are nonpartisan?
12    A. Yes.
13    Q. You would agree that you may not assume,
14 from a voter's ethnicity, that all Latino voters
15 think alike?
16    A. Yes.
17    Q. And you would agree that not all Latino
18 voters share the same political interests?
19    A. Yes.
20    Q. And you would agree that not all Latino
21 voters prefer the same candidates at the polls?
22    A. Yes.
23    Q. There have been several Latino candidates
24 who have run for city commission in Dodge City
25 since the year 2000; correct?

Page 12

1    A. Yes.
2    Q. And you would agree that there have been
3 several Latinos who have served on the city
4 commission in Dodge City since 2000; correct?
5    A. Yes.
6    Q. And you would agree that there is a
7 Latino currently serving on the city commission in
8 Dodge City; correct?
9    A. Yes.
10    Q. And that's Joseph Nuci; is that correct?
11    A. Yes.
12    Q. Your contention, as I understand it from
13 this lawsuit, is that Commissioner Joseph Nuci is
14 not Latino preferred. Is that your allegation?
15    A. Yes.
16    Q. Have you seen any statistical analysis
17 demonstrating that a majority of Latinos did not
18 vote for Mr. Nuci?
19    A. No.
20    Q. Do you have any statistical basis to
21 contend that Mr. Nuci is not Latino preferred?
22    MS. WAKNIN: Objection; form.
23    MR. RUPP: Go ahead.
24    THE WITNESS: Can you repeat the
25 question, please?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ALEJANDRO RANGEL-LOPEZ

Page 13

1    MR. RUPP: Sure.

2   BY MR. RUPP:

3    Q. Do you have any statistical basis to --

4   for your contention that Mr. Nuci is not Latino

5   preferred?

6    A. No.

7    Q. Do you have a contention that Mr. Nuci is

8   not Latino preferred because of any political

9   party affiliation?

10    A. Affiliation, no.

11    Q. In terms of your contention that Mr. Nuci

12   is not Latino preferred, is that contention based

13   on his vote on any particular local issue?

14    A. Sorry. Please restate the question.

15    Q. Sure. In terms of your contention that

16   Mr. Nuci is not Latino preferred, is that

17   contention based on Mr. Nuci's vote on any

18   particular political issue? Or we'll strike that.

19   Let me rephrase that. I said "political issue."

20   I didn't mean to.

21    In terms of your contention that Mr. Nuci is

22   not Latino preferred, is that because of his vote

23   on any particular local issue?

24    MS. WAKNIN: Objection; form.

25    THE WITNESS: To my knowledge, no. I

Page 14

1   mean, not any particular issue that I can think of

2   at this moment.

3   BY MR. RUPP:

4    Q. And I guess my question was focused on

5   any one issue. Is there some series of issues

6   that you believe -- that lead to your conclusion

7   that Mr. Nuci is not Latino preferred?

8    MS. WAKNIN: Objection; form.

9    THE WITNESS: Yes.

10   BY MR. RUPP:

11    Q. And what are those issues?

12    A. Commissioner Nuci has social media and

13   just about public -- just public statements

14   basically that, especially from Facebook and

15   things like that, that are anti-immigrant in -- in

16   rhetoric and in -- in -- yeah, anti-immigrant in

17   -- in rhetoric and sentiment that -- and that's

18   the one that I can think of at this moment.

19   Immigration issues.

20    Q. Have there been particular immigration

21   issues that have come before the city commission

22   in which you contend he has cast a vote that is

23   contrary to the wishes of Latino voters?

24    A. No, because immigration isn't a local

25   issue.

Page 15

1    Q. In terms of your view of Mr. Nuci's

2   Facebook posts, do you have copies of any of those

3   Facebook posts?

4    A. No.

5    Q. Do you recall with particularity what Mr.

6   Nuci said in any of those Facebook posts?

7    A. Not in particular, no.

8    Q. Other than those Facebook posts, are

9   there any or is there anything else that causes

10   you to believe that Mr. Nuci is not Latino

11   preferred?

12    A. Well, there's -- there's several things,

13   but the main issue -- the main points I make is

14   that he's not a -- a visible member of the Latino

15   community. He's not -- doesn't really -- he's not

16   in -- in any like immigrant, any spaces where the

17   Latine community kind of has events and community

18   spaces and -- and things along those lines, and

19   there's -- there's just in general has never, to

20   my knowledge, done any intentional outreach,

21   especially during elections or, I mean at any

22   time, really, but to the Latine community here in

23   Dodge City. Again, that's to my knowledge.

24    Q. And -- and -- and those would be opinions

25   held by you; correct?

Page 16

1    A. Yes.

2    Q. You can't speak from personal knowledge

3   as to whether your opinions are held by any other

4   members of the Latino community; is that correct?

5    A. I can only speak for my own opinions or

6   -- yeah.

7    Q. You would certainly agree that not all

8   members of the Latino community in Dodge City

9   share the identical views on immigration issues;

10   is that correct?

11    A. Correct.

12    Q. And you would agree that only a small

13   percentage of the Latino community in Dodge City

14   is, using your words, "visible" in terms of

15   community or Latino community organizations; is

16   that correct?

17    MS. WAKNIN: Objection; form.

18    THE WITNESS: Can you please restate

19   that?

20    MR. RUPP: Sure.

21   BY MR. RUPP:

22    Q. What -- and -- and you've described that

23   you don't consider Mr. Nuci to be visible in the

24   Latino community; correct?

25    MS. WAKNIN: Objection; form.

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 17

1    THE WITNESS: Yes.
2    BY MR. RUPP:
3    Q.  What percentage of the Latino community
4  in Dodge City do you consider to be, quotes,
5  visible, end quotes, in the community?
6    A.  I don't understand that question.
7    Q.  All right.  I -- I -- what -- what -- I'm
8  trying to figure out what exactly you mean when
9  you say that somebody is not visible in -- in
10  in the Latino community, and you've described that
11  to involve active in community outreach
12  organizations, if I'm paraphrasing it correctly.
13    A.  Not necessarily just community outreach
14  organizations.  The -- I mean, spaces and
15  organizations that specifically help Latine folks
16  or that cater to Latine -- the Latine community
17  here, so that would be, I don't know, like -- what
18  would that be?  There -- sorry.
19    There's a lot of in- -- I mean, it's
20  difficult to pin down, because it's in- -- a lot
21  of it is informal.  There's not formal spaces or
22  formal organizations or anything like that.  If
23  you -- to be a member of the -- like the -- the
24  Hispanic community here, the Latine community
25  here, you -- I mean, it -- you have -- you --

Page 18

1  it's not necessarily to speak Spanish or anything
2  like that, but being at events and being at -- I
3  mean, in -- in these neighborhoods and in these
4  businesses that -- that our community frequents.
5  I -- I believe that that's what I was getting at
6  more.
7    Q.  Okay.  Can you identify an event that
8  you're talking about?
9    A.  An event?  So let's say they have
10  corraleros, which is a -- out at Rancho El
11  Nopalito, so that's a Mexican rodeo or Mexican
12  little -- like stuff like that where it's -- it's
13  at more out of the way and it's -- it's -- I
14  mean, it -- it's -- it's a if you know, you know,
15  sort of thing.  I don't know, but like, yeah, I
16  don't -- like thing -- things like that and, I
17  mean, these community spaces would be places like
18  tianguis, like the tortilleria, the panaderia, one
19  of -- one of several of them, these, I mean, in
20  areas where our community normally lives which is,
21  I mean, we tend to be clustered, which is eastern
22  -- eastern south Dodge and stuff like that.
23    Q.  In terms of visibility, Mr. Nuci has, in
24  fact, been visible enough to be elected to the
25  city commission; correct?

Page 19

1    MS. WAKNIN:  Objection; form.
2    THE WITNESS:  Yes.
3    BY MR. RUPP:
4    Q.  Now, with regard to the local elections,
5  you would certainly agree that there may be times
6  when Latino voters in Dodge City support
7  candidates for city commission who are not Latino?
8    A.  Sorry.  Please restate that question.
9    Q.  Sure.  You would agree that Latino --
10  Latino voters in Dodge City may support candidates
11  for city commission who are not Latino?
12    A.  Yes.
13    Q.  And you would certainly agree that there
14  may be times when white voters support candidates
15  who are Latino?
16    A.  Yes.
17    Q.  You would agree that the ethnicity of a
18  candidate tells us nothing about whether a
19  majority of voters in any particular -- of any
20  particular ethnicity support that candidate;
21  correct?
22    A.  Yes.
23    Q.  The allegations in this lawsuit suggest
24  that there have been five Latino preferred
25  candidates who have run for city commission since

Page 20

1  2000.  Could you identify who those five persons
2  are?
3    A.  Yeah, they're -- I mean, I don't have
4  them all memorized from the top of my head, but --
5    Q.  Tell me what you remember; who you
6  remember.
7    A.  There's Jurado.  There's --
8    THE REPORTER:  Can you say those names a
9  little slower, please?
10    THE WITNESS:  Yeah.
11    A.  There is Jurado.  There is Becky --
12  Becky, I believe her name is Sanchez, that not for
13  city commission, though.  Sorry.  Blanca Soto and,
14  yeah, I don't -- I don't have them memorized.
15  Those are the two that I -- I -- I can think of
16  at this moment.
17    BY MR. RUPP:
18    Q.  Okay.  And so Jurado and -- Fernando
19  Jurado, is that who you're talking about?
20    A.  Mm-hmm.
21    Q.  And so tell me what you know about
22  Fernando Jurado, and I apologize, I'm not from
23  Dodge City, so these are not people I'm familiar
24  with, so just tell me what you can tell me about
25  Fernando Jurado.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ALEJANDRO RANGEL-LOPEZ

Page 21

1    A.  I don't know the man.  He ran in -- in
2    2000.  I mean, yeah, when he ran, I believe it
3    was early 2000.  I was four years old.
4    **Q.  All right.**
5    A.  I don't know much about him.
6    **Q.  All right.  In terms of Fernando Jurado**
7    **and you were four years old, what do you know that**
8    **makes him Latino preferred in the time that he ran**
9    **for city commission?**
10   A.  From -- a Latino preferred candidate is,
11   I mean, what makes those people Latino preferred
12   is that they're from the community.  They worked
13   with -- closely with the community, either with an
14   organization or through a business, through a
15   business connection or whatnot within the
16   community and like either, you know, has a
17   background in helping like, I mean, yeah, has a
18   background in helping the immigrant community and
19   being involved in it, in events, like I mentioned.
20   Reaching out, direct outreach and, I mean,
21   act- -- yeah, direct outreach and actually talking
22   to the Latine community here.  I feel that that's
23   -- that's what -- that's some -- those are some of
24   the things.
25   **Q.  So in terms of Fernando Jurado, do you**

Page 22

1    **know who he ran against with the other -- who the**
2    **other candidates for city commission were?**
3    A.  No, I do not.
4    **Q.  Do you know what the issues were in that**
5    **city commission election?**
6    A.  No, I do not.
7    **Q.  Do you know how Latino voters voted among**
8    **the various candidates for that -- in that city**
9    **commission election?**
10   A.  No.
11   **Q.  The -- second person that you've**
12   **identified is Blanca Soto?**
13   A.  Yes.
14   **Q.  You do know her, I take it?**
15   A.  Yes.
16   **Q.  What can you tell us about Blanca Soto?**
17   A.  Blanca Soto, she's -- she's not -- she --
18   she came to Dodge City.  She's not originally from
19   here, but she's been -- when I first met her, I
20   know her from when I was a student in high school
21   and she was a communities and schools person at
22   Dodge City High School and -- and, yes, she -- so
23   she -- she worked in the school district and then,
24   after that, she got a position with Kansas
25   Appleseed doing like outreach, doing work for

Page 23

1    them, and now she's, I believe, back at the school
2    district doing work with the Exito program, which
3    is for like, migrant or ESL students,
4    one of the two, at the school district, so she --
5    she has a lot of background, like I said, in --
6    in these organizations that cater to the needs of
7    the Latine community or in very close proximity.
8    **Q.  And do you know what part of town she**
9    **lives in?**
10   A.  I believe she lives up north somewhere.
11   **Q.  Okay.  So she's not from the south or the**
12   **east portions of Dodge City that you've spoken**
13   **about?**
14   A.  No, not to my knowledge.
15   **Q.  Okay.  In terms of the elections that**
16   **Blanca Soto has been a candidate in, do you know**
17   **how many times she has been a candidate for city**
18   **commission election?**
19   A.  No.  I believe -- no.  No, I don't.
20   **Q.  Do you know who the other candidates were**
21   **in any of those elections?**
22   A.  In the most recent one that I remember,
23   it was -- I mean, I believe it was her, as well
24   as like at least maybe two -- two or three of the
25   -- oh, wait.  It's Chuck Taylor, Joe Nuci, and --

Page 24

1    THE REPORTER:  What was after Chuck?
2    A.  Chuck Taylor, Joe Nuci, and the -- I
3    guess Michael -- Michael Burns, I believe, is the
4    current mayor.  They were on the ballot that year
5    as well, if I'm not mistaken.
6    BY MR. RUPP:
7    **Q.  Do you know any percentage of votes cast**
8    **by or who -- who -- strike that.**
9    **Do you know how Latino voters cast their**
10   **votes in that election that involved both Blanca**
11   **Soto and Joe Nuci, among others?**
12   A.  No, no.
13   **Q.  You do know that Joe Nuci prevailed and**
14   **Blanca Soto did not?**
15   A.  Yeah.
16   **Q.  Do you know -- well, strike that.  Are**
17   **there precincts within Dodge City that you**
18   **consider to be a majority or high density Latino**
19   **precincts?**
20   MS. WAKNIN:  Objection; form.
21   BY MR. RUPP:
22   **Q.  To the best of your knowledge -- let me**
23   **rephrase it.  To the best of your knowledge, are**
24   **there high density Latino precincts in Dodge City?**
25   A.  Yes.

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ALEJANDRO RANGEL-LOPEZ

Page 25

1   Q.  Can you identify any of those, either by
2  number or by area?
3       MS. WAKNIN:  Objection; form.
4       THE WITNESS:  I'm -- these -- I don't
5  know the precinct numbers, but it's -- there's --
6  there's a precinct.  I know what they look like is
7  the thing.  I just don't know their numbers.
8       MR. RUPP:  Sure.
9       THE WITNESS:  There's a district that
10 looks, it's long and it goes from downtown to all
11 basically east -- of east Dodge and, I mean, those
12 areas that I mentioned before, of east and south
13 Dodge.  There are several precincts that are
14 Latine, that are what you described.
15      BY MR. RUPP:
16      Q.  Okay.  Do you know -- and -- and -- and
17 when you say those are high density, would you de-
18 -- strike that.
19      The precincts that you've just described by
20 area, do you consider those to be high density
21 Latino?
22      MS. WAKNIN:  Objection; form.
23      THE WITNESS:  To the best of my
24 knowledge, yes.
25      BY MR. RUPP:

Page 26

1   Q.  Okay.  And do you know whether Blanca
2  Soto received the majority vote in any of those
3  Latino -- high density Latino precincts?
4       A.  No.
5       Q.  Do you know whether -- strike that.  Are
6  you aware of any city commission elections in
7  Dodge City where the issues were such that the
8  Latino community lined up on one side of a major
9  city issue and the white community lined up on the
10 other side?
11      MS. WAKNIN:  Objection; form.
12      MR. RUPP:  Go ahead.
13      THE WITNESS:  One issue, like keep --
14 yeah, please restate that.
15      MR. RUPP:  Sure.
16      BY MR. RUPP:
17      Q.  Are you aware -- and if you're not,
18 that's fine.  I'm just trying to -- just trying to
19 get your knowledge.
20      Have there been any city commission
21 elections, to your knowledge, in which there was a
22 local issue that divided the white and the Latino
23 communities, to your knowledge?
24      A.  No, I don't know.
25      Q.  In terms of your particular experience,

Page 27

1  am I correct that you did an internship with the
2  city manager's office in Dodge City?
3       A.  Yes.
4       Q.  Tell me how that came about.
5       A.  How -- how that came about?
6       Q.  Yeah.  How'd you get -- how'd you get
7  that internship?
8       A.  I reached out to assistant city manager
9  at the time, Ernestor De La Rosa.
10      THE REPORTER:  Would you say the last
11 name again?
12      THE WITNESS:  De La Rosa.
13      BY MR. RUPP:
14      Q.  De La Rosa?
15      A.  Yes.
16      Q.  And were you a student somewhere at the
17 time?
18      A.  Yes.
19      Q.  And where were you a student?
20      A.  University of Kansas.
21      Q.  All right.  What was -- what was your
22 major at the University of Kansas?
23      A.  I majored in public administration and
24 political science.
25      Q.  And did you obtain a degree there?

