**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
**Sharon Seibel-Robb on 06/22/2023**

```
1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF KANSAS
2

3   MIGUEL COCA and          :
    ALEJANDRO RANGEL-LOPEZ,:
4                            :   Case No. 6:22-cv-01274-EFM-RES
          Plaintiffs,        :
5                            :
    vs.                      :
6                            :
    CITY OF DODGE CITY,      :
7   ET AL,                   :
                             :
8        Defendants.         :   JUNE 22, 2023

9

10

11

12

13

14

15         VIDEOTAPED DEPOSITION OF:  SHARON SEIBEL-ROBB
                  (taken via Zoom videoconference)
16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT**

**F**

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
Sharon Seibel-Robb on 06/22/2023                    Pages 2..5

---

Page 2

1  APPEARANCES:
2
    Representing the Plaintiffs:
3
    AMERICAN CIVIL LIBERTIES
4    UNION OF KANSAS
     10561 Barkley Street, Suite 500
5    Overland Park, KS  66212
     BY:  SONNI WAKNIN, ESQ.
6    (913) 490-4100
     swaknin@aclukansus.org
7
8
    Representing the Defendants:
9
    FOULSTON SIEFKIN
10   7500 College Boulevard, Suite 1400
     Overland Park, KS  66210
11   BY:  CLAYTON J. KAISER, ESQ.
     (913) 498-2100
12   ckaiser@foulston.com
13
14  IN ATTENDANCE:
    Brandon Roberts, Videographer
15  Bradley Ralph, Esq.
    Chris Birzer, Esq.
16  Emily Shaul, Esq.
    Caleb Hersh, Esq.
17  Elizabeth Baggott, Esq.
18
19
20
21
22
23
24
25

---

Page 3

1            I N D E X
2
    WITNESS         DIRECT CROSS REDIRECT RECROSS
3
    Sharon Seibel-Robb   6    102
4
5  EXHIBITS:                              PAGE:
6  Plaintiff's
    Exhibit 70, bates Dodge_City_004145      54
7
    Exhibit 71, bates Dodge_City_004129      67
8
    Exhibit 72, bates Dodge_City_004127      70
9
10  *  Exhibits marked and retained by Ms. Waknin
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1            STIPULATIONS
2
3    It is hereby stipulated and agreed by and among
4    counsel for the respective parties that all formalities
5    in connection with the taking of this deposition,
6    including time, place, sufficiency of notice, and the
7    authority of the officer before whom it is being taken,
8    may be and are hereby waived.
9    It is further stipulated and agreed that objections
10   other than as to form are reserved to the time of trial.
11   It is further stipulated and agreed that the reading
12   and signing of said deposition by the deponent is hereby
13   not waived.
14   It is further stipulated that the proof of the
15   qualifications of the Notary Public before whom the
16   deposition is being taken is hereby waived.
17
18
19
20
21
22
23
24
25

---

Page 5

1    REPORTER:  Will the attorneys agree to
2    the usual stipulations, the virtual
3    testimony, and the remote oath, given by me,
4    even though the Witness and I are not in the
5    same state?
6    ALL:  Agreed.
7    REPORTER:  Ms. Seibel, would you like
8    the opportunity to read and sign your
9    deposition transcript?
10   THE WITNESS:  Yes.
11   VIDEOGRAPHER:  This is the beginning of
12   Media No. 1 in the deposition of Sharon Robb
13   in the matter of Miguel Coca, et al. versus
14   Dodge City.  Today's date is June 22, 2023,
15   and the time on the monitor is 10:00 a.m.
16   My name is Brandon Roberts, and I'm the
17   videographer.  The court reporter is Keli
18   McGilton.  We are here with Huseby Global
19   Litigation.
20   Counsel, please introduce yourselves,
21   after which the court reporter will swear in
22   the witness.
23   MS. WAKNIN:  This is Sonni Waknin on
24   behalf of Plaintiffs.
25   MR. KAISER:  This is Clayton Kaiser on

---

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
**Sharon Seibel-Robb on 06/22/2023**                                    Pages 6..9

Page 6

1      behalf of the Defendants.

2

3      SHARON SEIBEL, Deponent, having been first duly
4  sworn, was examined and deposed as follows:

5

6      DIRECT EXAMINATION BY MS. WAKNIN:

7

8      Q.  (By Ms. Waknin)  So Ms. Robb, I know that
9  you had just stated your name for the record, but do
10  you mind repeating it and spelling it for me?
11      A.  Sharon, S-H-A-R-O-N, Seibel, S-E-I-B-E-L,
12  Robb, R-O-B-B.
13      Q.  And would you like me to call you Ms. Robb
14  or Ms. Seibel?
15      A.  It doesn't matter.
16      Q.  Okay.
17      A.  Either one.
18      Q.  All right.  I'll call you Ms. Seibel if
19  that's agreeable to you.
20      A.  That's kind of what's on the papers and
21  so. . .
22      Q.  Well, Ms. Seibel, did you receive a subpoena
23  for your deposition today?
24      A.  Yes, I did.
25      Q.  And is that why you're appearing here today

Page 7

1  pursuant to the season?
2      A.  Yes.
3      Q.  No worries.  Do you mind just stating your
4  address for me?
5      A.  11576 US Highway 283, Dodge City, Kansas.
6      Q.  And how long have you lived in Dodge City?
7      A.  Since 2000, so about 23 years.
8          (Reporter instruction)
9      Q.  Do you mind restating your answer?
10      A.  23 years.
11      Q.  Wonderful.  Ms. Seibel, have you ever been
12  deposed before?
13      A.  No.
14      Q.  So I'm going to just go over some rules
15  regarding this deposition.  Is that okay with you?
16      A.  Yes.
17      Q.  Wonderful.  So I'm going to be asking you
18  questions.  The court reporter will be making a record
19  of your testimony and we also, as you may have heard,
20  have a videographer today, so all of your responses
21  during your deposition have to be verbal.  So "yes" or
22  "no," no head shaking, no saying "uh-huh" or "nuh-uh."
23  Is that okay?
24      A.  Yes.
25      Q.  So it's also important that we don't talk

Page 8

1  over each other or talk too fast.  I know I have a
2  problem with talking too fast, so if I'm speaking too
3  fast or my questions are too fast, please just let me
4  know.  But I do ask that you and I don't speak over
5  each other.  You just wait until I finish the question.
6  Does that sound agreeable to you?
7      A.  Yes.
8      Q.  You might hear Mr. Kaiser, who is counsel
9  for the Defendants, lodge an objection.  If you hear
10  that objection, that objection is for the record.  You
11  still have to answer the question unless you believe
12  the question would disclose any attorney/client
13  privileged information.  Do you understand that?
14      A.  Yes.
15      Q.  Ms. Seibel, are you represented by counsel
16  today?
17      A.  No.
18      Q.  If you don't understand a question, please
19  let me know.  If you answer a question, I'm going to
20  assume that you understood the contents of my question
21  and you answered based off of that understanding.  So
22  will you do me a favor and let me know if you don't
23  understand a question I'm asking you?
24      A.  Yes, I will.
25      Q.  Wonderful.  Did you bring any documents with

Page 9

1  you today?
2      A.  No.
3      Q.  And is your desk cleared of everything
4  except the Zoom on your computer?
5      A.  Yes.
6      Q.  Wonderful.  During this deposition you're
7  allowed to take brakes.  I just ask that if you want to
8  take a break you wait until I finish asking a question,
9  you finish giving an answer, and then you can tell me,
10  Ms. Waknin, I need to take a 5-, 10-minute break.
11  We'll also have a lunch break around 12:00 or
12  1:00 p.m., whenever you prefer, and you can just let me
13  know how long you'd like to take for that lunch break,
14  but I just want you to understand that you are allowed
15  to take breaks during this deposition if you have to go
16  tend to something.
17      A.  Okay.
18      Q.  Okay.  And at any point if you believe maybe
19  you didn't give a complete answer to a question, maybe
20  you remember something that you had given an answer to
21  previously, you're allowed to say -- revise your answer
22  or provide additional information.  Do you understand
23  that?
24      A.  Yes.
25      Q.  Okay.  And during the deposition, it's sworn

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
Sharon Seibel-Robb on 06/22/2023                    Pages 10..13

Page 10

1  testimony.  You were just sworn under oath, so you do
2  understand that you're giving an oath to tell the truth
3  today just like you would do before a judge in a court?
4      A.  Yes.
5      Q.  Is there any reason you think that you
6  wouldn't be able to answer my questions today
7  truthfully?
8      A.  No.
9      Q.  Okay.  So, Ms. Seibel, do you know anything
10  about the case at issue, Coca versus Dodge City?
11     A.  What I've reviewed in the documents, yes.
12     Q.  And what documents are you referring to?
13     A.  The papers that came with the subpoena.
14     Q.  Okay.  And is that the subpoena attachment
15  that you're referring to?
16     A.  Yeah.  Where it was talking about what
17  documents and information that I might have.
18     Q.  Okay.  Wonderful.  Have you read or heard
19  anything else about the case?  Do you know what the
20  case is about?
21     A.  Yes, I do.
22     Q.  And what is your understanding of what this
23  case is about?
24     A.  My understanding is that the two men are --
25  the suit has to do with the method that the city uses

Page 11

1  for electing council people.  They use a method, the
2  at-large method, and they're questioning that.
3      Q.  And how did you form this basis of
4  understanding?
5      A.  From the information that was attached with
6  the -- that were requesting documents.  That was
7  mentioned.
8      Q.  Okay.  So, Ms. Seibel, I just wanted to ask
9  you a little bit about yourself.  Do you mind telling
10  me where you're from, where you went to school, that
11  sort of thing?
12     A.  I'm from northwest Kansas, which is Sharon
13  Springs, Kansas.  That's where I went to school.  I had
14  a brief college at Fort Hays State.  And I now live in
15  Dodge City.
16     Q.  And how did you make your way over to Dodge
17  City?
18     A.  My first husband and I were grocery store
19  owners and we purchased a grocery store in Kinsley and
20  then we were able to sell that and we moved to Dodge.
21     Q.  And you had told me earlier you lived in
22  Dodge for at least two decades; is that right?
23     A.  Correct.
24     Q.  Do you have any children, Ms. Seibel?
25     A.  Yes, I do.  Yes, I do.

Page 12

1      Q.  And do they also go to school in Dodge?
2      A.  No, no.  My children went to school in
3  Sharon Springs.  I didn't move until after they
4  graduated high school.
5      Q.  And do you currently work?
6      A.  No.  I'm retired.
7      Q.  What was the job you had prior to your
8  retirement?
9      A.  Ford County Clerk and Election Officer.
10     Q.  And how long were you the Ford County Clerk
11  and Election Officer for?
12     A.  For 14 years.
13     Q.  Did you have to get elected to become the
14  Ford County Clerk?
15     A.  Yes, I did.
16     Q.  Why did you decide to run for Ford County
17  Clerk?
18     A.  I had previously been the county clerk in
19  Wallace County, and I enjoyed the work.  I liked the
20  work, and I was working in the county clerk's office.
21  I started working there in 2001.  So I was working as
22  the election clerk, and the current county clerk at the
23  time I was working was retiring.  And I felt like I had
24  plenty of experience in having been a county clerk and
25  election officer in another county, plus my years

Page 13

1  there, so I ran for office.
2      Q.  So when you're talking about working in the
3  elections office in 2001, are you talking about working
4  in the Ford County elections office in 2001 or in
5  Wallace County?
6      A.  No.  Ford County.
7      Q.  Okay.  So maybe let me back up.  When did
8  you first become employed with Ford County to do
9  election-related work?
10     A.  2001.
11     Q.  And then, if I'm understanding you
12  correctly, you after -- in 2001 when you were notified
13  that the former Ford County Clerk was retiring and you
14  decided to run for county clerk.
15     A.  That was 2008.
16     Q.  Okay.  2008.
17     A.  Yes.  I ran for office and was elected in
18  2008, took office in 2009.
19     Q.  What were you doing in the Ford County
20  Clerk's Office from 2001 to 2008?
21     A.  Elections.
22     Q.  And can you tell me a little bit about what
23  your duties or responsibilities were in elections?
24     A.  My responsibility was to collect the voter
25  registration cards that were mailed in, or we had sites

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
Sharon Seibel-Robb on 06/22/2023                                      Pages 14..17

Page 14

1   where we picked up election cards that had been filled
2   out, such as the library or the community college, and
3   to enter that information into the election system that
4   we had, and then to use that information, and then we
5   worked closely with the secretary of state's office on
6   the election part of it, making sure the candidates
7   were all listed.  We made ballots, we tabulated votes,
8   and then I made sure everybody was given voter credit,
9   and it's a whole sequence of getting ready for, going
10  through, and completing an election.
11      Q.  During that time, how many elections did you
12  oversee from 2001 to 2008?
13      A.  Oh, gosh.  It depends on the year.  Some
14  years you have primaries and generals.  I really can't
15  give you a number.
16      Q.  You know, if I'm using maybe a proper term,
17  is it a ton of elections?
18      A.  Well, it's at least a two a year, but
19  occasionally there are special elections called by
20  school districts or fire districts, or, you know, any
21  governing body can call and so without looking at
22  records, I can't tell you.
23      Q.  Did you like your work in the elections
24  office?
25      A.  Yes, I did.

Page 15

1   Q.  Why did you like your work in the elections
2   office?
3   A.  I just like that kind of work.  We interact
4   with a lot of people.  We help a lot of people.  It's
5   just exciting work.
6       Q.  When you were in the elections office, were
7   Dodge City elections held at a different time than,
8   let's say, federal or state elections?
9   A.  Yes, yes, they are.
10      Q.  When were they held?
11      A.  They would have been held in the
12  odd-numbered years, I believe, is how that works.
13      Q.  And was that in 2001 to 2008, was that set
14  by state law, county --
15      A.  Yes, yes.
16      Q.  Okay.
17      A.  State law.
18      Q.  So I want to also talk to you about Wallace
19  County.  So how long did you serve as a county clerk in
20  Wallace County?
21      A.  I was elected to three terms, but I left in
22  the first year of the third term, so that was about
23  probably ten years, but I had also worked in the
24  election office previous to being elected there also.
25      Q.  Roughly how many years have you collectively

Page 16

1   done election-related work, would you say?
2   A.  Oh, gosh, probably, let's see 28.
3       Q.  Wow.  And has the work changed throughout
4   the 28 years?
5   A.  Oh, yes.
6       Q.  Do you mind telling me a little bit how it's
7   changed?
8   A.  Well, for one thing, we've gone from having
9   our own in-house system for elections to being on the
10  state system where the state maintains the voter files,
11  and we have access through a secure link to that.  We
12  had paper ballots.  We had counting boards.  We had
13  nothing electronic until later in my term in Ford
14  County.  So I would guess, you know, going from paper
15  ballots to electronic voting machines are our big
16  changes.  Also, at one point in Ford County, we were
17  required to publish all of our ballots in Spanish and
18  English on the same ballot.  That was a big change.
19      Q.  Do you know about what year that was where
20  you had to -- I imagine -- let me strike that.
