### Page 1

```
 1  .
 2       IN THE UNITED STATES DISTRICT COURT
 3           FOR THE DISTRICT OF KANSAS
 4  .
 5  .
 6  MIGUEL COCA and
 7  ALEJANDRO RANGEL-LOPEZ,
 8       Plaintiffs,
 9   vs.     Case No. 6:22-cv-01274-EFM-RES
10  CITY OF DODGE CITY, et al.,
11       Defendants.
12  .
13  .
14  .
15           VIDEOTAPED DEPOSITION OF
16              MIGUEL COCA,
17  taken on behalf of the Defendants, pursuant to
18  Notice to Take Videotaped Deposition, beginning at
19  9:29 a.m. on the 25th day of April, 2023, at the
20  Dodge City City Hall, 806 North Second Avenue, in
21  the City of Dodge City, County of Ford, and State
22  of Kansas, before Lee Ann Bates, CSR, RPR, CRR.
23  .
24  .
25  .
```

### Page 2

```
 1            APPEARANCES:
 2  .
 3  .
 4  ON BEHALF OF THE PLAINTIFFS:
 5  .
 6    Ms. Sonni Waknin
 7    UCLA Voting Rights Project
 8    3250 Public Affairs Building
 9    Los Angeles, California  90065
10    (310) 400-6019
11    sonni@uclavrp.org
12  .
13    Mr. JD Colavecchio
14    Cleary Gottlieb Steen & Hamilton LLP
15    One Liberty Plaza
16    New York, NY 10006
17    212-225-2000
18    jdcolavecchio@cgsh.com
19  .
20  .
21  .
22  .
23  .
24  .
25  .
```

### Page 3

```
 1  ON BEHALF OF THE DEFENDANTS:
 2  .
 3    Mr. Anthony F. Rupp
 4    Ms. Tara Eberline
 5    Foulston Siefkin LLP
 6    7500 College Boulevard, Suite 1400
 7    Overland Park, Kansas  66210
 8    (913) 498-2100
 9    trupp@foulston.com
10    teberline@foulston.com
11  .
12  .
13  ALSO PRESENT:
14  .
15    Mijin Kang (via Zoom)
16    Hannah Colter (via Zoom)
17    Nick Hernandez
18    Brad Ralph
19    Tim Faulhaber, Videographer
20  .
21  .
22  .
23  .
24  .
25  .
```

### Page 4

```
 1                INDEX
 2  .
 3  .
 4  Certificate ----------------------------- 71
 5  .
 6  .
 7               WITNESS
 8  ON BEHALF OF DEFENDANTS:                PAGE
 9  MIGUEL COCA
10  Direct-Examination by Ms. Eberline         5
11  .
12  .
13              EXHIBITS
14  COCA DEPO EXHIBIT NO.:              MARKED
15  No 11  Plaintiffs' Map of Hispanic or
16        Latino Population in Dodge City
17        by Precinct (2020)              35
18  No 12  Facebook post                  60
19  No 13  Facebook post                  60
20  No 14  Facebook post                  61
21  No 15  Facebook post                  63
22  No 16  Facebook post                  64
23  .
24  .
25  .
```

EXHIBIT I

Page 5

1  THE VIDEOGRAPHER: Today is the 25th day
2  of April, 2023, and the time is approximately 9:28
3  a.m. We are at Dodge City City Hall to take the
4  deposition of Miguel Coca in the matter of Miguel
5  Coca and Alejandro Rangel-Lopez versus City of
6  Dodge City, et al., Case Number 6:22-cv-01274-EFM-
7  RES.
8  Would counsel please state your appearances
9  for the record.
10  MS. WAKNIN: Sonni Waknin from the UCLA
11  Voting Rights Project on behalf of plaintiffs.
12  MS. EBERLINE: Tara Eberline and Tony
13  Rupp appearing on behalf of defendants. Also
14  present are City Attorney, Brad Ralph, and City
15  Manager, Nick Hernandez.
16  MIGUEL COCA,
17  having been first duly sworn or affirmed to
18  testify to the truth, the whole truth, and nothing
19  but the truth, took the stand and testified as
20  follows:
21  DIRECT-EXAMINATION
22  BY MS. EBERLINE:
23  Q. Good morning, Mr. Coca. My name is Tara
24  Eberline. I am one of the attorneys representing
25  the defendants in this case. Thank you for your

Page 6

1  time today. Have you ever had your deposition
2  taken before?
3  A. I have not.
4  Q. All right. Let me go through just a
5  couple of rules and expectations for the day, and
6  you've probably spoken with your counsel about
7  some of these, but we'll take a break about every
8  hour, hour and 15 minutes, but if you need a break
9  otherwise, just let us know that, and that's no
10  problem. I would just ask that you answer the
11  question that I've asked before you take a break.
12  Fair enough?
13  A. Mm-hmm. Yes.
14  Q. Okay. And one of the things that's
15  sometimes challenging in depositions is that we
16  will need "Yes" or "No" or verbal answers to
17  questions, rather than a "Uh-huh" or a "Huh-uh" or
18  a shake of the head or a nod of the head. Is
19  that fair enough?
20  A. It is.
21  Q. And I may correct you on that, just to
22  make sure that our record is clear. I'm not
23  trying to be rude. Understood?
24  A. I understand.
25  Q. Okay. Very good. Start, if you would,

Page 7

1  with your current address.
2  A. My current address is 319 Kirk Street,
3  Dodge City, Kansas.
4  Q. And how long have you lived there?
5  A. I have lived there for over 13 years.
6  Q. Did you grow up in Dodge City?
7  A. I did.
8  Q. And are your current plans to continue
9  living in Dodge City, moving forward?
10  A. It is.
11  Q. Okay. Do you -- have you ever worked for
12  the City of Dodge City?
13  A. I have not.
14  Q. Do you have any family members who worked
15  for the City?
16  A. I do.
17  Q. And who is that?
18  A. I have two siblings, an older sister and
19  an older brother.
20  Q. What's your older sister's name?
21  A. Juana Coca.
22  Q. And what does she do for the City?
23  A. She works for the transportation
24  department as one of their customer service reps.
25  Q. How long has she worked for the City?

Page 8

1  A. I believe around five years.
2  Q. And what's your brother's name?
3  A. Diego Coca.
4  Q. And what does Diego do?
5  A. He is a firefighter/EMT.
6  Q. How long has he been a firefighter/EMT?
7  A. I believe we're getting -- he's getting
8  close to about three years.
9  Q. Do you have any other family members who
10  have worked for the City of Dodge City?
11  A. I do not.
12  Q. What -- tell us about your education and
13  background.
14  A. I went to school in -- here in Dodge City
15  Public School. I briefly went to the community
16  college here, Dodge City Community College, and
17  I'm currently attending Southern New Hampshire
18  University online.
19  Q. What are you studying?
20  A. I am studying political science.
21  Q. Are you currently employed?
22  A. I am.
23  Q. What's your job?
24  A. I work at Boot Hill Museum.
25  Q. What do you do for Boot Hill Museum?

Page 9

1  A. I am the administrative assistant.
2  Q. Is that a full-time job?
3  A. It is.
4  Q. And how long have you worked there?
5  A. My -- when I first started, it was in
6 2012, but I was working under a different
7 position.
8  Q. What were you doing then?
9  A. I was one of the entertainers.
10  Q. And what did that entail for your job
11 duties?
12  A. I performed during the summertime shows.
13  Q. Have you worked for Boot Hill
14 consecutively since 2012?
15  A. I left the museum briefly in -- at the
16 end of 2019.
17  Q. Did you have a different job in 2019?
18  A. Yes.
19  Q. What was that?
20  A. I was a barista at Scooter's Coffee.
21  Q. Have you ever run for office?
22  A. I have only -- not any -- I've only been
23 as a precinct committee person.
24  Q. You didn't run for state legislature in
25 2018?

