## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MIGUEL COCA, et al.,

        Plaintiffs,

    v.

CITY OF DODGE CITY, et al.,

        Defendants.

Case No. 6:22-cv-01274-EFM-RES

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION TO EXCLUDE EXPERT WITNESS MATT BARRETO, Ph.D.

Defendants' motion to exclude the testimony of Plaintiffs' expert Matt A. Barreto, Ph.D., should be denied. Defendants cannot challenge his impeccable qualifications; Dr. Barreto has been qualified as an expert in dozens of voting rights cases around the country and his opinions have been cited and relied upon by numerous federal judges. Instead, Defendants incorrectly argue that Dr. Barreto's homogenous precinct and ecological inference analyses are unreliable, and that Dr. Barreto is biased. Both purported bases for excluding Dr. Barreto are meritless. Dr. Barreto properly performed his analysis based on proven and reliable methods utilizing sufficient data, and his analysis and conclusions show no trace of bias. This Court, like scores of others, should readily find Dr. Barreto's testimony admissible under Federal Rule of Evidence 702.

## FACTUAL BACKGROUND

Dr. Barreto is a tenured professor of Political Science and Chicana/o Studies at the University of California, Los Angeles ("UCLA"). Ex. A, Barreto Report at Appendix F. He is a nationally recognized expert in the Federal Voting Rights Act ("VRA"), survey methodology, political behavior, racially polarized voting, and statistical methodology whose testimony is

regularly credited by federal courts, including in a ruling issued the morning of this filing. *See Petteway et al.*, No. 3:22-CV-00057-JVB (S.D. Tex. Oct. 13, 2023); *Fish v. Kobach*, 309 F. Supp. 3d 1048, 1059 (D. Kan 2018), *aff'd sub nom. Fish v. Schwab*, 957 F. 3d 1105 (10th Cir. 2020); *Rodriguez v. Harris Cnty. Tex.*, 964 F. Supp. 686, 713 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2020); *Nat'l Ass'n for Advancement of Colored People, Spring Valley Branch (NAACP Spring Valley Branch) v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021); *Veasey v. Perry*, 71 F. Supp. 3d 627, 663 (S.D. Tex. 2014), *aff'd in part, vacated in part, remanded sub nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *on reh'g en banc*, 830 F.3d 216 (5th Cir. 2016), *and aff'd in part, vacated in part, rev'd in part sub nom. Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016). He is the Faculty Director and Co-Founder of the UCLA Voting Rights Project ("UCLA VRP"). The UCLA VRP is a research center, Ex.B, Barreto Dep. Tr. at 7:19-8:2, and Dr. Barreto's responsibilities with the UCLA VRP are "largely educational." *Id.* at 12:22-13:5. He does *not* make decisions regarding litigation that the UCLA VRP is engaged in, does *not* oversee litigation, and was engaged as an expert only *after* the filing of this action. *Id.* at 8:3-21; Def. Ex. J.

Dr. Barreto was retained in this case to assess voting patterns in Dodge City, Kansas and to determine if voters in Dodge City exhibit racially polarized voting. Ex. A at ¶ 7. To assess voting patterns, he "obtained data from the State of Kansas and Ford County, Kansas for statewide election results by county and obtained the registered voter file with election vote history from the Kansas Secretary of State and from the Ford County Clerk." *Id.* at ¶ 9. Dr. Barreto "obtained race and ethnicity data for voting precincts from the U.S. Census and from the U.S. Census Surname list, using both sources in a process called Bayesian Improved Surname Geocoding (BISG) to

identify the racial/ethnic composition of each voting precinct." *Id.* In his report Dr. Barreto detailed the methodologies he used, which include homogenous precinct analysis and ecological inference, to determine if there was racially polarized voting. *Id.* at ¶ 21-30.

