# EXHIBIT B

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF KANSAS

 3

 4

 5   MIGUEL COCA and ALEJANDRO      )

 6   RANGEL-LOPEZ,        )

 7                   Plaintiffs,   )

 8        VS.                )   NO. 6:22-cv-01274

 9   CITY OF DODGE CITY, et al.,   )       EFM-RES

10                   Defendants.   )

11   _____)

12

13

14   DEPOSITION OF:

15              MATT A. BARRETO, PH.D.

16              FRIDAY, JUNE 23, 2023

17              9:15 A.M.

18

19

20

21   REPORTED BY:

22              Sari M. Knudsen

23              CSR No. 13109

24

25
```

Page 2

```
 1          Deposition of MATT BARRETO, PH.D.,
 2          taken on behalf of the DEFENDANTS,
 3          at 2000 Avenue of the Stars, Suite 400,
 4          Los Angeles, California, on FRIDAY,
 5          JUNE 23, 2023, before Sari M. Knudsen,
 6          CSR No. 13109.
 7
 8
 9     APPEARANCES OF COUNSEL:
10
11     FOR THE PLAINTIFF:
12          UCLA VOTING RIGHTS PROJECT
13          BY:  SONNI WAKNIN, ESQ.
14          3250 Public Affairs Building
15          Los Angeles, California  90025
16
17     FOR THE DEFENDANT:
18          FOULSTON SIEFKIN LLP
19          BY:  ANTHONY RUPP, ESQ.
20          7500 College Park Boulevard, Suite 1400
21          Overland Park, Kansas  66210
22          913-498-2100
23
24
25
```

```
1   ALSO PRESENT VIA ZOOM:

2            JONATHAN TOPAZ, ACLU

3            ALEXA SALES, SUMMER LAW FELLOW

4            PALMER TURNBALL, SUMMER LAW FELLOW

5            ISAAC DESANTOS, SUMMER LAW FELLOW

6            EMILY SHAUL, SUMMER LAW FELLOW

7            CALEB HERSH, SUMMER LAW FELLOW

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1                          I N D E X

2    WITNESS                  EXAMINATION              PAGE

3    MATT BARRETO, PH.D.  (BY MR. RUPP)                6

4

5

6

7

8                        E X H I B I T S

9    EXHIBIT NO.   PAGEDESCRIPTION

10   Exhibit 73    33        Article - "eiCompare:

11                           Comparing Ecological

12                           Inference Estimates across

13                           EI and EI:R X C"

14   Exhibit 74    53        Articles - "Ecological

15                           Inference in Voting Right

16                           Act Disputes:  Where Are We

17                           Now And Where Do We Want To

18                           Be?"

19   Exhibit 75    59        Recovering Vote Choice from

20                           Partial Incomplete Data

21   Exhibit 76    65        Cross-Level/Ecological

22                           Inference

23   Exhibit 77    67        Article - "The Limits of

24                           Ecological Inference:  The

25                           Case of Split-Ticket Voting"

Page 5

```
 1              E X H I B I T S
 2     EXHIBIT NO.    PAGEDESCRIPTION
 3     Exhibit 78     73      Article - "A Novel Method
 4                             for Showing Racially
 5                             Polarized Voting:  Bayesian
 6                             Improved Surname Geocoding"
 7     Exhibit 79     87      Article - "The Mobilizing
 8                             Effect of Majority-Minority
 9                             Districts on Latino Turnout"
10     Exhibit 80     103     Expert Report of Matt
11                             Barreto, Ph.D.
12     Exhibit 81     170     Notice of Deposition
13     Exhibit 82     177     Book entitled "Ethnic Cues"
14                             written by Matt Barreto,
15                             Ph.D.
16     Exhibit 83     180     Book entitled "Change They
17                             Can't Believe In" written by
18                             Christopher Parker and Matt
19                             Barreto, Ph.D.
20
21
22
23
24
25
```

Page 7

1    as the director, and so I've been appointed to that.

2         Q    And you indicated that you are a professor.

3    What type of a professor are you?

4         A    My Ph.D. is in political science from the

5    University of California Irvine.

6         Q    And are you a full professor?

7         A    Yes, I'm a full professor with tenure.

8         Q    We'll talk a little bit more about the UCLA

9    Voting Rights Project as we move along here.  But I

10   just want to make sure I understand in terms of your

11   relationship to this case.

12             Counsel for the plaintiffs in this case

13   comes from the UCLA Voting Rights Project.  Is that

14   correct?

15        A    I think there's a lot of counsel.  But I

16   know some are from UCLA, yes.

17        Q    All right.  And do they report to you?

18        A    They do not report to me, no.

19        Q    What is -- what is the relationship between

20   you as a Faculty Director of the UCLA Voting Rights

21   Project and the attorneys who represent the UCLA

22   Voting Rights Project in this case?

23        A    I mean, most -- basically we're co-workers.

24   We work at a similar research center.  But there's a

25   legal director of the Voting Rights Project who is

Page 8

1   named Chad Dunn, and he oversees both the legal

2   education and clinic as well as all the attorneys.

