# EXHIBIT C

MIGUEL COCA, ET AL. vs CITY OF DODGE CITY, ET AL.
Jonathan Katz, Ph.D. on 08/01/2023

```
 1              UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF KANSAS
 2

 3   MIGUEL COCA, et al.,        )
                                 )
 4            Plaintiffs,        )
                                 ) Case No.
 5   vs.                         ) 6:22-cv-01274-EFM-RES
                                 )
 6   CITY OF DODGE CITY, a       )
     municipal corporation,      )
 7   et al.,                     )
                                 )
 8            Defendants.        )

 9

10

11         DEPOSITION OF JONATHAN KATZ, Ph.D.

12            TAKEN ON BEHALF OF PLAINTIFFS

13                   AUGUST 1, 2023

14

15

16

17     Reported by Celena D. Davis, RPR, CCR, CSR

18              California CSR No. 14464

19

20

21

22

23

24

25
```

1                    INDEX OF EXAMINERS

2  DEPOSITION OF JONATHAN KATZ, Ph.D.

3                                                        Page:

4          Questions by Ms. Waknin . . . . . . . . . .   5

5          Questions by Mr. Kaiser . . . . . . . . . .116

6

7

8

9                         EXHIBITS

10                (No exhibits were marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF KANSAS
 2

 3  MIGUEL COCA, et al.,      )
                              )
 4           Plaintiffs,      )
                              ) Case No.
 5  vs.                       ) 6:22-cv-01274-EFM-RES
                              )
 6  CITY OF DODGE CITY, a     )
    municipal corporation,    )
 7  et al.,                   )
                              )
 8           Defendants.      )

 9

10        DEPOSITION OF JONATHAN KATZ, Ph.D., produced,

11  sworn and examined on the 1st day of August, 2023,

12  between the hours of 8:00 of that day and 6:00 in the

13  evening of that day via Zoom videoconference, before

14  CELENA D. DAVIS, a Registered Professional Reporter and

15  Certified Court Reporter within and for the State of

16  California and the State of Kansas.

17

18

19

20

21

22

23

24

25
```

```
 1                    APPEARANCES

 2

 3 COUNSEL FOR THE PLAINTIFFS:
   UCLA VOTING RIGHTS PROJECT
 4 by Ms. Sonni Waknin
   3250 Public Affairs Bldg.
 5 Los Angeles, California 90065
   sonni@uclavrp.org
 6

 7
   COUNSEL FOR THE DEFENDANTS:
 8 FOULSTON SIEFKIN LLP
   by Ms. Maria Drouhard
 9 and Mr. Clayton Kaiser
   1551 N. Waterfront Pkwy - Suite 100
10 Wichita, Kansas 67206
   ckaiser@foulston.com
11

12

13 REGISTERED PROFESSIONAL REPORTER
   CERTIFIED COURT REPORTER (MO)
14 CERTIFIED SHORTHAND REPORTER (IL)
   CERTIFIED SHORTHAND REPORTER (KS)
15 CERTIFIED SHORTHAND REPORTER CA NO. 14464
   Celena D. Davis
16 HUSEBY

