**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

MIGUEL COCA, et al.,

               Plaintiffs,

       v.

CITY OF DODGE CITY, et al.,

               Defendants.

Case No. 6:22-cv-01274-EFM-RES

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT
## OF UNDISPUTED MATERIAL FACTS

### I.   Adoption and operation of at-large elections in Dodge City

1.      In 1971, Dodge City ("the City") enacted Charter Ordinance No. 7, which first adopted the at-large system of election for City Commissioners. Charter Ordinance 7, *attached hereto as* Exhibit A-1.

Plaintiffs' Response:

    Undisputed.

2.      Charter Ordinance No. 7 is facially neutral and does not show any intent to discriminate against the Dodge City Latino population. Charter Ord. 7.

Plaintiffs' Response:

    Disputed in part. Charter Ordinance No. 7 is facially neutral, but the maintenance of

Charter Ordinance No. 7 does demonstrate an intent to discriminate against Hispanics in Dodge

City.[1]

3.      The legislative history of Charter Ordinance No. 7 is facially neutral and does not show any intent to discriminate against the Dodge City Latino population. March 29, 1971 Minutes, *attached hereto as* Exhibit A-2.

Plaintiffs' Response:

    Undisputed.

4.      Dodge City has elected its City Commissioners through at-large elections since 1971. Hernandez Dep. 123:24-124:19, *attached hereto as* Exhibit B.

Plaintiffs' Response:

    Undisputed.

5.      The at-large election system used by Dodge City is consistent with the at-large election systems in other Kansas cities, like Manhattan and Hays. Rangel-Lopez Dep. 86:16-87:9, *attached hereto as* Exhibit C.

---

[1] Terms defined in the Pretrial Order, Doc. 140, retain their meanings. Internal citations and quotations are omitted throughout this brief, except where otherwise indicated.

Plaintiffs' Response:

Disputed. There is insufficient evidence in the record to conclude that the at-large election system used by Dodge City is consistent with the at-large election systems in other Kansas cities. Mr. Rangel-Lopez stated that, to his knowledge, the at-large election system in Dodge City is similar to that of other Kansas cities like Manhattan and Hays, but noted that Lawrence moved from at-large to district-based elections. Defs. Ex. C, Doc. 146-19, Rangel-Lopez Dep. 86:16-87:9.

6.      City Commission elections are nonpartisan. Pretrial Order, at 3 ¶ 21, Doc. 140.1

Plaintiffs' Response:

Undisputed.

7.      Latino candidates have recently served on the City Commission, including current Commissioner Nuci, a defendant in this case. Nuci Dep. 12:1-6, *attached hereto as* Exhibit D; Rangel-Lopez Dep. 12:2-11.

Plaintiffs' Response:

Disputed in part. Commissioner Nuci is a Hispanic City Commissioner currently serving on the Commission, but there is no evidence that other Hispanic candidates have "recently" been elected to serve on the City Commission. Ex. A, Dr. Bejarano's Expert Report tbl.11, ¶ 86 n.123. Prior to Commissioner Nuci, the last Hispanic Commissioner was Blanca Soto, who was *appointed* —not elected—to her position in February 2021 and lost her election in November 2021. *Id.* ¶ 86. Prior to Blanca Soto, the last known Hispanic City Commissioner was Fernando Jurado, who served between 1999 and 2001. *Id.*

8.      The City does not campaign on behalf of or endorse candidates. De La Rosa Dep. 67:17-68:12, *attached hereto as* Exhibit E; Hernandez Declaration ¶ 4, *attached hereto as* Exhibit A.

Plaintiffs' Response:

Disputed in part. Although the City does not officially endorse candidates, the City has taken actions to promote certain candidates. The current Commissioners informally slate candidates for the City Commission. In the 2021 Dodge City Commission elections, there were advertisements for the "Republican Slate" for both the Dodge City Commission and the Dodge City School Board, which featured Commissioner Nuci and Commissioner Taylor. Ex. B, Dr. Barreto's Expert Report, App. D at 41. Current Commissioners line up potential candidates they would like to run. Ex. C, Email from Joseph Nuci to Debbie Cox (Jan. 25, 2021).

9.      The City does not engage in voter intimidation tactics to discourage Latino residents from voting. Hernandez Declaration ¶ 5.

Plaintiffs' Response:

Disputed. During the 2020 primary elections, the ACLU of Kansas's nonpartisan voter protection hotline fielded several calls from community members complaining of a "large and seemingly unnecessary police presence in and around voting locations." Ex. D, Letter from Lauren Bonds of ACLU KS to Debbie Cox (Oct. 16, 2020). Despite being alerted to these complaints, the Dodge City police was allowed to continue patrolling voting locations in unmarked cars. Ex. E, Email from Debbie Cox to Glenn Kerbs, et al. (Oct. 15, 2020).

10.     The City does not operate or administer City Commission elections—Ford County does. Doc. 140, at 4, ¶ 30; Seibel Dep. 21:6-7, *attached hereto as* Exhibit F; De La Rosa Dep. 50:7-9, 80:16-24.

Plaintiffs' Response:

Disputed in part. While Ford County formally administers elections, the City plays a role in the administration and operation of the Commission elections. For example, Dodge City changed the Commission election schedule to November of odd-numbered years beginning in 2017. Pretrial Order, Doc. 140 at 4, ¶ 20. Dodge City also established the required number of

qualified electors' signatures for nominating petitions for the Dodge City Commission. *See* Ex. F, Dodge City Ordinance No. 3715 (May 20, 2019).

11.     Ford County determines the location of election polling locations in Dodge City. Doc 140, at 4 ¶ 30; Hernandez Dep. 147:9-12.

Plaintiffs' Response:

Disputed in part. While determining polling locations is part of Ford County's election administration role, the City has worked together with Ford County to determine polling locations in Dodge City. For example, the City worked closely with the County to ensure that the Hoover Pavilion would be made a permanent polling location after the 2018 election. Ex. G, City Commission Update (Jan. 6, 2019); Defs. Ex. E, Doc. 146-21, De La Rosa Dep. 78:19-79:5; Defs. Ex. B, Doc. 146-18, Hernandez Dep. 147:13-149:5.

12.     Dodge City respects the role and duties of the Ford County Clerk's Office and does not intervene in the County's administration of elections. Seibel Dep. 21:6-7, De La Rosa Dep. 60:20-23, 61:20-62:8, 64:7-11.

Plaintiffs' Response:

Disputed. Defendants' contention is vague, inferential, and not proven by the record. Defendants do not explain what it means for Dodge City to "respect[] the role and duties" of Ford County and to "not intervene" in Ford County's election administration. The cited testimony of Ms. Seibel does not address either of those assertions. The cited testimony of Mr. De La Rosa merely sets forth his particular opinion—without corroborating evidence—that the City was respectful of Ford County's role.

13.     The City shares election information received from the Ford County Clerk in both English and Spanish through its media platforms and encourages all members of the community to vote. De La Rosa Dep. 64:12-24, 65:22-66:9; *see* Election Flyers (combined exhibit), *attached hereto as* Exhibit A-3.

Plaintiffs' Response:

Disputed in part. The documents cited by Defendants only show that the City has taken some steps, such as posting flyers to social media, to provide information about polling locations and election day transportation. However, this evidence alone is insufficient to support the inference that the City "encourages all members of the community to vote."

14.     Since at least 2018, the City has provided free door-to-door rides for its residents to election polls for early voting and on election day. De La Rosa Dep. 60:20-61:2, 76:21-77:11, 78:14-18; Election Flyers.

Plaintiffs' Response:

Undisputed.

15.     The City helps Ford County translate election documents regarding polling location, dates, and logistical information into Spanish. De La Rosa Dep. 60:23-61:5.

Plaintiffs' Response:

Undisputed.

16.     The City offers its bilingual staff the opportunity to assist Ford County at the polls on election day without taking a vacation day and while being paid by the city. De La Rosa Dep. 94:4-23; Hernandez Dep. 220:18-221:8; June 19, 2020 email, *attached hereto as* Exhibit A-5.

Plaintiffs' Response:

Undisputed.

17.     City employees are encouraged to vote and are permitted to do so during work time on election day. De La Rosa Dep. 61:10-16.

Plaintiffs' Response:

Undisputed.

18.     The City Clerk makes available applications for City Commission candidates and voter registration forms in English and Spanish. Pogue Dep. 20:22-21:3, *attached hereto as* Exhibit G; De La Rosa Dep. 63:15-18.

Plaintiffs' Response:

Undisputed.

19.     The City works with Ford County to provide voter registration opportunities at citizenship naturalization ceremonies to encourage newly naturalized citizens to register to vote. De La Rosa Dep. 63:7-14.

Plaintiffs' Response:

Undisputed.

20.     No resident has told City Managers Nick Hernandez or Cherise Tieben that they have encountered issues figuring out how to vote in a Commission election. Hernandez Dep. 220:5-9; Tieben Dep. 46:15-19, *attached hereto as* Exhibit H.

