# EXHIBIT L

# Federal Compliance Consulting LLC
## 11808 Becket Street
## Potomac, Maryland 20854
## 301-762-5272
## 240-536-9192 fax

Bruce L. Adelson
CEO/Attorney at Law
badelson1@comcast.net

Licensed in:
DC, MD, MI, VA

August 26, 2011

Sharon Seibel
Ford County Clerk and Election Officer
100 Gunsmoke, 4th Floor
Government Center
Dodge City, KS 67801

Dear Ms. Seibel:

    For your information, this letter addresses potential liability issues for Dodge City pursuant to Section 2 of the Voting Rights Act (VRA). The opinion contained in this letter reflects expertise obtained during my career with the United States Department of Justice (DOJ), Civil Rights Division, Voting Section.

    As you indicated, DOJ recently requested election returns and geographic data to conduct a Section 2 compliance analysis of Dodge City. DOJ will use this data to determine whether the City Commission's at-large method of election violates Section 2 of the VRA.

    In my experience, DOJ will use this data to complete an analysis of whether Dodge voters vote primarily on the basis of race. If they do so vote, the next inquiry concerns whether these voting patterns effectively prohibit minority voters from participating equally in the electoral process. If DOJ determines that the electoral structure for the City Commission violates the VRA, DOJ will seek a remedy, either via Consent Decree or contested litigation, which normally involves eliminating the at-large structure and constructing smaller election districts.

    The Dodge City Commission can avoid expensive and protracted litigation, however, if it attempts to address the issue that attracted DOJ, namely, the City's burgeoning Hispanic population and the lack of Hispanic representation on the Commission.

    According to the 2000 Census, Dodge City is approximately 42.9% Hispanic. However, Dodge City has not recently elected a Hispanic or other minority to the City Commission. It is

1

the combination of the City's at-large method of election and high minority population percentage that raise the red flags for DOJ investigations.

Unfortunately, Dodge seems to possess the initial criteria that may indicate a VRA Section 2 violation. Nonetheless, DOJ must complete a Section 2 investigation that not only includes the requested political and geographic data, but also community essentials, such as prominent minority leaders, former minority candidates, and historical information.

In determining whether Section 2 has been violated, courts conduct a "comprehensive, not limited, canvassing of relevant facts."[1] Under Section 2, challenged voting practices are not per se illegal; instead "[t]hose challenging an electoral device must prove that... the device 'result[s] in unequal access to the electoral process.'"[2] Moreover, the allegedly dilutive voting practice and the lack of proportional representation for the minority community, are not alone sufficient to make out a violation of Section 2.

The U.S. Supreme Court established the framework for vote dilution claims under Section 2 in *Thornburg v. Gingles,* 478 U.S. 30 (1986), which continues to serve as the seminal case for Section 2 determinations. The *Gingles* Court established certain preconditions, which are as follows:

    1. the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district,

    2. the minority group must be able to show that it is politically cohesive, and

    3. the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, such as the minority candidate running unopposed . . . usually to defeat the minority's preferred candidate.[3]

In assessing whether an election method, such as at-large elections, potentially violates Section 2, local officials should first inquire whether minority voters in the affected area have the potential to elect representative of their choice should the challenged system be replaced by an alternative, such as a single member district plan. As the *Gingles* Court explained:

---

[1] Thornburg v. Gingles. 478 U.S. 30, 48 (1986).

[2] Id. at 48 n. 14 (citations and internal quotations omitted). Johnson v. De Grandy, 512 U.S. 997, 1011 (1994). Brooks. 158 F.3d at 1238 (quoting Gingles. 478 U.S. at *46}.* Gingles. 478 U.S. at 46.

[3] *Gingles*, 478 U.S. at 50-51.

2

The reason that a minority group making [a vote dilution] challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the <u>potential</u> to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. . .. Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure. Id.

Once a determination is made regarding whether the minority population could constitute a majority in a single member district, officials must determine whether the minority group is politically cohesive and whether white voters generally vote as a bloc to preclude the minority's candidate of choice. The basis for such a finding results from a studied and thorough analysis of election returns, candidate information, and voting patterns over at least a ten year period.

If successful in satisfying the three *Gingles* preconditions, courts are then required to consider the totality of the circumstances and to determine, based upon an evaluation of past and present election and voting reality, whether the political process is equally open to minority voters. In *Gingles*, the Supreme Court adopted several factors that the U.S. Senate Judiciary Committee suggested should be considered in determining the totality of circumstances analysis, among them:

1. the history of voting-related discrimination in the State or political subdivision;

2. the extent to which voting in the elections of the State or political subdivision is racially polarized;

3. the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

4. the exclusion of members of the minority group from candidate slating processes;

5. the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

6. the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

DODGE_CITY_0004131

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

8. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. [4]

Anyone challenging the current method of election, however, is not limited to proving the matters referred to as the Senate factors, which include demonstrating a history of discrimination in housing and education, racial appeals and lack of access to the slating process, but can demonstrate circumstances beyond those factors.

While we have not yet conducted our own investigation, we assume, at this point, that with a more than 42% Hispanic population, Dodge City's Hispanic community could comprise a majority in at least one single member district. If this is the case, the first of the three *Gingles* preconditions could easily be satisfied and lead to the studied examination of the remaining two *Gingles* prongs. It is difficult to establish the application of the remaining two preconditions to Dodge City without an analysis of election returns, voter registration, and other data. Nonetheless, should DOJ's review of the requested data prove the existence of the remaining *Gingles* preconditions, DOJ would be well on its way to finding that the current configuration of the City Commission violates Section 2 of the VRA. Moreover, should DOJ find any combination of the Senate factors to apply to Dodge City, it could also maintain that the City Commission's at-large method of electing discriminates against minority voters.

In sum, it is our recommendation that the Dodge City Commission engage in a self-assessment of its possible Section 2 liability. Ignoring the reality of the City's changing demographics and the looming DOJ investigation, could invite potential litigation plus substantial cost and liability on a matter that could be addressed without DOJ intervention.

Please feel free to contact us if you wish any additional information.

Sincerely,

Bruce L. Adelson

---

[4] *Gingles*, 478 U.S. at 44-45.

DODGE_CITY_0004132