IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ, | ) ) ) |
| Plaintiffs, | ) ) Case No. 6:22-cv-01274-EFM-RES |
| vs. | ) ) ) |
| CITY OF DODGE CITY, *et al.* | ) ) ) |
| Defendants. | ) ) ) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR SUMMARY JUDGMENT MOTION**

Plaintiffs fail to raise a genuine issue of material fact on any of their remaining claims. Accordingly, Defendants motion should be granted and judgment entered in their favor.

**I.   Plaintiffs' Response to Defendants' Statement of Facts**

Many facts Plaintiffs purport to controvert are not actually controverted either by Plaintiffs' written response or by the record itself and should thus be deemed admitted: SOF ¶¶ 2, 5, 7, 8, 9, 10, 11, 12, 13, 20, 21, 22, 30, 33, 35, 40, 41, 42, 43, 44, 45, 48, 49, 50, 51, 52, 59, 63. *See* Local Rule 56.1. For example, Plaintiffs lodge arguments, draw inferences, and allege additional facts to color their arguments and inferences, but they fail to controvert material facts stated by Defendants. *See, e.g.,* SOF ¶¶ 7, 30, 40. Plaintiffs fail to dispute facts with record citations that establish a real dispute. *See, e.g.,* SOF ¶¶ 5, 10, 52. Some facts are disputed without any record citation. *See, e.g.,* SOF ¶¶ 2, 13; *see also* Local Rule 56. And they claim to controvert stipulated facts in the Pretrial Order, which is impermissible. *See, e.g.,* SOF ¶¶ 10, 11.

Plaintiffs also fail to controvert Defendants' facts by citing to the Complaint in this case, a complaint in a different case, and hearsay. *See, e.g.,* SOF ¶¶ 7, 20, 22, 44. Such sources are inadmissible and cannot support summary judgment. *See* Fed. R. Civ. P. 56(c)(1) and (e)(2); *see*

*also Conoco Inc. v. J.M. Huber Corp.*, 148 F. Supp. 2d 1157, 1166 (D. Kan. 2001). Plaintiffs repeatedly cite inadmissible hearsay sources contained in Pls. Ex. A, Dr. Christina Bejarano's Report. *See, e.g.,* Doc. 151-2, ¶ 107, ¶ 111, ¶ 137. They also allege facts that simply aren't true, such as that Lawrence has moved to district-based elections when that has not happened yet and may never happen based on how voters vote in an upcoming election. *See* SOF ¶ 5.[1]

**II.     Defendants' Response to Plaintiffs' Statement of Additional Facts**

1.     Controverted. Plaintiffs cite opinion testimony from an expert report that is conclusory and unreliable. Defendants incorporate their Memorandum in Support of Motion to Exclude Expert Witness Matt Barreto ("*Daubert* Motion") (Doc. 144). *See City of Chanute v. Williams Nat. Gas*, 743 F. Supp. 1437, 1454 (D. Kan. 1990). There is no evidence to support Plaintiffs' allegations, as explained in the *Daubert* Motion and illustrated by defense expert Dr. Katz. *See* Doc. 144-2, Katz Report at 2, 7-10. Plaintiff Rangel-Lopez also agreed in his deposition that "not all Latino voters prefer the same candidates at the polls[.]" Doc. 146-19 at 11:22. Dodge City voters may vote for up to three commissioner candidates. *See* Hernandez Supplemental Declaration § 3, *attached hereto as* Exhibit K.

2.     Controverted. Defendants incorporate their response to PSOF ¶ 1 here.

3.     Controverted. Defendants incorporate their response to PSOF ¶ 1 here.

4.     Controverted. Defendants incorporate their response to PSOF ¶ 1 here.

5.     Controverted. Defendants incorporate their response to PSOF ¶ 1 here. The evidence Plaintiffs cite, based on one Plaintiffs' subjective observations, does not establish that either is a Hispanic-preferred candidate. Plaintiff Coca testified that he is not aware of any evidence that would support which candidates are considered Latino preferred. Doc. 146-25 at 31:6-10.

