**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

MIGUEL COCA and
ALEJANDRO RANGEL-LOPEZ,

*Plaintiffs,*

v.

CITY OF DODGE CITY, a municipal corporation, the DODGE CITY COMMISSION, E. KENT SMOLL, in his official capacity as Mayor of Dodge City, MICHAEL BURNS, in his official capacity as Vice-Mayor of Dodge City, RICK SOWERS, in his official capacity as a member of the Dodge City Commission, CHUCK TAYLOR, in his official capacity as a member of the Dodge City Commission, and JOSEPH NUCI, in his official capacity as a member of the Dodge City Commission,

*Defendants.*

Case No. 22-1274-EFM

**MEMORANDUM AND ORDER**

Before the Court is Defendants' Motion for Summary Judgment (Doc. 145) on Plaintiffs Miguel Coca's and Alejandro Rangel-Lopez's remaining claims under Section 2 of the Voting Rights Act ("VRA")[1] and the Fourteenth Amendment's Equal Protection Clause. Plaintiffs assert that Dodge City's at-large voting scheme, by which the citizenry elects members of the Dodge City Commission, violates Section 2 of the VRA and the Equal Protection Clause. Because

[1] 52 U.S.C. § 10301.

Plaintiffs submit evidence establishing genuine issues of material fact sufficient to prevent judgment as a matter of law on each claim, the Court denies Defendants' Motion.

## I. Factual and Procedural Background[2]

### A. The parties

Both Plaintiffs are Latino U.S. citizens of legal voting age who reside in Dodge City (the "City"). The Defendants are the City itself and members of the Dodge City Commission: E. Kent Smoll, who also serves as the City's Mayor; Michael Burns, the City's Vice-Mayor; Rick Sowers; Chuck Taylor; and Joseph Nuci. It is this Commission, specifically the voting scheme by which members are elected, that forms the basis of Plaintiffs' claims.

### B. The City's election system

The City utilizes a commission-manager form of government as contemplated by K.S.A. § 12-184b(b)(3). Under this system, five members comprise the Commission, each serving either two-year terms or four-year terms depending on how many votes they receive. The City's citizens elect these members via an at-large voting system. In other words, the City is not divided into multiple districts—rather each member of the Commission receives votes from citizens all over the City. Furthermore, each citizen may vote for up to three candidates. The three candidates with the most overall votes are then elected to the Commission for various terms.

The City's present at-large election system came about in 1971 when the City enacted Charter Ordinance No. 7. The legislative history of Charter Ordinance No. 7 is facially neutral and does not show any intent to discriminate against the City's Latino population. The Commission elections are nonpartisan.

[2] Except where noted, the following facts are unconverted by the parties and supported by the record.

Elections in Dodge City are operated by Ford County. Ford County also determines the polling location for elections. From 2002 until 2018, Ford County chose to have just one polling location for City elections. Since 2018, there are two polling locations.

For the 2018 general election, Ford County moved one polling location to the Dodge City Expo Center, which is miles outside of the City limits and inaccessible by public transportation. Shortly after, the City began providing free door-to-door transportation to polling locations for all residents and worked with Ford County to establish the Hoover Pavilion as the permanent polling location going forward.

**C. The Department of Justice's 2011 inquiry**

On June 20, 2011, the U.S. Department of Justice ("DOJ") contacted Ford County for information regarding Dodge City's elections. Three months later, the DOJ advised Ford County Clerk Sharon Seibel of Congress's newly promulgated bilingual election requirement under Section 203 of the Voting Rights Act. The DOJ never subpoenaed or requested documents from the City. The DOJ soon closed this matter without any indication that either Ford County or Dodge City had engaged in any wrongdoing.

After receiving the notice from the DOJ, Ford County hired attorney Bruce Adelson for "Consultation and specialty services concerning U.S. Department of Justice Voting Rights Act Section 2 Investigation of Dodge City, Kansas." In a letter to Seibel, Adelson advised that should the DOJ find any VRA Section 2 violation , it would seek a remedy. At that time, Adelson opined that Dodge City possessed the initial criteria that indicated a Section 2 violation. He encouraged the Commission to conduct a further investigation and offered his services should Ford County or the City require more information. Adelson later met with Seibel, then-City Manager Cherise Tieben, another Dodge City employee, and possibly Dodge City's mayor. At the meeting, Adelson

stated that "there could be a potential problem," and that Dodge City should move to single-member districts "to avoid problems down the road."

