# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

MIGUEL COCA, et al.,

            Plaintiffs,

      v.

CITY OF DODGE CITY, et al.,

            Defendants.

Case No. 6:22-cv-01274-EFM-RES

## PLAINTIFFS' TRIAL BRIEF

Plaintiffs Miguel Coca and Alejandro Rangel-Lopez, by and through their undersigned counsel, hereby submit the following Trial Brief outlining their legal claims, pertinent authority, and anticipated evidence in support.

## BACKGROUND

Plaintiffs are two Latino citizens of Dodge City, Kansas, who filed this lawsuit under Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. §10301, and 42 U.S.C. § 1983. Plaintiffs allege that the at-large voting scheme for the Dodge City Commission violates their rights under the VRA and the Fourteenth Amendment to the United States Constitution. On December 12, 2023, this Court denied Defendants' Motion for Summary Judgment, Doc. # 159, allowing the case to proceed to trial on both claims. Trial will begin on February 26, 2024.

## ARGUMENT AND AUTHORITIES

### I.    Section 2 of the Voting Rights Act

Plaintiffs' first claim alleges that the Dodge City Commission's at-large voting scheme violates Section 2 of the VRA because it dilutes the voting power of the Latino/a/e voting population in Dodge City and prevents them from electing their representatives of choice. "Th[e

Supreme] Court has long recognized that multimember districts and at-large voting schemes may "operate to minimize or cancel out the voting strength of racial [minorities in] the voting population." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (internal quotation marks omitted). "In *Thornburg v. Gingles*, the Supreme Court established the framework for assessing at-large voting systems under Section 2." *Holloway v. City of Va. Beach*, 42 F.4th 266, 270 (4th Cir. 2022) (citing *Gingles*, 478 U.S. at 38-51). The *Gingles* preconditions set out three threshold requirements Plaintiffs must meet to demonstrate that an at-large voting system unlawfully dilutes the minority group's vote and prevents them from electing candidates of choice.

The Court then must assess whether, under the totality of the circumstances, members of the minority group have less opportunity to participate in the electoral process and elect candidates of their choice. 52 U.S.C. § 10301(b). The Supreme Court has directed that the list of non-exhaustive factors in the Senate Report on the 1982 amendments to the VRA ("Senate Factors") be considered for the totality of the circumstances analysis. *Gingles*, 478 U.S. at 35-37.

A.   ***Gingles* I**

The first *Gingles* precondition states that "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. As such, to establish the first *Gingles* precondition, Plaintiffs must demonstrate that the Latine population in Dodge City is large and geographically compact enough to constitute a numerical majority *in at least one district* in a single-member district map for the Dodge City Commission. *See Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020) ("Under *Gingles*, plaintiffs challenging an at-large system on behalf of a protected class of citizens must demonstrate that (1) the group is sufficiently large and geographically compact to constitute a majority in a single-member district …") (internal quotation marks omitted); *Holloway*, 42 F.4th

at 270 (similar); *Ruiz v. City of Santa Maria*, 160 F.3d 543, 550 (9th Cir. 1998) (similar); *Davis v. Chiles*, 139 F.3d 1414, 1419 (11th Cir. 1998) (similar); *Large v. Fremont Cnty., Wyo.*, 709 F. Supp. 2d 1176, 1190 (D. Wyo. 2010); *Gingles*, 478 U.S. at 50.

With respect to numerosity, courts apply a bright-line 50% plus one rule in determining whether the minority is "sufficiently large" for purposes of the first *Gingles* precondition. *See Bartlett v. Strickland*, 556 U.S. 1, 12 (2009) (plurality opinion). With respect to compactness, "[t]he first Gingles condition refers to the compactness of the minority population, not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry ("LULAC")*, 548 U.S. 399, 428 (2006). "While no precise rule has emerged governing § 2 compactness, the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* at 433 (internal quotation marks omitted); *see also Allen v. Milligan*, 599 U.S. 1, 18 (2023) ("A district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably compact."). One of those traditional districting criteria is the constitutional requirement to maintain equal population, *id.* at 20; "[a] maximum population deviation between voting districts of less than ten percent is presumptively constitutional," *McCoy v. Chicago Heights Elec. Comm'n*, 880 F.3d 411, 415 (7th Cir. 2018). And as the Supreme Court recently explained, Section 2's "question whether additional majority-*minority* districts can be drawn, after all, involves a quintessentially race-conscious calculus," which allows a mapdrawer to "take race into account" as one, non-predominant factor when drawing maps in compliance with federal law. *Allen*, 599 U.S. at 30-31 (internal quotation marks omitted) (emphasis in original).

