# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MIGUEL COCA, et al.,        )
                              )
              Plaintiffs,   )      Case No. 6:22-cv-01274-EFM-RES
                              )
vs.                        )
                              )
CITY OF DODGE CITY, et al.,  )
                              )
             Defendants.   )

## DEFENDANTS' TRIAL BRIEF

Plaintiffs' claims arise under Section 2 of the Voting Rights Act and the Fourteenth Amendment to the Constitution.

As noted by the Court, "the voting scheme by which members [of Dodge City's City Commission] are elected [is] the basis of Plaintiffs' claims. (Doc. 158, at 2). At-large elections are not per se violations of the Constitution or the VRA. *See Rogers v. Lodge*, 458 U.S. 613, 617 (1982); *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986). It is well established that "[f]ederal-court review of districting represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). Accordingly, "[c]ourts only take the extraordinary step of intruding on [local] political process[es] when there is clear evidence that constitutional [or statutory] rights are being violated." *Dean v. City of Charlotte*, 2022 WL 1698644, at *6 (W.D.N.C. May 26, 2022). Plaintiffs have failed to make the requisite showing to justify the intrusion and compulsion they seek in this case.

Section 2 of the VRA forbids "any State or political subdivision" from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. 10301(a). The right protected by Section 2 is "equality of opportunity, not a

guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson v. DeGrandy,* 512 U.S. 997, 1014, n. 11 (1994). Section 2 explicitly states, "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion of the population."

Recognizing that at-large systems are not per se violative of the Voting Rights Act, the Supreme Court's opinion in *Gingles* sets forth the foundation for assessing at-large voting systems for vote dilution under Section 2.

Plaintiffs bear the burden to show:

1. The *minority* group is sufficiently large and geographically compact to constitute a majority in a reasonably configured district.

2. The *minority* group is politically cohesive.

3. The white *majority* votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate.

In the Tenth Circuit, "[t]he inquiries into remedy and liability . . . cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system." *Sanchez v. Colorado,* 97 F.3d 1303, 1311 (10th Cir. 1996).

Only if the plaintiffs can satisfy each *Gingles* precondition does the analysis then proceed to a totality of the circumstances test to determine whether the voting system "results in unequal access to the electoral process." *Gingles,* 478 U.S. at 46. "[I]t is the plaintiff's burden to establish each of *Gingles* preconditions and to show, under the totality of the circumstances, that members of the protected class suffer unequal access to the political process." *Wright v. Sumter Cnty. Bd of Election & Registration,* 979 F.3d 1282, 1302 (11th Cir. 2020).

There is no denial of equal access to the electoral process under Dodge City's at-large system. The remedies proposed by the Plaintiffs are impermissible. Plaintiffs here cannot sustain their burden of proof on any one of the three prerequisites. The failure to establish any one of the prerequisites is fatal. Moreover, the totality of the circumstances weighs heavily in the favor of Dodge City. Accordingly, judgment should be entered in Defendants' favor.

### The Demographics of Dodge City

Dodge City is a small city with a total population of approximately 27,000. The Latino population, both citizens and non-citizens, is growing rapidly. There are 3,000 fewer white persons in the Voting Age Population than there were in 2000. There are 4,500 more Latinos in the VAP than there were in 2000. The Latino VAP has grown from 37.5% in 2000 to 50% in 2010 to 57.9% in 2020.

When one considers the Citizen Voting Age Population (eligible voters), Plaintiff's expert Barreto indicates that in 2021, Latinos make up 46.1 percent citywide and whites make up 47.2% citywide. That means that by 2021 there was a nearly even split (no wide majority) of either white or Latino voters. Thereafter, new numbers for 2022 have been published by the Census Bureau. The dramatic transformation of the electorate in Dodge City has continued and now Latino ***voters constitute a majority of the CVAP.*** And it is not just a majority, but rather a majority of nearly 5% of the CVAP. Plaintiffs and Defendants agree that these trends will continue. Accordingly, right now and for the foreseeable future Latinos have the voting power to elect their candidates of choice in an at-large voting system in Dodge City.

