### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ, ) ) ) | |
| Plaintiffs, ) | Case No. 6:22-cv-01274-EFM-RES |
| ) | |
| vs. ) | |
| ) | |
| CITY OF DODGE CITY, ) | |
| ) | |
| Defendant. ) ) | |

### DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS

The defendants move for judgment on partial findings under Federal Rule of Civil Procedure 52(c).

### I.   Introduction

The plaintiffs seek to divide Dodge City by race without public comment, without public support, and without a legal basis. Dodge City gives all of its voters, including Latino voters, every opportunity to elect candidates of their choice. The plaintiffs have thus not established the necessary *Gingles* factors or that the totality of the circumstances favors relief under Section 2 of the Voting Rights Act. Moreover, the plaintiffs have no evidence—as one of the plaintiffs' experts has even admitted—that Dodge City maintains an at-large election system because of, and not merely in spite of, its alleged discriminatory effect. Finally, the plaintiffs have offered no basis for this Court to enjoin Dodge City from holding municipal elections in odd-numbered years. The plaintiffs have been fully heard on the pertinent issues and judgment is warranted in the City's favor.

**II.     Standard**

When a claim or defense in a bench trial can only be supported by a favorable finding on an issue, courts may enter judgment on partial findings after "a party has been fully heard on an issue . . . and the court finds against the party on that issue." Fed. R. Civ. P. 52(c). In making findings under Rule 52(c), courts do *not* apply the "deferential standard" that applies to motions for judgment as a matter of law and do *not* view the "evidence in the light most favorable" to the non-moving party. *Jones v. Estate of Cole*, 483 F. App'x 468, 472 n.4 (10th Cir. 2012); *see also* Fed. R. Civ. P. 52(c) advisory committee's note to 2007 amendment ("The standards that govern judgment as a matter of law in a jury case have no bearing on a decision under Rule 52(c).").

**III.    Argument**

The evidence in this case does not suggest that Dodge City's at-large election system unlawfully dilutes Latino voting strength, nor does the evidence suggest that Dodge City ever established or maintained an at-large election system to discriminate against Latino voters. To the contrary, the plaintiffs' evidence shows only that they seek certain victory for their preferred candidates in Dodge City Commission elections, not merely the level playing field that Dodge City already provides. *See Sanchez v. State of Colorado*, 97 F.3d 1303, 1309 (10th Cir. 1996) ("As enacted, Section 2(b) promises protected minorities an even playing field, not a certain victory."); *see also Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994) ("[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground[.]").

   **a. The Court should find that Dodge City never intended to discriminate against Latino voters by maintaining an at-large election system.**

This Court noted at the summary-judgment stage that the "evidence of the City's discriminatory intent is slim," and that it did "not account for [the City's] own evidence against

finding discriminatory intent." Mem. & Order, ECF No. 159 at 15. The plaintiffs' evidence of the City's intent to discriminate against Latinos at trial is not only slim, but non-existent.

At best, the plaintiffs can show that the DOJ's involvement in Dodge City and Mr. Adelson's letter to the City demonstrate an awareness of potential—yet speculative—consequences. But the plaintiffs have not connected Mr. Adelson's letter to any affirmative decision that the City Commission made to maintain at-large voting because of its allegedly discriminatory effect on Latino voters. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Ms. Seibel-Robb, however, dispelled any notion that Dodge City was at risk of violating § 2. Among other things, Dodge City provides a multitude of election and election-related materials in English and Spanish; Ms. Seibel testified that she had never received a complaint that Latinos were unaware of how to run for office or were otherwise unable to do so; Ms. Seibel had never received a complaint about Dodge City's use of at-large voting; Ms. Seibel fully complied with the DOJ's inquiry and never heard anything back about a potential voting-rights issue; and Ms. Seibel understood from Mr. Adelson's letter that there was only a "potential" of a civil-rights violation, not that he had real concerns that Dodge City was in violation of federal law.

Moreover, even if Dodge City's at-large elections had a discriminatory effect on Latinos, the City's mere "awareness of consequences" is not enough for the plaintiffs to prove that Dodge City's at-large elections violate the Fourteenth Amendment. *See id*. Similarly, as this Court has already concluded, the Commission's decision not to follow through on then-Commissioner Scoggins' proposal to move to district voting only shows "the possibility of switching to a district based voting system," not even a mere awareness of consequences. Mem. & Order, ECF No. 159 at 14.

