# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MIGUEL COCA, et al.,

            Plaintiffs,

     v.

CITY OF DODGE CITY,

            Defendant.

Case No. 6:22-cv-01274-EFM-RES

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs filed this lawsuit under Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. §10301, and 42 U.S.C. § 1983.[1] On February 26, 2024, the Court held a five-day bench trial on all claims. The Court thereafter instructed the parties to submit their proposed findings of fact and conclusions of law. Plaintiffs respectfully request that the Court make the following findings of fact and conclusions of law and enter judgment in Plaintiffs' favor.

---

[1] Plaintiffs' claim under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution was dismissed during trial following Defendant's Motion for Judgment on Partial Findings. Order, Doc. 200. Plaintiffs maintain their claims under Section 2 of the VRA and 42 U.S.C. § 1983.

**FINDINGS OF FACT**

**I.      Parties**

1.      Plaintiff Alejandro Rangel-Lopez is a resident of Dodge City, Kansas. Mr. Rangel-Lopez identifies as Latino/Hispanic,[2] is a citizen of the United States, and is over the age of eighteen.[3]

2.      Mr. Rangel-Lopez was born and raised in Dodge City, Kansas,[4] and is a first generation Mexican-American. His parents immigrated to the United States in the 1990s.[5] Mr. Rangel-Lopez attended Dodge City schools for pre-kindergarten through high school.[6]

3.      Mr. Rangel-Lopez lives within Dodge City limits on the west side, south of Comanche Street,[7] and is registered to vote in Dodge City, Kansas.[8] He has voted in every election, including for the Dodge City Commission, since he registered to vote in 2018,[9] and plans to vote in future elections.[10]

---

[2] Plaintiffs have previously used the term "Latine" as a gender-neutral substitute for Latino. For accuracy in citations to the transcripts of the trial testimony, Plaintiffs use "Latino" and/or "Hispanic" in this filing.

[3] Trial Tr. Vol. I, 7:6–7 (Rangel-Lopez); Stipulation of Facts and Exhibits, Doc. 178 ¶ 8.

[4] *Id.* at 7:21–8:3 (Rangel-Lopez).

[5] *Id.* at 7:21–8:3 (Rangel-Lopez).

[6] *Id.* at 7:21–8:6 (Rangel-Lopez).

[7] *Id.* at 7:2–5 (Rangel-Lopez); Stipulation of Facts and Exhibits, Doc. 178 ¶ 11.

[8] Trial Tr. Vol. I, 7:8–11 (Rangel-Lopez); Stipulation of Facts and Exhibits, Doc. 178 ¶ 9.

[9] Trial Tr. Vol. I, 7:12–18 (Rangel-Lopez); Stipulation of Facts and Exhibits, Doc. 178 ¶ 10.

[10] Trial Tr. Vol. I, 7:19–20 (Rangel-Lopez); Stipulation of Facts and Exhibits, Doc. 178 ¶ 10.

4.      Mr. Rangel-Lopez is employed by Loud Light, an organization dedicated to youth civic engagement. He is a campaign manager for Loud Light's New Frontiers project, helping youth in southwest Kansas become more civically involved in order to advocate for issues they care about.[11]

5.      Plaintiff Miguel Coca is a resident of Dodge City, Kansas. He identifies as Latino/Hispanic, is a citizen of the United States, and is over the age of eighteen.[12]

6.      Mr. Coca was born and raised in Dodge City. He first lived in a trailer park called Lazy Acres in south Dodge City,[13] and now lives on the east side.[14] He has always lived south of Comanche Street.[15] Mr. Coca attended public school in Dodge City, specifically Beeson Elementary, Comanche Intermediate, Dodge City Middle School, and Dodge City High School.[16]

7.      Mr. Coca has voted in every Dodge City Commission election since 2019 and plans to vote in future elections.[17]

8.      Defendant is the City of Dodge City, Kansas, a municipal entity capable of being sued under Kansas state law.

---

[11] Trial Tr. Vol. I, 11:22–12:6 (Rangel-Lopez).

[12] Stipulation of Facts and Exhibits, Doc. 178 ¶ 3.

[13] Trial Tr. Vol. III, 121:9–23 (Coca).

[14] *Id.* at 126:12–19 (Coca); Stipulation of Facts and Exhibits, Doc. 178 ¶ 5.

[15] *Id.* at 126:21–25 (Coca).

[16] *Id.* at 124:21–125:5 (Coca).

[17] *Id.* at 129:23–130:10 (Coca); Stipulation of Facts and Exhibits, Doc. 178 ¶ 7.

## II.   Plaintiffs' Experts

9.      Plaintiffs introduced expert testimony from four individuals, whose qualifications and expertise are discussed below.

### A.  Dr. Matthew Barreto

10.      Dr. Matthew A. Barreto is a tenured Professor of Political Science and Chicano Studies at the University of California, Los Angeles.[18] Prior to his appointment at the University of California, Los Angeles, Dr. Barreto was a tenured professor at the University of Washington.[19]

11.      Dr. Barreto holds a Ph.D. from the University of California, Irvine, a Master of Science from the University of California, Irvine, and a B.A. from Eastern New Mexico University.[20]

12.      He is also a cofounder and faculty director of the Latino Policy and Politics Institute, and the cofounder and director of the UCLA Voting Rights Project[21] and is also affiliated with the Chicano Studies Research Center and Center for the Study of Los Angeles at Loyola Marymount University.[22]

---

[18] Dr. Barreto CV, Ex. 111 at 1.

[19] *Id.* at 1; Trial Tr. Vol. II, 41:8–13 (Barreto).

[20] Dr. Barreto CV, Ex. 111 at 1.

[21] *Id.* at 1; Trial Tr. Vol. II, 41:8–13 (Barreto).

[22] Dr. Barreto CV, Ex. 111 at 1.

13.     Dr. Barreto has published over eighty peer-reviewed articles, primarily regarding race and ethnicity in the political system and voting patterns, ecological inference, Latino politics, and survey methodology.[23] His research has been cited by others over 5,800 times.[24]

14.     Dr. Barreto has published four books and has won the American Political Science Association (APSA) Best Book Award for Race, Ethnicity, Politics in 2014.[25]

15.     Dr. Barreto has served as an expert witness in over fifty federal voting rights cases and has testified in federal court around forty times, with most of this testimony concerning racially polarized voting analysis.[26]

16.     Dr. Barreto has been found credible as an expert witness in federal voting rights cases all over the country, including in the District of Kansas.[27]

17.     Here, Dr. Barreto testified as an expert in social science methods, mapping, racially polarized voting, demographic change, racial and ethnic politics and *Gingles* preconditions II and III.[28]

18.     Having observed Dr. Barreto's testimony and reviewed his analysis and tables, the Court credits his analyses, opinions, and testimony, finds his opinions and conclusions largely uncontested, and grants them substantial weight.

---

[23] *Id.* at 2–6; Trial Tr. Vol. II, 44:6–20 (Barreto).

[24] Dr. Barreto CV, Ex. 111 at 2.

[25] *Id.* at 2; Trial Tr. Vol. II, 47:1–12 (Barreto).

[26] Trial Tr. Vol. II, 51:24–52:7 (Barreto).

[27] *Fish v. Kobach*, 309 F. Supp. 3d 1048, 1059 (D. Kan. 2018), *aff'd sub nom*, *Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020).

[28] *See, e.g.*, Trial Tr. Vol. II, 68:1–13, 73:5–24; 109:1–110:25 (Barreto); Trial Tr. Vol. IV, 206:12–207:12 (Barreto).

peace

**B. Dr. Kassra AR Oskooii**

19.　　Plaintiffs' expert Dr. Kassra AR Oskooii is a tenured Professor of Political Science at the University of Delaware.[29] His main areas of academic expertise are in redistricting, American political behavior, race and ethnic politics, and political methodology.[30]

20.　　Dr. Oskooii received a Bachelor's Degree in Political Science in 2008 from the University of Washington. He also received a Master's and Doctorate in Political Science from the University of Washington in 2013 and 2016, respectively.[31]

21.　　Dr. Oskooii has taught classes related to voting rights and representation, redistricting, American politics and political behavior, and race and ethnic politics. As part of his courses on redistricting, Dr. Oskooii covers apportionment, the Census, and traditional districting criteria, and teaches students how to draw single-member district maps for jurisdictions that currently employ at-large election systems.[32]

22.　　Dr. Oskooii has published 22 peer-reviewed journal articles. He has published peer-reviewed articles related to Section 2 of the VRA, ecological inference, and Latino politics, and frequently uses surveys in his peer-reviewed work.[33]

23.　　Dr. Oskooii has been retained as an expert witness or government consultant in

---

[29] Trial Tr. Vol. II, 222:16–223:2 (Oskooii).

[30] *Id.* at 223:5–7 (Oskooii).

[31] *Id.* at 222:7–15 (Oskooii); Dr. Oskooii CV, Ex. 63.

[32] Trial Tr. Vol. II, 223:8–225:1 (Oskooii).

[33] *Id.* at 225:2–22 (Oskooii).

voting matters "about a dozen times."[34] In addition to this case, Dr. Oskooii has submitted redistricting maps as a retained expert in two other instances—he submitted remedial maps for Washington State's legislative redistricting, and drew maps for the Roswell Independent School District. A federal court recently adopted his map for the Washington State Legislature, and the Roswell Independent School District also adopted Dr. Oskooii's map, which remains in place today.[35]

24.     In a recent decision in *Soto Palmer v. Hobbs*, the Western District of Washington adopted Dr. Oskooii's remedial map for the Washington State Legislature.[36] The Court found that Dr. Oskooii "was diligent" in drawing the map and that he "adher[ed] to state law, traditional redistricting criteria, and public input."[37] The Court also found that Dr. Oskooii "drew the adopted map without reference to political or partisan criteria," and that Dr. Oskooii's map "was not drawn or adopted to favor or discriminate against either political party."[38]

25.     Dr. Oskooii has also served as a racially polarized voting expert for the second and third *Gingles* preconditions.[39] In *Petteway v. Galveston*, the Southern District of Texas "credit[ed] [Dr. Oskooii's] analyses, opinions, and testimony and grant[ed] them substantial weight."[40]

---

[34] *Id.* at 226:21–25 (Oskooii).

[35] *Id.* at 227:1–14 (Oskooii); *Soto Palmer v. Hobbs*, No. 3:22-cv-05035, Doc. #290, slip op. (W.D. Wash. Mar, 15, 2023).

[36] *Soto Palmer v. Hobbs*, No. 3:22-cv-05035, Doc. #290, slip op. (W.D. Wash. Mar, 15, 2023).

[37] *Id.* at 8.

[38] *Id.* at 5, 9–10.

[39] Trial Tr. Vol. II, 227:22–24 (Oskooii).

[40] *Petteway v. Galveston Cnty.*, No. 3:22-cv-57, 2023 WL 6786025, at *9 (S.D. Tex. Oct. 13, 2023); Trial Tr. Vol. II, 228:4–9 (Oskooii).

26.     The Defendant did not put forth any expert testimony rebutting Dr. Oskooii's findings.

27.     Dr. Oskooii spent around three hours on the stand including over two hours of cross-examination.[41] The Court was able to question and observe him closely. Throughout Dr. Oskooii's live testimony, his opinions were clear, consistent, and forthright, and he had no difficulty articulating the bases for his mapping decisions. He was forthright with the Court when discussing the characteristics of Plaintiffs' illustrative maps.

28.     The Court finds Dr. Oskooii highly credible, including with respect to his bottom-line conclusion, which he unequivocally adhered to and which he supported with specific detailed testimony, that the illustrative maps he drew properly balance all of the traditional districting principles set forth in *Gingles* I.

**C.  Dr. Christina Bejarano**

29.     Plaintiffs' expert Dr. Christina Bejarano has been a Professor of Political Science with tenure at Texas Women's University since 2019.[42] She was previously a Professor of Political Science at the University of Kansas for 12 years.[43]

30.     She has a Bachelor's degree in Psychology from the University of North Texas, and a Master's and Doctorate in Political Science from the University of Iowa.[44]

31.     Dr. Bejarano's areas of academic expertise include American electoral politics, specifically the political representation and political behavior of Latinos and women, both as voters

---

[41] Trial Tr. Vol. III, 94:11–12 (Oskooii).

[42] Trial Tr. Vol. I, 66:2–14 (Bejarano).

[43] *Id.* at 66:1–7 (Bejarano); Dr. Bejarano CV, Ex. 43.

[44] Trial Tr. Vol. I, 65:22–24 (Bejarano).

and candidates. Dr. Bejarano has been researching Latino politics for about 20 years and for 17 years as a professor. Much of her Latino politics research focuses on the state and local level.[45]

32.     Dr. Bejarano teaches classes related to Latino Politics, State and Local Politics, Racial Minority Politics, and American Politics. As it relates to Latino politics, Dr. Bejarano's work has focused largely on Latino political behavior; obstacles Latino voters and political candidates face, including those presented by electoral design; and the characteristics of Latino elected officials.[46] While teaching at the University of Kansas, she incorporated "information about Kansas politics, especially as it pertains to obstacles that voters and candidates would face as women and Latinos in Kansas."[47]

33.     Dr. Bejarano has published seven peer-reviewed journal articles that focus on Latinos and women in U.S. politics, seven book chapters on Latinos and women in U.S. politics, two peer-reviewed books on Latino political involvement, and has co-authored a political science textbook on U.S. government.[48]

34.     In forming her opinions, Dr. Bejarano employed sources and methods consistent with standard practice in her field of political science and the methodology in her own published work. She relied on about 100 sources, including, among others: quantitative data, including from the American Community Survey ("ACS") and decennial Census; election data and results in Dodge City and Kansas; social science literature; news reports and articles; and Dodge City

---

[45] *Id.* at 66:15–67:1, 70:2–10 (Bejarano).

[46] *Id.* at 67:2–9, 67:21–68:16 (Bejarano).

[47] *Id.* at 67:11–15 (Bejarano); Dr. Bejarano CV, Ex. 43.

[48] Trial Tr. Vol. I, 68:18–70:1, 71:4–11 (Bejarano).

Commission meeting minutes. Dr. Bejarano testified that there was a "high degree of agreement" among the sources she reviewed in this case.[49]

35.　　Defendant did not put forward any expert testimony rebutting virtually any of Dr. Bejarano's findings.

36.　　The Court finds Dr. Bejarano credible, her methodology to be sound, and conclusions largely uncontested and reliable. Accordingly, the Court credits Dr. Bejarano's testimony and conclusions.

**D.  Dr. Rubèn Martinez**

37.　　Plaintiffs' expert Dr. Rubén Martinez is a sociologist who specializes in the areas of political sociology, social stratification, and race relations.[50]

38.　　Dr. Martinez has a Bachelor of Science from the University of Southern Colorado, a Master's in Sociology from Arizona State University, and a Doctorate in Sociology from the University of California Riverside.[51]

39.　　Dr. Martinez has been a Professor of Sociology at multiple universities, a Sociology department chair, and a director of multiple sociological research institutes.[52] He has taught various courses in Sociology, including Sociological Theory and Race and Ethnic Relations.[53]

---

[49] *Id.* at 73:19–74:25, 75:12–16 (Bejarano).

[50] Trial Tr. Vol. II, 180:15–181:1 (Martinez).

[51] *Id.* at 178:14–17 (Martinez).

[52] *Id.* at 178:20–179:4 (Martinez); Dr. Martinez CV, Ex. 139.

[53] Dr. Martinez CV, Ex. 139.

40.     Dr. Martinez has published approximately 50 peer-reviewed journal articles, has written chapters of several books, and been awarded several grants in the field of Sociology.[54]

41.     In forming his opinions, Dr. Martinez relied on sources and methodologies that he would typically employ as a Sociologist.[55]

42.     Defendant did not put forward any expert testimony rebutting Dr. Martinez's findings.

43.     The Court finds Dr. Martinez credible, his methodology to be sound, and conclusions reliable. While Dr. Martinez's analysis was mostly focused on treatment of Hispanics in Kansas and the Southern Midwest generally, rather than Dodge City specifically, there was no reason presented to suggest that his conclusions do not apply to Dodge City as part of the larger area. Accordingly, the Court credits Dr. Martinez's testimony and conclusions.

### III.     Demographics of the Dodge City Electorate

44.     Dodge City has two primary racial/ethnic groups that comprise the electorate: Non-Hispanic whites (whites) and Latinos.[56]

45.     In 2000, non-Hispanic whites comprised 51.5%[57] and Latinos comprised 42.9% of the total population of the City of Dodge City.[58]

---

[54] Trial Tr. Vol. II, 182:8–20 (Martinez); Dr. Martinez CV, Ex. 139.

[55] Trial Tr. Vol. II, 188:16–189:23 (Martinez).

[56] *Id.* at 197:23–198:7 (Martinez).

[57] Barreto Report Table 1, Ex. 112.

[58] *Id.*

46.     In 2000, non-Hispanic whites comprised roughly 75% of the Citizen Voting Age Population (CVAP) in Dodge City[59] and Latinos comprised 19.53%.[60]

47.     Since 2000, Dodge City has experienced a large and consistent growth of Latinos as a share of the total population and a decline of non-Hispanic whites as a share of the total population.[61]

48.     In 2020, non-Hispanic whites comprised 29.3% of the total population in Dodge City—a 37.2% decline from 2000.[62] By contrast, in 2020, Latinos comprised 63.9% of the total population in Dodge City—a 64.6% growth from 2000.[63]

49.     In 2021, non-Hispanic whites comprised 43% of Citizen Voting Age Population in Dodge City.[64] By contrast, in 2021, Latinos comprised 46.1% of the Citizen Voting Age Population in Dodge City.[65]

50.     The Latino population in Dodge City is located primarily south of Comanche Street.[66] The non-Hispanic white population in Dodge City is located primarily north of Comanche Street.[67]

---

[59] Trial Tr. Vol. II, 130:23–131:2 (Martinez).

[60] *Id.* at 130:12–21 (Martinez).

[61] *Id.* at 126:24–127:8 (Martinez).

[62] Barreto Report Table 1, Ex. 112.

[63] *Id.*

[64] Trial Tr. Vol. II, 130:23–131:9 (Martinez); Dodge City CVAP Estimates, Ex. 149.

[65] Trial Tr. Vol. II, 84:3–13 (Martinez); Dodge City CVAP Estimates, Ex. 149.

[66] Barreto Report Figure 1, Ex. 115.

[67] *Id.*

51.     Despite their 64.6% population growth, Latinos are not close to being a majority of the registered voters in Dodge City.[68]

52.     In the November 2022 General Election, voters south of Comanche Street, an area with a high density of Latinos, accounted for just 34% of all registered voters in Dodge City.[69]

53.     In the November 2022 General Election, voters north of Comanche Street, a high-density non-Hispanic white area, accounted for 66% of all registered voters in the city, constituting a majority.[70]

54.     Similarly, Latinos are not close to making up a majority of actual voters in Dodge City because their voter turnout is extremely low, especially in odd-numbered election years.[71]

55.     In the November 2022 General Election, despite making up 46.1% of Citizen Voting Age Population, Latino voters accounted for just 30% of actual voters in Dodge City.[72] White voters in Dodge City accounted for 64% of actual voters.[73]

56.     As Dr. Barreto demonstrated and the U.S. Census data shows, non-Hispanic whites and Latinos are highly segregated within Dodge City. Comanche Street marks a stark divide between the Latino and non-Latino populations.[74]

---

[68] Trial Tr. Vol. II, 84:20–85:3 (Barreto).

[69] *Id.* at 84:20–85:3 (Barreto).

[70] *Id.*

[71] *Id.* at 85:5–13 (Barreto).

[72] *Id.*

[73] *Id.*

[74] *Id.* at 69:3–6 (Barreto).

57.     Census block groups south of Comanche Street have a high density of Latinos, while census block groups north of Comanche Street have a high density of non-Latinos, or whites.[75]

58.     For example, Census Block Group 1, Track 9618.01, which is south of Comanche Street on the southeast side of Dodge City, has a density of 96.1% Latino.[76]

59.     Slightly further south, Census Block Group 1, Track 9621.01 has a density of 86.9% Latino.[77]

60.     In contrast, an L-shaped census block group north of Comanche Street and the United States Highway 50 has a density of 93% non-Latino.[78]

## IV.    The *Gingles* Preconditions

61.     *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986), sets out three threshold requirements Plaintiffs must meet to demonstrate that an at-large voting system unlawfully dilutes the minority group's vote and prevents them from electing candidates of choice. Evidence presented at trial regarding each *Gingles* precondition is set forth below.

### A.  *Gingles* I

62.     The Court heard significant evidence regarding the first *Gingles* precondition: that the Latino population is sufficiently large and geographically compact to constitute a majority in a single-member district.[79]

---

[75] Barreto Report Figure 1, Ex. 115.

[76] Barreto Report Table 3, Ex. 114; Trial Tr. Vol. II, 64:15–24 (Barreto).

[77] Barreto Report Table 3, Ex. 114; Trial Tr. Vol. II, 64:25–65:3 (Barreto).

[78] Barreto Report Figure 1, Ex. 115; Trial Tr. Vol. II, 65:8–13 (Barreto).

[79] *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986).

63.     Based on this evidence, the Court finds that it is possible to draw a map for the Dodge City Commission—while respecting traditional districting principles—that contains five single-member districts and in which Latinos comprise a numerical majority of the Citizen Voting Age Population in at least one district. Defendant conceded this point, confirming on the record: "[T]here's no dispute that you can create one or more CVAP districts where Hispanics have more than 50 percent."[80]

64.     Indeed, the Latino population in Dodge City is large and geographically compact enough to comprise a majority in three districts in a five-district map for the Dodge City Commission.[81]

65.     In fact, it is virtually impossible to draw a map for the Dodge City Commission that contains less than two majority-Latino districts.[82]

66.     Plaintiffs put forth 14 demonstrative maps through mapping expert Dr. Kassra AR Oskooii. Dr. Oskooii drew his illustrative maps to reflect different conceptions of Dodge City's communities of interest[83] using Dave's Redistricting Application ("DRA") mapping software, "a very well-known and publicly available application that is also used by independent [redistricting]

---

[80] Trial Tr. Vol. V, 44:13–15 (Def's Closing); *see also* Trial Tr. Vol. V, 45:15–16, 47:1–4 (Def's Closing).

[81] Trial Tr. Vol. II, 228:18–229:7 (Oskooii); Oskooii Tables and Maps, Exs. 69, 71, 73, 75, 77, 79, 81, 83, 85, 87, 89, 91, 93, 95–109.

[82] Trial Tr. Vol. II, 272:17–273:5 (Oskooii).

[83] *Id.* at 229:21–230:8 (Oskooii).

commissions around the country."[84] Each of Dr. Oskooii's 14 maps contains three majority-Latino districts—Districts 1, 2, and 3.[85]

67.     All 14 of Dr. Oskooii's maps follow applicable districting guidelines—they all achieve population equality; the districts are relatively compact, reasonably shaped, and contiguous to the extent the city boundaries allow; and respect different conceptions of communities of interest in Dodge City.[86]

68.     Defendant did not offer any maps of its own, nor did it provide any witness that disagreed with or contradicted Dr. Oskooii's testimony that it is possible to draw three majority-Latino districts in a map for the Dodge City Commission. Moreover, none of Defendant's witnesses disagreed with, rebutted, or contradicted any of Dr. Oskooii's findings about Dodge City, especially and including his testimony about communities of interest in Dodge City. Defendant did not present evidence that it was even *possible* to draw a map for the Dodge City Commission that contains no districts where Latinos make up a numerical majority.

69.     Dr. Oskooii was asked to rely on traditional redistricting criteria to determine whether the Hispanic population in Dodge City, Kansas is sufficiently large and geographically compact to allow for the creation of at least two Hispanic Citizen Voting Age Population majority single-member districts in a five districted plan.[87]

70.     In drawing the illustrative maps, Dr. Oskooii was guided by applicable districting

---

[84] *Id.* at 229:13–17 (Oskooii).

[85] *Id.* at 253:6–16 (Oskooii); Oskooii Tables and Maps, Exs. 69, 71, 73, 75, 77, 79, 81, 83, 85, 87, 89, 91, 93, 95–109.

[86] Trial Tr. Vol. II, 252:12–253:23 (Oskooii); Oskooii Tables and Maps, Exs. 69, 71, 73, 75, 77, 79, 81, 83, 85, 87, 89, 91, 93, 95–109.

[87] Trial Tr. Vol. II, 228:20–229:1 (Oskooii).

principles: population equality, compactness, contiguity, reasonable shape, and respect for communities of interest.[88]

71.    As to population equality, for jurisdictions like Dodge City, "courts generally tolerate a 10 percent threshold between the most populous district and the least populous."[89] All of Dr. Oskooii's 14 maps achieve this level of population equality.[90]

72.    As to compactness, contiguity, and reasonable shape, traditional districting principles provide that a mapmaker cannot "change or alter the boundaries of a jurisdiction," which requires consideration of the "particularities of the jurisdiction."[91]

73.    Dodge City is neither particularly compact nor contiguous. In the southwest part of the city, there are "three small pieces of non-populated parcels that are part of city boundaries." On the eastern side of the city, the airport is disconnected from the rest of Dodge City as is the entertainment district on the western side.[92]

74.    Dr. Oskooii's illustrative maps are reasonably shaped, reasonably compact, and contiguous to the extent the city boundaries allow.

75.    Certain redistricting criteria that are applicable in some jurisdictions were not applicable here. For example, Dr. Oskooii did not consider preserving the core of prior districts,

---

[88] *Id.* at 230:9–22 (Oskooii).

[89] *Id.* at 232:11–19 (Oskooii).

[90] *Id.* at 252:12–18 (Oskooii); Oskooii Tables 1–17, Exs. 69, 71, 73, 75, 77, 79, 81, 83, 85, 87, 89, 91, 93, 95.

[91] Trial Tr. Vol. II, 232:23–233:9 (Oskooii).

[92] Oskooii Report Figure 1, Ex. 64; Trial Tr. Vol. II, 233:20–234:17 (Oskooii).

avoiding pairing incumbents, or splitting counties or cities because Dodge City is currently an at-large jurisdiction completely entailed within a single county and city.[93]

76.     Dr. Oskooii considered avoiding the splitting of precincts, or VTDs, to the extent it was practical. Yet Dodge City has about 20 voting-tabulated districts of precincts—the majority of which have zero population.[94] Six precincts hold around 95% of the total population and none of them are "populous enough to comprise a single district that would meet the requirements of population parity."[95] In light of these challenges, "some of these VTDs, but not all of them, have to be split to meet all the applicable redistricting criteria."[96]

77.     Traditional districting principles provide that communities of interest are "geographic regions or areas in which residents have commonalities based on factors such as social, cultural, ethnic, racial, or economic interests that may subject them to a common legislation."[97] Communities of interest are "fluid" and "don't have rigid boundaries."[98]

78.     Dr. Oskooii determined relevant communities of interest in Dodge City in three main ways: (1) publicly available resources in which the City of Dodge City describes itself and its areas; (2) hearing "directly from as many residents and citizens of Dodge City," and (3) his "own observations driving and walking through nearly every single street and corner" in Dodge

---

[93] *Id.* at 230:23–231:18 (Oskooii).

[94] *Id.* at 231:19–232:2 (Oskooii).

[95] *Id.* at 232:1–7.

[96] *Id.* at 231:19–232:10 (Oskooii).

[97] *Id.* at 234:20–24 (Oskooii).

[98] *Id.* at 235:2–4 (Oskooii).

Case 6:22-cv-01274-EFM   Document 211   Filed 03/22/24   Page 18 of 148


avoiding pairing incumbents, or splitting counties or cities because Dodge City is currently an at-large jurisdiction completely entailed within a single county and city.[93]

76.     Dr. Oskooii considered avoiding the splitting of precincts, or VTDs, to the extent it was practical. Yet Dodge City has about 20 voting-tabulated districts of precincts—the majority of which have zero population.[94] Six precincts hold around 95% of the total population and none of them are "populous enough to comprise a single district that would meet the requirements of population parity."[95] In light of these challenges, "some of these VTDs, but not all of them, have to be split to meet all the applicable redistricting criteria."[96]

77.     Traditional districting principles provide that communities of interest are "geographic regions or areas in which residents have commonalities based on factors such as social, cultural, ethnic, racial, or economic interests that may subject them to a common legislation."[97] Communities of interest are "fluid" and "don't have rigid boundaries."[98]

78.     Dr. Oskooii determined relevant communities of interest in Dodge City in three main ways: (1) publicly available resources in which the City of Dodge City describes itself and its areas; (2) hearing "directly from as many residents and citizens of Dodge City," and (3) his "own observations driving and walking through nearly every single street and corner" in Dodge

---

[93] *Id.* at 230:23–231:18 (Oskooii).

[94] *Id.* at 231:19–232:2 (Oskooii).

[95] *Id.* at 232:1–7.

[96] *Id.* at 231:19–232:10 (Oskooii).

[97] *Id.* at 234:20–24 (Oskooii).

[98] *Id.* at 235:2–4 (Oskooii).

18

City during a four-day trip there.[99] Those Dodge City resources included dodgecity.org, the Dodge City Housing Authority website, the Ford County and Dodge City Business and Retail Development Guide, and historical maps of the City, among others.[100]

79.     He spoke to residents in every part of Dodge City to understand the major themes that "emerge about different communities of interest or geographic regions."[101] Just as jurisdictions and map drawers around the country hold "public hearings, town halls, [or] online forums" to get input from residents about their communities before drawing maps, Dr. Oskooii conducted these interviews as part of "best practices" for map drawers.[102]

80.     The Court finds that Dr. Oskooii's illustrative maps consider and respect communities of interest. This is particularly true given Dr. Oskooii's extensive testimony, summarized below, about how his maps reflect Dodge City's natural boundaries.

   a.   **Dodge City's Natural Boundaries**

81.     ***South Dodge City.*** There are three main boundaries that could demarcate south Dodge City ("South Dodge"). The first conception of South Dodge is the area below the Wyatt Earp Boulevard. The second conception is the area below Trail Street. The third conception is the area beginning below the Arkansas River.[103] Dr. Oskooii's 14 illustrative maps present these three different conceptions of South Dodge.[104]

---

[99] *Id.* at 235:7–8, 235:14–15 (Oskooii).

