# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MIGUEL COCA and | ) | |
| ALEJANDRO RANGEL-LOPEZ, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 6:22-cv-01274-EFM-RES |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF DODGE CITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## Table of Contents

PRELIMINARY STATEMENT ON BEHALF OF DEFENDANT .......................................... 1

INTRODUCTION............................................................................................................ 3

PROPOSED FINDINGS OF FACT................................................................................. 7

    I.    Plaintiffs ................................................................................................................. 7

    II.    Dodge City Background ......................................................................................... 8

        A.    Population and Demographics ......................................................................... 8

        B.    Socioeconomic Data ...................................................................................... 11

            1.    Income.................................................................................................... 12

            2.    Education ............................................................................................... 12

            3.    Health.................................................................................................... 13

            4.    Housing.................................................................................................. 14

            5.    Voter Turnout........................................................................................ 14

        C.    Government, Leadership, and Outreach ........................................................ 16

            1.    Commission-Manager Governance ....................................................... 16

            2.    Latino Representation and Candidacies................................................. 17

            3.    City Leadership ..................................................................................... 19

            4.    Community Engagement and Outreach to Latinos................................. 20

        D.    At-Large Elections in Dodge City ................................................................ 25

            1.    Implementation, Function, and Purpose ............................................... 25

            2.    Public Comments on At-Large Elections .............................................. 27

        E.    Election Administration ................................................................................ 31

            1.    County Administration of Dodge City's Elections................................ 31

            2.    Polling Locations .................................................................................. 33

            3.    Department of Justice Inquiries ............................................................ 35

        F.    City Commission Campaigns ........................................................................ 37

    III.    The Plaintiffs' Proposed Districts....................................................................... 39

        A.    Racial Predomination in the Plaintiffs' Maps............................................... 39

        B.    The "Performance Analysis" of Dr. Oskooii's Maps ................................... 43

    IV.    Racial Voting Patterns Evidence ........................................................................ 46

        A.    The Experts .................................................................................................... 46

        B.    Background ..................................................................................................... 46

C.    Application of the Ecological Inference Methodology in this Case ............................ 49

1.    The Endogenous Election Results .......................................................... 51

2.    The Exogenous Election Results .......................................................... 54

**PROPOSED CONCLUSIONS OF LAW** ................................................................. **57**

I.    Plaintiffs have not proven their Section 2 claim. ............................................. 58

A.    Although it is possible to draw at least one City Commission district in which the district has a Hispanic Citizen Voting Age majority, Plaintiffs nevertheless have not satisfied *Gingles* factor 1 because race predominates in Plaintiffs' proposed maps and because there is insufficient evidence that the Plaintiffs' proposed maps would enhance Latinos' ability to elect their so-called candidates of choice. ................................. 59

1.    Race predominated in Plaintiffs' 14 proposed maps. ................................. 60

2.    There is no credible evidence that any of the districts in Dr. Oskooii's proposed maps will actually perform. ............................................................. 64

B.    Plaintiffs have not satisfied *Gingles* factors 2 and 3 because they have not shown that the minority group in question is "politically cohesive" and the "white "majority" votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."69

1.    Dr. Barreto's analysis does not show racial bloc voting in Dodge City Commission elections or that White voters are voting in a manner that usually defeats the so-called Latino candidate of choice. ............................................................. 70

2.    Plaintiffs' non-statistical evidence does not show racial bloc voting in Dodge City Commission elections. ......................................................................... 85

C.    The totality of the circumstances does not show that Dodge City's at-large elections dilute Latino votes ......................................................................... 86

II.    Plaintiffs failed to show a Fourteenth Amendment violation. ......................................... 101

III.    Plaintiffs have failed to show that injunctive relief is warranted here ....................... 103

IV.    Plaintiffs' § 1983 claim fails. ......................................................................... 105

**CONCLUSION** ......................................................................................... **105**

**PRELIMINARY STATEMENT ON BEHALF OF DEFENDANT**

Defendant City of Dodge City, by and through counsel, submits the Proposed Findings and Conclusions below pursuant to the Court's instruction.

Defendant submits that the evidence must be viewed as set forth by the Supreme Court in *Johnson v. DeGrandy,* 512 U.S. 997 (1994). Section 2 protects "equality of opportunity." It is not a "guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson*, 512 U.S. at 1014 n.11. The question is whether the at-large voting method utilized in Dodge City minimizes or cancels out the votes of Latino voters under Section 2 of the Voting Rights Act. Defendant submits that the evidence establishes that Plaintiffs' claims fail on all issues.

In submitting the proposed findings and conclusions, Defendant advises the Court of three preliminary matters.

First, the Court granted in part Dodge City's motion for judgment on partial findings on Plaintiffs' Fourteenth Amendment claim and Plaintiffs' request for injunctive relief to hold municipal elections in even-numbered years. *See* Trial Tr. Vol. III at 217:13-24. Because Federal Rule of Civil Procedure 52(c) also requires findings of fact and conclusions of law under Rule 52(a), Defendant has included relevant findings and conclusions below.

Second, Defendant briefly advises the Court regarding its proposed findings and conclusions on the first factor of the three-factor test set forth in *Gingles v. Thornberg*, 478 U.S. 30, 50-51 (1986), as this factor provides an additional basis for a finding that Plaintiffs have not met their burden of proof. At trial, the Court indicated that it may, based on the size of the Latino community in Dodge City, be thinking that questions regarding how a proposed map is drawn and whether a proposed map will perform should be addressed later at the remedy stage (if necessary), not now when determining if a Section 2 violation even occurred. However, whether proposed

1

maps comport with "traditional districting principles" is part of the first *Gingles* factor, *Abrams v. Johnson*, 521 U.S. 74, 91 (1997), which is why Plaintiffs have asserted throughout that "Dr. Oskooii considered traditional districting criteria when drawing the demonstrative maps" when discussing *Gingle* I, *see, e.g.*, *Pretrial Order*, CM/ECF Doc. 140. Furthermore, as stated in *Abbott v. Perez*, 585 U.S. 579 (2018), there is no section 2 violation "if the alternative to the districting decision at issue would not enhance the ability of minority voters to elect the candidates of their choice," *id.* at 617 (reversing the district court's section 2 finding), which is why Plaintiffs sought (and received) admission of Exhibits 121-135 and had Dr. Barreto discuss these tables and his "performance analysis" at trial, Trial Tr. Vol. II at 105:10-111:11. In light of *Abrams* and *Abbott*, it has been the City's position in this litigation that Plaintiffs' claim fails *Gingles* I because Dr. Oskooii's maps do not "comply with traditional redistricting principles," "pack Latinos into one or more single-member districts and pack Whites into other single-member districts," and will not "result in the election of more Latino-preferred candidates to the City Commission." *Pretrial Order* at 20-21.

Admittedly, there is some debate as to where specifically the "performance analysis" fits in the *Gingles* framework. One Fifth Circuit panel has indicated that it is part of the threshold, three-factor inquiry, *see Harding v. Cnty. of Dallas, Tex.*, 948 F.3d 302, 311 (5th Cir. 2020), while another has taken the position that it is part of the "totality of the circumstances" analysis, *Fusiler v. Landry*, 963 F.3d 447, 457 (5th Cir. 2020). As set forth below in the City's proposed Conclusions of Law, it is the City's position that, based on existing precedent and how the analysis is configured, issues related to a proposed map's racial considerations and performance should be taken up in *Gingles* I. Regardless of where the Court houses this analysis, though, it must be

performed during these initial findings portion of this case. The City does not understand Plaintiffs to contest this proposition.

Third, the Court has previously issued its Memorandum and Order holding that there is a private right of action under the Voting Rights Act (Doc. 71) and denying the Defendant's motion for interlocutory relief. Defendant preserves for appeal, if necessary, all issues associated with whether there is a private right of action under the Voting Rights Act.

## INTRODUCTION

This matter came before the Court for trial on the issue of whether the at-large voting system in place in the City of Dodge City, Kansas, violates section 2 of the Voting Rights Act, as alleged by Plaintiffs.

Section 2 protects "equality of opportunity." It is not a "guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson v. DeGrandy,* 512 U.S. 997, 1014, n.11 (1994). To establish a Section 2 violation, Plaintiffs must prevail on two inquiries. In the first, Plaintiffs must show that the three-factor test set forth in *Gingles v. Thornberg*, 478 U.S. 30, 50-51 (1986), is met—namely, that (1) the minority group in question is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group in question is "politically cohesive"; and (3) the "white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." "Only when a party has established the *Gingles* requirements does a court proceed to [the second step to] analyze whether a violation has occurred based on the totality of the circumstances." *Bartlett v. Strickland*, 556 U.S. 1, 11-12 (2009). Upon hearing the evidence, the Court is persuaded that Plaintiffs have not established by a preponderance of the evidence that there has been a denial of opportunity to Hispanic voters in the City. To the contrary, to use the terminology used in *Monroe v. City of*

*Woodville, Miss.*, 881 F.2d 1327, 1335 (5th Cir. 1989), *opinion corrected on reh'g*, 897 F.2d 763 (5th Cir. 1990), "there is . . . no discernible structural impediment to [Hispanic] success at the polls." Dodge City is a small city with a total population of approximately 27,000. The Latino population, both citizens and non-citizens, is growing rapidly. There are 3,000 fewer white persons in the Voting Age Population than there were in 2000. There are 4,500 more Latinos in the VAP than there were in 2000. The Latino VAP has grown from 37.5% in 2000 to 50% in 2010 to 57.9% in 2020.

When one considers the Citizen Voting Age Population ("CVAP"), *i.e.*, eligible voters, Plaintiffs' expert Dr. Matthew Barreto indicates that, in 2021, Latinos made up 46.1 percent citywide and Whites made up 47.2% citywide. That means that by 2021, there was a nearly even split (no wide majority) of either White or Latino voters. Thereafter, new numbers for 2022 have been published by the Census Bureau. The dramatic transformation of the electorate in Dodge City has continued and now Latino ***voters constitute the largest plurality of the CVAP***—making up nearly 5% more than Whites of Dodge City's CVAP. Plaintiffs and Defendants agree that these trends will continue. Accordingly, right now, and for the foreseeable future, Latinos have the voting power to elect their candidates of choice in an at-large voting system in Dodge City.

Plaintiffs claim that Latinos bear the effects of discrimination in that they lag behind Whites in such areas as education, employment and health, depriving Latinos of the ability to participate in the political process. The reality is that Dodge City is welcoming to the Latino community, including migrants. The socio-economic discrepancy is explained not by discrimination but rather by the fact that Dodge City is welcoming to a migrant community that is socio-economically behind the rest of the Dodge City populace when they arrive. Despite these challenges, a review of key indicators demonstrates significant improvement for Latinos in Dodge

City. In time periods considered by Plaintiffs' expert Dr. Christina Bejarano, the Latino unemployment rate has improved from 7.1% to 4.5%. There are fewer Latinos than Whites receiving Supplemental Nutrition Assistance Program ("SNAP") benefits. The median household income for Latinos has increased from $44,354 to $54,133. The number of Latinos with less than a high school diploma has dropped from 62.4% to 44.2%. More Latinos than Whites have internet access. Some 57.9% of Latinos own houses. Latinos live throughout Dodge City. While Plaintiffs claim a North/South divide in Dodge City between whites in the North and Latinos in the South, the reality is that, in many areas of the North, Latinos are the plurality or there is only a small difference between the number of Whites and Latinos.

The Latino community in Dodge City is vibrant. Latinos own and operate many downtown businesses and have leadership positions in community and professional organizations, such as the Chamber of Commerce, local unions, charitable organizations, political parties, Main Street Dodge, Engage Dodge, the Cultural Relations Advisory Board, and educational fields. Latinos have been elected to the City Commission. When a vacancy arose on the City Commission, the sitting Commission appointed a Latino, Ms. Blanca Soto, to fill it. The City Commission has also hired a Latino, Nick Hernandez, to serve as City Manager.

The Court recognizes that this case has not been driven by Latino groups and organizations within the City. Plaintiffs called no unsuccessful Latino candidates and no candidate or potential Latino candidate testified that there was a lack of opportunity or that there were structural barriers to success at the polls. The evidence was convincing that Latinos are welcomed in the community, are active in political parties, community groups and organizations, and that a large percentage of downtown business owners as well as union leaders are Latino. There are active and vibrant Latino organizations. Between 2000 and now, the Hispanic CVAP ("HCVAP") increased from 19.53%

of the population to 48.68%. In 2022, for the first time, Latinos became the largest plurality of the CVAP in Dodge City.

As former Assistant City Manager Ernestor De La Rosa testified, by becoming more active in local elections, registering to vote and voting, "we would flip any committee or commission in the community tomorrow." Not a single witness, including either of the Plaintiffs, testified to any evidence of a single issue coming before the City Commission that has divided the white and Latino communities in Dodge City.

While there have been few Latino candidates who have run for election, there was a Latino elected to the City Commission in the two most recent elections that Plaintiffs' racially polarized voting expert, Dr. Matthew Barreto, analyzed. Looking at the four City Commission elections that Dr. Barreto reviewed, they do not produce, at least under Dr. Barreto's analysis, reliable conclusions based on the limited reliable data resulting from there being too few precincts, a lack of homogenization in the existing precincts, inconsistent voting patterns, and voters being able to choose up to three candidates (but not being required to do so). Furthermore, Dr. Barreto's results do not establish Latino cohesion or that White bloc voting "usually" defeat the so-called Latino preferred candidate.

Turning to the applicable Senate Factors, Dodge City has participated in numerous initiatives to welcome Latinos to the City and to encourage their civic involvement, such as the Cultural Relations Advisory Board, the Welcoming Dodge City Strategic Plan, the International Festival, the New Americans Dinner, the Engage Dodge Program, and providing free public transportation to vote. Dodge City has also hosted United State Citizenship and Immigration Services ("USCIS") Mobile Services, US Naturalization Ceremonies, Mexican Consulate Mobile Services, and Guatemalan Consulate Services. These efforts, along with others, have led to Dodge

City being recognized as a leader when it comes to integrating immigrants into the community. In short, Dodge City has been very forward looking in its involvement with its Latino citizens and has striven to ensure that its Latino citizens can meaningfully participate in their local government if they so choose.

Under all of the circumstances, the Court finds that Plaintiffs have not met their burden of proof and the Court finds in favor of the City on all issues.

## PROPOSED FINDINGS OF FACT

### I.  Plaintiffs

1.      Plaintiff Alejandro Rangel-Lopez is a first-generation Mexican American. Trial Tr. Vol. I at 7:21-8:7.

2.      Mr. Rangel-Lopez lives in Dodge City. *Id.* at 7:2-5.

3.      Mr. Rangel-Lopez has voted in Dodge City elections for the City Commission and plans to vote in future Dodge City elections. *Id.* at 7:12-20.

4.      While Mr. Rangel-Lopez recalls voting for Ms. Blanca Soto and Ms. Jan Scoggins in City Commission elections, *id.* at 20:10-17, he gave no indication that a large number of other Latinos voted for Ms. Soto or Ms. Scoggins or had otherwise mobilized in support of them when they ran for City Commission.

5.      Mr. Rangel-Lopez was selected for an internship in the Dodge City City Manager's Office in the Summer of 2022. *Id.* at 23:2-7.

6.      Mr. Rangel-Lopez was also appointed to serve on the Steering Committee tasked with formulating Dodge City's "Strategic Plan" for welcoming and integrating immigrants into the Dodge City community. *See* Def.'s Ex. 447 at 2; Trial Tr. Vol. I at 213:9-11.

7.      Plaintiff Miguel Coca lives in Dodge City. Trial Tr. Vol. III at 126:12-16.

8.      Mr. Coca has voted in Dodge City elections for the City Commission and intends to vote in future Dodge City elections. *Id.* at 129:9-15, 130:8-10.

9.      While Mr. Coca recalls voting for Ms. Blanca Soto and Ms. Jan Scoggins in City Commission elections, *id.* at 130:11-17, he gave no indication that a large number of other Latinos voted for Ms. Soto or Ms. Scoggins or had otherwise mobilized in support of them when they ran for City Commission.

10.     Mr. Coca has served on the Dodge City Library Board, a position that he was appointed to by the Dodge City City Commission (Dodge City Commission). *Id.* at 134:20-24.

## II. Dodge City Background

### A. Population and Demographics

11.     Following the development of the cattle industry in Dodge City in the 1980s, the Latino population in Dodge City began to grow. Trial Tr. Vol. III at 224:5-226:9.

12.     Since at least 2000, Dodge City has had a consistent growth in its Latino population and a consistent decrease in its White population. Trial Tr. Vol. II at 126:24-127:8; *id.* at 82:16-23 (describing the "large growth in the Hispanic Latino population" in Dodge City). From 2000 to 2020, the Latino population in Dodge City grew by nearly 65%. Pls.' Ex. 112.

13.     In 2000, Dodge City's population was 25,152. Pls.' Ex. 112. Of that population, Latinos made up 42.9% and Whites made up 51.5%. *Id.* In the same year, the U.S. Census Bureau's American Community Survey ("ACS") estimated that Latinos made up an estimated 36.78% and Whites made up an estimated 57.76% of Dodge City's voting-age population ("VAP"). Def.'s Ex. 518 at 1. According to the same survey, Latinos made up an estimated 19.53%, or 2,560 people, and Whites made up an estimated 75.58%, or 9,905 people, of Dodge City's citizens of voting age population ("CVAP"). *Id.* at 2.

14.    In 2010, Dodge City's population was 27,340. Pls.' Ex. 112. Of that population, the Latino share increased to 57.5% and White share went down to 37.2%. In the same year, the Latino share of the voting-age population increased to 47.59% and the White share went down to 47.04%. Def.'s Ex. 518 at 1. Likewise, the Latinos' estimated share of the citizens of voting age population went up to 30.15%, or 3,938 people, and the Whites' estimated share went down to 65.11%, or 8,504 people. *Id.* at 2.

15.    In 2020, Dodge City's population was 27,788. Pls.' Ex. 112. Of that population, the Latino share of Dodge City's population increased again to 63.9% and the White share decreased to 29.3%. *Id.*

16.    The next year, in 2021, ACS estimated that the Latino share of Dodge City's voting-age population increased from 2010 to 59.02% and the White share decreased to 34.83%. Def.'s Ex. 518 at 1. At the same time, the Latinos' estimated share of the citizens of voting age population went up to 46.13%, or 6,398 people, and the Whites' estimated share decreased to 47.24%, or 6,552 people. *Id.* at 2.

17.    In 2022, ACS estimated that the Latino share of Dodge City's voting-age population increased slightly to 59.51% and the White share decreased slightly to 33.93%. *Id.* at 1. At the same time, the Latinos' estimated share of the citizens of voting age population increased to 48.68%, or 7,176 people, and the Whites' estimated share decreased to 43.87%, or 6,468 people. *Id.* at 2.

18.    Three factors typically drive demographic changes in population: birth rates, death rates, and migration patterns. Trial Tr. Vol. II at 132:3-13.

19.    The Latino population is "considerably younger" in Dodge City than the White population. Trial Tr. Vol. II at 132:14-17; *id.* at 83:10-19 (noting the "extremely young" Latino

population in Dodge City). Thus, for example, Latino students make up approximately 80% of the enrollment at Dodge City's public schools.  Trial Tr. Vol. II at 200:4-17; Trial Tr. Vol. III at 224:5-226:9.

20.     Latinos in Dodge City have immigrated to the United States from numerous countries, including Mexico, Guatemala, Cuba, and Puerto Rico. Trial Tr. Vol. IV at 89:14-25; see also Trial Tr. Vol. I at 156:4-12 ("Pan-ethnic is a collection of Latinos from Latin American descent from different countries."). As a result, not all Latinos in Dodge City share the same political ideology, *id.* at 56:9-11, and, thus, "the ethnicity of a candidate tells us nothing about whether a majority of voters of any particular ethnicity support the candidate," *id.* at 55:4-7.

21.     In addition to Latino immigrants that have naturalized, there is "a sizeable number of noncitizen[]" and "undocumented immigrants" of Latino descent in Dodge City. Trial Tr. Vol. I at 126:14-127:2

22.     Dodge City's surface area is approximately five miles by five miles. Trial Tr. Vol. IV at 93:14-19; *see also* Trial Tr. Vol. II at 164:12-13 ("Q: In terms of the city of Dodge City, it's a small city? A: I think that's fair.").

23.     By car, it would likely take a person less than 15 minutes to drive from one side of Dodge City to the other. Trial Tr. Vol. IV at 93:20-25; Trial Tr. Vol. III at 143:5-9; *see also* Trial Tr. Vol. III at 230:2-13 ("[T]here is no point in Dodge City you can't reach in less than ten minutes.").

24.     Despite its smaller size, Dodge City has 4 grocery stores dispersed throughout town. Trial Tr. Vol. IV at 97:16-25.

**B. Socioeconomic Data**

25.     Two of Dodge City's largest employers, National Beef and Cargill, are meatpacking plants. Trial Tr. Vol. I at 189:17-25; Trial Tr. Vol. III at 224:5-226:9.

26.     Dodge City's meatpacking industry has attracted a substantial immigrant population that has coincided with the growth of Dodge City's Latino community. Trial Tr. Vol. III at 224:5-226:9; *id.* at 299:17-300:6 (referring to the plants' "large section" of "immigrant labor"); Trial Tr. Vol. II at 198:19-200:3; *id.* at 200:4-17 ("Latinos are the labor force that sustains the meatpacking plants[.]"); Trial Tr. Vol. I at 190:6-10.

27.     Approximately 70% of the employees at National Beef and Cargill are of Latino descent. Trial Tr. Vol. I at 190:6-10.

28.     Latinos, however, work in every sector of Dodge City's community. Trial Tr. Vol. III at 224:5-226:9.

29.     Latinos in Dodge City own the majority of businesses in downtown Dodge City, and are active in community organizations, church organizations, and other local charitable organizations. Trial Tr. Vol. I at 63:10-23; Trial Tr. Vol. III at 226:15-228:10; Trial Tr. Vol. IV at 75:8-19. For instance, Ms. Coral Lopez, a Latino, is Director of Dodge City Main Street, an entity that, among other things, "organizes the downtown business." Trial Tr. Vol. I at 46:1-8.

30.     Plaintiffs' expert Dr. Christina Bejarano testified regarding a number of disparities between Whites and Latinos that she perceived in income, education, health, housing, and voter turnout. The tables Dr. Bejarano produced largely show that Latinos' lives are improving. *See, e.g.*, Pls.' Ex. 46 & 47. While Dr. Bejarano contends that many disparities persist, she concedes that she is unaware of any jurisdiction that has completely eliminated the disparities that she noted between Whites and Latinos in Dodge City. Trial Tr. Vol. 1 at 170:7-11.

### 1. Income

31.     From 2010 to 2014, the median household income for Latinos in Dodge City was $44,354. By 2017 to 2021, Latinos' median household income had risen to $54,133. Pls.' Ex. 46. In the same timeframe, the percentage of Latinos with an income below the poverty level dropped from 23.1% to 17.9%; the percentage of Latino children living in poverty dropped from 12.2% to 9%; the Latino unemployment rate dropped from 7.1% to 4.5%; and the percentage of Latinos receiving supplemental nutrition assistance dropped from 14.8% to 8.2%. *Id.*

32.     From 2010 to 2014, the median household income for Whites in Dodge City was $53,327. By 2017 to 2021, the median income for Whites has risen to $64,250. Pls.' Ex. 46. In the same timeframe, the percentage of Whites with an income below the poverty level dropped from 12.1% to 6.8%; the percentage of White children living in poverty dropped from 4.2% to .3%; the White unemployment rate dropped from 5.9% to 2.8%; but the percentage of Whites receiving supplemental nutrition assistance rose from 7.4% to 10.5%. *Id.*

33.     Plaintiffs' expert, Dr. Christina Bejarano, did not analyze the statistical significance of the differences in income between Latinos and Whites in Dodge City. Trial Tr. Vol. I at 128:2-4. However, Dodge City's expert, Dr. Kimberly Nelson, analyzed the measures above and found that none had actual statistical significance—*i.e.*, that the differences arise from some factor other than chance. Def.'s Ex. 468 at 4; Trial Tr. Vol. IV at 43:23-44:15.

