**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

MIGUEL COCA and        )
ALEJANDRO RANGEL-LOPEZ,    )
                     )
        Plaintiffs,      )     Case No. 6:22-cv-01274-EFM-RES
                     )
vs.                  )
                     )
CITY OF DODGE CITY,       )
                     )
        Defendant.     )
_____)

**DODGE CITY'S RESPONSE TO**
**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## Table of Contents

**INTRODUCTION**................................................................................................ 1

**RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT** ..................................... 4

**RESPONSE TO PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW** ......................... 50

   I.   Plaintiffs have not shown that Latinos are politically cohesive........................................ 50

     A.   No Court has ever approved of what Dr. Barreto is attempting to do here. ................ 51

     B.   Dr. Barreto's point estimates are not reliable in this case.............................................. 53

     C.   Dr. Barreto's EI analysis does not show Latino cohesion or that so-called Latino preferred candidates always lose. ........................................................................................ 58

        1.   There is no discernable Latino voter cohesion in this case...................................... 61

        2.   So-called Latino preferred candidates have won and have done so many times...... 64

     D.   Dr. Barreto's exogenous elections are not able to show what his endogenous ones do not. ...................................................................................................................................... 65

   II.   Plaintiffs have not shown that racial bloc voting is occurring.......................................... 67

   III.   Plaintiffs did not show that Latinos will perform under a district-based election method, as is required. ........................................................................................................ 72

   IV.   Plaintiffs have not shown that the Senate Factors favor them. ...................................... 77

     A.   Senate Factor 1.................................................................................................................... 79

     B.   Senate Factor 2.................................................................................................................... 82

     C.   Senate Factor 3.................................................................................................................... 82

     D.   Senate Factor 4.................................................................................................................... 86

     E.   Senate Factor 5.................................................................................................................... 87

     F.   Senate Factor 6.................................................................................................................... 94

     G.   Senate Factor 7.................................................................................................................... 95

     H.   Senate Factor 8.................................................................................................................... 99

     I.   Senate Factor 9.................................................................................................................. 105

     J.   Proportionality ................................................................................................................. 106

**CONCLUSION** ................................................................................................... 107

## INTRODUCTION

Plaintiffs have not met their burden to establish that the at-large voting system in place in Dodge City violates section 2 of the Voting Rights Act. Plaintiffs did not show that the three-factor test set forth in *Gingles v. Thornberg,* 478 U.S. 30 (1986), is met. Second, Plaintiffs have failed to establish a violation based on the totality of the circumstances. There is no discernible structural impediment to Latino success at the polls.

The Latino community in Dodge City is large, vibrant, and fully integrated into the community. It is a plurality of the Citizen Voting Age Population ("CVAP"), and there is no evidence that it does not have "equality of opportunity" to elect minority candidates of its choice.

*Gingles II* and *III* require Plaintiffs to establish that Latinos are "politically cohesive" and that the White majority votes sufficiently as a bloc to enable it to usually defeat the minority preferred candidate. Plaintiffs did not establish these elements. Moreover, Whites no longer constitute the majority of the CVAP, and Latinos are no longer the minority of the CVAP. As shown at trial, there is very little data to determine racially-polarized voting and voter cohesion in this case. Dodge City is a small community. There are few voters. There are only eight precincts. Vote totals in those precincts are small, and the margins between the first-place vote-getter in those precincts and the fourth-place vote-getter in City Commission elections is frequently statistically insignificant. Moreover, each voter has the opportunity to vote for multiple candidates.

As accurately stated by Dr. Katz, the fundamental problem here with regard to *Gingles II* and *III* is that we do not have enough "data points." Trial Tr. Vol. IV at 151:8-16. The data points "are actually the individual precincts. So you only have eight precincts in the elections . . . for the City [Commission, which means that] you have eight data points to identify somewhere on the order of 12 to 21 parameters, that is 12 to 21 candidate vote shares, by group." *Id.* Accordingly,

we "have less data than [we] have parameters that [we are] interested in estimating. *Id.* at 151:17-152:1. This problem is magnified by the fact that there "are no homogenous precincts. Not even close to homogenous." *Id.* at 152:19-153:15. Plus, City Commission voters are free to cast one, two, or three votes. *See id.* at 155:3-10. "What that means is, the identification, that is the point estimates that I get, are coming purely from the strong assumption of constancy," which "no one believes is true," *id.* at 152:16-18, "and that the model is linear," *id.* at 151:17-152:1. Put simply, "the lack of data [in this case] means there are lots of statistical uncertainty." *Id.* at 152:19-153:15. As a result, "[w]e just don't know how Latinos or Whites voted in particular elections. We do not see clear winners of which candidate is the preferred candidate of any group. So it's more about the level of statistical uncertainty. We just don't know." *Id.* at 158:18-159:6.

Dr. Barreto acknowledges the challenges of his task in a circumstance like this with little data, stating: "Even though we have few precincts, that's all we have. We can't double or triple the precincts here. We just try to do the best we can with the data and draw a conclusion." Trial Tr. Vol. II at 173:14-174:3. Despite this acknowledgement, though, Dr. Barreto claims that "the level of the uncertainty in [his] conclusions is none." *Id.* at 147:14-20. As Dr. Katz noted, and should be obvious, without a "presentation of measured statistical uncertainty," which is the case for all of Dr. Barreto's analysis, "you can't make such a claim." Trial Tr. Vol. IV at 160:8-13.

In short, Plaintiffs have not put forward reliable data with regard *Gingles II* and *III*. Moreover, even if one accepts the vote percentages that Dr. Barreto includes in his tables, those vote totals do not demonstrate either that Latinos are politically cohesive in their votes for City Commission or that the White majority votes sufficiently as a bloc to enable it to usually defeat Latino-preferred candidates.

In reviewing the analysis of Dr. Barreto, the Court can and should weigh that this case arises out of a "class project" in one of Dr. Barreto's classes at UCLA, that the organization that Dr. Barreto co-founded—the UCLA Voting Rights Project—is representing Plaintiffs in this case, and that the Voting Rights Project attorneys will seek a recovery of attorneys' fees if they prevail. Thus, Dr. Barreto has a vested interest in the success of Plaintiffs' case—evident by the fact that he is the only witness on the Plaintiffs' side (expert or otherwise) that was present throughout the entire trial and served as the Plaintiffs' rebuttal witness at the conclusion of the evidence. The named Plaintiffs were similarly not present throughout the trial. Dr. Barreto's involvement in this case goes well beyond that of a disinterested expert and is a fair consideration for the Court. Dr. Barreto's role, coupled with all the other identified shortcomings in his analysis, militates strongly in favor of discounting entirely his testimony, which was the only statistical testimony Plaintiffs produced on *Gingles II* and *III*, as well as the "performance analysis" of the proposed maps put forth for *Gingles I*.

Contrary to the Plaintiffs' argument, Dodge City is not "unresponsive to the interest and needs of its Latino constituents." The overwhelming weight of the evidence in this case is that Latinos are welcome in the community, are active in political parties, community groups and organizations, and that a large percentage of downtown business owners as well as union leaders are Latino. The National League of Cities just recognized Dodge City as a finalist for its cultural diversity award, and the City's efforts to be welcoming to the immigrant community–and Latinos specifically–are unmatched in Kansas and have been the model for other diverse cities throughout Kansas. In other words, Dodge City is nothing like how Plaintiffs' counsel and experts perceive it. In light of this, and Plaintiffs' failure to show a section 2 violation, judgement should be entered in the City's favor.

## RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT

The Court has heard the evidence and has had the opportunity to weigh it. Accordingly, this is unlike a summary judgment motion, and Dodge City does not respond individually to each of Plaintiffs' proposed findings of fact. With that said, Dodge City does address a number of Plaintiffs' proposed factual findings below. As certain of Plaintiffs' proposed findings share common deficiencies, Dodge City groups them together and sets forth the deficiencies that are common to that particular group.[1]

**RPFoF ¶ 12:** This finding omits that Dr. Barreto formed the UCLA Voting Rights Project with Mr. Chad Dunn and that Mr. Dunn and the UCLA Voting Rights Project are counsel for Plaintiffs. *See* DFoF ¶ 239. Additionally, this finding omits that Plaintiff Rangel-Lopez met with Michael Rios, the "lead data scientist" for the UCLA Voting Rights Project and someone who Dr. Barreto "work[s] very closely with in 2021 to discuss voting-related issues in Dodge City. DFoF ¶ 241. During this meeting, Mr. Rios indicated to Plaintiff Rangel-Lopez that, "from just a glance at Dodge City, you know, that there [i]s potential for a lawsuit there." *Id.*

**RPFoF ¶ 13:** This finding omits that Dr. Barreto has published at least four academic papers with Dr. Oskooii. DFoF ¶ 192. Additionally, this finding omits that Dr. Barreto has published at least ten academic papers with Dr. Loren Collingwood, *see* Pls.' Ex. 111 at 2-6, who is also a former student of Dr. Barreto's, *id.* at 14, as well as co-developer, along with Dr. Oskooii, of the EI software that Dr. Barreto used in this case and others, *see* Trial Tr. Vol II at 89:4-7. The article that Plaintiffs rely upon in an attempt to impeach Dr. Kim Nelson's testimony regarding the

---

[1]       References to "PFoF" in this document are to the corresponding proposed findings of fact in Plaintiffs' Proposed Findings of Fact & Conclusions of Law, CM/ECF Doc. 211. References to "DFoF" are to the corresponding proposed findings of fact in Dodge City's Proposed Findings of Fact & Conclusions of Law, CM/ECF Doc. 212. References to "RDFoF" are to Dodge City's responses to those PFoF's that it controverts.

efficacy of switching to district-based elections, *see* PFoF ¶ 252, is one that Dr. Collingwood drafted, *see* Trial Tr. Vol. IV at 57:14-61:3.

**RPFoF ¶ 15-16:** These findings are irrelevant to Dr. Barreto's reliability or credibility in this case. Dodge City would note that the one Kansas case that Plaintiffs do cite, *Fish v. Kobach*, 309 F. Supp. 3d 1048 (D. Kan. 2018), was not a section 2 case and thus he did not offer any testimony related to *Gingles*. Furthermore, while Dr. Barreto has been found reliable and credible by some courts, other courts, including this one, have found his analysis to be unreliable. For instance, with regard to Dr. Barreto's homogenous precinct analysis, this Court found it to be "unreliable" and "would not assist the trier of fact because it is based on insufficient facts and data." CM/ECF Doc. 158 at 8. Approximately one month after this Court made that finding, the Eastern District of North Carolina reached a similar conclusion, but instead of limiting its critique to just one of Dr. Barreto's analyses, it found that "all of [his] conclusions" were "undercut" by the manner in which he performed his analysis. *Pierce v. North Carolina State Board of Elections*, --- F. Supp. 3d ----, 2024 WL 307643, at *19 (E.D.N.C. Jan. 26, 2024), *aff'd*, --- F.4th ----, 2024 WL 1321267 (4th Cir. Mar. 28, 2024).

**RPFoF ¶ 18:** For the reasons stated in DFoF ¶¶ 201-37, Dr. Barreto's analysis, opinions, and testimony are not "largely uncontested," and such conclusions are not entitled to any weight. As Dr. Jonathan Katz alluded to, Dr. Barreto's work in this case is not consistent with the standard in the field, and Dr. Barreto's utter disregard for any "measure or discussion of statistical uncertainty in his report" is "[m]ost problematic." Trial Tr. Vol. IV at 160:1-7.

**RPFoF ¶ 20:** This finding omits that Dr. Barreto was Dr. Oskooii's dissertation advisor and the two have maintained a long-standing relationship, DFoF ¶ 192, which has included, among other things, the two co-authoring at least four academic papers together, *id.*; Trial Tr. Vol. III at

29:24-30:17, co-developing the "eiCompare package" that Dr. Barreto used in this case, *see* Trial Tr. Vol. II at 89:4-7, and the two being retained in the majority of cases that Dr. Oskooii has served as an expert in and actually co-authoring expert reports in two of the cases, *see id.* at 25:3-26:13.

**RPFoF ¶ 23:** This finding is irrelevant to Dr. Oskooii's reliability or credibility in this case. This finding omits that Dr. Oskooii advised the State of Maryland on a Congressional Map that was ultimately adopted by the State and later found to be an "extreme gerrymander." Trial Tr. Vol. III at 43:3-45:3. Additionally, it omits that, while it appears that a Washington court did finally approve a revised remedial map that Dr. Oskooii put forward in a case where a section 2 violation had already been found, *see* PFoF ¶ 24; *see also* Trial Tr. Vol. III at 12:16-17:6, prior to this case, Dr. Oskooii had never been qualified as a testifying expert for purposes of *Gingles I. See* Trial Tr. Vol. II at 227:1-11; *see also* Trial Tr. Vol. III at 20:17-24:23. Thus, while it is true, as Dr. Oskooii says, that "no one has rejected [his mapping] opinions," *id.* at 17:7-13, it is equally true that "no Court[ has] ever accepted his demonstrative . . . maps" because, prior to this case, he had never produced any, *id.* at 17:14:17.

**RPFoF ¶ 24:** The district court's holding in *Soto Palmer v. Hobbs*, No. 3:22-cv-05035, 2024 WL 1138939 (W.D. Wash. Mar. 15, 2024), is irrelevant to Dr. Oskooii's reliability or credibility in this case. This finding omits that the UCLA Voting Rights Project and Ms. Sonni Waknin are also counsel in *Soto Palmer*. Trial Tr. Vol. III at 12:8-15. Additionally, the "remedial map" that was ultimately approved was part of a set of proposed "remedial maps" that Dr. Oskooii had to revise because they double-bunked incumbents, which remedial maps should not do. *Id.* at 13:10-14:15. Although Dr. Oskooii initially contested that the Yakima Nation objected to his revised "remedial maps," he later admitted that the Nation had indicated that his "remedial maps" did respect its various "communit[ies] of interest." *Id.* at 14:16-16:12.

6

**RPFoF ¶ 25:** Dr. Oskooii's prior testimony on racially polarized voting is irrelevant because Dr. Oskooii did not opine on racially polarized voting in this case for the purpose of *Gingles* factors II or III. *See* Trial Tr. Vol. II at 228:18-229:1; *see also* PFoF ¶ 120 ("Plaintiffs presented testimony regarding *Gingles II* and *III* through their witness, Dr. Matthew Barreto."). Regardless, it further omits that Dr. Oskooii has given the State of Maryland advice on racially polarized voting that led to maps that were rejected as an unconstitutional gerrymander. *See* RPFoF ¶ 23.

**RPFoF ¶ 26:** Dr. Oskooii's testimony did not establish that *Gingles I* was met. *See* DFoF ¶¶ 175-200.

**RPFoF ¶¶ 27-28:** For the reasons stated in DFoF ¶¶ 175-200, Dr. Oskooii's maps do not satisfy *Gingles I*, and the Court should not accept Dr. Oskooii's testimony.

**RPFoF ¶¶ 31-34:** It is uncontroverted that Dr. Bejarano has taught courses on Latinos. It is controverted, though, that beyond general trends that she has observed through her review of the subject, she knows anything specific about how Dodge City generally operates or Latinos' involvement in political life in that community, as she has never been to Dodge City, including when she lived and taught in Kansas for 12 years, Trial Tr. Vol. I at 139:23-140:1, she has never spoken to anyone working for the City about how it operates, *id.* at 139:1-22, she does not "know what an election campaign in Dodge City typically looks like," *id.* at 163:10-12, she did not review what role, if any, Latinos play "in the types of community organizations that sometimes can be influential in local elections," *id.* at 163:13-19, she is "[un]aware of any barriers to Latinos filing to run for City Commission in Dodge City," *id.* at 163:20-22, she is unaware whether Dodge Citians can vote by absentee ballot and that the City will drive residents to the polling location, *id.* at 164:15-24, she does not know what the specific turnout rate is for Latinos in on-cycle elections

or off-cycle elections, *id.* at 171:11-15, she did not analyze how many Latino "candidates [have] placed their name on the ballot in Dodge City," *id.* at 172:19-23, and she performed no analysis regarding the likelihood that Latinos or so-called Latino preferred candidates would perform better if Dodge City moved from at-large elections to district-based elections, *id.* at 162:10-15. As discussed throughout this Response, as well as Dodge City's proposed findings and conclusions, there is substantial testimony from witnesses who actually live, work, and serve in Dodge City, such as Rick Sowers, Nick Hernandez, Melissa McCoy, Ernestor De La Rosa, David Rebein, Cherise Tieben, Fernando Jurado, and Sharon Seibel-Robb, that rebut the application of Dr. Bejarano's general trends.

**RPFoF ¶¶ 35-36:** Dr. Bejarano was not a credible or reliable witness. For example: (1) Dr. Bejarano refused to answer basic questions because she believed they were unclear, *see* Trial Tr. Vol. I at 158:2-160:7; *see also* Trial Tr. Vol. III at 201:9-11 (noting the Court was "troubled by [Dr. Bejarano's] obstinate refusal to answer questions on the pretense that they were unclear"); (2) Dr. Bejarano would not make a determination whether Joe Nuci was Latino, Trial Tr. Vol. I at 172:24-173:7, even though Mr. Nuci has self-identified as Latino, Trial Tr. Vol. III at 236:4-10; (3) her opinions are based largely on her general understanding of Latinos, as opposed to a local assessment of Latinos in Dodge City, RPFoF ¶¶ 31-34; and (4) the NALEO tables that Dr. Bejarano "rel[ied] pretty heavily on," DFoF ¶ 60, did not include any of the three Latinos that had served on the Commission over the past 25 years, *see* Trial Tr. Vol. I at 172:24-173:11 & 81:2-15; Pls. Ex. 55. Regarding example 4, while Dr. Bejarano added parentheticals in Plaintiffs' Exhibit 55 to note that Fernando Jurado and Blanco Soto had served on the Commission, she refused to add Joe Nuci to Exhibit 55 of her Expert Report, opting instead to relegate him to a footnote (which

is not included on Plaintiffs' Exhibit 55) because "there was some confusion and debate possibly over whether [Mr. Nuci's] self-identification was acknowledged by everybody." DFoF ¶ 60 & n.1.

**RPFoF ¶¶ 41-43:** Dr. Martinez was not a reliable or credible witness. As the Court noted, Dr. Martinez "had very little to say about Dodge City in the last 50 years." Trial Tr. Vol. V at 11:24-12:2. Nor did Dr. Martinez give the Court any reason to infer that Dr. Martinez's testimony has any bearing on Dodge City specifically. Rather, Dr. Martinez admitted that he did not find any evidence of official discrimination in Dodge City that post-dates the Civil Rights Act or any discrimination that could possibly have any connection to the present -ay Latino population in Dodge City. *See* DFoF ¶ 93.

**RPFoF ¶ 50:** Dodge City does not have a clear north-south divide between its White and Latino populations. As testified to by lifetime Dodge City resident and former Dodge City Manager, Cherise Tieben, Latinos do not primarily live "south of Comanche Street," but, rather, live "[a]ll over the community." Trial Tr. Vol. III at 242:6-243:6. Ms. Tieben is uniquely qualified to testify about Dodge City housing and the inhabitants that fill those homes as, starting in the mid-2000s, she spent approximately 10 years addressing various housing issues in Dodge City. *Id.* 242:24-243:14. Plaintiffs' only evidence to the contrary is Dr. Barreto's "Heat Map," Pls.' Ex. 115, which is incomplete and misleading and deserves no weight. Dr. Barreto admitted that he chose the colors green and red specifically to show "high contrast," Trial Tr. Vol. II at 119:14-25, and the "Heat Map" does not include the actual percentages of Whites and Latinos in any given neighborhood, *see id.* Rather, Dr. Barreto's "Heat Map" is designed to show neighborhoods as effectively segregated from one another even if the neighborhoods are highly integrated. For instance, even if Whites only comprise 50% plus one of the population and Latinos comprise 50% minus one, the area is still shaded red. *See id.* at 122:13-23. This appears to have occurred

frequently, as much of the "Heat Map" is a dull red or green. *See* Pls.' Ex. 115. Further compounding the problem is that the "Heat Map" is based on nearly 10-year old data derived from the 2015 American Community Survey regarding total population. *Id.* at 123:14-16. Additionally, Dr. Barreto's "Heat Map" does not reflect the actual number of people that live in any given neighborhood, allowing the "Heat Map" to show that substantial areas like the Boot Hill Casino or the land around Dodge City's wastewater treatment plant are majority white when virtually no one lives there. *See id.*; *see also* Trial Tr. Vol. II at 118:13-16; *id.* at 119:6-13; *id.* at 120:1-6; *id.* at 125:22-126:2.

**RPFoF ¶ 51:** The record does not support this fact. The cited transcript section merely says what PFoF ¶ 52 says—namely, that 34% of registered voters live below Comanche Street. Other than the "Heat Map," which, as set forth in RPFoF ¶ 50, is incomplete and misleading, and does not actually include voting-related numbers, such as CVAP or registered voters, but, rather, is simply based on total population, *see* Trial Tr. Vol. II at 123:14-16, there is nothing in the record reflecting what percentage of the registered voters in Dodge City are Latino. The closest Plaintiffs get to producing any numbers regarding Latino registration in Dodge City is Dr. Bejarano's Table 9, Pls.' Ex. 53. However, as Dr. Bejarano stated at trial, these numbers are not Dodge City specific, but rather are statewide numbers for the State of Kansas. Trial Tr. Vol. I at 170:22-171:15. Thus, the record does not permit a conclusion to be drawn regarding what the registration rate of Latinos is in Dodge City.

**RPFoF ¶ 52:** The citation for this fact does not support the assertion that "South Dodge" has "a high density of Latinos"—whatever that may mean. The citation for this fact merely says that 34% of registered voters in Dodge City live south of Comanche. Nothing in the record assigns a percentage to how many Latinos live in "South Dodge." Plaintiffs offered only two exhibits that

could even arguably be viewed as addressesing this issue: Dr. Barreto's "Heat Map" and Pls.' Ex 114. As mentioned above in RPFoF ¶ 50, Dr. Barreto's "Heat Map" is incomplete and misleading. As for Pls.' Ex. 114, it does not actually provide Census Block Group information for the entire City; no, it is a cherry-picked list of those Census Block Groups, "the smallest unit of census geography," *Feldman v. Ariz. Secr. of State's Office*, 2016 WL 5900127, at *4 (D. Ariz. Oct. 11, 2016), that Plaintiffs believe have the starkest demographic differences. The population in Pls.' Ex. 114, which is just total population, is just a fraction of Dodge City's population (roughly 20%, as the cited Census Block Groups account for just 5,720 people). Accordingly, we cannot reasonably infer from an incomplete table like Pls.' Ex. 114 how dense the Latino population is in "South Dodge." Rather, Pls.' Ex. 114 merely permits us to say what percentage of Dodge City Latinos live in the 6 Census Block Groups that Plaintiffs chose and no one has testified is representative of the whole City. As noted by lifelong Dodge Citian, and former City Manager Cherise Tieben, who has spent years working on housing issues in Dodge City, Latinos do not live "primarily south of Comanche Street"—they live "[a]ll over the community." Trial Tr. Vol. III at 242:6-244:2.

**RPFoF ¶ 53:** The citation for this fact does not support the assertion that "North Dodge" is a "a high density non-Hispanic white area"—whatever that may mean. For essentially the same reasons that we do not know how dense the Latino population is in "South Dodge," we do not know how dense the "non-Hispanic white" population is in "North Dodge." *See* RPFoF ¶ 52.

**RPFoF ¶ 54:** This fact is not supported by the record. First, the transcript citation says nothing about "odd-numbered years elections years," as Dr. Barreto was testifying just about "the November 2022 general election." Trial Tr. Vol. II at 85:10-13. Second, this fact's assertion that Latino "voter turnout is extremely low" is based on Dr. Barreto's "estimate[] that Latinos

accounted for 30 percent of all voters on Dodge City [sic], while Whites accounted for 64 percent of all voters in Dodge City." *Id.* at 85:5-9. Dr. Barreto did not provide the basis for his "estimate" at trial, but, based on his testimony, *see id.* at 84:20-85:9 (indicating that Dr. Barreto's 64/30 voter turnout "estimate" came from the same paragraph in his expert report as the 66/34 North/South divide), it appears that the former was derived from the latter. As set forth in RPFoF ¶¶ 53 and 54, since we do not know what percentage of the 34% of registered voters in "South Dodge" are Latino and what percentage of the 66% of registered voters in "North Dodge" are "non-Hispanic white," we cannot extrapolate out what percentage voted in the 2022 general election.

**RPFoF ¶ 55:** This fact is not supported by the record. The record does not establish that Latinos accounted for just 30% of actual Dodge City voters in the 2022 election, or, conversely, that 64% of actual Dodge City voters in that same election were White. These are merely Dr. Barreto's "estimates," which, as discussed in RPFoF ¶ 54 are based on a faulty premise.

**RPFoF ¶ 56:** Dr. Barreto did not establish a "stark divide" between the North and South side of Comanche Street, and the testimony does not support the assertion. *See* RPFoF ¶ 50.

**RPFoF ¶¶ 57-60:** These facts are based on Dr. Barreto's "Heat Map," which, as set forth in RPFoF ¶ 50, should not be credited because it is incomplete and misleading, as well as Pls.' Ex. 114, which, as set forth in RPFoF ¶ 52, is incomplete and does not reflect citywide numbers, but rather only those Census Block Groups—the smallest Census geographical area—that Plaintiffs believe show the starkest demographic differences in the entire City. Thus, the misleading "Heat Map" and limited Census Block Group information in this case, which accounts for roughly only 20% of the City's total population, do not prove the north/south divide that PFoF ¶¶ 57-60 attempt to show.

**RPFoF ¶¶ 62-118:** For the reasons stated in DFoF ¶¶ 175-200, Dodge City opposes Plaintiffs' factual findings supporting *Gingles I*.