Page 28

1   A.  Yes.
2   Q.  And when did you obtain a degree?
3   A.  I got my Bachelor of Arts in public
4  administration and political science.
5   Q.  And when?
6   A.  August of 2022.
7   Q.  Congratulations.  And what year was the
8  internship?
9   A.  20 -- 2022.
10  Q.  Okay.  So that was the same summer that
11 you ultimately graduated in?
12  A.  Yes.
13  Q.  And did you interview for the internship
14 position?
15  A.  Yes.
16  Q.  And with whom did you interview?
17  A.  I interviewed with -- it was, I believe,
18 with Ernestor and Nick, and I don't remember if
19 Melissa McCoy was there, but I know that Nick and
20 Ernestor were -- were -- were there.
21      THE REPORTER:  And what was the other
22 name?
23      MR. RUPP:  Ernesto.
24      THE WITNESS:  Ernestor.
25      BY MR. RUPP:

# ALEJANDRO RANGEL-LOPEZ

Page 29

1    Q.  All right.  And so the -- so -- so to
2    help understand the folks you're talking about,
3    Ernestor De La Rosa was the assistant city manager
4    at the time; is that correct?
5        A.  Yes.
6        Q.  And the city manager was Nick Hernandez;
7    is that correct?
8        A.  Yes.
9        Q.  And both Nick Hernandez and Ernestor De
10   La Rosa were members or were -- were Hispanic;
11   correct?
12       A.  Yes.
13       Q.  Did they approve of you for -- for the
14   internship?
15       A.  Yes.
16       Q.  And then you did -- did you work in the
17   city manager's office during that internship?
18       A.  Yes.
19       Q.  So what were your job responsibilities
20   during that internship?
21       A.  I was an administrative intern.  My
22   duties were to assist the assistant city manager
23   and the assistant city managers with projects, but
24   mainly, I helped Ernestor De La Rosa.  I worked
25   with Ernestor De La Rosa on projects related to

Page 30

1    the International Festival and the Cultural
2    Relations Advisory Board, as well as -- yeah, just
3    -- yeah, so that -- I mean, a lot of things, but
4    those are -- those were my main responsibilities.
5    Yeah.
6        Q.  And let's just -- let's talk a little bit
7    about each of those.  What was the International
8    Festival?
9        A.  The International Festival is a yearly
10   festival held here in downtown Dodge where
11   celebrating Welcoming Day and Welcoming Week.  It
12   was started in, I believe, like '20, 2019,
13   and then skipped 2020.  It doesn't matter, but --
14   but yeah, it's just a festival, a downtown
15   festival, where they have food trucks and
16   community organizations come down for a -- for an
17   afternoon.
18       Q.  And in terms of you did mention that it
19   skipped 2020, was that because of Covid?
20       A.  Yes.
21       Q.  Okay.  In terms of Welcoming Day, who
22   support -- I mean, what organizations support
23   Welcoming Day?
24       A.  Main Street Dodge City, City of Dodge
25   City, Chamber of Commerce, and there are community

Page 31

1    -- other community organizations also that are
2    involved in sponsoring.
3        Q.  And what is Welcoming Week?
4        A.  Welcoming Week is a broader -- it's a --
5    it's a bigger thing.  It's a -- it's part of a --
6    it's a program by Welcoming America, which is I
7    believe how they -- how it first came about was,
8    yeah, welcoming.  It's just a week of welcoming
9    people from -- immigrants and people from all
10   different backgrounds, and it's celebrated.  I
11   mean, it's a -- it's a national thing, because
12   it's a national organization.
13       Q.  And the City of Dodge City participates
14   in that?
15       A.  Yes.
16       Q.  And, in fact, that was part of -- part of
17   what you participated in, in your role as an
18   intern; correct?
19       A.  Yes.
20       Q.  Okay.  And were you pleased with the
21   opportunity to be involved in that -- that
22   festival?
23       A.  Yeah.
24       Q.  And pleased with the opportunity to work
25   with Mr. De La Rosa in that regard?

Page 32

1        A.  Yeah.
2        Q.  I assume you found Mr. De La Rosa to be
3    welcoming to the Hispanic community?
4        A.  Yes.
5        Q.  And active in -- in -- in trying to be
6    helpful to the Hispanic community?
7        A.  Yes.
8        Q.  And I assume that you found the same for
9    Mr. Hernandez?
10       A.  Yes.
11       Q.  Tell us about the cultural relations
12   board.
13       A.  The Cultural Relations Advisory Board is
14   a -- is a, yeah, a committee, a standing committee
15   of -- of the City of Dodge City to advise it on
16   cultural issues and host cultural events and
17   things along -- things related to our -- our,
18   yeah, our multicultural community, basically.  So
19   they -- they host, like I mentioned, an
20   International Festival and, among other things,
21   but they -- yeah, they also worked on a -- a
22   welcoming report that was -- that I was also
23   involved in prior to being -- prior to joining the
24   City as an intern.
25       Q.  And so the welcoming report, describe

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

Page 33

1  what that is.
2     A.   The -- yeah. So the welcoming report was
3  -- it's a -- a series of recommendations made and
4  through -- made through a process of -- I mean,
5  there was a standing committee of -- for the
6  welcoming plan in the Cultural Relations Advisory
7  Board that made up of people from members of the
8  community, from the -- that worked closely with
9  the -- the immigrant community or are a part of it
10  themselves.
11     So, yeah, so they met over the course of
12  about a year and then brought these
13  recommendations forward to the city commission,
14  and it's a plan that is supposed to provide an
15  outline for how to better welcome people and --
16  and to help them stay in Dodge City.
17     **Q.   Were you pleased with the opportunity to**
18  **work with that Cultural Relations Advisory Board?**
19     A.   Oh, yes.
20     **Q.   And what made you pleased for that**
21  **opportunity?**
22     A.   Because it's -- I mean, it's -- for me, I
23  felt it was a chance to be -- I mean, it was --
24  it was a -- 'cause I -- I'm more familiar with
25  nonprofit work, so it was a nice -- it was nice

Page 34

1  to, I guess, be a part of something other than --
2  other than -- sorry. Let me rephrase that, I
3  guess.
4     It was nice to like be in a -- in a space
5  that is meant where -- I mean, the -- I really --
6  I really love -- I was -- yeah, I really love
7  like working on diversity, equity, inclusion
8  issues and on, on the Cultural Relations Advisory
9  Board, it's one of the few ways to kind of do
10  that here and I -- and help directly influence
11  policy related to the community that I'm a part
12  of.
13     **Q.   What was your -- so -- so take this back.**
14  **Were you involved in the Cultural Relations**
15  **Advisory Board before becoming an intern?**
16     A.   Yes.
17     **Q.   So tell us about your involvement before**
18  **becoming an intern.**
19     A.   Well, it was -- I was a member of the
20  steering committee for the welcoming plan for the
21  Cultural Relations Advisory Board.
22     **Q.   And did you have a part in writing the**
23  **report?**
24     A.   Writing the report itself, no.
25     **Q.   Okay. Did you -- who was the primary**

Page 35

1  scrivener of the report, if there was a primary
2  person who wrote it?
3     A.   Well, that's the thing. It was, towards
4  the end, it got kind of hot potatoed, but it was
5  Kate Schieferecke at first and then I believe -- I
6  don't know if she finished out the report or it
7  was someone else who did it. I don't know who
8  wrote the -- who wrote the final report.
9     **Q.   Did you support the final report as**
10  **written?**
11     A.   As written, no.
12     **Q.   Okay. Did you report -- support the**
13  **final report or the -- did you support the report**
14  **as drafted?**
15     A.   That's -- no.
16     **Q.   Okay. What was it about the report that**
17  **you did not like or did not -- strike that. You**
18  **said -- let me rephrase the question. What was it**
19  **about the report that you did not support?**
20     A.   It wasn't necessarily that I didn't
21  support the -- I -- I -- I -- I think the report
22  is well intentioned. However, there were a --
23  there were things that were omitted that were
24  discussed in -- in these meetings among the group
25  related to, I mean, just structural -- structural

Page 36

1  issues that could -- that we could address and --
2  and help to make things more equitable for our
3  immigrant community here, and I just felt like a
4  lot of it was watered down to not piss off the --
5  I mean, the city commission. We were very aware
6  that a welcoming plan is -- was -- was a -- is a
7  lot, and like a -- something -- yeah, it's a --
8  it's a larger endeavor that is directly tied to a
9  very salient issue, and I don't know. It was --
10  it was watered down a lot, so that we -- it would
11  pass the city commission.
12     **Q.   Now, in terms of the committee, who was**
13  **the chair of the committee?**
14     A.   The chair? I'm not -- I don't know.
15     **Q.   All right. Let me -- let me ask it a**
16  **different. Typically, with a committee, somebody**
17  **runs the meeting. Was there somebody who ran the**
18  **meetings?**
19     A.   Yes. It was typically Ernestor or Kate
20  Schieferecke.
21     **Q.   And were there any other persons who**
22  **conducted the meetings?**
23     A.   Probably. I don't remember, though.
24     **Q.   Okay. And in terms of that committee,**
25  **were any city commissioners on that committee?**



Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ALEJANDRO RANGEL-LOPEZ

Page 37

1    A.  No, not to my knowledge.  It's a -- it's
2  a committee for residents.  It's so that the
3  commission can hear from residents.  I don't
4  believe a commissioner was a member of that body,
5  aside from Blanca, maybe, when she was appointed.
6  I'm not sure, though.
7    Q.  And in terms of reaching the final
8  recommendations, was there a process by which that
9  committee reached its recommendations?
10    A.  Yes.  We -- yes, there was.
11    Q.  And what was that process?
12    A.  Well, really, it was -- there were
13  various stages.  However, there -- there was -- so
14  at the beginning, it was -- it's a -- I mean,
15  they brought together other members of the -- the
16  standing committee were folks who work in -- in
17  this field or work directly with -- with the
18  Hispanic and Latine community.  Sorry.  Can you
19  restate the question?
20    Q.  Yeah.  I think the question was -- and I
21  may not rephrase it exactly as I phrased it the
22  first time, but the gist of it was how did it
23  reach its conclusions?  What was the process?
24    A.  Yeah.  So they brought two other
25  stakeholders who work in this -- in -- who work

Page 38

1  with the Latine community, so these were people
2  from -- I mean, I'm not going to list them off,
3  because there are a lot of people there, but they
4  spoke with -- I spoke with them and we tackled
5  issues by topic, really, related to, I mean, okay.
6  Government, school, health care, like -- like,
7  yeah, health and environment.  Just stuff like
8  that.  Those might not have been the exact like
9  phrasing that they used, but yeah, we -- we went
10  topic -- I mean, sub -- topic by topic and really
11  kind of, okay.  So here's -- so okay.  Health
12  care.  What are some health care challenges?  We
13  looked at both strengths and weaknesses.
14    Q.  So -- so I'm going to interrupt you just
15  for a second.  I'm assuming that what you're
16  talking about is some form of a brainstorming
17  session; is that correct?
18    A.  Well, this was over the course of a year.
19  I mean, we had -- we met about once a month or so
20  over the course of a -- or of the -- of 2020,
21  into 2021, I believe, but yeah, it was -- and then
22  there was -- there's also a survey session and --
23  and then -- and then another session after that to
24  look over the results and then finalize like
25  recommendations and the report itself.

Page 39

1    Q.  Okay.  In terms of the earlier sessions
2  that you indicated over the course of a year or so
3  to brainstorm ideas, for lack of a better word,
4  was there somebody who was facilitating those
5  discussions?
6    A.  Yes.
7    Q.  And who was that?
8    A.  The -- I mean, the -- I mean, it's Kate
9  Schieferecke or Ernestor De La Rosa.
10    Q.  Okay.  And then in terms of shepherding
11  the final report, who -- who -- who did that?
12    A.  I'm not sure.
13    Q.  The -- you indicated that you were
14  involved before your time as an intern with the
15  City.  Once you became an intern of the City, what
16  was your role with regard to the Cultural
17  Relations Advisory Board?
18    A.  My role prior to being an intern?
19    Q.  No.  After you became an intern, what did
20  you do?
21    A.  Oh, I sat in on -- on meetings and took
22  -- took minutes, took notes.  I -- I mean, what
23  was at the time that summer, there was a -- so I
24  also helped with the citizenship ceremony.  I
25  helped Ernestor with that, and that was also part

Page 40

1  of the Cultural Relations Advisory Board, but a
2  lot of it was International Festival related, so I
3  helped come up with the -- the materials for -- so
4  the stuff that we would give out to sponsors or
5  potential sponsors, all those forms.  All those --
6  you know, all the forms for the vendors and the
7  nonprofits and stuff like that to come and sign up
8  to be at the International Festival.
9    I worked on like visual stuff for it.  I --
10  and I also did some work on the -- there was the
11  Welcoming Dodge City Facebook page.  I helped take
12  care of that for -- for -- and get it ready for
13  International Festival.  So, yeah, it was -- those
14  were my main duties there, basically.
15    Q.  In terms of the -- the minutes you kept
16  for the Cultural Relations Advisory Board, that's
17  who it was for; is that correct?
18    A.  Yeah.
19    Q.  Yes?  And what kind of a meeting?  Was it
20  that board meeting that you kept the minutes of?
21    MS. WAKNIN:  Objection; form.
22    BY MR. RUPP:
23    Q.  Just help me out.  What -- what -- what
24  meetings did you keep minutes of?
25    A.  Yeah, it was the Cultural Relations



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 41

1 Advisory Board meetings.
2 **Q. Okay. And how often did those occur?**
3 A. Oh, pretty -- well, I -- every -- I think
4 they're monthly meetings, every other week, every
5 two weeks. It felt like every two weeks, we had
6 a meeting, but that -- that might have not -- I
7 don't know, yeah. I think -- I think it was
8 every two weeks. I'm not sure, though.
9 **Q. Okay. So in terms of you also described**
10 **the citizenship ceremony, is this a -- when**
11 **citizens or folks who are not born in the United**
12 **States are sworn in to be citizens of the United**
13 **States?**
14 A. Correct. There was a ceremony held at
15 the local conference center here.
16 **Q. And was that conducted by one of the**
17 **Kansas federal judges?**
18 A. Yes.
19 **Q. And do you recall which judge that was?**
20 A. No, I don't.
21 **Q. And that was held in Dodge City in the**
22 **year -- the summer that you were an intern; is**
23 **that correct?**
24 A. Mm-hmm.
25 **Q. You have to answer audibly.**