21          When you were required, when Ford County was
22  required, to provide Spanish and English language
23  ballots, was that under Section 203 of the Federal
24  Voting Rights Act?
25      A.  Yes, it was.

Page 17

1   Q.  And do you know what year Ford County was
2   designated?
3   A.  Pardon me.  I'm sorry.  I talked over you.
4       Q.  That's okay.
5   A.  2004 we began the process of making that
6   happen.
7       Q.  When did Ford County get notified that they
8   were covered, I guess, under Section 203 of the Federal
9   Voting Right Act?
10      A.  I wasn't the county clerk then.  I was the
11  election clerk, but I'm going to say around that same
12  time that we started having meetings with secretary of
13  state and making that happen, 2003, '04, '05, somewhere
14  in there.
15      Q.  Do you mind defining for me the role of the
16  Ford County Clerk?
17      A.  As we are the election officer of the
18  county, we also do a lot of over things.  Are you
19  interested in that part, or are you just wanting to
20  know elections?
21      Q.  Why don't we just specifically talk about
22  elections, if that's okay with you.
23      A.  Okay.  As we do elections, of course, all
24  the filings are done in our office.  Anyone who wants
25  to run for office comes to our office to file.  You can

MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.
Sharon Seibel-Robb on 06/22/2023                    Pages 18..21

Page 18

1   either file by fee or by petition.  We have to verify
2   those petitions, make sure that those names are all
3   good, registered in good standing voters.  We collect
4   all the voter registrations.  We make sure those are
5   entered into the system, and people are placed in the
6   proper voting precinct for what their address is.  And
7   then we -- of course, all of the candidate's names are
8   then -- we design the ballot.  We have a form -- the
9   secretary of state -- we follow, and we submit all that
10  to -- we have a company that we worked with that would
11  print our ballots.
12          And then we, of course, have to set up the
13  voting place.  We have to secure board workers, and we
14  are present at the elections and try to -- and keep in
15  touch with all the voting precincts during the day.  At
16  the end of the day, we tabulate the votes.  At this
17  point in the process, we have electronic equipment to
18  help us do that.  We use to have counting boards that
19  made for very late nights.
20          And then at the end of the election day, all
21  the information is brought back to the office and
22  tabulated, and we have -- then we start the whole
23  reporting part of elections where we are making reports
24  to media, to precincts, to secretary of state.  It goes
25  on and on.  The reports go on and on.

Page 19

1       Q.  So I want to ask you a question about the
2   petition process for when a candidate files.  You said
3   that there are two ways, either by fee or by petition;
4   is that correct?
5       A.  That is correct.
6       Q.  And by petition, do you mean that -- well,
7   what do you mean "by petition"?  How does a candidate
8   file by petition?
9       A.  When a candidate decides that they want to
10  run for office, they come to our office and pick up the
11  papers and what they need to go out into the community
12  and collect signatures.  And we have a formula to
13  calculate how many signatures they need to get
14  qualified, and we give them those numbers, and then
15  they go and collect the signatures.  And it's usually
16  by party.  You know, it's usually a Republican or a
17  Democrat list of names that they can get from us to go
18  out and get signatures, and then they return the
19  petition to our office, and we verify those signatures,
20  making sure that those people are -- that their
21  signature matches what we have on file.
22      Q.  Okay.  And do candidates for local elections
23  generally file by fee or by petition, you know, in your
24  experience?
25      A.  My experience in local elections it was by

Page 20

1   fee.
2       Q.  And when you say that there is a formula to
3   calculate how many signatures one might need by
4   petition, what was that formula?
5       A.  It's a percent of the registered Republican
6   or Democrats, and I can't tell you the percent anymore.
7   I don't remember.
8       Q.  No worries.  Would it be larger for Ford
9   County than Dodge City, would you say?
10      A.  No.
11      Q.  Why is that?
12      A.  Well, we don't have -- are you talking about
13  the rural Ford County?
14      Q.  So I guess what I'm asking is like, for
15  example, there's the Dodge City Commission, right?  And
16  so there's elections for those seats.  And then there's
17  the Ford County Commissions, right?  And there's
18  elections for those seats.
19      A.  Correct.
20      Q.  So when there's a petition and someone
21  wanted to file by petition, would they need more
22  signatures for the Ford County Commission election
23  seat, or would they need more signatures for the Dodge
24  City election seat?
25      A.  It depends on the county commissioner

Page 21

1   district or the precinct or the -- for the city
2   commission, and it depends on the number of registered
3   voters.  And I would say it would be more for Dodge
4   City, but I -- yeah, I'm not exactly sure, but just
5   given the amount of population.
6       Q.  Okay.  Did the Ford County Clerk oversee
7   Dodge City Commission election?
8       A.  Yes.
9       Q.  And so you were -- and I apologize.  Maybe
10  I'm jumping around a little bit, and I hope that --
11  just let me know if you can't follow me sometimes.  But
12  I want to just ask you, when did you stop being the
13  Ford County Clerk?
14      A.  2015.
15      Q.  Okay.  Is there a reason why you decided not
16  to run again?
17      A.  I was retirement age, and I was ready to
18  retire, and I had someone interested in taking the
19  reins and becoming the next county clerk.  It seemed a
20  good time to do that.
21      Q.  And when you say, Someone waiting to -- you
22  know, willing to take the reins, what do you mean by
23  that?
24      A.  It was the person who was working in my
25  office as the election clerk.

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
Sharon Seibel-Robb on 06/22/2023                    Pages 22..25

Page 22

1     Q.   And who was that person?
2     A.   Debbie Cox.
3     Q.   And in your experience, what's your
4  experience with running for office in Ford County?
5     A.   Well, my experience was when I decided to
6  run, I filed by petition.  I got the required number of
7  signatures.  I posted all the election signs, did all
8  the parades, did all the things you need to do to let
9  people know who you are and what you're running for.
10 And we don't really have a campaign type, you know,
11 we're-going-to-lower-taxes type of thing.  We don't do
12 that because we're not in control of that.  Just
13 letting people know who you are and why you want the
14 job and also my experience that I had.  My past
15 experience needed to be shared with people, so that's
16 my experience.
17    Q.   In that first election in 2008, were you
18 running in a contested election?
19    A.   Yes, I was.
20    Q.   And who were you running against, if you
21 remember?
22    A.   Karen Blankman.
23    Q.   Do folks in Dodge City vote in Ford County
24 Clerk race?  In the Ford County Clerk race?
25    A.   Okay.  Say that again.

Page 23

1     Q.   No worries.  So do folks who live in Dodge
2  City, can they vote for Ford County Clerk?
3     A.   Oh, yes.
4     Q.   And when you were running in that first --
5  in that 2008 election, did you campaign in Dodge City?
6     A.   Yes, I did.
7     Q.   And do you mind explaining to me how you
8  campaigned in Dodge City?
9     A.   I put out signs.  I knocked on doors.  I
10 asked -- I had campaign literature.  I had posters that
11 told about me.  I had door hangers.  I had -- I went to
12 different forums that were hosted by Republican Women
13 and other groups, and I had TV ads.  I had radio ads.
14    Q.   Wow.
15    A.   Yeah.
16    Q.   That's a lot.  That's a lot of work.  That's
17 wonderful.  When you were putting up signage, where did
18 you primarily put up signage in Dodge City?
19    A.   I had contacted people -- I had -- I had
20 contacted people in each of the precincts in the city
21 that I knew because I -- part of more election board
22 workers that had worked for me, and I contacted them.
23 So I had signage in every precinct.
24    Q.   And did that include like south Dodge, too?
25    A.   Yes.

Page 24

1     Q.   And when you knocked on doors, primarily
2  where did you knock on doors for canvassing?
3     A.   Most all over the town.  You know, I can't
4  say that I covered every precinct in town, but I did a
5  great deal of them.
6     Q.   I think, in your experience living in Dodge
7  City and being a Ford County Clerk, are there areas in
8  Dodge City that are -- well, strike that.
9          Do you know the demographics of Dodge City?
10    A.   I do somewhat, yes.
11    Q.   And what are those demographics?
12    A.   Dodge City is majority minority community.
13    Q.   And what do you mean when you say that?
14    A.   We are -- there are more non-English
15 speaking Hispanics and other groups in Dodge City than
16 there are Caucasian.
17    Q.   And, pardon me, this might be a rude
18 question, but how do you -- what do you mark on the
19 census form like for race or ethnicity?
20    A.   What do I mark?
21    Q.   Yes.
22    A.   I don't even know what the options are
23 except Caucasian.  I think there's probably something
24 else.  Does it say non-something or -- I don't know.
25    Q.   Yeah.  No worries.  I was just wondering, do

Page 25

1  you identify as Hispanic or the term Latino?
2     A.   Do I identify as that?
3     Q.   Yes.
4     A.   No.
5     Q.   Okay.  And when you were campaigning in 2008
6  for Ford County Clerk, did you do any outreach to the
7  Hispanic community in Dodge City?
8     A.   Yes, I did.  I had people who were helping
9  and working on the election boards that I knew -- who
10 were Hispanic that I knew, and I asked them if I could
11 put signage in their yard, handed them information that
12 they could disseminate to their groups that they were
13 involved in.
14    Q.   And after you ran in 2008, when was the next
15 election you ran in for Ford County Clerk?
16    A.   Let's see, 2008.  2012.
17    Q.   And was that a contested election for Ford
18 County Clerk?
19    A.   No.
20    Q.   Did you run unopposed then?
21    A.   Yes, I believe I did.
22    Q.   And in 2016 when Debbie Cox decided she was
23 going to run for Ford County Clerk, did she run
24 uncontested, to your knowledge?
25    A.   Let's see, she -- I think she has had

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
**Sharon Seibel-Robb on 06/22/2023**                              **Pages 26..29**

Page 26

1  opposition. You know, I can't say for sure, but I
2  believe she did have opposition.
3       Q. And is that in both elections she's run in?
4  Because I know she's run in, you know, elections since
5  2016.
6       A. Yes. I believe she -- I can't tell you who
7  they were. I don't remember, but I believe she did
8  have opposition in both.
9       Q. No. That's no problem. You had mentioned
10  that Debbie Cox, that you had some -- that she was kind
11  of like a successor almost to you. Is that a fair
12  characterization?
13       A. Yes. She was interested in being the county
14  clerk, yes.
15       Q. And in elections in Ford County or Dodge
16  City, do you feel like it's generally the case that
17  there are kind of long-standing incumbents in office?
18       A. There have been in the past. I wouldn't say
19  it's the case now.
20       Q. And why wouldn't you say it's the case now?
21       A. Well, there's been -- well, of course --
22  some of the offices in the county have had a couple of
23  changes. And some are elected, some are not. They're
24  hired. But I would say in the county commissioners,
25  the county appraiser, you know, some of the main

Page 27

1  offices of the county, yeah, there has been
2  long-standing, uh-huh.
3       Q. And I'm going to just talk to you
4  specifically maybe about the Dodge City Commission, so
5  are you familiar with any -- with like the elections
6  for Dodge City Commission?
7       A. Yes, I am.
8       Q. Do you mind explaining to me your
9  familiarity with that?
10       A. Well, we oversee those elections. Those are
11  part of what we do. Every candidate who files for an
12  office, we oversee every election held in the county
13  and so they are -- they're on the candidate list.
14       Q. Are you a voter for Dodge City Commission
15  elections?
16       A. Yes, I am. We have three commission
17  districts.
18       Q. For Dodge City?
19       A. No, not for Dodge City. I'm sorry. I
20  thought you said Ford County.
21       Q. No, no worries. I was asking, you stated
22  that you lived in Dodge City, so I was wondering, have
23  you voted in Dodge City Commission elections, so for
24  the city counsel?
25       A. I have. I do not live in the city now. I

Page 28

1  live in the county.
2       Q. Okay. And when did you vote in those city
3  elections?
4       A. From the time I registered when I moved over
5  here until I moved to the county in 2015 or 2016.
6       Q. And so with your experience as someone who
7  has run elections in Ford County and overseen those
8  Dodge City Commission elections and then you, yourself,
9  a voter in those elections, would you say that, you
10  know, over, I would say, maybe like the past seems like
11  16 years that you were voting or 17 years you were
12  voting in those elections that there was a lot of
13  contested elections?
14       A. Yeah. I would say a majority of the races
15  would have -- the candidate would have opposition.
16       Q. Okay. And to your knowledge, did any
17  Hispanics or folks who identify as Hispanic or Latino
18  run for Dodge City Commission?
19       A. I do not believe that -- I do not believe --
20  I cannot remember one during my tenure as election
21  officer.
22       Q. Did you find that strange in a majority
23  minority city that there were no Hispanics or Latinos
24  that ran for Dodge City Commission?
25       A. I did not at the time, no.

Page 29

1       Q. Okay. Why not?
2       A. I don't really know. I don't -- it just,
3  you know -- I don't know.
4       Q. It just seemed like a --
5       A. I guess it was just the way it was. We
6  announced all the positions that were open. Anyone
7  could file that wanted to file, and, you know, we took
8  the applications that were given us, you know, so. . .
9       Q. So maybe it just seems like a -- it just
10  seemed like a fact of life in Dodge City that there
11  weren't a lot of Latino or Hispanic folks who ran for
12  commission? Am I understanding you correctly?
13       A. Okay. Say it again.
14       Q. No worries. So it seems like it just kind
15  of was the case for a while that there weren't really
16  Latino or Hispanic folks who were going to run for
17  Dodge City Commission? Is that the case?
18       A. Yeah. I mean they did not file for office
19  and did not run.
20       Q. Do you think that, in your experience, that
21  there was, you know, an infrastructure for Hispanic or
22  Latino candidates to run for Dodge City Commission?
23       A. I don't know what you mean by
24  "infrastructure."
25       Q. Yeah. No worries. So I know that you had

Page 30

1    talked a lot -- we talked a lot about when you ran for
2    office.  You had signage, you had TV ads, radio ads,
3    you knocked on doors.  Is that a fair characterization?
4        A.  Yes.  That's what I did.
5        Q.  How did you know how to do that?  How did
6    you know how to run for office?
7        A.  Well, because I've been in the business for
8    many years, I knew how it worked, you know.  But the
9    information was always put out.  You know, we had
10   notifications we were required to publish in the paper
11   that this election was coming up, these positions were
12   open and, you know, all the information would be
13   available at our office.  People could come and get all
14   the information, and that's how we got the information
15   out.
16       Q.  Did you publish those ads about running for
17   office in Spanish?
18       A.  My ads for my --
19       Q.  Apologies.  I'm talking over you.  I'm so
20   sorry.  No.  You had mentioned that Ford County like
21   put out ads in the newspaper, announcements about
22   running for different commission elections or like at
23   least the ability to sign up for elections; is that
24   right?