Page 10

1  A. I made an attempt but I never officially
2 filed.
3  Q. When you say you "made an attempt," help
4 me understand. What does that mean?
5  A. I only filed for the financial, but I
6 never was on the ballot.
7  Q. Did you decide to withdraw from that
8 race?
9  A. I did.
10  Q. Why did you decide not to run for state
11 legislature in 2018?
12  A. I believe that I couldn't do it at the
13 time.
14  Q. Are you a registered Democrat?
15  A. I am.
16  Q. And you mentioned you serve as the
17 precinct representative for your precinct correct?
18  A. I do.
19  Q. And that's the -- as the Democratic
20 Precinct Representative, I assume?
21  A. Yes.
22  Q. Which precinct do you represent?
23  A. I believe it is Precinct 1.
24  Q. Which area of the city does that
25 encompass?

Page 11

1  A. Encompasses parts of south Dodge City.
2  Q. Do you know the racial and ethnic
3 breakdown of your precinct?
4  A. I don't know the exact numbers, but it is
5 mostly majority Hispanic Latino.
6  Q. And what's the basis for your conclusion
7 about that?
8  A. That is who is in my neighborhood and the
9 surrounding areas as well.
10  Q. Do you know the -- the breakdown of the
11 political affiliation of the individuals who live
12 in your precinct?
13  A. I do not.
14  Q. Would you agree that there are both
15 Republicans and Democrats that live within your
16 precinct?
17  A. I believe there is.
18  Q. And you would agree that there's both
19 Republicans and Democrats that live throughout the
20 city of Dodge City; correct?
21  A. Yes.
22  Q. Have you served as chair or vice-chair of
23 the Ford Democratic Party?
24  A. I have.
25  Q. In both of those roles?

Page 12

1  A. Yes.
2  Q. And when were you chair of the Ford
3 County Democratic Party?
4  A. I was chair of the democratic party from
5 March of 2022 to November of 2022.
6  Q. Is that an elected position?
7  A. It is elected by the precinct committee.
8  Q. And what are your responsibilities as
9 chair of the Ford County Democratic Party?
10  A. You oversee the executive board, and that
11 includes  financials and making sure all the
12 financial filings are up to date, as well as
13 keeping informed all of those that attend the
14 meetings, as well as overseeing and presiding over
15 the meetings.
16  Q. Is part of your responsibilities as chair
17 of the party to set policy positions?
18   MS. WAKNIN: Objection; misstates
19 testimony.
20   THE WITNESS: No, not really.
21 BY MS. EBERLINE:
22  Q. Okay. And when were you vice-chair of
23 the Ford County Democratic Party?
24  A. I was vice-chair from December, 2020, to
25 March of 2022.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 13

1  Q. What were your job duties or
2  responsibilities as vice-chair of the Democratic
3  party?
4  A. To be -- to -- any duties assigned by the
5  chair of the party as well as, in the absence of
6  the chair, preside over the meetings.
7  Q. Do you currently serve in any position
8  with the Ford County Democratic Party?
9  A. Just as a precinct committee person.
10  Q. Okay. In your work with the Democratic
11  party in this area of the state, have you worked
12  with both Latino and white Democrats?
13  A. Yes.
14  Q. And would you agree that there are both
15  Latino and white Republicans in this area of the
16  state as well?
17  A. I do believe there is.
18  Q. And that's true within the city of Dodge
19  City as well; correct?
20  A. I believe so.
21  Q. And would you agree with me that
22  political party is not synonymous with race or
23  ethnicity?
24  A. I'm not sure about that.
25  Q. Well, would you agree with me that we

Page 14

1  can't assume that someone is one political party,
2  based on their ethnicity?
3  A. Yes.
4  Q. Okay. Are there districts or precincts
5  within Dodge City that are high density Latino, to
6  your knowledge?
7  MS. WAKNIN: Objection; form.
8  THE WITNESS: I believe there is.
9  BY MS. EBERLINE:
10  Q. And which ones are those?
11  A. The only one that I'm really familiar of
12  the residents are the ones in my precinct, because
13  I am in the immediate area often.
14  Q. Okay. You don't have personal knowledge
15  about the -- the ethnic breakdown of any specific
16  area within the city of Dodge City, other than
17  your neighborhood. Is that fair?
18  MS. WAKNIN: Objection; form.
19  THE WITNESS: I know my area, as well as
20  I see residents throughout the entire community,
21  as well, that are Latino.
22  BY MS. EBERLINE:
23  Q. Okay. You'd agree that there are
24  residents that are Latino throughout the entire
25  city of Dodge City area; correct?

Page 15

1  A. Yes.
2  Q. And would you agree with me that over the
3  time that you've lived in Dodge City, that the
4  city has become more integrated?
5  MS. WAKNIN: Objection; form.
6  THE WITNESS: I'm not quite sure. Any
7  area that I've been, there is -- where I populate
8  and where I am, there is quite a few Latinos
9  there.
10  BY MS. EBERLINE:
11  Q. Do you have personal knowledge about
12  whether the trends in the city of Dodge City are
13  to become a more integrated community?
14  MS. WAKNIN: Objection; form.
15  THE WITNESS: I believe that the Latine
16  population is throughout every aspect of Dodge
17  City.
18  BY MS. EBERLINE:
19  Q. Are you alleging in this case that
20  Latinos are a politically cohesive minority group
21  within Dodge City?
22  A. I believe they are.
23  Q. And would you agree with me, though, that
24  the Latino citizen -- citizens in Dodge City are a
25  diverse group of people that do have different

Page 16

1  ideas about things?
2  A. I believe they are, like most groups.
3  Q. And not all Latinos within Dodge City
4  think alike; correct?
5  A. That is true.
6  Q. And there are many factors that would
7  impact an individual's voting decisions?
8  A. Like most people, there is, yes.
9  Q. And those factors might include
10  relationship with or knowledge of the candidate
11  who's running; correct?
12  A. Yes.
13  Q. And the candidate's views on specific
14  issues might be relevant; correct?
15  A. Yes.
16  Q. And issues that are important to one
17  voter might be different than the issues that are
18  important to another voter. Agree?
19  A. Very possible.
20  Q. And an individual's personal experiences
21  would impact their decisions on voting; correct?
22  A. Yes.
23  Q. And there may be other factors as well
24  that would impact who a voter votes for in any
25  given commission election; correct?



Page 17

1  A.  It is possible.
2  Q.  And so, in light of all of those
3  different factors that might impact a voter's
4  decision, would you agree with me that one's
5  ethnicity is not an accurate predictor of who one
6  would vote for in a city commission election?
7      MS. WAKNIN:  Objection; form.
8      THE WITNESS:  It's a possibility, but I
9  believe that most people in my community talk to
10 each other, and that's the major factor, in my
11 opinion.
12     BY MS. EBERLINE:
13 Q.  Well, help me understand what you just
14 said.  What do you mean by that?
15 A.  I believe that even most people in
16 certain ethnic communities, in most, actually,
17 communicate with each other.  They talk to each
18 other and that, I believe, has a factor into it.
19 Q.  Okay.  So one additional factor in who a
20 voter might vote for would be who their friends or
21 neighbors would recommend; is that right?
22 A.  It's a possibility, yes.
23 Q.  Okay.  So we've listed five or six or
24 maybe more different factors that might impact who
25 one votes for.  Agreed?

Page 18

1  A.  Mm-hmm.
2      MS. WAKNIN:  Objection; misstates
3  testimony.
4      BY MS. EBERLINE:
5  Q.  And so would you agree with me that
6  ethnicity alone is not a fair indicator of who one
7  is going to vote for in a city commission
8  election?
9  A.  I do believe it is a major factor,
10 though.
11 Q.  But not the only factor; correct?
12 A.  No.
13 Q.  Would you agree?
14 A.  Yes.
15 Q.  Okay.  Would you agree that not all
16 Latinos within the City of Dodge City prefer the
17 same candidates for city commission?
18 A.  It is a possibility, but I do not know
19 every Latino in Dodge City.
20 Q.  And Latino voters here may support
21 candidates who are not Latino; correct?
22 A.  Yes, it is a possibility.
23 Q.  Just as white voters may support
24 candidates who are Latino; correct?
25 A.  Yes, it is a possibility.