Dr. Barreto has coauthored a software program (*eiCompare*), now used by experts around the country, to perform racially polarized voting analysis.[1] Dr. Barreto has coauthored two peer-reviewed academic papers explaining the process to use and present findings for ecological inference, and his article in *Sociological Methods and Research*[2] presents and compares ecological inference average point estimates alone, absent confidence intervals. *See* Matt Barreto et al., *Estimating Candidate Support: Comparing Iterative EI and EI-RxC Methods*, 48 SOCIO. METHODS AND RSCH. 4 (2019). Dr. Barreto identified all sources of data, software, and software packages he used in his report (all of which are also publicly available and were, prior to his testimony, in the custody of Defendants). Ex. A; *see* Ex. B, Barreto Dep. Tr. at 164:15-22. Indeed, Defendants' expert Dr. Jonathan Katz also utilized ecological inference in his report (Ex. C, Katz Dep. Tr. at 89:16-24), has used ecological inference methodologies in his consulting work (*id.* at 38:14-22), and himself utilized the same BISG methodology that Dr. Barreto pioneered in voting rights cases in his own report in the instant action. *See, e.g.*, *NAACP Spring Valley Branch*, 462 F. Supp. 3d at 392 (S.D.N.Y. 2020); *see* Ex. C, Katz Dep. Tr. at 65:6-12. In preparing his report for this case, Dr. Katz understood Dr. Barreto's code, replicated Dr. Barreto's EI analysis, and stated that "mostly what I did was follow Dr. Barreto's code." *Id*. at 95:18-21, 98:6-9. This allowed Dr. Katz to consider any confidence interval information that he wished to examine as it is an optional piece

---

[1] The software has been downloaded more than 20,000 times and is regularly used in expert analysis on racially polarized voting.
[2] *Sociological Methods and Research* is a leading academic journal of research and statistical methodology in the social sciences.

of information available in the output of Dr. Barreto's results. In short, Defendants' expert examining racially polarized voting in many respects followed Dr. Barreto's methodology.

## STANDARD OF REVIEW

Federal Rule of Evidence 702 permits a court to allow a qualified expert to testify so long as the "(1) testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The rule's "liberal thrust" makes "rejection of expert testimony…the exception rather than the rule." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 at 588 (1993); *Gomez v. Martin Marietta Corp.,* 50 F.3d 1511, 1519 (10th Cir. 1995). This is especially true in a bench trial where the court's "gatekeeper" role is significantly diminished. *See Lawson v. Spirit Aerosystems, Inc.*, No. 18-1100-EFM, 2021 WL 2290822, at *4 (Melgren, C.J., D. Kan. June 4, 2021) ("Because the doctrine is designed to protect juries [it] is largely irrelevant in the context of a bench trial.") (internal quotation marks omitted); *Attorney General of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) ("[W]hile *Daubert*'s standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial.").

## ARGUMENT

Here, Dr. Barreto's methodology is accepted by the expert community and there is a factual basis for any assumptions on which he relied. Defendants' motion should therefore be denied. *See, e.g.*, *Vowell v. Coffeyvill Res. Ref. & Mktg., LLC*, No. 09-1303-ERM, 2011 WL 1754781, at *2 (D. Kan. May 9, 2011) ("To survive Defendant's Daubert motion, Plaintiff only needed to show that [the expert's] methodology—relying on past results to predict future performance—is not

unaccepted by the expert community and that there is a factual basis for the assumptions that [he] has relied upon.").

**I.      Dr. Barreto's analysis is based on accepted reliable methods and data.**

Dr. Barreto uses well-established and accepted methodology of homogenous precinct analysis and ecological inference analysis, accepted by scores of previous courts (including the U.S. Supreme Court) and published in peer-reviewed social science journals.