3       Q    And in terms of decisions, for example,

4   with regard to if the UCLA Voting Rights Project is

5   going to get involved in taking a plaintiff's case,

6   who makes that decision?

7       A    Mr. Dunn.

8       Q    Do you -- are you involved in that

9   decision?

10      A    No.

11      Q    How do they -- how do they separate out

12  what the lawyers do and what you do?

13      A    I think it's like any voting rights case.

14  The lawyers are involved in all the legal

15  components.  I don't have a J.D.  So I don't work on

16  any complaints or briefs or anything like that.

17          I have a Ph.D. in political science, and so

18  I oversee data analysis, data science, and I do

19  educational seminars on what it means to be an

20  expert witness and the type of research that goes

21  into those reports.

22      Q    When do you first become aware that the

23  UCLA Voting Rights Project is contemplating taking a

24  case?

25      A    It depends.  It varies a lot.

Page 25

1    very high-density Latino.  But I don't have the

2    numbers memorized.

3        Q    All right.  We'll talk about those as we go

4    through the report.

5             But a majority is much different than

6    90 percent. Correct?

7        A    It's different.

8        Q    In terms of -- you know, we are going to

9    talk about homogenous precincts.  But a majority

10   doesn't make a precinct -- I mean, the fact that a

11   majority is White or a majority is Latino does not

12   make that precinct homogenous.  Correct?

13       MS. WAKNIN:  Objection.  Form.

14       THE WITNESS:  Incorrect.

15   BY MR. RUPP:

16       Q    So it's your contention here today that

17   merely having 51 percent of a precinct makes it a

18   homogenous precinct?

19       MS. WAKNIN:  Objection.  Form.

20       THE WITNESS:  That's not my contention.

21   BY MR. RUPP:

22       Q    What is your contention?

23       A    Identifying homogenous precincts takes a

24   broad view of a number of conditions or variables.

25   Depending on the jurisdiction you are in, the

1    homogenous precinct identification will vary

2    dramatically.

3            If you are in a city like San Antonio that

4    has 400 or so precincts, including pockets of very

5    high-dense Latino neighborhoods and very high-dense

6    White neighborhoods, you would employ the same

7    theory as you would in Dodge, but you would have

8    different data at your disposal.  And in Dodge, we

9    have a lot less precincts, but the theory is the

10   same.

11           A homogenous precinct might be the precinct

12   that is the most concentrated of one racial or

13   ethnic group for purposes of homogenous precinct

14   analysis, and the exact percentage point may be less

15   critical than which are the ones that are the most

16   heavily concentrated.

17       Q    So in order to get accurate numbers, you

18   are saying you can have a homogenous precinct that

19   doesn't reach 90 percent.  Is that correct?

20       A    I don't understand what you mean by, quote,

21   "accurate numbers."

22       Q    Well, I mean, the touchstone of expert

23   testimony is to try to get reliable information.

24   Correct?

25       A    I would agree with that.

Page 27

1    Q   And most literature would suggest that in

2  order to get reliable information in an ecological

3  inference study, you would need to have homogenous

4  precincts.  Correct?

5    A   I think the literature suggests that you

6  need to have variation in the independent variable,

7  and more variation is better.

8    Q   And by "more variation," you need precincts

9  that are 90 percent.  Correct?

10    A   No.

11    Q   How much -- what is the base level in order

12  to get an accurate study of -- using an ecological

13  inference test of -- of the percentage of Latinos

14  that need to be in a precinct in order to determine

15  that it is a homogenous precinct?

16    A   I think your question doesn't make any

17  sense.  But I think I understand it --

18    Q   Okay.

19    A   -- so I'm going to try to give you an

20  answer.  If this is not what you're looking for, let

21  me know.

22    Q   All right.

23    A   I'll refer back to my previous description

24  of what constitutes homogenous precinct.

25       I think the question you are asking me is

```
                                           Page 39

 1           epidemiology, public health and many social
 2           sciences."
 3           Are you backing off from that statement?
 4      A    I am disagreeing with your opinion of the
 5   sentence.
 6      Q    I'm just reading the sentence.
 7      A    No.  You said something like isn't this
 8   important?  You gave an editorialization.  I was
 9   disagreeing with that.  I'm not disagreeing that the
10   sentence exists in the paper.
11      Q    The sentence is a truthful statement.
12   Correct?
13      A    The sentence is accurate that scholars in
14   some of the hard sciences have not found their
15   application of ecological inference to be reliable.
16           And as we go on to state in political
17   science and in voting studies, it is generally
18   accepted and considered to be quite reliable so much
19   so that multiple political scientists have spent
20   time writing software packages to continue its use.
21      Q    I'm going to go on to that.  We're going to
22   go through this kind of line by line here.
23           The next sentence after the sentence that
24   we just read says,
25                   "For example, Friedman explains that
```

1          assessments based on aggregate level data."