17 Also Present:   Alexa Salas
                   Michael Herndon
18                 Matt Barreto

19

20

21

22

23

24

25
```

 1  public.  But I don't honestly know.
 2       Q.   Dr. Katz, did you give any public
 3  presentations before the LA County Redistricting
 4  Commission on racially polarized voting?
 5       A.   I did.
 6       Q.   And these were public presentations; is
 7  that correct?
 8       A.   That is correct.
 9       Q.   And when did you give these pubic
10  presentations?
11       A.   I have no idea on the dates.  I'd have to
12  go back to my calendar.  Sometime in -- sometime in
13  2021.
14       Q.   And when you were doing your ecological
15  inference analysis for the LA County Redistricting
16  Commission, what race data did you use when conducting
17  your EI?
18       A.   I honestly don't remember if we had -- I
19  think most likely we had name-matched the voting
20  records, because that's what is available at the
21  statewide database.  But that's just a guess, without
22  coming back to looking at the notes.
23       Q.   Okay.  And so when you say name-matched,
24  are you talking about surname analysis?  What are you
25  talking about?

1  and Smith's method of bounds, right, we can actually
2  formally say without making any assumptions, what is the
3  range of voting behavior, and what the bounds are.  So
4  that's what we mean by homogenous precincts:  Precincts
5  that are almost all one ethnic group.
6        Q.   And what is the percent needed of one race
7  or ethnic group for you to believe that that precinct is
8  homogenous?
9        A.   Again, I would say at least 90 percent.
10 Again, what I can do is what I did in this report:  For
11 the most homogenous precinct, I actually calculated the
12 bounds.
13       Q.   And what is the basis for the 90 percent
14 number that you -- to make a precinct homogenous?
15       A.   It's just a convention often used in the
16 field about what is almost -- based on the bounds, the
17 bounds won't be too large; although they can still be --
18 depending on voting behavior, they can be large when
19 there's about 90 percent.
20            Again, more homogenous is always better
21 than less homogenous.  It's actually a verifiable
22 question about voting behavior.  We can just calculate
23 the bounds in those precincts.
24       Q.   So in your basis, 90 percent; is that from
25 the literature on the topic?

1       A.   Yeah.  I don't even remember where.  People
2  have done this.  When people have looked at Duncan and
3  Smith bounds, as a general rule of thumb in a two-way
4  race, 90 percent of the bounds are going to be pretty
5  tight on a two-way race.  We don't have two-way races in
6  Dodge City.
7       Q.   So your basis for the 90 percent equaling a
8  homogenous precinct, that is based on Duncan and --
9       A.   Duncan and Smith, I think.
10      Q.   Duncan and Smith; is that correct?
11      A.   Correct.
12      Q.   Anything else that forms your basis that
13 90 percent equals a homogenous precinct?
14      A.   I didn't say 90 percent of people is
15 homogenous.  I said that's often used as a rule of
16 thumb.  In this case, we have no precinct which is even
17 over 60 percent Latino, and the bounds are incredibly
18 large.
19      Q.   And if I -- let's say if it were the case
20 that there were 80 percent homogenous precincts, or
21 three precincts that were 80 percent Latino, would that
22 be enough for a statistical analysis, in your expert
23 opinion?
24      A.   Again, that would be better.  How much
25 better?  We'd have to do the analysis.

1      A.   I just made -- you're making up
2  hypotheticals.  Hypothetically, if I know how one voted,
3  I can tell if there's racially polarized voting.  That's
4  one way.  So it would be one estimation that could allow
5  me to -- it's not going to come from the aggregate data.
6      Q.   What type of data would it come from?
7      A.   Again, something that allows you to
8  estimate how individuals actually voted.
9      Q.   Did you, Dr. Katz, have access to other
10 election data for the City of Dodge City besides Dodge
11 City Commission elections?
12     A.   Yes.  I had all the data that Dr. Barreto
13 provided in his discovery materials.
14     Q.   And was it possible for you to analyze all
15 the elections that Dr. Barreto analyzed?
16     A.   Possible, yes.
17     Q.   Would it have been possible for you to
18 analyze the elections that Dr. Barreto analyzed to
19 determine if statistically valid inferences could be
20 drawn?
21     A.   Yes.  But the real problem is mostly the
22 races that Dr. Barreto analyzed are partisan races,
23 two-way partisan races, which are not similar in kind to
24 what goes on in the Dodge City Commission.
25     Q.   My question was:  Is it possible for you to

1          Q.   And what exactly did you get from
2   Mr. Benson?
3          A.   The files which are in the discovery
4   materials that says they are the original file names
5   with the appended geocoded.
6          Q.   And once you have the geocoded files, what
7   did you do next, Dr. Katz?
8          A.   I ran Dr. -- I, for the most part, followed
9   Dr. Barreto's analysis where he then used this Bayesian
10  Improved name-matching to figure out the race and
11  ethnicity based on surname matching and geolocation of
12  voters.
13         Q.   And so when you -- I'm sorry.  Apologies.
14  I interrupted you.
15              Dr. Katz, when you say Bayesian Improved
16  name-matching, are you referring to Bayesian Improved
17  Surname Geocoding?
18         A.   Yes.  It's the exact code that Dr. Barreto
19  used.
20         Q.   And I'm going to use the abbreviation, for
21  everyone's sake, as BISG.  Do you understand what I mean
22  when I say BISG?
23         A.   I do.
24         Q.   Okay.  Have you ever used BISG before?
25         A.   Yes.

1 and row by column, or R by C?
2      A.   Okay.  So King's original model was for a
3 two-by-two case.  That is, the quintessential example
4 from American history are Black or African-American
5 voters versus White voters, two-way races.
6           Dr. King made -- sort of alluded to in his
7 book, saying this generalizes to when there's, say,
8 three groups, or when there's more than two candidates,
9 really straightforward.  It turns out that while the
10 math generalized straightforwardly, the actual
11 estimation is actually very difficult.
12           So there was a follow-up article that
13 actually generated the method for generalizing it to
14 multiple candidates and multiple groups, which is the
15 shorthand for what you're calling R by C.
16      Q.   Did you use King's EI or R by C or rows by
17 columns when you were conducting your ecological
18 inference analysis in this report?
19      A.   Since there are multiple candidates, you
20 have to be using what you call R by C.  It's just a
21 generalization.  In this case, we have more than two
22 groups and more than two candidates.  The software
23 package I use, if you're asking that information, is EI
24 Pack, so that's E-I P-a-c-k.
25      Q.   And you keep referring, Dr. Katz, to say