Plaintiffs' Response:

Disputed. There is insufficient evidence to determine whether Mr. Hernandez or Ms.

Tieben in particular have ever been informed by a resident that they have encountered issues

figuring out how to vote in a Commission election. The record is clear, however, that the City has

received complaints from residents of issues they have encountered while trying to figure out how

to vote. In 2018, Dodge City voters were sent registration cards with erroneous information about

their polling location for the midterm election. Ex. H, *Voter Suppression in Minority Communities:*

*Learning from the Past to Protect Our Future Before the Comm. On Oversight and Reform*, 116th

Cong. 13 (2020). In 2018, the single polling location for Dodge City was moved to the Expo

Center, which was inaccessible by public transportation. Ex. A ¶ 111. The County and the City

received complaints from voters on the impact of this change. *Id*.; Ex. I, Complaint, Doc. 1,

*Rangel-Lopez v. Cox*, No. 2:18-cv-02572 (D. Kan. Oct. 26, 2018); Ex. H at 11-13.

## II.     Welcoming Initiatives for Latino Immigrants

21.     The City has participated in numerous initiatives to welcome Latino immigrants to the City and to encourage their civic involvement, such as: the Cultural Relations Advisory Board, the Welcoming Dodge City Strategic Plan, the International Festival, the New Americans Dinner, the Engage Dodge Program, and providing free public transportation to vote. The City

has also hosted United State Citizenship and Immigration Services (USCIS) Mobile Services, US Naturalization Ceremonies, Mexican Consulate Mobile Services, and Guatemalan Consulate Services. *See* Hernandez Declaration ¶ 8; Dodge City Civic Engagement Efforts, *attached hereto as* Exhibit A-4; *see* De La Rosa Dep. 161:19-162:5; Rangel-Lopez Dep. 111:23-112:2.

Plaintiffs' Response:

Disputed in part. It is not clear that these few programs are "numerous" for a city of Dodge City's size, or that they demonstrate that the City "welcome[s] Latino immigrants" or "encourage[s] their civic involvement."

22.     The City has been recognized as one that goes above and beyond to integrate immigrants into the community. De La Rosa Dep. 227:24-228:11.

Plaintiffs' Response:

Disputed. During his deposition, Mr. De La Rosa stated his opinion that the City goes above and beyond to integrate "citizens" into the community, not immigrants. Defs. Ex. E, Doc. 146-21, De La Rosa Dep. 227:24-228:11. In fact, former and current Commissioners have publicly taken anti-immigrant positions. Defs. Ex. C, Doc. 146-19, Rangel-Lopez Dep. 14:4-19. Dodge City police have also provided assistance to ICE for immigration raids by providing location information for specific Hispanic individuals. Ex. A ¶ 137; *see also* Defs. Ex. E, Doc. 146-21, De la Rosa Dep. at 196:15-198:4. Regardless, Defendants provide no corroborating information to assess whether Mr. De La Rosa's particular opinion on this issue is accurate. Moreover, Plaintiff Rangel-Lopez testified during his deposition that there were "two towns" within Dodge City. Defs. Ex. C, Doc. 146-19, Rangel-Lopez Dep. Tr. 85:15-86:4.

23.     The City developed a Cultural Relations Advisory Board, comprised of city and community volunteers, to advise the City Commission on matters related to or affecting communities of color. De La Rosa Dep. 161:19-162:5; Coca Dep. 38:22-25, *attached hereto as* Exhibit I; Rangel-Lopez Dep. 32:11-24; Strategic Plan, at 10, *attached hereto as* Exhibit A-6.

Plaintiffs' Response:

Undisputed.

24.     The Cultural Relations Advisory Board organizes events and community partnerships, including the International Festival. Rangel-Lopez Dep. 32:13-24.

Plaintiffs' Response:

Undisputed.

25.     The Board partnered with the Mexican Consulate to provide customer services and with Genesis Family Health to bring basic health services to the community. De La Rosa Dep. 161:19-162:5, 163:17-165:3.

Plaintiffs' Response:

Undisputed.

26.     In 2021, the Cultural Relations Advisory Board developed a Strategic Plan for Welcoming and Integration ("Strategic Plan") to help welcome and integrate newcomers into Dodge City community and civic life. De La Rosa Dep. 162:15-18, 166:1-5; Rangel-Lopez Dep. 111:23-112:2; *see generally* Strategic Plan.

Plaintiffs' Response:

Undisputed.

27.     The Strategic Plan focuses on the five pillars of: (1) equitable access to community life, (2) civic engagement, (3) refugee and immigrant integration, (4) safe and health community, and (5) economic opportunity and education. Strategic Plan, at 3-4.

Plaintiffs' Response:

Undisputed.

28.     The City implemented the Engage Dodge Program, where residents can learn what city services are available, what programs the city offers, and get to meet city employees. Rangel-Lopez Dep. 105:13-24; *see* https://www.dodgecity.org/1016/Engage-Dodge.

Plaintiffs' Response:

Undisputed.

29.     The Engage Dodge Program provides civic engagement education for newcomers or the general public. Sessions in the Program discuss elections, the City Commission, and the City Manager's Office. The Program includes Spanish-speaking groups and translation services. De La Rosa Dep. 68:21-69:25; Dodge City Civic Engagement Efforts, at 2.

Plaintiffs' Response:

    Undisputed.

### III.    2011 Department of Justice Inquiry of Ford County

    30.    On June 20, 2011, the U.S. Department of Justice ("DOJ"), Civil Rights Division sought information on elections from Ford County. Seibel Dep. 80:21-81:4; June 2011 DOJ Letter, *attached hereto as* Exhibit A-10.

Plaintiffs' Response:

    Disputed in part. DOJ requested information from Ford County on elections in the City of

Dodge City, Kansas. Defs. Ex. A-10, Doc. 146-11, Letter from DOJ Civil Rights Division to Ford

County Clerk Sharon Seibel (June 29, 2011).

    31.    On October 20, 2011, the DOJ advised then-Ford County Clerk Sharon Seibel of the newly promulgated bilingual election requirements under Section 203 of the Voting Rights Act. October 2011 DOJ Letter, *attached hereto as* Exhibit A-11.

Plaintiffs' Response:

    Undisputed.

    32.    The DOJ never subpoenaed or otherwise requested documents from the City of Dodge City. Hernandez Dep. 136:23-137:7, 138:2-11, 142:3-9.

Plaintiffs' Response:

    Undisputed.

    33.    The DOJ never made any findings of wrongdoing by Dodge City, and the matter was closed without any action required or recommended by the City of Dodge City. Seibel Dep. 111:8-25.

Plaintiffs' Response:

    Disputed. Defendants provide no evidence—in the cited deposition testimony or

otherwise—for their assertion that DOJ never made any findings of wrongdoing by Dodge City or

closed the matter.

IV.     **Commissioner Scoggins's 2019 inquiry**

34.     On February 25, 2019, Jan Scoggins emailed then-City Manager Cherise Tieben and asked her to add to the Commission agenda a request to consider a combination of districts and at-large seats for City Commission elections. She indicated the request was coming from a "community group," but she did not identify that community group. De La Rosa Dep. 142:14-143:15; Jan Scoggins Email, *attached hereto as* Exhibit A-7.

Plaintiffs' Response:

Undisputed.

35.     City Manager Tieben asked Commissioner Scoggins to raise the request during Commission reports at the next Commission meeting, and she encouraged the community group to attend and bring the issue forth during the visitors' section of the meeting. *See* Jan Scoggins Email.

Plaintiffs' Response:

Disputed. Defendants misrepresent the contents of Jan Scoggins's email. City Manager

Tieben did not ask Commissioner Scoggins to raise at the next Commission meeting the request

by a community group to consider a combination of districts and at-large seats for City

Commission elections. Ex. AA, Email from Jan Scoggins to Cherise Tieben (Feb. 25, 2019).

Instead, Tieben said she was "going to make an assumption and you can correct me if I'm wrong"

that Commissioner Scoggins wanted to request the Commission to direct staff to explore districts

and term limits for the Commission. *Id*. Tieben further stated, "If that is the case, you could simply

make that request of the Commission at the end of the meeting during Commission reports." *Id*.

Tieben also did not "encourage" the community group to bring the issue forth during the visitors'

section. Instead, she said, "if the community group is wishing to attend, they can bring the issue

forward in the Visitors Section[.]" *Id*.

36.     On March 4, 2019, at Commissioner Jan Scoggins's request during a City Commission meeting, the Commission directed City staff to gather information for further discussion about a change to Commission elections to have three Commissioners elected by districts and two elected at large, and to consider term limits. Hernandez Dep. 127:4-128:4; March 4, 2019 Meeting Minutes, *attached hereto as* Exhibit A-8.

Plaintiffs' Response:

      Undisputed.

37.      Neither Ms. Scoggins's email nor the Commission minutes indicate the reason Commissioner Scoggins desired to investigate a possible change. *See* Jan Scoggins Email and March 4, 2019 Meeting Minutes.

Plaintiffs' Response:

      Undisputed.