---

[1] For a discussion on this point, *see* https://lawrencekstimes.com/2023/02/16/lawrence-form-city-government-vote/.

6. Controverted. The evidence Plaintiffs cite does not support the allegations in PSOF ¶ 6. There is no record evidence that any Latino organization argued for the inclusion of at-large elections in the Strategic Plan. Plaintiff Rangel-Lopez testified that he raised the topic of at-large elections at a Steering Committee brainstorming session for "at least a five-minute discussion." Doc. 146-19 at 37:20-39:6; 49:11-13. No other Committee member, besides Rangel-Lopez, proposed changing to at-large elections. *Id.* at 59:9-12; 51:6-11. And there is no evidence that any other Committee member asked to include at-large elections in the Strategic Plan.

7. Controverted. Plaintiffs cite opinion testimony from Dr. Bejarano's report, which makes a conclusory and unsupported allegation that the overall impact of the Cultural Relations Board is not documented. Her allegation is opinion, not evidence. *See Chanute*, 743 F. Supp. at 1454.

8. Controverted. The evidence cited does not establish that the Bilingual Engage Dodge Program began in fall 2022, just that it was held in fall 2022. *See* Doc. 151-15 at 3.

9. Uncontroverted but immaterial.

10. Uncontroverted but immaterial.

11. Uncontroverted but immaterial.

12. Controverted in part. Defendants admit that Ford County moved the polling location in 2018 due to potential construction at the prior site. Doc 151-18. The evidence Plaintiffs cite does not establish that the move was racially motivated or done without community input. Defendants object that Doc. 151-2 at ¶¶ 110-111, citing to allegations from a complaint in a different lawsuit, and Doc. 151-9, a U.S. Congressional Report, are inadmissible and immaterial.

13. Controverted in part. Defendants admit that the City has provided free transportation to election polling locations since 2018. The evidence Plaintiffs cite does not establish that the polling location move in 2018 caused voter access concerns. Defendants incorporate their objection to Doc. 151-2 in response to PSOF ¶ 12 here.

14. Uncontroverted but immaterial.

15. Uncontroverted but immaterial.

16. Controverted in part. Defendants clarify that the record shows Mr. Adelson was retained by Ford County to conduct a Section 2 "investigation," not to analyze liabilities. Doc. 151-12.

17. Uncontroverted but immaterial.

18. Uncontroverted but immaterial.

19. Controverted in part. Ms. Seibel testified regarding the meeting with Dodge City officials and Mr. Adelson: "I don't remember exactly who all was there. I think the mayor at the time, which Dodge City's mayor changes every year, I think. I don't remember who that person was. And then there was Nannette Pogue and Cherise Tieben." Doc. 146-22, Seibel Dep. 65:18-22. Mr. Adelson's fears never came to fruition. *Id.* at 109:15-111:25.

20. Uncontroverted but immaterial.

21. Uncontroverted but immaterial.

22. Controverted. Defendants object that Doc. 151-2 at ¶ 107, which repeats hearsay found in a report by Plaintiff Rangel-Lopez, is inadmissible. The referenced City Commission meeting minutes do not support the allegations in PSOF ¶ 22. *See* Doc. 146-9.

23. Uncontroverted but immaterial. A "law student extern[]" did the research. Doc. 151-22.

24. Uncontroverted but immaterial. Nannette Pogue is not an attorney and the Election Document does not contain her legal analysis. Doc. 146-23, Pogue Dep. 79:5-80:10; *see* Doc. 151-22 and 151-23.

25. Controverted in part. There is no evidence that Scoggins submitted a proposal about the election system or the Commission voted not to consider one. Instead, Scoggins "asked the City Commission to direct staff to look at changing the elections in Dodge City[.]" Doc. 146-9 at 2.

26. Controverted in part. Assistant City Manager De La Rosa attended a zoom webinar where a report about at-large elections in Southwest Kansas, edited by Plaintiff Rangel-Lopez for the non-profit Loud Light, was discussed. Doc. 146-21, De La Rosa Dep. 20:1-5; Doc. 146-19, Rangel-Lopez Dep. 56:10-57:1; 76:9-23; 78:10-17. Roxana Arjon served as City intern. Doc. 146-19 at 78:7-9. Defendants deny that the testimony Plaintiffs cite shows any harm caused by at-large election systems or that Arjon co-presented. *See* Doc. 146-19 at 78:7-9. The report discussed some advantages of at-large election systems. Doc. 146-19 at 88:4-92:19.