### D. Commissioner Scoggins' 2019 inquiry

On February 25, 2019, Jan Scoggins emailed Tieben and asked her to add a request to consider a combination of districts and at-large seats for City Commission elections to the Commission's agenda. She indicated that a "community group" made the request, but she did not identify the group. Tieben responded by directing Scoggins to make her request to the Commission at a formal meeting. Tieben also indicated that members of the community group would be welcome to bring up the issue during the Visitors Section of the Commission meeting.

On March 4, 2019, Scoggins raised the issue at a Commission meeting. However, no community members spoke at that meeting. The Commission then directed City staff to investigate a change to Commission elections whereby three Commissioners would be elected by districts, two Commissioners would be elected at large. During that investigation, a law student extern working for the League of Kansas Municipalities opined that the second and third preconditions articulated in *Thornburg v. Gingles*[3] would likely be met in Dodge City.

On April 15, 2019, City Attorney Brad Ralph presented a report on the possibility of changing the election structure to the Commission. The meeting's minutes do not reflect the details of Ralph's report. After hearing Ralph's report, Commissioners Brian Delzeit and Joyce Warshaw voiced opposition to changing the election structure. Because further investigation did not have a

---

[3] 478 U.S. 30, 50–51 (1986) (holding plaintiffs must first establish three preconditions prior to stating a claim for Section 2 violation, namely that: (1) the minority group can demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the minority group can demonstrate that the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate).

majority of the Commission's support, the investigation ceased. Neither party explains why the Commissioners reached this decision.

**E. Dodge City demographics and past election results**

Dodge City's Hispanic population has increased dramatically over the past few decades. In 2000, the Latino citizens of voting age population ("CVAP") in Dodge was 2,560, constituting 19.53% of the City's total citizen voting age population. The City's white CVAP was 9,905 or 75.6% of the City's total citizen voting age population. By 2021, Latino CVAP was 6,398, comprising 46.13% of the City's total citizen voting age population. In contrast, the white CVAP had shrunk to 6,552 or 47.24%.

Because Plaintiffs claim that no Hispanic-preferred candidate has been elected to the Commission since 2000, past election results are vital to their case. The parties focus mainly on City Commission elections held in 2014, 2017, 2019, and 2021. The Latino CVAP by precinct in each of these elections is below.

| | Latino Voters (%) | | | |
|---|---|---|---|---|
| Precinct | 2021 | 2019 | 2017 | 2014 |
| 1 | 39.1 | 38.9 | 30.1 | 20.4 |
| 2 | 54.5 | 49.0 | 44.5 | 39.7 |
| 3 | 59.9 | 49.4 | 45.4 | 53.7 |
| 4 | 31.4 | 29.8 | 27.8 | 31.8 |
| 5 | 18.7 | 17.0 | 15.6 | 12.2 |
| 6 | 12.6 | 12.2 | 11.3 | 4.1 |
| 7 | 8.8 | 9.4 | 9.5 | 1.9 |
| 8 | – | – | – | 6.5 |
| 9 | 20.8 | 8.4 | – | – |

By candidate, the results for the 2014 election were:

| 2014 | Precinct 1 | Precinct 2 | Precinct 3 | Precinct 4 | Precinct 5 | Precinct 6 | Precinct 7 | Precinct 8 | Precinct 9 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Russ McBee | 33 | 10 | 5 | 47 | 72 | 85 | 1 | 0 | 0 | 253 |
| Joe Peters | 43 | 11 | 19 | 61 | 124 | 159 | 5 | 2 | 0 | 424 |
| Jan Scoggins | 41 | 13 | 29 | 82 | 97 | 172 | 2 | 0 | 0 | 436 |
| E. Kent Smoll - 2yr term | 30 | 9 | 15 | 51 | 116 | 200 | 2 | 1 | 0 | 424 |
| Rick Smowers | 30 | 12 | 14 | 55 | 128 | 201 | 1 | 0 | 0 | 441 |
| Jeffrey A. Turner | 23 | 15 | 9 | 44 | 123 | 139 | 4 | 2 | 0 | 359 |
| Liliana Zunlga | 37 | 21 | 29 | 59 | 99 | 145 | 2 | 1 | 0 | 393 |
| | | | | | | | | | | |