In Section 2 vote dilution litigation such as this case, illustrative maps offered by plaintiffs are used to assess whether the jurisdiction has committed a *violation* of Section 2 *only*; that is, to

help the Court establish that it is *possible* for the jurisdiction in question to draw a map that contains a district where the minority group is large and geographically compact enough to constitute a majority. *See Sanchez v. State of Colo.*, 97 F.3d 1303, 1311 (10th Cir. 1996) ("[P]laintiffs' proposed district is not cast in stone. It was simply presented to demonstrate that a majority-black district is feasible….") (quoting *Clark v. Calhoun Cnty., Miss.*, 21 F.3d 92, 95 (5th Cir. 1994)). To that end, plaintiffs at the trial stage need not establish that the illustrative maps are the *exact proper remedy*; "at this stage, a plaintiff need only show that a remedy may be feasibly developed." *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1106 (E.D. Cal. 2018); *see also id.* ("neither the plaintiff nor the court is bound by the precise lines drawn in these illustrative redistricting maps."). As one federal court explained:

> every Section 2 case may be divided into two phases: a liability phase, where the Court determines whether the challenged electoral device dilutes minority voting power, and a remedy phase, where the challenged jurisdiction remedies the dilution. Under this scheme, the ultimate viability and effectiveness of a remedy is considered at the remedial stage of litigation and not during analysis of the *Gingles* preconditions.

*Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 745 (S.D. Tex. 2013).[1]

Put simply, "[t]he ultimate end of the first *Gingles* precondition is to prove that a solution is possible, and not necessarily to present the final solution to the problem." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (internal quotation marks and alterations omitted); *see also Hall v. Louisiana*, 108 F. Supp. 3d 419, 429 n.7 (M.D. La. 2015) (acknowledging distinction "between an illustrative plan used to establish the first *Gingles* precondition, versus a redistricting plan submitted as a proposed remedy after a Section 2 violation has been found.").

---

[1] "If a § 2 violation is found, the [jurisdiction] will be given the first opportunity to develop a remedial plan." *Sanchez*, 97 F.3d at 1311 (quoting *Clark*, 21 F.3d at 95).

At trial, Plaintiffs will present testimony from expert map drawer Dr. Kassra A.R. Oskooii, who will demonstrate that he drew 14 demonstrative maps for the Dodge City Commission, and that in all those maps, the Latine population was large and compact enough to constitute a numerical majority in three districts in each map. This evidence is more than sufficient to show that it is possible to draw a map for the Commission that contains a *single* majority-Latine district.

### B.  *Gingles* II and III

The second and third *Gingles* preconditions, together referred to as racially polarized voting, asks whether (1) "the minority group is politically cohesive" (*Gingles* II), and (2) "the white majority votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate," (*Gingles* III). *Sanchez*, 97 F. 3d at 1310; *Gingles*, 478 U.S. at 53 n.21.

Under Section 2, racial polarization exists when members of a protected class vote together for the same candidates or electoral outcomes, and the white majority usually votes against those candidates and/or outcomes. *See Sanchez*, 97 F.3d at 1312 (stating that courts evaluate political cohesiveness by looking at the "voting preferences expressed in actual elections."); *Sanchez v. Bond*, 875 F.2d 1488, 1493 (10th Cir. 1989). There is no requirement that Plaintiffs demonstrate that white voters are hostile or hold racist views towards minority-preferred candidates to demonstrate racially polarized voting. *See Gingles,* 478 U.S. at 70–71; *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1123 (3d Cir. 1993). Indeed, the standard "looks only to the difference between how majority votes and minority votes were cast; it does not ask why those votes were cast the way they were nor whether there are other factors present in contested elections." *Collins v. City of Norfolk, Va.*, 816 F.2d 932, 935 (4th Cir. 1987); *see also, e.g., Gingles*, 478 U.S. at 51, 61-62; *Sanchez*, 97 F. 1303 at 1321; *Gomez v. City of Watsonville*, 863 F.2d 1407,

1416 (9th Cir. 1988). Additionally, *Gingles* III has "no simple doctrinal test" and can "vary according to a variety of factual circumstances." *See Gingles*, 478 U.S. at 50-51.

In the Tenth Circuit, a showing of racially polarized voting does not require completely divergent racial preferences. *See Sanchez*, 97 F.3d at 1319. Demonstrating political cohesiveness typically requires statistical and non-statistical evaluation of relevant elections. *See Bone Shirt,* 461 F.3d at 1020; *see also Luna,* 291 F. Supp. 3d at 1117.