Plaintiffs claim that Latinos bear the effects of discrimination in that they are behind whites in such areas as education, employment and health, depriving Latinos of the ability to participate in the political process. The reality is that Dodge City is welcoming to the Latino community,

including migrants. The socio-economic discrepancy is explained not by discrimination but rather by the fact that Dodge City is welcoming to a migrant community that is socio-economically behind when they arrive in Dodge City. Despite these challenges, a review of key indicators demonstrates significant improvement for Latinos in Dodge City. In time periods considered by Plaintiffs' expert Dr. Christina Bejarano, the Latino unemployment rate has improved from 7.1% to 4.5%. There are fewer Latinos than Whites receiving SNAP benefits. The median household income for Latinos has increased from $44,354 to $54,133. The number of Latinos with less than a high school diploma has dropped from 62.4% to 44.2%. More Latinos than Whites have internet access. Some 57.9% of Latinos own houses. Latinos live throughout Dodge City. While Plaintiffs claim a North/South divide in Dodge City between whites in the North and Latinos in the South, the reality is that, in many areas of the North, Latinos are the plurality or there is only a small difference between the number of Whites v. Latinos.

The Latino community in Dodge City is vibrant. Latinos own and operate many downtown businesses and have leadership positions in community and professional organizations, such as the Chamber of Commerce, local unions, charitable organizations, political parties, Main Street Dodge, Engage Dodge, the Cultural Relations Advisory Board, and health care and education. Latinos have been elected to the City Commission. When vacancies have occurred on the City Commission, the Commission has appointed a Latino, Blanca Soto, to fill it. The City Commission has also hired a Latino, Nick Hernandez, to serve as City Manager.

## Proportionality

Plaintiffs' emphasis on the lack of a proportional number of Latinos on the City Commission is misleading in that the first step to becoming an elected official is to place one's name on the ballot. Few Latinos have done so. When dealing with such a small sample size, it is

pure speculation for Plaintiffs to argue that any Latino candidate who was not elected was, in fact, racially preferred. Compounding the problem for Plaintiffs is the fact that Latinos do not make up a substantial majority in any one precinct nor, according to Plaintiffs own expert Dr. Matt Barreto, do Latinos vote at a very high rate, thus, even in those precincts with a Latino majority, it is impossible to determine whether the results from those precincts were driven by Latino voters or White voters.

For instance, in 2010 and 2012, there were only three candidates. Thus, every candidate who ran for office was elected. It took very few votes to win the election.

In 2014, there were seven candidates, two of whom were incumbents. The two incumbents were elected along with Jan Scoggins, whom plaintiffs contend is Latino-preferred. While Defendants dispute that there is evidence that she is Latino-preferred, that is nonetheless the contention of Plaintiffs. There was one candidate with a Latino surname.

In 2017, there were seven candidates on the ballot and only one of them had a Latino surname. However, the candidate with the Latino surname was on the ballot only because it was too late in the process for her name to be removed when she decided that she did not want to run anymore.

In 2019, the only person on the ballot who identifies as Latino, Joe Nuci, was elected.

Nuci was reelected in 2021. There was one other candidate who identifies as Latino, Blanca Soto, and one with a Latino surname, Michelle Salinas. Neither Soto nor Salinas won any precincts in any part of the City and neither was elected.

In the recent 2023 election, Nuci was the only Latino on the ballot, and he was not re-elected to a third term. Plaintiffs have made no claim and provided no expert report suggesting racially-polarized voting in the 2023 election.

**Elections in Odd-Numbered Years**

With certain exceptions not applicable here, Kansas law requires city elections to take place in odd-numbered years. K.S.A. 25-2107(a). This is a law of uniform applicability and Dodge City does not believe that it, or any other city, has home-rule authority to opt out of the law. *See* Kan. Const. art. XII, § 5(c)(1). As far as Dodge City knows, no city in Kansas has opted out and Dodge City is not aware of any legal proceeding in any city in the State testing whether a city has the authority to conduct its elections in even-numbered years.

There had been an effort by some in the state legislature nearly 10 years ago to change the date of such elections to November of even-numbered years. That effort failed. Most Kansas cities, including Dodge City, vigorously opposed that effort. The belief was that city elections would be relegated to the bottom of the ballot and that city issues would be ignored by voters and that such elections would become divisive – caught up in national politics.

There is no evidence that any commissioner, citizen, or organization in Dodge City has ever come before the Commission and argued in favor of attempting to opt out of the state law requiring elections in November of odd-numbered years.

**How this case came about**

This case is not the result of any longstanding push by Latino voters or organizations in Dodge City to switch to single-member districts in Dodge City. Rather, it is a class project stemming from students in the class of Dr. Matt Barreto at the UCLA Voting Rights Project ("UCLA VRP"). The UCLA VRP thus initiated the idea and serves as plaintiffs' counsel. Dr. Barreto serves as Plaintiffs' expert on *Gingles II* and *III.* UCLA has not produced the work of the student, any analysis by Dr. Barreto upon his receipt of the student's work, or any notes of Dr.