None of the plaintiffs' evidence supports an inference that Dodge City maintained at-large elections *because of,* and not merely *in spite of*, its effect on Latino voting. *Feeney*, 442 U.S. at 279. To the contrary, the plaintiffs' expert, Dr. Martinez, testified that he had *no evidence* that Dodge City maintained at-large voting because of its allegedly negative effect on Latino voting. The plaintiffs failed to prove a Fourteenth Amendment violation and partial judgment should be entered in Dodge City's favor on the plaintiffs' Fourteenth Amendment claim.

**b. The plaintiffs have not shown a violation of § 2 of the Voting Rights Act.**

***i. The plaintiffs have not proffered a map to prove that Latinos can make up a majority in a single-member district without racial considerations predominating.***

The plaintiffs assert 14 maps drawn by Dr. Oskooii show that Dodge City could potentially create single-member districts. Dr. Oskooii's critical flaw, however, is that race predominates every single map. *See Allen v. Milligan*, 599 U.S. 1, 30 (2023) (internal quotation marks and citations omitted) (plurality op.) ("[W]e have made clear that there is a difference between being aware of racial considerations and being motivated by them. The former is permissible; the latter is usually not."). Because all of Dr. Oskooii's illustrative maps use race as the "essential basis" for the lines he drew, none should be credited, and, as a result, this Court should find that the plaintiffs have failed to satisfy *Gingles I. Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189-90 (2017) ("The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn[.]").

***ii. The plaintiffs did not establish Gingles II or III.***

The plaintiffs rely on Dr. Barreto to establish that: (1) Latinos are "politically cohesive"; and (2) that White voters "vote sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Sanchez*, 97 F.3d at 1310 (quoting *Gingles*, 478 U.S. at 50-51).

4

Dr. Barreto, however, did not establish that White voters "vote sufficiently as a bloc" in a way that they usually defeat the minority's preferred candidate. To start, Dr. Barreto, admits that he did not evaluate and did not opine on the question whether voting in Dodge City was racially polarized in 2023. Nor did Dr. Barreto establish that Dodge City had racially polarized voting in 2019. On top of that, Dr. Barreto never addressed Dodge City's Commissioner elections in 2010 and 2012 when only three candidates ran for three open seats on the City Commission.

Dr. Barreto's testimony thus comes down to Dodge City's 2021 election for City Commission when at least one Latino candidate, Joe Nuci, was elected. On the other hand, however, the only other Latina candidate that year, Blanca Soto, didn't perform well anywhere in the community. One may not engage in speculation that the reason that Ms. Soto did not win the election was based on her ethnicity. Dr. Barreto also relies inappropriately on the results of partisan, exogenous statewide elections. These two-person races between a single Democrat and a single Republican are much different than the races for city commission where a voter casts a ballot for up to three candidates in a non-partisan race over completely local issues. *See Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668500, at *22 (S.D. Tex. Apr. 25, 2014) ("In this case, the exogenous elections chosen by Dr. Barreto are not similar to the endogenous elections in a critical respect . . . . These partisan exogenous elections cannot be used to overcome the evidence supplied by the non-partisan endogenous elections").

### iii.  *The totality of the circumstances does not show unlawful vote dilution.*

Before getting to the Senate Factors, it bears noting that the fact that Latino citizens of voting age population is the largest voting bloc in Dodge City—and soon will be the inevitable majority voting bloc—creates a "difficult burden" for the plaintiffs to establish a § 2 violation. *See Salas*, 964 F.2d at 1555 (noting "a registered voter majority class faces an obvious, difficult burden

5

in proving that their inability to elect results from white bloc voting"). The plaintiffs have not met that burden.

Despite that burden, the plaintiffs lack evidence to support at least four of the Senate Factors.