[100] *Id.* at 235:5–236:6 (Oskooii).

[101] *Id.* at 236:10–15 (Oskooii).

[102] *Id.* at 236:16–237:7 (Oskooii).

[103] *Id.* at 242:15–22 (Oskooii).

[104] *Id.* at 243:3–25 (Oskooii).

82.     Under the first conception, South Dodge is too populous to constitute a single district. Moreover, the area under the third conception of South Dodge is not populous enough to comprise a single district.[105]

83.     Notably, all three of these conceptions primarily exist south of Comanche Street. The area below Comanche Street is far too populous to fit into one district.[106]

84.     South Dodge has some common characteristics. It is a commercial area, with two of the largest employers, National Beef and Cargill meatpacking plants, as well as auto dealerships. South Dodge "is socioeconomically less privileged than other regions of Dodge City," with the residential areas defined by "predominantly small to mid-size, single-family housing units," as well as public housing.[107]

85.     South Dodge is represented by District 1 across Dr. Oskooii's maps.[108]

86.     ***Wyatt Earp Corridor.*** The Wyatt Earp Corridor is "a major four-lane intersection that goes through the width of the City from west to east or east to west." It is home to many hotels, restaurants, shops, landmarks, and the Amtrak station. It is a high-population area.[109]

87.     In most maps, Dr. Oskooii used the Wyatt Earp Corridor as a natural boundary to divide certain districts. However, the Wyatt Earp Corridor can also be considered its own

---

[105] *Id.* at 242:23–243:3 (Oskooii).

[106] Trial Tr. Vol. III, 116:1–6 (Oskooii).

[107] Trial Tr. Vol. II, 244:3–245:6 (Oskooii).

[108] Oskooii Maps 1–14, Exs. 96–109.

[109] Trial Tr. Vol. II, 245:7–246:5 (Oskooii).

community of interest. In order to reflect this latter conception, Dr. Oskooii treated the Wyatt Earp Corridor as its own community of interest in District 2 in Maps 9–12.[110]

88.     ***Central Dodge City.*** Center City Dodge or Old Dodge City, as it is known to some residents, generally begins from Central Avenue to 14th Avenue, east-to-west, and goes from either around Hoover Pavilion or Wyatt Earp Boulevard to Comanche Street, south-to-north.[111] This is a distinct, high-traffic area that contains government buildings, certain tourist attractions like the Boot Hill Museum, and shops and restaurants. It also has numbered streets, unlike those streets east of Central Avenue.[112]

89.     Center Dodge is typically represented by District 3 in Dr. Oskooii's illustrative maps.[113]

90.     ***Mideast Dodge City.*** The area south of Comanche and east of Central Avenue is heavily residential, with small single-family housing units, including affordable housing. This is an economically distressed area. Unlike the area west of Central Avenue, it has lettered streets, from A- to- P.[114]

91.     This area of Mideast Dodge City is typically represented by District 2 in Dr. Oskooii's 14 illustrative maps—save for Maps 9–12, in which District 2 covers the Wyatt-Earp Corridor.[115]

---

[110] *Id.* at 246:6–15 (Oskooii); Oskooii Maps 9–12, Exs. 104–07.

[111] Trial Tr. Vol. II, 246:19–23, 247:12–17 (Oskooii).

[112] *Id.* at 246:16–247:25 (Oskooii).

[113] Oskooii Maps 1–14, Exs. 96–109.

[114] Trial Tr. Vol. II, 248:1–21 (Oskooii).

[115] Oskooii Maps 1–14, Exs. 96–109.

92.  ***North Dodge City.*** North Dodge City—north of Comanche Street—is an affluent, high-income neighborhood. North Dodge City is generally more affluent than the areas below Comanche Street.[116]

93.  Dodge City itself recognizes this socioeconomic distinction between the areas below and above Comanche Street. Dodge City has a Neighborhood Revitalization Program, which has identified areas of economic need in the City. The City has designated the *entire* area of the city below Comanche Street as an area in need of revitalization, while it has designated *none* of the area above Comanche Street as an area in need of revitalization.[117]

94.  ***Northwest vs. Northeast Dodge City***. Northwest and Northeast Dodge City share some similarities—namely, their relatively high socioeconomic status, mentioned *supra*. Yet there are some differences. Northeast Dodge City is particularly wealthy—with a country club, large and impressive houses, and older money. Northwest Dodge, by contrast, has some newer and more middle-class housing development, as well as several major retailers and the City's community college and high school.[118]

95.  Recognizing these differences, Sixth Avenue serves as a natural boundary that can divide Northwest Dodge City and Northeast Dodge City.[119]

---

[116] Trial Tr. Vol. II, 248:13–21; 249:14–250:14 (Oskooii).

[117] *Id.* at 250:15–251:20 (Oskooii).

[118] *Id.* at 244:21–245:1, 249:14–250:14 (Oskooii).

[119] *Id.* at 251:21–252:8 (Oskooii).

96.     In particular, North 14th Avenue generally serves as the demarcation point for West Dodge.[120] The North 14th Avenue Corridor itself is an "important area" with national retailers, the community college, and the city's only high school.[121]

97.     In Dr. Oskooii's 14 illustrative maps, Northwest Dodge City is generally represented by District 4 and Northeast Dodge City is generally represented by District 5.[122]

### b.   The Illustrative Maps

98.     In **Map 1**, District 1 largely adopts the Trail Street conception of South Dodge. District 2 covers the mideast portion of Dodge City, while Center City is conceived as between Central Avenue and 14th Avenue and encompassed by District 3. Northern Dodge City is conceived as above Comanche Street and is divided into two districts—Districts 4 and 5—by 6th Avenue.[123]

99.     **Map 2** presents a different conception of District 1, the South Dodge district, by incorporating Wyatt Earp Boulevard as the upper boundary on the west side and Trail Street on the east side. Because District 1 extends further northwest than in Map 1, District 3 loses some population in the southwest part of the district. To gain population back for population equality purposes, part of District 3 extends north of Comanche Street, taking part of District 5's population. Also, District 4 only extends as far south as West Wyatt Earp Boulevard, in light of District 1 taking the population in the southwest.[124]

---

[120] *Id.* at 248:22–249:1 (Oskooii).

[121] *Id.* at 249:1–13 (Oskooii).

[122] Oskooii Maps 1–14, Exs. 96–109.

[123] Trial Tr. Vol. II, 254:4–18 (Oskooii); Oskooii Map 1, Ex. 96.

[124] Trial Tr. Vol. II, 259:25–261:2 (Oskooii); Oskooii Map 2, Ex. 97.

100.     In **Map 3**, District 3—instead of capturing the area north of Comanche Street as it does in Map 2—instead extends further west of North 14th Avenue to pick up some population. As a result, District 4 correspondingly captures some areas past North 14th Avenue, stopping at 9th and 6th Avenues for equal population purposes. Districts 1, 2, and 5 remain largely the same as they did in Map 2.[125]

101.     **Map 4** presents a different conception of District 3, the Center Dodge District, by encompassing areas right below Wyatt Earp Boulevard and capturing the Hoover Pavilion and Wright Park Zoo. As a result of this change, District 4, the Western Dodge District, does not extend south past Division Street. Also as a result of the new District 3, District 1 extends all the way north to the Wyatt Earp Boulevard on the east side and only up to the Arkansas River on the west side. District 2, the Eastern Dodge City District, starts at Central Avenue—instead of Avenue A as it does in Map 3—and does not extend further south beyond Wyatt Earp Boulevard.[126]

102.     **Map 5** presents a slightly different conception of District 3, the Center Dodge District, while still encompassing Hoover Pavilion and Wright Park Zoo as it did in Map 4. District 3 in Map 5 attempts to keep more of 6th through 9th Avenues within the Center City district than it did in Map 4. As a result, District 4 must extend further south than it did in Map 4, but it still does not need to go below the Wyatt Earp Corridor. Districts 1, 2, and 5 remain largely the same as they did in Map 4.[127]

103.     **Map 6** presents a new conception of District 1, the South Dodge District, by incorporating the Arkansas River as its northeastern boundary. As Dr. Oskooii noted, the "area

---

[125] Trial Tr. Vol. II, 261:3–262:1; Oskooii Map 3, Ex. 98.

[126] Trial Tr. Vol. II, 262:5–263:2; Oskooii Map 4, Ex. 99.

[127] Trial Tr. Vol. II, 263:3–7 (Oskooii); Oskooii Map 5, Ex. 100.

below [the] Arkansas River does not have enough population to be in one district."[128] Accordingly, the western part of District 1 extends above the Wyatt Earp Boulevard, for the first time, in order to gain enough population to achieve population equality.[129]

104.    Consequently, in Map 6, District 4 loses some population. In order to gain sufficient population, it captures some area directly above District 3's northern boundary, cutting across 6th Avenue and taking some population from District 5. District 3 reverts back to its almost-perfect-square configuration that it had in Maps 1–3, while District 2 extends further south to capture the population District 1 ceded in the southeast.[130]

105.    **Map 7** presents the same conception of District 1, the South Dodge District, as Map 6 and incorporates the Arkansas River as its northeastern boundary. Yet rather than have District 4 gain population east of 6th Avenue in the central part of Dodge City, it gains that population east of 6th Avenue in the northern part of the city. This conception of northwest Dodge unites new housing developments with other soon-to-be other areas of growth in North Dodge. As a result, District 5 loses population and needs to regain equal population by extending slightly below Comanche Street, eating a bit into some of District 3's population.[131]

106.    **Map 8** attempts to (i) present a similar conception of District 4 as existed in Map 7, while also (ii) adopting the version of District 3, the Center City district, that extends further south to include Hoover Pavilion and the Wright Park Zoo (as existed in Maps 4–5). In order to do this while still abiding by equal population and other redistricting criteria, District 3 needs to

---

[128] Trial Tr. Vol. II, 263:212–24 (Oskooii).

[129] *Id.* at 263:18–264:4 (Oskooii); Oskooii Map 6, Ex. 10.

[130] Trial Tr. Vol. II, 264:5–18 (Oskooii); Oskooii Map 6, Ex. 101.

[131] Trial Tr. Vol. II, 264:19–265:17 (Oskooii); Oskooii Map 7, Ex. 102.

extend a bit below the Arkansas River. District 1, in turn, extends further north on the east side to East Trail Street, to pick up population, which cuts into District 2's southern population.[132]

107.     As mentioned *supra*, **Map 9** presents a new conception of District 2 by recognizing the Wyatt Earp Corridor as its own community of interest. This conception is also reflected—with some variations—in Maps 10–12.[133] By following an important intersection reflective of a notable community in Dodge City, and given the particularities of the Dodge City boundaries, this district is reasonably shaped and compact.[134]

108.     As a result, District 3, the Center Dodge District, moves further east in a way that grabs some population in Mideast Dodge City. Districts 1, 4, and 5 are largely consistent with prior illustrative maps.[135]

109.     **Map 10** presents a slightly different conception of District 3 than was presented in Map 9. In Map 10, District 3 moves west back to North 14th Avenue, in an attempt to recapture some of the Center City Dodge area that it ceded in Map 9. Consequently, more of District 4— which loses population when District 3 moves west in Map 10—proceeds further east of 6th Avenue than it did in Map 9. That forces District 5 to extend a bit below Comanche Street to regain some population. Districts 1 and 2 are largely similar to their configurations in Map 9.[136]

---

[132] Trial Tr. Vol. II, 265:18–266:7; (Oskooii) Oskooii Map 8, Ex. 103.

[133] Trial Tr. Vol. II, 267:6–12; Oskooii Map 9, Ex. 104.

[134] Trial Tr. Vol. II, 267:2–22, 268:20–25 (Oskooii); Oskooii Map 9, Ex. 104.

[135] Trial Tr. Vol. II, 268:11–19 (Oskooii); Oskooii Map 9, Ex. 104.

[136] Trial Tr. Vol. II, 269:1–13 (Oskooii); Oskooii Map 10, Ex. 105.

110.    **Map 11** presents a slightly different conception of District 2 than in Maps 9 and 10.[137] In Map 11, District 2 "more fully captures both sides of Wyatt Earp Corridor" by extending to the westernmost part of the city on both sides of the street.[138] The other districts are largely similar to their configurations in either Map 9 or Map 10.[139]

111.    **Map 12** presents a similar conception of District 2 as in Map 11, but District 2 here extends farther south below the West Wyatt Earp Boulevard to capture more area on the western side of the corridor. Consequently, District 1, which loses population in the west, extends above Trail Street on the eastern side to make up for that population loss. The remaining districts are fairly similar to their configurations in Map 11.[140]

112.    Dr. Oskooii used the same methodology to create **Map 13** as he did for the previous 12 maps, but also considered race and ethnicity as an additional, non-predominant factor, as is traditional in the *Gingles* I framework. When drawing Maps 1–12, Dr. Oskooii did not consider race and ethnicity data when drawing his maps. When drawing Maps 13–14, Dr. Oskooii was aware of where racial and ethnic groups were concentrated, but considered this along with all other factors when drawing map lines.[141]

---

[137] Oskooii Map 11, Ex. 106.

[138] Trial Tr. Vol. II, 269:17–18 (Oskooii); Oskooii Map 11, Ex. 106.

[139] Trial Tr. Vol. II, 269:14–20 (Oskooii); Oskooii Map 10, Ex. 105.

[140] Oskooii Map 11, Ex. 106.

[141] Trial Tr. Vol. II, 270:6–19, 271:16–17 (Oskooii).

113.    Because race was not a predominant factor, Map 13 looks very similar to the previous maps—it largely reflects the same communities of interest of South Dodge, Mideast, Center Dodge City, and northwest and northeast Dodge.[142]

114.    Dr. Oskooii also considered race and ethnicity as an additional, non-predominant factor when creating **Map 14**.[143] Because race was not a predominant factor, Map 14 looks very similar to previous maps.[144]

115.    District 4 is slightly different in Map 14 than in Map 13 in that it encompasses more of the newer housing developments in the northeast. Consequently, District 5 extends below Comanche Street to gain some population that it lost by virtue of District 4's configuration.[145]

116.    Defendant presented no evidence that race predominated in any of Dr. Oskooii's maps. To the contrary, Dr. Oskooii testified repeatedly that he did not consider race or ethnicity data when drawing twelve of his fourteen maps; that for Maps 13–14, he used race only as "an additional factor" and "not the predominant factor"; and explained his many mapping decisions almost without any discussion of race but rather concerns about population equality, compactness, and communities of interest.[146]

117.    The reason why there is a majority of white voters in Districts 4 and 5 is "the population distribution and concentration of the different demographic groups across Dodge City";

---

[142] *Id.* at 271:13–272:4 (Oskooii); Oskooii Map 13, Ex. 107.

[143] Trial Tr. Vol. II, 270:9–11, 271:16–17 (Oskooii).

[144] *Id.* at 271:13–272:4 (Oskooii); Oskooii Map 14, Ex. 108.

[145] Trial Tr. Vol. II, 272:5–16 (Oskooii); Oskooii Map 14, Ex. 108.

[146] *See, e.g.*, Trial Tr. Vol. II, 270:9–272:4 (Oskooii); Trial Tr. Vol. III, 54:2–6, 114:113:21–114:6 (Oskooii) (Dr. Oskooii testifying that race cannot predominate for a map drawer if he is not considering race or ethnicity data when drawing maps).

*i.e.*, there are many white people who live in North Dodge.[147] If Dr. Oskooii wanted to make those districts less white, the unrebutted testimony is that he would have had to violate other traditional districting criteria to do so.[148] Simply put, no one—least of all Dr. Oskooii—controls where people live in Dodge City.[149]

118.    In Map 14, there are 3,284 eligible voters in District 3, which is majority-Latino, as compared to 2,656 eligible voters in District 5, which is majority-white.[150] Thus, in one of just two maps where Dr. Oskooii actually considered race and ethnicity, there are far more eligible voters in a majority-Latino district than in a majority-white district.

## B. *Gingles* II and III

119.    The second and third *Gingles* preconditions, together referred to as racially polarized voting, ask whether (1) "the minority group is politically cohesive" (*Gingles* II), and (2) "the white majority votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate," (*Gingles* III).[151]

120.    Plaintiffs presented testimony regarding *Gingles* II and III through their expert witness, Dr. Matthew Barreto.

121.    Utilizing ecological inference methods, Dr. Barreto demonstrated that Latino voters in Dodge City are cohesive, in that a large majority of Latino voters consistently favor the same

---

[147] Trial Tr. Vol. III, 114:11–25 (Oskooii).

[148] *Id.* at 115:1–6 (Oskooii).

[149] *Id.* at 114:11–25 (Oskooii).

[150] *Id.* at 115:7–24 (Oskooii); Oskooii Report Table 17, Ex. 95.

[151] *Sanchez v. State of Colorado*, 97 F. 3d 1303, 1310 (10th Cir. 1996); *Thornburg v. Gingles*, 478 U.S. 30, 32, 53 n.21 (1986).

candidates across a series of elections.[152] Dr. Barreto also demonstrated that white voters within Dodge City are also cohesive and vote sufficiently as a bloc to usually defeat Latino-preferred candidates.[153] These results were consistent across several different data sources and over one hundred forty statistical models.[154]

122.    There is no bright line for determining political cohesion, but rather it must be determined by an analysis of several elections across time that show a particular pattern within a relevant jurisdiction.[155]

123.    Ecological inference is "[t]he common technique that is used to study racially polarized voting."[156] Ecological inference was cited in the foundational *Thornburg v. Gingles* case and has been refined and used since to assess racially polarized voting in a jurisdiction.[157]

124.    Two forms of ecological inference, King's Iterative Ecological Inference (King's EI) and Rows by Columns (RxC EI), use aggregate data to identify voting patterns through statistical analysis of candidate choice and racial demographics within a precinct.[158] Both forms

---

[152] Trial Tr. Vol. IV, 206:13–23 (Barreto).

[153] *Id.* at 207:3–13 (Barreto).

[154] *Id.* at 206:13–23 (Barreto).

[155] *See* Trial Tr. Vol. II, 93:2–18 (Barreto) (Dr. Barreto describing the need to review multiple elections and election cycles to determine broader trends over time to determine cohesion.); Trial Tr. Vol. IV, 206:13–207:2 (Barreto) (Dr. Barreto describing a conclusion on cohesion in terms of the relative strength of voting patterns rather than as a numerically sufficient determination), *see also* Trial Tr. Vol. II, 100:24–101:4 (Barreto) (Dr. Barreto describing that variances and differences in numerical estimations do not change his opinion on racially polarized voting, where instead he is looking for patterns and weighing the evidence).

[156] Trial Tr. Vol. II, 45:11–12 (Barreto).

[157] Trial Tr. Vol. II, 45:9–20 (Barreto).

[158] Trial Tr. Vol. IV, 145:5–12 (Barreto).

of ecological inference have been established as reliable and standard methods of measuring racially polarized voting.[159]

125.    Both King's EI and RxC EI are appropriate for analyzing elections with more than two candidates and/or more than two racial/ethnic groups.[160]

126.    Both King's EI and RxC EI models produce point estimates that reflect the estimated support a candidate received from a particular racial or ethnic group.[161] A point estimate is the center of the distribution of an ecological inference model.[162] It is the number that is the most accurate estimate of percentage of support from the ecological inference model.[163] Point estimates for King's EI and RxC EI are the best descriptors of the data on racially polarized voting because they "contain[] the most probabilistic outcome."[164]

127.    With respect to the analysis conducted by Dr. Barreto, the point estimates here demonstrate the support that candidates received from white and Latino voters in Dodge City.[165]

---

[159] *Id.* at 203:23–204:4 (Barreto).

[160] *Id.* at 204:15–205:4 (Barreto).

[161] Trial Tr. Vol. II, 96:8–18 (Barreto).

[162] *Id.* at 101:15–102:1 (Barreto).

[163] *Id.*

[164] *Id.* at 171:5–9 (Barreto).

[165] *Id.* at 96:6–18 (Barreto); Barreto Report Appendix A Table 1, Ex. 121.

### a.   Bayesian Improved Surname Geocoding (BISG) Methodology

128.    BISG analysis creates a probability that a given voter who participated in a given election is of a particular racial/ethnic group based upon their surname and racial composition of their Census block.[166]

129.    BISG was developed after *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668500 (S.D. Tex. Apr. 25, 2014), to deal with the precise problem in that case—that the relatively few number of precincts made it harder to make determinations about racially polarized voting.

130.    Studies have validated the reliability of using BISG for conducting racially polarizing voting analysis and have found the method especially useful for analysis of political subdivisions that have a small number of precincts[167] and where voting turnout is relatively low, such as in Dodge City.[168] Government entities have also utilized BISG for election-related research and policy.

131.    Both Plaintiffs' and Defendant's experts agree on the accuracy and probative value of BISG when estimating race and ethnicity of a voter. [169]

132.    Today, because of BISG, "we have much more precise estimates" for racially polarized voting in jurisdictions that have relatively few precincts.[170] In short, BISG has mostly

---

[166] Trial Tr. Vol. II, 89:19–90:4 (Barreto).

[167] *Id.* at 91:7–24 (Barreto).

[168] *Id.* at 91:9–16 (Barreto).

[169] Trial Tr. Vol. IV, 151:1–161:17, 179:10–17 (Katz).

[170] Trial Tr. Vol. II, 175:10–12 (Barreto).

solved this issue of analyzing racially polarized voting in jurisdictions with relatively few precincts.[171]

133.    Dr. Barreto's undisputed BISG-based analysis of Dodge City shows strong cohesion among Latino voters, with over 70% of Latino voters favoring the same candidates in a bulk of the 24 elections assessed.[172]

134.    Utilizing BISG, Dr. Barreto was able to obtain precise and accurate point estimates of racially polarized voting in Dodge City.[173]

135.    The Court finds BISG a reliable methodology to use when conducting a racially polarized voting analysis to determine the probability of a voter's race and ethnicity.

### b.  Relevant Elections

136.    All types of elections—both endogenous and exogenous elections—are relevant and proper to analyze for the purpose of determining whether it is more likely than not that racially polarized voting exists within Dodge City.

137.    Both Plaintiffs' and Defendant's experts agree that exogenous elections (which are elections for offices other than those that are the subject of the lawsuit) are relevant to analyze for the purpose of a polarized voting analysis.[174]

---

[171] *Id.* at 175:4–12; 176:8–13 (Barreto).

[172] Barreto Report Appendix A Table 1, Ex. 121.

[173] Trial Tr. Vol. II, 174:25–175:12 (Barreto).

[174] Trial Tr. Vol. IV, 156:10–22 (Katz).

138.    Both experts agreed that local exogenous elections that are "similar in kind" to endogenous elections—for example, those elections that are nonpartisan or feature more than two candidates—are useful and relevant to analyze.[175]

139.    Because polarized voting is determined based on a pattern of elections, all elections, including statewide elections, have probative value and can be considered when determining whether there are polarized voting patterns within Dodge City.[176]

### c.    Political Cohesion Amongst Latino Voters in Dodge City.

140.    In his ecological inference analysis, Dr. Barreto analyzed 24 elections over nine election cycles, between 2014–2022.[177]

141.    As noted *supra*, Dr. Barreto ran these 24 elections each in two separate models—(1) King's Iterative Ecological Inference methodology (King's EI), and (2) Rows by Columns (RxC EI). In Dr. Barreto's Ecological Inference table, the King's EI model is represented on the lefthand side of the table, while the RxC model is represented on the righthand side of the table.[178]

142.    According to both models, it is clear that Latino voters in the City of Dodge City are political cohesive.[179]

---

[175] *See generally* Trial Tr. Vol. II, 156:3–13 (Barreto); Trial Tr. Vol. IV, 156: 17–157:11 (Katz).

[176] Trial Tr. Vol. II, 92:20–93:18, 99:22–101:8 (Barreto); Trial Tr. Vol. IV, 210:4–16 (Barreto).

[177] Barreto Report Appendix A Table 1, Ex. 121.

[178] *Id.*

[179] *See generally* Trial Tr. Vol. II, 95:1–103:6 (Barreto).

#### i. Dr. Barreto's Undisputed King's Iterative Ecological Inference Results Demonstrate Latino Voter Cohesion.

143.    King's EI is the gold standard of voting rights cases and federal and state courts have relied on this method for determining polarized voting in both two-candidate and multi-candidate elections.[180]

144.    King's EI is the most accurate model to understand multi-candidate elections because the model runs each candidate against the field, showing the results of running each candidate against all others one at a time and producing less averaging.[181]

145.    The undisputed King's EI results from 24 elections, over 9 election cycles occurring over a ten-year period, demonstrate a strong, consistent pattern of Latino voter cohesion.[182]

146.    In Dodge City Commission races, the King's EI results demonstrated that Latino voters usually strongly preferred at least one candidate in the "pick three" races and usually preferred different sets of candidates than non-Latinos.[183]

---

[180] Trial Tr. Vol. IV, 203:23–204:7 (Barreto).

[181] Trial Tr. Vol. II, 100:10–17 (Barreto).

[182] Barreto Report Appendix A Table 1, Ex. 121; Trial Tr. Vol. II, 93:2–18 (Barreto) (Dr. Barreto describing the need to review multiple elections and election cycles to determine broader trends over time to determine cohesion.); Trial Tr. Vol. IV, 206:13–207:2 (Barreto) (Dr. Barreto describing a conclusion on cohesion in terms of the relative strength of voting patterns rather than as a numerically sufficient determination), *see also* Trial Tr. Vol. II, 100:24–101:4 (Dr. Barreto describing that variances and differences in numerical estimations do not change his opinion on racially polarized voting, where instead he is looking for patterns and weighing the evidence). *See* Trial Tr. Vol. IV, 175:10–12 (Katz) (Dr. Katz describing that he did not run King's Iterative ecological inference for the *four* elections that he ran.).

[183] Barreto Report Appendix A Table 1, Ex. 121.

147.    For example, the King's EI results for the 2014 Dodge City Commission election show that Latina candidate Liliana Zuniga, who did not win election, was the most-preferred candidate by Latinos and the least-preferred by whites.[184]

148.    The King's EI results for the 2017 Dodge City Commission election show that Charles Sellens, who did not win election, was the most-preferred candidate by Latinos and the second-least-preferred candidate by whites.[185]

149.    In the 2019 Dodge City Commission election, the King's EI results demonstrate that Adam Hessman, who did not win election, was the most-preferred candidate by Latinos and the second-least-preferred candidate by whites.[186]

150.    In the 2021 Dodge City Commission election, the King's EI results demonstrate that Jan Scoggins, who did not win election, was the most-preferred candidate by Latinos and the second-least-preferred candidate by whites.[187]

151.    In other local elections that were multi-candidate, the King's EI results demonstrated that Latino voters usually strongly preferred their own sets of candidates and usually strongly preferred at least one candidate in a "pick three" multi-candidate race.[188]

---

[184] *Id.*

[185] *Id.*

[186] *Id.*

[187] *Id.*

[188] *Id.*

152.    For example, in the 2021 Dodge City School Board race, the King's EI results demonstrate that Nagel, who did not win election, was the highest vote-getter among Latinos but received extremely low support among whites.[189]

153.    In the 2019 Dodge City Community College Trustees election, Garcia, who did not win election, was the highest vote-getter among Latinos but the lowest vote-getter among whites.[190]

154.    Both Dr. Barreto and Dr. Katz agree that in the 2017 Dodge City Commission election, Zuniga was least preferred among white voters.[191]

155.    Since multi-candidate elections allow voters to pick more than one candidate, the point estimates understandably show less stark numerical cohesion of Latino voters than county or statewide elections. However, analysis shows that Latino voters consistently and strongly prefer their own sets of candidates.[192]

156.    Based on the King's EI results, in local and statewide elections that only featured two candidates going head-to-head, Latino voters voted cohesively for a preferred candidate.[193]

157.    Latino cohesion was consistently strong in state and countywide elections. Undisputed analysis of 2022 statewide elections using the King's EI results demonstrated that on average, Latino voters in Dodge City voted cohesively at levels up to 70%. In some elections

---

[189] *Id.*

[190] *Id.*

[191] *See* Barreto Report Appendix A Table 1, Ex. 121; Trial Tr. Vol. IV, 167:23–168:9 (Katz).

[192] Trial Tr. Vol. II, 100:1–101:9 (Barreto).

[193] Barreto Report Appendix A Table 1, Ex. 121.

analyzed, including the Ford County Clerk election in 2018, Latino support for preferred candidates reached over 75% based on the King's EI analysis.[194]

158.     Undisputed analysis of the 2020 elections also shows Latino voter cohesion. In 2020 statewide and countywide elections, Dr. Barreto's King's EI analysis shows that Latino voters supported the same candidate on average 75% of the time.[195]

159.     In the 2020 Ford County Clerk race, Dr. Barreto's King's EI analysis demonstrated that Angie Gonzalez, the Latina candidate, received more than 75% of the Latino vote but less than 14% of the white vote. She lost the election.[196]

160.     Similarly, undisputed analysis of the 2018 statewide elections shows even higher levels of Latino voter cohesion. In 2018 statewide elections, Dr. Barreto's King's EI analysis shows that Latino voters supported the same candidate, on average, 85% of the time.[197]

161.     Dr. Barreto's King's EI analysis of 2016 and 2014 statewide elections show similarly high levels of Latino voter cohesion, with Latino voters supporting the same candidates at levels as high as 86%.