### 2. Education

34.     From 2010 to 2014, the percentage of Latinos in Dodge City with less than a high-school diploma was 62.4%. Pls.' Ex. 47. By 2017 to 2021, the percentage dropped to 44.2%. In the same timeframe, the percentage of Latinos that completed at least high school rose from 18.7% to 27.3%; the percentage of Latinos with some college or an associate's degree rose from 14.5%

to 22.7%; and the percentage of Latinos with a bachelor's degree or higher rose from 4.3% to 5.8%. *Id.*

35.     From 2010 to 2014, the percentage of Whites in Dodge City with less than a high-school diploma was 6.3%. Pls.' Ex. 47. By 2017 to 2021, the percentage was 4.5%. In the same timeframe, the percentage of Whites with a just high school degree decreased from 24.1% to 18.3%; the percentage of Whites with some college or an associate's degree decreased from 41.1% to 36.7%; and the percentage of Whites with a bachelor's degree or higher rose from 28.5% to 40.5%. *Id.*

36.     The Principal of Dodge City High School is Latino. Trial Tr. Vol. I at 32:16-19.

37.     Plaintiff Rangel-Lopez, who was schooled completely in Dodge City public schools, graduated second in his class at Dodge City High School and went on to the University of Kansas, where he was awarded the "Undergraduate of the Year Award for the School of Public Affairs and Administration." *Id.* at 8:11-22.

38.     Plaintiff Rangel-Lopez "absolutely" agrees that he received a good education from Dodge City High School and received the support services he needed while there. *Id.* at 32:9-22.

### *3.   Health*

39.     From 2010 to 2014, the percentage of Latinos with no health-insurance coverage was 25.5%. Pls.' Ex. 51. By 2017 to 2021, the percentage of Latinos without health-insurance coverage dropped to 19.4%. *Id.*  In the same timeframe, the percentage of Latino children without health-insurance coverage dropped from 5.5% to 3.6%. *Id.*

40.     From 2010 to 2014, the percentage of Whites with no health-insurance coverage was 8.3%. *Id.* By 2017 to 2021, the percentage of Whites without health-insurance coverage

dropped to 6.6%. *Id.* In the same timeframe, the percentage of White children without health-insurance coverage dropped from 1.1% to .4%. *Id.*

### 4. *Housing*

41.　　From 2006 to 2009, the percentage of Latinos who owned a home was 61.1%. Pls.' Ex. 50. By 2017 to 2021, the percentage of Latinos who owned a home dropped slightly to 57.9%. *Id.* In the same timeframe, the percentage of Latinos who rented a home rose slightly from 38.9% to 42.1%. *Id.*

42.　　From 2006 to 2009, the percentage of Whites who owned a home was 69.6%. *Id.* By 2017 to 2021, the percentage of Whites who owned a home dropped slightly to 69.1%. *Id.* In the same timeframe, the percentage of Whites who rented a home rose slightly from 30.4% to 30.9%. *Id.*

### 5. *Voter Turnout*

43.　　Dr. Matthew Barreto estimated that, in the 2022 general election, White voters accounted for 64% of voters in Dodge City, while Latino voters accounted for 30 percent. Trial Tr. Vol. II at 84:20-85:13. While Plaintiffs and their experts allege that there is a substantial drop off in voting between even- and odd-year voting, *see, e.g.*, Trial Tr. Vol. I at 100:3-6, Dr. Barreto provided no testimony regarding what he believed the turnout rate for Whites and Latinos was in odd-year, City Commission elections. As the percentage of vote share for Latinos in odd-year elections is lower in every one of Dr. Barreto's table than it is even-year elections, it appears that the percentage of White voter turnout is even greater in even years. Pls.' Exs. 122-135; Trial Tr. Vol. I at 167:12-22 (Dr. Bejarano: "Yes, Latinos turn out at lower rates than Whites for -- and the drop off is more apparent in off-cycle elections than on-cycle.").

44. Dodge City is divided into nine relevant precincts of varying population sizes and densities. Def.'s Ex. 465 at 1; Pls.' Exs. 36 & 40 (showing voting results for 10 precincts in Dodge City); Trial Tr. Vol. II at 143:2-9.

45. There has been no evidence that the precincts in Dodge City are homogenously Latino. Plaintiffs have not put forth any evidence regarding what percentage of eligible voters in a given Dodge City precinct are Latino or White.

46. The estimated percentage of Latino turnout per precinct in the 2021, 2019, 2017, and 2014 City Commission elections is as follows:

| Precinct | Latino Voters (%) | | | |
| --- | --- | --- | --- | --- |
| | 2021 | 2019 | 2017 | 2014 |
| 1 | 39.1 | 38.9 | 30.1 | 20.4 |
| 2 | 54.5 | 49.0 | 44.5 | 39.7 |
| 3 | 59.9 | 49.4 | 45.4 | 53.7 |
| 4 | 31.4 | 29.8 | 27.8 | 31.8 |
| 5 | 18.7 | 17.0 | 15.6 | 12.2 |
| 6 | 12.6 | 12.2 | 11.3 | 4.1 |
| 7 | 8.8 | 9.4 | 9.5 | 1.9 |
| 8 | — | — | — | 6.5 |
| 9 | 20.8 | 8.4 | — | — |

Def's. Ex. 465 at 1; *see also* Trial Tr. Vol. IV at 161:17-162:23.

47. Based on the election results in the record, candidates can win a seat on the Dodge City Commission with less than 900 votes. *See* Pls'. Exs. 40 (2021: Nuci, 870 votes) & 36 (2019: Nuci, 818 votes).

48. The margin of victory in Dodge City Commission elections is typically one hundred votes or less. *See* Pls.' Exs. 40 (92 votes separated third-place finisher Joe Nuci and fourth-place

finisher Jeffrey Reinert); 36 (59 votes separated third-place finisher Joe Nuci and fourth-place finisher Adam Hessman); CM/ECF Doc. 199, Jurado Dep. at 12:25-13:4 (then-Commissioner Jurado lost by two votes in the 2000 City Commission election).

49.     The difference in support for City Commission candidates is even smaller at the precinct level. For instance, in 2021, in Precinct 3, where Latinos constituted nearly 60% of the turnout, *see* Def.'s Ex. 465 at 4, the top four vote getters were separated by less than 3 votes: (1) Nuci, 40; (2) Taylor, 39; (3) Soto, 38; (4) Scoggins, 37, Pls.' Ex. 40. For the precinct with the second-highest percentage of Latino turnout, Precinct 2, 13 votes separate first place and fourth place: (1) Burns, 43; (2) Taylor, 39; (3) Soto, 31; (4) Nuci, 30. *Id.* The top vote getters in the most populous precinct with the lowest Latino turnout, Precinct 6, was won by Candidate Burns. Then-Commissioner Nuci came in second there.

## C. Government, Leadership, and Outreach

### 1. Commission-Manager Governance

50.     Dodge City uses a commission-manager form of government. Trial Tr. Vol. IV at 35:20-24.

51.     Under the commission-manager form of government, commissioners appoint a professional city manager who runs the City's day-to-day operations and gives the Commission policy advice. Trial Tr. Vol. IV at 35:25-36:9; *id.* at 90:4-14.

52.     Dodge City's commission-manager form of government is consistent with the standard form of government for cities of Dodge City's population size. Trial Tr. Vol. IV at 50:3-18.

53.     The Dodge City Commission is made up of five commissioners. Trial Tr. Vol. IV at 127:15-128:1.

54. Issues that face the Dodge City Commission are not partisan issues. Trial Tr. Vol. I at 55:8-18. The Dodge City Commission's primary role, for example, is to set the mill levy. Trial Tr. Vol. IV at 121:15-16.

55. There is no evidence that any issue has come before the Dodge City Commission that has divided the community along racial or ethnic lines. Trial Tr. Vol. III at 315:18-21; Trial Tr. Vol. III at 143:21-25; Trial Tr. Vol. IV at 125:16-19.

56. Similarly, Mr. Ernestor De La Rosa, whose role as an assistant city manager for Dodge City included efforts to be responsive to the needs of the Latino community, testified that he did not recall any issues where the Latino community did not feel heard by the Dodge City Commission. Trial Tr. Vol. III at 298:7-14; *id.* at 315:22-316:25. Plaintiffs Rangel-Lopez and Coca testified similarly. *See* Trial Tr. Vol. I at 50:3-52:11 & Trial Tr. Vol. III at 143:21-25.

57. Former City Commissioner Fernando Jurado testified that he does not recall back in the late 1990s/early 2000s, Latinos in Dodge City having issues that needed to be addressed that were different than the issues that Whites faced in the City. CM/ECF Doc. 199, Jurado Dep. at 33:12-20.

### 2. *Latino Representation and Candidacies*

58. In 1982, Dodge City elected its first Latino commissioner and mayor, Louis Sanchez. Trial Tr. Vol. II at 186:2-187:2; Trial Tr. Vol. IV at 87:17-22.

59. Since 1996, three Latinos have served on the Dodge City Commission: Fernando Jurado, from 1998-2000; Joe Nuci, from 2019-2023; and Blanca Soto, in 2021. CM/ECF Doc. 199, Jurado Dep. at 12:19-24 (Jurado); Pls.' Exs. 36, 40 (Nuci); Trial Tr. Vol. I at 82:6-15 (Soto).

60. The source National Association of Latino Elected and Appointed Officials ("NALEO"), which Dr. Bejarano "rel[ied] pretty heavily on," Trial Tr. Vol. I, at 77:8-14, did not reflect that any of the aforementioned Latinos had served on the Dodge City Commission. *See*

17

Pls.' Ex. 55; *see also* Trial Tr. Vol. I at 81:2-11 (Dr. Bejarano noting that the "parentheticals" in Exhibit 55 are "additional Latinos that were not being captured fully in the NALEO directory").[1] According to Dr. Barreto, NALEO is an "extremely accurate" source that "call[s] every single elected official or their office in the United States to determine if the person is Hispanic or Latino." Trial Tr. Vol. II at 49:19-50-7. Dr. Barreto offered no explanation how, if NALEO actually "call[s] every single office and ask[s] people to self-identify," *id.*, all three of the Latinos that have served on the Dodge City Commission in the recent past were missed.

61.     In the same timeframe, four Latinos have filed to run for seats on the City Commission or run for City Commission: Fernando Jurado in 1998 and 2000; Liliana Zuniga in 2014 and 2017; Joe Nuci in 2019, 2021, and 2023; and Blanca Soto in 2021. CM/ECF Doc. 199, Jurado Dep. at 10:3-14, 12:25-13:1 (Jurado); Trial Tr. Vol. II at 73:23-74:1 (Zuniga); Pls.' Exs. 36, 40, Trial Tr. Vol. I at 61:9-22 (Nuci); Trial Tr. Vol. I at 61:23-62:1 (Soto).

62.     Mr. Jurado testified that he believed he was not re-elected to office in 2000 because he did not campaign aggressively enough. CM/ECF Doc. 199, Jurado Dep. at 15:7-13. Mr. Jurado gave no indication that he believed he was not re-elected for any race-related reason or that the City's at-large election method for City Commission was to blame for his defeat. *Id.* at 3-6.

63.     Ms. Zuniga filed paperwork to run for a seat on the Dodge City Commission in 2017, but for health and timing reasons she could not actively campaign and could not withdraw her name from the ballot. Trial Tr. Vol. IV at 78:2-13.

64.     In 2021, then-Commissioner Joyce Warshaw resigned from the Commission. Trial Tr. Vol. I at 51:6-10.

---

[1]     Notably, Dr. Bejarano never added Commissioner Nuci to her table, Trial Tr. Vol. 1 at 83:16-84:2; rather, he was relegated to just a footnote due to "some concern" about whether his self-identification as a Latino was correct, *id.* at 83:24.

65.    The Commission received 13 applications for Ms. Warshaw's open seat, and the Commission ultimately interviewed two finalists, Blanca Soto and Jan Scoggins, to appoint to Ms. Warshaw's vacant seat. Trial Tr. Vol. I at 51:14-19; Trial Tr. Vol. IV at 124:16-125:4.

66.    The Commission voted unanimously to appoint Blanca Soto, a Latina, to the Dodge City Commission. Trial Tr. Vol. IV at 125:5-9; Trial Tr. Vol. I at 51:20-22.

67.    Ms. Soto lives in the northern half of Dodge City. Trial Tr. Vol. I at 60:23-24.

68.    Numerous other Dodge City Commissioners live in the northern half of Dodge City, including current or former Commissioners Smoll, Sowers, Scoggins, Delzeit, Warshaw, Nuci, Reinert, and Pogue. Trial Tr. Vol. III at 148:2-5 & 149:23-150:9.

69.    One current commissioner, Chuck Taylor, lives in the southern half of Dodge City. Trial Tr. Vol. I at 60:25-61:2.

### 3.  City Leadership

70.    Dodge City's city manager, Nick Hernandez, is Latino. Trial Tr. Vol. IV at 86:3-7, 89:9-13.

71.    City Manager Hernandez is a reflection of the role that Latinos play in the leadership in the community. He testified that he is a fifth-generation Ford County resident, whose great-great grandfather first migrated to Dodge City's Mexican village and whose great grandfather worked for the railroad. Trial Tr. Vol. IV at 87:7-16. Mr. Hernandez's great uncle's brother, Louis Sanchez, was the first Hispanic mayor of Dodge City. *Id.* at 87:17-22. After growing up in Dodge City, Mr. Hernandez himself served in the Marine Corps and attained a master's degree in public administration. *Id.* at 86:22-87:6. Now, in addition to serving as City Manager, Mr. Hernandez is on the governing body of the League of Kansas Municipalities and is an ex officio board member of the Dodge City Chamber of Commerce and the Ford County Economic Development Corporation. *Id.* at 90:18-91:3. On top of that, Mr. Hernandez has served in roles

with Humanities Kansas and the Kansas Emergency Management Committee for Planning and Response. *Id.*

72.     From 2014 to 2022, Mr. Ernestor De La Rosa served in numerous roles as an employee of Dodge City, ultimately as the assistant city manager for legislative affairs. Trial Tr. Vol. III at 272:23-274:18. Mr. De La Rosa identifies as Latino-Hispanic. Trial Tr. Vol. III at 272:14-15.

73.     From 2020 to the present day, Melissa McCoy has served as an assistant city manager in Dodge City. Trial Tr. Vol. IV at 66:17-20. Ms. McCoy, who previously lived in Mexico for nearly 10 years, is fluent in Spanish, and is married to a Mexican national who is a naturalized United States citizen. *Id.* at 66:21-67:5; *id.* at 68:5-17. In addition to Ms. McCoy, Connie Vasquez, a Latino, currently service as the City Clerk for Dodge City. Trial Tr. Vol. I at 42:19-24.

74.     Plaintiff Rangel-Lopez views Ms. McCoy and Mr. De La Rosa as people that have been "very active with Latino issues in the community," Trial Tr. Vol. I at 39:15-16 (McCoy), "passionate about Latino issues," *id.* at 38:6-7 (De La Rosa), and who he "look[s] up to as public servants," *id.* at 39:17-20. Plaintiff Rangel-Lopez describes Ms. Vasquez as "wonderful." *Id.* at 42:24.

75.     Plaintiff Rangel-Lopez also believes that Mr. Hernandez tries to be receptive to the needs of the Latino community in Dodge City. *Id.* at 38:23-25.

### 4.  *Community Engagement and Outreach to Latinos*

76.     At the time of trial, the National League of Cities named Dodge City as a finalist for its cultural diversity award as a result of Dodge City's Engage Dodge program. Trial Tr. Vol. IV at 70:11-71:9. The Engage Dodge program is a program that Dodge City offers to the public and its residents who received naturalization scholarships that is designed to educate them about

local government, including Dodge City's department heads, city staff, administration, and commissioners. *Id.*; Trial Tr. Vol. III at 308:16-309:6.

77.    Dodge City gives its city employees additional pay if they are bilingual in English and Spanish. Trial Tr. Vol. IV at 68:21-69:11.

78.    Dodge City publishes city documents in both English and Spanish. Trial Tr. Vol. III at 314:2-4.

79.    Dodge City is a member of the Southwest Kansas Coalition, along with Garden City and Liberal, that works on legislative issues important to Southwest Kansas including housing, transportation, air transportation, and immigration. Trial Tr. Vol. III at 274:10-18.

80.    Through the Southwest Kansas Coalition, Dodge City was successful in bringing mobile United States citizenship and immigration services to Dodge City that ultimately resulted in naturalization ceremonies taking place in Dodge City. Trial Tr. Vol. III at 284:2-285:5. Dodge City also offered free space in its facilities for the events in coordination with Dodge City's Cultural Relations Advisory Board and the Ford County elections office. *Id.* At those events, Dodge City encouraged its new citizens to register to vote. *Id.*

81.    Dodge City further published information in its city buildings, where individuals would come in to pay their utility bills, to inform residents in Spanish and English about how to become a citizen and how to vote. Trial Tr. Vol. III at 285:6-14.

82.    Dodge City established the Cultural Relations Advisory Board in 2010 to work on multicultural affairs in Dodge City. Trial Tr. Vol. III at 299:17-300:6. The Cultural Relations Advisory Board is made up of representatives from organizations in the Dodge City community, along with two at-large members, and provides Dodge City feedback and help with other events like Dodge City's International Festival. *Id.*; Def.'s Ex. 447; Trial Tr. Vol. IV at 73:15-74:2.

83.     Dodge City specifically includes representatives of its meatpacking plants on the Cultural Relations Advisory Board. Trial Tr. Vol. III at 299:17-300:23.

84.     Dodge City holds the International Festival on an annual basis in conjunction with the Welcoming America organization's Welcoming Week. Trial Tr. Vol. III at 307:1-18; Def's Ex. 458 at 1. The goal of the International Festival is to bring together residents of different backgrounds and ethnicities. Trial Tr. Vol. III at 307:1-18.

85.     Among other initiatives, the Cultural Relations Advisory Board ("the Board") obtained a grant from Welcoming America and the Immigration Policy Institute to develop a Strategic Plan for Welcoming and Integration for new immigrants to Dodge City ("the Plan"). Trial Tr. Vol. III at 300:24-302:2. Pillars of the Strategic Plan included: (1) Equitable Access; (2) Civic Engagement; (3) Refugee and Immigration Integration; (4) Safe and Healthy Community; and (5) Economic Opportunity and Education. *See* Def's Ex. 447 at 3-4. The process for developing the Plan started in February 2021 and concluded one year later. *See id.* at 2. Plaintiff Rangel-Lopez, along with a number of other prominent Latinos in the community, including, but not limited to, Ms. Monica Vargas, who Plaintiffs called at trial, and Ms. Blanco Soto, was appointed as a member of the Steering Committee for the Strategic Plan. Trial Tr. Vol. I at 23:2-7; Def.'s Ex. 447 at 2-3.

86.     Beginning in 2021, Dodge City began hosting the New Americans Dinner for recently naturalized citizens and their guests, where guests have an opportunity to speak and share their story of becoming United States citizens. Trial Tr. Vol. III at 307:24-308:15. Def's Ex. 458 at 1. Dodge City's city manager and city commissioners attend the New Americans Dinner to connect with the community. Trial Tr. Vol. III at 307:24-308:15.

87.     Dodge City further offers naturalization scholarships to residents who participate in Engage Dodge to help defray naturalization fees through the United States Citizenship and Immigration Services. Trial Tr. Vol. III at 309:7-310:3; Def's Ex. 458 at 3.

88.     In addition, in response to requests from its residents, Dodge City invites representatives from Mexico's Consular Services to assist residents in voting abroad or with immigration issues. Trial Tr. Vol. III at 310:4-311:3; *id.* at 311:24-312:11. Likewise, Dodge City invites and hosts representatives from the Guatemalan Consulate to provide the same services to Dodge City's Guatemalan residents. *Id.* at 311:12-312:11.

89.     Dodge City also offers a Deferred Action for Childhood Arrivals ("DACA") clinic that helps individuals renew their DACA enrollment or naturalize in the United States. Trial Tr. Vol. III at 312:16-25.

90.     Dodge City actively promoted and assisted with the 2020 Census, including by knocking on residents' doors to discuss the census and holding in-person registration days with the Dodge City school district. Trial Tr. Vol. III at 313:1-314:1.

91.     When the coronavirus pandemic occurred in 2019, the President of the United States issued an executive order recognizing the importance that "processors of beef . . . in the food supply chain continue operating . . . ." Def.'s Ex. 499 at 1. The order thus directed the Secretary of Agriculture to "take all appropriate action . . . to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the [Center for Disease Control] and [Occupational Safety and Health Administration]." *Id.*

92.     In response to the pandemic, Mr. De La Rosa also successfully engaged the Kansas Governor's Office to ensure that the Governor prioritized meatpacking workers as essential workers who would be among the first to receive vaccines. Trial Tr. Vol. III at 297:9-298:6.

93.     Plaintiffs retained Dr. Ruben Martinez to opine on the history of official discrimination in Dodge City Kansas. Trial Tr. Vol. II at 207:25-208:9. Dr. Martinez, however, testified that he did not find any evidence of official discrimination in voting or elections in Dodge City. Trial Tr. Vol. II at 221:2-5. Likewise, Dr. Martinez was unable to find any policy of school segregation in Dodge City or ban on children from the Mexican Village attending Dodge City public schools. *Id.* at 219:13-23. Dr. Martinez offered no testimony regarding any discrimination that Latinos faced in employment or receiving healthcare. While Dr. Martinez remembered finding an unnamed article in an unnamed publication written sometime in the early 1980s by someone who he "think[s] his name [wa]s Arthur or Arturo Martinez" that "mentioned that there was restrictive covenants [in Dodge City]," *id.* at 196:9-17, Dr. Martinez did not find and "review [any] actual covenants themselves or the municipal code" to confirm the existence of restrictive covenants in Dodge City, *id.* at 216:4-8.

94.     The City renders its services to its citizens without consideration of race or where they live. For instance, since 2017, the City has utilized what is called the pavement condition index ("PCI"). Trial Tr. Vol. IV at 94:10-22. The PCI divides the City into six maintenance zones and scores each road in a particular zone. *Id.* The City maintains these zones on a "rotational-type basis," with those areas with the lowest PCI score getting the attention first. *Id.* at 94:10-95:10. Additionally, the City is currently in the midst of a $15 million "streetscape project in the downtown area," *Id.* at 94:1-9. The City has "committed up to $5 million for improvements in the Downtown Historic Heritage Area." *Id* at 95:19-96:2. Also, the City has committed substantial amounts of resources and time to a "complete reconfigur[ation] of the Wright Park area," "adding a water feature for [its] residents," and "redoing the Hoover Pavilion," "Friendship Park," and the "Beeson playground system." *Id.* at 96:5-97-1. All of these investments are south of Comanche

and many are also below the more southern Wyatt Earp Boulevard and Trail Street. *Id.* at 96:5-97:1. While the City has shown property owners some grace regarding the condition of the sidewalks on their property and offers a "sidewalk program that helps offset the cost [of] maintain[ing] th[em]," the responsibility for maintaining those sidewalks remains, under Kansas law, ultimately with the property owner. *Id.* at 97:2-15; *see also* K.S.A. 12-1808.

95.     City leadership is intentional about listening and responding to the needs of its residents. For example, at every City Commission meeting, a portion is specifically allotted to visitors and that allotment is set at the beginning, not the end, of the meeting so as not to discourage Dodge Citians from participating. *Id.* at 92:6-93:10. To participate in the meeting, a resident need not call ahead or be asked to be put on the agenda; rather, they just show up. *Id.* at 93:11-13.

**D.  At-Large Elections in Dodge City**

*1.  Implementation, Function, and Purpose*

96.     Since before1971, Dodge City has used an at-large election method to elect its city commissioners. Stipulation of Facts & Exs., CM/ECF Doc. 178 at 2 ¶ 16, 4 ¶ 43.

97.     Of the cities in the United States that have a population between 20,000-50,000 and use a commission-manager form of government, more than 66% of those cities use an at-large election method. Trial Tr. Vol. IV at 38:12-20; Def.'s Ex. 468.

98.     Historically, beginning in the early 1900s, cities moved away from ward-based election systems to help eliminate corruption and to better enable public choice in elections. Trial Tr. Vol. IV at 39:3-19.