**RPFoF ¶ 121:** Dr. Barreto did not demonstrate that Latino voters in Dodge City are cohesive or that White voters in Dodge City vote as a bloc to usually defeat Latino-preferred candidates. *See* DFoF ¶¶ 213-37.

**RPFoF ¶ 122:** This fact asserts an erroneous legal conclusion. As set forth in Dodge City's proposed findings and conclusions, courts have established thresholds for determining whether a population is sufficiently cohesive. *See* CM/ECF Doc. 212 at 82 (collecting cases).[2] While there may be cases in which it is a close call whether cohesion exists, this is not such a case, where the "point estimates" are closely grouped and the confidence intervals for these "estimates" not only overlap but, with regard to the confidence intervals for White voters, falls completely within the confidence interval for Latino voters with only one minor exception.[3] *See, e.g.*, DFoF ¶¶ 229-30.

**RPFoF ¶¶ 124-25:** King's EI is not an appropriate tool for multi-candidate elections like the Dodge City Commission elections. *See* Def's FoF ¶¶ 206-12, 226-228. Moreover, there is simply not enough data to draw reliable conclusions from an ecological inference analysis. As accurately stated by Dr. Katz, the problem here with regard to *Gingles* II and III is that we do not have enough "data points." Trial Tr. Vol. IV at 151:8-16. The data points "are actually the individual precincts. So you only have eight precincts in the elections . . . for the City Council[, which means that] you have eight data points to identify somewhere on the order of 12 to 21

---

[2]       For citations to Dodge City's proposed conclusions of law, CM/ECF Doc. 212, the pincite is to the page number listed in the document's CM/ECF timestamp, as opposed to the page number in the document's footer. There is a difference between the two because the former includes the document's table of contents, while the latter does not. There is no difference between the two in Plaintiffs' proposed findings and conclusions.

[3]       The one exception occurred in 2017 and regarded Liliana Zuniga, the candidate who did not actually campaign that year. DFoF ¶ 63. For Ms. Zuniga, the confidence interval for White voters fell outside of the confidence interval for Latino voters by .9% on the left boundary. Def.'s Ex. 465 at 4.

parameters, that is 12 to 21 candidate vote shares, by group." *Id.* Accordingly, we "have less data than [we] have parameters that [we are] interested in estimating. *Id.* at 151:17-152:1. This problem is magnified by the fact that there "are no homogenous precincts. Not even close to homogenous." *Id.* at 152:19-153:15. Plus, City Commission voters are free to cast one, two, or three votes. *See id.* at 155:3-10. "What that means is, the identification, that is the point estimates that I get, are coming purely from the strong assumption of constancy," which "no one believes is true," *id.* at 152:16-18, "and that the model is linear." *Id.* at 151:17-152:1. Put simply, "the lack of data [in this case] means there are lots of statistical uncertainty." *Id.* at 152:19-153:15. As a result, "[w]e just don't know how Latinos or Whites voted in particular elections. We do not see clear winners of which candidate is the preferred candidate of any group. So it's more about the level of statistical uncertainty. We just don't know." *Id.* at 158:18-159:6.

**RPFoF ¶ 126:** "Point estimates" tell us nothing here because there is insufficient data, they are closely grouped, and the confidence intervals for these "estimates" do not merely overlap at the tails, but, with regard to the confidence intervals for White voters, fall completely within the confidence interval for Latino voters with only one exception. *See* DFoF ¶¶ 217-222, 229, 230. Tellingly, Dr. Barreto did not include confidence intervals for any of his analysis, despite that being the standard in the field. DFoF ¶ 223; *see also Mo. State Conf. of the N.A.A.C.P. v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1042 (E.D. Mo. 2016) ("A statistical estimate with a 95% degree of confidence employs the level of statistical certainty that is consistent with generally accepted standards for EI in the field of political science, and is consistent with peer-review standards for research in that field."), *aff'd*, 894 F.3d 924 (8th Cir. 2018); *Benavidez v. Irving Indep. Sch. Dist.*, 2014 WL 4055366, at *11 n. 20 (N.D. Tex. Aug. 15, 2014) ("It is standard in the area of political science for confidence intervals to be set at 95%."); *Fabela v. City of Farmers*

*Branch, Tex.*, 2012 WL 3135545, at \*10 (N.D. Tex. Aug. 2, 2012) ("According to Dr. Engstrom, it is standard in the area of political science for confidence intervals to be set at 95%.").

**RPFoF ¶ 127:** Dr. Barreto's "point estimates" do not demonstrate with statistical or legal certainty the support that candidates received from White and Latino voters in Dodge City. The "point estimates" represent a possible likely outcome, which, for the reasons discussed in RPFoF ¶¶ 124-26, are of little probative value here.

**RPFoF ¶¶ 128-135:** The value of Bayesian Improved Surname Geocoding ("BISG") is limited to determining the probability of a voter's race. *See* DFoF ¶¶ 224-25. It merely improves the inputs into Dr. Barreto's calculations by purportedly making Dr. Barreto better able to unmask the racial identity of Dodge City voters and to purportedly estimate, through his EI analysis, how much of the electorate Latinos represent. BISG does not resolve the issue of uncertainty with limited data points nor does it provide any additional indications regarding how a particular person voted. *Id.* It simply assists the analyst in determining whether the voter file is likely Latino. *Id.* Regarding uncertainty or scarcity of the available data in this case, BISG is of no assistance because the two things are "totally unrelated." Trial Tr. Vol. IV at 171:17-172:12. Contrary to Plaintiffs' indication otherwise, BISG was not developed to address any surname issue that the court identified with Dr. Barreto's *Gingles* II or III analysis in *Cisneros v. Pasadena Indep. Sch. Dist.*, 2014 WL 1668500 (S.D. Tex. Apr. 25,2014). In *Cisneros*, the Court accepted Dr. Barreto's surname analysis for purposes of *Gingles* III, it only rejected such analysis with regard to *Gingles* I. 2014 WL 1668500, at \*13 n.5 (discussing why its "refutation of Spanish-surname data to analyze the first factor of *Gingles* [did not] contradict the Court's acceptance of Spanish-surname data to analyze the third factor of *Gingles*"). Thus, as noted by Dodge City in its proposed findings and conclusions, Plaintiffs' repeated assertion that BISG somehow fixes the ails that the *Cisneros* court

15

identified in Dr. Barreto's analysis there is false. *See* CM/ECF Doc. 212 at 85; *see also Cisneros*, 2014 WL 1668500, at *24.

**RPFoF ¶¶ 136-139:** The overwhelming majority of the 24 elections that Dr. Barreto analyzed are not informative on the question of whether racially polarized voting is occurring in Dodge City Commission elections. For starters, only 4 of Dr. Barreto's 24 reviewed elections relate to the elections in question. DFoF ¶ 214. Of the remaining 20, 17 were for state or federal, partisan offices involving two candidates and one vote.[4] *Id.* at ¶¶ 214, 233-34. An additional election was for a partisan, local office involving two candidates and one vote. *Id.* These types of elections are, as even Dr. Barreto admits and his own analysis shows, "quite different contest[s]." *Id.* at ¶¶ 234-35, 237. An admission that Dr. Barreto's own analysis supports. *Id.* at ¶ 235. As set forth in Dodge City's proposed findings and conclusions, *see* CM/ECF Doc. 212 at 86, as well in RPFoF ¶¶ 157-61, these partisan elections should carry no weight in this case. As for Dr. Barreto's two remaining exogenous elections—the 2021 School Board and 2019 Dodge City Community College Trustees ("DCC Trustees") elections, they do not reveal any discernable form of cohesion. *See, e.g.*, DFoF ¶ 236. Thus, the simple fact that Dr. Barreto chose a particular exogenous election to analyze does not make it relevant. Rather, as Dr. Katz stated, exogenous elections "may or may not provide relevant information about the voting behavior of various groups." Trial Tr. Vol. IV at 156:7-25. Exogenous elections "can be useful in so far as those exogenous elections are similar in kind and; therefore, voters display similar voting behavior." *Id.* Here, 18 of Dr. Barreto's 20 exogenous elections clearly do not fit that bill, and the two that more closely match the elections in question do not show any cohesion.

---

[4]     The 2016 United States Senate race did apparently have a third-party candidate, but that candidate was clearly not a factor in the election. *See* Pls.' Ex. 121 at 3. Every other federal or state election had just two candidates.

**RPFoF ¶ 142:** Dr. Barreto's King's EI methodology should be disregarded in this case as it is not reliable for elections like the ones at issue in this case. RPFoF ¶¶ 124-25. Even if this methodology is considered, neither it nor the RxC method show that Latino voters in Dodge City are politically cohesive. *See* DFoF ¶¶ 226-37; *see also id.* at ¶¶ 48-49; RPFoF ¶¶ 147-50.

**RPFoF ¶¶ 143-46:** King's EI is not appropriate nor is it the most accurate model for multi-candidate, multi-vote elections like those for Dodge City Commission. RPFoF ¶¶ 124-25. The RxC method is a form of ecological inference that is adapted specifically "for multiple groups and multiple candidates," and, as even noted by Dr. Barreto, is viewed as the "second version of ecological inference" that was developed "some years" after Professor King had first developed King's EI. DFoF ¶ 209. There has been no showing that any court, federal or state, has accepted the King's EI methodology for multi-candidate, multi-vote elections like those for Dodge City Commission where there are significant differences between its results and those from RxC, the latter of which was specifically designed for multi-candidate, multi-vote elections. A comparison between the two methods' results and actual election results in this case confirms that RxC's single "regression for all [] candidates across Latinos and non-Latinos" is in fact better than King's EI's binary approach of running each candidate "versus the field" in multiple regressions for elections like those for Dodge City Commission because the results from RxC more closely track the actual results. Trial Tr. Vol. II at 99:22-100:22; *compare* Pls.' Ex. 40 (showing a tight pattern of voting in the most homogenously Latino precinct in all of Dr. Barreto's analysis, Precinct 3, *see* also Def.'s Ex. 465, at 1) *with* Pls.' Ex. 121 (RxC method showing that the top candidates were separated by just a few percentage points, which, in an election with a small number of voters, reveals a tight vote count).

**RPFoF ¶¶ 147-50:** The record does not support these facts' assertion that the candidate identified therein was in fact the "most preferred" Latino candidate nor does it show that racially-cohesive voting is occurring in Dodge City. First, Dr. Barreto did not analyze the most recent, most probative City Commission election, the one that occurred in November 2023. Trial Tr. Vol. II at 137:5-15. Second, there is insufficient data in this case to draw reliable conclusions from an ecological inference analysis about any of the cited elections. *See, e.g.*, RPFoF ¶¶ 124-25, 126, 127. Third, King's EI is not appropriate for a multi-candidate, multi-vote case like this. *See, e.g.*, RPFoF ¶¶ 124-25, 143-46. Fourth, there is essentially nothing in the record to support these facts' assertion that the aforementioned candidates were actually the "most preferred candidate by Latinos." Charles Sellens' name had not been uttered once in this litigation until Plaintiffs' post-trial briefing. Adam Hessman was mentioned once at trial, but only while Dr. Barreto was discussing his EI table. *See* Trial Tr. Vol. II at 136:18-137:4.

As for Liliana Zuniga, nothing was mentioned about her campaign (other than she did not campaign in 2017 due to health issue, DFoF ¶ 63), what platform she ran on, or whether Latinos in Dodge City actually supported her. Outside of Dr. Barreto discussing his expert analysis, and Melissa McCoy discussing Ms. Zuniga's attempt to drop out of the 2017 campaign, the only person to mention Ms. Zuniga was Plaintiff Coca. Plaintiff Coca offered only two things about Ms. Zuniga: that she "is in the Hispanic community" and that she "lost her election." Trial Tr. Vol. III at 131:9-17. What Plaintiff Coca meant by "in the Hispanic community" is unclear, but what is clear that he likely has no idea whether Latinos strongly preferred Ms. Zuniga, a person Plaintiff Coca admits he only "somewhat knows," *id.* at 131:11-14, and didn't vote for, *id.* at 130:11-17.

Regarding Ms. Scoggins, unlike the other so-called "most preferred" candidates, she did take the stand and both Plaintiffs did testify that they had voted for her. Remarkably, though, other

than saying that she campaigned in "South Dodge," just like she had in "North Dodge," *id.* at 159:10-11, Ms. Scoggins offered no reason to believe that she was in fact the "most preferred" Latino candidate in 2021, or any other year that she had run for that matter. In fact, her utter lack of testimony regarding what issues Latinos face in Dodge City, how she addressed those issues while in office, and what things she hoped to improve for Latinos while a Commissioner suggests the opposite. Further militating against the notion that Ms. Scoggins was the "most preferred" Latino candidate is that, when she spoke to "civic[,] social[,] and church group[s], she apparently only spoke to groups whose members "were all Caucasian." *Id.* at 158:3-13. Ms. Scoggins implied that other candidates did not campaign in "South Dodge" in 2021, *id.* at 159:180-23, but Chuck Taylor, unlike Ms. Scoggins, actually lives in "South Dodge," Trial Tr. Vol. I at 60:25-61:2, which may explain why he was the so-called "most preferred" Latino candidate that year under Dr. Barreto's RxC analysis. Furthermore, despite Ms. Scoggins not seeing them in "South Dodge," three other candidates in addition to Mr. Taylor (Michael Burns, Joe Nuci, and Blanco Soto) outperformed her in the precincts in "South Dodge," Precincts 2 and 3, *see* Trial Tr. Vol. II at 135:4-5, 136:2-3, in 2021. Pls.' Ex. 40. What's more, Taylor, Burns, and Nuci were the top vote getters in Precincts 5 and 6, which are in "North Dodge." *Id.* at 136:4-6, 135:23-24. The fact that Ms. Scoggins is the only so-called "most preferred" candidate that Plaintiffs presented, and Ms. Scoggins' testimony gave no basis to conclude that she was in fact the candidate that Latinos "most preferred," further refutes the notion that Dr. Barreto's analysis should be given any weight in this case.

**RPFoF ¶¶ 151-53:** King's EI is not appropriate nor is it the most accurate model for multi-candidate, multi-vote elections like those for Dodge City School Board or DCCC Trustees for the same reasons stated above with regard to City Commission elections. *See* RPFoF ¶¶ 143-46. The

inaccuracy of King's EI in this case is further confirmed by the single "slate" advertisement in this case that Kansans for Liberty PAC put out. Plaintiffs contend that Nicole Nagel was "the highest vote getter among Latinos but received extremely low support among Whites." PFoF ¶ 152. However, this is belied by the other candidates that are listed on the "slate" that included Ms. Nagel. *See* Pls.' Ex. 137. For instance, the "slate" included the person who purportedly was the so-called "least preferred" Latino candidate for School Board that year under King's EI, Jeanie Zortman, as well as the "most preferred" White candidate for City Commission that year under King's EI, Joe Nuci. Pls.' Ex. 121. Assuming that the Kansans for Liberty PAC's purpose in circulating its slate was to indicate what candidates it believed shared a common political ideology, *see* Trial Tr. Vol. II at 157:7-13) (Dr. Barreto describing the "slate" as "the Republican slate"), it would indeed seem strange that the candidate who was allegedly "most preferred" by Latinos but one of the "least preferred" by Whites would be lumped together with the "least preferred" Latino candidate for School Board and the "most preferred" candidate for City Commission if voters are voting along racial lines.

Similarly, the results for DCCC Trustees under King's EI make no sense. According to Plaintiffs, racial bloc voting is occurring because Mr. Garcia, who we know nothing about, had the highest "point estimate" for Latinos and the lowest "point estimate" for Whites and lost his election. PFoF ¶ 153. However, the candidates with the second and third highest "point estimates" for Latinos in that race, which, under Dr. Barreto's own standard, should be considered Latino preferred, DFoF ¶ 216, were the so-called "most-preferred" White candidates. *See* Pls.' Ex. 121. There may be a logical reason for this, but it is far from obvious.

**RPFoF ¶ 154:** This fact mischaracterizes Dr. Katz's testimony. Dr. Katz's complete testimony is that, with regard to Ms. Zuinga, "we don't know for Whites either" because "[t]hey all overlap." Trial Tr. Vol. IV at 168:10-13.

**RPFoF ¶ 155:** This fact is inconsistent with the record and existing precedent. Starting with the record, the cited testimony was that the "differences get smaller [because of] the methodological reasons inside the [RxC] regression," not because of how real voters actually vote. Trial. Tr. Vol. II at 100:18-22. This distinction matters because Dr. Barreto attempted to persuade this Court to believe that King's EI is more accurate because it does less "averaging," indicating that RxC's results were not representative of the underlying voters' voting preferences. *Id.* If, as Plaintiffs allege, multi-candidate, multi-vote elections neutralize "numerical cohesions," that concession further confirms the inappropriateness of Plaintiffs' reliance on Kings' EI. Furthermore, as set forth in Section I.A below, as well as DFoF ¶¶ 226-237 and RPFoF ¶¶ 147-150, no cohesion has actually been shown through Dr. Barreto's statistical analysis. As for existing precedent, as discussed below in Section I.A, no court has adopted the methodologies used by Dr. Barreto in a case similar to this.

**RPFoF ¶¶ 156-61:** The fact that King's EI seemingly created consistent results in two-candidate, one-vote partisan elections is not surprising or relevant to the analysis in this case. As even Dr. Barreto admitted at trial, "multi-candidate elections, where you get three votes[, are] quite different contest[s] than just a two-person vote for one." DFoF ¶ 234. This admission is bore out in Dr. Barreto's own analysis. *Id.* at ¶ 235. Further distinguishing the two-candidate, one-vote elections that Dr. Barreto reviewed is the fact that they are partisan and involved some of the most polarizing candidates that this Country and State have ever seen. DFoF ¶ 237. As should be obvious and as stated by Dr. Katz, two-candidate, one-vote partisan elections "tend[] to lead to

very polarized elections especially given there is racial differences, racial and ethnic differences in party registration" that reflect preferences "for the party not for candidates." Trial Tr. Vol. IV at 158:3-10. When the exogenous elections are as different from the endogenous elections as Dr. Barreto's are, courts have refused to give much, if any, weight to them and certainly do not allow them to establish patterns that are not seen in the endogenous elections. *See, e.g.*, CM/ECF Doc. 212 at 86.

**RPFoF ¶¶ 162-63:** King's EI results are not appropriate for multi-candidate, multi-vote elections like the one at issue here. RPFoF ¶¶ 143-46, 147-50, 151-53. Furthermore, results from two-candidate, one-vote partisan elections are not relevant in this case. RPFoF ¶¶ 156-61. On both of these points, Dr. Katz offered testimony against Dr. Barreto regarding them. *See* Trial Tr. Vol. IV at 175:3-176:13 (King's EI should not be used); *id.* at 156:17-158:17 (two-candidate, one-vote partisan elections should not be used). In addition to these two specific points, Dr. Katz also generally refuted Dr. Barreto's claim that he had sufficient data in this case to draw any reliable conclusions. *See id.* at 158:18-161:1, 167:1-10. Due to the limited number of precincts and the lack of homogeneity in them, "the ballots are not providing any real information about how Latinos voted in that election[, rather,] the driver of the estimation of the vote share is coming from the strong cost assumption of ecological regression." *Id.* at 163:24-164:8; *accord* RPFoF ¶¶ 124-25; DFoF ¶¶ 208, 212.

**RPFoF ¶¶ 164-173:** These facts are not supported by the record because there is insufficient data in this case to draw statistically and legally significant conclusions, RPFoF ¶¶ 162-63, two-candidate, one-vote partisan elections are not relevant to this case since they are fundamentally different, RPFoF ¶¶ 156-61, King's EI is not appropriate for this multi-candidate, multi-vote case, RPFoF ¶¶ 143-46, 151-53, King's EI does not credibly reveal who is the "most

preferred" Latino candidate, RPFoF ¶¶ 147-50, 136-139, and the RxC Method does not reveal any voting cohesion in endogenous elections, DFoF ¶¶ 227-231, or exogenous multi-candidate, multi-vote elections, DFoF ¶ 236, or any cohesive voting patterns in multi-candidate, multi-vote elections, RPFoF ¶¶ 147-50. For many of the same reasons that Dr. Barreto's Kings EI analysis did not show racially polarized voting, Dr. Barreto's RxC analysis did not show racially polarized voting. *See* DFoF ¶¶ 213-37. Contrary to Plaintiffs' representation that there is just "some variations between King's EI and RxC results," PFoF ¶ 173, as alluded to by the Court, and as shown in the record, the variations are quite stark, DFoF ¶¶ 226, 228, 236.

**RPFoF ¶¶ 174-89:** These facts are not supported by the record because there is insufficient data in this case to draw statistically and legal significant conclusions, RPFoF ¶¶ 162-63, two-candidate, one-vote partisan elections are relevant to this case since they are fundamentally different, RPFoF ¶¶ 156-61, King's EI is not appropriate for this multi-candidate, multi-vote case, RPFoF ¶¶ 143-46, 151-53, and the RxC Method does not reveal any voting cohesion in endogenous elections, DFoF ¶¶ 227-231, or exogenous multi-candidate, multi-vote elections, DFoF ¶ 236.

Regarding Plaintiffs' claim that "white voters located in North Dodge have clear electoral preferences that differ from the heavily Latino South Dodge," PFoF ¶ 186, it is unmoored from the record. While Dr. Barreto did testify to this, like so much of his testimony it is belied by the actual election results in Dodge City Commission elections. In 2021, the most homogenously Latino of the City Commission election precincts were Precincts 2 and 3. RPFoF ¶¶ 147-50. These two precincts are in "South Dodge." *Id.* The precincts with the most White voters were Precincts 5 and 6. *Id.* These precincts are in "North Dodge." *Id.* Completely contrary to what Dr. Barreto indicated, the top three vote-getters in Precincts 2 and 3 in 2021 (Chuck Taylor, Michael Burns, and Joe Nuci) were the same top three vote-getters in Precincts 5 and 6 in 2021. *Id.*

In 2019, it was a similar story. The most homogenously Latino of the 2019 City Commission election precincts were Precincts 2 and 3. Ex. 465 at 1. The precincts with the most White voters were again Precincts 5 and 6. *Id.* Nevertheless, the top two vote-getters in Precincts 2 and 3 (Kent Smoll and Rick Sowers) were the same top two vote-getters in Precincts 5 and 6. Pls.' Ex. 36. Thus, the only two election results in this case's record reveal that voters in "South Dodge" seem to prefer the same candidates that voters in "North Dodge" do, not that "White voters in North Dodge have clear electoral preferences that differ from the heavily Latino South Dodge," as Plaintiffs claim is the case.

Finally, contrary to Plaintiffs' claim that "Hispanic-preferred candidates rarely are successful," PFoF ¶ 187, the evidence that so-called Latino preferred candidates win half of the seats in the races that Dr. Barreto analyzed. DFoF ¶ 229. Similarly, Latino candidates have won half of the seats in elections that they have actually ran in during the time reviewed by Dr. Barreto. This rate is either greater than or equal to the "success rate" of White candidates of the time, which, depending on whether Michelle Salinas identifies as Latino or White, is 10 out of 20 or 10 out of 21. *See* Pls.' Ex. 121.

Finally, the "point estimates" from Dr. Barreto's RxC analysis do not show that "White voters within Dodge City do not vote for identified Latino-preferred candidates." No, they show that, during the City Commission elections that Dr. Barreto reviewed, half of the so-called Latino preferred candidates were also the alleged candidates of choice for Whites.

**RPFoF ¶ 190:** This fact is not supported by the record for the reasons stated in RPFoF ¶¶ 191-203.

**RPFoF ¶ 191:** This fact does not provide a basis to limit the weight of Dr. Katz's testimony. As set forth in RPFoF ¶¶ 124-25, 143-46 and DFoF ¶ 212, it is not proper to use King's

EI in a case like this. Thus, the fact that Dr. Katz opted not to perform such an analysis tells us nothing. As for Dr. Barreto's exogenous elections, 18 out of 20 were two-candidate, one-vote partisan elections, which are fundamentally different than the elections at hand here. RFPoF ¶¶ 136-39. As for the two local multi-candidate, multi-vote nonpartisan elections that Dr. Barreto analyzed but Dr. Katz did not, the RxC method, which is the one proper for multi-candidate, multi-vote elections, did not show "clear evidence of polarization" as Plaintiffs' allege, as the clustering of candidates in those elections were arguably tighter than those in the City Commission race. *See* Pls.' Ex. 121 at 1-2. Additionally, 3 of the 7 so-called Latino-preferred candidates were also allegedly the White preferred candidate and with a change of less than .6% of the Latino vote, 4 out of 7 candidates would have been the same. *See id.* This is hardly the case where the unreviewed elections make a material difference. As shown in *Pierce v. North Carolina State Board of Elections*, --- F. Supp. 3d ----, 2024 WL 307643 (E.D.N.C. January 26, 2024), the fact that Dr. Barreto ran more models here than Dr. Katz does not bear on his credibility because the overwhelming majority of the elections he reviewed are not representative of the elections at issue in a particular case. 2024 WL 307643, at *19 (finding that "all of Dr. Barreto's conclusions" were "undercut" because it had been "demonstrate[d] that fuller data sets could change his estimated outcomes," despite the fact that Dr. Barreto had performed "more than 350 ecological inference statistical models . . . across 31 recent elections").

**RPFoF ¶ 192:** As stated the in RPFoF ¶ 191, the fact that Dr. Katz did not review the two local multi-candidate, multi-vote nonpartisan elections that Dr. Barreto analyzed does not make a material difference in this case. As for the Ford County Clerk election case, it was a two-candidate, one-vote partisan election just like 17 of Dr. Barreto's other 20 exogenous elections. For the reasons stated in RPFoF ¶¶ 136-39, 191, not reviewing those cases is of no moment.