Page 42

1 A. Yes.
2 **Q. And what was the role of the City with**
3 **regard to that citizenship ceremony?**
4 A. Well, Ernestor -- I mean, Ernestor, the
5 city -- I mean, the city -- assistant city
6 manager, he -- I mean, it was -- it's his -- it's
7 a public venue and also, it was largely organized
8 by Ernestor and the -- and his efforts there, his
9 -- his contacts with the USCIS and -- and whatnot.
10 **Q. I take it from the descriptions that you**
11 **have given that there are multiple -- or strike**
12 **that.**
13 **In terms of leadership in the community,**
14 **you've described that Nick Hernandez is Hispanic**
15 **and is the city manager; correct?**
16 MS. WAKNIN: Objection; form.
17 MR. RUPP: Go ahead.
18 THE WITNESS: Yes.
19 BY MR. RUPP:
20 **Q. And you've described that Ernestor De La**
21 **Rosa was the assistant city manager and he is**
22 **Hispanic; correct?**
23 A. Yes.
24 **Q. What about -- and -- and you've described**
25 **in terms of the Cultural Relations Advisory Board.**

Page 43

1 **Would you consider the members of that advisory**
2 **board to be leaders in the community?**
3 A. Yes.
4 **Q. In terms of your internship, did you have**
5 **any interactions with the city commissioners?**
6 A. Every once in a while, I met them at a
7 city commission meeting and they would come in to
8 grab their -- their -- I mean, any -- any stuff
9 for the city commission meeting, because the files
10 for the commissioners were right by my desk at the
11 time, but yeah. Not too often, though.
12 **Q. Okay. At any time while you were an**
13 **intern, were there any issues before the city**
14 **commission in which there was a divisive issue**
15 **between the Latino community and the white**
16 **community?**
17 A. No.
18 **Q. At any time while you were a -- an**
19 **intern, did you have any interactions with -- or**
20 **strike that.**
21 **At any time while you were an intern, did you**
22 **prepare any reports for the City on the form of**
23 **government?**
24 A. On -- reports? No.
25 **Q. Did you have any interactions with the**

Page 44

1 **city manager regarding the form of government?**
2 A. Not with the city manager, no.
3 **Q. Did you have any interactions with the**
4 **city commission regarding the form of government?**
5 A. Not, no.
6 **Q. While you were there, did any citizens,**
7 **to your knowledge, complain to the City about the**
8 **form of government?**
9 A. During my internship?
10 **Q. During your internship.**
11 A. No.
12 **Q. Did you have any -- while you were there,**
13 **did any public interest groups come to the City**
14 **about the form of government?**
15 A. No.
16 **Q. In terms of your involvement with the**
17 **Cultural Relations Advisory Board, did they make**
18 **any recommendations about the form of government?**
19 A. No, those recommendations were left off.
20 **Q. Okay. What recommendations did the**
21 **cultural advisory committee consider pertaining to**
22 **the form of government?**
23 A. Well, I -- are -- okay. So is this still
24 during my internship or is this the steering
25 committee?

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 45

1    Q.  All right.  Let's -- let's take it for
2  the -- that's a good question and I -- my question
3  wasn't clear, so let's -- let's -- let's walk
4  through -- through the entirety of the time,
5  first, and then we'll narrow it down, but during
6  the entirety of the time that you were on the
7  Cultural Relations Advisory Board, were there
8  discussions before that board about the form of
9  government?
10    A.  I'm sorry.  Is -- so I'm still not
11  understanding what -- whether this is the steering
12  committee or the Cultural Relations Advisory Board
13  while I was an intern.
14    Q.  It's the whole time, so --
15    A.  Whole time?
16    Q.  -- so from beginning to -- steering
17  committee to end.
18    A.  Yeah.
19    Q.  So at any point in that continuum.
20    A.  Yes, where they -- yes, it was -- it was
21  brought up.
22    Q.  Okay.  So when was it brought up, to the
23  best of your recollection?  I'm not looking for
24  the specific date.  I'm just looking for general.
25    A.  It --

Page 46

1    MS. WAKNIN:  Objection; form.
2    THE WITNESS:  I brought it up while I was
3  a member of the steering committee, and it was
4  earlier in the process, I believe.  I -- it was
5  in 20 -- the year 2021, I know that.  I don't
6  know when, specifically.
7    BY MR. RUPP:
8    Q.  Okay.  Was this at a -- did you bring
9  this up at a meeting or in a brainstorming
10  session?  What was the context in which you
11  brought it up?
12    MS. WAKNIN:  Objection; form.
13    THE WITNESS:  We were bringing -- we were
14  discussing strengths and weaknesses in the -- in
15  -- in these fields or in these -- in these areas
16  that we were looking at, and while we were looking
17  at -- discussing weaknesses, I brought up our --
18  the way that the City runs its elections.
19    BY MR. RUPP:
20    Q.  And to whom did you bring this up?
21    A.  I brought this up during the meeting to
22  the entire group.
23    Q.  And do you recall approximately how many
24  people were in attendance?  Did it constitute the
25  entire group at that meeting?

Page 47

1    A.  It was -- no, I don't have an exact
2  number.  I don't know, but most -- most members, I
3  believe, were in attendance.
4    Q.  Okay.  And if most members were in
5  attendance, do you have any idea how many that
6  would be?
7    A.  No, I don't remember the number of people
8  who were on that committee.
9    Q.  Okay.  Now, in terms of the time you
10  brought it up, was this in a time -- at a time
11  where the report was being written or was this in
12  a time before the report was being written?
13    MS. WAKNIN:  Objection; form.
14    THE WITNESS:  This was before.
15    BY MR. RUPP:
16    Q.  Okay.  And having not been at those
17  meetings, but having been in a number of -- of
18  similar meetings in various groups over the course
19  of time, the -- there are times where people are
20  asked to brainstorm and throw out ideas that they
21  think might be beneficial to the City, then
22  somebody might take a note on a board or a -- a
23  flow or some sort of a document or in a computer
24  or -- or whatever.  Was there somebody doing that
25  on the night or the day that you made that

Page 48

1  recommendation?
2    MS. WAKNIN:  Objection; form.
3    THE WITNESS:  Yes, there was someone
4  taking notes of what we were discussing.
5    BY MR. RUPP:
6    Q.  Okay.  And who was that person?
7    A.  I believe that was Kate Schieferecke.
8    Q.  Okay.  And was this in a setting where
9  folks were brainstorming or were they making
10  recommendations that the following provision ought
11  to be included in a report?
12    What -- I'm just trying to get -- trying to
13  get as much context for what was going on at the
14  time that you made -- you made your comment.
15    MS. WAKNIN:  Objection; form.  Objection;
16  compound.
17    THE WITNESS:  Can you restate that
18  question?
19    MR. RUPP:  Sure.
20    BY MR. RUPP:
21    Q.  What can you tell me about the context of
22  your comments?
23    MS. WAKNIN:  Objection; form.
24    THE WITNESS:  Yes, we were discussing --
25  it was -- all I -- what I remember is that it was



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ALEJANDRO RANGEL-LOPEZ

Page 49

1  a -- a discussion on these strengths and
2  weaknesses and as other members -- as members of
3  the committee were stakeholders, so there were
4  people from the school district.  There were
5  people from various community organizations and
6  from the City and -- and health care organizations
7  and whatnot, so we were all talking about what
8  kind of things should be included or talked about
9  in the report and, in this discussion, I brought
10 up the way that Dodge City runs its elections, and
11 we had a -- I believe -- it was at least a
12 five-minute discussion, but I don't remember how
13 long exactly, but yeah, that was the context.
14     BY MR. RUPP:
15     Q.  All right.  And you've mentioned Kate
16 several times.  Who is -- who is Kate?  What does
17 she do?
18     A.  She was a -- I forgot her official title,
19 but was a -- like a community liaison, sort of,
20 for Lead for America, which was -- which is a --
21 another nonprofit that the -- that the City
22 partnered with to -- or it wasn't -- it was the
23 City and Catholic Charities, also.  I'm not sure
24 who the partner there is kind of mixed up but,
25 yeah, the -- it was -- wait.  Sorry.  Where was

Page 50

1  I?  Yeah.
2     Q.  My question had to do with who Kate is.
3     A.  Yeah, no, yeah.  So Kate was the
4  community liaison person for Lead for America.
5     Q.  All right.  And so Kate was not a City
6  employee; correct?
7     A.  No.
8     Q.  That is correct?
9     A.  Yes; that is correct.
10    Q.  Okay.  And Kate was not part of the city
11 commission; correct?
12    A.  No.
13    Q.  That is correct?
14    A.  That is correct.
15    Q.  All right.  And in terms of this -- your
16 comments to -- to the -- to this group, you
17 indicated it was a five-minute discussion;
18 correct?
19        MS. WAKNIN:  Objection; form.
20        THE WITNESS:  It was at least five
21 minutes.  I don't -- I don't know the exact amount
22 of time we spent on the topic.
23     BY MR. RUPP:
24     Q.  Okay.  At -- at one of the meetings of
25 the cultural advisory committee; correct?

Page 51

1     A.  A cultural related -- Cultural Relations
2  Advisory Board steering committee meeting, yes.
3     Q.  Okay.  And the cultural relations
4  steering committee met regularly; correct?
5     A.  Yes.
6     Q.  Okay.  Do you recall anyone else at that
7  Cultural Relations Advisory Committee, other than
8  yourself, proposing a change to the form of
9  government?
10    A.  Anyone else on the committee, no, not
11 proposing.
12    Q.  What specific discussions and by whom do
13 you recall when you raised the issue?
14        MS. WAKNIN:  Objection; form.  Objection;
15 compound.
16        THE WITNESS:  Who -- who?
17     BY MR. RUPP:
18     Q.  Let's start with do you recall anyone
19 else discussing the issue after you brought it up?
20     A.  Yeah, there was a discussion that I
21 remember Gloria.  Like I don't know why I can't
22 remember her last name right now, but she works
23 with Genesis Family Health here, and there were
24 other people who also chimed in, because they were
25 curious about what -- what I was -- what we were

Page 52

1  discussing, 'cause it's not -- you know, 'cause
2  it's a -- it's not really a widely known thing,
3  not widely known topic or any -- any -- I mean,
4  election law, election procedure.
5     Q.  Okay.  So were they asking questions?
6  Were other folks asking questions?  Is that what
7  you recall?
8     A.  Asking questions and also discussing how
9  these -- how there are systemic challenges in
10 achieving Latine representation.
11    Q.  And what were the systemic challenges
12 that you recall them discussing?
13    A.  I mean, we discussed the at-large
14 election system and how the -- how that affects
15 minority and Latine turnout in -- in local
16 elections and, overall, just like why.  It was in
17 a bigger discussion to why don't people vote?  Why
18 don't -- why doesn't the Hispanic community vote
19 and is high numbers, and that was also part of the
20 -- the conversation, because it's a -- there are
21 systemic challenges.
22    Q.  And I assume that there were other topics
23 other than at-large elections that were discussed;
24 is that correct?
25    A.  Yes.

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ALEJANDRO RANGEL-LOPEZ

Page 53

1    Q.  Other challenges for -- for Latine
2    turnout; is that correct?
3        A.  Yes; not necessarily just turnout.  I
4    mean, this is a welcoming plan, so it was systemic
5    issues related to how they are -- how they are
6    able to, you know, get -- I mean, get -- I don't
7    like this word, get assimilated into the
8    community, but get more -- I mean, more well --
9    more integrated and, yeah, so it was just systemic
10   challenges all around and health care and -- and
11   -- and systems of governance and -- and whatnot.
12       Q.  I would assume that over the course of
13   the many months of the steering committee, that
14   multiple topics were -- were brainstormed; is that
15   correct?
16       A.  Yes.
17       Q.  And not all of those topics made it into
18   the report recommended to the city commission;
19   correct?
20       A.  Yes.
21       Q.  The committee determined what ones the
22   majority of the committee wanted to present to the
23   city commission; is that correct?
24       A.  The majority of the committee wanted to
25   -- sorry.

Page 54

1    Q.  Strike that.  They -- they ultimately the
2    -- the community relations advisory board agreed
3    on a -- a report to be submitted to the city
4    commission; correct?
5        A.  Yeah.
6        Q.  Now, in your discussions within the
7    community advisory -- relations advisory board,
8    you indicated that most people really weren't
9    familiar with the question of at-large elections
10   within the City of Dodge City; is that correct?
11       MS. WAKNIN:  Objection; form.
12       THE WITNESS:  Yes.
13   BY MR. RUPP:
14       Q.  At any time that you are aware of, has
15   there been a widespread community movement in
16   Dodge City to change the form of government within
17   Dodge City?
18       MS. WAKNIN:  Objection; form.
19       THE WITNESS:  Not -- no, not to my
20   knowledge.
21   BY MR. RUPP:
22       Q.  In the time that you were an intern with
23   the City of Dodge City, did you ever make a
24   proposal to the city commission or to the city
25   manager to change the form of government within

Page 55

1    the City of Dodge City?
2        A.  As an intern, no.
3        Q.  Okay.  At any point other than -- I mean,
4    strike that.  Let me broaden the time frame.
5        Other than through this lawsuit, have you
6    ever proposed to the City of Dodge City changing
7    the form of government?
8        A.  Other than through this lawsuit?  Yeah.
9    Yeah, I mean, I worked with -- with the Cultural
10   Relations Advisory Board, and that -- that --
11   that's also when it came up and when -- yeah, and
12   Ernestor was also -- has been aware of this as an
13   issue or as an issue of concern since, I mean, for
14   -- for a bit, I mean, since the -- the -- the
15   report was released that we put out.
16       Q.  Okay.  So I'm going to take you back and
17   after we get through this topic, we'll take a
18   little break.  In terms of the -- the times you've
19   brought this up, you've described a conversation
20   that you had at a Cultural Relations Advisory
21   Board meeting that lasted at least five minutes;
22   correct?
23       MS. WAKNIN:  Objection; form.
24       THE WITNESS:  Yes.
25   BY MR. RUPP:

Page 56

1    Q.  Okay.  Is there any other time in a
2    public setting where you've raised the issue of
3    at-large elections in the City of Dodge City?
4        A.  No, that I can remember.
5        Q.  Is there any other time where you heard
6    any groups or organizations within the City of
7    Dodge City calling for a change in the form of
8    government?
9        A.  Any other group?  Any groups, no.
10       Q.  Okay.  And you indicated that Ernestor De
11   La Rosa was aware of this issue.  Tell me what
12   you mean.
13       A.  He was present at the -- at a town hall
14   presentation we had for the report, the release of
15   the -- the report on at-large districts, and that
16   was -- so, yeah, that was when it was released in
17   2021, and he -- yeah, he attended the zoom -- zoom
18   webinar.
19       Q.  And that was a different report than the
20   cultural relations advisory report; is that
21   correct?
22       A.  Yes, that is a different report.
23       Q.  That is the New Frontiers report that
24   we're going to go over here in a little bit; is
25   that correct?