25       A.  Correct, but they weren't ads.

Page 31

1        Q.  Okay.  Sorry.
2        A.  They were legal publications that were
3    required to be published, and they were published like
4    three times.  This is all part of the statutes in
5    Kansas for elections that these publications are made.
6    These positions are open as certified to me by the city
7    or the township or whatever entity.  Those are all
8    certified to me.  I then make the legal publications as
9    county clerk.  And then the information is to contact
10   our office if you're interested in any of this.
11       Q.  Were those legal publications published in
12   Spanish?
13       A.  Yes, they were.
14       Q.  When did Ford County start publishing them
15   in Spanish?
16       A.  Probably that same time in the 2004, '05,
17   '06 era, somewhere in there.
18       Q.  Are there informal -- to your knowledge, are
19   there informal organizations or formal organizations in
20   Ford County that support candidates running for
21   election?
22       A.  Well, that would be like the Republican
23   Women.  They do a lot to support candidates.
24   Democratic Women.  There used to be a League of Women
25   Voters, but they're not active anymore.  So that's

Page 32

1    probably about it.
2        Q.  What about the chamber of commerce?
3        A.  During my tenure they did not necessarily
4    promote or support a candidate or candidates.
5        Q.  Did that change after you tenure?
6        A.  I don't know.
7        Q.  So you had mentioned the Republican Women's
8    organization twice now.  Do you mind telling me what
9    that organization is?
10       A.  It's a group of Republican women.  They have
11   a -- they're an organized group.  They have a
12   president.  They have regular meetings.  I can't say if
13   they're active now because I'm not part of the group,
14   but that's how it was when I was county clerk.  They
15   were active, and they would set up an information booth
16   at different events.  They had a permanent setup for
17   several weeks at the mall here in Dodge City where they
18   disseminated information.  They had all the voter
19   information that we had for them.  They would take it
20   to their location, as well as the Democrats, and they
21   had registration cards in Spanish and English.  They
22   had all the -- all the materials we had in our office
23   were in Spanish and English and available to any group
24   who wanted to promote, but you know, and they would --
25   of course, the Republicans had their list of candidates

Page 33

1    who were Republican, and Democrats had their lists for
2    the Democrats.  That's just normal procedure.
3        Q.  Did the Republican Women's organization,
4    during the time that you were part of it, were they
5    involved in Dodge City Commission elections?  So what I
6    mean by that is did they endorse candidates for those
7    elections?
8        A.  They didn't endorse them, and they may have
9    set up a booth, you know, with information.
10       Q.  So what do you mean that they didn't endorse
11   them?
12       A.  As far as I know, they weren't saying, Vote
13   for, but they had candidate information that if you
14   wanted to put up someone's sign in your yard, they
15   would have that available.  But it was open to anyone,
16   you know, that wanted to -- that was just -- it was an
17   information-providing service.
18       Q.  And when you say that the Republican Women
19   had like their list of candidates, what candidates were
20   those?
21       A.  Well, it would have been a list of
22   Republican candidates that were going to be on the
23   ballot.  We're talking about like at a primary
24   election.  They would have had the list of the
25   Republican candidates.  The Democrats would have had

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
**Sharon Seibel-Robb on 06/22/2023**                                Pages 34..37

Page 34

1  the list of the Democratic candidates and all
2  information available.  If you wanted to know more
3  about the Democrat candidate, you could go to that
4  booth and get whatever information that candidate had
5  provided.
6      Q.  And during your time, I think, when you were
7  involved with the Republican Women's organization, did
8  they endorse, or did they support any Hispanic
9  candidates for local office?
10      A.  I don't believe we had any, no.
11      Q.  Okay.  I'm going to ask you some questions
12  about redistricting.  Are you familiar with the concept
13  of redistricting?
14      A.  Yes, I am.
15      Q.  And what is redistricting, in your own
16  words?
17      A.  Redistricting happens when the legislature
18  is ordered to -- they redraw the congressional lines.
19  And then we go and reset those lines.  We have to
20  follow that, whatever the legislature, or at one point
21  it was the supreme court had to do it, and then we have
22  to redraw those lines and get people in the right
23  congregational district.  Now, that's that
24  redistricting.  As far as precinct lines, that's
25  another type of redistricting.

Page 35

1      Q.  Does Ford County for Ford County Commission
2  redistrict?
3      A.  For -- okay.  Say again.
4      Q.  How does the -- you know, let me back up
5  actually.  Does the Ford County Commission use a
6  district-based election system or an at-large based
7  election system for Ford County?
8      A.  Ford County Commissioners file by district.
9      Q.  And do those districts for Ford County
10  Commissioner get redistricted every ten years, to your
11  knowledge?
12      A.  No, not -- that's not considered part of the
13  state redistricting.
14      Q.  Is there local redistricting?
15      A.  Yes, yes.
16      Q.  Okay.  Are those involved -- does the Ford
17  County Commission redistrict as part of local
18  redistricting?
19      A.  That's a local thing, yes.  The county
20  determines that, and we try to keep them as equal in
21  population as possible.  There's three districts.  And
22  then we do the precincts for the City of Dodge City
23  same way.
24      Q.  And what is the process for drawing precinct
25  lines for the City of Dodge City?

Page 36

1      A.  The main goal is to get them, the
2  population, distributed equally as much as it can.
3      Q.  And when you say, "precinct lines," are you
4  talking about a voting precinct?
5      A.  Yes.
6      Q.  Are those also called voting -- like VTDs or
7  voting district tab --
8      A.  Yes.
9      Q.  Okay.  So what is -- can you walk me through
10  that process of when Ford County has to redraw the
11  voting precinct lines in Dodge City.  What does that
12  look like?
13      A.  We use the census map.  I've only been
14  through the precinct redrawing one time, and I was
15  election clerk.  I wasn't the county clerk and election
16  officer at that time.  I was working in the office.
17  And we used the census maps.  And you can go on a
18  website or you can log in and you can get population,
19  and you move those around until you get them as equal
20  and then -- it's a system where it kind of redrew the
21  line for us, and then we could look at it and see, you
22  know, how that was going to look, and if that was
23  doable, you know, if it wasn't through somebody's
24  house, you know, that kind of thing.
25      Q.  How long did that process take y'all?

Page 37

1      A.  It took -- probably three or four months.
2      Q.  Did anyone from the secretary of state's
3  office help y'all do that?
4      A.  They were -- at that point our voting system
5  wasn't on the state site.  We were still in-house.  As
6  far as they helped us with statutory regulations as to
7  what you can and can't do.
8      Q.  And so all in all to change the voting
9  precincts for Dodge City, in your mind, it takes about
10  maybe three to four months; is that correct?
11      A.  It may be a little quicker now because of
12  the systems that we have in place.  We have different
13  ways of looking at things instead of -- you know, we
14  were still doing pen and paper then.  So I'm sure it
15  could be a little bit quicker situation now, but,
16  again, I don't know for sure what she has available to
17  her.
18      Q.  Understood.  I wanted to ask you about -- in
19  your experience of, you know, an election clerk and
20  election officer and Ford County Clerk, if Dodge City
21  moved from at-large to district-based elections, what
22  steps would Ford County need to take to help implement
23  that change, from your experience?
24      A.  They are an at-large.
25      Q.  So if Ford County -- so sorry.  Apologies.

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
**Sharon Seibel-Robb on 06/22/2023**                                    Pages 38..41

Page 38

1  If the city decided to go to district-based elections,
2  right?  They had to draw districts.  What steps would
3  need to be taken to implement that change based off of
4  like for the election side of things for Ford County?
5       A.  At this point I've been out of the office
6  for several years, and I don't know what the statutory
7  requirements are.  I don't know what the secretary of
8  state election procedures are anymore.  I can't really
9  say what it would take at this point to do that.
10      Q.  Okay.  Did you administer district-based
11  elections for Ford County Commission?
12      A.  Yes.
13      Q.  Is that different from administering an
14  at-large election in Dodge City?
15      A.  Well, not the administration of it.  It's
16  the filing that's different.
17      Q.  So the administration is just, from your
18  experience, pretty similar?
19      A.  The rules for conducting an election are
20  given to us through the secretary of state's office,
21  and that's pretty standard through every election,
22  unless there's legislation that has changed things.
23      Q.  And so I'm just trying to understand -- it
24  wouldn't be the case that it's harder to administer an
25  at-large election than it is a district-based election,

Page 39

1  from your experience?
2       A.  No, it would not be.
3       Q.  Okay.  We have been going for about 50
4  minutes.  Do you want to -- do you feel like you can
5  continue?  Do you want a break, Ms. Seibel?
6       A.  Let's continue.
7       Q.  Okay.  Wonderful.  When you were Ford County
8  Clerk and Elections Officer, so during that, I would
9  say, 16-year time period, what was the relationship
10  between Ford County and the City of Dodge City like in
11  your experience?
12      A.  We have a good working relationship.
13      Q.  And do you mind explaining to me a little
14  bit what informed your assertion?
15      A.  Say again.
16      Q.  Why do you say that there's a good working
17  relationship.  Sorry.  I might ask some weird
18  questions, and I apologize, so I appreciate you having
19  me rephrase them.
20      A.  The working relationship between the two
21  government entities is very important because we are --
22  Dodge City is part of Ford County as well, you know,
23  and so we do a lot of things.  For one thing, we do
24  special assessments for the city.  You know, we do tax
25  statements.  We do all this -- we have lot of working

Page 40

1  things, and we have a lot of projects that the city and
2  county work on together.  So we do maintain a very good
3  working relationship with them.
4       Q.  And when it comes to election materials, how
5  does Ford County work with Dodge City on -- if they do,
6  on providing election-related information?
7       A.  Every piece of information in our office is
8  made available to the city.  When we -- before we had
9  online -- you can register to vote online with the
10  motor vehicle department now.  We provide the city
11  office with our registration cards, with brochures, and
12  pamphlets.  Everything concerning elections was
13  available in the city office as well as in our office.
14      Q.  And could the city make its own -- provide
15  its own election information to its residents, or can
16  only Ford County do that?
17      A.  I would assume -- I don't know for sure what
18  you're saying, but the information always comes from
19  our office first, and then it goes to the library, to
20  the city, to different places where people would be in
21  and out of, you know, that they could pick up
22  information.  But as far as the city making their own,
23  I don't know if they would even do that.  I'm not sure.
24      Q.  In your experience, did the city ever reach
25  out to your office about providing, you know,

Page 41

1  additional or about providing election materials to
2  residents voting for Dodge City Commission elections?
3       A.  I can't say that for sure.  I don't really
4  remember how that would have happened.  I don't know
5  for sure.
6       Q.  Did the city ever engage with your office
7  about ensuring that Hispanic residents understood, or
8  Hispanic voters understood the election cycle in Dodge
9  City?
10      A.  Well, they would send over their list of
11  candidates.  They would collect their filings.  When
12  people would want to file, they could file at their
13  office as well and so they would get that information
14  to us.  The elections are conducted through the county
15  clerk's office and so information starts there.
16      Q.  And so what I'm trying to understand is
17  whether or not Dodge City had ever engaged with Ford
18  County to do additional like voter education outreach,
19  you know, specifically maybe to Hispanic citizens.
20      A.  You know, I don't remember that specific
21  situation.  They may have, but I can't say that for
22  sure.
23      Q.  And did Ford County -- what steps did Ford
24  County take to make sure that Hispanic citizens were or
25  Hispanic voters were educated about the Dodge City

MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.
Sharon Seibel-Robb on 06/22/2023                                    Pages 42..45

Page 42

1  Commission election?
2        A.  We did not specifically -- well, we made
3  legal publications that were specific to the city
4  because it didn't involve rural Ford County, so the
5  legal publications that we're required to make were
6  specific to the city, so it showed the positions that
7  were open, the filing deadline, the way to file, the
8  two ways that you can file.  All that information is
9  part of the legal publications that we're required to
10 make.
11       Q.  Anything else?
12       A.  I don't recall anything specific.
13       Q.  What did Ford County, during your tenure, do
14 with respect to voter education to ensure that Hispanic
15 voters in Ford County understood or were educated about
16 elections?
17       A.  End of the -- the person who was clerk when
18 I was election clerk, the clerk before me, we attended
19 a lot of meetings.  We contacted some of our Hispanic
20 board workers and said, Hey, you know, do you belong to
21 a group that we could come and speak to?  And we would
22 take materials, and we took a voting machine.  We
23 showed them how it worked, where the Spanish -- you
24 know, how it came up in Spanish and English, and handed
25 out voter registration cards, filing information,

Page 43

1  filing fees, all that, all the information that was
2  needed for a candidate to file and for a person to be
3  able to go and vote.
4        Q.  Did Ford County do anything else, or was
5  everything you listed everything that was done?
6        REPORTER:  I'm sorry.  Can you start
7        your answer again, ma'am.
8        THE WITNESS:  We did things -- we set up
9        an information booth at the mall.  We took
10       our voting machine up there.  People passing
11       by, you know, that wasn't part of an
12       organization that we had spoken at.  We
13       talked to a lot of people there.  We helped
14       them get familiar with the voting machine,
15       helped them register to vote if they wanted
16       to, gave them all the information that we
17       had available on elections.
18       Q.  (By Ms. Waknin)  Did you -- I'm trying to
19 find the right word.  Did you ever partner with any
20 Hispanic organizations in Ford County for voter
21 education?
22       A.  There were a couple of groups that I can't
23 remember the name of them, but they were part of a
24 church group.  I can't remember the name of it, but
25 yeah, there were a couple of groups that we knew that

Page 44

1  held meetings, and we contacted a person and
2  disseminated information to them.
3        Q.  So besides the church group, do you remember
4  any other Hispanic organizations that you partnered
5  with?
6        A.  We did, but I can't remember the name of
7  them.
8        Q.  Do you know anything about the recount
9  election in 2000 from the Dodge City Commission?
10       A.  In 2000?
11       Q.  Uh-huh.
12       A.  No.  That was before I went to work in the
13 office.
14       Q.  Yeah.  I wasn't sure maybe when you got to
15 work in the office in 2001 if someone had told you
16 about it, so I figured I would ask.
17       A.  They did tell me about it.  I'm sure it was
18 discussed, but I don't -- I wasn't in on the actual
19 part of it.
20       Q.  No worries.  I'm going to talk to you about
21 polling places now.  When was the first time the issue
22 of the number of polling places came up for Ford County
23 elections?
24       A.  It did not come up during my time.
25       Q.  So when did Dodge City go from -- institute

Page 45

1  only having one polling location within the city during
2  your time in Ford County?
3        A.  Okay.  Say that again.
4        Q.  Okay.  So let me phrase it this way:  How
5  many polling locations did Dodge City have while you
6  were Ford County -- during your tenure in the Ford
7  County elections office/as Ford County Clerk?
8        A.  There was one in the City of Dodge City.
9        Q.  And when did the City of Dodge City have
10 only -- start like having only one polling location?
11       A.  I don't know when that happened.
12       Q.  Did it happen during your tenure in the
13 elections office?