Page 19

1  Q.  And commission votes are secret ballots.
2  Yes?
3  A.  Yes.
4  Q.  And so the only person whose votes you
5  have personal knowledge about are your own.
6  Agreed?
7  A.  That is true.
8  Q.  And city commission elections here are
9  nonpartisan elections; correct?
10 A.  Yes.
11 Q.  Are you aware of any exit polling that
12 reflects how voters vote in Dodge City Commission
13 elections?
14 A.  No, I'm not aware of any exit polling in
15 general.
16 Q.  Are you aware of any data or research
17 that would reflect the voting for Dodge City
18 Commission elections?
19 A.  No, other than the data that is released
20 of election results.
21 Q.  Okay.  In your time living in Dodge City,
22 have you had opportunities to interact with
23 families in which one member of the family is
24 Hispanic but not all members of the family are
25 Hispanic?

Page 20

1  A.  Yes.
2  Q.  And is that a relatively common
3  occurrence in Dodge City?
4  A.  It happens frequently.
5  Q.  And so it may be that a -- a husband and
6  a wife, for example, one may be Hispanic and one
7  may be white; correct?
8  A.  Yes.
9  Q.  And so you'd agree with me that an
10 individual's last name is not necessarily
11 indicative of their ethnicity; correct?
12 A.  That is true.
13 Q.  Are you making an allegation in this case
14 that white voters are voting as a bloc in city
15 commission races?
16 A.  I am.
17 Q.  And what is your -- what is your evidence
18 that supports that allegation?
19 A.  Just on how the elections have already
20 turned out already, with the history of who has
21 been on the commission previously.
22 Q.  Any other evidence?
23 A.  None -- none that come to mind at this
24 moment.
25 Q.  Have you engaged in any communications

Page 21

1  with the City of Dodge City regarding the City's
2  at-large election process?
3     A.  I have not.
4     Q.  Have you engaged with other members of
5  the Dodge City community related to the city's at-
6  large commission election process?
7     A.  I have talked to my friend Alejandro
8  about this.
9     Q.  Have you spoken to anyone other -- and
10 are you referring to Alejandro Rangel-Lopez?
11    A.  I am.
12    Q.  Have you spoken to anyone other than Mr.
13 Rangel-Lopez about the City's at-large election
14 process?
15    A.  Only when people bring it up to me in
16 passing.
17    Q.  All right.  Let's talk first about your
18 communications with Mr. Rangel-Lopez.  When was
19 the first time that you and Mr. Lopez, Mr. Rangel-
20 Lopez, spoke about the at-large election process?
21    A.  I believe it would have been around the
22 fall of 2021.
23    Q.  And who initiated that conversation?
24    A.  Mr. Lopez did.
25    Q.  What did he tell you?

Page 22

1     A.  He just wanted to talk to me about
2  something and then one thing just led to another
3  and we started talking about the at-large
4  districts, I guess.
5     Q.  What did Mr. Rangel-Lopez tell you about
6  at-large elections?
7     A.  Well, we mostly discussed on how they
8  work.
9     Q.  And what's your understanding of how they
10 work?
11    A.  That the entire community votes for the
12 commission together versus, you know, districts.
13    Q.  Do you recall anything else about that
14 conversation with Mr. Rangel-Lopez?
15    A.  I don't.
16    Q.  Did you discuss at the time any efforts
17 that the two of you might undertake to change the
18 election process?
19    A.  Not at that time, no.
20    Q.  Okay.  When is the first time that you
21 had a discussion with Mr. Rangel-Lopez about
22 changing the City of Dodge City's election
23 process?
24    A.  It would have been several weeks after.
25    Q.  Still in the fall or winter of 2021?

Page 23

1     A.  Yes.
2     Q.  And tell me about that conversation.
3     A.  We just discussed whether or not we
4  wanted to do something about it.
5     Q.  And did you make a decision at that time?
6     A.  Not at that time, no.
7     Q.  When did you decide to take action to
8  change the at-large election process in the city?
9     A.  For myself personally, it would have
10 still been in the fall of '21.
11    Q.  At that time, or at any other time, did
12 you take any steps other than filing this lawsuit
13 to change the election process in Dodge City?
14    A.  No.
15    Q.  Why not?
16    A.  Because I believe any other way wouldn't
17 have gotten to what we wanted, as well it was
18 difficult for us -- myself personally, at least,
19 to find ways to do it, other than this lawsuit.
20    Q.  Did you explore any alternatives?
21    A.  I considered going and talking to the
22 commission.
23    Q.  And you ultimately decided not to do
24 that?
25    A.  Yes.

Page 24

1     Q.  Why is that?
2     A.  Because I was worried for how the impact,
3  it would impact my family and their jobs, as well
4  as my own.
5     Q.  What caused you to worry about your job
6  or your family's jobs if you spoke to the
7  commission?
8     A.  Because I have family members that work
9  for the City, and my place of employment also
10 deals with the City as well, frequently.
11    Q.  What led you to believe that speaking to
12 the commissioners about at-large elections would
13 have an impact on your or your family's jobs?
14    A.  Mainly because I have trouble talking to
15 the commission.  I don't feel comfortable around
16 them.
17    Q.  Okay.  So there was some personal
18 nervousness about that?
19    A.  Yes.
20    Q.  Okay.  When was the first time that you
21 spoke to an attorney related to a decision to file
22 this lawsuit?
23    A.  It would have been not that long after I
24 personally decided that I wanted to do it, so it
25 still would have been in the fall of '21.

Page 25

1  Q. And who did you speak to?
2  A. I spoke to my current attorney.
3  Q. Who is that?
4  A. Sonni Waknin.
5  Q. Okay. And I'm not going to ask you about
6  the substance of any conversation that you've had
7  with counsel, but my question is: Did you
8  continue to have conversations with counsel from
9  the fall of 2021 until the filing of this lawsuit
10 in January of 2023?
11 A. Yes.
12 Q. And in those conversations, was there
13 anyone else a member of those communications,
14 other than yourself and your attorney?
15     MS. WAKNIN: I'm going to object to the
16 extent that you're -- just want to clarify that
17 you're not asking for attorney-client privileged
18 communications.
19     BY MS. EBERLINE:
20 Q. Absolutely, so I don't want to know what
21 you talked about. What I'm asking about is who
22 was present in your conversations with counsel.
23     MS. WAKNIN: Yeah, that makes sense.
24     THE WITNESS: I don't believe there was
25 anyone else present.

Page 26

1  BY MS. EBERLINE:
2  Q. So in each of the conversations you had
3  with counsel, it was just you and your attorney in
4  the communication; is that correct?
5  A. Mm-hmm. Yes.
6  Q. Okay. Did you ever speak to Melissa
7  McCoy or Ernestor De La Rosa about your concerns
8  related to at-large elections?
9  A. I did not.
10 Q. Did you speak to any City of Dodge City
11 employee before you filed this lawsuit about at-
12 large elections?
13 A. No, I did not.
14 Q. Have you made any efforts to recruit city
15 commission candidates?
16 A. I thought about it, but most people that
17 I would talk to in regards to previous elections,
18 when I was the chair for the Democratic party,
19 stated that they didn't feel comfortable running.
20 Q. Who did you speak to?
21 A. Various people. I don't remember most of
22 them, off the top of my head.
23 Q. Do you remember any?
24 A. Umm. I'm trying to think. I do not.
25 Q. Okay. You mentioned that you may have

Page 27

1  had conversations about at-large elections with
2  other people in passing. Do you remember any
3  individuals that you've spoken to about at-large
4  elections, other than Mr. Rangel-Lopez?
5  A. I really don't. Most of it is when
6  people talked about it with me at the store or
7  when I went out in various businesses in town.
8  Q. And is it a topic that you would bring
9  up?
10 A. No.
11 Q. You don't recall the names of any
12 individuals with whom you've spoken about at-large
13 elections, other than Mr. Rangel-Lopez and your
14 counsel; correct?
15 A. I do not, no.
16 Q. Is that correct?
17 A. That is, yes.
18 Q. Okay. What efforts have you undertaken
19 to encourage the Latino community to participate
20 in city commission elections?
21 A. I have shared things on social media
22 which is, I believe, at least within my group as
23 well, that it's the easiest way to communicate
24 with people and reach people.
25 Q. Anything else?