**a.   Homogenous Precinct Analysis**

Homogeneous precinct analysis ("HPA") is a tool frequently used by political science experts to determine the presence of racially polarized voting in a jurisdiction. *See Sanchez v. State of Colo.,* 97 F.3d 1303, 1313 (10th Cir. 1996). Prior to the development of ecological inference methodology, homogenous precinct analysis was the gold standard in courts determining whether voters are racially polarized, and courts, including the Supreme Court, have accepted it as a proper methodology. *See Thornburg v. Gingles*, 478 U.S. 30, 52-53 (1986); *Large v. Fremont County, Wyo.*, 709 F. Supp. 2d 1176, 1193 (D Wyo. 2010). Although ecological inference is now a commonly used method for determining racially polarized voting, HPA can help confirm results of ecological inference analysis. *See Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1309 (N.D. Ga. 2022).

Defendants allege that Dr. Barreto's analysis is based on insufficient data, that the testimony is not the product of reliable principles, and that Dr. Barreto applied these principles unreliably. Doc. 144 at 6. These allegations are meritless. First, Dr. Barreto performed his HPA utilizing sufficient data: precinct level results that were publicly available or provided by Ford County and race and ethnicity data from the U.S. Census and U.S. Census surname list to perform BISG and to identify the racial and ethnic composition of precincts. Ex. A, Barreto Report at ¶ 9.

Second, Dr. Barreto's testimony is a product of reliable principles and techniques. While Defendants assert that HPA may only be used when there are precincts upwards of 90 percent, Doc. 144 at 5, social scientists and voting rights experts have consistently applied this method without such a threshold. *See* Christian Collet, *Bloc Voting, Polarization, and the Panethnic Hypothesis: The Case of Little Saigon*, 67 J. OF POL. 3, at 290 (2005) (conducting a homogenous precinct and bloc voting analysis of Asian American candidates with precincts of only 50% to 60% homogeneity); Tyler Reny, et al., *Threat, Mobilization, and Latino Voting in the 2018 Election*, 16 FORUM 4, 573-599 (2018) (defining a Latino homogenous precinct as a precinct that is 80% *total population* density Latino, *not* HCVAP); Matt Barreto, *¡Sí Se Puede! Latino Candidates and the Mobilization of Latino Voters*, 101 AM. POL. SCI. REV. 3, 425-441, 431 fn.11 ("Heavily white and heavily Black precincts are those with a VAP population of 80% or more…those identified as 50% or more Asian populations were considered heavily Asian…[in San Francisco] majority Latino is used."); Matt Barreto, et al., *Metropolitan Latino Political Behavior: Voter Turnout and Candidate Preference in Los Angeles*, 27 J. OF URBAN AFFAIRS 1, 71-91 (2005); James W. Loewen and Bernard Grofman, *Recent Developments in Methods Used in Vote Dilution Litigation*, 21 THE URBAN LAWYER 3, 600 (1989). Similarly, voting rights experts James W. Loewen and Bernard Grofman[3] have recognized that there is no bright line for homogenous precinct analysis, and that experts may need to go below 90 percent depending on the demographics of a particular jurisdiction. In their paper, Loewen and Grofman simply "use the precincts with the highest percentage" of minority voters for their HPA on Lee County. *See* Loewen and Bernard Grofman at 600 (1989).

---

[3] Professor Bernard Grofman is a foremost voting rights expert who was found credible by the United States Supreme Court in the seminal voting rights case *Thornburg v. Gingles*, 478 U.S. 30 (1986).

Here, Dr. Barreto utilized the approach prescribed by these many political scientists, including Loewen and Grofman, due to the size, geography, and local conditions of Dodge City. As Dr. Barreto explained at his deposition, the HPA here takes the official election results and compares the most heavily Latino voting precincts and the most heavily white voting precincts. Ex. C, Barreto Dep. Tr. at 25:8-27:10. In his report, Dr. Barreto identified Precinct 3 as having the highest Latino vote share, while Precincts 5 and 6 have the highest white vote share. Ex. B, at ¶ 36. When looking at total population, one can see that according to the U.S. Census Bureau, Census Tract 9618.01, Block Group 1[4] which is in the heart of Precinct 3 is 96.1% Latino and 81.6% by VAP. By contrast, Census Tract 9618.01, Block Group 2 in the heart of Precinct 6, is 96.3% **not** Hispanic or Latino and about 80% **not** Hispanic or Latino by VAP.[5] As such, Dr. Barreto's use of Precinct 3 to demonstrate the most heavily Hispanic precinct and Precinct 6 to demonstrate the most heavily white or Non-Hispanic precinct for his homogenous precinct analysis followed proper methodology.