2          Is that correct?

3     A    That's the first sentence.

4     Q    So EI -- eiCompare is, in fact, a new

5   package.  Correct?

6     A    It was --

7     Q    True statement?

8     A    It was at the time of this article.  I

9   would say it's no longer new.  But...

10    Q    And it is attempting to address the

11  ecological inference problem.

12         What is the ecological inference problem?

13    A    The ecological inference problem, sort of

14  just generally, is something that was discussed by

15  sociology scholar named Goodman in the 1950's that

16  attempting to infer from ecological units can be

17  problematic, can lead you to the wrong conclusions

18  unless you use the proper regression techniques and

19  statistical analysis.

20    Q    And so the ecological inference problem is

21  that without reliable data, you are likely to end up

22  or at least bare a huge margin of error.  Correct?

23    A    No.

24    Q    What -- the ecological inference problem is

25  the problem, in essence, described in the first

```
                                           Page 51
 1      A    That is correct.
 2      Q    In terms of Dr. Cho, if I remember
 3  correctly, she is both on the university -- or the
 4  Political Science Department and the law school
 5  faculty at Michigan.  Is that correct?
 6      A    I know she's in the Midwest.  She was at
 7  Illinois for a long time.
 8      Q    Maybe it's Illinois.  I think you are
 9  correct.  I think it's Illinois.
10      A    We could look her up though.
11      Q    At a reputable school?
12      A    Certainly.
13      Q    She's a well-known scholar in this field.
14  Correct?
15      A    I know who she is.
16      Q    And you've cited to her in your
17  bibliography.  Correct?
18      A    That is true.
19      Q    All right.  You've also cited a number of
20  articles on the next page, page 100, by a
21  J. Greiner.
22           J. Greiner is at Harvard.  Is that correct?
23      A    Yes.
24      Q    Reputable.  Correct?
25      A    Sure.
```

1      Q     So much so that you have cited to him at

2  least three times in your bibliography.  Correct?

3      A     Let me just clarify and disagree with your

4  characterization of I believe what you said was,

5  quote, "So reputable that you cited to him four

6  times."  That's not the reason.

7            The reason we cite this stuff is, as I

8  said, we find it relevant, either in agreement,

9  disagreement.  But the citation in four or 27

10 citations to an author does not suggest that I find

11 them, quote, so reputable.

12           I don't have any basis here today to tell

13 you that I don't.  I just want to clarify that.

14 That just because something appears in any scholar's

15 bibliography, it's because they found it relevant,

16 and they found some value to the debate or the

17 exchange that the scholars were having.

18     Q     Do you at any point in the -- in your

19 article, Exhibit No. 73, point out that you disagree

20 with Dr. Greiner on key points?

21     A     Off the top of my head, I don't recall.  I

22 would need to sit and go through it.

23           We have a second article, the same team of

24 scholars in sociological methods and research, SMR,

25 in which this article here is meant to be more of a

Page 150

1    applied.  I would not say all the same.

2        Q    So bear with me just a second while I find

3    a definition of "homogenous" online.

4            "Homogenous, consisting of all -- of parts

5    all of the same kind."

6            That's what homogenous means.  Correct?

7        A    I don't know what source you're looking at

8    or application.

9        Q    Oxford Dictionary it looks like.

10           But in terms of homogenous, in terms of

11   getting back to -- to be homogenous, nearly

12   everybody in a voting district needs to be of the

13   same race or ethnicity.  Correct?

14       A    No.  That's why I was trying to clarify.

15   That depending on the application of the term, it

16   has come to mean, in the voting rights scholarship,

17   the precincts that are the most heavily contained of

18   one group or another.  Because it is used and can be

19   used in any jurisdiction to conduct a certain type

20   of analysis.

21           So it could be the case, depending on the

22   jurisdiction that you are in, that precincts that

23   are identified as homogenous theoretically could be

24   80 or 90 percent Black or Hispanic.  It could also

25   be the case that they are 50 or 60 percent.

Page 164

1       MS. WAKNIN:  Objection.  Form.

2       THE WITNESS:  It's information that's available

3   to anyone who wants to run the eiCompare software,

4   yes.

5   BY MR. RUPP:

6       Q    Right.  So instead of reporting the results

7   from your eiCompare software here or presenting us

8   with documents from your eiCompare software showing

9   your work and showing your results, your answer is

10  we need to buy your eiCompare software and run the

11  analysis ourselves.  Is that what you are saying?

12      MS. WAKNIN:  Objection.  Form.

13      THE WITNESS:  No.

14  BY MR. RUPP:

15      Q    Go ahead.  Tell me why that's wrong.  What

16  is wrong about my question?

17      MS. WAKNIN:  Objection.  Form.

18      THE WITNESS:  Well, first of all, it's free.

19  You can just download it.  Your expert presumably

20  already has it downloaded in our studio.  So they

21  don't have to buy anything.  So that's the first

22  part that's wrong.

23  BY MR. RUPP:

24      Q    Why didn't you show your work?

25      A    I did.