38.      No community members spoke at the Commission meeting. Hernandez Dep. 128:20-22.; March 4, 2019 Meeting Minutes.

Plaintiffs' Response:

      Undisputed.

39.      On April 15, 2019, at a City Commission meeting, the Commissioners received a report from City Attorney Brad Ralph regarding the matter of moving from at-large elections to a combination of districts and at-large positions. April 15, 2019 Meeting Minutes, *attached hereto as* Exhibit A-9.

Plaintiffs' Response:

      Undisputed.

40.      A majority of the commissioners did not request further investigation of the matter, so the Commission took no additional action. The minutes do not reflect the reasoning behind any Commissioners' position. *See* April 15, 2019 Meeting Minutes; Hernandez Dep. 234:25-236:6.

Plaintiffs' Response:

      Disputed in part. A majority of the Commissioners did not request further investigation of

the matter. Additionally, Brian Delzeit and Joyce Warshaw affirmatively said they were opposed

to staff continuing to look into the issue of at-large election systems, without providing any

reasoning behind this stance. Defs. Ex. A-9, Doc. 146-10, City Commission Meeting Minutes at 2

(April 15, 2019). However, Ms. Scoggins affirmatively requested that the staff continue to look

into the issue, *id.*, and it is reasonable to infer that she did so because she determined that it merited consideration.

**V.      The Commission is responsive to Dodge City citizens.**

41.      Other than March 19, 2019, and April 15, 2019, no City Commission minutes indicate that the issue of at-large versus district elections has been raised with the Commission or by any commissioner. Hernandez Dep. 81:10-25; Tieben Dep. 71:17-24.

Plaintiffs' Response:

Disputed in part. While only the March 19, 2019, and April 15, 2019 Commission meeting minutes produced in this case dealt with the issue of at-large elections, concerns about the inequity of the City's at-large election system were brought to the attention of City officials and Commissioners at least as early as 2011, when the DOJ initiated an investigation into whether Dodge City's at-large system for Commission elections violates the anti-dilution provision of Section 2 of the VRA. *See* Defs. Ex. A-10, Doc. 146-11, Letter from DOJ Civil Rights Division to Ford County Clerk Sharon Seibel (June 29, 2011); Ex. J, Letter from Sharon Seibel to Ford County Commissioners (July 13, 2011). After Ford County was contacted by DOJ in connection with the investigation, Ford County retained an external consultant, Mr. Adelson, to conduct an analysis of Dodge City's Section 2 liabilities. Ex. J; Ex. K, Invoice for Services of Federal Compliance Consulting LLC (Dec. 21, 2011). Former Ford County clerk Sharon Seibel testified in her deposition that she and the consultant Mr. Adelson met with then-Dodge City mayor Defendant Rick Sowers, along with two Dodge City employees, Nanette Pogue and Cherise Tieben, to discuss the Section 2 analysis. Defs. Ex. F, Doc. 146-22, Seibel Dep. 65:12-67:4, 74:22-75:23. She recalled the consultant expressing during this meeting "that there could be a potential problem," Defs. Ex. F, Doc. 146-22, Seibel Dep. 66:5-11, and that Dodge City should move to single-member districts "to avoid problems down the road," Defs. Ex. F, Doc. 146-22, Seibel Dep. 74:22-75:23. The

consultant Mr. Adelson wrote a letter to the Ford County clerk concluding that Dodge City "seem[ed] to possess the initial criteria that may indicate a VRA Section 2 violation" and recommended that "the Dodge City Commission engage in a self-assessment" of Section 2 liability. *See* Ex. L, Letter from Bruce Adelson to Sharon Seibel at 2, 4 (Aug. 26, 2011).

42. There has been no protest and no petitions presented to the City Commission requesting a change to at-large elections. Hernandez Dep. 24:1-25; 126:9-127:2.

Plaintiffs' Response:

Disputed. There is insufficient evidence in the record to conclude that no "protests" or "petitions" have been presented, in part because those terms are ambiguous. For example, as previously discussed, at a public meeting in 2019, residents from south Dodge City raised concerns regarding Dodge City's use of at-large elections. Ex. A ¶ 107. Mayor Brian Delzeit and Commissioner Jan Scoggins were present. *Id*. In response to this meeting, the City Commission held discussions regarding changing the electoral system. Ex. A ¶ 108. Additionally, on March 4, 2019, at Commissioner Jan Scoggins's request during a City Commission meeting, the Commission directed City staff to gather information for further discussion about a change to Commission elections to have three Commissioners elected by single-member districts and two elected at-large. Defs. Ex. B, Doc. 146-18, Hernandez Dep. 127:4-128:4; Defs. Ex. A-8, Doc. 146-9, City Commission Meeting Minutes at 3 (Mar. 4, 2019).

43. At-large elections have not been an election issue in City Commission races. Hernandez Declaration ¶ 13.

Plaintiffs' Response:

Disputed. Defendants do not explain how they are defining the term "election issue," nor is there any record of the election issues from any City Commission race. There is no evidence to indicate that at-large elections have not been an election issue for City Commission races. In fact,

the evidence shows that citizens of Dodge City have had concerns about the difficulties that at-large elections created for Hispanics running for office and have indicated that they would prefer the City Commission elections to be a district-based system. Ex. AA; Ex. A ¶ 107.

44.     There have been no significant efforts by the public to ask the City to change the form of government. Hernandez Dep. 81:10-25; Rangel-Lopez Dep. 54:6-20.

Plaintiffs' Response:

Disputed. Defendants provide no explanation for what would constitute "significant efforts" by the public. Regardless, members of the Dodge City community raised the issue of changing the form of government from at-large to district-based with their City Commissioner, Jan Scoggins, and the City Mayor Brian Delzeit. Ex. AA; Ex. A ¶ 107. As a representative, Ms. Scoggins then raised the issue at a Commission meeting. Ex. AA; Defs. Ex. A-8, Doc. 146-9, City Commission Meeting Minutes at 3 (Mar. 4, 2019). Furthermore, at the same public meeting attended by Ms. Scoggins and Mr. Delzeit, residents from south Dodge City raised issues they found with the at-large election system, but explained that they felt that running for City commission to fix it would be a waste of time, as they would inevitably lose to residents from north Dodge City. Ex. A ¶ 107.

45.     Plaintiffs are not aware of any widespread community movement in Dodge City to change the method of electing Commissioners, and they are not aware of any community groups that have called for a change in the way Commissioners are elected. Rangel-Lopez Dep. 54:6-20; Hernandez Dep. 81:10-25.

Plaintiffs' Response:

Disputed. Defendants provide no explanation of what would constitute "widespread community movement" to change the method of electing Commissioners. Alejandro Rangel-Lopez worked with community group New Frontiers on a report on at-large methods of election that was presented in a 2021 town hall meeting, attended by then-City Manager Ernestor De La

Rosa and approximately 50 to 60 community members. Defs. Ex. C, Doc. 146-19, Rangel-Lopez

Dep. 55:3-57:1; 76:9-81:14.

46.     Prior to filing this lawsuit, neither Plaintiff asked the City to change the method of electing City Commissioners. Coca Dep. 23:11-19; Rangel-Lopez Dep. 54:22-56:4.

Plaintiffs' Response:

        Undisputed.

47.     Plaintiff Rangel-Lopez interned for the City Manager's office in 2022, and, in doing so, he worked with the City Manager and City Commission. Rangel-Lopez Dep. 26:25-3; 29:16-30:5; 43:4-11.

Plaintiffs' Response:

        Undisputed.

48.     Rangel-Lopez was planning to sue the City about at-large elections while he was an intern, but he did not speak to the City Manager or any City staff about the idea of moving to district elections. Rangel-Lopez Dep. 66:22-67:16.

Plaintiffs' Response:

        Disputed. During his deposition, Mr. Rangel-Lopez stated that litigation is "always

something that is an option in . . . this field of work." Defs. Ex. C, Doc. 146-19, Rangel-Lopez

Dep. 66:11-67:3. Mr. Rangel-Lopez did not raise the idea of moving to district-based elections to

the City Manager or the Commission. However, Mr. Rangel-Lopez met with the Dodge City

Cultural Relations Advisory Board in 2021 to discuss his concerns with the at-large voting system.

Defs. Ex. C, Doc. 146-19, Rangel-Lopez Dep. 55:5-15. The Cultural Relations Advisory Board

was created and established by the City and acts as an advisor to the "[g]overning [b]ody of the

City of Dodge City." Ex. M, Dodge City Resolution No. 2023-15 (April, 17, 2023). During his

deposition, Mr. Hernandez called it an "arm of the City." Defs. Ex. B, Doc. 146-18, Hernandez

Dep. 159:25-160:3.

49.     Prior to filing this lawsuit, no interest groups asked the City to change the method of electing City Commissioners. Hernandez Dep. 81:10-25; Rangel-Lopez Dep. 54:6-20.