27. Controverted. Plaintiffs mischaracterize the City corporate representative's testimony and the question posed to him. The representative was not asked about the City's basis for maintaining the at-large election system, but about his "personal priorities" and "specific plans" and how to accomplish his goals. Doc. 146-18, Hernandez Dep. 206:8-208:17; *see* 23:17-25:11.

**III.     Summary judgment is warranted on Plaintiffs' section 2 claim.**

Plaintiffs argue that it would be improper to grant summary judgment on their section 2 claim because the analysis is just too "fact intensive." Doc. 151, at 25. That is not true. It has long been established that, when a plaintiff, as here, has failed to meet *Gingles*' preconditions,

5

summary judgment should be granted to avoid costly and time-consuming trials for claims on which the plaintiff cannot prevail. *See McNeil v. Springfield Park Dist.*, 851 F.2d 937, 943 (7th Cir. 1988) (collecting cases). Accordingly, the fact that Plaintiffs assert a section 2 claim, or that this case is to be tried to the bench, does not preclude summary judgment.

Here, the primary reason that summary judgment should be granted on Plaintiffs' section 2 claim is that Plaintiffs expert for *Gingles* factors 2 and 3, Dr. Matt Barreto, should be excluded because, as set forth in Dodge City's *Daubert* motion and supporting briefing, Dr. Barreto's opinions are not reliable. Without Dr. Barreto's opinions, Plaintiffs are left with only a hodge-podge of evidence that is insufficient to raise a material issue of fact as to whether Latinos in Dodge City are politically cohesive and whether Whites are engaging in racial bloc voting.

Starting with the unadorned election results for Dodge City Commission, Plaintiffs misconstrue Defendants' point in citing to them. Contrary to Plaintiffs' contention, Defendants' citation to these results was not an attempt to perform some type of HPA. Doc. 151, at 27. No, as Defendants' expert, Dr. Katz, points out, and is a fatal flaw in Dr. Barreto's opinions, such an analysis is improper in a case like this where there has never been anywhere near 90% Latino voters in any given precinct. Rather, Defendants' point in citing to these results was merely to rebut the notion that Plaintiffs had previously made that their so-called Latino-preferred candidates were the "top vote getters in high Latine population precincts, but lost in low Latine population precincts," Doc. 30, at ¶ 62, and to demonstrate how the unadorned election results fail to create any reasonable inference that Latino voters overwhelming vote one way and Whites vote another. Simply put, when Latinos do not make up the overwhelming majority of voters in any precinct, voters are permitted to vote for up to three candidates,[2] there are no exit polls, and

---

[2] If one were to examine the ballot of any voter in Dodge City of any ethnicity, one would not be able to determine that voter's preferred candidate with anything better than 33% accuracy. We know the voter prefers one

the so-called "candidate of choice" is not the clear favorite in the precincts that Plaintiffs have identified as being minority precincts or the clear loser in the precincts that Plaintiffs claim are White, there is no basis to find political cohesion or racial bloc voting, much less at the level necessary to sustain a finding that *Gingles* factors 2 and 3 are met. *See LULAC v. Abbott*, 604 F. Supp. 3d 463, 499 (W.D. Tex. 2022) (noting that even 51% is "far short of the large majority typically required to show political cohesion"). Plaintiffs offer no support to the contrary.