The results for the 2017 election were:

| 2017 | Precinct 1 | Precinct 2 | Precinct 3 | Precinct 4 | Precinct 5 | Precinct 6 | Precinct 7 | Precinct 8 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Brian Delzeit | 72 | 11 | 15 | 163 | 330 | 519 | 18 | 1 | 1129 |
| Kevin D. Gwaltney | 56 | 21 | 16 | 109 | 235 | 394 | 11 | 0 | 842 |
| Charles J. Sellens | 18 | 22 | 14 | 70 | 358 | 223 | 7 | 1 | 529 |
| E. Kent Smoll | 56 | 27 | 23 | 131 | 255 | 358 | 1 | 0 | 851 |
| Joyce Warshaw | 42 | 22 | 41 | 186 | 295 | 411 | 13 | 1 | 1011 |
| Liliana Zuniga | 31 | 14 | 24 | 56 | 98 | 167 | 8 | 0 | 398 |
| Written-Ins | 1 | 0 | 0 | | 3 | 2 | 0 | 0 | |
| | | | | | | | | | |

The results for the 2021 election were:

| 2021 | Precinct 1 | Precinct 2 | Precinct 3 | Precinct 4 | Precinct 5 | Precinct 6 | Precinct 7 | Precinct 8 | Precinct 9 | Precinct 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Michelle L. Salinas | 47 | 19 | 23 | 70 | 154 | 207 | 18 | 0 | 0 | 0 | 538 |
| Joseph Nuci | 66 | 30 | 40 | 99 | 227 | 370 | 38 | 0 | 0 | 0 | 870 |
| Chuck Taylor | 83 | 39 | 39 | 108 | 242 | 346 | 21 | 0 | 2 | 0 | 880 |
| Blanca Ilean Soto | 50 | 31 | 38 | 87 | 154 | 234 | 25 | 0 | 1 | 0 | 620 |
| Dayton Rhoten | 16 | 9 | 6 | 40 | 74 | 106 | 6 | 0 | 1 | 0 | 258 |
| Jan Scoggins | 50 | 28 | 37 | 70 | 154 | 251 | 17 | 0 | 1 | 0 | 608 |
| Michael Burns | 59 | 43 | 28 | 96 | 238 | 463 | 37 | 0 | 2 | 0 | 966 |
| Jeffrey J. Reinert | 45 | 22 | 33 | 84 | 210 | 349 | 34 | 0 | 1 | 0 | 778 |

Results for the 2019 City Commission election were not provided to the Court.

## F. Hispanic-preferred candidates

For the above elections, Plaintiffs contend that Liliana Zuniga and Blanca Soto were the Hispanic-preferred candidates. Plaintiff Coca based this belief on Zuniga's interaction with the community.[4] However, Coca knew nothing about who actually voted for Zuniga, how Ms. Zuniga had run her campaign, what issues Zuniga campaigned on, how Zuniga fared in any of Dodge City's precincts, or even whether he had voted for Zuniga.

[4] In context, Coca's statement seems to be referring to the Hispanic community.

Coca confirmed that Soto campaigned as a Latino candidate, but he was unaware of whether Soto was the Hispanic candidate of choice. Plaintiff Rangel-Lopez, however, stated in his deposition that not all Latino voters prefer the same candidates at the polls. Plaintiffs also contend that Scoggins is a Hispanic-preferred candidate. Scoggins was elected to the Commission in 2014 but lost when she ran for reelection in 2021.

**G. Plaintiffs' experts—racially polarized voting and historical discrimination**

In his report, Plaintiffs' expert Dr. Matthew Barreto opined that both Hispanics and Whites in Dodge City vote as blocs. Dr. Barreto arrived at his opinion by using an ecological inference analysis to review Commission elections between 2014 and 2021, as well as 20 other general elections between 2014 and 2022. He concluded that there was obvious evidence of racially polarized voting, with Hispanic-preferred candidates receiving greater percentages of votes in heavily Hispanic districts while performing poorly in heavily white districts. Specifically, he concluded that Hispanic voters sided for the same candidates of choice with clear support in the 65% to 75% range, while white voters had consistent bloc voting with rates as high as 85% opposition to Hispanic-preferred candidates. Defendants dispute this testimony as unreliable and contrary to their own expert's opinion.