When analyzing the statistical evidence put on by Plaintiffs to demonstrate political cohesion, courts have relied on point estimates—especially where, as here, the point estimates are consistent across elections. "[P]oint estimates [] are undisputedly the best estimates in the data for determining racially polarized voting." *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13-CV–0087-D, 2014 WL 4055366, at *12 (N.D. Tex. Aug. 15, 2014) (internal quotation marks omitted); *Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *10 (N.D. Tex. Aug. 2, 2012) (same). Indeed, as a federal court recently found, "point estimates are the most likely outcomes," especially when "similar results repeat[] year after year," and therefore it is not necessary to "rely on confidence intervals where voting patterns were consistent." *NAACP, Spring Valley Branch v. East Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 390 (S.D.N.Y. 2020); *see also Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1309 (N.D. Ga. 2022) (crediting racially polarized voting expert who conducted ecological regression and Kings ecological inference as reliable and qualified despite not using confidence intervals with her analysis); ECF No. 158 at 9 & n.23.

Courts may analyze any elections it sees fit when evaluating *Gingles* II and III. However, some elections have more probative value than others, such as contested elections and endogenous elections. *See Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.,* 201 F. Supp.

3d 1006, 1040 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018). Endogenous elections are elections in the jurisdiction at issue, while exogenous elections are elections in different jurisdictions where the electorate also votes. The Tenth Circuit has held that "*Gingles* doesn't require perfect uniformity of result. That plaintiffs' figures presented a pattern of racial bloc voting over time is probative of *Gingles'* second and third preconditions." *Sanchez*, 97 F.3d at 1317; *see also Cuthair v. Montezuma-Cortez, Colorado Sch. Dist. No. RE-1*, 7 F. Supp. 2d 1152, 1167 (D. Colo. 1998) ("[racially polarized voting and bloc voting] is determined on a sliding scale. It varies based on the district and a variety of other circumstances.").

Under Section 2, Plaintiffs may also demonstrate vote dilution based on evidence of racially polarized voting drawn from exogenous, not endogenous elections. *See Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1465 (M.D. Ala. 1988) (finding that Plaintiffs established political cohesion through analyzing two exogenous county-wide elections and lay testimony revealing a strong sense of community among Black voters); *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1208 (5th Cir. 1989) ("To the extent that these comments indicate that the district court believed that plaintiffs could not, as a matter of law, make out a vote dilution claim based on evidence of racially polarized voting drawn from elections other than the aldermanic elections themselves, this view is incorrect under both *Gingles* and *Citizens for a Better Gretna.*"); *Cane v. Worcester Cnty., Md.,* 840 F. Supp. 1081, 1088 (D. Md. 1994). In *Gingles,* the Court expressly advocated for flexibility when there may be sparse or incomplete data for determining whether polarized voting exists. *Gingles,* 478 U.S. at 57 n.25 ("The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances."); *see also Cane*, 840 F. Supp. at 1088 (relying on exogenous elections

and testimony that changes from at-large to single member system mitigates discouragement of the minority community to elect candidates of choice satisfied *Gingles* II.).

Moreover, there is also no set number of elections necessary to determine that *Gingles* II and III are satisfied. *See Bone Shirt*, 461 F.3d at 1021 (finding evidence of polarization in two endogenous elections enough to support a finding of *Gingles* II and III for plaintiffs). The size of a jurisdiction or the number of voting precincts evaluated also does not hinder a finding of political cohesion; polarized voting has been found in comparably-sized or smaller jurisdictions than Dodge City. *See U.S. v. Blaine Cnty., Montana*, 897, 910 (9th Cir. 2004) (affirming a finding of a Section 2 violation in a jurisdiction of 7,009, almost four times less populous than Dodge City); *Cuthair*, 7 F. Supp. 2d at 1154 (finding a Section 2 violation in a jurisdiction with under 19,000 residents when the suit was filed and finding racially polarized voting in at-large elections where about 600 total votes were cast); *Cane v. Worcester Cnty*, *Md.,* 35 F.3d 921, 923 (4th Cir. 1994) (finding a Section 2 violation in a county of about 35,000); *Potter v. Washington Cnty., Fla.*, 653 F. Supp. 121, 122 (N.D. Fla. 1986) (approving a consent decree finding Section 2 effects liability for a jurisdiction that is has a total population of 14,509); *Windy Boy v. Big Horn Cnty.*, 647 F. Supp. 1002, 1004 (D. Mont. 1986) (finding a Section 2 violation in a county of 11,096).

Additionally, the "legal concept of racially polarized voting incorporates neither causation nor intent." *Gingles*, 478 U.S. at 63. Rather, courts look simply at whether the race of voters alone correlates with the selection of certain candidates or electoral decisions. "The *reasons* [Latino] and white voters vote differently have no relevance to the central inquiry of § 2." *Id.* at 63 (emphasis added); *see also id.* at 100 (O'Connor, J., concurring) (agreeing, along with three other justices, that where statistical evidence shows minority political cohesion and assesses prospects of winning, "defendants cannot rebut this showing by offering evidence that the divergent racial

voting patterns may be explained in part by causes other than race"); *Gomez v. City of Watsonville*, 863 F.2d at 1416 (holding that courts should look "only to actual voting patterns" to determine whether voting is racially polarized and not speculate as to the reasons why); *Collins v. City of Norfolk, Va.*, 816 F.2d at 935. Ultimately, in assessing *Gingles* II and III, the Tenth Circuit has concluded that *Gingles* "instructs us to look for the theme of racial polarization and the extent which that polarization robs the minority of meaningful access to the political process." *Sanchez*, 97 F.3d at 1321.