Barreto at the time. The unnamed student associated with the project has not been identified as a Dodge City resident.

Plaintiff Rangel-Lopez, a recent University of Kansas graduate, interned in the City Manager's Office in the summer of 2022. He was working with the City Manager and staff and in a position of unusual access to city government. While there, he did not use his position to address with the City Manager's Office or the City Commission any views he might have had about switching to single member districts. He never mentioned to city staff that he had been working with attorneys from the UCLA VRP dating back to 2020 about suing Dodge City over these issues, as he has now testified. Prior to filing suit, neither Rangel-Lopez nor Plaintiff Coca gave Dodge City any notice or seek an opportunity to argue their cause. The same is true of the organizations supporting the lawsuit – the UCLA VRP and the ACLU. They did not seek public dialogue on the issue before attempting to force this issue without citizen input.

One prior commissioner, Ms. Jan Scoggins, did briefly raise the question of whether Dodge City should consider a hybrid system of two at-large commissioners and three single-member districts. She apparently did so after a meeting with an unidentified group. That unidentified group never came before the Commission to present any reasons for the change. Other than Ms. Scoggins, there was no strong support for switching to single-member elections.

### At-large elections

In 1971, the voters of Dodge City enacted Charter Ordinance No. 7, which adopted the commissioner-manager form of government including the at-large system of election for its non-partisan City Commission. This method for electing City Commissioners has remained in effect since that time. At-large elections are facially neutral, and they were not adopted in Dodge City for discriminatory reasons. Neither has Dodge City maintained the at-large system for

discriminatory reasons. Frankly, there has been very little discussion about switching to single-member districts and no significant push by Latino leadership to make such a change.

Dr. Kimberly Nelson is a professor of Public Administration and Government at the University of North Carolina-Chapel Hill, School of Government. She is a nationally-recognized expert in local government form, structure, and management. She opines that Dodge City's form of government is most associated with at-large voting and is the most popular form of municipal government in the United States. It is associated with better performance on a number of measures.

The evidence will show that many Kansas cities of similar size use the same at-large system for city elections. This list includes, among others, Manhattan, Hays, Garden City, and Liberal. Furthermore, contrary to Plaintiffs' intimations otherwise, there are a number of non-discriminatory reasons why cities prefer at-large elections to single-member districts, such as, having city commissioners that ask themselves what is best for Dodge City as a whole, as opposed to what is best just for their own individual district.

As even Plaintiffs acknowledge, there have been no divisive issues that have splintered Dodge City—likely because Dodge City strives to improve the life of all of its citizens. Since Dodge City has a commissioner-manager model of governance, its day-to-day operations are run by City Manager Nickolaus Hernandez, a Latino who grew up in Ford County, and his supporting offices. In addition to Mr. Hernandez, other Latinos, like Mr. Ernestor de la Rosa (who the Court will hear from) have filled the upper echelon of city government in Dodge City.

**Opportunity**

Latinos in Dodge City are not deprived of any opportunity to participate in the political process.

Elections in Dodge City are conducted by the non-party, Ford County. The County provides ballots and instructions in English and Spanish and bilingual poll workers. There are currently two polling locations for election-day voting in Dodge City for all elections, including elections for City Commission. The concept that there is a single "election day" is a bit of a misnomer as well. Ford County makes available advance voting at the county office downtown for essentially a three-week period in advance of the election. Absentee voting is also available.

Based on Plaintiffs' assertions throughout this case, a well-publicized polling location change made by the Ford County Clerk for the 2018 general election (not a City Commission election) is a focus of an argument that somehow there are impediments to vote in Dodge City.

Prior to 2018, Ford County had operated one polling location in Dodge City. That location, the Civic Center, was owned by the school district. With little advanced warning, the school district advised the Ford County Clerk of the unavailability of the Civic Center for the general election in light of an anticipated construction project. Faced with this unanticipated challenge, the Ford County Clerk will testify that she did her best to find a location that was (a) under the control of the County, (b) of sufficient size, and (c) handicapped accessible. The County's Expo Center, immediately south of Dodge City, met those criteria. She provided notice in English and Spanish to every registered voter. There was extensive publicity about the changed polling location—in both English and Spanish. Buses were made available to take anyone who mistakenly appeared at the Civic Center to get voters to the right location. In addition, Dodge City provided door-to-door transportation from voters' homes to the polling location. Dodge City also volunteered its bilingual employees, who are paid up to 10% more for their bilingual ability, to serve as poll workers.