On Senate Factor 1, Dr. Martinez opined that Mexicans in Dodge City have historically faced discrimination but failed entirely to tie that historical discrimination, let alone recent discrimination, to any obstacle that Latinos face in casting a vote. *See Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986) (quoting Senate Factor 1 as relating to historical discrimination that "touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process"); *see also De Grandy*, 512 U.S. at 1013 (holding, even where district court found a history of discrimination, that the district court "was not critical enough in asking whether a history persistent discrimination reflected in the larger society and its bloc-voting behavior portended any dilutive effect from a newly proposed districting scheme, whose pertinent features were majority-minority districts in substantial proportion to the minority's share of voting-age population."); *Salas*, 964 F.2d at 1556 (reasoning that a Section 2 plaintiff "could conceivably prove that . . . low turnout at elections was the result of prior official discrimination," but that the plaintiffs in that case "offered no evidence directly linking this low turnout with past official discrimination").

In fact, Dr. Martinez gave *no* opinion on the effect of historical discrimination on Hispanic voter turnout. Rather, to the extent Dr. Martinez had anything relevant to say about at-large voting, he merely opines that scholars have historically tied at-large elections to discrimination. He has not, however, shown or opined that Dodge City employs or maintains at-large elections in way that dilutes Latino votes.

6

On Senate Factor 4, the plaintiffs introduced one exhibit reflecting a slate of Republican Party candidates for the Dodge City Commission. One of those candidates is a Latino; the other has an undisputedly Latino surname. Aside from that, Ms. Seibel-Robb testified that she never heard a complaint that any Latino did not know how to run for office. The plaintiffs' evidence failed entirely to show that Latino candidates have been denied access to the candidate slating process.

On Senate Factor 6, the plaintiffs elicited no testimony at all that racial appeals have ever happened in a Dodge City election generally, or in an election for City Commissioner, specifically.

Finally, on Senate Factor 9, the plaintiffs elicited no testimony about the policy reasons for maintaining at-large elections, let alone shown that those policy reasons are "tenuous." To the contrary, the plaintiffs appear to proceed on the incorrect assumption that at-large districts dilute Latino voting strength *per se* and therefore violate § 2 of the Voting Rights Act. The law, however, provides otherwise. *See Thornburg v. Gingles*, 478 U.S. 30, 46 (1986) (holding "at-large elections[] may not be considered per se violative of § 2"). Regardless, had the plaintiffs inquired, the policy reason is that Dodge City's elected officials *and* its population prefer for their Commissioners to each represent the entire population, including Latinos—Dodge City's "policy" for at-large elections is thus unity, not racial division.

Dr. Bejarano opined that Senate Factors 3, 5, 7, and 8 were established in Dodge City, but she failed to meaningfully connect abstract, academic theory to factual reality.[1]

---

[1]   As a general matter that permeates Dr. Bejarano's testimony, Dr. Bejarano's initial refusal to answer basic questions on cross examination—for example, whether citizens have a responsibility to vote; whether individual voters should vote if they want their voice heard; or whether individual voters have any responsibility at all—defies credibility. *But see* K.S.A. 25-2302 ("It is the duty of all legally qualified voters to register to vote.").

Namely, on Senate Factor 3, Dr. Bejarano opined that Dodge City's use of single-member districts, in theory, would increase descriptive representation. Dr. Bejarano, however, ignored that Mr. Rangel-Lopez himself acknowledged that Latinos in Dodge City make up a substantial portion of business owners and community leaders. Moreover, Dr. Bejarano fails to account for the fact that Dodge City is not a large community in the first place where candidates typically run inexpensive, yard-sign campaigns. And finally, Dr. Bejarano does not account for the fact that Ms. Seibel-Robb had never received a complaint about Latinos either: (1) being capable of running for office; or (2) voting for their candidates of choice in general.

On Senate Factor 5, Dr. Bejarano relied on resource-mobilization theory and statistical socioeconomic disparities in Dodge City to opine that Latinos have suffered from past discrimination. But Dr. Bejarano acknowledged she did not analyze what a typical city-commission campaign looks like or how much it typically costs to run a city-commission campaign. In addition, Dr. Bejarano refused to acknowledge that: (1) the Latino community in Dodge City includes migrants and first-generation Americans who are welcomed into the community; and (2) her own data demonstrates that the Latino community is making strides in every relevant socioeconomic category across the community.[2] Equally telling, Mr. Rangel-Lopez—himself a first-generation American—graduated second in his class at Dodge City High School and went on to attain a bachelor's degree from the University of Kansas and earn numerous awards along the way. Like the fact that Latino voters are soon to make up the majority of the citizen voting-age population in Dodge City, the plaintiffs' failure to demonstrate a history of

---

[2]   Dr. Bejarano also acknowledged that a potential move from at-large voting to single-member districts would not change Dodge City's alleged socioeconomic disparity.

discrimination weighs heavily in favor of Dodge City. *See De Grandy*, 512 U.S. at 1013; *Salas*, 964 F.2d at 1556.