162.     Based on the King's EI results, Latino voters are highly cohesive in Dodge City.[198]

163.     Notably, Defendant offers *no* evidence—from Dr. Katz or otherwise—that contests or rebut any of Dr. Barreto's King's EI analysis. Dr. Katz *only* ran an RxC analysis for four

---

[194] *Id.*

[195] *Id.*

[196] *Id.*

[197] *Id.*

[198] Trial Tr. Vol. IV, 206:21–207:2 (Barreto); Barreto Report Appendix A Table 1, Ex. 121.

elections, and did *not* run a King's EI analysis. So, Dr. Barreto's King's EI analysis and testimony are entirely unrebutted.[199]

> ### ii. Dr. Barreto's Largely Undisputed RxC Ecological Inference Results Demonstrate Latino Voter Cohesion

164.    The RxC EI results from 24 elections, over 9 election cycles, demonstrate that Latino voters exhibit strong levels of cohesion.[200]

165.    In election after election, there are clear Latino candidates of choice based on the RxC EI results.[201]

166.    In Dodge City Commission races, the RxC EI results show that Latino voters usually strongly prefer at least one candidate in the "pick three" races and usually prefer different sets of candidates than non-Latinos.[202]

167.    In other local elections that are multi-candidate, the RxC EI results show that Latino voters usually strongly preferred at least one candidate in "pick three" races and usually preferred different sets of candidates than non-Latinos.[203]

168.    In exogenous elections, the undisputed RxC EI results demonstrate that in most elections analyzed, almost over two-thirds of all Latino voters strongly preferred the same candidates.[204]

---

[199] Trial Tr. Vol. IV, 203:1–14 (Barreto).

[200] Barreto Report Appendix A Table 1, Ex. 121.

[201] Trial Tr. Vol. IV, 206:21–25 (Barreto); Barreto Report Appendix A Table 1, Ex. 121.

[202] Barreto Report Appendix A Table 1, Ex. 121.

[203] *Id.*

[204] *Id.*

169.    Latino cohesion was consistently strong in state and countywide elections. Undisputed analysis of 2022 statewide elections using the RxC EI results demonstrated that Latino voters in Dodge City voted cohesively, on average, almost 68% of the time.[205]

170.    Undisputed analysis of the 2020 elections also shows Latino voter cohesion. In 2020 statewide and countywide elections, Dr. Barreto's RxC EI analysis shows that Latino voters supported the same candidate, on average, almost 65% of the time.[206]

171.    Similarly, undisputed analysis of the 2018 elections show even higher levels of Latino voter cohesion. In 2018 statewide elections, Dr. Barreto's RxC EI analysis shows that Latino voters supported the same candidate, on average, 73% of the time.[207]

172.    Dr. Barreto's RxC EI analysis of 2016 and 2014 elections show similarly high levels of Latino voter cohesion, with Latino voters supporting the same candidates at levels as high as 70%.[208]

173.    Even though there are some variations between King's EI and RxC results, given that RxC does more averaging in multi-candidate races, both models demonstrate clear patterns of polarization and are accurate.[209]

### d.  White Bloc Voting Occurs Within Dodge City

174.    Based on both King's EI and RxC EI, white voters in Dodge City engage in bloc voting such that a large majority of Dodge City's white voters favor, and vote cohesively for, their

---

[205] *Id.*

[206] *Id.*

[207] *Id.*

[208] *Id.*

[209] Trial Tr. Vol. II, 99:22–100:9 (Barreto).

own set of candidates in state, county, and city-wide elections,[210] and these candidates are different than, and run in opposition to, those favored by Latino voters.[211]

175.    This bloc voting by non-Hispanic white voters in Dodge City results in the candidates favored by non-Hispanic white voters defeating the Latino candidate of choice.[212]

176.    White voters in Dodge City have more political influence in deciding elections because they comprise 64% of the actual voters in Dodge City, whereas Latinos comprise only 30% of all voters in Dodge City.[213]

177.    In recent Dodge City Commission elections, undisputed evidence shows that there are clear patterns of non-Hispanic white voters usually preferring candidates running in opposition to those preferred by Latino candidates.[214]

178.    As the Dodge City Commission elections contain multiple candidates, the point estimates understandably show less stark numerical polarization; however, the pattern of polarization between white and Latino voters is still clear and undeniable based on both models used by Dr. Barreto.[215]

179.    In the 2021 Dodge City Commission election, for example, the two candidates most preferred by whites won election despite receiving minimal support from Latinos.[216]

---

[210] Barreto Report Appendix A Table 1, Ex. 121.

[211] Trial Tr. Vol. IV, 207:3–13 (Barreto).

[212] *Id.*

[213] Trial Tr. Vol. II, 84:20–85:9.

[214] Barreto Report Appendix A Table 1, Ex. 121.

[215] Trial Tr. Vol. II, 100:1–101:8.

[216] Barreto Report Appendix A Table 1, Ex. 121.

180.    In the 2019 Dodge City Commission election, Hessman, who garnered the highest proportion of support from Latino voters, received minimal support from white voters in Dodge City and ultimately lost the election.[217]

181.    Similarly, in the 2019 Dodge City Community College Trustees race, white voters bloc voted against Garcia, the Latino-preferred candidate. Garcia lost the election.[218]

182.    Undisputed analysis of state and countywide general elections similarly displays the presence of white voters consistently and cohesively voting for candidates running in opposition to the Latino-preferred candidates.[219]

183.    In 2022, on average, over 70% of white voters in Dodge City voted for candidates running in opposition to the Latino-preferred candidates. These levels of cohesion amongst white voters in Dodge City reached as high as 84%.[220]

184.    Similarly, in 2020, in state and countywide general elections, on average, over 75% of white voters in Dodge City voted for candidates running in opposition to the Latino-preferred candidates. These cohesion levels reached as high as 86%.[221] For example, in the Ford County Clerk race in 2020, more than 86% of whites voted for Debbie Cox, according to the King's EI model, over the Latina candidate. Cox won the election.[222]

---

[217] *Id.*

[218] *Id.*

[219] *Id.*

[220] *Id.*

[221] *Id.*

[222] *Id.*

185.    White voters showed similar levels of bloc voting in the 2018, 2016, and 2014 state and countywide general elections, with white voters consistently voting cohesively for candidates running in opposition to the Latino-preferred candidates at high levels, with some elections demonstrating white voter cohesion at over 90% cohesion.[223]

186.    As stated *infra*, white voters located in North Dodge have clear electoral preferences that differ from the heavily Latino South Dodge.[224] If a candidate for an election was equally preferred by all racial or ethnic groups, there would be no difference in voting patterns in the heavily white North Dodge compared to the heavily Latino South Dodge.[225] There are clear patterns based on the 2014 Dodge City Commission election, 2017 Dodge City Commission election, and 2018 Ford County Clerk election, however, that white-preferred candidates receive more of their average vote share in white areas of Dodge City and receive less of their average vote share in Hispanic areas of Dodge City.[226] This means there is cohesive white voting occurring in Dodge City.[227]

187.    Additionally, a finding of white bloc voting within Dodge City is supported based on the fact that Hispanic-preferred candidates rarely are successful.[228]

---

[223] *Id.*

[224] Trial Tr. Vol. II, 70:3–81:1 (Barreto).

[225] *Id.* at 74:4–9 (Barreto).

[226] *Id.* at 70:3–81:1 (Barreto).

[227] Trial Tr. Vol. IV, 207:3–13, 211:19–23 (Barreto).

[228] *Id.* at 207:3–9 (Barreto).

188.    Further, based on both the King's EI and RxC EI point estimates, when there are Latino-preferred candidates, white voters within Dodge City do not vote for identified Latino-preferred candidates.[229]

189.    The undisputed evidence demonstrates that white voters in the City of Dodge City are political cohesive and vote as a bloc to usually defeat Latino-preferred candidates.

**e.  Dr. Katz's Testimony is Extremely Limited and Entitled to Little, If Any, Weight**

190.    The Court does not find the testimony of Dr. Katz persuasive on the issue of Latino cohesion and white bloc voting. The Court makes this determination for three main reasons.

191.    *First*, Dr. Katz's opinions in this case are extremely limited. All Dr. Katz did was run an RxC EI analysis for the Dodge City Commission elections in 2021, 2019, 2017, and 2014. That means that Dr. Katz has no opinions about any of Dr. Barreto's King's EI analysis for *any* of the 24 elections examined, *including* the four Dodge City Commission elections. And Dr. Katz ran his RxC EI analysis for just four of the 24 elections that Dr. Barreto examined, meaning that even his RxC EI analysis ignores 20 out of the 24 elections at issue.[230] This means that Dr. Katz leaves the vast majority of Dr. Barreto's analysis entirely unrebutted. As Dr. Barreto explained, even Dr. Katz's RxC analysis is insufficient because"[f]our elections is just far too few for us to draw a conclusion."[231]

---

[229] *Id.* at 207:10–13 (Barreto).

[230] *Id.* at 176:18–177:4; 202:1–203:14 (Katz).

[231] *Id.* at 210:4–8 (Barreto). Indeed, Dr. Katz himself does not seem to be drawing much of a conclusion; he testified that his only conclusion is that "we cannot reject the claim that there is no racially polarized voting." *Id.* at 158:22–159:6 (Katz). In other words, Dr. Katz does not actually conclude that there is no racially polarized voting in Dodge City.

192.    Dr. Katz claimed—without citation to any authority—that analyzing the exogenous elections would not be "helpful" because the available exogenous elections were partisan and only between two candidates.[232] This is plainly wrong, as Dr. Katz himself confirmed.[233] Dr. Barreto analyzed the 2021 Dodge City School Board election and the 2019 Dodge City Community College Trustees election, both of which were nonpartisan, multi-candidate, citywide elections and which demonstrate clear evidence of polarization.[234] Although he could have, Dr. Katz did not analyze these races, nor the 2020 Ford County Clerk race that included much of the same electorate, featured a Latina candidate, was a local race, and showed stark evidence of polarization.[235]

193.    More broadly, this Court rejects the idea that just because *some* exogenous elections have *some* differences from the endogenous elections, that those elections have *nothing* to say about racial polarization in Dodge City. Dr. Barreto's ecological inference models measure how Latinos and whites vote, and it is certainly relevant that across *all* statewide exogenous elections there is a stark pattern of racial polarization.[236]

194.    *Second*, in the limited analysis he conducted, Dr. Katz largely agrees with Dr. Barreto on the point estimates for the RxC EI analysis, *i.e.*, Dr. Katz and Dr. Barreto got very similar results for the figures that are the most accurate estimate of percent support from a group

---

[232] *Id.* at 158:11–17 (Katz).

[233] *Id.* at 179:6–9 (Katz).

[234] *Id.* at 177:5–178:16 (Katz); Barreto Report Appendix A Table 1, Ex. 121.

[235] Trial Tr. Vol. IV, 178:17–24 (Katz); Barreto Report Appendix A Table 1, Ex. 121.

[236] Barreto Report Appendix A Table 1, Ex. 121.

of voters.[237] This both bolsters the validity of Dr. Barreto's methodology and renders dubious Dr. Katz's finding that polarization is not established.

195.    *Third*, Dr. Katz's two main criticisms of Dr. Barreto's work are unconvincing.

196.    Dr. Katz claims that a jurisdiction must have a sufficient number of homogenous precincts for ecological inference point estimates to be valid.[238]

197.    Yet both a federal court and a redistricting commission have rejected this argument.[239] Indeed, even Dr. Katz himself has testified that Gary King, the political scientist who developed ecological inference in the first place, has not indicated any bright-line rule for the number of homogenous precincts for ecological inference estimates to be reliable.[240] In that case, the federal court found "no basis to conclude that there is some minimum number of homogeneous precincts required before ER and EI analysis have any probative value in a § 2 case."[241]

198.    And indeed, Dr. Katz has personally performed work in other cases in which he conducted ecological regression and ecological inference without any reference to the number of homogenous precincts in the jurisdiction.[242]

---

[237] Trial Tr. Vol. IV, 185:14–186:14 (Katz); 206:13–20 (Barreto).

[238] *Id.* at 162:24–163:8 (Katz).

[239] *Id.* at 187:13–189:7 (Katz).

[240] *Id.* at 188:10–16 (Katz).

[241] *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1123 (E.D. Cal. 2018).

[242] Trial Tr. Vol. IV, 189:1–10 (Katz).

199.    Dr. Katz also critiques Dr. Barreto's RxC EI analysis of the four Dodge City Commission elections because he asserts that some of the confidence intervals overlap, creating some statistical uncertainty.[243]

200.    Yet as Dr. Barreto explained, "the center point" of the confidence interval—the point estimate—"is by far the most likely" outcome. "As you move away from that [point estimate]" and toward the lower bounds of the confidence interval, "these points are far, far less likely" to be accurate than the point estimate. As such, "focus[ing] on the point estimates first and foremost" is the best practices to determine whether racial polarization exists in a jurisdiction.[244]

201.    Dr. Katz himself appears to have been selective with this criticism. He acknowledged in his testimony that he published a peer-reviewed article in which he stated that one political party was likely to do better in an election than another political party despite the fact that *there were overlapping confidence intervals* because the former party had a higher point estimate.[245] As Dr. Barreto explained, Dr. Katz correctly interpreted the data when he wrote the article—that "even though there is heavy overlap [in the confidence intervals], in his words . . . it is still likely that this party defeated that party."[246] It is unclear to the Court why Dr. Katz is taking issue with the sort of analysis he himself conducted in a peer-reviewed journal some years ago.

202.    Dr. Katz's testimony even conflicts with his own work in this very case. In his expert report and testimony to the Court, Dr. Katz testified as to BISG estimates he arrived at to estimate the number of Latinos who live in Dodge City's precincts. Dr. Katz testified that he did

---

[243] *Id.* at 181:12–18 (Katz).

[244] *Id.* at 208:5–209:6 (Barreto).

[245] *Id.* at 182:15–184:25 (Katz).

[246] *Id.* at 208:16–20 (Barreto).

not disclose the confidence intervals for these point estimates but still found them to be valid and accurate.[247]

203.    In other words, Dr. Katz's core critique of Dr. Barreto runs contrary not just to his own peer-reviewed, published work, but to his own work in this very case.

### f.   Additional Evidence of Racially Polarized Voting in Dodge City

204.    Additionally, to aid the Court, Dr. Barreto presented his racially polarized voting analysis through showing the demographic and physical divisions within the Dodge City electorate.[248] Particularly in a racially segregated jurisdiction such as Dodge City, it is probative for the racially polarized voting analysis that voters north of Comanche Street—a heavily white area—vote in markedly different ways from voters south of Comanche Street—a heavily Latino area.[249]

205.    For example, in the 2014 City Commission election, Latina candidate Liliana Zuniga performed extremely well in high-density Latino precincts of Dodge City.[250] By contrast, white candidate Rick Sowers underperformed in high-density Latino precincts but overperformed in the low-density Latino precincts, such as a precinct in the far northeast region of Dodge City.[251] Sowers won election to the Commission, while Zuniga lost.[252]

---

[247] *Id.* at 180:6–21 (Katz).

[248] Trial Tr. Vol. II, 70:3–81:1 (Barreto).

[249] Trial Tr. Vol. II, 70:5-81:1 (Barreto).

[250] *Id.* at 73:9–13, 75:12–15 (Barreto).

[251] *Id.* at 75:16–76:12 (Barreto).

[252] *Id.* at 73:24–74:1, 75:12–15 (Barreto).

206.    In the 2017 City Commission election, Brian Delzeit received a lower-than-average share of the vote in high-density Latino precincts but a higher-than-average share of the vote in low-density Latino precincts that are at least 90% white.[253] Delzeit was elected to the Commission.

207.    In the 2019 City Commission election, Joseph Nuci received a higher-than-average share of the vote in the low-density Latino northern part of Dodge City and a lower-than-average share of the vote in the high-density Latino southern part of Dodge City.[254] Nuci was elected to the Commission. In the 2020 County Clerk election in Ford County, Latina candidate Angie Gonzalez received above average support in the heavily Latino southern part of Dodge City and below average support in the heavily white northern part of Dodge City.[255] By contrast, her opponent, Debbie Cox, a white candidate, performed poorly in the southern part of Dodge City and performed well in the northern part of Dodge City.[256] Cox defeated Gonzalez in the election. Across these many elections, the evidence demonstrates: (1) voters in the heavily Latino South Dodge vote in markedly different ways than voters in the heavily white North Dodge; (2) voters who perform well in North Dodge and poorly in South Dodge typically win elections; and (3) voters who perform well in South Dodge but poorly in North Dodge typically lose elections.

---

[253] *Id.* at 77:22–78:8 (Barreto).

[254] *Id.* at 78:13–21 (Barreto).

[255] *Id.* at 79:18–80:21 (Barreto).

[256] *Id.* (Barreto).

g.   **Dr. Barreto's Performance Analysis**

208.     Separately, Dr. Barreto conducted what is called a "performance analysis"; that is, whether and which of Dr. Oskooii's illustrative maps contain majority-Latino districts where Latinos have an opportunity to elect their preferred candidates.[257]

209.     To do so, for each district in each map, Dr. Barreto plugged in two main inputs: (1) the percentage of the Citizen Voting Age Population by race (the first column); and (2) an estimated percentage of the actual voters on Election Day who would be white versus Latino (the second column).[258]

210.     From those two data points, Dr. Barreto was able to estimate what percentage the Latino-preferred candidate and the white-preferred candidate would get on Election Day, taking into account the racially polarized voting analysis Dr. Barreto had already conducted. In other words, these estimates are based on the real data of how Latinos and whites vote in Dodge City, rather than any sort of assumption that all Latinos would vote for the same candidate and all whites would vote for a different candidate.[259]

211.     Dr. Barreto conducted this analysis using two models: (1) based on *current* turnout patterns, and (2) based on *elevated* turnout. As to the latter, "there is a lot of political science literature that suggests when you finally have an opportunity to elect someone from your community there is something called empowerment and you vote at higher rates." In fact, there is

---

[257] Trial Tr. Vol. II, 103:7–14 (Barreto); Barreto Report Appendix B Tables 1–14, 122–135.

[258] Trial Tr. Vol. II, 107:2–108:16 (Barreto); Barreto Report Appendix B Tables 1–14, Exs. 122–135.

[259] Trial Tr. Vol. II, 108:17–109:15 (Barreto); Barreto Report Appendix B Tables 1–14, Exs. 122–135.

"considerable evidence that Latino turnout increases" when they are put into a majority-Latino district. This elevated turnout model accounts for the possibility that turnout might increase if Dodge City moved from at-large to single-member district elections with majority-Latino districts.[260]

212.    Dr. Barreto's performance analysis demonstrates that all 14 of Dr. Oskooii's illustrative maps contain at least one, and in some cases two, majority-Latino districts that provide the Latino population an opportunity to elect their preferred candidates—even assuming the current turnout model. Under the elevated turnout model, all 14 maps contain three majority-Latino districts that provide the Latino population an opportunity to elect their preferred candidates.[261]

213.    Defendant conducted no performance analysis to counter Dr. Barreto's analysis, and offered no expert or lay testimony that rebutted or contradicted any part of this analysis. This Court credits Dr. Barreto's performance analysis in full.

## V.    Totality of the Circumstances

214.    If the Court finds that the *Gingles* preconditions are met, the Court then must assess whether, under the totality of the circumstances, members of the minority group have less opportunity to participate in the electoral process and elect candidates of their choice.[262] The Supreme Court has directed that the list of non-exhaustive factors in the Senate Report on the 1982

---

[260] Trial Tr. Vol. II, 106:6–24; 110:5–23 (Barreto); Barreto Report Appendix B Tables 1–14, Exs. 122–135.

[261] Trial Tr. Vol. II, 111:3–11 (Barreto); Barreto Report Appendix B Tables 1–14, Exs. 122–135.

[262] 52 U.S.C. § 10301(b).

amendments to the VRA ("Senate Factors") be considered for the totality of the circumstances analysis.[263]

215.     Plaintiffs put forth expert and lay witness testimony to demonstrate that the Latino community has less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. This evidence is broken down below by Senate Factor, focusing on the Senate Factors that Plaintiffs argued in closing were most applicable to this case.

### A.  Senate Factor 1

216.     Senate Factor 1 focuses on the "extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, to vote, or otherwise to participate in the democratic process."[264]

217.     There are multiple instances in which Latinos have faced *de jure* or *de facto* discrimination in Ford County, of which Dodge City is the County Seat, in the context of voting.

218.     In 1998, Ford County consolidated Dodge City's seven polling locations into one location.[265]

219.     Thereafter, the Department of Justice sent poll monitors to Ford County to ensure that Section 203 Voting Rights Act requirements were being followed by Ford County.[266]

---

[263] *Gingles*, 478 U.S. at 35–37.

[264] *Gingles*, 478 U.S. at 36–37.

[265] Stipulation of Fact and Exhibits, Doc. 178 ¶ 45.

[266] Trial Tr. Vol. I, 234:9–23 (Seibel).

220.    In 2018, Ford County moved Dodge City's sole polling location from the Civic Center to the Expo Center, which is located outside of Dodge City limits.[267]

221.    A U.S. Congressional Oversight Committee report found that local officials did not meet with concerned citizens or attempt to address Latino concerns before they moved the polling place outside of Dodge City in 2018.[268]

222.    In 2018, Plaintiff Rangel-Lopez sued the Ford County Clerk, Debbie Cox, for moving Dodge City's only polling location without sufficient notice to voters and for providing incorrect information to voters regarding where to vote.[269]

223.    After the filing of the 2018 lawsuit, the Ford County Clerk committed to opening an additional polling location for a total of two polling sites in Dodge City.[270] Today, Ford County operates two polling locations for all elections.[271]

224.    Spanish-language election materials were only made available following a fax from the Department of Justice in 2011 notifying Ford County of its legal obligation under Section 203 of the Voting Rights Act to make ballots available in Spanish and meet disability requirements.[272] During Ms. Seibel's tenure, the Ford County Clerk's Office did not employ a full-time Spanish-

---

[267] Stipulation of Fact and Exhibits, Doc. 178 ¶ 46.

[268] Trial Tr. Vol. I, 105:23–106:3 (Bejarano).

[269] Trial Tr. Vol. I, 9:18–10:6 (Rangel-Lopez).

[270] Trial Tr. Vol. I, 10:7–15 (Rangel-Lopez).

[271] *Id.*

[272] Trial Tr. Vol. I, 232:8–233:8 (Seibel).

speaking staff member to comply with these requirements, instead relying on various County employees for translation.[273]

225.    Currently, Ford County still lacks sufficient election information in Spanish.[274] Information on how to run for office is not available in Spanish.[275]

226.    Additionally, Latino residents in Ford County have endured *de facto* and *de jure* discrimination in access to public facilities in Dodge City in living memory.

227.    For years, Dodge City's Latino population was concentrated in the Mexican Village south of town where homes did not have running water.[276] Stores in North Dodge did not allow Latinos to enter and those that did would not allow Latinos to return items they had purchased.[277]

228.    The Dodge City public swimming pool only allowed Latino residents access on the free day, which was the last day before the pool would be drained and new water would be put in.[278]

229.    Latino students and children from the Mexican Village were only integrated into the wider Dodge City public school system within living memory of current Dodge City residents.[279]

---

[273] Trial Tr. Vol. I, 233:9–19 (Seibel).

[274] Trial Tr. Vol. I, 19:20–20:4 (Rangel-Lopez).

[275] *Id.*

[276] Trial Tr. Vol. III, 155:7–22 (Scoggins).

[277] Trial Tr. Vol. III, 154:15–20 (Scoggins).

[278] Trial Tr. Vol. III, 155:2–6 (Scoggins).

[279] Trial Tr. Vol. III, 155:7–22 (Scoggins).

230.    Indeed, Latinos were denied access to other public accommodations and suffered through segregated theaters in town.[280]

231.    Residents of Dodge City spoke to how many Latinos live in poor areas with gangs, attend older and underfunded schools, and are consistently frustrated when the city buses regularly skip stops in Latino areas.[281]

232.    Residents of Dodge City spoke to how predominantly white neighborhoods in North Dodge City have better resources and government services, while the predominantly Latino neighborhoods in South Dodge City suffer from buckled sidewalks, dilapidated alleyways where residents' garages open, highly inadequate snow removal compared to North Dodge City, and a lack of playsets in the parks.[282] South Dodge City has few grocery stores, the only exceptions being stores like Dollar General or family shops.[283] In the Dodge City school system, Latino children were historically discouraged from speaking Spanish in school,[284] encouraged to be perceived as "one of the good ones,"[285] and when offered the opportunity to build a Lego version of their town, Latino children in South Dodge built jails rather than libraries.[286]

233.    Latinos in Dodge City have suffered from racial discrimination by other residents in Dodge City and officials/employees of the City. Residents and Latino community leaders

---

[280] Trial Tr. Vol. II, 186:15–25 (Martinez).

[281] Trial Tr. Vol. III, 123:2–9, 125:6–126:3, 128:7–13 (Coca).

[282] Trial Tr. Vol. I, 14:8–16:10 (Rangel-Lopez).

[283] Trial Tr. Vol. I, 17:2–15 (Rangel-Lopez).

[284] Trial Tr. Vol. II, 186:22–25 (Martinez).

[285] Trial Tr. Vol. I, 27:9–28:11 (Rangel-Lopez).

[286] Trial Tr. Vol. III, 153:5–24 (Scoggins).

described people driving through their neighborhoods screaming racial slurs,[287] discriminatory remarks by teachers in the Dodge City schools,[288] and organizers from Dodge City threatening to kick a Latina union leader out of a community event.[289]

### B.  Senate Factor 2

234.    Senate Factor 2 evaluates "the extent to which voting in the elections of the state or political subdivision is racially polarized."[290] The Court incorporates by reference its Findings of Fact, discussed *supra*, as it relates to the second and third *Gingles* preconditions and the considerable evidence of racially polarized voting in Dodge City.

### C.  Senate Factor 3

235.    Senate Factor 3 concerns the extent to which "the state or political subdivision has used…voting practices or procedures that may enhance the opportunity for discrimination against the minority group."[291]

236.    Dodge City continues to employ voting practices and procedures that increase the opportunity for discrimination against Latino voters. One such practice is its at-large election system.

237.    At-large election systems affect both *descriptive representation* for Latinos; that is, the rate at which Latinos are elected to office and how it relates to their share of the population[292];

---

[287] Trial Tr. Vol. III, 133:19–24 (Coca).

[288] Trial Tr. Vol. I, 27:9–28:11 (Rangel-Lopez).

[289] Trial Tr. Vol. I, 201:20–202:20 (Vargas).

[290] *Gingles*, 478 U.S. at 37.

[291] *Id.*

[292] Trial Tr. Vol. I, 76:2–20 (Bejarano).

and *substantive representation*; that is, whether elected officials representing Latinos reflect, think about, and act on the interests of their Latino constituents, whether or not those elected officials themselves are actually Latino.[293]

238.    In terms of descriptive representation, there is a consistent finding in political science literature that at-large election systems "hamper descriptive representation for racial and ethnic minorities and Latinos in terms of lower rates of those minorities and Latinos that are able to win office."[294]

239.    This is because at-large election systems present obstacles to running for office, including the increased costs of running a campaign city-wide versus in a smaller single-member district. Latinos tend to have fewer resources and thus at-large systems disproportionately affect Latino communities. Additionally, it is harder for Latinos to garner sufficient support to win at-large elections. Thus, Latinos tend to run for office at lower rates in at-large systems as compared to single-member district systems.[295]

240.    Preeminent historians who testified before Congress during the seminal 1982 reauthorization of the Voting Rights Act "made it very clear that the motivation for implementing the spread of [the at-large] model at that time was grounded in racial animosity."[296]

241.    Dr. Martinez explained that once an election system is institutionalized, it becomes part of the day-to-day practices of communities that continue to carry out these systems that were established to limit the representation of people of color in local office, even though the

---

[293] Trial Tr. Vol. I, 96:22–97:10 (Bejarano).

[294] Trial Tr. Vol. I, 93:3–15 (Bejarano).
[295] Trial Tr. Vol. I, 93:16–94:15 (Bejarano).

[296] Trial Tr. Vol. II, 202:22–203:2 (Martinez).

communities today may not be aware of the history or original motivation for implementing the system.[297]

242.    There is also a consistent finding in the political science literature that when jurisdictions *switch* from at-large election systems to single-member district systems, the opportunity for descriptive representation of racial and ethnic minorities and Latinos increases.[298]

243.    Minority populations that comprise more than 30 to 40 percent of the voting age population and which are residentially segregated tend to see the greatest increase in descriptive representation when an at-large election system is changed to a single-member district system.[299]

244.    Such is the case here. The Hispanic Citizen Voting Age Population in Dodge City is approximately 46%, and perhaps more to the point, all of Dr. Oskooii's illustrative maps have three districts where Latinos make up a majority of the Citizen Voting Age Population. Further, the factual record is clear that Dodge City is racially segregated such that the Hispanic population is geographically concentrated. As such, Dodge City meets the conditions under which a minority population is likely to experience an increase in descriptive representation after moving from an at-large election system to a single-member district system.[300]

245.    According to the political science literature, at-large election systems also have a dilutive effect on substantive representation for minority populations as compared to single-

---

[297] Trial Tr. Vol. II, 203:3–7 (Martinez).

[298] Trial Tr. Vol. I, 94:16–95:2 (Bejarano).

[299] Trial Tr. Vol. I, 95:21–96:10 (Bejarano).

[300] Trial Tr. Vol. I, 96:11–21 (Bejarano).

member districts.[301] Substantive representation of Latinos is higher when they live in single-member districts with large Latino populations.[302]

246.    The Dodge City Commission has differential terms for elected Commissioners – the two candidates who receive the most votes serve four-year terms, while the third-place finisher serves a two-year term.[303] A candidate who is a lower vote-getter will need to run for re-election in order to stay in office as long as the top vote-getters.[304]

247.    The differential terms are compounded with other obstacles faced by Latino candidates that result in decreased descriptive representation, *i.e.*, the very same challenges that make it difficult for Latinos to run for election citywide make it difficult for Latino candidates to finish among the two top candidates and receive a full term.[305]

248.    Defendant offered no evidence to rebut Dr. Bejarano's testimony that: (i) at-large elections have a dilutive effect on descriptive representation for Latinos; (ii) at-large elections harm substantive representation for Latinos; (iii) substantive representation is better for Latinos living in single-member districts with large Latino populations; and (iv) moving from at-large to single-member district elections can improve descriptive representation for Latinos, especially where the Latino population is large and residentially segregated.