99.     At-large elections, by a wide margin, are the most common election for forms of city government like Dodge City. Def.'s Ex. 468 at 2. As Dr. Kimberly Nelson testified, at-large elections were not historically designed to suppress anyone's voting power. Trial Tr. Vol. IV at

39:20-40:12. Rather, the founder of the council-manager form of government, Richard Childs, favored at-large elections in smaller communities to facilitate the election of leaders who look out for the interests of the whole community; smaller communities that use districts, on the other hand, tend to elect single-issue candidates whose focus is so narrow that it has a tendency to create dysfunctional conflict. Trial Tr. Vol. IV at 39:20-41:10. Overall, it is Dr. Nelson's professional opinion that district-based "boards generally don't function as well as they would in an at-large system. *Id.*

100.     At trial, Dodge City city employees and City Commissioners discussed the value of at-large elections in Dodge City. City Manager Hernandez testified that while "he believe[s] that there is a place for district elections, especially in communities that are large enough to not have proper representation or not have the ability to actually communicate with any of [their] Commissioners," Dodge City is not such a community, constituting roughly have a single district in Wichita. Trial. Tr. Vol. IV at 98:23-99:13. Mr. Hernandez also highlighted the risk of district-based elections in smaller communities, where commissioner races can be decided by just a handful of votes. *Id.* From his perspective as City Manager, Mr. Hernandez stated that the current form of elections for City Manager results in "a unified community [and] a unified Dodge City." *Id.* at 98:18-22. Former City Manager, Ms. Cherise Teiben, echoed that sentiment, stating, based on her roughly 40 years of service to the City, that it is her "belief that five people that represented everybody gave better representation than one that represented this segment because it seemed like they would be doing more politics [and looking out more for their own respective ] district versus what's best for the City as a whole." Trial Tr. Vol. III at 251:12-25. Sitting and former City Commissioners also expressed a similar view. Current Commissioner Sowers stated that, under the at-large election method, "each and every individual in the City has five commissioners they

can go and talk to. I represent the entire City. The entire community." Trial Tr. Vol. IV at 127:15-128:1. Former Commissioner Jurado described the advantage of at-large elections being: "you represent the whole city, not just a district or a part of the city." CM/ECF No. 199, Jurado Dep. at 15:14-19.

101.    There is no evidence that Dodge City adopted at-large elections to discriminate against Latinos or any other minority group. *See* Trial Tr. Vol. II at 201:25-203:18 (opining on at-large elections generally); Trial Tr. Vol. IV at 39:20-40:12 (same). Likewise, there is no evidence that Dodge City has maintained its current form of at-large City Commission elections in order to discriminate against Latinos

102.    Notably, unlike district elections' effect on African American candidates, district elections do not have a strong effect in the chances for Latino candidates' election to office. Trial Tr. Vol. IV at 41:11-17. According to Dr. Nelson, she has not seen "a very strong effect for district elections alone leading to a better chance for a Latino candidate being elected." *Id.* District elections also do not affect the likelihood that women will be elected to office. *Id.* at 42:8-11.

### 2. *Public Comments on At-Large Elections*

103.    Ms. Seibel Robb, who served in the Ford County Clerk's office from 2001 to 2015, never received a complaint about Dodge City's use of at-large elections generally or that Dodge City's at-large elections adversely affected Latinos' ability to elect their candidates of choice. Trial Tr. Vol. II at 16:11-19.

104.    Ms. Cherise Tieben testified that, in her roughly forty-years of service as a Dodge City city employee, she was unaware of a single complaint made by Latinos that the method by which Dodge Citians elect their City Commissioners prevented or otherwise dissuaded them from running for City Commission. Trial Tr. Vol. III at 247:10-248:7.

105.    Plaintiff Rangel-Lopez recalls one private conversation that he had in 2017 at a meeting with Ms. Scoggins and another individual, Johnny Dunlap, director of the Ford County Democratic Party, Trial Tr. Vol. I at 34:20-22, about at-large election system and a potential move to single-member districts. *Id.* at 21:15-22:4. Mr. Rangel-Lopez believes that wasn't the only conversation they had about at-large districts, but did not remember any other specific conversation. *Id.* at 22:5-12.

106.    As a member of the Cultural Relations Advisory Board's Steering Committee, Mr. Rangel-Lopez raised the idea of moving away from at-large elections in 2021, but the Steering Committee, which was composed of a number of prominent and influential Latinos in the area, including, but not limited to, Ms. Blanco Soto and Ms. Monica Vargas (who testified at trial), *see* Def's. Ex. 447 at 2, decided against including the issue in its final Strategic Plan. Trial Tr. Vol. I at 24:4-10; *id.* at 25:5-25.

107.    Mr. De La Rosa, who was a member of the Cultural Relations Advisory Board's planning team, explained that Mr. Rangel-Lopez brought up the idea of district elections and that the group discussed the issue, but that Mr. Rangel-Lopez did not bring it up again after that. Trial Tr. Vol. IV at 14:12-15:6.

108.    When Mr. Rangel-Lopez interned in the City Manager's office, he never raised a concern about Dodge City's at-large election system with city officials—elected or otherwise. Trial Tr. Vol. I at 28:12-16; Trial Tr. Vol. III at 278:8-17.

109.    Plaintiff Coca recalls one private conversation he had with Mr. Rangel-Lopez about Dodge City's use of at-large elections. Trial Tr. Vol. III at 135:23-136:8. Mr. Coca, however, did not raise the issue of at-large elections with the Dodge City Commission or anyone else part of Dodge City's city government. *Id.* at 136:9-12.

28

110.    In November 2018, Dodge City's then-City Manager, Cherise Tieben, sent an email to City Commissioners to inform them that "there may be a group attending the City Commission to discuss the possibility of districting instead of at-large elections," and that she and her staff had already begun "researching the pros and cons of such action." Pls.' Ex. 20.

111.    No group, however, ever came before the City Commission to discuss the possibility of districting. Trial Tr. Vol. III at 179:8-13; Trial Tr. Vol. IV at 126:6-14.

112.    In February 2019, then-Commissioner Scoggins raised the issues of districting at a City Commission meeting. Trial Tr. Vol. III at 166:12-14. The meeting minutes show that Ms. Scoggins "asked the City Commission to direct staff to look at changing elections in Dodge City to having 3 City Commissioners elected by District and 2 elected at-large, and to also consider term limits." Pls.' Ex. 29 at 3. The Dodge City Commission then directed city staff, including the Legal Department, to get more information for further discussion. *Id.*; Trial Tr. Vol. IV at 134:6-16.

113.    At a later commission meeting in April 2019, City Attorney Brad Ralph discussed the issue of at-large and district elections, *id.* at 127:1-4, and, ultimately, Commissioners Delzeit and Warshaw opposed city staff continuing to look into the measure. Pls.' Ex. 32 at 2.

114.    When asked at trial what her thought process was for making her 2019 request, Ms. Scoggins stated that she "didn't really know [w]hat [she] had [been] thinking about"—she just "want[ed] a change." Trial Tr. Vol. III at 179:1-7. Who exactly she wanted change for, though, is unclear from the record, and there is no indication that Ms. Scoggins's request was for the benefit of Latinos, as she mentioned no Latino group, or even any individual Latino, as supporting her effort.

115. Ms. Scoggins did say that she does not recall the Democratic Party, Republican Party, union organizations, chambers of commerce, charitable groups, or Latino organizations expressing support for district elections. Trial Tr. Vol. III at 180:4-20; *id.* at 156:23-157:3.

116. Commissioner Sowers was not aware of any community support, other than Commissioner Scoggins, for a move to district elections in 2019. Trial Tr. Vol. IV at 126:11-25.

117. Mr. Dave Rebein, a four-generation Dodge Citian and active member of the Dodge City community, had never heard that Dodge City's use of at-large elections was a potential issue until this lawsuit was filed. Trial Tr. Vol. III at 229:12-230:1.

118. Mr. Rebein further testified that district elections would be divisive and would have the effect of preventing qualified candidates from attaining office. Trial Tr. Vol. III at 234:2-237:1.

119. In contrast, at-large elections, as noted by former City Commissioner and Latino, Mr. Fernando Jurado, are more unitive because commissioners "represent the whole city, not just a district or a part of the city." CM/ECF Doc. 199, Jurado Dep. at 15:14-19. This sentiment is one echoed by others that have substantial experience in city government administration. *See, e.g.*, Trial Tr. Vol. IV at 40:13-41:10; Trial Tr. Vol. III at 251:12-25.

120. Both Mr. Rebein and Mr. De La Rosa testified that, with Dodge City's current demographics and trends, all five city commissioners in Dodge City could be Latino under its current election system. Trial Tr. Vol. III at 234:2-237:1 ("I look forward to the day, and I believe the day is coming, where we will have a majority and maybe all five commissioners that would be Hispanic, that's a very, very possible thing."); *id.* at 318:16-319:16 ("[H]aving lived in Dodge City, if we were an active community, voter community, regardless of what it is, having the 60 percent, 70 percent Latino Hispanic and they knew local elections, they were registered to vote, we would flip any committee or commission in the community tomorrow."); Trial Tr. Vol. IV at

25:3-14 ("If my community were to be educated and showed up to the polls, those commissions, those boards would look different tomorrow.").

## E. Election Administration

### 1. County Administration of Dodge City's Elections

121.    The Ford County Clerk is responsible for administering elections in Dodge City and, among other responsibilities, is responsible for establishing polling locations, publishing election materials, recording voter registrations, printing ballots, and tabulating votes. Trial Tr. Vol. I at 226:20-227:7; *id.* at 59:24-60:17; *id.* at 230:3-7.

122.    Ford County gives voters numerous options to vote, including three weeks of advance voting at the Ford County Government Center in downtown Dodge City, absentee voting, and in-person voting on election day. Trial Tr. Vol. I at 60:4-17; *id.* at 164:13-17; Trial Tr. Vol. III at 293:14-22.

123.    Kansas law requires that Dodge City hold its city-commission elections in odd-numbered years. Trial Tr. Vol. III at 180:21-181:6; K.S.A. 25-2107(a).

124.    Aside from choosing an election method by ordinance, Dodge City has no formal role in the conduct of municipal elections. Trial Tr. Vol. III at 249:12-19; *id.* at 279:2-21.

125.    Three seats on the Dodge City Commission go up for election in each election cycle. Trial Tr. Vol. IV at 116:12-17. The top two vote-getters in each election serve four-year terms, while the third-place vote-getter serves a two-year term. *Id.*

126.    Voters in City Commission elections can thus vote for up to three candidates in each election, though they may vote for less than three. Trial Tr. Vol. II at 137:16-138:12 & 100:4-5. Here, the only evidence regarding whether voters generally cast all 3 of their respective votes in Dodge City Commission elections is Dr. Barreto, who said, based on his experience, it "is quite

common to hear from voters that they might have only voted for two if they recognized two names or in some instances only one." *Id.* at 138:8-16. Dr. Barreto concedes that the fact that voters like those in Dodge City Commission elections get up to three votes "presents a challenge for us." *Id.* at 138:17-139:14.

127.    Elections for the Dodge City Commission are non-partisan. Stipulation of Facts & Exs., CM/ECF Doc. 178 at 4 ¶ 44; Trial Tr. Vol. I at 55:8-10; Trial Tr. Vol. III at 228:16-229:6.

128.    Since at least the early 2000s, Ford County has published election materials in both English and Spanish, including filing instructions, ballots, voting instructions, and election-related signage. Trial Tr. Vol. I at 232:15-233:8; Trial Tr. Vol. II at 17:17-18:7.

129.    The Ford County Clerk's Office also makes efforts to educate Latino voters, including attending meetings of Latino organizations, helping Latinos register to vote, walking Latinos through the voting process, going to high-traffic locations in Dodge City to educate Latino voters, and submitting election-related materials to Dodge City's Spanish paper. Trial Tr. Vol. II at 18:22-20:6.

130.    Though Dodge City does not have a formal role in administering local elections, it partners with Ford County in advertising election information, assisting with accessibility issues, and providing bilingual poll workers, facilities, and free public transportation. Trial Tr. Vol. III at 279:2-9; *id.* at 285:23-287:2.

131.    Dodge City, for example, gives employees the option to take off work on election day to assist as bilingual poll workers (receiving pay from Ford County), or to get paid their normal wage to work at a polling site as a poll worker. Trial Tr. Vol. IV at 69:12-70:2.

132.    Dodge City also publishes election-related advertisements in English and Spanish reminding the public to register to vote. Def.'s Ex. 446; Trial Tr. Vol. III at 279:25-280:18; *id.* at 281:22- 282:3.

133.    Since at least 2015, Dodge City has also offered its residents free public transportation to vote in advance or on election day. Trial Tr. Vol. III at 281:3-17.

134.    Since at least 2016, Dodge City has also published advertisements in English and Spanish about the availability of free public transportation to Dodge City's polling locations on election days. Def's Ex. 445; Trial Tr. Vol. III at 280:19-281:20; *id.* at 281:3-14; Def's Ex. 409; Trial Tr. Vol. III at 289:8-290:7.

135.    In addition, Dodge City encourages its own employees to vote and allows them to take time out of the workday to vote. Def.'s Ex. 452; Trial Tr. Vol. III at 282:16-283:19.

### 2. *Polling Locations*

136.    Since at least 2001, Ford County used one polling location in Dodge City. Trial Tr. Vol. II at 20:11-16.

137.    In 2018, Ford County moved Dodge City's polling location from the Civic Center, on the north side of Dodge City, to the Expo Center, near Dodge City's southern city limits. Stipulations of Fact & Exs., CM/ECF Doc. 178 at 4 ¶¶ 45-46; Trial Tr. Vol. I at 229:25-230:20; Trial Tr. Vol. III at 249:20-250:8.

138.    Dodge City had no role in deciding where the new polling location would be. Trial Tr. Vol. III at 249:12-19.

139.    Because Dodge City elects its commissioners in odd-numbered years, the 2018 election was not a city-commission election. Trial Tr. Vol. III at 180:21-181:6; Trial Tr. Vol. III at 293:11-13.

140. In response to the polling-location change, Dodge City offered free door-to-door public transportation to the new polling location, positioned bilingual City staff at the former polling location to explain the location change, and provided free transportation from the old polling location to the new polling location. Trial Tr. Vol. III at 291:21-292:25.

141. There is no evidence in the record that any resident of Dodge City could not vote in 2018 because of the change in polling location. *See* Trial Tr. Vol. III at 295:15-19; Trial Tr. Vol. III at 250:9-21.

142. A federal lawsuit was brought against the Ford County Clerk over the polling-location change in 2018. Trial Tr. Vol. I at 9:16-10:6. Like here, Plaintiff Rangel-Lopez was the plaintiff in that case as well.

143. After the 2018 election, the Ford County Clerk committed to opening a second polling location in Dodge City. Trial Tr. Vol. I at 10:7-15.

144. Today, Dodge City has two polling locations. Trial Tr. Vol. I at 10:7-15; *id.* at 229:12-13.

145. The only evidence in the record regarding wait time at Dodge City polling locations indicates that the longest a voter must wait to vote, even in even-year Presidential elections, is three minutes. Trial Tr. Vol. IV at 98:4-14.

146. There is no evidence in the record that any Dodge Citian has complained about wait times at Dodge City's polling locations. *See id.* at 98:15-17.

147. There is no evidence in the record that the current number of polling locations in Dodge City has led to anyone—Latino or otherwise—being unable to vote. *See* Trial Tr. Vol. III at 250:16-21.

148.    There is no evidence in the record that the number of polling locations in Dodge City was intended to suppress or otherwise adversely affect Latinos' ability to vote nor has there been any evidence that the number or location of polling locations in Dodge City have had such an effect.

### 3. *Department of Justice Inquiries*

149.    Beginning in the early 2000s, the United States Department of Justice sent poll watchers to Dodge City to observe Dodge City elections for four or five election cycles. Trial Tr. Vol. II at 22:1-23:8.

150.    The Department of Justice indicated to Ford County that the County would only hear back from them if they found a violation. Trial Tr. Vol. II at 23:9-19.

151.    The Department of Justice, however, never gave Ford County any indication that Ford County was discriminating against Latinos, that Latinos were having their votes depressed, or that Latinos faced any impermissible barriers to voting in Dodge City. Trial Tr. Vol. II at 24:7-18.

152.    At the time, and until 2018, Ford County used one polling location at the Dodge City Civic Center. Stipulations of Fact & Exs., CM/ECF Doc. 178 at 4 ¶¶ 45-46.

153.    In June 2011, the Department of Justice sent Ford County a letter requesting various election materials dating back to January 2000 including maps, voter lists, turnout data, and election data. Pls.' Ex. 1.

154.    After the Department of Justice contacted Ford County, the Ford County Clerk, Ms. Sharon Seibel Robb, disclosed the request to the County Commission. Ms. Seibel Robb also contacted a voting-rights consultant, Mr. Bruce Adelson, and later asked for and received from the

Ford County County Commission authority to engage Mr. Adelson to assist her with the County's response. Pls.' Ex. 3.

155.    Neither Ford County nor Dodge City officials expressed any kind of pushback to the Ford County Clerk having Mr. Adelson investigate voting-rights issues. Trial Tr. Vol. I at 240:5-15.

156.    According to Mr. Adelson, based on his "expertise obtained during [his] career with the United States Department of Justice (DOJ), Civil Rights Division, Voting Section," the Department of Justice "w[ould] use th[e requested] data to determine whether the City Commission's at-large method election violates Section 2 of the VRA. . . . If DOJ determines that the electoral structure for the City Commission violates the VRA, DOJ will seek a remedy, either via Consent Decree or contested litigation, which normally involves eliminating the at-large structure and constructing smaller election districts." Pls.' Ex. 4 at 1.

157.    Mr. Adelson conducted an investigation into the matter, including meeting with Dodge City city officials. Trial Tr. Vol. II at 13:24-14:4.

158.    Mr. Adelson never produced a report to Ford County that documented his findings or opinions. Trial Tr. Vol. II at 28:3-5.

159.    Ms. Seibel Robb does not recall Mr. Adelson giving any oral opinion on whether racially polarized voting was happening in Dodge City, or whether he had concluded that there was a Section 2 violation. Trial Tr. Vol. II at 28:3-9; *id.* at 28:25-29:2.

160.    After Mr. Adelson's investigation ended, neither Ms. Seibel Robb nor Dodge City concluded that Dodge City needed to revise its election method. Trial Tr. Vol. II at 14:5-18.

161.    Ford County ultimately responded to the Department of Justice's letter and produced all of the information and data that the Department of Justice requested. Trial Tr. Vol. II at 29:10-30:5.

162.    After Ford County produced the documents that the Department of Justice requested, the Department of Justice did not contact Ford County again about a potential section 2 violation. Trial Tr. Vol. II at 30:16-20. Furthermore, the Department never sought a "remedy, either via Consent Decree or contested litigation," as Mr. Adelson had previously warned it would if a violation was found in fact found.

**F.  City Commission Campaigns**

163.    Campaigns for city commission in Dodge City are inexpensive, where candidates typically advertise by yard signs, personally knock on voters' doors, and attend community-organization meetings. Trial Tr. Vol. I at 19:3-20:9; Trial Tr. Vol. III at 158:3-9; Trial Tr. Vol. III at 173:4-9; Trial Tr. Vol. III at 230:14-231:6; Trial Tr. Vol. IV at 119:18-120:2.

164.    Dr. Bejarano did not analyze either the amounts that candidates spent on campaigning for the Dodge City Commission or the methods by which candidates campaign for the Dodge City Commission. Trial Tr. Vol. I at 163:7-12.

165.    In 2006, during Commissioner Rick Sowers's first campaign for the Dodge City Commission, he estimated that he spent between $4,000 and $6,000. Trial Tr. Vol. IV at 120:14-25. Since then, he cannot recall spending more than $1,000 on any of his four subsequent campaigns for city commission. Trial Tr. Vol. IV at 121:1-3.

166.    Former Dodge City Commissioner Jan Scoggins agreed that a campaign for the Dodge City Commission was not particularly expensive. Trial Tr. Vol. III at 172:25-173:9. According to Ms. Scoggins, she "spoke to every civic and social club and church group that would

let [her] speak to them." *Id.* at 158:3-9. Despite Plaintiffs contending that Ms. Scoggins was the Latino preferred candidate, Ms. Scoggins apparently never spoke to a single Latino organization or club; instead, the members of the organizations and clubs that she spoke to allegedly "were all Caucasian." *Id.* at 158:10-13.

167.    Mr. David Rebein, who has served as the head of both the Republican Party and the Democratic Party in Ford County at various times, testified that campaigns in Dodge City are "extremely inexpensive," and that candidates typically spend less than $5,000. Trial Tr. Vol. III at 230:14-231:6; *see also id.* at 223:10-20. Mr. Rebein reasoned that it is "not effective" to spend money on campaign advertisements for City Commission. Trial Tr. Vol. III at 230:14-231:6.

168.    Mr. Rebein, who has also "been involved in recruiting for campaigns" testified that "it's hard to get people" to run for the Dodge City Commission, that "a lot of people don't want to do it," and that a lot of people who could otherwise run for the City Commission have "other priorities." Trial Tr. Vol. III at 234:2-237:1. Similarly, Ms. Tieben testified regarding efforts to recruit Latinos to run and recounted how the individuals that had been approached demurred "because they ran businesses and they felt like it would take too much time." Trial Tr. Vol. III at 247:14-248:7.

169.    There is no evidence that racial appeals have ever been used in Dodge City campaigns generally or in Dodge City Commission elections specifically. Trial Tr. Vol. III at 231:7-24; Trial Tr. Vol. II at 16:24-17:5.

170.    Similarly, Dr. Bejarano was not aware of and did not describe any specific barriers to Latinos filing to run for the Dodge City Commission. Trial Tr. Vol. I at 163:20-22.

171.    Ms. Sharon Seibel Robb, who served in the Ford County Clerk's office from 2001 to 2015, had never heard a complaint that Latinos were unable to run for the Dodge City

Commission because the barriers were too high. Trial Tr. Vol. II at 16:20-23. Forty-year Dodge City city employee, and former City Manager, Ms. Tieben similarly testified. *See* Trial Tr. Vol. III at 247:10-248:7.

172.     In 2021, a Republican Party-oriented political-action committee, Kansans for Liberty, released a "slate" of candidates that included Joe Nuci, a Latino, and Michelle Salinas, who has a Latino surname. Pls.' Ex. 137; *see also* Trial Tr. Vol. I at 53:13-54:13.

173.     Plaintiffs presented no evidence that a large number of Latinos in Dodge City had mobilized behind or otherwise campaigned for any particular candidate for Dodge City Commission.

174.     There is no evidence that City Commission elections are marred by racial appeals. The evidence shows the contrary—in 1998 and 2000, Fernando Jurado campaigned for the Dodge City Commission on a platform of "unity in the community." CM/ECF Doc. 199, Jurado Dep. At 10:3-14. And, as Mr. Rebein testified, the longstanding theme in Dodge City "is to unify, unify, unify." Trial Tr. Vol. III at 231:7-24.

## III. The Plaintiffs' Proposed Districts

### A.  Racial Predomination in the Plaintiffs' Maps

175.     Plaintiffs' mapping expert, Dr. Oskooii, drew 14 proposed maps, each dividing Dodge City into five districts. Trial Tr. Vol. II at 229:10-12; *see also* Pls.' Exs. 96 (Map 1), 97, (Map 2), 98 (Map 3), 99 (Map 4), 100 (Map 5), 101 (Map 6), 102 (Map 7), 103 (Map 8), 104 (Map 9), 105 (Map 10), 106 (Map 11), 107 (Map 12), 108 (Map 13), 109 (Map 14).

176.     When drawing his maps here, Dr. Oskooii was "given essentially a blank canvas," where, he has the map drawer, "g[o]t to decide where the lines go." Trial Tr. III at 5:10-15.

177. According to Dr. Oskooii, the way in which map drawers guard against bias—implicit or otherwise—is to moor themselves to the "applicable redistricting criteria." *Id.* at 5:16-6:15. Dr. Oskooii went on to say that map drawers that "predominantly us[e] race and ethnicity" could be engaging in "gerrymander[ing]" by "putting more of a particular group in a certain district in order to impact their ability to affect elections." *Id.* at 6:3-7:8.

178. Dr. Oskooii testified that he considered three traditional redistricting criteria when he drew his maps: population parity, compactness and contiguity, and communities of interest. Trial Tr. Vol. II at 228:18-229:1; *id.* at 230:9-19. Dr. Oskooii did not, however, attempt to minimize the splitting of precincts, which is listed as the first consideration in the handout published by the Kansas Office of Revisor of Statutes during the most recent Congressional and state legislative redistricting cycle, Pls.' Ex. 145, and, which is the only source that Dr. Oskooii listed as authority for his consideration of what constitutes a traditional redistricting criteria in Kansas, Trial Tr. Vol. III at 64:23-65-8.

179. It is Dr. Oskooii's understanding that demonstrative maps in which race predominates cannot be used for satisfying *Gingles* part 1. *Id.* at 54:7-10.

180. Of the three criteria that Dr. Oskooii considered, only one was "objective": total population. Trial Tr. Vol. III at 71:19-22. However, other than satisfying the basic one-person, one-vote requirement, total population has no place in the *Gingles* analysis. *Id.* at 73:21-24. As for the other two criteria that Dr. Oskooii considered, they are subjective. For compactness, Dr. Oskooii admits that it "is a relative inquiry" for which he performed no mathematical test to determine how compact his districts or populations therein were. *Id* at 74:22-75:12. With regard to communities of interest, Dr. Oskooii stated that the analysis is "definitely fluid" and not subject to "rigid boundaries." Trial Tr. Vol. II at 234:25-235:4.