**RPFoF ¶ 193:** The "stark pattern" Plaintiffs distill from two-candidate, one-vote partisan elections is not informative of how Dodge Citians vote in local, multi-candidate, multi-vote non-partisan elections. This is evident from the results in Dr. Barreto's EI table, as well as Dr. Barreto's concession that gross majority of his exogenous elections are "quite different" than City Commission ones. DFoF ¶ 234.

**RPFoF ¶ 194:** The fact that Dr. Katz's "point estimates" were similar to Dr. Barreto's does not confirm the propriety of Dr. Barreto's analysis. "Point estimates" tell us nothing here because there is insufficient data, they are closely grouped, and the confidence intervals for these "estimates" do not merely overlap at the tails, but, with regard to the confidence intervals for White voters, fall completely within the confidence interval for Latino voters with only one exception. *See* RPFoF ¶¶ 126, 127; DFoF ¶¶ 217-222, 229, 230. Tellingly, Dr. Barreto did not include confidence intervals for any of his analysis, despite that being the standard in the field. *See, e.g.*, DFoF ¶ 223; *see also Mo. State Conf. of the N.A.A.C.P. v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1042 (E.D. Mo. 2016) ("A statistical estimate with a 95% degree of confidence employs the level of statistical certainty that is consistent with generally accepted standards for EI in the field of political science, and is consistent with peer-review standards for research in that field."), *aff'd*, 894 F.3d 924 (8th Cir. 2018); *Benavidez v. Irving Indep. Sch. Dist.*, 2014 WL 4055366, at *11 n. 20 (N.D. Tex. Aug. 15, 2014) ("It is standard in the area of political science for confidence intervals to be set at 95%."); *Fabela v. City of Farmers Branch, Tex.*, 2012 WL 3135545, at *10 (N.D. Tex. Aug. 2, 2012) ("According to Dr. Engstrom, it is standard in the area of political science for confidence intervals to be set at 95%.").

**RPFoF ¶ 195:** For the reasons stated in RPFoF ¶¶ 191-94, 196-203, this fact is not supported by the record.

**RPFoF ¶ 196:** This fact is not supported by the record and mischaracterizes Dr. Katz's testimony. Dr. Katz's testimony is not that you have to have a certain number of homogenous precincts in order to do an EI analysis. If that were the case, you would just run a homogenous analysis and take the guessing and assumptions out of the analysis. What Dr. Katz actually said is that, when you have few precincts and these precincts "are [not] anywhere homogenous," "the ballots are not providing any real information about how Latinos voted in that election, but, rather, "the driver of the estimation of the vote share is coming from the strong cost assumption of ecological regression." Trial Tr. Vol. IV at 162:24-163:8.

As this Court has already recognized in rejecting Dr. Barreto's homogenous precinct analysis, there are no homogenous precincts in this case. CM/ECF Doc. 158, at 7-8. So this case is not about, and Dr. Katz did not say, that there must be a set number of homogenous precincts before an EI analysis can take place, but there must be something close to that so that an analyst does not "dip[] heavily into speculation," *id.* at 8, as Dr. Barreto has done here. The prevalence of speculation and corresponding lack of reliability and certainty of Dr. Barreto's "point estimates" is confirmed by the fact that the confidence interval for them are extremely broad and not only overlap but, with regard to the confidence intervals for White voters, falls completely within the confidence interval for Latino voters with only one exception. *See, e.g.*, DFoF ¶¶ 229-30. Dr. Barreto does not dispute a single one of Dr. Katz's confidence intervals, despite Plaintiffs calling him in rebuttal. As Dr. Katz testified, you expect broad confidence intervals in cases where you have very little data and underlying assumptions are driving the analysis because:

> [a]s the sample size of my pole gets bigger, my margin of error, my pole gets smaller. That is a general principle which holds for all statistical analysis as I get more data, right, my uncertainty, my statistical uncertainty around my estimates decrease.

Trial Tr. Vol. IV at 153:1-5.

**RPFoF ¶ 197:** As noted in RPFoF ¶ 196, Plaintiffs set up a straw-man argument that neither Dr. Katz nor Dodge City has made and then attempt to knock it down. The problem here is not that there is not enough homogenous precincts, but, rather, that there are no precincts remotely close to being homogenous. It is uncontroverted that of the 31 precincts in which votes were cast for City Commissioner from 2014 to 2021, **every one of them** had a Latino voter turnout less than 60%. %. Def.'s Ex. 465 at 1. Only **3 of the 31 precincts** had a Latino voter turnout greater than 50%. *Id.* Only **7 of the 31 precincts** had a Latino voter turnout greater than 40%. *Id.* One can quibble about whether precincts that 80% or 85% are sufficiently homogenous to permit reliable conclusions to be drawn, but that is not our case and those are not our facts.

Even the court in *Luna v. Cnty of Kern*, 291 F. Supp. 3d 1088, 1123 (E.D. Cal. 2018), "recognize[d] the obvious—that larger numbers of homogeneous precincts produce more accurate EI estimates." As the *Luna* court curiously did not say how many precincts were at issue in that case and gave no indication if the precincts in that case or anything like the ones here, its persuasive value in this case is muted. Further militating against giving that case any weight is that, from a population standpoint, Dodge City is nothing like Kern County, as Kern County grew "roughly 178,000 residents from 2000 to 2010." *Id.* at 1101. Thus, the insufficient data issue we have in our case presumably was not an issue in *Luna*. Regardless, we know too little about *Luna* to give anywhere near the weight to it that Plaintiffs attempt to.

**RPFoF ¶ 198**: This is a strawman argument that does not contradict anything that Dr. Katz testified to at trial. Again, the testimony is not that there were too few homogenous precincts, but, rather, that the precincts in question "are [not] anywhere homogenous," RPFoF ¶ 196, which requires strong assumptions to made and for the analysis to be driven by those assumptions, not the actual votes that are cast. RPFoF ¶ 196. As discussed below, there is not a single court that has

countenanced what Dr. Barreto and Plaintiffs are doing in this case. *See infra* Sect. I.A. This Court should not be the first.

**RPFoF ¶ 199**: This fact mischaracterizes Dr. Katz's testimony and uncontroverted work in this case. As shown in Def.'s Ex. 465 at 2-5, it is not Dr. Katz's opinion that "some of the confidence intervals overlap." No, it is not that the confidence intervals here merely overlap at the tail, but, rather, that, with regard to the confidence intervals for White voters, they fall completely within the confidence intervals for Latino voters with only one minor exception. *See id.*

**RPFoF ¶ 200:** It is not contested that Dr. Barreto testified to the assertions set forth in this fact. However, it is uncontroverted that Dr. Barreto's failure to provide a confidence interval for his analysis is not consistent with the standard in the field. *Mo. State Conf. of the N.A.A.C.P. v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1042 (E.D. Mo. 2016) ("A statistical estimate with a 95% degree of confidence employs the level of statistical certainty that is consistent with generally accepted standards for EI in the field of political science, and is consistent with peer-review standards for research in that field."), *aff'd*, 894 F.3d 924 (8th Cir. 2018); *Benavidez v. Irving Indep. Sch. Dist.*, 2014 WL 4055366, at *11 n. 20 (N.D. Tex. Aug. 15, 2014) ("It is standard in the area of political science for confidence intervals to be set at 95%,"); *accord Fabela v. City of Farmers Branch, Tex.*, 2012 WL 3135545, at *10 (N.D. Tex. Aug. 2, 2012) ("According to Dr. Engstrom, it is standard in the area of political science for confidence intervals to be set at 95%.").

Additionally, while point estimates may be informative when the points are distinct and not closely grouped, that is not the case here. Furthermore, as noted in RPFoF ¶ 199, it is not that there is mere overlap at the tails of the confidence intervals for Dr. Barreto's "point estimate," the problem here is that, with regard to the confidence intervals for White voters, they fall completely within the confidence intervals for Latino voters with only one minor exception. Def.'s Ex. 465 at 2-5.

**RPFoF ¶ 201:** This fact both overstates the overlap involved in the peer-reviewed Article that Dr. Katz wrote and understates the amount of overlap in this case. As even Dr. Barreto acknowledged, what Dr. Katz said in this article is that, "judging from the very little overlap, it is quote: 'highly likely that the Conservatives will out poll Labour and Alliance." Trial Tr. Vol. IV at 209:7-21; *accord id.* at 183:20-184:2 (Katz: "I think the statement is actually rather straightforward. There's some overlap. There's slightly more – there's a slightly higher chance that in this analysis that the Labour candidate did better than the Alliance candidate but it could have been the other way."). "Very little overlap" or "some overlap" is not what we have in this case. No, the problem here is that, with regard to the confidence intervals for White voters, they fall completely within the confidence intervals for Latino voters with only one minor exception. Def.'s Ex. 465 at 2-5. Thus, this is not a case with disparate "point estimates" and slender confidence intervals. It is the opposite—closely clustered "point estimates" and wide intervals. This is nothing like the estimates and intervals in the peer-reviewed article that Plaintiffs tried to impeach Dr. Katz with.

**RPFoF ¶ 202:** This fact is incomplete and mischaracterizes Dr. Katz's testimony. The fundamental difference between "point estimates" for candidate preference and number of voters in a precinct is that the former is unknown and the latter, for purposes of the EI analysis, is treated as a "known," or "accepted value." Trial Tr. Vol. IV at 180:6- 18. This is so because the latter "is the data that was input into [the] EI" versus being the product of it. *Id.* Plaintiffs are comparing apples and oranges here.

**RPFoF ¶ 203**: For the reasons stated in RPFoF ¶¶ 191-203, this fact is not supported by the record.

**RPFoF ¶¶ 204-07:** As explained elsewhere, the so-called "demographic and physical divisions" in Dodge City are not how Dr. Barreto and Plaintiffs make them out to be. *See* RPFoF ¶¶ 50-53, 57-60. Looking at the actual election results for Dodge City Commission, versus listening to Dr. Barreto and Plaintiffs's description of them, paints a much different picture. For instance, in 2021, the most homogenously Latino of the City Commission election precincts were Precincts 2 and 3. RPFoF ¶¶ 147-50. These two precincts are in "South Dodge." *Id.* The precincts with the most White voters were Precincts 5 and 6. *Id.* These precincts are in "North Dodge." *Id.* Completely contrary to what Dr. Barreto indicated in his testimony, the top three vote-getters in Precincts 2 and 3 in 2021 (Chuck Taylor, Michael Burns, and Joe Nuci) were the same top three vote-getters in Precincts 5 and 6 in 2021. *Id.* 2019 was a similar story. The most homogenously Latino of the City Commission election precincts then were Precincts 2 and 3. Ex. 465 at 1. The precincts with the most White voters at that time were again Precincts 5 and 6. *Id.* Nevertheless, the top two vote-getters in Precincts 2 and 3 (Kent Smoll and Rick Sowers) were the same top two vote-getters in Precincts 5 and 6. Pls.' Ex. 36. Thus, the only two election results in this case's record reveal that voters in "South Dodge" seem to prefer the same candidates that voters in "North Dodge" do, not that "White voters in North Dodge have clear electoral preferences that differ from the heavily Latino South Dodge," as Plaintiffs claim is the case.

Dr. Barreto's "demonstrative exhibits," which are the genesis for PFoF ¶¶ 204-07, obviously are not answer, as they could not and were not admitted into evidence. Trial Tr. Vol. II at 76:21-77:19. Even if they had, like Dr. Barreto's "Heat Map," they are incomplete and misleading. This is so because the "demonstrative exhibits" are based on "ratios, not raw numbers." Trial Tr. Vol. II at 118:13-16. Furthermore, Dr. Barrato's "demonstrative exhibits" do not disclose what he used as the "average vote share" nor do they set forth how many voters are

actually in a given area. Thus, if an area has only a couple of voters and those couple of voters deviate from Dr. Barreto's undisclosed "average vote share," then Dr. Barrato's "demonstrative exhibits" gave the impression that an area either strongly favored or disfavored a candidate, though, we may be only talking about one or two votes. Trial Tr. Vol. II at 126:9-23. This possibility is not just some undergraduate hypothetical, as we learned on Dr. Barreto's cross. For instance, in the "demonstrative exhibit" that Dr. Barreto presented on direct of Liliana Zuniga in 2014, it appeared that she was very much favored by the residents of the far west side of town by the Boot Hill Casino based on the roughly 20 plus signs in that region. Trial Tr. Vol. II at 118:1-21. However, we learned on cross that that area "might have been seven votes." *Id.* Likewise, at the northern-most end of Dr. Barreto's "demonstrative exhibit," it looked like Ms. Zuniga was strongly disfavored there based on the roughly 15 red dots in that area. *Id.* at 118:22-119:13. However, this was, as Dr. Barreto ultimately admitted, "also a lower-populated area" that is where the "wastewater treatment plant was" located, as well as a "big park." *Id.* Without actual vote numbers, as well as what the undisclosed "average vote share" was, it is impossible to make any sense of the "demonstrative exhibits" or Dr. Barreto's testimony regarding them. Accordingly, no weight should be given to the testimony based on Dr. Barreto's "demonstrative exhibits."

**RPFoF ¶¶ 208-13:** Dr. Barreto's "performance analysis" should not be accepted at all. First, it is based on demonstrative maps in which race impermissibly predominated. DFoF ¶¶ 175-200. It was necessary for race to predominate in the demonstrative maps drawn by Dr. Oskooii, Dr. Barreto's former student, frequent colleague in section 2 cases, and co-developer of the EI software used in this case because without Latinos or Latinos plus African Americans having a CVAP of at least double that of Whites, none of the districts in Dr. Oskooii's 14 demonstrative maps would have performed. *See* DFoF ¶ 200; RPFoF ¶ 13. Even when Latinos or Latinos plus

African Americans have twice the CVAP of Whites, Dr. Barreto's "performance analysis" reveals that they are still barely able to clear 50%. *See* Pls.' Exs. 122-35.

Second, while Dr. Barreto claims that his "performance analysis" is "based on real data of Latinos and Whites vote in Dodge City," what is really driving this analysis is the results of Dr. Barreto's review of exogenous elections, not Dodge City Commission elections, as should be the case. DFoF ¶ 195-98. We know that exogenous elections are the driver because not a single City Commission election gets anywhere near the 75%/25% assumption that Dr. Barreto applied in his "performance analysis." *Id.*

Third, Dr. Barreto's "elevated turnout" analysis made up of an enhancement that Dr. Barreto still has never disclosed and is unmoored to any voting patterns observed in Dodge City. Rather, it is an undisclosed number that Dr. Barreto has made up based on his "past [non-Dodge City related] analysis" and so-called "real-world examples." *Id.* at ¶ 198. The fact that Dr. Barreto performed and Plaintiffs' presented a "performance analysis" confirms, what the Supreme Court indicated in *Abbott v Perez*, 585 U.S. 579, 617 (2018), and circuit courts have since held, that "performance analyses" are necessary to show a section 2 violation because, without them, there is no reason to believe that "the alternative to the districting decision at issue would [actually] enhance the ability of minority votes to elect the candidates of their choice," which directly relates to "the ultimate question [of section 2 of] whether a districting decision dilutes the votes of minority votes."

Fourth, the "November – Even Years" columns in Dr. Barreto's "performance analysis" tables should be disregarded as they are completely irrelevant to any issue that remains in the case.

**RPFoF ¶¶ 216-33:** In describing the Senate Factors of significance to this case in closing argument, Plaintiffs' counsel did not address Factor 1. Trial Tr. Vol. V at 9-10; 49. Dodge City

does not have a history of official discrimination that has touched the right of Latinos to vote or participate in the democratic process. For good reason, therefore, Plaintiffs' counsel did not even address this factor in closing argument. *See* Trial Tr. Vol. V at 49:12-17. Notably, Plaintiffs' proposed Senate Factor 1 findings ignore that Dr. Martinez admitted he did not find evidence of official discrimination in Dodge City in voting or elections. DFoF ¶ 93.

**RPFoF ¶¶ 218:** There is no evidence in the record that the decision to have one polling location in Dodge City from 1998 to 2018 was intended to discriminate against Latinos. DFoF ¶ 148.

**RPFoF ¶¶ 219:** The Department of Justice's poll monitors monitored many elections in Ford County and never gave any indication that Latino voters were being discriminated against or that their votes were being depressed or that there were any impermissible barriers to Latino voting in Dodge City. Trial Tr. Vol. II at 22:6-24:18.

**RPFoF ¶ 220-223:** Ford County's decision to move its polling location was not discriminatory. To start, there is no evidence that the polling-location change in 2018 prevented a single voter from voting. DFoF ¶ 141. Moreover, Ford County moved the polling location in an even-numbered year, so the change could not have impacted a Dodge City Commission election. DFoF ¶ 139.

**RPFoF ¶¶ 224-25:** The DOJ raised Section 203 compliance with the County in the early 2000s, and since that time, Ford County election materials have been available in Spanish and English. At the time of Ms. Seibel-Robb's retirement, Ford County provided all documents related to elections—including those on how to run for office—in Ford County and Dodge City in English and Spanish. The Ford County Clerk's Office had access to County employees who were fluent in Spanish and available to translate documents. Trial Tr. Vol. I at 233:7-22; Vol. II at 17:9-22

**RPFoF ¶ 226-233:** Plaintiffs' anecdotal, lay-opinion evidence attempts to show that Dodge City otherwise discriminates against Latinos in its provision of services or maintenance of public areas, but the evidence from Dodge City itself proves that it does not. DFoF ¶ 94. Their remaining evidence is similarly too isolated and attenuated to show a nexus between a history of alleged discrimination and Latinos' ability to vote today, particularly where Dodge City's growing Latino population is a relatively recent phenomenon. *See* DFoF ¶¶ 11-17. For example, Plaintiffs' assertion that Dodge City schools were historically segregated overlooks that Dodge City's public-school enrollment is now 80% Latino and Mr. Rangel-Lopez testified that they gave him a great education. DFoF ¶¶ 19, 37-38. Plaintiffs also ignore the plethora of evidence that Ford County and Dodge City actively advertise and assist Latinos in exercising their right to vote. *See* DFoF ¶¶ 127-35.

**RPFoF ¶ 234:** The City incorporates its Findings of Fact that relate to the second and third *Gingles* preconditions. DFoF ¶¶ 201-244.

**RPFoF ¶ 236-239:** There is no evidence in this case that Dodge City's at-large election system has ever prevented an interested Latino from running for office. DFoF ¶¶ 103-04, 170-71. Plaintiffs did not call any witnesses to testify that they chose not to run for election because of the at-large method. Campaigns for Dodge City Commission are inexpensive, and the evidence is that it is hard to get people to run for the Dodge City Commission generally, let alone Latinos specifically. DFoF ¶¶ 167-68. Dodge City is also a small community—it takes 15 minutes or less to get from one side of Dodge City to the other. DFoF ¶¶ 22-23. Unlike a metropolitan area like Kansas City or Wichita, it is not cost- or time-prohibitive to campaign for election in a community the size of Dodge City.

**RPFoF ¶¶ 240-52:** At-large elections were not designed to suppress minority voting power; they were designed to facilitate the election of leaders who look out for the interests of the whole community. DFoF ¶ 99. Nor does Dodge City maintain at-large elections to suppress minority voting power. Rather, if anything, the evidence shows that White voters are currently *enhancing* Latino voting power. *See* RPFoF ¶¶ 174-89. Moreover, Dodge City's at-large elections foster a sense of unity and give each resident of Dodge City—a community of just 27,000 people—*five* commissioner-representatives. DFoF ¶¶ 15, 100-02.

Switching from an at-large system to a district-voting system would not have an effect on descriptive representation in Dodge City. DFoF ¶ 102. Finally, substantive representation is not an issue in Dodge City, where Plaintiffs adduced no evidence that any Latino has ever felt that the Dodge City Commission has faced a racially divisive issue or otherwise failed to represent Latino interests. DFoF ¶¶ 54-57. Thus, Dr. Bejarano's selective review of political science literature—without any application to the actual realities in Dodge City—should be rejected.

**RPFoF ¶¶ 253-257:** Dodge City's use of odd-year elections for the Dodge City Commission is mandated by the Kansas Legislature. DFoF ¶ 123. The Court thus correctly granted Dodge City's motion for judgment on partial findings on Plaintiffs' request to move Dodge City Commission elections to even-numbered years. Trial Tr. Vol. III at 217:13-24. Notably, off-cycle elections avoid municipal elections from being at the bottom of ballot and lumped in with party politics in what is intended to be nonpartisan elections. Trial Tr. Vol. III at 175:3-176:13.

Plaintiffs cite no evidence of specific turnout disparities in Dodge City for even- and odd-year elections. *See* Trial Tr. Vol. I at 171:10-13. But combined with the fact that White voters tend to enhance the prospects for Latino-preferred candidates attaining office in Dodge City, the

evidence does not support a finding that odd-year elections for Dodge City Commission enhance the opportunity for discrimination against Latinos.

**RPFoF ¶¶ 259-311:** Plaintiffs' proposed findings do not show that any history of discrimination in Dodge City has resulted in in adverse impact on Latinos with respect to education, employment or health, nor do they show any causal connection between any alleged history of discrimination in Dodge City and any socioeconomic disparity between Latinos and Whites today. Latinos did not begin migrating to Dodge City in substantial numbers until the meatpacking plants created employment opportunities in Dodge City sometime in the early 1980s. DFoF ¶¶ 11-17, 25-26. Since then, the Latino population has been increasing and, as Latinos move on from an initial employment foothold to find other opportunities in the community, their socioeconomic metrics have substantially improved across the board. DFoF ¶¶ 25-49. Dodge City prides itself on being a community that welcomes new immigrants with open arms. Its economic opportunities and extensive immigrant services make it an appealing new home for immigrants from numerous countries every year. New immigrants often arrive with few resources and some arrive without immigration status. Trial Tr. Vol. IV at 17:5-25; 18:25-19:6; Vol. I at 163:3-13.

**RPFoF ¶¶ 277-285:** Dr. Martinez's testimony is unhelpful to Plaintiffs, as Dr. Martinez concedes that he did not find any evidence of official discrimination in voting or elections in Dodge City; he did not find any policy of school segregation in Dodge City or ban on children from the Mexican Village attending Dodge City public schools; and he offered no testimony regarding any discrimination that Latinos faced in employment or receiving healthcare. His source of authority for restrictive covenants in Dodge City was an unidentified article from the 1980s, but he did not review any actual covenants to confirm their existence. DFoF 93. Dr. Martinez's testimony about "other centuries, other states, and other cities" should be rejected as irrelevant. Trial Tr. Vol. V at 11:24-12:2.

**RPFoF ¶ 300:** Mr. Rangel-Lopez himself is a campaign manager for New Frontiers who works "in southwest Kansas to build youth power," and he works "with folks in Garden City and Dodge City to figure out ways to get them involved and get their voices heard on the issues and policies that they care about." Trial Tr. Vol. I at 11:24-12:6.

**RPFoF ¶ 307:** Plaintiffs omit that the "slate" included: (1) Joe Nuci, a Latino; and (2) Michelle Salinas, a woman with a Hispanic surname. The slate proves that Latinos do not face unique barriers to any slating processes or running for the Dodge City Commission. *See* DFoF ¶¶ 170-72.

**RPFoF ¶ 309:** Mr. Rangel-Lopez is incorrect. *See* DFoF ¶¶ 128-29.

**RPFoF ¶ 311:** This conclusory fact is not supported by the record and should be rejected by the Court. What Plaintiffs' proposed findings establish is that Latinos migrate to Dodge City for work opportunities and begin their lives with less socioeconomic opportunity at the start. *See* PFoF ¶ 285 (noting even Dr. Martinez "found that while Latinos originally came to Dodge City to work on the railroads, they are now the force that sustains the meatpacking plants"). None of the policies that Plaintiffs point to—for example, segregation at Dodge City's founding, PFoF ¶ 278; the existence of the Mexican Village, PFoF ¶ 279-80; discriminatory restrictive covenants, PFoF ¶ 281; sundown towns that were *not* Dodge City, PFoF ¶ 284; or a Latino-only school in Kansas City, Kansas, PFoF ¶ 284—have any bearing on the socioeconomic conditions that Latinos have in Dodge City today.

**RPFoF ¶¶ 315-17; 322-33:** Despite Dr. Barreto's attempt to rehabilitate it, the National Association of Latino Elected and Appointed Officials directory is not reliable. In Dodge City alone, Dr. Bejarano testified that NALEO omitted: (1) Fernando Jurado as a City Commissioner between 1999 and 2001; (2) Joe Nuci as a City Commissioner from 2019 to 2023; and (3) Blanca

Soto as a City Commissioner in 2021. *See* Pls.' Ex. 55. Its conclusions about Latino officials in Dodge City—or elsewhere—deserve no weight.

Plaintiffs never introduced any evidence of the number of Latinos who have run for office in any election that Dr. Bejarano analyzed. *See* Trial Tr. Vol. I at 172:19-23 ("I did not do an analysis of all the candidates."). Without that information, it is impossible to assess Latino candidates' success rates as compared to White candidates' success rates. At the same time, Dr. Bejarano agreed that "one of the ways we can get more candidates elected" was to get more Latino candidates to run for office. *Id.* at 172:9-18.

**RPFoF ¶ 334:** The record does not support a finding that Ms. Soto's struggle to campaign for Dodge City Commission was a consequence of Dodge City's at-large election system. Mr. De La Rosa never testified that it was a result of Dodge City's at-large election system, but that Latino community leaders chose not to support Ms. Soto. *See* Trial Tr. Vol. IV at 23:16-24:14. Mr. De La Rosa's testimony further overlooked that Mr. Rangel-Lopez himself is part of the non-profit "ecosystem" to promote Latino political causes at New Frontiers. *See* Trial Tr. Vol. I at 11:22-12:6.

**RPFoF ¶ 335:** Ms. Vargas's lay opinion testimony of Ms. Gonzalez's campaign deserves no weight. Ms. Vargas does not live in Dodge City and cannot credibly opine on the merits of local elections or campaigns. *See* Trial Tr. Vol. I at 204:9-25.