Appino & Biggs Reporting Service, Inc.    5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604    Suite 101    Suite 305
785-273-3063    Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com    913-383-1131    316-201-1612
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 57

1    A.  Yes.
2        MR. RUPP:  All right.  Why don't we take
3  a -- how long do you want?
4        MS. WAKNIN:  Probably 10 minutes.
5        MR. RUPP:  10-minute break will be fine.
6        THE VIDEOGRAPHER:  It is 10:42 a.m.
7  We're going off the record.
8        (THEREUPON, a break was then taken.)
9        THE VIDEOGRAPHER:  It is 10:59 a.m.
10  We're back on the record.
11       BY MR. RUPP:
12       Q.  Earlier, we asked you at various time
13  frames about conversations you had had with the
14  city manager or the city commission about the form
15  of government, and I just want to make sure,
16  because I sometimes limited those questions to the
17  time that you were an intern, so I'm going to ask
18  you some of those same questions on a broader time
19  frame.
20       At any point in time, have you had a
21  conversation with any of the city commissioners
22  about the form of government?
23       MS. WAKNIN:  Objection; form.
24       THE WITNESS:  Not the current
25  commissioners, no.

Page 58

1    BY MR. RUPP:
2    Q.  And at any point in time, have you had
3  any conversations with any former commissioners
4  about the form of government?
5    A.  Yes.
6    Q.  And who would that be?
7    A.  Former commissioner Jan Scoggins.
8    Q.  Anyone else?
9    A.  And I -- we -- Blanca Soto and I had a, I
10  believe, a brief conversation about it.  I'm not
11  sure if it was while she was a city commissioner,
12  though.
13       Q.  And I'm going to go through the list here
14  and then I'm going to come back to these
15  conversations.  At any point in time, have you had
16  any conversations with the current or any prior
17  city managers of the City of Dodge City pertaining
18  to the form of government?
19       A.  City managers, no.
20       Q.  Okay.  Other than the one conversation
21  where you indicated Mr. De La Rosa was present,
22  have you had any conversations with any assistant
23  city managers, present or past, about the form of
24  government in Dodge City?
25       A.  Yes.

Page 59

1    Q.  With whom?
2    A.  Oh, wait.  Present or past?  Yeah, just
3  Ernestor would be the only one.
4    Q.  In terms of your conversation -- so
5  strike that.
6        How many conversations have you had with Jan
7  Scoggins about -- strike that.  I'm going to
8  rephrase the question.
9        And with regard to form of government, you
10  understand I'm also talking about at-large
11  elections; correct?
12       A.  Yes.
13       Q.  Okay.  And in terms of Jan Scoggins, how
14  many conversations can you recall having with Ms.
15  Scoggins about the form of government?
16       A.  At -- I'm -- I don't know.  I don't have
17  an exact number, but at -- at least three times.
18  It's -- it's something that comes up regularly
19  with -- I mean, with -- I mean, it came up
20  regularly at the time with -- with the folks like
21  Jan Scoggins and stuff like that who made me aware
22  of the issue to begin with.
23       Q.  Were -- was this as part of a group of
24  some sort?
25       A.  The conversations with Jan Scoggins?

Page 60

1    Q.  Yes.
2    A.  Some of them.  Again, I can't recall
3  which of them were with a group and which were
4  individual, but this is something that has come up
5  several times with the conversations with Jan
6  Scoggins.
7    Q.  What in particular -- you said that she
8  made you aware of this issue; is that correct?
9    A.  Well, she -- not her directly.
10   Q.  Okay.
11   A.  But --
12   Q.  Tell me how you became aware of this
13  issue.  Let's start with that.
14       A.  I first became aware of the at-large
15  election system when, back when I was 17, at a --
16  yeah, when I was 17, from -- at a meeting.
17       Q.  And what kind of a meeting was that?
18       A.  I went with my friends to a Ford County
19  Democrats meeting, and that was one of the things
20  that we talked about in an aside with Johnny
21  Dunlap, who was the Ford County Chair at the time.
22       Q.  And when you say "in an aside," I assume
23  that means not in a regular meeting, but in a side
24  conversation.  Is that what you mean?
25       A.  Yes.

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ALEJANDRO RANGEL-LOPEZ

Page 61

1  **Q. Okay. And I take it that the Ford County**
2  **democratic party did not take a public issue on**
3  **the form of government; is that correct?**
4  A. Well, no, not -- not at the time, no.
5  It's -- I mean, yeah, Ford County democratic party
6  doesn't really have a -- a -- well, I mean, at
7  the time, did not have issues that they worked on,
8  but yes, that was -- I mean, it is more of like
9  Johnny -- Johnny Dunlap would -- Johnny Dunlap
10  would talk to anyone who would hear him out on it,
11  basically, and that's -- that's how it -- that's
12  how I was made aware of it, and then I did my own
13  -- I started looking into it more on my own.
14  **Q. In looking into it more on your own, how**
15  **did you become involved in conversations with Jan**
16  **Scoggins about this topic?**
17  A. I mean, Jan Scoggins was a regular --
18  was, yeah, was a regular attendee of those
19  meetings, of the -- those Ford County Democrats
20  meetings and, I mean, she was aware of the issue
21  along with side me because of conversations with
22  Johnny, I believe. So, yeah, it was at those
23  meetings and also during other conversations when
24  I helped out her -- helped out on her campaign for
25  state representative one year.

Page 62

1  **Q. And what do you recall Ms. Scoggins**
2  **saying about at-large elections in Dodge City?**
3  A. What -- I mean, she -- she brought up the
4  issue at a -- I mean, before she left the city
5  commission, and discussed it, she -- I can't speak
6  for -- I don't know what -- I can't speak for
7  her, but she's generally in favor of having, yeah,
8  neighborhood districts.
9  **Q. And I guess I'm not asking you to speak**
10  **for her. I just am curious what -- what it is**
11  **that you recall that she specifically told you on**
12  **this issue.**
13  A. Specifically, nothing. I mean, just
14  she's in -- that she's -- she's a supporter of
15  changing the way we elect our city commissioners.
16  **Q. Okay. At some point, you decided to get**
17  **involved in litigation over this issue; is that**
18  **correct?**
19  A. Yes.
20  **Q. Did you seek out counsel or did someone**
21  **seek you out?**
22  MS. WAKNIN: I'm going to object to the
23  extent this question may call for any attorney-
24  client privileged information. Mr. Rangel-Lopez,
25  you can answer if you do not disclose any

Page 63

1  attorney-client communications.
2  THE WITNESS: Can you restate the
3  question?
4  MR. RUPP: Sure.
5  BY MR. RUPP:
6  **Q. And I'm -- to be clear, I'm not asking**
7  **you to disclose any communications you had with**
8  **any attorney. I'm simply asking you, did you --**
9  **did you seek out counsel or did someone seek you**
10  **out to be a plaintiff in this lawsuit?**
11  A. I -- I -- I didn't -- I don't -- I don't
12  -- I don't know how to answer that question. I
13  mean, I -- I didn't -- it was -- you know, I
14  don't -- I -- to the best of my knowledge, I was
15  -- I was in contact with like it was just while
16  writing the report, there was just like contacts
17  with working on -- on people -- I mean, groups
18  working on this issue, but even before then, I was
19  aware of this, so it was -- I don't know. It's
20  like asking if the chicken or the egg came first.
21  I don't -- like I'm very -- I don't know. I
22  didn't seek out counsel, really.
23  **Q. Did you -- I guess how did you first come**
24  **into contact with a lawyer about potentially**
25  **bringing the lawsuit that we have today? Once**

Page 64

1  again, I'm not asking you what you said to the
2  lawyer.
3  A. Mm-hmm.
4  **Q. I'm just asking you how you came in**
5  **contact with the lawyer.**
6  A. How I came in contact with the lawyer?
7  It was through a -- it was in 20 -- 2020, and I
8  mean, I'm in contact with lawyers a lot just
9  because of the nature of my work and the field
10  that I'm in, but I -- I -- it was a meeting. It
11  was -- so it was someone -- so I was just some --
12  I was talking -- I was connected with lawyers just
13  with -- it was in -- I can't remember the exact
14  time line. I don't. It was in 2020 and I met
15  with -- met with a lawyer who -- and talked about
16  the situation in Dodge and -- and what it's like
17  here, and they just wanted to get more background.
18  **Q. Okay.**
19  A. And I -- I talked -- talked to him about
20  that.
21  **Q. And who is the lawyer?**
22  A. Who -- who was the lawyer?
23  **Q. Mm-hmm.**
24  A. It was Sonni and -- Sonni and someone
25  from the ACLU of Kansas.


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ALEJANDRO RANGEL-LOPEZ

Page 65

1    Q.  Did you first contact the ACLU or did
2  someone put you in contact with the ACLU?
3    A.  I was already in contact with the ACLU
4  from previous -- previous litigation.
5    Q.  When did you make a decision to bring a
6  lawsuit against the City of Dodge City on this
7  issue?
8       MS. WAKNIN:  I'm going to object to the
9  extent that this question may call for attorney-
10  client privileged information.  Mr. Rangel-Lopez,
11  if you can answer the question without disclosing
12  any attorney-client privileged information, you
13  may do so.
14       THE WITNESS:  When did I decide?  I mean,
15  probably it was sometime last year.  I don't
16  remember, again, the exact date, because it's --
17  it's something that's constantly floating in there
18  (indicating) as like a something I'm always
19  thinking about, but I'd say definitively October
20  of last year.
21       BY MR. RUPP:
22    Q.  October of 2022?
23    A.  Probably, I'd say so.  I can't say for
24  certain.
25    Q.  And without disclosing the content of any

Page 66

1  communication with counsel, do you recall when you
2  -- when that first conversation was with ACLU and
3  the UCLA Voting Rights Project?
4    A.  I'm sorry.  Please repeat that question.
5    Q.  Sure.  Do you recall the date of your
6  first meeting with counsel about this topic?
7    A.  No, I do not.
8    Q.  Do you remember the month and year?
9    A.  My first meeting with counsel?  No.  It
10  was -- my first meeting with actual counsel was
11  sometime late last year.
12    Q.  So sometime late in 2022?
13    A.  Well, meeting with them?
14    Q.  Yes.
15    A.  Like as my counsel?
16    Q.  No.  Meeting with them as potentially
17  your counsel.
18       MS. WAKNIN:  Objection; form.
19       THE WITNESS:  Yeah, late last year.
20  That's all I -- I remember.
21       BY MR. RUPP:
22    Q.  At the time that you were an intern for
23  the City of Dodge City, were you contemplating
24  suing the City of Dodge City based on its form of
25  government?

Page 67

1    A.  At the time, well, yes, it's always --
2  it's always something that is an option in -- in
3  this -- I mean, in this field of work.
4    Q.  Okay.  In the time that you were an
5  intern with the City of Dodge City, in the city
6  manager's office, did you raise with the city
7  manager any questions about putting on the ballot
8  and whether to change the form of government in
9  Dodge City?
10    A.  No.
11    Q.  At any time where you -- when you were
12  working for the City of Dodge City, did you raise
13  to the city commission the prospect of putting on
14  the ballot a change to the at-large election
15  system in Dodge City?
16    A.  No.
17       MS. WAKNIN:  Can you move your microphone
18  up?
19       THE REPORTER:  Do you want letters or
20  numbers?
21       MR. RUPP:  Numbers.  1.
22       (THEREUPON, Deposition Exhibit No 1
23  marked for identification.)
24       BY MR. RUPP:
25    Q.  I'm going to hand for you or hand to you

Page 68

1  Exhibit Number 1, which is the Amended Complaint
2  for Declaratory and Injunctive Relief in this --
3  that has been filed by your counsel in this
4  lawsuit.  Have you seen this document before?
5    A.  Yes.
6    Q.  Okqy.  It indicates, in paragraph 2, that
7  "The commission plays a central role in the city's
8  government.  The commission sets the tax rates."
9       MS. WAKNIN:  The zoom had dropped.
10       MR. RUPP:  Okay.
11       THE VIDEOGRAPHER:  Should be back on.
12       MR. RUPP:  All right.  I'm going to start
13  the question again.
14       BY MR. RUPP:
15    Q.  In paragraph 2 of the amended complaint,
16  it says "The commission plays a central role in
17  the City's government.  The commission sets the
18  tax rates," and I'm going to stop right there with
19  the second.
20       As I understand it, you're not aware of any
21  issues that have divided the Latino and white
22  community about tax rates; is that correct?
23    A.  On tax rates?  No.
24    Q.  Okay.  "It approves the City's budget."
25  As we sit here today, you're not aware of any



Appino Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ALEJANDRO RANGEL-LOPEZ

Page 69

1 **divisive issues between the Latino and white**
2 **communities on the City's budget; is that correct?**
3    A. No, not --
4    **Q. That is correct?**
5    A. Yes; that is correct.
6    **Q. It indicates that "The commission**
7 **appoints members to various boards and**
8 **commissions." Are you aware of any divisive**
9 **issues between the Latino and white communities on**
10 **the appointment of to various boards and**
11 **commissions?**
12    A. Di- -- division? Like a --
13    **Q. Yeah.**
14    A. Well, there's -- no.
15    **Q. Okay. It -- it indicates that "The city**
16 **commission plays a central role in enacting**
17 **municipal ordinances." Are you aware of any**
18 **divisive issues between the Latino and the white**
19 **community in Dodge City over the enactment of any**
20 **municipal ordinances?**
21    A. Yes, there -- yes.
22    **Q. Which -- which -- which municipal**
23 **ordinances?**
24    A. Actually, I think it -- this ties back
25 more to boards and commissions, I believe.

Page 70

1    **Q. All right. So let me finish that. In**
2 **terms of the commission playing in a -- a central**
3 **role in the City's enactment of municipal**
4 **ordinances, you're not aware of any divisive**
5 **issues between the Latino and white communities**
6 **over the enactment of any municipal ordinances in**
7 **Dodge City; is that correct?**
8    A. No, not any specific ones.
9    **Q. Okay. And I'm going to go back to the**
10 **issue of appointments to boards, but I'm going to**
11 **finish the line of thought here first.**
12    **Are you aware of any divisive issues between**
13 **the Latino and white community in the City of**
14 **Dodge City over the appointment of a city manager?**
15    A. No.
16    **Q. Let's go back, then. You've raised the**
17 **question of appointments to various boards and**
18 **commissions. What -- what divisive issues are you**
19 **aware of between the Latino and white communities**
20 **over appointments to various boards and**
21 **commissions?**
22    A. Well, it's -- I -- less of a divisive
23 thing, I think, but more of a -- there's a dis-
24 -- there's disparities in who's appointed to these
25 boards and, yeah, and how these -- how vacancies

Page 71

1 are filled. If you look -- if you take a look at
2 these boards, advisory boards, a lot of -- I'm not
3 -- I can't speak for certain, but they are
4 majority white and not -- I mean, and the people
5 who are appointed to these commissions and who
6 doesn't get appointed to these commissions and
7 who's involved and who's not is reflected in what
8 kind of ordinances and what kind of
9 recommendations are passed in the city commission,
10 so that -- that is -- so, yes, there is like a --
11 a disparity there, but it manifests itself in
12 different -- in different -- in a lack of
13 something, like then like there's -- there's
14 conflict. There's not really conflict because, I
15 don't know. It's just that, yeah, 'cause I mean,
16 people just in general don't know that things are
17 happening.
18    **Q. What board -- can you identify a single**
19 **board that -- that you believe the city commission**
20 **appointed in which this disparity that you've**
21 **described exists?**
22    A. Yes. So the -- the commission, or really
23 the City, the most -- the -- the -- the clearest
24 example I can think of at this moment is the Land
25 Bank board, the new one that was -- that was