14       A.  No.  It was already that way when I came to
15 work there.
16       Q.  Was there conversations during your tenure
17 in the elections office about opening more polling
18 locations in the City of Dodge City?
19       A.  Not with me.
20       Q.  When you say not with you, does that mean
21 that there were?
22       A.  No, no, there weren't, as far as I know.
23       Q.  Did you ever inquire as to why there was
24 only one polling location in the City of Dodge City?
25       A.  We probably talked about it.  I can't

Page 46

1  remember.  As election clerk, I wasn't the county
2  clerk.  I may not have been in on that conversation.
3      Q.  During your tenure in the Ford County
4  Clerk's Office -- so when I say that, I mean during
5  that 16-year period.  Do you understand that?
6      A.  Uh-huh.  Yes.
7      Q.  Was there conversations about opening more
8  than one polling location in the City of Dodge City?
9      A.  No.
10      Q.  Why weren't those conversations being had?
11      A.  I don't think there was any concern.
12  Nothing was ever brought to me or was voiced to me as a
13  concern about there only being one place.
14      Q.  So would it have been the case that someone
15  had to complain to the Ford County Clerk's Office about
16  there being only one polling location for the office to
17  investigate whether or not to open more polling
18  location?
19      A.  I don't know that it would have had to have
20  been a complaint, but I think it would have been
21  through observation as to how things were going and how
22  they were being handled at the one location, and they
23  all seemed -- it seemed to be working very well.  Had
24  there been a complaint, we would have addressed it.
25      Q.  Did you receive complaints from voters in

Page 47

1  the City of Dodge City during your time in the Ford
2  County Clerk's Office?
3      A.  No, I did not.
4      Q.  Was there a process where citizens could
5  voice complaints to the Ford County Clerk's Office?
6      A.  The process would have been to just call and
7  talk to me.
8      Q.  During your tenure in the elections office,
9  did the Department of Justice ever have poll monitors
10  in Ford County?
11      A.  Yes, they did.
12      Q.  When did they have poll monitors in Ford
13  County?
14      A.  That started probably in 2006 or '04,
15  probably 2004 because that would have been a general
16  election.
17      Q.  And what were the circumstances that brought
18  Department of Justice poll monitors to Ford County?
19      A.  There were, I think, five or six counties in
20  Kansas that came under Section 203, and Dodge City
21  being the largest of those groups of counties and the
22  largest Hispanic or non-English-speaking population,
23  they came to Dodge City.  But at points they visited
24  Garden City and Liberal.  Those are the three large
25  cities of the six counties -- I think it was five or

Page 48

1  six counties that were set out.  But, yeah, they came
2  to Dodge City then.
3      Q.  When were you first notified that Department
4  of Justice poll monitors would be coming to monitor
5  Ford County elections/go to Dodge City?
6      A.  I wasn't the county clerk when that
7  happened.  I can't tell you the exact date, but it
8  would have been around the 2004 election time.
9      Q.  Did you interact with any members of the --
10  any poll monitors of the Department of Justice during
11  your time when you were the elections officer?
12      A.  Yes, I did.
13      Q.  And what were those interactions?
14      A.  Normally they would call ahead of time and
15  say, you know, that we're going to be there, and let us
16  know that they would come.  And then they had to come
17  to our office.  And I wasn't the clerk then, but they
18  had to get poll observer badges.
19      Q.  Did you speak with any of these poll
20  monitors when they were conducting their observations?
21      A.  Briefly during the day when they were at the
22  voting center.
23      Q.  What did you speak with them about?
24      A.  Most of the conversation was just easy
25  conversation as to how the day was going and how the

Page 49

1  turnout was.  No procedural conversation.
2      Q.  Did you know why the Department of Justice
3  sent poll monitors to Ford County to monitor the
4  elections?
5      A.  They were there to make sure that we were
6  handling the non-English-speaking voters, as well as
7  voters who had disabilities.
8      Q.  During your time in the Ford County
9  Elections Office or as Ford County Clerk, how many
10  times did the Department of Justice send poll monitors?
11      A.  I can't say the exact number, but it was
12  probably five times.  I may not be exact on that, but,
13  yeah.
14      Q.  How many monitors were sent each time that
15  they had come -- that the Department of Justice sent
16  poll monitors?
17      A.  I believe the first time that they sent
18  people, it was probably about -- I think it was maybe
19  four to six, and then as time went on and years went
20  on, it went down to two.
21      Q.  Why did the Department of Justice send poll
22  monitors for maybe about five elections or five times?
23      A.  I don't know why they chose to do five
24  times.
25      Q.  So the Department of Justice sent poll

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
**Sharon Seibel-Robb on 06/22/2023**                    Pages 50..53

---

Page 50

1   monitors in 2004, to your best recollection; is that
2   correct?
3       A.  Yes.
4       Q.  And when was the next time that the
5   Department of Justice sent poll monitors to Ford County
6   to observe Ford County elections?
7       A.  The next general election would have been in
8   2008.
9       Q.  And why was the Department of Justice
10  sending poll monitors to monitor Ford County elections
11  in 2008?
12      A.  It would have been for the same reasons.
13  They were observing the way handling the
14  non-English-speaking voters and the voters with
15  disabilities.
16      Q.  And when was -- after 2008 when was the next
17  time that the Department of Justice sent poll monitors
18  to monitor Ford County elections?
19      A.  To the best of my recollection, I think it
20  was probably '12.  I don't know -- I can't remember for
21  sure.
22      Q.  It seems like -- would it be the case that
23  you believe that the Department of Justice sent poll
24  monitors to observe Ford County elections in general
25  elections?  November general elections?

Page 51

1       A.  Yes.
2       Q.  To the best of your recollection, when was
3   the last time that the Department of Justice sent poll
4   monitors to monitor Ford County elections?
5       A.  I do not -- I do not remember for sure when.
6       Q.  When was the last time during your tenure?
7       A.  The last time I had any interaction with
8   them would have been in '12.
9       Q.  And was this all to observe the way that the
10  county implemented non-English election materials and
11  voter with disability access?
12      A.  Yes.
13      Q.  Did the Department of Justice ever, I guess,
14  reach out to Ford County about the way it implemented
15  non-English election materials?
16      A.  No.  There were never any reports or
17  information provided to us after they observed our
18  elections.
19      Q.  Did you ever speak with other county clerks
20  in other parts of the country that also had large
21  Hispanic populations during your tenure as Ford County
22  Clerk?
23      A.  I did speak with a clerk in Nebraska who had
24  had DOJ visit her and was actually fined, and they did
25  find some offenses that they felt were enough for her

Page 52

1   to receive some fines and some oversight.
2       Q.  What was your reaction when the Department
3   of Justice notified Ford County that they would be
4   coming to monitor Ford County elections?
5       A.  Well, it makes you very nervous.  They're
6   not very forthcoming with information as to what are
7   you observing, you know, that kind of information, and
8   I guess that's so they can see exactly what, you
9   know -- how we would handle it.  They did talk to our
10  voters a lot as they either entered the voting arena or
11  they left.  They spoke with them and asked a lot of
12  questions, but they never asked us any questions as
13  election officials.
14      Q.  And was that every single time?  So in your
15  recollection, the five times that the DOJ had done
16  election observation, was that kind of your feeling
17  each time?
18      A.  That they conducted the same sort of -- they
19  all had notebooks and pens and were writing and stuff
20  and talking to people.  That was their -- that was how
21  they conducted themselves every time.
22      Q.  Ms. Seibel, we've been going for an hour and
23  ten minutes.  Would you like to take a five-minute
24  break, or would you like to continue?
25      A.  Continue.

Page 53

1       Q.  Okay.  I am going to show you -- actually,
2   was the Department of -- US Department of Justice
3   sending poll monitors the only time that the Department
4   of Justice had contacted Ford County about elections?
5       A.  Okay.  Could you say that again, please.
6       Q.  Sure.  So was the Department of Justice, the
7   US Department of Justice, sending poll monitors to Ford
8   County the only time that the Department of Justice had
9   contacted you or Ford County regarding elections?
10      A.  Well, there was the initial notice of the
11  Section 203 compliance that we needed to provide
12  non-English-speaking materials and plus a
13  disabilities -- we had to upgrade our poll places and
14  make sure they were accessible.  There was contact
15  regarding that.  Later in my term there was some
16  contact from them concerning the majority minority
17  population.
18      Q.  Can you tell me about the contact from the
19  Department of Justice regarding the majority minority
20  population.  What was that?
21      A.  I can't remember the exact wording and all,
22  but it had to do with the way the city conducted their
23  elections.
24      Q.  Are you speaking about Dodge City, the way
25  that Dodge City conducted their elections?

Page 54

1    A. Dodge City. Yes, Dodge City.
2    Q. And was that an inquiry by the Department of
3  Justice under Section 2 of the Voting Rights Act, to
4  your best recollection?
5    A. I'm not sure. I can't remember.
6    Q. All right. That's fine. I'm going to show
7  you a document.
8
9        (Screen-sharing Exhibit 70)
10
11    Q. (By Ms. Waknin) This was produced to us by
12  Dodge City. You can see it has this thing called a
13  Bates label. It says Dodge_City_004145. Do you see
14  that?
15    A. Okay. No.
16      MS. WAKNIN: Can anyone else see my
17      screen?
18      THE WITNESS: I see it now.
19    Q. (By Ms. Waknin) Okay. Wonderful. Do you
20  see this Bates label?
21    A. Yes.
22    Q. Okay. Wonderful. And Ms. Seibel, I'm going
23  to let you review this document. I'm going to go
24  through it slowly so you can read it, and you just let
25  me know when you're done reading it. I am going to

Page 55

1  mark this document as Exhibit 1 -- actually -- sorry.
2      MR. KAISER: Sonni?
3      MS. WAKNIN: Yes.
4      MR. KAISER: I think we're at -- if we
5      start at 70, I think we should be good.
6      MS. WAKNIN: Okay. I was going to say
7      we probably need to mark it because there's
8      multiple depositions going on today. Yeah,
9      we'll mark this as Exhibit 70.
10      THE WITNESS: Okay, yes.
11    Q. (By Ms. Waknin) Have you gotten a chance to
12  read this document, Ms. Seibel?
13    A. I did.
14    Q. In your own words, can you explain to me
15  what this document is.
16    A. This is a letter that I sent to or made
17  available for the county commissioners that shared the
18  information that I had received.
19    Q. And what information did you receive?
20    A. It was a request from the Department of
21  Justice for information.
22    Q. What information was that?
23    A. They were wanting -- what do I say? They
24  want information for all -- I don't think I say in here
25  specifically what they were asking for.

Page 56

1    Q. I think -- I'm going to read a sentence. It
2  says -- I think over here it says, To ask them for sure
3  if they wanted all elections or just federal elections.
4    A. Okay.
5    Q. So would it be that the US Department of
6  Justice sent you a letter requesting information from
7  elections in Ford County going back to 2000?
8    A. Yes.
9    Q. Do you remember that letter?
10    A. Barely.
11    Q. When you received that letter from the
12  Department of Justice, what was your reaction? And
13  when I say "that letter," I'm referring to this
14  June 29, 2011, letter or fax that you received.
15    A. Apparently, I received a fax from the Department
16  of Justice. My reaction was, as I said in here, you
17  know, Exactly what is it you want? And then I also
18  state in there that I just attended a conference about
19  this very subject, and I was asking their permission to
20  meet with this man and see where we could -- what we
21  could do.
22    Q. And is that the IACREOT conference?
23    A. Yes.
24    Q. What is that?
25    A. It's IACREOT.

Page 57

1    Q. What is that type of conference?
2    A. It's an election conference. I'm trying to
3  remember what the letters all stand for. It's
4  elections officer -- EO is election officer, and I
5  don't remember what those other letters stand for.
6    Q. No. It's okay. I think just understanding
7  that it's an elections conference is very helpful, so
8  no worries.
9    A. Okay. Yeah.
10    Q. And I think you just said that at that
11  elections conference there was a topic actually about
12  if you get a letter from the Department of Justice; is
13  that correct? What do you mean?
14    A. I don't know for sure that the speaker spoke
15  exactly about getting something from the Department of
16  Justice, but he spoke about how things are beginning to
17  happen with majority minority groups and that we need
18  to be aware of them if we have that situation in our
19  state, county, or, you know, in our area.
20    Q. So what do you mean by aware of majority and
21  minority groups and kind of like that situation? Do
22  you mind being a little bit more specific?
23    A. So to make us aware that our communities
24  could be majority minority, and maybe we aren't really
25  aware of that particular situation. And then he went

Page 58

1  on to talk about, you know, how that looks and so it
2  made my eyes open, you know, as to, okay, I think he's
3  talking about communities like ours, so that's why I
4  requested permission to meet with him and see if we fit
5  that description.
6        Q.  And so did the -- the person that you're
7  talking about, is that Mr. Bruce Adelson?
8        A.  Yes.
9        Q.  And did Mr. Adelson talk to you about
10  minority vote dilution?
11        A.  Yes.
12        Q.  And what did you understand minority vote
13  dilution to mean?
14        A.  Oh, gosh.  It's been awhile.  I'm not sure
15  exactly how to explain that.
16        Q.  Would it be fair to say that Mr. Adelson
17  talked to you about whether or not minority populations
18  would be able to elect candidates of their choice or
19  have an equal opportunity due to the election system?
20        A.  He did talk about that, yes.
21        Q.  And is that what you meant by your eyes were
22  opened, that you learned about minority vote dilution
23  and thought that might be occurring or just that might
24  be something you have to pay attention to in Ford
25  County?

Page 59

1        A.  It would be something I would have to pay
2  attention to.  I was curious to know about it.
3        Q.  And when you -- and I'm going to look at the
4  second and third paragraph.  It says, I did call
5  Ms. Meza and ask which elections they wanted
6  information for.
7            And she said, All.
8            I asked her why they would need so much back
9  information, and she stated that they were conducting
10  research under Section 2 of the Voting Rights Act,
11  which has to do with the dilution of minority
12  populations in voting precincts.
13            Is that a correct or accurate statement of
14  what occurred?
15        A.  Yes.
16        Q.  And why did you call -- so you -- strike
17  that.
18            What was your conversation with Ms. Meza
19  like?
20        A.  I don't remember.  It's been too long ago.
21  She was the person that would contact us and say, you
22  know, they were coming, and she was the only contact
23  person that we really had with any of the DOJ, and she
24  was the one that sent the fax.
25        Q.  And what was your reaction when you got that

Page 60

1  fax?
2        A.  My reaction was that I had just been to a
3  meeting and learned a little bit about this, and I
4  think it's something we need to check into.
5        Q.  And did you contact any officials in the
6  City of Dodge City regarding this inquiry?
7        A.  I did.
8        Q.  With the Department of Justice?
9        A.  I did.  I spoke with the city clerk at that
10  time, and we talked about it a little bit.