Page 28

1  A. Other than talking to people when I come
2  across them on the street, no.
3  Q. Do you recall any Dodge City Commission
4  election in which a candidate campaigned as a
5  Latino preferred candidate?
6  A. Yes.
7  Q. And who are you referring to?
8  A. Blanca Soto.
9  Q. What did Ms. Soto do that reflected her
10 -- her desire to campaign as a Latino preferred
11 candidate?
12 A. Umm. She would campaign in areas that
13 were predominantly Hispanic and Latino.
14 Q. Where was that?
15 A. I recall that she actually knocked doors
16 in my neighborhood and, eventually, I also went to
17 go help her knock doors and campaign in parts of
18 the center of Dodge City.
19 Q. Do you know whether she was also
20 campaigning in other neighborhoods within Dodge
21 City?
22 A. She -- she told me that she did, yes.
23 Q. So she campaigned throughout the city;
24 correct?
25 A. Mm-hmm.

Page 29

1  Q. Yes?
2  A. Yes.
3  Q. Did Ms. Soto do anything else that
4  indicated to you that she was campaigning as a
5  Latino preferred candidate?
6  A. She also was very present in a lot of, I
7  guess, cultural, Hispanic Latino cultural events
8  as well, and that's where most people recognize
9  her from is either from that or from her work, her
10 professional work.
11 Q. And what's her professional work?
12 A. She's worked in various places. I know
13 at one point in time, she's worked for the school
14 district, I think. Possibly Kansas Appleseed.
15 Q. And you'd agree that the school district
16 and Kansas Appleseed are not Latino specific
17 organizations; correct?
18 A. That is correct.
19 Q. Okay. Do you recall any other Dodge City
20 Commission election in which that you would allege
21 a candidate campaigned as a Latino preferred
22 candidate?
23 A. I really don't recall it.
24 Q. And so the only one that you can recall
25 at this time is Ms. Soto; correct?

Page 30

1  A. Yes.
2  Q. Okay. What makes a candidate Latino
3  preferred?
4  A. I believe it's someone that really has
5  the interest of the Latino community at heart;
6  someone that spends time with them; that someone
7  that many people in the Latino community feel
8  comfortable going to talk to them about various
9  issues.
10 Q. Any other characteristics of a Latino
11 preferred candidate?
12 A. Not -- none that come to mind at this
13 moment.
14 Q. Okay. Who determines whether a candidate
15 is Latino preferred?
16 A. Umm. I believe it's when the Latino
17 community start talking amongst each other and
18 they start showing their preferences towards a
19 candidate.
20 Q. And that's reflected in just one-on-one
21 conversations between members of the Latino
22 community?
23 A. Yes.
24 Q. Okay. There would be no data that would
25 reflect which candidates are Latino preferred;

Page 31

1  correct?
2     MS. WAKNIN: Objection; form.
3     BY MS. EBERLINE:
4  Q. To your knowledge?
5  A. To my knowledge, I am not aware.
6  Q. Are you aware of any documents or
7  evidence that would support which candidates are
8  Latino preferred?
9     MS. WAKNIN: Objection; form.
10    THE WITNESS: I am not aware.
11    BY MS. EBERLINE:
12 Q. And who, from your perspective, gets to
13 determine whether someone is a Latino preferred
14 candidate?
15 A. I believe it's not just one person. It's
16 many people.
17 Q. Who are those people?
18 A. Friends, family, neighbors.
19 Q. The amended complaint that you filed in
20 this case asserts that there are not any Latino
21 preferred candidates on the commission at this
22 time; is that right?
23 A. I do believe so.
24 Q. Would you agree that Joseph Nuci is a
25 member of the commission presently?

Page 32

1  A. He is.
2  Q. And is it your allegation that Mr. Nuci
3  is not a Latino preferred candidate?
4  A. I believe he isn't.
5  Q. And why is that?
6  A. Many members, including myself, were not
7  aware he was Latino until very recently.
8  Q. And so who determines that he is not
9  Latino preferred?
10    MS. WAKNIN: Objection; asked and
11 answered.
12    MS. EBERLINE: Go ahead and answer.
13    THE WITNESS: Because pretty much he has
14 not affiliated himself with Latino community, and
15 that's mostly what most people are thinking.
16    BY MS. EBERLINE:
17 Q. When you say "what most people are
18 thinking," you're speaking for yourself; correct?
19 A. Myself. Some of my neighbors and family
20 members have talked to amongst each other about
21 it.
22 Q. Okay. You would agree that Mr. Nuci is
23 Latino, however?
24 A. He claims he is.
25 Q. Do you have any reason to deny that

Page 33

1 that's true?
2    A.  I don't.
3    Q.  Do you have any statistical analysis
4 reflecting that Mr. Nuci is not a Latino preferred
5 candidate?
6    A.  I don't.
7    Q.  Do you have any other evidence that would
8 reflect your opinion that Mr. Nuci is not a Latino
9 preferred candidate?
10   A.  I don't.
11   Q.  Is your conclusion that he's not a Latino
12 preferred candidate based on his position on any
13 city commission issue?
14   A.  None that I'm aware of.
15   Q.  Are you aware of any positions that Mr.
16 Nuci has taken in a city commission matter that is
17 contrary to the interests of the Latino community?
18   A.  None that I'm aware of.
19   Q.  How long have you lived in the city of
20 Dodge City?
21   A.  My whole life.
22   Q.  And how old are you?
23   A.  I am 27 years old.
24   Q.  Over the course of your lifetime, would
25 you agree that the Latino population just in Dodge

Page 34

1 City has continued to grow?
2    A.  It has.
3    Q.  And would you agree that the percentage
4 of the population in Dodge City that is Latino has
5 continued to grow?
6    A.  It has.
7    Q.  In fact, you allege in the amended
8 complaint that the Latino population is
9 approximately 65% of the city's total population
10 at this time; correct?
11   A.  Yes.
12   Q.  So roughly two-thirds of the population
13 of Dodge City is Latino?
14   A.  Yes.
15   Q.  Would you agree that the trends reflect
16 that Latinos are on their way towards becoming a
17 voting majority in Dodge City?
18   A.  I believe so.
19   Q.  And, in fact, that may happen in the very
20 near future; correct?
21   A.  It is a possibility, yes.
22   Q.  And would you agree that if the majority
23 of the voting age population in Dodge City is
24 Latino, that Latino voters could control city-wide
25 elections?

Page 35

1    A.  It's a possibility, but I don't believe
2 it's going to happen, likely.
3    Q.  And do you have any evidence to support
4 that belief?
5    A.  In past, there hasn't really been any
6 candidates the Latino -- Latino preferred
7 candidates.
8       (THEREUPON, Deposition Exhibit No 11
9 marked for identification.)
10 BY MS. EBERLINE:
11   Q.  Mr. Coca, I've handed you a document
12 marked Exhibit Number 11.  Do you see that?
13   A.  Yes.
14   Q.  Do you recognize this document?
15   A.  Yes, vaguely.
16   Q.  This was a map that was included in the
17 amended complaint that you filed in this case;
18 correct?
19   A.  I believe so.
20   Q.  Do you know who prepared this map?
21   A.  It was assisted in preparation by my
22 attorneys.
23   Q.  Okay.  And do you have personal knowledge
24 about the source of the information that was used
25 to prepare the map?