Neither Defendants nor Dr. Katz provide social science authority for their claim that homogenous precinct analysis requires a 90 percent homogeneity threshold. Dr. Katz himself could not testify as to any treatises or published work on which he based that threshold, at first saying vaguely it was from "Duncan and Smith" then simply saying the requirement was "shorthand." Ex. D, Katz. Dep. Tr. 57:24-58:18.[6]

---

[4] https://data.census.gov/table/ACSDT5Y2021.B03002?g=1500000US200579618011,200579618012; https://data.census.gov/table/DECENNIALPL2020.P4?g=1500000US200579618011,200579618012&d=DEC+Redistricting+Data+(PL+94-171).

[5] *Id.*

[6] Indeed, there is no such "Duncan and Smith" paper that exists on voting rights. Perhaps Dr. Katz meant Duncan and Davis. Even if this is the case, Duncan-Davis bounds have nothing to do with homogenous precinct analysis; instead they are part of ecological correlation and Duncan-Davis do not establish a 90 percent homogenous requirement. *See* Dudley Duncan and Beverly Davis, *An Alternative to Ecological Correlation*, 64 AM. SOCIO. REV., 610-625 (1953).

An artificial threshold of any percentile does not change the plain facts before the Court that Dr. Barreto is providing an opinion on how the most heavily Latino precincts vote for candidates, as compared to the most heavily white precincts, in accordance with the prevailing social science methodology in the field. Defendants' arguments regarding Dr. Barreto's HPA, at most, go to the weight of his testimony. In sum, Defendants provide no support for their attack on Dr. Barreto's HPA.

### b.  Ecological inference

Courts across the county repeatedly accept ecological inference methodology as proper for determining the presence of racially polarized voting. *See United States v. Alamosa County, Colo.*, 306 F. Supp. 2d 1016, 1029 (D. Colo. 2004); *Alabama State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama*, 612 F. Supp. 3d 1232, 1275 (M.D. Ala. 2020); *United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 597 (E.D. Mich. 2019); *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1118 (E.D. Cal. 2018); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1290 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 757–58 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015); *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 723 (N.D. Tex. 2009); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 387–88 (S.D.N.Y.), *aff'd*, 543 U.S. 997 (2004). Indeed, Defendants have not cited one recent case in which ecological inference methodology was rejected by a court for the purposes of a racially polarized voting analysis. Dr. Barreto thus correctly utilized ecological inference in accordance with commonly accepted practice to determine the presence of racially polarized voting in Dodge City. Defendants' arguments to the contrary should be rejected.

### c.  Confidence Intervals

Defendants complain about the lack of confidence intervals in Dr. Barreto's report, but confidence intervals do not determine the reliability of an ecological inference used in racially polarized voting analysis. *See NAACP Spring Valley Branch*, 462 F. Supp. 3d at 389–90. Federal courts in voting rights lawsuits have frequently found ecological inference analysis reliable where experts have either omitted confidence intervals or where their disclosed confidence intervals were broad. *See Alpha Phi Alpha Fraternity Inc.*, 587 F. Supp. 3d at 1309 (crediting an expert who conducted HPA, ecological regression, and Kings ecological inference as reliable and qualified despite not including confidence intervals with her analysis); *NAACP Spring Valley Branch*, 462 F. Supp. 3d at 390; *Petteway*, No. 3:22-CV-00057-JVB, at * 46.

Reliance on point estimates, rather than confidence intervals, to determine the accuracy of an analysis is common practice—especially where, as here, the point estimates are consistent across elections. *See Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *10 (N.D. Tex. Aug. 2, 2012) (noting that point estimates are "undisputedly the 'best estimates' in the data"); *see also NAACP Spring Valley Branch*, 462 F. Supp. 3d at 390 (where expert for Defendants in a voting rights case "admitted that point estimates are the most likely outcomes, that 'similar results repeating year after year' would constitute a 'pattern,' and that in another case, he did not rely on confidence intervals where voting patterns were consistent").