Plaintiffs' Response:

Disputed. There is insufficient evidence to determine whether any interest groups had asked the City to change the method of electing City Commissioners. Mr. Rangel-Lopez does not speak for the City. Mr. Hernandez does speak for the City, but merely stated that whether to maintain the at-large election system has "only been discussed at one point," when Commissioner Scoggins raised it in 2019. Defs. Ex. B, Doc. 146-18, Hernandez Dep. 81:10-25.

50.     The Plaintiffs did not make any effort to change the form of government in Dodge City through the democratic process. Coca Dep. 23:11-19; Rangel-Lopez Dep. 54:22-56:4.

Plaintiffs' Response:

Disputed. As the record shows, Plaintiffs made multiple attempts to change the form of government in Dodge City through the democratic process. Mr. Rangel-Lopez met with the Dodge City Cultural Relations Advisory Board to discuss his concerns with the at-large voting system. Defs. Ex. C, Doc. 146-19, Rangel-Lopez Dep. 55:5-15. Mr. Rangel-Lopez also assisted in presenting a report that revealed the disparate impact of at-large voting on the Hispanic community in Dodge City during a 2021 town hall, at which members of the City government were present, including Mr. De La Rosa. Defs. Ex. C, Doc. 146-19, Rangel-Lopez Dep. 55:3-57:1. Mr. Rangel-Lopez also discussed his concerns about at-large voting with former Commissioners Scoggins and Soto. Defs. Ex. C, Doc. 146-19, Rangel-Lopez Dep. 58:2-22.

51.     No members of the current City Commission have voted for or against the current form of government at any City Commission meeting. Hernandez Dep. 82:2-4.

Plaintiffs' Response:

Disputed. After then-Commissioner Scoggins proposed changing the method of election at a 2019 Commission meeting, a majority of the Commission (which included current

Commissioners Rick Sowers and Kent Smoll) voted not to further consider the proposal. Defs. Ex. A-8, Doc. 146-9, City Commission Meeting Minutes at 3 (Mar. 4, 2019); Defs. Ex. A-9, Doc. 146-10, City Commission Meeting Minutes at 2 (Apr. 15, 2019).

52.     Following the filing of this lawsuit, the City consulted with trusted leaders in the Dodge City Latino community regarding the at-large city council election system. The feedback the City received was that the Latino leaders believed the at-large system united Dodge City, and they did not see a need to change to district-based elections. Hernandez Dep. 23:17-25:11, 26:1-5.

Plaintiffs' Response:

Disputed. Defendants have provided no specifics about meetings with anyone in the Dodge City Latino community regarding the at-large city council election system and rely on self-serving statements by City Manager Nick Hernandez that reflect his opinions. Further, Mr. Hernandez testified in his deposition that the City did not explain to anyone in the Hispanic community the issues presented by the at-large method of election, or why Plaintiffs are challenging that system. Defs. Ex. B, Doc. 146-18, Hernandez Dep. 28:19-29:18.

**VI.     Relevant Election and Precinct Information**

53.     The percentage of Latino voters by Precinct in Dodge City Commission Elections from 2014 to 2021, as set forth in Table 1, Dr. Katz Expert Report at 4 (Defendants' Exhibit J).

Plaintiffs' Response:

Undisputed.

54.     The results for the 2021 Dodge City Commission General Election, as set forth in Defendants' Exhibit A-12.

Plaintiffs' Response:

Undisputed.

55.     The results for the 2017 Dodge City Commission General Election, as set forth in Defendants' Exhibit A-13.

Plaintiffs' Response:

> Undisputed.

56.     The results for the 2014 Dodge City Commission General Election, as set forth in Defendants' Exhibit A-14.

Plaintiffs' Response:

> Undisputed.

57.     The results for the 2006 Dodge City Commission Primary Election, as set forth in Defendants' Exhibit A-15.

Plaintiffs' Response:

> Undisputed.

58.     The results for the 2000 Dodge City Commission General Election, as set forth in Defendants' Exhibit A-16.

Plaintiffs' Response:

> Undisputed.

59.     While Mr. Coca stated during his deposition that Liliana Zuniga and Blanca Soto were the preferred candidates of Latinos, Coca Dep. 42:5-10, he had no colorable basis for why that was the case. For instance, for Ms. Zuniga, Mr. Coca's basis for saying that she was the preferred candidate was "her interaction with the community." Coca Dep. 42:16-43:6.

Plaintiffs' Response:

> Disputed. Mr. Coca stated that Ms. Zuniga was a Hispanic-preferred candidate because she
>
> interacts with the *Hispanic* community. Defs. Ex. I, Doc. 146-25, Coca Dep. 42:16-19.

60.     However, when pressed about Ms. Zuniga, Mr. Coca knew nothing about who actually voted for Ms. Zuniga, how Ms. Zuniga had run her campaign, what issues Ms. Zuniga campaigned on, how Ms. Zuniga fared in any of Dodge City's precincts, or even whether he had voted for Ms. Zuniga. Coca Dep. 43:7-22.

Plaintiffs' Response:

> Undisputed.

61.     As for Ms. Soto, Mr. Coca confirmed that she campaigned as a Latino candidate, but he admitted that he was unaware of any "data," "documents," or "evidence" that would confirm whether Ms. Soto was indeed the candidate of choice. Coca Dep. 29:3-31-10.

Plaintiffs' Response:

    Undisputed.

62.     Regarding bloc voting, Mr. Coca admitted that, other than how the election ended up, he had no "evidence" of it. Coca Dep. 20:13-24.

Plaintiffs' Response:

    Undisputed.

63.     Defendants have filed a motion to exclude the testimony of Dr. Matt Barreto, the plaintiffs' sole expert on *Gingles* factors II and III. *See generally* Doc. 144.

Plaintiffs' Response:

    Defendants' statement is not a material fact at issue in the litigation.

## PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

1.     Hispanic voters in Dodge City are cohesive and vote for candidates of choice by roughly a 2-to-1 margin or greater. Ex. B ¶¶ 31, 52.

2.     White voters usually vote as a bloc against Latino candidates of choice, with rates as high as 85% opposition. Ex. B ¶¶ 34, 53. "White voters demonstrate bloc-voting against Latino-preferred candidates across every single exogenous election analyzed[.]" Ex. B ¶ 53.

3.     Dr. Barreto's homogenous precinct analysis for thirteen recent endogenous and exogenous elections shows "obvious" evidence of racially polarized voting, with Hispanic-preferred candidates performing well in the heavily Hispanic Precinct 3, but very poorly in the heavily white Precincts 5 and 6. Ex. B ¶¶ 35-44.

4.     Dr. Barreto's ecological inference models for 24 recent exogenous and endogenous elections "show that Latinos vote cohesively, for like candidates of choice," and that Hispanic-

preferred candidates "typically receive very low rates of support from white voters, who effectively bloc[k] these candidates from winning office in the at-large voting system." Ex. B ¶¶ 46-47, App. A.

5.      Liliana Zuniga and Blanca Soto were Hispanic-preferred candidates based on their presence at Hispanic events, campaigning in Hispanic neighborhoods, and overall "interaction with the community." Defs. Ex. I, Doc. 146-25, Coca Dep. 28:3-29:18; 42:5-43:6.

6.      The Strategic Plan for Welcoming and Integration failed to take into account issues raised by stakeholders who work with the Hispanic community, including the impact of the Commission's at-large election system on civic engagement in the Hispanic community, which was raised at a meeting of the Cultural Relations Advisory Board's steering committee in 2021. Defs. Ex. C, Doc. 146-19, Rangel-Lopez Dep. 35:9-36:11, 44:16-53:20.

7.      "[T]here is little clear official city documentation explaining the overall impact of the Cultural Relations Advisory Board on quelling the racial tension in Dodge City." *See* Ex. A ¶ 131.

8.      The Bilingual Engage Dodge program began in fall 2022. Ex. N, Welcoming Plan Implementation Report at 3 (May 18, 2023).

9.      The Strategic Plan for Welcoming and Integration was completed in February 2022. Ex. N at 1.

10.     According to a document titled "City of Dodge City Civic Engagement Efforts," the City has shared all social media posts in both English and Spanish only since 2022. Ex. O, City of Dodge City Civic Engagement Efforts at 5.

11.     The Cultural Relations Advisory Board began hosting the New Americans dinner in 2021. Ex. P, Email thread between Ernestor De La Rosa and Nick Hernandez (May 28, 2021).

12.     In 1998, Dodge City's seven polling locations were consolidated into just one location, which served more than ten times the number of voters compared to the average polling site in Kansas. Ex. A ¶ 110. In 2018, the single polling site was moved miles outside of the City's limits, without community input. Ex. A ¶ 111; Ex. H; Ex. W, Email and Attachments from Abbey Martin to Melissa McCoy and Brad Ralph (Oct. 31, 2018); Ex. Q, Open Letter from the Dodge City Mayor (Oct. 23, 2018); Ex. X, Email thread between Ray Petty and Cherise Tieben (Oct. 27-Nov. 5, 2018).