As for the fact that "Defendants d[id] not even mention the 2019 Dodge City Commission elections, Doc. 151, at 31, there is good reason: up until Plaintiffs' summary judgment response, Plaintiffs had never identified a Latino "candidate of choice" for that year. Beginning with the Amended Complaint, Plaintiffs contended only that there was a so-called Latino "candidate of choice" for 2000, 2006, 2014, 2017, and 2021. Doc. 30, at ¶ 62. In the Pretrial Order, Plaintiffs claimed only that there was a so-called Latino "candidate of choice" for 2014, 2017, and 2021. Doc. 140, at 7. Glaringly missing from both documents, and most importantly the Pretrial Order, is any mention of 2019. Plaintiffs are not allowed to raise a new theory now. *See Wagoner v. Pfizer, Inc.*, 2009 WL 10671278, at *4 (D. Kan. Jan. 21, 2009).

Regardless, the unadorned election results for 2019, like the results for 2021, 2017, and 2014, are unintelligible because Latinos do not make up the overwhelming majority of voters in any precinct, voters may vote for up to three commissioner candidates, there are no exit polls, and the so-called "candidate of choice" is not the clear favorite in Plaintiffs' Latino precincts or the clear loser in Plaintiffs' White precincts. *See* "Official General Election results for 11-05-

---

of three, but we don't know which one. Under these circumstances, to attempt to extrapolate the preferred candidate of an entire group of voters when we cannot get better than 33% accuracy on any one voter is rampant speculation.

2019," *available at* http://www.fordcounty.net/DocumentCenter/View/22724/Ford-County-Historical-Election-Results-for-website.[3]

As for Plaintiffs' "exogenous election" results, even Plaintiffs recognize that they are not of the same probative value as those for "endogenous elections." Doc. 151, at 31. Nevertheless, citing exclusively to Dr. Barreto's analysis of them, Plaintiffs claim that these results should be considered. They should not. As set forth in Defendants' *Daubert* motion, Dr. Barreto's exogenous election results are ill-suited in this context and should not be considered. Without Dr. Barreto, Plaintiffs are again left with the unadorned "exogenous election" results, which, like the "endogenous election" results, are not informative. Plaintiffs seem to suggest that there is a clearer divide between the "heavily Latino precincts" and "high density white precincts" in the 2021 USD 443 School Board Election, *id.* at 31-32, but this division is illusory. As the results show, for precincts 2 and 3, *i.e.*, the precincts with the highest percentage of Latino voters, the alleged Latino candidate of choice, Ms. Carmen Valverde, had the fourth highest combined vote count and was only 1 vote ahead of the fifth-place finisher and 3 votes ahead of the sixth-place finisher for those precincts. *See* "Official General Election results for 11-02-2021," at 13-18, *available at* http://www.fordcounty.net/DocumentCenter/View/22724/Ford-County-Historical-Election-Results-for-website. Thus, while it is technically true that Ms. Valverde would have won a seat "if only the heavily-Latino precincts were considered," as four seats were open, this fact has no practical significance because one more vote would not have made a difference.

With respect to the election years that Plaintiffs have settled on challenging, Defendants' reference to Plaintiffs' choice to ultimately ignore election years 2000 and 2006 was not to argue that Plaintiffs had not considered enough election cycles, as Plaintiffs charge, Doc. 151, at 32,

---

[3] Dr. Barreto specifically cited to the listed website and relied upon it for his stated opinions. (Doc. 151-3, at 3 n.3). The 2019 results were also produced during discovery and are attached. *See* 2019 Election Results, *attached hereto as* Exhibit K-2.

but rather to highlight a reoccurring theme in this case, which is that Plaintiffs' initial misgivings about Dodge City were not borne out in discovery. Plaintiffs brought this lawsuit based, at least in part, on the fact that four candidates with Latino-sounding names had not been elected to the Dodge City Commission over the last twenty years. Doc. 30, at 12. Plaintiffs apparently only used the candidates' names to determine that these candidates must have been the Latino preferred candidate. When no actual evidence to support their theory for 2000 and 2006 surfaced, Plaintiffs were forced to abandon it. While Plaintiffs have yet to do the same for 2021, 2017, and 2014, they should have, as there is insufficient evidence to show that, in those years, Latino voters had a "candidate of choice" and that Whites voted as a bloc to reject that candidate. Accordingly, the problem for Plaintiffs is not that they did not review enough elections, but, rather, that the evidence in this case does not support their contentions.