Additionally, Plaintiffs rely on a report from another expert, Dr. Rubén Martinez, that at-large voting systems "were historically implemented in cities across the U.S. as a tool to suppress the voting power of minorities and the working class."

**H. Procedural history of this case**

Plaintiffs initiated the present lawsuit on December 15, 2022, asserting claims for violating Section 2 of the VRA, the Fourteenth Amendment's Equal Protection Clause, and the Fifteenth Amendment. Defendants quickly filed a motion to dismiss each of Plaintiffs' claims. The Court

granted that motion in part, dismissing Plaintiffs' Fifteenth Amendment claim and allowing Plaintiffs' other claims to go forward.

On September 22, 2023, Defendants filed the present Motion for Summary Judgment. At the same time, Defendants filed motions to exclude two of Plaintiffs' experts, Dr. Barreto and Dr. Ruben Martinez. The Court granted each motion in part, finding that Dr. Barreto's homogenous analysis and Dr. Martinez's opinions based on personal observations were inadmissible under Fed. R. Evid. 702.

## II. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[5] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[6] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[7] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[8] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[9] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[10]

---

[5] Fed. R. Civ. P. 56(a).

[6] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[7] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[10] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

## III. Analysis

Defendants' Motion frames the relevant issues as simple and straightforward—do Plaintiffs present sufficient evidence to create genuine issues of material fact for each of their claims? For Plaintiffs' Section 2 claim, Defendants argue that Plaintiffs fail to provide evidence capable of creating a genuine issue of material fact on the second and third *Gingles* factors. For the same reasons, Defendants claim that Plaintiffs' Section 2 claim brought under 42 U.S.C. § 1983 fails as a matter of law. Finally, Defendants contend that Plaintiffs fail to provide sufficient evidence that Defendants intentionally decimated against Hispanics as required for Plaintiffs' Equal Protection claim. Ultimately, the Court concludes that genuine issues of material fact exist as to each of Plaintiffs' claim that are best left for trial. Therefore, the Court denies Defendants' Motion.

### A. Genuine issues of material fact as to the second and third *Gingles* preconditions prevents summary judgment on Plaintiffs' Section 2 claim.

First, Plaintiffs claim that Defendants violated Section 2 of the VRA. To survive summary judgment, plaintiffs must show that the evidence could support finding the "necessary preconditions" set out in *Thornburg v. Gingles*.[11] Namely, plaintiffs must show that: (1) "the minority group [can] demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) the minority group can "demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate."[12] If the plaintiff satisfies this first step, courts must proceed to the second step—that is, determining under the totality of the circumstances

---

[11] 478 U.S. 30, 50 (1986).

[12] *Id.* at 50–51.

whether "the political processes leading to nomination or election . . . are not equally open to participation by members of a [protected] class . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[13]

Defendants do not dispute the first *Gingles* precondition nor the totality of the circumstances analysis in their Motion. Thus, the Court will solely analyze whether Plaintiffs provide sufficient evidence to create triable issues of fact as to *Gingles*' second and third preconditions.

To establish the second *Gingles* precondition, Plaintiffs must provide evidence that Latinos in Dodge City vote cohesively as a group. Under the third *Gingles* precondition, Plaintiffs must establish that the white majority votes as a bloc sufficient to defeat the Latino-preferred candidates. Obviously, courts "may not assume from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls."[14] Statistical evidence is vital to both of these preconditions.[15]

Here, Defendants' argument relies almost entirely on their assumption that the Court would grant their motion to exclude Plaintiffs' expert Dr. Barreto. The Court denied that motion in part and admitted the relevant portions of Dr. Barreto's report for the reasons contained with its prior order (Doc. 158). Therefore, the Court will consider Dr. Barreto's ecological inference analysis in ruling on Defendants' present Motion.

---

[13] *Id.* at 43 (52 U.S.C. § 10301(b)).