Plaintiffs will demonstrate here through statistical and non-statistical evidence that in both endogenous and exogenous elections Latine voters in the City of Dodge City are politically cohesive. Plaintiffs rely chiefly on the expert testimony of Dr. Matt Barreto, who conducted a statistical analysis using ecological inference, which this Court has already found "enjoys a wide acceptance from courts dealing with vote dilution cases." ECF No. 158 at 8 & n.20 (citing cases). Plaintiffs, again aided by Dr. Barreto's analysis, will further show that in elections for Dodge City Commission and other elections analyzed white voters in the City of Dodge City vote as a bloc, and usually defeat Latine preferred candidates.

### C. Senate Factors and the Totality of the Circumstances

Once a court finds all three *Gingles* preconditions are met, it must determine whether "the totality of the circumstances reveal that the [minority group's] members … have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Gingles*, 478 U.S. at 43 (internal quotations omitted). This inquiry "depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process. The lack of electoral opportunity is the key." *Sanchez*, 97 F.3d at 1310 (internal quotations omitted). It is "only the very unusual case in which the plaintiffs can

establish the existence of the three *Gingles* factors but still have failed to establish a violation of §

2 under the totality of circumstances." *Clark v. Calhoun Cnty., Miss.*, 21 F.3d at 97; *Wright v.*

*Sumter Cnty. Bd. Of Elections and Registration*, 979 F.3d 1282, 1304; *NAACP, Inc. v. City of*

*Niagara Falls, N.Y.*, 65 F.3d 1002, 1019 n.21 (2nd Cir. 1995) (internal quotation marks omitted).

The totality of the circumstances analysis is led by the Senate Factors. "[T]here is no

requirement that any particular number of [Senate Factors] be proved, or that a majority of them

point one way or the other." *Sanchez*, 97 F.3d at 1310; s*ee also Cuthair,* F. Supp. 2d at 1171

(finding a Section 2 violation where Plaintiffs demonstrated SF 1 and 5, while "other [Senate

Factors] show that efforts have been made to improve the situation of the [minority community].").

Nor are the factors exclusive, as courts can consider other factors relevant to determining the

openness of the political process. *Sanchez*, 97 F.3d at 1310. Plaintiffs briefly discuss these nine

factors in order.

***Senate Factor 1:*** Senate Factor 1 looks at "the extent of any history of official

discrimination in the state or political subdivision that touched the right of the members of the

minority group to … to participate in the democratic process." *Gingles*, 478 U.S. at 36-37. In the

Tenth Circuit, courts may analyze the entire history of the minority group's existence within the

region when determining whether there is a history of discrimination. *See Cuthair,* 7 F. Supp at

1169 (finding SF 1 existed after analyzing 150 years of Native American history in the region and

Colorado). In evaluating this factor, courts may rely not just on evidence from the jurisdiction

itself, but also on "statewide data or expert testimony applying general data to the [jurisdiction]."

*Mo. NAACP*, 894 F.3d at 940; *see also Blaine*, 363 F.3d at 913 (finding that requiring that courts

look only at the jurisdiction would be an "overly narrow interpretation of the first Senate factor").

Additionally, evidence of past voting rights lawsuits demonstrates a history of official

discrimination. *See Soto Palmer v. Hobbs,* No. 3:22-CV-05035-RSL, 2023 WL 5125390, at *7 (W.D. Wash. Aug. 10, 2023). Plaintiffs will submit evidence of prior acts of voter suppression, including some that resulted in lawsuits, in Ford Couty and Kansas. Plaintiffs' expert Dr. Ruben Martinez will demonstrate that Dodge City, southwest Kansas, and the broader state of Kansas have had a long and continuing history of official discrimination against Latines in voting and political participation, in addition to employment, housing, and general segregation, satisfying Senate Factor One.

**Senate Factor 2:** Senate Factor 2 evaluates "the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 37. As noted *supra*, Plaintiffs will demonstrate at trial that there is significant racial polarization in Dodge City.

**Senate Factor 3:** Senate Factor 3 analyses the extent to which "the state or political subdivision has used … voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37. Examples of voting practices that enhance discrimination are at-large elections, majority vote requirements, staggered terms of office which weaken the effect of single-shot voting and holding elections in non-presidential years. *See Large*, 709 F. Supp 2d at 1216-17; *Luna*, 291 F. Supp. 3d at 1136; *Soto Palmer v. Hobbs*, NO. 3:22-cv-05035-RSL, 2023 WL 5125390 at *7-8 (W.D. Wash. 2023). For purposes of satisfying Senate Factor 3, these voting practices or procedures need not be "the but-for cause of a minority candidate's electoral defeat." *Luna*, 291 F. Supp. 3d at 1136.