While this one-time only unanticipated change in polling location was unfortunate for everyone, it was not intended to impair the Latino vote. The change impacted all voters equally.

Whether it was by voting in advance, or by absentee, or in person on election day, all voters had equal opportunity to exercise their right to vote—and Dodge City stepped up to do its part to help.

Moreover, although the United States Department of Justice ("DOJ") has previously sent poll watchers and sought information about at-large elections, it has never asserted that there is anything impermissible about Dodge City elections.

Dodge City has participated in numerous initiatives to welcome Latinos to the City and to encourage their civic involvement, such as the Cultural Relations Advisory Board, the Welcoming Dodge City Strategic Plan, the International Festival, the New Americans Dinner, the Engage Dodge Program, and providing free public transportation to vote. Dodge City has also hosted United State Citizenship and Immigration Services ("USCIS") Mobile Services, US Naturalization Ceremonies, Mexican Consulate Mobile Services, and Guatemalan Consulate Services. These efforts, along with others, have led to Dodge City being recognized as a leader when it comes to integrating immigrants into the community.

In short, Dodge City has been very forward looking in its involvement with its Latino citizens and has striven to ensure that its Latino citizens can meaningfully participate in their local government if they so choose.

### Issues To Be Decided Trial

#### A.  *Plaintiffs cannot prove a Section 2 violation.*

As noted above, and as this Court knows, to prove a Section 2 violation a plaintiff must prevail on the initial three-part test in *Gingles* and then under the totality of the circumstances. Plaintiffs cannot do either here.

### 1.  Plaintiffs don't satisfy *Gingles* I.

The remedy proposed by Plaintiffs to create five single-member districts and to violate state law by holding elections in November of even-numbered years is not a "permissible remedy." It would inappropriately divide a community in which Latinos are now the CVAP majority into five districts divided by ethnicity. Under *Gingles* I, the *minority group* must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district (emphasis is ours). Here, Latinos are no longer the minority group and are already the majority in a reasonably configured citywide district.

As repeatedly stated by the Supreme Court, Section 2 "is not concerned with maximizing minority voting strength." *Bartlett v. Strickland*, 556 U.S. 1, 23 (2009). Rather, it is focused on equality of opportunity. Accordingly, considerations of race may not predominate in Plaintiffs' illustrative maps. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 30 (2023) (internal quotation marks and citations omitted) (plurality op.) ("[W]e have made clear that there is a difference between being aware of racial considerations and being motivated by them. The former is permissible; the latter is usually not."). Plaintiffs' illustrative maps must still "comport[] with traditional districting criteria." *Id.* at 18. Here, Plaintiffs' illustrative maps fail to meet this standard. Plaintiffs' proposed maps subjugate traditional districting criteria for the purpose of composing and maximizing Latino-majority districts. As none of Plaintiffs' illustrative maps are free of that stain, none should be credited, and, as a result, this Court should find that Plaintiffs have failed to satisfy *Gingles* factor 1. *See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 480 (1997) ("Because the very concept of vote dilution implies—and, indeed, necessitates—the existence of an 'undiluted' practice against which the fact of dilution may be measured, a § 2 plaintiff must also postulate a reasonable

alternative voting practice to serve as the benchmark 'undiluted' voting practice." (Citation omitted)).

Moreover, because plaintiffs' proposed remedy is to violate state law regarding the date of the election, the remedy violates the guidance of *Sanchez v. Colorado*, 97 F.3d 1303, 1311 (10th Cir. 1996), that "inquiries into remedy and liability . . . cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system."

Finally, the evidence at trial will not show that Plaintiffs' proposal will actually result in more Latinos or so called Latino preferred candidates being elected to the City Commission. Accordingly, *Gingles* factor I is not met. *See Abbott v. Perez*, 585 U.S. 579, 618 (2018) ("Under *Gingles*, the ultimate question is whether a districting decision dilutes the votes of minority voters, . . . and it is hard to see how this standard could be met if the alternative to the districting decision at issue would not enhance the ability of minority voters to elect the candidates of their choice.").

### 2.   Plaintiffs don't satisfy *Gingles* factors II and III.

The Plaintiffs base their claims under *Gingles* II and III entirely on the professor for the class project that was apparently the basis for this suit, Dr. Matt Barreto. From a statistical perspective, Dr. Barreto's work gets a failing grade.