On Senate Factor 7, Dr. Bejarano opined that Latinos have been underrepresented in Dodge City, Ford County, and Kansas. But the law requires equal opportunity, not equal descriptive or substantive representation. *See* 52 U.S.C. § 10301(b). Moreover, the extent that Latinos have been elected to the Ford County Commission (which uses district voting in any event) or to statewide or federal office is irrelevant. Then, as it relates to Dodge City elections, Dr. Bejerano did not analyze the number of Latino candidates who chose to run for office and then ignored that several Latino candidates have been elected to and served in office, including Fernando Jurado and Joe Nuci.

Finally, on Senate Factor 8, Dr. Bejarano opined that Dodge City was unresponsive to the needs of the Latino community. In support, she identified: (1) Dodge City's response to the Covid-19 pandemic in the meatpacking plants; (2) alleged racial tension over a 2010 shooting in Dodge City; (3) racial profiling statistics; and (4) Dodge City Police's coordination with U.S. Immigration and Customs Enforcement during a raid in 2017. None, however, demonstrate Dodge City's unresponsiveness. With respect to the coronavirus response, Dr. Bejarano ignores that the President of the United States ordered the meatpacking plants to maintain operations throughout the pandemic. With respect to the 2010 shooting, Dr. Bejarano's testimony only shows that it was an isolated incident that was not, in fact, publicly divisive. With respect to racial profiling statistics, Dr. Bejarano's numbers overlook that Latinos in Dodge City make up close to the same percentage of the population as those individuals who were stopped or arrested. And finally, Dr. Bejarano's inference that the Dodge City Police are unresponsive to the population because they coordinated with one federal law-enforcement agency lacks any credible basis.

9

Finally, on Senate Factor 2, and as shown above, Dr. Barreto showed only that White voters turn out to vote in larger numbers than Latino voters, not that White voters vote as a group to defeat Latino preferred candidates.

### c. The plaintiffs are not entitled to an injunction requiring elections in even-numbered years.

The Court should also enter judgment on the plaintiffs' claim to move Dodge City's municipal elections from odd-numbered years to even-numbered years. On this point, the plaintiffs' evidence shows only that voter turnout is lower for odd-year, off-cycle elections than it is for even-year, on-cycle elections. But the plaintiffs cannot make a § 2 violation out of low voter turnout alone, particularly when Latinos in Dodge City: (1) make up nearly half of Dodge City's citizens of voting age population; and (2) constitute the single largest racial group of voters in Dodge City. *See* 52 U.S.C. § 10301(b) ("Nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."); *see also Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992) ("Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote.

Moreover, Dodge City does not have Home Rule authority to move municipal elections to even-numbered years. Under current Kansas law, cities must hold city-officer elections in odd-numbered years. *See* K.S.A. 25-2107(a).[3] Yet Dodge City's Home Rule authority only extends to

---

[3] K.S.A. 25-2107(a) provides: "The general election of city officers shall be held on the Tuesday following the first Monday in November of each odd-numbered and even-numbered years, if needed."

It appears that the argument that K.S.A. 25-2107 is not uniformly applicable stems from the "if needed" clause at the end of K.S.A. 25-2107(a). However, that clause only permits a city to move its elections to an even-number year for: (1) "the purpose of staggering terms"; or (2) "having three-year terms of office," *see* Kan. Legis. Research Dep't, *2015 Summary of Legislation* 46 (2015), *available at* https://www.kslegresearch.org/KLRD-web/Publications/SummaryofLegislation/2015_summary_of_legislation.pdf, as set forth in

laws that are *not* "enactments of statewide concern applicable uniformly to all cities" or "other enactments applicable uniformly to all cities." Kan. Const., art. XII, § 5(c)(1). Therefore, because K.S.A. 25-2107(a) is uniformly applicable to all cities, Dodge City does not have Home Rule authority to exempt itself from K.S.A. 25-2107 under its Home Rule powers.