249.    Indeed, Defendant's expert Dr. Kimberly Nelson offered no testimony about the dilutive effect of at-large election systems. Her testimony about Latino representation focused

---

[301] Trial Tr. Vol. I, 97:11–24 (Bejarano).

[302] *Id.*

[303] Trial Tr. Vol. I, 98:20–99:1 (Bejarano); Stipulation of Facts and Exhibits, Doc 178 ¶ 17.

[304] Trial Tr. Vol. I, 99:2–12 (Bejarano).

[305] *Id.*

exclusively on whether, and under what conditions, moving from at-large to single-member districts would improve descriptive representation for Latinos (*i.e.* whether single-member districts can *remedy* the dilutive effect of at-large systems). Even on this more discrete, latter point, Dr. Nelson acknowledged that moving from at-large to single-member districts has at least "some effect" on the election of Latinos to office.[306]

250.    Dr. Nelson did *not* testify that moving from at-large to single-member districts would have zero effect on descriptive representation for Latinos, but rather merely that based on the literature she reviewed, it is "unlikely to result in a *significant* increase in minority representation in city government."[307] The only article Dr. Nelson discussed in her testimony to support this conclusion analyzed California school board elections.[308] Dr. Bejarano referenced this article when summarizing the political science literature that found that moving from at-large to single-member district elections has "a more significant" effect when the minority population comprises "30 to 40 percent of the voting age population."[309]

251.    And indeed even on this narrow point, Dr. Nelson testified that she was not offering an opinion about the effectiveness of a switch from at-large to single-member districts on the ability of Latinos in Dodge City to elect representatives from their community to the Dodge City Commission.[310] Dr. Nelson also testified that she does not know the level of geographic

---

[306] Trial Tr. Vol. IV, 43:3–6 (Nelson).

[307] Trial Tr. Vol. IV, 58:1–5 (Nelson) (emphasis added).

[308] Trial Tr. Vol. IV, 42:19–43:2 (Nelson).

[309] Trial Tr. Vol. I, 95:24–96:7 (Bejarano).

[310] Trial Tr. Vol. IV, 49:9–17 (Nelson).

concentration of Latinos in Dodge City, nor the geographic concentration of Latinos in the illustrative districts that Dr. Oskooii drew.[311]

252.    Dr. Nelson's literature review even on her narrow focus was significantly incomplete. For example, she acknowledged that she did not review a peer-reviewed article in the Urban Affairs Review—a journal she has published in and which she called "reputable"—that found a 10-12% increase in minority representation in municipal government by switching from at-large to single-member districts.[312] Dr. Nelson testified that such an increase would qualify as "significant."[313] That same article found a 21% increase among cities with larger shares of Latinos.[314] Dr. Nelson's literature review also did not contain other peer-reviewed articles that found beneficial effects of moving from at-large to single-member districts on descriptive representation for Latinos.[315] Dr. Nelson later acknowledged that her literature review was not fully "comprehensive" and that she "missed" the particular Urban Affairs Review article in question.[316] For all these reasons, this Court finds Dr. Nelson's opinions in this case unpersuasive and extremely limited.

---

[311] Trial Tr.. Vol. IV, 56:17–23 (Nelson).

[312] Trial Tr. Vol. IV, 57:2–60:12 (Nelson).

[313] Trial Tr. Vol. IV, 58:11–15 (Nelson).

[314] Trial Tr. Vol. IV, 60:13–17 (Nelson).

[315] Trial Tr. Vol. IV, 61:4–11 (Nelson).

[316] Trial Tr. Vol. IV, 64:18–65:7 (Nelson).

253.    Another dilutive voting practice is off-cycle elections. Off-cycle elections occur in odd-numbered years and do not occur at the same time as national and state elections, which are held in November of even-numbered years.[317]

254.    Dodge City has off-cycle elections for the City Commission that occur in November of odd-numbered years.[318]

255.    Off-cycle elections depress voter turnout because voters must devote more political resources to keeping track of the election schedule and the candidates' specific stances, particularly in a nonpartisan race. The effect is disproportionately felt by racial and ethnic minorities because they lack political resources as compared to majority populations and face additional costs in allocating attention to elections.[319]

256.    It is uncontested that, as compared to on-cycle elections, the drop-off in voter turnout from on-cycle to off-cycle elections is disproportionately larger for racial and ethnic minorities compared to the drop-off for whites.[320]

257.    Because Dodge City uses at-large elections, differential terms and off-year elections, the opportunity for discrimination against Latinos is enhanced.[321]

---

[317] Trial Tr. Vol. I, 99:13–22 (Bejarano).

[318] Trial Tr. Vol. I, 99:23–100:2 (Bejarano).

[319] Trial Tr. Vol. I, 100:3–101:2 (Bejarano).

[320] Trial Tr. Vol. I, 101:3–10 (Bejarano).

[321] Trial Tr. Vol. I, 101:11–13 (Bejarano). Plaintiffs recognize that the Court granted the City's motion to dismiss Plaintiffs' claim that, as a matter of remedy, the Court order the City to institute even-year elections. Totally apart from the question of remedy, however, the evidence shows that off-year elections, particularly in combination with at-large systems, as a factual matter tend to discourage minority participation.

### D.  Senate Factor 5

258.    Senate Factor 5 concerns "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process."[322]

259.    Throughout trial, Plaintiffs put forward evidence pointing to significant barriers across employment, education and health which hinder the Hispanic community's ability to participate effectively in the political process.

260.    The Resource Mobilization Theory, a widely accepted theory in political science, stands for the proposition that "political resources or social economic resources are needed to effectively participate in politics, and those with fewer socioeconomic resources are also going to have fewer political resources to devote to politics, so those with fewer socioeconomic resources are going to have more obstacles to participate in politics."[323]

261.    The political resources required to effectively participate in politics include time, energy, political knowledge, education, and information.[324]

262.    Latinos in Dodge City have fewer political resources than whites because they suffer from a slew of socioeconomic disparities in terms of financial resources, education, health, and housing.

---

[322] *Gingles*, 478 U.S. at 37.

[323] Trial Tr. Vol. I, 123:5–21 (Bejarano).

[324] Trial Tr. Vol. I, 124:6–10 (Bejarano).

263.    A community that lacks economic resources also lacks political resources needed to participate in politics.[325]

264.    There are economic disparities between the Latino population and white population in Dodge City across key economic indicators.[326]

265.    Latinos in Dodge City have lower median household incomes, higher poverty rates, higher child poverty rates, and higher unemployment rates, than white residents of Dodge City. According to 2021 ACS 5-year estimates, the median household income in Dodge City was $54,133 for Latinos as compared to $64,250 for whites; the income below poverty level rate was 17.9% for Latinos as compared to 6.8% for whites; the child poverty rate was 9% for Latinos as compared to 0.3% for whites; and the unemployment rate was 4.5% for Latinos as compared to 2.8% for whites.[327] These disparities have been consistent across time.[328]

266.    Education is also correlated with political participation, both because education is linked with economic well-being and because education provides individuals with the knowledge to understand and participate in politics effectively.[329]

267.    Latinos in Dodge City have dramatically lower rates of educational attainment than whites in Dodge City. According to the 2021 ACS 5-year estimates, the share of Latinos in Dodge City who had less than a high school diploma was 44.2%, as compared to 4.5% of whites.[330] Just

---

[325] Trial Tr. Vol. I, 123:22–124:10 (Bejarano).

[326] Bejarano Report Table 2, Ex. 46; Trial Tr. Vol. I, 129:2–6 (Bejarano).

[327] Bejarano Report Table 2, Ex. 46; Trial Tr. Vol. I, 125:2–8 (Bejarano).

[328] Bejarano Report Table 2, Ex. 46; Trial Tr. Vol. I, 125:2–16 (Bejarano).

[329] Trial Tr. Vol. I, 129:7–14 (Bejarano).

[330] Bejarano Report Table 3, Ex. 47; Trial Tr. Vol. I, 130:3–131:18 (Bejarano).

5.8% of Latinos in Dodge City have a college degree or higher, as compared to 40.5% of whites. These disparities have been generally consistent over time.[331]

268.    Health and access to quality healthcare are further indicators of socioeconomic standing.[332] Moreover, lack of health insurance "can negatively impact those political resources that are needed to pay attention and participate effectively in politics." When a group disproportionately lacks quality health insurance, that group faces higher rates of disease and poor health, leading to less time, information, knowledge, and resources to effectively participate in politics.[333]

269.    Latinos in Dodge City have a much lower rate of health insurance coverage as compared to whites in Dodge City. According to the ACS 2021 5-year estimates, 19.4% of Latinos in Dodge City did not have any health insurance coverage, as compared to 6.6% of whites.[334]

270.    Home ownership is linked to higher political participation because (i) home ownership is another indicator of wealth, and (ii) those who own a home have more stability and are less likely to move frequently, which means their registration stays current and they become more invested in political participation.[335]

271.    Latinos in Dodge City have a lower rate of home ownership and are more likely to rent homes or apartments. According to the 2021 ACS 5-year estimates, 57.9% of Latinos owned a home, as compared to 69.1% of whites, while 42.1% of Latinos were renters, as compared to

---

[331] *Id.*

[332] Trial Tr. Vol. I, 131:20–132:4 (Bejarano).

[333] Bejarano Report Table 7, Ex. 51; Trial Tr. Vol. I, 132:5–24 (Bejarano).

[334] *Id.*

[335] Trial Tr. Vol. I, 133:9–17 (Bejarano).

30.9% of whites.[336] This disparity in the data remained consistent over the time period analyzed by Dr. Bejarano.

272.    According to the 2009 ACS 5-year estimates, the median home value for Latinos in Dodge City was $67,300 as compared to $103,400 for whites. (The American Community Survey did not produce this data after 2009).[337]

273.    There is thus a consistent and longstanding pattern of socioeconomic disparities for Latinos in comparison to whites in Dodge City.

274.    Latinos in Kansas consistently have a lower rate of voter registration and voter turnout as compared to whites. In 2020, 51.5% of Latino citizens were registered to vote and 45.5% turned out to vote, as compared to 75.3% of white citizens who were registered and 70.7% who turned out. In 2016, 54.7% of Latino citizens were registered to vote and 48.9% turned out to vote, while 74.4% of white citizens were registered and 65.3% turned out.[338]

275.    Dr. Nelson—who does not contest any of Dr. Bejarano's data nor that these socioeconomic disparities exist in Dodge City—noted that Dr. Bejarano did not do a statistical significance test when evaluating socioeconomic disparities in Dodge City.[339] Dr. Bejarano explained that "social scientists don't generally use a statistical significance test" when evaluating socioeconomic disparities and that "[i]t is common" for political scientists to evaluate socioeconomic disparities using census or ACS data without statistical significance tests.[340] This

---

[336] Bejarano Report Table 6, Ex. 50; Trial Tr. Vol. I, 134:16–24 (Bejarano).

[337] Bejarano Report Table 6, Ex. 50; Trial Tr. Vol. I, 134:25–135:19 (Bejarano).

[338] Bejarano Report Table 9, Ex. 53; Trial Tr. Vol. I, 137:12–21 (Bejarano).

[339] Trial Tr. Vol. IV, 44:1–5 (Nelson).

[340] Trial Tr. Vol. I, 128:5–129:1 (Bejarano).

is in part because social scientists consider ACS and census data particularly reliable within the political science field.[341]

276.    It is important to note also that many of these socioeconomic disparities—in addition to being *consistent* over time—have also *worsened* over time. The gaps between Latinos and whites in Dodge City in areas such as median household income, poverty rates, college graduation rates, rates of home ownership, health insurance coverage, and voter turnout and registration rates are *wider* today than they have been in years past.[342]

277.    Dr. Martinez testified about the history of race relations in Dodge City and in Kansas more broadly.[343] In order to examine this history, Dr. Martinez reviewed oral histories, news accounts, official documents from the Ford County election office, historical documents, and scholarly work. The oral histories he reviewed included those of Luis Sanchez, who was the first Latino elected to the Dodge City Commission in 1982, and Fred Rodriguez, another resident of Dodge City.[344]

278.    At its founding, Dodge City had segregation between white residents, who lived on the north side of the Arkansas river, and African-American residents, who lived on the south side of the Arkansas river.[345]

---

[341] Trial Tr. Vol. I, 128:5–21 (Bejarano).

[342] Bejarano Report Tables, Exs. 46–47, 50–51, 53.

[343] Trial Tr. Vol. II, 183:14–16 (Martinez).

[344] *Id.* at 184:10–186:14 (Martinez).

[345] *Id.* at 194:18–22 (Martinez).

279.    Latinos first came to Dodge City in the early 1900s to work on the local railroads.[346] When Latinos arrived in Dodge City, the Mexican Village was formed. The Mexican Village consisted of a number of row houses where Latinos lived, made of scrap wood and lumber, without any running water or indoor plumbing.[347]

280.    In their oral histories, both Luis Sanchez and Fred Rodriguez described growing up in the Mexican Village in Dodge City and spoke to their experiences being denied access to public accommodations in Dodge City. They were not allowed to use the swimming pool or to enter into barbershops. They described how Spanish was not permitted in the schools and that public theaters were segregated.[348] When the Mexican Village was eliminated, the majority of Latino residents moved to the southeast side of Dodge City.[349]

281.    There is evidence that restrictive housing covenants were used in Dodge City, which prohibited the sale of certain houses in certain areas of Dodge City to Latinos.[350]

282.    In response to the discrimination they faced, Mexicans and Mexican-Americans in Dodge City established a chapter of the American G.I. Forum in 1954. The American G.I. Forum was a civil rights organization founded in south Texas after a funeral home refused to address the wishes of the family of a Hispanic solider killed in World War II.[351]

---

[346] *Id.* at 195:5–12 (Martinez).

[347] *Id.* at 195:9–17 (Martinez).

[348] *Id.* at 186:2–187:2 (Martinez).

[349] *Id.* at 196:4–8 (Martinez).

[350] *Id.* at 196:12–17 (Martinez).

[351] *Id.* at 196:21–197:22 (Martinez).

283.    Dr. Martinez opined that, despite the limited number of studies on the experience of Latinos in Kansas, it is still possible to identify general patterns. For example, Kansas had "sundown towns," in which local ordinances and practices prohibited people of color from being in the town after dark. The Ku Klux Klan also had a presence in Kansas and lynchings occurred.[352]

284.    Segregation existed with respect to African-Americans in Kansas before Latinos began to arrive in the state. Latinos in turn "tended to be absorbed into those structures or patterns." For example, legislation allowed first-class cities in Kansas to segregate students of color from white students. The Clara Barton School served the Mexican community of Kansas City, Kansas from 1923 to 1953. In Dodge City, a school was built in the Mexican Village, which existed up until approximately 1955.[353]

285.    With respect to current race relations in Dodge City, Dr. Martinez found that while Latinos originally came to Dodge City to work on the railroads, they are now the labor force that sustains the meatpacking plants. "They have been absorbed into…the lower strata of the economy. So they stay there to work, and they continue to raise their kids there."[354]

286.    Plaintiffs' fact witnesses provided additional testimony in favor of Senate Factor 5. Mr. Rangel-Lopez described experiencing racism in Dodge City public schools, where he was described as "one of the good ones" by his elementary school teacher. He believes this label referred to the fact that he could pass as white, spoke English well, and behaved in class. He heard similar sentiments repeated by teachers and others in the community throughout his public-school

---

[352] *Id.* at 188:1–15 (Martinez).

[353] *Id.* at 193:6–194:9 (Martinez).

[354] *Id.* at 200:4–17 (Martinez).

career. He perceived a subtle undertone that he should behave, or he would be "lumped in with the rest of them."[355]

287.    Mr. Coca recounted how he was considered an ESL student in Dodge City public schools even though he learned to speak English and Spanish simultaneously. He was pulled out of class for testing, which he found frustrating and caused additional academic challenges. Being unnecessarily labeled an ESL student made him feel inferior.[356]

288.    Mr. Coca also described his less subtle experiences with people screaming racial slurs at him while walking home in Dodge City.[357]

289.    Mr. Coca was appointed to the Dodge City library board in summer 2022, prior to this lawsuit, but his application for re-appointment was not approved and he was replaced in January 2024.[358]

290.    Former Dodge City Commissioner Jan Scoggins testified that growing up in Dodge City, she witnessed prejudice against Latinos. Ms. Scoggins recalled that there was one public swimming pool in Dodge City in Wright Park. Hispanics were allowed to swim on what was called "free day." It was the last day before they drained the pool and refilled it with fresh water.[359]

291.    Ms. Scoggins also testified that, when she was growing up, Hispanics were not allowed in the stores in the north part of Dodge City. If a Hispanic person did enter a store, they

---

[355] Trial Tr. Vol. I, 27:9–28:11 (Rangel-Lopez).

[356] Trial Tr. Vol. III, 133:25–134:13 (Coca).

[357] *Id.* at 133:19–24 (Coca).

[358] *Id.* at 134:14–135:7 (Coca).

[359] *Id.* at 154:21–155:6 (Scoggins).

would not be permitted to try on clothes. If they purchased something, they would not be allowed to return it.[360]

292.    Ms. Scoggins recounted how her childhood neighbor, Art Scroggins, was the superintendent of schools and was the first to integrate the Roosevelt School when Ms. Scoggins was in kindergarten or first grade. Prior to that, Mexican children were not allowed to attend the Dodge City public schools.[361]

293.    More recently, as a Commissioner, Ms. Scoggins visited Sunnyside Elementary School, located in South Dodge. The elementary school had invited the Commissioners to see Lego cities that the students built as part of an after-school art project. Ms. Scoggins observed that while she did not see many libraries or airports, "every one of those kids had put a jail in their city."[362]

294.    Ms. Scoggins testified that, in Dodge City, "the schools with the lowest family income would be Sunnyside and Beeson"—two heavily Latino schools in South Dodge.[363] She also testified that children in these schools lacked supplies such as Legos and their own books at home.[364]

295.    Monica Vargas, Political and Community Outreach Director for the United Food and Commercial Workers International Union, Local 2, testified that approximately 70% of all meatpacking workers in the Dodge City plants (National Beef and Cargill) are Hispanic.[365] Ms.

---

[360] *Id.* at 154:15–20 (Scoggins).

[361] *Id.* at 155:7–22 (Scoggins).

[362] *Id.* at 153:1–24 (Scoggins).

[363] *Id.* at 152:18–22 (Scoggins).
[364] *Id.* at 153:11–12 (Scoggins); *see also* Trial Tr. Vol. III, 151:20–22 (Scoggins).

[365] Trial Tr. Vol. I, 190:8–10 (Vargas).

Vargas explained that most members of the Hispanic community in Dodge City are connected to the meatpacking plants through one or more family members who have worked in the plants.[366]

296.     Ms. Vargas testified about the resistance she has personally faced as an advocate for the Hispanic community in Dodge City. For example, when Ms. Vargas attended a free dental services fair held in Dodge City in order to provide bilingual information about the U.S. Census and voter registration, the fair's organizers stationed her in an area that made it difficult for her to speak with the event's participants. When she asked to be moved, the organizer threatened to kick her out and said he knew her "kind of people."[367]

297.     Ms. Vargas further testified that meatpacking workers in Dodge City are often unable to participate effectively in the political process due to the exhausting nature of the work in the plants.[368] Furthermore, many Hispanic individuals working in the meatpacking plants lack understanding of the local electoral system because they are either immigrants themselves or children of immigrants and grew up without parents who were familiar with and could educate them on the electoral system.[369]

298.     During summer 2020, Mr. Rangel-Lopez worked as a COVID Compliance Monitor at National Beef.[370] Mr. Rangel-Lopez detailed the conditions he experienced working at National

---

[366] *Id.* at 208:18–22 (Vargas).

[367] *Id.* at 201:20–202:20 (Vargas).

[368] *Id.* at 196:3–20 (Vargas).

[369] *Id.*

[370] *Id.* at 11:2–21 (Rangel-Lopez).

Beef. There is a fabrication side of the plant, which is the cold freezer where workers put the meat in boxes, and the kill floor, where workers slaughter the cows and prepare them for fabrication.[371]

299.    Mr. Rangel-Lopez described the kill floor at National Beef as sweltering hot. Temperatures can reach 110 degrees Fahrenheit outside and even hotter inside the plant. There is no air conditioning on the kill floor, only fans to provide cooling and popsicles are sometimes handed out. People's hands and feet look like they have been in the shower for too long and people on the kill floor are always covered in blood. Meanwhile, the fabrication side of the plant is freezing. In sum, according to Mr. Rangel-Lopez, working in the plants is brutal.[372]

300.    Defendant's witness Ernestor De La Rosa, former Assistant City Manager, testified that Dodge City does not have non-profit organizations that support Hispanic community members who run for office in Dodge City. Mr. De La Rosa noted that Dodge City also lacks non-profits that educate or engage first-generation immigrants about local elections and local government. [373]

301.    Mr. De La Rosa testified that campaigning as a first-generation immigrant and first-time candidate against an experienced, longtime Commissioner is "a tall order."[374] He also agreed that it is difficult for community members to engage in the electoral process when the people in power do not reflect the community members.[375]

---

[371] *Id.* at 12:7–13:14 (Rangel-Lopez).

[372] *Id.*

[373] Trial Tr. Vol. IV, 23:16–24:14 (De La Rosa).

[374] *Id.* at 24:15–25:2 (De La Rosa).

[375] *Id.* at 16:20–17:8 (De La Rosa).

302.     Mr. Coca likewise testified that he rarely sees Hispanic people in positions of power in Dodge City. Rather, he noted that his family members primarily work retail and fast food jobs in Dodge City and have many Hispanic coworkers in these types of jobs.[376]

303.     Mr. Coca has never considered running for Dodge City Commission because he does not believe that resources are available to him that would allow him to run successfully and that it would be "difficult trying to garner support."[377]

304.     David Rebein testified that elections in Dodge City are "more of a popularity contest."[378] He also explained that "candidates are recruited by their friends…[T]hat's the way it has historically been, that's the way it still is."[379] Mr. De La Rosa agreed that one "could argue" that Dodge City elections are popularity contests.[380]

305.     Mr. Rangel-Lopez testified that elections are yard-sign contests and that candidates put them in front of businesses or properties they own. Mr. Rangel-Lopez observed that the people who run for Commission are often realtors or people with high name recognition. He believes it is difficult to get into the political space because of the need for name recognition.[381]

---

[376] Trial Tr. Vol. III, 132:8–21 (Coca).

[377] *Id.* at 131:21–132:7 (Coca).

[378] *Id.* at 231:7–16 (Rebein).

[379] *Id.* at 228:17–21 (Rebein).

[380] Trial Tr. Vol. IV, 25:3–17 (De La Rosa).

[381] Trial Tr. Vol. I, 19:3–20 (Rangel-Lopez).

306.     Mr. Rangel-Lopez believes that in order to run for office successfully in Dodge City, you have to know whom to talk to and be part of a certain group. You need to know people in power.[382]

307.     Mr. Rangel-Lopez testified that the Kansas for Liberty PAC broadcasted a Republican slate of candidates for the ostensibly non-partisan 2021 Dodge City Commission and School Board Elections.[383]

308.     Ms. Scoggins believes she came in last place in the 2023 Commission election because a group of three candidates who aligned with the Republican party engaged in negative campaigning against her.[384]

309.     According to Mr. Rangel-Lopez, there is a lack of information available in Spanish on how to run for office. The County Clerk website is outdated.[385]

310.     Mr. Coca has never considered running for Dodge City Commission because he does not believe that resources are available to him that would allow him to run successfully and that it would be "difficult trying to garner support."[386]

311.     Senate Factor 5 is met due to the disparities in education, health, housing, poverty, and voter turnout and registration among the Latino community in Dodge City.[387] These disparities cannot be realistically separated, at least in part, from the earlier history of racial discrimination

---

[382] *Id.* at 20:5–9 (Rangel-Lopez).

[383] *Id.* at 53:9–16 (Rangel-Lopez); Barreto Report Appendix D, Ex. 137.

[384] Trial Tr. Vol. III, 161:3–162:6 (Scoggins).

[385] Trial Tr. Vol. I, 19:20–20:4 (Rangel-Lopez)

[386] Trial Tr. Vol. III, 131:21–132:7 (Coca).

[387] Trial Tr. Vol. I, 137:22–24 (Bejarano).

against non-whites in Dodge City, as exemplified by the unimpeached testimony of Ms. Scoggins, Ms. Vargas, Mr. Rangel Lopez and Mr. Coca about their personal experiences and observations of such behavior. While it is extraordinarily difficult to show "causation" for social scientists,[388] the longstanding nature of the disparities also shows that they are not simply the result of a recent influx of immigrants to the city.

### E.  Senate Factor 7

312.     Senate Factor 7 concerns "the extent to which members of the minority group have been elected to public office in the jurisdiction."[389]

313.     Plaintiffs demonstrated that Hispanic community members have seldom been elected to public office in Dodge City, Ford County, or Kansas.

314.     Dr. Bejarano testified that under minority empowerment theory, "if racially ethnic minorities can see themselves reflected in those that represent them, they can be more [] motivated to…pay attention to politics, to have political interest, to be more likely to participate in politics and vote, and also to feel like they have a more representative democracy and feel more trust in the government."[390]

315.     Dr. Bejarano used data published by the National Association of Latino Elected and Appointed Officials ("NALEO") survey, which is regularly relied on by experts in the field of Latino politics, to determine the rate of election of Latinos in Dodge City, Ford County, and Kansas.[391]

---

[388] *Id.* at 143:12–16 (Bejarano).
[389] *Gingles*, 478 U.S. at 37.

[390] Trial Tr. Vol. I, 76:21–77:7 (Bejarano).

[391] *Id.* at 76:10–20, 77:8–14 (Bejarano).

316.    The NALEO directory is an annual publication intended to provide a comprehensive directory of Latinos that have been elected and appointed to office throughout the U.S. NALEO staff verify the accuracy of the survey to ensure the source represents the number of Latinos elected in the U.S.[392]

317.    Plaintiffs' expert Dr. Barreto testified that he worked on the NALEO directory as a graduate student.[393] He considers the directory to be "extremely accurate" and believes it is "widely used by academics to understand Latino elected and appointed officials.[394]

318.    To determine whether a particular group is underrepresented, overrepresented, or otherwise, political scientists compare the group's share of the population with its share of elected officials in the relevant jurisdictions.[395]

319.    As of 2021, Latinos comprised 64.6% of the total population in Dodge City, 55.8% of the total population in Ford County, and 12.7% of the total population in the state of Kansas.[396]

320.    As of 2021, Latinos made up 46.1% of the Citizen Voting Age Population in Dodge City, 37.1% of the citizen voting-age population in Ford County, and 8.1% of the Citizen Voting Age Population in the state of Kansas.[397]

---

[392] *Id.* at 77:8–78:5 (Bejarano).

[393] Trial Tr. Vol. II, 49:7–18 (Barreto).

[394] *Id.* at 49:19–50:7 (Barreto).

[395] Trial Tr. Vol. I, 76:2–20 (Bejarano).

[396] Bejarano Report Table 10, Ex. 54; Trial Tr. Vol. I, 79:20–80:2, 83:11–15 (Bejarano).

[397] *Id.*

Case 6:22-cv-01274-EFM   Document 211   Filed 03/22/24   Page 78 of 148

321.    Based on their share of the total population and Citizen Voting Age Population, Latinos in Dodge City are dramatically underrepresented at all levels of government—municipal, county, statewide, and federal.

322.    Just two Latinos—Fernando Jurado and Joseph Nuci—have been elected to the Dodge City Commission between 1996–2023. There is "stark underrepresentation for Latinos on the Dodge City Commission" and there has been for decades.[398]

323.    Dr. Bejarano's Table 11 includes Blanca Soto, a Latina, for 2021. Yet, to be clear, Ms. Soto was never *elected* to office. She was *appointed* to fill a vacancy on the Commission in 2021, but subsequently lost her campaign for election.[399] Mr. Nuci was not included in the NALEO directory of Latino elected officials. For that reason, Dr. Bejarano did not include him in her table demonstrating her findings in reliance on the NALEO directory. However, Dr. Bejarano identified Commissioner Nuci as a Latino elected official through supplemental research and included this information in a footnote to the table of Latino Municipal Officials in Kansas and Dodge City (1996–2021).[400] Regardless, as noted *supra*, Mr. Nuci is just one of two Latinos elected to the Dodge City Commission in the past nearly 30 years; his inclusion or non-inclusion does not change the "stark underrepresentation for Latinos on the Dodge City Commission."[401] The other, Mr. Jurado, is included in Dr. Bejarano's table and not in a footnote, as Defendant erroneously suggested at trial.

---

[398] Bejarano Report Table 11, Ex. 55; Trial Tr. Vol. I, 81:18–82:4 (Bejarano).

[399] Bejarano Report Table 11, Ex. 55; Trial Tr. Vol. I, 82:6–12 (Bejarano).

[400] Bejarano Report Table 11, Ex. 55; Trial Tr. Vol. I, 82:13–83:6 (Bejarano).

[401] Trial Tr. Vol. I, 83:8–15 (Bejarano).