181.    In an effort to purportedly understand Dodge City's communities of interest, Dr. Oskooii reviewed a handful of electronic and printed sources, Trial Tr. Vol. III at 84:8-85:8, as well as spent a few days in Dodge City talking with residents about the community and different geographic areas in Dodge City, Trial Tr. Vol. II at 229:18-230:8.

182.    Prior to speaking with people in Dodge City, Dr. Oskooii never developed a list of key people to talk to, Trial Tr. Vol. III at 87:11-14, nor did he develop a list of questions for each person that he was to talk to, *id.* at 87:15-86:1. As Dr. Oskooii made no contemporaneous notes, *id.* at 91:21-92:5, he does not know such basic facts as: (1) how many people he actually spoke to, *id.* at 88:2-5; (2) what percentage of the people he spoke to were White versus Latino, *id.* at 88:6-14; (3) what percentage of the people he spoke to lived in "North Dodge" versus "South Dodge," or any region in the City for that matter, *id.* at 89:6-12, 90:6-11; (4) whether the people he spoke to were citizens and were eligible to even vote, *id.* at 90:19-21; and (5) how many people he spoke to who were first-generation immigrants, *id.* at 90:22-91:1.

183.    Rather than planning out his informal interviews of people in Dodge City, Dr. Oskooii simply struck up conversations with roughly one hundred people that he happened to encounter while walking and driving around Dodge City. *Id.* at 85:14-21 & 88:2-5.

184.    Dr. Oskooii did not speak to anyone who spoke only Spanish. *Id.* at 91:2-8.

185.    For this engagement, Dr. Oskooii produced a table for each map that lists out each proposed district's population, number of citizens of voting-age population, and the percentage that Whites, Hispanics, African Americans, and Asians made up of the citizens of voting age population in each district. *See* Pls.' Exs. 69 (Map 1), 71 (Map 2), 73 (Map 3), 75 (Map 4), 77 (Map 5), 79 (Map 6), 81 (Map 7), 83 (Map 8), 85 (Map 9), 87 (Map 10), 89 (Map 11), 91 (Map 12), 93 (Map 13), & 95 (Map 14).

186.     Dr. Oskooii testified that in Maps 1 through 12, he analyzed only the total population for each district. Trial Tr. Vol. III at 74: 10-13. According to Dr. Oskooii, for Maps 1 through 12, he did not consider citizen, race, or age. In Maps 13 and 14, however, Dr. Oskooii testified that he specifically accounted for the population's citizenship, race, and ethnicity. Trial Tr. Vol. II at 232:11-19; *id.* at 270:6-11; Trial Tr. Vol. III at 111:1-4.

187.     With one exception, in each of Dr. Oskooii's 14 maps the following is true:

    i.    In Districts 1-3, there is a majority of Hispanic citizens of voting-age population;

    ii.    In Districts 1-3, Hispanics make up more than 55% of the citizens of voting-age population;

    iii.    In Districts 1-3, Whites make up less than 40% of the citizens of voting-age population;

    iv.    In Districts 4-5, Whites have a majority of the citizens of voting age population;

    v.    In Districts 4-5, the White citizens of voting-age population exceeds 60%;

    vi.    In Districts 4-5, the Hispanic voting-age population is less than 30%;

    vii.    In Districts 1-3, there are approximately one-and-a-half times more Hispanic eligible voters than White eligible voters;

    viii.    In Districts 4-5, there are approximately two times more White eligible voters than Hispanic eligible voters; and

    ix.    Districts 4 and 5 always have approximately two times more White eligible voters than the number of White eligible voters in Districts 1-3.

Trial Tr. Vol. III at 96:24-98:7; *id.* at 100:3-7; *id.* at 100:17-101:6; *id.* at 106:15-24; *id.* at 109:19-23; *id.* at 110:12-17; *id.* at 111:19-112:1.

188.    The sole exception from the constants listed above is Map 14, where the Hispanic citizens of voting age population in District 3 was 52.18%, as opposed to 55%. Trial Tr. Vol. III at 111:5-18.

189.    Outside of the constants listed above, the citizen voting age population, as well as the district lines, in Dr. Oskooii's proposed maps vary dramatically from map to map. For example, in Maps 1, 4, 5, 8, 13, and 14, District 4 has approximately twice as many eligible voters as District 2 does. *See* Pls.' Exs. 69 (Map 1), 75 (Map 4), 77 (Map 5), 83 (Map 8), 93 (Map 13), 95 (Map 14). Elsewhere, though, in Maps 9-12, Districts 2 and 4 have roughly the same number of eligible voters. *See* Pls.' Exs. 85 (Map 9), 87 (Map 10), 89 (Map 11), 91 (Map 12).

190.    With respect to the boundary lines, Districts 2 and 3 vary greatly in Dr. Oskooii's maps. In Maps 1-8 and 13-14, for example, District 2 is on the eastern side of Dodge City. *See* Pls.' Exs. 96-103, 108-09. In Maps 9-12, however, District 2 crosses Dodge City's entire width. *See* Pls.' Exs. 104-07. Similarly, in Maps 2, 3, 9, 10, 11, and 12, Dr. Oskooii placed District 3 north of Wyatt Earp Boulevard roughly in the center of town. *See* Pls.' Exs. 97-98, 104-07. But in Maps 4, 5, 8, 13, and 14, District 3 straddles Wyatt Earp Boulevard from the center of Dodge City to the City's western edge. *See* Pls.' Exs. 99-100, 103, 108-109.

### B.  The "Performance Analysis" of Dr. Oskooii's Maps

191.    Dr. Barreto, a tenured professor from the University of California, Los Angelas, Pls.' Ex. 111, completed a "performance analysis" of each of Dr. Oskooii's 14 maps to determine if they "give Latinos an opportunity to elect a candidate of their choice," Trial Tr. Vol. II at 105:10-106:5. The purpose of this "performance analysis," according to Dr. Barreto, is to prevent "go[ing] through the whole hassle of the whole trial, decid[ing] that the current system was bad and then adopt[ing] districts where no one could get elected." *Id.* at 105:20-25. Based on his vast experience,

Dr. Barreto believes that "performance analys[es]" are "an important part to demonstrate that [proposed] districts will work." *Id.* at 105:25-106:1.

192. Dr. Barreto and Dr. Oskooii have a long-standing relationship. Dr. Barreto was Dr. Oskooii's dissertation advisor back in the mid-2010s. Trial Tr. Vol. III at 26:20-23. Pls.' Ex. 111 at 14. Dr. Oskooii and Dr. Barreto have been retained in several voting-rights cases, each time by the plaintiff. Trial Tr. Vol. III at 25:3-26:13. Dr. Barreto and Dr. Oskooii have also co-authored at least four academic papers, Trial Tr. Vol. III at 29:24-30:25—at least two of which specifically relate to the ecological inference models that Dr. Barreto used for his expert opinions in this case, Pls.' Ex. 111 at 3.

193. Since Dr. Barreto estimates that White voters turnout in substantially larger numbers than Latino voters (in 2022, Dr. Barreto estimated that the figure was 64% to 30%, *id.* at 84:20-85:13), it cannot be assumed that just because Latinos make up a majority of eligible voters in a particular district in one of Dr. Oskooii's proposed maps that they will be able to elect their so-called of choice, *i.e.*, that a proposed district will perform.

194. Furthermore, unlike with African Americans, it is not settled that simply moving from at-large elections to district-based elections will have a material effect on Latinos' ability to elect their candidate of choice. Trial Tr. Vol. IV at 41:11-42:18.

195. For his "performance analys[es]," Dr. Barreto assumed that that 75% of Latinos would support a hypothetical Latino-preferred candidate and 25% of White voters would cross over to support the hypothetical Latino-preferred candidates. Trial Tr. Vol. II at 108:25-109:16.

196. Dr. Barreto's assumption is derived from how Latinos purportedly voted in partisan, two-person, one-seat statewide contests, Trial Tr. Vol. II at 108:25-109:15 & 155:12-24, not contests like the Dodge City Commission where voters can vote for up to three non-partisan

44

candidates in a field of more than three candidates, *see, e.g.*, Pls.' Ex. 36 (showing five candidates in the 2019 election, among other write-in candidates); Pls.' Ex. 40 (showing eight candidates in the 2021 election, among other write-in candidates). This is so, despite Dr. Barreto recognizing and telling the Court, in a different context, that "multi-candidate elections, where you get three votes [are] quite different contest[s] than just a two-person vote for one. Trial Tr. Vol. II at 99:22-100:9; *see also id.* at 141:2-13 (stating that "you can't directly overlay a vote for three election on what will happen in a single-member district" because "voting would be quite different if you could only vote for your most preferred candidate").

197.    In running his "performance analysis," Dr. Barreto used the citizen voting age population numbers associated with the 14 maps proposed by Plaintiffs, Trial Tr. Vol. II at 107:2-16, his estimate of turnout for Latino, White, Black and other racial group voters, *id.*, and his estimate of how cohesive Latino and White voters are (75% to 25%), *id.* at 108:25-109:15, to estimate how likely it was that a hypothetical Latino preferred candidate in a hypothetical two-candidate race (Latino voters preferred versus White voters preferred) would prevail in each of the five districts in the 14 proposed maps, *see id.* at 107:17-108:24 & 153:21-154:3.

198.    All of Dr. Barreto's tables had an analysis based on an undisclosed "current turnout," again an estimated number that Dr. Barreto seemingly largely drew from partisan, two-person, one-seat statewide elections, and "elevated turnout," a number that Dr. Barreto made up based on his "past [non-Dodge City related] analysis," as well as so-called "real-world examples" like "Yakima, Washington." Trial Tr. Vol. II 158:18-159:3. Dr. Barreto did not show his analysis. At trial, Dr. Barreto could not recall how much of a boost he gave to Latino turnout in the "elevated" turnout tables. Trial Tr. Vol. II, at 159:1-2 (Dr. Barreto: "I don't know the exact number as I sit here today, but it was a standard rate assuming an elevated turnout.").

199.    Despite Dr. Barreto's claim that "most often [there are] two districts" that perform in Dr. Oskooii's maps, Trial Tr. Vol. II, at 111:3-11, only 2 of Dr. Oskooii's 14 maps had two purported "performing districts" in November of odd year elections, *i.e.*, when Dodge City Commission elections are actually held. These two exceptions were found in Maps 11 and 12.

200.    For every one of the districts that Dr. Barreto found performed, the Latino CVAP in them was approximately double of the White CVAP, *see* Pls.' Ex. 122 (Map 1), Pls.' Ex. 123 (Map 2), Pls.' Ex. 124 (Map 3), Pls.' Ex. 125 (Map 4), Pls.' Ex. 126 (Map 5), Pls.' Ex. 127 (Map 6), Pls.' Ex. 128 (Map 7), Pls.' Ex. 129 (Map 8), Pls.' Ex. 130 (Map 9), Pls.' Ex. 134 (Map 13), and Pls.' Ex. 135 (Map 14), or the combined CVAP for Latinos and Blacks was at least double of that for Whites, *see* Pls.' Ex. 131 (Map 10), Pls.' Ex. 132 (Map 11), and Pls.' Ex. 133 (Map 12).

## IV.   Racial Voting Patterns Evidence

### A.  The Experts

201.    For their racially polarized voting ("RPV") expert, Plaintiffs again utilized Dr. Barreto.

202.    Defendant retained Dr. Jonathan Katz, a tenured professor from the California Institute of Technology. Def.'s Ex. 464.

203.    Both Dr. Barreto and Dr. Katz have published dozens of articles related to elections and districting, *see* Pls.' Ex. 111 & Def.'s Ex. 465, and have participated in roughly 50 cases in an expert capacity, Trial Tr. Vol. II at 51:22-52:5; Trail Tr. Vol. IV at 144:6-12.

### B.  Background

204.    As the racial group at issue in this case is Latino, Dr. Barreto performed his RPV analysis on that group as compared to Whites.

205.     As a group, Latinos, unlike Blacks, are less likely to vote as a bloc because Latinos come from many different places and cultures, which can lead to ideological differences. Trial Tr. Vol. IV at 90:1-3 & 42:12-18; *see also* Trial Tr. Vol. I at 156:4-12 (agreeing that Latinos have multiple countries of origin and testifying that "[p]an-ethnic is a collection of Latinos from Latin American descent from different countries").

206.     To attempt to demonstrate that Latinos vote as a group in Dodge City Commission elections, Dr. Barreto relied on two ecological-inference models—King's EI and a rows-by-columns ("RxC") model—to purportedly estimate White and Latino voting patterns. Trial Tr. Vol. II at 93:2-94:17 & 96:3-18; *see also* Pls.' Ex. 121.

207.     Ecological-inference models are a statistical tool that try to "unpack from the aggregate level electoral results how different groups voted in a given election." Trial Tr. Vol. IV at 144:20-145:8; *see also* Trial Tr. Vol. II at 60:8-20.

208.     Ecological-inference models, like ecological regression models, rely, in part, on a constancy assumption that "voting behavior is the same across every precinct." Trial Tr. Vol. IV at 149:13-150:18. That assumption, however, "no one believes is true" because people are complex—they live in different areas of the city and vary in their social or economic status. *Id.* at 152:2-18. While, in general, ecological-inference models purportedly "relax th[is] assumption," since there are so few precincts in Dodge City and the precincts are nowhere near homogenous, the reliance on the constancy assumption, as well as others, such as that your model is linear, is all the more necessary. *Id.* at 152:19-153:15; *accord* 158:18-159:7; 151:8-152:18. As noted by Dr. Katz, here, Dr. Barreto had to "rely[] heavily on the constancy assumption" in light of the type of data he had. *Id.* at 152:19-153:15. Dr. Barreto does not contest that conclusion.

209.     King's EI is named after Gary King, the professor "who first developed ecological inference regression." Trial Tr. Vol. II at 93:24-94:17. The RxC model is a form of ecological inference that is adapted specifically "for multiple groups and multiple candidates." Trial Tr. Vol. IV at 174:6-9. As noted by Dr. Barreto, RxC is viewed as the "second version of ecological inference" that was developed "some years" after Professor King had first developed King's EI. Trial Tr. Vol. II at 93:24-94:17.

210.     Dr. Barreto used both ecological inference methods here, as he contends that the results under both models are "quite similar"—"almost identical." *Id.* at 93:24-94:17. In support of this position, Dr. Barreto claims that he and Dr. Loren Collingwood, another one of his former students, Pls.' Ex. 111 at 14, have found in three articles that they have written that, in "multi-candidate, multi-race elections," there is "striking consistency" between the results from King's EI and the results from the RxC model.[2] Trial Tr. Vol. IV at 204:14-205:4.

211.     According to Dr. Barreto, when applied to elections like Dodge City Commission elections, King EI, which is made to operate binarily (*i.e.*, head-to-head battles), runs election results "iterative[ly]," meaning that, if there are eight candidates in a particular year running for City Commission, "[i]t runs every single one of th[o]se eight candidates against the field . . . one at a time." RxC, on the other hand, which "generalize[s] ecological inference to allow for more than two candidates and more than two groups," Trial Tr. Vol. IV at 175:3-14, "does a little more averaging because there are precincts where people are voting for similar candidates at the third position even if they have very different ones and twos," Trial Tr. Vol. II at 99:25-100:23.

212.     Dr. Katz elied on the RxC model, or "King's EI generalized to more than two candidates, and two groups." Trial Tr. Vol. IV at 174:23-175:2. Relying, at least in part, on Dr.

---

[2]          In addition to Dr. Collingwood, Dr. Oskooii appears to have co-authored at least two of the three articles that Dr. Barreto referenced. *See* Pls.' Ex. 111 at 3.

Karen Feree's 2004 peer reviewed article in the Political Analysis Journal entitled "Iterative Approaches to RxC Ecological Inference Problems: Where They Can Go Wrong and One Quick Fix," Dr. Katz believes that it is improper to use King EI in cases like this because it "iterate[s] . . . incorrect inferences." *Id.* at 175:3-176:7.

### C.  Application of the Ecological Inference Methodology in this Case

213.    Dr. Barreto reviewed 24 elections while performing his RPV analysis of Dodge City Commission elections. *See* Pls.' Ex. 121; Trial Tr. Vol. II at 92:20-93:1.

214.    Of these 24 elections, only 4 of them were endogenous elections, *i.e.*, elections for Dodge City Commissioners. The other 20 elections were exogenous, or elections for offices other than Dodge City Commission.

215.    For each of the elections that Dr. Barreto performed, he determined what the "point estimate" was for the candidates in that election with regard to Latino and White voters' support. *See* Pls.' Ex. 121. The point estimate is the "centerpoint of the distribution" of potential outcomes, which, according to Dr. Barreto, is the "most likely outcome" of racial voting patterns. Trial Tr. Vol. II at 100:24-102:1; Trial Tr. Vol. IV at 201:5-17.

216.    According to Dr. Barreto, the three highest "point estimates" for Latino and White voters in Commission races should be viewed as the preferred candidate for that racial group "because there were three candidate positions available." Trial Tr. Vol. IV at 212:24-213:8; *see also* Trial Tr. Vol. II at 135:6-19, 137:23-138:7 & 140:18-141:1.

217.    As "point estimates" are just that – estimates - there is uncertainty in them. To measure that uncertainty, statisticians use confidence intervals to describe the "ranges of the[] parameters" of "group voting behaviors that are consistent with the observed data." Trial Tr. Vol. IV at 159:7-22.

218.     As stated by Dr. Katz, "the typical standard in social sciences is to use 95 percent confidence intervals." Trial Tr. Vol. IV at 181: 1-5. Other than to say that inclusion of confidence intervals would have made his tables too "messy," Trial Tr. Vol. IV at 214:7-13, and that he believes that a 95% confidence interval is too high of a standard in a civil case, *See* Trial Tr. Vol. IV at 211:24-212:10 (Dr. Barreto stating that, because the Plaintiffs must only prove their case by a preponderance of the evidence, a "95 percent statistical level doesn't seem appropriate to me for the examination today"), Dr. Barreto does not challenge that 95% confidence intervals are the standard in the field.

219.     The level of statistical certainty in either model coincides with the volume of data that the model relies on. *See* Trial Tr. Vol. IV at 152:19-153:15 ("As the sample size . . . gets bigger, my margin of error . . . gets smaller. That is a general principle which holds for all statistical analysis as I get more data . . . my statistical uncertainty around my estimates decrease[s].").

220.     Dr. Barreto, however, did not analyze or identify the distribution of confidence intervals or potential outcomes to support his point estimates for White or Latino voting behavior. Trial Tr. Vol. II at 146:1-4; *id.* at 147:14-22; Trial Tr. Vol. IV at 214:2-16. Rather, Dr. Barreto simply testified that he was 100% confident in his conclusions. Trial Tr. Vol. II at 147:14-20 ("[T]he level of the uncertainty in my conclusions is none.").

221.     Without a "presentation of measured statistical uncertainty," however, "you can't make such a claim." Trial Tr. Vol. IV at 160:8-13.

222.     For the four endogenous elections that Dr. Katz reviewed, he provided a 95% confidence interval. Def.'s Ex. 465, at 2-5, Trial Tr. Vol. IV at 180:22-25. Dr. Barreto has not challenged the end point percentages for the confidence intervals that Dr. Katz's formulated.

223.    The typical standard in social sciences is to use a 95% confidence interval. Trial Tr. Vol. IV at 181:1-5.

224.    To make his determination as to whether voters in the elections he reviewed were Latino or White, Dr. Barreto relied upon on Bayesian Improved Surname Geocoding ("BISG"), a statistical technique that assists in analyzing the race and ethnicity of voters in a given jurisdiction by matching surnames with a given ethnicity. Trial Tr. Vol. II at 89:19-90:4; Trial Tr. Vol. IV at 143:10-13.

225.    While BISG purportedly helps improve uncertainty in elections, it still only produces an estimate and cannot say with certainty that any particular voter is Latino. Trial Tr. Vol. IV at 171:17-172:12; *id.* at 179:18-180:5. For instance, BISG cannot determine if someone with a name similar to former Dodge City Commission candidate Michelle Salinas's name is White or Latino. *See* Trial Tr. Vol. IV at 172:3-12. This could be for a multitude of reasons, including marriage, from which a person may receive a Latino surname but not themselves be Latino. As indicated by Plaintiff Rangel-Lopez this is "[m]ore common than it used to be" in Dodge City. Trial Tr. Vol. I at 54:14-15. Additionally, BISG does not solve the lack of data or small sample size. Trial Tr. Vol. IV at 171:17-172:12.

### 1. The Endogenous Election Results

226.    While use of King's EI and the RxC model may result in "striking[ly] consisten[t]" results in certain elections, there is no such consistency with regard to the four endogenous elections Dr. Barreto reviewed in this case. First, the level of support that certain Dodge City Commission candidates received under one model versus the other fluctuated significantly. For instance, in the most recent City Commission election that Dr. Barreto analyzed (2021), three candidates—Scoggins, Reinert, and Salinas—purportedly received over twice as much support

from Latinos under one model than they did under the other. *See* Pls.' Ex. 121 at 1. In other races, such as the 2014 race, some candidates (Scoggins and Zuniga) received over 10% more Latino support under King's EI than they did under the RxC model. *Id.* at 3. While 10% may not be a substantial amount in a two-candidate race (assuming a wide disparity in preferences), when, under the RxC model, the difference between White and Latino support for every candidate for Dodge City Commission but one has been less than 8.1%,[3] this difference is significant.

227.    Additionally, the RxC model tended to produce significantly smaller voting disparities between Whites and Latinos compared to King's EI. *See generally* Pls.' Ex. 121. In fact, for many candidates, the disparity between Latino and White voters' preferences under King's EI was multiple times larger than it was under the RxC model. *See* Pls.' Ex. 121 at 1 (showing a King's EI disparity of 22.9% for Jan Scoggins in 2021, but an RxC voting disparity of just 4.2%); *id.* at 2 (showing a King's EI voting disparity of 21.4% for Candidate Hessman in 2019, but an RxC voting disparity of just 8.1%); *id.* (showing a King's EI voting disparity of 7.1% for then-Candidate Nuci in 2019, but an RxC voting disparity of 0%); *id.* (showing a King's EI disparity of 17.9% for candidate Sellens in 2017, but an RxC voting disparity of just 7.7%).

228.    Dr. Barreto does not know why exactly these disparities between his two chosen methods exist, but he has a "theory" that relates to the fact that elections in which voters "get three votes [are] quite different contest[s] than just a two-person vote for one," which makes sense because RxC was designed for races involving more than two candidates whereas King's EI was designed for binary elections. Trial Tr. Vol. II at 99:22-100:22.

229.    Focusing just on the RxC method, the difference in support between White and Latino voters for individual Dodge City Commission candidates, based on Dr. Barreto's given

---

[3]      The one and only candidate was Candidate Zuniga in 2017, who, under the RxC model, purportedly had an -11.6% difference between how White to Latino voters preferred her. *See* Pls.' Ex. 121 at 2.

"point estimate," is 5% or less in the overwhelming majority of cases. *See* Pls.' Ex. 121. What's more, for the four City Commission elections that Dr. Barreto reviewed, in two of them (2019 and 2017), 2 of the 3 alleged top voter getters of Latino voters were also 2 of the 3 alleged top vote getters of White voters. *See id.* In the two other City Commission elections (2021 and 2014), 1 of the 3 alleged top voter getters of Latino voters was also an alleged top vote getter of White voters, and, in 2021, with the change of just .6% in the Latino vote in favor of then-Candidate Burns, 2 of the 3 top alleged vote getters would have been the same for both Latinos and Whites. *Id.* In other words, in every one of the 4 City Commission elections Dr. Barreto reviewed, at least 1 of the top 3 vote getters of the Latino vote was also 1 of the top 3 vote getters of the White vote, at least 1 of the so-called Latino preferred candidates won a seat on City Commission, and the so-called Latino preferred candidates, as shown by Dr. Barreto's own analysis, have won half of the available seats on the City Commission.

230.    Looking beyond just the "point estimates" that Dr. Barreto gave, and considering the confidence intervals that Dr. Katz produced—which Dr. Barreto did not contest—there is not only heavy overlap between the confidence intervals for Latino and White voters in Dodge City Commission elections, but, with just one exception, you can actually fit each of the confidence intervals for White voters completely within the corresponding confidence interval for Latinos.[4] In light of how much overlap there is in this particular case, the Court agrees with Dr. Katz that "we can't say with any statistical certainty which was the preferred candidate or if any candidate was preferred by Latinos" in any of the City Commission elections Dr. Barreto reviewed. Trial Tr. Vol. IV at 165:6-10; *accord id.* at 167:15-170:9 & 166:7-13; *see also id.* at 171:8-16.