**RPFoF ¶¶ 337-38:** Mr. De La Rosa testified credibly and noted *twice* that Latinos in Dodge City could flip any commission into a unanimously Latino-preferred commission under the current system "tomorrow." In Mr. De La Rosa's view, the issue is voter registration and turnout. Trial Tr. Vol. III at 318:16-319:16 ("[I]f we wanted to . . . having lived in Dodge City, if we were an active community, voter community, regardless of what it is, having the 60 percent, 70 percent

Latino Hispanic and they knew local elections, they were registered to vote, we would flip any committee or commission in the community *tomorrow*." (emphasis added)); Trial Tr. Vol. IV at 25:3-14 ("If my community, again, we have skin in the game too. If my community were to be educated and showed up to the polls, those boards would look different tomorrow."). Accordingly, Mr. Rebein further testified that the issue is not Dodge City's at-large election system, but putting resources into registering voters and getting people to vote. Trial Tr. Vol. III at 234:2-237:1 ("Now, if I was going to put my efforts on something it would be on . . . figuring out who's eligible to vote, getting them registered and getting people to vote. And that's everybody. Everybody needs to do that. We have a problem with that just like everybody does.").

**RPFoF ¶ 343:** There is no credible evidence that Mr. Nuci revealed himself as Hispanic and lost election because it became "public information" that Mr. Nuci was Hispanic. Mr. Rangel-Lopez testified without credibility that "[a]t least I didn't know" Mr. Nuci was Latino. Trial Tr. Vol. I at 61:20-22. Similarly, Ms. McCoy's testimony is about an undisclosed statement in a memo about this litigation that was only used to "refresh the witness's recollection" and never entered into evidence. *See* Trial Tr. Vol. IV at 82:4-13. Mr. Nuci is, and has always been known in the community, as Hispanic. Trial Tr. Vol. III at 234:2-237:1 ("Well, you know, I know we laugh, okay, Joe Nuci, you know, because somebody apparently has questioned whether Joe Nuci is Hispanic. Joe Nuci says he's Hispanic, he is Hispanic[.]"); *see also* Pls.' Ex. 121 (showing a picture of Joe Nuci in a candidate advertisement for the 2021 Dodge City Commission, where Joe Nuci won election).

**RPFoF ¶¶ 345-421:** It bears underscoring that Plaintiffs' proposed factual findings on Senate Factor 8 almost entirely ignore the many positive actions Dodge City has taken to respond to the needs of its Latino community and meet the Latino community "where they are." Trial Tr.

Vol. III at 316:22-317:25. Plaintiffs thus ask the Court to ignore the reality that, among other things: (1) Dodge City has been nominated for national awards for its work on cultural diversity, DFoF ¶ 76; (2) Dodge City offers pay incentives for bilingual employees, DFoF ¶ 77; (3) Dodge City's publishes city documents in English and Spanish, DFoF ¶ 78; (4) Dodge City is a member of the Southwest Kansas Coalition, DFoF ¶ 79; (5) Dodge City brings United States citizenship and immigration services to Dodge City, DFoF ¶ 80; (6) Dodge City publishes information about how to become a citizen and how to vote, DFoF ¶ 81; (7) Dodge City hosts of the International Festival, DFoF ¶ 84; (8) Dodge City hosts a New Americans Dinner, DFoF ¶ 86; (9) Dodge City offers naturalization scholarships, DFoF ¶ 87; (10) Dodge City hosts both Mexican and Guatemalan Consulate Services, DFoF ¶ 88; (11) Dodge City's offers a DACA clinic, DFoF ¶ 89; and (10) Dodge City stood up the Cultural Relations Advisory Board, DFoF ¶ 85, which is intended "to work on multicultural affairs, issues in the community," Trial Tr. Vol. III at 299:17-300:6, and has, among other things, published a Strategic Plan for Welcoming and Integration for new immigrants to Dodge City, DFoF ¶ 85.

**RPFoF ¶ 347-49:** Dr. Bejarano's evasive cross-examination testimony and inability to answer basic questions gives her no credibility. *See* Trial Tr. Vol. III at 201:9-11 (noting Dr. Bejarano's "obstinate refusal to answer questions on the pretense that they were not clear").

**RPFoF ¶ 350:** Plaintiffs' replete use of the passive voice about who moved the polling location in 2018 is no mistake—Ford County, not Dodge City, moved the polling location in 2018. DFoF ¶ 137. Plaintiffs further ignore the herculean efforts Dodge City undertook specifically to respond to any issues that Ford County's decision caused, DFoF ¶ 138, and the undisputed fact that the polling location change did not impact the ability of a single Dodge Citian to vote, DFoF ¶ 145-47.

41

**RPFoF ¶ 351:** There is no evidence that the 2010 shooting "sparked racial tensions." At most, Dr. Bejarano's testimony shows that Dodge City responded to the 2010 shooting by creating the Cultural Relations Advisory Board in the same year. *See* Trial Tr. Vol. I at 109:11-110:11 (noting Dodge City agreed to "create some type of committee to work on addressing creating more community with Latinos and other diverse communities"); Trial Tr. Vol. III at 299:17-300:6 (noting the Cultural Relations Advisory Board in 2010). The Cultural Relations Advisory Board has been effective. Trial Tr. Vol. IV at 73:15-74:2.

**RPFoF ¶ 352-53:** Dodge City has not failed to respond to concerns about at-large elections. At-large elections have never been a significant public issue in Dodge City. *See* DFoF ¶¶ 103-20. Dr. Bejarano's cited testimony is vague, inconsistent with the testimony of actual Dodge City residents, and unsupported. It should not be credited. There is no evidence in the record of Latino Dodge Citians raising concerns about the at-large method of election or the reduced number of polling locations, nor is there evidence that either factor affected Latinos at all, let alone disproportionately. The cited testimony similarly does not support the final sentence of paragraph 353.

**RPFoF ¶¶ 354-56:** Plaintiffs ignore that President Trump issued an executive order requiring the meatpacking plants to maintain operations. DFoF ¶¶ 91-92. Apparently, Dr. Bejarano who testified regarding the City's response to COVID at the meatpacking plant, was unaware that the executive order had been issued. Trial Tr. Vol. I at 179:16-180:23. Plaintiff Rangel-Lopez worked at the meatpacking plants as a COVID compliance officer, and his specific job was to ensure that "everyone was wearing their masks properly and was social distancing at the time." Trial Tr. Vol. I at 12:7-13:14. Additionally, the City engaged the Kansas Governor's Office to

ensure that the Governor prioritized meatpacking workers as essential workers who would be among the first to receive vaccines. DFoF ¶ 92.

**RPFoF ¶ 357-360:** Not a single witness at trial from Dodge City described any inadequacy in how the City responded to the 2010 shooting or that there was any sort of social unrest following that event. *See also* RPFoF ¶ 351.

**RPFoF ¶ 358:** The Cultural Relations Advisory Board was established in the same year as the 2010 shooting. Trial Tr. Vol. III at 299:17-300:6. It has been effective. Trial Tr. Vol. IV at 73:15-74:2. Among other accomplishments, the Cultural Relations Advisory Board established the City's strategic plan for welcoming immigrants. Trial Tr. Vol. III at 301:5-302:2; *see also* Def's. Ex. 447. Nor is there credible evidence of "racial unease" in Dodge City before 2010 or after. *But see* DFoF ¶ 174.

**RPFoF ¶ 359:** The facts refute Dr. Bejarano's opinion that Latinos face a disproportionate number of arrests and citations. In 2010, Latinos made up 57.5% Dodge City's population; by 2020, that share increased to 63.9%. DfoF ¶¶ 14-15. The evidence Dr. Bejarano relied on show that the percentages of the Dodge City Police's arrest and citation numbers track these statistics. *See* Pls.' Ex. 17 (showing Latinos made up between 52.4% and 62.9% of all stops; between 57.7% and 69.1% of all citations; and between 57.5% and 75% of arrests).

**RPFoF ¶ 360:** This summarized finding is inconsistent with the record and should be rejected. *See* RPFoF 357-359.

**RPFoF ¶¶ 361-62:** Dodge City's cooperation with Immigration and Customs Enforcement (ICE) on one cited occasion in 2017 does not show a lack of responsiveness. *See* Trial Tr. Vol. I at 119:4-21 ("[T]he fact that local law enforcement cooperated with immigration authorities is not

a negative factor."). Plaintiffs further ignore that Dodge City makes substantial efforts when it comes to immigration assistance. DFoF ¶¶ 83-89.

**RPFoF ¶¶ 363-65:** Ms. Vargas's testimony that she does not know how to contact the Dodge City Commission is not credible. "All five [commissioners] are available. They have email addresses and typically they have their cell phone or their home phone listed on the web page, and we do share those as well." Trial Tr. Vol. IV 92:17-22. This fact undermines all of Ms. Vargas's testimony. Ms. Vargas's testimony regarding assistance during the COVID-19 pandemic is also not credible. *See* Dodge City's Response to PFoF 353-56.

**RPFoF ¶¶ 366-368:** Dodge City is not a tale of two cities. Trial Tr. Vol. III at 231:25-234:1 ("As I was coming up here this morning I crossed Comanche, I saw three [$]500,000, million dollar homes south of Comanche. Our biggest businesses and industries are south of Comanche, you know, the Chevrolet dealership, Toyota dealership, all of that is south of Comanche. The courthouse, what I consider our crown jewel in Dodge City, which is the depot, you know, our historic Santa Fe depot that has completely been renovated, has a theater in it, that is all south of Comanche. . . . Is there development . . . in the south party of town? Yes, there is. . . .I think we have either newly constructed or under constructed over 600 living spaces in Dodge City. I don't know if its exactly equal but it's pretty equal north and south. And so I don't think that you can say a t[ale] of two cities at all."). Like all cities, some pockets of town have more expensive homes than others, but that fact does not support this concept of Dodge City being divided North and South.

**RPFoF ¶ 369:** Plaintiffs omit that Commissioner Chuck Taylor lives south of Comanche street. DFoF ¶ 69.

**RPFoF ¶¶ 371-76:** Dodge City does not discriminate in its maintenance of roads or other public spaces, nor do they pay less attention to "South Dodge." DFoF ¶ 94. The City maintains brick roads in its historic districts. Trial Tr. Vol. I at 43:20-44:6. And while the City has created a sidewalk program to assist homeowners, the sidewalks Plaintiff Rangel-Lopez described as buckled are the responsibility of each homeowner; not the City. Trial Tr. Vol. IV at 97:1-7. Notably, neither Plaintiffs ever brought any of the alleged perceived issues to the Commission's attention. Indeed, Plaintiff Rangel-Lopez worked in the City Manager's office and never raised any of these alleged issues. Trial Tr. Vol. III at 278:8-279:1.

**RPFoF ¶¶ 378; 387:** Dodge City has four grocery stores dispersed throughout town. DFoF ¶ 24. Mr. Rangel-Lopez's lay opinion that east Dodge City is a food desert is not credible.

**RPFoF ¶¶ 383-84:** Dodge City does not have bad schools. Trial Tr. Vol. IV at 88:2-89:8. Thus, Mr. Rangel-Lopez "absolutely" agreed that he received a good education at Dodge City High School and was a high-achieving student at the University of Kansas. DFoF ¶¶ 37-38. This is consistent with City Manager Nick Hernandez's assessment, which was that the public schools were "pretty amazing," as "they had given [opportunities] to [his] children [that] far exceed[] the last two communities that [he] ha[d] been in." Trial Tr. Vol. IV at 88:2-21. As Mr. Hernandez recounted, his daughter had just been admitted into pharmacy school within a year of graduating from Dodge City High School, and his son is part of one of the top Junior ROTC programs in the entire Country. *Id* at 88:4-21.

**RPFoF ¶ 389:** Dodge City is investing significant resources in its parks, including those in the southern area of Dodge. DFoF ¶ 94.

**RPFoF ¶ 390:** The City's public transportation service serves north and south Dodge City equally, and runs on time. Trial Tr. Vol. V at 77:20-78:15. Outside of Plaintiff Coca's testimony

at trial, there is no evidence that untimely buses are an issue that has been brought to the City's attention.

**RPFoF ¶ 391**: Dodge City has not failed to respond to public interest in district-based elections. *See* DFoF ¶¶ 103-20. If anything, Dodge City maintains an openness to district-based elections *if the public* could decide the issue. Trial Tr. Vol. IV at 99:14-16 ("[T]he public should make that decision.").

**RPFoF ¶¶ 393-98:** Plaintiffs omit that Ford County fully complied with the DOJ's inquiry. DFoF ¶¶ 161-62. The DOJ conducted a thorough investigation, examined large volumes of data spanning more than ten years and numerous election cycles, and ultimately took no action. DFoF ¶ 153-162. As the Court noted during trial, "when the City is under extensive investigation that results in nothing, I don't think that puts them on notice that they have a problem." Trial Tr. Vol. V, at 20:25-21:2.

**RPFoF ¶ 403-05:** After Mr. Rangel-Lopez raised the idea of moving away from at-large elections to the Cultural Relations Advisory Board Steering Committee in 2021, the Steering Committee—which was composed of a number of prominent and influential Latinos in the area, including, but not limited to, Ms. Blanco Soto and Ms. Monica Vargas (who testified at trial)—decided against including the issue in its final Strategic Plan. DFoF ¶ 106.

**RPFoF ¶ 407:** Mr. Rangel-Lopez's lay opinion that Dodge City's policies do not match its welcoming rhetoric is entitled to no weight. Among other issues, Mr. Rangel-Lopez did not point to a specific policy that conflicted with Dodge City's rhetoric. *See* Trial Tr. Vol. I at 26:10-25. To the extent Mr. Rangel-Lopez complains that Dodge City's policies do not support undocumented immigrants, he omits that: (1) immigration is a question of federal law; and (2) Dodge City assists substantially with immigration-related services. *See* DFoF ¶¶ 79-81, 87-89.

**RPFoF ¶ 413:** Dodge City provides its services without consideration of race or where they live. DFoF ¶ 94.

**RPFoF ¶ 414:** Dodge City does not administer elections and has no obligation to track voter turnout rates. DFoF ¶ 121. Regardless, Plaintiffs ignore that Dodge City undertakes substantial effort to assist its residents with awareness of elections and providing everyone an equal opportunity to vote. DFoF ¶¶ 130-35.

**RPFoF ¶ 415:** Mr. Hernandez acknowledged that in two disparate months in 2018, February and December, over 70% of police arrests, stops, citations, and warnings involved Latinos—not the entire year. Trial Tr. Vol. IV at 106:7-13. This percentage is similar to the percentage of the Latino population in Dodge City. *See* Pl's. Ex. 112 (showing Dodge City's population was 63.9% Hispanic in 2020). Plaintiffs ignore that in other months, Latinos were involved in as few as 57.5% of arrests and 52.4% of total stops. Pls.' Ex. 61 at 1.

**RPFoF ¶¶ 416-17:** As the Court remarked at trial, what the Dodge City Police's use of a plainclothes officer at a public meeting "is not in any way outside the customary law enforcement practice and procedures," Trial Tr. Vol. I at 118:3-15, and the evidence about the Dodge City Police Chief's decision to send a plainclothes officer to a public meeting should be entitled to no weight, *see id.* at 121:24-122:5.

**RPFoF ¶¶ 418-20:** Plaintiffs' lay-opinion testimony about the responsiveness of the Dodge City Commission to the needs of Latinos should receive no weight. Among other problems, Ms. Scoggins and Mr. Rangel-Lopez did not identify a specific issue that the Dodge City Commission did not respond to. Moreover, the evidence is there have been no issues before the Dodge City Commission where the Latino community did not feel heard or represented. DFoF ¶¶ 55-57.

**RPFoF ¶ 421:** As stated above, Dr. Bejarano did not provide credible testimony. *See* Response to PFoF 35-36.

**RPFoF ¶ 423-24:** Dodge City has not been on notice of Latino vote dilution since 2010. Plaintiffs' sole citation for this conclusion is Dr. Bejarano's retelling of an article she allegedly read—which is not in the trial record—about a shooting in Dodge City. Neither that article nor Dr. Bejarano's testimony reflects that the City was on notice of vote dilution.

**RPFoF ¶¶ 425-26:** The Department of Justice investigation did not put the City on notice of any Section 2 violation. Rather, the DOJ conducted a thorough investigation, examined large volumes of data spanning more than ten years and numerous election cycles, and ultimately took no action. DFoF 153-162. As the Court noted during trial, "when the City is under extensive investigation that results in nothing, I don't think that puts them on notice that they have a problem." Trial Tr. Vol. V, at 20:25-21:2.

**RPFoF 427-28:** Ms. Tieben testified that at the time of the 2018 polling place lawsuit, people outside of the community mentioned the City's lack of districts, but City residents did not raise the issue. Trial Tr. Vol. III, at 252:23-253:2; 254:13-21.

**RPFoF 429-30:** Ms. Scoggins raised the issue of district elections at a Commission meeting, and the Commission directed City staff to look into the matter. DFoF 112. Notably, not even Ms. Scoggins described a proposed move to district voting as a solution to Latino vote dilution. DFoF ¶ 114. Indeed, until this lawsuit, no political party, organization, or individual has made district-based elections in Dodge City a public issue, let alone given Dodge City an indication that at-large voting was diluting Latino voting power. DFoF ¶ 115-17.

**RPFoF ¶¶ 431-34:** Dodge City described its policy justifications for maintaining an at-large system at length. DFoF ¶¶ 99-100. Plaintiffs' dismissal of these justifications as "minimal" ignores the record.

**RPFoF ¶ 435:** The Trozzolo memo was only used in an attempt to refresh Ms. McCoy's recollection in this case and was never admitted into evidence. Trial Tr. Vol. IV at 79:17-81:11. Moreover, Ms. McCoy testified that she did not recall anything in the memo or how the Trozzolo firm recommended Dodge City "strengthen" its position. Trial Tr. Vol. IV at 81:4-6. It is thus not substantive evidence in this case. Regardless, it is entirely unremarkable that a public-relations firm hired in response to a lawsuit would advise its client to "strengthen" the client's position in that lawsuit.

**RPFoF ¶ 436:** Having a City Commission that represents the City as a whole is and has been the will of Dodge Citians. DFoF ¶ 100. The use of at-large elections is entirely consistent with that goal. *See* Trial Tr. Vol. III at 234:2-237:1 (describing a potential move to district elections as "negative because it's divisive . . . by definition," and noting that district-based voting "will hurt the cause" of having a "majority and maybe all five commissioners that would be Hispanic"); Trial Tr. Vol. IV at 40:13-41:2 (noting "boards generally don't function as well" in a district-based system "as they would in an at-large system").

**RPFoF ¶ 437:** Ms. Scoggin's anecdotal evidence in 2023 does not defeat Dodge City's consistent justification for its at-large method. The more telling fact is that Plaintiffs have no evidence that, despite an alleged "significant socioeconomic divide" in Dodge City, PFoF 436, any racial appeal has ever been used in a Dodge City campaign in any form—even in campaigns when Latinos were on the ballot. DFoF ¶ 174.

**RESPONSE TO PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW**

Plaintiffs' attempt to force Dodge City to abandon its 50-plus year practice of at-large City Commission elections for district-based elections fails for many reasons. First, Plaintiffs have not sustained their burden of showing that the *Gingles* preconditions have been met. Second, Plaintiffs have not shown that switching from at-large elections to district-based ones will actually "enhance the ability of minority voters to elect the candidates of their choice," which is the "ultimate question" in the section 2 analysis. *Abbott v. Perez*, 585 U.S. 579, 617 (2018). Third, the totality of the circumstances does not support a finding of a section 2 violation. Accordingly, judgment should be entered in Dodge City's favor here.

**I.   Plaintiffs have not shown that Latinos are politically cohesive.**

There is nothing in the limited data available that tells us anything about how Latinos vote in City Commission elections. There is nothing that demonstrates that Latinos vote cohesively. As Dr. Katz noted: "We just don't know how Latinos or Whites voted in particular elections. We do not see clear winners of which candidate is the preferred candidate of any group. So it's more about the level of statistical uncertainty. We just don't know." Trial Tr. Vol. IV at 158:18-159:6. Here, there are very few precincts. There are no homogenous precincts. Dr. Katz's opinion on this matter is well founded and consistent with existing case law. Nevertheless, even if one were to assume that the "point estimate" numbers used by Dr. Barreto are reliable (a false assumption), those estimates tell us nothing about racially polarized voting in City Commission elections.

In their proposed findings and conclusions, Plaintiffs make four primary arguments. **First**, Plaintiffs contend that Dodge City's objection to Dr. Barreto's analysis based on the limited data sets in this case "is unpersuasive" because "polarized voting has often been found in comparably-sized or smaller jurisdictions than Dodge City. CM/ECF Doc. 211 at 119. **Second**, Plaintiffs allege

that Dodge City's argument about confidence intervals is unfounded because "[p]oint estimates are undisputedly the best estimates in the data," and, "here the point estimates are consistent across elections." *Id.* at 122. **Third**, Plaintiffs argue that, based on Dr. Barreto's King EI analysis, "Latino voter cohesion was clear in all of the Dodge City Commission elections analyzed," and, "[i]n all of those elections, the Latino-preferred candidate did not win election." *Id.* at 118. **Fourth**, Plaintiffs say that, "[i]n both local and statewide exogenous elections, Latino voters also demonstrated strong cohesion, upwards of two-thirds and in some cases over 75% cohesion for preferred candidates." *Id.* at 119. As to Dodge City's contention that Dr. Barreto's reliance on exogenous elections is improper, Plaintiffs argue that there is "no authority to support this proposition." *Id.* at 120. Plaintiffs go on to aver that there are "several exogenous elections that were substantially similar to the Dodge City Commission elections—multi-candidate, local, nonpartisan, and off-cycle elections—that demonstrated stark evidence of polarization." *Id.* at 120-21. None of Plaintiffs' arguments withstand scrutiny.

A. **No Court has ever approved of what Dr. Barreto is attempting to do here.**

Plaintiffs' attempt to conjure up racial polarization findings in a jurisdiction like Dodge City is truly unprecedented. In its proposed findings and conclusions, Dodge City set forth why ecological inference analysis was not appropriate in this case because, among other things, of how little reliable data there is. CM/ECF at 212 at 73-88.[5] According to Plaintiffs, though, "the size of a jurisdiction population or the number of voting precincts evaluated does not hinder a finding of political cohesion." CM/ECF Doc. 211 at 118. In support of this proposition, Plaintiffs cite five

---

[5]     For citations to Dodge City's proposed conclusions of law, CM/ECF Doc. 212, the pincite is to the page number listed in the document's CM/ECF timestamp, as opposed to the page number in the document's footer. There is a difference between the two because the former includes the document's table of contents, while the latter does not. There is no difference between the two in Plaintiffs' proposed findings and conclusions.

cases—none of which can shoulder the weight Plaintiffs foist upon them. *Id.* at 118 n. 601.[6] Two

of the five cases can be dismissed out of hand. Case one, *Windy Boy v. Big Horn County*, 647 F.

Supp. 1002 (D. Mont. 1986), was actually decided before *Gingles*. Accordingly, *Windy Boy* did

not evaluate political cohesion within the context of *Gingles II*, as *Gingles II* did not even yet exist.

In case two, *Potter v. Washington County*, 653 F. Supp. 121 (N.D. Fla. 1986), while the order in

question does post-date *Gingles* by 11 days, it does not actually apply *Gingles*, or even discuss

cohesion for that matter, because the County had already "admitted liability under the Voting

Rights Act" in a proposed consent judgment that was submitted well before *Gingles* was decided.

653 F. Supp. at 122. Thus, *Potter* offers Plaintiffs no assistance. The same is true for Plaintiffs'

third case, *United States v. Blaine County*, 363 F.3d 897 (9th Cir. 2004). There, "the County's

expert witness conceded that American Indians [the minority group in question] voted cohesively

in 100 percent of the County Commissioner elections and 95 percent of exogenous elections for

county, state, and national offices." 363 F.3d at 910. Obviously, Dodge City has not conceded

away the cohesion issue in this case. Plaintiffs' fourth case, *Cuthair v. Montezuma-Cortez, Colo.

Sch. Dist. No. RE-1*, 7 F. Supp. 2d 1152 (D. Colo. 1998), is similarly unhelpful to Plaintiffs. There,

unlike here, "virtually all of the precincts from School District elections [the election at issue in

that case] were homogenous," which the Court found made "[t]he homogenous precinct analysis .

. . particularly compelling and reliable." *Id.* at 1168. Finally, in Plaintiffs' fifth case, *Cane v.

Worcester County*, 35 F.3d 921, 921, 925 (4th Cir. 1994), the district court actually disregarded

the experts' polarization analysis because it "failed to produce reliable statistical evidence because

of the lack of available data and a truncated analysis caused by the small number of districts and

---

[6]     Plaintiffs cite to the same exact cases in footnote 603 on page 119 of their proposed findings and conclusions
in support of the idea that "polarized voting has often been found in comparably sized or smaller jurisdictions than
Dodge City."

lack of a majority African–American district."[7] Far from supporting Plaintiffs' position, *Cane* refutes it.

In addition to the specific distinctions just noted, each of Plaintiffs' decades-old cases fail for the common reason that not one of them reviewed the application of the ecological inference methodologies that Dr. Barreto employed here (either King's EI or the RxC method), much less approve of Dr. Barreto's methodologies in a case involving less than 10 precincts and precincts in which the most homogenous precinct was less than 60% Latino—an occurrence that happened only once in a 10-year timeframe. In short, Plaintiffs have provided no support for the proposition that, contrary to Dr. Barreto's representations in *Cisneros* that a "very small number of voting precincts makes it more difficult to analyze voting patterns and make determinations of racial bloc voting," 2014 WL 1668500, at *12, Dr. Barreto's methodologies are appropriate here.