Page 72

1 created shortly after I was -- shortly -- I think
2 it was September, October of this past year, but
3 the -- the folks who are appointed or asked to
4 serve on these boards are business leaders or
5 people who are realtors, people like a -- like
6 architects, things like that.
7    When you look at other land bank boards in
8 other communities, you see that there are a wide
9 array of people from different backgrounds, from
10 tenants to -- to other community members and
11 people from nonprofits, housing-based nonprofits,
12 but that's -- that's the -- and that -- and that
13 is -- and then I don't know if they're all white.
14 I believe they are, but that's one of the things
15 that I -- that I can think of, which leads to
16 just disparities and it just, how land is used,
17 how -- and how the housing situation is handled
18 here in the city.
19    So that's one of them, but that extends to --
20 I wouldn't say all of them, because I don't know
21 and I'm not aware of all of them, but this extends
22 to other commissions, so like the Community
23 Facilities Advisory Board, things like -- things
24 like that, that set the -- like that manage how
25 sales tax from -- from -- from funding sources,

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 73

1  such as the Why Not Dodge and stuff like that,
2  what kind of community facilities are built and
3  maintained and all sort of -- sorts of things like
4  that, and when you have people on these boards who
5  are -- who don't come from these backgrounds, who
6  don't come from the -- the immigrant community or
7  from the Latine community, who know what is needed
8  and necessary for the -- for the community on
9  regards to, you know, community facilities or
10  whatnot or cultural relations, it -- it influences
11  what that looks like and, yeah, so that's --
12  that's what more -- more I'd get at, I think, with
13  -- with that statement, that I know it's very --
14  it's a -- it's tricky to suss out because it's --
15  yeah, that's all I have for -- for right now.
16      **Q.  What is the Land Bank?**
17      A.  A Land Bank?  The Land Bank board, from
18  my understanding of it, the -- from what I've read
19  in other communities and from what I saw in -- in
20  the proposal for when it was being approved, it
21  takes -- it looks at abandoned or un--- like
22  unclaimed property or just vacant lots in
23  neighborhoods or areas of the city, and the Land
24  Bank decides, okay.  I mean, the Land Bank is in
25  charge of those city or public -- those city-owned

Page 74

1  lots or those vacant lots, figuring out what to
2  put in them, how to infill and assess -- yeah,
3  infill and -- and other neighborhood things and
4  land uses for them.
5      **Q.  Who appoints to the land use board?**
6      A.  The appointments for these --
7      **Q.  I'm sorry.  I called it the land use**
8  **board.  I meant the -- so I'm going to rephrase**
9  **the question.  Who appoints to the Land Bank?**
10      A.  I'm -- the city commission and -- but
11  recommendations of who joins the -- the board were
12  -- are the responsibility of the city manager's
13  office.
14      **Q.  In paragraph 4, you describe the Latine**
15  **population as having extensive participation in**
16  **the community.  Is that a correct statement?**
17      A.  Yes.
18      **Q.  And how would you describe the extensive**
19  **population or participation in the City of Dodge**
20  **City by the Latine community?**
21      A.  I mean, I -- how do I describe my lived
22  experience?  I don't know.  I mean, it's like over
23  60% of the population is Hispanic.  It's day-in,
24  day-out, the community is influenced by the
25  Hispanic community, just very -- in several

Page 75

1  aspects, from the way that we work, the way that
2  we live, celebrate, things like that, so I don't
3  really -- what specifically would you -- I don't
4  know, like extensive participation in the
5  community.
6      So there's a vibrant -- I mean, soccer
7  culture here is huge.  It's influenced the way
8  that the community looks.  I mean, you can't drive
9  a block or two in -- in these neighborhoods where
10  a community's clustered without seeing like a
11  house covered in like a -- like, I mean, covered
12  in stucco in the style of like a, you know, like
13  a home in Mexico.
14      There's, I mean, the -- the -- the Diocese.
15  The schools are over 70 and 80% Hispanic and
16  though they have their own -- the 70%.  I can't
17  say 80%, but 70%, and they have their own, like
18  there's other organizations as part of that
19  school, like school district.
20      There's teachers now, more and more teachers
21  that are Hispanic.  When I grew up, none of my
22  teachers were Hispanic, and now like most of my --
23  my little sister's teachers are -- she can point
24  to more than one Hispanic teacher, so stuff like
25  along those lines where they -- we work in.  I

Page 76

1  don't know.
2      There's -- everywhere.  I don't know.  I
3  could sit here all day describing like Dodge City
4  and like how Latines and our population has -- has
5  impacted the community.
6      (THEREUPON, Deposition Exhibit No 2
7  marked for identification.)
8  BY MR. RUPP:
9      **Q.  I've handed you what's been marked as**
10  **Exhibit Number 2.  Can you describe what this**
11  **document is?**
12      A.  This is La Voz Del Pueblo report on at-
13  large districts in southwest Kansas.
14      **Q.  This is -- you've referenced several**
15  **times in this -- in today's deposition a report**
16  **from -- called the New Frontiers report.**
17      A.  Mm-hmm.
18      **Q.  Is this the New Frontiers report?**
19      A.  Yes.
20      **Q.  If we look at page 2, it said it was**
21  **written by Roxana Arjon and edited by you; is that**
22  **correct?**
23      A.  Yes.
24      **Q.  And how did you come to be the editor?**
25      A.  I'm project coordinator for New Frontiers

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 77

1 and I -- it was part of my -- my job to edit it
2 and make it look nice and presentable.
3 **Q. And when did this project start?**
4 A. The -- that it started June of 2021.
5 **Q. And when did the report get written?**
6 A. That summer of 2021.
7 **Q. And to whom was -- so what -- what --**
8 **what occurred -- what was the purpose of the**
9 **report?**
10 A. The purpose of the report was to provide
11 an insight into at-large elections in the region,
12 as well as how that impacts, yeah, and its
13 impacts.
14 **Q. I'm going to go back to the -- the report**
15 **itself. It indicates that it was written by**
16 **Roxana Arjon. Who's Roxana Arjon?**
17 A. Roxana Arjon, at the time, they were the
18 -- they were our Dodge City organizer with New
19 Frontiers.
20 **Q. "They." Are you referring to Roxana?**
21 A. Yes.
22 **Q. Okay. And in terms of being the**
23 **organizer, what does that mean?**
24 A. They -- well, really, that summer, I
25 mean, an organizer, they -- they -- since I was

Page 78

1 coordinator, they helped me with knocking on
2 doors. That summer, we were also working on a
3 pantry, so -- but helping to build that and
4 researching for this report.
5 **Q. Okay.**
6 A. Or doing research for this report.
7 **Q. And is Roxana Arjon currently an intern**
8 **with the City of Dodge City?**
9 A. Correct.
10 **Q. The New Frontiers project is a mutually**
11 **-- or describes -- let me start that again.**
12 **At the top of the page, it describes that**
13 **"New Frontiers project is a mutual aid community**
14 **project that lives under the civic engagement**
15 **nonprofit organization Loud Light"; is that**
16 **correct?**
17 A. Correct.
18 **Q. Below that, it says "Special thanks to**
19 **Lauren Bonds, Melissa Stiehler and Mark**
20 **McCormick." Who's Lauren Bonds?**
21 A. Lauren Bonds was -- is an attorney. At
22 the time, she -- they were with -- oh, they were
23 with the ACLU of Kansas but, at the time of this
24 report, I believe they were transitioning to a
25 different role but I don't remember the different

Page 79

1 organization.
2 **Q. Okay. And Melissa Stiehler?**
3 A. Melissa Stiehler is my current
4 supervisor.
5 **Q. Okay. And Mark McCormick?**
6 A. Mark McCormick, I believe, still works
7 with the ACLU of Kansas and does communications
8 work with them and also is a professor at the KU
9 School of Journalism, I believe.
10 **Q. The report itself, Exhibit Number 2, when**
11 **-- I don't see a date on it. Maybe I'm just**
12 **missing it. Is it dated?**
13 A. I don't believe we dated it, but it was
14 -- yeah, it was released in -- in fall of 2021.
15 **Q. Okay. And when it was released, to whom**
16 **was it released?**
17 A. To the general public. Put it on our
18 website, where it still lives. We put out a press
19 release, also, and we held a town hall info
20 session that folks -- that we had about 50, 60 in
21 attendance. That's also publicly available.
22 **Q. So let's talk about each of those things.**
23 **When you say you have released it to the public,**
24 **was there a mass mailing to all the citizens of**
25 **Dodge City or to some group or who did it go to?**

Page 80

1 MS. WAKNIN: Objection; form. Objection;
2 compound.
3 THE WITNESS: It was -- we -- yeah, we
4 did an email blast to all the folks on our list
5 at Loud Light, yeah. Basically, we did it with a
6 press release and with the full report and, yes,
7 that's -- yeah, that's -- that's what we -- yeah.
8 BY MR. RUPP:
9 **Q. Okay. I want to make sure I understand**
10 **that answer. In terms of the email, this would be**
11 **to Loud Light's email list?**
12 A. Yes. Yeah. Yeah.
13 **Q. And --**
14 A. And social media, obviously, but that's
15 just a followers -- that's just to the people who
16 were, I mean, following us at the time and
17 following our page.
18 **Q. Okay. So, to be clear, the email blast**
19 **would have gone out to folks on email or on Loud**
20 **Light's email mass mailing or mass email list,**
21 **whatever that -- however that would be organized,**
22 **correct, number one?**
23 A. Yes.
24 **Q. And it would have been posted on social**
25 **media to those folks who followed Loud Light on --**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com
6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131
800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ALEJANDRO RANGEL-LOPEZ

Page 81

1  on social media; correct?
2      A.  Yes.
3      Q.  And --
4      A.  Well, it was released -- well, Loud Light
5  social media, but New Frontiers social media,
6  also.  They're two separate things.
7      Q.  And then there was a press release.  Do
8  you know to whom that was sent?
9      A.  It was sent to the -- I don't remember
10  exactly.  However, it was sent to the -- the
11  Globe, the Garden -- I mean, Dodge City daily --
12  Dodge City Globe, Garden City Telegram.  Maybe --
13  I'm not sure if we sent it to the Liberal Times &
14  Leader.
15          THE VIDEOGRAPHER:  I think I might need
16  to switch to the WiFi here instead of my hot spot,
17  if that keeps going out.  I'm sorry.
18          MR. RUPP:  All right.  Can we finish his
19  -- I think we're in mid-answer, and let me --
20  let's let him finish his answer before we switch.
21          THE WITNESS:  What was I saying?
22          MR. RUPP:  And maybe you should read back
23  his answer to this point, just so that we have it.
24          THE REPORTER:  Answer:  It was sent to
25  the -- I don't remember exactly.  However, it was

Page 82

1  sent to the -- the Globe, the Garden -- I mean,
2  the Dodge City Daily -- Dodge City Globe, Garden
3  City Telegram.  I'm not sure if we sent it to the
4  Liberal Times & Leader.
5          THE WITNESS:  So Liberal Times & Leader,
6  High Plains Public Radio, HPPPR, HPPR, and media
7  contacts at the Kansas Reflector.  Yeah, just
8  anyone who's on the media list for -- for Loud
9  Light and New Frontiers.
10          MR. RUPP:  If you want to change, now's a
11  good time.
12          THE VIDEOGRAPHER:  It's 11:41 a.m.  We're
13  going off the record.
14          (THEREUPON, a break was then taken.)
15          THE VIDEOGRAPHER:  It is 11:42 a.m.
16  We're back on the record.
17      BY MR. RUPP:
18      Q.  On the second page of this report, which
19  has a Bates number ending in 4 at the bottom,
20  there's a quote by you.  Can you read that quote
21  to us?
22      A.  Yeah, absolutely.  (Reading) In
23  communities where Latinas and non-whites are the
24  majority, we continue to be led by people whose
25  interests end at their home's doorstep.  Nuestras

Page 83

1  communidades deserve representation in elected
2  office.  Let's talk about how to make that happen.
3      Q.  What do you mean when you say that these
4  communities "continue to be led by people whose
5  interests end at their home doorstep"?
6      A.  What I was getting at is that
7  we're being represented by folks in elected office
8  who -- whose values don't -- whose, yeah, whose
9  values and experience don't really extend past
10  their -- their own needs and the needs of their
11  own community and their own -- their -- I mean,
12  yeah, and the groups that they're involved with
13  and maintaining the status quo for themselves and
14  -- and -- and their friends, so that's what I mean
15  by "home's doorstep" where, yeah, these folks,
16  their interests end at their doorstep, and then
17  once you're out into the actual city with the rest
18  of the folks, these values are -- yeah, there's no
19  really interest in getting in -- in -- in hearing
20  their perspectives or working them into positions
21  of actual like -- like -- like of power and things
22  like that.
23      Q.  And are you talking here about members of
24  the Dodge City City Commission?
25      A.  Yes, that's -- that's what I refer to.

Page 84

1      Q.  And on what basis would you allege that
2  members of the Dodge City City Commission's
3  interests end at their home's doorstep?
4      A.  Sorry.  Please re- -- restate that
5  question.
6      Q.  On what basis would you allege that
7  members of the Dodge City City Commission's
8  interests end at their home doorstep?
9      A.  Well, just based on -- on -- on the -- on
10  the experiences of -- of myself, which are the
11  only ones that I can speak on, but also, you know,
12  those that I've -- those of my friends and family
13  and loved ones who -- who have also shared their
14  -- these interests, I mean, these beliefs with me,
15  so what it -- so I'm sorry.  I'm -- can you
16  please -- one more time.
17      Q.  I believe the question was:  On what
18  basis do you allege that the interests of the
19  members of the Dodge City City Commission end at
20  their own -- at their home doorstep?
21      A.  Okay, yeah.  I mean, yes.  So what I was
22  getting at, like I said, the -- the lived
23  experience, my own lived experiences and those of
24  -- those from growing up and being born and raised
25  here in Dodge City, as well as from friends and

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 85

1  family who have expressed, you know, I -- and I've
2  seen that, you know, these city commissioners, the
3  only time they're really out and visible in the
4  community is when they're running for office and,
5  even then, they will only put a sign in -- I
6  mean, they'll only put out a yard sign.
7      There have been no real efforts by these
8  candidates or commissioners, really, even as
9  commissioners, to -- that aren't led by city
10  employees themselves, really, but city
11  commissioners.  There's no outreach to the -- to
12  the -- to the Hispanic community and Hispanic like
13  organizations, really.
14      There's -- I mean, in Dodge City, there's
15  just two towns.  There's two towns.  There's two
16  populations, you know.  You -- if you don't have
17  to interact with the Hispanic community, you
18  won't.  I mean, yeah, if you don't have to
19  interact with the other side, you don't -- you
20  don't do it, really, and that's the attitude.
21  There's -- yeah.
22      There's -- there's two cities in Dodge City;
23  two populations that have their own informal
24  structures and support networks and even formal
25  structures.  However, what -- what I see is that

Page 86

1  the -- the -- that the white community has more
2  hold on the -- white and upper class, I guess I
3  would say, have more of a hold on the formal
4  systems here.
5      Q.  Let's turn to the next page that ends in
6  Bates number 5 on the bottom.  Turn your attention
7  to the first paragraph, the last sentence.  It
8  reads "In most smaller cities, representatives are
9  elected through at-large elections, meaning
10  representatives are chosen by and represent the
11  entire town, as opposed to the neighborhood."
12      Would you agree that that's a true statement
13  as to the -- most of the smaller cities in the
14  state of Kansas?
15      A.  Yes, that's true.
16      Q.  The at-large election system that is used
17  by Dodge City is consistent with the at-large
18  elections system in Lawrence and Manhattan and
19  Hays, for example; correct?
20      MS. WAKNIN:  Objection; form.
21      THE WITNESS:  From my knowledge, yes,
22  although I believe Lawrence recently moved over to
23  a -- a -- to districts.
24  BY MR. RUPP:
25      Q.  And Lawrence is a -- a -- did that