11        Q.  Who was that?
12        A.  Nannette -- no.  Cherise Tieben and Nannette
13  Pogue.
14        Q.  When did you have those conversations
15  regarding the DOJ inquiry with Ms. Tieben and
16  Ms. Pogue?
17        A.  Sometime in this timeframe.  I can't tell
18  you that exactly.
19        Q.  So I guess based off of this letter between
20  like June and July of 2011?
21        A.  Possibly.  It could have been later.  I
22  don't know.  I don't remember.
23        Q.  It's just that you had made Ms. Tieben and
24  Ms. Pogue aware of the Department of Justice inquiry
25  regarding Section 2 of the Voting Rights Act; is that

Page 61

1  correct?
2        A.  That is correct.
3        Q.  What did Ms. Tieben and Ms. Pogue say to you
4  regarding the Department of Justice Section 2 inquiry?
5        A.  I don't remember exactly the conversation.
6        Q.  I'm going to unscreenshare.  Actually, I'm
7  going to bring that exhibit back up.
8
9            (Screen-sharing Exhibit 70)
10
11        Q.  (By Ms. Waknin)  On the first line -- do you
12  mind reading the first line, the first sentence of the
13  third paragraph, for me?
14        A.  Which one?
15        Q.  It starts with, As you know, the clerk's
16  office.
17        A.  Okay.
18        Q.  Do you mind reading that for me?
19        A.  As you know, the clerk's office has been
20  under the watchful eye of the Department of Justice
21  since 2002 with them visiting the civic center at
22  almost every election held since that time.
23        Q.  What is the civic center?
24        A.  The civic center is the voting location in
25  Dodge City.

MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.
Sharon Seibel-Robb on 06/22/2023                                          Pages 62..65

Page 62

1    Q. And so would it be the case, then, that the
2  Department of Justice had come to Dodge City to monitor
3  elections possibly more than five times if they had
4  been coming since 2002?
5    A. I can't remember how many times. It's
6  possible. Without looking at records, I can't tell you
7  that exactly.
8    Q. Okay. So I mean just based off of your
9  letter that you wrote here, it was likely that they had
10 been coming since 2002, if what you wrote was correct;
11 is that --
12   A. Well, that would be correct, yes. My
13 recollection is I didn't give you that far date back,
14 but apparently that's what it was.
15   Q. That's fine. That's why I asked about it.
16   A. Okay.
17   Q. So, Ms. Seibel, you had written this letter
18 to the Ford County Commissioners. What happened after
19 you provided the Ford County Commissioners with this
20 information regarding Mr. Adelson and the Department of
21 Justice Section 2 inquiry?
22   A. They allowed me to contact him and set up
23 this consultation and meeting, and they were interested
24 in knowing the outcome and were concerned and wanted to
25 make sure we were complying with and doing what was

Page 63

1  required.
2    Q. When did you reach out to Mr. Adelson for a
3  consultation with respect to the Section 2 inquiry by
4  the Department of Justice?
5    A. In that -- I think in that letter, did I say
6  that -- well, he was coming on July 15th. I don't know
7  exactly when I talked to him.
8    Q. What did you speak with Mr. Adelson about
9  during your consultation with him?
10   A. To the best of my recollection, I told him
11 that I had attended his seminar at the meeting and that
12 I had gotten this fax from the Department of Justice
13 and there seemed to be some interest in Dodge City's
14 population and that I would be interested in knowing if
15 he could help us out in any way.
16   Q. And what did Mr. Adelson tell you in
17 response to what you said to him?
18   A. That he would be glad to do a study and do
19 some observations and see what he determined or what he
20 could see.
21   Q. Did anything -- where did this consultation
22 with Mr. Adelson occur?
23   A. He had a counterpart or I don't know if it's
24 an employee. There was a person that came out and did
25 a lot of the footwork for him, and then when they

Page 64

1  conferred about whatever her reports were -- which I
2  never saw. I don't anything that was on there -- and
3  then he came back and met with all of us, with the
4  county commissioners.
5    Q. So what I'm understanding is after that
6  initial consultation with Mr. Adelson, did Ford County
7  hire Mr. Adelson to do an analysis?
8    A. Yes, we did.
9    Q. And what exactly did you hire Mr. Adelson to
10 do?
11   A. It was a study or -- like an observation.
12 They visited. They talked with people. They gathered
13 some information from us. Gosh, it's hard to remember
14 what all they did.
15   Q. Did Mr. Adelson tell you any preliminary
16 thoughts about whether or not there was a Section 2
17 violation with respect to the City of Dodge City
18 elections?
19   A. Okay. Say that again.
20   Q. Well, did Mr. -- when you were speaking with
21 Mr. Adelson about the DOJ's inquiry under Section 2 of
22 the Voting Rights Act, which was about Dodge City's use
23 of the at-large method of election, did Mr. Adelson
24 tell you any thoughts he had, like preliminary thoughts
25 he had about whether or not there was a violation?

Page 65

1    A. No. I don't think that he ever mentioned
2  that there was a violation, but that there was a
3  definite majority minority population, and they had
4  visited with people, and I don't -- there wasn't really
5  any actual thought or decision that he came to at that
6  point. It was fact-gathering information.
7    Q. Understood. Did Mr. Adelson meet with Dodge
8  City election officials while he was conducting his
9  analysis?
10   A. There aren't Dodge City election. It's
11 Dodge City Commission.
12   Q. So apologies. Did Mr. Adelson meet with
13 officials in Dodge City with respect to his Section 2
14 analysis?
15   A. Yes, we did.
16   Q. And who were those officials that
17 Mr. Adelson met with?
18   A. I don't remember exactly who all was there.
19 I think the mayor at the time, which Dodge City's mayor
20 changes every year, I think. I don't remember who that
21 person was. And then there was Nannette Pogue and
22 Cherise Tieben.
23   Q. So it's your recollection that both
24 Ms. Pogue and Ms. Tieben met with Mr. Adelson?
25   A. Yes.

Page 66

1    Q.   And that meeting was with respect to a
2  potential Section 2 violation and his inquiry into
3  whether or not that existed; is that correct?
4    A.   Correct.
5    Q.   And what did Mr. Adelson, to your best
6  recollection, speak with Ms. Tieben and Ms. Pogue
7  about?
8    A.   As I remember, he just discussed what it
9  was, you know, what it was we were talking about and
10 what it was he was checking into for us and letting
11 them know that there could be a potential problem.
12   Q.   And what exactly did he say he was looking
13 into during this conversation with Ms. Tieben and
14 Ms. Pogue?
15   A.   The method of election.
16   Q.   And did he share with Ms. Pogue and
17 Ms. Tieben how he would be conducting an analysis into
18 whether or not the at-large method of election diluted
19 minority voting?
20   A.   I don't remember that specifically, but I'm
21 sure he did tell them exactly what he was going to do.
22   Q.   And when was this -- when was this meeting
23 with these Dodge City officials?
24   A.   I don't remember the date.
25   Q.   And you stated that Mr. Adelson also spoke

Page 67

1  in addition to Ms. Tieben and Ms. Pogue with the Dodge
2  City Commission; is that correct?
3    A.   I believe only the mayor was there for that
4  meeting.  It wasn't a formal meeting.
5    Q.   And did Mr. Adelson provide you with any
6  information addressing the potential liabilities for
7  Dodge City under Section 2 of the Voting Rights Act?
8    A.   He did not.
9    Q.   I'm going to show you -- I'm going to show
10 you a document.
11
12        (Screen-sharing Exhibit 71)
13
14   Q.   (By Ms. Waknin)  And I'm going to -- this is
15 Dodge City, Dodge_City_004129.  This is a document that
16 Dodge City produced in response to a discovery request
17 by Plaintiffs.  I'm going to mark this as Exhibit 71.
18 And Ms. Seibel, I'll let you take a --
19   A.   Okay.
20   Q.   -- look at this.  It's four pages, so just
21 let me know when to scroll.
22   A.   Okay.  Okay.  Go ahead and scroll.  Okay.
23 Okay.
24   Q.   Ms. Seibel, in your own words, what is this
25 document I've just shown you?

Page 68

1    A.   This is a letter that he addressed to me
2  after he had visited Dodge City and did his assessment.
3    Q.   Okay.  And who is "he" that you're referring
4  to?
5    A.   Mr. Adelson.
6    Q.   And this letter is from August 2011; is that
7  correct?
8    A.   Yes, that's correct.
9    Q.   Okay.  And so Mr. Adelson stated that he in
10 this letter had not conducted his own investigation; is
11 that correct?
12   A.   That is what it says, yes.
13   Q.   So would it maybe have been after this
14 letter that Mr. Adelson conducted his investigation
15 into Dodge City?
16   A.   I would -- yes, I would say so.
17   Q.   Okay.  In this letter did Mr. Adelson
18 provide you with his preliminary thoughts about whether
19 or not there was a Section 2 liability?
20   A.   Well, okay.
21   Q.   Sorry.
22   A.   Okay.  Ask your question again, please.
23   Q.   Sure.  So is it the case, you know, that
24 Mr. Adelson provided you in this letter his thoughts
25 about whether or not there could be a Section 2

Page 69

1  liability for the City of Dodge City using the at-large
2  method of election?
3    A.   Okay.  He does say that.
4    Q.   Did you share this letter with city
5  officials in the City of Dodge City?
6    A.   I'm sure I would have.  I can't say that
7  specifically, but I'm sure I would have.
8    Q.   And so it seems here on page 2 it says,
9  unfortunately, Dodge seems to possess the initial
10 criteria that may indicate a VRA Section 2 violation.
11       Is that right?
12   A.   That's what it says.
13   Q.   After you received this letter from
14 Mr. Adelson that said -- with his preliminary thoughts
15 that there was likely Section 2 liability, what did you
16 think?
17   A.   I can't say for sure.  Probably I contacted
18 the City and we discussed it.
19   Q.   When you were speaking with me earlier about
20 the conversation with Mr. Adelson, Ms. Tieben, and
21 Ms. Pogue, were you also involved in those
22 conversations?
23   A.   Yes.
24   Q.   And I think you said earlier Ford County
25 actually ended up hiring Mr. Adelson; is that right?

**Page 70**

1    A.  Yes, that's right.

2    Q.  Did Mr. Adelson produce a report for Ford

3 County regarding the Section 2 liability?

4    A.  No.

5    Q.  What did Mr. Adelson end up producing with

6 respect to his contract with you all?

7    A.  Gosh, I don't remember that for sure.

8    Q.  Did Mr. Adelson conduct a Hispanic citizen

9 voting age election analysis?

10    A.  I don't know.

11    Q.  Did Mr. Adelson conduct any -- provide you

12 with any research that he produced in response to his

13 consulting agreement with Dodge City -- I mean with

14 Ford County?

15    A.  I don't know.  I don't remember for sure

16 what all he provided.

17    Q.  I am going to show you another document.

18 I'm going to mark this Exhibit 72.

19

20        (Screen-sharing Exhibit 72)

21

22    Q.  (By Ms. Waknin)  It's Bates labeled

23 Dodge_City_0004127.  Ms. Seibel, are you familiar with

24 this document I'm showing you?  It's an invoice from

25 Mr. Adelson to yourself when you were Ford County

**Page 71**

1 Clerk.

2    A.  Yes.

3    Q.  And it says that this invoice is for

4 consultation and specialty services concerning the US

5 Department of Justice Voting Rights Act Section 2

6 investigation in Dodge City; is that correct?

7    A.  That's what it says, yes.

8    Q.  And under the Services it says that the

9 billing invoice period was from November 1st to

10 November 30th, 2011; is that correct?

11    A.  Yes.

12    Q.  And for Services it says that Mr. Adelson

13 conducted a Dodge City Section 2 investigation and

14 research.  Is that your understanding of what

15 Mr. Adelson did?

16    A.  Yes.

17    Q.  It also says that Mr. Adelson conducted a

18 Hispanic citizen voting age census data retrieval and

19 analysis; is that right?

20    A.  That's correct.

21    Q.  Did Mr. Adelson, during the time that you

22 had hired him in Ford County, have conversations with

23 you about his research findings?

24    A.  I'm sure we did have conversations.

25    Q.  Do you remember the content of those

**Page 72**

1 conversations?

2    A.  I do not.  I do not.

3    Q.  Did you have conversations with Dodge City

4 officials about Mr. Adelson's research?

5    A.  I do not remember that.

6    Q.  How long was Mr. Adelson hired by -- for how

7 long was Mr. Adelson hired by Ford County to do a

8 Section 2 analysis?

9    A.  I don't remember.

10    Q.  Would you say maybe about a few months?

11 Would that sound right?

12    A.  I don't remember.

13    Q.  When did the relationship with Mr. Adelson

14 or the consulting relationship with Mr. Adelson for

15 investigation into a Section 2 -- potential Section 2

16 violation in Dodge City end?

17    A.  I don't remember the date.

18    Q.  What was the end result of Mr. Adelson's --

19 strike that.

20        Did Mr. Adelson have any conclusion about

21 whether or not there was a Section 2 violation for the

22 City of Dodge City's use of the at-large method of

23 election at the end of his consulting work with you

24 all, with Ford County?

25    A.  I don't remember if there were any more

**Page 73**

1 letters or conversation or not.

2    Q.  Did you think Mr. Adelson was qualified to

3 investigate whether or not Dodge City had a potential

4 Section 2 liability for the use of the at-large method

5 of election?

6    A.  Yes.

7    Q.  Why did you think Mr. Adelson was qualified?

8    A.  Having attended his seminar and speaking

9 with him about it.

10    Q.  So what was it about speaking with

11 Mr. Adelson and attending his seminar that you felt

12 that Mr. Adelson was qualified to do this type of work?

13    A.  His familiarity with the situations.

14    Q.  And by situations, do you mean DOJ Section 2

15 liability investigations?

16    A.  Yes.

17    Q.  And why was Mr. Adelson familiar with

18 Section 2 liability investigations?

19    A.  Well, he had done several of these before in

20 other states.

21    Q.  Do you know what Mr. Adelson's professional

22 background is or was?

23    A.  He had previously worked for DOJ.

24    Q.  And do you know if that was in the voting

25 rights division of the Department of Justice?

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
Sharon Seibel-Robb on 06/22/2023                                        Pages 74..77

Page 74

1    A.  I believe it was.
2    Q.  And so because Mr. Adelson had previously
3  worked for the voting rights division in the Department
4  of Justice, you had attended his seminar, and that he
5  had done previous federal compliance investigations,
6  you found that Mr. Adelson was a qualified person to
7  conduct this analysis for Ford County and for the City
8  of Dodge City; is that right?
9    A.  Correct.
10   Q.  Did you have any problem with Mr. Adelson
11 when he was conducting his analysis or research?
12   A.  Not that I recall.
13   Q.  And if Mr. Adelson told you a conclusion,
14 would you have -- you know, one way or the other would
15 you have believed that conclusion to be correct?