Page 36

1    A.  I believe it's possibly through the
2 census.
3    Q.  Are you speculating on that?
4    A.  I honestly do not recall at this exact
5 moment in time.
6    Q.  Okay.  Do you know whether the current
7 Dodge City voting precincts are reflected on this
8 map?
9    A.  I honestly could not tell.
10   Q.  Do you have personal knowledge about the
11 way the map was -- was created or what it
12 reflects?
13   A.  I believe it reflects the -- where most
14 Latino residents and Hispanic residents live in
15 Dodge City.
16   Q.  Okay.  Do you have personal knowledge
17 about the underlying data that supports the -- the
18 map?
19   A.  I do not recall at this moment.
20   Q.  All right.  Have you alleged in this case
21 that you live in an area that could be drawn as a
22 Latino majority district?
23   A.  I do.
24   Q.  And what area is that?
25   A.  I live in south Dodge City.

Page 37

1  Q. How did you reach the conclusion that you
2  live in an area that could be drawn as a Latino
3  majority district?
4   A. Because in the area, it is majority
5  Latino.
6   Q. Where would you propose that the lines be
7  drawn?
8    MS. WAKNIN: Objection; form.
9    THE WITNESS: In just areas in my -- near
10 where I live.
11   BY MS. EBERLINE:
12   Q. Okay. Do you know with any more
13 specificity than that?
14   A. I do not.
15   Q. All right.
16    MS. WAKNIN: Are we done with this
17 exhibit?
18    MS. EBERLINE: Yeah, I think so.
19    MS. WAKNIN: Okay.
20   BY MS. EBERLINE:
21   Q. Mr. --
22    MS. WAKNIN: I was going to tell him I
23 think he could hand it back.
24    MS. EBERLINE: That's fine.
25   BY MS. EBERLINE:

Page 38

1  Q. Mr. Coca, do you have any personal
2  knowledge of any history of discrimination by the
3  City of Dodge City against Latinos?
4   A. None that come to mind at this moment.
5   Q. Have you ever experienced any
6  discriminatory actions from the City personally?
7   A. I have not personally, no.
8   Q. Are you familiar with the programs and
9  efforts that the City of Dodge City have
10 undertaken to be welcoming to the Latino
11 community?
12    MS. WAKNIN: Objection; form. Objection;
13 compound.
14    MS. EBERLINE: You can go ahead and
15 answer.
16    THE WITNESS: I'm aware of some programs.
17   BY MS. EBERLINE:
18   Q. What are you aware of?
19   A. One that I'm aware of in particular is
20 Welcoming Dodge City that welcomes new citizens to
21 Dodge City, especially from foreign countries.
22   Q. Are you aware of the city's cultural
23 awareness advisory board -- I'm sorry -- Cultural
24 Relations Advisory Board?
25   A. I am somewhat familiar with it.

Page 39

1  Q. Are you aware of the City of Dodge City's
2  International Festival?
3   A. I am.
4   Q. Have you participated in either the
5  Welcoming Dodge City events or the International
6  Festival?
7   A. I have worked a naturalizing citizenship
8  event through work as a bartender at the museum,
9  and then I am on the board of -- on Main Street
10 Dodge City, which is one of the organizations that
11 helps put on International Festival.
12   Q. Are you familiar with the city's New
13 Americans Dinner?
14   A. I am somewhat familiar with it, yes.
15   Q. Was that the event that -- that you had
16 participated in as a bartender or was that a
17 separate event?
18   A. It would have been that event.
19   Q. Okay. Are you familiar with the Engage
20 Dodge Program?
21   A. Somewhat familiar.
22   Q. Are you familiar with the City's
23 participation in US naturalization ceremonies?
24   A. Somewhat.
25   Q. Are you aware of the City's work with the

Page 40

1  Mexican Consulate Mobile Services to come to Dodge
2  City and provide documentation services?
3   A. Not really.
4   Q. Are you aware of the Guatemalan Consulate
5  Services that have been provided through the City
6  of Dodge City?
7   A. Somewhat.
8   Q. Are you aware that the City provides
9  naturalization scholarships to individuals who are
10 interested in becoming naturalized citizens?
11   A. I was not aware of that.
12   Q. Are you aware of the City's
13 naturalization clinic?
14   A. No, I was not.
15   Q. Are you aware of the DACA clinics that
16 the City and partners have hosted?
17   A. No, I am not.
18   Q. You'd agree with me that the City of
19 Dodge City has engaged in significant efforts to
20 engage the Latino community?
21   A. Somewhat I believe so, yes.
22   Q. Okay. Are you aware of any issues that
23 have come before the Dodge City Commission in
24 which the Latino community has taken one position
25 and the white community has taken another position



Page 41

1  on the issue?
2      A.  I am not aware of any at this moment.
3      Q.  You had mentioned that you believed Ms.
4  Soto's campaign -- let me start over and make sure
5  I get the language right.
6      I believe you testified that Ms. Soto
7  campaigned as a Latino preferred candidate; is
8  that accurate?
9      A.  Yes.
10     Q.  And that conclusion was not based on any
11 conversation with Ms. Soto.  Would you agree?
12     A.  That is true, yes.
13     Q.  Are you aware of any campaign in which a
14 candidate has made an appeal to the white
15 community, more specifically?
16         MS. WAKNIN:  Objection; form.
17         THE WITNESS:  None that I'm really aware
18 of at this moment.
19         BY MS. EBERLINE:
20     Q.  What barriers, if any, exist to members
21 of the Latino community in Dodge City electing the
22 candidates of their choice to the commission?
23     A.  They don't -- I personally believe that
24 many of them don't have information on most of the
25 candidates that run.

Page 42

1      Q.  Are there any other barriers, to your
2  knowledge?
3      A.  None that I can -- none that I can think
4  of at this moment.
5      Q.  Other than Ms. Soto, are you aware of any
6  other Latino candidates of choice who have not
7  been elected to City of Dodge City commission
8  elections?
9      A.  The only one that I'm really aware of,
10 other than Ms. Soto, is Liliana Zuniga.
11         THE REPORTER:  Would you say her name
12 again, please?
13         THE WITNESS:  Liliana Zuniga.
14         THE REPORTER:  Thank you.
15         BY MS. EBERLINE:
16     Q.  So let's talk about Ms. Zuniga for a
17 moment.  What makes Ms. Zuniga a candidate of
18 choice for the Latino community?
19     A.  Because she interacts with the community.
20 She is a business owner that many members in the
21 community talk to about her, and I believe many
22 people, including some of my friends, actually
23 have gone to her for various advice on various
24 things in their personal life.
25     Q.  Do you know anything about her position

Page 43

1  on city commission issues?
2      A.  I don't recall.
3      Q.  Any other reasons that Ms. Zuniga is a
4  Latino candidate of choice?
5      A.  Other than with her interaction with the
6  community, no.
7      Q.  Do you know who within Dodge City voted
8  for Ms. Zuniga?
9      A.  I'm not aware of most people's voting
10 records.
11     Q.  Did you vote for her?
12     A.  I don't recall which election that was.
13     Q.  Do you recall any information about Ms.
14 Zuniga's campaign?
15     A.  No, I do not.
16     Q.  And you don't have any personal
17 familiarity with her efforts to persuade voters to
18 vote for her; correct?
19     A.  I don't recall.
20     Q.  And do you know how Ms. Zuniga fared in
21 any of the Dodge City precincts?
22     A.  I do not.
23     Q.  Do you know Ms. Soto's position on any
24 City of Dodge City issue?
25         MS. WAKNIN:  Objection; form.

Page 44

1          THE WITNESS:  Not really off the top of
2  my head at the moment.
3          BY MS. EBERLINE:
4      Q.  Are you familiar with Jose Vargas?
5      A.  I am not.
6      Q.  You had alleged in your amended complaint
7  that he was a Latino candidate of choice who was
8  not elected; is that right?
9      A.  Yes.
10     Q.  Yet you have no personal knowledge about
11 Mr. Vargas; correct?
12     A.  Other than he ran for the commission, no.
13     Q.  Okay.  You don't know anything about his
14 position on any issue that may have come before
15 the City of Dodge City Commission; correct?
16     A.  No.
17     Q.  Would you agree?
18     A.  I agree.
19     Q.  Okay.  And you don't have any knowledge
20 about Mr. Vargas's voting record or his -- his
21 campaign materials; correct?
22         MS. WAKNIN:  Objection; form.  Objection;
23 compound.
24         BY MS. EBERLINE:
25     Q.  Is that correct?