Further, the social science literature does not agree that confidence intervals must be presented to determine the accuracy of point estimate averages. Indeed, Professors Stephen Ziliak and Deirdre McCloskey published an award-winning University Press book, STEPHEN. ZILIAK AND DEIRDRE MCCLOSKEY, THE CULT OF STATISTICAL SIGNIFICANCE: HOW THE STANDARD ERROR COSTS US JOBS, JUSTICE, AND LIVES, (2008), in which they detail through extensive evidence how confidence intervals quite often distract scholars and policy makers from the true underlying facts.

Specifically, multiple scholars in the social sciences argue that confidence intervals have become too heavily relied upon to "dismiss" important findings because they do not achieve a particular, often arbitrary, level of statistical significance. *See, e.g.*, Jeff Gill, *The Insignificance of Null Hypothesis Significance Testing*, 52 POL. SCI. Q. 3, p 647-58 (1999) (noting that these tests were originally developed for biology and that "there is absolutely no theoretical justification for wholesale importation into completely unrelated fields such as political science"). While confidence intervals might provide some information to consider, there is no accepted standard in political science or social science that they must be included in an expert report in order for the findings to be reliable, and indeed, many scholars today argue *against* their inclusion as necessary to demonstrate statistical significance.

Defendants' cited cases do not undermine this trend.[7] Indeed, they cite no cases dealing directly with the VRA nor the issue of racially polarized voting analysis. Rather, the cases they cite deal with lab testing results in unrelated contexts (motor vehicle tire standards and DNA blood testing). These types of analysis differ substantially from political science and voting studies using ecological inference. Ex. B, Barreto Dep. Tr. at 39:11-20; *see also* Loren Collingwood, et al., *eiCompare Comparing Ecological Inference Estimates across EI and EI:R x C,"* 8 R J., 92–101 at 92 (2016). In any event, contrary to Defendants' argument on this point, Dr. Barreto "showed his work" for his ecological inference analysis.[8] Dr. Barreto provided all the data necessary to recreate

---

[7] For example, in *Ho v. Michelin North America, Inc.*, cited by Defendants, the challenged expert's testimony had a number of issues outside of lacking a "measured error rate," including that his opinion was not supported by any peer-reviewed evidence or testing and actually was contrary to accepted scientific literature on the subject. 520 Fed.Appx. 658, 666 (2013). In *United States v. Shea,* another case cited by Defendants, the court in a jury trial admitted the challenged expert testimony, noting that many of the merits of the defendants' arguments went to the weight of the evidence rather than the admissibility. 957 F. Supp. 331, 340-341 (D.N.H 1997) *aff'd*, 159 F.3d 37 (1st Cir. 1998).

[8] Defendants misrepresent *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 164 (W.D. Tex.), *appeal dismissed sub nom. Brooks v. Abbott*, 143 S. Ct. 441, 214 L. Ed. 2d 251 (2022). There, the court found Dr. Barreto's testimony credible, and the court relied upon his testimony in its opinion.

his analysis. Dr. Katz himself confirmed that it was possible for him to analyze all the elections Dr. Barreto analyzed. Ex. C, Katz Dep. Tr. at 62:14-16. Dr. Barreto provided Defendants and Dr. Katz with the *eiCompare* code, which would allow Dr. Katz to consider any confidence interval information that he wished to examine. Contrary to Defendants' claim, Dr. Barreto directly addresses the issue of confidence intervals in his report, specifically noting the problem with relying on confidence intervals with smaller data sets such as what is present in Dodge City. Ex. A, Barreto Report at 19 n.40. At most, Defendants have shown a difference of opinion between Dr. Barreto and Dr. Katz on this issue, which is precisely why the Court should hear testimony from both experts at trial.