13.     Free transportation to election polling locations began in 2018 after the polling location was moved to the Expo Center. Ex. Q; Ex. N at 4. The move to the Expo Center caused voter access concerns in the community and led to a lawsuit filed against the Ford County Clerk. Ex. A ¶¶ 111-112.

14.     Ford County is required to provide all election materials in both English and Spanish under Section 203 of the Voting Rights Act. Ex. R, Voting Rights Act Amendments of 2006, Determinations Under Section 203, 81 Fed. Reg. 87532 (Dec. 5, 2016).

15.     After Ford County was contacted by DOJ in June 2011 to request certain election information regarding Dodge City, *see* Defs. SOF ¶ 30, Ford County Clerk Sharon Seibel spoke with DOJ attorney Catherine Meza, who confirmed that DOJ had requested the election data because it was "conducting research under Section 2 of the Voting Rights Act" pertaining to "dilution of minority populations in voting precincts." Ex. J.

16.     Shortly thereafter, in 2011, Ford County retained a former employee of the DOJ's Voting Rights Division, Bruce Adelson of Federal Compliance Consulting LLC ("FCC"), as an external consultant to conduct an analysis of Dodge City's Section 2 liabilities. Ex. J; Ex. K.

17.     Ms. Seibel and Mr. Adelson agreed that Dodge City officials should be "involved in the conversation" regarding the Section 2 analysis. Ex. S, Email thread between Bruce Adelson and Sharon Seibel (July 11-Sept. 26, 2011).

18.     In August 2011, Mr. Adelson wrote a letter addressed to Ms. Seibel concluding that Dodge City "seem[ed] to possess the initial criteria that may indicate a VRA Section 2 violation[,]" Ex. L at 2, and recommending that "the Dodge City Commission engage in a self-assessment" of its Section 2 liability. Ex. L at 4. Ms. Seibel testified that she was "sure" she would have shared the letter with Dodge City officials. Defs. Ex. F, Doc. 146-22, Seibel Dep. 69:4-7.

19.     Ms. Seibel testified that in 2011, she and Mr. Adelson met with then-Dodge City mayor Defendant Rick Sowers, along with two Dodge City employees, Cherise Tieben and Nanette Pogue, to discuss FCC's Section 2 analysis. Defs. Ex. F, Doc. 146-22, Seibel Dep. 65-67, 75. Ms. Seibel recalled that Mr. Adelson stated during this meeting "that there could be a potential problem," *id*. 66:5-11, and that Dodge City should move to single-member districts "to avoid problems down the road," *id*. 74:22-75:23.

20.     In December 2011, FCC invoiced Ford County for work in November 2011 that included, among other things, a "teleconference with Dodge City officials." Ex. K.

21.     In November 2018, aware that a group was planning to attend a Dodge City Commission meeting to "discuss the possibility of districting instead of at-large elections," then-City Manager Cherise Tieben instructed her staff to research the "pros and cons" of changing the election system. Ex. T, Email and attachment from Cherise Tieben to City Commissioners (Nov. 5, 2018); Defs. Ex. G, Doc. 146-23, Pogue Dep. 13:2-15, 52:7-23.

22.     In 2019, at a public meeting attended by then-Mayor Brian Delzeit and then-Commissioner Jan Scoggins, residents from south Dodge City voiced their concerns regarding at-

large elections, in part because they made it difficult for candidates from south Dodge to win elections. Ex. A ¶ 107; Ex. AA.

23.     On March 5, 2019, the day after Commissioner Jan Scoggins raised changing the election system at a March 4, 2019 Commission meeting and staff was directed to research the issue, *see* Defs. SOF ¶ 36, Ms. Pogue forwarded legal research she received from the League of Kansas Municipalities in February 2019 to City Attorney, Brad Ralph. Ex. U, Email from Nanette Pogue to Brad Ralph (Mar. 5, 2019). The research concluded that the second and third prongs of *Gingles* would "likely be met" in Dodge City. *Id*.

24.     On March 13, 2019, City Clerk Nanette Pogue shared an "Election Information" report with Ms. Tieben based on her review of the City's ordinances and the research from the League of Kansas Municipalities indicating that the second and third prongs of *Gingles* would "likely be met" in Dodge City. Defs. Ex. G, Doc. 146-23, Pogue Dep. 54:13-55:19, 64:16-25; Ex. V, Email and Attachment from Nanette Pogue to Cherise Tieben (Mar. 13, 2019).

25.     On April 15, 2019, a majority of the Commission (which included current Commissioners Rick Sowers and Kent Smoll) briefly discussed Commissioner Scoggin's proposal to consider changing the at-large election system and voted not to further consider the proposal. Defs. Ex. A-9, Doc. 146-10, City Commission Meeting Minutes at 2 (Apr. 15, 2019).

26.     In 2021, City Manager Ernestor De La Rosa attended a town hall webinar at which Roxana Arjon (a Dodge City employee) and Alejandro Rangel-Lopez (a former Dodge City intern) presented a report detailing the history of and harms caused by at-large election systems in southwest Kansas. Defs. Ex. C, Doc. 146-19, Rangel-Lopez Dep. 56:10-57:1.

27.     The City's only stated basis for maintaining the at-large election system is to avoid "division." Defs. Ex. B, Doc. 146-18, Hernandez Dep. 208:3-17.

## LEGAL STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). "The moving party bears the initial burden of showing an absence of any genuine issue of material fact[,]" *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1261 (D. Kan. 2003), *aff'd*, 145 F. App'x 238 (10th Cir. 2005), and the Court must view the record in a light most favorable to the non-moving party. *See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir. 1991). The Court may not weigh the evidence or make credibility determinations at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If there is sufficient evidence upon which a reasonable fact-finder could find for Plaintiffs, then Defendants' motion for summary judgment must fail. *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993) (citing *Anderson*, 477 U.S. at 248).

## ARGUMENT

Summary judgment is rarely appropriate in voting rights cases, the resolution of which requires fact-intensive analyses. *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. Of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015) ("Summary judgment in [Section 2] cases presents particular challenges due to the fact-driven nature of the legal tests required by the Supreme Court and our precedent."); *Nipper v. Smith*, 39 F.3d 1494, 1498 (11th Cir. 1994) ("Voting rights cases are inherently fact-intensive, particularly those section 2 vote dilution claims alleging that, due to the operation of a challenged voting scheme, minority voters are denied an equal opportunity to participate in the political process and to elect representatives of their choice."); *see also Thornburg v. Gingles*, 478 U.S. 30, 45 (1986) (explaining that Congress intended that the Section

25

2 results test "depends upon a searching practical evaluation of the 'past and present reality,' and on a 'functional' view of the political process"). Trial courts have a "special vantage point" in Section 2 vote dilution cases, which involve an "intensely local appraisal" of all the relevant facts and resolution of "complex questions of fact and law." *Ga. NAACP*, 775 F.3d at 1343, 1349. "[T]he ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *Sanchez v. State of Colo.*, 97 F.3d 1303, 1311 (10th Cir. 1996) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994)). The record here includes more than enough evidence upon which a reasonable fact-finder could find for Plaintiffs on each of their claims.

I.   **Defendants Are Not Entitled To Summary Judgment On The Section 2 Claim.**

A.   **Defendants' Motion For Summary Judgment On The Section 2 Claim Fails Because Their Motion To Exclude Dr. Barreto Fails.**

Defendants do not contest that Plaintiffs have made a sufficient showing to satisfy *Gingles* I (whether the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district) or the totality of the circumstances inquiry. Rather, Defendants' motion on the Section 2 claim is solely focused on *Gingles* II (political cohesion of the minority group) and *Gingles* III (bloc voting of the white majority), and is primarily premised on the success of the motion Defendants concurrently filed to exclude the testimony of Plaintiffs' expert Dr. Matt Barreto, who opined on *Gingles* II and III. *See* Doc. 146 at 13.

Dr. Barreto's testimony must be permitted because his ecological inference and homogenous precinct analyses of voting patterns in Dodge City are methodologically sound.[2] In fact, using court-approved techniques, Dr. Barreto found "a strong and consistent pattern of

---

[2] *See* Plaintiffs' Opposition to Defendants' Motion to Exclude Expert Witness Matt Barreto, Ph.D., filed concurrently with this brief.

racially polarized voting" in Dodge City in which Hispanic voters are "cohesive in their support for Latino-preferred candidates" and "non-Hispanic whites consistently bloc vote against Latino candidates of choice." Ex. B ¶ 12. Given that Defendants' Section 2 motion hinges entirely on the success of their motion to exclude, the instant motion must also be denied.

### B. Defendants' Interpretation Of The Dodge City Commission Election Results Is Incomplete And Flawed.

In his expert report, Dr. Barreto showed racially polarized voting in Dodge City in two ways. As one method, he conducted ecological inference analysis ("EI") to determine how Hispanic voters and white voters in Dodge City voted in 24 recent elections. As a second method, he conducted a homogenous precinct analysis ("HPA") to determine how Hispanic-preferred and white-preferred candidates perform in the most heavily-Hispanic and most heavily-white precincts in Dodge City. These approaches are the two most widely-accepted ways to assess racially polarized voting in a jurisdiction, Pls. Opp'n to Defs. Mot. to Exclude Expert Witness Matt Barreto, Ph.D., Sections I.a-b, and both showed consistent evidence of racially polarized voting in Dodge City, Ex. B ¶¶ 35-44, ¶¶ 45-54.