Finally, with regard to Mr. Coca's "lived experiences," they do not provide the missing link. As Defendants stated in their opening brief, and Plaintiffs are forced to concede in their response, Mr. Coca's testimony boils to the belief that Ms. Soto and Ms. Zuniga was the Latino "candidate of choice" based on their "interaction with the community." Doc. 151, at 33. Despite Defendants specifically pointing out that Mr. Coca admittedly knew nothing about who actually voted for Ms. Zuniga, how Ms. Zuniga had run her campaign, what issues Ms. Zuniga campaigned on, how Ms. Zuniga fared in any of Dodge City's precincts, or even whether he had voted for Ms. Zuniga, Plaintiffs have failed to provide any substantiation for Mr. Coca's naked assertion. Doc. 146-25 at 42:25-44:2. Likewise, Mr. Coca admitted that he was unaware of any "data," "documents," or "evidence" that would confirm Ms. Soto was indeed the candidate of choice. *Id*. at 31:6-10. Thus, the Court is left with Mr. Coca's bald assertion without supporting details. This is insufficient to permit Plaintiffs' section 2 claim to proceed to trial.

IV.     **Summary judgment is warranted on Plaintiffs' § 1983 claim.**

There is no viable § 1983 claim in this case for two reasons. First, Plaintiffs have waived the claim by not including it in the Pretrial Order. *See Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir.2002) ("[C]laims, issues, defenses, or theories of damages not in the pretrial order are waived even if they appeared in the complaint."). Plaintiffs' argument that the Court should nevertheless ignore its waiver because Defendants noted it in a footnote should be ignored because it places form over substance. Doc. 151, at 34. Arguments may be disregarded only when they are presented in a "perfunctory" manner. Here, the issue of waiver is simple and straightforward: the claim is not in the Pretrial Order and is thus waived. Nothing more needs to be said. Furthermore, whether Defendants raised the issue or not, the fact remains that Plaintiffs do not assert a § 1983 theory in the Pretrial Order. Therefore, there is no such claim remaining.

Second, there is no § 1983 claim because Plaintiffs cannot satisfy *Gingles* factors II and III. Plaintiffs do not contest that satisfaction of *Gingles* is also needed for a § 1983 claim. Thus, for the same reasons that Plaintiffs' section 2 claims fails, Plaintiffs' § 1983 claim also fails.

V.      **Summary judgment is warranted on Plaintiffs' Fourteenth Amendment claim.**

At this point, Plaintiffs concede that Dodge City did not adopt at-large voting in 1971 to suppress Latino voters. Doc. 151, at 2 ¶ 3. Rather, Plaintiffs claim that Defendants have violated Plaintiffs' Fourteenth Amendment rights by not adopting an electoral process that no group (including Latinos) has requested or any government agency has demanded, despite federal officials monitoring Dodge City elections since at least the early 2000s. Resp. to PSOAF 14. In short, Plaintiffs' Fourteenth Amendment claim is in search of a constitutional problem.

Plaintiffs are wrong that it is improper to grant summary judgment on a Fourteenth Amendment voting rights claim. *See, e.g.*, *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 368-

10

72 (6th Cir. 2002); *Turner v. State of Ark.*, 784 F. Supp. 553, 578 (E.D. Ark. 1991) (three judge panel). This makes sense because the Fourteenth Amendment does not magically grant a plaintiff a right to trial simply because they file a claim under it. A triable issue must still be shown, which means that a plaintiff must show that the relevant "decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite' of the law's differential treatment of a particular class or persons." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012) (alterations in original omitted). Plaintiffs have failed to do that here.

Plaintiffs contend that the following three things are "evidence of discriminatory intent" and show that Dodge City has known of the disparate impact of at-large voting on Latinos since at least 2011: (1) a 2011 letter from a voting rights consultant stating that Dodge City "seem[ed] to possess the initial criteria that may indicate a VRA Section 2 violation" and that Dodge City should engage in a self-assessment, *i.e.*, hire the consultant, to confirm compliance, Doc. 151, at 35-36, (2) Dodge City spent only one month looking into district-based elections in 2019 after one commissioner raised the issue, *id.* at 36-37, and (3) the alleged presence of a handful of the *Arlington Heights* factors, *id.* at 37-40. Plaintiffs' evidence does not measure up.