[14] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (further citation, quotations, and brackets omitted).

[15] *See, e.g.*, *Growe v. Emison*, 507 U.S. 25, 41 (1993).

With the admission of Dr. Barreto's report, Defendants' argument falls apart at the seams. Perhaps because of their complete confidence in their motion to exclude, Defendants failed to include any alternative arguments in their Motion should the Court allow Dr. Barreto's report to be considered.[16] In essence, Plaintiffs' Response stands unopposed.

Regardless of the parties' briefing, or lack thereof, the Court finds that Plaintiffs have sufficiently established a genuine issue of material fact as to whether the second and third *Gingles* precondition has been established in this case. Primarily, this is due to Dr. Barreto's report. Using ecological inference analysis of both endogenous and exogenous elections, Dr. Barreto opines that Latinos in Dodge City voted cohesively for Scoggins, Soto, and Zuniga. He also stated that whites consistently vote to prevent Latino-preferred candidates from being elected. Should the trier of fact—here, the Court—credit Dr. Barreto's testimony above that of Defendants' experts, it could conclude that the City's Hispanic population is politically cohesive and that whites vote as a bloc to prevent Hispanic-preferred candidates from being elected. Under Fed. R. Civ. Proc. 56(a), nothing more is required.

Plaintiffs also rely on their own lay testimony to show that Hispanics are politically cohesive and preferred Soto and Zuniga in past Commission elections. To rebut this testimony, Defendants cite a host of cases holding that lay testimony is relevant but insufficient to establish political cohesion in voting dilution cases.[17] But Defendants' argument misses the point because the Court denied in relevant part Defendants' motion to exclude Dr. Barreto. Through Dr. Barreto,

[16] Defendants conduct an interesting statistical analysis of Commission elections in their Motion. But their burden here is not to be persuasive, but to show that no genuine issue of material fact exists. Thus, the Court considers Defendants' argument regarding the statistics of past Commission elections irrelevant for the purposes of this Order because it does not address Dr. Barreto's report.

[17] *See, e.g.*, *Sanchez v. Colorado*, 97 F.3d 1303, 1320 (10th Cir. 1996) ("[W]hile lay testimony is relevant to determine who is the candidate of choice, it is not alone dispositive.").

Plaintiffs submit statistical evidence in support of their contentions. As the Court previously concluded, weighing the persuasive value of Dr. Barreto's opinion is a matter best reserved for trial. But for now, Dr. Barreto's opinion—supported by Plaintiffs' lay testimony—is sufficient to create a genuine issue of material fact as to whether Hispanics are politically cohesive and whether whites vote en bloc to defeat Hispanic-preferred candidates.

Briefly, Defendants argue in a footnote that Plaintiffs abandoned their Section 2 claim asserted via 42 U.S.C. § 1983 by not explicitly including it in the pretrial order. This argument fails for a few reasons. First, the Court in its order on Defendants' previous motion to dismiss clearly acknowledged § 1983 as merely an alternative vehicle for Plaintiffs' Section 2 claim. There is no indication that Plaintiffs have abandoned that claim. Second, "the Tenth Circuit has repeatedly held that arguments 'raised in a perfunctory manner, such as in a footnote, are waived.'"[18] Thus, the Court holds it is Defendants who have waived any argument as to Plaintiffs asserting their Section 2 claim via § 1983. Accordingly, the Court denies Defendants' Motion as to Plaintiffs' Section 2 claim.

**B. Genuine issues of material fact as to Plaintiff's Equal Protection Claim prevents summary judgment on Plaintiffs' Section 2 claim.**

Defendants also move for summary judgment on Plaintiffs' § 1983 claim for violation of the Fourteenth Amendment's Equal Protection Clause. Specifically, Defendants claim that Plaintiffs have failed to show that the at-large method of Dodge City Commission elections was begun or is being maintained or operated with the intent to racially discriminate against the City's Latino population. But Plaintiffs do not argue that the at-large voting method was enacted in 1971

[18] *Madison, Inc. v. W. Plains Reg'l Hosp., LLC*, 2018 WL 928822, at *10 (D. Kan. 2018) (quoting *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002)).

with discriminatory intent. Rather, Plaintiffs contend that Defendants maintain the at-large voting scheme with discriminatory intent.