Plaintiffs' expert Dr. Christina Bejarano will testify that Dodge City employs three major voting practices and procedures that enhance the opportunity for discrimination against Latines: at-large election systems, staggered term election and differential length of terms for commissioners, and off-cycle timing for elections. Congress and the Supreme Court have

recognized that "among the most common [election schemes which enhance vote dilution] are at-large elections . . ." *Id*; *Rogers v. Lodge,* 458 U.S. 613, 616 (1982) ("At-large voting schemes and multimember districts tend to minimize the voting strength of minority groups by permitting the political majority to elect *all* representatives of the district."). The Dodge City Commission structure, wherein the winning candidate with the least number of votes gets a two-year term as opposed to a four-year term, can also compound the dilutive effect of the at-large system because of the difficulty of Latino-preferred candidates to get white support.

Additionally, Dodge City local elections are held off cycle, meaning they are held in odd-numbered, non-presidential years. "Off-cycle elections also enhance the opportunity for discrimination in two primary ways"—because minority groups have a larger dropoff in turnout from presidential to off-cycle elections as compared to whites, and because they "increase the relative influence of well-organized interest groups in maintaining the status quo." *Mo. NAACP*, 201 F. Supp. 3d at 1079-80, *aff'd* 894 F.3d 924; *see also, e.g.*, *Ketchum v. Byrne*, 740 F.2d 1398, 1404 n.5 (7th Cir. 1984); *NAACP, Spring Valley Branch*, 462 F. Supp. 3d at 409.

The touchstone for the third Senate factor is identifying "voting procedures that may operate to lessen the opportunity of [the minority group] to elect candidates of their choice." *Gingles*, 478 U.S. at 39. Under the Section 2 results standard—which "repudiated" the "intent test" in vote dilution cases like this one, *id.* at 44—Plaintiffs are under no obligation to show that the city has intentionally maintained these voting procedures for a discriminatory purpose, or even that the city has the legal authority to change those voting procedures or practices.

***Senate Factor 4***: Senate Factor evaluates "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at

37. At trial, Plaintiffs will put forth fact and expert testimony demonstrating that there is formal and informal Commission candidate slating that dilutes the vote of the Latine community.

**Senate Factor 5:**  Senate Factor 5 looks at "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Id.* "[P]olitical participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes." *Id.* at 69; *White v. Regester*, 412 U.S. 755, 768–69 (1977); *see also See United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 n.36 (11th Cir. 1984) ("[D]iscrimination can contribute to the inability of [the minority group] to assert their political influence and to participate equally in public life").

"Plaintiffs are not required to prove a causal connection between [the effects of discrimination] and a depressed level of political participation." *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 294 (5th Cir. 1996); *Whitfield v. Democratic Party of State of Ark.*, 890 F.2d 1423, 1430–31 (8th Cir. 1989) (similar); S. Rep. No. 97-417, at 29 n.144 (1982) (similar). "Rather, the burden is on those who deny the causal nexus to show that the cause is something else." *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1038 (D.S.D. 2004); *Marengo Cnty. Comm'n*, 731 F.2d at 1569 ("when there is clear evidence of present socioeconomic or political disadvantage … the burden is not on the plaintiffs to prove that this disadvantage is causing reduced political participation"); *Wright,* 979 F.3d at 1294. Indeed, where plaintiffs have established socioeconomic disparities, courts have been skeptical of blaming depressed voter turnout on the supposed apathy of minority voters. *See, e.g.*, *Marengo Cnty. Comm'n*, 731 F.2d at 1568–69 ("[b]oth Congress and the courts

have rejected efforts to blame reduced black participation on 'apathy'"); *Teague*, 92 F.3d at 294–95; *Whitfield*, 890 F.2d at 1431–32; *Gomez,* 863 F.2d at 1416.

Courts have found that indicators such as racial and ethnic disparities in home ownership; poverty; voting/registration; education; unemployment rates; per capita income; and many others support a finding that Senate Factor 5 is met. *See Cuthair*, 7 F. Supp. 2d at 1169–70; *Wright*, 979 F.3d at 1294–95; *Blaine*, 363 F.3d at 914; *Bone Shirt*, 336 F. Supp. 2d at 1037-38; *United States v. Berks Cnty., Pa.*, 277 F. Supp. 2d 570, 580–81 (E.D. Pa. 2003); *Jeffers v. Clinton*, 730 F. Supp. 196, 211 (E.D. Ark. 1989), *aff'd*, 498 U.S. 1019 (1991); *Mo. NAACP*, 201 F. Supp. 3d at 1069-73, *aff'd*, 894 F.3d 924 (8th Cir. 2018); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 435-36, 445 (S.D.N.Y. 2010). Courts consider all inequalities and accord more weight to the plaintiff's position when there is a multitude of disparities. *See Wright*, 979 F.3d at 1294–95.

Dr. Bejarano's testimony will show that, as compared to white residents, Hispanics in Dodge City face a wide array of stark socioeconomic disparities in income and poverty, education, health, and housing, and that Kansas' Latine population has lower rates of political participation. Dr. Martinez's testimony will contextualize the stark socioeconomic disparities by explaining the history of discrimination against Hispanics in Dodge City in areas such as housing, education, and public spaces.

***Senate Factor 6***: Senate Factor 6 evaluates "whether political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37. Courts have found the existence of this factor based on just a handful of salient incidents. *See generally United States v. Alamosa Cnty.*, 306 F. Supp. 2d 1016, 1025-26 (D. Colo. 2004) (finding racial appeals based on three elections where candidates identified own ethnicity); *Jeffers*, 730 F. Supp. at 212 ("simply informing the voters that one's opponent is black seems to be enough to do the trick"). Courts

evaluating this factor will consider the effect of a particular statement on the minority community, including if the statement stokes fear and or anger, to determine whether these statements of racial appeals. *See Soto Palmer,* No. 3:22-CV-05035-RSL, 2023 WL 5125390, at *9 (W.D. Wash. Aug. 10, 2023) (finding statements regarding non-citizens and immigration said by candidates within the political jurisdiction and region are racial appeals in a region with a large Latino community.). At trial, Plaintiffs will demonstrate evidence of racial appeals in Dodge City.

      ***Senate Factor 7:*** The seventh Senate Factor concerns "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37. "The core question posed in Factor 7 is whether [minority] candidates have historically been successful in the [jurisdiction], not whether individual [minority] candidates were more attractive candidates or could have run better campaigns." *Mo. NAACP*, 894 F.3d at 939. Courts consider both whether minority candidates have been elected and whether minority residents can elect their preferred candidates. *Clerveaux v. E. Ramapo Cent. School Dist.*, 984 F.3d 213, 241 (2d Cir. 2021). "[P]roof that some minority candidates have been elected does not foreclose a § 2 claim" or satisfaction of Senate Factor 7, *Gingles*, 478 U.S. at 75—especially if those elected are "unresponsive to the needs of [the minority group's] constituents, *NAACP, Spring Valley Branch*, 462 F. Supp. 3d at 409; *see also Gingles*, 478 U.S. at 75; *Clerveaux*, 984 F.3d at 241.

      Evidence that minority candidates are less likely to run for office can also weigh in favor of Senate Factor 7. *See Blaine*, 363 F.3d at 914 (Senate Factor 7 supported Plaintiffs as there was a qualified pool of minority candidates who were unwilling to run for office because white bloc voting made it difficult to succeed). Additionally, "evidence of [minorities] working as [government] employees is neither relevant nor probative" and "has no bearing on whether [election schemes] dilutes [minority] voting strength." *Bone Shirt*, 336 F. Supp. 2d at 1043; *see*

*City of Carrollton Branch of the N.A.A.C.P. v. Stallings*, 829 F.2d 1547, 1560 (11th Cir. 1987) (finding appointments of minorities to various county boards did "not demonstrate the ability of [minorities] to get elected to political office . . .").

Courts assessing Senate Factor 7 look also to the rates of election of the minority population to other offices across the state. *See, e.g.*, *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 56 F.3d 904 (8th Cir. 1995) (evaluating exogenous elections in assessment of Senate Factor 7); *NAACP v. Fordice*, 252 F.3d 361, 370 (5th Cir. 2001) (holding district court was correct in considering exogenous elections when evaluating Senate Factor 7). At trial, Plaintiffs will demonstrate that Hispanics are, and have been for decades, starkly underrepresented on the Dodge City Commission and in elected offices across municipal, county, state, and federal governments.

***Senate Factor 8:*** Senate Factor 8 evaluates "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. "A lack of responsiveness is 'evidence that minorities have insufficient political influence to ensure that their desires are considered by those in power.'" *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 2023 WL 7037537, at *131 (N.D. Ga. Oct. 26, 2023) (quoting *Marengo Cnty. Comm'n*, 731 F.2d at 1572); *see also Bone Shirt*, 336 F. Supp. 2d at 1043 (unresponsiveness exists where governing bodies "need not be accountable to minority interests."). When elected officials are "largely unaware" of the particularized issues of the minority community, there is generally a lack of responsiveness. *See Large,* 709 F. Supp. 2d at 1226(finding an at-large election scheme violated § 2). "[R]esponsiveness, like many things, is a question of both kind and degree." *Sanchez*, 97 F.3d at 1325 (internal citation omitted). Plaintiffs need not demonstrate the steps officials should take to increase responsiveness to establish Senate Factor 8. *Stallings*, 829 F.2d at 1561.

Government programs and expenditures that broadly benefit both the minority and majority communities are *not* probative of responsiveness to the specific concerns of the minority community. *Bone Shirt*, 336 F. Supp. 2d at 1047 ("Much of the testimony . . . relates to measures that broadly affect both Indians and non-Indians. As a result, this evidence is less probative of responsiveness to specific Indian concerns."); *Blaine*, 363 F.3d at 914 (rejecting argument that Senate Factor 8 is not met because at-large elections make elected officials responsive to all voters throughout the jurisdiction).

Expert and fact testimony at trial will show that elected officials in Dodge City have shown a lack of responsiveness to the particularized needs of the Hispanic community with respect to voter access, health, discrimination, and immigration enforcement, among other areas. Testimony will also establish that Dodge City's government functions principally to serve the white residents, while the needs of the Hispanic community in south Dodge are often left unmet.

***Senate Factor 9***: Senate Factor 9 addresses "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 37 (internal quotation marks omitted). While Plaintiffs do not need to establish discriminatory intent under the results test, "the tenuousness of the justification for a state policy may indicate that the policy is unfair"; that is, that "the device has a discriminatory result." *Marengo Cnty. Comm'n*, 731 F.2d at 1571. Additionally, the tenuousness inquiry is also beneficial insofar as it has "the propensity to show whether a state's policy was pretextual." *Cousin v. McWherter*, 46 F.3d 568, 576 (6th Cir. 1995). Given that Plaintiffs will demonstrate at trial that the at-large system has discriminatory results and is maintained with discriminatory intent, this evidence is more than sufficient to satisfy the lower bar to establish tenuousness.

17

*Proportionality*: While it is not dispositive, "proportionality is a relevant fact in the totality of circumstances" analysis. *LULAC v. Perry*, 548 U.S. at 436 (internal quotation marks omitted). "'Proportionality' as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994). Here, the proportionality analysis involves "comparing the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population." *LULAC*, 548 U.S. at 436 (evaluating proportionality in that case by using CVAP). Dodge City has a 46% Hispanic citizen voting-age population ("HCVAP"), and yet in the current system, there are no districts—at-large or single-member—that are majority-HCVAP. By contrast, Plaintiffs will demonstrate that it is possible for Dodge City to comply with the Supreme Court's directive of "rough proportionality," *id.* at 438 (quoting *De Grandy*, 512 U.S. at 1023), by adopting a single-member district system.

### III.   Equal Protection Clause of the Fourteenth Amendment—Discriminatory Intent

To prevail on their claim of intentional discrimination in violation of the Fourteenth Amendment, Plaintiffs must show that race was a "motivating factor" in maintaining the at-large election system for the Dodge City Commission. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). An electoral device, such as an at-large voting scheme, that is "maintained for invidious purposes" violates the Fourteenth Amendment, even where such device was "racially neutral when adopted." *Rogers*, 458 U.S. at 616–17 (internal citations omitted). Plaintiffs are not required to produce a smoking gun or to prove that racial considerations predominated over all other considerations in Dodge City's operation of the dilutive at-large method of election. *Vill. of Arlington Heights,* 429 U.S. at 265. Rather, "'[d]iscriminatory purpose" . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action *at least*

*in part "because of,"* not merely "in spite of," its adverse effects on an identifiable group.'" *Navajo Nation v. State of New Mexico*, 975 F.2d 741, 743–44 (10th Cir. 1992) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (italicization in original).

In *Arlington Heights*, the Supreme Court set forth several non-exhaustive factors that constitute indirect evidence establishing a prima facie case of intentional discrimination: (1) "impact," i.e., whether the challenged activity "bears more heavily on one race than another," (2) "historical background of the decision," (3) "the specific sequence of events leading up to the challenged decision," (4) "departures from the normal procedural sequence," (5) "legislative or administrative history[,]" (6) "foreseeability of discriminatory impact," (7) "knowledge of discriminatory impact," and (8) "the availability of less discriminatory alternatives." *Jean v. Nelson*, 711 F.2d 1455, 1485–86 (11th Cir. 1983) (describing the *Arlington Heights* factors as "some examples" of evidence for an intentional discrimination claim) (internal citations omitted); *see also Perkins v. City of W. Helena, Ark.*, 675 F.2d 201, 209–16 (8th Cir. 1982) (evaluating *Arlington Heights* factors together with other evidence relevant to discriminatory intent).

The evidence to be presented at trial will demonstrate through the *Arlington Heights* factors that diminishing the voting influence of the Hispanic population by continued operation of a dilutive at-large method of election contravenes the Fourteenth Amendment. As an initial matter, the evidence at trial will show that Defendants have possessed knowledge of the discriminatory impact of Dodge City's at-large electoral system for over a decade, thereby establishing *Arlington Heights* Factors 6 and 7. Moreover, Plaintiffs will establish that the discriminatory impact has only grown more foreseeable, as the Hispanic population in Dodge City has increased substantially yet Hispanic candidates of choice have continued to run for Commission unsuccessfully, and voting in Dodge City Commission elections is consistently racially polarized.

Evidence will also demonstrate that years after first being on notice of the discriminatory impact of the at-large scheme,  the Dodge City Commission in 2019 summarily rejected a proposal to adopt district-based elections, which is a readily available "less discriminatory alternative" to at-large systems under *Arlington Heights* Factor 8. The Commission made this decision despite legal research conducted by the League of Kansas Municipalities in 2019 suggesting that Dodge City met the *Gingles* pre-conditions for vote dilution. To date – even after the filing of this lawsuit by residents – Dodge City has never given due consideration to district-based elections, with "unity" the only justification offered by officials. Such circumstances are probative of intentional discrimination under *Arlington Heights* factors 2, 3, 4, and 5, which examine the context and fairness of procedures surrounding the challenged decision.

Additional evidence presented by Plaintiffs' experts will provide further proof of discriminatory intent. At trial, Plaintiffs' expert will testify as to the discriminatory impact of at-large election systems, which helps establish the first *Arlington Heights* factor. As further evidence that Dodge City has maintained the at-large election system at least in part because of its adverse effects on an identifiable group, Plaintiffs' expert Dr. Martinez will testify that any disparate impact was foreseeable given the historical implementation of at-large voting methods to suppress the voting power of minorities and the working class. Lastly, Dr. Martinez will emphasize that Dodge City's continuous use of the at-large system must be analyzed as part of a larger historical trend of discrimination against Hispanics and other racial minorities in Dodge City.

## CONCLUSION

Plaintiffs respectfully assert that, under the prevailing legal standards described above, they will present sufficient evidence to establish violations of Section 2 of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment.

Dated: February 20, 2024

Respectfully submitted,

By: */s/ Kunyu Ching*

Sharon Brett KS 28696
Kunyu Ching KS 29807
**AMERICAN CIVIL LIBERTIES UNION OF KANSAS**
10561 Barkley Street
Suite 500
Overland Park, KS 66212
sbrett@aclukansas.org
kching@aclukansas.org
913-490-4100

Chad W. Dunn*
Sonni Waknin*
Bernadette Reyes*
**UCLA VOTING RIGHTS PROJECT**
3250 Public Affairs Building
Los Angeles, CA 90065
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org
310-400-6019

Jonathan Topaz*
Sophia Lin Lakin*
Victoria Ochoa*
**AMERICAN CIVIL LIBERTIES UNION, INC.**
125 Broad Street, 18th Floor
New York, NY 10004
jtopaz@aclu.org
slakin@aclu.org
vochoa@aclu.org
212-549-2500

Abena Mainoo*
Jonathan I. Blackman*
Mijin Kang*
Katherine MacAdam*
Isabella Masiello*
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006
amainoo@cgsh.com
jblackman@cgsh.com
mkang@cgsh.com
kmacadam@cgsh.com
imasiello@cgsh.com
212-225-2000

Scott Fuqua*
**FUQUA LAW & POLICY, P.C.**
P.O. Box 32015
Santa Fe, NM 87594
scott@fuqualawpolicy.com
505-982-0961

*Attorneys for Plaintiffs*

* Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to D. Kans. Loc. R. 5.1(f), I hereby certify that on this 20th day of February

2024, a true and correct copy of the foregoing was served via the United State District Court's

CM/ECF system on all parties or persons requiring notice, including upon attorneys for

defendants:

FOULSTON SIEFKIN LLP
Anthony F. Rupp, KS #11590
Tara Eberline, KS #22576
Sarah E. Stula, KS #27156
7500 College Boulevard, Suite 1400
Overland Park, Kansas 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com
sstula@foulston.com

FOULSTON SIEFKIN, LLP
Clayton Kaiser, KS #24066
Samuel Walenz
1551 North Waterfront Parkway, Suite 100
Wichita, Kansas 67206
(316) 267-6371
(316) 267-6345 (fax)
ckaiser@foulston.com
swalenz@foulston.com

By: */s/ Kunyu Ching*
Kunyu Ching KS 29807
**AMERICAN CIVIL LIBERTIES**
**UNION OF KANSAS**
10561 Barkley Street
Suite 500
Overland Park, KS 66212
sbrett@aclukansas.org
913-490-4100