Dr. Barreto violates all measures of scientific reliability in that he does not show his work or his margin of error. These errors run throughout all of his analyses, not just his ecological inference analysis. Dr. Barreto also does not work with adequate sample sizes. He has previously testified that the sample sizes he is working with here are too small to satisfy *Gingles* II and III. *See Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-cv-2579, 2014 WL 1668500, at *7 (S.D. Tex. Apr. 25, 2014). Dr. Barreto attempts to distinguish his prior testimony by saying that he now

uses a "novel" method called Bayesian Improved Surname Geocoding ("BISG") that he and Plaintiffs' attorneys recently wrote about, arguing that it overcomes the problems that have limited their success in the past. This self-serving argument fails as the purportedly more effective measure of estimating which voters are Latino by using voter files rather than census data does nothing to fix the problem of sparse data. There is no valid statistical solution to the lack of data.

The article that Dr. Barreto wrote, along with Plaintiffs' lawyers here, acknowledges that, in *Cisneros*, the court rejected as unreliable a method similar to BISG in Exhibit 481, page 28, stating:

> The limitations on ACS's sample methodology for analysis of small jurisdictions played out dramatically in *Cisneros v. Pasadena Independent School* District, in which the court found that polarization could not be proved due to insufficient data. The court rejected a method similar to BISG—of using surname analysis of actual voters—opting instead to rely solely on ACS VAP data despite its limitations under the circumstances. Doing so led the court to conclude "that there is no evidence of racially polarized voting in the recent endogenous elections."

Even if BISG had the ability to produce reliable information, it would still require a scientist to show his work and his measure of error. Dr. Barreto does neither. In fact, on pages 40-41 in his jointly published article with Plaintiffs' counsel, Dr. Barreto had this to say about BISG confidence intervals: "[t]wo immediate trends were clear in the BISG data. First, for both white and Black voters, the confidence interval, or uncertainty estimate surrounding the vote choice prediction, was smaller and tighter, which is evidence of a more accurate prediction . . . ."

The article by Dr. Barreto and Plaintiffs' lawyers highlights the refusal of Dr. Barreto to provide confidence intervals in this case. It also highlights the challenges caused by dealing with different racial and ethnic groups. The literature is replete with evidence that black voters are considerably more likely to vote in a bloc than Latino voters are. This is reflected in a learned treatise relied upon by Plaintiffs' expert Bejarano, Ex. 490. There, the authors wrote:

> Scholars continue to debate the degree to which electoral institutions matter for representation. The literature predicts that minorities benefit from districts while women benefit from at-large elections. The mechanisms by which institutions affect the ability of traditionally underrepresented groups to win seats have been understudied. Using an analysis of over 7,000 cities and interviews with city councilors, we find that compared to at-large systems, district systems can increase diversity only when underrepresented groups are highly concentrated and compose a substantial portion of the population. In addition, we find that the electoral system has a significant effect on representation only for African American male and white female councilors; the proportion of African American women and Latina councilors is not affected by the use of either district or at-large systems.

Simply put, Plaintiffs cannot establish that they are politically cohesive or that Whites vote sufficiently as a bloc to enable them to defeat the Latino preferred candidate for City Commission. These failures are further magnified by Dr. Barreto's acknowledgement that the CVAP for Latinos and Whites in Dodge City was virtually even in 2021, and the subsequent evidence that there are now more people in the Latino CVAP than in the White CVAP.

### 3.   The totality of the circumstances does not favor Plaintiffs' position.

Although it will not be necessary for the Court to engage in the totality-of-the-circumstances analysis because Plaintiffs will not be able to prevail on the first part of *Gingles*, even if the Court reaches this stage, the outcome will still be the same. At bottom, under the totality of the circumstances, the Plaintiffs must show that "the political processes leading to nomination or election are not equally open to participation by members of a protected class in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." (Doc. 159, at 9-10) (citation omitted).

Plaintiffs will not be able to make the requisite showing. Other than the erroneous view of Plaintiffs' expert Dr. Ruben Martinez that at-large elections gained widespread acceptance as a tool to suppress the minority vote, (Doc. 140, at 8)—a position that Defendants' expert Dr. Kim Nelson will quickly dispel—there is no evidence that Dodge City has imposed any barriers that

impede Latinos' ability to vote or run for City Commission. The fact of the matter is that Latinos and their allegedly preferred candidates have run for office, and they have won. Latinos have been appointed to and served on the City Commission. Latinos are employed at the upper echelon of city government in Dodge City. Latinos hold prominent positions in the education, business, and political communities in Dodge City. In short, Latinos are free to participate in the nomination and election of Dodge City Commissioners if they so desire. It is hard to complain about the failure to elect a candidate who does not run for office *See, e.g.*, *Johnson v. DeGrandy*, 512 U.S. 997, 1020 (1994) ("[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground.").

Additionally, Dr. Martinez's contention that "discrimination against Hispanics historically has been commonplace in Dodge City and neighboring municipalities" is baseless. (Doc. 140, at 8). As recognized by the Court, Dr. Martinez "has zero prior experience with Dodge City history, Kansas history, or the Voting Rights Act." (Doc. 159, at 13). While this may not be enough to exclude an expert who is attempting to opine on Dodge City history at the summary judgment stage, it would certainly seem that such facts strongly militate against giving Dr. Martinez's testimony any weight at trial.

Plaintiffs' reliance on perceived disparities between Latinos and Whites on various economic, educational, and financial matters is misplaced. For starters, it is not surprising that some level of disparity exists, as many in the Latino community are first-generation immigrants, and thus their current standing likely has nothing to do with discrimination but rather is tied to their recent immigration. Furthermore, Plaintiffs provide no explanation for how the substantial gains that Latinos have made in each of the categories that they cite to has impacted Latinos' ability to participate in the local political process. Finally, Plaintiffs do not account for how all of the

outreach efforts that Dodge City has implemented, such as free rides to the polls, has diminished the effect of the alleged disparities that they reference. While Plaintiffs claim that Latinos participate less than Whites based on their alleged disparities, they provide no evidence to lead a reasonable factfinder to believe that Latinos' alleged lack of participation is due to the cited disparities, as opposed to an individual decision not to participate. Instead, Plaintiffs opt to merely Pavlovianly cite to various American Community Survey estimates without providing any context or analysis for them. (*See generally* Doc. 140, at 12-15).

### B. Plaintiffs will not be able to show a Fourteenth Amendment Violation.

Plaintiffs concede, as they must, that Dodge City's election method was not enacted with discriminatory intent in 1971. (Doc. 158, at 12-13). Instead, they argue that Dodge City has maintained the method for a discriminatory purpose. (*Id.* at 13). As pointed out by the Court at the summary judgment stage, Plaintiffs evidence in favor of its Fourteenth Amendment position is "slim" and "does not account for Defendants' own evidence against finding discriminatory intent." (*Id.* at 15). While the Court was previously constrained by drawing all inferences in favor of Plaintiffs, that restraint will be lifted at trial, and it will then be time to put to rest Plaintiffs' unfounded discrimination theory.

Considering all of the relevant evidence here, Plaintiffs cannot prevail on their Fourteenth Amendment claim because there is no evidence of invidious discrimination. Recognizing this, Plaintiffs pivot and ask this court to infer discriminatory intent based on the mere knowledge that someone could one day argue that its "at-large system impermissibly dilutes Hispanic's voting power." (Doc. 140, at 19). As a general rule, mere "awareness of consequences" is insufficient for a Fourteenth Amendment claim. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). This case does not present an exception to that rule. Specifically, Plaintiffs' Fourteenth Amendment

claim boils down to two primary things: (1) a 2011 request for information made by the DOJ to Ford County and (2) Ms. Scoggins's request for the City to look into adopting a hybrid form of elections, not the straight five-member single districts that Plaintiffs propose here. (Doc. 140, at 19-20).

Starting with the 2011 DOJ request, nothing ever come from it. The so-called expert that Ford County retained, Mr. Bruce Adelson,[1] who Plaintiffs tellingly elected not to present, merely stated that there was a "potential" threat of action. This threat obviously never came to fruition, as neither Ford County nor Dodge City heard anything again from the DOJ in the thirteen years following the DOJ's initial request for information. Likewise, no community group prior to the filing of this lawsuit gave any indication that it believed that Dodge City's election method was impermissible or violative of any of its members' rights. Thus, Dodge City had no reason to believe that what it was doing was wrongful in any way.

As for Ms. Scoggins's request, it too is a nothingburger. Elected officials pose ideas all of the time—some that get support others that do not. Ms. Scoggins indicated that she was fronting her request on behalf of a community group. However, no community group ever came forward, nor did Ms. Scoggins ever identify the group. Additionally, Ms. Scoggins gave no indication that her request to look into the matter was based on the belief that the current system unlawfully diluted the voting power of Latinos or that Dodge City was doing anything impermissible. Rather, Ms. Scoggins simply asked that Dodge City look into the issue (*i.e.*, whether Dodge City should

---

[1]     Notably, Mr. Adelson was retained by the Michigan Independent Citizens Redistricting Commission ("Redistricting Commission") to be its "voting rights act legal counsel" as it redrew Michigan's legislative districts following the 2020 decennial census. In *Agee v. Benson*, No. 1:22-cv-272, 2023 WL 8826692 (W.D. Mich. Dec. 21, 2023), though, the Redistricting Commission's districts were struck down by a three-judge panel on the ground that the process that the Redistricting Commission employed, and which Mr. Adelson's client advocated for, violated the Equal Protection Clause. Throughout its opinion, the three-judge panel recounted the many instances that it believed Mr. Adelson had provided the Redistricting Commission erroneous VRA advice. The three-judge panel's opinion may explain why Plaintiffs are not calling Mr. Adelson in this case, but instead are relying upon such things as a November 2011 invoice to explain what advice Mr. Adelson provided to Ford County.

go to a mixed at-large/ward model, not the five-single member districts that Plaintiffs propose), which the City did. After the City Attorney reported on it, the Commission decided not to deviate from its then-nearly fifty-year process for one that, outside of Ms. Scoggins, apparently no one was interested in. There is nothing about that decision that suggests discriminatory intent.

Attempting to buttress their undeniably "slim" evidence of discriminatory intent, Plaintiffs may cite to a memo penned by "a law student extern working for the League of Kansas Municipalities." (Doc. 159, at 4). This memo is not entitled to any weight. First, it appears that the extern was not even advocating for the City to abandon its at-large election method. (*See* Pltfs. Ex. 4, at Dodge_City_0003610 (stating that "Dodge City would need to pass an ordinance establishing that they will be electing their commissions by single-member districts, rather than through their current at-large process" and that "Dodge City would need to be careful to not dilute the voting power of Hispanics and Latino voters in any map that it adopted")). Rather, the extern was warning about potential consequences that could arise from adopting a district-based model. Second, as is true of the Mr. Adelson opinions that Plaintiffs rely upon, the extern's opinions were merely the product of their view of the demographic information and ham-handed belief that there may be some possible VRA violation based on such information, though the individual had not performed the underlying analysis necessary to hold that belief.

Finally, it appears that Plaintiffs intend to produce evidence relating to the Dodge City Police Chief's alleged use of a plainclothes officer to record a public meeting on a then-pending immigration bill. If they do, this evidence should be excluded. First, it is hearsay, as Plaintiffs are not calling the Dodge City Police Chief, nor do any of their disclosed witnesses have first-hand knowledge of any plainclothes officer's presence. Even if a witness had such knowledge, the evidence should still be excluded because it is not relevant, as Dodge City's Police Chief is not the

decisionmaker for any of the actions challenged in this suit. *Feeney*, 442 U.S. 279. Furthermore, there is no indication, other than Plaintiffs' experts' rank speculation, that the Police Chief's actions were motivated by discriminatory intent. In fact, the available evidence is to the contrary.

### C.  Plaintiffs will not be able to show a violation of Section 1983.

As Plaintiffs' section 1983 claim is based entirely on their theory that Defendants violated Section 2 and/or the Fourteenth Amendment, it necessarily follows that their section 1983 claim must also fail because Plaintiffs cannot prevail on their underlying theories.

### D.  Plaintiffs' requested relief will not remedy the issues that they have raised.

Plaintiffs primarily seek two things from this litigation: (1) to force Dodge City to move its elections to even-numbered years, and (2) to force Dodge City to abandon its at-large election method for a district-based one. (Doc. 140, at 33). Regarding the first, Dodge City is powerless to take such action, as Kansas law requires city commissioner elections to be held in odd-numbered years with just two exceptions. *See* K.S.A. 25-2107(a). Plaintiffs' expert Dr. Christina Bejarano's conclusion to the contrary, which apparently is based on a manual that the Kansas Secretary of State's Office had previously produced, should not be credited. Dodge City's Home Rule authority only extends to laws that are *not* "enactments of statewide concern applicable uniformly to all cities" or "other enactments applicable uniformly to all cities." Kan. Const., art. XII, § 5(c)(1). Therefore, because K.S.A. 25-2107(a)'s plain text shows that it uniformly applicable to all cities, Dodge City does not have Home Rule authority to exempt itself from K.S.A. 25-2107 through its Home Rule powers.[2] Dr. Bejarano's views on what Dodge City's Home Rule powers are is an

---

[2]     It appears that the argument that K.S.A. 25-2107 is not uniformly applicable stems from the "if needed" clause at the end of section a in K.S.A. 25-2107. However, that clause only permits a city to move its elections to an even-number year "for the purpose of staggering terms or having three-year terms of office," *see* Kan. Legis. Research Dep't, *2015 Summary of Legislation* 46 (2015), *available at* https://www.kslegresearch.org/KLRD-web/Publications/SummaryofLegislation/2015_summary_of_legislation.pdf, as set forth in K.S.A. 25-21a01, an act that was passed along with K.S.A. 25-2107 in H.B. 2104 during the 2015 Kansas Legislative Session.

inadmissible legal conclusion and should be rejected on that ground. *See Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) ("[T]he judge is the sole arbiter of the law and its applicability.").

As for the district-based request, there will be no evidence, other than Plaintiffs' experts' unsupported speculation, that district-based elections will actually result in more Latinos or so-called Latino-preferred candidates being elected to the Dodge City Commission. Based on recent examples, such as what has happened in the City of Yakima, Washington, a city referenced in Dr. Barreto's own report, it appears that the remedy Plaintiffs seek may actually hinder Latinos' ability to elect their preferred candidate, further adding support to the Supreme Court's earlier admonition that courts are "not [to] assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (citation omitted).

## Conclusion

Section 2 and the Fourteenth Amendment are not guarantors of electoral success for so-called minority-preferred candidates. Rather, the aforementioned laws serve as a bulwark against certain discriminatory practices. In this case, Plaintiffs have not and will not be able to show that Dodge City's at-large elections for City Commissioners constitute such a practice. As a result, Plaintiffs' requests in this case should be denied and judgment should be entered in Defendants' favor.

Respectfully submitted,

FOULSTON SIEFKIN LLP

By: */s/ Anthony F. Rupp*        
    Anthony F. Rupp, KS #11590
    Tara Eberline, KS #22576
    Sarah E. Stula, KS #27156
    7500 College Boulevard, Suite 1400
    Overland Park, Kansas  66210
    (913) 498-2100
    (913) 498-2101 (fax)
    trupp@foulston.com
    teberline@foulston.com
    sstula@foulston.com

    -and-

    Clayton Kaiser, KS #24066
    Samuel J. Walenz, KS #29114
    FOULSTON SIEFKIN, LLP
    1551 North Waterfront Parkway, Suite 100
    Wichita, Kansas 67206
    (316) 267-6371
    (316) 267-6345 (fax)
    ckaiser@foulston.com
    swalenz@foulston.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that on the 20th day of February 2024, the foregoing was electronically filed with the Clerk of the Court by using the Court's e-Filing system which will send notification of electronic filing to counsel for all parties of record:

Sharon Brett, KS #28696
Kunyu L. Ching, KS #29807
**AMERICAN CIVIL LIBERTIES UNION OF KANSAS**
sbrett@aclukansas.org
kching@aclukansas.org

 -and-

Chad W. Dunn *(Pro Hac Vice)*
Sonni Waknin *(Pro Hac Vice)* Bernadette Reyes *(Pro Hac Vice)* **UCLA VOTING RIGHTS PROJECT**
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org

  -and-

Jonathan Topaz *(Pro Hac Vice)*
Sophia Lin Lakin *(Pro Hac Vice)*
Luis M. R. Roman *(Pro Hac Vice)*
Victoria Ochoa *(Pro Hac Vice)*
**AMERICAN CIVIL LIBERTIES UNION, INC.**
jtopaz@aclu.org
slakin@aclu.org
lroman@aclu.org
vochoa@aclu.org

Abena Mainoo *(Pro Hac Vice)*
Jonathan I. Blackman *(Pro Hac Vice)*
Mijin Kang *(Pro Hac Vice)*
Katherine M. MacAdam *(Pro Hac Vice)*
Isabella Masiello *(Pro Hac Vice)*
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
amainoo@cgsh.com
jblackman@cgsh.com
mkang@cgsh.com
kmacadam@cgsh.com
imasiello@cgsh.com`

  -and-

Scott Fuqua *(Pro Hac Vice)*
**FUQUA LAW & POLICY, P.C.**
scott@fuqualawpolicy.com

*ATTORNEYS FOR PLAINTIFFS*

*/s/ Anthony F. Rupp*

22