Nor can the plaintiffs overcome two key hurdles in overriding Kansas law to the contrary. First, the Tenth Circuit reasons that § 2 of the Voting Rights Act should only displace state electoral laws to the extent they necessarily conflict with federal law. *See Large v. Fremont County*, 670 F.3d 1133, 1144-4 (10th Cir. 2012) (counseling against displacement of state electoral laws "that need *not* be disturbed to cure the Section 2 violation"). Second, in the same vein, the Tenth Circuit reasons that state interests play a "major role" when fashioning remedies under § 2 of the Voting Rights Act. *See Nipper v. Smith*, 39 F.3d 1494, 1541 (11th Cir. 1994) (holding that a state's "interest plays a major role in our consideration of the remedies the appellants propose as alternatives to the challenged electoral schemes"); *see also White v. Weiser*, 412 U.S. 783, 795 (1973) (cautioning courts against intruding on state policy "any more than necessary" in fashioning reapportionment plans). Here, where Kansas law establishes an interest in odd-year municipal elections, this Court should not override that interest.

## IV.   Conclusion

The Court should enter judgment in the defendant's favor under Federal Rule of Civil Procedure 52(c).

---

K.S.A. 25-21a01, an act that was passed along with K.S.A. 25-2107 in H.B. 2104 during the 2015 Kansas Legislative Session.

Respectfully submitted,

**FOULSTON SIEFKIN LLP**

By: */s/ Anthony F. Rupp*
Anthony F. Rupp, KS #11590
Tara Eberline, KS #22576
Sarah E. Stula, KS #27156
7500 College Boulevard, Suite 1400
Overland Park, Kansas  66210
T (913) 498-2100 | F (913) 498-2101
trupp@foulston.com
teberline@foulston.com
sstula@foulston.com

- and-

Clayton J. Kaiser, KS #24066
Samuel J. Walenz, KS #29114
FOULSTON SIEFKIN, LLP
1551 North Waterfront Parkway, Suite 100
Wichita, Kansas 67206
T (316) 267-6371 | F (316) 267-6345
ckaiser@foulston.com
swalenz@foulston.com

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

  I certify that on the 28th day of February 2024, the foregoing was electronically filed with the Clerk of the Court by using the Court's CM/ECF system which will send notification of electronic filing to all parties of record, including plaintiffs counsel:

Sharon Brett, KS #28696
Kunyu L. Ching, KS #29807
**AMERICAN CIVIL LIBERTIES UNION OF KANSAS**
sbrett@aclukansas.org
kching@aclukansas.org

 -and-

Chad W. Dunn *(Pro Hac Vice)*
Sonni Waknin *(Pro Hac Vice)*
Bernadette Reyes *(Pro Hac Vice)*
**UCLA VOTING RIGHTS PROJECT**
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org

-and-

Jonathan Topaz *(Pro Hac Vice)*
Sophia Lin Lakin *(Pro Hac Vice)*
Luis M. R. Roman *(Pro Hac Vice)*
Victoria Ochoa *(Pro Hac Vice)*
**AMERICAN CIVIL LIBERTIES UNION, INC.**
jtopaz@aclu.org
slakin@aclu.org
lroman@aclu.org
vochoa@aclu.org

Abena Mainoo *(Pro Hac Vice)*
Jonathan I. Blackman *(Pro Hac Vice)*
Mijin Kang *(Pro Hac Vice)*
Katherine M. MacAdam *(Pro Hac Vice)*
Isabella Masiello *(Pro Hac Vice)*
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
amainoo@cgsh.com
jblackman@cgsh.com
mkang@cgsh.com
kmacadam@cgsh.com
imasiello@cgsh.com

 -and-

Scott Fuqua *(Pro Hac Vice)*
**FUQUA LAW & POLICY, P.C.**
scott@fuqualawpolicy.com


*ATTORNEYS FOR PLAINTIFFS*

      */s/ Anthony F. Rupp*
      Anthony F. Rupp, KS #11590