324.    Between 1996 and 2021, Latinos made up less than 1% of municipal officials in the state of Kansas, compared to their much larger share of the total and Citizen Voting Age Population statewide. Latinos are underrepresented in municipal offices statewide.[402]

325.    Only one Latino served on the Dodge City School Board between 1996 and 2021. Thus, Latinos are heavily underrepresented on the Dodge City School Board.[403]

326.    Between 1996 and 2021, far less than 1% of School Board officials in the state of Kansas have been Latinos. Thus, Latinos are also underrepresented on School Boards in Kansas.[404]

327.    In Dodge City, no Latino served as an elected judicial or law enforcement official between 1996 and 2021, indicating stark underrepresentation.[405]

328.    Latinos are underrepresented in both judicial and law enforcement offices in Kansas. Between 1996–2012 and 2017–2021, no Latinos in Kansas held any of those offices. Just one Latino held one of the offices between 2013–2016.[406]

329.    No Latinos were elected to the Ford County Commission between 1996 and 2021, denoting significant underrepresentation.[407]

330.    Between 1996 and 2021, there have been no more than 3 Latinos serving as county board officials across the state of Kansas at any given time. There are anywhere between 315 and 1,000 such positions each year. Even in a best case scenario, this means Latinos have a rate of

---

[402] *Id.* at 84:6–16 (Bejarano).

[403] Bejarano Report Table 12, Ex. 56; Trial Tr. Vol. I, 85:15–24 (Bejarano).

[404] Bejarano Report Table 12, Ex. 56; Trial Tr. Vol. I, 85:25–86:12 (Bejarano).

[405] Bejarano Report Table 13, Ex. 57; Trial Tr. Vol. I, 87:12–88:1 (Bejarano).

[406] Bejarano Report Table 13, Ex. 57; Trial Tr. Vol. I, 87:12–88:1 (Bejarano).

[407] Bejarano Report Table 14, Ex. 58; Trial Tr. Vol. I, 88:19–24 (Bejarano).

election to county boards across Kansas of less than one percent, which constitutes significant underrepresentation.[408]

331.    There have been 2 to 6 elected Latinos in the Kansas State Legislature, out of 165 total seats, each year between 1996 and 2021. This range of 1.2%-3.6% Latino representation in the state legislature is far less than their share of the statewide population.[409]

332.    No Latinos were elected to any of the seven statewide executive offices Dr. Bejarano examined between 1996 and 2021.[410]

333.    No Latinos were elected to the U.S. Congress to represent Kansas between 1996 and 2021.[411]

334.    Plaintiffs' fact witnesses provided additional testimony in favor of Senate Factor 7. Mr. De La Rosa testified to the difficulties Hispanic candidate Blanca Soto faced in seeking election to the Dodge City Commission. As a consequence of Dodge's at-large election system, Ms. Soto had to spread her efforts and campaign throughout Dodge City. Mr. De La Rosa recalled hearing criticism of Ms. Soto such as "why isn't she campaigning?" or "why is she so late putting up signs?"[412] He had a conversation with Ms. Soto in which she expressed frustration because she was trying to run a campaign as a single mom also working a full-time job.[413] Mr. De La Rosa felt that Latino community leaders should have done more to support Ms. Soto's campaign, but

---

[408] Bejarano Report Table 14, Ex. 58; Trial Tr. Vol. I, 88:25–89:21 (Bejarano).

[409] Bejarano Report Table 15, Ex. 59; Trial Tr. Vol. I, 90:13–25 (Bejarano).

[410] Bejarano Report Table 15, Ex. 59; Trial Tr. Vol. I, 91:1–13 (Bejarano).

[411] Trial Tr. Vol. I, 91:16–23 (Bejarano).

[412] Trial Tr. Vol. IV, 23:16–24:14 (De La Rosa).

[413] Trial Tr. Vol. III, 317:13:23 (De La Rosa).

understood "[t]hat was a lot to ask of them."[414] Mr. De La Rosa suggested that "it goes back to the ecosystem of the infrastructure" and that Dodge City doesn't have non-profit organizations that support Latino candidates or work to engage and energize voters.[415] Ultimately, Blanca Soto was not elected.[416]

335.    Ms. Vargas testified that Hispanic candidate Angie Gonzalez ran for Ford County Clerk in 2020. Despite conducting what Ms. Vargas characterized as "a pretty impressive campaign" consisting of knocking on doors with her children, Ms. Gonzalez lost the election.[417]

336.    Former Commissioners spoke to the cost of running a citywide campaign in Dodge City. Mr. Sowers' campaign for Commission cost him between $4,000 and $6,000.[418] Fernando Jurado's 1998 campaign cost approximately $2,000.[419] Ms. Scoggins self-financed her campaign in 2023.[420]

337.    Mr. De La Rosa agreed that Hispanics are underrepresented on the Dodge City Commission. Moreover, Mr. De La Rosa testified that the low-to-moderate income individuals living in South Dodge have never successfully elected anyone from their community to the Commission.[421]

---

[414] Trial Tr. Vol. IV, 24:7–10 (De La Rosa).

[415] *Id.*

[416] *Id.* at 23:16–24:14 (De La Rosa).

[417] Trial Tr. Vol. I, 197:10–18 (Vargas).

[418] Trial Tr. Vol. IV, 120:14–25 (Sowers).

[419] Deposition Designation of Fernando Jurado, Doc. 186, 11:7–11.

[420] Trial Tr. Vol. III, 160:9–11 (Scoggins).

[421] Trial Tr. Vol. IV, 19:21–20:2 (De La Rosa).

338.    Mr. De La Rosa discussed "how crucial it is to have representation on some of these important commissions."[422]

339.    Assistant City Manager Melissa McCoy believes that "having service from our diverse representatives in the community is always beneficial." She agreed that the election of a Latino candidate in Dodge City would provide inspiration to Latinos in Dodge City.[423]

340.    Mr. Rangel-Lopez and Mr. Coca recalled voting for Jan Scoggins and Blanca Soto for Dodge City Commissioner. Mr. Coca explained that he voted for these candidates because they had "the interests of the Hispanic population at heart" and "they listen." Neither of these candidates won.[424]

341.    Mr. Coca testified that Hispanic candidate Liliana Zuniga also ran for Dodge City Commission and lost.[425]

342.    According to Mr. Coca, former Commissioner Joseph Nuci has not been involved in the Latino community in Dodge City. Mr. Coca and Mr. Rangel-Lopez did not know Mr. Nuci was Hispanic prior to the filing of this lawsuit.[426]

343.    After having been elected twice, Mr. Nuci lost re-election in 2023, after it became public knowledge in Dodge City that he is Hispanic.[427]

---

[422] *Id.* at 23:13–15 (De La Rosa).

[423] Trial Tr. Vol. IV, 83:2–84:5 (McCoy).

[424] Trial Tr. Vol. I, 20:10–21 (Rangel-Lopez); Trial Tr. Vol. III, 130:11–22 (Coca).

[425] Trial Tr. Vol. III, 131: 9–20 (Coca)

[426] *Id.* at 130:23–131:8 (Coca); Trial Tr. Vol. I, 61:17–22 (Rangel-Lopez).

[427] Trial Tr. Vol. IV, 84:16–85:1 (McCoy); Trial Tr. Vol. I, 61:6–22 (Rangel-Lopez).

344.    Because Latinos are underrepresented in elected offices at each of the city, county, statewide, and federal levels, Senate Factor 7 is met.[428]

### F.  Senate Factor 8

345.    Senate Factor 8 concerns "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."[429]

346.    Plaintiffs presented evidence of a significant lack of responsiveness on the part of elected officials to the needs of the Hispanic community in Dodge City.

347.    Political science literature states that responsiveness to a community indicates substantive representation, i.e., when elected officials act "on behalf of their constituents[.]"[430]

348.    In evaluating responsiveness in local offices, political scientists consider (1) concerns or preferences expressed by the community or a proxy group, (2) whether there is a disproportionate impact of policies on the community, and (3) if local or state officials acknowledge the community's preferences or concerns. Dr. Bejarano followed this rubric in evaluating the Commission's responsiveness to the Latino community in Dodge City.[431]

349.    Dr. Bejarano researched responsiveness to Latino concerns in Dodge City by examining certain illustrative issues: "voter access, [health], [] racial discrimination and immigration enforcement."[432] Her findings, which the Court credits, are discussed below.

---

[428] Trial Tr. Vol. I, 91:24–92:2 (Bejarano).

[429] *Gingles*, 478 U.S. at 36–37.

[430] *Id.* at 101:25–102:7 (Bejarano).

[431] *Id.* at 103:13–22 (Bejarano).

[432] *Id.* at 102:21–103:1 (Bejarano).

350.    ***Voter Access.*** Prior to 2002, Dodge City had seven polling locations.[433] From 2002 until the 2018 election, only one polling location existed for all of Dodge City.[434] In 2018, the sole polling location in Dodge City was moved to a new location outside of city limits. There were concerns expressed that the move would disproportionately impact the Latino community, as the new polling location was not accessible by public transportation. A Congressional oversight committee concluded that local officials did not hold meetings with concerned citizens or address Latino concerns before making the decision to move the polling location outside city.[435]

351.    Furthermore, in a meeting initiated by Latino community leaders in Dodge City following a high-profile shooting in 2010 that sparked racial tensions, the City indicated that it would look into its use of at-large elections in response to Latinos' expressed concerns that they did not have political representation on the Commission. Dr. Bejarano found little evidence of any substantial follow-through on this promise.[436]

352.    Finally, residents of South Dodge City have indicated their concerns about the use of at-large elections by expressing the sentiment that it is not "worth [it] to try to run city wide and to put their hat in the ring to run for City Commission." Dr. Bejarano explained that "those concerns were expressed," including to Commissioner Jan Scoggins in 2019. "[T]he City Commission had discussions and didn't follow through."[437]

---

[433] Stipulation of Facts and Exhibits Doc. 178 ¶ 29, Trial Tr. Vol. I, 104:15–21 (Bejarano).

[434] Stipulation of Facts and Exhibits Doc. 178 ¶ 29.

[435] Trial Tr. Vol. I, 104:14–105:10 (Bejarano).

[436] *Id.* at 109:11–110:20 (Bejarano).

[437] *Id.* at 103:23–104:13 (Bejarano).

353.     As to voting, all three indicia of unresponsiveness were met. As to the first indicator, Latinos expressed concerns about both the at-large method of election and the reduced number of polling locations. As to the second indicator, both issues disproportionately affected Latinos. And as to the third indicator, the City acknowledged the concerns that the at-large system was preventing Latinos from having more robust political representation.[438]

354.     *Health.* The meatpacking industry was the hardest-hit industry during the COVID-19 pandemic, with infection rates even higher than in long-term care facilities. In Dodge City, Latinos "heavily comprise the workers in the meatpacking plants." "[T]here were concerns about the meatpacking plants in terms of safety protocols that were taken and whether there was enough precaution, safety precautions taken to both safeguard the workers and the surrounding communities during the height of the pandemic."[439]

355.     Latino meatpacking workers expressed concerns about the safety conditions through their union. Workers also submitted complaints to the Occupational Safety and Health Administration ("OSHA") about fearing for their health and safety. The evidence supports those concerns: Latinos suffered from the highest rates of COVID-19 in Kansas, and higher rates of death from COVID-19 than other racial and ethnic groups in Kansas.[440] The Latino meatpacking community was continuously concerned that not enough was being done to protect workers from COVID-19.[441]

---

[438] *Id.* at 105:11–106:3 (Bejarano).

[439] *Id.* at 106:4–21 (Bejarano).

[440] *Id.* at 106:22–107:19 (Bejarano).

[441] *Id.* at 107:20–108:3 (Bejarano).

356.   Despite union and OSHA complaints, nothing was done to address these health concerns. The City took no steps, formal or informal, to provide health resources, or family or other support, to this vital industry whose Latino workers were being disproportionately affected by the pandemic.[442]

357.   ***Racial Discrimination.*** In 2010, there was a high-profile shooting in Dodge City that involved a Latino and two white men. This shooting "sparked discussions about racial discrimination and a hostile climate that Latinos and immigrants were facing in Dodge City."[443] After the shooting, Latino leaders met with City officials to discuss their concerns and the issue of racial profiling by local law enforcement toward Latinos. City leaders responded by saying that they did not believe "racial bias was evident" in the community. Latino leaders were quoted saying the City was in denial regarding instances of racial discrimination in Dodge City.[444]

358.   The City pledged to address these concerns among the Latino community by looking into its use of at-large elections, investigating racial profiling, and developing a committee to facilitate open dialogue with Latinos and other diverse communities in Dodge City.[445] However, Dr. Bejarano found little evidence of any substantial follow-through by the City on these action items to address the concerns of the Latino community. The City briefly discussed switching from at-large elections to single-member districts but did not make the change. The City did not engage in a racial profiling study, nor did it address any possible issues with racial profiling. The City did create the Cultural Relations Advisory Board, but there is no evidence that it was able to quell the

---

[442] *Id.* at 106:22–107:19 (Bejarano).

[443] *Id.* at 108:4–14 (Bejarano).

[444] *Id.* at 108:15–109:10 (Bejarano).

[445] *Id.* at 109:11–110:11 (Bejarano).

racial unease in Dodge City, or pass any concrete policies that addressed Latinos' concerns about racial discrimination in Dodge City.[446] Furthermore, former Commissioner Jan Scoggins testified that the Cultural Relations Advisory Board is advisory in nature only, and it has no authority to act on its own accord. She also testified that the Board has had little effect on addressing any of the disparities between north and South Dodge.[447]

359.    Based on data available from September 2017 through February 2018, December 2018, and January 2020, Dr. Bejarano concluded that Latinos face a disproportionate rate of law enforcement citations and arrests – the most punitive outcomes for law enforcement stops – as compared to their share of the voting age population. Dr. Bejarano utilized the voting age population as the reference point because it reflects the number of adult residents.[448]

360.    All three indicia of unresponsiveness are met as it relates to racial discrimination issues. As to the first indicator, Latinos in the community spoke out against racial discrimination and racial profiling, and even went as far as to say City officials were in denial about the fact. As to the second indicator, the racial profiling statistics show that Latinos are disproportionately cited and arrested compared to their share of the voting-age population. And as to the third indicator, the City acknowledged that they had room for improvement on these issues (but provided little substantive follow through).[449]

361.    ***Immigration***. Dr. Bejarano also expressed concerns about the effect of Dodge City law enforcement cooperating with Immigration and Customs Enforcement (ICE) officials during

---

[446] *Id.* at 110:12–113:12 (Bejarano).

[447] Trial Tr. Vol. III, 156:3–22 (Scoggins).

[448] Bejarano Report Table 17, Ex. 61; Trial Tr. Vol. I, 112:3–22 (Bejarano).

[449] Trial Tr. Vol. I, 113:8–23 (Bejarano).

high-profile immigration raids that targeted areas in Southwest Kansas, including Dodge City, particularly among the meatpacking employees.[450] Although not a violation of federal, state, or local law, local law enforcement officials recognized that the raids destroyed trust with the Latino community and created a further divide between community leaders and the Latino community.[451]

362.    Plaintiffs' fact witnesses provided additional testimony in favor of Senate Factor 8. Ms. Vargas testified that the minority communities of rural Kansas and Southwest Kansas face particularly harsh circumstances in comparison to Hispanics living in other parts of Kansas. Services and resources in Dodge City are lacking.[452] Ms. Vargas described the lack of immigration and naturalization services available to the Hispanic community in Dodge City. Specifically, Ms. Vargas noted that her organization, the United Food and Commercial Workers International Union (UFCW), currently provides approximately 45 to 50 naturalization scholarships per year, each worth $600. By contrast, Catholic Charities, working in tandem with Dodge City, provides 12 scholarships per year worth $400 each. In Ms. Vargas's view, these immigration programs are insufficient.[453]

363.    Despite the lack of services available in Dodge City, the Commission does not coordinate with the UFCW.[454] Ms. Vargas testified that she does not know how to contact the Commission and only interacts with the Dodge City government on occasion through certain

---

[450] *Id.* at 113:24–114:9 (Bejarano).

[451] *Id.* at 114:10–25; 122:22–23 (Bejarano).

[452] *Id.* at 194:12–195:5 (Vargas).

[453] *Id.* at 191:19–192:11 (Vargas).

[454] *Id.* at 198:16–25 (Vargas).

employees, namely Ernestor De La Rosa and Melissa McCoy.[455] By comparison, Ms. Vargas noted that in her role as the UCFW's Political and Community Outreach Director, she "know[s] who to approach at the state government or event at the federal government" and that she "[doesn't] see a willingness to create that [connection] with the union" on the part of the Dodge City Commission.[456]

364.    Ms. Vargas also testified that the Dodge City government did not assist the UFCW in protecting meatpacking workers in Dodge City during the COVID-19 pandemic. Approximately 700–800 workers rotated shifts at the plants in a given day, working in close quarters. The UFCW focused on providing hand sanitizer and masking guidelines because meatpacking workers were continuously exposed to the virus. As a result of the COVID-19 pandemic, the Local 2 lost 17 members.[457]

365.    In the early days of the pandemic, Ms. Vargas reached out to Mr. De La Rosa, who provided her with contact information for the Dodge City Health Department. Despite Ms. Vargas's efforts to establish contact, the Health Department never responded.[458]

366.    Mr. Rangel-Lopez and Ms. Vargas both described Dodge City as "two different towns" or "two communities in one town." [459] Mr. Hernandez testified that the north is characterized by larger, more expensive houses as compared to the south part of Dodge City.[460]

---

[455] *Id.* at 210:25–211:19 (Vargas).

[456] *Id.* at 198:20–25 (Vargas).

[457] *Id.* at 192:12–193:12 (Vargas).

[458] *Id.* at 193:13–24 (Vargas).

[459] *Id.* at 220:23–221:15 (Vargas); Trial Tr. Vol. I, 13:19–14:8 (Rangel-Lopez).

[460] Trial Tr. Vol. IV, 108:13–24 (Hernandez).

Mr. Hernandez lives north of Comanche Street.[461] Mr. Rangel-Lopez noted that the part of town north of Comanche Street has a country club, nicer neighborhoods, newer houses, more affluent areas, and better resources than the part of town south of Comanche Street.[462] Mr. Rangel-Lopez observed that white people generally live in the north part of town.[463]

367.     Ms. Scoggins testified that "North Dodge is a higher socioeconomic area north of Comanche. The homes are bigger. The streets are wider. The yards are bigger." She also testified that the roads have better upkeep in North Dodge, and that there is more retail in North Dodge.[464]

368.     Mr. Rangel-Lopez believes that North Dodge controls resources and the formal power structure.[465] In Mr. Rangel-Lopez's experience, the part of town north of Comanche Street gets more attention from the city government.[466] To his knowledge, most of the Commissioners come from North Dodge.[467]

369.     Ms. Scoggins testified that she knows where current or former Dodge City Commissioners Kent Smoll, Rick Sowers, Brian Delzeit, Joyce Warshaw, Joe Nuci, Jeff Reinert, and Daniel Pogue live, and that they all live in North Dodge.[468]

---

[461] *Id.* at 108:8–10 (Hernandez).

[462] Trial Tr. Vol. I, 13:19–14:7 (Rangel-Lopez).

[463] *Id.* at 17:20–18:1 (Rangel-Lopez).

[464] Trial Tr. Vol. III, 149:7–13, 150:10–21, 150:25–151:5 (Scoggins).

[465] Trial Tr. Vol. I, 17:20–18:10 (Rangel-Lopez).

[466] *Id.* at 13:19–14:7 (Rangel-Lopez).

[467] *Id.* at 17:20–18:14 (Rangel-Lopez).

[468] Trial Tr. Vol. III, 149:23–150:9 (Scoggins).

370.    Commissioner Rick Sowers testified he lives north of Comanche Street.[469]

371.    In comparison to North Dodge, the area south of Comanche Street has brick roads, intersections without stop signs, sidewalks that are not maintained, or are buckled with tree roots or blocked by trash cans.[470] Ms. Vargas testified that the roads in front of the meatpacking plants are destroyed. The baseball field, the soccer field and the YMCA, where Hispanic community members take their children for recreational purposes, are all in poor condition. By contrast, the golf course located in North Dodge is well kept.[471]

372.    Mr. Rangel-Lopez testified that South Dodge City is lower income and that immigrants tend to live in the south east part of Dodge City.[472] Mr. Hernandez confirmed that the majority of the Hispanic minority community is located in the poorer neighborhoods of South Dodge.[473]

373.    In Mr. Rangel-Lopez's view, because Commissioners do not live or spend time in South Dodge, they are not familiar with the issues encountered by the people who live there. People in South Dodge get left behind and there is a lack of investment by the City.[474]

374.    Mr. Rangel-Lopez testified that his neighborhood has alleys through which residents access their garages. At some point more than 10 years ago, the trash collection system

---

[469] Trial Tr. Vol. IV, 129:17–22, 130:17–18 (Sowers).

[470] Trial Tr. Vol. I, 13:19–14:11 (Rangel-Lopez); *see also* Trial Tr. Vol. III, 150:12–14 (Scoggins).

[471] Trial Tr. Vol. I, 220:23–221:15 (Vargas).

[472] Trial Tr. Vol. I, 17:20–18:5 (Rangel-Lopez); *see also* Trial Tr. Vol. III, 149:15–22 (Scoggins).

[473] Trial Tr. Vol. IV, 108:13–24 (Hernandez).

[474] Trial Tr. Vol. I, 17:20–18:21 (Rangel-Lopez).

in the alleys switched from dumpsters to rolling bins and the City stopped maintaining the alleys after that switch. There are potholes and huge ruts in the alleys.[475]

375.    Mr. Rangel-Lopez recalled that the park in his neighborhood had a wooden playset when he was growing up. The playset was later removed and has not yet been replaced.[476] In comparison, the playgrounds north of Comanche Street are nicer and have new playsets and rubberized flooring.[477]

376.    Mr. Rangel-Lopez testified that the roads are different between North and South Dodge City. The roads are plowed and cleared in the nicer parts of town. In his neighborhood, Division Street is the main road where people pick up their children from Linn Elementary, the school he attended. After a storm, Division Street will have an inch or two of ice. In comparison, streets on the north side of Dodge City will be plowed, salted, and accessible after storms.[478]

377.    According to Mr. Rangel-Lopez, there are visible differences between the elementary schools in North and South Dodge. Ross Elementary, the newest school, is where people want to send their children. Ross is located in the north part of town. Sunnyside, Linn, and Beeson Elementary are located in the south part of town.[479]

---

[475] *Id.* at 13:19–14:22 (Rangel-Lopez).

[476] *Id.* at 13:19–15:12 (Rangel-Lopez).

[477] *Id.* at 15:4–15 (Rangel-Lopez).

[478] *Id.* at 15:16–16:10 (Rangel-Lopez).

[479] *Id.* at 16:11–17:1 (Rangel-Lopez); *see also* Trial Tr. Vol. III, 152:15–153:6 (Scoggins).

378.    Mr. Rangel-Lopez testified that there are limited grocery stores in the south and east part of Dodge City. East Dodge is a food desert, meaning there is no access to fresh fruit and produce.[480]

379.    In Mr. Rangel-Lopez's view, wanting "better services in your part of town…[for] your part of town [to] have good roads [that are] better plowed during the winter…and parks that are well maintained" are standard things "that anyone who lives in a community would want in their neighborhood" and should not be considered "divisive."[481]

380.    Mr. Coca testified that he lived in a trailer park in South Dodge from birth until age 13. He recalled that while living in the trailer park, his family was struggling, that his parents worked 10 to 12 hour shifts, and that his siblings took care of him.[482] His parents worked at a gas station, a truck stop restaurant, and a truck wash.[483]

381.    Mr. Coca testified that most of his neighbors in the trailer park were Hispanic. He described conditions in the trailer park as consisting of rough streets and dilapidated trailers. He mostly stayed indoors because there was gang activity in the trailer park.[484]

382.    Mr. Coca's family had to move out of their trailer on three days' notice and they moved to a house in South Dodge City. The neighborhood was mostly Hispanic.[485]

---

[480] Trial Tr. Vol. I, 17:2–19 (Rangel-Lopez); *see also* Trial Tr. Vol. III, 150:25–151:5 (Scoggins).

[481] Trial Tr. Vol. I, 50:10–24 (Rangel-Lopez).

[482] Trial Tr. Vol. III, 122:11–123:1 (Coca).

[483] *Id.* at 123:17–21 (Coca).

[484] *Id.* at 123:2–14 (Coca).

[485] *Id.* at 123:22–124:20 (Coca).

383.     Mr. Coca attended public school in Dodge City from elementary school through high school. Mr. Coca went to Beeson Elementary near the trailer park, Comanche Intermediate, Dodge City Middle School, and Dodge City High School. Mr. Coca testified that Beeson Elementary and Comanche Intermediate are in South Dodge, that Dodge City Middle School is slightly north of Comanche, and that Dodge City High School is in North Dodge.[486]

384.     Mr. Coca described Beeson Elementary and Comanche Intermediate as older schools. Beeson Elementary in particular was very Hispanic and most students shared his socioeconomic status. According to Mr. Coca, Dodge City High School was nicer and significantly better funded.[487]

385.     Mr. Coca testified that the east side of South Dodge is largely Hispanic. He said many of his neighbors work in agriculture and there is agriculture housing not far from where he lives.[488]

386.     Mr. Coca testified that East Dodge is similar to South Dodge, with dilapidated buildings and trailers in his neighborhood. The streets in East Dodge are not in great condition.[489]

387.     Like Mr. Rangel-Lopez, Mr. Coca described South Dodge as having limited options for grocery stores: only a Dollar Tree, a Dollar General, and a deli.[490]

388.     Mr. Coca's family members mostly work in retail and fast food, along with many Hispanic co-workers. According to Mr. Coca, more affluent people work in banks and office jobs.

---

[486] *Id.* at 124:22–125:14 (Coca).

[487] *Id.* at 125:15–126:3 (Coca).

[488] *Id.* at 127:1–7 (Coca).

[489] *Id.* at 128:14–20 (Coca).

[490] *Id.* at 133:4–12 (Coca); *see also* Trial Tr. Vol. III, 150:25–151:5 (Scoggins).

Mr. Coca expressed that he is lucky to have an office job working at the Dodge City Community College.[491]

389.    Mr. Coca indicated that there are only one or two parks in South Dodge and there was a "micro park" with a swing set when he was growing up.[492]

390.    Mr. Coca described how he frequently took the bus to work from South Dodge, where he used to live with his family. In his experience, buses in South Dodge are often late and his stop has been skipped many times. One week in November 2023, the bus passed by his stop every time he tried to take it.[493]

391.    There was also significant testimony regarding whether the City has been responsive to requests from the community directly relevant to this case, including whether to move to single-member commission districts. For example, former Commissioner Scoggins testified that, at the request of a community group, she raised the idea of introducing single-member districts in Dodge City but, as confirmed by Mr. De La Rosa, the Commission did not hold any kind of public forum to seek feedback from the local community on the issue.[494] Nor was a study prepared by or for the City on the matter.[495] Ultimately, the Commission directed staff to gather some information on single-member districts but there was no further follow up or discussion on the matter.[496]

---

[491] *Id.* at 132:8–20 (Coca).

[492] *Id.* at 133:14–18 (Coca).

[493] *Id.* at 128:1–13 (Coca).

[494] *Id.* at 167:6–169:19 (Scoggins); Trial Tr. Vol. IV, 12:11–21 (De La Rosa).

[495] Trial Tr. Vol. IV, 111:25–112:2 (Hernandez).

[496] Trial Tr. Vol. III, 167:6–-169:19 (Scoggins); Trial Tr. Vol. IV, 12:42–13:5 (De La Rosa).

392.     Similarly, former Ford County Clerk Sharon Seibel testified that, at some point before she became County Clerk, Ford County received notice from the Department of Justice that, under Section 203 of the VRA, Ford County was required to make voting materials, including ballots, available in Spanish.[497] Prior to receiving this notification, Ford County did not provide voting materials in Spanish.[498]

393.     The Department of Justice reached out to Ford County again in 2011 when Ms. Seibel was serving as the County Clerk for Ford County.[499] The Department of Justice requested information regarding Dodge City elections back to 2000.[500]

394.     Around the same time, in mid-2011, Ms. Seibel attended a conference in Atlantic City, New Jersey at which Bruce Adelson, a former lawyer in the Department of Justice's voting section, gave a seminar on vote dilution in counties or cities that have a majority minority population. After attending this presentation, Ms. Seibel contacted the Ford County Commissioners and told them "this could very well be something we need to be watching for."[501]

395.     In response, Ford County authorized Ms. Seibel to have a phone conference with Mr. Adelson and Ford County subsequently signed a retainer agreement with Mr. Adelson in

---

[497] Trial Tr. Vol. I, 232:22–233:1 (Seibel).

[498] *Id.* at 233:2–5 (Seibel).

[499] Letter from DOJ to Ford Cnty., 6/29/2011, Ex. 1.

[500] Letter from S. Seibel to Ford Cnty. Commissioners, 7/13/2011, Ex. 3.

[501] Trial Vol. I, 234:24–236:9 (Seibel).

August 2011 to "[c]onduct [a] Section 2 investigation of the Dodge City Commission's at-large election system, and related issues, for possible violation of the VRA's Section 2."[502]

396.    Mr. Adelson's investigation consisted of reviewing election data and traveling to Dodge City with his colleague, Gilda Daniels, to interview community members. Ms. Seibel testified that she was confident in Mr. Adelson's methods and the results he reached.[503]

397.    Ms. Seibel testified that she and Mr. Adelson met with City Clerk Nannette Pogue, then-City Manager Cherise Tieben, and the Dodge City mayor to discuss Mr. Adelson's investigation.[504] Ms. Seibel recalled that she "made them aware that there [was] a potential for a violation and that a study should be done to verify that."[505] Ms. Seibel testified that after she went to the City with Mr. Adelson's findings, she was not made aware of any further action taken by the City on the issue.[506]

398.    Although the DOJ did not issue a findings letter, there was no evidence that DOJ issued a closing letter or any other document demonstrating that they concluded there was *not* a Section 2 violation.

---

[502] *Id.* at 236:14–23 (Seibel); Trial Tr. Vol. II, 5:1–12 (Seibel); Bruce Adelson Retainer Agreement, Ex. 5.

[503] Trial Tr. Vol. II, 5:15–6:17 (Seibel).

[504] Trial Tr. Vol. I, 237:15–25 (Seibel); Bruce Adelson Invoice, Ex. 6.

[505] Trial Tr. Vol. II, 14:1–10 (Seibel).

[506] *Id.* at 14:19–24 (Seibel).

399.     Mr. Rangel-Lopez identified Jan Scoggins as someone he spoke to about at-large elections and recalled discussing the topic with Ms. Scoggins before she raised it to the Commission in 2019.[507]

400.     In November 2018, at the request of then-City Manager Cherise Tieben, City Clerk Nannette Pogue researched the possibility of switching to district-based elections for the Dodge City Commission.[508] Ms. Tieben had been notified by then City Commissioner Jan Scoggins that a community group might attend a Commission meeting to discuss the topic of districting.[509] As part of her research, Ms. Pogue contacted the League of Kansas Municipalities (the "League") to request information on the different types of governments within Kansas.[510] The League outlined considerations under Section 2 of the Voting Rights Act and informed Ms. Pogue that Dodge City would need to be careful to not dilute the voting power of Hispanic and Latino voters in any adopted map.[511] Ms. Pogue does not recall her findings being discussed at any Dodge City Commission meeting that she attended.[512]

401.     In February 2019, Ms. Scoggins emailed Ms. Tieben to request that districting be added to the agenda for the next Commission meeting.[513] Ms. Tieben responded that Ms. Scoggins

---

[507] Trial Tr. Vol. I, 20:22–21:4 (Rangel-Lopez); Trial Tr. Vol. I, 22:5–18 (Rangel-Lopez); Commission Meeting Minutes, 3/4/2019, Ex. 29; Email from N. Pogue to B. Ralph, 3/5/2019, Ex. 30.

[508] Nannette Pogue Deposition Designations, Doc. 191, 53:8–11.

[509] *Id.* at 52:11–53:3 ; Email and attachment from C. Tieben to City Commissioners, 11/5/2018, Ex. 20 at 2.

[510] Nannette Pogue Deposition Designations, Doc. 191, 55:13–19.

[511] *Id.* at 68:20–24.

[512] *Id.* at 69:19–70:1.

[513] Trial Tr. Vol. III, 165:2–16; Email from J. Scoggins to C. Tieben, 2/26/2019, Ex. 27.

could instead raise the issue at the end of the meeting.[514] Ms. Scoggins was disappointed that the issue could not even garner enough interest to be put on the formal agenda.[515]

402.    After Jan Scoggins raised the issue at a City Commission meeting, there was very little discussion and it was never brought up among the Commission again.[516] Ms. Scoggins described the other Commissioners' reactions to the proposal as "dismissive."[517]

403.    Mr. Rangel-Lopez testified that he was involved in the Dodge City Cultural Relations Advisory Board ("CRAB"), an advisory board established by Dodge City and made up of community members that makes non-binding suggestions and published a Strategic Plan for Welcoming and Integration.[518]

404.    Mr. Rangel-Lopez recalled that, during a meeting of the Steering Committee for the Strategic Plan for Welcoming and Integration, he raised his concern that at-large elections are a structural issue in Dodge City and a barrier to achieving representation. He recalled that the topic was discussed for about ten to fifteen minutes, but it was not included as a recommendation in the final plan.[519]

405.    Mr. De La Rosa similarly recalled the Steering Committee discussing district-based elections at Mr. Rangel-Lopez's request and that it "somehow [] did not land with a

---

[514] Email from C. Tieben to J. Scoggins, 2/26/2019, Ex. 27.

[515] Trial Tr. Vol. III, 169:11–19 (Scoggins).

[516] Trial Tr. Vol. I, 22:5–23 (Rangel-Lopez); *see also* Trial Tr. Vol. III, 167:6–169:19 (Scoggins).

[517] Trial Tr. Vol. III, 168:9–24 (Scoggins).

[518] Trial Tr. Vol. I, 23:2–24:3 (Rangel-Lopez).

[519] *Id*. at 25:5–25 (Rangel-Lopez).

recommendation for that particular item."[520] Mr. De La Rosa testified that the Steering Committee did not hold a vote on the suggestion and, that at that time, Mr. De La Rosa was aware that Commissioner Scoggins had previously proposed single-member districts at a Commission meeting and that the Commission did not support the idea.[521]

406.    During the Steering Committee meetings, Mr. Rangel-Lopez also raised the idea of implementing a municipal ID program, which would provide a government issued ID to undocumented individuals or others who do not qualify for other forms of ID in order to help them access city services and other public benefit programs.[522]

407.    Mr. Rangel-Lopez believes that Dodge City tries to be welcoming but that its policies do not match the rhetoric.[523]

408.    Mr. Rangel-Lopez testified that he did not go to the Commission to ask about single-member districts because he did not believe that his concerns would be seriously considered.[524] It became clear when he worked as an intern for Dodge City that the City government operates on a need-to-know basis. Mr. Rangel-Lopez explained that he did not know the Commissioners, as they did not campaign or engage with his community.[525]

409.    Mr. Rangel-Lopez testified that he brought this lawsuit because he wanted people to have hope that they could have representation in local government, where it matters most. He

---

[520] Trial Tr. Vol. III, 305:19–306:11 (De La Rosa).

[521] Trial Tr. Vol. IV, 14:6–15:16 (De La Rosa).

[522] Trial Tr. Vol. I, 24:4–25:4 (Rangel-Lopez).

[523] *Id.* at 26:10–25 (Rangel-Lopez).

[524] *Id.* at 28:12–29:6 (Rangel-Lopez).

[525] *Id.* at 28:12–30:10 (Rangel-Lopez).

wants his family to feel comfortable and safe, and to live with dignity. He hopes his future children have opportunities he did not have growing up.[526]

410.     Mr. Coca testified that he did not vote in local elections prior to 2019 because he felt it was pointless and that his vote did not matter.[527] In 2016, Mr. Coca began to realize how things trickle down to local government. He started voting in local elections in 2019. He has voted in every election since and plans to continue.[528]

411.     Mr. Coca testified that he did not raise his concerns regarding the at-large election system to the Commission because he believed it was pointless. He also has family members who work for the City and feared for their jobs. Mr. Coca explained that there is severe distrust of government in the Hispanic community.[529]

412.     Mr. Coca testified that he brought this lawsuit because he wanted to create change. He believes single-member districts would encourage people to run for office so the Hispanic community has a voice. Mr. Coca believes that having a candidate supported by the Latino community on the Commission would create change for multiple generations.[530]

413.     Mr. Hernandez testified that Dodge City does not track what proportion of its residents' primary language is Spanish.[531] Dodge City also does not assess how its budget

---

[526] *Id.* at 31:1–32:2 (Rangel-Lopez).

[527] Trial Tr. Vol. III, 129:11–22 (Coca).

[528] *Id.* at 129:23–130:10 (Coca).

[529] *Id.* at 136:9–23 (Coca).

[530] *Id.* at 136:24–137:17 (Coca).

[531] Trial Tr. Vol. IV, 102:8–10 (Hernandez).

decisions regarding road maintenance impact the Hispanic minority community.[532] Nor does Dodge City assess whether its services are being provided equitably. [533]

414.    Furthermore, according to Mr. Hernandez, Dodge City also does not track voter turnout rates, nor does the City analyze whether there are lower rates of voter turnout among Hispanics as compared to white voters in Dodge City.[534] The City publishes information on voter registration in English and Spanish – as required under Section 203 of the Voting Rights Act – but the City does not track whether residents are receiving the information nor whether the information measures are effective.[535]

415.    Mr. Hernandez testified that in 2018, over 70 percent of police arrests, stops, citations and warnings in Dodge City involved Hispanic community members. Mr. Hernandez acknowledged that he has access to racial and ethnic demographics of policing data in Dodge City but has only reviewed the data in the context of this litigation.[536]

416.    Mr. Hernandez testified that the decision by the Dodge City police department to send an undercover police officer to secretly record a June 2023 meeting held by the Kansas Hispanic and Latino American Affairs Commission to educate the public on immigration-related legislation was made in "poor judgment" and agreed it was "not a good way of building trust with the Hispanic community."[537]

---

[532] *Id.* at 104:16–20 (Hernandez).

[533] *Id.* at 105:15–18 (Hernandez).

[534] *Id.* at 109:15–21 (Hernandez).

[535] *Id.* at 109: 4–14 (Hernandez).

[536] *Id.* at 1105:19–106:11 (Hernandez).

[537] *Id.* at 108:2–7 (Hernandez).

417.     Ms. Vargas, who led the June 2023 meeting as Chair of the Kansas Hispanic and Latino American Affairs Commission described learning of the undercover police officer's presence months later as "upsetting" and "creat[ing] more fear and distrust." [538]

418.     Ms. Scoggins testified that based on her experience as a Commissioner and her decades of living and voting in Dodge City, she does not believe the Commission as a whole has been responsive to the concerns of Latinos. [539]

419.     Mr. Rangel-Lopez says he has never had a Commissioner knock on his door in South Dodge City to ask for his vote, nor has he seen Commissioners in his neighborhood. [540] Similarly, Mr. Coca has never seen any Commissioners visit South or East Dodge, other than former Commissioner Blanca Soto. Mr. Coca testified that he has never seen any Commissioner, other than Blanca Soto, attend events of the Hispanic community. [541]

420.     Ms. Scoggins testified that when she campaigned in South Dodge in 2021 and 2023, she never encountered any other candidates campaigning in South Dodge nor saw their campaign signs in South Dodge. [542]

421.     Dr. Bejarano's testimony provided credible examples of how Dodge City and other area elected officials are unresponsive to, or take actions contrary to, the Latino community's needs.

---

[538] Trial Tr. Vol. I, 199:11–201:19 (Vargas).

[539] Trial Tr. Vol. III, 155:23–156:2 (Scoggins).

[540] Trial Tr. Vol. I, 18:22–19:2 (Rangel-Lopez).

[541] Trial Tr. Vol. III, 135:8–33 (Coca).

[542] *Id.* at 159:18–23; 160:21–161:2 (Scoggins).

**G. Senate Factor 9**

422.    Senate Factor 9 concerns "whether the policy underlying the state or political subdivision's use of such voting…practice or procedure is tenuous."[543]

423.    Dodge City has been on notice that there may be issues related to Latino vote dilution and representation since 2010.[544]

424.    In 2010, after a high-profile shooting that occurred in Dodge City, Latino community leaders brought up the lack of political representation of Latinos on the Dodge City Commission and the City government responded that it would investigate the use of at-large elections.[545]

425.    As explained *supra,* the City was notified in 2011 by Ford County Clerk that the Department of Justice was investigating Dodge City's method of election for a potential Section 2 Voting Rights Act violation.[546]

426.    After the Department of Justice notice, then-Ford County Clerk Sharon Seibel hired a former Department of Justice lawyer and Voting Rights Act consultant to meet with Dodge City to discuss potential Voting Rights Act liability with respect to the use of at-large elections.[547]

---

[543] *Gingles*, 478 U.S. at 36–37.
[544] Trial Tr. Vol. I, 108:9–110:6 (Bejarano).

[545] *Id.* at 109:21–110:3.

[546] *Id.* at 237: 15–22.

[547] *Id.* at 237:23–25.

427.     Further, the issue of moving to district-based elections for the Dodge City Commission had been discussed within the City continuously in the years prior to 2018 as something that Dodge City would have to "monitor" as the City grew.[548]

428.     Prior to 2018, Dodge City was on notice that there was a threat of a lawsuit to force the City into district based elections.[549]

429.     Again, in 2019, the implementation of district-based elections was raised to the Dodge City Commission by a sitting Dodge City Commissioner, Jan Scoggins.[550] In 2019, then-Dodge City Commissioner Jan Scoggins asked then-City Manager Cherise Tieben to add moving to district-based elections to a formal Dodge City Commission meeting agenda.[551]

430.     Commissioner Scoggins felt that Dodge City staff were not willing to add the issue of districting to the Commission meeting agenda.[552]

431.     Researching the possibility of districting for the Dodge City Commission was then briefly discussed at two Dodge City Commission meetings in 2019 and ultimately dismissed.[553] The Court heard testimony at trial regarding Dodge City's minimal justifications for continuing to use at-large elections for City Commission. For example, Defendant's expert Dr. Kimberly Nelson opined that the Council-Manager form of government is associated with certain benefits such as

---

[548] Trial Tr. Vol. III, 253:6–11 (Tieben).

[549] Id. at 257:8–13 (Tieben).

[550] Trial Tr. Vol. I, 22:5–23 (Rangel-Lopez).

[551] Trial Tr. Vol. III, 165:17–166:3 (Scoggins).

[552] Id. at 165:22–166:3 (Scoggins).

[553] Id. at 166:12–169:19 (Scoggins). *See also* Commission Meeting Minutes, 3/4/2019, Ex. 29; Commission Meeting Minutes, 4/15/2019, Ex. 32.

less dysfunctional conflict, greater budget solvency, increased innovation, and lower risks of corruption.[554]

432.    However, Dr. Nelson acknowledged that the benefits of the Council-Manager form of government are not dependent on electing those representatives through an at-large election system. Nearly 20% of representatives in Council-Manager governments are elected through districts.[555]

433.    Defendant provided no evidence that the at-large election system is necessary to achieve any particular policy purpose, and provided no evidence demonstrating that the at-large election system accomplishes any particular goal, other than that it has always been in place.

434.    Indeed, when asked whether he sees any benefits of the current at-large election system in Dodge City, former Assistant City Manager Mr. De La Rosa acknowledged that he "struggle[s] with it" because he wants to see Latino representation. Mr. De La Rosa did not name any benefits of the at-large system in his response to this question and stated that he is "on the fence on the issue."[556]

435.    Furthermore, the City hired public relations firm Trozzolo shortly after the filing of this lawsuit. Trozzolo prepared a "Dodge City Community Engagement Plan" that listed "strengthen the position of the current at-large system [as] the strongest method now and in the future" as one of the challenges faced by the City.[557] The City's consultant thus acknowledged that

---

[554] Trial Tr. Vol. IV, 45:20–46:18 (Nelson).

[555] *Id.* at 52:1–12 (Nelson).

[556] Trial Tr. Vol. III, 317:6–318:15 (De La Rosa); Trial Tr. Vol. IV, 27:3–21 (De La Rosa).

[557] Trial Tr. Vol. IV, 79:17–81:11 (McCoy).

the City needed to convince its residents of the correctness of its official position that at-large elections are the "strongest" electoral method.

436.    Current City Manager Mr. Hernandez testified that the Dodge City Commission believes at-large elections are the best election method for Dodge City because it "wants to have a unified community."[558] However, no evidence was put forward to indicate that this aspiration has been achieved in Dodge City, while there is considerable evidence of a significant socioeconomic divide between Dodge City's Hispanic and non-Hispanic populations, that is reflected in the rates of political participation of these two groups and the rates of political success of their candidates of choice in the at-large system. Mr. Hernandez also acknowledged that some of the Commissioners could lose their positions if the at-large system were replaced.[559] Mr. Hernandez believes that "the public" should decide Dodge City's method of election.[560]

437.    In fact, to the contrary, there is evidence that Dodge City Commission elections have grown more partisan and bitterly contested over time. Ms. Scoggins testified that in the 2023 election, "[t]here was a whole change in the environment and that she experienced "negative campaign[ing]" and "negative advertising" against her by three other candidates for the Dodge City Commission affiliated with the Republican party—two of whom subsequently won election.[561]

438.    Ms. Scoggins also testified that, when she brought up the possibility of districting to the Commissioners, other Commissioners appeared "dismissive" and "almost bothered even to

---

[558] Trial Tr. Vol. IV, 98:18–22 (Hernandez).

[559] *Id.* at 100:3–101:14 (Hernandez).

[560] *Id.* at 99:13-15 (Hernandez).

[561] Trial Tr. Vol. III 161:13–162:6 (Scoggins).

have to consider it." Ms. Scoggins testified that *no* Commissioner or city employee opposed single-member districts on the basis of disunity, or otherwise expressed that at-large elections were important for unity. And Ms. Scoggins noted that if the City did switch to districts, "it would be very possible that many of [the current Commissioners] would be running against each other in the same district."[562]

## CONCLUSIONS OF LAW

Plaintiffs' claim alleges that the Dodge City Commission's at-large voting scheme violates Section 2 of the VRA because it dilutes the voting power of the Latino voting population in Dodge City and prevents them from electing their representatives of choice. "Th[e Supreme] Court has long recognized that multimember districts and at-large voting schemes may operate to minimize or cancel out the voting strength of racial [minorities in] the voting population."[563] "In *Thornburg v. Gingles*, the Supreme Court established the framework for assessing at-large voting systems under Section 2."[564] The *Gingles* preconditions set out three threshold requirements Plaintiffs must meet to demonstrate that an at-large voting system unlawfully dilutes the minority group's vote and prevents them from electing candidates of choice.

The Court then must assess whether, under the totality of the circumstances, members of the minority group have less opportunity to participate in the electoral process and elect candidates of their choice.[565] The Supreme Court has directed that the list of non-exhaustive factors in the

---

[562] *Id.* at 168:15–170:2 (Scoggins).

[563] *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (internal quotation marks omitted).

[564] *Holloway v. City of Va. Beach*, 42 F.4th 266, 270 (4th Cir. 2022) (citing *Gingles*, 478 U.S. at 38–51).

[565] 52 U.S.C. § 10301(b).

Senate Report on the 1982 amendments to the VRA ("Senate Factors") be considered for the totality of the circumstances analysis.[566]

The Court's conclusions regarding the *Gingles* preconditions and the totality of the circumstances are set forth below.

## I.    Plaintiffs Have Met the *Gingles* Preconditions for a Section 2 Violation

### A.   *Gingles* I

To meet the first *Gingles* precondition, Plaintiffs must show that the Latino population in Dodge City is "sufficiently large and geographically compact to constitute a majority in a single-member district."[567] In other words, Plaintiffs must demonstrate that it is possible for Latinos to constitute a majority in at least *one* district in a single-member district map for the Dodge City Commission.[568]

The Court begins with a brief review of the caselaw governing *Gingles* I. With respect to numerosity, contrary to Defendant's representation, a bright-line 50% plus one rule applies in assessing whether the minority population is sufficiently large for the purposes of *Gingles* I.[569] With respect to compactness of the minority population, for *Gingles* I purposes, compactness "refers to the compactness of the minority population, not to the compactness of the contested

---

[566] *Gingles*, 478 U.S. at 35–37.

[567] *Id.* at 50.

[568] *See Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020) ("Under Gingles, plaintiffs challenging an at-large system on behalf of a protected class of citizens must demonstrate that (1) the group is sufficiently large and geographically compact to constitute a majority in a single-member district …") (internal citation omitted); *Ruiz v. City of Santa Maria*, 160 F.3d 543, 550 (9th Cir. 1998) (similar); *Wright v. Sumter Cnty. Bd. of Elections and Registration*, 979 F.3d 1282, 1288 (11th Cir. 2020) (similar); *Large v. Fremont Cnty., Wyo.*, 709 F. Supp. 2d 1176, 1190 (D. Wyo. 2010); *Gingles*, 478 U.S. at 50.

[569] *See Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2009) (plurality opinion).

district."[570] "While no precise rule has emerged governing § 2 compactness, the inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'"[571] One of those traditional districting criteria is the constitutional requirement to maintain equal population[572]; "[a] maximum population deviation between voting districts of less than ten percent is presumptively constitutional."[573] And as the Supreme Court recently confirmed, Section 2's "question whether additional majority-minority districts can be drawn, after all, involves a 'quintessentially race-conscious calculus,'" and allows a mapdrawer to "take race into account" as one, non-predominant factor when drawing maps in compliance with federal law.[574]

In Section 2 vote dilution litigation, such as this case, illustrative maps offered by plaintiffs are used to assess whether the jurisdiction has committed a *violation* of Section 2 *only*; that is, to help the Court establish that it is *possible* for the jurisdiction in question to draw a map that contains a district where the minority group is large and geographically compact enough to constitute a majority.[575] To that end, plaintiffs at the trial stage need *not* establish that the illustrative maps are

---

[570] *League of United Latin Am. Citizens v. Perry* ("LULAC"), 548 U.S. 399, 433 (2006) (internal citation omitted).

[571] *Id.*; *see also Allen v. Milligan*, 599 U.S. 1, 18 (2023) ("A district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably compact.").

[572] *Allen*, 599 U.S. at 20.

[573] *McCoy v. Chi. Heights Election Comm'n*, 880 F.3d 411, 415 (7th Cir. 2018).

[574] *Allen*, 599 U.S. at 30–31 (internal citation omitted).

[575] *See Sanchez v. State of Colo.*, 97 F.3d 1303, 1311 (10th Cir. 1996) ("[P]laintiffs' proposed district is not cast in stone. It was simply presented to demonstrate that a majority-black district is feasible….") (quoting *Clark v. Calhoun Cnty., Miss.*, 21 F.3d 92, 95 (5th Cir. 1994)).

the *exact proper remedy*; "at this stage, a plaintiff need only show that a remedy may be feasibly developed," and "neither the plaintiff nor the court is bound by the precise lines drawn in these illustrative redistricting maps."[576]

> As one federal court explained:
>
> [E]very Section 2 case may be divided into two phases: a liability phase, where the Court determines whether the challenged electoral device dilutes minority voting power, and a remedy phase, where the challenged jurisdiction remedies the dilution. Under this scheme, the ultimate viability and effectiveness of a remedy is considered at the remedial stage of litigation and not during analysis of the *Gingles* preconditions.[577]

Put simply, the "ultimate end of the first *Gingles* precondition is to prove that a solution is possible, and not necessarily to present the final solution to the problem."[578]

Based on the uncontested evidence presented at trial, *Gingles* I is easily met in this case. Plaintiffs' expert Dr. Oskooii has put forth 14 demonstrative maps that all show that the Latino population is large and geographically compact enough to constitute a numerical majority in *three* single-member districts. FOF ¶¶ 64-66. This is far more than what is necessary to establish the first *Gingles* precondition, which is satisfied when the minority group makes up the majority in just *one* single-member district. Dr. Oskooii's maps abided by applicable districting criteria, including equal population; reasonable shape, compactness, and contiguity to the extent the

---

[576] *Luna v. Cnty. of Kern*, 291 F. Supp.3d 1088, 1106 (E.D. Cal. 2018); *see also Chen v. City of Houston*, 206 F.3d 502, 519 (5th Cir. 2000) ("[T]here is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles.").

[577] *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 745 (S.D. Tex. 2013).

[578] *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (internal citation omitted); *see also Hall v. Louisiana*, 108 F. Supp. 3d 419, 429 n.7 (M.D. La. 2015) (acknowledging distinction "between an illustrative plan used to establish the first Gingles precondition, versus a redistricting plan submitted as a proposed remedy after a Section 2 violation has been found.").

jurisdiction allows; and respecting different conceptions of communities of interest. FOF ¶¶ 67-80.

Defendant concedes the *Gingles* I inquiry, confirming on the record: "[T]here's no dispute that you can create one or more CVAP districts where Hispanics have more than 50 percent." FOF ¶ 63. Defendant presented no maps; presented no evidence that any of Dr. Oskooii's maps failed to abide by applicable districting criteria; contested no findings about Dr. Oskooii's communities of interest; and indeed did not present evidence that it was even *possible* to draw a map for the Dodge City Commission that contains no districts where Latinos make up a numerical majority. FOF ¶¶ 68.

At trial, Defendant made three arguments regarding *Gingles* I, none of which have merit. First, Defendant seemed to take issue with the extent to which race may or may not have been taken into account by Dr. Oskooii in drawing his maps. Defendant is correct that race cannot *predominate* the map drawing process.[579] "The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn" and ultimately centers on the mapmakers' "predominant motive for the design of the district as a whole."[580] The Supreme Court provides certain guideposts that can be used in determining whether racial predominance exists, including: (1) whether the mapdrawer credibly testified that he balanced the various traditional districting principles and that race did not predominate among the various considerations; (2) whether the mapper articulated specific factors and reasons other than race that support the particular mapping decisions taken in constructing the illustrative maps; and (3) whether plaintiffs

---

[579] *Allen*, 599 U.S. at 31 ("[R]ace may not be 'the predominant factor in drawing district lines unless [there is] a compelling reason.'") (internal citation omitted).

[580] *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189, 192 (2017).

put forward additional evidence to show the illustrative maps maintain and respect communities of interest.[581]

There is zero evidence of racial predominance here. As noted *supra*, there is no evidence in the record—from Defendant or otherwise—that Dr. Oskooii subordinated traditional districting criteria in favor of race. There is, by contrast, voluminous evidence in the record that Dr. Oskooii applied traditional districting criteria, drew his maps based on these districting criteria, and respected different conceptions of communities of interest. *See* FOF ¶¶ 67-80. Indeed, the unrebutted evidence is that Dr. Oskooii *did not even consider race and ethnicity* for twelve of his fourteen maps and that when he considered race for Maps 13 and 14, he used it as just one, non-predominant factor. FOF ¶¶ 114-118. There is simply no evidence in the record to suggest racial predominance. Defendant's suggestion that Dr. Oskooii intentionally gerrymandered the majority-white Districts 4 and 5 lacks any evidentiary support; as Dr. Oskooii explained, those districts are majority-white because those areas have a large white population, and it would violate traditional redistricting principles to draw districts otherwise. FOF ¶ 117.

Second, Defendant has argued that *Gingles* I requires that majority-minority districts be performing districts, but Defendant is wrong about the law on this point. For starters, this Court is unaware of *any* court that has determined a performance analysis as part of the *Gingles* I analysis. Even more broadly, courts differ on whether a performance analysis—*i.e.* an analysis proving that at least one of the majority-minority districts in the illustrative maps gives the minority group an opportunity to elect preferred candidates—is even necessary at all. Some courts consider it only

---

[581] *See Allen*, 599 U.S. at 19–22, 29–32 n.5

as part of the totality of the circumstances analysis rather than under any of the *Gingles* preconditions.[582]

Regardless, Plaintiffs' expert Dr. Matthew Barreto conducted the very performance analysis Defendant seeks, and found that all 14 of Dr. Oskooii's maps contain at least one performing majority-Hispanic district, even assuming current turnout levels. FOF ¶ 212. (Under the elevated turnout model, for which there is support in the political science literature, all 14 maps would have three majority-Hispanic districts in which the Hispanic community can elect candidates of choice. FOF ¶ 212). This analysis is unrebutted; Defendant has put forth *no* evidence to the contrary. FOF ¶ 213. Therefore, even if a performance analysis is necessary to Plaintiffs' *Gingles* I claim—which it is not—Plaintiffs have satisfied it.

Finally, Defendant made statements at trial and in prior briefing that the Latino population in Dodge City is too large to be covered by Section 2, but this argument is also contrary to law. Under the VRA, the term "'minority' does not refer to a purely numerical fact," but rather to the protection of "any citizen who is a member of a protected class of racial or language minorities."[583] "The plain text of the statute, as affirmed by caselaw, makes clear that the [VRA] is concerned with protecting the minority in its capacity as a national racial or language group."[584] Thus, as the Supreme Court has acknowledged, "it may be possible for a citizen voting-age majority to lack real electoral opportunity" and still require the protection of the VRA.[585] Thus, even racial

---

[582] *See Perez v. Abbott*, 253 F. Supp. 3d 864, 883 (W.D. Tex. 2017).

[583] *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 933 (8th Cir. 2018) (quoting *Gingles*, 478 U.S. at 43).

[584] *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1547 (5th Cir. 1992).

[585] *LULAC*, 548 U.S. at 428.

minorities who constitute a majority within a challenged district can prevail on a Section 2 claim when the district does "not present the 'real electoral opportunity' protected by Section 2."[586] The "demographic and political contexts" in which a Court must assess a vote dilution claim can support a finding that "minority voters might have 'less opportunity . . . to elect representatives of their choice' even where they remain an absolute majority in a contested voting district."[587] The Court therefore concludes that "[Plaintiffs'] do not lose VRA protection simply because they [now] represent a bare numerical majority within [a] district."[588] Of course, this argument is irrelevant also because Defendant is wrong on the facts—Latinos are not a majority of the Dodge City population based on citizen voting-age population data, even using the 2023 ACS 5-year estimates.

Further, "[u]nder § 2, a municipality cannot defend diluting a minority's voting power with the argument that demographic shifts might or even will eventually tilt the balance in the other direction."[589] This is particularly true here, where the Defendant does not have any statistical evidence to suggest that any speculative demographic shifts in the future will have any electoral effect. Indeed, unrebutted testimony from Dr. Barreto reveals that just 30 percent of actual voters in Dodge City are Latino, compared to about 64 percent who are white. FOF ¶ 55. There is no indication in the record that Latinos are on the verge of becoming a dominant political group in Dodge City.

---

[586] *Pope v. Cnty. of Albany*, 687 F.3d 565, 576 n.8 (2d Cir. 2012) (quoting *LULAC*, 548 U.S. at 428).

[587] *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003).

[588] *Ferguson-Florissant Sch. Dist.*, 894 F.3d at 934.

[589] *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 713 (S.D. Tex. 2017), *judgment entered*, No. CV H-14-3241, 2017 WL 10242075 (S.D. Tex. Jan. 16, 2017).

For all of the foregoing reasons, the Court concludes that Plaintiffs have satisfied the first *Gingles* precondition.

## B.  *Gingles* II

Having satisfied the first precondition, Plaintiffs must also demonstrate that the Latino population is politically cohesive.[590] This is referred to as the second *Gingles* precondition. As with *Gingles* I, the Court begins with a review of the applicable law.

Plaintiffs can satisfy *Gingles* II by demonstrating that members of a protected class vote together for candidates or electoral outcomes. For example, "[a] showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim."[591] Political cohesiveness is proven through voting patterns over time.[592] Cohesion is a "sliding scale that varies with the district and a variety of factual circumstances and may emerge more distinctly over a period of time."[593] Additionally, a showing of racially polarized voting does not require completely divergent racial preferences.[594]

Importantly, in assessing racially polarized voting under *Gingles*, there is no requirement that Plaintiffs demonstrate that white voters are hostile or hold racist views towards minority-

---

[590] *Gingles,* 478 U.S. at 51.

[591] *Id.* at 56.

[592] *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1401 (E.D. Wash. 2014); *Gomez v. City of Watsonville*, 863 F. 2d 1407, 1415 (9th Cir. 1988) ("[W]hether a racial group is politically cohesive depends on its *demonstrated propensity* to vote as a bloc for candidates or issues popularly recognized as being affiliated with the group's particularized interests") (internal citation omitted).

[593] *Sanchez v. State of Colo.*, 97 F.3d 1303, 1312–13 (10th Cir. 1996).

[594] *See Sanchez*, 97 F.3d at 1319.

preferred candidates to demonstrate racially polarized voting.[595] The standard "looks only to the difference between how majority votes and minority votes were cast; it does not ask why those votes were cast the way they were nor whether there are other factors present in contested elections."[596]

Courts may analyze any elections it sees fit when evaluating polarized voting. Some elections may have more probative value than others, such as contested elections and endogenous elections.[597] Under Section 2, Plaintiffs may also demonstrate vote dilution based on evidence of racially polarized voting drawn from exogenous elections, and not just endogenous elections.[598]

In *Gingles*, the Court expressly advocated for flexibility when there may be sparse or incomplete data for determining whether polarized voting exists.[599] The Tenth Circuit has held that "*Gingles* doesn't require perfect uniformity of result. That plaintiffs' figures presented a pattern of

---

[595] *See Gingles*, 478 U.S. at 70–71; *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1123 (3d Cir. 1993).

[596] *Collins v. City of Norfolk, Va.*, 816 F.2d 932, 935 (4th Cir. 1987); *see also, e.g., Gingles*, 478 U.S. at 51, 61–62; *Sanchez*, 97 F.3d at 1321; *Gomez v. City of Watsonville*, 863 F.2d 1407, 1416 (9th Cir. 1988).

[597] *See Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1040 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018).

[598] *See Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1208 (5th Cir. 1989) ("To the extent that these comments indicate that the district court believed that plaintiffs could not, as a matter of law, make out a vote dilution claim based on evidence of racially polarized voting drawn from elections other than the aldermanic elections themselves, this view is incorrect under both *Gingles* and *Citizens for a Better Gretna*."); *Cane v. Worcester Cnty., Md.*, 840 F. Supp. 1081, 1088 (D. Md. 1994).

[599] *Gingles*, 478 U.S. at 57 n.25 ("The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances."); *see also Cane*, 840 F. Supp. at 1088 (relying on exogenous elections and testimony that changes from at-large to single member system mitigates discouragement of the minority community to elect candidates of choice satisfied *Gingles* II.).

racial bloc voting over time is probative of *Gingles*' second and third preconditions."[600] As such, the size of a jurisdiction's population or the number of voting precincts evaluated also does not hinder a finding of political cohesion.[601]

In analyzing the evidence Plaintiffs presented in support of *Gingles* II, the Court credits and relies heavily on the testimony of Plaintiffs' expert Dr. Matt Barreto and concludes that Latino voters in Dodge City are political cohesive. This Court finds that Plaintiffs have proven that Latino voters vote cohesively over an extensive period of time. *See supra*. Plaintiffs have offered overwhelming and largely undisputed evidence that over a ten-year period, the electorate within Dodge City exhibits racial polarization. FOF ¶¶ 142-189. The point estimates, "which are undisputedly the 'best estimates' in the data"[602] shows that Latinos in Dodge City vote in favor of preferred candidates and do so in an established pattern over 24 elections in 9 election cycles. FOF ¶¶ 143-145.  Latino voter cohesion was clear in all of the Dodge City Commission elections analyzed, in which Latino voters strongly supported a preferred candidate. FOF ¶ 146. In all of those elections, the Latino-preferred candidate did not win election, in large part because they were

---

[600] *Sanchez*, 97 F.3d at 1317 n.29; *see also Cuthair v. Montezuma-Cortez, Colo. Sch. Dist. No. RE-1*, 7 F. Supp. 2d 1152, 1167 (D. Colo. 1998) ("[Racially polarized voting and bloc voting] is determined on a sliding scale. It varies based on the district and a variety of other circumstances.").

[601] *See Windy Boy v. Big Horn Cnty.*, 647 F. Supp. 1002, 1004 (D. Mont. 1986) (finding a Section 2 violation in a county that has a total population of 11,096.); *U.S. v. Blaine Cnty., Montana*, 363 F.3d 897, 910 (9th Cir. 2004) (affirming a finding of a Section 2 violation in a jurisdiction with 7,009 residents, almost four times less populous than Dodge City); *Cuthair*, 7 F. Supp. 2d at 1154 (finding a Section 2 violation where about 600 total votes were cast in the relevant election); *Cane v. Worcester Cnty, Md.*, 35 F.3d 921, 923 (4th Cir. 1994) (finding a Section 2 violation in a county with a total population of about 35,000); *Potter v. Washington Cnty., Fla.*, 653 F. Supp. 121, 122 (N.D. Fla. 1986) (approving a consent decree finding Section 2 effects liability for a jurisdiction that is has a total population of 14,509).

[602] *Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *11 (N.D. Tex. Aug. 2, 2012).

one of the least preferred candidates among the white population. FOF ¶¶ 147-150. In both local and statewide exogenous elections, Latino voters also demonstrated strong cohesion, upwards of over two-thirds and in some cases over 75% cohesion for preferred candidates. FOF ¶¶ 157-158. The Latino-preferred candidates identified over the twenty-four elections analyzed were different than the white-preferred candidates in Dodge City. FOF ¶¶ 121; 147-161; 174. Indeed, on average Latinos who are clustered in South Dodge gave more vote share to a certain, preferred candidate, such as Liliana Zuniga. FOF ¶ 147.

While Latino voters have different vote choices than white voters in Dodge City, this does not mean that voters have any racial animosity, but instead simply that voters of different racial or ethnic groups within Dodge City express opposite electoral preferences. FOF ¶¶ 179-188. Simply put, Plaintiffs have demonstrated clearly that Latino voters have different vote choices in City, Ford County, and Statewide elections than non-Hispanic white voters.

While Dodge City is a small jurisdiction, it is not the case that racial polarization cannot be determined. If the number of precincts was a barrier to determine racial polarization, jurisdictions around the country could limit the number of voting precincts such that racially polarized voting could never be examined. This cannot be so. Plaintiffs' evidence demonstrates that the use of BISG can allow for the determination of cohesion and voter preference in jurisdictions with limited number of precincts. FOF ¶¶ 128-135. Defendant's expert's assertions that Dodge City is too small of a jurisdiction to determine if polarized voting is occurring is unpersuasive. FOF ¶¶ 196-198. Indeed, polarized voting has often been found in comparably-sized or smaller jurisdictions than Dodge City.[603] Additionally, since *Gingles* instructs a local appraisal

---

[603] *See Blaine Cnty., Montana*, 363 F.3d at 910 (affirming a finding of a Section 2 violation in a jurisdiction of 7,009, almost four times less populous than Dodge City); *Cuthair*, 7 F. Supp. 2d at 1154 (finding a Section 2 violation and racially polarized voting in at-large elections where about

when evaluating minority group cohesion, Plaintiffs produced evidence that Latino voters who are primarily located within South Dodge City, which is located below Camanche Street, have different vote choices than the non-Hispanic white voters who live primarily in North Dodge. FOF ¶ 186. This evidence also shows both Latino cohesion and non-Hispanic white cohesion in Dodge City Commission elections. As such, the Court places weight on Plaintiffs' evidence that different areas of Dodge City have different candidate and vote choice preferences. Plaintiffs also provided ample evidence of non-statistical cohesion among Latinos in Dodge City, in that Latino voters had preferred candidates in Dodge City Commission elections. FOF ¶¶ 204-207.

Once again, as noted *supra*, the vast majority of Plaintiffs' evidence on racial polarization is uncontested. Dr. Katz's opinions are extremely limited. He did not run King's EI analysis for *any* of the 24 elections that Dr. Barreto examined, meaning that Dr. Barreto's King's EI analysis is fully unrebutted. FOF ¶ 163. And Dr. Katz only ran an RxC EI analysis for *four* out of those 24 elections, meaning that his RxC EI analysis itself ignores 20 out of 24 elections at issue. FOF ¶ 191. This leaves Dr. Barreto's testimony largely untouched.

Dr. Katz claims that evaluating exogenous elections would not be "helpful," *see* FOF ¶ 192, but he provides no authority to support this proposition. Indeed, federal appellate courts and the law of the case dictate that exogenous elections—while not as probative as endogenous elections— are no doubt "probative" for determining racial cohesion.[604] Dr. Katz ignored several exogenous

---

600 total votes were cast); *Cane v. Worcester Cnty, Md.*, 35 F.3d 921, 923 (4th Cir. 1994) (finding a Section 2 violation in a county of about 35,000); *Windy Boy v. Big Horn Cnty.*, 647 F. Supp. 1002, 1004 (D. Mont. 1986) (finding a Section 2 violation in a county of 11,096); *Potter v. Washington Cnty., Fla.*, 653 F. Supp. 121, 122 (N.D. Fla. 1986) (approving a consent decree finding Section 2 effects liability for a jurisdiction that is has a total population of 14,509).

[604] *Rodriguez v. Bexar Cnty., Tex.*, 385 F.3d 853, 860 n.5 (5th Cir. 2004) ("This court has repeatedly endorsed the analysis of exogenous elections in Section 2 vote dilution cases."); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021 (8th Cir. 2006) ("[E]xogenous elections hold some probative value."); *Coca v. City of Dodge City*, No. 22-1274-EFM, 2023 WL 8545263, at *6 (D. Kan. Dec.

elections that were substantially similar to the Dodge City Commission elections—multi-candidate, local, nonpartisan, and off-cycle elections—that demonstrated stark evidence of polarization. *Id.* Moreover, Dr. Katz testified that he had the ability to analyze all of the elections that Dr. Barreto examined, but simply choose not to. *Id.* It is surprising that Dr. Katz chose only to analyze four elections, given that another court rejected Dr. Katz's conclusion that statistically significant evidence of racially polarized voting did not exist based on analysis of a limited number of elections.[605] Similarly, this Court finds that Dr. Katz's conclusion that there is no statistically significant evidence of racially polarized voting based on his analysis of only four elections is insufficient to rebut Dr. Barreto's findings.

Further, the minimal analysis that Dr. Katz conducted is largely unpersuasive. Dr. Katz received similar point estimates to Dr. Barreto in the only four elections that Defendant analyzed, meaning that both experts largely agree on the point estimates for the RxC EI analysis. FOF ¶ 194. This means that both experts agree on the likeliest estimates for vote share, which weighs in favor of polarization and bolsters Dr. Barreto's analysis.

And this Court rejects Dr. Katz's two major criticisms of Dr. Barreto's report. This Court, like others, finds that ecological inference analysis does not require the presence of homogenous precincts to be accurately conducted given that both experts received similar point estimates.[606] FOF ¶¶ 196-197. Rather, conclusions reached through ecological inference analysis of non-

---

11, 2023) (noting courts "uniformly recognize the[] relevance [of exogenous elections] in voting dilution cases, especially when data concerning endogenous elections is limited.") (Melgren, J.).

[605] *Soliz v. Santa Clarita Comm. Coll. Dist.*, No. BC512736, 2014 WL 3555687, at *2 (Cal.Super. June 09, 2014).

[606] *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1123 (E.D. Cal. 2018). ("Dr. Katz admitted that Gary King, the political scientist who developed EI [(Ecological Inference)], indicated no bright line percentage of homogeneous precincts is necessary in order for ecological inference estimates to be reliable.").

homogenous precincts are no more statistically uncertain than those reached through analysis of homogenous precincts. *Id.*

Additionally, Dr. Katz's argument regarding confidence intervals or bands are also unpersuasive. FOF ¶¶ 199-200. As Dr. Barreto explained, and as many courts have found, when analyzing the statistical evidence put on by plaintiffs to demonstrate political cohesion, courts have relied on point estimates—especially where, as here, the point estimates are consistent across elections. FOF ¶ 200. "[P]oint estimates [] are undisputedly the best estimates in the data" for determining racially polarized voting.[607] Indeed, as a federal court recently noted, "point estimates are the most likely outcomes," especially when "similar results repeat[] year after year," and, therefore, it is not necessary to "rely on confidence intervals where voting patterns were consistent."[608] Courts in Section 2 cases have denied similar arguments regarding broad confidence intervals made by Dr. Katz, and instead have found that broad confidence intervals do not defeat a finding of voter cohesion, especially when point estimates are consistent.[609] This is especially the case when Latino turnout is low, such as in Dodge City.[610]

---

[607] *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13-CV-0087-D, 2014 WL 4055366, at *12 (N.D. Tex. Aug. 15, 2014) (internal citation omitted); *Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *10 (N.D. Tex. Aug. 2, 2012) (same).

[608] *NAACP, Spring Valley Branch v. East Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 390 (S.D.N.Y. 2020); *see also Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1309 (N.D. Ga. 2022) (crediting racially polarized voting expert who conducted ecological regression and Kings ecological inference as reliable and qualified despite not using confidence intervals with her analysis).

[609] *Montes*, 40 F. Supp. 3d at 1404–05; ( "[T]he Court respectfully declines Defendant's invitation to reject Dr. Engstrom's analysis on the basis of the challenged confidence intervals."); *Fabela v. City of Farmer's Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *10 (N.D. Tex. Aug. 2, 2012).

[610] *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1404–05 (E.D. Wash. 2014) ("[I]f low voter turnout could defeat a section 2 claim, excluded minority voters would find themselves in a vicious cycle: their exclusion from the political process would increase apathy, which in turn would

Dr. Katz's criticism does not just cut against federal courts' findings around the country, but against his own work. As noted *supra*, Dr. Katz, in his peer-reviewed published work, has made findings about likely vote choice in the face of confidence intervals with heavy overlap, and indeed in this case relied on BISG estimates without disclosing the associated confidence intervals. FOF ¶¶ 201-202. Plaintiffs do not need to carry their burden at the 95 percent statistical level; Plaintiffs' largely unrebutted evidence demonstrates Latino voter cohesion in Dodge City by a preponderance of the evidence.[611]

Taken together, the undisputed King's EI statistical analysis of twenty-four elections, the RxC EI analysis of twenty-four elections, and the non-statistical evidence of cohesion all support the conclusion that Latino voters are politically cohesive, and that cohesion is distinctly evident over a period of time.[612] The Court finds that Plaintiffs have met *Gingles* II.

### C.  *Gingles* III

The final *Gingles* precondition, *Gingles* III, requires that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."[613] Many of the legal standards outlined in the section on *Gingles* II also govern the *Gingles* III inquiry, but the Court makes note of a few additional areas of applicable law.

---

undermine their ability to bring a legal challenge to the discriminatory practices, which would perpetuate low voter turnout, and so on.").

[611] *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1123–24 (E.D. Cal. 2018) ) ("Dr. Katz admitted that Gary King, the political scientist who developed EI [(Ecological Inference)], indicated no bright line percentage of homogeneous precincts is necessary in order for ecological inference estimates to be reliable.").

[612] *Sanchez*, 97 F.3d at 1312–13.

[613] *Id.* at 1310; *Gingles*, 478 U.S. at 90 (O'Connor, I., concurring).

As the Tenth Circuit has made clear, "[r]acial polarization or bloc voting 'exists where there is a consistent relationship between the race of the voter and the way in which the voter votes . . . or to put it differently, where [minority] voters and white voters vote differently.'"[614] *Gingles* III has "no simple doctrinal test" and can "vary according to a variety of factual circumstances."[615] Bloc voting is determined on a sliding scale that varies and there needs to be "a flexible approach, noting that the isolated success of a minority candidate in a district that usually exhibits vote polarization will not alone negate plaintiffs' showing."[616] "[W]hile legally significant white bloc voting enables the majority 'in the ordinary course, to trounce minority-preferred candidates most of the time,' its presence may be more subtle requiring close inquiry over time.[617]

Based on the evidence presented at trial, the Court concludes that white voters in Dodge City are political cohesive and vote at a sufficient rate to usually defeat Latino-preferred candidates. FOF ¶¶ 174-175. The evidence shows that white voters in Dodge City vote cohesively and in opposition to Latino voters in almost all elections and that they do so at a rate sufficient to usually defeat the minority-preferred candidate consistently. *Id.*

Defendant did not dispute the King's EI statistical evidence presented by Dr. Barreto demonstrating that over a ten-year period, white voters in Dodge City voted cohesively in both exogenous and endogenous elections. FOF ¶ 163. As noted above, Dr. Katz analyzed only four elections only using the RxC methodology, and did not state whether white voters were cohesive or not in those only four elections. FOF ¶ 191. Indeed, he admitted that in the 2017 Dodge City

---

[614] *Sanchez*, 97 F.3d at 1312.

[615] *See Gingles*, 478 U.S. at 57–58.

[616] *Sanchez*, 97 F.3d at 1313.

[617] *Id.* at 1312.

Commission election, candidate Zuniga—who lost that election—was least preferred among white voters. As stated above, based on a local appraisal, all types of elections are probative for determining political cohesion within Dodge City. Defendant did not produce any evidence that rebuts a showing that white voters are cohesive and bloc vote in exogenous elections. Further, white voters within Dodge City are a larger percent of the electorate and vote at higher rates in elections than Latino voters. FOF ¶¶ 51-55. Because white voters make up a larger share of actual voters in Dodge City, their voting strength and levels of cohesion work together to usually bloc Latino-preferred candidates in both local and statewide elections. FOF ¶ 176. Additionally, over a twenty-five-year period, just two Latinos have been elected to the Dodge City Commission, FOF ¶ 322, one of which has been identified as not being a Latino-preferred candidate. FOF ¶ 207, 342. The lack of Latino candidates being elected in the history of the at-large voting system in Dodge City is powerful evidence that the non-Latino majority will "usually" defeat the Latino minority's preferred candidate.[618] The ability of the majority to "usually" defeat the minority's preferred candidate is borne out by the statistical evidence. FOF ¶ 121.

The undisputed evidence shows that white voters in Dodge City vote cohesively and in opposition to Latino voters in almost all elections and that they do so at a rate sufficient to defeat the minority-preferred candidate consistently. FOF ¶ 121. As such, the Court finds that—like *Gingles* II—*Gingles* III has been met.

In reaching this conclusion, the Court gives considerable weight to the following: (i) Plaintiffs' quantitative expert's results were largely uncontested, (ii) Plaintiffs analyzed a sufficient

---

[618] *See Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1405 (E.D. Wash. 2014) ("At the outset, it bears noting that no Latino candidate has *ever* been elected to the Yakima City Council in the history of the current at-large voting system. This is powerful evidence that the non-Latino majority will 'usually' defeat the Latino minority's preferred candidate.").

number of local and state elections to demonstrate both Latino and white political cohesion within Dodge City utilizing both King's EI and RxC EI, and (iii) Defendant did not deny the existence of racially polarized voting occurring in Dodge City, and (iv) Defendant's expert did not conduct a full racially polarized voting analysis in that his analysis lacked sufficient elections to discern whether a pattern of polarized voting existed. Further, in reaching this conclusion, the Court is not suggesting that non-Latinos in Dodge City are deliberately conspiring to outvote their Latino counterparts nor that they vote with any racial intent or wrongdoing. As stated above, intent is not relevant in a Section 2 *effects* claim.[619] Plaintiffs have made a compelling showing that it is more likely than not that Latino voters and white voters within Dodge City have different and distinct electoral preferences. FOF ¶ 121, 143-189. Plaintiffs have proven based on a preponderance of the evidence that the electorate in the City of Dodge City is racially polarized, and therefore, satisfied *Gingles* II and III.

In sum, Plaintiffs have satisfied all three *Gingles* preconditions.

## II.   Plaintiffs Have Demonstrated a Section 2 Violation, Considering the Totality of the Circumstances

Having found that the Plaintiffs satisfied the *Gingles* preconditions, this Court must next determine whether "the totality of the circumstances reveal that the [minority group's] . . . members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[620] To determine whether vote dilution exists under the totality of the circumstances, the Court conducts "a searching practical evaluation of the past and

---

[619] *See Gingles,* 478 U.S. at 70–71; *Jenkins,* 4 F.3d at 1123; *Montes,* 40 F. Supp. 3d at 1407.

[620] *Gingles,* 478 U.S. at 43 (internal quotations omitted).

present reality," which is an analysis "peculiarly dependent upon the facts of each case . . . and requires an intensely local appraisal."[621] "The lack of electoral *opportunity* is the key."[622]

As federal appeals courts around the country have found, "it will be only the very unusual case in which [the plaintiffs] can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances."[623] If Plaintiffs have satisfied the *Gingles* preconditions but a court determines the totality of the circumstances does not show vote dilution, "the district court must explain with particularity why it has concluded, under the particular facts of that case, that an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act."[624]

To undertake the totality-of-the-circumstances determination, courts use the nine factors specified in a report of the Senate Judiciary Committee accompanying the 1982 amendments to the Voting Rights Act, known as the "Senate Factors."[625] The nine Senate Factors are:

> (1) "[T]he extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group . . . to participate in the democratic process;
>
> (2) [T]he extent to which voting in the elections of the state or political subdivision is racially polarized;

---

[621] *Gingles*, 478 U.S. at 45, 79 (internal quotation marks and citations omitted).

[622] *Sanchez*, 97 F.3d at 1310 (emphasis removed).

[623] *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993); *Wright v. Sumter Cnty. Bd. Of Elections and Registration*, 979 F.3d 1282, 1304 (11th Cir. 2020) (internal citations omitted); *Sanchez*, 97 F.3d at 1303, 1322; *Clark v. Calhoun Cnty., Miss.*, 21 F.3d 92, 97 (5th Cir. 1994).

[624] *Jenkins*, 4 F.3d at 1135.

[625] *Gingles*, 478 U.S. at 36–37, 44–46.

(3) [T]he extent to which the state or political subdivision has used . . . voting practices or procedures that may enhance the opportunity for discrimination against the minority group[,]" such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

(4) "[I]f there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) [T]he extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process;"

(6)  The use of over or subtle racial appeals in political campaigns;

(7) "[T]he extent to which members of the minority group have been elected to public office in the jurisdiction;"

(8) Evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group; and

(9) That the policy underlying the state's or the political subdivision's use of the contested practice or structure is "tenuous."[626]

The Senate factors are "neither comprehensive nor exclusive," and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."[627] "When combined with the *Gingles* preconditions, any one factor or combination of factors may be sufficient, but are not necessary in whole or part, for a Section 2 violation."[628] The Supreme Court has explained that "the most important" Senate Factors are Senate Factor 7 (the "extent to which minority group members have been elected to public office in the jurisdiction") and Senate Factor 2 (the "extent to which voting in the elections of the state or political subdivision

---

[626] *Id.* at 36–37.

[627] *Id.* at 45 (internal citations omitted).

[628] *Clerveaux v. E. Ramapo Cent. School Dist.*, 984 F.3d 213, 231 (2d Cir. 2021); *see Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1249–50 (5th Cir 1988) (finding totality of circumstances met with just Senate Factors 2, 5, and 7, and explicitly rejecting the argument that "responsiveness precludes a finding of a § 2 violation").

is racially polarized").[629] Indeed, Senate Factors 2 and 7 "predominate the totality-of-circumstance analysis."[630]

The Senate Report "emphatically rejects" mechanistic application of the Senate Factors.[631] As such, courts may look beyond the political subdivision at issue and consider evidence relating to the broader context in which the jurisdiction is situated.[632] Each Senate Factor and the Court's conclusions of law related thereto is discussed below.

### A.  Senate Factor 1

There is some evidence of a history of official discrimination within Dodge City and Kansas that has impacted the right of Latinos in Dodge City to participate in the democratic process. When drafting Senate Factor 1, "Congress was concerned not only with present discrimination, but with the vestiges of discrimination which may interact with present political structures to perpetuate a historical lack of access to the political system."[633] Evidence that is relevant under

---

[629] *Gingles*, 478 U.S. at 48 n.15 (internal quotation marks omitted).

[630] *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1063 (E.D. Mo. 2016), aff'd, 894 F.3d 924 (8th Cir. 2018); *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006); *Gingles*, 478 U.S. at 48–49 n.15.

[631] *United States v. Blaine Cnty., Mont.*, 363 F.3d at 913.

[632] *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 940 (8th Cir. 2018) (finding it appropriate for courts to evaluate "statewide data or expert testimony applying general data to the [jurisdiction]" under Senate Factors 1, 3, and 5); *see also United States v. Blaine Cnty., Montana*, 363 F.3d at 913 (rejecting defendant's argument that "the district court could only look at official discrimination by [the defendant] County, not the state or federal government).

[633] *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 778–79 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015); *Gingles,* 478 U.S. at 69 ("Congress intended that the Voting Rights Act eradicate inequalities in political opportunities that exist due to the vestigial effects of past purposeful discrimination.").

this Senate Factor includes statewide data applying to the jurisdiction, evidence of past voting rights lawsuits or settlements within the state and region in which the jurisdiction is located, and the existence of racially segregated schools and public facilities.[634] Lay witness testimony is relevant and highly credible in evaluating Senate Factor 1.[635]

Plaintiffs have provided contemporaneous evidence that there have been voting rights issues within Ford County that apply to Latinos in Dodge City. FOF ¶¶ 216-233. Specifically, there was a lawsuit against Ford County in 2018 concerning the movement of the sole voting location in Dodge City and lack of sufficient notice to voters in Dodge City of the move. FOF ¶¶ 220, 222. A Congressional report found that the movement of the polling location was a voter suppressive action by the Ford County Clerk and done without proper community input from the Latino community. FOF ¶ 221. The Court notes that in *Fish v. Kobach*, 309 F. Supp. 3d 1048 (D. Kan. 2018), *aff'd sub nom. Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020), two Kansas statutes were found to violate the National Voter Registration Act and infringe the rights of Kansas voters under the Fourteenth Amendment. While *Fish* does not directly concern Dodge City or Ford County, the Senate Factor 1 inquiry looks to statewide and a regional history of discrimination as state laws and barriers obviously effect local jurisdictions.[636] The Court finds these two recent instances of voting related discrimination probative.[637] Furthermore, several witnesses—including former

---

[634] *See Rodriguez* 964 F. Supp. 2d at 778–79; *Mo. NAACP*, 894 F.3d at 940; *see also Blaine*, 363 F.3d at 913; *Soto Palmer v.* Hobbs, No. 3:22-CV-05035-RSL, 2023 WL 5125390, at *7 (W.D. Wash. Aug. 10, 2023).

[635] *See Soto Palmer,* 2023 WL 5125390 at *7; *Rodriguez,* 964 F. Supp. 2d at 779.

[636] *See Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1066–72 (E.D. Mo. 2016), aff'd, 894 F.3d 924 (8th Cir. 2018)

[637] Montes v. City of Yakima, 40 F. Supp. 3d 1377, 1409–10 (E.D. Wash. 2014).

Dodge City Commissioner Scoggins—testified about discrimination and segregation against Latinos in Dodge City. Ms. Scoggins testified about an area in South Dodge City called "Mexican Village" that was south of the railroad tracks and where Latino rail workers resided. FOF ¶¶ 227; *see also* FOF ¶ 279. The Latino residences in the Mexican Village did not have running water and their children were not allowed to attend public schools. FOF ¶¶ 227, 229. Ms. Scoggins discussed how Latinos were not allowed in stores in North Dodge when she was young. FOF ¶ 227. When Ms. Scoggins was growing up in Dodge City, Latino residents were only allowed to swim in Dodge City park facilities during "free day," which was the last day before the City drained the pool and put in new water. FOF ¶ 228, *see also* FOF ¶ 280. Ms. Scoggins testified that the Dodge City schools had to be desegregated. FOF ¶ 229. The effects of this segregation can be felt today, as Latino residents still live primarily in South Dodge City and the Latino students in Dodge City schools have lower educational achievement than white students. FOF ¶¶ 231-232.

Given both the recent voting rights litigation and testimony regarding a history of segregated facilities in Dodge City, the Court finds this factor weighs slightly in Plaintiffs' favor.

## B.  Senate Factor 2

The second Senate Factor is "the extent to which voting in the elections of the state or political subdivision is racially polarized."[638] "Although no [Senate Factor] is indispensable, the legislative history of the amendment to section 2 indicates that racially polarized voting will ordinarily be the keystone of a dilution case."[639] For the reasons discussed above in conjunction

---

[638] *Gingles*, 478 U.S. at 37.

[639] *McMillian v. Escambia Cnty.*, 748 F.2d 1037, 1043 (5th Cir. 1984); *see also Gingles*, 478 U.S. at 51 n.15.

with the second and third *Gingles* preconditions, the Court finds that elections are marked by racial polarization. FOF ¶ 234. As such, this factor weighs very strongly in favor of Plaintiffs.

### C. Senate Factor 3

Based on the evidence at trial regarding Senate Factor 3, this Court finds that this factor weighs in favor of Plaintiffs. It is important to note that this Senate Factor does not examine intent nor ask *why* an election practice was selected or utilized; the inquiry is whether or not a subdivision uses a practice that has the *effect* of enhancing the opportunity for discrimination.[640] For purposes of satisfying Senate Factor 3, these voting practices or procedures need not be "the but-for cause of a minority candidate's electoral defeat."[641] Voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group include at-large electoral systems, off-year elections, staggered terms, and inconveniently located polling locations or limited polling locations.[642] Here, Dodge City employs several voting practices or procedures that may enhance the opportunity for discrimination against the Latino community in at least three ways.

Dodge City continues to utilize at-large elections, off-cycle elections, and differential terms, FOF ¶¶ 236-257, three practices that courts have repeatedly found to enhance the opportunity of

---

[640] *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 402 (S.D.N.Y. 2020), (citing *Gingles*, 478 U.S. at 37, 45), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.,* 984 F.3d 213 (2d Cir. 2021).

[641] *Luna v. Cnty. Of Kern*, 291 F. Supp. 3d 1088, 1136 (E.D. Cal. 2018).

[642] *See Large v. Fremont Cnty., Wyo.*, 709 F. Supp 2d 1176, 1216–17 (D. Wyo. 2010); *Soto Palmer v. Hobbs*, NO. 3:22-cv-05035-RSL, 2023 WL 5125390 at *7–8 (W.D. Wash. 2023); *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 401–02 (S.D.N.Y. 2020) ("The District holds at-large, staggered, off-cycle elections with numbered posts, all of which have the effect of diluting minority votes."), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021); *United States v. Village of Port Chester*, No. 06-CV-15173, 2008 WL 190502, at *28 (S.D.N,Y, Jan. 17, 2008); *Luna v. Cnty. Of Kern*, 291 F. Supp. 3d 1088, 1136 (E.D. Cal. 2018).

discrimination and satisfy Senate Factor 3. [643] As to Dodge City's at-large election system, Congress and the Supreme Court have recognized that "among the most common [election schemes which enhance vote dilution] are at-large elections…"[644] As Dr. Bejarano testified, and Defendant does not contest, the political science literature is clear that at-large election systems both hamper descriptive representation for Latinos by making it harder for Latinos to win office, and hamper substantive representation for Latinos such that their representatives are less responsive to their concerns and needs. FOF ¶¶ 237-241, 245. Dr. Bejarano also testified that the political science literature is clear that *switching* from at-large to single-member district systems increases the opportunity for Latinos to win office in a jurisdiction, particularly when the Latino population is of a sufficient size (about 30-to-40 percent of the population) and racially segregated—both of which are the case in Dodge City. FOF ¶¶ 242-244. Defendant's own expert acknowledges that moving from at-large to single-member districts has at least "some effect" on the election of Latinos to office, and acknowledges that her incomplete literature review did not address articles that found significant increases in Latino representation in municipal government upon switching from at-large to single-member districts. FOF ¶¶ 249-252.

Further, as other courts have noted, "off-cycle elections also enhance the opportunity for discrimination" because the unrebutted testimony is that minority groups have a larger drop-off in turnout from presidential to off-cycle elections as compared to whites, *see* FOF ¶¶ 253-256, and

---

[643] *See Large v. Fremont Cnty., Wyo.*, 709 F. Supp 2d 1176, 1216–17 (D. Wyo. 2010); *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1136; (E.D. Cal. 2018); *Soto Palmer v. Hobbs*, No. 3:22-cv-05035-RSL, 2023 WL 5125390 at *7–8 (W.D. Wash. 2023).

[644] *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1136; (E.D. Cal. 2018); *Rogers v. Lodge*, 458 U.S. 613, 616 (1982) ("At-large voting schemes and multimember districts tend to minimize the voting strength of minority groups by permitting the political majority to elect all representatives of the district.") (emphasis in original).

because they "increase the relative influence of well-organized interest groups in maintaining the status quo."[645] While Plaintiffs no longer seek to move from off-cycle to on-cycle elections as a *remedy*, the case law is clear that off-cycle elections are a type of election practice "that tend[s] to enhance the opportunity for discrimination"—which is all that is required to satisfy Senate Factor 3. [646] Thus, while off-cycle/odd-numbered year elections are themselves lawful, their use in combination with the at-large method of election hampers the opportunity of minorities to vote for candidates of choice, and is thus probative of Senate Factor 3. FOF ¶¶ 254-256.

Finally, Dodge City's differential length of terms compounds the dilutive nature of its at-large election system. Courts have also concluded that staggered terms for elected officials enhance opportunities for discrimination against minorities, because this prevents strategic "bullet voting" by the minority group in elections with multiple winners.[647] The unrebutted testimony from Dr. Bejarano is that the challenges that make it difficult for Latinos to win election citywide are the

---

[645] *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1079–80 (E.D. Mo. 2016), *aff'd* 894 F.3d 924 (8th Cir. 2018); *see also, e.g.*, *Ketchum v. Byrne*, 740 F.2d 1398, 1404 n.5 (7th Cir. 1984); *NAACP, Spring Valley Branch,* 462 F. Supp. 3d at 401.

[646] *Id.* (quoting *Gingles*, 478 U.S. at 37, 45); *see also generally NAACP, Spring Valley Branch,* 462 F. Supp. 3d at 409 "[T]he third Senate Factor does not examine intent; rather, it asks whether the subdivision has used election practices "that tend to enhance the opportunity for discrimination." (citing *Gingles*, 478 U.S. at 37, 45)).

[647] "When all candidates for a legislative body are elected at-large at the same time, a minority group still has the opportunity to elect a minority-preferred candidate through bullet voting, also known as one-shot voting. Minority voters can concentrate their vote on electing one minority-preferred candidate, while the majority vote will be split among the majority candidates." *Blaine*, 363 F.3d, at 913 n.25; *see id.* at 913–14; *Wright*, 979 F.3d at 1295–96 (Senate Factor 3 weighed slightly in favor of the plaintiff because the county used "staggered terms for the at-large seats"); *United States v. Charleston Cnty., S.C.*, 365 F.3d 341, 351 (4th Cir. 2004); *Collins v. City of Norfolk, Va.*, 883 F.2d 1232, 1236 (4th Cir. 1989); *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995) ("The majority vote requirement, staggered terms, and at-large structure also tend to suppress minority voters' influence.").

*same* challenges that make it difficult for Latino candidates to finish among the top two candidates and win a four-year term. FOF ¶¶ 246-248.

Because Dodge City uses these voting practices, and because these practices enhance the opportunity for discrimination against Latinos, Senate Factor 3 weighs in favor of Plaintiffs.

### D.  Senate Factor 4

While there appears to be some candidate slating in the Dodge City Commission elections, there is no evidence in the record that Latinos have been denied access to those slates. It is noteworthy, however, that the candidate slate introduced into evidence was in fact for a particular political party, which cuts against the City's theory that its at-large elections foster unity because they are non-partisan. FOF ¶¶ 308, 437.

### E.  Senate Factor 5

Under Senate Factor 5, Plaintiffs are required to "demonstrate both depressed political participation and socioeconomic inequality, but need not prove any causal nexus between the two."[648] The Court concludes that there is evidence of stark socioeconomic disparities between Latinos and whites in Dodge City, historical discrimination against Latinos, and depressed voter turnout among Latinos.

Plaintiffs have offered overwhelming, unrebutted evidence through the testimony of Dr. Bejarano that the Latino community in Dodge City has long-suffered, and continues to suffer, socioeconomic and other disparities in various aspects of life that impair their ability to participate in the political process—in median household income, poverty rates, child poverty rates,

---

[648] *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1137 (E.D. Cal. 2018) (finding Senate Factor 5 weighed in plaintiffs' favor where Latinos "constitute the majority of the population in Kern County (50.4 percent in 2014), [but] have been unable to influence elections commensurate with their population size because they form a much smaller percentage of the electorate and are socioeconomically disadvantaged compared to non-Hispanic whites.").

unemployment rates, high school graduation rates, college graduation rates, health insurance rates, homeownership rates, median home values, and voter registration and turnout rates. FOF ¶¶ 259-276. These are precisely the sort of indicators that support a finding that Senate Factor 5 is met.[649] And, because there is a multitude of disparities, more weight is afforded to Plaintiffs' position.[650]

"Plaintiffs are not required to prove a causal connection between [the effects of discrimination] and a depressed level of political participation."[651] "Rather, the burden is on those who deny the causal nexus to show that the cause is something else."[652]

Defendant does not seriously dispute that Latinos in Dodge City suffer from disparities in nearly every facet of life, from socioeconomic indicators such as employment, income, poverty, and education, to health and housing. Defendant also does not dispute that these disparities have the effect of making it harder to participate in the political process, or that minority participation is depressed. Defendant suggested at trial that things have improved over time for Latinos; that

---

[649] *Cuthair v. Montezuma-Cortez, Colo. Sch. Dist. No. RE-1*, 7 F. Supp. 2d 1152, 1169–70 (D. Colo. 1998); *Wright v. Sumter Cnty. Bd. Of Elections and Registration*, 979 F.3d 1282, 1294–95 (11th Cir. 2020); *United States v. Blaine Cnty., Mont.*, 363 F.3d 897, 914 (9th Cir. 2004); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1037–38 (D.S.D. 2004); *United States v. Berks Cnty., Pa.*, 277 F. Supp. 2d 570, 580–81 (E.D. Pa. 2003); *Jeffers v. Clinton*, 730 F. Supp. 196, 211 (E.D. Ark. 1989), *aff'd*, 498 U.S. 1019 (1991); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1069–73 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 435–36, 445 (S.D.N.Y. 2010).

[650] *Wright v. Sumter Cnty. Bd. Of Elections and Registration*, 979 F.3d 1282, 1294–95 (11th Cir. 2020).

[651] *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 294 (5th Cir. 1996); *U.S. v. Village of Port Chester*, 2008 WL 190502, at *29–30 (S.D.N.Y. 2008); *Whitfield v. Democratic Party of State of Ark.*, 890 F.2d 1423, 1430–31 (8th Cir. 1989) (similar); S. Rep. No. 97–417, at 29 n.144 (1982) (similar).

[652] *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1038 (D.S.D. 2004); *Marengo Cnty. Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984) ("when there is clear evidence of present socioeconomic or political disadvantage . . . the burden is not on the plaintiffs to prove that this disadvantage is causing reduced political participation"); *Wright*, 979 F.3d at 1294.

argument ignores that wide disparities exist and in fact in many areas have *widened* over time. FOF ¶ 276.

Dr. Martinez's testimony further supports a finding that Latinos have experienced discrimination in Dodge City and Kansas, including segregation in schools and public accommodations and racially restrictive covenants. FOF ¶¶ 277-285. Testimony from lay witnesses confirms this history and also speaks to the hostilities faced by Latinos in day-to-day life in Dodge City and as advocates for the Hispanic community. FOF ¶¶ 286-311.

Importantly, courts routinely conclude that Senate Factor 5 is met without an express finding of causation between past discrimination and present socioeconomic inequalities, and have done so where Latinos were the minority population at issue.[653] Such a finding of definitive

---

[653] *See, e.g.*, *Sanchez v. State of Colo.*, 97 F.3d 1303, 1323 (10th Cir. 1996) (finding factor 5 favored plaintiffs when "poverty, unemployment, school drop-out, housing, and alcoholism disproportionately affect the Hispanic community," even though defendant's witness testified that "today, 'Hispanics have equal access to education, jobs, and loans'"); *U.S. v. Blaine Cnty., Montana*, 363 F.3d 897, 914 (9th Cir. 2004) ("[T]he County contends that there is no causal link between discrimination and whatever socioeconomic disparities might exist."); *NAACP, Spring Valley Branch v. East Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 408 (S.D.N.Y. 2020) ("This factor concerns how blacks and Latinos are doing socioeconomically compared to whites in the District… Plaintiffs have shown that blacks and Latinos in the District lag behind whites socioeconomically . . . Thus, Senate Factor 5 weighs in Plaintiffs' favor[.]"), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021); *U.S. v. Village of Port Chester*, 2008 WL 190502, at *29–30 (S.D.N.Y. 2008); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1413 (E.D. Wash. 2014) (finding that Senate Factor 5 weighed in favor of the Plaintiffs over the defendant's argument that the socioeconomic disparities could not be attributed to discrimination); *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1137–38 (E.D. Cal. 2018) (finding factor 5 favored plaintiffs even when "Latino educational attainment [] had improved," because "defendants did not present evidence at trial that there currently is no education gap between Latinos and non-Hispanic whites"); *United States v. Osceola Cnty., Fla.*, 475 F. Supp. 2d 1220, 1234 (M.D. Fla. 2006) ("Hispanics in Osceola County have lower levels of education and income, and are more likely to be living in poverty than are non-Hispanics, particularly non-Hispanic whites . . . These disparities make it more difficult for Hispanic candidates to run for countywide office . . ."); *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13-CV-0087-D, 2014 WL 4055366, at *22 (N.D. Tex. Aug. 15, 2014) (finding Senate Factor 5 was met because Hispanics "exhibit lower educational attainment, lower income, and higher poverty rates"); *see also U.S. v. City of Euclid*,

causation would be almost impossible to prove, *see* FOF ¶ 311, and would essentially render Senate Factor 5 duplicative of Senate Factor 1.

Although the Court expressed some questions during closing arguments that current socioeconomic disparities may be attributable to the Dodge City Latino population's recent immigration, rather than historical inequalities, the weight of the evidence and the legal principles governing analysis of Senate Factor 5 indicate that the answer to that question is not dispositive.

For these reasons, the Court finds that there is sufficient evidence to conclude that Senate Factor 5 weighs in favor of Plaintiffs.

### F.  Senate Factor 6

There is no evidence in the record of racial appeals used in campaigns in Dodge City.

### G.  Senate Factor 7

The Court concludes that Senate Factor 7 weighs strongly in Plaintiffs' favor because Latinos have a staggering lack of electoral success at all levels of government—in Dodge City, Ford County, statewide and federal elections.

As noted, *supra*, Senate Factors 7 and 2 are "the most important Senate factors" when the challenging an at-large electoral system.[654] "The core question posed in Factor 7 is whether [minority] candidates have historically been successful in the [jurisdiction], not whether individual [minority] candidates were more attractive candidates or could have run better campaigns."[655] When viewing the extent of minority electoral success, the appointment of a Latino candidate and

---

580 F. Supp. 2d 584, 609–10 (N.D. Ohio 2008); *Large v. Fremont Cnty., Wyo.*, 709 F. Supp. 2d 1176, 1218–19 (D. Wyo. 2010).

[654] *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1410 (E.D. Wash. 2014); *see also Blaine Cnty.*, 363 F. 3d at 903; *Gingles*, 478 U.S. at 48 n.15.

[655] *Mo. NAACP*, 894 F.3d at 939.

subsequent loss by that appointed candidate is a circumstance that weighs heavily of finding vote dilution.[656]

The Court credits Dr. Bejarano's analysis of the lack of Latino success in Dodge City. FOF ¶¶ 314-315, 318-333. Currently, no Latinos serve on the Dodge City Commission. *See* FOF ¶¶ 322-323, 343. From 1996–2021, just two Latinos were elected to the Dodge City Commission, only one Latino was elected to the Dodge City School Board, and none were elected to judicial or law enforcement offices or to the Ford County Commission. FOF ¶¶ 322-323, 325, 327, 329. This is an extraordinary paltry rate compared to the Latino share of the Dodge City and Ford County population. FOF ¶¶ 319-320. Evidence from just outside Dodge City and Ford County paints a similar picture—the rates of Latinos to elected offices in municipal offices, school boards, judicial and law enforcement positions, and statewide office across Kansas, as well as to federal congressional office, are similarly very low compared to their share of the population. FOF ¶¶ 324, 326, 328, 330-333.

Defendant did not rebut this evidence. Instead, they pointed to the fact that over a twenty-four-year period, two Latino candidates have been elected to the Commission, and that non-elected members of the City's government are Latino. Proof that a couple of Latino candidates have been elected over several decades does not foreclose satisfaction of Senate Factor 7,[657] especially if

---

[656] *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1414 (E.D. Wash. 2014).

[657] *Gingles*, 478 U.S. at 75 ("[T]he Senate Report expressly states that the election of a few minority candidates does not necessarily foreclose the possibility of dilution of the [minority] vote, noting that if it did, the possibility exists that the majority citizens might evade § 2 by manipulating the election of a safe minority candidate.") (internal quotations omitted); *Harvell v. Blytheville Sch. Dist.* No. 5, 71 F.3d 1382, 1390 (8th Cir. 1995); *Large v. Fremont Cnty., Wyo.*, 709 F. Supp. 2d 1176, 1221 (D. Wyo 2010); *see also Sanchez v. State of Colo.*, 97 F.3d 1303, 1325 (10th Cir. 1996); *Clerveaux v. E. Ramapo Cent. School Dist.*, 984 F.3d 213, 241 (2d Cir. 2021) ("[The] two black men who won four of six contested elections, were heavily vetted and slated by the Organization.

those elected are unresponsive to the needs of their Latino constituents, as Plaintiffs contend with respect to Joe Nuci. FOF ¶¶ 207, 342. Furthermore, Blanca Soto's appointment to the Dodge City Commission in 2021 and subsequent failure to be reelected to the Dodge City Commission demonstrates the lack of electoral success for Latino candidates. FOF ¶¶ 323, 334. And evidence that Dodge City has hired non-elected Hispanic employees is "neither relevant nor probative" of Senate Factor 7 and "has no bearing on whether [an election scheme] dilutes [minority] voting strength or whether [minorities] have an equal opportunity to become involved in the political process"[658] Overall, that relatively few Latinos have run for office in Dodge City weighs in favor of Senate Factor 7.[659]

Plaintiffs also put forward lay witness testimony regarding the barriers that Latinos face when running political campaigns in Dodge City, particularly in the at-large system. FOF ¶¶ 300-306, 309-310, 334-. Lay witnesses credibly testified that these barriers discourage Latinos from running for office. FOF ¶¶ 300-306, 309-310. Expert witnesses testified that it is more difficult for Latino candidates to run in at-large systems because of the increased cost. FOF ¶ 239. Defendant's evidence in response—anecdotal testimony from a small number of individuals about the costs of their own campaigns—does little to convince this Court that Latino candidates are able to have electoral success in Dodge City.

Based on all of this evidence, the Court finds that Senate Factor 7 weighs in favor of the Plaintiffs.

---

They were not minority-preferred candidates. Once elected, they aligned with the white majority and took positions counter to minority interests.").

[658] *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1043 (S.D. 2004); *see City of Carrollton Branch of the N.A.A.C.P. v. Stallings*, 829 F.2d 1547, 1560 (11th Cir. 1987).

[659] *United States v. Blaine Cnty., Mont.*, 363 F.3d 897, 914 (9th Cir. 2004).

### H.  Senate Factor 8

The Court concludes that Senate Factor 8 weighs in Plaintiffs' favor because elected officials in Dodge City are unresponsive to the interests and needs of its Latino constituents. A lack of responsiveness is "evidence that minorities have insufficient political influence to ensure that their desires are considered by those in power."[660] Where elected officials are "largely unaware" of the particularized issues of the minority community, there is generally a lack of responsiveness.[661] Furthermore, while the City may be responsive to some needs of Latinos, overall, the testimony demonstrated a lack of services and a disparity in the quality between where Latino residents in Dodge City live and where white residents primarily live.[662]

The Court credits Dr. Bejarano's testimony concluding that the Commission has been unresponsive to the Latino community's expressed concerns with respect to voting issues, health, and racial discrimination. FOF ¶¶ 347-360. In particular, Dr. Bejarano testified that several indicia of unresponsiveness that political scientists examine were met as to all three of these issue areas. FOF ¶¶ 347-360. Dr. Bejarano also noted the consensus in the political science literature that Latinos face a lack of responsiveness in jurisdictions around the country, but experience higher rates of responsiveness when they live in districts with large Latino populations. FOF ¶¶ 347, 245, 248. Such would be the case in a single-member district plan in Dodge City, given that the Latino population is large enough to constitute three majority-Hispanic districts. FOF ¶¶ 66, 212.

---

[660] *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1572 (11th Cir. 1984); *Sanchez v. State of Colo.*, 97 F.3d 1303, 1325 (10th Cir. 1996) ("Responsiveness is a question of both kind and degree.") (quoting *Clark v. Calhoun County, Miss.*, 88 F.3d 1383, 1401 (5th Cir. 1994)).

[661] *Large v. Fremont Cnty., Wyo.*, 709 F. Supp. 2d 1176, 1226 (D. Wyo. 2010).

[662] *See Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1250 (5th Cir. 1988) (A finding of responsiveness does not necessarily preclude a § 2 violation.").

Moreover, many of Plaintiffs' lay witnesses testified credibly to the existence of "two towns" in Dodge City: one in North Dodge where affluent residents are able to have their concerns heard and marshal resources for investment in schools, roads, parks and infrastructure, and one in South Dodge, where the poorer Hispanic community deals with poorly maintained roads, dilapidated housing, worse public resources, less access to fresh food, less affluent schools, and unreliable public transportation. FOF ¶¶ 362-368, 371-390, 413. Indeed, the City itself acknowledges this tale of two towns, designating the *entire* area south of Comanche Street as an area of economic need and *none* of the area north of Comanche Street. FOF ¶ 93. Witnesses testified that most Dodge City Commission candidates—and certainly the ones who win election—do not campaign in South Dodge and are not visible in the Latino community. FOF ¶¶ 408, 419-420. The vast majority of current and former Commissioners live in North Dodge. FOF ¶¶ 368-370. The Court heard testimony that the Dodge City government does not coordinate with, and is unresponsive to, the UFCW, the meatpacking plant union whose members are heavily Latino. FOF ¶¶ 363-365. The City is, at best, falling woefully short of even tracking these problems, let alone addressing them— it does not track whether its City services are offered equitably, whether its budget decisions disproportionately harm Latinos, or the racial voter turnout and registration gap in the City. FOF ¶¶ 413-415. And the City's racial discrimination in policing—about which Latino leaders in the City said the City was in denial, FOF ¶¶ 357-360, 415—persist to today. Dodge City's own City Manager called the police department's decision to send an undercover police officer to secretly record a June 2023 meeting among Latino community members "poor judgment" and "not a good way of building trust with the Hispanic community." FOF ¶ 416. While the history that led to the existence of "two towns" may be complex, the overall lack of responsiveness to the needs of the

Latino community indicates that the political process is not equally open to Latinos in Dodge City. Based on this evidence, Senate Factor 8 weighs in favor of Plaintiffs.

### I.   Senate Factor 9

The Court concludes that Senate Factor 9 is met because the justifications proffered by Defendant for the at-large election system are tenuous. The "tenuousness of the justification for a state policy may indicate that the policy is unfair."[663] While a jurisdiction "'is entitled to make policy choices about when and how it will address various priorities,' a policy's rationales are tenuous when the enacted law 'fail[s] to correspond in any meaningful way to the legitimate interests [it] claims to have been advancing.'"[664]

Defendant did not introduce any convincing testimony explaining why the City must continue to use the at-large method of election. FOF ¶¶ 433, 436. Instead, multiple witnesses testified to expressly telling City officials about the impact of the at-large method of election on the Latino community in Dodge. FOF ¶¶ 334, 351-352, 399-405, 429, 434.  For example, in a meeting initiated by Latino community leaders in Dodge City following a high-profile shooting in 2010 that sparked racial tensions, the City indicated that it would look into its use of at-large elections in response to Latinos' expressed concerns that they did not have political representation on the Commission. FOF ¶ 424. One year after the City indicated it would look into the lack of Hispanic political representation, the Ford County Clerk and a Voting Rights Act consultant notified the Dodge City Mayor and City officials that the City may have Section 2 VRA liability. FOF ¶¶ 425-426, 428, 394-397.  The former City Manager testified that the issue of district-based

---

[663] *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984).

[664] *Petteway v. Galveston Cnty.*, No. 3:22-CV-57, 2023 WL 6786025, at *51 (S.D. Tex. Oct. 13, 2023), *aff'd sub nom. Petteway v. Galveston Cnty., Texas*, 86 F.4th 214 (5th Cir. 2023), *reh'g en banc granted, opinion vacated*, 86 F.4th 1146 (5th Cir. 2023).

elections had been discussed on-and-off for multiple years since 2010 and it was something that the City would need to "monitor" as the city grew. FOF ¶ 427. The City again looked into district-based election systems in 2018 and 2019 when a City Commissioner raised the idea of voting districts before the City Commission. FOF ¶¶ 429-431. Indeed, a former high-level City employee declined to express a view as to whether at-large election systems are favorable, said he "struggle[d] with it" and failed to offer a compelling reason why the City must retain its current system. FOF ¶¶ 434.

The main justification the City has offered is the abstract idea that at-large elections promote "unity," and the unsupported proposition that "the public" should choose the method of election. FOF ¶¶ 436, 438. Yet all evidence in the record suggests the opposite. A public relations firm hired by Dodge City found that "strengthen[ing] the position of the current at-large system" was one of the challenges the City faced. FOF ¶ 435. Ms. Scoggins testified that elections under the at-large system are not unified, but in fact bitterly contested and partisan; she faced a deluge of negative campaigning from Commission candidates running on a partisan slate. FOF ¶¶ 308, 437. Ms. Scoggins also testified that *none* of the Commissioners or city employees she spoke with expressed "unity" as a justification for sticking with the current at-large system. FOF ¶ 438. Instead, both Plaintiffs' and Defendant's witnesses noted that—because the current Commissioners live in North Dodge—they would likely have to run against each other if the City moved to single-member districts, and as such some of those Commissioners would lose their positions. FOF ¶¶ 436, 438. Ms. Scoggins testified that the Commissioners were "dismissive" about the issue and had no interest in debating it. FOF ¶¶ 402, 438. The City changed its position on the importance of debating the issue only when doing so benefited its position in this litigation. FOF ¶¶ 402, 438

Regardless, the very point of Section 2 of the VRA is to avoid subjecting a minority group to the political will of the majority if that results in an electoral system that deprives the minority of the opportunity to elect candidates of choice. Because the City's defense of its at-large system is at best questionable and unsupported, the Court finds that Senate Factor 9 weighs in favor of Plaintiffs.

### J.  Proportionality.

One final note regarding proportionality. While it is not dispositive, "proportionality is a relevant fact in the totality of circumstances" analysis.[665] "'Proportionality' as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population."[666] Here, the proportionality analysis involves "comparing the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population."[667] Despite comprising more than 46% of the citizen voting-age population, FOF ¶ 49, Latinos have no majority-Latino districts or opportunity to elect Latino-preferred candidates in the at-large system. By contrast, Plaintiffs have demonstrated—through Dr. Oskooii's illustrative maps—that it is possible for Dodge City to comply with the Supreme Court's directive of "'rough proportionality'" by adopting a single-member district system.[668]

*** 

For the foregoing reasons, the Court finds that Plaintiffs have demonstrated by a totality of the circumstances that Latines in Dodge City "have less opportunity than other members of the

---

[665] *LULAC v. Perry*, 548 U.S. 399, 436 (2006) (internal quotation marks omitted).

[666] *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994).

[667] *LULAC*, 548 U.S. at 436–38 (evaluating proportionality in that case by using CVAP).

[668] *Id.* at 438 (quoting *De Grandy*, 512 U.S. at 1023).

electorate to participate in the political process and to elect representatives of their choice."[669] Specifically, the Court finds that Senate Factors 1, 2, 3, 5, 7, 8, and 9, as well as the proportionality factor, all support this conclusion.

## CONCLUSION

Based on all of the evidence heard at trial, the Court concludes that Dodge City's at-large City Commission election scheme violates Section 2 of the Voting Rights Act. The Court therefore concludes that Plaintiffs have carried their burden under both Section 2 and 42 U.S.C. § 1983, and that they are entitled to equitable relief, including a change in the election system from at-large to single-member districts.

The Court shall issue a separate Order governing the remedial phase of this case, to include the submission of proposed remedial maps for dividing Dodge City into five single-member districts.

---

[669] *Gingles*, 478 U.S. at 43 (internal quotations omitted).

Dated: March 22, 2024

Chad W. Dunn*
Sonni Waknin*
Bernadette Reyes*
**UCLA VOTING RIGHTS PROJECT**
3250 Public Affairs Building
Los Angeles, CA 90065
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org
310-400-6019

Scott Fuqua*
**FUQUA LAW & POLICY, P.C.**
P.O. Box 32015
Santa Fe, NM 87594
scott@fuqualawpolicy.com
505-982-0961

Respectfully submitted,

By: */s/ Sharon Brett*
Sharon Brett KS 28696
Kunyu Ching KS 29807
**AMERICAN CIVIL LIBERTIES UNION
OF KANSAS**
10561 Barkley Street
Suite 500
Overland Park, KS 66212
sbrett@aclukansas.org
kching@aclukansas.org
913-490-4100

Abena Mainoo*
Jonathan I. Blackman*
Mijin Kang*
Katherine MacAdam*
Isabella Masiello*
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
One Liberty Plaza
New York, NY 10006
amainoo@cgsh.com
jblackman@cgsh.com
mkang@cgsh.com
kmacadam@cgsh.com
imasiello@cgsh.com
212-225-2000

Jonathan Topaz*
Sophia Lin Lakin*
Victoria Ochoa*
**AMERICAN CIVIL LIBERTIES
UNION, INC.**
125 Broad Street, 18th Floor
New York, NY 10004
jtopaz@aclu.org
slakin@aclu.org
vochoa@aclu.org
212-549-2500

*Attorneys for Plaintiffs*

* Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

Pursuant to D. Kans. Loc. R. 5.1(f), I hereby certify that on this 22 day of March 2024, a true and correct copy of the foregoing was served via the United State District Court's CM/ECF system on all parties or persons requiring notice, including upon attorneys for defendant:

FOULSTON SIEFKIN LLP
Anthony F. Rupp, KS #11590
Tara Eberline, KS #22576
Sarah E. Stula, KS #27156
7500 College Boulevard, Suite 1400
Overland Park, Kansas 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com
sstula@foulston.com

FOULSTON SIEFKIN, LLP
Clayton Kaiser, KS #24066
Samuel Walenz
1551 North Waterfront Parkway, Suite 100
Wichita, Kansas 67206
(316) 267-6371
(316) 267-6345 (fax)
ckaiser@foulston.com
swalenz@foulston.com

By: /s/ *Sharon Brett*
Sharon Brett KS 28696
**AMERICAN CIVIL LIBERTIES**
**UNION OF KANSAS**
10561 Barkley Street
Suite 500
Overland Park, KS 66212
sbrett@aclukansas.org
913-490-4100