---

[4]    The one exception occurred in 2017 and regarded Candidate Zuniga, the candidate who did not actually campaign that year. For Candidate Zuniga, the confidence interval for White voters fell outside of the confidence interval for Latino voters by .9% on the left boundary.

231.    Although Dr. Barreto has "[n]o doubts at all" that racially polarized voting is occurring in Dodge City Commission elections, Trial Tr. Vol. II 176:20-22, he does concede that the 2019 City Commission election does "not hav[e] any obvious Latino candidates of choice," *id.* at 136:11-17.

232.    Dr. Barreto admits that he has not reviewed the City Commission election that occurred in November 2023 for racially polarized voting. *Id.* at 137:5-15. Thus, Plaintiffs have no RPV analysis to offer for the most recent City Commission election.

### 2.    *The Exogenous Election Results*

233.    Of the 20 exogenous elections Dr. Barreto analyzed, 17 were for federal or statewide, partisan offices, 1 was for a local, partisan office, and 2 were for local, non-partisan offices. *See* Pls.' Ex. 121.

234.    The 17 federal or statewide elections that Dr. Barreto analyzed are fundamentally different from the elections for Dodge City Commission. Most notably, these 17 elections occurred in even years, are partisan, and largely involve just two candidates running for just one seat, while the Dodge City Commission elections occur in odd years, are non-partisan, and involve at least three candidates running for three seats. *See* Pls.' Ex. 121. In light of this, even Dr. Barreto admitted, in response to inquiry from the Court, that "multi-candidate elections, where you get three votes[, are] quite different contest[s] than just a two-person vote for one." Trial Tr. Vol. II at 99:22-100:22.

235.    Dr. Barreto's analysis supports the conclusion that partisan, two-party statewide races are different than Dodge City Commission elections. Specifically, in the elections Dr. Barreto analyzed, the exogenous, partisan, two-candidate-but-one-seat elections reflected substantially higher rates of polarized voting than the endogenous City Commission elections. *See* Pls.' Ex. 121. For example, the lowest level of polarized voting that Dr. Barreto found in the most

54

recent general election that he analyzed was the Attorney General race, which came out to 37.8% using the RxC method. *Id.* at 1. Conversely, the highest level of polarized voting that Dr. Barreto found in the most recent City Commission election he analyzed was just 5.6%, or a percentage nearly 7 times less than Dr. Barreto found for close-in-time partisan, two-candidate statewide races. *Id.*

236.     With regard to the 2020 Ford County County Clerk race, it was obviously local, but it too occurred in even years, involved just two candidates running for one seat, and was partisan. As for the 2021 School Board race and the 2019 Dodge County Community College Trustees election, they were both local, non-partisan elections in which multiple candidates ran for multiple seats. However, Dr. Barreto's analysis (and results) for these elections largely mirrored Dr. Barreto's troubling analysis (and results) for the 4 Commission elections he reviewed. Among other things, Dr. Barreto's analysis of these races fluctuated widely depending on whether he was using King's EI or the RxC method. For instance, in the 2021 School election, Candidate Killion went from being one of the candidates with the lowest Latino support under King's EI to having his Latino support over doubled and him being viewed as a Latino preferred candidate under the RxC method. In the 2019 Trustee election, Candidate Turley saw his status as a Latino preferred candidate under King's EI removed when the RxC method was applied, as the application of the latter cut his support in nearly half (24% to 13.4%). In addition to the unexplained fluctuations between Dr. Barreto's two methods, when the RxC method was applied, it showed that White and Latino voters largely supported many of the same top 7 candidates (3 out of 7), and, to the extent that a difference was detected, typically, just a few percentage points separated the two racial groups regarding their so-called most preferred candidates. *See id.* at 2-3.

237.    In total, 18 of Dr. Barreto's 20 exogenous elections were partisan. According to Dr. Barreto, "[t]he current theory and political science developed since, probably 2008, is that partisanship has polarized our country and has created disparate communities." Trial Tr. Vol. II at 156:23-157:6. In addition to the effect of partisanship generally, the exogenous elections that Dr. Barreto analyzed here involved some of the most polarizing candidates that the United States and/or Kansas has ever seen.

## V.  This Lawsuit

238.    Dr. Barreto first became "aware of Dodge City as an area of interest" through a "class project" that one of his students turned into him five or six year ago. Trial Tr. Vol. II at 56:20-57:5 & 168:19-25.

239.    Dr. Barreto is "faculty director of . . . the Latino Policy and Politics Institute at UCLA. Early on into that Institute, [Dr. Barreto] created a research project or a research program called the Voting Rights Project, and that was co-created with Mr. Chad Dunn." Trial Tr. Vol. II at 54:7-16. The UCLA Voting Rights Project and Mr. Dunn are representing Plaintiffs in this lawsuit.

240.    Ms. Sonni Waknin, another California-based attorney from the UCLA Voting Rights Project and counsel for Plaintiffs, met with Plaintiff Rangel-Lopez in February 2020, though Plaintiff Rangel-Lopez contends that that meeting did not relate to the filing of this lawsuit. Trial Tr. Vol. I at 41:12-19.

241.    In 2021, Plaintiff Rangel-Lopez met with Michael Rios, *id.* at 41:20-42:9, the "lead data scientist" for the UCLA Voting Rights Project and someone who Dr. Barreto "work[s] very closely with," Trial Tr. Vol. II at 57:16-25. Mr. Rios indicated during his 2021 meeting with

Plaintiff Rangel-Lopez that, "from just a glance at Dodge City, you know, that there [i]s potential for a lawsuit there." Trial Tr. Vol. I at 42:3-9.

242.    Plaintiff Rangel-Lopez's meetings with Ms. Waknin and Mr. Rios, as well as his meeting with Ms. Scoggins and the Ford County Democratic Party Chair about districting for that matter, occurred prior to him starting his internship with the City of Dodge City in the Summer of 2022. However, at no time during his internship with the City of Dodge City did Plaintiff Rangel-Lopez indicate to the City Commission or anyone in the Dodge City City Manager's Office that he believed at-large elections were suppressing the vote of Latinos. Trial Tr. Vol. I at 40:8-9; Trial Tr. Vol. III at 278:14-17.

243.    Prior to the filing of this lawsuit, other than Plaintiff Rangel-Lopez meeting with Ms. Scoggins and a Ford County Democratic Party leader in 2017, Ms. Scoggins's meeting with an undisclosed group and subsequently requesting more information about district-based voting from City staff in the end of 2018/beginning of 2019, and Plaintiff Rangel-Lopez raising the issue of district-based elections during a CRAB Steering Committee Meeting in 2021, there is no evidence in the record that anyone in Dodge City had ever suggested, much less advocated for Dodge City moving to district-based elections for City Commission.

244.    Ms. Scoggins, the only person prior to this lawsuit being filed who apparently ever gave any indication to the City Commission that district-based elections should be considered, does not recall any group, including Latino organizations, coming out and supporting a move to district-based elections. Trial Tr. Vol. III at 180:4-20.

### PROPOSED CONCLUSIONS OF LAW

Plaintiffs have failed to carry their burden of proof with regard to all of their claims in this case. *See, e.g.*, *Village of Arlington Heights v. Metro. Housing Development Corp.*, 429 U.S. 252,

270 (1977) (the plaintiff has the burden of proving that a discriminatory purpose or intent animates a challenged actor's actions); *LULAC v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 846 (5th Cir. 1997) (stating that, for a section 2 claim, the plaintiff has the burden "to prove by a preponderance of the evidence that all of the *Gingles* preconditions were satisfied and that based on the totality of the circumstances the at-large election system diluted the voting strength of [the alleged minority]"). Here, as the largest plurality in Dodge City, Plaintiffs have "an obvious, difficult burden [on their section 2 claim] in proving that their inability to elect results from white bloc voting, [though] they are not precluded, as a matter of law, from seeking to prove such a claim." *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). At trial, the Court granted judgment in Defendant's favor on Plaintiffs' Fourteenth Amendment claim, but reserved judgment on Plaintiff's section 2 claim. After reviewing the trial transcript, the admitted exhibits, and the parties' submissions, the Court now concludes that Defendant is entitled to judgment on Plaintiffs' section 2 claim for the reasons stated below.

## I.  Plaintiffs have not proven their Section 2 claim.

Plaintiffs have failed to show a section 2 violation. At-large elections are not per se violations of Section 2. *See Rogers v. Lodge*, 458 U.S. 613, 617 (1982). Furthermore, Plaintiffs cannot prevail simply because "members of [their] protected class [are not] elected in numbers equal to their proportion of the population," 52 U.S.C. § 10301(b), or the existing method of elections does not "maximiz[e] minority voting strength," *Bartlett v. Strickland*, 556 U.S. 1, 23 (Kennedy, J., plurality op.).[5] This is so because the right that Section 2 protects is "equality of

---

[5]       As three justices signed on to Justice Kennedy's plurality opinion (Roberts, Kennedy, and Alito), and the two other justices in the majority would have found that section 2 does not authorize a vote-dilution claim at all, the *Strickland* plurality opinion is viewed as the controlling opinion under *Marks v. United States*, 430 U.S. 188, 193 (1977), because it is the narrowest. *See, e.g.*, *Backus v. South Carolina*, 857 F. Supp. 2d 553, 566 n.2 (D.S.C. 2012) (three-judge panel), *aff'd*, 568 U.S. 801 (2012).

opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson,* 512 U.S. at 1014, n.11. To establish a Section 2 violation, Plaintiffs must prevail on two inquiries. In the first, Plaintiffs must show that the three-factor test set forth in *Gingles v. Thornberg*, 478 U.S. 30, 50-51 (1986), is met—namely, that (1) the minority group in question is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group in question is "politically cohesive"; and (3) the "white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." "Only when a party has established the *Gingles* requirements does a court proceed to [the second step to] analyze whether a violation has occurred based on the totality of the circumstances." *Bartlett*, 556 U.S. at 11-12. Here, Plaintiffs have failed to satisfy *Gingles* factors 1, 2, and 3, as well as to show, under the totality of the circumstances, that a section 2 violation has occurred. Accordingly, judgment will be entered in Defendant's favor on all claims in this case.

**A. Although it is possible to draw at least one City Commission district in which the district has a Hispanic Citizen Voting Age majority, Plaintiffs nevertheless have not satisfied *Gingles* factor 1 because race predominates in Plaintiffs' proposed maps and because there is insufficient evidence that the Plaintiffs' proposed maps would enhance Latinos' ability to elect their so-called candidates of choice.**

The Court agrees that, in a jurisdiction like Dodge City where the largest plurality of eligible voters, by race, is Latino, it is possible to draw at least one City Commission district in which the citizen voting age population is majority Latino. However, *Gingles* factor 1 is not satisfied simply because the alleged minority in a case is so large that it possibly constitutes a majority of all eligible voters in a city. No, if that were the case, there would have been no need for Plaintiffs to call Dr. Oskooii and admit his 14 demonstrative maps or to have Dr. Barreto complete his "performance analysis" of his former student's maps. Plaintiffs could have just cited Dodge City's CVAP numbers, and the analysis would be complete. That did not happen here

because that is not an accurate reflection of the current state of the law. First, Plaintiffs have the burden of "postulat[ing] a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice" *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 480 (1997). This alternative voting practice must comport with "traditional districting principles," *Abrams v. Johnson*, 521 U.S. 74, 92 (1997), and race may not predominate, *see Allen v. Milligan*, 599 U.S. 1, 31 (2023) (plurality decision) ("[R]ace may not be "the predominant factor in drawing district lines unless [there is] a compelling reason."). Second, as Dr. Barreto alluded to during his direct, the proposed alternative must actually "enhance the ability of minority voters to elect the candidates of their choice." *Abbott v. Perez*, 585 U.S. 579, 618 (2018). If it does not, then the alternative should not be adopted.

### 1. *Race predominated in Plaintiffs' 14 proposed maps.*

Race may not predominate in the drawing of the demonstrative maps that are submitted to the Court. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 31 (2023) (plurality decision). Dr. Oskooii, Plaintiffs' *Gingles* factor 1 expert, does not challenge this proposition. FoF ¶ 179. However, it appears that indeed race is what drove the map drawing in this case. Dr. Oskooii claims that his first twelve demonstrative maps did not consider age, ethnicity, or citizenship. FoF ¶ 186. He says that he considered only total population when he drew his first twelve maps. FoF ¶ 186. The consistent pattern across the first twelve maps, and, most tellingly, the first twelve maps and Dr. Oskooii's last two maps, which admittedly did consider age, ethnicity, and citizenship, belie Dr. Oskooii's contention. As shown at trial, there are nine constants across all fourteen of Dr. Oskooii's fourteen maps:

  i.   In Districts 1-3, there is a majority of Hispanic citizens of voting-age population;

  ii.  In Districts 1-3, Hispanics make up more than 55% of the citizens of voting-age population;

   iii.    In Districts 1-3, Whites make up less than 40% of the citizens of voting-age population;

   iv.    In Districts 4-5, Whites have a majority of the citizens of voting age population;

   v.    In Districts 4-5, the White citizens of voting-age population exceeds 60%;

   vi.    In Districts 4-5, the Hispanic voting-age population is less than 30%;

   vii.    In Districts 1-3, there are approximately one-and-a-half times more Hispanic eligible voters than White eligible voters;

   viii.    In Districts 4-5, there are approximately two times more White eligible voters than Hispanic eligible voters; and

   ix.    Districts 4 and 5 always have approximately two times more White eligible voters than the number of White eligible voters in Districts 1-3.

FoF ¶ 187. Dr. Oskooii provided no answer for why these constants existed across all of his maps, and, as discussed more fully below, it appears that the identified disparities were intentional because without them, Plaintiffs could not have shown that any of the districts in their demonstrative maps would actually "perform."

The stark disparities between Hispanic and White eligible voters in the maps that Dr. Oskooii drew cannot be said to have been naturally occurring or necessary to respect existing communities of interest. Outside of the aforementioned constants, there were significant changes in Dr. Oskooii's maps—both in Dr. Oskooii's CVAP numbers, the numbers that matter for purposes of *Gingles* factor 1, *see, e.g.*, *Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019, 1023 & n.12 (5th Cir. 2009) (collecting cases), and the shape of Dr. Oskooii's proposed districts. For instance, regarding CVAP numbers, District 2 in Maps 1, 4, 5, 8, 13, and 14 has approximately half the number of eligible voters as District 4 in those same maps. FoF ¶ 189. Whereas, in Maps

9-12, Districts 2 and 4 have nearly the same CVAP numbers. FoF ¶ 189. As for the shape of Dr. Oskooii's maps, while the shape of Districts 4 and 5, *i.e.*, Dr. Oskooii's White districts, remain largely the same, Districts 2 and 3 change dramatically. FoF ¶ 190. Starting with District 2, in Maps 1-8 and 13-14, it is confined to the Eastern half of town, but in Maps 9-12, it is stretched like a thin slice of bacon from the Western-most parts of Dodge to the Eastern-most parts. FoF ¶ 190. Additionally, District 3 in Maps 2, 3, 9, 10, 11, and 12 is located entirely above Wyatt Earp Boulevard and in the center to the center-East portions of town, but, in Maps 4, 5, 8, 13, and 14, District 3 straddles Wyatt Earp Boulevard (with significant parts North and South of that so-called "natural boundary") and flows from the center of town to the Western-most boundaries of Dodge City. FoF ¶ 190. Thus, there were significant differences in Dr. Oskooii's maps, but the aforementioned nine constants remained oddly the same throughout.

Likewise, the nine constants' occurrence cannot be explained by Dr. Oskooii's communities of interest analysis. Simply put, this analysis should not be credited at all. As Dr. Oskooii readily admitted on the stand, his "concept of communities of interest" does not "have rigid boundaries," rather, "is definitely fluid." FoF ¶ 180. This fluidity is confirmed by the fact that Dr. Oskooii's maps regularly disregard communities that he purportedly contends exist. For instance, despite Wyatt Earp Boulevard supposedly constituting a community of interest, Trial Tr. Vol. II at 246:6-15, Dr. Oskooii keeps it together only in Maps 9-12, breaking it up into two (usually three (sometimes 4)) districts in all of his other maps. Similarly, Dr. Oskooii contends that there are "visually available" and "well described [disparities] by residents that repeatedly came up [during his in-person investigation]" regarding neighborhoods North of East Comanche and neighborhoods South of East Comanche. *Id.* at 244:21-245:6. Nevertheless, in 5 of his 14 maps (Maps 7, 8, 10, 13, and 14), Dr. Oskooii stretches District 5 down below East Comanche. *See* FoF

¶ 190. If there were indeed such stark differences between the two locations, and communities of interest were actually carrying weight in the analysis, then this sort of contortion should not be taking place. *See, e.g.*, *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) ("[C]ombining 'discrete communities of interest'—with 'differences in socio-economic status, education, employment, health, and other characteristics'—is impermissible.").

Additionally, the methodology that Dr. Oskooii employed here was anything other than scientific. To be clear, the Court does not take issue with the proposition that map drawers with essentially no background knowledge of a particular jurisdiction like Dr. Oskooii in this case should speak to members of the community to inform their so-called "conceptions of communities of interest"; they should. The problem here is the methodology, or, more properly, lack of methodology, that Dr. Oskooii employed to form his so-called opinions. Dr. Oskooii made no preset list of questions that he intended to ask each of the people he spoke to. FoF ¶¶ 182-83 He made no effort to identify people that were representative of any group or sector in Dodge City. FoF ¶¶ 182-83. He did not set targets on what percentage of the community's various racial groups that he needed to speak to. FoF ¶ 183. Rather, he simply struck up conversations with roughly one hundred people that he happened to encounter while walking and driving around Dodge City. FoF ¶ 183. Who Dr. Oskooii actually spoke to and what exactly was said, we will never know because Dr. Oskooii made no notes to record his conversations. FoF ¶ 182. This sort of analysis is not worthy of being credited and will not be.

Again, while it is true that it certainly appears possible that at least one Latino CVAP majority district could be drawn in Dodge City, it is nevertheless Plaintiffs' duty to put forward a map that in fact does that and does so in compliance with traditional redistricting principles, which they have failed to do in this case. Accordingly, Plaintiffs have not met *Gingles* factor 1.

## 2. There is no credible evidence that any of the districts in Dr. Oskooii's proposed maps will actually perform.

 As recently declared by the Supreme Court in *Abbott v. Perez*, 585 U.S. 579, 618 (2018), Plaintiffs must show that their proposed districts will actually "enhance the ability of minority voters to elect the candidates of their choice." While there is some debate right now with regard as to where exactly the "performance analysis" is to take place, *compare Harding v. Cnty. of Dallas, Tex.*, 948 F.3d 302, 311 (5th Cir. 2020) (indicating that it takes place in the *Gingles* threshold analysis) *with Fusiler v. Landry*, 963 F.3d 447, 457 (5th Cir. 2020) (stating, in a post-*Harding* case, that the performance of a proposed district fits within the "totality of the circumstances" analysis), based on existing Tenth Circuit precedent, and the fact that "performance analyses" are pegged directly to the alternative maps proposed by Plaintiffs, it appears to the Court that the most natural point for this analysis is *Gingles* factor 1. In *Sanchez v. State of Colo.*, 97 F.3d 1303, 1311 (10th Cir. 1996), the Tenth Circuit has said this about the first *Gingles* factor:

> [T]he first prerequisite asks about the existence of a legally cognizable injury. As such, this element of proof assists a court in finding a reasonable alternative practice as a benchmark against which to measure the existing voting practice. The inquiries into remedy and liability, therefore, cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system.

(Internal citations and quotation marks omitted). As "district court[s] must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system," if a plaintiff cannot show that they will be able to elect their so-called candidate of choice under any map that comports with traditional redistricting principles, it seems to the Court then that the plaintiff has not satisfied *Gingles* factor 1. Dr. Barreto appears to agree with this position, stating that the whole reason he did a "performance analys[es]" on Dr. Oskooii's

analysis was to avoid "go[ing] through the whole hassle of the whole trial, decid[ing] that the current system was bad and then adopt[ing] districts where no one could get elected." FoF ¶ 191.

Here, Plaintiffs' performance evidence comes solely from Dr. Barreto, who relies solely on the proposed maps drawn by Dr. Oskooii. FoF ¶ 191. Dr. Barreto's analysis is flawed in that he does not show his work. For example, one cannot discern from his charts the purported "turnout" rates he uses for his analysis and the extent of cohesiveness he uses to analyze how the districts will perform. FoF ¶ 198. In light of Dr. Barreto's reliance, it is clear why Dr. Oskooii, who, in addition to having a long-term close relationship with Dr. Barreto, has been in many of the same cases as Dr. Barreto, as well as written many related articles with him, drew his maps in a way that consistently packed as many White voters as possible into Districts 4 and 5. FoF ¶ 192. As it is Dr. Barreto's position that White eligible voters vote at a rate of over 2 to 1 compared to Latinos in even-year elections (which apparently actually understates the disparity in odd-year elections), *see* FoF ¶ 193, simply making Latinos the bare majority in Districts 1 through 3 would not have resulted in the drawing of a "performing" district. Instead, to offset the alleged disparity in turnout, there must be at least twice as many minority eligible voters than White eligible voters in a proposed district in order for that district to perform. Dr. Barreto's performance analysis "based on current turnout" in November of odd-year elections confirms that fact in that the only districts in which the so-called Latino candidate of choice is elected are those districts in which the percentage of minority eligible voters is at least twice that of White eligible voters.[6] Without Dr. Oskooii packing White eligible voters in Districts 4 and 5, it is clear that Dr. Barreto would not have been able to find a single district that would perform under his analysis. As it is improper to

---

[6]       The Court gives no weight to Dr. Barreto's analysis relating to November of even year elections, as it is not relevant. As for Dr. Barreto's "elevated turnout" analysis, his methodology is not credible, as it appears to be based purely on speculation, as opposed to an accepted methodology in the field. *See* FoF ¶ 198. Accordingly, the Court gives no weight to that analysis as well.

rely upon maps in which race considerations predominate in *Gingles* factor 1, the Court does not credit Dr. Barreto's performance analysis as showing that Dr. Oskooii's maps will actually perform for Latinos.

The Court also does not credit Dr. Barreto's performance analysis because it improperly relies upon exogenous election results that appear to be at odds with the results in the 4 endogenous City Commission elections Dr. Barreto reviewed. While circuit courts have "not barred limited consideration of exogenous elections," they have "unequivocally stated that evidence from elections for the office at issue is more probative." *Harding*, 948 F.3d at 312 (alterations in original omitted). Here, Dr. Barreto stated that his performance analysis was based on the assumption that 75% of Latino eligible voters would vote for the so-called Latino preferred candidate, while 25% of White eligible voters would vote for the so-called Latino preferred candidate. FoF ¶ 197. Those percentages did not come from City Commission election results, as there is no divide anywhere close to that in City Commission elections; rather, they came from statewide, partisan elections, which even Dr. Barreto admits are "quite different contest[s]" and the Court finds are not particularly relevant in light of the clear differences between those elections as born out by Dr. Barreto's table in Appendix A and common sense. *See* FoF ¶ 196. These differences are no doubt why courts have been admonished not to allow exogenous elections to drive the analysis as Dr. Barreto has done here. Accordingly, since Dr. Barreto's "performance analys[es]" are primarily derived from exogenous elections that are fundamentally different than those actually at issue in this litigation, the Court does not find them to be creditable evidence of performance for Dodge City Commission elections.

In addition to the lack of persuasive "performance analysis," the Court is not convinced, at a practical level, that forcing Dodge City to abandon its 50-plus year practice in favor of district-

based elections will actually "enhance the ability of [Dodge City Latinos'] to elect the candidates of their choice" over the present system. *See* FoF ¶ 194. As Dr. Kimberly Nelson testified, there is no consensus among experts that switching from at-large elections to district-based elections will actually lead to more so-called Latino candidates of choice being elected, as the Latino racial grouping, unlike other racial minorities, such as Blacks, seems to be a broader and more diverse grouping. FoF ¶¶ 20, 194, 205. Thus, simply grouping Latinos into smaller districts does not seem to provide the answer.

What's more, based on the most recent CVAP numbers for Dodge City, it does not appear that adopting Plaintiffs' proposal here would actually advance Latinos' long-term (or even possibly short-term) best interest. The 2022 CVAP estimates show that Latinos are now the largest racial or ethnic group in Dodge City at 48.7% and the percentage of White eligible voters in Dodge City is just 43.9%. FoF ¶ 17. The disparity between these two groups will, based on the evidence adduced at trial, only continue to grow with time. *See* FoF ¶¶ 12-19. There has been no showing that other racial minorities in Dodge City vote with Whites or even that Whites vote as bloc—in fact, the evidence is to the contrary. Likewise, it has not been shown that there are environmental barriers to Latinos running for City Commission. FoF ¶ 170. Like their White counterparts, Latinos own businesses, are involved in the community, and are appointed to positions of authority. FoF ¶ 29. Thus, as Mr. De La Rosa pointedly put it at trial, Latinos currently have the ability to "flip any committee or commission in the community tomorrow" if they simply registered and voted. FoF ¶ 120. The Court is unwilling to foist upon the citizens of Dodge City an election method that apparently few in the City want, *see* FoF ¶¶ 103-18, presumes that eligible voters will continue to not exercise their right of franchise, and is not clearly helpful for Latinos to elect their candidate of choice. *See, e.g.*, *Aldasoro v. Kennerson*, 922 F. Supp. 339, 373 (S.D. Cal. 1995) ("While

Hispanics *presently* have the ability to elect in a single member district, this Court also has determined that Hispanics *now* have the ability to elect at-large. There is no current condition of vote dilution in El Centro." (Emphasis in original)).

Besides not being helpful, it appears that Plaintiffs' proposed alternative would actually be hurtful to Latinos' by packing voters and candidates into defined districts that do not permit Latinos to maximize their ever-growing voting power. Contrary to Plaintiffs' intimation, Latino and Latino preferred candidates for Dodge City Commission do not exclusively live in "South Dodge." For instance, Ms. Soto, who, besides Mr. Nuci, is the Latino candidate that the Court has heard the most about, actually lives in "North Dodge." FoF ¶ 67. The Court struggles to see how placing Ms. Soto into districts like those drawn by Dr. Oskooii where the electorate is at least 60% White (and, in many cases, nearly 75% of the CVAP population) enhances Latinos' ability to elect other Latinos.[7] The same is true for so-called Latino preferred candidates. The so-called Latino preferred candidate that the Court heard the most about at trial, Ms. Scoggins, lives in "North Dodge." FoF ¶ 68. If Ms. Soto and Ms. Scoggins cannot prevail in citywide elections where Latinos make up a much larger percentage of the electorate, there is no reason to think that they will fare any better if only voters in "North Dodge" can vote for them.

Additionally, successful White City Commission candidates do not live exclusively in "North Dodge." For instance, Mr. Chuck Taylor lives in "South Dodge." FoF ¶ 69. Thus, if the Court were to force Dodge City to go to district-based elections, any future Latino candidate or

---

[7]    Notably, with one exception, every one of Dr. Oskooii's proposed fourteen demonstrative maps, which Dr. Oskooii claims are a "fair representation of the[] different prominent regions" had "North" Dodge City wholly located in Districts 4 and 5 - districts that had White CVAPs of 60% to 74.77%. FoF ¶ 187.v. The one exception is that, in Map 2, District 3 has a finger that reaches into a small area above Comanche Street.

candidate that Latinos purportedly preferred more than Mr. Taylor[8] would have to overcome Mr. Taylor's existing name notoriety and incumbency, which, no doubt, may impact who runs for City Commission (and wins) in whatever district is drawn in "South Dodge."

For the reasons set forth above, despite Dodge City likely having a sufficiently large Latino CVAP to constitute a majority in one district that complies with traditional redistricting principles, Plaintiffs have failed to satisfy *Gingles* factor 1 because (1) race predominated in their proposed maps that they have submitted to the Court, (2) Plaintiffs have not shown that so-called Latino preferred candidates will perform under an alternative method of elections, and (3) the Court is not convinced that moving to district-based elections will actually improve Latinos' ability to elect their so-called candidate of choice.[9]

**B. Plaintiffs have not satisfied *Gingles* factors 2 and 3 because they have not shown that the minority group in question is "politically cohesive" and the "white "majority" votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."**

Plaintiffs have not shown that racially polarized voting is occurring in Dodge City such that either Whites or Latinos are politically cohesive in City Commission elections and that the white "majority" votes as a bloc to defeat the majority's preferred candidate. As repeatedly stated by the Supreme Court, lower courts "may not assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (citation omitted). In other

---

[8]     As discussed below, the notion that Mr. Chuck Taylor, who appeared on Plaintiffs' Republican slating exhibit, was only the White preferred candidate of choice is inconsistent with Plaintiffs' own expert's analysis, which showed, using the RxC method, that Mr. Taylor was actually the most preferred candidate by Latinos in 2021.

[9]     Even if the Court's assessment of Dr. Barreto's "performance "analys[es]" was supposed to occur in the second step of *Gingles*, the result would still be the same—the Court would find that no section 2 violation has occurred. *See, e.g.*, *Fusilier*, 963 F.3d at 462 (reversing the district court's section 2 violation finding in the totality-of-the-circumstances part of the analysis because, among other things, it was "not a well-supported proposition on th[e] record" that "the plaintiffs' proposed majority-minority district sufficiently enhance[d] minority voters' ability to elect the candidates of their choice").

words, courts "may not presume bloc voting within . . . a single minority group." *Growe v. Emison*, 507 U.S. 25, 41 (1993). Therefore, to satisfy the second *Gingles* factor, a plaintiff must show that bloc voting is occurring and that it is occurring at such a level "that a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56. As for the third *Gingles* factor, Plaintiffs "must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Thornberg v. Gingles*, 478 U.S. 30, 51 (1986) (internal citation omitted).

There is no discernable pattern of Latino voters voting one way and White voters voting another and, in a manner, to block Latino voters' candidate of choice in Dodge City Commission elections, which is necessary for the Court to find that *Gingles* factors two and three are met. As discussed more fully below, the data from Dr. Barreto's own analysis shows that Latino and White voters have voted for many of the same City Commission candidates, and, when, Dr. Barreto's analysis indicates that these two racial groups may have preferred different candidates, the difference is just a few percentage points, which, in a race measured typically by hundreds of votes, amounts to just a handful votes. These differences are, in the Court's view, not legally or practically significant and do not show the requisite bloc voting necessary to find a Section 2 violation. What's more, Plaintiffs' non-statistical evidence is insufficient to show what Dr. Barreto's analysis did not show, as it too does not indicate that racial bloc voting is occurring.

### 1. Dr. Barreto's analysis does not show racial bloc voting in Dodge City Commission elections or that White voters are voting in a manner that usually defeats the so-called Latino candidate of choice.

The fundamental problem with Dr. Barreto's analysis is that there is not enough reliable data to draw creditable conclusions. It cannot be forgotten what the purpose of Dr. Barreto's

endeavor was: to determine how individual groups privately voted based on aggregate voting information. *See* FoF ¶ 206-07. BISG may better enable Dr. Barreto to estimate what the demographic makeup of the individual voters in a particular precinct is, *see* FoF ¶¶ 224-25, but it does not give him any more insight into how those individuals in that precinct actually voted. FoF ¶ 225. Instead, to make his estimates, Dr. Barreto had to rely upon a host of assumptions, including the constancy assumption, which is that voters of a particular group will vote consistently across the various precincts, and that his model is linear. FoF ¶ 208 The reliance on such assumptions becomes all the more necessary when precincts, like those in Dodge City, are few in number and nowhere near homogenous. FoF ¶ 208. As noted by Dr. Katz, here, Dr. Barreto had to "rely[] heavily on the constancy assumption," an assumption "no one believes is true," FoF ¶ 208, which would seem to be the all more truer in a case like this where even Plaintiff Rangel-Lopez freely admits that not all Latinos in Dodge City share the same political ideology, FoF ¶ 20. At trial, other than to acknowledge that King's EI and the RxC model "make some different assumptions," Trial Tr. Vol. II at 93:24-94:13, Dr. Barreto did not expound on what assumptions his analysis actually relied upon when he performed it on Dodge City elections.[10] *See id.* Likewise, on rebuttal, Dr. Barreto did not contest Dr. Katz's opinion that his analysis "rel[ied] heavily on the constancy assumption." FoF ¶ 208. Thus, it is uncontroverted that Dr. Barreto's relied, in great part, on assumptions that were not disclosed and appear to be discredited.

Looking at how Dodge City voters actually voted, the Court is not convinced that the results of Dr. Barreto's analysis accurately capture Dodge City voters' voting preferences, as opposed to being just a reflection of the underlying assumptions that Dr Barreto used in putting together his

---

[10]    Dr. Barreto did describe his assumption that 75% of Latino voters would vote for the Latino preferred candidate. However, that related solely to his separate "performance analysis" under *Gingles* I, not his RPV analysis under *Gingles* II and III. FoF ¶ 197.

models. For example, in the 2021 City Commission election, Latinos constituted nearly 60% of the turned out voters in Precinct 3. FoF ¶ 49. The turnout in Precinct 3 is the most homogenously Latino of any of the precincts that Dr. Barreto reviewed in his City Commission election analysis. FoF ¶ 46. However, the two candidates that Plaintiffs have long touted as the preferred candidates of Latinos—Ms. Soto and Scoggins—did not overwhelming win that precinct. FoF ¶ 49. In fact, they did not even win it at all, taking instead third and fourth, respectively. FoF ¶ 49. The same story is true for Precinct 2 in 2021, which was the second most homogenously Latino precinct in all of the City Commission elections that Dr. Barreto reviewed, *see* FoF ¶ 46, where the top two vote getters in that precinct were people without the last name Soto or Scoggins. FoF ¶ 49. In every other populated precinct in the 2021 City Commission election cycle, Latinos made up between 8.8% and 39.1% of the electorate. FoF ¶ 46. In the most populous precinct in Dodge City, Precinct 6, Latinos were a mere 12.26%. FoF ¶ 46. Notably, the candidate who won Precinct 6 also won Precinct 2, and the candidate who took second in Precinct 6 won Precinct 3. FoF ¶ 49. While there may be a perfectly good explanation for how Latino voter preference can be reliably calculated when a clear winner is not found in the precincts with the highest percentages of Latino voters and the Latino vote share in other precincts is just a fraction of the White vote share, the Court is not aware of one. Therefore, for common sense reasons similar to those related to the Court's unwillingness to entertain Dr. Barreto's homogenous precinct analysis when there clearly was no homogenous precinct, the Court is unwilling to find that Dr. Barreto's Ecological Inference analysis shows polarized voting when actual results indicate the opposite.

Further cutting against Dr. Barreto's claim that there is no uncertainty in his RPV conclusions is how few of City Commission election cycles he analyzed. As noted above, the Court does not find that the 2021 election supports a RPV finding. At trial, Dr. Barreto conceded that the

2019 election is "one [that does] not have any obvious Latino candidates of choice." Thus, based on the record, there are only two City Commission elections that could conceivably support Dr. Barreto's racial polarized voting conclusion in this case—2017 and 2014. As discussed more fully below, the Court does not conclude that Dr. Barreto's analysis actually shows that racially polarized voting did in fact occur in 2017 and 2014. Regardless, though, as even Dr. Barreto admitted in the *Cisneros v. Pasadena Independent School District* case, and reaffirmed here, *see* Trial Tr. Vol. IV at 210:4-20 ("Four election is just far too few for us to draw a conclusion."), two elections "are not frequent or numeric enough to draw conclusions about the current state of the environment in [Dodge City]." 2014 WL 1668500, at *12 (S.D. Tex. 2014).

This Court is not alone in questioning Dr. Barreto's analysis. Less than two months ago, the Court in *Pierce v. North Carolina State Board of Elections*, --- F. Supp. 3d ----, 2024 WL 307643, at *19 (E.D.N.C. Jan. 26, 2024), found that "all of Dr. Barreto's conclusions" were "undercut" because it had been "demonstrate[ed] that fuller data sets could change his estimated outcomes." In *Pierce*, Dr. Barreto purportedly ran an even more extensive analysis than he did here, performing "more than 350 ecological inference statistical models . . . across 31 recent elections," *id.* at *18, as opposed to the 140 models across 24 elections he performed in this case, Trial Tr. Vol. II at 93:2-18. As *Pierce* confirms, simply running hundreds of models over dozens of elections does not show anything if the expert is engaging in "an unusual form of . . . election analysis," *Pierce*, 2024 WL 307643, at *18, which is what the Court believes Dr. Barreto is doing here in light of the apparent and unexplained inconsistency between his absolute certainty that racially polarized voting is occurring in Dodge City and the actual election results in the Dodge City precincts that he analyzed. *See id.* at *19 (noting, among other things, that "Dr. Barreto [had] not explain[ed] the profound discrepancies between the methods of analysis he performed").

Conceivably, some measure of statistical certainty would have improved the credibility of Dr. Barreto's analysis. However, Dr. Barreto did not provide a single confidence interval for any of his analysis. FoF ¶ 220. Contrary to Dr. Barreto's intimation otherwise, the Court does not find this consistent with the practice in the specific field of political science, *see Mo. State Conf. of the N.A.A.C.P. v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1042 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018) ("A statistical estimate with a 95% degree of confidence employs the level of statistical certainty that is consistent with generally accepted standards for EI in the field of political science, and is consistent with peer-review standards for research in that field."), or the practice of statistics more generally, *see ATA Airlines, Inc. v. Fed. Exp. Corp.*, 665 F.3d 882, 895 (7th Cir. 2011) ("Confidence intervals (familiar as the 'margins of error' reported in predictions of election outcomes) are statistical estimates of the range within which there can be reasonable confidence that a correlation or prediction is not the result of chance variability in the sample on which the correlation or prediction was based; 95 percent confidence is the standard criterion of reasonable confidence used by statisticians."). Thus, far from being "plucked out of the air," as Plaintiffs' counsel claims is the case, Trial Tr. Vol. V at 8:13-14, Dr. Katz's confidence intervals are the standard for statisticians and political scientists alike.

There is no legitimate reason for Dr. Barreto's failure to provide confidence intervals in this case. *See* FoF ¶ 221. According to Dr. Barreto, "for no other reason than for brevity," he did not include confidence intervals in his reported tables. Trial Tr. Vol. Vol. IV at 214:7-16. Dr. Barreto claims that this is "the way [he] **always** present[s] [his] tables." *Id.* (emphasis added). However, the Court has found two very recently published cases where in fact Dr. Barreto did include confidence intervals. *See Petteway v. Galveston Cnty.*, --- F. Supp. 3d ----, 2023 WL 6786025, at *16 (S.D. Tex. Oct. 13, 2023), (Dr. Barreto discussing the "wide[] confidence

interval[s]" in his report),[11] *aff'd sub nom. Petteway v. Galveston Cnty., Tex.*, 86 F.4th 214 (5th Cir. 2023), *reh'g en banc granted, opinion vacated*, 86 F.4th 1146 (5th Cir. 2023); *Nat'l Ass'n for Advancement of Colored People , Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 390 (S.D.N.Y. 2020), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021) ("In his preliminary report, Dr. Barreto reported confidence intervals using CVAP data for the contested races in 2013, 2015, 2016, and 2017; the 2012 presidential election; and the 2017 races using BISG."). To the Court, the reason Dr. Barreto did not include a confidence interval here is clear: he wanted to avoid the necessary inference that flows from having overlapping confidence intervals. *See* FoF ¶ 230.

As recognized in these types of cases, "[s]tatisticians routinely employ a rule of thumb that when the error margins of two populations estimates overlap, there is no statistical significan[ce] difference between those two numbers." *Mo. State Conf. of the N.A.A.C.P.*, 201 F. Supp. 3d at 1022. There may be cases where overlapping confidence intervals are not that concerning. For instance, as Dr. Barreto testified, if only "the highest 5 percent of one estimate [overlaps] the lowest 5 percent of another estimate," then potentially the overlapping issue is mitigated. Trial Tr. Vol. II at 172:5-6. However, the overlap here is not just at the tail. No, Dr. Barreto's point estimates are separated by only a few percentage points. FoF ¶¶ 227, 229. Dr. Katz's confidence intervals for those estimates, which Dr. Barreto does not contest, are typically multiple times larger than that difference. FoF ¶ 222. Possibly more importantly, with one exception,[12] Dr. Katz's confidence

---

[11]    A copy of the Dr. Barreto's report in that case and underlying confidence tables can be found at Case No. 3:22-cv-57 (S.D. Tex. 2022), CM/ECF Doc. 184-5 at 18-41. The Court takes judicial notice only of the fact that Dr. Barreto does include confidence intervals in his RPV reports, not any of information contained therein. *See, e.g.*, *Van Woudenberg v. Gibson*, 211 F.3d 560, 568 (10th Cir.2000) (noting that a court is permitted to take judicial notice of "facts which are a matter of public record"), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001).

[12]    The one exception occurred in 2017 and regarded Candidate Zuniga, the candidate who did not actually campaign that year. For Candidate Zuniga, the confidence interval for White voters fell outside of the confidence interval for Latino voters by .9% on the left boundary. FoF ¶ 226.

intervals for White voters **<u>fit entirely</u>** within the confidence interval for Latino voters.[13] FoF ¶ 230. Due to these facts, the Court cannot say that any of the differences that Dr. Barreto purportedly found between how White and Latino voters vote in Dodge City Commission elections actually exist, as opposed to merely being the product of an incomplete analysis. *See, e.g.*, *El Paso Apartment Ass'n v. City of El Paso*, 2009 WL 10669391, at *7 (W.D. Tex. Dec. 18, 2009) ("The Court cannot—particularly in a case such as this where the statistical differences are so small— ignore the statistical uncertainty of said data. Given the overlapping confidence intervals, the Court cannot find to a statistical certainty that a greater proportion of minorities live in non-residential properties as opposed to residential properties or all El Paso properties subject to storm-water fees. Thus, no disparate impact on the identified protected class exists."), *aff'd*, 415 F. App'x 574 (5th Cir. 2011).

Dr. Barreto's contention that requiring a 95% confidence interval "doesn't seem appropriate" in light of the applicable burden of proof," Trial Tr. Vol. IV at 211:24-212:10, "mix[es] the preponderance of the evidence standard with the standard for scientific reliability." *Lax v. APP of New Mexico ED, PLLC*, 2022 WL 715735, at *12 (D.N.M. Mar. 10, 2022), *aff'd*, 2022 WL 2711230 (10th Cir. July 13, 2022). As succinctly put by the Sixth Circuit, "[t]he confidence interval is not a 'burden of proof' in a legal sense; rather, it is a commonsense mechanism upon which statisticians rely to confirm their findings and to lend persuasive power within their profession." *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1353 n.1

---

[13]     There was an elongated discussion between Plaintiffs' counsel and Dr. Katz regarding an article that Dr. Katz had previously written that related to overlapping confidence intervals. *See* Trial Tr. Vol. IV at 182:15-184:25. This discussion, though, is largely irrelevant because the scenario presented in that articles, separate point estimates that have overlapping lines on only one side of their confidence intervals, is not present here. Here, not only do all of Dr. Barreto's point estimates for White voters fall within the confidence interval for Latino voters, but, with only one minor exception set forth in the previous footnote, so do the confidence intervals for Whites. Put slightly differently, with just the .9% Zuniga exception, the point estimates and confidence intervals for White voters is completely subsumed by the confidence interval for Latino voters in every one of the four City Commission elections that Dr. Barreto analyzed. Simply put, we are not merely talking about overlapping tails here.

(6th Cir. 1992). Put slightly differently, confidence intervals are needed because "[a] scientific analysis must be reliable under scientific principles for the Court to accept. Plaintiffs have presented no evidence that statisticians would find statistical significance based on a confidence interval of 51%." *Lax*, 2022 WL 715735, at *12; *see also* FoF ¶¶ 217-23. Therefore, in light of Dr. Barreto's failure to include a confidence interval, and the apparent inconsistencies between the actual data and Dr. Barreto's conclusions, the Court does not find Dr. Barreto's RPV analysis reliable or creditable.

Even if the Court found Dr. Barreto's analysis reliable, it still would not justify a finding that *Gingles* II and III were met here. Before getting into the data in this case, the Court pauses to address the two methods of ecological inference that Dr. Barreto purportedly employed here: King's Iterative and RxC. FoF ¶¶ 206-11. As indicated by the Court at trial, the Court is troubled by the variance in the differences between the purported support for City Commission candidates by Latino and White voters under the two methods. Unlike the two candidate, partisan elections that Dr. Barreto analyzed, where the variance between the two methods seems to be fairly slight, the variance in the multi-candidate City Commission elections that Dr. Barreto analyzed was quite large. FoF ¶ 226. For instance, in the 2021 City Commission election, Dr. Barreto's analysis regarding Ms. Jan Scoggins under the King's EI showed a difference of 22.9% between White and Latino voters; however, under RxC, the difference was just 4.2%, or more than five times less. FoF ¶ 227. Similar ratios are also present for many other City Commission candidates in the City Commission elections that Dr. Barreto analyzed. FoF ¶ 227. Dr. Barreto claims that his research has shown that these methods "are almost identical" and that there is "striking consistency" between their results, but the results from the application of King's EI and RxC in the context of Dodge City Commission elections are not consistent, much less identical. Dr. Barreto has a theory

for why this is and believes that King's EI is the more accurate method, but the Court does not find that theory credible as RxC was specifically designed to be used in cases where multiple candidates are running and the manner in which King's EI functions (running each candidate separately against all of the field individually) is not representative of how voting actually occurs for Dodge City Commission where each voter may vote for up to three candidates. FoF ¶ 228. As even Dr. Barreto admitted, "multi-candidate elections, where you get three votes[,] is a quite different contest than just a two-person vote for one." FoF ¶ 228. Thus, the Court finds that King's EI, which is geared for the latter, is not an appropriate tool in this case.

Turning to Dr. Barreto's RxC analysis, it does not show racially polarized voting. Starting with the results listed in Dr. Barreto's Appendix A, they show a consistent pattern of White and Latino voters voting for the same candidate. *See* FoF ¶ 229. "Although the [*Gingles*] Court did not set out a precise mathematical formula to determine when a minority group is cohesive, it indicated a showing that 'a significant number' of minority voters 'usually' vote for the same candidate would satisfy the plaintiff's burden." *Mallory v. Ohio*, 173 F.3d 377, 383 (6th Cir. 1999). Here, no candidate in Dr. Barreto's RxC analysis garnered more than 23.5% of the Latino vote in any City Commission election.[14] *See* FoF ¶ 227 & Pls.' Ex. 121. Furthermore, for the majority of the candidates that Dr. Barreto's RxC analysis found to be the Latino candidate of choice, their

---

[14]    The Court realizes that, in elections in which voters may cast up to 3 votes, the maximum share of the vote that a candidate can receive is 33.33% if each voter casts 3 votes. Here, however, Plaintiffs presented no evidence regarding whether Dodge City voters generally (or, more importantly, Dodge City Latino voters specifically) cast all 3 of their respective votes in City Commission elections or rather engage in a voting practice known as "single shot" or "bullet" voting. Nothing in Kansas law prevents voters from doing the latter. As recognized by Dr. Barreto, each Dodge City voter can, as Plaintiff Rangel-Lopez apparently does, vote for less than three candidates, and, in fact, based on Dr. Barreto's experience, it "is quite common to hear from voters that they might have only voted for two if they recognized two names or in some instances only one." Trial Tr. Vol. II at 138:8-16. Accordingly, it is mere speculation as to whether 33.33% or some higher percentage is the maximum amount that a City Commissioner candidate could receive from either White or Latino voters in a given election, and, thus, the Court cannot say that the ceiling of possible vote share in City Commission elections should be capped at just 33.33%.

percentage of Latino support was merely in the teens. *Id.* While the Court realizes that the Supreme Court has not assigned a specific numerical threshold to its "a significant number of a minority voters" standard, the Court believes that under any reasonable interpretation of that phrase a candidate eliciting less than a fraction of a particular group's possible vote share cannot be said to be their candidate of choice. *See, e.g.*, *LULAC v. Abbott*, 604 F. Supp. 3d 463, 499 (W.D. Tex. 2022) (noting that even 51% is "far short of the large majority typically required to show political cohesion"); *N.A.A.C.P., Inc. v. City of Columbia, S.C.*, 850 F. Supp. 404, 415-16 (D.S.C. 1993) ("A group is minimally cohesive if 50% of group members support a single candidate and maximally cohesive if 100% do."), *aff'd as modified*, 1994 WL 449081 (4th Cir. Aug. 22, 1994); *cf., e.g.*, *Levy v. Lexington Cnty., S.C.*, 589 F.3d 708, 720 (4th Cir. 2009) ("Thus, minority voters may be racially polarized but still lack political cohesion if their votes are split among several different minority candidates for the same office."); *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 503 (E.D. Tex. 2020) ("Imagine a town. In that town, White citizens only vote for candidates that are of type A. Minority citizens, on the other hand, split their support among candidates of types B, C, and D. In this hypothetical community, RPV clearly exists, but there is no evidence of minority political cohesiveness. This is because minorities do not coalesce around one particular type of candidate—they are split, not cohesive."); *Nash v. Blunt*, 797 F. Supp. 1488, 1504 (W.D. Mo. 1992) (three judge panel) ("[T]he black vote was split almost evenly for two candidates, thus there was no minority preferred candidate.").

What's more, in each City Commission election that Dr. Barreto reviewed, at least one of the candidates that he identified as being preferred based on point estimates was the preferred candidate for both White voters and Latino voters. In fact, in half of the City Commission election that Dr. Barreto reviewed (2019 and 2017), 2 of the 3 candidates he identified as being the

preferred candidates were the same for White voters and Latino voters. FoF ¶ 229. In 2021, with the change of just .6% in the Latino vote in favor of then-Candidate Burns, 2 of the 3 top alleged vote getters would have been the same for both Latinos and Whites. FoF ¶ 229.

Additionally, in every one of the City Commission elections that Dr. Barreto reviewed and analyzed, a change of just a couple of percentage points would have resulted in **all** three of the so-called Latino preferred candidates being the same candidates of choice for White voters. In 2021, a change of just 2.5% of the Latino vote in favor of Candidates Nuci and Burns would have made them, along with Candidate Taylor, the candidates of choice for both White and Latino voters. *See* FoF ¶ 229 & Pls.' Ex. 121 at 1. Likewise, in 2019, a change of just 5% of the Latino vote in favor of Candidate Nuci would have made him, along with Candidates Sowers and Smoll, the preferred candidate of choice for both White and Latino voters. *See* FoF ¶ 229 & Pls.' Ex. 121 at 2. Dr. Barreto contends that there was no "obvious" candidate of choice in the 2019 election, despite not drawing the same conclusion in equally tight races. FoF ¶ 231.

A similar story of sameness is told in election years 2017 and 2014—in 2017, had Candidate Gwaltney received 7% more of the Latino vote, all three so-called candidates of choice would have been the same for Whites and Latinos; in 2014, just 8% of the Latino vote allegedly separated Candidates Sowers and Smoll from being the candidates of choice for both White and Latino voters along with Candidate Peters. FoF ¶ 229 & Pls.' Ex. 121 at 2-3. In other words, in elections like those for Dodge City Commission where allegedly only a few hundred Latino votes are cast, the change of just a few votes (or estimates on whether a particular voter is Latino or White based on their surname) would have resulted in there being absolutely no discernable difference between the voting preferences for Latino and White voters, much less a meaningful difference. In light of that, the Court is unwilling to find that bloc voting has been shown. *See, e.g.*,

*Apsley v. Boeing Co.*, 722 F. Supp. 2d 1218, 1247 (D. Kan. 2010), (granting summary judgment on plaintiffs' ADEA disparate impact claim, despite plaintiffs' evidence showing a statistically significant disparity, since plaintiffs' statistical evidence "lack[ed] practical significance" because had forty-eight decisions out of a pool of thousands had been made differently the plaintiffs' statistical evidence would be stripped of its meaning), *aff'd*, 691 F.3d 1184 (10th Cir. 2012); *see also Cisneros v. Pasadena Indep. Sch. Dist.*, 2014 WL 1668500, at *22 (S.D. Tex. Apr. 25, 2014) (quoting Dr. Barreto as saying: "if you only have a group of 10 people, and you miscalculate two of them, that's a 20 percent error rate").

On top of failing to show bloc voting, Dr. Barreto's analysis does not show that White voters "usually" vote in a manner to defeat the so-called Latino preferred or Latino candidates. *Cousin v. Sundquist*, 145 F.3d 818, 823 (6th Cir. 1998) ("[T]he inquiry in the second pre-condition differs from that involved in the third: the former asks merely whether voters of the same race tend to vote alike, and the latter evaluates whether 'a bloc-voting majority can routinely outvote' the minority, thereby 'impair[ing] the ability of a protected class to elect candidates of its choice.'" (Quoting *Johnson v. DeGrandy*, 512 U.S. 997, 1007 (1994)). Under Dr. Barreto's RxC analysis, the Latino preferred candidate won half of the seats (6 out of 12) available in the four elections that Dr. Barreto reviewed. FoF ¶ 229. If Latino candidate Joe Nuci is added, the number of Latino-preferred and Latino candidates who have won a seat on the Dodge City Commission jumps to 8 out 12, or 67%. *See* FoF ¶ 229 & Pls.' Ex. 121 at 1-2. Although the Supreme Court has not specified what "usually" means, courts have found that when the so-called minority preferred candidate prevails at or near 50% of the time, the third *Gingles* factor is not met. *See, e.g., Lewis v. Alamance Cnty., N.C.*, 99 F.3d 600, 606 n.4 (4th Cir. 1996) (collecting cases and stating: "[w]e

need not in this case specify a meaning for the[] terms ['usually,' 'normally,' and 'generally'];
suffice it to say that they mean something more than just 51%").

BISG does not resolve the aforementioned issues. Leading up to trial, and in order to avoid
exclusion of Dr. Barreto, Plaintiffs represented that Dr. Barreto's admission in *Cisneros v.
Pasadena Independent School District*, 2014 WL 1668500, at *12 (S.D. Tex. 2014), that
jurisdictions with "very small number of voting precincts make[] it more difficult to analyze voting
patterns and make determinations of racial bloc voting" did not apply with equal force here because
of BISG. *See* CM/ECF Doc. 150 at 14 ("Dr. Barreto has testified that a smaller number of precincts
does make it harder to determine polarized voting, [but] he has developed a methodology utilized
by Plaintiffs' and Defendants' experts in this case to overcome such hurdles: BISG."). As the Court
has since learned, though, BISG merely improves the inputs into Dr. Barreto's calculations by
purportedly making Dr. Barreto better able to unmask the racial identity of Dodge City voters and
to estimate how much of the electorate Latinos represent. FoF ¶ 225. BISG does not make up for
a dearth of precincts or data flowing therefrom, suggesting that a racially polarized finding cannot
be found. BISG does not make the application of King's EI in a multi-candidate, multi-vote case
like this more appropriate. FoF ¶ 225. BISG does not explain how racial bloc voting is occurring
when the election results, across the board, show that White and Latino voters prefer many of the
same City Commission candidates. *See* FoF ¶ 229. BISG does not demonstrate that White voters
"usually" defeat the Latino preferred candidate when the so-called Latino preferred candidate
alone, based on Dr. Barreto's own "point estimates," have won half of the seats that have been
available over the past 10 years. *See* FoF ¶ 229. Put simply, this Court is in exactly the same place
that the *Cisneros* court was 10 years ago and draws the same conclusion: Dr. Barreto's analysis is
insufficient to show a section 2 violation.

The aforementioned issues are not resolved by the analysis that Dr. Barreto did on exogenous elections. Again, exogenous elections are not meant to be the primary vessel for carrying Plaintiffs' water, and they certainly cannot be used to draw conclusions about endogenous elections that are actually belied by those elections' actual results. Here, Dr. Barreto reviewed 20 exogenous elections. FoF ¶ 233. However, 17 of these 20 exogenous elections, or 85% of them, are partisan, statewide, one-vote, two-candidate elections. FoF ¶ 233-35, 237. For what should be obvious reasons, the Court does not find these elections (which involved some of the most polarizing candidates that this Country and State have ever seen) probative of non-partisan, Dodge City-based, three votes, multiple candidate Dodge City Commission elections. *See, e.g.*, *Kumar*, 476 F. Supp. 3d at 509 (noting that exogenous elections with "partisan contests with party labels . . . present very different circumstances that color the data—most importantly being the partisan nature of the elections"); *York v. City of St. Gabriel*, 89 F. Supp. 3d 843, 857 (M.D. La. 2015) ("[B]oth experts testified that partisan politics play a heightened role in state and federal elections, in a manner not present in local elections. Accordingly, the Court declines to consider the evidence of Iberville Parish elections offered by the experts, for it does not find them sufficiently reflective of the local voting patterns at issue in this matter."); *Cisneros*, 2014 WL 1668500, at *22 ("In this case, the exogenous elections chosen by Dr. Barreto are not similar to the endogenous elections in a critical respect, and the results from the exogenous elections run counter to the results from the endogenous elections. The exogenous elections chosen by Dr. Murray suffer from the same flaws. These partisan exogenous elections cannot be used to overcome the evidence supplied by the non-partisan endogenous elections.").

As for the Ford County County Clerk race in 2020, it is not probative because it was a partisan, one-vote, two-candidate election, which, based on Dr. Barreto's own analysis, looks

nothing like the Dodge City Commission elections. FoF ¶ 236. As for Dr. Barreto's 2 remaining elections—one for school board in 2021 and one for Dodge City Community College Trustees in 2019, they are non-partisan, multiple vote and candidate elections. FoF ¶ 236. However, like Dr. Barreto's endogenous election results, they do not actually show bloc voting. Starting with the school board election, one of the candidates was the preferred candidate of both White and Latino voters. FoF ¶ 236 & Pls.' Ex. 121 at 1. Another candidate (Candidate West) was .6% away from being the preferred candidate of both White and Latino voters. FoF ¶ 236 & Pls.' Ex. 121 at 1. Additionally, a shift of less than 5% in how Latinos voted in the school board election would have resulted in Latinos and White voters supporting the same four candidates. FoF ¶ 236 & Pls.' Ex. 121 at 1. In light of these facts, how few votes are cast, and the amount of estimating and assuming that apparently occurred in Dr. Barreto's analysis, the 2021 school board election offers little assistance to Plaintiffs.

The same is true for the 2019 Dodge City Community College Trustees election. There, two of the three candidates preferred by White and Latino voters were the same under Dr. Barreto's analysis. FoF ¶ 236 & Pls.' Ex. 121 at 1. Furthermore, if 5% of the Latino vote had shifted in favor of Candidate Turley, all three would have been preferred both by White and Latino voters. FoF ¶ 236 & Pls.' Ex. 121 at 1. For reasons similar to those set forth in the previous paragraph, the Court does not view the 2019 Dodge City Community College Trustees election as evincing racial bloc voting.

In conclusion, the overwhelming majority of the races that Dr. Barreto analyzed (and are clearly the driver of his opinions) offer little to no probative value on City Commission elections because they are partisan, one-vote, two-candidate elections. Second, those races that are most probative (*i.e.*, the 4 City Commission elections), as well as the 2 other non-partisan local elections

that Dr. Barreto reviewed, do not actually show bloc voting. Instead of showing that White and Latino voters support different candidates, Dr. Barreto's analysis indicates that White and Latino voters support many (if potentially not all when standard confidence intervals are considered) of the same candidates. Thus, Dr. Barreto's analysis, by itself, does not satisfy *Gingles* factor two and three—more is needed.

### 2. Plaintiffs' non-statistical evidence does not show racial bloc voting in Dodge City Commission elections.

A plaintiff may rely on lay testimony to make their requisite showing, though such evidence typically is not "alone dispositive." *Sanchez v. State of Colo.*, 97 F.3d 1303, 1320 (10th Cir. 1996). Here, Plaintiffs produced no failed Latino City Commission candidates. They did, however, call former Commissioner Jan Scoggins. While Ms. Scoggins outlined what she did both in running for City Commission and while serving on the Commission, her testimony had no nexus to Dodge City Latinos. She made no mention of running a Latino-focused campaign, championing Latino issues while on the Commission, or otherwise being a preferred Latino candidate of choice. FoF ¶ 166. Even Ms. Scoggins' testimony on why she requested research on district voting bears no connection to Dodge City Latinos; rather, when asked why she made her request, Ms. Scoggins merely stated that she believed some change was necessary, though she did not say why or how such change would have benefited Latinos in Dodge City. FoF ¶ 114.

As for other candidates that Plaintiffs have previously claimed are the candidates of choice for Latinos, the evidence adduced at trial did not help Plaintiffs. Regarding Candidate Zuniga, it is uncontroverted that, while her name was on the 2017 City Commission ballot it was only because Candidate Zuniga attempted to formally drop out of the race too late. FoF ¶ 63. As Ms. Melissa McCoy testified, Candidate Zuniga did not actually run a campaign in 2017 due to health

issues and had sought to remove her name from the ballot but could not. FoF ¶ 63. Thus, ethnicity had nothing to do with Ms. Zuniga not prevailing—she lost because she effectively did not run.

Finally, the evidence is that Latinos are now the largest plurality in Dodge City. FoF ¶ 17. Because Latinos are now the largest plurality (and that percentage appears destined to continue to rapidly increase), there are no systematic barriers in Dodge City to voting, and that racial bloc voting is not occurring to any discernable degree, the Court finds that there is no "bloc-voting majority [that] can routinely outvote" Latinos in Dodge City. *Cousin v. Sundquist*, 145 F.3d 818, 823 (6th Cir. 1998). As aptly noted by Mr. De La Rosa, Latinos currently have the ability to elect their preferred candidates. FoF ¶ 120. "White voter behavior . . . cannot be the cause of these candidates' defeat if [Latino] voters themselves have failed to take reasonable steps to assure their victory." *N.A.A.C.P., Inc. v. City of Columbia, S.C.*, 850 F. Supp. 404, 415-16 (D.S.C. 1993).

### C. The totality of the circumstances does not show that Dodge City's at-large elections dilute Latino votes.

 Dodge City's at-large elections do not violate Section 2 under the totality of the circumstances. *See, e.g.*, *Fusilier v. Landry*, 963 F.3d 447, 459 (5th Cir. 2020). In considering the totality of the circumstances under Section 2, courts look to the Senate Factors set forth in *Gingles*. *See Wisc. Legis. v. Wisc. Elections Comm'n*, 595 U.S. 398, 402 (2022) ("If the preconditions are established, a court considers the totality of circumstances to determine whether the political process is equally open to minority voters." (Quotations omitted)). The Senate Report factors, though, are "neither comprehensive nor exclusive . . . . [O]ther factors may also be relevant and may be considered." *Gingles*, 478 U.S. at 45. A "[f]ailure to prove the totality of the circumstances establishes the minority is not harmed by the challenged practice[.]" *Sanchez v. State of Colo.*, 97 F.3d 1303, 1311 (10th Cir. 1996). The totality-of-the-circumstances analysis is "peculiarly dependent on the facts of each case" and requires "an intensely local appraisal of the design an

impact of the contested electoral mechanisms." *Gingles*, 478 U.S. at 79 (citations and quotations omitted). Courts thus must engage in a "searching practical evaluation of the past and present reality" with a "functional view of the political process." *Sanchez*, 97 F.3d at 1310.

A searching practical evaluation of the past and present reality in Dodge City shows that Latinos enjoy the same opportunity as Whites to elect candidates of their choice in Dodge City.

For good reason, Plaintiffs effectively conceded the first Senate factor in closing argument. *See* Trial Tr. Vol. V at 49:11-17. The first Senate factor looks to the extent of any history of official discrimination in Dodge City "that touched the right of the members of the minority group to register, to vote, or otherwise participate in the political process." *Id.* at 1310 n.11. Specifically, the first Senate factor asks, "how the challenged electoral structure interacts with social and historical conditions *to cause* an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Id.* at 1323 (emphasis in original, quotations omitted). Here, the Plaintiffs attempted to demonstrate a history of discrimination in Dodge City through Dr. Martinez, but Dr. Martinez largely opined on pre-Civil Rights movement discriminatory practices *outside* of Dodge City. FoF ¶ 93. Moreover, Dr. Martinez ultimately testified that he did not find any evidence of official discrimination in voting or elections in Dodge City. FoF ¶ 93. *See, e.g.*, *Pierce v. N.C. State Bd. of Elections*, --- F. Supp. 3d ----, 2024 WL 307643, at *23 (E.D.N.C. Jan. 26, 2024) ("Plaintiffs cite just one case from the last 30 years in which a court found the General Assembly acted with discriminatory intent when it enacted a voting law. The court gives little weight to plaintiffs' overwhelmingly outdated evidence." (Citation omitted)).

To the extent Dr. Martinez identified historical discrimination at all, there is no evidence in the record to support an inference that those remote historical events interact with Dodge City's

at-large elections in a way that *causes* an inequality in the opportunities that Latinos enjoy today. *See id.* at 1323 (holding district court did not err when it concluded most events of historical discrimination were "too remote in time to establish a present impediment"); *see also Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995) ("The court must determine whether the challenged electoral structure deprives a racial minority of equal opportunity to participate in the political process *at present*." (emphasis in original)); *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992) ("Here, plaintiffs introduced evidence of disputed accuracy that, at some Board elections, Hispanic turnout was roughly seven percentage points below that of Anglos. However, they offered no evidence directly linking this low turnout with past official discrimination. Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote." (footnote omitted)).

The second Senate factor is the extent to which voting in Dodge City's elections is racially polarized. *Sanchez*, 97 F.3d at 1310 n.11. The analysis of this factor follows the Court's analysis of the second and third *Gingles* factors, and Plaintiffs have not shown that voting in Dodge City Commission elections is racially polarized. *See* FoF ¶¶ 226-37.

The third Senate factor looks to the extent that Dodge City's at-large elections "enhance the opportunity for discrimination against the minority group[.]" *Id.* at 1310 n.11. Dodge City has no issues traditionally associated with violations of Senate factor 3. Ther are no unusually large voting districts, majority vote requirements, anti-single shot provisions, or other practices that may enhance the opportunity for discrimination. Dodge City's expert Dr. Kim Nelson testified that at-large elections were not designed to enhance the opportunity for discrimination against minority groups. FoF ¶ 99. Rather, at-large elections were designed to provide smaller cities like Dodge City better, more effective governance, and Dodge City's at-large elections do just that. FoF ¶ 98-

100. In the same vein, as Mr. De La Rosa testified about Dodge City's elections, Dodge City has gone "above and beyond in informing the City with accessibility language, access, assisting . . . providing a facility as a polling location, [and] public transportation for our citizens." FoF ¶ 130. Thus, there is no evidence in the record that Dodge City's at-large elections were adopted or maintained to enhance the opportunity to discriminate against Latinos. FoF ¶ 101. To the contrary, two witnesses, Mr. Rebein and Mr. De La Rosa, testified accurately and credibly that, given the prevailing demographics in Dodge City and sufficient voter turnout, Latino-preferred candidates could make up the entire Dodge City Commission under the current system.  FoF ¶ 120.

The fourth Senate factor asks whether Dodge City has a candidate slating process and, if it does, whether Latinos in Dodge City have been denied access to that process. *Sanchez*, 97 F.3d at 1310 n.11. Plaintiffs here did not present evidence that Dodge City has a formal slating process. To the extent Plaintiffs produced any evidence supporting this factor, they rely on a 2021 "slate" of candidates that the Republican Party-oriented political action committee Kansans for Liberty approved. FoF ¶ 171. On that slate, however, appear: (1) Joe Nuci, who is Latino; and (2) Michelle Salinas, who has a Latino surname, and Chuck Taylor, who appears to be a Latino-preferred candidate in the election based on the evidence adduced at trial. *See, e.g.*, FoF ¶ 172, Pls.' Ex. 121 & Ex. 465. The evidence does not support a finding that Latinos have been denied access to candidate slating in Dodge City, whether official or unofficial.

The fifth Senate factor reviews the extent that Latinos in Dodge City "bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Id.* at 1310 n.11. Here, Plaintiffs' efforts fail because there is nothing showing that the alleged disparities that Dr. Bejarano testified about are based on discrimination. *See* FoF ¶¶ 25-42. Rather, any socioeconomic disparities in Dodge City

are better explained by the fact that Dodge City is a welcoming community for migrants and first-generation Latino Americans. FoF ¶¶ 11-21, 76-95. Additionally, even if some causal connection existed, in light of current election practices in the City—*e.g.*, mail-in and three-week advance voting, as well as measures that Dodge City takes to ensure access to the ballot box, including free public transportation to vote in advance of or on election day, *see* FoF ¶¶ 122, 128-135, any noted disparity is not impacting Latinos' ability to effectively participate in the political process.

Admittedly, there appear to be some disparities between Latinos and Whites in Dodge City. As noted by Dr. Bejarano, though, she is unaware of any community that has completely eliminated these disparities. FoF ¶ 30. Many of the socio-economic metrics show that those metrics are dramatically improving for Latinos in Dodge City. FoF ¶ 30. This is true even though a portion of the Latino population in Dodge City is migrant and non-English speaking. No one disputes that migrants frequently arrive in Dodge City with few assets and may be undocumented. Their presence in Dodge City is not reflective of discrimination, but rather just the opposite—that Dodge City is, and immigrants view it is being, an inviting and welcoming place to Latinos. FoF ¶¶ 11-21, 76-95; *see, e.g.*, *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1225 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999) ("The socioeconomic data before this court does not distinguish between Hispanics who are recent immigrants and those who have been in this country for longer periods, particularly those who are citizens. This information is important to this analysis, but was not presented."); *Aldasoro v. Kennerson*, 922 F. Supp. 339, 365 (S.D. Cal. 1995) ("[I]t is critical to distinguish between foreign born and native born Hispanics in addressing this Senate factor" because "the lower socioeconomic status of immigrants, or of those unable to speak English, is not due to discrimination in this country.").

Plaintiff Rangel-Lopez is an example of the types of opportunities that Dodge City has to offer to its migrant community. The son of first-generation immigrants, FoF ¶ 1, Plaintiff Rangel-Lopez went on to graduate as salutatorian of Dodge City High School, to graduate from the University of Kansas, winning department honors, and then to return to Dodge City, where he actually worked for the City Manager's office and is now working for a civic engagement organization in Southwest Kansas. FoF ¶ 1-6, 37, This is far from an isolated example. Mr. Rebein offered a number of anecdotal stories regarding immigrants that have made good on the American Dream in Dodge City. *See* Trial Tr. Vol. III at 226:15-228:10. In addition to economic prosperity, Latinos are active in community organizations, church organizations, and other local charitable organizations. In short, Latinos and immigrants are part of the Dodge City community and have largely thrived in that community, in no little part due to the efforts of the City.

To attempt to paint a different narrative, Plaintiffs proffered Dr. Martinez. However, after performing his own separate professional investigation, Dr. Martinez was unable to find any policy of school segregation in Dodge City. FoF ¶ 93. Likewise, Dr. Martinez was unable to find any policy of discrimination in voting, and, while Dr. Martinez remembered finding an unnamed article in an unnamed publication written sometime in the early 1980s by someone who he "think[s] his name [wa]s Arthur or Arturo Martinez" that "mentioned that there was restrictive covenants [in Dodge City]," Dr. Martinez did not find and "review [any] actual covenants themselves or the municipal code" to confirm their existence. FoF ¶ 93. Dr. Martinez offered no testimony regarding any discrimination that Latinos faced in employment or receiving healthcare. FoF ¶ 93. While Dr. Martinez did offer testimony about sporadic or geographically remote instances of discrimination, he did not tie it back to Dodge City. FoF ¶ 93. As a result, as indicated at trial, the Court finds that the aforementioned is insufficient to show meaningful instances of historical discrimination

against Latinos in or around Dodge City. *See Sanchez*, 97 F.3d at 1323 (agreeing with the district court that evidence of discrimination was "too remote in time to establish a present impediment in voting"); *Butts v. City of New York*, 779 F.2d 141, 150 (2d Cir. 1985) (reversing the district court's finding that "past discrimination in New York voting had occurred to an extent made significant by Section 2 of the Act" because there was "slim proof on the issue of past discrimination").

Relatedly, the Court does not find that, to the extent any discrimination happened in the past, it is impacting the current Latino population in Dodge City in any adverse way, much less causing the disparities that Dr. Bejarano noted. *See, e.g.*, *Sanchez*, 97 F.3d at 1323 (quoting the Senate Report accompanying the 1982 amendments to section 2 and its intimation that the identified disparities must "*aris[e] from* past discrimination" (emphasis added)); *Pierce*, 2024 WL 307643, at *23 ("Dr. Burch's report, however, contains no statistical analysis demonstrating that race discrimination by North Carolina *caused* the socioeconomic disparities that Dr. Burch discusses in her report. Accordingly, this factor does not help plaintiffs." (Emphasis added)). While it is certainly possible with a longtime, static population in an area, such as African Americans in the Deep South, that the lingering vestiges of long-ago discrimination may still raise its ugly head, the Latino community in Dodge City is a fairly recent phenomenon. FoF ¶¶ 11-12. As testified to by longtime Dodge Citian Mr. Rebein, it was not until the development of the cattle industry in the 1980s that the Latino population in Dodge City began to explode. FoF ¶ 11. Dr. Barreto's tables support that timeline, showing that, in just the past 20 years, the Latino population has grown by nearly 65%. FoF ¶¶ 13-17. Over that corresponding 20 years, the record reveals that Dodge City has striven to be (and has been formally recognized as) a welcoming community to Latinos, including to the many first-generation immigrants that make up that group. FoF ¶¶ 76-95. It seems intuitive to the Court that disparities will exist between a racial community that includes many

first-generation immigrants that likely came to this Country with little to nothing and racial groups that have long inhabited Dodge City.

City Manager Hernandez is a reflection of the role that Latinos play in the leadership in the community. FoF ¶ 71. He is a fifth-generation Ford County resident, whose great-great grandfather first migrated to Dodge City's Mexican village and whose great grandfather worked for the railroad. FoF ¶ 71. Mr. Hernandez's great uncle's brother, Louis Sanchez, was the first Latino mayor of Dodge City. FoF ¶ 71. After growing up in Dodge City, Mr. Hernandez himself served in the Marine Corps and attained a master's degree in public administration. FoF ¶ 71. Now, in addition to serving as City Manager, Mr. Hernandez is on the governing body of the League of Kansas Municipalities and is an ex officio board member of the Dodge City Chamber of Commerce and the Ford County Economic Development Corporation. FoF ¶ 71. On top of that, Mr. Hernandez has served in roles with Humanities Kansas and the Kansas Emergency Management Committee for Planning and Response. FoF ¶ 71. Those who have served with Mr. Hernandez in the City Manager's Office—such as Assistant City Managers Ms. McCoy and Mr. De La Rosa and City Clerk Ms. Vasquez—are, uncontrovertibly, of the same ilk. FoF ¶¶ 72-73.

In short, Plaintiffs have adduced no evidence showing that discrimination (past or current) is the cause of the cited-to disparities. During closing arguments, Plaintiffs' counsel stated that the "thing that actually moved [him] the most" with regard to Senate factor 5 was "when Ms. Scoggins talked about the incident of the kids getting the Legos and all of the Hispanic kids putting a jail in their model cities." Trial Tr. Vol. V at 14:9-24. The Court does not view Ms. Scoggins' testimony regarding school-aged children that she visited sometime between 2014 and 2019 as relevant to the Senate factor 5 at all for two reasons. First, Ms. Scoggins' testimony was just that she had visited an after-school program in South Dodge; she made no mention of the students' racial

makeup and there is nothing in the record that supports the notion that "all" of the students were Latino. *See* Trial Tr. Vol. III at 153:1-24. Second, while Plaintiffs' counsel may view Senate Factor 5 as "impressionistic," Trial Tr. Vol. V at 14:9-24, the Court is not convinced that what children include in an after-school project is any evidence of alleged discrimination or the possible side effects therefrom, especially when the thing that is included is part of every well-functioning society. Accordingly, without any nexus between the identified disparities and alleged past discriminatory practices, and without a showing of discrimination against the Latino population that now makes up Dodge City, the Court is unwilling to find that the fact that certain metrics for Latinos in Dodge City appear lower than for Whites is helpful to Plaintiffs.

The sixth Senate factor asks whether political campaigns in Dodge City have been characterized by overt or subtle racial appeals. They have not. FoF ¶ 169. The evidence is to the opposite—in 1998 and 2000, Fernando Jurado campaigned for the Dodge City Commission on a platform of "unity in the community." FoF ¶ 174. And, as Dodge City political leader Mr. Rebein credibly testified, the longstanding theme in Dodge City "is to unify, unify, unify." FoF ¶ 174. Accordingly, this factor is of no help to Plaintiffs. *See Sanchez*, 97 F.3d at 1324 (upholding district court's finding of "no evidence in the political campaigns of overt or subtle racial appeals").

The seventh Senate factor reviews the "extent to which members of the minority group have been elected to public office in the jurisdiction." *Id.* at 1310 n.11. Since 1998, three Latino individuals have served as City Commissioners. FoF ¶ 59. Two, Fernando Jurado and Joe Nuci, were elected. FoF ¶ 59. The third, Blanca Soto, was appointed. FoF ¶ 64-67. Outside of these three individuals, the record reveals that only one other Latino,[15] Liliana Zuniga, ran for City

---

[15] There was evidence that one other candidate, Michelle Salinas, has a Hispanic surname. There was no evidence regarding whether she identifies as Latino. It is clear she did not receive a substantial number of votes in any precinct.

Commission—though, in her most recent run, Ms. Zuniega did not actually campaign. FoF ¶ 61, 63. There is no evidence in the record that the seemingly small number of Latino candidates is due to any environmental barriers that have been placed on Latino candidates running for City Commission. *See* FoF ¶¶ 163-68, 170-71. Latinos own and run businesses in the community, they, like Plaintiffs in this case, are appointed to and serve on various civic boards, and they have been specifically sought out to run but have demurred due to the perceived commitment such a position would entail. FoF ¶ 168. To state an obvious political reality: one must place one's name on the ballot to win election.  Ultimately, it is the responsibility of citizens to register and to vote. K.S.A. 25-2302 ("It is the duty of all legally qualified voters to register to vote."). After equivocating on this point, Plaintiffs' expert Bejarano ultimately agreed that citizens have "some responsibility" to vote. Trial Tr. Vol. I at 160:9-13. She also testified that she was not aware of and did not discuss any barriers to voting. *Id.* at 163:20-22. The fact that very few Latinos have become candidates, despite the lack of barriers for doing so, militates against the Court giving this factor much, if any, weight. *See York v. City of St. Gabriel*, 89 F. Supp. 3d 843, 860 (M.D. La. 2015) (stating that, due to the "dearth" of candidates that have ran for office, that the court is "careful to avoid overstating the degree of the non-election of Whites, given the low rate of White candidacy in St. Gabriel elections"); *see also Johnson v. DeGrandy*, 512 U.S. 997, 1020 (1994) ("[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground.").

Regarding Ms. Bejarano's National Association of Latino Elected and Appointed Officials (NALEO) tables, the Court gives them little weight here. Looking at the City Commission elections, NALEO was batting an even .000. Despite, two of the Commissioners having undeniably Latino surnames—Jurado and Soto, NALEO's research did not uncover them and list them in its directory. While it may be that NALEO may accurately relay Latino status of federal

or other similarly high-profile positions, the Court's experience with it in this case indicates that NALEO is not a reliable source when accessing Senate factor 7. *See* FoF ¶ 60.

Finally, the Court notes that proportionality is not the law. *See* 52 U.S.C. § 10301(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."); *Gingles*, 478 U.S. at 46 ("[T]he conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation."). Thus, a "[l]ack of proportionality can never by itself prove dilution, for courts must always carefully and searchingly review the totality of the circumstances." *Johnson*, 512 U.S. at 1026 (O'Connor, J., concurring), *quoted with approval in Wisc. Legis. v. Wisconsin Elections Comm'n*, 595 U.S. 398, 405 (2022); *see also Wisc. Legis.*, 595 U.S. at 405 (noting that the Court rejects focuses that are "exclusively on proportionality").

Senate factor 8 asks whether "there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Sanchez*, 97 F.3d at 1310 n.11. The Dodge City Commission's responsiveness to the needs of Dodge City's Latino community has not been lacking, nor can the Court fairly say that "there is a *significant* lack of responsiveness" on the part of the Dodge City Commission. In fact, it has been the opposite. FoF ¶¶ 76-95; *see also* FoF ¶¶ 122-35. While there was some discussion by Plaintiffs regarding perceived disparate conditions of roads, sidewalks, and parks in and around Dodge City, it is uncontroverted that the City's maintenance of its roads is based on an objective process, sidewalks are property owners' responsibilities, and the City has committed millions to improving conditions in and around "South Dodge," including its parks. FoF ¶ 94. Furthermore, neither Plaintiff was able to identify any single issue that has divided the White and Latino communities in Dodge City. Senate factor 8 clearly favors the City. *Cf., e.g.*, *McCarty v. Henson*, 749 F.2d 1134, 1137 (5th Cir.

1984) ("The district court cited numerous uncontroverted examples of the Board's responsiveness to the needs of the black community, including participation in funding programs for disadvantaged students, appointment of black citizens to advisory committees, and efforts to recruit and hire more minority employees. The plaintiffs did not rebut this evidence of the Board's responsiveness by coming forward with specific instances of present Board unresponsiveness.").

Finally, Senate factor 9 looks to whether the policy underlying Dodge City's use of at-large elections "is tenuous." *Sanchez*, 97 F.3d at 1310 n.11. The analysis here focuses on whether "the procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact." *Id.* at 1325. As at-large elections are "not a *per se* violation of the VRA or the U.S. Constitution, . . . the burden is on Plaintiffs to show that this factor is satisfied." *York v. City of St. Gabriel*, 89 F. Supp. 3d 843, 861 (M.D. La. 2015).

In this case, Dodge City's at-large elections do not "depart[] from past practices" at all—the practice is long established. FoF ¶ 96. And there is no evidence at all about the process Dodge City used when it adopted at-large elections. *See Sanchez*, 97 F.3d at 1326 (focusing on "evidence of the process" by which the defendants adopted the challenged measure). As recounted by multiple witnesses with long histories in city government—both in academia and in the field, as well as everyday citizens, there are many legitimate, non-discriminatory reasons for adopting an at-large method of elections in a city like Dodge City. Plaintiffs have not adduced any credible evidence to the contrary.

It is undisputed that the at-large election method for city governments like Dodge City is, by a wide margin, the most utilized method for cities that are similar in size to Dodge City. FoF ¶ 97. Likewise, it is undisputed that this form of government guards against "single-issue candidates" and cuts down on "dysfunctional conflict." FoF ¶ 98-99. It is Dr. Nelson's professional

opinion that district-based "boards generally don't function as well as they would in an at-large system." FoF ¶ 99. According to City Manager Hernandez, while "he believe[s] that there is a place for district elections, especially in communities that are large enough to not have proper representation or not have the ability to actually communicate with any of [their] Commissioners," Dodge City is not such a community, constituting, as a whole, roughly half a single district in a larger jurisdiction like Wichita. FoF ¶ 100. Mr. Hernandez also highlighted the risk of district-based elections in smaller communities, where commissioner races can be decided by just a handful of votes. FoF ¶ 100. From his perspective as City Manager, Mr. Hernandez stated that the current form of elections for City Manager results in "a unified community [and] a unified Dodge City." FoF ¶ 100. Former City Manager, Ms. Cherise Teiben, echoed that sentiment, stating, based on her roughly 40 years of service to the City, that it is her "belief that five people that represented everybody gave better representation than one that represented this segment because it seemed like they would be doing more politics [and looking out more for their own respective] district versus what's best for the City as a whole." FoF ¶ 100. Sitting and former City Commissioners also expressed a similar view. Current Commissioner Sowers stated that, under the at-large election method, "each and every individual in the City has five commissioners they can go and talk to. I represent the entire City. The entire community." FoF ¶ 100. Former Commissioner Jurado, a Latino, described the advantage of at-large elections being: "you represent the whole city, not just a district or a part of the city." FoF ¶ 100.

To combat this consistent and persuasive line of testimony, Plaintiffs again rely upon Dr. Martinez, who, based on "historians [who] tended to focus on the South," opined that the at-large election method was the product of "racial animosity and that race was part of the motivation behind establishing this model." *See* Trial Tr. Vol. II at 201:1-203:18. According to Dr. Martinez,

the purpose behind the at-large election method was to "insur[e] that the working class and people of color who were getting elected into local government and so forth, were not going to be the ones that were key decision-makers [going forward]." *Id.* at 202:6-12. Dr. Martinez indicated that this form of election method is common when "members of the dominant group become threatened." *Id.* at 198:8-18. While that may have been indeed the case in the South, the Court finds zero evidence of that in Dodge City, especially in light of the fact that, when the at-large method was adopted, there was not a racial minority to speak of, at least certainly not a significant one.

The Court further finds that the utter lack of local outcry against the at-large election method utilized in Dodge City buttresses the City's position. *See* FoF ¶¶ 103-17. To be sure, if there was evidence of large and/or many contingents of Dodge Citians calling for a change in the City Commissioner election, then it would likely be more difficult for the City to fly the unity banner. However, there is no such evidence here. Likewise, the Department of Justice is well aware of Dodge City's at-large election method, yet never deemed it necessary to intervene. FoF ¶¶ 149-62; *see York*, 89 F. Supp. 3d at 862 (citing the fact that, years before a private suit was brought, the Department Justice had "issued a letter of no objection to St. Gabriel's at-large alderman election plan" as support for its conclusion that factor nine was not met). What was shown at trial is that Dodge City is a well-functioning city that is recognized as a welcoming community for Latinos, both by outside organizations, such as the National League of Cities, as well as immigrants, who continue to migrate to Dodge City in great numbers. FoF ¶ 76. Outside of the tables that Dr. Bejarano produced, which, again, the Court finds reflect trends, to the extent they are negative, attributable to the group's large first-generation immigrant status, as opposed to current or past discrimination, there is no evidence in the record that Dodge City's method of City

Commission elections is adversely impacting Latinos. Accordingly, the Court finds that Dodge City's at-large election method is not tenuous. *Cf., e.g.*, *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1234 (11th Cir. 2000) (en banc) (affirming the district court's finding that the method was not tenuous because there was no evidence that the minority had objected to it, and, in fact, had "voted overwhelmingly against single-member districts").

Outside of the nine enumerated Senate factors, the Court finds that other facts militate against finding that Dodge City's current at-large election method prevents Latinos from participating and electing their candidate of choice. As noted above in the Court's *Gingles* factor 1 analysis, the Court is not convinced that Plaintiffs' proposed district method will actually "enhance" Latinos' ability to elect their so-called candidates of choice; rather, based on, among other things, sustained demographic changes in Dodge City and testimony regarding where so-called Latino preferred candidates actually live, it appears that it will hinder it in light of Latinos' ever growing citizen voting age population. Furthermore, the Court is not convinced that simply moving from at-large elections to district-based elections will have a material effect on Latinos' ability to elect their candidate of choice. As Dr. Nelson stated, unlike for African Americans, "she d[id]n't see a very strong effect for district elections alone leading to a better chance for a Latino candidate being elected." FoF ¶ 102. In light of what has presented in this case, the Court shares Dr. Nelson's sentiment, at least as it relates to Latinos in Dodge City.

Furthermore, the Court finds that the fact that Latinos are now the largest racial bloc of voters cuts against the finding of a section 2 violation. It is recognized that when a racial minority is the largest racial group in a jurisdiction that a party making a claim on its behalf will have an "obvious, difficult burden." *Salas v. Sw. Tex. Jr. College Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). While that difficult burden may be met where there is specific evidence that the ability to

vote is acutely more difficult for members of the minority group versus White voters or turnout is depressed by past or current official discrimination against a minority group, there is no such evidence in this case. Rather, for whatever reason, Latinos have not opted to exercise their right to vote. "Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote." *Id.* at 1556.

## II. Plaintiffs failed to show a Fourteenth Amendment violation.

The Court previously noted at the summary-judgment stage that the "evidence of the City's discriminatory intent is slim," and that it did "not account for [the City's] own evidence against finding discriminatory intent." CM/ECF Doc. 159 at 15. At trial, and after being presented with the full context of Plaintiffs' evidence, the Court finds that Plaintiffs' evidence of the City's intent to discriminate against Latinos is not only slim, but non-existent. Accordingly, at the close of Plaintiffs' case, the Court granted judgment on the Plaintiffs' Fourteenth Amendment claim for the reasons set forth herein. Plaintiffs have failed to show, for the reasons stated above, that Latinos' voting power has been diluted by the implementation or maintenance of the at-large election method for Dodge City Commission.

Plaintiffs failed to show any affirmative decision that the City Commission made to maintain at-large voting because of its allegedly discriminatory effect on Latino voters. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). In fact, the evidence in the record dispels the existence of such a connection. The record here shows, among other things, that (1) Dodge City and Ford County provide a multitude of election and election-related materials in English and Spanish, FoF ¶¶ 128, 132, 134; (2) no one in City or County leadership had received a complaint that Latinos were unaware of how to run for office or were otherwise unable to do so, FoF ¶ 171 (3) no one in City or County leadership had received a complaint about Dodge City's use of at-

large voting, FoF ¶ 104; (4) Ms. Seibel fully complied with the Department of Justice's inquiry FoF ¶ 161; and (5) the Department of Justice gave no indication after receiving the County's voluminous submission in response to the Department's 2011 request that it believed there was a section 2 or other violation, FoF ¶ 162. While Mr. Adelson's solicitation materials certainly raised the "potential" of a civil-rights violation, there is no evidence that anyone, including Mr. Adelson, actually believed that Dodge City's at-large election violated any applicable law. FoF ¶ 160. Plaintiffs' own counsel agrees "that there [wa]s not a conclusion reached [by Mr. Adelson] that certain *Gingles* preconditions were met." Trial Tr. Vol. III at 215:1-3. As a result, the Court believes that the 2011 Department of Justice inquiry, and subsequent actions, cuts against a Fourteenth Amendment finding.

Similarly, as this Court has already concluded, the Commission's decision not to follow through on then-Commissioner Scoggins' proposal to move to a hybrid system that would include two at-large positions and three single-member district voting only shows "the possibility of switching to a district-based voting system," not even a mere awareness of a discriminatory effect on Latinos. CM/ECF Doc. 159 at 14. In fact, Ms. Scoggins did not testify that she raised the issue because of discrimination. Rather, her hope was to have each voter have a "neighbor" on the Commission. FoF ¶ 114. At that point, there was apparently no community support for a move to district-based elections, and, possibly most importantly, there was no indication from anyone, including Ms. Scoggins, that Latinos were being adversely impacted by at-large elections. *See* FoF ¶ 115-16. Accordingly, the fact that Ms. Scoggins wanted further research on district-based elections to be performed in 2019 and the Commission did not support that request is not evidence of any sort of discriminatory purpose.

The *Arlington Heights* factors do not save Plaintiffs' Fourteenth Amendment claim. At trial, other than ubiquitously citing to the "evidence that was presented," the only specific evidence that Plaintiffs cited to in support of the *Arlington Heights* factors was the 2011 Department of Justice inquiry and the 2019 Scoggins request. Trial Tr. Vol. III at 215:1-12. As mentioned above, the Court does not believe either of the aforementioned events have the effect that Plaintiffs attribute to them. In short, after reviewing the evidence in the record, and hearing Plaintiffs' arguments on the matter, the Court finds that Plaintiffs have failed to produce any evidence that credibly supports an inference that Dodge City initially implemented or subsequently maintained at-large elections because of its alleged discriminatory effect on Latino voting. *Feeney*, 442 U.S. at 279. To the contrary, Plaintiffs' own discrimination expert, Dr. Martinez, testified that he had no evidence that Dodge City maintained at-large voting because of its allegedly negative effect on Latino voting. In light of the aforementioned, Plaintiffs failed to prove a Fourteenth Amendment violation and judgment is entered in Dodge City's favor on that claim.

## III.   Plaintiffs have failed to show that injunctive relief is warranted here.

Consistent with its ruling at the close of Plaintiffs' evidence, the Court also enters judgment on Plaintiffs' claim to move Dodge City's City Commission elections from odd-numbered years to even-numbered years. On this point, Plaintiffs' evidence shows only that voter turnout is lower for odd-year, off-cycle elections than it is for even-year, on-cycle elections. FoF ¶ 43. Plaintiffs cannot make a section 2 violation out of low voter turnout alone, particularly when Latinos in Dodge City: (1) make up nearly half of Dodge City's citizens of voting age population; and (2) constitute the single largest racial group of voters in Dodge City. FoF ¶ 17; *see* 52 U.S.C. § 10301(b) ("Nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."); *see also Salas v. Sw. Tex. Jr.*

*Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992) ("Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote.")

Moreover, Dodge City does not have Home Rule authority to move municipal elections to even-numbered years. Under current Kansas law, cities must hold city-officer elections in odd-numbered years. *See* K.S.A. 25-2107(a).[16] Yet Dodge City's Home Rule authority only extends to laws that are *not* "enactments of statewide concern applicable uniformly to all cities" or "other enactments applicable uniformly to all cities." Kan. Const., art. XII, § 5(c)(1). Therefore, because K.S.A. 25-2107(a) is uniformly applicable to all cities, Dodge City does not have Home Rule authority to exempt itself from K.S.A. 25-2107 under its Home Rule powers.

Nor can Plaintiffs overcome two key hurdles in overriding Kansas law to the contrary. First, the Tenth Circuit reasons that section 2 of the Voting Rights Act should only displace state electoral laws to the extent they necessarily conflict with federal law. *See Large v. Fremont County*, 670 F.3d 1133, 1144-45 (10th Cir. 2012) (counseling against displacement of state electoral laws "that need *not* be disturbed to cure the Section 2 violation"). Second, in the same vein, state interests play a "major role" when fashioning remedies under section 2 of the Voting Rights Act. *See Nipper v. Smith*, 39 F.3d 1494, 1541 (11th Cir. 1994) (holding that a state's "interest plays a major role in our consideration of the remedies the appellants propose as alternatives to the challenged electoral schemes"); *see also White v. Weiser*, 412 U.S. 783, 795 (1973) (cautioning courts against intruding on state policy "any more than necessary" in fashioning

---

[16]       K.S.A. 25-2107(a) provides: "The general election of city officers shall be held on the Tuesday following the first Monday in November of each odd-numbered and even-numbered years, if needed."

It appears that the argument that K.S.A. 25-2107 is not uniformly applicable stems from the "if needed" clause at the end of K.S.A. 25-2107(a). However, that clause only permits a city to move its elections to an even-number year for: (1) "the purpose of staggering terms"; or (2) "having three-year terms of office," *see* Kan. Legis. Research Dep't, *2015 Summary of Legislation* 46 (2015), *available at* https://www.kslegresearch.org/KLRD-web/Publications/SummaryofLegislation/2015_summary_of_legislation.pdf, as set forth in K.S.A. 25-21a01, an act that was passed along with K.S.A. 25-2107 in H.B. 2104 during the 2015 Kansas Legislative Session.

reapportionment plans). Here, where Kansas law establishes an interest in odd-year municipal elections, this Court will not override that interest absent a finding that it is warranted, which the Court does not find in this case.

## IV.   Plaintiffs' § 1983 claim fails.

Section 1983 was not mentioned by the Plaintiffs at trial or in closing argument. Nor is Section 1983 mentioned among Plaintiffs' claims in the pretrial order. Accordingly, the Court considers this claim to have been abandoned. Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985). As set forth above, the Court does not find that Plaintiffs have shown a violation of either the Fourteenth Amendment or the Voting Rights Act. Accordingly, judgment is entered on this claim as well.

## CONCLUSION

For the reasons stated herein, the Court grants judgment in Defendant's favor on all of Plaintiffs' claims in this case. It is so Ordered.

Respectfully submitted,

**FOULSTON SIEFKIN LLP**

By: */s/ Clayton J. Kaiser*

    Anthony F. Rupp, KS #11590
    Tara Eberline, KS #22576
    Sarah E. Stula, KS #27156
    7500 College Boulevard, Suite 1400
    Overland Park, Kansas  66210
    T (913) 498-2100 | F (913) 498-2101
    trupp@foulston.com
    teberline@foulston.com
    sstula@foulston.com

    - and-

    Clayton J. Kaiser, KS #24066
    Samuel J. Walenz, KS #29114
    FOULSTON SIEFKIN, LLP
    1551 North Waterfront Parkway, Suite 100
    Wichita, Kansas 67206
    T (316) 267-6371 | F (316) 267-6345
    ckaiser@foulston.com
    swalenz@foulston.com

ATTORNEYS FOR DEFENDANT

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 22nd of March 2024, the foregoing was electronically filed with the Clerk of the Court by using the Court's e-Filing system which will send notification of electronic filing to counsel for all parties of record, and a true and correct copy was served by electronic mail upon:

Sharon Brett, KS #28696
Kunyu L. Ching, KS #29807
**AMERICAN CIVIL LIBERTIES
UNION OF KANSAS**
sbrett@aclukansas.org
kching@aclukansas.org

 -and-

Chad W. Dunn *(Pro Hac Vice)*
Sonni Waknin *(Pro Hac Vice)*
Bernadette Reyes *(Pro Hac Vice)*
**UCLA VOTING RIGHTS PROJECT**
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org

 -and-

Jonathan Topaz *(Pro Hac Vice)*
Sophia Lin Lakin *(Pro Hac Vice)*
Luis M. R. Roman *(Pro Hac Vice)*
Victoria Ochoa *(Pro Hac Vice)*
**AMERICAN CIVIL LIBERTIES
UNION, INC.**
jtopaz@aclu.org
slakin@aclu.org
lroman@aclu.org
vochoa@aclu.org

Abena Mainoo *(Pro Hac Vice)*
Jonathan I. Blackman *(Pro Hac Vice)*
Mijin Kang *(Pro Hac Vice)*
Katherine M. MacAdam *(Pro Hac Vice)*
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
amainoo@cgsh.com
jblackman@cgsh.com
mkang@cgsh.com
kmacadam@cgsh.com

 -and-

Scott Fuqua *(Pro Hac Vice)*
**FUQUA LAW & POLICY, P.C.**
scott@fuqualawpolicy.com

*ATTORNEYS FOR PLAINTIFFS*

*/s/ Clayton Kaiser*