### B.  Dr. Barreto's point estimates are not reliable in this case.

Simply put, "point estimates" are not an adequate substitute for confidence intervals in a case like this. The cases that Plaintiffs cite in support of the proposition that "point estimates are undisputedly the best estimates in the data," *see* CM/ECF Doc. 211 at 122 n. 607, actually confirm Dodge City's—and Dr. Katz's—position by declaring that "[i]t is standard in the area of political science for confidence intervals to be set at 95%," *Benavidez v. Irving Indep. Sch. Dist.*, 2014 WL 4055366, at *11 n. 20 (N.D. Tex. Aug. 15, 2014); *accord Fabela v. City of Farmers Branch, Tex.*, 2012 WL 3135545, at *10 (N.D. Tex. Aug. 2, 2012) ("According to Dr. Engstrom, it is standard in the area of political science for confidence intervals to be set at 95%."); *see also* CM/ECF Doc.

---

[7]        Notably, while in the district court, the plaintiff's expert in *Cane*, like Dr. Barreto here, tried to offer a homogenous precinct election analysis. Like this court, the district court in *Cane* rejected that effort because, in order for that analysis to be proper, "the actual vote in precincts [must be] at least 90% or more of one race," which, like here, was not met in *Cane*. 840 F. Supp. 1081, 1087 (D. Md. 1994); *see also Ala. State Conf. of N.A.A.C.P. v. Ala.*, 612 F. Supp. 3d 1232, 1275 (M.D. Ala. 2020) ("The homogeneous precinct analysis requires a geographical unit where 90% or more of the voters are of a single race.").

212 at 77 (collecting cases). Plaintiffs make no attempt to explain why Dr. Barreto ignored this standard here. Instead, Plaintiffs merely claim that "it is not necessary to 'rely on confidence intervals where voting patterns [a]re consistent.'" CM/ECF Doc. 211 at 122 (quoting *N.A.A.C.P., Spring Valley Branch v. East Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 390 (S.D.N.Y. 2020)).

In making their consistency argument, though, Plaintiffs leave out the most important part of their selective quote from *East Ramapo*: that the consistency that courts care about is the consistency between the statistics that an expert has created and "the anecdotal evidence year after year." 462 F. Supp. 3d at 390. Without anecdotal evidence, the only thing consistent about charts like Dr. Barreto's EI table is that the top three "point estimates" are shaded one color, and everyone else is shaded another. As shown in the most recent City Commission election that Dr. Barreto reviewed, specifically, the results for Candidate Salinas, the surnames in charts like Dr. Barreto's are not enough to gauge whether a candidate is in fact the preferred candidate of the Latino community. *See* RPFoF ¶¶ 147-50. More is needed, and, as is true of so much of Plaintiffs' case, that something more is missing.

Typically, in these types of cases, the plaintiffs put on evidence that particular candidates are widely favored by the minority group in question or that the minority group in question tends to think alike politically. *See, e.g.*, *Cane v. Worcester Cnty., Md.*, 840 F. Supp. 1081, 1089 (D. Md. 1994) (citing testimony from the President of the local chapter of the NAACP that "the County's African-American Community is . . . politically active" and that the "African-American community 'worked together like a family'" on "a redistricting proposal" when reaching its conclusion "that African-Americans are politically cohesive in Worcester County"). This is so, because, as noted by the Tenth Circuit, such evidence "would seem to be required if the court is to

identify the presence or absence of distinctive minority group interests." *Sanchez v. Bond*, 875 F.2d 1488, 1494 (10th Cir. 1989).

Here, there is an absolute paucity of such evidence. To begin with, Latinos generally, and Latinos in Dodge City specifically, are not monolithic. DFoF ¶ 20. As noted by Plaintiff Rangel-Lopez, not all Latinos share the same political ideology, and "the ethnicity of a candidate tells us nothing about whether a majority of voters of any particular ethnicity support the candidate." DFoF ¶ 20. Thus, just because a candidate is Latino does not mean that Latinos in the community support them. DFoF ¶ 20. Furthermore, there is no evidence that there is any issue—including how City Commissioners are elected—that has divided Whites and Latinos and galvanized a divide between those two groups. DFoF ¶ 55. With regard to specific candidates, the same is true.

Initially in this case, the Court was told that "[t]he following Latine-preferred candidates have unsuccessfully run for the Dodge City Commission: Fernando Jurado in 2000, Jose Vargas in 2006, Liliana Zuniga in 2014 and 2017, and Blanco Soto in 2021." CM/ECF Doc. 1 at ¶ 61. Plaintiffs maintained that position when they later filed their Amended Complaint. CM/ECF Doc. 30 at ¶ 62. At the pretrial stage, Plaintiffs pivoted away from Messrs. Jurado[8] and Vargas and replaced them with Ms. Jan Scoggins, who Plaintiffs claimed was the Latino preferred candidate in the 2017 and 2014 City Commission elections. CM/ECF Doc. 140 at 7.

At trial, Plaintiffs failed to produce any anecdotal evidence that Latinos as a group, as opposed to the two plaintiffs, supported any of the then-professed Latino preferred candidates of

---

[8] At least with regard to Mr. Jurado, it is clear why Plaintiffs eventually gave up pursuing their section 2 claim based on him—Mr. Jurado believes that race had nothing to do with his unsuccessful run. DFoF ¶ 62. Rather, it appears that Mr. Jurado was initially cited solely because he, like the other three listed, had a Latino surname. *Compare* Am. Compl., CM/ECF Doc. 30 at 30 ¶ 62 (listing Fernando Jurado as a Latino-preferred candidate in 2000) *with* Pls.' Ex. 121 (omitting analysis of the 2000 Dodge City Commission election) *and* Jurado Dep., CM/ECF Doc. 199 Ex. A at 15:7-13 (noting Mr. Jurado believed he lost election 2000 because he did not campaign aggressively enough).

choice.[9] For starters, Plaintiffs did not call Ms. Zuniga or Ms. Soto to talk about their unsuccessful campaigns or to discuss why they purportedly believed they were the Latino preferred candidate of choice. While Plaintiffs did call Ms. Scoggins, Plaintiffs never asked for and Ms. Scoggins never provided a basis to believe she was actually a Latino preferred candidate. Ms. Scoggins did talk about her campaign, but she indicated that she spoke only with groups that apparently had White members. DFoF ¶ 166. Ms. Scoggins also testified about her 2019 information request that we have heard so much about, but she gave no indication that that request was intended to benefit Latinos. DFoF ¶ 114. Similarly, Ms. Scoggins did not recount anything that she had done as a City Commissioner to specifically benefit the Latino community in Dodge City. Thus, other than Plaintiffs' argument that Ms. Scoggins is the preferred Latino candidate, there is no evidence that that is indeed true.

Plaintiffs' other witnesses do not make up for this lack of candidate testimony. Only two fact witnesses mentioned Candidate Zuniga. The first, Ms. Melissa McCoy, merely stated that Ms. Zuniga did not run in 2017 due to health reasons. DFoF ¶ 63. The second, Plaintiff Coca, stated he "somewhat kn[e]w [Zuniga] personally" and that she was "in the Hispanic Community." Trial Tr. Vol. III at 131:9-17. However, he, like Plaintiff Rangel-Lopez, did not testify that he voted for Ms. Zuniga then or that he knew anyone who had. This testimony (or lack thereof) does not reasonably lead to the conclusion that Ms. Zuniga was the Latino candidate of choice in 2014 or in 2017, particularly when it is uncontroverted that she did not actually run in 2017.

---

[9]      Regarding Dr. Barreto's "demonstrative exhibits" that purportedly "show[ed] the demographic and physical divisions within the Dodge City," they were just a repackaging of Dr. Barreto's flawed "racially polarized voting analysis." CM/ECF Doc. 211 at ¶¶ 204-207; *see also* Trial Tr. Vol. II at 73:2-8 ("These are just visualizations of what the racially polarized voting data tells us about North Dodge and South Dodge."). This had to be the case because, if it were otherwise, Dr. Barreto's "demonstrative exhibits" would have constituted improper and untimely supplements to his report. Trial Tr. Vol. II at 76:21-77:19. Accordingly, these "demonstrative exhibits" should not be viewed as providing additional evidence regarding supposed Latino preference in Dodge City.

As for Ms. Soto, both Plaintiffs did at least say that they had voted for her, and Mr. Coca indicated that she had attended events in the Hispanic community. But once again, neither Plaintiff said anything about how much support Ms. Soto had received from other Latinos in Dodge City or what other Latinos thought of her. Ms. Monica Vargas, who has never lived in Dodge City, Trial Tr. Vol. I at 204:9-12, did testify that the union that she works for endorsed Ms. Soto, *id.* at 197:2-3. However, this endorsement was based on responses to "a basic questionnaire" and Ms. Vargas's apparent belief that Ms. Soto had "shown a lot of commitment to work[ing]" for her union's members. *Id.* at 197:4-9. How Ms. Soto had "work[ed]" for her union's members or whether Ms. Soto's "work[]" was solely on behalf of the union's Latino members or the membership as a whole Ms. Vargas did not say. Regardless, as Ms. Vargas indicated that her belief was that "Dodge City meatpacking workers" are "very little" involved "in local politics," *id.* at 196:3-20, it appears that the endorsement decision did not come from the union's Latino members, but, rather, someone in the union's corporate headquarters in Wichita, *id.* at 206:9-207:1. With respect to Ms. Scoggins, no one, including Ms. Scoggins, testified about what she had done for Latinos in Dodge City or why Dodge City Latinos favor her.

In sum, there is no "consistent" showing that actual Dodge City Latinos supported the candidates that Dr. Barreto's tables purportedly showed that they did. The problem with this and having to rely essentially solely on an expert's statistics to support a finding of cohesion is highlighted in Plaintiffs' own proposed findings and conclusions of law. According to Plaintiffs, "the most-preferred candidate by Latinos" in the 2017 City Commission election was Mr. Charles Sellens. CM/ECF Doc. 211 at ¶ 148. If the Court cannot recall hearing that name before, there is good reason for that: Mr. Sellens' name was never uttered before in this litigation—not at trial, not in the Pretrial Order or earlier briefing, and not in Plaintiffs' Amended and Original Complaints.

Mr. Sellens is an absolute enigma. The same is true for the so-called "most preferred candidate by Latinos" in 2019, Mr. Adam Hessman. *Id.* at ¶ 149. Now, Mr. Hessman did get one shout-out at trial, but it was just Dr. Barreto discussing his EI tables. Trial Tr. Vol. II at 136:18-137:4. No fact witness said anything about Mr. Hessman or provided any reason to believe that what Dr. Barreto's tables showed for 2019 married up, at all, with reality. As for the so-called "most-preferred candidate[s] by Latinos in 2021 and 2014, they were Ms. Scoggins and Ms. Zuniga, respectively. As discussed, other than the fact that Dr. Barreto's tables say so, there is nothing in the record that suggest that Mses. Scoggins and Zuniga were the Latino preferred candidates in 2021 or 2014. Thus, naked "point estimates" like the ones that Dr. Barreto provided tell us nothing, especially in a case like this where only a few percentage points separate most "point estimates" and, with just one exception, the confidence interval for every "point estimate" for White voters is completely subsumed by the corresponding confidence interval for the Latino voters' "point estimate."

### C. Dr. Barreto's EI analysis does not show Latino cohesion or that so-called Latino preferred candidates always lose.

Overlooking for the moment the lack of data and the unreliability of Dr. Barreto's "point estimates," Dr. Barreto's EI analysis still fails because it does not show Latino voter cohesion or a lack of success for the so-called Latino preferred candidate. Before getting to that, though, Plaintiffs' argument that "King's EI is the most accurate model to understand multi-candidate elections" must be addressed. PFoF ¶ 144. Simply put, this argument is false because King's EI is not meant for multi-vote, multi-candidate elections like those held for Dodge City Commission. RPFoF ¶ 143-46. King's EI may indeed be the "gold standard of voting rights cases" in elections involving just two candidates and one vote, PFoF ¶ 143, but this case does not involve such elections. As even Dr. Barreto concedes, elections in which voters "get three votes [are] quite different contest[s] than just a two-person vote for one." DFoF ¶ 228. As noted by Dr. Katz, the

RxC model was specifically designed to address the former—to "generalize[ King's] ecological inference to allow for more than two candidates and more than two groups." DFoF ¶ 211.

Despite being called to rebut Dr. Katz, Dr. Barreto said nothing about RxC's origins nor did he attempt to refute the fact that RxC was created for more multi-candidate, multi-vote races. Additionally, Dr. Barreto did not opine on why the RxC model was created, why RxC is viewed as the "second version of ecological inference," or what problem statisticians, including the founder of King's EI, intended to fix by developing the RxC model "some years" after King's EI was first formed, DFoF ¶ 210. The reason Dr. Barreto did none of the aforementioned is because it is well established that the RxC model "is an improved EI technique that can generate estimates for more racial group and more candidates." *N.A.A.C.P. v. East Ramapo C. Sch. Distr.*, 462 F. Supp. 2d 368, 382 (S.D.N.Y. 2020) (a case in which Dr. Barreto and his former student, Dr. Loren Collingwood, were RPV experts together in favor of the plaintiff). Specifically, the RxC method is the method that is viewed as being the one "appropriate for analyzing elections with more than two candidates or more than two racial or ethnic groups." *Petteway v. Galveston County*, --- F. Supp. 3d ----, 2023 WL 6786025, at *15 (S.D. Tex. Oct. 13, 2023) (a case in which Dr. Barreto was an RPV expert in favor of the plaintiff). Thus, Dr. Barreto's statement that "King's EI is the most accurate model to understand multi-candidate elections" is nonsense, PFoF ¶ 144, and appears to be an instance in which Dr. Barreto is merely saying what he thinks he needs to "to suit the exigencies of the moment," *Pierce v. N.C. State Bd. of Educ.*, --- F.4th ----, 2024 WL 1321267, at *12 (4th Cir. Mar. 28, 2024).

Equally nonsensical is Dr. Barreto's implication that King's EI should be used here, even though it is designed for binary elections, DFoF ¶ 211, because his research shows that the results from King's EI are "striking[ly] consisten[t]"—"almost identical"—to those from the RxC

method, DFoF ¶ 210. Clearly, if the results were in fact "almost identical," there would be no need to resort to King's EI—Plaintiffs would just point to the methodology that was specifically designed for this type of case, the RxC method. The reason Plaintiffs rely on the King's EI methodology, *see* PFoF ¶¶ 147-52 & 157-62, is because it purports to show differences much greater than those under the RxC method. As the Court noted during trial, "the difference columns between the two methods are much more in variant than in some of the[] other elections that Dr. Barreto reviewed." Trial Tr. Vol. II at 99:22-24. For instance, in the 2021 Dodge City Commission race, Ms. Jan Scoggins went from purportedly being the clear favorite of Latinos applying the King's EI to having her apparent support cut more than in half and barely making the top three candidates for Latinos under the RxC method. *See* Pls.' Ex. 121 at 1. Tellingly, Dr. Barreto has no answer for this; rather, he only has a "theory." DFoF ¶ 228.

Dr. Barreto's own "theory," when compared to the actual results in the endogenous elections he reviewed, cuts against applying King's EI in this case. According to Dr. Barreto, his "theory" is that the RxC method does "a little bit more averaging" than King's EI so "the differences [between candidates] get smaller." Trial Tr. Vol. II at 99:22-100:22. Due to the RxC method purportedly "just r[unning] one regression for all [] candidates across Latinos and non-Latinos," Dr. Barreto hypothesizes that King's EI binary approach of running each candidate "versus the field" in multiple regressions is "the most accurate way to understand voting preferences." *Id.* However, when the King's EI results are stood up to actual election results, they fall down and confirm that the results from King's EI should not be used here. *See, e.g.*, *Cane v. Worcester County*, 35 F.3d 921, 925 (4th Cir. 1994) (affirming a district court's reliance on actual election "results" and corresponding rejection of "the two statistical methods used by the parties' experts to evaluate voting behavior [on the ground the experts] failed to produce reliable statistical

evidence because of the lack of available data and a truncated analysis caused by the small number of districts and a lack of a majority African-American district").

Looking at the actual election results for 2021, specifically the results in Precinct 3 (the most homogenously Latino precinct in all of Dr. Barreto's analysis based on election turnout, DFoF ¶ 49), it is apparent that the RxC method more accurately captures what occurred than King's EI does. King's EI purportedly shows that Ms. Scoggins was wildly more popular amongst Latinos than any other candidate. This showing is belied by the actual results, though. In Precinct 3, which, again, had nearly 60% Latino turnout, Ms. Scoggins was not the clear winner. DFoF ¶ 49. In fact, she was not even a winner. Rather, she came in fourth—with the top four vote getters all being closely clustered, which is consistent with the tight clustering that was shown with the RxC method. As for the person with the least number of actual votes in Precinct 3 (Mr. Dayton Rhoten), Dr. Barreto's King's EI analysis showed him as still having nearly one-and-a-half times the support of Mr. Jeffrey Reinert, who had received over five times the actual number of votes in Precinct 3 than Mr. Rhoten. *See* Pls.' Exs. 40, 121 at 1. Under the RxC method, Mr. Reinert was shown, more sensibly, to have nearly twice as much support from Latinos as Mr. Rhoten. Pls.' Ex. 121 at 1. There may be a perfectly good reason for the counterintuitive results that the application of King's EI created in this case, but Dr. Barreto's "theory" is not it. Accordingly, Dr. Barreto's King's EI analysis should not be credited here.

### 1. *There is no discernable Latino voter cohesion in this case.*

It is worth noting at the outset that Plaintiffs have offered no evidence of racially polarized voting or vote counts for the November 2023 City Commission election. Not only was this the most recent City Commission election, but it was also the first election that Latinos constituted the largest CVAP in Dodge City. It is recognized that the most "recent elections are the most probative in determining vote dilution." *Levy v. Lexington Cnty., S.C., Sch. Dist. Three Bd. of Trustees*, 2012

WL 1229511, at *13 (D.S.C. Apr. 12, 2012) (granting judgment to the defendants because the plaintiffs had failed to show bloc voting in the most recent elections). This is especially true where "environmental change occurs," such as a substantial increase in a minority groups' CVAP numbers like has transpired in Dodge City, *see* Def.'s Ex. 518 at 2 (Latino CVAP has nearly doubled in just twelve years), and does so very in the very recent past. *Uno v. City of Holyoke*, 72 F.3d 973, 992 (1st Cir. 1995). This failure of proof cuts against Plaintiffs, as it is their burden to show racially polarized voting.

Considering the most recent results for the elections that Dr. Barreto reviewed—2021, 2019, and 2017, they do not show Latino voter cohesion. In 2021, Plaintiffs' self-proclaimed "most preferred" Latino candidate, Jan Scoggins, was outperformed by Chuck Taylor, Michael Burns, and Joe Nuci in Precincts 2 and 3, which are located in "South Dodge" and were the most homogenously Latino of all of the precincts in all of the City Commission races Dr. Barreto reviewed. RPFoF ¶¶ 147-50. What's more, Messrs. Taylor, Burns, and Nuci were the top-three vote-getters in Precincts 5 and 6, which are in "North Dodge" and were two of the most homogenously White precincts in 2021. *Id.* Finally, last but certainly not least, a Latino, Mr. Nuci, was elected in 2021. Thus, the actual results in 2021 do not show racial vote cohesion, at least not in the way Plaintiffs allege.

2019 presented a similar story. Again, a Latino candidate, Mr. Nuci, won. Furthermore, the top vote-getters in the most-Latino precincts, Precincts 2 and 3, *see* Def.'s Ex. 465 at 1, were the top voter-getters in two of the most-White precincts, Precincts 5 and 6, *see id. See* Pls.' Ex. 36.

For 2017, Plaintiffs did not present any election results. The only thing that we know about this campaign is that the so-called "most preferred" Latino candidate in 2014 dropped out of the 2017 race. Pls.' Ex. 121 at 3 (showing Candidate Zuniga was a Latino-preferred candidate in the

2014 election); Trial Tr. Vol. IV at 78:2-13 (noting Candidate Zuniga dropped out of the 2017 race for health reasons).

The information about the 2014 City Commission election is even more scarce, as no fact witness or admitted exhibits discuss it. Thus, even if an election that occurred when Latinos likely had 1.5 times less eligible voters than they do now was probative, which seems like a dubious proposition, we know nothing about the 2014 election—other than what Dr. Barreto tells us.

Dr. Barreto's RxC analysis, though, is not helpful. Under this method, in all but one of the four City Commission elections that Dr. Barreto reviewed, 5% or less separated the candidate with the highest "point estimate" from the candidate with the fourth highest "point estimate," the latter of whom Dr. Barreto indicated should not be viewed as being Latino preferred.[10] In 2021, the difference was 3.5%; in 2019, it was 4.8%; and in 2017, it was 2.2%. *See* Pls.' Ex. 121 at 1-3. The one exception in which the difference was greater than 5% occurred nearly ten years ago, where 7.1% separated the first and fourth candidate. *Id.* at 4. Furthermore, less than 2% separated the candidate with the third highest "point estimate," *i.e.*, the last so-called Latino preferred candidate, and the candidate with the fourth highest "point estimate" in all of Dr. Barreto's City Commission elections. DFoF ¶ 216. In 2021, the difference was .6%; in 2019, it was 1.9%; in 2017, it was .6%; and in 2014, it was .9%. Pls.' Ex. 121 at 1-4.

At trial, the Court asked Plaintiffs' counsel whether there was a "threshold" for determining cohesion. Trial Tr. Vol V at 7:8-15. Counsel effectively responded with the Justice Potter Stewart standard: "you'll know it when you see it, Your Honor." *See id.* at 7:16-9:5. In their findings and conclusions, Plaintiffs provide no support for the Justice Stewart standard or any other one for that matter. However, courts have made clear that cohesion does not exist if Latino voters "do not

---

[10]       According to Dr. Barreto, since there are three open seats, the candidates with the three highest "point estimates" for Latino support should be viewed as Latino preferred. DFoF ¶ 216.

coalesce around one particular type of candidate [or, in this case, three candidates]," but, rather, "split" their vote. *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 503 (E.D. Tex. 2020); *see also* CM/ECF Doc. 212 at 82 (collecting cases). Counsel is unaware of, and Plaintiffs have not cited to, any case that has found cohesion where a difference of 7% or less separated the so-called most preferred candidates from non-preferred candidates, especially when the statistical analysis, like the one performed by Dr. Barreto here, is based on an extremely small data set, relies on a myriad of assumptions and estimates, and deviates from standard practice in the field and provides no confidence interval for the "point estimates." In fact, the law is to the contrary. *See, e.g.*, *Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1358 (4th Cir. 1989) ("Most, though not all, of the statistical disparity would vanish in Petersburg if one more black were appointed to the school board. The wide statistical swing produced by the addition of a single black school board member in each of the three jurisdictions raises serious doubts as to whether the disparities are statistically significant.").

### 2. So-called Latino preferred candidates have won and have done so many times.

Plaintiffs' statement that, "[i]n all [reviewed Dodge City Commission] elections, the Latino-preferred candidate did not win election" is based on a misunderstanding of the testimony. Dr. Barreto did not say that only the candidate with the highest "point estimate" in his analysis should be viewed as Latino preferred. No, he said that, in light of the fact that there are three open seats in each Commission election, the three candidates with the highest "point estimates" should be viewed as preferred. DFoF ¶ 216. When that standard is applied, the so-called Latino preferred candidates did not just win seats, they won half of the seats that were available, which, as discussed more fully below in the bloc voting section, precludes a finding that White voters "usually" vote to defeat the Latino preferred candidate. *See* Section II, *infra*.

**D. Dr. Barreto's exogenous elections are not able to show what his endogenous ones do not.**

The 20 exogenous elections that Dr. Barreto reviewed are of no help to Plaintiffs. For starters, 18 of these elections are partisan, two-candidate, one-vote elections, which even Dr. Barreto recognizes are "quite different" than the type of races at issue here. DFoF ¶ 196. In light of this difference, as well as the fact that these exogenous elections seemingly show polarization that looks nothing like what was seen in the endogenous elections, the Court should give them no weight. Plaintiffs' claim that there is "no authority to support this proposition" is baseless. As set forth in Defendants' proposed findings and conclusions, while it is possible that exogenous elections may be probative in certain cases, they offer little to no assistance when the exogenous elections are fundamentally different from the ones in question and show disparities that the endogenous elections do not. *See* CM/ECF Doc. 212 at 86 (collecting cases); *see also LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir.1993) (indicating that elections results should be discounted when "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens"). This is so because exogenous elections "should be used only to supplement the analysis of the specific election at issue," not serve as a replacement for them as Dr. Barreto's exogenous elections clearly are here. *Clay v. Bd. of Educ. of City of St. Louis*, 90 F.3d 1357, 1362 (8th Cir. 1996) (affirming rejection of expert's analysis that relied "much" on exogenous elections); *accord Cisneros v. Pasadena Indep. Sch. Dist.*, 2014 WL 1668500, at *22-23 (S.D. Tex. Apr. 25, 2014) (finding Dr. Barreto's "exogenous elections [not] to be particularly probative of voting patterns for the non-partisan PISD Board elections" because "the exogenous elections chosen by Dr. Barreto are not similar to the endogenous elections in a critical respect[—they were partisan], and the results from the exogenous elections run counter to the results from the endogenous elections").

As for the remaining two exogenous elections that Dr. Barreto reviewed (2021 School Board and 2019 DCCC Trustees), they provide no "stark evidence of polarization" as Plaintiffs claim. Before getting to the lack of polarization in these elections, it is worth noting that the same fluctuations and disparities between King's EI and the RxC method that the Court highlighted in the endogenous election context persist with regard to the School Board and DCCC Trustees elections. For example, in 2021, School Board Candidate Killion went from being one of the least Latino preferred candidates under King's EI to having his Latino support doubled by the RxC method and becoming a Latino preferred candidate. Pls.' Ex. 121 at 1. Two other candidates in the 2021 School Board race (West and Zortman) also had their percentage of Latino support doubled when the switch from King's EI to the RxC method was made. *Id.* A similar phenomenon occurred in the 2019 DCCC Trustees race. *Id.* at 2. Candidate Turley went from being a preferred Latino candidate under King's EI to having his support cut nearly in half under the RxC method and no longer being a Latino preferred candidate. *Id.* Conversely, Candidate Hampton had his level of Latino support tripled in the switch from King's EI to the RxC method and he skyrocketed from purportedly being one of the lowest Latino supported candidates to being just 1.3% from being a Latino-preferred candidate. *Id.* Candidate Wells saw a similar, but not as drastic, jump as Hampton, as his level of Latino support doubled from the move. *Id.* Again, Dr. Barreto does not have an answer for this; he only has a "theory," a "theory" that, based on the actual results in the multi-candidate, multi-vote elections that were reviewed, confirms why RxC is more accurate and reliable than King's EI in cases like this.

Looking now at the election results for the School Board and DCCC Trustees, they do not show polarization. In the 2021 School Board election, only 5.2% of support separated the allegedly "most preferred" candidate under the RxC method from the "least preferred" candidate in the 10-

person, 4-seat race. *Id.* at 1. Remarkably, the so-called least Latino preferred candidate under RxC (Candidate Roths) was actually a Latino preferred candidate under King's EI. *Id.* Additionally, just .4% of support separated the fourth-place finisher for Latino support under the RxC method, *i.e.*, the last person Dr. Barreto indicated should be viewed as a Latino preferred candidate, from the fifth, sixth, and seventh place finishers, persons who Dr. Barreto stated should not be viewed as being preferred. *Id.*

Similar results occurred in the 2019 DCCC Trustees race. 5.9% was the spread between the purported most and least Latino preferred candidates in this 7-person, 3 seat race. *Id.* at 2. The difference between the third-place finisher and the fourth- and fifth-place finisher was 1.4% or less. *Id.* at 2. Counsel has not found, and Plaintiffs have not cited to, any cases indicating that infinitesimal differences like those purportedly found by Dr. Barreto are actionable, especially when Dr. Barreto's analysis is based on extremely limited data, relies on a myriad of assumptions and estimates, and deviates from standard practice in the field. In fact, the law is to the contrary. *See, e.g.*, *Irby*, 889 F.2d at 1358.

## II. Plaintiffs have not shown that racial bloc voting is occurring.

Plaintiffs boldly proclaim that "[t]he undisputed evidence shows that White voters in Dodge City vote cohesively and in opposition to Latino voters in almost all elections and that they do so at a rate sufficient to defeat the minority-preferred candidate consistently." CM/ECF Doc. 211 at 125. The evidence does no such thing. Dr. Barreto's own analysis shows that White and Latinos favor the same candidate at least half of the time and that Latino preferred candidates win at least half of the available seats, despite Latinos voting at half the rate of Whites. Sensing that they cannot win under any objective standard, Plaintiffs argue for a "sliding scale" approach. *Id.* at 124. While the Tenth Circuit has stated that "a flexible approach" to *Gingles III* should be

employed to avoid "isolated success" of preferred candidates, the approach applied cannot be so flexible that it effectively does away with *Gingles III*'s standard, which is: "the white majority votes sufficiently as a bloc to enable it . . . *usually* to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (emphasis added).

Where, as is the case here, the Latino preferred candidate wins half of all of the available seats, courts have found, time and again, that it cannot be said that White voters "usually" defeat the minority's preferred candidate. *See, e.g.*, *Johnson v. Hamrick*, 296 F.3d 1065, 1081 (11th Cir. 2002) (finding "no error in the district court's finding that the plaintiffs cannot prevail under the third prong of *Gingles*" because "the preferences of the White and African–American communities have often been the same, or extremely close to one another, and that the African–Americans' candidates of choice have prevailed as frequently as they have lost, some 45.5 percent of the time"); *Lewis v. Alamance County*, 99 F.3d 600, 606 n.4 (4th Cir. 1996) (collecting cases and stating: "[w]e need not in this case specify a meaning for the[] terms ['usually,' 'normally,' and 'generally']; suffice it to say that they mean something more than just 51%"); *Clarke v. City of Cincinnati*, 40 F.3d 807, 812-13 (6th Cir. 1994) ("[H]owever, 47 percent of blacks' preferred black candidates were elected. This success rate gives us no reason to find that blacks' preferred black candidates have 'usually' been defeated."); *United States v. Alamosa County*, 306 F. Supp. 2d 1016, 1023 (D. Colo. 2004) ("[T]he Court cannot conclude that ethnic bloc voting 'usually' results in the defeat of the minority-preferred candidate" when, "[c]onstruing the evidence most favorably to the Government, this tally shows that, at most, ethnic bloc voting defeated the Hispanic candidate in 50% of the elections.");[11] *Armstrong v. Allain*, 893 F. Supp. 1320, 1330 (S.D. Miss.

---

[11]     Although the *Almamosa* court stated that it had construed the *Gingles III* evidence in the light most favorable to the plaintiff, it appears that it did so only for effect, as, at this point, Plaintiffs' evidence is no longer reviewed in a light most favorable to Plaintiffs.

1994) ("The parties have stipulated that since 1970, 132 of 270 bond issues in this state—nearly one-half —have been passed. This figure alone suggests that white bloc voting does not exist to such an extent that a white voting bloc is "usually" able to defeat the minority's choice on the ballot."); *see also McConchie v. Scholz*, 577 F. Supp. 3d 842, 859 (N.D. Ill. 2021) (three judge panel) ("Latino-preferred candidates' electoral victories are powerful evidence that there is an absence of majority bloc voting (either by a White-bloc or by a non-Latino-bloc)."). Plaintiffs have not cited any contrary authority; rather, they merely ask for the Court to take into account all of the relevant "factual circumstances." CM/ECF Doc. 211 at 124.

The relevant "factual circumstances" in this case do not help Plaintiffs. Starting with the statistical evidence, according to Dr. Barreto's own analysis, a change of merely 1.6% of the Latino vote in 2021 in favor of Candidates Nuci and Burns would have resulted in Whites and Latinos favoring the same three candidates and the so-called Latino preferred candidates winning all of the possible seats. Pls.' Ex. 121 at 1. Similarly, a change of only 4.8% of the Latino vote in 2019 in favor of Candidate Nuci would have resulted in Whites and Latinos favoring the same three candidates and the so-called Latino preferred candidate winning all of the possible seats. *Id.* at 2. In 2017, a change of 1.3% of the Latino vote and .2% of the White vote in favor of Candidate Smoll would have resulted in White and Latinos favoring the same three candidates and the so-called Latino preferred candidate winning all of the possible seats. *Id.* These small differences, coupled with the uncontroverted wide confidence intervals, as well as utter lack of evidence of racial animosity amongst Dodge City's many and varied races or divide in the community regarding any political issue, do not support the notion that Whites and Latinos are *consistently* voting for different candidates and that Whites "usually" defeat the Latino candidate of choice. *See, e.g.*, *Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1358 (4th Cir. 1989) ("Most, though

not all, of the statistical disparity would vanish in Petersburg if one more black were appointed to the school board. The wide statistical swing produced by the addition of a single black school board member in each of the three jurisdictions raises serious doubts as to whether the disparities are statistically significant."). As a result, Plaintiffs cannot prevail on *Gingles III*. *See, e.g.*, *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002) ("[P]laintiffs seeking to establish the third *Gingles* factor "must show not only that whites vote as a bloc, but also that white bloc voting *regularly causes* the candidate preferred by black voters to lose; in addition, plaintiffs must show not only that blacks and whites sometimes prefer different candidates, but that blacks and whites *consistently* prefer different candidates." (Emphasis in original)).

Plaintiffs' claim that "[t]he lack of Latino candidates being elected in the history of the at-large voting system in Dodge City is powerful evidence that the non-Latino majority will 'usually' defeat the Latino minority's preferred candidate" falls flat. CM/ECF Doc. 211 at 125. The analysis is not as myopic as Plaintiffs suggest. "The Court must scrutinize carefully 'the countervailing evidence of other causative agents' that might explain Hispanic lack of success before concluding that 'the record sustains a claim that racial politics—specifically, the interaction of race and the electoral system—have resulted in significantly diminished opportunities for participation in elective government.'" *Vecinos de Barrio Uno v. City of Holyoke*, 960 F. Supp. 515, 521 (D. Mass. 1997) (quoting *Uno v. City of Holyoke*, 72 F.3d 973, 983-84 (1st Cir. 1995)).

Here, in the four election cycles that Plaintiffs analyzed, three Latino candidates ran: (1) Joe Nuci in 2021 and 2019, (2) Blanco Soto in 2021, and (3) Liliana Zuniga in 2017 and 2014. As learned at trial, Ms. Zuniga did not actually campaign in 2017. Thus, Latinos have really only run for four seats, winning two of them. Both of these facts are significant. *See, e.g.*, *United States v. Alamosa County*, 306 F. Supp. 2d 1016, 1032 (D. Colo. 2004) (finding *Gingles III* in the

defendants' favor and noting that "Hispanic candidates have been elected as county commissioners not once, but three times in the last twenty years" and "ha[d] prevailed in 60% of the elections in which *they competed*" (emphasis added)); *see also Irby*, 889 F.2d at 1358 (affirming the district court's rejection of a section 2 claim, despite there being a "'significant disparity' in Buckingham and Halifax counties between the percentage of blacks in the population and the racial composition of the school boards," because "[t]he evidence showed that 'although blacks comprise a large portion of the population, they are not seeking school board seats in numbers consistent with their percentage of the population'").

As for the two seats that Latinos did not win, the evidence in the record demonstrates that these losses had nothing to do with race. Regarding Ms. Soto, she did not run an effective campaign in 2021. As Mr. De La Rosa recounted, people in the community were asking at the time, "why isn't she campaigning"? Trial Tr. Vol. IV at 23:16-24:14. Following the defeat, people blamed the loss on Ms. Soto "start[ing] late to a campaign." Trial Tr. Vol. III at 317:6-318:15. With respect Ms. Zuniga's 2014 campaign, Plaintiffs presented no evidence regarding it. Instead, it appears that Plaintiffs rely wholly on the fact that Ms. Zuniga is apparently Latino. However, as Plaintiff Rangel-Lopez agreed, in Dodge City, "the ethnicity of a candidate tells us nothing about whether a majority of voters of any particular ethnicity support the candidate." DFoF ¶ 20. Thus, the record indicates that, on the only two occasions that a Latino ran for and lost a City Commission seat, the the reason for the loss had nothing to do with race but was attributable to some other cause. *See, e.g.*, *Teague v. Attala County*, 1995 WL 1945393, at *8 (N.D. Miss. Mar. 20, 1995) (finding that *Gingles III* was not met, despite "no black candidate for county office in Attala County ha[d] ever received a majority of the White vote or ha[d] been elected in a majority White election district,"

because "[t]he defendants presented several lay witnesses at trial that testified about factors other than race which determined political preference and election outcomes in Attala County").

To the extent Plaintiffs are asking this Court to infer bloc voting based on the alleged lack of Latino-preferred candidates on the Commission from 2000 to 2014, there is no basis for doing so because the "court simply ha[s] no information as to which candidates . . . Hispanic voters had supported in elections prior to [2014] . . . and it thus ha[s] no evidence which could lead it to conclude that minority-preferred candidates usually lost races for the [Commission]." *Valladolid v. City of Nat'l City*, 976 F.2d 1293, 1297 (9th Cir. 1992). Accordingly, Plaintiffs have not sustained their burden of showing that racial bloc voting has or is occurring in Dodge City.

### III. Plaintiffs did not show that Latinos will perform under a district-based election method, as is required.

Not once in their nearly 150 pages of briefing do Plaintiffs cite to the Supreme Court's decision in *Abbott v Perez*, 585 U.S. 579 (2018), nor do they acknowledge the Supreme Court's admonition there that, "[u]nder *Gingles*, the ultimate question is whether a districting decision dilutes the votes of minority voters, and it is hard to see how this standard could be met if the alternative to the districting decision at issue would not enhance the ability of minority votes to elect the candidates of their choice." 585 U.S. at 617. Instead, Plaintiffs contend, without citation, that "courts differ whether a performance analysis—*i.e.*, an analysis proving that at least one of the majority-minority districts in the illustrative maps gives the minority group an opportunity to elect preferred candidates—is even necessary at all." CM/ECF Doc. 211 at 113. There is a reason that Plaintiffs do not cite to a single post-*Abbott* case to support their "courts differ" position: such a division is illusory. As far as counsel has found, in every post-*Abbott* case in which performance has been raised, the reviewing Court has required, as part of the plaintiffs' burden, a showing that the proposed map will perform in plaintiffs' favor. *See, e.g.*, *Fusilier v. Landry*, 963 F.3d 447, 462

(5th Cir. 2020) (citing to *Perez* and reversing a section 2 finding because the plaintiffs failed to carry their burden of showing "that their new districting schemed enhances their ability to elect candidates of their choosing" as their proposed district had only a black voting age population of 53.33% but "a 56% black voting age population was required to ensure blacks have the opportunity to elect their preferred candidate"); *Anne Harding v. County of Dallas,* 948 F.3d 302, 311 (5th Cir. 2020) (affirming denial of section 2 claim because, among other things, the "plaintiffs did not offer *any* evidence at trial that would show how Republican candidates would fare in commissioner elections under their Remedial Plan, and the Defendants did" (emphasis in original and internal quotation marks omitted)).

Plaintiffs acknowledge this burden, at least tacitly, by offering at trial Dr. Barreto's "performance analysis." If a performance analysis is not necessary for a section 2 violation to be found, then there would be no reason to offer such evidence at this stage. With that said, Dr. Barreto's "performance analysis" is insufficient to show performance. Plaintiffs do not challenge and freely admit the fact that Dr. Barreto's "performance analysis" is based on the proposed maps that Dr. Oskooii drew. PFoF ¶ 208. To be considered in the *Gingles* analysis, though, proposed maps must comply with the applicable districting rules. *See Abbott*, 585 U.S. at 617 (refusing to consider performance analysis that is based on a map that would require breaking Texas' "County Line Rule"). Here, Plaintiffs concede that Dodge City "is correct that race cannot *predominate* the map drawing process" and any map in which it does cannot be relied upon. CM/ECF Doc. 211 at 112. They nevertheless contend that "[t]here is zero evidence of racial predominance here." *Id.* at 113. Plaintiffs are wrong.

Realizing that map drawers, like other actors, rarely readily admit (and usually deny) that race animated their challenged action, *cf. Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016)

("Direct evidence—an overt admission of discriminatory intent—is rare, and not at issue where, as here, no supervisor admits racial motivation"), courts do not require direct evidence of racial predomination in order to find it. Rather, racial predomination can be shown through such things as "indications that attaining a racial percentage within a given district was nonnegotiable." *Covington v. North Carolina*, 316 F.R.D. 117, 129 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017). That is exactly what we have here.

Despite Dr. Oskooii dramatically changing the shape and configuration of his districts, and Dr. Oskooii purportedly considering race in only two of his maps, the same racial percentages persisted throughout all of Dr. Oskooii's maps. As Dodge City showed at trial, and Plaintiffs do not contest in their proposed findings and conclusions, each one of Dr. Oskooii's maps share, among others, the following 7 constants: (1) in Districts 1-3, Hispanics make up more than 55% of the citizens of voting age population; (2) in Districts 1-3, Whites make up less than 40% of the citizens of voting-age population; (3) in Districts 4-5, the White citizens of voting-age population exceeds 60%; (4) in Districts 4-5, the Hispanic voting-age population is less than 30%; (5) in Districts 1-3, there are approximately one-and-a-half times more Hispanic eligible voters than White eligible voters; (6) in Districts 4-5, there are approximately two times more White eligible voters than Hispanic eligible voters; and (7) Districts 4 and 5 always have approximately two times more White eligible voters than the number of White eligible voters in Districts 1-3. DFoF ¶ 187.

The aforementioned consistency was necessary because, without it, Dr. Oskooii's maps would not perform, as Latino voter turnout is roughly half of White voter turnout. This fact is confirmed by Dr. Barreto's "performance" tables, which show that, "based on current turnout," only those districts that have twice as many Latino voters or twice as many Latino and Black voters

will perform and do so at the slimmest of margins.[12] In other words, the racial percentage constants listed above had to be non-negotiables because, without packing White voters in proposed Districts 4 and 5, Districts 1 through 3 would not perform. Dr. Oskooii, Dr. Barreto's former student, frequent colleague in section 2 cases, and co-developer of the EI software used in this case, RPFoF ¶¶ 208-13; RPFoF ¶ 13, knew that and used his "discretion" to draw maps that cleared (ever so barely) *Abbott*'s seemingly low performance threshold. As racial considerations predominated, Dr. Oskooii's maps cannot be relied upon for a "performance analysis," nor can they be used to satisfy Plaintiffs' burden under *Gingles I* to put forth a "reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice," *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 480 (1997).

Even if Dr. Oskooi's maps and Dr. Barreto's "performance analysis" could be considered, though, Plaintiffs still have not shown that their ability to elect their so-called candidate of choice is enhanced. Plaintiffs misconstrue Dodge City's "demographic shift[]" argument as it relates to performance. It is not Dodge City's position that Latinos will "becom[e] a dominant political group" sometime in the future; no, the argument is, as Mr. De La Rosa explicitly stated, and others indicated, Latinos have the ability today to "flip" every seat if they wanted, DFoF ¶ 120, which absolutely bears on the question of whether Plaintiffs' proposed election alternative (districts) will actually *enhance* Latino voters' ability to elect their so-called candidate of choice. If minority voters already have the ability to elect their candidate of choice, and there is no evidence that that ability is being thwarted by some outside force or lingering vestiges of past discrimination, there can be no section 2 violation. *See, e.g.*, *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1556 (5th

---

[12]     As noted in Dodge City's proposed findings and conclusions, Dr. Barreto's "enhanced turnout" tables should not be credited at all, as Dr. Barreto effectively made up his multiplier, a multiplier that even Dr. Barreto cannot say how big it was.

Cir. 1992) ("Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote.").

Here, as the largest plurality of voters (and near majority), Latinos have the ability to exercise their political will. Furthermore, there is no evidence that others are attempting or have attempted to strip Latinos of that ability by preventing them from registering to vote. Likewise, there is no evidence that anyone in Dodge City has put up barriers to Latinos filing and running for City Commission, a fact that Dr. Bejarano confirmed. DFoF ¶ 170. In fact, the evidence is to the contrary, as multiple actors in Dodge City, including the City itself, encourage and assist Latinos with the registration process. Trial Tr. Vol. III at 284:2-285:17 (City); Trial Tr. Vol. II at 18:22-20:6 (County); Trial Tr. Vol. I at 9:16-10:6 (local clubs) & 189:5-16 (local union). Furthermore, the evidence shows that elections in Dodge City are intended and designed to maximize voting from all Dodge Citians, with mail-in and three-week advance voting being available and the City offering free door-to-door transportation for voters to vote in advance of or on election day. *See* DFoF ¶¶ 122 & 128-135. Thus, if a voter wants to vote or a candidate wants to run in Dodge City, they can.

Dr. Bejarano's testimony does not call into question the conclusions that naturally flow from an assessment of the relevant evidence. Not only is Dr. Bejarano's testimony regarding the supposed effect of district-based election on Latino voting wrong as a general matter, but it is also devoid of any appraisal of the facts unique to Dodge City as set forth above. Accordingly, Dr. Bejarano's testimony should not be viewed as credibly predicting what would happen in Dodge City if the City was forced to abandon its long-held practice of at-large City Commission elections for newly minted district-based elections.

In short, outside of pure speculation, there is no plausible basis to believe that moving to district-based elections will do anything to positively impact Latino voters' ability to elect their candidate of choice.

As for where exactly the "performance analysis" is performed, Dodge City agrees that the law on the matter is unsettled. As said in its conclusions of law, Dodge City believes the analysis fits most comfortably within *Gingles* I in light of that factor's focus on the plaintiff's proposed maps, which is what a "performance analysis" is derived from. At least one court has stated that such an approach "makes sense." *Harding v. County of Dallas*, 336 F. Supp. 3d 677, 694 n.15 (N.D. Tex. 2018) (ultimately eliding on the issue, though, and "assum[ing] that plaintiffs ha[d] satisfied each of the three *Gingles* prongs" on its way to concluding that no section 2 violation had occurred because plaintiffs' proposal was not effective), *aff'd sub nom. Anne Harding v. Cnty. of Dallas, Tex.*, 948 F.3d 302 (5th Cir. 2020). However, at least one other court appears to have indicated that *Abbott* adds a fourth consideration to the *Gingles* preconditions, *Anne Harding v. Cnty. of Dallas, Texas*, 948 F.3d 302, 311 (5th Cir. 2020) (analyzing performance apparently outside of the *Gingles* preconditions, but not in the totality of the circumstances), while another has said that the "performance analysis" is part of the totality of the circumstances analysis, *Fusilier v. Landry*, 963 F.3d 447, 462 (5th Cir. 2020). Regardless of where the analysis is put, it must be performed, and the conclusion to the "ultimate question" remains the same: Plaintiffs have not shown that district-based elections will actually enhance Latino voters' ability to elect their so-called candidates of choice.

## IV. Plaintiffs have not shown that the Senate Factors favor them.

"Simply clearing the *Gingles* hurdles, while necessary to prove a possible violation of § 2, is not sufficient to establish an actual violation." *Pierce v. N.C. State Bd. of Elections*, --- F.4th --

--, 2024 WL 1321267, at *14 (4th Cir. Mar. 28, 2024) (alteration in original and citation omitted). "To prove an actual violation, a plaintiff who demonstrates the three preconditions must also show, based on the totality of circumstances, that the political processes leading to nomination or election are not equally open to participation by minority voters. *Id.* (alterations in original and internal quotation marks omitted). Thus, while Plaintiffs are correct that courts have stated that it is rare that the *Gingles* preconditions are met but the totality-of-the-circumstances analysis is not, Plaintiffs must still "show, under the totality of circumstances, that the political process in not equally open to minority voters." *Allen v. Milligan*, 599 U.S. 1, 18 (2023). When a plaintiff fails to make such a showing, as Plaintiffs do here, courts have not hesitated to find in the defendant's favor solely on totality-of-the-circumstances grounds. *See, e.g.*, *Johnson v. De Grandy*, 512 U.S. 997, 1009 (1994) (reversing the district court's section 2 violation, despite crediting the district court's "f[inding] that the three *Gingles* preconditions were satisfied," because it "part[ed] company from the district court in assessing the totality of the circumstances"); *Fusilier v. Landry*, 963 F.3d 447, 459 (5th Cir. 2020) ("Even if all three *Gingles* preconditions are sustainable, section 2 is not violated unless the totality the circumstances also 'weigh[s] in favor of a finding that at-large voting for the 32nd JDC interacts with social and historical factors to cause an inequality in the political process for black voters.' At this level, contrasted with the relatively weak support for the plaintiffs' position on the *Gingles* factors, the Attorney General's arguments become decisive."); *United States v. Alamosa County*, 306 F. Supp. 2d 1016, 1040 (D. Colo. 2004) ("Although the evidence presented at trial is arguably facially sufficient to satisfy the three *Gingles* preconditions, upon consideration of the totality of the circumstances, it does not prove that the at-large method of electing county commissioners in Alamosa County dilutes the vote of Hispanic residents.").

Here, despite recognizing that the totality-of-the-circumstances analysis is "peculiarly dependent upon the facts of each case . . . requires an intensely local appraisal," CM/ECF Doc. 211 at 127 (citation omitted), Plaintiffs' arguments are surprisingly wooden and blithely unattached from what actually has occurred and is occurring in Dodge City. When the record in this case is applied to the actual standards for the totality-of-the-circumstances analysis, it is clear that Plaintiffs do not satisfy the second part of *Gingles*, and their section 2 claim fails on this independent basis, as well.

### A. Senate Factor 1

Contrary to Plaintiffs' intimations, Senate Factor 1 is not some roaming factor that considers whether any Latino has ever faced any discrimination from any person at any time while living in Dodge City or elsewhere in Kansas. In full, as opposed to Plaintiffs' truncated version of it, Senate Factor 1 simply asks: "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise participate in the democratic process." *Pierce v. N.C. State Bd. of Elections*, --- F.4th ----, 2024 WL 1321267, at *31 (4th Cir. Mar. 28, 2024). The answer to this question is a resounding no. Plaintiffs' own discrimination expert, Dr. Martinez, admitted that he found no official discrimination. Trial Tr. Vol. II at 216:24-2 (housing) *id.* at 217:4-7 (education); *id.* at 221:2-5 (voting) *id.* at 218:1-5 (official discrimination generally after the Civil Rights Act was passed). Furthermore, not one of Plaintiffs' witnesses said that discrimination had impacted Dodge City Latinos' ability to register to register, to vote, or otherwise to participate in the democratic process. That should be the end of the analysis.

Plaintiffs' resort to the 2018 lawsuit brought by Plaintiff Rangel-Lopez against Ford County and the *Fish* case do not warrant a different conclusion. Beginning with the lawsuit against

Ford County, Plaintiff Rangel-Lopez conceded at trial that the Court denied him the relief that he sought: a temporary restraining order ("TRO"). Trial Tr. Vol. I at 10:7-15. Not only did the court do that, but it did so because, among other things, "the court conclude[d] that plaintiffs ha[d] not shown that they are likely to prevail" or that "it [wa]s in the public interest to grant plaintiffs the relief that they s[ought]." *Rangel-Lopez v. Cox*, 344 F. Supp. 3d 1285, 1291-92 (D. Kan. 2018). Consistent with that conclusion, and likely most importantly, Plaintiffs did not present a single witness that stated that Latinos were adversely impacted, in any way, by Ford County's 2018 polling location decision. Thus, Plaintiff Rangel-Lopez's 2018 lawsuit proves nothing.

The same is true for *Fish*. There, the question was not whether the State of Kansas had illegally discriminated against Latinos, but, rather, whether a race-neutral voter-ID law exacted an undue burden on the right to vote and/or was preempted by the National Voter Registration Act. While the Tenth Circuit answered both questions in the affirmative, there was no indication that that decision was based, in any way, on some finding of racial discrimination, which is what makes *Fish* fundamentally different from the case that Plaintiffs cite for the proposition that *Fish* is relevant: *Missouri State Conf. of the NAACP v. Ferguson-Florissant District*, 201 F. Supp. 3d 1006 (E.D. Mo. 2016). *See* CM/ECF Doc. 211 at 130 n. 636. In *Ferguson*, in evaluating Senate Factor 1, the court considered the "many Missouri statutes and constitutional provisions [that] permitted—or required—discrimination against Black Missourians." 201 F. Supp. 3d at 1066. Obviously, the race-neutral law at issue in *Fish* is not of the same ilk as those raised in *Ferguson*, and thus *Ferguson* provides no basis to find *Fish* relevant in this case.

Ms. Scoggins' testimony regarding alleged discrimination outside of political participation is also unavailing. First, conditions of private homes or decisions of business owners are not relevant to whether a government actor violated section 2. *See, e.g.*, *Frank v. Walker*, 768 F.3d

744, 753 (7th Cir. 2014) ("Section 2(a) forbids discrimination by "race or color" but does not require states to overcome societal effects of private discrimination that affect the income or wealth of potential voters."). Second, who could swim in a community pool decades before the overwhelming majority of the current-day Latino community in Dodge City arrived does not "touch[ upon] the right[s] of the members of the minority group to register, to vote, or otherwise participate in the democratic process," and, thus, is not relevant to the Senate Factor 1 inquiry. Third, while Ms. Scoggins remembers Latinos not attending public schools until she was in "kindergarten, first grade," Trial Tr. Vol. III at 155:7-11, or until roughly 70 years ago, *id.* at 147:12-13, Plaintiffs' discrimination expert, Dr. Martinez, was unable to locate during his investigation any evidence of government-forced school segregation in Dodge City—an investigation that included, among other things, combing through such obscure sources as Master's and Doctoral thesis papers for relevant information, Trial Tr. Vol. II at 185: 1-186:1. Fourth, even if this information was credited, it is, as even Plaintiffs' own cases indicate, too stale to impact the analysis. *See Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1409 (E.D. Wash. 2014) (finding that Yakima County's persistence "in administering literacy tests to Latino voters for several years after the passage of the Voting Rights Act of 1965" was "only marginally relevant because it arose many years ago in the context of newly-enacted legislation limiting (and later prohibiting) the use of literacy tests by federal and state election authorities").

Instead of supporting the notion that official discrimination has impacted Dodge City Latinos' ability to participate in the political process, the record does the opposite. With regard to voting, it was shown at trial that Dodge Citians, including Latinos, have a plethora of options for voting. Additionally, to the extent a Dodge Citian wants to vote in-person, in advance or on election day, the City gives free door-to-door transportation to the polling site. Also, all the

materials associated with elections in Dodge City—from candidate registration, to voting instructions, to the ballot, to even directions to the polling locations—are in Spanish and English. Furthermore, City and County officials have engaged in numerous outreach efforts, including, but not limited to, helping newly naturalized citizens with voter registration and demonstrating how the voting machines work. In short, Dodge City is nothing like the jurisdictions that were contemplated when Senate Factor 1 was drafted. *See, e.g.*, *France v. Pataki*, 71 F. Supp. 2d 317, 330 (S.D.N.Y. 1999) (finding that New York was "[u]nlike jurisdictions typically involved in Voting Rights Act case" because "New York City has taken steps to encourage minority voting" and "the election practices in question were not adopted as a part of a racist historical tradition").

### B.  Senate Factor 2

Relying on Dr. Barreto's flawed analysis, Plaintiffs contend that this factor "weights very strongly in [their] favor." CM/ECF Doc. 211 at 131-32. For the reasons set forth in Defendants' proposed findings and conclusions, *see* CM/ECF Doc. 212 at 72-89, as well as those in Sects. I-II above, racial polarization has not been shown in this case. Accordingly, Senate Factor 2 favors Defendants. *See, e.g.*, *France*, 71 F. Supp. 2d at 330 ("Moreover, as discussed above, given the numerous flaws in plaintiffs' report, and the evidence presented by defendants regarding the absence of racial polarization, the Court concludes that this factor tilts against the plaintiffs.").

### C.  Senate Factor 3

Plaintiffs contend that Dodge City employs the following three voting practices or procedures that tend to enhance the opportunity for discrimination against Latinos: (1) at-large elections, (2) off-cycle elections, and (3) differential terms. CM/EMF Doc. 211 at 132. Notably, not one of these practices are listed in Senate Factor 3, nor do Plaintiffs contend that any of them are akin to those that are—namely, "unusually large election districts, majority vote requirements,

and prohibitions against bullet voting." Nevertheless, Plaintiffs claim that this factor favors them; it does not.

Starting with at-large elections, they "are not *per se* violative of minority voters' rights." *Gingles* 478 U.S. at 48. Likewise, an at-large election for city-wide offices does not constitute an "unusually large election district[]." This is because "[d]istrict implies a division that has already occurred. That is clearly not the case with [city-wide] elections." *Ala. State Conf. of N.A.A.C.P. v. Ala.*, 612 F. Supp. 3d 1232, 1275 (M.D. Ala. 2020). Also, there is no evidence that Dodge City adopted the at-large method to suppress the Latino vote. *See Johnson v. DeGrandy*, 512 U.S. 997, 1018 (1994) (noting that at-large elections are "censurable when the object of their use is discriminatory"). Thus, while at-large elections may have been used in other jurisdictions to dilute minority votes, Plaintiffs did not produce a single example of that happening in the over-50 years that Dodge Citians have been picking their Commissioners through the at-large method. Therefore, the simple fact that Dodge City utilizes the at-large election method for election of its City Commissioners does not result in Factor 3 favoring Plaintiffs. Rather, Plaintiffs must show that this method of elections, coupled with other relevant facts in this case, leads to enhanced opportunity to discriminate. Here, the facts do not support such a finding.

Unlike cases that Plaintiffs cite, the size of the geographical scope of the Dodge City Commission election—approximately 25 square miles—is not large and does not exact a heavy burden on Dodge City Commission candidates. *See Large v. Fremont Cnty., Wyo.*, 709 F. Supp. 2d 1176 (D. Wyo. 2010) (indicating that campaigning in a 9,250 square mile county could enhance the opportunity for discrimination); *Blaine*, 363 F.3d at 913 (same for a county of 4,638 square miles).

Likewise, this is not a case in which the minority group's vote is being drowned out by White voters based on the utilization of at-large elections. As shown by Dr. Barreto's analysis, Latinos have been able to elect their so-called candidate of choice to half of the available seats. Furthermore, Plaintiffs completely ignore the fact that Latinos are now the largest plurality in Dodge City, and, based on current and sustained trajectories, that lead is going to only increase with time. *See* DFoF ¶¶ 11-19. In their proposed findings and conclusions, Plaintiffs say nothing of this fact, opting instead to merely Pavlonianly cite to Dr. Bejarano's assertion that a switch to district-based elections "increases the opportunity for Latinos to win office" when the minority population is "30-to-40 percent of the population." Latinos are well past the "30-to-40 percent" mark now and appear to have the potential, as Messrs. De La Rosa and Rebein stated, to elect all their preferred City Commission candidates, as opposed to barely being able to elect one like Dr. Barreto's "performance analysis" reveals would be the case if Latinos were locked into a single district. DFoF ¶ 120. Thus, even if Dr. Bejarano's opinion was credited, which it should not be because it is inconsistent with the prevailing thought in the field and Dr. Bejarano provided no examples of where this alleged phenomenon actually occurred in Dodge City, it is far from clear that moving to district-based elections would actually address the issues that Plaintiffs have raised with regard to at-large elections.

Adding the fact that City Commission elections are off-cycle does not change the analysis. Plaintiffs suggest that there is something nefarious about Dodge City "continu[ing] to utilize . . . off-cycle elections [when] courts have repeatedly found [it] to enhance the opportunity of discrimination." CM/ECF Doc. 211 at 132-33. This is not so. As the Court knows, state law mandates the off-cycle practice for municipal elections. DFoF ¶ 123. Furthermore, the practice makes sense, as it prevents what are clearly city-centric elections from being drowned out by

national politics and issues. As for Plaintiffs' allegation that Latinos have a "larger drop-off in turnout in presidential to off-cycle elections as compared to Whites," it is unfounded. Plaintiffs claim that Dr. Bejarano's testimony on this point is "unrebutted." It is not. As Dr. Bejarano admitted on the stand, she has no idea what Latino and White turnout is in non-presidential elections in Dodge City. Thus, there is nothing in the record showing that turnout in off-cycle elections adversely affects Dodge City Latinos more than Whites.

Finally, Plaintiffs erroneously claim that Dodge City Commission's staggered terms "prevent[] 'bullet voting' by the minority group in elections with multiple winners." CM/ECF Doc. 211 at 134. This argument is based on a misreading of the cases cited in footnote 647, the footnote that purportedly supports the aforementioned statement. Starting with Plaintiffs' lead case, *Blaine*, 363 F.3d at 913, while it did hold that staggered voting effectively stripped the plaintiffs of their ability to bullet vote, what Plaintiffs miss is that *only one* of the three commissioners on the county commission in question there stood for election every two years, as the county commission had staggered six-year terms. Thus, in *Blaine*, only one seat was available in each election due to staggering. In situations like that, "[s]ingle-shot voting is not possible" because the voter only gets one vote. However, *Blaine* says nothing about the effect of staggering when voters, like those in Dodge City, may (but certainly do not have to) vote for up to three candidates in City Commission elections. The remainder of the other court decisions in footnote 647 of Plaintiffs' proposed findings and conclusions are equally uninformative here because they each also involved "majority vote requirements," a practice that also prevents "bullet voting" and is explicitly listed in Senate Factor 3 as a practice that possibly enhances the opportunity for discrimination. Thus, the fact that Dodge City Commissioners have staggered terms has no bearing on Senate Factor 3. *See, e.g.*, *United States v. Alamosa County*, 306 F. Supp. 2d 1016, 1018 & 1035 (D. Colo. 2004) (finding

that the fact that board members "serve four-year, staggered terms" acting "in concert with the at-large election of county commissioners [did not] impair[], impede[] or discourage[] participation by Hispanic individuals in the electoral process").

### D. Senate Factor 4

Plaintiffs concede that "there is no evidence in the record that Latinos have been denied access to [any City Commissioner] slates." CM/ECF Doc. 211, at 135. That should be the end of the analysis with regard to Senate Factor 4. Plaintiffs nevertheless attempt to limit the import of that concession by arguing that the single candidate slate that they found in over a roughly 25-year period is somehow evidence of disunity in Dodge City. Plaintiffs do not flesh out how exactly their single candidate slate is evidence of disunity or how disunity is relevant to the Senate Factor 4 inquiry. Elections by their very nature are not unitive events as they pit candidates against each other. Furthermore, the fact that a local political organization[13] may have a view on which candidates it believes would best serve its community is hardly surprising. Regardless, the fact that local political organizations may occasionally weigh in City Commission elections is of no moment here. First, local political parties, much less an advocacy group like "Kansas for Liberty PAC," do not have a formal role in the City Commission election process as they do not pick the candidates for it. *See France v. Pataki*, 71 F. Supp. 2d 317, 331 (S.D.N.Y. 1999) (stating that the "slating inquiry is whether minorities have been able to get on the ballot"). Second, to the extent a slate was endorsed on one occasion, Latinos and their preferred candidates are clearly not shut out of the process. Looking at the single candidate slate introduced into evidence, the candidates listed for City Commissioner were either Latino (Nuci), the most Latino preferred candidate under Dr. Barreto's RxC analysis (Taylor), or had a Latino surname (Salinas). Pls.' Ex. 137. As for the Dodge

---

[13] It was not even a political party that put out the single candidate slate in the record; rather, it was a seemingly obscure advocacy group known as the "Kansas for Liberty PAC." *See* Pls.' Ex. 137.

City School Board, Ms. Nicole Nagel was the most Latino preferred candidate under both Dr. Barreto's RxC method and as his King EI analysis. *Id.* In fact, Ms. Nagel's support from Latinos was purportedly three times stronger than it was by Whites under King's EI and nearly two times greater under RxC. Pls's Ex. 121. Far from showing any racial disunity in the community, Plaintiffs' slate evidence confirms that race has nothing to do with local non-partisan elections in Dodge City.

### E.  Senate Factor 5

Realizing that their evidence of discrimination is weak at best, Plaintiffs attempt to read out the "bear the effects of discrimination" requirement from Senate Factor 5. According to Plaintiffs, despite Senate Factor 5's clear charge that there must be evidence of "discrimination in such areas as education, employment, and health, Senate Factor 5 can nevertheless be "met without an express finding of causation between past discrimination and present socioeconomic inequalities." CM/ECF Doc. 211 at 137. Plaintiffs further go on to say that they "are not required to prove a causal connection between the [effects of discrimination] and a depressed level of political participation" and that "the burden is on those who deny the causal nexus [*i.e.*, Dodge City] to show that the cause is something else." *Id.* at 136. Plaintiffs' view is thus, if there are disparities in education, employment, and health, as well as disparities in political participation, between Whites and Latinos, then Senate Factor 5 is met. Plaintiffs are wrong.

It is important to recognize that there are two different nexuses that Senate Factor 5 contemplates. The first is the nexus between discrimination in the jurisdiction and adverse results that minorities have allegedly faced in education, employment, and health. The second is the nexus between those alleged adverse results in education, employment, and health and the minority group's participation in the political process. The cases Plaintiffs quote on page 136 and cite in

footnotes 650 and 651 relate solely to the second nexus. But as for the first nexus, it is well established that discrimination must have caused the alleged disparities in education, employment, and health, and it is the Plaintiffs' burden to show that causation. *See Pierce v. N.C. State Bd. of Elections*, --- F. Supp. 3d ----, 2024 WL 307643, at *23 (E.D.N.C. Jan. 26, 2024) ("Dr. Burch's report, however, contains no statistical analysis demonstrating that *race discrimination by North Carolina caused the socioeconomic disparities* that Dr. Burch discusses in her report. Accordingly, this factor does not help plaintiffs." (Emphasis added)), *aff'd*, --- F.4th ----, 2024 WL 1321267, at *18 (4th Cir. Mar. 28, 2024) ("The district court found that Plaintiffs presented no evidence connecting the disparities they reported between black and white North Carolinians to official race discrimination or unresponsive elected officials. Plaintiffs reply not with evidence but by asserting this is 'an obvious reality.' On this record, we cannot conclude the district court clearly erred." (Internal citation omitted)); *France v. Pataki*, 71 F. Supp. 2d 317, 332 (S.D.N.Y. 1999) ("The fifth Senate factor requires that *as a result of past discrimination*, African-American and Latinos suffer from lower socioeconomic conditions than whites." (Emphasis added)); *see also Gingles*, 478 U.S. at 70 ("Congress intended that the Voting Rights Act eradicate inequalities in political opportunities exist *due to the vestigial effects of past purposeful discrimination*." (Emphasis added)).

The Senate Report from which Senate Factor 5 is derived, Senate Report 97-417, confirms that, while it may be proper to assume the second nexus, one cannot do the same for the first nexus, stating "'[t]he courts have recognized that disproportionate educational, employment, income level and living conditions *arising from past discrimination* tend to depress minority political participation.'" *Sanchez*, 97 F.3d at 1323 (emphasis added) (quoting S. Rep. 97-417, 1982 U.S.C.C.A.N. 177 at 207 n.114). Thus, while there is, understandably, recognition that adverse

conditions in education, employment, income, and living conditions can depress political participation, there is no legal support for the conclusion that courts are free to disregard what caused those conditions when assessing Senate Factor 5. In fact, a number of cases have explained why this so when the minority group in question is Latino, versus another group that has a longstanding presence in a community and an undeniable and well-documented history of discrimination, such as African Americans. *See, e.g.*, *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1225 (S.D. Tex. 1997) ("The socioeconomic data before this court does not distinguish between Hispanics who are recent immigrants and those who have been in this country for longer periods, particularly those who are citizens. This information is important to this analysis, but was not presented."), *aff'd*, 165 F.3d 368 (5th Cir. 1999); *Aldasoro v. Kennerson*, 922 F. Supp. 339, 365 (S.D. Cal. 1995) ("[I]t is critical to distinguish between foreign born and native born Hispanics in addressing this Senate factor" because "the lower socioeconomic status of immigrants, or of those unable to speak English, is not due to discrimination in this country.").

Plaintiffs' cases are not to the contrary. Tellingly, Plaintiffs do not actually say that any case has ever explicitly held that the first nexus listed above is not necessary; rather, they merely say that courts "routinely conclude that Senate Factor 5 is met without an *express finding of causation*." CM/ECF Doc. 211 at 137 (emphasis added). Plaintiffs' argument on Senate Factor 5 demonstrates why precedent should be evaluated based on what was actually said as opposed to what was not in one particular section of a decision. Doing the latter here permits Plaintiffs to imply that their failing to meet the first nexus "is not dispositive," *id.* at 138, though, the cases cited in Plaintiffs' footnote 653 could not reasonably be read to warrant such a conclusion.

For starters, 9 of Plaintiffs' 10 cases in footnote 653 included findings either inside or outside of Senate Factor 5 that the racial community in question had clearly been disparately

treated in education, employment, healthcare, or the political process more generally. *See* **1.** *Sanchez v. State of Colo.*, 97 F.3d 1303, 1322-23 & nn. 34 & 35 (10th Cir. 1996) (stating that the "the Hispanic Community" in question was "a predominantly native-born Hispanic population," that, "[i]n 1977, the Colorado Attorney General found sufficient evidence of discrimination against Hispanic citizens to warrant referring his report to the Voting Rights Section of the Department of Justice," and that "[t]he record include[d] a 1978 letter from the Regional Director of Civil Rights finding the Saguache County School District segregated students on the basis of national origin");[14] **2.** *United States v. Blaine Cnty., Mont.*, 363 F.3d 897, 914 (9th Cir. 2004) (disregarding the defendants' claim that "there [wa]s no causal link between discrimination and whatever socioeconomic disparities might exist" because there was "extensive evidence of official discrimination by federal, state, and local governments against Montana's American Indian population"); **3.** *N.A.A.C.P., Spring Valley Branch v. East Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 374 & 413-15 (S.D.N.Y. 2020) (recounting outside of Senate Factor 5 about how the board in question, which had been overwhelming white, had, among other things "allowed for numerous Board decisions privileging private school[s, which were 98% White] and/or harmful to public [schools, which was 92% Black or Latino]," and "eliminated hundreds of public school teaching, staff, and administrative positions," which had resulted in "[s]tudents [being] given academically deficient schedules full of free time and filler[s]" and "[g]raduation rates and test scores [to] s[i]nk"); **4.** *United States v. Vill. of Port Chester*, 2008 WL 190502, at *16 (S.D.N.Y. Jan. 17, 2008) (stating outside of Senate Factor 5 that "[o]ther courts in this district have cited the

---

[14]      It must not be forgotten that the *Sanchez* case was filed with the district court in 1994. Thus, while 1977 and 1978 are now nearly 50 year ago, at the time that *Sanchez* was brought, less than 20 years had elapsed since the cited actions had occurred and no doubt would have been still been in the mind of the then "predominantly native-born Hispanic population." Such facts are unlike those here where the alleged discrimination, at the latest, would have occurred decades before the overwhelming majority of the current-day Dodge City Latino community first arrived.

'regrettable history of discrimination in employment, housing and education in the Westchester County area'"); **5.** *Luna v. County of Kern*, 291 F. Supp. 3d 1088, 1134 (E.D. Cal. 2018) (stating outside of Senate Factor 5 that the plaintiffs' discrimination expert presented "compelling evidence of a history of discrimination" and noting, among other things, that, "[f]rom the beginning of Kern County's history, race relations were inseparable from labor relations" and that there was "[e]vidence presented at trial suggest[ing] that Latino students continue to experience present-day discrimination in education"); **6.** *United States v. Osceola Cnty., Fla.*, 475 F. Supp. 2d 1220, 1235 & n.35 (M.D. Fla. 2006) (stating outside of Senate Factor 5 that there is "evidence of a history of discrimination against Hispanic voters and candidates in Osceola County" and that "[d]iscrimination toward Hispanics has not been limited solely to the political arena," but included "discrimination in employment" as well); **7.** *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13-CV-0087-D, 2014 WL 4055366, at *21 (N.D. Tex. Aug. 15, 2014) (stating outside of Senate Factor 5 that a longstanding elected official had testified, uncontrovertedly, that there was "deep-rooted racial prejudice in the community, and that such prejudice was reflected in school board elections"); **8.** *United States v. City of Euclid*, 580 F. Supp. 2d 584, 605 (N.D. Ohio 2008) (stating outside of Senate Factor 5 that "the government showed both that Euclid has a history of discrimination in the areas of housing and education and that its history in those areas has resulted in depressed political participation among African–Americans"); **9.** *Large v. Fremont County*, 709 F. Supp. 2d 1176, 1184 & 1186 (D. Wyo. 2010) (stating outside of Senate Factor 5 that "[t]he long history of discrimination against Indians in the United States, Wyoming, and Fremont County is undeniable" and describing "culturally erosive policies such as allotment and compulsory boarding school enrollment" that had been utilized). Thus, the fact that Plaintiffs' cases did not routinely

discuss racial discrimination in Senate Factor 5 means nothing—the presence of such discrimination (and its adverse effects) was abundantly clear, unlike here.

As for the Plaintiffs' 10th and last case, *Montes v. City of Yakima*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014), it does not do what Plaintiffs' other 9 cases failed to do—namely, rebut the clear case law that, for Senate Factor 5, discrimination must be shown to have caused the noted discrepancies. In fact, the *Montes* court does not contest the fact that discrimination must be shown, as it stated that it believed that discrimination had been shown. 40 F. Supp. 3d at 1413. The court's basis for its discrimination conclusion, though, is not persuasive, as it assumed away the key question. According to the *Montes* court, "[w]hile not conclusive proof, marked disparities in socio-economic status are circumstantial evidence of discrimination." In other words, the court assumed that the observed "marked disparities" were caused by discrimination because there were "marked disparities." No court has countenanced this type of circular reasoning—probably because, as set forth above in the *Perez* and *Aldasoro* cases, there are a myriad of non-discriminatory reasons that a largely first-generation Latino community like the one found in Dodge City may not have the same educational, financial, and insurance attainment that others in Dodge City have. Likely sensing that its reasoning would not survive scrutiny, the *Montes* court stated that "this factor weigh[ed] slightly in Plaintiffs' favor," despite many of the identified disparities in that case being substantially greater than those in this case. *Compare* CM/ECF Doc. 211 at ¶¶ 258-275 *with Montes*, 40 F. Supp. 3d at 1413.

In short, there is no support for Plaintiffs' proposition that it does not have to show discrimination in education, employment, healthcare, or the political process more generally to satisfy Senate Factor 5. Plaintiffs cannot make such a showing here. In addition to the utter dearth of any evidence of discrimination, the personal stories of the witnesses presented at trial strongly

indicate that discrimination had no role to play in the disparities that Dr. Bejarano purportedly found. As noted in Dodge City's proposed findings and conclusions, Plaintiff Rangel-Lopez, the son of first-generation immigrants, DFoF ¶ 1, went on from being the salutatorian of his Dodge City High School class to winning department honors at the University of Kansas, DFoF ¶ 37. Mr. De La Rosa, who also grew up in Dodge City, went from being a first-generation immigrant himself to leading some of the largest communities in Kansas. Trial Tr. Vol. III at 271:20-273:19. Mr. Hernandez, a descendant of Mr. Luis Sanchez, whose oral testimony Plaintiffs' discrimination expert Mr. Martinez relied upon for his opinions, *see* CM/ECF Doc. 211 at ¶ 280, is Dodge City's present-day City Manager, "run[ning] the day-to-day operations of the City" and "oversee[ing] every single department within the City whether it be water, sewer, fire, [or] police." Trial Tr. Vol IV at 90:4-14. This history of success has continued with Mr. Hernandez's own children—one who was just admitted into pharmacy school within a year of graduating from Dodge City High School and another that is part of one of the top Junior ROTC programs in the Country. *Id* at 88:4-21. These stories of "educational, economic and professional successes [that come from Plaintiffs' and Defendants' Latino witnesses alike] belie complaints of lingering disadvantage." *United States v. Alamosa County*, 306 F. Supp. 2d 1016, 1036 (D. Colo. 2004).

Reading Senate Factor 5 to require causation neither renders it "duplicative of Senate Factor 1" nor does it lay a burden on a plaintiff that "would be almost impossible to prove" as Plaintiffs claim. CM/ECF Doc. 211 at 138. As made clear from their plain language, Senate Factor 1 is focused primarily on discrimination that specifically relates to political participation (*e.g.*, "to register, to vote, or otherwise participate in the democratic process"), while Senate Factor 5 utilizes a broader lens and focuses primarily on discrimination in areas outside of the political process that can nevertheless can impact a minority group's political participation (*i.e.*, "education,

employment, and health"). Thus, even if a jurisdiction does not discriminate directly when it comes to voting, Senate Factor 5 is intended to still capture the jurisdiction's non-political discriminatory activities that have effectively stifled the minority group's political voice. Accordingly, requiring a showing of discrimination for Senate Factor 5, as the factor's plain language requires, does not render it redundant of Senate Factor 5, which is focused on something different.

The claim that requiring evidence of causation between discrimination and disparities would make Senate Factor 5 "almost impossible to prove" is false. Historically, Senate Factor 5 was not an impediment if there was a well-established minority population in a jurisdiction and a clear history of discrimination against that population. As more years and decades separate a jurisdiction's current day from its allegedly discriminatory past, it is understandable that plaintiffs will have a steeper burden to show that practices that occurred, in most jurisdictions, many decades ago have a lingering effect today. To do otherwise would freeze jurisdictions in a long-ago era and ignore the "substantial efforts [that many jurisdictions have made] to address discrimination during the last 50 [or more] years." *Alamosa Cnty.*, 306 F. Supp. 2d at 1038. The difficulty of proving causation is further compounded when the overwhelming majority of the minority group that a plaintiff is purportedly bringing a section 2 lawsuit on behalf never experienced the alleged discrimination. Nevertheless, irrespective of how difficult the showing may be, such difficulties do not justify ignoring and reading out the discrimination requirement in Senate Factor 5.

## F.  Senate Factor 6

Plaintiffs concede, without qualification, that there has been no evidence of racial appeals in campaigns. This factor thus unquestionably favors Dodge City.

## G.  Senate Factor 7

Plaintiffs claim that this Factor favors them because there is a "staggering lack of electoral success at all levels of government—in Dodge City, Ford County, statewide and federal elections." CM/ECF Doc. 211 at 138. According to Plaintiffs, you simply count how many Latino candidates have won seats on the City Commission, and you disregard all other related facts. *Id.* at 138-39. Doing that here, Plaintiffs contend that "two Latino candidates" "over a twenty-four-year period" is simply insufficient. *Id.* This position is not supported by the applicable law or record.

First, Plaintiffs' straitjacket approach to Senate Factor 7 is inconsistent with the fluid analysis that *Gingles* mandates. The fluidity that *Gingles* (and its progeny) contemplates was intended to stave off rigidness and permit common sense to be applied to the given facts from a jurisdiction to determine if that jurisdiction is actually preventing a minority group from participating in the political process. For instance, when former Commissioner Fernando Jurado states that he lost his campaign by two votes because, in his opinion, he ran a bad campaign, *see* DFoF ¶¶ 48, 62, that fact should be weighed in Senate Factor 7's equation. Likewise, when politically involved Latinos in Dodge City say that Ms. Soto ran a bad campaign that, too, should factor into the assessment of Senate Factor 7, as this too provides context for Ms. Soto's loss. Plaintiffs' single cite to the contrary, *Missouri State Conference of the N.A.A.C.P. v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924 939 (8th Cir. 2018), should not be followed because it is inconsistent with *Gingles*' charge and is not a reasonable extension of the cases that it cited, or any other existing precedent that Dodge City is aware of.

Second, even if the Court were to avoid the context of the races in which Latinos have run, which it should not, Plaintiffs cannot get past the fact that half of the Latino candidates that have campaigned and run in the 20-plus years leading up to the filing of this case have won seats on the Commission. In even the Eighth Circuit case that Plaintiffs cite for the proposition that context

cannot be considered when accessing Senate Factor 7, the underlying district court considered the "success rate" of the Black candidates in the races that they actually ran in (roughly 20%) versus simply counting up how many Black candidates had been elected to the board in question. *See Missouri State Conference of the N.A.A.C.P. v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1063-66 (E.D. Mo. 2016). Additionally, in one of the two cases that the Eighth Circuit purportedly relied upon for its anti-context statement, *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995), the Court looked at the "minimal electoral success under the present scheme," as shown by "only [one] minority victory in nine attempts."[15] The practice of looking at "success rate" of those who actually run versus just counting up how many seats minority candidates have won is consistent with the practice in the Tenth Circuit. *See United States v. Alamosa County*, 306 F. Supp. 2d 1016, 1023 (D. Colo. 2004) (distinguishing *Sanchez*, 97 F. 3d 1303, on the ground that the Latino candidate had "been elected as county commissioner not once, but three times in the last twenty years" and stating that Latino "candidates have prevailed in 60% of the elections in which they competed").

Here, the record reveals that in the roughly 20-plus years leading up to the filing of this suit, Latino candidates won half of the seats for which they actually competed. Starting in 1998, Fernando Jurado won election, but lost in 2000 by 2 votes. Jurado Dep., CM/ECF Doc. 199, Ex. A at 36:6-13. In 2014 and 2017, Lilliana Zuniga lost, but it is uncontroverted that she did not actually run in 2017 due to health reasons. Trial Tr. Vol. IV at 78:2-13. In 2019 and 2021, Joe Nuci won his campaigns. Def's. Ex. 36 (showing 2019 results); Def's. Ex. 40 (showing 2021 results). In 2021, Blanco Soto lost. Def's. Ex. 40. Thus, in total, in the 20-plus years leading up to

---

[15] In the other case, there was not even "minimal electoral success," as "not one Indian-preferred candidate was elected to the state legislature from the area that includes District 26 during the period of 1982 to 2002." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006).

the filing of this suit, Latino candidates won half of the seats for which they actually ran. The results are the same when only the campaigns that Dr. Barreto reviewed are considered, as Mr. Jurado's 50% "success rate" falls off. Noteworthily, the "success rate" for Latinos actually exceeds the "success rates" of White candidates in the elections that Dr. Barreto reviewed, as only 10 out of 21 White candidates prevailed during that time.[16]

Likely sensing that no court has apparently found that Senate Factor 7 is met when minority candidates have a "success rate" of or near 50%, Plaintiffs encourage the Court to look more broadly—namely, county, state, and federal elections—and consider the "extraordinarily paltry rate" of Latino candidates being elected in those elections. CM/ECF Doc. 211 at 139. There are multiple problems with this request. First, by and large, the factual basis for Plaintiffs' assertion that Latinos have not held exogenous offices is NALEO and its tables, which, as pointed out in Dodge City's findings and conclusions, were batting an even .000% on accurately identifying the Latinos on Dodge City Commission for the past 24 years. Dr. Barreto's endorsement notwithstanding, why would the Court credit any of NALEO's number for other local offices like "school board," "judicial or law enforcement offices," or "Ford County Commission"? Second, of the 20 exogenous elections that Dr. Barreto reviewed, 14 did not relate to "public office in the jurisdiction," *i.e.*, Dodge City, but, rather, involved statewide or nationwide offices and thus are not relevant. Third, regardless of what office was question, outside of just the 2020 County Clerk office, there is no evidence that 19 of Dr. Barreto's 20 exogenous elections even had a Latino candidate. Yes, there are a couple people in the local races that have Latino surnames, but the fact that someone has a Latino surname does not tell us whether they are actually Latino. *See United States v. Alamosa Cnty., Colo.*, 306 F. Supp. 2d 1016, 1022 (D. Colo. 2004) (discounting the

---

[16]     As there is no evidence in the record regarding 2021 Candidate Salinas' race, she is not considered in the calculation.

expert's surname analysis its "degree of error [wa]s further compounded due to the long and extensive history of intermarriage among Hispanic and Anglo residents in Alamosa County"). Thus, Plaintiffs' exogenous elections merely show that only one Latino ran an unsuccessful campaign.

To be sure, a lack of candidates for City Commission could weigh in a plaintiff's favor if there was evidence that the community or the residents therein were actively working to thwart Latinos from running. But there is no such evidence here. In fact, the evidence is that there had been attempts to recruit Latino candidates but that they had demurred. Likewise, this is not a situation where the Latino-candidate cupboard is bare. As shown at trial, Latinos own and operate many downtown businesses and have leadership positions in community and professional organizations, such as the Chamber of Commerce, local unions, charitable organizations, political parties, Main Street Dodge, Engage Dodge, the Cultural Relations Advisory Board, and educational fields. DFoF ¶ 29. There is no formal slating process, and, to the extent informal slating occurs, Latinos, candidates with Latino surnames, and Latino preferred candidates have been included on those slates. DFoF ¶ 172. In short, if Latinos wanted to run in Dodge City, they can and appear to have the ability to do so successfully.

Undoubtedly, short of guaranteeing Latino candidates' electoral success, which section 2 clearly and unequivocally does not do, there will be challenges that Latino candidates, like White candidates, must overcome to be successful. The numbers bear that out, showing that the "success rate" for both White and Latino candidates is approximately one-half. A move to districts will not change that and could quite possibly make it worse or deprive Latinos from experiencing their true voting prowess. As Mr. De La Rosa said, district-based elections are not a gold bullet. Trial Tr. Vol. III at 318:16-319:16. While Latino candidates may not have to campaign across the whole

City, which is miniscule in size (25 square miles) compared to other jurisdictions that Plaintiffs' cases involved, their odds of success are not necessarily improved because Latino candidates will now be subject to a winner-take-all system that could pit them against popular incumbents, such as Mr. Rick Sowers. For instance, as Mr. De La Rosa noted, since Ms. Soto lives in "North Dodge," if Ms. Soto were to run again under Plaintiffs' proposed plan, she quite likely would have to run against an incumbent like Mr. Sowers. Trial Tr. Vol. IV at 24:15-25:2. Regardless of the quality of candidate, that would be a "tall order." *Id.* Accordingly, the record does not support a finding that Senate Factor 7 favors Plaintiffs.

### H. Senate Factor 8

Plaintiffs concede, as they reasonably must, "that the Commission [has been] responsive to some needs of Latinos." CM/ECF Doc. 211 at 141. However, relying principally on Dr. Bejarano, as well as a smattering of sound bites from various fact witnesses, Plaintiffs contend that this admitted responsiveness is not enough. Plaintiffs' position does not hold water.

Starting with Dr. Bejarano, she is not credible. It would take a paid expert who has never been to Dodge City, Trial Tr. Vol. I at 139:23-140:1, and who never talked to anyone working for the City, *id.* at 139:1-22, to say that Dodge City is not responsive to Latinos' needs. To give Dr. Bejarano's testimony some air of being the product of a formal methodology, Plaintiffs claim that:

> In evaluating responsiveness in local offices, political scientists consider (1) concerns or preferences expressed by the community or a proxy group, (2) whether there is a disproportionate impact of policies on the community, and (3) if local or state officials acknowledge the community's preferences or concerns. Dr. Bejarano followed this rubric in evaluating the Commission's responsiveness to the Latino community in Dodge City.

CM/ECF Doc. 211 at ¶ 348. If that is indeed what happened, Dr. Bejarano's testimony would have been brief. Looking at factor one, there is not a single Latino concern or preference that any witness credibly testified was brought before the Dodge City Commission and the Commission ignored.

Instead, the common refrain from both Plaintiffs' and Dodge City's witnesses is that there is no issue that has divided the racial groups. Trial Tr. Vol. IV at 125:10-18.

The closest Plaintiffs get is Ms. Scoggins' 2019 request for information regarding ward-based elections. Leading up to this request, Ms. Scoggins did indicate that a group of citizens (which was not identified as being Latino or Latino supporting) were interested in this issue. However, no group actually ever showed up at a City Commission meeting to support Ms. Scoggins' request or to advocate for a change, leaving the Commission to believe that this is an issue of interest for Ms. Scoggins, but no one else. DFoF ¶ 111. Nevertheless, Plaintiffs want to turn Ms. Scoggins' request into some evidence of knowledge about the impermissibility of the City's at-large election method, despite no one (including Ms. Scoggins) ever making such an assertion, and no Latino or Latino group indicating that they believed that their rights were being violated. City officials, including the City Attorney, looked into the issue and ultimately the Commission elected not to further pursue Ms. Scoggins' request. DFoF ¶ 113. Notably, the two Commissioners who are listed in the minutes as opposing further action on the request were so-called Latino preferred candidates in the 2017 City Commission election, according to Dr. Barreto's own RxC analysis (Warshaw and Delzeit). DFoF ¶ 113; Pls.' Ex. 121 at 2. Simply put, prior to this lawsuit being filed, there was no reason for the Commission to believe that district-based elections were a concern of anyone but Ms. Scoggins.

In light of the paucity of any testimony supporting the notion that the Commission ignored any Latino issue brought before it, Plaintiffs turn to Dr. Bejarano's recitation of a third-party source's story regarding "a high-profile shooting" in 2010. According to Dr. Bejarano, the City did not follow through on things that it said it would in the aftermath of that shooting. However,

there was not a single witness at trial that described any inadequacy in how the City responded to the 2010 shooting or that there was any sort of social unrest following that event.

To the contrary, the evidence in the record reveals a number of proactive things that the City has done to ensure that Latinos' interests are being heard and met, including, but not limited to: (1) offering pay incentives for bilingual employees to ensure that they can meet all Dodge Citians' needs; (2) publishing City documents in English and Spanish; (3) being part a member of the Southwest Kansas Coalition; (4) bringing United States citizenship and immigration services to Dodge City; (5) providing information about how to become a citizen and how to vote; (6) sponsoring the International Festival and New Americans Dinner; (7) offering naturalization scholarships; (8) hosting both Mexican and Guatemalan Consulate Services; (9) putting on a DACA clinic; and (10) standing up the Cultural Relations Advisory Board, which is intended "to work on multicultural affairs, issues in the community" and has, among other things, published a Strategic Plan for Welcoming and Integration for new immigrants to Dodge City. RPFoF ¶¶ 345-421. These types of Latino-specific actions are precisely what this factor is geared to assess. *See, e.g.*, *France v. Pataki*, 71 F. Supp. 2d 317, 333 (S.D.N.Y. 1999) ("When assessing responsiveness, the Second Circuit has looked to programs and efforts implemented to address the needs of the minority groups.").

Turning to whether there is a disproportionate effect on Latinos from the City's policies, there is nothing showing this. Plaintiffs tried to make much of the fact that Latinos seemingly had more interactions with law enforcement in 7 specific, scattered months that Dr. Bejarano reviewed. However, far from any gross disparity, the percentages showed that law enforcement actions for Latinos is roughly proportional to the percentage of Latinos in the total population of Dodge City. *Compare* Pls.' Ex. 112 *with* Pls.' Ex. 61. Furthermore, to the extent Latinos had more interaction

in certain law enforcement interaction categories in a couple of months, Dr. Bejarano's analysis does not appear to take into account that the Latino community in Dodge City is significantly younger than the White community, thus, it should not be surprising that, on a few occasions, such a thing occurred. DFoF ¶ 19.

Plaintiffs attack on the City for not monitoring Latino relations more is an interesting one. As set forth, there is no doubt that the importance of its race relations with Latinos is a matter that the City is acutely aware of and is proactive to maintain. Furthermore, there can be no doubt that the City is putting its money where its proverbial mouth is, spending tens of millions of dollars to revitalize its down town, which is South of Comanche and where many Latinos own and operate businesses, to improving the quality of life for residents South of Comanche by "complete[ly] reconfigur[ing] the Wright Park area" and "adding a water feature for [its] residents," and "redoing the Hoover Pavilion," "Friendship Park," and the "Beeson playground system." DFoF ¶ 94. Additionally, other than Plaintiffs' random and anecdotal musings, there is no evidence of a disparity between how the City administers its services to its residents. In fact, as Mr. Hernandez testified, there is a reasoned, objective method that the City utilizes for determining how to spend its resources on such things as maintaining its infrastructure. DFoF ¶ 94. The fact that the City does not divert its funds to assess how it is delivering its services to its community of only 27,000 people tells us nothing other than it is attempting to be a good steward of its limited resources.

Curiously, Plaintiffs cite the fact that that the City has "designat[ed] the *entire* area south of Comanche Street as an area of economic need" as evidence of the City's non-responsiveness. CM/ECF Doc. 211 at 142. How Plaintiffs think that this helps them in the context of this case is unclear. Instead of showing a lack of responsiveness, it indicates the exact opposite. As former City Manager Cherise Tieben testified, "improv[ing] significantly [] the housing stock" is

something that she spent years working on, and, that effort, coupled with her effort "to get the City back into the First-Time Home Buyers Program," not only improved living conditions in Dodge City but led to "the community [being] far more integrated." Trial Tr. Vol. III at 242:24-243:6.

As alluded to above, Ms. Tieben's successor, Mr. Hernandez (and his team), has continued and arguably upped Ms. Tieben's earlier efforts by procuring tens of millions of dollars for projects that are intended "to revitalize our downtown to bring redevelopment there" and, among other things, "replac[e] antiquated utilities to make those better for all businesses and the people that live down there." Trial Tr. Vol. IV at 74:3-75:7. In addition to spending money, the City has entered into strategic partnerships with entities like Dodge City Community College, through the College's "construction program," to "build houses in what could . . . be seen as blighted neighborhoods or [to] improv[e] houses that are in those neighborhoods." *Id.* at 75:20-76:20. Thus, like so much of Plaintiffs' evidence, the fact that the City has identified the "area south of Comanche Street as an area of economic need" is only a sliver of the story. What is really noteworthy, at least with regard to responsiveness, is what the City has done to rectify the identified need.

Also curious is Plaintiffs' dogged reliance on there being a meaningful divide between "North" and "South" Dodge when it comes to political power in Dodge City. Despite the candidates that Plaintiffs have long touted as being Latino preferred hailing from "North" Dodge, Plaintiffs continue to whistle the refrain that folks from "North Dodge" do not represent them— though, residents from north and south Dodge City consistently vote for the same candidates. RPFoF ¶¶ 174-89. Likewise, Plaintiffs continue to ignore that Mr. Chuck Taylor is from "South Dodge." DFoF ¶ 69. As for conditions in the City, Plaintiffs cherry-pick from primarily their own testimony where they claim that "South Dodge" has "poorly maintained roads, dilapidated

housing, worse public resources, less access to fresh food, less affluent schools, and unreliable public transportation." CM/ECF Doc. 211 at 142. As certain as death and taxes, there will always be things that residents can complain of, though. The proof of how serious these issues are in the minds of those residents is what they do with those concerns. Here, the uncontroverted evidence in this record is that neither Plaintiffs, nor anyone else for that matter, ever brought any of the aforementioned perceived issues to the Commission's attention. *See* DFoF ¶ 55, 95; Even more remarkable, Plaintiff Rangel-Lopez worked in the City Manager's office and never once thought to raise the alleged issues that he and his friend Plaintiff Coca now profess to be so stark in their City. While there are undoubtedly things that Dodge City could do to further improve the lives of its residents, that fact (which is true of all cities) does not reveal that Dodge City has been unresponsive to Latinos in any cognizable way.

Finally, although many of the things that the City has done in response to perceived Latino-related issues are set forth above, it bears mentioning that the City Commission that Plaintiffs imply is out of touch with the needs of the Latino community appointed a Latino when an opening on the Commission came up in 2021. DFoF ¶ 65. While such action could possibly be dismissed if a suit like this was pending, *but see Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1232 (11th Cir. 2000) (refusing to "adopt a bright-line rule limiting the probative value of minority electoral success[] when the minority candidate is elected during the pendency of section 2 litigation"), no such action was on file or even suggested when the Commission unanimously appointed Ms. Soto to the Commission. As there was no showing that anyone in the Latino community had made such a request, this fact does not fit squarely within Senate Factor 8, it nevertheless seems relevant.

### I.  Senate Factor 9

Despite Dodge City implementing at-large City Commission elections over 50 years ago, and current and former City Commissioners, current and former City Managers, and a Dodge City resident that has led both the local Republican and Democratic Party alike lauded the benefits of such an election method, Plaintiffs accuse Dodge City of "not introduc[ing] any convincing testimony explaining why the City must continue to use the at-large method of election[s]." CM/ECF Doc. 143. According to Plaintiffs, at-large elections in Dodge City "fail[] to correspond in any meaningful way to the legitimate interests [they] claim[] to have been advancing." *Id.*

The benefits of at-large elections should be obvious. As Commissioner Sowers stated, commissioners represent the whole City, not just a discrete subsection of that City. Trial Tr. Vol. IV at 127:15-128:1. There is nothing here revealing that at-large elections for City Commission were adopted for an elicit purpose or to permanently entrench White voters' interests (whatever that could mean) for generations to come. No, the process in question has been in place for 50 years now and was established well before a significant Latino population had been formed. DFoF ¶ 96. As the cases have long said, there is nothing inherently nefarious about having at-large elections and there is nothing here that suggests that this process was initiated or maintained for such a reason.

Plaintiffs' insinuation that the interest that Dodge City's witnesses uniformly discussed and explained is pretextual is unmoored from the record. Simply put, prior to this lawsuit, no one had ever seriously challenged the purpose behind at-large elections. There is no evidence of City Commissioners or other City leaders claiming an interest in one situation and asserting a different interest in a different context. Ms. Scoggins' testimony about what other commissioners purportedly told her is not to the contrary. Ms. Scoggins' testimony on this matter was limited to just saying that no other commissioners saying that "unity" was the basis for maintaining the at-

large method. *See* Trial Tr. Vol. III at 168:15-18. However, this question confuses what was the thrust of Fernando Jurado's earlier campaigns and the professed justification of at-large elections. The former was about bringing people together for a particular candidate or issue; the latter is about having elected officials that look for out what is best for the City as a whole as opposed to subsections of it. On this second point, which is what Dodge City's witnesses testified to, the testimony is uncontroverted.

### J. Proportionality

There is a reason that Plaintiffs bury their "proportionality" argument on page 145 of a 146-page document and never raised it in the Pretrial Order as a valid consideration: it seemingly violates section 2's clear prohibition against plaintiffs utilizing the Voting Rights Act to force proportional representation. *See* 52 U.S.C. § 10301(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). In order to make this single-paragraph argument, Plaintiffs turn *Johnson v. DeGrandy*, 512 U.S. 997 (1994), and *LULAC v. Perry*, 548 U.S. 399, 436 (2006), on their head, as those cases dealt with Defendants arguing that there could be no section 2 because the minority group in question had already achieved a seat share that was proportional to their percentage of the voting-age population. In other words, proportionality was a shield utilized by the sued jurisdiction, not a sword wielded by the plaintiff, as Plaintiffs attempt to do here.

In *Johnson*, the Supreme Court declared: "We hold that no violation of § 2 can be found here, where, in spite of continuing discrimination and racial bloc voting, minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population." 512 U.S. at 1000. The Supreme Court stressed in *Johnson*, though, that proportionality was not necessarily "dispositive" or "safe harbor" in all cases

and that, in some, it may be overcome. *Id.* at 1000 & 1018. *LULAC* presented just such a case. There, like the Supreme Court in *DeGrandy*, the lower court, a split three-judge panel, found that the plaintiffs' claim was barred based on what it referred to "*DeGrandy* proportionality." *Session v. Perry*, 298 F. Supp. 451, 492-94 (E.D. Tex. 2004). When the case made it up to the Supreme Court, the Court found that proportionality was not enough to overcome the plaintiffs' section 2 claim.[17] *LULAC*, 548 U.S. at 436. In short, neither *DeGrandy* nor *LULAC* involved an offensive use of proportionality by a Plaintiff and should not be read to permit what Plaintiffs are trying to do here, as 52 U.S.C. § 10301(b) prohibits such action.

Even if proportionality could be used in the way that Plaintiffs are attempting to use in this case, it still would not help Plaintiffs because proportionality is met here. Despite Latinos making up less than 50% of the electorate, 50% of their preferred candidates for City Commission in the years Dr. Barreto reviewed have won seats on the Commission. Accordingly, proportionality would not favor Plaintiffs even if it was considered, which it should not.

## CONCLUSION

For the reasons stated herein, the Court should grant judgment in Dodge City's favor.

---

[17]     The *LULAC* case involved two separate orders from the same three-judge panel. The first order, which is cited above, is the one relating to "*DeGrandy* proportionality." The second order, *Henderson v. Perry*, 399 F. Supp. 2d 756 (E.D. Tex. 2005), related to political gerrymandering.

Respectfully submitted,

**FOULSTON SIEFKIN LLP**

By: _/s/ Clayton J. Kaiser_
    Anthony F. Rupp, KS #11590
    Tara Eberline, KS #22576
    Sarah E. Stula, KS #27156
    7500 College Boulevard, Suite 1400
    Overland Park, Kansas  66210
    T (913) 498-2100 | F (913) 498-2101
    trupp@foulston.com
    teberline@foulston.com
    sstula@foulston.com

    - and-

    Clayton J. Kaiser, KS #24066
    Samuel J. Walenz, KS #29114
    FOULSTON SIEFKIN, LLP
    1551 North Waterfront Parkway, Suite 100
    Wichita, Kansas 67206
    T (316) 267-6371 | F (316) 267-6345
    ckaiser@foulston.com
    swalenz@foulston.com

    ATTORNEYS FOR DODGE CITY

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 5th day of April 2024, the foregoing was electronically filed with the Clerk of the Court by using the Court's e-Filing system which will send notification of electronic filing to counsel for all parties of record, and a true and correct copy was served by electronic mail upon:

Kunyu L. Ching, KS #29807
**AMERICAN CIVIL LIBERTIES**
**UNION OF KANSAS**
kching@aclukansas.org

  -and-

Chad W. Dunn *(Pro Hac Vice)*
Sonni Waknin *(Pro Hac Vice)*
Bernadette Reyes *(Pro Hac Vice)*
**UCLA VOTING RIGHTS PROJECT**
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org


   -and-

Jonathan Topaz *(Pro Hac Vice)*
Sophia Lin Lakin *(Pro Hac Vice)*
Luis M. R. Roman *(Pro Hac Vice)*
Victoria Ochoa *(Pro Hac Vice)*
**AMERICAN CIVIL LIBERTIES**
**UNION, INC.**
jtopaz@aclu.org
slakin@aclu.org
lroman@aclu.org
vochoa@aclu.org

Abena Mainoo *(Pro Hac Vice)*
Jonathan I. Blackman *(Pro Hac Vice)*
Mijin Kang *(Pro Hac Vice)*
Katherine M. MacAdam *(Pro Hac Vice)*
**CLEARY GOTTLIEB STEEN &**
**HAMILTON LLP**
amainoo@cgsh.com
jblackman@cgsh.com
mkang@cgsh.com
kmacadam@cgsh.com

  -and-

Scott Fuqua *(Pro Hac Vice)*
**FUQUA LAW & POLICY, P.C.**
scott@fuqualawpolicy.com


*ATTORNEYS FOR PLAINTIFFS*

*/s/ Clayton Kaiser*

109