Page 87

1  through representative -- and I'm not sure if it
2  has occurred, but Lawrence's process is -- is a
3  public process involving debate and discussion and
4  -- and public input; correct?
5      MS. WAKNIN:  Objection; form.  Objection;
6  foundation.
7  BY MR. RUPP:
8      Q.  Correct?
9      A.  Yes; correct.
10      Q.  It's not through kind of springing it on
11  the City through a lawsuit; correct?
12      MS. WAKNIN:  Objection; form.
13      THE WITNESS:  No, but Lawrence is also a
14  very, very different city, as are most smaller
15  cities in Kansas who don't have to deal with our
16  demo- -- who don't have demo- -- these demographic
17  -- the demographics that we do.
18  BY MR. RUPP:
19      Q.  Okay.  And one of the differences between
20  Lawrence and Dodge City is that Lawrence is
21  100,000 people and Dodge City is not; correct?
22      A.  Correct.  And it's much more -- there's
23  less diversity than here.  Well, not less
24  diversity.  Smaller -- it's more homogenous, I
25  would say, than -- than Dodge City, and there are

Page 88

1  less distinct community groups and neighborhoods,
2  really, or -- yeah, that -- that could also
3  influence how districts are drawn.
4      Q.  And -- and turn -- let's go to the bottom
5  of page -- of the -- that has the Bates number 5
6  at the end.  The last sentence says "We also hope
7  that this study will encourage local, elected
8  leaders to consider looking into the switch from
9  at-large elections to single-member district
10  elections."
11      Did you ever ask to be heard before the city
12  commission in Dodge City with the hope of
13  encouraging local elected leaders to consider
14  looking into a switch from at-large elections to
15  single-member district elections?
16      A.  No.
17      Q.  On page 7, Bates number 7, the second
18  sentence or third sentence of the paragraph that
19  begins "While the use."  So Bates number 7, middle
20  paragraph, that starts "While the use."  You see
21  that on -- you're on --
22      A.  (Witness nods head affirmatively.)
23      Q.  -- same page with me?  Third sentence
24  reads "With a small population, it made sense to
25  follow this election system, as it was likely for

Page 89

1 residents of a town to know one another." Is that
2 a correct statement?
3     A.  Yes.
4     Q.  "It was also easier and cost-effective to
5 hold the elections, as there would be no need to
6 print different ballots for each district." You
7 see that?
8     A.  Yes, I do.
9     Q.  Okay.  Let's go to the bottom of page 8,
10 Bates number 8.
11       MS. WAKNIN:  I don't think he knows what
12 a Bates number is.
13       MR. RUPP:  Okay.  These little numbers at
14 the bottom.
15       THE WITNESS:  (Nods head affirmatively.)
16       MS. WAKNIN:  Okay.
17 BY MR. RUPP:
18     Q.  The last full sentence is a -- is -- or,
19 I guess, second to the last full sentence, it's a
20 quotation from the Hays Free Press.  Do you see
21 that?
22     A.  Mm-hmm.
23     Q.  Is that yes?
24     A.  Yes, I do.
25     Q.  All right.  And Hays is one of the cities

Page 90

1 that has at-large elections in the state; correct?
2     A.  I believe so.  To the best of my
3 knowledge, yes.
4     Q.  All right.  And Hays is kind of in the
5 north central part of the state; correct?
6     A.  Yes.
7     Q.  Roughly same size as Dodge?
8     A.  Hmm.  Roughly.
9     Q.  It says, "As the Hays Free Press put it,
10 the commission form of government makes 'every man
11 directly accountable to every voter in the city.
12 It elects city officials as citizens rather than
13 as ward partisans.'"  Do you see that?
14     A.  Yes.
15     Q.  And is that a description you've heard
16 before is the advantages of at-large elections?
17     A.  Yes, and I believe the context -- yeah.
18 Yeah, I have heard those as reasons.
19     Q.  Okay.  Let's go to the page with Bates
20 number 11 at the bottom, and it has a section
21 called "Concerns Surrounding the Switch to
22 District Elections."  Do you see that?
23     A.  Mm-hmm.  Yes, I do.
24     Q.  And, once again, you edited this
25 document; correct?

Page 91

1     A.  Yes, I edited it and formatted it.
2     Q.  And in the sentence that would be, I
3 guess, the second sentence, it says "Many
4 opponents of district elections cite reasons such
5 as the cost of creating single-member districts
6 and redistricting every few years, in addition to
7 the increased costs of holding the elections."  Do
8 you see that?
9     A.  Yes, I do.
10     Q.  And those are truthful reasons; correct?
11 There are -- it is costly to have single-member
12 districts; correct?
13       MS. WAKNIN:  Objection; form.
14       THE WITNESS:  Yes, although I don't know
15 the specifics now, since things -- things like the
16 paper ballot and things like that aren't used in
17 Ford County anymore.
18 BY MR. RUPP:
19     Q.  The next sentence says "Other opponents
20 doubt the usefulness of district elections in
21 increasing representation on the boards," and I
22 assume by here, "the boards" are referring to city
23 commission and other governing boards; is that
24 correct?
25     A.  Yes.

Page 92

1     Q.  And if a -- and that's a -- that's a
2 statement that you included in the New Frontiers
3 report; correct?
4     A.  Yes.
5     Q.  Okay.  "They believe that switching to
6 district elections will not magically fix the
7 issue and prefer other methods of increasing
8 representation, such as registering minority
9 voters or encouraging them to vote"; correct?
10     A.  Yes.
11       MS. WAKNIN:  Objection; form.
12       THE WITNESS:  Yes.
13 BY MR. RUPP:
14     Q.  Now, it says "Additionally, opponents
15 cite that creating districts would lead to
16 litigation and believe it is best to stick to the
17 status quo, which has worked before."  Do you see
18 that?
19     A.  Yes, I do.
20     Q.  Now, you are aware that -- that
21 constitutionally, if you have districts, you need
22 to make sure that they're all of equal population;
23 correct?
24     A.  Yes.
25     Q.  And infrequently, there is litigation in

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 93

1 states and communities that have districts over
2 the manner in which districts are drawn; correct?
3    MS. WAKNIN: Objection; form.
4    THE WITNESS: Yes.
5 BY MR. RUPP:
6    Q.  Because one group or another does not
7 believe that the districting plan meets to their
8 satisfaction with keeping, quotes, community --
9 communities of interest together in some fashion;
10 correct?
11    A.  Correct.
12    Q.  And an at-large system doesn't have to go
13 through the redistricting process with each new
14 census; correct?
15    A.  Correct.
16    MR. RUPP:  It is now right around noon.
17 Why don't we take our noon recess.
18    THE VIDEOGRAPHER:  It is 11:59 a.m.
19 We're going off the record.
20    (THEREUPON, a break was then taken.)
21    THE VIDEOGRAPHER:  It is 1:15 p.m.  We're
22 back on the record.
23    MR. RUPP:  We'll mark that one.
24    (THEREUPON, Deposition Exhibit No 3
25 marked for identification.)

Page 94

1 BY MR. RUPP:
2    Q.  All right.  I've handed you what's been
3 marked as Exhibit Number 3.  This is a -- appears
4 to be a social media post; is that correct?
5    A.  Yes; that is correct.
6    Q.  The -- and I take it it is one of yours;
7 is that correct?
8    A.  Yes; that is correct.
9    Q.  And all I see in terms of what we have
10 here is a -- I see only one page.  Is there a
11 longer -- for example, this sentence ends "Dodge
12 City has a history of" and I don't see the rest
13 of that.  Would you be able to provide, on this
14 and the other social media posts that you've had,
15 kind of the remainder of the threads?
16    A.  What the rest of that post is?
17    Q.  Yes.
18    A.  Yeah, so I was just -- so what this is is
19 I shared and comment -- shared with my own comment
20 a post from the City of Dodge City about a -- a
21 letter of consent that was put out by the city
22 commission and the City of Dodge, their Cultural
23 Relations Advisory Board, on immigrant
24 resettlement -- immigrant and refugee resettlement
25 here in Dodge City when Donald Trump passed those,

Page 95

1 or when he put out his executive order.  That post
2 is publicly available on Dodge City's social --
3 social media, yeah.
4    Q.  And -- and so, as I understand it, the
5 City of Dodge City Mayor signed a letter of
6 consent to the United States Department of State
7 stating that "The City of Dodge City wishes to
8 continue to be a home for refugees.  A letter was
9 requested by Catholic Charities of Southwest
10 Kansas in response to President Trump's Executive
11 Order 13888 On Enhancing State and Local
12 Involvement in Refugee Resettlement," and then it
13 goes on from there; is that correct?
14    A.  Yes; that's correct.
15    Q.  And you -- you posted "I've always been
16 proud to call Dodge City my home"; is that
17 correct?
18    A.  Yes.
19    Q.  And that was a truthful statement?
20    A.  Yes.
21    Q.  And then the next sentence says "This
22 only adds to the pride I feel when I say from my
23 -- when I say I'm from this little town out in
24 western Kansas"; correct?
25    A.  Yes; correct.

Page 96

1    Q.  And then you said "Love Trumps Hate" with
2 a capital T for Trump; correct?
3    A.  Yeah.
4    (THEREUPON, Deposition Exhibit No 4
5 marked for identification.)
6 BY MR. RUPP:
7    Q.  Exhibit 4 appears to be a social media
8 post from you; is that correct?
9    A.  Yes.
10    Q.  And you -- that's your picture?
11    A.  Yes.
12    Q.  And you indicate that this was the last
13 day of your internship with the City of Dodge City
14 government, "as well as my last time going to
15 class and undergrad at the University of Kansas";
16 correct?
17    A.  Yes.
18    Q.  And I take it that that was a proud
19 moment for you?
20    A.  Yes.
21    Q.  And you posted it because you were proud
22 of doing it; correct?
23    A.  Yes.
24    (THEREUPON, Deposition Exhibit No 5
25 marked for identification.)


Appino & Biggs Reporting Service, Inc.
5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com
6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131
800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 97

1  BY MR. RUPP:
2  **Q.  What is Exhibit Number 5?**
3  A.  What is it?
4  **Q.  Yes.**
5  A.  Yes.  This is a statement -- this is a --
6  an email from Ernestor De La Rosa, the assistant
7  city manager at the time, and yeah, this is
8  basically, this is referring to, yeah, an incident
9  that happened that year when a group brought in a
10  speaker that had historically or has a -- had,
11  slash, has a history of Islamophobic and like
12  anti-immigrant hate speech.
13  **Q.  And who was the group?**
14  A.  This was, I believe, the Wild West
15  Republican Women's Club, an event held at the
16  conference center at Boot Hill Casino and Resort.
17  **Q.  The -- Mr. De La Rosa's email, do you**
18  **recognize the group that it's emailed there or to?**
19  A.  You mean the folks that it was sent to?
20  **Q.  Yes.**
21  A.  Some of them.
22  **Q.  Okay.  I mean, was that a specific group,**
23  **to the best of your knowledge, or --**
24  A.  I believe this was to anyone -- yeah,
25  these all -- I don't think this was a specific

Page 98

1  group, I don't believe, to the best of my
2  knowledge.  They're just folks who are in, like,
3  in work with the Hispanic, slash, Latine community
4  or like business folks, also, who work there.
5  **Q.  I see that you are copied on it.  Do you**
6  **-- had you taken an interest on this issue with --**
7  **with Mr. De La Rosa?**
8  A.  Well, I mean, I've always been very
9  interested in and close to diversity issues and
10  topics related to that here -- here locally.
11  **Q.  I see that one of the names that's also**
12  **copied is Kate Schieferecke, and it identifies her**
13  **with an email address of Catholic Charities.  Is**
14  **that consistent with your understanding of where**
15  **she works?**
16  A.  Yes, I believe, to the best of my
17  knowledge.
18  **Q.  All right.  And then there's somebody**
19  **named Coral Lopez copied at dodgedev.org.  Do you**
20  **know who Coral Lopez is?**
21  A.  Yes.
22  **Q.  And who's Coral Lopez?**
23  A.  Coral is, I believe she still is, the
24  Coral -- Coral -- the downtown like -- yeah,
25  Downtown Dodge City, like Main Street

Page 99

1  organization, and with the development
2  organization.
3  **Q.  Economic development?**
4  A.  Economic development.
5  **Q.  And this statement says "The City of**
6  **Dodge City and has been for many years**
7  **committed to recognizing, honoring, and embracing**
8  **the diversity of our community."  Did you support**
9  **this statement?**
10  A.  Yeah, absolutely.  Support, yes.
11  (THEREUPON, Deposition Exhibit No 6
12  marked for identification.)
13  BY MR. RUPP:
14  **Q.  I've handed you what's been marked as**
15  **Exhibit Number 6 and it bears a Bates number --**
16  **Bates numbers from page 190 to 194, indicating**
17  **that it came from a production of things that the**
18  **plaintiffs have produced.  It doesn't necessarily**
19  **mean it came from you.  It may have.  I'm just**
20  **asking you if you can identify what this is.**
21  A.  Yes, I believe this is the -- the chat
22  history from when we did the town hall for the --
23  the report on at-large districts.
24  **Q.  Okay.  So this would be for the New**
25  **Frontiers report that's been marked as Exhibit**

Page 100

1  **Number 2?**
2  A.  Yes; correct.
3  **Q.  Okay.  And -- and this chat report, do**
4  **you know who prepared it, or was it done by using**
5  **the Zoom transcription function?**
6  A.  Yes, it's a -- it was just a download
7  strip from the Zoom transcription.
8  **Q.  Okay.  And is there anything in**
9  **particular in this report that you found**
10  **significant?**
11  A.  In -- in this?
12  **Q.  Yes, in Exhibit Number 6.**
13  A.  That I found significant?
14  **Q.  Yes.**
15  A.  In what way?
16  **Q.  All right.  In terms of is there anything**
17  **about this report that you think is -- supports**
18  **your arguments in this lawsuit?**
19  A.  I believe, yeah, to the -- let me see.
20  I'm reading through it currently.  One that's --
21  one message that stands out in particular is from
22  minute -- I mean, F -- it's hour 19, minute 22.
23  19:22:18 on 191.  It's from Jan Scoggins.  She
24  talks about when she was a commissioner and the --
25  when she asked for districting or that -- well, I

**Appino & Biggs** Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 101

1  guess I'll just read it.
2      (Reading) When I was a commissioner in Dodge
3  City, I asked for districting, and it was not a
4  welcome topic by any of the other commissioners.
5  I still feel districting is essential to
6  representation.
7      That's just one of them that off of -- from
8  the -- from the beginning here.
9      Q.  All right.  Is that the only -- only --
10  only chat on districting that -- that you see in
11  this chat?
12      A.  Yeah, that's the only specific thing.
13      Q.  And I see in this -- in this chat
14  comments, for example, on page 193, 20:3:36,
15  comments about pantry hours, food pantry.  A
16  couple lines later, at 20:5:54, discussions about
17  food stamps and food banks.  20:12:57, comments
18  about bilingual cooking classes and healthy food
19  locally.
20      So it looks like in this conversation, there
21  -- there's a wide range of topics, and districting
22  took up a comment; correct?
23      A.  Yes.  Oh, I stand corrected.  This is the
24  -- the chat from the launch of New Frontiers that
25  summer, that same summer.  As far as I'm

Page 102

1  concerned, we talked about at-large districting, I
2  think, but the talking about the pantry, yes, it's
3  a -- it's an organization that we work on a lot
4  of variety of issues and, at the time, we had a
5  food pantry, so that was maintained by me through
6  mutual aid, so that's no longer part of our -- our
7  programming.
8      Q.  All right.  Is there anything on Exhibit
9  Number 6 that gives the date of this meeting?
10      A.  Gives a date?
11      Q.  Yes.
12      A.  For this meeting?
13      Q.  Yeah.
14      A.  What date it was in?  Yeah.  It was --
15  yeah, it was 2021, and this was, I believe, in
16  June, early June.  I don't remember an exact date.
17      Q.  Okay.  And you can't tell from this
18  document what --
19      A.  Not from this document, no, but the link
20  on here, there's a link to a Facebook Live, and
21  that would probably -- that would probably lead to
22  the -- the full conversation, the recorded
23  conversation.
24      (THEREUPON, Deposition Exhibit No 7
25  marked for identification.)

Page 103

1      BY MR. RUPP:
2      Q.  I've handed you what's been marked as
3  Exhibit Number 7.  Is this the -- it's marked
4  "Draft" but is this a draft of the Dodge City
5  Welcoming Plan that you described earlier?
6      A.  Yes.
7      Q.  And it appears to be pages 202 through
8  206 of documents you've produced; correct?
9      A.  Yes.
10      Q.  And it -- this draft, it appears to
11  include three priority areas:  Equitable Access
12  and Communications; Civic Engagement; and Refugee
13  and Immigrant Integration; correct?
14      A.  Yes.
15      Q.  And then safe and -- two -- two
16  categories were not included in the draft at the
17  time that you -- or of this document; is that
18  correct?
19      A.  Yes.
20      Q.  Okay.  And these -- these were the
21  recommendations coming out of the welcoming plan;
22  correct?
23      A.  For the welcoming plan from the steering
24  committee, yes.
25      Q.  Okay.  And would it be fair to say that

Page 104

1  there is nothing coming out of this steering
2  committee suggesting that the City of Dodge City
3  should change its form of government?
4      A.  Correct, to the best of my knowledge.
5      (THEREUPON, Deposition Exhibit No 8
6  marked for identification.)
7      BY MR. RUPP:
8      Q.  You've been handed Exhibit Number 8 and
9  it's captioned "City of Dodge City Civic
10  Engagement Efforts."  Have you seen this document
11  before?
12      A.  Not to my knowledge, no.
13      Q.  All right.  Within Exhibit 8, there are
14  several -- several categories of civic engagement
15  efforts by the City, and we've talked about a
16  couple of those.  The first one is Cultural
17  Relations Advisory Board.  That's the board that
18  we've talked about earlier in the deposition; is
19  that correct?
20      A.  Yes; that's correct.
21      Q.  Then the second one is Welcoming Dodge
22  City Strategic Plan.  That's the welcoming plan
23  that we've talked about; is that correct?
24      A.  Yes.
25      Q.  The third one is the International


Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ALEJANDRO RANGEL-LOPEZ

Page 105

1 Festival, and that's the festival that you
2 described that you worked on as an intern;
3 correct?
4    A.  Yes.
5    Q.  The next one is the New Americans Dinner.
6 Are you familiar with that one?
7    A.  Yes, I helped with the one in 2022.
8    Q.  And what is the New Americans Dinner?
9    A.  It's a dinner put on by the Cultural
10 Relations Advisory Board for local residents who
11 have just been -- to celebrate getting
12 naturalized.
13    Q.  The Engage Dodge program, are you
14 familiar with that?
15    A.  Yes.
16    Q.  What is that?
17    A.  It's a -- it's a community -- it's a
18 program where you spend a -- a -- I don't know
19 how, what the time line is, but a few weeks or
20 months just learning about what the -- what
21 services are available, what programs the city
22 offers, and get to meet the, you know, the
23 employees of the City, so it's for facilities and
24 all that.
25    Q.  The next one is the United States

Page 106

1 Citizenship and Immigration Services Mobile
2 Services.  Are you familiar with that?
3    A.  Yes.
4    Q.  What -- how -- what do you know about
5 that?
6    A.  I also helped out with -- with this last
7 year.  It's when the US Customs and Immigration
8 Enforcement folks from Wichita, from the office in
9 Wichita, come out and provide biometric and other
10 services to folks looking to, I mean, yeah, trying
11 to get their legal situation sorted out, so they
12 don't have to drive all the way out to Wichita or
13 elsewhere.
14    Q.  Then it describes US Naturalization
15 Ceremony.  I believe you described at least one of
16 these before.  It says that in two years, '21 and
17 '22, City of Dodge City hosted a citizen
18 naturalization ceremony; correct?
19    A.  Yes.
20    Q.  Okay.  Then there's a -- the next one
21 that's listed there is Mexican Consulate Mobile
22 Services.  Do you see that?
23    A.  Yes.
24    Q.  Are you familiar with that?
25    A.  Yes.

Page 107

1    Q.  What -- what's your familiarity with
2 that?
3    A.  Mexican Consulate comes to Dodge City,
4 sets -- and set up appointments with Mexican
5 nationals to get their -- their -- their -- any --
6 any -- any services that they might need, but
7 mainly it's birth certificate, passports and
8 citizenship stuff, so that they don't -- so folks
9 don't have to drive all the way up to Kansas City
10 for that.
11    Q.  Next one that's listed is Guatemalan
12 Consulate Services.  Are you familiar with that?
13    A.  Yes.
14    Q.  And how is it that you're familiar with
15 that?
16    A.  I volunteered to help at the consulate.
17 Was it either -- it was last year.  No.  So,
18 yeah, I've helped out with it.
19    Q.  And the next listed one is Free Public
20 Transportation to Vote.  Do you see that?
21    A.  Yes.
22    Q.  Are you familiar with that?
23    A.  Yes.
24    Q.  And what is that?
25    A.  City offers free rides to polling places

Page 108

1 by using the public transportation system.
2    Q.  Do you consider that a good thing?
3    A.  Yeah.
4    Q.  And the next item on there is United
5 States Citizenship and Immigration Services
6 Naturalization Presentation.  I guess they present
7 to the community on how to become a US citizen; is
8 that correct?
9    A.  Yes.
10    Q.  Are you familiar with that?
11    A.  Yes, I'm aware of them and that they've
12 happened.
13    Q.  Okay.  The next item on the third page
14 there is the City of Dodge City Naturalization
15 Scholarship.  Do you see that?
16    A.  Yes.
17    Q.  Are you familiar with that?
18    A.  Yes.
19    Q.  Okay.  What's your familiarity?
20    A.  That the City provides scholarships for
21 folks wanting to take a -- like, yeah.  I mean,
22 it helps with fees related to naturalization and,
23 yeah, that's -- that's what I know, for the most
24 part.  That's that they pay for, yeah, pay for
25 these fees and pay for -- it helps to pay for



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 109

1  classes.
2      Q.  Next one that's listed is a
3  Naturalization Clinic in conjunction with UFCW2,
4  the City and Catholic Charities.  Are you familiar
5  with that?
6      A.  Yes.
7      Q.  What's -- what is that?
8      A.  It's a -- it's a clinic where folks can
9  come in from a certain -- I mean, yeah, it's a --
10 it's periodically held and a -- there's -- it's a
11 day where you come in a certain time or set an
12 appointment and they help you get -- gets their
13 paperwork turned in and all sorted out.
14     Q.  The next thing that's listed is DACA
15 Clinic.  What is that?
16     A.  It's a -- the city's -- the city and
17 partners have hosted a free DACA renewal clinic to
18 members of the community, so it's for folks to
19 renew their DACA status.
20     Q.  And what is DACA status?
21     A.  Deferred Action on Childhood Arrivals.
22     Q.  And the next one that's listed is
23 Southwest Kansas Coalition Legislative Policy.  Do
24 you see that?
25     A.  Yes.

Page 110

1      Q.  And it describes that the Southwest
2  Kansas Coalition is made up of the cities of Dodge
3  City, Garden City, and Liberal, with the City of
4  Hays as an associate member, and that SKC strongly
5  supports sensible immigration reform, including
6  but not limited to a permanent solution and
7  pathway to citizenship for DACA recipients.  Do
8  you see that?
9      A.  Yes.
10     Q.  And would you view that as a good thing?
11     A.  Generally, yes.
12     Q.  The next item that's listed there is
13 Bilingual Pay Increase for City Employees.  Do you
14 see that?
15     A.  Yes.
16     Q.  And then the next one is Bilingual Media
17 Posts and Media Releases.  Do you see that?
18     A.  Yes.
19     Q.  And is there anything on here that --
20 that you see that -- that you disagree with as --
21 as civic engagement effort by the City of Dodge
22 City on Exhibit 8?
23     A.  I mean, that's not related to -- to civic
24 engagement?
25     Q.  I guess my question was perhaps poorly

Page 111

1  phrased and I'll try it again.  Are all of these
2  efforts made by the City of Dodge City to engage
3  with a -- with its diverse community?
4          MS. WAKNIN:  Objection; form.
5          THE WITNESS:  Yeah, I mean.
6  BY MR. RUPP:
7      Q.  And are you aware of any -- I mean, you
8  may or may not be, but are you aware of any other
9  cities in the state of Kansas that have as many
10 civic engagement efforts with regard to their
11 diverse communities?
12     A.  Are there any other?
13     Q.  To your knowledge, one way or the other.
14     A.  I mean, I focus a lot on Dodge City and
15 this region of the state, southwest region, and it
16 seems consistent with what I've seen in other
17 communities and -- and similar -- similar
18 demographics, similar -- yeah, similar situations,
19 similar populations, and all that.
20         (THEREUPON, Deposition Exhibit No 9
21 marked for identification.)
22 BY MR. RUPP:
23     Q.  I've handed you what's been marked as
24 Exhibit Number 9, and it appears to be a Strategic
25 Plan for Welcoming and Integration from the City

Page 112

1  of Dodge City; is that correct?
2      A.  Yes.
3      Q.  And at the bottom, it lists three
4  organizations, one of which is the City of Dodge;
5  is that correct?
6      A.  Yes.
7      Q.  Then there's Catholic Charities of
8  Southwest Kansas.  You see that?
9      A.  Yes.
10     Q.  And then the third is Gateways for
11 Growth.  Are you familiar with Gateways for
12 Growth?
13     A.  Yes.
14     Q.  And what is Gateways for Growth?
15     A.  Gateways for Growth, this -- Gateways for
16 Growth is, I believe, the -- the program or
17 organize -- organization, I'm not -- or nonprofit,
18 I'm not sure which one, but that provided the
19 funding and also did a study on -- or, yeah, it
20 looked at the -- the immigrant population here
21 that funded this -- this report, I believe.
22     Q.  And does this stem from the welcoming
23 planning committee that you were a part of?
24     A.  Yes.
25     Q.  And, in fact, I believe you are

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ALEJANDRO RANGEL-LOPEZ

Page 113

1  identified on page 2 as being a part of the
2  steering committee and lead coordinator of the New
3  Frontiers project; correct?
4      A.  Yes.
5      Q.  And it describes a ten-member steering
6  committee, correct, on page 2?
7      A.  Yes.  Yes, I believe so.
8      Q.  And some of the names we've talked about
9  today are included in either the planning team or
10  the steering committee; correct?
11      A.  Yes.
12      Q.  I want to talk about a few of the names
13  that I don't think we've identified yet today, one
14  of which is Monica Vargas, Political and Community
15  Outreach Director of UFCW2.  Do you see that?
16      A.  Yes.
17      Q.  What is UFCW2?
18      A.  The United Food and Commercial Workers
19  Local 2.  They represent -- they're a labor union
20  representing the workers at Cargill and the Dodge
21  City National Beef plant, as well as the Liberal
22  National Beef plant.
23      Q.  All right.  I don't believe we've talked
24  about the name Elva Dominguez, who's identified as
25  the Patient Navigator at Genesis Family Health.

Page 114

1  Are you familiar with her?
2      A.  Yes.
3      Q.  And what -- what are -- what can you tell
4  me about her role as patient navigator at Genesis
5  Family Health?
6      A.  Well, I've had a couple conversations
7  with her, though I don't know what she does,
8  exactly.  All I know is that she works at Genesis
9  and at -- when I was doing work on food and
10  security, I know that she did -- she also helped
11  or ran the food pantry at Genesis Family Health.
12  I'm not sure.
13      Q.  Okay.  Another person who's identified
14  here as being on the steering committee is Gloria
15  Calderon, Community Health Worker Supervisor, also
16  at Genesis, and what was her role?
17      A.  She also works at Genesis Family Health
18  and -- yeah, she's -- she does a lot of work in
19  -- in the health care and immigrant, slash, like
20  refugee, like, yeah, health care.
21      Q.  Next person listed is Blanca Soto, and
22  you've identified her several times today; is that
23  correct?  Is that correct?
24      A.  Yes.
25      Q.  And she has been an appointed member of

Page 115

1  the Dodge City City Commission before; is that
2  correct?
3      A.  Yes.
4      Q.  And she has been a candidate for the
5  Dodge City City Commission for an elected
6  position; correct?
7      A.  Yes.
8      Q.  And she serves in a -- as Engagement
9  Coordinator of EOSL and Diversity, Dodge City
10  Public Schools.  You see that?
11      A.  Mm-hmm.  Yes.
12      Q.  The next person who's listed is Bianca
13  Alvarez, and she's listed as Bright Beginnings
14  Parent and Community Specialist for Dodge City
15  Public Schools.  Do you see that?
16      A.  Yes.
17      Q.  And it describes that in addition to this
18  planning committee and this steering committee,
19  that there was community engagement with over 200
20  Dodge City residents completing online surveys.
21  Do you see that; correct?
22      A.  Yes.
23      Q.  And this appears to be a more complete
24  version of the draft that you had previously
25  identified and what has been marked as Exhibit

Page 116

1  Number 7; is that correct?
2      A.  Yes.
3      Q.  And by "more complete," the earlier
4  version didn't yet have a couple of the sections
5  drafted; correct?
6      A.  Correct.
7      Q.  And -- and Exhibit 9 has some additional
8  sections that were not included in Exhibit 7;
9  correct?
10      A.  Yes.
11      Q.  Okay.  In terms of some of the witnesses
12  that have been identified as witnesses in -- in
13  this case, you have -- you've -- you have listed
14  Mr. Hernandez.  What is it that you would
15  anticipate that Mr. Hernandez would know
16  pertaining to the matters at issue in this case?
17      MS. WAKNIN:  Objection; form.
18      MR. RUPP:  Go ahead.
19      THE WITNESS:  He's the city manager.
20  BY MR. RUPP:
21      Q.  And you have also identified the city
22  clerk.  What is it that you would anticipate that
23  the city clerk would know that would be familiar
24  or that would be pertinent to the facts in this
25  case?

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 117

1    A.  City clerk.  I -- I worked with her.
2    Well, yeah, my desk was right next to hers when I
3    worked, when I was interning here over the summer
4    and, yeah, I mean, as an office mate, we -- I --
5    she saw, knows, or she knew most of what I was
6    working on, and we worked or I helped update some
7    of our forms that she regularly uses when
8    interacting with the public, especially those that
9    are looking to start up food trucks.
10       Prior to me updating those forms, most of the
11   -- yeah, the food truck information for people
12   looking to start a food truck, regulations,
13   procedures, all that stuff wasn't available in
14   English, so I worked on translating all that, and
15   she works with -- I mean, she -- she talks a lot,
16   interacts a lot with the general -- with the
17   public, and she has a -- pretty -- I feel, a --
18   a great understanding of -- of the community and
19   what's needed and just a -- just how -- providing
20   background on, yeah, what I did in the summer,
21   during the internship.
22       **Q.  And do you anticipate -- or strike that.**
23   **Were there any conversations that you had with the**
24   **city clerk about at-large elections?**
25       A.  No.

Page 118

1    **Q.  The next, or another person you've**
2    **identified, is Joe Nuci, who's obviously a city**
3    **commissioner.  Other than the fact that he's a**
4    **city commissioner and was elected to that**
5    **position, is there anything else that you would**
6    **anticipate that he would know that would be**
7    **pertinent to the issues in this lawsuit?**
8        A.  Aside from those already mentioned, no.
9            (THEREUPON, Deposition Exhibit No 10 was
10   marked for identification.)
11       BY MR. RUPP:
12       **Q.  I'm going to hand you Exhibit Number 10,**
13   **which is your supplemental initial disclosures**
14   **under the Federal Rules.  These are disclosures of**
15   **known witnesses who might be anticipated to**
16   **support your claim at -- at this stage, and there**
17   **are several folks identified here.  You have**
18   **identified, on page 3, past Latine candidates of**
19   **choice, and there are five names there.  Ms. Soto,**
20   **who we've discussed earlier today; correct?**
21       A.  Yes.
22       **Q.  Liliana Zuniga.  Who is that?  It's page**
23   **3.**
24       A.  Liliana?
25       **Q.  Mm-hmm.**

Page 119

1    A.  She ran -- she ran for office.
2        **Q.  Do you know when?**
3    A.  Not specifically, no.
4        **Q.  Do you know who she ran against?**
5    A.  No, I do not.  Yeah, not -- no, not -- I
6    don't.
7        **Q.  All right.  Jose Vargas.  Do you know who**
8    **that is?**
9    A.  Yes.
10       **Q.  And how do you know Mr. Vargas?**
11   A.  We met when I -- well, it was 2017 or
12   2018 and, yeah, he's a -- at a -- I'm sure a
13   -- some sort of Ford County Democrats meeting, but
14   yeah, he and his wife at the time were running, I
15   think, La Raza, I think, Community Services, or
16   it's an office here downtown that they -- I think
17   they, again, catered towards the needs of the
18   Latine community.
19       **Q.  Then Fernando Jurado, and we have**
20   **discussed him earlier today, I believe; is that**
21   **correct?**
22   A.  Yes.
23       **Q.  And then Angie Gonzalez.  Who is that?**
24   A.  Angie Gonzalez is a -- she ran for Ford
25   County Clerk back in 20 -- 20 -- 2020, possibly.

Page 120

1    I don't -- I don't remember what year exactly but,
2    yeah, and she's currently, I believe, employed at
3    the community housing, at CHAD, which is under the
4    -- the Economic Development Corporation.
5        **Q.  Of these five people who are identified**
6    **-- well, strike that.**
7        **Has Ms. Gonzalez ever run for city**
8    **commission, to your knowledge?**
9    A.  Not to my knowledge, no.
10       **Q.  Okay.  Of the five people we just talked**
11   **about, Ms. Soto, Ms. Zuniga, Mr. Vargas, Mr.**
12   **Jurado, and Ms. Gonzalez, have you spoken with any**
13   **of those about this lawsuit?**
14   A.  No.
15       **Q.  Then you identify several additional fact**
16   **and lay witnesses there, and the first one you**
17   **identify is the Dodge City Latino organizations**
18   **and officers of such organizations, including**
19   **Dodge City League of United Latin American Cities,**
20   **or Citizens, LULAC.  Are there any particular**
21   **individuals at LULAC who you would anticipate**
22   **would support your claims in this lawsuit?**
23   A.  I can't remember her name at the moment,
24   so no.
25       **Q.  The next one you list there is Janeth**

# ALEJANDRO RANGEL-LOPEZ

Page 121

1 Vasquez, City Commissioner of the City of Liberal,
2 Kansas. What might she know about the at-large
3 election system in Dodge City?
4    A. She -- Janeth Vasquez is a city
5 commissioner in Liberal, which has a -- I mean,
6 it's the same system used here in Dodge City.
7    Q. Okay. And is she Hispanic?
8    A. Yes.
9    Q. And has she been elected in an at-large
10 election to the City Commission of Liberal?
11    A. Yes.
12    Q. The next is Joyce Warshaw, former mayor
13 of Dodge City, Kansas. What do you anticipate
14 that she might know that would be pertinent to the
15 question of at-large elections in Dodge City?
16    A. I believe she was a member of the city
17 commission while -- when -- when Jan Scoggins
18 brought it up.
19    Q. Have you spoken with -- with Mayor
20 Warshaw about this issue?
21    A. No.
22    Q. The next you have listed is Melissa
23 Stiehler, who is your boss at Loud Light; correct?
24    A. Correct.
25    Q. What do you anticipate Ms. Stiehler may

Page 122

1 know about the at-large issues here?
2    A. Prior to working with Loud Light, she was
3 at the ACLU of Kansas doing voting rights
4 organizing, and I met her back in, I believe it
5 was either 2017 or 2018, and since then, you know,
6 she's -- she's -- she's aware of -- so I've known
7 her since -- for that long and I've talked to her
8 about at-large districts and as have several other
9 people when she meets in Dodge City, but, yeah.
10    Q. The next is an organization, Kansas
11 Appleseed. Is there any particular officer or
12 affiliated staff member you would anticipate
13 testifying on your behalf in this matter?
14    A. Not anyone in particular related to this,
15 no.
16    Q. The next is AJ Amaro. Who is AJ Amaro?
17    A. AJ Amaro is -- he lives here in Dodge
18 City. I do volunteer work with him.
19    Q. And what kind of volunteer work is that?
20    A. He is -- he runs a -- I believe it's
21 called the Education Growers. It's a long -- it's
22 a -- there's an acronym, but it's a -- they grow
23 hemp and I -- I -- I help with the -- their farm
24 and help plant -- and help to plant stuff and
25 volunteer in that capacity.

Page 123

1    Q. And what is it that you might anticipate
2 Mr. Amaro to know about the issue of at-large
3 elections?
4    A. He's a long-time resident of Dodge City.
5    Q. The next is Greta Clark. Who is that?
6    A. Greta Clark is, I believe, to the best of
7 my knowledge, the current chair of the Ford County
8 Democrats, but also provides -- teaches those
9 citizenship classes at the UFCW.
10    Q. And have you had discussions with Ms.
11 Clark about at-large elections?
12    A. No.
13    Q. And what is it that you think that she
14 might know that would be pertinent to the issue of
15 at-large elections?
16    A. Well, I haven't talked to her about at-
17 large elections, although she's been in
18 discussions where it -- it comes up in with other
19 people. As mentioned, Johnny Dunlap, this is
20 something that he talks about with a lot of folks
21 that he meets.
22    Q. Okay. Martin Rosas. Who is that?
23    A. I believe he is the president of the UFCW
24 Local 2.
25    Q. And what is it that you anticipate that

Page 124

1 he might know that would be pertinent to at-large
2 elections?
3    A. He works with a labor union, representing
4 a large chunk of -- I mean, representing the
5 worker -- people who work at these -- at these
6 places where Hispanics tend to work, I guess.
7    Q. And have you had any discussions with him
8 about at-large elections?
9    A. Not to my knowledge, no.
10    Q. Who is Maribel Sanchez?
11    A. Maribel Sanchez is a -- a, I guess, a
12 former -- I've never -- she's two years older than
13 me and like a mentor/friend who does work with a
14 Latine nonprofit in Washington, D.C. working on
15 legislation or, no, high school civic engagement,
16 I believe, but she's born and raised -- well, not
17 -- maybe not born here, but raised here for sure,
18 yeah.
19    Q. And have you spoken with her about at-
20 large elections in Dodge City?
21    A. No.
22    Q. The next is Jan Scoggins, and we've
23 spoken with her or about her a little bit today.
24 Is there anything that you would anticipate that
25 she would know about at-large elections in Dodge

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604          Suite 101                 Suite 305
785-273-3063             Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com       913-383-1131              316-201-1612

# ALEJANDRO RANGEL-LOPEZ

Page 125

1  City that we have not yet discussed today?
2      A.  Jan Scoggins?
3      Q.  Yes.
4      A.  Not to my knowledge, that I can think of
5  at this -- at the moment, no.
6      Q.  Okay.  Who is Amy Soberanes?
7      A.  Amy Soberanes is -- she lives here, went
8  to high school with her and, yeah, she -- she
9  volunteers with me occasionally, yeah.
10     Q.  And have you had any discussions with her
11 about at-large elections?
12     A.  Not to my recollection, no.
13     Q.  And I believe we have already discussed
14 Monica Vargas; is that correct?
15     A.  I believe so.
16     Q.  Remind me who she is.
17     A.  Monica Vargas is the -- is a community
18 and -- community outreach director and legal
19 affairs person at the UFCW Local 2.
20     And I guess just to clarify, Maribel, I
21 haven't spoken to her directly about it.  However,
22 she was present at the -- at the -- at both the
23 launch of New Frontiers and the release of the
24 report, so it's not a direct conversation, though
25 I guess I have technically spoken to her about it.

Page 126

1      MR. RUPP:  Why don't we take a few
2  minutes and I'll discuss with my colleagues and
3  determine whether I'm done.
4      THE VIDEOGRAPHER:  It's 2:17 p.m.  We're
5  going off the record.
6      (THEREUPON, a break was then taken.)
7      THE VIDEOGRAPHER:  It is 2:24 p.m.  We're
8  back on the record.
9      MR. RUPP:  Thank you very much.  We have
10 no additional questions at this time.
11     MS. WAKNIN:  I'm going to ask a few
12 questions.
13     THE VIDEOGRAPHER:  Can I have you slip on
14 your microphone?
15     MS. WAKNIN:  This one?
16     THE VIDEOGRAPHER:  Yeah.
17     MS. WAKNIN:  Okay.
18     THE VIDEOGRAPHER:  I think it's upside
19 down.  You can twist it.
20     MS. WAKNIN:  There we go.
21     THE VIDEOGRAPHER:  Thank you.
22     MS. WAKNIN:  Wonderful.  Are we on the
23 record?
24     THE VIDEOGRAPHER:  Yes.
25     CROSS-EXAMINATION

Page 127

1      BY MS. WAKNIN:
2      Q.  Alejandro, do you mind going to Exhibit
3  3?  Or Exhibit 2, apologies, and just let me know
4  once you have it.
5      A.  Yes, I've got it.
6      Q.  Mr. Rangel-Lopez, can you please go to
7  page 1.
8      A.  Yes.
9      Q.  Are you at page 1?
10     A.  Yes, I am.
11     Q.  Mr. Rangel-Lopez, what does it mean that
12 this report was edited by you?
13     A.  It means I made it look -- look nice.  I
14 worked on the formatting, basically putting it all
15 -- all together into what you see in front of you.
16 I didn't write anything, but so the only thing I
17 did was make it into a -- something that is
18 presentable.
19     Q.  So I just want to clarify.  Did you write
20 this quote that is on page 2?  It says "By
21 Alejandro Rangel-Lopez."
22     A.  Yes, that's -- yes, that's the only thing
23 I wrote in this.
24     Q.  Other than that quote, is there anything
25 in this report that you wrote yourself, that is

Page 128

1  your words?  You can take a second and page
2  through the report.
3      A.  No.
4      MS. WAKNIN:  Okay.  No further questions.
5      MR. RUPP:  Nothing additional.
6      THE VIDEOGRAPHER:  It is 2:27 p.m.  We're
7  going off the record.  This concludes the
8  deposition.
9      THE REPORTER:  Can I get signature and
10 copy orders on the transcript record, please?
11     MS. WAKNIN:  We're going to reserve
12 signature and then we'll -- I think I told you
13 we're also ordering a rough copy and a rush copy
14 as well.
15     MR. RUPP:  And we will take ours
16 electronically.
17     THE REPORTER:  Any rush delivery or rough
18 draft?
19     MR. RUPP:  No.
20     (THEREUPON, the deposition concluded at
21 2:28 p.m.)
22 .
23 .
24 .
25 .

Appino & Biggs Reporting Service, Inc.
5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604      Suite 101            Suite 305
785-273-3063          Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com   913-383-1131          316-201-1612
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ALEJANDRO RANGEL-LOPEZ

Page 129

```
1           SIGNATURE
2  .
3       The deposition of ALEJANDRO RANGEL-LOPEZ
4  was taken in the matter, on the date, and at the
5  time and place set out on the title page hereof.
6  .
7       It was requested that the deposition be
8  taken by the reporter and that same be reduced to
9  typewritten form.
10 .
11      It was agreed by and between counsel and
12 the parties that the deponent will read and sign
13 the transcript of said deposition.
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 .
25 .
```

Page 130

```
1           AFFIDAVIT
2  .
3  STATE OF _____:
4  COUNTY/CITY OF _____:
5  .
6       Before me, this day, personally appeared,
7  ALEJANDRO RANGEL-LOPEZ, who, being duly sworn,
8  states that the foregoing transcript of his/her
9  Deposition, taken in the matter, on the date, and
10 at the time and place set out on the title page
11 hereof, constitutes a true and accurate transcript
12 of said deposition, along with the attached Errata
13 Sheet, if changes or corrections were made.
14 .
15      _____
16      ALEJANDRO RANGEL-LOPEZ
17 .
18      SUBSCRIBED and SWORN to before me this
19 _____ day of _____, 2023 in the
20 jurisdiction aforesaid.
21 .
22 _____   _____
23 My Commission Expires    Notary Public
24 .
25 .
```

Page 131

```
1       DEPOSITION ERRATA SHEET
2  .
3  RE:    APPINO & BIGGS REPORTING SERVICE, INC.
4  .
5  FILE NO.: 68818
6  .
7  CASE:  MIGUEL COCA AND ALEJANDRO RANGEL-LOPEZ vs.
8         CITY OF DODGE CITY, ET AL.
9  .
10 DEPONENT: ALEJANDRO RANGEL-LOPEZ
11 .
12 DEPOSITION DATE: 04/24/2023
13 .
14 To the Reporter:
15 I have read the entire transcript of my Deposition
16 taken in the captioned matter or the same has been
17 read to me.  I request that the following changes
18 be entered upon the record for the reasons
19 indicated.  I have signed my name to the Errata
20 Sheet and the appropriate Certificate and
21 authorize you to attach both to the original
22 transcript.
23 .
24 .
25 .
```

Page 132

```
1  PAGE:LINE FROM    TO       REASON
2  .
3  .
4  .
5  .
6  .
7  .
8  .
9  .
10 .
11 .
12 .
13 .
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 SIGNATURE:_____ DATE:_____
25      ALEJANDRO RANGEL-LOPEZ
```

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**ALEJANDRO RANGEL-LOPEZ**

Page 133

```
 1              CERTIFICATE
 2   STATE OF KANSAS
 3   COUNTY OF SHAWNEE
 4       I, Lee Ann Bates, a Certified Court
 5   Reporter, Commissioned as such by the
 6   Supreme Court of the State of Kansas,
 7   and authorized to take depositions and
 8   administer oaths within said State
 9   pursuant to K.S.A 60-228, certify that
10   the foregoing was reported by
11   stenographic means, which matter was
12   held on the date, and the time and place
13   set out on the title page hereof and
14   that the foregoing constitutes a true
15   and accurate transcript of the same.
16       I further certify that I am not
17   related to any of the parties, nor am I
18   an employee of or related to any of the
19   attorneys representing the parties, and
20   I have no financial interest in the
21   outcome of this matter.
22       Given under my hand and seal this
23   27th day of April, 2023.
24        _____
25         Lee Ann Bates, C.S.R. No. 1067
```

**Appino Biggs** Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612