16   A.  I think so.
17   Q.  Was it ever the case where Mr. Adelson, to
18 your knowledge, suggested that Dodge City should move
19 from the at-large method of election to district-based
20 elections?
21   A.  Okay.  Say it again.
22   Q.  Sure.  Was it during the time that you were
23 working with Mr. Adelson, did he suggest that Dodge
24 City should move from the at-large method of election
25 to district-based elections for City Commission?

Page 75

1    A.  I think it was that he was suggesting that
2  there should be a change made to avoid problems down
3  the road.
4    Q.  And would that change have been moving from
5  the at-large method of election to single-member
6  district elections?
7    A.  Yes.
8    Q.  Okay.  And did Mr. Adelson share these
9  thoughts with the City of Dodge City?
10   A.  Yes.  We talked about it in the meeting that
11 we had with the mayor and the city clerk and city
12 administrator.
13   Q.  So from your recollection, Mr. Adelson
14 recommended in the meeting with Ms. Tieben, Ms. Pogue,
15 and the mayor at the time of Dodge City that Dodge City
16 should move from the at-large method of election to
17 single-member district elections due to a potential
18 liability under Section 2 in the future; is that
19 correct?
20   A.  I think he did recommend it, yes.  It wasn't
21 in a -- it wasn't a formal meeting or anything like
22 that, but he was wanting to help them avoid possible
23 litigation.
24   Q.  You had mentioned that Mr. Adelson had
25 another expert or person that was assisting him.  Do

Page 76

1  you remember that person?
2    A.  I do not.
3    Q.  Does the name Gilda Daniels sound familiar
4  to you?
5    A.  Say the name again, please.
6    Q.  Gilda Daniels.
7    A.  I don't remember that name.
8    Q.  Did you meet with the person that was
9  assisting Mr. Adelson?
10   A.  I don't remember meeting with her.
11   Q.  I'm going to -- could it be the case that
12 you had met with her and just don't remember?
13   A.  I just don't remember.
14   Q.  In response to -- in that meeting with the
15 mayor, Ms. Pogue, and Ms. Tieben with Mr. Adelson, what
16 was the response by Dodge City election officials to
17 Mr. Adelson's suggestion that the city should move from
18 the at-large method of election to single-member
19 district-based election?
20   A.  I don't remember.  I don't recall that they
21 were aware that there was a problem or could be a
22 potential problem.  I don't think they were aware of it
23 and so it was kind of like kind of shocking to them.
24 That was kind of their reaction.  They weren't aware
25 that -- and because another comment was made that they

Page 77

1  had not received any complaints, they weren't aware
2  that that was an issue.
3    Q.  Did Mr. Adelson make them aware that that
4  could be -- that potential minority vote dilution could
5  be an issue in Dodge City?
6    A.  Yes.  That was part of his presentation.
7    Q.  And when you say "presentation," what form
8  did this presentation take by Mr. Adelson?
9    A.  He just explained to them what it was we
10 were talking about, what the situation was, and that
11 there was a potential for Dodge City to fall under that
12 and could be -- there could be a problem.
13   Q.  When you say "under that," what are you
14 specifically referencing?
15   A.  Under the majority minority and the dilution
16 of voting and the method of election.
17   Q.  And once Dodge City election officials
18 became aware that potential minority vote dilution
19 could be a problem in Dodge City --
20      (Reporter instruction)
21   Q.  (By Ms. Waknin)  So after the mayor and
22 Dodge City officials were made aware that minority vote
23 dilution could be an issue due to the at-large method
24 of election for the Dodge City Commission, what
25 happened next after -- with respect to what city

Page 78

1  officials did?
2      A.  Nothing ever happened after that meeting, to
3  my recollection.
4      Q.  Did anyone from the City of Dodge City reach
5  out to you about whether or not -- about changing their
6  election system after you had that meeting with those
7  officials and Mr. Adelson?
8      A.  I don't recall any formal letter or any
9  communication in that sense that we may have discussed
10  it and they had not had complaints, and so they
11  weren't -- again, like I said earlier, they just
12  weren't aware that there was a problem.
13      Q.  So after Mr. Adelson, though, told them,
14  told Dodge City officials that minority vote dilution
15  could be a problem, to your knowledge, were any steps
16  taken by those Dodge City officials with respect to the
17  at-large method of election?
18      A.  Not that I'm aware of.
19      Q.  Did you think it was strange that -- strike
20  that.
21          What was your -- what is your reaction to --
22  did you have any reaction to Dodge City not changing
23  its at-large method of election after Mr. Adelson told
24  them there would be a potential violation under
25  Section 2 of the Voting Rights Act?

Page 79

1      A.  I don't remember what my reaction was at
2  that time.
3      Q.  If someone had told you that Ford County
4  potentially had an issue with minority vote dilution
5  and that person had the credentials that Mr. Adelson
6  had, would you have investigated changing the election
7  system for Ford County?
8      A.  Yes, I would have.
9      Q.  And why would you have?
10      A.  Having been under the watchful eye of DOJ, I
11  believed in their -- that they would -- something would
12  happen.
13      Q.  Did you do anything else with respect to the
14  Dodge City at-large method of election after that
15  meeting with Mr. Adelson and the Dodge City officials?
16      A.  No.
17      Q.  Did the issue -- after the investigation by
18  Mr. Adelson, the recommendation by Mr. Adelson, did the
19  issue of at at-large elections in Dodge City come up
20  again in front of you?
21      A.  Not that I remember.
22      Q.  Why did the county pay for Mr. Adelson's
23  consulting services if Mr. Adelson was investigating
24  Dodge City?
25      A.  Because we conduct all the elections.

Page 80

1      Q.  Ms. Seibel, it's about -- we've been going
2  about two hours now.  Would you like to take a lunch
3  break, or would you like to continue?
4      A.  I would continue.
5          (Reporter request)
6          MS. WAKNIN:  Okay.  We'll take a --
7  Ms. Seibel, in order to -- we're going to
8  take a ten-minute break for the court
9  reporter so they can take a break.  Does
10  that work for you?
11          THE WITNESS:  Yes.
12          MS. WAKNIN:  Okay.  Wonderful.  Can we
13  please go off the record.
14          VIDEOGRAPHER:  The time is 11:55 a.m.,
15  and we are now off the record.
16
17                    *  *  *  *  *
18
19          VIDEOGRAPHER:  All right.  The time is
20  12:07, and we are now on the record.
21      Q.  (By Ms. Waknin)  So, Ms. Seibel, I
22  apologize.  I know I asked you a lot of questions about
23  this, and I'm just going to go back and understand
24  maybe the timeline about Mr. Adelson's work with Ford
25  County.  So if I understand correctly, in about June of

Page 81

1  2011 the Department of Justice sent Ford County a
2  letter requesting all election information; is that
3  correct?
4      A.  Yes.
5      Q.  Did they request any other information
6  besides election information?  And by "they" I mean the
7  Department of Justice.
8      A.  I don't believe so.
9      Q.  And after you received that letter in June
10  of 2011, you contacted Ms. Meza who is an employee in
11  the voting rights division at the Department of Justice
12  regarding the letter; is that correct?
13      A.  The fax, yes.
14      Q.  The fax -- sorry.  And so let's go back.
15  What form did the fax take to provide information?
16      A.  I don't remember.
17      Q.  So what was your call with -- and you had a
18  call then after between June 2011 and July 2011 with
19  Ms. Meza at the Department of Justice regarding the
20  Department of Justice request to Ford County; is that
21  correct?
22      A.  Did I have a call with her, yes.
23      Q.  And what were the contents of that call with
24  Ms. Meza around June or July of 2011?
25      A.  I don't remember that specifically, but

Page 82

1  according to that letter that you showed me, I asked
2  her what particular pieces of information she wanted,
3  or did she want all of it.
4      Q.  And it appears that, based off of your
5  recollection, Ms. Meza wanted all of the election
6  materials or election information.
7      A.  According to the letter, yes.
8      Q.  And that -- with your understanding, it
9  was -- Ms. Meza was requesting this information in June
10 or July of 2011 because the Department of Justice was
11 conducting an investigation into Dodge City; is that
12 correct?
13     A.  I don't remember that.  Whatever's in the
14 letter is what I have to go by because I don't remember
15 specifically.
16     Q.  Okay.  After this conversation with Ms. Meza
17 you sent a letter in July of 2011 to the Ford County
18 Commissioners about the conversation you had with
19 Ms. Meza, the Department of Justice inquiry into the
20 City of Dodge City with respect to Section 2, and
21 requested that the county hire Mr. Bruce Adelson to
22 conduct a Section 2 liability investigation; is that
23 correct?
24     A.  According to the letter, yes.
25     Q.  And then Mr. Adelson in August of 2011 sent

Page 83

1  you a letter with his preliminary thoughts with respect
2  to whether or not Dodge City had a potential Section 2
3  violation or liability; is that correct?
4      A.  That is correct.  He sent me a letter.
5      Q.  And in that letter Mr. Adelson said that he
6  believed there was potential Section 2 liability
7  for the City of Dodge City due to the at-large method
8  of election; is that correct?
9      A.  Correct.
10     Q.  Between August of 2011 and, I would say,
11 November of 2011, Mr. Adelson conducted an
12 investigation into the City of Dodge City's method of
13 election; is that correct?
14     A.  I'm not for sure on the dates, but he did do
15 an investigation, yes.
16     Q.  Do those dates roughly sound right, to your
17 recollection?
18     A.  I would say so, yes.
19     Q.  And some time between August of 2011 and
20 when Ford County or when Mr. Adelson ended his
21 consulting contract with Ford County, you, Mr. Adelson,
22 Ms. Tieben, Ms. Pogue, and the mayor of Dodge City had
23 a meeting regarding Dodge City's potential Section 2
24 liability; is that correct?
25     A.  Correct.

Page 84

1      Q.  Do you remember around what timeframe this
2  meeting was?
3      A.  I do not.
4      Q.  Would this meeting have been after
5  Mr. Adelson conducted his investigation?
6      A.  I'm thinking it said in the letter it was
7  before.  I think it was before he actually did the
8  complete investigation.
9      Q.  Did Mr. Adelson meet with Dodge City
10 election officials after he completed his investigation
11 or Dodge City officials after he completed his
12 investigation?
13     A.  I don't remember if he did or not.
14     Q.  During this meeting with Mr. Adelson,
15 yourself, and the Dodge City officials, Ms. Tieben,
16 Ms. Pogue, and the mayor, it's your understanding that
17 Mr. Adelson expressed that there might be a potential
18 Section 2 liability or Section 2 violation with respect
19 to the at-large method of election and minority vote
20 dilution; is that correct?
21     A.  Correct.
22     Q.  And Mr. Adelson, in your recollection,
23 suggested during this meeting with Dodge City officials
24 that the city move from single -- from the at-large
25 method of election to district-based elections; is that

Page 85

1  correct?
2      A.  Yes.
3      Q.  After this meeting with Mr. Adelson,
4  Ms. Pogue, Ms. Tieben, and the mayor at the time of
5  Dodge City, what happened after that meeting?
6      A.  Nothing, as I remember.
7      Q.  Did you reach out to Ms. Pogue, Ms. Tieben,
8  or the mayor of Dodge City with respect to the
9  potential Section 2 liability?
10     A.  I don't recall that I did.
11     Q.  Would you have emailed -- apologies.
12     A.  Not in a formal capacity.  We may have had
13 discussion personally, maybe phone.  There may have
14 been an email back and forth.  I don't recall.
15     Q.  So after this presentation by Mr. Adelson
16 where he expressed that the city should go to
17 single-member district-based elections to avoid a
18 potential Section 2 lawsuit, there was no -- from your
19 recollection, you did not have any formal
20 communications with Dodge City officials regarding the
21 Section 2 liability issue?
22     A.  That's my recollection, yes.
23     Q.  And you may have had informal communications
24 with Dodge City officials about the potential Section 2
25 liability ; is that correct?

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
Sharon Seibel-Robb on 06/22/2023                              Pages 86..89

Page 86

1    A.  There may have been.  I can't verify that.
2    Q.  And after that meeting with Mr. Adelson, the
3  city did not move to single-member district-based
4  elections; is that right?
5    A.  That's correct.
6    Q.  And did the city talk about moving to
7  single-member district-based elections, to your
8  recollection, in a city commission meeting?
9    A.  I don't know.  I don't attend their
10  meetings.
11    Q.  Did the city officials reach out to you
12  after this meeting with Mr. Adelson about whether or
13  not Ford County could implement single-member
14  district-based elections in Dodge City?
15    A.  Ford County would not implement
16  single-member district -- the city implements their own
17  method of election.
18    Q.  Did Dodge City ever reach out to see if --
19  to your office, the Ford County Clerk's Office, about
20  how Ford County would run single-member district-based
21  elections after this meeting with Mr. Adelson?
22    A.  Not that I remember.
23    Q.  Okay.  And so based off of -- strike that.
24        What, if anything, to your recollection, did
25  Dodge City election officials do after receiving

Page 87

1  information from Mr. Adelson that there was potential
2  Section 2 liability due to minority vote dilution
3  because of the at-large method of election?
4    A.  Okay.  Could you say the question again.
5    Q.  To your knowledge, what did Dodge City
6  election officials do after receiving -- sorry -- not
7  election -- strike that.
8        To your recollection, what did Dodge City
9  officials do after receiving the information from
10  Mr. Adelson that there was a potential Section 2
11  minority vote dilution liability or violation?
12    A.  I don't know what they did on their own.
13    Q.  But in connection with the Ford County
14  Clerk's Office, did Dodge City officials do anything?
15    A.  I don't remember that they did.
16    Q.  Did you, as Ford County Clerk, follow up
17  with Dodge City officials regarding whether or not they
18  were going to change from the at-large method of
19  election to district-based elections after
20  Mr. Adelson's recommendation?
21    A.  I don't believe I did.
22    Q.  Why did you not?
23    A.  It's up to the city to determine their own
24  method of election.  The Ford County Clerk's Office
25  doesn't do that.

Page 88

1    Q.  Okay.  And after Mr. Adelson, was there a
2  time when you were Ford County Clerk that the issue of
3  Dodge City's at-large method of election was raised?
4    A.  No.
5    Q.  Now, Ms. Seibel, I'm going to ask you some
6  questions about voter turnout.  Are you familiar with
7  voter turnout during your time as the Ford County Clerk
8  or as the elections officer in Ford County?
9    A.  Yes.
10    Q.  And how was voter turnout in Ford County
11  elections?
12    A.  It depended on what type of election we were
13  conducting.  Federal elections, presidential, that sort
14  of thing, turnout was much larger than it would be in a
15  state election or a local election.
16    Q.  With respect to Dodge City Commission
17  elections, do you remember what the turnout looked
18  like -- voter turnout looked like for those elections?
19    A.  It would depend on how many candidates were
20  running and who the candidates were.
21    Q.  In your experience, what was the Latino
22  voter turnout for Ford County elections generally?
23    A.  I can't tell vote by Latino or Caucasian.
24  Okay.  Go ahead.
25    Q.  I'm sorry.  Apologies.  I'll let you -- I

Page 89

1  should let you finish your thought.  I'm sorry.
2    A.  We don't record votes by Latino or Caucasian
3  or any other -- there's no way of knowing exactly that
4  number.
5    Q.  When you were running for office for Ford
6  County Clerk, were you familiar with voter turnout on a
7  personal level or as a candidate?
8    A.  Both.
9    Q.  And did you experience -- what was your
10  experience with Latino voter turnout when you were
11  running as a candidate?
12    A.  I can't break it out that way.
13    Q.  Is there a difference between voter turnout
14  in even-year elections compared to odd-year
15  elections --
16    A.  Yes.
17    Q.  -- in your experience?
18    A.  Yes.
19    Q.  What is that difference?
20    A.  It's because it's a presidential.  It's a
21  federal election in the even-numbered years.
22    Q.  Is it the case that a presidential election
23  would increase or decrease voter turnout then?
24    A.  Increase.
25    Q.  So is it your belief that -- or is it in

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
Sharon Seibel-Robb on 06/22/2023                    Pages 90..93

Page 90

1  your experience as Ford County Clerk that there was an
2  increase in voter turnout during even-year elections?
3        A.  Say that again, please.
4        Q.  Sure.  Is it your experience as Ford County
5  Clerk and as an elections officer that there is an
6  increase in voter turnout in even-year elections?
7        A.  Yes, presidential elections.
8        Q.  And you say "presidential elections."
9  Specifically is there lower turnout in even-year
10 midterm elections?
11       A.  Somewhat lower.
12       Q.  And what about odd-year elections?  Is
13 there -- what is the turnout in odd-year elections
14 compared to even-year election?
15       A.  It's much lower.
16       Q.  And is turnout generally higher or lower in
17 local election?
18       A.  Local elections are lower, yes.
19       Q.  In your experience as a county clerk, would
20 you be able to administer a local election in an even
21 year during November general election that might happen
22 in 2018 or 2020?
23       A.  We could conduct a special election in an
24 even-numbered year for a school district or anybody
25 that's wanting to hold a special election.

Page 91

1        Q.  So I'm just trying to -- I'm trying to
2  understand.  If like, for example, if local elections
3  are happening during odd-numbered general -- like
4  odd-number years in November, would you actually --
5  would it be the case that Ford County could administer
6  that election instead in an even-number year, or would
7  it be harder for the county clerk to administer a local
8  election in conjunction with a federal election?
9        A.  Well, that is up to the state legislature
10 when those are conducted.  It's not a Ford County
11 decision.
12       Q.  Understood.  And so I'm not asking about if
13 you can as a matter of law.  I'm just asking like as a
14 matter of being able to actually implement or like
15 administer.  You know, I know that you have experience
16 administering elections.  Like does it matter during an
17 election how many -- does it make it harder for Ford
18 County or like, in your experience as a county clerk
19 administering elections or implementing elections, how
20 many races are on a ballot in a particular year?
21       A.  I don't know that it has to do with how
22 many.  It's what the races are more than the number.
23       Q.  And can you explain what you mean by that,
24 "what the races are"?
25       A.  Typically the school board and city and all

Page 92

1  those are the election -- there's fire districts -- not
2  fire districts -- water districts.  There's townships.
3  I mean we're going clear down to precinct people.
4  There's a lot of elections.  And so what I mean by that
5  is it depends what elections are being held.
6        Q.  Could it be the case that Ford County could,
7  though, administer like the City of Dodge City
8  elections, if state law permitted, during a general --
9  like during an even-year general election?
10       A.  Well, because we are the election officer,
11 yes.  We would do it.  But -- go ahead.  You go.
12       Q.  I just was wondering, would it make it more
13 difficult.  And I'm sorry for interrupting you.  I
14 don't mean to.  I think Zoom is a little bit hard.
15       A.  Would it be more difficult?  That's your
16 question?
17       Q.  Uh-huh.  Yes.
18       A.  Only in the fact that it adds more races and
19 longer ballots.
20       Q.  In your experience, does having elections
21 during both even years and odd years make it more
22 expensive to administer elections for Ford County?
23       A.  I don't think so.
24       Q.  Would it be cheaper for Ford County to
25 administer all local elections at the same time as your

Page 93

1  state and federal elections during even years?
2        A.  There would be some expense saving, but I
3  don't know that it would be a great factor in that.
4        Q.  How does Ford County implement Section 203
5  on the Federal Voting Rights Act, from your experience?
6        A.  We provide language assistance by the ballot
7  being printed in Spanish and English.  We have
8  accommodations for disabled voters.  We have headsets
9  that they can listen to the ballot and mark -- use of
10 electronic voting machines.  They can mark their own
11 ballot.  We provide assistance for people who can't
12 read the ballot or can't use the ballot or can't use
13 the voting machine or choose not to use it.  They can
14 also choose not to use it.  We provide assistance for
15 that.
16       All of our signage is in English and
17 Spanish.  Directions into and out of the voting center
18 are all provided in English and Spanish, and there are
19 handicap-accessible parking spaces.  At some of our
20 rural locations, there are the handicap -- you can ring
21 the bell.  Law provides that a person can -- two board
22 members can bring a ballot out to a person that can't
23 get into or chooses not to come into the facility.  We
24 provide all that.
25       Q.  To your knowledge, does Ford County, or

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
Sharon Seibel-Robb on 06/22/2023                                    Pages 94..97

Page 94

1  during your time as Ford County Clerk, did Ford County
2  have a bilingual election coordinator?
3        A.  No, not a coordinator.
4        Q.  Did Ford County have bilingual staff who
5  translated elections material?
6        A.  Yes, yes, we did.
7        Q.  And apologies if I use that term.  I've seen
8  it in other states that have Section 203 obligations.
9  They normally call that person a bilingual coordinator.
10 But did you have a staffer who was the person -- in
11 your office who was the person responsible for ensuring
12 Section 203 compliance?
13       A.  I did not have a staff person in my office,
14 but in my building I had access to court people who
15 were bilingual and another office building -- another
16 office right next to mine that had bilingual clerks.
17 They weren't my staff, but they were available to me.
18       Q.  Did Ford County have the ability to hire a
19 bilingual election staffer?
20       A.  Yes.
21       Q.  And did Ford County hire a bilingual --
22 specific bilingual election staffer?
23       A.  Not during -- not my office.  There were
24 bilingual workers in other offices.
25       Q.  Why did Ford County not hire a specific

Page 95

1  bilingual elections staff member?
2        A.  Because I had these other available to me
3  and for the time that I needed them, it was sufficient.
4        Q.  And when you were saying the time you needed
5  them, what time were you referring to?
6        A.  The time that they would translate the
7  ballot and come up with the Hispanic wording, and the
8  secretary of state's office also provided that help for
9  us.
10       Q.  Did you have a staff member year-round in
11 the elections office who spoke Spanish?
12       A.  No.
13       Q.  And why not?
14       A.  Because I had other people in the building
15 available to me that I was able to use for that
16 purpose.
17       Q.  Was there a case, then, if a voter came in
18 or a person came into the elections office who
19 primarily spoke Spanish, how would your -- how would
20 the Ford County Clerk's Office work with that voter or
21 person?
22       A.  I had a staff in an office just down the
23 floor below me that had a clerk that we would call, and
24 she would come up and assist.
25       Q.  Was it the case that there were folks who

Page 96

1  had come to your office during your tenure as the Ford
2  County Clerk who primarily spoke Spanish and needed to
3  receive information in Spanish for voting?
4        A.  Rarely.
5        Q.  Rarely.  That situation did occur, though,
6  at least a few times?
7        A.  It may have.
8        Q.  Besides ballots and signage, what else did
9  the Ford County Clerk's Office translate into Spanish
10 with respect to elections?
11       A.  All the voting instructions, all the filing
12 instructions, everything to do with election that
13 needed to be disseminated to the public was translated
14 to Spanish, and a lot of it was provided from the
15 secretary of state's office for us.
16       Q.  Did the Ford County Clerk's Office ever make
17 recommendations to folks who were running for office or
18 candidates for office that they translate their signage
19 and materials into Spanish?
20       A.  I don't know that we recommended it, no.
21       Q.  What did you think -- strike that.
22           Do you think it's important that election
23 materials be translated into Spanish in Ford County?
24       A.  Yes.
25       Q.  Why do you think that?

Page 97

1        A.  To reach the population that we need to.
2        Q.  Was there discussion, to your understanding,
3  prior to when Ford County was covered under Section 203
4  providing Spanish language materials to voters?
5        A.  No.
6        Q.  And why not?
7        A.  I wasn't the clerk then.  I don't know what
8  her decision was about that.
9        Q.  Does the Ford County Clerk's Office or
10 elections office encourage folks to register and vote?
11       A.  Yes.
12       Q.  How do y'all do that?
13       A.  Through the legal publications that are
14 made, and they're made in a time -- we have a timetable
15 of how these things are done and that elections are
16 coming up and what the positions are open for election
17 are going to be, mostly through our legal publications.
18       Q.  Anything else besides legal publications?
19       A.  We have materials in the -- well, during my
20 time it was in a display rack outside the door of my
21 office that as soon as the election cycle rolled
22 around, the secretary of state sent out all that
23 information as, you know, what election is coming up
24 this year, what offices are going to be open statewide,
25 and then we would match that with local information.

Page 98

1    Q.  Is there -- did your office ever go into
2  popular places in Ford County to do voter education and
3  registration?
4    A.  Yes, we did.
5    Q.  What places did y'all go to?
6    A.  We visit the library, community college.
7  One of the places where we did really well with getting
8  people registered was at the mall with lots of traffic.
9    Q.  Anywhere else?
10    A.  I'm sure there were others.  I don't
11  remember all of them.
12    Q.  What specific outreach did the Ford County
13  Clerk's Office do to the Hispanic population in Ford
14  County to encourage voter registration and voter
15  education?
16    A.  We attended meetings of some of their groups
17  that were organized, and I can't remember the names of
18  the groups or how many there were, but whenever we had
19  the opportunity, we took all of our voting information
20  from our office that we had that we could hand out.  We
21  also took our voting machine so they could get the idea
22  of how that worked and what it looked like when a
23  ballot came up with both languages and how you select
24  that.  And, yeah, I mean I don't remember all the
25  places we went, but we did a lot.

Page 99

1    Q.  Did y'all ever partner with local Hispanic
2  businesses for voter education and outreach?
3    A.  Yes.  We used the local Spanish newspaper
4  for our legal publications.
5    Q.  Any other Hispanic businesses that Ford
6  County partnered with for voter outreach?
7    A.  Not that I -- I don't remember that we did.
8    Q.  Besides the location you told me, so
9  library, mall, did Ford County ever go to, let's say,
10  the soccer -- did Ford County Clerk's Office ever go
11  to, let's say, like the soccer fields in Dodge City to
12  do voter outreach and education?
13    A.  No.
14    Q.  Did y'all ever go to any like Hispanic
15  cultural events, so like a Cinco De Mayo parade or
16  festival, to do voter education and outreach?
17    A.  We did a couple of those.  I can't remember
18  what they were called.  We did.  We set up a table.
19    Q.  And when y'all set up a table and did that
20  voter outreach to the Hispanic population, did you have
21  a person with the Ford County Clerk's Office that spoke
22  Spanish at those outreach events?
23    A.  I believe we asked one of our board workers
24  that usually worked for us to go with us.  It wasn't my
25  staff, but she was -- she worked for the elections.

Page 100

1    Q.  And did that person usually go with y'all?
2    A.  It wasn't always the same person, but, yes,
3  we would usually take someone.  Whoever our contact
4  person was for that group was usually there to help us.
5    Q.  Did Dodge City election -- Dodge City
6  officials.  I keep on saying "election officials."  I
7  apologize.  I'm talking to you, who was an election
8  official.
9        Did Dodge City officials work with your
10  office, the Ford County Clerk, on information
11  dissemination to Hispanic voters about elections?
12    A.  Yes.  They had the same information.  We
13  supplied them with the brochures and everything that we
14  had and they displayed them in their office.
15    Q.  Do you know if they did any other voter
16  outreach to the Hispanic population in Dodge City?
17    A.  I don't know if they -- I'm sorry.  I don't
18  know if they did or not.
19    Q.  Do you -- in your experience as Ford County
20  Clerk, have you ever encountered anyone who had issues
21  trying to vote in Dodge City or the Dodge City
22  Commission elections?
23    A.  Yes.  There were people who needed
24  assistance at the ballot booth or at the voting
25  machine.  Maybe the translation we had wasn't as clear

Page 101

1  to them as what they were used to speaking.  There
2  sometimes was a little bit of issue in the dialect, I
3  guess, would be the term, and we had board workers
4  there who could assist them.
5    Q.  Good.  Based on your experience at the Ford
6  County Clerk's Office, if Dodge City had made the
7  decision to move from at-large elections for the
8  commission to single-member district-based elections,
9  what information would the county clerk's office need
10  to be able to administer that change?
11    A.  I don't know what the law is on that now.  I
12  don't know exactly how they would do that now at this
13  point.
14    Q.  Generally, do you think that you'd have to
15  redraw voting precincts for new district lines?
16    A.  I'm sure there would have to be something
17  like that done, but I don't know -- I don't know the
18  statutory requirement for doing that anymore.
19    Q.  Okay.  And, you know, I think I only have
20  one or two more questions for you, Ms. Seibel.  So if
21  the Ford County Clerk's Office had administered -- like
22  has the Ford County Clerk's Office administered
23  elections based on districts before?
24    A.  We have county commissioner districts, yes.
25  And we have a school --

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
Sharon Seibel-Robb on 06/22/2023                    Pages 102..105

1    Q.  So it's --
2    A.  -- we have a school district, too, filed by
3  district.
4    Q.  And so it's the case that it's possible in
5  local elections for the Ford County Clerk's Office to
6  administer single-member district-based elections?
7    A.  Yes, it is possible.  It's up to the city to
8  decide their method, and then we go with what the
9  statutes require.
10    MS. WAKNIN:  Okay.  Well, I have no
11    further questions for you, Ms. Seibel.  That
12    might change.  Mr. Kaiser has an opportunity
13    to ask you questions now, so I'm not sure if
14    you want to take a break or the court
15    reporter needs a break.  But I'm going to
16    pass the witness.
17    MR. KAISER:  Thank you, Sonni.
18    Keli, do you need a break?
19    REPORTER:  I'm ready to go.  Thank you.
20    MR. KAISER:  Okay.
21    Ms. Seibel, are you good to go?
22    THE WITNESS:  I'm good to go.
23    MR. KAISER:  Okay.
24
25    CROSS-EXAMINATION BY MR. KAISER:

1
2    Q.  (By Mr. Kaiser)  At the beginning of this
3  deposition, Ms. Seibel, you were asked about the
4  different duties that the election officers had.  One
5  of them was voter registration.  During your time as
6  the election officer working in the elections office at
7  Ford County, are you aware of any instance in which
8  Hispanics or Latinos were prevented from running for
9  Dodge City Commission?
10    A.  No.
11    Q.  Additionally, you had said that one of your
12  duties was to set up the voting place.  Are you aware
13  of any instance in which Hispanics or Latinos were
14  prevented from voting at one of the voting sites?
15    A.  No.
16    Q.  Additionally, it says that you or someone
17  with the elections office would have been present at
18  elections.  Are you aware of any instance in which
19  Hispanics or Latinos were intimidated while at the
20  voting place?
21    A.  No.
22    Q.  Related to the polling places, it's my
23  understanding that the DOJ had sent poll monitors
24  beginning, I guess, based on the letter that you
25  reviewed, in 2002; is that correct?

1    A.  That's correct.
2    Q.  And as Ms. Waknin has talked with you, you
3  had conversations with the DOJ poll monitors
4  intermittently while they were at poll sites, correct?
5    A.  That's correct.
6    Q.  And at any point did the poll monitors ever
7  indicate to you that the way in which Ford County was
8  running its election was impermissible in any way?
9    A.  No.  They never shared any information with
10  us, either at the election or after.
11    Q.  And pulling back a little bit.  I think you
12  may have already answered this:  Outside of the poll
13  monitors and just the DOJ in general, did the DOJ ever
14  indicate to you, based on what they saw or what they
15  had heard from their poll monitors, that any voting
16  right that Hispanics or Latinos may have had been
17  violated?
18    A.  No.
19    Q.  I'd like to talk a little bit about the
20  engagement with Mr. Adelson.  I, too, want to sort of
21  set up a timeline here.  What precipitated your
22  engagement of Mr. Adelson?
23    A.  That I had attended the IACREOT meeting,
24  listened to his seminar on what a majority minority
25  looks like, and realized that we could have that

1  situation.  Then when I got home from that meeting,
2  there was a letter from DOJ talking about that same
3  situation and so I contacted him.
4    MR. KAISER:  And, Ms. Waknin, will you
5    please pull up Deposition Exhibit 71 and
6    share that?
7    MS. WAKNIN:  Sure.  Do you remember the
8    Bates number?
9    MR. KAISER:  Yes.  I believe it's 4129.
10    MS. WAKNIN:  I'm going to put it in the
11    chat for everyone.  So that way you can have
12    it yourself, if that works.
13    MR. KAISER:  Thank you, Ms. Waknin.  All
14    right.  I think I finally figured this out.
15
16    (Screen-sharing Exhibit 71)
17
18    Q.  (By Mr. Kaiser)  Ms. Seibel, do you see an
19  August 26th letter?
20    A.  Yes, I do.
21    Q.  Okay.  And I believe this is the letter that
22  Mr. Adelson had sent to you prior to performing any
23  investigation; is that correct?
24    A.  Yes.
25    Q.  And in this letter there's multiple parts.

Page 106

1  On page 2 there are three preconditions that were set
2  forth in Gingles.  Do you see those three
3  preconditions?
4        A.  Yes, I do.
5        Q.  And then scrolling down to page 3 and
6  continuing on to page 4, do you see that there are
7  eight factors that, I guess, are part of the Gingles
8  analysis?
9        A.  Yes, I see those.
10        Q.  And then going down to page 4 here, and
11  beginning at the highlight here on the second sentence
12  of the second-to-last substantive paragraph,
13  Mr. Adelson opines or discusses his preliminary
14  findings with regard to the first Gingles precondition.
15  Do you see that sentence?
16        A.  Yes, I do.
17        Q.  Do you recall at any point Mr. Adelson
18  discussing the two other preconditions that are set
19  forth in the Gingles case?
20        A.  I don't remember specifically that being
21  discussed.  As I recollect, it had to do more with the
22  fact that the method of election needed to be
23  addressed.
24        Q.  Do you recall Mr. Adelson ever speaking with
25  you about political cohesiveness?

Page 107

1        A.  I don't remember that.
2        Q.  Do you ever remember him discussing with you
3  whether or not white voters are able -- or sufficiently
4  vote as a block to prevent Hispanic candidates of
5  choice from being elected?
6        A.  I don't remember -- I don't remember
7  discussing that with him, no.
8        Q.  And then turning to the eight Senate
9  factors, do you ever recall discussing with Mr. Adelson
10  whether or not Dodge City has a history of
11  voter-related discrimination?
12        A.  No.
13        Q.  Do you ever remember discussing with him to
14  the extent to which voting in the elections in Dodge
15  City is racially polarized?
16        A.  No, I don't.
17        Q.  Do you ever recall whether or not Dodge City
18  has utilized voting practices or procedures that tend
19  to enhance the opportunity for discrimination against
20  Hispanics or Latinos?
21        A.  No.
22        Q.  Do you ever remember discussing with
23  Mr. Adelson whether or not members of -- Hispanic or
24  Latino members were prevented from the slating process
25  for candidates for Dodge City Commission?

Page 108

1        A.  No.
2        Q.  Do you remember discussing with Mr. Adelson
3  whether Latinos or Hispanics bear the effects of past
4  discriminations in areas such as education, employment,
5  and health?
6        A.  No.
7        Q.  Do you recall discussing with Mr. Adelson
8  residents or citizens of Dodge City using overt or
9  subtle racial appeals in political campaigns?
10        A.  No.
11        Q.  Do you recall discussing with Mr. Adelson
12  whether or not members of the minority group had been
13  elected to public office in Ford County?
14        A.  No.  I don't remember that.
15        Q.  Do you recall discussing whether or not
16  members of the minority group had been elected to the
17  Dodge City Commission?
18        A.  Yeah.  I think we talked about people filing
19  and being elected.  I can't remember for sure exactly.
20        Q.  Are you aware of any barriers that any city
21  officials put on Hispanic or Latino candidates from
22  joining or entering into the commission race?
23        A.  No.
24        Q.  Are you aware of any political group in Ford
25  County or around Ford County that prevented Hispanics

Page 109

1  or Latinos from entering as candidates for the Dodge
2  City Commission?
3        A.  No.
4        Q.  And are you -- did you have any
5  conversations with Mr. Adelson whether or not there had
6  been a lack of responsiveness on the part of elected
7  officials to the particular needs of Hispanics or
8  Latinos in Dodge City?
9        A.  No.
10        Q.  Is it fair to say that your conversations
11  with Mr. Adelson, and whether or not there was a
12  potential Section 2 violation, hinged on his analysis
13  of the first precondition of the Gingles test?
14        A.  Yes.
15        Q.  Now, we had spent a fair amount of time on
16  what you recall to be Mr. Adelson's recommendation, and
17  I want to break that down into two different parts.  Is
18  it your recollection that Mr. Adelson said that there
19  was a potential violation or an actual violation of
20  Section 2 in Dodge City?
21        A.  He said "potential," as I remember it.
22        Q.  And do you recall whether or not he said
23  that Dodge City needed to abandon the at-large election
24  process or that it should consider doing so?
25        A.  It was presented as a consideration to avoid

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
Sharon Seibel-Robb on 06/22/2023                                      Pages 110..113

Page 110

1  future litigation.
2          Q.  And I want to focus a little bit on that
3  risk of potential litigation.  What was the risk that
4  he identified to you, Ms. Seibel?
5          A.  Involvement with the DOJ.  The specific
6  risk, I think it -- I don't know exactly what the
7  penalty or how that would play out, but that there
8  would be a lawsuit.  I think DOJ, from the original
9  letter that I received.
10         Q.  And isn't it true in his initial -- in
11 Mr. Adelson's letter to you on August 26th that he sort
12 of laid out the steps that the DOJ would likely take in
13 its investigation of Ford County or Dodge City?
14         A.  Yes.
15         Q.  And focusing now on -- starting on
16 paragraph 2, isn't it true that his first or the first
17 stop that he identified would be that the DOJ requested
18 election returns and geographic data to conduct a
19 Section 2 compliance analysis?
20         A.  Yes.
21         Q.  And then moving down to paragraph 3, if
22 after performing that analysis they thought that Dodge
23 City voters primarily voted based on race, that the
24 next inquiry would be whether or not those voting
25 patterns effectively prohibit minority voters from

Page 111

1  participating equally in the electoral process?
2          A.  Okay.  The question --
3          Q.  Is that the step two is that the next step
4  for the DOJ would be determining whether or not voting
5  patterns effectively prohibit minority voters from
6  participating in the electoral process?
7          A.  Yes.  I agree.
8          Q.  At any point did the Department of Justice
9  notify you or, to your knowledge, the City of Dodge
10 City that it had made a finding that there were voting
11 patterns that effectively prohibited Hispanics or
12 Latinos from participating equally in the electoral
13 process?
14         A.  No.
15         Q.  Then the third step that Mr. Adelson sets
16 forth in his letter to you, Ms. Seibel, was that the
17 DOJ, quote, will seek a remedy, end quote.  Are you
18 aware at any point of the DOJ seeking a remedy
19 regarding Dodge City's at-large election process?
20         A.  No.
21         Q.  Is it fair to say that the concern that
22 Mr. Adelson raised in his letter to you all with
23 respect to the DOJ seeking a remedy never came to
24 fruition?
25         A.  Never.  Never did.

Page 112

1          Q.  Now, this may have been just my poor
2  note-taking, but it seemed to me -- or I'm going
3  clarify, do you recall, I guess, going back to
4  Ms. Waknin's timeline, when the meeting -- or let me
5  take a step back.  Do you know for sure that the Mayor
6  of Dodge City was involved in a meeting with
7  Mr. Adelson?
8          A.  I do not know for sure.  I don't remember
9  exactly -- it seems like he was there, but I don't -- I
10 can't say that for sure.  I know we met with the other
11 two people.
12         Q.  Ms. Tieben and Ms. Pogue?
13         A.  Tieben and Pogue, yes.
14         Q.  So do you recall, Ms. Seibel, when that
15 meeting with Mr. Adelson and the two other ladies that
16 you had identified, when that occurred in relation to
17 when Mr. Adelson performed his investigation?
18         A.  I do not.  The timeline is too long ago.
19         Q.  Is it possible that the meeting occurred
20 prior to Mr. Adelson performing his investigation?
21         A.  I think it was, yes.
22         Q.  There was some conversation, Ms. Seibel,
23 with respect to voter turnout and specifically when
24 local elections are held in Kansas.  Do you know the
25 advantage -- from your perspective as a county

Page 113

1  official, are there any advantages to holding city and
2  local elections in odd years?
3          A.  I don't know what -- as the administrator of
4  an election, it's kind of a break for us from, you
5  know, the big, long ballot of a general election, and
6  so it moves it away from all of that, and there's a
7  potential of double candidates.  I mean you could
8  have -- there are offices that you could file for and
9  also be on the ballot somewhere else.
10         Q.  Are you aware of why the State of Kansas
11 mandates that local elections like the Dodge City
12 Commission be held in odd years?
13         A.  I'm not.
14             MR. KAISER:  Those are all the questions
15         that I have, Ms. Waknin.
16             MS. WAKNIN:  We have no questions on
17         Redirect.
18             REPORTER:  If that's all the questions,
19         I'm going to let the videographer go off the
20         record and then I'm going to get transcript
21         orders.  All set, Brandon.
22             MS. WAKNIN:  I just want to make sure,
23         actually, that Ms. Seibel understands the
24         read and sign and that we had gotten that on
25         the record that she reserved the right for

**MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ vs CITY OF DODGE CITY, ET AL.**
**Sharon Seibel-Robb on 06/22/2023**      **Pages 114..117**

**Page 114**

```
 1   read and sign.
 2       REPORTER:  Ms. Seibel, you elected to
 3   read and sign the deposition; is that
 4   correct?
 5       THE WITNESS:  Yes.
 6       MS. WAKNIN:  We can go off the record.
 7       VIDEOGRAPHER:  With no further
 8   questions.  The time is 1:00.  This
 9   concludes the deposition.  We are off the
10   record.
11       REPORTER:  I'd like to get transcript
12   orders, please.
13       Mr. Kaiser, you're representing all the
14   defendants, correct?
15       MR. KAISER:  That is correct.
16       REPORTER:  And would you like to order a
17   transcript on their behalf?
18       (Off-record conversation)
19       MS. WAKNIN:  We'll do an expedite.
20       REPORTER:  For Monday okay?
21       MS. WAKNIN:  Yeah, Monday is fine.  PTX
22   and PDF.
23       MR. KAISER:  Same, expedited, PTX and
24   PDF.
25       (Deposition concluded at 2:02 p.m.)
```

**Page 115**

```
 1                STATE OF CONNECTICUT
 2
 3       I, Keli McGilton, a Notary Public in and for the
     State of Connecticut, do hereby certify that there came
 4   before me on the 22nd day of June, 2023, via Zoom
     videoconference the following named person, to wit:
 5   SHARON SEIBEL, who was by me duly sworn to testify to
     the truth and nothing but the truth as to her knowledge
 6   touching and concerning the matters in controversy in
     this cause; that she was thereupon examined upon her
 7   oath and said examination reduced to writing by me; and
     that the statement is a true record of the testimony
 8   given by the witness, to the best of my knowledge and
     ability.
 9
10       I further certify that I am not a relative or
     employee of counsel/attorney for any of the parties, nor
11   a relative or employee of such parties; nor am I
     financially interested in the outcome of the action.
12
13       WITNESS MY HAND this 24th day of June, 2023.
14
15
16                  _____
                         Keli McGilton
17                       Notary Public
18
19
20
21
22
23
24
     My Commission expires:
25   July 31, 2027
```

**Page 116**

```
 1
           IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF KANSAS
 3
     MIGUEL COCA and         :
 4   ALEJANDRO RANGEL-LOPEZ,:
                             :   Case No. 6:22-cv-01274-EFM-RES
 5       Plaintiffs,         :
 6   vs.                     :
 7   CITY OF DODGE CITY,     :
     ET AL,                  :
 8                           :
           Defendants.       :   JUNE 22, 2023
 9
10
11
12
13
14       I, SHARON SEIBEL, do hereby certify, under the pains
     and penalties of perjury, that the foregoing testimony
15   is true and accurate, to the best of my knowledge and
     belief.
16
         WITNESS MY HAND, this  day of       , 2023.
17
18
19                  _____
20                      Sharon Seibel
21
22
23
     cc:  Sonni Waknin, Esq.
24        Clayton J. Kaiser, Esq.
25   km
```

**Page 117**

```
 1            CHANGES AND SIGNATURE
 2   WITNESS NAME: Sharon Seibel-Robb, 06/22/2023
 3   PAGE    LINE    CHANGE          REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16       I, Sharon Seibel-Robb, have read the foregoing
17   transcript and hereby affix my signature that same is
18   true and correct, except as noted above.
19
20                  _____
21                      Sharon Seibel-Robb
22       Sworn to and Subscribed before me
23   _____, Notary Public.
24   This_____day of _____, 20____.
25   My Commission Expires:
```