Page 45

1  A. I don't have any knowledge.
2  Q. Okay. Are you familiar with Mr. Fernando
3  Jurado?
4  A. Other than he ran for the city
5  commission, not really.
6  Q. Do you know Mr. Jurado's position on any
7  city issue?
8  A. I don't recall.
9  Q. Do you know what efforts Mr. Jurado made
10 to campaign for commission?
11    A. I do not recall.
12    Q. He ran in 2000. At the time, you would
13 have been young; correct?
14    A. Yes.
15    Q. All right. Are you familiar with Angie
16 Gonzalez?
17    A. I am, actually.
18    Q. Who is Angie Gonzalez?
19    A. Angie Gonzalez has previously ran for, to
20 my knowledge, for county clerk.
21    Q. And that would be in Ford County;
22 correct?
23    A. Yes, in Ford County.
24    Q. When did she run?
25    A. She ran in 2020.

Page 46

1  Q. Did you participate in her campaign?
2  A. I did not, other than I voted for her.
3  Q. Do you have any recollection of Ms.
4  Gonzalez's position on any Ford County issues?
5  A. I don't recall any at this moment in
6  time.
7  Q. Other than what you've shared so far, do
8  you recall anything about Ms. Gonzalez or her
9  platform that she ran on?
10       MS. WAKNIN: Objection; form. Objection;
11 compound.
12       THE WITNESS: I do recall that she was
13 really open towards having more civic engagement
14 and encouraging people to go out and vote.
15    BY MS. EBERLINE:
16    Q. You would agree that Ms. Gonzalez ran for
17 a county position and not a city position;
18 correct?
19    A. That is the one I recall, yes.
20    Q. And you're not making any allegation in
21 this case that Ms. Gonzalez ran for any elected
22 position within the City of Dodge City; correct?
23    A. I don't recall at this moment.
24    Q. What is the Education Growers Development
25 Company?

Page 47

1  A. It is a nonprofit organization that
2  encourages renewable resources, encourages growing
3  your own food, as well as encourages sustainable
4  building materials through the use of hemp.
5  Q. Are you an employee of the Education
6  Growers Development Company?
7  A. No. I volunteered there briefly.
8  Q. Does the Education Growers Development
9  Company participate in -- let me start over.
10       Does the Education Growers Development
11 Company take a position on the form of elections
12 that occur in the City of Dodge City?
13    A. They do not.
14    Q. Did you have any sort of leadership role
15 with the Education Growers Development Company?
16    A. I was one of the founding members of it
17 and I served for, I want to say, about a month as
18 their vice president on their board.
19    Q. When was that?
20    A. It would have been early of -- it would
21 have been towards the beginning of the year of
22 2022.
23    Q. Have you been involved with the Loud
24 Light organization in any way?
25    A. I have not, other than occasionally

Page 48

1  attending their forums online.
2  Q. Have you ever been employed by Loud
3  Light?
4  A. No, I have not.
5  Q. And have you had any involvement with
6  Loud Light's New Frontiers project?
7  A. Other than their forums and talking to
8  one of their representatives, Mr. Alejandro
9  Rangel-Lopez.
10    Q. And you've shared with me the substance
11 of those conversations already; correct?
12    A. Mm-hmm. Yes.
13    Q. Okay. You mentioned that you serve on
14 the Main Street Dodge City board; is that right?
15    A. Yes.
16    Q. How did you come to be a member of that
17 board?
18    A. So I briefly worked with some of my
19 friends in a marketing agency, and they joined the
20 organization, and then when they put out
21 applications for the board, I applied.
22    Q. And who appointed you to that board?
23    A. I believe it would have been the other
24 members of the board.
25    Q. That appointment comes from the board



Page 49

1  itself, rather than from the City of Dodge City?
2  A. Yes.
3  Q. What was the application process?
4  A. You fill out a form with your basic
5  information, as well as stating why you want to be
6  a part of the board.
7  Q. During what time period have you been a
8  member of the Main Street Dodge City board?
9  A. I was appointed in December of '21 and I
10 am still serving on the board.
11 Q. Have you been a part of selecting other
12 new members to the board of Main Street Dodge
13 City?
14 A. Yes.
15 Q. Has Main Street Dodge City taken a
16 position on at-large elections in Dodge City?
17 A. They have not.
18 Q. Has there been any discussion during the
19 Main Street Dodge City events or meetings related
20 to at-large elections in Dodge City?
21 A. None that I'm aware of.
22 Q. Are you also a member of any other boards
23 within the city of Dodge City?
24 A. I am on the board of trustees for the
25 Dodge City Public Library.

Page 50

1  Q. And when did you become appointed to that
2  board?
3  A. In July of 2022.
4  Q. And are you currently a member?
5  A. I am.
6  Q. What was the application process for that
7  position?
8  A. You put -- you put your basic information
9  and you select which of the various boards in the
10 community you want to be a part of, and then you
11 put reasons why you believe you'd be a best fit.
12 Q. And you were selected for the library
13 board position?
14 A. Yes, I was appointed.
15 Q. And that application process for
16 positions on boards or commissions of the City of
17 Dodge City, that application process is open to
18 all residents; is that right?
19 A. Yes.
20     MS. WAKNIN: Objection; form. Objection;
21 compound.
22     THE WITNESS: I'm aware it's open to all
23 residents.
24 BY MS. EBERLINE:
25 Q. And so anyone who is interested in

Page 51

1  serving on a board or a commission could submit
2  their name for consideration; correct?
3      MS. WAKNIN: Objection; form. Objection;
4  compound.
5      THE WITNESS: Yes.
6      MS. EBERLINE: Let's take a break.
7      THE VIDEOGRAPHER: It is 10:20 a.m.
8  We're going off the record.
9      (THEREUPON, a break was then taken.)
10     THE VIDEOGRAPHER: It is 10:36 a.m.
11 We're back on the record.
12 BY MS. EBERLINE:
13 Q. All right. Mr. Coca, I've handed you
14 Exhibit 10. This is a document that your counsel
15 served in this case, and I'm going to ask you to
16 turn to page 3 for me, please. If you'll see
17 that Section E, that's entitled "Additional Fact
18 and Lay Witnesses." Do you see that?
19 A. I do.
20 Q. And then we're going to jump down to the
21 bullet points here and I'm going to ask you about
22 some of the folks that you've identified. The
23 first bullet point there refers to Dodge City
24 Latino organizations and officers of such
25 organizations, including Dodge City League of

Page 52

1  United Latin American Citizens. Do you see that?
2  A. I do.
3  Q. Are you familiar with LULAC?
4  A. I am familiar with it, but I'm not
5  familiar with anyone that serves on it currently.
6  Q. And do you have any knowledge of what
7  information LULAC may have related to the claims
8  you've made in this lawsuit?
9  A. None that come to mind at this moment.
10 Q. Are you aware of any other Dodge City
11 Latino organizations that would have knowledge or
12 information related to the claims you've made in
13 this lawsuit?
14 A. None that come to mind at this moment.
15 Q. And have you spoken to anyone at LULAC
16 related to at-large elections?
17 A. I believe I have not.
18 Q. And have you spoken to any other Dodge
19 City Latino organization or officer of any such
20 organization about at-large elections?
21 A. I don't believe I have.
22 Q. Who is Janeth Vasquez?
23 A. I am familiar that she's a city
24 commissioner of Liberal, Kansas.
25 Q. Have you spoken to Ms. Vasquez about your

Page 53

1 claims in this case?
2　　A.　I have not.
3　　Q.　Do you know what information she may have
4 related to your case?
5　　A.　I do not.
6　　Q.　Who is Ms. Warshaw?
7　　A.　She's the former mayor of Dodge City.
8　　Q.　Do you know Ms. Warshaw?
9　　A.　Not personally.
10　　Q.　Have you ever spoken to her?
11　　A.　I have not.
12　　Q.　Do you know what information she may have
13 related to the claims you've made in this case?
14　　A.　I do not.
15　　Q.　Who is Melissa Stiehler?
16　　A.　She is an employee of the Loud Light
17 Kansas nonprofit.
18　　Q.　Do you know Ms. Stiehler personally?
19　　A.　I do not.
20　　Q.　Have you ever had any conversations with
21 Ms. Stiehler about your claims in this case?
22　　A.　I have not.
23　　Q.　Do you know what information she may have
24 related to your claims in this case?
25　　A.　I am not aware of any.

Page 54

1　　Q.　What is Kansas Appleseed?
2　　A.　It is a -- to my understanding, it's a
3 nonprofit organization that helps with civic
4 engagement.
5　　Q.　Have you had any conversations with any
6 officer or staff member or volunteer with Kansas
7 Appleseed about at-large elections or your claims
8 in this case?
9　　A.　I don't recall any current employees, no.
10　　Q.　Are there former Kansas Appleseed
11 employees who you've spoken to about at-large
12 elections?
13　　A.　Blanca Soto.
14　　Q.　What conversations have you had with
15 Blanca Soto about your claims in this case?
16　　A.　More or less how they work, how the at-
17 large districts work.
18　　Q.　When did that conversation -- was it one
19 conversation or multiple?
20　　A.　I believe it was one, but it was one, I
21 think, in like passing.  Nothing that I can really
22 recall.
23　　Q.　Did that occur before or after you filed
24 your lawsuit?
25　　A.　I believe it would have been before.

Page 55

1　　Q.　Have you had any conversations with Ms.
2 Soto about your claims in this case?
3　　A.　No.
4　　Q.　Have you spoken to any other Kansas
5 Appleseed officer or staff member about at-large
6 elections or your claims in this case?
7　　A.　I don't believe I have.
8　　Q.　And do you have any knowledge or
9 information about what Kansas Appleseed or its
10 officers or staff members may know about your
11 claims in this case?
12　　A.　I do not.
13　　Q.　Who is AJ Amaro?
14　　A.　AJ Amaro, he is a personal friend and
15 associate of myself, and he also is the -- if I
16 recall his titles correctly, he is the president
17 of Education Growers Development Company.
18　　Q.　Have you spoken to Mr. Amaro about at-
19 large elections?
20　　A.　A couple times, mainly to -- he was
21 asking how at-large elections work.
22　　Q.　Have you spoken to him about your claims
23 in this case?
24　　A.　I have not, no.
25　　Q.　Have you spoken to him about at-large

Page 56

1 elections since you filed your lawsuit?
2　　A.　I have not, no.
3　　Q.　What information, if any, would AJ Amaro
4 have related to your claims in this lawsuit?
5　　A.　I'm not aware of any he has.
6　　Q.　Why did you list him as a witness?
7　　A.　Umm.  Mainly because he is one of the
8 people that I personally dis- -- I guess would
9 discuss various Latino-based things, like -- many
10 things, like I say, I discuss with, I guess, that
11 most people discuss with, I guess their family
12 members and friends, I would discuss with him.
13　　Q.　Who is Greta Clark?
14　　A.　Greta Clark, she is currently the
15 chairperson of the Ford County Democratic Party.
16　　Q.　Have you had conversations with Ms. Clark
17 about at-large elections?
18　　A.　A few times, yes.
19　　Q.　Tell me about those conversations.
20　　A.　They mostly were centered around the
21 difference between at-large and district
22 elections.
23　　Q.　Have you spoken to Ms. Clark about the
24 claims in this lawsuit since you filed the
25 lawsuit?

Page 57

1 A. No, I have not.
2 Q. Are you aware of any information that Ms.
3 Clark would have that's relevant to your claims in
4 this lawsuit?
5 A. None that I can think of at this exact
6 moment.
7 Q. Who is Martin Rosas?
8 A. I believe he is affiliated with one of
9 the local unions for packing plants.
10 Q. Do you know Mr. Rosas personally?
11 A. I do not, no.
12 Q. Have you ever had a conversation with
13 him?
14 A. No.
15 Q. Do you know why he's listed as a witness
16 in this case?
17 A. I believe because -- my personal belief
18 is that he would have information regarding to a
19 lot of the Latino community members, considering
20 that is the vast majority of the employees of the
21 beef packing plants.
22 Q. But you don't have personal knowledge
23 about any information he would have that's
24 relevant to this case; correct?
25 A. No, I do not, no.

Page 58

1 Q. Would you agree with that statement?
2 A. I would.
3 Q. Okay. Who's Maribel Sanchez?
4 A. The name does not sound familiar at this
5 moment.
6 Q. Who is Jan Scoggins?
7 A. She is a former city commissioner.
8 Q. Have you had any conversations with Ms.
9 Scoggins about at-large elections?
10 A. I don't recall any.
11 Q. What information might Ms. Scoggins have
12 related to the claims in this case?
13 A. I can't think of any at this exact moment
14 in time.
15 Q. Who's Amy Soberanes?
16 A. The name does not sound familiar at this
17 moment.
18 Q. Who's Monica Vargas?
19 A. The name sounds familiar, but I do not
20 recall where I can place it from, at this moment.
21 Q. You don't recall ever having a
22 conversation with Ms. Vargas about the claims in
23 this case?
24 A. No, I believe not.
25 Q. And do you know what information she

Page 59

1 might have related to the claims in this case?
2 A. I do not recall at this moment.
3 Q. Have you ever had any conversations with
4 Johnny Dunlap about at-large elections?
5 A. I have not, no.
6 Q. Do you know Mr. Dunlap?
7 A. I do, yes.
8 Q. And who is he?
9 A. He is a teacher at Dodge City High School
10 and he also is the former chairperson of the Ford
11 County Democratic Party.
12 Q. Do you know whether Mr. Dunlap would have
13 any information relevant to your claims in this
14 case?
15 A. I am not aware at this moment.
16 Q. Okay. You had mentioned earlier that
17 you're on the library board of trustees; correct?
18 A. Yes.
19 Q. Were you appointed by the city commission
20 to that position?
21 A. I believe that's how the process works,
22 yes.
23 Q. So the mayor recommended you and then the
24 commission approved you; correct?
25 A. I believe that's how the process works.

Page 60

1 Q. Okay.
2    (THEREUPON, Deposition Exhibit No 12
3 marked for identification.)
4    BY MS. EBERLINE:
5 Q. Mr. Coca, what is Exhibit 12?
6 A. It is a screenshot of one of my social
7 medias.
8 Q. This is from your Facebook feed; is that
9 correct?
10 A. Yes, it's from my personal Facebook feed.
11 Q. And does it reflect you having posted an
12 article or some sort of story from the Lawrence
13 Journal-World?
14 A. Yes.
15 Q. Do you recall who wrote the story that
16 you had posted on November 27th, 2019?
17 A. I do not.
18 Q. Do you recall what the contents of the
19 posting was?
20 A. I don't remember at this time.
21    (THEREUPON, Deposition Exhibit No 13
22 marked for identification.)
23    BY MS. EBERLINE:
24 Q. What is Exhibit 13?
25 A. It is a screenshot from my personal

Page 61

1　social media, Facebook social media.
2　　Q.　And this is an editorial that you had
3　linked to in your Facebook page?
4　　A.　Yes.
5　　Q.　Do you recall who wrote that editorial?
6　　A.　I do not.
7　　Q.　Do you recall what it was about?
8　　A.　Not really.
9　　Q.　Do you recall whether it had anything to
10　do with at-large elections?
11　　A.　I do not recall at this moment.
12　　　　(THEREUPON, Deposition Exhibit No 14
13　marked for identification.)
14　　BY MS. EBERLINE:
15　　Q.　What is Exhibit 14?
16　　A.　It is another screenshot from my personal
17　Facebook social media.
18　　Q.　In this one you included a comment that
19　you drafted yourself; correct?
20　　A.　Yes.
21　　Q.　Do you recall what speaker you were
22　referring to when you described the speaker as
23　being a part of a Texas-based anti-Islamic hate
24　group?
25　　A.　I do not recall the name of the speaker,

Page 62

1　but I do recall the event that it was at -- it
2　was at.
3　　Q.　What was that event?
4　　A.　It was the Dodge City Republican Expo.
5　　Q.　And what is the Dodge City Republican
6　Expo?
7　　A.　To my recollection, it is where many
8　Republicans throughout, I believe, the state
9　assemble together in a convention here in Dodge
10　City.
11　　Q.　And you don't recall who the speaker was
12　that you had described?
13　　A.　I do not recall their name.
14　　Q.　Why were you opposed to the speaker?
15　　A.　If I recall correctly, his beliefs were
16　not anything that I would personally believe, and
17　I was opposed to him coming to our community.
18　　Q.　Do you recall whether that speaker ended
19　up coming to Dodge City?
20　　A.　I don't recall at this moment.
21　　Q.　Did this post or the -- the conversation
22　or the anticipated speech in June of 2020 have
23　anything to do with at-large elections?
24　　A.　I believe -- I don't recall.
25　　Q.　Do you have any reason to believe that he

Page 63

1　came to speak about at-large elections?
2　　A.　I don't believe he did.
3　　　　(THEREUPON, Deposition Exhibit No 15
4　marked for identification.)
5　　BY MS. EBERLINE:
6　　Q.　Okay.  What is Exhibit 15?
7　　A.　It is a screenshot from my Facebook
8　social media.
9　　Q.　And this is a link to an article in the
10　Kansas Reflector, correct?
11　　A.　Yes.
12　　Q.　Do you recall who the author of this
13　story was?
14　　A.　If I recall correctly, it would have been
15　Alejandro Rangel-Lopez.
16　　Q.　And do you recall what the substance of
17　the article was?
18　　A.　Umm.  If I recall correctly, the
19　substance of the article was pretty much trying to
20　encourage people to engage with the community, if
21　I'm correct.
22　　Q.　You don't recall this article referring
23　to at-large elections, do you?
24　　A.　I don't remember at this time.
25　　　　(THEREUPON, Deposition Exhibit No 16

Page 64

1　marked for identification.)
2　　BY MS. EBERLINE:
3　　Q.　What is Exhibit 16?
4　　A.　It is a screenshot of my Facebook social
5　media and it is a post in regards to Blanca Soto.
6　　Q.　And so you reposted a posting from
7　Working Kansas Alliance; correct?
8　　A.　Yes.
9　　Q.　You had mentioned in your testimony
10　earlier that you supported Ms. Soto on social
11　media.  Is this an example of that?
12　　A.　It is.
13　　Q.　Were there other instances on your social
14　media in which you supported Ms. Soto in her
15　campaign?
16　　A.　I don't recall at this moment.
17　　Q.　And is this the only post that you can
18　recall in which you supported any city commission
19　candidate?
20　　A.　At this moment, I believe it is.
21　　Q.　Mr. Coca, what are you asking the court
22　to do in this case?
23　　A.　Maybe more specific?
24　　Q.　What remedy are you requesting from the
25　court?



Page 65

1  A. I am requesting that we switch over to
2  district-based elections for the city commission.
3  Q. Why shouldn't that decision to switch to
4  district elections be made by the voters of the
5  City of Dodge City?
6  A. Because I believe my voting rights
7  shouldn't be put on the ballot, to be honest. I
8  believe that we should honestly have better fair
9  representation and I believe that we don't have it
10 in our current at-large district system.
11 Q. You would agree that the current system
12 has elected commissioners to represent to you and
13 the other members of the City of Dodge City;
14 correct?
15 A. They have elected people to the
16 commission, yes.
17 Q. And those commissioners represent all
18 members of the city; correct?
19 A. They are supposed to.
20 Q. And you're asking the court to make the
21 decision for the citizens of Dodge City to change
22 the election system; correct?
23 A. Yes.
24      MS. EBERLINE: Okay. That's all the
25 questions we have.

Page 66

1      MS. WAKNIN: I have no questions.
2      THE VIDEOGRAPHER: It is 10:54 a.m.
3  We're going off the record. This concludes the
4  deposition.
5      THE REPORTER: Could I get signature
6  instructions on the transcript record?
7      MS. WAKNIN: We will be reserving the
8  right for signature.
9      THE REPORTER: And send it to you?
10     MS. WAKNIN: Yes, and then I don't think
11 we're going to be ordering a rough of this one.
12 Just a rush.
13     MS. EBERLINE: E-tran from us, same as
14 yesterday. No rush or rough.
15     (THEREUPON, the deposition concluded at
16 10:54 a.m.)
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 .
25 .

Page 67

1                SIGNATURE
2  .
3      The deposition of MIGUEL COCA was taken
4  in the matter, on the date, and at the time and
5  place set out on the title page hereof.
6  .
7      It was requested that the deposition be
8  taken by the reporter and that same be reduced to
9  typewritten form.
10 .
11     It was agreed by and between counsel and
12 the parties that the deponent will read and sign
13 the transcript of said deposition.
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 .
25 .

Page 68

1                AFFIDAVIT
2  .
3  STATE OF _____:
4  COUNTY/CITY OF _____:
5  .
6      Before me, this day, personally appeared,
7  MIGUEL COCA, who, being duly sworn, states that
8  the foregoing transcript of his/her Deposition,
9  taken in the matter, on the date, and at the time
10 and place set out on the title page hereof,
11 constitutes a true and accurate transcript of said
12 deposition, along with the attached Errata Sheet,
13 if changes or corrections were made.
14 .
15      _____
16             MIGUEL COCA
17 .
18     SUBSCRIBED and SWORN to before me this
19 _____ day of _____, 2023 in the
20 jurisdiction aforesaid.
21 .
22 _____      _____
23 My Commission Expires        Notary Public
24 .
25 .

Page 69

1 DEPOSITION ERRATA SHEET
2 .
3 RE: APPINO & BIGGS REPORTING SERVICE, INC.
4 .
5 FILE NO.: 68819
6 .
7 CASE: MIGUEL COCA AND ALEJANDRO RANGEL-LOPEZ
8 vs. CITY OF DODGE CITY, ET AL.
9 .
10 DEPONENT: MIGUEL COCA
11 .
12 DEPOSITION DATE: 04/25/2023
13 .
14 To the Reporter:
15 I have read the entire transcript of my Deposition
16 taken in the captioned matter or the same has been
17 read to me. I request that the following changes
18 be entered upon the record for the reasons
19 indicated. I have signed my name to the Errata
20 Sheet and the appropriate Certificate and
21 authorize you to attache both to the original
22 transcript.
23 .
24 .
25 .

Page 70

1 PAGE:LINE FROM    TO      REASON
2 .
3 .
4 .
5 .
6 .
7 .
8 .
9 .
10 .
11 .
12 .
13 .
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 SIGNATURE:_____ DATE:_____
25      MIGUEL COCA

Page 71

1 CERTIFICATE
2 STATE OF KANSAS
3 COUNTY OF SHAWNEE
4    I, Lee Ann Bates, a Certified Court
5 Reporter, Commissioned as such by the
6 Supreme Court of the State of Kansas,
7 and authorized to take depositions and
8 administer oaths within said State
9 pursuant to K.S.A 60-228, certify that
10 the foregoing was reported by
11 stenographic means, which matter was
12 held on the date, and the time and place
13 set out on the title page hereof and
14 that the foregoing constitutes a true
15 and accurate transcript of the same.
16    I further certify that I am not
17 related to any of the parties, nor am I
18 an employee of or related to any of the
19 attorneys representing the parties, and
20 I have no financial interest in the
21 outcome of this matter.
22    Given under my hand and seal this
23 27th day of April, 2023.
24    _____
25    Lee Ann Bates, C.S.R. No. 1067