### d.  Endogenous Elections

Defendants agree that endogenous elections are generally the most probative elections to look at when determining the presence of racially polarized voting. As such, Dr. Barreto analyzed all the Dodge City commission elections over the past decade, of which there were four. Recent elections are the most probative.[9] *See, e.g.*, *Nipper v. Smith*, 39 F.3d 1494, 1537-38 (11th Cir. 1994); *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995) ("In particular, elections that provide insights into past history are less probative than those that mirror the current political reality.") (citation omitted); *Luna*, 291 F.Supp.3d at 1133 (finding reelection of a candidate of color "roughly two decades ago" to be of little relevance and not detracting from court's finding of lack of electoral success based upon more recent elections). Thus, having examined Dodge City Commission elections between 2014 to present, Dr. Barreto analyzed the most probative elections for his racially polarized voting analysis.

---

[9] In this case, recent elections were also the only election results available to Plaintiffs. Ford County refused to supply Plaintiffs with election results earlier than 2012.

Defendants claim, without support, that Dr. Barreto cannot draw any conclusions from any elections prior to 2021 due to the lack of majority Latino precincts, Doc. 144 at 11, but homogenous precincts are not required for proper ecological inference analysis. A federal court rejected this exact argument when Dr. Katz made it in that case. *See Luna*, 291 F.Supp.3d at 1123-24. There, the court noted that Gary King, the developer of EI, never supported requiring homogenous precinct analysis for reliable EI estimates. Indeed, Dr. Katz himself had performed EI analysis without any reference to homogenous precincts. *Id*. at 1124-25. The *Luna* court cited a slew of other cases similarly rejecting the necessity of homogenous precincts for proper EI analyses. *Id*. at 1124.[10]

The only support Defendants have for this argument is their discussion of the "ecological inference problem," where they again provide a wildly distorted and out of context quote from Dr. Barreto. Specifically, Defendants omit Dr. Barreto stating not only that he disagreed with the idea that there is an "ecological inference problem"[11] but also that he disagreed with Dr. Greiner's statement on ecological regression producing impossible outcomes. Doc. 144 at 11. Defendants cannot and do not cite any cases in which courts analyzing VRA claims have determined that ecological inference is unreliable or that there is an "ecological inference problem." In short, this is a lawyer-made argument without any support in the social science literature or caselaw. Defendants' accusations in this regard should be dismissed entirely.

---

[10] The *Luna* court specifically cited: *Patino v. City of Pasadena*, 230 F.Supp.3d 667,691 (S.D. Tex. 2017); *Montes*, 40 F.Supp.3d at 1377; *Hall v. Louisiana*, 108F.Supp.3d 419, 433 (M.D. La. 2015); *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-cv-2579, 2014 WL 1668500 (S.D. Tex. Apr. 25, 2014); *Rodriguez*, 964 F.Supp.2d at 686; *Benavidez*, 638 F. Supp. 2d at 724–25; and *Teagues v. Attala County*, 92 F.3d 283, 291-92 (5th Cir. 1996).

[11] The full quote is as follows: **Q** "What is the ecological inference problem?
 **A** The ecological inference problem, sort of just generally, is something that was discussed by sociology scholar named Goodman in the 1950's that attempting to infer from ecological units can be problematic, can lead you to the wrong conclusions unless you use the proper regression techniques and statistical analysis.
 **Q** And so the ecological inference problem is that without reliable data, you are likely to end up or at least bare a huge margin of error. Correct?
**A** No." (Barreto Dep. Tr. at 47:20-23).

### e. Exogenous Elections

It is correct methodology for experts in VRA cases to also analyze exogenous elections. *See*, *e.g.*, *Large v. Fremont Cnty., Wyo.*, 709 F. Supp. 2d 1176, 1193-1194 (D. Wyo. 2010); *United States v. Blaine County, Mont.*, 363 F.3d 897, 912 (9th Cir. 2004) (finding it is appropriate to "examin[e] exogenous elections to supplement its analysis of racially cohesive voting patterns in the at-large county commission elections"). Defendants' arguments are unsuited for a *Daubert* motion and instead go to the weight this Court should afford Dr. Barreto's analysis about exogenous elections. While endogenous elections are generally the most probative elections when determining the presence of racially polarized voting, exogenous elections still hold probative value. *See Luna*, 291 F. Supp. 3d at 1123; *United States v. Blaine County, Mont.*, 363 F.3d 897, 912 (9th Cir. 2004); *NAACP v. Fordice*, 252 F.3d 361, 370 (5th Cir. 2001); *Petteway*, 3:22-CV-00057-JVB, at *47 ("Due to the limited number of contested endogenous elections, it was necessary to analyze exogenous elections.").

In arguing otherwise, Defendants once again distort the law in claiming that "a federal court did not consider Dr. Barreto's testimony on exogenous statewide elections to have benefit…." Doc. 144 at 12. The opinion they cite did not even discuss exogenous elections. Rather, Defendants' quote is with respect to a discrete topic of primary election analysis in a case concerning a single state-level legislative district in which there are party primaries. It in no way supports their challenge to the admissibility of Dr. Barreto's evidence, and the Court should dismiss these arguments.

### II. There is Enough Relevant Data For a Proper Ecological Inference Analysis

Dodge City elections provide sufficient relevant data for a proper ecological inference analysis; indeed, courts in VRA cases have found polarized voting in numerous jurisdictions

even smaller than Dodge City. *See Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1385 (8th Cir. 1995); *Stabler v. Cnty. of Thurston, Neb.*, 129 F.3d 1015, 1018 (8th Cir. 1997).

As with much of Defendants' motion, Defendants mischaracterize the record, particularly about Dr. Barreto's testimony in *Cisneros v. Pasadena Independent School District*, No. 4:12-CV-2579, 2014 WL 1668500 (S.D. Tex. 2014). There, Dr. Barreto served as plaintiffs' expert to analyze polarized voting. In their motion, Defendants incorrectly claim that jurisdiction had 58 voting precincts; the Pasadena Independent School District in fact had ten to eleven consolidated voting precincts during the endogenous elections analyzed. Doc. 144. at 11 ("The PISD had ten polling places during the 2002 election, and eleven during the 2009 election."). Dr. Barreto acknowledged the limitation of a smaller number of precincts and, as he did in this instant case, analyzed exogenous elections as well. *Id.* at *13. While Dr. Barreto has testified that a smaller number of precincts does make it harder to determine polarized voting, he has also developed a methodology utilized by both Plaintiffs' and Defendants' experts in this case to overcome such hurdles: BISG. BISG was not yet developed when Dr. Barreto testified in *Cisneros*, and was, in part, developed thereafter for use in the VRA cases to address the Court's opinion in *Cisneros*. *See* Barreto, et al., *A Novel Method for Showing Racially Polarized Voting: Bayesian Improved Surname Geocoding*, 46 NYU REV. L. & SOC. CHANGE 1 (2022). Defendants' motion ignores this important context. *See NAACP Spring Valley Branch*, 462 F. Supp. 3d at 392; *Petteway*, 3:22-CV-00057-JVB, at *44.

### III. There is No Evidence of Bias

Finally, Defendants' arguments about Dr. Barreto's alleged "bias" are equally unmoored from reality and must be disregarded. Dr. Barreto has been found to be a credible and qualified witness in countless voting rights cases, including in the United States District Court for the

District of Kansas. *See Fish v. Kobach*, 309 F. Supp. 3d 1048, 1059 (D. Kan. 2018), *aff'd sub nom. Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020). Dr. Barreto's testimony has been credited in other cases in which the UCLA Voting Rights Project attorneys have served as Plaintiffs' counsel. *See Soto Palmer v. Hobbs*, No. 3:22-CV-05035-RSL, 2023 WL 5125390, at *5, 7 (W.D. Wash. Aug. 10, 2023); *Petteway*, No. 3:22-CV-00057, at *45-46.

When determining if an expert may be disqualified due to bias, courts have inquired into whether the expert had affirmatively sought employment, whether the expert had preconceived notions of the litigation, and whether the expert was "so obsessed" with the case that they cannot function at trial. *See Sands v. Integon Nat'l Ins. Co.*, No. 18-CV-00714-PAB-NYW, 2020 WL 7027442, at *12 (D. Colo. Nov. 30, 2020); *United States v. Kelley*, 6 F. Supp. 2d 1168, 1183 (D. Kan. 1998). There is no evidence of any of this. The fact VRP attorneys are part of the Plaintiffs' legal team and that Plaintiffs' counsel collectively, after litigation began, retained Dr. Barreto, shows that he is a well-known expert who has worked with some of them in the past. This is hardly grounds to disqualify him.

Similarly, Defendants' lackluster attempt, without evidence and in the face of scores of court opinions to the contrary, to state that Dr. Barreto is "results-driven" must fail. Dr. Barreto analyzed the proper data for conducting a racially polarized voting analysis (the same data Defendants' expert analyzed), which are precinct level election data, demographic data, and voter file history. His opinions are based on objective data analyses that Defendants have replicated. Their disagreement with his conclusions is no basis for disqualification.

## <u>CONCLUSION</u>

Defendants' motion to strike the opinions of Dr. Barreto should be denied.

Dated: October 13, 2023

Respectfully submitted,


Chad W. Dunn*
Sonni Waknin*
Bernadette Reyes*
**UCLA VOTING RIGHTS PROJECT**
3250 Public Affairs Building
Los Angeles, CA 90065
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org
310-400-6019

Jonathan Topaz*
Sophia Lin Lakin*
**AMERICAN CIVIL LIBERTIES
UNION, INC.**
125 Broad Street, 18th Floor
New York, NY 10004
jtopaz@aclu.org
slakin@aclu.org
212-549-2500

Scott Fuqua*
**FUQUA LAW & POLICY, P.C.**
P.O. Box 32015
Santa Fe, NM 87594
scott@fuqualawpolicy.com
505-982-0961

By: */s/ Sharon Brett*
Sharon Brett    KS 28696
Kunyu Ching    KS 29807
**AMERICAN CIVIL LIBERTIES UNION
OF KANSAS**
10561 Barkley Street
Suite 500
Overland Park, KS 66212
sbrett@aclukansas.org
kching@aclukansas.org
913-490-4100

Abena Mainoo*
Jonathan I. Blackman*
JD Colavecchio*
Mijin Kang*
Elizabeth R. Baggott*
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
One Liberty Plaza
New York, NY 10006
amainoo@cgsh.com
jblackman@cgsh.com
jdcolavecchio@cgsh.com
mkang@cgsh.com
ebaggott@cgsh.com
212-225-2000


*Attorneys for Plaintiffs*

* Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

Pursuant to D. Kans. Loc. R. 5.1(f), I hereby certify that on this 13th day of October

2023, a true and correct copy of the foregoing was served via the United State District Court's

CM/ECF system on all parties or persons requiring notice, including upon attorneys for

defendants:

FOULSTON SIEFKIN LLP
Anthony F. Rupp, KS #11590
Tara Eberline, KS #22576
Sarah E. Stula, KS #27156
7500 College Boulevard, Suite 1400
Overland Park, Kansas 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com
sstula@foulston.com

FOULSTON SIEFKIN, LLP
Clayton Kaiser, KS #24066
1551 North Waterfront Parkway, Suite 100
Wichita, Kansas 67206
(316) 267-6371
(316) 267-6345 (fax)
ckaiser@foulston.com

By: */s/ Sharon Brett*
Sharon Brett KS 28696
**AMERICAN CIVIL LIBERTIES**
**UNION OF KANSAS**
10561 Barkley Street
Suite 500
Overland Park, KS 66212
sbrett@aclukansas.org
913-490-4100