In their motion, Defendants opt for neither approach. They completely ignore all of Dr. Barreto's detailed EI findings, never putting forth any argument about how the voting patterns of Hispanics in Dodge City compare to those of white residents in Dodge City. Their motion, based solely on precinct-level results, contains no affirmative evidence about how any white citizens or any Hispanic citizens voted. Instead, they appear to attempt some form of an HPA in support of their motion, but they run into two problems. First, their HPA-style analysis is not methodologically sound. Rather than focusing on the most homogenous precincts in Dodge City, which is the methodologically sound way to do this analysis, *see* Ex. B ¶ 35, they rely on an approach proffered by no expert, which includes many other precincts, in a transparent effort to

cherry-pick the data. Second, their HPA-style analysis, if anything, demonstrates clear evidence of racially polarized voting.

Defendants first claim that there cannot be racially polarized voting in the 2021 City Commission elections because "the three precincts with the greatest percentage of Latino voters" —Precincts 1, 2 and 3—"had three different winners." Doc. 146 at 18, 21. But that framing is highly misleading because Defendants include Precinct 1, which has a Hispanic citizen voting age population ("HCVAP") of just 39.1%—over 20 percentage points less than Precinct 3 (59.9% HCVAP) and 15 percentage points less than Precinct 2 (54.5% HCVAP). Defs. Ex. J, Doc. 146-26, Dr. Katz Expert Report at 4. Precinct 1 is not majority-HCVAP, is far less homogenous for Hispanic voters, and is, demographically speaking, extremely different from Precinct 3, such that one should potentially expect different results in the two precincts in the event of racially polarized voting.

If anything, Defendants' analysis of the 2021 City Commission elections bolsters Dr. Barreto's analysis. In Precinct 3, Dodge City's most heavily Hispanic precinct, the Hispanic-preferred candidates Dr. Barreto identified, Blanca Soto and Jan Scoggins, received only a few votes less than the first- and second-place finishers. Defs. Ex. A-12, Doc. 146-13, 2021 Election Results. In Precinct 3, Soto's and Scoggins's margins of defeat behind the first-place finisher were just 5% and 7.5%, respectively. *See* Defs. Ex. A-12, Doc. 146-13, 2021 Election Results. Yet, in Precinct 1, a more heavily white precinct, both candidates had a margin of defeat behind the first-place finisher of 39.8%. *See id*. Even more strikingly, in the heavily white Precinct 6, Soto's and Scoggins's margins of defeat behind the first-place finisher were 49.5% and 45.8%, respectively. In this way, Hispanic candidates of choice Soto and Scoggins performed relatively strongly in the heavily-Hispanic Precinct 3, worse in the less-Hispanic Precinct 1, and much worse in the even-

less-Hispanic Precinct 6—a pattern indicative of racially polarized voting. Defendants also fail to rebut Dr. Barreto's (1) ecological inference figures showing that Scoggins and Soto were preferred among Hispanics but lost because of poor support with white voters, *see* Ex. B at App. A at 23, and (2) targeted homogenous precinct analysis, which shows that unsuccessful Hispanic-preferred candidates did very poorly in the two most-heavily white precincts (Precincts 5 and 6), but that all three elected candidates performed very well in those two precincts, *see id.* ¶¶ 37-39 & tbl.4. Compounding their error, Defendants argue that the Hispanic-preferred candidates Soto and Scoggins finished, at best, third in "the three precincts with the greatest percentage of Latino voters", and therefore that those candidates cannot be Hispanic-preferred. *See* Doc. 146 at 18. But Defendants ignore that those candidates' best showing, by far, was in Precinct 3—the most-heavily Hispanic precinct and thus the one that Dr. Barreto concluded was most probative for HPA, Ex. B ¶ 36.

Defendants make the same mistakes in analyzing the 2017 Commission elections. This time, they conveniently discuss disparate outcomes across the *four* most-heavily Hispanic precincts. They neglect to note that Precincts 2 and 3 both had a 45% HCVAP in 2017, while Precinct 1 had just a 30.1% HCVAP and Precinct 4 had a 27.8% HCVAP. As explained above, Defendants' analysis is not probative because Precincts 1 and 4 in 2017 were neither homogenous, heavily-Hispanic, nor demographically similar to Precincts 2 and 3. In any event, as it did for the 2021 elections, Defendants' analysis only proves Plaintiffs' point. Defendants acknowledge that Zuniga, the Hispanic-preferred candidate, "took second in Precinct 3 (which had the highest percentage of Hispanic voters at just 45.4%)," and that she did relatively worse in Precincts 1 and 4, which had significantly lower HCVAP figures. Doc. 146 at 19. Those precinct results also show that Zuniga performed her best in Precinct 3, her next-best in Precincts 1, 2, and 4—the three next-

highest HCVAP precincts behind Precinct 3, as Defendants note—and her worst in the remaining precincts, where the Hispanic population share was lowest. Defs. Ex. A-13, Doc. 146-14, 2017 Election Results. Again, the Hispanic-preferred candidate did best in the most heavily Hispanic precinct, and did progressively worse in precincts with lower concentrations of Hispanics. As with 2021, this is a perfect illustration of racially polarized voting. Further, as they did for the 2021 results, Defendants ignore Dr. Barreto's (1) ecological inference analysis showing how Hispanics and whites voted starkly differently in the 2017 elections, *see* Ex. B at App. A at 24, (2) analysis showing that the top white-preferred candidate won election in 2017 despite being the second-least preferred candidate among Hispanics, *see id.* ¶ 50, and (3) analysis showing that two candidates that received high Hispanic support lost because they had "very low support from white voters," *id.*

Defendants concede that the Hispanic-preferred candidate Zuniga was the top vote-getter in the two precincts with the highest share of Hispanic voters in the 2014 City Commission elections, but claim that those results are "without any practical significance and/or probative value" due to the tight clustering of votes. Doc. 146 at 19-20. Defendants cannot simultaneously assert that it is inconsequential that in 2014 the Hispanic-preferred candidates Zuniga and Scoggins each won the heavily Hispanic Precinct 3 by a margin of ten votes over the next-place finisher and also hang their hat on the 2021 elections in which Nuci, who is not a Hispanic-preferred candidate, won Precinct 3 by a much tighter margin of two votes. *See* Doc. 146 at 9, 18, 20. In any event, here too, Dr. Barreto's (1) ecological inference analysis shows that Hispanics overwhelmingly voted for Zuniga but that lack of white support cost her the election, *see* Ex. B at App. A at 25, (2) homogeneous precinct analysis shows that "Zuniga finished in *first place*" in the most heavily Hispanic precincts, Precincts 2 and 3, but that "in the two most heavily white voting precincts,

Precincts 5 and 6, Zuniga landed in a distant fifth place," *id.* ¶ 41, and (3) homogeneous precinct analysis shows that the white-preferred candidate won election by finishing top in the two whitest precincts (Precincts 5 and 6) despite finishing with very low support in the most heavily-Hispanic precincts, Precincts 2 and 3, *see id.*

Finally, Defendants do not even mention the 2019 Dodge City Commission elections, in which the top candidate among Hispanics "was the last place vote getter among whites" and lost. *Id.* ¶ 49, App. A at 24. Rather than engage with this evidence of Hispanic cohesion and white bloc voting, Defendants simply ignore it. The summary judgment burden requires far more.

### C. There Is Other Relevant Evidence Of Minority Political Cohesion And White Bloc Voting.

The results of other elections and lay witness testimony also show Hispanic political cohesion and white bloc voting.

Courts have repeatedly recognized that election results for positions that are not exclusively representative of the particular jurisdiction at issue, but overlap with or include it (exogenous elections), have probative value for racially polarized voting analysis in Section 2 cases. *See, e.g.,* *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021 (8th Cir. 2006) ("Although they are not as probative as endogenous elections, exogenous elections hold some probative value."); *United States v. Blaine County, Mont.*, 363 F.3d 897, 912 (9th Cir. 2004) (concluding that it was appropriate for the district court to "examin[e] exogenous elections to supplement its analysis of racially cohesive voting patterns in the at-large county commission elections").

Defendants ignore clear evidence of racial polarization based on recent citywide elections that include the same electorate as Dodge City Commission elections. *See, e.g.,* Ex. B ¶ 40 (2021 USD 443 School Board election where Hispanic candidate "would have been elected if only the heavily-Latino precincts were considered," but lost because she "received her lowest vote totals in

31

the highest density white precincts"); *id.* App. A at 24 (2019 Dodge City Community College election where Hispanic-preferred candidate lost election due to low support from white voters).

County- and state-level election results are also relevant to determining whether racially polarized voting exists because they may help to corroborate and bring into focus patterns seen in local elections. Dr. Barreto found "consistent patterns of Latino cohesion" in county, statewide, and federal elections, with the EI models reporting an average cohesion score of 75.6% for Hispanic-preferred candidates. Ex. B ¶ 52. Meanwhile, "[w]hite voters demonstrate bloc-voting against Latino-preferred candidates across every single exogenous election analyzed for state legislature, Ford County offices, and statewide elections." *Id.* ¶ 53. Dr. Barreto's HPA bears this out as well, with stark differences between the heavily-Hispanic Precinct 3 and the heavily-white Precinct 6 across all of the many recent exogenous election results available. *Id.* ¶¶ 42-44 & tbl.5 & figs. 2-4. As Dr. Barreto explained, the Election Law Clinic at Harvard Law School's analysis of the 2016-2020 Ford County elections as part of its "RPV Near Me Project" corroborated his finding of statistically significant racially polarized voting. *See* Ex. B ¶ 12. Defendants do not contest the stark evidence of racial polarization in county, statewide, and federal elections outlined in Dr. Barreto's report.

In a footnote, Defendants criticize Plaintiffs for only analyzing elections from 2014 to present. Doc. 146 at 17 n.3. But courts regularly consider the most recent elections to be the most relevant. *See, e.g., Nipper*, 39 F.3d at 1537-38; *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995) ("Though past elections may be probative of racially polarized voting, they become less so as environmental change occurs. In particular, elections that provide insights into past history are less probative than those that mirror the current political reality.").

The Tenth Circuit has found that lay witness testimony is also relevant to racially polarized voting analysis. *Sanchez v. Bond*, 875 F.2d 1488, 1493–94 (10th Cir. 1989) ("The experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive."). Even Defendants' own expert Dr. Jonathan Katz acknowledged that "history" and "local knowledge" can supplement election results in establishing voting patterns. Ex. Y, Dr. Katz Dep. 50:2-18. Plaintiff Coca testified that he believed Liliana Zuniga and Blanca Soto were Hispanic-preferred candidates based on their presence at Hispanic events, campaigning in Hispanic neighborhoods, and overall "interaction with the community." Plaintiffs' Statement of Additional Facts ("SOF") ¶ 5 (Defs. Ex. I, Doc. 146-25, Coca Dep. 28:3-29:18; 42:5-43:6).

The Tenth Circuit has concluded that *Gingles* "instructs us to look for the theme of racial polarization and the extent to which that polarization robs the minority of meaningful access to the political process." *Sanchez*, 97 F.3d at 1321. As the record demonstrates, a factual dispute exists as to whether there is a theme of racial polarization in Dodge City that robs Hispanic voters of access to the political process. Summary judgment therefore should be denied.

## II. Defendants Are Not Entitled To Summary Judgment On The So-Called "Section 1983 Claim."

Plaintiffs do not have a Section 1983 claim, *contra* Doc. 146 at 24; they have a Section 2 claim for which Section 1983 provides an alternative cause of action. This Court has already twice rejected Defendants' argument that Section 1983 does not provide Plaintiffs with a cause of action to bring their Section 2 results claim, *see* Docs. 71, 118, calling Defendants' argument "somewhere on the spectrum between 'quite bold' and 'absurd.'" Doc. 118 at 6. Defendants have already "[i]mplicitly acknowledge[d] that no caselaw supports their position" on the Section 1983 issue.

*Id*. Because summary judgment is unwarranted on the second and third *Gingles* factors, *see supra* Section I, it is unwarranted for the same reasons here.

In a footnote, Defendants erroneously argue that, "[b]ased on the Pretrial Order, it appears that Plaintiffs have waived their § 1983 claim to the extent that it is based on section 2 of the VRA." Doc. 146 at 24 n.6. Defendants are wrong. It was not necessary to reference Section 1983 in the Pretrial Order because, as the Court previously held, Section 1983 is simply an alternative vehicle for asserting a Section 2 claim. Doc. 71 at 12. Plaintiffs have consistently pleaded their Section 1983 cause of action and defended it throughout the litigation. *See* Docs. 1, 30, 48, 86. Defendants have also waived their argument by relegating it to a footnote, because "the Tenth Circuit has repeatedly held that arguments 'raised in a perfunctory manner, such as in a footnote, are waived.'" *Madison, Inc. v. W. Plains Regional Hospital, LLC*, No. 17-1121-EFM-GLR, 2018 WL 928822, at *10 (D. Kan. Feb. 16, 2018) (Melgren, C.J.) (quoting *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002)); *see also, e.g.*, *United States v. Walker*, 918 F.3d 1134, 1153 (10th Cir. 2019) (same).

## III. Defendants Are Not Entitled To Summary Judgment On The Equal Protection Claim.

There is a triable issue of fact as to whether Dodge City maintained the at-large method of election with discriminatory intent in violation of the Fourteenth Amendment. Discriminatory intent claims "require a fact intensive examination of the record," making them unsuitable for disposal at the summary judgment stage. *See Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980) ("[Q]uestions of intent, which involve intangible factors including witness credibility, are matters for consideration of the fact finder after a full trial."); *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 983-84 (N.D. Fla. 2021) (denying summary judgment on Section 2, Fourteenth Amendment, and Fifteenth Amendment claims); *Hunt v. Cromartie*, 526 U.S. 541, 549

(1999) (holding that summary judgment was precluded because triable issues existed regarding whether state legislature drew congressional redistricting plan with an impermissible racial motive). Multiple times over the past 15 years, Dodge City was put on notice that the at-large method of election resulted in vote dilution. *See* SOF ¶¶ 15-26. Yet, the City persisted in maintaining its discriminatory system. This evidence of discriminatory intent precludes an award of summary judgment.

**A.  Defendants Were Put On Notice Of Unlawful Vote Dilution As Early As 2011.**

Under the *Arlington Heights* framework, knowledge of discriminatory impact constitutes evidence that race is a motivating factor in a challenged action. *Jean v. Nelson*, 711 F.2d 1455, 1485–86 (11th Cir. 1983). As described in the evidence cited at SOF ¶¶ 15-26, Dodge City has known since 2011 that its at-large system likely dilutes Hispanics' voting power in violation of federal law, yet it continues to maintain that system today. The consultant retained by the county met with then-Dodge City mayor Defendant Rick Sowers, along with two Dodge City employees, Nanette Pogue and Cherise Tieben, to discuss the Section 2 analysis and told them that "that there could be a potential problem," SOF ¶ 19 (Defs. Ex. F, Doc. 146-22, Seibel Dep. 66:5-11), and that Dodge City should move to single-member districts "to avoid problems down the road," *id*. (Defs. Ex. F, Doc. 146-22, Seibel Dep. 65:12-67:4; 74:22-75:23). The consultant then wrote a letter to the Ford County clerk concluding that Dodge City "seem[ed] to possess the initial criteria that may indicate a VRA Section 2 violation" and recommended that "the Dodge City Commission engage in a self-assessment" of Section 2 liability, which the Clerk testified she was "sure" she would have shared with Dodge City officials. SOF ¶ 18 (Ex. L at 2; Ex. F, Doc. 146-22, Seibel Dep. 69:4-7). Yet, there is no evidence that the City ever conducted an assessment of whether its at-large system violates federal law and, instead, it persisted with an at-large election system. Defs. SOF ¶ 4. Since then, the Hispanic population has only continued to grow, from 50.0% of the voting age

population in 2010 to 57.9% of the voting age population in 2020. *See* Ex. B at 5, tbl.2. The discriminatory effects of at-large voting, known as early as 2011, have only worsened.

Defendants—without support—view DOJ's decision not to bring a formal Section 2 action against Dodge City as indicative that DOJ concluded there was no violation. Doc. 146 at 26-27. This is an inferential leap to which Defendants are not entitled at summary judgment. *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) ("When applying [the summary judgment] standard, [the court] must view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."). DOJ could decline to bring an action for any number of reasons, including (frequently) cost. Indeed, in its Statement of Interest in this case, DOJ observed that "the achievement of the VRA's laudable goal to make the guarantees of the Fifteenth Amendment finally a reality for all citizens could be severely hampered if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General." Doc. 54 at 3-4. Here, Dodge City was on notice of vote dilution and took no steps towards evaluating whether to change its election system to preserve the voting rights of its residents. Dodge City's knowledge of the discriminatory impact of its at-large election system constitutes evidence that race was a motivating factor in maintaining the at-large system.

**B. The Commission Hastily Rejected A Proposal To Move To District-Based Elections In 2019.**

Just a few years ago, without providing any rationale for its decision, the Dodge City Commission quickly dismissed a request from a community group to consider moving to a district-based election system, despite staff research indicating that Dodge City met at least two of the *Gingles* preconditions for racial vote dilution. In March 2019, then-Commissioner Jan Scoggins brought the topic of adopting a district-based election system to a Commission meeting on behalf of a community group. Defs. SOF ¶¶ 34, 36; SOF ¶ 23. At this meeting, the Commission directed

City employees to obtain more information regarding transitioning to a district system. SOF ¶ 23 (Defs. Ex. A-8, City Commission Meeting Minutes at 3 (Mar. 4, 2019)). The next day, City employee Ms. Pogue forwarded legal research she received from the League of Kansas Municipalities in February 2019 to City Attorney Brad Ralph. SOF ¶ 23 (Ex. U). The research concluded that the second and third prongs of *Gingles* would "likely be met" in Dodge City. *Id.* Nevertheless, just over a month after Scoggins's proposal, the Commission formally voted not to give any further consideration to the issue of whether the City should adopt district-based elections. SOF ¶ 25 (Defs. Ex. A-9, Doc. 146-10, City Commission Meeting Minutes at 2 (Apr. 15, 2019)). The Commission's meeting minutes did not provide any rationale for the decision. SOF ¶ 25 (*Id.*).

In addition to supporting an inference of intentional discrimination, the City staff's and the Commission's (abridged) consideration of whether to transition to a district system at a minimum shows that there is a factual dispute about whether the Dodge City Commission is empowered to change the election system, or whether instead Ford County as administrator of elections has sole authority to do so.[3] Again, Dodge City's awareness of the discriminatory impact of its at-large election system, combined with the hasty decision to cease considering the transition to a district-based election system even as it knew it was potentially in violation of federal law, is evidence of intentional discrimination in violation of the Fourteenth Amendment.

### C. Plaintiffs Have Demonstrated Additional *Arlington Heights* Factors Supporting A Finding Of Intentional Discrimination.

In addition to the evidence described above showing Dodge City's knowledge that the at-large system dilutes the votes of Hispanics, there is further evidence that race is "a motivating

---

[3] Also relevant to this dispute is that Dodge City (not Ford County) enacted Charter Ordinance No. 7, which first adopted the at-large system of election for Dodge City Commissioners in 1971. *See* Defs. SOF ¶ 1. In addition, Dodge City admitted to having influence over matters regarding election administration such as opening additional polling locations. *See* Defs. Ex. B, Doc. 146-18, Hernandez Dep. 147:13-15.

factor" in the operation of the dilutive at-large method of election under the *Arlington Heights* framework. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The *Arlington Heights* factors include: (1) "impact," i.e., whether the challenged activity "bears more heavily on one race than another," (2) "historical background of the decision," (3) "the specific sequence of events leading up to the challenged decision," (4) "departures from the normal procedural sequence," (5) "legislative or administrative history[,]" (6) "foreseeability of discriminatory impact," (7) "knowledge of discriminatory impact," and (8) "the availability of less discriminatory alternatives[.]" *Jean*, 711 F.2d at 1485–86; *see also Rogers v. Lodge*, 458 U.S. 613, 616, 623, 625 (1982) (affirming a finding that, although an at-large election system was "racially neutral when adopted, it [was] maintained for invidious purposes" based on evidence that (1) Black residents constituted a substantial majority of the county's population, but were a distinct minority of the registered voters, (2) there had been bloc voting along racial lines, and (3) past discrimination had restricted the present opportunity of Blacks to participate effectively in the political process).

The discriminatory impact of the at-large system is clear: Hispanics make up nearly two-thirds of the total population and nearly half of the citizen voting-age population in Dodge City, and yet there have been just two Hispanic Commissioners elected over at least the last 25 years. *See* Ex. A ¶¶ 84-86. The report of Plaintiffs' expert Dr. Christina Bejarano catalogues extensively the negative effects of this lack of representation, including a lack of responsiveness to the particularized needs of the Hispanic community in areas such as voter access, health, and discrimination, *id.* ¶¶ 98-138, and stark inequalities between the Hispanic and non-Hispanic residents of Dodge City across a wide array of socio-demographic measures including income and poverty, educational attainment, housing, and health indicators, *id.* ¶¶ 44-74. None of the City's

civic engagement programs, most of which only came into being in the last 5 years, negate these inequities. *See* SOF ¶¶ 8-11, 13. Nor do the City's recent measures to provide access to the polls (following a 2018 lawsuit regarding inequitable access), SOF ¶¶ 12-13, or Spanish-language election information resolve these fundamental disparities.

The discriminatory impact of the at-large election system on the Hispanic community in Dodge City was foreseeable. While at-large methods of election are not *per se* dilutive, they were historically implemented in cities across the U.S. as a tool to suppress the voting power of minorities and the working class. Ex. Z, Dr. Martinez's Expert Report ¶ 8.04. Dodge City officials were aware of this history; a report detailing the harms of at-large voting in southwest Kansas was presented at a town hall attended by then-City Manager Ernestor De La Rosa in 2021. SOF ¶ 26 (Defs. Ex. C, Doc. 146-19, Rangel-Lopez Dep. 56:10-57:1). The prevailing political science literature also indicates that where the Hispanic population is large and residentially segregated—as it is in Dodge City—Hispanics have better representation in single-member districts than in at-large districts. Ex. A ¶ 30. Dodge City was alerted to the dilutive nature of its at-large method of election at least as early as 2011. SOF ¶¶ 15-20. Notwithstanding the 60% increase in the Hispanic population between 2000 and 2020 and the readily available alternative of district-based elections, Dodge City left its 50-year-old election system intact. The City's only stated basis for maintaining this system is to avoid "division." SOF ¶ 27 (Defs. Ex. B, Doc. 146-18, Hernandez Dep. 208:3-17).

The decision to maintain the status quo must be viewed in the context of a history of discrimination against Hispanics and other racial minorities in Dodge City that has hindered Hispanics' ability to integrate into the City's political system. *See* Ex. A ¶ 74. Until the passage of the 1964 Civil Rights Act, Hispanics were denied access to public accommodations in Dodge City

and the sale of houses in certain areas to Hispanics was prohibited by racially restrictive covenants. Ex. Z ¶¶ 3.22; 3.24-3.29. In 1998, the number of election polling locations in Dodge City was reduced to just one, serving more than ten times the number of voters than the average polling site in Kansas. SOF ¶ 12 (Ex. A ¶ 110). In 2018, the single polling site was moved more than a mile outside of the City's limits, without community input. SOF ¶ 12 (*Id*. ¶ 111; Ex. H at 11-13). And finally, less discriminatory alternatives are available; namely, moving from at-large to single-member districts, which would improve Hispanic representation.

Dodge City's decision to stand by the at-large election system while knowing its dilutive impact on Hispanic voters demonstrates that race is a motivating factor in maintaining the at-large system, in violation of the Fourteenth Amendment.

## CONCLUSION

The Court should deny Defendants' motion for summary judgment.

Dated: October 13, 2023

Respectfully submitted,

By: */s/ Sharon Brett*

Chad W. Dunn*
Sonni Waknin*
Bernadette Reyes*
**UCLA VOTING RIGHTS PROJECT**
3250 Public Affairs Building
Los Angeles, CA 90065
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org
310-400-6019

Jonathan Topaz*
Sophia Lin Lakin*
**AMERICAN CIVIL LIBERTIES
UNION, INC.**
125 Broad Street, 18th Floor
New York, NY 10004
jtopaz@aclu.org
slakin@aclu.org
212-549-2500

Scott Fuqua*
**FUQUA LAW & POLICY, P.C.**
P.O. Box 32015
Santa Fe, NM 87594
scott@fuqualawpolicy.com
505-982-0961

Sharon Brett KS 28696
Kunyu Ching KS 29807
**AMERICAN CIVIL LIBERTIES UNION
OF KANSAS**
10561 Barkley Street
Suite 500
Overland Park, KS 66212
sbrett@aclukansas.org
kching@aclukansas.org
913-490-4100

Abena Mainoo*
Jonathan I. Blackman*
JD Colavecchio*
Mijin Kang*
Elizabeth R. Baggott*
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
One Liberty Plaza
New York, NY 10006
amainoo@cgsh.com
jblackman@cgsh.com
jdcolavecchio@cgsh.com
mkang@cgsh.com
ebaggott@cgsh.com
212-225-2000

*Attorneys for Plaintiffs*

* Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

Pursuant to D. Kans. Loc. R. 5.1(f), I hereby certify that on this 13th day of October

2023, a true and correct copy of the foregoing was served via the United State District Court's

CM/ECF system on all parties or persons requiring notice, including upon attorneys for

defendants:

FOULSTON SIEFKIN LLP
Anthony F. Rupp, KS #11590
Tara Eberline, KS #22576
Sarah E. Stula, KS #27156
7500 College Boulevard, Suite 1400
Overland Park, Kansas 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com
sstula@foulston.com

FOULSTON SIEFKIN, LLP
Clayton Kaiser, KS #24066
1551 North Waterfront Parkway, Suite 100
Wichita, Kansas 67206
(316) 267-6371
(316) 267-6345 (fax)
ckaiser@foulston.com

By: */s/ Sharon Brett*
Sharon Brett KS 28696
**AMERICAN CIVIL LIBERTIES
UNION OF KANSAS**
10561 Barkley Street
Suite 500
Overland Park, KS 66212
sbrett@aclukansas.org
913-490-4100