### 1. *Plaintiffs' evidence from 2011 shows nothing.*

Plaintiffs' claim that Dodge City has known for "15 years" that its at-large election process was unlawful hinges entirely upon a three-and-a-half letter that a consulting firm, Federal Compliance Consulting LLC, wrote to Ford County in 2011. This position is remarkable for a number of reasons. First, while the letter does say that Dodge City "seems to possess the initial criteria that may indicate a VRA Section 2 violation," Doc. 151-13, at 2, the author admitted that he had "not yet conducted [his] own investigation," *id.* at 4. The author went on to say that a determination on whether *Gingles* factors 2 and 3 could not be made "without an

analysis of election returns, voter registration, and other data," which the author obviously had not done. *Id*. After walking through the parade of horribles that could befall Dodge City, the consulting firm ended its letter by saying that Dodge City could avoid "its possible Section 2 liability" and "potential litigation plus substantial cost and liability on a matter that could be addressed without DOJ intervention" by simply hiring the consulting firm. Thus, the 2011 letter is far from actually asserting a researched and analyzed conclusion; rather, it appears more aptly characterized as a solicitation for work, which should be given no weight, especially as the author admits that he had "not yet conducted [his] own investigation." *Cf. Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 203 n.24 (1976) (explaining that warnings of the potentially vast impact of a bill by "legislative opponents[—]who [i]n their zeal to defeat a bill . . . understandably tend to overstate its reach"—should be "entitled to little weight").

Second, the fact that Dodge City did not take the consulting firm up on its offer is of no moment. The point in hiring the consulting firm would have been to stave off the parade of horribles of which the consulting firm had warned. In its letter, the firm outlined the following as the steps the DOJ would take after "request[ing] election returns and geographic data":

> In my experience, DOJ will use this data to complete an analysis of whether Dodge voters vote primarily on the basis of race. If they do so vote, the next inquiry concerns whether these voting patterns effectively prohibit minority voters from participating equally in the electoral process. If DOJ determines that the electoral structure for the City Commission violates the VRA, DOJ will seek a remedy, either via Consent Decree or contested litigation, which normally involves eliminating the at-large structure and constructing smaller election districts.

Doc. 151-13, at 1. As noted by Ms. Sharon Siebel, the recipient of the consultant's letter, what was warned of never came to fruition—in 2011, or in the intervening twelve years for that matter. Resp. to SOAF 19. In fact, there is no evidence that the DOJ took any follow-up measures after receiving Ford County's materials. Doc. 151, at 10 ¶32. Thus, while Plaintiffs want to quibble about whether or not the DOJ actually determined that no violation was present

based on its twelve-years of inaction, Doc. 151, at 36, the fact remains that, based on the very letter upon which Plaintiffs rely, there was no reason for Dodge City to believe that its decades-old form of voting was violative of any legal standard. Thus, there is no way for a reasonable factfinder to say that Dodge City knew that it was committing voting rights violations in 2011.

Third, even if the receipt of a warning of a possible problem—from a person that had admittedly not actually investigated the problem warned of and which the government regulator charged with addressing that problem never followed-up on after looking into it—could constitute knowledge of the alleged problem's actual existence (which seems dubious), Dodge City's actions in regard to the 2011 letter still are not evidence of discriminatory purpose. The reason for this is that "[d]iscriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Stated another way, even if "a discriminatory effect [is] a foreseen (or known) consequence of [government] action, . . . it does not run afoul of the Constitution unless it is an intended consequence of [government] action." *SECSYS*, 666 F.3d at 685. Here, there is nothing showing that Dodge City's refusal to continue to engage a paid consultant and maintain its decades-old practice was motivated by race. As a result, even if Plaintiffs' 2011 evidence showed knowledge of a violation (which it does not), it still would not be enough to deny summary judgment.

### 2. *Plaintiffs' 2019 evidence fares no better.*

According to Plaintiffs, two things happened in 2019 that show intentional discrimination: (1) the Commission "hastily rejected" the idea that Dodge City abandon its nearly-fifty year old system of voting after then-Commissioner Jan Scoggins raised the idea; and (2) the circulation of a five-paragraph email written by a "law student extern[]" for the League of Kansas Municipalities, *see* Doc. 151-22, at 2, that stated, without performing any real factual or

13

legal investigation, that *Gingles* factors 2 and 3 would "likely be met" in Dodge City. Doc. 151, at 36-37. Neither of these events can carry the weight Plaintiffs foist upon them.

Starting with Plaintiffs' "hastily rejected" claim, it is baseless. It is uncontroverted that, after then-Commissioner Scoggins requested that City staff look into the issue, City staff looked into the issue. Doc. 151, at 11-12 ¶ 36. Furthermore, a month after the issue was raised, City Attorney Brad Ralph presented on it to the Commission. *Id.* at 12 ¶ 39. Ultimately, a majority of the commissioners did not vote in favor of continuing to research the issue and no additional actions were taken on it. Doc 146-10 at 2. While Plaintiffs may not like that fact, this is not evidence of discriminatory motive. *See Moore*, 293 F.3d at 370 ("Allegations that the Legislature acted with haste and did notengage [sic] in extensive fact-finding might be a legitimate and even a valid critique of its behavior, but is does not lead to an inference of racial discrimination.").

Plaintiffs' apparent attempt to breathe some sort of arbitrariness into the situation by claiming that the Commission didn't "provid[e] any rationale for its decision" fails. Doc. 151, at 37. As the minutes show, the Commission does not typically provide the rationale for its decisions. Rather, only the matter and vote result are recorded in the minutes. Furthermore, the rationale for maintaining a system that has been in place for then-nearly fifty years without issue, as opposed to adopting something dramatically different, should be clear.

Turning to the legal extern's email, there is a reason that Plaintiffs devote two sentences to it—there is nothing there. It was drafted by a person who has no apparent background in voting rights law and was not the product of any real factual or legal analysis. This is insufficient to call into question the Commission's decision, let alone show that it was based on race.

### 3. Additional **Arlington Heights** *factors do not save Plaintiffs' claim.*

Plaintiffs rely on four alleged categories of evidence to show that their Fourteenth Amendment claim is saved by the *Arlington Heights* factors: (1) evidence of the so-called "impact" of at-large voting, (2) evidence that Dodge City was aware of the foreseeable impact of at-large voting, (3) a history of discrimination against Latinos, and (4) the availability of less discriminatory alternatives. Doc. 151, at 37-40. Plaintiffs' reliance is misplaced.

Starting with Plaintiffs' first and second categories, *see* Doc. 151, at 38-39, they are insufficient, as they do not indicate that Dodge City acted with discriminatory purpose. Again, as noted above, knowledge of a likely impact is not the same as acting with discriminatory purpose. *See Moore*, 293 F.3d at 369 (finding that the *Arlington Heights* factors did not create a factual issue, despite "[n]either side disput[ing] that the [action in question] has a substantial impact on African-American citizens"). Plaintiffs' intimation that foreseeability should be treated differently here because at-large voting has been "historically implemented . . . as a tool to suppress the voting power of minorities and the working class" should be rebuffed because Plaintiffs concede that there is no evidence that that was Dodge City's intent in 1971. The same should occur to the town hall report that Plaintiffs cite. While a report was allegedly presented, what Plaintiffs leave out is that one of them, Mr. Rangel-Lopez, actually edited the report, which was written by a member of a local advocacy group that is now an intern in the City Office. Doc 146-19 at 76:20-23; 77:14-78:9. Thus, this report and any claim regarding its purported effect should be given no weight. *Cf. Ernst*, 425 U.S. at 203 n.24.

Regarding Plaintiffs' evidence of discrimination, there are two types that Plaintiffs allege: historical and actions taken by Ford County. Doc. 151, at 39-40. Neither is helpful. Beginning with Plaintiffs' historical evidence, the most recent events that they cite to allegedly occurred

15

before the passage of the Civil Rights Act in 1964. These alleged events, to the extent they even occurred, are not probative of whether Dodge City is currently maintaining its at-large form of voting for discriminatory purposes. *See League of Women Voters v. Fla.*, 66 F.4th 905, 923 (11th Cir. 2023) (reversing the district court's finding that the relevant history showed discrimination because *Arlington Heights* does not "provid[e] an unlimited look-back to past discrimination" and no legislative action taken "since the year 2000 offer[s] [any] support for [a] finding of discriminatory intent"). As for polling locations, Dodge City does not set them; rather, it is Ford County's decision as a matter of statutory law. Accordingly, those decisions are not relevant to the claims against the City. *See id.* at 924 (finding that voter roll purges were not evidence of legislative discriminatory intent because the purge was "not conducted by the Legislature").

Finally, the fact that Plaintiffs identify an alternative form of voting does not mean that the *Arlington Heights* less-discriminatory-alternative factor is met. Doc. 151, at 40. As recently confirmed by the Eleventh Circuit, the analysis asks whether the alternative "would have achieved the same objectives" as the action being challenged. As Plaintiffs recognize, one of the key factors in maintaining the at-large system is unity, which is met under the present system because elected officials do not represent just one particular section of Dodge City, but, rather, all of Dodge City. Going to a district-based model is obviously antithetical to that objective.

Respectfully submitted,

**FOULSTON SIEFKIN LLP**

By: */s/ Anthony F. Rupp*
    Anthony F. Rupp, KS #11590
    Tara Eberline, KS #22576
    Sarah E. Stula, KS #27156
    7500 College Boulevard, Suite 1400
    Overland Park, Kansas 66210
    T (913) 498-2100 | F (913) 498-2101
    trupp@foulston.com
    teberline@foulston.com
    sstula@foulston.com

    - and-

    Clayton J. Kaiser, KS #24066
    FOULSTON SIEFKIN, LLP
    1551 North Waterfront Parkway, Suite 100
    Wichita, Kansas 67206
    T (316) 267-6371 | F (316) 267-6345
    ckaiser@foulston.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

      I certify that on the 27th of October 2023, the foregoing was electronically filed with the Clerk of the Court by using the Court's e-Filing system which will send notification of electronic filing to counsel for all parties of record, and a true and correct copy was served by electronic mail upon:

| | |
|---|---|
| Sharon Brett, KS #28696<br>**AMERICAN CIVIL LIBERTIES UNION OF KANSAS**<br>sbrett@aclukansas.org | Abena Mainoo *(Pro Hac Vice)*<br>Jonathan I. Blackman *(Pro Hac Vice)*<br>JD Colavecchio *(Pro Hac Vice)*<br>Mijin Kang *(Pro Hac Vice)*<br>Elizabeth R. Baggott *(Pro Hac Vice)*<br>**CLEARY GOTTLIEB STEEN & HAMILTON LLP**<br>amainoo@cgsh.com<br>jblackman@cgsh.com<br>jdcolavecchio@cgsh.com<br>mkang@cgsh.com<br>ebaggott@cgsh.com |
| Chad W. Dunn *(Pro Hac Vice)*<br>Sonni Waknin *(Pro Hac Vice)*<br>Bernadette Reyes *(Pro Hac Vice)*<br>**UCLA VOTING RIGHTS PROJECT**<br>chad@uclavrp.org<br>sonni@uclavrp.org<br>bernadette@uclavrp.org | |
| Jonathan Topaz *(Pro Hac Vice)*<br>Sophia Lin Lakin *(Pro Hac Vice)*<br>Luis M. R. Roman *(Pro Hac Vice)*<br>**AMERICAN CIVIL LIBERTIES UNION, INC.**<br>jtopaz@aclu.org<br>slakin@aclu.org<br>lroman@aclu.org | Scott Fuqua *(Pro Hac Vice)*<br>**FUQUA LAW & POLICY, P.C.**<br>scott@fuqualawpolicy.com |

*ATTORNEYS FOR PLAINTIFFS*

                                                               */s/ Anthony F. Rupp*