Generally, "[q]uestions of intent which involve intangible factors, including witness credibility, are matters for consideration of [the] fact finder after a full trial."[19] Therefore, drawing ultimate inferences regarding a party's intent is often inappropriate at the summary judgment stage.[20]

To show a violation of the Equal Protection Clause, "[p]roof of racially discriminatory intent or purpose is required."[21] Specifically, a plaintiff must show that racial discrimination was a "motivating factor in the decision.[22] In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*,[23] the Supreme Court recognized that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."[24] With that in mind, the Supreme Court articulated several factors for courts to consider in determining whether a plaintiff has established discriminatory intent.[25] These are: "(1) historical background of the decision, (2) the specific sequence of events leading up to the challenged decision, (3) departures from the normal procedural sequence, as well as substantive departures, and (4) legislative or administrative

[19] *Vail Assocs., Inc. v. Vend-Tel-Co.*, 516 F.3d 853, 869 (10th Cir. 2008) (quoting *Baum v. Great W. Cities, Inc.*, 703 F.2d 1197, 1210–11 (10th Cir.1983)).

[20] *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980).

[21] *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

[22] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

[23] 429 U.S. 252 (1977).

[24] *Id.* at 266.

[25] *Id.* at 267–68.

history."[26] Because this is a non-exhaustive list, subsequent Supreme Court cases have added (5) discriminatory impact[27] and (6) the foreseeability of that discriminatory impact.[28]

Here, Plaintiffs rely on two past events and five additional factors to show discriminatory intent by Dodge City. First, the two past events. Plaintiffs cite Adelson's statement that there "could be a potential problem" with the at-large voting system as evidence that Dodge City "knew" the at large voting system violated Section 2. While Defendants make a colorable argument that Adelson's prior letter was little more than solicitation by a consulting firm, the Court at this stage must view the evidence in the light most favorable to Plaintiffs. In that light, Adelson's letter and later statements to City employees informed the City of the possible illegality of its current at large voting system. The City's knowledge of possible Section 2 violation is at least relevant to the intent inquiry for Plaintiffs' Equal Protection claim.

Plaintiffs also argue that the Dodge City Commission's rejection of Commissioner Scoggins proposal to adopt a district-based election system in 2019 demonstrates intent. The merely reveals that Scoggins raised the issue at a Commission meeting, City Attorney Ralph gave a report to the Commission on that issue, and a majority of the Commission did not request further investigation. At that point, Commission members dropped the matter entirely. Neither party has provided any evidence regarding the reasoning for this decision. But it does show that the Commission, acting on the City's behalf, was aware of the possibility of switching to a district-based voting system.

---

[26] *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985) (summarizing *Arlington* factors).

[27] *Rogers v. Lodge*, 458 U.S. 613, 618 (1982).

[28] *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 464–66 (1979).

Examining the various *Arlington* factors, Plaintiffs infer discrimination from the surrounding circumstances. First, Plaintiffs claim that the "stark inequalities between the Hispanic and non-Hispanic residents of Dodge City across a wide array of socio-demographic measures including income and poverty, educational attainment, housing, and health indicators" are evidence of the impact of the at-large voting system. Second, they claim that impact was foreseeable, citing Dr. Martinez's report that such systems "were historically implemented in cities across the U.S. as a tool to suppress the voting power of minorities and the working class." Third, Plaintiffs point to a "history of discrimination against Hispanics" in Dodge City from before 1964, as well as the elimination of all but one polling location in 1998 and the one-time moving of the polling location to outside city limits in 2018.

This "evidence" of the City's discriminatory intent is slim. And it does not account for Defendants' own evidence against finding discriminatory intent. But still, Plaintiffs' evidence is not slim enough for the Court to conclude that, as a matter of law, no reasonable fact finder could infer Defendants' discriminatory intent. In cases like this, intent is best evaluated by a fact finder at trial instead of on summary judgment. Thus, the Court concludes that a genuine issue of material fact exists as to whether the City has maintained the at-large voting system with discriminatory intent. Because Defendants offer no other argument for summary judgment on Plaintiffs' Equal Protection claim, the Court denies Defendants' Motion.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 145) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 12th day of December, 2023.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE