# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MIGUEL COCA, ALEJANDRO
RANGEL-LOPEZ,

              Plaintiffs,

     v.

CITY OF DODGE CITY, a municipal
corporation,

           Defendant.

Civil Action No.:
6:22-cv-01274-EFM-RES

## PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Miguel Coca and Alejandro Rangel-Lopez submit this Response to Defendant City of Dodge City's Proposed Findings of Fact and Conclusions of Law (Doc. 212).

Defendant's Proposed Findings of Fact and Conclusions of Law are legally and factually unpersuasive. Defendant all but concedes the first *Gingles* precondition, acknowledging that it is possible to draw at least one majority-Latino district in a map for the Dodge City Commission and failing to contest the compactness, equal population, reasonable shape, contiguity, or communities of interest of *any* of Plaintiffs' fourteen illustrative maps. On the second and third *Gingles* preconditions, Defendant—whose expert witness analyzed *zero* out of 24 elections under one ecological inference model, and just *four* out of 24 elections under another—is forced to trot out various lawyer-made arguments for the first time, after the City's highly limited expert testimony left most of Plaintiffs' evidence untouched. And Defendant has no legitimate basis to contest any of the hard, empirical data supporting Plaintiffs' claim on the totality of the circumstances, including: the paltry rate of election of Latinos to all levels of elected office, the dilutive effect of

many election practices in Dodge City, and the glaring socioeconomic disparities facing Latinos borne out in Census Bureau data. The difficult evidentiary spot in which Defendant finds itself explains its various misstatements of the record, manufactured disputes, and makeweight red herrings in its Proposed Findings of Fact and Conclusions of Law. As a fair reading of the record reveals, the evidence demonstrates that Plaintiffs have satisfied all three *Gingles* preconditions and the totality of the circumstances necessary for finding a Section 2 violation. For the reasons set forth below, Plaintiffs respectfully request that the Court reject Defendant's Proposed Findings of Fact and Conclusions of Law and find in favor of Plaintiffs.

## I.    PLAINTIFFS HAVE SATISFIED THE FIRST *GINGLES* PRECONDITION.

Defendant essentially concedes the *Gingles* I inquiry, acknowledging that "it is possible to draw at least one City Commission district in which the citizen voting age population is majority Latino."[1] Further, Defendant does not contest:

- All of Dr. Oskooii's 14 illustrative maps satisfy equal population,[2]

- All of Dr. Oskooii's 14 illustrative maps have three majority-Hispanic citizen voting-age population districts,[3]

- All districts in all of Dr. Oskooii's 14 illustrative maps are geographically compact and the majority-Latino districts therein all contain a compact Latino population,[4]

- All districts in all of Dr. Oskooii's 14 illustrative maps are reasonably shaped,[5]

---

[1] Def.'s Prop. Findings of Fact and Concls. of Law, Doc. 212 at 59; *see also id.* at 63.

[2] Pls.' Prop. Findings of Fact and Concls. of Law, Doc. 211 ¶ 67.

[3] *Id.* ¶ 66.

[4] *Id.* ¶¶ 67, 74.

[5] *Id.*

- All districts in all of Dr. Oskooii's 14 illustrative maps are contiguous to the extent city boundaries allow,[6]

- Any of the different conceptions of communities of interest that Dr. Oskooii recognized in his maps,[7] or that

- It is virtually impossible to draw a map for the Dodge City Commission that contains fewer than two majority-HCVAP districts.[8]

Rather than sensibly capitulate on *Gingles* I in the fact of this overwhelming, uncontroverted evidence, Defendant puts forth two counterarguments. Both are meritless.

### A. Race Did Not Predominate in Any of Dr. Oskooii's Maps.

First, Defendant offers up an entirely lawyer-made argument: that despite all evidence and testimony to the contrary, "race predominated in [Plaintiffs'] proposed maps that they have submitted to the Court."[9] Under any factual record, this argument would be a steep uphill climb. "The Supreme Court has implemented a high bar to racial gerrymander challenges, requiring a showing of racial predominance such that traditional districting criteria are subordinate to the racial consideration."[10] The "[Supreme] Court to date has not affirmed a predominance finding, or remanded a case for a determination of predominance, without evidence that some district lines deviated from traditional principles."[11] The party alleging racial predominance must show that the

---

[6] *Id.*

[7] *Id.* ¶ 67; *see also, e.g., id.* ¶¶ 81–97.

[8] Doc. 211 ¶¶ 65, 68.

[9] Doc. 212 at 69.

[10] *Robinson v. Ardoin*, 86 F. 4th 574, 595 (5th Cir. 2023); *see also Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017); *Easley v. Cromartie*, 532 U.S. 234, 241–42 (2001) (calling the racial predominance standard "demanding" for those alleging predominance).

[11] *Bethune-Hill*, 580 U.S. at 190.

district "is *unexplainable on grounds other than race*."[12]

In view of the factual record here, such an argument is downright frivolous. To begin with, Defendant offers no testimony or evidence to rebut that:

- Dr. Oskooii *did not even consider* race and ethnicity data when drawing Maps 1– 12,[13]

- Race cannot predominate in a map if the map drawer does not even consider race and ethnicity data when drawing that map,[14] and

- Dr. Oskooii examined race and ethnicity data as merely one, non-predominant factor among many in drawing Maps 13–14, as is customary under a *Gingles* I analysis.[15]

Defendant cannot cite to *any* exhibit or testimony that states that race predominated in any of Dr. Oskooii's 14 illustrative maps. Nor, as noted *supra*, does it object to *any* of Dr. Oskooii's treatment of traditional districting criteria across his 14 maps.

To fully capture just how absurd Defendant's argument is, it is worth underscoring that, for the traditional *Gingles I* analysis, map drawers consider race and ethnicity data precisely the way that Dr. Oskooii did for Maps 13 and 14.[16] Dr. Oskooii's unrebutted testimony is that out of an abundance of caution, he took the extra step of drawing Maps 1–12 first without any race or ethnicity data because, at the time he drew his maps, the Supreme Court was considering whether

---

[12] *Easley*, 532 U.S. at 241–42 (internal quotation marks omitted) (emphasis added).

[13] Doc. 211 ¶ 116.

[14] *Id.* ¶ 116 n.146.

[15] *Id.* ¶¶ 112, 114, 116.

[16] *See generally Allen v. Milligan*, 599 U.S. 1, 23 (2023) (finding that requiring map drawers to not consider race when drawing maps would constitute an "attempt to remake our § 2 jurisprudence anew").

to revise the *Gingles* I exercise to disallow map drawers from considering race.[17] Thus, Dr. Oskooii *went above and beyond* what is required by *Gingles* I in Maps 1–12 to ensure that race did not predominate. In this way, this case is almost uniquely ill-suited to a claim of racial predominance.

The only "evidence" for racial predominance Defendant purports to offer are nine aspects of Dr. Oskooii's maps.[18] These are simply different nine ways of saying the following: across Dr. Oskooii's maps, (i) there are relatively many white voters and relatively few Latino voters in Districts 4 and 5, located in North Dodge above Comanche Street; and (ii) there are relatively many Latino voters and relatively few white voters located in Districts 1–3, located south of Comanche Street. Defendant appears mystified by this fact, erroneously stating—without reference to any authority or trial testimony—that this "cannot be said to have been naturally occurring," and that "Dr. Oskooii provided no answer for why these" conditions existed in his maps.[19]

Contrary to Defendant's misrepresentation, there is a very simple explanation for this naturally occurring fact: Dodge City, as the Court heard time and again, is racially segregated, with whites residing heavily in North Dodge and Latinos heavily in South Dodge.[20] And that is exactly the answer that Dr. Oskooii provided to Defendant's question. Because of "the population distribution and concentration of the different demographic groups across Dodge City"—i.e., the fact that white people disproportionately live in North Dodge and Latinos disproportionately in South Dodge—it would have "violate[d] some other traditional districting criteria" to make the

---

[17] Doc. 211 ¶¶ 112, 114, 116; Trial Tr. Vol. II 270:19–271:12 (Oskooii).

[18] Doc. 212 at 42, 60–61.

[19] *Id.* at 61.

[20] *See, e.g.*, Doc. 211 ¶¶ 50, 52–53, 56–60, 117, 186, 204–207, 232, 244, 366, 384.

districts below Comanche Street demonstrably less Latino or the districts above Comanche Street demonstrably less white.[21] Dr. Oskooii does not "control where people live in Dodge City,"[22] which is the critical factor in drawing compact districts; nor does he control the fact that Dodge City has distinct communities of interest that he recognized—and testified about at length—in all five of his districts across his maps.[23] Defendant's duplicative nine "facts" about Dr. Oskooii's maps only bolster Plaintiffs' claim, because they corroborate the record evidence Plaintiffs adduced at trial that Dodge City is racially segregated, which itself is probative of a Section 2 claim.

Defendant then notes—without any explanation for why this is relevant to its racial predominance theory—that "Districts 2 and 3 vary greatly in Dr. Oskooii's maps," while Districts 4 and 5 "remain largely the same."[24] As a preliminary matter, Plaintiffs dispute the meaningless premise that District 3 "varied" more than Districts 4 and 5 across Dr. Oskooii's maps.[25] More importantly, Dr. Oskooii explained the race-neutral reasons for these variations in Districts 2 and 3 in detail. As to District 2, Dr. Oskooii recognized that the Wyatt Earp Corridor could be conceived as either (i) a natural boundary, or (ii) its own community of interest.[26] As such, Dr.

---

[21] *Id.* ¶ 117 (citing Trial Tr. Vol. III, 114:11–115:6 (Oskooii)).

[22] *Id.*

[23] *See id.* ¶¶ 81–115.

[24] *See* Doc. 212 at 46, 65.

[25] District 4 in Map 4, for example, varies considerably from District 4 in Maps 7–10. Are the differences between District 3 in Maps 3 and 5 appreciably more significant than the differences between these iterations of District 4? Defendant provides no reason to believe they are, nor any methodology for how to even determine such a thing.

[26] Doc. 211 ¶¶ 86–87, 107.

Oskooii incorporated it as a natural boundary in Maps 1–8 and 13–14, but as its own community of interest in Maps 9–12.[27] This also provides the explanation for Defendant's observation—again untethered to any particular argument about racial predominance—for why there are more eligible voters in District 2 in the Maps 9–12 configurations than in the other configurations of District 2.[28] As to District 3, Dr. Oskooii explained that there are different conceptions for the southern boundary for Center Dodge: either Wyatt Earp Boulevard, or further south to encompass the Hoover Pavilion and Wright Park Zoo.[29] Thus, to provide the Court with a menu of options, Dr. Oskooii presented both possibilities, with the latter conception apparent in Maps 4–5, 8, and 13–14. Defendant provides no evidence to refute *any* of this testimony about communities of interest in Dodge City—only innuendo about some ambiguous, nefarious purpose.[30] And Defendant certainly has provided no evidence that, or even a theory as to how, race predominated in any of these decisions on communities of interest, which Dr. Oskooii explained at length without any reference to race.[31]

---

[27] *Id.* Defendant's argument that this treatment of District 2 somehow shows that Dr. Oskooii "regularly disregard[s] communities that he purportedly contends exist" is a canard that seeks to punish Dr. Oskooii for providing a variety of 14 different maps to choose from. Doc. 212 at 65. It is not possible to demonstrate the Wyatt Earp Corridor as its own community of interest *and* a natural boundary *in the same map*. Consequently, Dr. Oskooii opted for the first approach in some maps and the second approach in other maps. It is profoundly disingenuous for Defendant to claim that Dr. Oskooii does not respect the Wyatt Earp Boulevard as a community of interest because he cannot preserve it in all 14 maps.

[28] Doc. 212 ¶ 189; *see also id.* at 61–62.

[29] Doc. 211 ¶¶ 88–89, 101–102, 106.

[30] It is true that in a handful of Dr. Oskooii's maps, a miniscule portion of District 5 extends below Comanche Street, while the vast majority of the district remains above Comanche. Doc. 212 at 65–66. Defendant conveniently ignores Dr. Oskooii's unrebutted testimony that such extensions were necessary in those particular maps to achieve equal population. Doc. 211 ¶¶ 105, 109, 115.

[31] *See* Doc. 211 ¶¶ 81–115.

Finally, Defendant takes issue with Dr. Oskooii's interviews with Dodge City residents to obtain input on communities of interest.[32] Defendant presents no case law, authority, or evidence of any kind for its fact-free claim that "the methodology that Dr. Oskooii employed here was anything other than scientific."[33]

To the contrary, as Dr. Oskooii stated in unrebutted testimony, his interviews were fully in line with nationwide best practices of map drawers seeking input—whether in town halls or in notice and comment periods—from residents about their communities of interest.[34] When map drawers and state and local governments around the country solicit input from residents during the redistricting process, those map drawers do not ask residents "a preset list of questions," or insist on getting input from a "set target[]" of the jurisdiction's "various racial groups."[35] These town halls and notice and comment periods are not scientific surveys but rather qualitative research,[36] which is precisely the sort of methodology Dr. Oskooii used and to which Defendant provides no evidentiary basis for challenging. Defendant's quibble on this methodology is also a moot point.

---

[32] Doc. 212 at 66.

[33] *Id.* To the extent Defendant is asserting that Dr. Oskooii's methodology is intrinsically unreliable, one might have expected that it would have moved to exclude his testimony under *Daubert* in accordance with this Court's scheduling order. It of course did no such thing, revealing this argument as a grasp at a very flimsy straw. *See Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1289–90 (10th Cir. 2000) ("A party may waive the right to object to evidence on *Kumho/Daubert* grounds by failing to make its objection in a timely manner."); *see also Est. of Smart v. Chaffee*, No. 14-2111-JPO, 2020 WL 7643505, at *12 & n.79 (D. Kan. Dec. 23, 2020) (denying untimely *Daubert* motion not made by court-ordered deadline and listing supporting cases); *Praseuth v. Newell-Rubbermaid, Inc.*, 219 F. Supp. 2d 1157, 1162 (D. Kan. 2002) (*Daubert* argument not timely made is waived).

[34] Doc. 211 ¶ 79.

[35] Doc. 212 at 66.

[36] Doc. 211 ¶ 79; *see also* Trial Tr. Vol. III, 118:10-17 (Oskooii).

Dr. Oskooii did not hear *anything* from the residents on communities of interest that was inconsistent with how Dodge City describes itself,[37] and Defendant has not identified with particularity a *single* inaccuracy concerning any of Dr. Oskooii's conceptions of communities of interest.[38] And of course, Defendant presents no nexus whatsoever between its evidence-free criticism of Dr. Oskooii's methodology and its claim that race predominated in Dr. Oskooii's maps.

Defendant was welcome to submit any alternative maps in this case. It elected not to. Defendant was welcome to offer a qualified expert witness to criticize the population parity, contiguity, reasonable shape, compactness, or communities of interest in Dr. Oskooii's maps. It did not do so.[39] Defendant was welcome to put forward a witness who could explain how race supposedly predominated in Dr. Oskooii's maps. It did not do so. Instead, Defendant presents only attorney argument—unsupported by any testimony, witness, or exhibit—that race predominated, including in Maps 1–12 for which Dr. Oskooii did not even look at race and ethnicity data. The Court should disregard this cheap attempt at distraction and instead credit Dr. Oskooii's testimony fully.

---

[37] Trial Tr. Vol. II, 237:16-22 (Oskooii).

[38] Doc. 211 at 112.

[39] Defendant erroneously claims that the only districting criteria that Dr. Oskooii used that was "objective" is equal population. Doc. 212 at 43. No one testified to this, least of all Dr. Oskooii. Defendant provides no explanation of what constitutes an "objective" districting criteria versus a "non-objective" one. There is certainly nothing in the case law that would support such a classification. *See generally Allen*, 599 U.S. at 15 (describing "contiguity," "compactness," and "respecting communities of interest" as traditional districting criteria); *see also id.* at 35 (similar). Dr. Oskooii used each of these criteria.

**B. A Performance Analysis is Not Necessary to Establish the First *Gingles* Precondition, But Even If It Were, It is Satisfied Here.**

Second, Defendant claims that Plaintiffs fail to meet *Gingles* I because "Plaintiffs have not shown that so-called Latino preferred candidates will perform under an alternative method of elections."[40] As a preliminary matter, and as Plaintiffs noted in their Proposed Conclusions of Law, Plaintiffs are not aware of any court that has ever considered a performance analysis for purposes of the first *Gingles* precondition.[41] The Court will not find any such cases in Defendant's Proposed Conclusions of Law, either. Indeed, Defendant acknowledges that some courts do not consider it as part of the *Gingles* preconditions *at all*.[42] Defendant's citation to *Sanchez v. State of Colorado*, 97 F.3d 1303, 1311 (10th Cir. 1996)[43] is highly misleading. *Sanchez* does not even mention performance analysis anywhere in its opinion, let alone claim that it is part of the *Gingles* I inquiry.

Even if a performance analysis were necessary, Dr. Barreto's performance analysis details that even under current turnout models, all 14 of Dr. Oskooii's illustrative maps contain at least one majority-Latino district that provide the Latino population with an opportunity to elect its preferred candidates.[44] This performance analysis stands unrebutted—Defendant provides no performance analysis of its own, and it presents no testimony or exhibits that contradict any aspect of Dr. Barreto's analysis.[45] Instead, Defendant offers up a hodgepodge of unconvincing criticisms.

---

[40] Doc. 212 at 72.

[41] Doc. 211 at 113–14.

[42] *See* Doc. 212 at 67–72.

[43] *Id.* at 67.

[44] Doc. 211 ¶¶ 208–213, *see also id.* at 114.

[45] *Id.* ¶ 213, *see also id.* at 114.

First, Defendant complains that Dr. Barreto's vote share estimates are not credible because they come from "statewide, partisan elections," rather than Dodge City Commission elections.[46] This is not entirely true: Dr. Barreto's model also includes the 2020 Ford County Clerk race, a countywide race involving a Latina candidate that showed stark racial polarization.[47] Dr. Barreto also examined endogenous elections as a necessary threshold inquiry to determine if cohesion existed. More importantly, though, two-person exogenous elections are arguably more probative for the performance analysis here because Plaintiffs' proposed remedy would install two-person races in single-member districts—meaning that the exogenous elections provide certain important information for how Latinos and whites will vote in two-person races that the multi-candidate, pick-three endogenous elections might not.[48]

Regardless, the endogenous elections provide very similar vote share estimates to the exogenous elections. Using actual election data, Dr. Barreto estimated that Latinos were voting for Latino-preferred candidates roughly 75% of the time and for white-preferred candidates 25% of the time, while roughly the opposite was true for whites in Dodge City.[49] This amounts to a roughly 3-to-1 margin for both racial groups: Latino-preferred candidates received about three Latino votes

---

[46] Doc. 212 at 69.

[47] Doc. 211 ¶¶ 159, 207; Barreto Report Appendix A Table 1, Trial Ex. 121.

[48] *See Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1209 n.11 (5th Cir. 1989) ("[P]laintiffs should be able to rely on evidence derived from exogenous elections, with the recognition that such evidence must be evaluated according to its probative value."); *see also Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 761 n.59 (S.D. Tex. 2013) ("The Court finds that the exogenous elections chosen are sufficiently similar in character to the endogenous elections that the racial bloc voting results of the exogenous elections would be probative regarding the existence of racial bloc voting . . . ."), *aff'd sub nom. Gonzalez v. Harris Cnty.*, 601 F. App'x 255 (5th Cir. 2015).

[49] Trial Tr. Vol. II, 109:6-15 (Barreto).

for every one white vote, and white-preferred candidates received about three white voters for every one Latino vote. If one isolates the white-preferred and Latino-preferred candidates in the Dodge City Commission races, one finds that there is roughly the same 3-to-1 margin—if not more dramatic polarization—in the vote share. For example, in the 2021 City Commission election, under Dr. Barreto's King's iterative Ecological Inference ("King's EI") model, Latino-preferred candidates Scoggins and Soto received a 4.6-to-1 and a 3.26-to-1 vote share of Latinos to whites, respectively, while white-preferred candidates Reinert and Burns received a 5.31-to-1 and a 2.39-to-1 vote share of whites to Latinos, respectively.[50] In the 2017 City Commission election, under Dr. Barreto's King's EI model, Latino-preferred candidates Sellens and Zuniga received a 3.26-to-1 and a 2.73-to-1 vote share of Latinos to whites, respectively, while white-preferred candidate Delzeit received a 2.79-to-1 vote share of whites to Latinos.[51] And in the 2014 Dodge City Commission election, under Dr. Barreto's King's EI model, the Latino-preferred candidate Zuniga received a 4.63-to-1 vote share of Latinos to whites, while the white-preferred candidate Sowers received a 3.75-to-1 vote share of whites to Latinos.[52] These results across the endogenous elections thus coalesce around a rough 3-to-1 vote share between the two different racial groups for their preferred candidates in Dodge City Commission elections, which is the same vote share that Dr. Barreto adopted for his performance analysis. Contrary to Defendant's argument that "there is no divide anywhere close to [75% to 25%] in City Commission elections,"[53] that divide

---

[50] Barreto Report Appendix A Table 1, Trial Ex. 121.

[51] *Id.*

[52] *Id.* It is worth noting that all of these Latino-preferred candidates lost, while all but one of these white-preferred candidates won—strong evidence for both the second and third *Gingles* preconditions.

[53] Doc. 212 at 69.

is very similar to what exists when analyzing preferred candidates using Dr. Barreto's unrebutted King's EI figures.[54]

Second, Defendant argues in a footnote that this Court should "give[] no weight" to Dr. Barreto's performance analysis based on elevated turnout, because "his methodology is not credible, as it appears to be based purely on speculation, as opposed to an accepted methodology in the field."[55] As the Court has already correctly noted in its prior rulings in this case, "the Tenth Circuit has repeatedly held that arguments 'raised in a perfunctory manner, such as in a footnote, are waived,'"[56] and Defendant provides no reason for deviating from that principle here with respect to Dr. Barreto's elevated turnout model.

Even if the Court entertains the argument, Dr. Barreto's elevated turnout model is based on well-developed political science literature and election data. Dr. Barreto himself has written about 20 peer-reviewed articles and a book about elevated turnout models.[57] Here, based on past literature discussing elevated turnout and real-world examples, Dr. Barreto applied a "standard rate" of elevated turnout that was reflected in the literature and election data.[58] This peer-reviewed literature contains empirical coefficients stating that turnout increases by about 22%, which is the standard rate Dr. Barreto used and which can be discerned by looking at Dr. Barreto's performance

---

[54] *See generally* Doc. 211 ¶ 191.

[55] Doc. 212 at 68 n.6.

[56] Mem. & Order, Doc. 159 at 12 & n.18 (quoting *Madison, Inc. v. W. Plains Reg'l Hosp., LLC*, 2018 WL 928822, at *10 (D. Kan. 2018) (quoting *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002)).

[57] Trial Tr. Vol. II, 106:14-16, 158:22-23, 160:3-9 (Barreto).

[58] *Id.* 158:20–159:3 (Barreto).

analysis tables.[59] Even if the Court chooses not to credit Dr. Barreto's elevated turnout analysis—

which the uncontested record shows is supported by the political science literature—Dr. Barreto's

analysis based on current voter turnout levels still shows that all 14 of Dr. Oskooii's maps contain

at least one performing district, which is far more than the baseline *one* majority-Latino district in

*one* map necessary to satisfy a performance analysis.[60]

Finally, Plaintiffs address another of Defendant's evidence-free, lawyer-manufactured

theories trotted out for the first time post-trial: that Dr. Oskooii intentionally gerrymandered his

illustrative maps because otherwise "Plaintiffs could not have shown that any of the districts in

their demonstrative maps would actually 'perform.'"[61] Yet Dr. Oskooii played no part in the

performance analysis whatsoever,[62] and indeed the unrebutted testimony is that—in addition to

---

[59] *Id.* 160:10-14 (Barreto); *see also* Barreto Report Appendix B Tables 1–14, Trial Exs. 122–135.

[60] *See* Doc. 211 ¶¶ 208–213; *see also id.* at 114. Separately, Defendant claims that "only 2 of Dr. Oskooii's 14 maps had two purported 'performing districts' in November of odd year elections." Doc. 212 at 49. This assertion is inaccurate. "[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson v. DeGrandy*, 512 U.S. 997, 1014 n.11 (1994); *see also Bartlett v. Strickland*, 556 U.S. 1, 20 (2009) ("Section 2 does not guarantee minority voters an electoral advantage."). As such, competitive, closely contested districts in which Latinos have an *opportunity*—but not a *guarantee*—to elect candidates of choice constitute "performing" districts. Districts 3 in Maps 4, 5, and 9, for example, are certainly performing districts because they are extremely close races, giving those maps two performing districts under the current turnout model. Barreto Report Appendix B Tables 4, 5, 9, Trial Exs. 125–126, 130. Regardless, this is all irrelevant—Plaintiffs need only establish that one map has one such district. *See generally* Doc. 211 at 109 n.568.

[61] Doc. 212 at 64.

[62] As to Defendant's insinuations about Dr. Oskooii's and Dr. Barreto's professional relationship, Doc. 212 at 65, Dr. Oskooii's unequivocal and unrebutted testimony is that his retention in this case had "nothing" to do with Dr. Barreto, that he never spoke to Dr. Barreto about the substance of this case, and that Dr. Barreto did not instruct him to make any findings in this case. Trial Tr. Vol. III, 112:12-25 (Oskooii). Defendant has not produced a shred of evidence to suggest otherwise, or that Dr. Oskooii had any role in assessing the performance of his illustrative maps. The slew of unsubstantiated personal attacks directed at Plaintiffs' well-qualified experts

not considering race and ethnicity data for 12 out of his 14 maps—he "did not look at any partisanship data, election data, or partisan analytics" at all when drawing any of his maps.[63] Further, Defendant provides zero support for its claim that if Dr. Oskooii violated traditional districting principles and placed fewer white voters in Districts 4 and 5, "Dr. Barreto would not have been able to find a single district that would perform under his analysis."[64] Finally, Defendant's argument makes no sense on its own terms: the City simultaneously argues that Dr. Oskooii intentionally gerrymandered his districts to ensure performance, yet also that the districts do not actually perform.[65] Defendant cannot have it both ways. Ultimately, the unrebutted evidence demonstrates that neither of these contradictory contentions is true.

*Gingles* I is more than satisfied here.

## II.    PLAINTIFFS HAVE SATISFIED THE SECOND AND THIRD *GINGLES* PRECONDITIONS.

Dr. Barreto analyzed 24 elections using two separate ecological inference models, finding clear evidence of racially polarized voting in both models. By contrast, Defendant's witness, Dr. Katz, analyzed *zero* out of 24 elections for one model and just *four* out of 24 elections in the other. Faced with Dr. Barreto's sound statistical analysis, which Dr. Katz barely touched, Defendant resorts to throwing a number of unsubstantiated criticisms at Dr. Barreto's analysis. None stick.

Under Section 2, racial polarization exists when members of a protected class vote together for the same candidates or electoral outcomes, and the white majority usually votes against those

---

throughout Defendant's Proposed Findings of Fact and Conclusions of Law speaks volumes on Defendant's lack of credible arguments on the core issues in this case.

[63] Trial Tr. Vol. III, 113:17-20 (Oskooii).

[64] Doc. 212 at 68.

[65] *Id.* at 67–72.

candidates and/or outcomes.[66] Plaintiffs have met this standard. Defendant does not contest that

most of the exogenous elections Dr. Barreto analyzed, including the 2020 Ford County Clerk race,

demonstrated stark polarization between the voting choices of Latino and white voters in Dodge

City.[67] As noted in Plaintiffs' Proposed Findings of Fact, Defendant presented no evidence

responding to *any* of Dr. Barreto's King's EI findings demonstrating racial polarization.[68] Nor has

Defendant even cited to—much less rebutted—any expert or lay witness testimony refuting the

conclusion that, over a ten-year period and multiple election cycles, Latino and white voters have

divergent electoral choices.

Yet, Defendant asks this Court to adopt conclusions of law grounded in neither legal

precedent nor the factual record. First, Defendant argues that Dr. Barreto's analysis is broadly

unreliable. Second, Defendant attempts to attack Dr. Barreto's King's EI analysis, despite

introducing no supporting evidence. Third, Defendant contends that Dr. Barreto's RxC analysis

does not demonstrate bloc voting because the numerical results do not meet Defendant's arbitrary,

invented standards. Plaintiffs address each of these unconvincing arguments in turn.

### A. Dr. Barreto's Conclusions are Soundly Structured and Grounded in Adequate Data.

Before discussing Dr. Barreto's King's EI and RxC analyses, Plaintiffs first address

Defendant's assorted attacks on the reliability of Dr. Barreto's findings.

---

[66] *See Sanchez*, 97 F.3d at 1312 (stating that courts evaluate political cohesiveness by looking at the "voting preferences expressed in actual elections").

[67] Doc. 212 ¶¶ 234–236.

[68] Doc. 211 ¶¶ 143–163, 191.

1.  <u>The number and nature of the elections at issue</u>

Defendant objects to (i) Dr. Barreto's use of exogenous elections in his racial polarization analysis, and (ii) the number of elections he analyzed. These arguments are unpersuasive.

Exogenous elections have probative value in determining the presence of racially polarized voting.[69] Indeed, the case law dictates that analysis of exogenous elections is especially helpful where, as here, there are a limited number of endogenous elections available for examination.[70] In the absence of numerous endogenous elections, exogenous elections still hold probative value even if they do not exactly replicate the conditions of the endogenous elections.[71]

Defendant simultaneously argues that the exogenous elections are not probative of polarization in Dodge City,[72] and that the exogenous elections "reflected substantially higher rates of polarized voting than the endogenous City Commission elections."[73] In other words, Defendant swings from arguing that exogenous elections are irrelevant to arguing that they show *too much* polarization. These arguments make no sense, together or separately. While Plaintiffs appreciate

---

[69] *See Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1121–23 (E.D. Cal. 2018); *United States v. Blaine Cnty.*, 363 F.3d 897, 911–12 (9th Cir. 2004); *NAACP v. Fordice*, 252 F.3d 361, 370 (5th Cir. 2001); *Petteway v. Galveston Cnty.*, No. 3:22-CV-57, --- F. Supp. 3d. ---, 2023 WL 6786025, at *16 (S.D. Tex. Oct. 13, 2023) ("Due to the limited number of contested endogenous elections, it was necessary to analyze exogenous elections."), *aff'd sub nom. Petteway v. Galveston Cnty.*, 86 F.4th 214 (5th Cir. 2023), *reh'g en banc granted, opinion vacated*, 86 F.4th 1146 (5th Cir. 2023).

[70] Doc. 211 at 120 n.604.

[71] *See id*; *Rodriguez v. Bexar Cnty.*, 385 F.3d 853, 860 n.5 (5th Cir. 2004) ("This court has repeatedly endorsed the analysis of exogenous elections in Section 2 vote dilution cases."); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021 (8th Cir. 2006) ("[E]xogenous elections hold some probative value.").

[72] Doc. 212 at 86.

[73] *Id.* ¶¶ 235–236.

Defendant's admission that the exogenous elections consistently show stark levels of polarization, polarization is determined by a demonstration of different preferred candidates over multiple elections and races—not whether there is more or less polarization in two-person contests compared to multi-candidate contests.[74] In both endogenous and exogenous elections, Dr. Barreto examined the voting preferences of the *same* groups of Latino voters and white voters in Dodge City. Moreover, Defendant's claim that the exogenous elections are not probative because they "involved some of the most polarizing candidates that the United States and/or Kansas has ever seen" is pure conjecture.[75] Defendant does not identify any specific races or candidates for this argument, it cites no factual support or authority for its claim that these exogenous races involved abnormally "polarizing" candidates, and it does not even provide a definition for what a "polarizing candidate" is or how to measure such a thing. If anything, the increasingly partisan nature of the Dodge City Commission races makes them *more* similar to the partisan exogenous elections than Defendant would have the Court believe.[76]

Defendant also objects to "how few of City Commission elections [Dr. Barreto]

---

[74] *See* Doc. 211 ¶¶ 122, 178, 192–93; Trial Tr. Vol. IV, 99:12–101:8 (Hernandez); *see also* Doc. 211 at 124 (citing *Sanchez*, 97 F.3d at 1312–13) (noting that isolated incidents should not negate the plaintiffs' showing, where determining the presence of polarization may require monitoring multiple elections over time); *Sanchez*, 97 F.3d at 1317 n.29 ("*Gingles* doesn't require perfect uniformity of result. That plaintiffs' figures presented a pattern of racial bloc voting over time is probative of *Gingles*' second and third preconditions."); *Cuthair v. Montezuma-Cortez, Colo. Sch. Dist. No. RE-1*, 7 F. Supp. 2d 1152, 1167 (D. Colo. 1998) ("[Racially polarized voting and bloc voting] is determined on a sliding scale. It varies based on the district and a variety of other circumstances.").

[75] Doc. 212 ¶ 237.

[76] Doc. 211 ¶¶ 138, 437; *see also* Trial Tr. Vol. I, 53:13-16 (Rangel-Lopez); Trial Tr. Vol. II, 157:10-14 (Barreto); Trial Tr. Vol. III, 161:17-20 (Scoggins); Trial Ex. 137 (advertisement for the Republican slate for Dodge City Commission).

analyzed."[77] Yet, Dr. Barreto analyzed all available City Commission elections in the span of a decade. In *Gingles*, the Supreme Court expressly advocated for flexibility when there may be sparse or incomplete data for determining whether polarized voting exists, noting that "[t]he number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances."[78] Accordingly, courts have often found polarization where only two endogenous and some other exogenous elections were at issue—far fewer than the four endogenous and 20 exogenous elections analyzed here.[79] Likely recognizing this, Defendant falsely claims "Dr. Barreto conceded" that he could not find racial polarization in the 2019 City Commission election.[80] Yet Dr. Barreto testified to just the opposite, finding that "there was racially polarized voting in this [the 2019 Dodge City Commission] election."[81] If anything, it is Defendant's expert who analyzed too few elections—a grand total of merely four—to rebut a

---

[77] Doc. 212 at 75.

[78] *Gingles*, 478 U.S. at 57 n.25.

[79] *See, e.g.*, *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 502–03 (5th Cir. 1987) (finding evidence of polarization in two endogenous elections sufficient to support a finding of *Gingles* II and III for plaintiffs); *Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1465 (M.D. Ala. 1988) (finding that Plaintiffs established political cohesion through analysis of two endogenous elections and lay testimony revealing a strong sense of community among Black voters); *Westwego Citizens*, 872 F.2d at 1208 ("To the extent that these comments indicate that the district court believed that plaintiffs could not, as a matter of law, make out a vote dilution claim based on evidence of racially polarized voting drawn from elections other than the aldermanic elections themselves, this view is incorrect under both *Gingles* and *Citizens for a Better Gretna*."); *Cane v. Worcester Cnty.*, 840 F. Supp. 1081, 1088 (D. Md. 1994) (finding evidence of polarization in three endogenous elections several exogenous elections).

[80] Doc. 212 at 75–76.

[81] Doc. 211 ¶¶ 149, 153, 180, 181, 192; *see also* Trial Tr. Vol. II, 136:25–137:2 (Barreto); Trial Tr. Vol. IV, 205:25–206:12 (Barreto).

finding of racially polarized voting.[82]

Defendant seeks to have it both ways. On one hand, it contends that Dr. Barreto analyzed too few endogenous elections, even though Dr. Barreto analyzed every City Commission election available in the past decade. On the other hand, Defendant claims that Dr. Barreto should have examined *fewer* elections, because the twenty exogenous elections he examined are purportedly too dissimilar to the Dodge City Commission elections. Adopting Defendant's logic would lead to the conclusion that there is simply no way to *ever* measure racially polarized voting in jurisdictions like Dodge City, which would give those jurisdictions carte blanche to maintain unlawfully dilutive elections systems. Here, Dr. Barreto properly analyzed all available endogenous elections, and particularly given the relatively limited number of available endogenous elections, his consideration of exogenous elections was entirely appropriate.[83]

### 2. Confidence intervals

Next, Defendant lodges two complaints about Dr. Barreto's analysis with respect to confidence intervals. First, Defendant argues that the Court should disregard Dr. Barreto's analysis because he did not specifically detail the confidence intervals for his analysis in his report.[84] Yet the Court has already noted that "caselaw dealing with voting rights appears to accept that confidence intervals may be unnecessary in this context."[85] Indeed, federal courts have found

---

[82] *See, e.g.*, *Soliz v. Santa Clarita Cmty. Coll. Dist.*, No. BC512736, 2014 WL 3555687, at *2 (Cal. Super. June 09, 2014) ("Dr. Katz' conclusion of no statistically significant evidence of RPV is based on an examination of the 'limited number of relevant elections' which severely limits the validity of statistic inferences.").

[83] *See Thornburg v. Gingles*, 478 U.S. 30, 57 n.25 (1986); *Luna*, 291 F. Supp. 3d at 1123; *Blaine Cnty.*, 363 F.3d at 911–12; *Fordice*, 252 F.3d at 370; *Petteway*, 2023 WL 6786025, at *16.

[84] Doc. 212 at 77.

[85] Doc. 158 at 9.

racial polarization to satisfy the second and third *Gingles* preconditions without specific disclosure of confidence intervals.[86] Regardless, the unrebutted evidence shows that Dr. Barreto provided the data regarding the statistical uncertainty of his analysis, and Dr. Katz had all the information necessary to extract the confidence intervals.[87] Dr. Barreto and Dr. Katz both received similar point estimates for the elections they ran because they "both us[ed] the same data set… us[ed] the same ecological inference software," and both ran the same models.[88]

Defendant attempts to fact check Dr. Barreto's testimony that his standard practice is not to disclose confidence intervals in his reports, alleging that he included confidence intervals in two of his recently filed expert reports.[89] While these two reports did have some tables in appendices containing some confidence intervals, the principal tables on which Dr. Barreto relied and which formed the exclusive basis of his testimony in court were tables that included point estimates *without* confidence intervals.[90] And in Dr. Barreto's rebuttal report in the *Petteway* case, none of his many ecological inference tables—which look strikingly similar to the tables he produced in

---

[86] *See, e.g.*, *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 337 (N.D.N.Y. 2015) (crediting Plaintiffs' racially polarized voting expert where he did not indicate margins of error or confidence intervals.); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1309 (N.D. Ga. 2022) (crediting an expert who conducted ecological regression and King's EI as reliable and qualified despite not including confidence intervals with her analysis).

[87] Doc. 211 ¶ 199; *see also* Trial Tr. Vol. II, 145:8-25 (Barreto); Trial Tr. Vol. IV, 201:17-24 (Barreto).

[88] Trial Tr. Vol. IV, 201:17-24 (Barreto); Trial Tr. Vol. IV, 185:14–186:14 (Katz); Trial Tr. Vol. II, 102:4-14 (Barreto).

[89] Doc. 212 at 77–78.

[90] *See* Ex. 4, Decl. of Dr. Matt A. Barreto and Michael Rios, MPP, *Petteway v. Galveston Cnty.*, No. 3:22-cv-57 (S.D. Tex. June 2, 2023), ECF No. 184-5, at 17–22; Ex. A, Sept. 14, 2018 Expert Report of Matthew A. Barreto and Loren Collingwood, *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, No. 7:17-cv-08943-CS-JCM (S.D.N.Y. Nov. 11, 2018), ECF No. 227-1.

this case—included confidence intervals.[91] Well beyond these two cases, as Dr. Barreto testified, it is his standard practice to report point estimates in table form without confidence intervals.[92] And, as noted *supra*, the courts in both cases Defendant cites rejected the argument that wide confidence intervals impacted a finding of cohesion, and instead credited Dr. Barreto's findings on racial polarization and performance analysis.[93]

Second, Defendant argues that this Court should disregard *all* of Dr. Barreto's analysis because some of the confidence intervals in his RxC analysis overlapped, such that some results did not rise to the level of 95% statistical significance.[94] But a 95% confidence interval is not required to conduct ecological inference. As Plaintiffs noted in their Proposed Conclusions of Law, courts around the country have often relied exclusively on point estimates to make findings on racial polarization, have found that point estimates "are the most likely outcomes" and "are undisputedly the best estimates in the data," and have rejected arguments that broad confidence intervals should defeat findings of voter cohesion.[95]

---

[91] Ex. 8, Apr. 14, 2023 Rebuttal Decl. of Dr. Matt A. Barreto and Mr. Michael Rios, *Petteway v. Galveston Cnty.*, No. 3:22-cv-57 (S.D. Tex. June 2, 2023), ECF No. 184-9, at 11–24.

[92] *See* Ex. A, Decl. of Dr. Matt A. Barreto, *Reyes et al. v. Chilton et al.*, No. 4:21-cv-05075 (E.D. Wash. Jan. 5, 2023), ECF No. 79-1 at 46; Ex. 2, Decl. of Matt Barreto in Supp. of Plfs.' 2d Mot for Partial Summ. J., *Portugal et al. v. Franklin Cnty. et al.*, No. 21-2-50210-11, (Franklin Cnty. Sup. Ct., Wash. 2022); Ex. 2, Decl. of Matt Barreto, Ph.D., *Navajo Nation et al. v. San Juan Cnty. et al.*, No. 1:22-cv-0095 (D.N.M. July 25, 2023), ECF. No. 119-2 at 12–18.

[93] *Petteway*, 2023 WL 6786025, at \*16; *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020) (finding Dr. Barreto "to be entirely credible").

[94] Doc. 212 at 78.

[95] Doc. 211 at 122 (quoting and citing cases); *see also Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1404 (E.D. Wash. 2014) (finding that broad confidence intervals "do not defeat a finding of Latino voter cohesion").

Defendant claims that Plaintiffs are improperly conflating the preponderance of evidence legal standard (i.e., a greater than 50% chance that racially polarized voting exists in Dodge City) with the standard for scientific reliability (i.e., a purported 95% threshold for statistical significance).[96] But Defendant does not cite to any per se rule that an expert's findings must satisfy 95% statistical significance before the Court can accept those findings. As another district court has found, Defendant's argument asks this Court to "adhere slavishly" to a requirement of mathematical certainty best reserved for a "hypothetical mathematical challenge," not a finding of racially polarized voting where the standard of proof is a preponderance of the evidence.[97] Courts have similarly accepted ecological inference analyses conducted using an 80% confidence interval for the purpose of racially polarized voting,[98] and Dr. Katz confirmed that he could run his ecological inference analysis at an 80 or 85% confidence interval.[99]

Defendant ignores the many federal courts that have explicitly rejected its argument about the preponderance of the evidence standard. The Seventh Circuit, for instance, held that it is not necessary for findings to achieve 95% statistical significance for plaintiffs to carry their burden under the preponderance of the evidence:

> Statisticians and scientists usually want at least 95 percent certainty, . . . but any number greater than 50 percent would have allowed the district court to conclude that the plaintiffs had established the citizenship requirement by a preponderance of the evidence.[100]

---

[96] Doc. 212 at 79–80.

[97] *United States v. City of Euclid*, 580 F. Supp. 2d 584, 602 (N.D. Ohio 2008).

[98] *Yumori-Kaku v. City of Santa Clara*, 59 Cal. App. 5th 385, 421–25 (Cal. Ct. App. 2020).

[99] Trial Tr. Vol. IV, 181:4-11 (Katz).

[100] *In re Sprint Nextel Corp.*, 593 F.3d 669, 676 (7th Cir. 2010) (internal citation omitted).

The same is true of the en banc D.C. Circuit:

> Typically, a scientist will not so certify evidence unless the probability of error, by standard statistical measurement, is less than 5%. That is, scientific fact is at least 95% certain. Such certainty has never characterized the judicial or the administrative process. It may be that the "beyond a reasonable doubt" standard of criminal law demands 95% certainty. But the standard of ordinary civil litigation, a preponderance of the evidence, demands only 51% certainty.[101]

Federal district courts have found the same. In *Luna v. County of Kern*, the court similarly rejected the notion that mathematical certainty was necessary to demonstrate a Section 2 violation over polarized voting estimates.[102] Giving less weight to Dr. Katz's critique, the *Luna* court stated that it was "unpersuaded that [Dr. Katz's] criticisms preclude plaintiffs from demonstrating Latino political cohesiveness by a preponderance of the evidence."[103] And in *NAACP, Spring Valley Branch v. East Ramapo Central School District*, the court—which credited Dr. Barreto's testimony—found that drawing conclusions about patterns of point estimates "does not require a 95 percent statistical test" and disagreed that courts must reject results that do not report a 95% confidence interval.[104] Defendant provides no reason for the Court to depart from these sound decisions rejecting attempts to hold Section 2 plaintiffs to a standard far beyond the preponderance of the evidence.[105]

---

[101] *Ethyl Corp. v. EPA*, 541 F.2d 1, 28 n.58 (D.C. Cir. 1976) (en banc) (internal citation omitted); *see also Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 453–54 & n.139 (D.C. Cir. 1980) (similar).

[102] *Luna*, 291 F. Supp. 3d at 1125.

[103] *Id.* at 1123.

[104] *NAACP, Spring Valley*, 462 F. Supp. 3d at 389–90.

[105] Defendant also states—without support—that "Dr. Barreto does not challenge that 95% confidence intervals are standard in the field." Doc. 212 ¶ 218. This statement is false; Dr. Barreto stated only that "[t]his is common in some published articles, but not all." *See* Trial Tr. Vol. II, 170:21–171:1 (Barreto).

Any reliance on Dr. Katz's testimony on confidence intervals would be misplaced for multiple reasons. First, his limited opinions are contradictory. For example, Defendant cites Dr. Katz for the proposition that an analyst cannot make a claim regarding vote share-based point estimates without the presentation of statistical uncertainty.[106] But on the witness stand, Dr. Katz testified that his BISG results presented were *point estimates* for which he did not include or report out confidence bands.[107] Additionally, Dr. Katz's testimony about never being able to make claims regarding overlapping confidence is undercut by his own academic work where he made claims regarding vote share based on confidence intervals that had "heavy overlap."[108] Defendant's claims based on Dr. Katz's testimony regarding confidence bands are not credible.

Finally, it is important to note that Defendant's complaints regarding overlapping confidence intervals relate *only* to Dr. Barreto's RxC analysis.[109] Defendant does not point to any confidence interval issues with respect to Dr. Barreto's King's EI analysis—not through Dr. Katz, nor any other expert or fact witness. As such, even if the Court agreed with Defendant that it should disregard consistent evidence of polarization across 24 elections under Dr. Barreto's RxC model, Dr. Barreto's King's EI model remains wholly unrefuted, as to confidence intervals or otherwise.

### 3.   Constancy assumption

Next, Defendant claims that Dr. Barreto's analysis rests "on a constancy assumption that voting behavior is the same across every precinct," which Dr. Katz claimed was necessary due to

---

[106] *See* Doc. 212 ¶ 221.

[107] *See* Trial Tr. Vol. IV, 180:11-17 (Katz).

[108] *See id.*, 183:9–184:25.

[109] *See, e.g.,* Doc. 212 at 78–80.

a limited number of homogenous precincts in Dodge City.[110] This argument relies on Dr. Katz's outdated theory of constancy assumption that other courts have dismissed.[111] Dr. Katz's testimony regarding the constancy assumption is a generalized critique of ecological *regression* that was developed in the 1950s.[112] The constancy assumption is no longer an issue where, as here, Dr. Barreto used BISG and applied both methods of ecological *inference*.[113] Dr. Barreto firmly rejected the notion that he relied on the constancy assumption, instead utilizing BISG and both Kings EI and RxC to demonstrate a ten-year pattern of divergent vote preferences between Latinos and white voters in Dodge City.[114]

Further, Dr. Katz's conclusion that Dr. Barreto's analysis relies on the constancy assumption stems from Dr. Katz's previously rejected and unsupported theory that an accurate ecological inference analysis requires the presence of homogenous precincts.[115] Indeed, even Dr. Katz himself does not follow his own theory, as he admitted to performing ecological inference analyses without any reference to homogenous precincts.[116] The Court should decline to adopt this inapt theory discarded by the very expert who espouses it.

---

[110] *Id.* ¶ 208.

[111] *See, e.g.*, *Luna*, 291 F. Supp. 3d at 1123–24.

[112] Trial Tr. Vol. IV, 149:13–153:15 (Katz).

[113] Doc. 211 ¶¶ 128–135, 141.

[114] *Id.*; *see also* Trial Tr. Vol. IV, 199:11-21 (Barreto); Doc. 211 ¶¶ 133, 145, 164.

[115] *See Luna*, 291 F. Supp. 3d at 1123–24; Trial Tr. Vol. IV, 152:19–153:11 (Katz); Doc. 211 ¶¶ 196–197.

[116] *See Luna*, 291 F. Supp. 3d at 1125.

4.  BISG

Throughout this case, Defendant has claimed that Dodge City has insufficient precincts to show ecological inference, cherry-picking a statement from Dr. Barreto that he made prior to the implementation of BISG.[117] Acknowledging now that Dr. Barreto has explained that BISG makes it far easier to ascertain racial polarization in a jurisdiction with relatively few precincts, Defendant claims for the first time that while BISG "make[s] Dr. Barreto better able to unmask the racial identity of Dodge City voters," it "does not make up for a dearth of precincts."[118] Yet as Defendant's own expert Dr. Katz explained, BISG "reduces one source of uncertainty. We don't have to worry about turnout" assumptions.[119]

This improvement is precisely Dr. Barreto's point. BISG provides more precise point estimates because the ecological inference models use more accurate race estimates and only consider voters who actually turn out to vote.[120] Thus, in situations involving few precincts, BISG removes much of the uncertainty that occurs when turnout is low and there is a discrepancy between the number of actual voters and the number of registered voters—which is the case here. Contrary to Defendant's representation, Dr. Barreto is correct that BISG has made it far easier to find polarization in jurisdictions with limited precincts.[121] Dr. Barreto testified credibly that

---

[117] *See, e.g.*, Defs.' Br. in Supp. of Mot. to Exclude Expert Witness Matt Barreto, Doc. 144, at 10–11; Defs.' Trial Br., Doc. 184 at 12–13.

[118] Doc. 212 at 85.

[119] Doc. 211 ¶ 130; Trial Tr. Vol. IV, 172:4-5 (Katz).

[120] Doc. 211 ¶¶ 132, 134; Trial Tr. Vol. II, 91:7-24,163:22–164:11 (Barreto).

[121] Doc. 212 at 85.

modern ecological inference models and BISG can identify racially polarized voting patterns in jurisdictions such as Dodge City.

Ultimately, Defendant's argument on BISG echoes its argument on the relatively limited number of available endogenous elections: in both, the City asks the Court to immunize it from a Section 2 violation, either because elections are not frequent enough for Defendant's liking, or because there are too few precincts. As Dr. Barreto observed, such a ruling would "create[] a dangerous impetus for jurisdictions to just reduce their precincts so they could never be found to have any voting patterns."[122] The Court should decline Defendant's invitation—based on an outdated understanding of racial polarization methodology—to allow such jurisdictions to dilute the political power of certain citizens with impunity.

### B. Dr. Barreto's King's EI Analysis Demonstrating Racially Polarized Voting Stands Unrebutted.

Defendant has not refuted Dr. Barreto's King's EI conclusions and did not present any witness or evidence that responded to that analysis.[123] Nor has Defendant rebutted or cited to any expert or lay witness testimony invalidating Dr. Barreto's conclusion that over a ten-year period and multiple election cycles, Latino and white electoral choices have diverged.[124]

Instead, Defendant misstates the record in order to support its assertion that King's EI was designed for binary elections, not multi-candidate races like the Dodge City Commission.[125] The

---

[122] Trial Tr. Vol. II, 173:14-20 (Barreto); Doc. 211 at 119.

[123] Doc. 211 ¶¶ 143–163, 191.

[124] *Id.* ¶¶ 145, 163.

[125] Doc. 212 ¶ 228.

only evidence Defendant cites for this claim is a brief bit of testimony from Dr. Barreto.[126] Yet nowhere in this testimony did Dr. Barreto claim that "King's EI was designed for binary elections"; in fact, he was explaining why King's EI was the preferred model to use for the Dodge City elections:

> The EI, the pat on the left, runs iterative. It runs every single one of these eight candidates against the field. And so it runs them iteratively, one at a time…And I believe in these elections where you have multiple candidates and up to three votes that is the most accurate way to understand voting preferences.[127]

The only authority for Dr. Katz's claim that King's EI is not useful here was an article that he agreed (i) he did not cite in his report, and (ii) which was not based on data.[128] The record instead reflects that King's EI is the gold standard of voting rights analysis, and there is nothing in the record suggesting that it should not be used in a multi-candidate race.[129] Another federal court explicitly rejected Defendant's argument, finding instead that "it is appropriate to employ King's EI methodology to assess voting behavior in multi-candidate and multi-seat elections."[130]

Defendant cannot rebut the clear finding that, in each Dodge City Commission election evaluated, the Latino-preferred candidate (i) was not supported by whites, and (ii) consequently lost. Under the King's EI model, in 2021, Jan Scoggins was the Latino-preferred candidate for the City Commission, receiving the largest percent of vote share for Latinos—yet she came in dead

---

[126] *Id.* ¶ 228 (citing Trial Tr. Vol. II, 99:22–100:22 (Barreto)).

[127] Doc. 211 ¶ 144; *see also* Trial Tr. Vol. II, 100:10-17 (Barreto).

[128] Trial Tr. Vol. IV, 176:8-17 (Katz).

[129] Doc. 211 ¶¶ 143–144.

[130] *City of Euclid,* 580 F. Supp. 2d at 602 n.25.

last in the election.[131] In 2019, Adam Hessman was the candidate most preferred by Latino voters, winning 32.1% of the Latino vote share under the King's EI model, but he also failed to win election to the Commission.[132] In 2017, Charles Sellens received the highest Latino vote share (25.8%) under the King's EI model, but he lost after garnering minimal white support.[133] And in 2014, Liliana Zuniga was the candidate most preferred by Latino voters, winning 33.3% of the Latino vote share under the King's EI model, but she too failed to win election.[134] The King's EI model, in other words, shows clear Latino voter cohesion and clear majority bloc voting that is able to defeat Latino candidates of choice *in every Dodge City Commission election analyzed*. This unrebutted analysis is more than sufficient on its own to support a finding of the second and third *Gingles* preconditions.

### C.  Dr. Barreto's RxC Analysis Likewise Demonstrates Racially Polarized Voting.

Next, Defendant attacks Dr. Barreto's RxC analysis. Defendant concedes that "Dr. Barreto's analysis indicates that these two racial groups [whites and Latinos] may have preferred different candidates."[135] Yet rather than fully acknowledge that racially polarized voting exists, Defendant instead quibbles, stating that the difference in the RxC model between Latino-preferred candidates and white-preferred candidates sometimes comes down to "just a few percentage points," rending such polarization legally insignificant.[136]

---

[131] Doc. 211 ¶ 150.

[132] *Id.* ¶ 149.

[133] *Id.* ¶ 148.

[134] *Id.* ¶ 147.

[135] Doc. 212 at 73.

[136] *Id.*

Defendant's contention is wrong for several reasons. First, in multi-candidate elections, there are less likely to be massive gulfs between the various candidates because voters are picking three candidates at a time and, accordingly, there are smaller margins of victory.[137] Defendant notes, for example, that under the RxC model, the difference between white and Latino support is typically less than 8.1%, which Defendant claims—without support—does not indicate polarization.[138] But eight points is a highly substantial difference in polarization given that in these multi-candidate races, *no candidate won more than 18% of the vote*.[139] In fact, the eight-point difference represents 45% of the entire vote total that the winning candidate received and 80% of the vote total that the losing candidate received. Defendant provides no authority or methodology to explain why, in its view, this is an insufficiently small level of polarization.

Similarly, Defendant cites no case law supporting its contention that a larger—or *any* particular—percentage difference between majority-preferred and minority-preferred candidates is required to demonstrate polarization in multi-candidate races.[140] Rather, courts recognize that "the degree of support may be lower when many candidates are running because minorities may split their vote."[141] Further, in multi-candidate elections, such as Dodge City Commission races,

---

[137] Barreto Report Appendix A Table 1, Trial Ex. 121.

[138] Doc. 212 ¶ 226.

[139] Barreto Report Appendix A Table 1, Trial Ex. 121.

[140] Indeed, in these scenarios, it is likely mathematically impossible for a candidate to have over 50% polarization. *See* Doc. 211 ¶ 122.

[141] *Holloway v. City of Va. Beach*, 531 F. Supp 3d 1015, 1075 (E.D. Va. 2021), *vacated and remanded on other grounds as moot*, 42 F.4th 266 (4th Cir. 2022); s*ee also Lewis v. Alamance Cnty.*, 99 F.3d 600, 613 n.10 (4th Cir. 1996) ("[W]e do not believe that the mere failure to achieve a threshold of 50% in a multi-candidate election necessarily means that a candidate cannot be viewed as a black-preferred candidate.").

it is "virtually unavoidable that certain white candidates would be supported" by minority voters in the event that only one or no members of the minority group run for office.[142] These instances of support do not "negate instance[s] in which white votes defeat a [Latino] preference."[143] Such is the case here.[144] Indeed, "[t]o hold otherwise would doom any Section 2 claim in which white candidates, acceptable to minorities and non-minorities alike, are regularly elected but in which minority candidates, preferred by minorities but unfavored by whites, are consistently defeated."[145] This is in keeping with the Tenth Circuit's precept that "*Gingles* doesn't require perfect uniformity of result."[146] In the elections featuring Spanish-surname candidates that Dr. Barreto analyzed, those candidates were more preferred by Latino voters and extremely less preferred by white voters in Dodge City.[147] For decades, Courts of Appeals across the country have acknowledged that elections involving minority candidates may be more probative "on the

---

[142] *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1119 n.15 (5th Cir. 1991) (internal citations omitted).

[143] *Citizens for a Better Gretna*, 834 F.2d at 502.

[144] For example, in the 2017 Dodge City Commission race, the RxC model indicates that a fair number of Latinos voted for Joyce Warshaw, a white candidate who received significant support from the white community. However, the Latina candidate, Liliana Zuniga, lost despite significant Latino support because she lacked white support. Barreto Report Appendix A Table 1, Trial Ex. 121. This strong Latino support for Ms. Zuniga's candidacy contradicts Defendant's suggestion that Ms. Zuniga was not a meaningful City Commission candidate because she did not campaign. *See* Doc. 212 ¶ 63.

[145] *Ruiz v. City of Santa Maria*, 160 F.3d 543, 553–54 (9th Cir. 1998).

[146] *Sanchez*, 97 F.3d at 1317 n.29; *see also Cuthair*, 7 F. Supp. 2d at 1167 (D. Colo. 1998) ("[Racially polarized voting and bloc voting] is determined on a sliding scale. It varies based on the district and a variety of other circumstances.") (citation omitted).

[147] *See* Barreto Report Appendix A Table 1, Trial Ex. 121; Doc. 211 ¶¶ 153, 159, 181, 323, 334–335.

question of whether racial polarization exists."[148]

Defendant appears to suggest that, in a multi-candidate race with anywhere from five to ten candidates, Plaintiffs must be able to establish polarization as to *each and every candidate* in order to establish racial polarization. That suggestion runs contrary to case law. Courts have recognized that when determining polarization and bloc voting by white voters, "whether minority voters and white voters would elect different sets of candidates if each voted separately—is more clearly in line with existing Section 2 jurisprudence."[149] If Dodge City Latino voters were voting separately, they would elect different candidates in almost every single contest than if whites were voting separately.[150] For example, under the RxC model, if only Latinos voted in the 2021 City Commission election, candidates Soto, Scoggins, and Taylor would have won election, while if only white voters voted, Nuci, Burns, and Taylor would have been elected.[151] This is a clear demonstration of divergent electoral choices.

---

[148] *See Lewis*, 99 F.3d at 610 & n.8; *accord Ruiz*, 160 F.3d at 552–53; *Uno v. City of Holyoke*, 72 F.3d 973, 988 n.8 (1st Cir. 1995); *NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1016–18 (2d Cir. 1995); *Nipper v. Smith*, 39 F.3d 1494, 1539–40 (11th Cir. 1994); *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1128 (3d Cir. 1993); *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993). By contrast, the only Latino-preferred candidates who have won election in the past several years are white.

[149] *City of Euclid*, 580 F. Supp. 2d at 603; *see also Gingles*, 478 U.S. at 53 n.21; *Brown v. Bd. of Comm'rs of City of Chattanooga,* 722 F. Supp. 380, 400 (E.D. Tenn. 1989) (labeling races as either "racially polarized" or "not racially polarized" and deeming contests as "racially polarized" where African–American support was as low as 37.5%).

[150] *See* Barreto Report Appendix A Table 1, Trial Ex. 121.

[151] *Id.* Under the King's EI model, which shows somewhat starker polarization, the different racial groups exhibited completely divergent voter preferences in the 2021 Dodge City election. According to King's EI, Latinos voting alone would have elected Scoggins, Soto, and Taylor, whereas whites voting alone would have elected Nuci, Burns, and Reinert.

Finally, Defendant suggests that the Court should somehow disregard Dr. Barreto's entire analysis because there are "significantly smaller voting disparities" between the King's EI and RxC models.[152] But Defendant provides no testimony or analytical framework for what would constitute unduly large "disparities" between the models, or any case law determining that such disparities are relevant to the analysis. In other words, this argument is Defendant's lay interpretation only. While the King's EI and RxC analyses do not reach the exact same point estimates—as expected, given that they are different models—they are consistent in demonstrating which candidates are Latino-preferred and which are white-preferred in multi-candidate races.[153] For example, Dr. Barreto's 2021 ecological inference results demonstrate that under both King's EI and RxC analyses, Latinos preferred Scoggins, Soto, and Taylor.[154] His analysis of the 2014 and 2019 Dodge City Commission races similarly demonstrate that Latinos had the same sets of preferred candidates.[155] The Court should not somehow discredit Dr. Barreto's entire analysis because he went the extra step of running two different ecological inference models, both of which showed clear evidence of polarization.

### D. Defendant's Other Miscellaneous Arguments are Unpersuasive and Erroneous.

Defendant's last isolated *Gingles* II and III arguments are no more successful than their others. For one, Plaintiffs note the irony that Defendant attempts to draw conclusions from data it successfully moved to strike. Specifically, Defendant spends significant time discussing voting results from individual precincts to see whether "the most homogenously Latino" precincts voted

---

[152] Doc. 212 ¶ 227.

[153] Barreto Report Appendix A Table 1, Trial Ex. 121.

[154] *Id.* at 1.

[155] *Id.*

for Latino-preferred candidates.[156] This discussion is essentially an unsophisticated take on a homogenous precinct analysis—a method of determining polarization to which Defendant itself objected and the Court excluded in this case.[157] As Dr. Barreto explained, the ecological inference models are a far superior way of determining polarization than cherry-picking results from precincts that Defendant claims are not even homogenous.[158]

Defendant also objects to Dr. Barreto's findings of polarization in two local exogenous elections: the 2021 Dodge City School Board and 2019 Dodge City Community College Trustees races.[159] It is wrong on both counts. As to the 2021 School Board race, clear polarization exists across most candidates in both the King's EI model and RxC model. For example, under the King's EI model, there is more than a 2-to-1 vote share gap between whites and Latinos for *all* ten candidates in the race.[160] And in the 2019 DCCC Trustees race, Defendant remarkably ignores that Garcia—a Latino-surnamed candidate—lost election despite being the clear Latino-preferred candidate in both models. Under the King's EI model, Garcia received 29.5% of the Latino vote but just 5.9% of the white vote—as clear an example of whites voting as a bloc to defeat a Latino-preferred candidate as one could find.[161]

---

[156] Doc. 212 at 75.

[157] *Compare id.* (discussing homogenously Latino precincts) *with* Mem. & Order, Doc. 158 at 6–8 (striking Dr. Barreto's homogenous precinct analysis).

[158] Trial Tr. Vol. II, 170:4-17 (Barreto).

[159] Doc. 212 at 86–87. Defendant appears to concede that polarization exists in the 2020 Ford County Clerk race—a local exogenous race in which a Latina candidate lost despite massive Latino support, because she had very minimal white support. *Id.* at 86.

[160] Barreto Report Appendix A Table 1, Trial Ex. 121.

[161] *Id.*

Finally, Defendant resorts to attacking the credibility of one of the most cited and credited racial polarization experts in the country.[162] Such attacks are mere distractions from what cross-examination of Defendant's expert, Dr. Katz, revealed: that multiple courts and a redistricting commission have found Dr. Katz not credible or otherwise did not credit his opinions, and in fact rejected the failed theory that he attempted regurgitate in this case.[163] Specifically, Dr. Katz has been found to have incorrectly used ecological inference,[164] created models with errors leading to "illogical results,"[165] and relied upon assumptions not "generally accepted in their field of science."[166] Additionally, in sharp contrast to Dr. Barreto, Defendant also attempts to rely on experts who have no expertise in this area. For example, Defendant relies on Dr. Nelson's

---

[162] Defendant's attempt to cast doubt on Dr. Barreto's credibility through a single case, *Pierce v. N.C. State Bd. of Elections*, No. 4:23-CV-193-D, 2024 WL 307643 (E.D.N.C. Jan. 26, 2024), *aff'd but criticized*, No. 24-1095, 2024 WL 1321267 (4th Cir. Mar. 28, 2024) is unconvincing. Defendant omits significant distinctions between that case and this one: first, the *Pierce* plaintiffs claimed the North Carolina state legislature violated Section 2 by *not* engaging in race-based districting and *not* creating a racially gerrymandered majority-Black Senate district—claims and facts very different than those raised here. 2024 WL 307643, at *1. Additionally, the *Pierce* court rendered its ruling at the preliminary injunction stage, without the benefit of discovery, a fulsome expert report, or live testimony from Dr. Barreto. *E.g.*, *id.* at *19 (noting that "this case would greatly benefit from discovery, including, for example, Dr. Barreto's deposition and Dr. Barreto producing his complete data files to the legislative defendants"). *Pierce* does not change the fact that Dr. Barreto has testified in federal court over 40 times, including in the District of Kansas, which credited his testimony. *See Fish v. Kobach*, 309 F. Supp. 3d 1048, 1059 (D. Kan. 2018).

[163] *See* Trial Tr. Vol. IV, 189:1-7, 190:22–191:20, 193:21–194:3, 195:23–196:11 (Katz).

[164] Court's Oral Decision, *Borders v. King Cnty.*, No. 05-2-00027-3 (June 6, 2005) ("The Court finds that the method of proportionate deduction and the assumption relied upon by Professors Gil and Katz are a scientifically unaccepted use of the method of ecological inference."), *available at* https://www.seattleweekly.com/news/borders-et-al-v-king-county-et-al/.

[165] *Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 150 (E.D. Va. 2018).

[166] Court's Oral Decision, *Borders v. King Cnty.*, No. 05-2-00027-3.

testimony for the assertion that Latinos "are less likely to vote as a bloc."[167] But Dr. Nelson unequivocally testified that she does not know if Latinos vote as a bloc and that she is not offering any opinions about racially polarized voting, its effects, or its causes.[168]

Finally, Defendant leaves unrebutted Plaintiffs' additional evidence of racially polarized voting demonstrating that different regions of Dodge City have different vote preferences, with the largely Latino South Dodge preferring different candidates than the predominately white North Dodge.[169]

Plaintiffs have more than met their burden of proof in demonstrating that all three *Gingles* preconditions are satisfied. Plaintiffs next address Defendant's equally ineffective arguments concerning the totality of the circumstances.

### III. DEFENDANT FAILS TO REBUT PLAINTIFFS' EVIDENCE DEMONSTRATING A SECTION 2 VIOLATION UNDER THE TOTALITY OF THE CIRCUMSTANCES.

In its treatment of the "totality of the of the circumstances," Defendant goes to great lengths to present a picture of a harmonious Dodge City that is a welcoming community to all, regardless of race or ethnicity. Unfortunately, this picture of "unity" is an aspiration, not reality; it ignores the actual conditions of life of many of Dodge City's Latino residents. And it assumes that Dodge City exists in some kind of vacuum untouched by the vestiges of discrimination that occurred in Kansas and in Dodge City itself, as Plaintiffs' experts detailed and Plaintiffs and other fact witnesses experienced. In presenting its idealized conception of Dodge City, Defendant ignores wholesale evidence adduced by Plaintiffs, cites only generalized testimony of witnesses who are

---

[167] Doc. 212 ¶ 205.

[168] *See* Trial Tr. Vol. IV, 56:23–57:1, 63:15-18 (Nelson).

[169] Doc. 211 ¶¶ 204–207.

largely Dodge City employees or members of the City's power structure, makes factual assertions that are unsupported by the record, and relies heavily on evidence that is legally irrelevant.

None of this overcomes the largely unrebutted evidence that the totality of the circumstances indicates a lack of electoral opportunity for the Latino community in Dodge City. The totality of the circumstances inquiry is, principally, guided by hard, empirical, quantitative data: the rate of election of Latinos to various offices in the City and elsewhere; whether Latinos face socioeconomic disparities in terms of metrics like income and poverty, educational attainment, housing, and health; whether Dodge City experiences racially polarized voting; whether, according to the empirical political science literature, election practices such as at-large elections, off-cycle voting, and differential terms have a dilutive effect on Latinos and racial and ethnic minorities. On these legally determinative questions, Defendant has no meaningful response.

### A. Defendant Selectively Disregards the Evidence and Makes Unsubstantiated Factual Claims.

It is no surprise that Defendant's witnesses claim life in Dodge City is great for the Latino community, as each of their witnesses are either members of the political establishment itself, or worked for the Dodge City government and therefore have an interest in maintaining the status quo in a relatively small town where personal contacts are all-important. Indeed, Defendant did not call *any* members of the Dodge City Latino community who were not City employees at some point. These insiders and employees were the only source of the City's assertions that single-member district elections lack community support[170] and that Latinos do not face issues different

---

[170] *See* Doc. 212 ¶ 116 ("Commissioner Sowers was not aware of any community support, other than Commissioner Scoggins, for a move to district elections in 2019."); *id*. ¶ 117 ("Mr. Dave Rebein, a four-generation Dodge Citian and active member of the Dodge City community, had never heard that Dodge City's use of at-large elections was a potential issue until this lawsuit was filed."); *id*. ¶ 62 ("Mr. Jurado gave no indication that he believed he was not re-elected for any

from those faced by whites.[171]

The City did not refute Plaintiffs' evidence from both expert and fact witnesses of past and present overt and subtle discrimination against Latinos in Dodge City. Defendant merely points out areas where documentary evidence of historical discrimination is sparse,[172] without any mention of the testimony *confirming* the existence of discrimination and segregation in Dodge City's history: Latinos were initially largely confined to the Mexican Village,[173] Dodge City schools were segregated,[174] Latinos in Dodge City were forced to attend different theaters and barber shops,[175] Latinos were not allowed to benefit from certain customer accommodations

---

[171] race-related reason or that the City's at-large election method for City Commission was to blame for his defeat."); *id*. ¶ 118 ("Mr. Rebein further testified that district elections would be divisive and would have the effect of preventing qualified candidates from attaining office."); *id*. ¶ 119 ("[A]t-large elections . . . are more unitive because commissioners 'represent the whole city, not just a district or a part of the city.'") (citing Fernando Jurado's testimony); *id*. at 101 ("Mr. Hernandez stated that the current form of elections for City Manager results in 'a unified community [and] a unified Dodge City . . . Former City Manager, Ms. Cherise Teiben, echoed that sentiment, stating, based on her roughly 40 years of service to the City, that it is her 'belief that five people that represented everybody gave better representation than one that represented this segment because it seemed like [representatives of single districts] would be doing more politics [and looking out more for their own respective] district versus what's best for the City as a whole.'").

[171] *Id*. ¶ 57 ("Former City Commissioner Fernando Jurado testified that he does not recall back in the late 1990s/early 2000s, Latinos in Dodge City having issues that needed to be addressed that were different than the issues that Whites faced in the City."); *id*. ¶ 56 ("Mr. Ernestor De La Rosa . . . testified that he did not recall any issues where the Latino community did not feel heard by the Dodge City Commission." ).

[172] *Id*. ¶ 93.

[173] Doc. 211 ¶¶ 227, 279–280.

[174] *Id*. ¶¶ 229, 292.

[175] *Id*. ¶¶ 227, 230, 280, 291.

provided to white shoppers in many North Dodge shops (if they were permitted to enter at all),[176] and Latinos were only permitted to swim in the public pool on "free day," immediately before the water was drained and replaced.[177] Additionally, Defendant's Proposed Findings of Fact did not address testimony regarding more recent experiences of harassment and prejudice against Latinos in Dodge City.[178] Defendant not only ignores the testimony of fact witnesses who have experienced life firsthand as Latinos in Dodge City, it also ignores compelling evidence from Jan Scoggins, a fourth-generation Dodge City resident who has lived there for decades and who was willing to speak out about the discrimination and disparities she witnessed growing up in Dodge both historically and more recently as a community member and Dodge City Commissioner.[179]

Defendant's claim that Dr. Martinez "largely opined on pre-Civil Rights movement discriminatory practices *outside* of Dodge City"[180] brushes aside Dr. Martinez's Dodge City-specific findings, including the presence of restrictive covenants,[181] school segregation,[182] and segregation in public accommodations[183]—findings corroborated by fact testimony.[184] Perhaps more importantly, Defendant's contention is premised on the assumption that discrimination and

---

[176] *Id.* ¶ 291.

[177] *Id.* ¶¶ 228, 290.

[178] *Id.* ¶¶ 233, 286–289, 296.

[179] *Id.* ¶¶ 291–93; *see also* Trial Tr. Vol. III, 148:23 (Scoggins).

[180] Doc. 212 at 90.

[181] Doc. 211 ¶ 281.

[182] *Id.* ¶ 284.

[183] *Id.* ¶ 280.

[184] *Id.* ¶¶ 227–230.

racial dynamics present historically and in the state more widely are irrelevant. As Plaintiffs explained in their Conclusions of Law, courts consider evidence beyond the immediate jurisdiction at issue under the totality of the circumstances.[185] Here, the broader context of historical race relations in Kansas includes lynchings, Ku Klux Klan operations, school segregation, and sundown towns.[186]

On several occasions, Defendant claims that if Latinos "simply registered and voted," they could establish the political power they seek.[187] But where plaintiffs in Section 2 actions have established socioeconomic disparities, courts have been skeptical of blaming depressed voter turnout simply on the supposed apathy of minority voters.[188] Additionally, on several occasions, Defendant claims that "[n]ot a single witness, including either of the Plaintiffs, testified to any evidence of a single issue coming before the City Commission that has divided the white and Latino communities in Dodge City."[189] Yet the Court heard unrebutted testimony from Dr. Bejarano that, in the aftermath of the 2010 shooting, Latino leaders determined that the City was "in denial" about racial discrimination in the City.[190]

---

[185] *Id*. at 129 n.632.

[186] *Id*. ¶¶ 283–284.

[187] *E.g.*, Doc. 212 at 70.

[188] *See, e.g.*, *United States. v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1568–69 (11th Cir. 1984) ("Both Congress and the courts have rejected efforts to blame reduced black participation on 'apathy'"); *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 294–95 (5th Cir. 1996); *Whitfield v. Democratic Party of State of Ark.*, 890 F.2d 1423, 1431–32 (8th Cir. 1989); *Gomez v. City of Watsonville*, 863 F.2d 1407, 1416 (9th Cir. 1988).

[189] Doc. 212 at 9; *see also id.* at 99, ¶ 55.

[190] Doc. 211 ¶ 357.

Defendant asserts that there has been an "utter lack of local outcry against the at-large election method utilized in Dodge City."[191] This statement ignores every instance that Plaintiffs have identified of members of the community raising the issue of district-based elections over the course of a decade.[192] Further, the Court heard testimony that the City Commissioners prevented issues like district-based elections from even coming before the Commission.[193] Section 2 does not require evidence of people marching in the streets to show that an issue was raised but ultimately not addressed.

Notably, Defendant's proposed factual conclusions on the totality of the circumstances are almost wholly devoid of expert analysis, consisting instead of fact witnesses' anecdotal and uncorroborated lay opinions. Defendant does not cite any experts in its lackluster effort to show that the Senate Factors are not met, other than Dr. Nelson's testimony tangentially related to Senate Factor 3.[194] Defendant cites no expert testimony for its assertions that: Latinos are not particularly concentrated in one area of the city,[195] a claim that its own witnesses acknowledged is contradicted by unrebutted Census data;[196] Latinos in Dodge City experience "economic prosperity" and "have

---

[191] Doc. 212 at 102.

[192] Doc. 211 ¶¶ 351–353, 358, 399–405, 424, 429, 431.

[193] *Id.* ¶¶ 399–408.

[194] Doc. 212 ¶¶ 99, 102.

[195] *Id.* at 8 ("While Plaintiffs claim a North/South divide in Dodge City between whites in the North and Latinos in the South, the reality is that, in many areas of the North, Latinos are the plurality or there is only a small difference between the number of Whites and Latinos.").

[196] Trial Tr. Vol. III, 268:11-19 (Tieben acknowledging that Census data, in contradiction to her previous testimony, indicates that high-density Latino areas in Dodge City are south of Dodge City, noting that "I learned a long time ago you don't argue with the Census") (Tieben).

largely thrived . . . in no little part due to the efforts of the City";[197] "Latinos in Dodge City own the majority of businesses in downtown Dodge City";[198] "socioeconomic disparities in Dodge City are better explained by the fact that Dodge City is a welcoming community for migrants and first generation Latino Americans";[199] "to the extent any discrimination happened in the past" it is not "impacting the current Latino population in any adverse way";[200] and "with Dodge City's current demographics and trends, all five city commissioners could be Latino under [Dodge City's] current election system."[201] Without expert analysis (and in some cases, even lay testimony) to substantiate these assertions, the Court should not only these conclusions skeptically, it should disregard them completely.

Finally, and perhaps most importantly, Defendant largely fails to rebut Plaintiffs' Senate Factors evidence—especially the quantitative data analyzed by Dr. Bejarano. First, as to Senate Factor 3, Defendant does not even *address* Plaintiffs' argument and testimony about the dilutive effect of off-cycle elections and differential terms on Latinos and racial and ethnic minorities.[202] Defendant appears to acknowledge that Dr. Nelson's limited analysis relates to the potential *switch* from at-large to single-member districts, leaving entirely untouched Dr. Bejarano's analysis about the dilutive effect of at-large elections on Latino representation in the first place, which is all that

---

[197] Doc. 212 at 94.

[198] *Id.* ¶ 29.

[199] *Id.* at 92–93.

[200] *Id.* at 95.

[201] *Id.* ¶ 120.

[202] Doc. 211 at 132–34.

the Senate Factor 3 inquiry concerns.[203] Even in this narrow area, Dr. Nelson testified that even her incomplete literature review found "that moving from at-large to single-member districts has at least 'some effect' on the election of Latinos to office."[204]

Second, Defendant does not challenge the accuracy of any of Dr. Bejarano's socioeconomic data under Senate Factor 5, instead conceding, as it must, that "there appear to be some disparities between Latinos and Whites in Dodge City."[205] Accordingly, the Court should adopt Dr. Bejarano's Senate Factor 5 findings in their entirety. Defendant claims on several occasions that the socioeconomic data "largely show that Latinos' lives are improving."[206] This is not an accurate interpretation of the data—many of the disparities have in fact *widened* as compared to whites in Dodge City, and the disparities have maintained for years.[207] It is the disparities *between* the groups that is legally relevant, as opposed to the changes that occur over time within the same group.[208]

Defendant asserts that Senate Factor 5 cannot be met because the disparities between whites and Latinos should be attributed to newly arrived Latino immigrants,[209] but this is pure

---

[203] Doc. 212 at 70.

[204] Doc. 211 ¶ 249.

[205] Doc. 212 at 93.

[206] *Id.* ¶ 30; *see also id.* at 93 (arguing socioeconomic "metrics are dramatically improving for Latinos in Dodge City").

[207] Doc. 211 ¶¶ 258–274, 276.

[208] *See, e.g.*, *Luna*, 291 F. Supp. 3d at 1137–38 (finding Senate Factor 5 favored plaintiffs even when "Latino educational attainment . . . had improved," because "defendants did not present evidence at trial that there currently is no education gap between Latinos and non-Hispanic whites").

[209] Doc. 212 at 90.

conjecture. Defendant cites *no* evidence to show that these socioeconomic disparities are actually concentrated among new immigrants. Finally, Defendant relies heavily on Dr. Nelson's testimony that she did not find statistical significance in socioeconomic disparities. This, too, has no bearing on the Senate Factor 5 analysis, as Dr. Bejarano explained that it is not standard practice for social scientists to run statistical significance testing on descriptive socioeconomic data from Census and American Community Survey ("ACS") data because these data are considered reliable within the field.[210]

Third, as it relates to Senate Factor 7, it is unrebutted that in a city in which Latinos make up 63.9% of the total population[211] and more than 46% of the citizen voting-age population,[212] no Latino currently serves on the City Commission, and just two Latinos have been elected in the past three decades, both of whom lost reelection.[213] Defendant claims that "NALEO is not a reliable source when accessing Senate Factor 7" because the organization did not include every single Latino former City Commissioner in its directory.[214] Yet Defendant did not put forth any witness contesting the accuracy of the NALEO directory. Defendant also does not contest that the inclusion or non-inclusion of these commissioners—in the NALEO directory or otherwise—does not change Dr. Bejarano's findings of "'stark underrepresentation for Latinos on Dodge City Commission.'"[215] Nor does Defendant contest any of the data in Dr. Bejarano's tables. Instead, it

---

[210] Doc. 211 ¶ 275.

[211] *Id*. ¶ 48.

[212] *Id*. ¶ 49.

[213] Doc. 211 ¶¶ 322, 343; Dep. Design. of Fernando Jurado, Doc. 186, 12:19–13:4.

[214] Doc. 212 at 98–99.

[215] Doc. 211 ¶ 323.

confirms it.[216] Defendant cannot point to a *single* Latino elected official who was not accounted for in Dr. Bejarano's analysis, nor to any witness who criticized NALEO's directory. Thus, even if the Court were to find NALEO unreliable—a proposition for which there is no actual evidentiary support—it is irrelevant because the results in Dr. Bejarano's Senate Factor 7 tables are uncontested. Indeed, Dr. Bejarano did not exclusively rely on NALEO for her findings but conducted supplemental research, which ensured full accuracy in her tables and demonstrated her diligence in this case.

Additionally, without meaningfully defining the term, Defendant claims it is "inexpensive" to run for the Dodge City Commission.[217] But Defendant does not dispute that it is more expensive to run city-wide than in a single district, nor does it dispute Dr. Bejarano's data showing the poverty rate and median household incomes among Latinos is much higher than the rate for whites, making it comparatively harder for Latinos to marshal resources to run.[218]

Fourth, as it relates to Senate Factor 8, Dr. Bejarano's testimony regarding a lack of responsiveness with respect to voting issues, health, and racial discrimination is unrebutted.[219] Defendant put forward no concrete evidence to show the City has "committed millions" to improving the conditions in South Dodge.[220] Mere assertions of investment offered by a single witness representing the City—without supporting documents or expert testimony—does not

---

[216] *See* Doc. 212 ¶ 59 (acknowledging, as Dr. Bejarano testified, that Fernando Jurado, Joe Nuci, and Blanca Soto were the only Latinos who have served on the Commission since 1996; Ms. Soto was appointed, not elected).

[217] *Id.* ¶ 163.

[218] Doc. 211 ¶¶ 239, 265.

[219] *See, e.g.*, *id.* ¶¶ 349–360.

[220] Doc. 212 at 99.

counter the Plaintiffs' overwhelming testimony regarding the differences between South and North Dodge.[221] The City did not offer evidence of any project that has been completed—indeed, most of the projects Mr. Hernandez listed are in the very early stages—or of any direct beneficial impact on the Latino community of any such investment, most of which appear to be targeted at developing tourism in historic Dodge City (a small area that happens to be south of Comanche Street, but is largely not a residential neighborhood).[222]

Lastly, as it relates to Senate Factor 9, Defendant claims that commissions elected at-large function better and promote unity, while district-based elections can be decided by just a handful of votes.[223] As noted in Plaintiffs' Proposed Findings of Fact, the record evidence suggests that in practice, Dodge City's at-large elections are partisan and bitterly divided, while Defendant has provided no evidence that anyone—outside the context of this litigation—has said that the at-large election system is important for City unity.[224] Defendant's claim about margin of victory is both

---

[221] Doc. 211 at 96, ¶¶ 366–368, 371–390 ("Mr. Rangel-Lopez and Ms. Vargas both described Dodge City as 'two different towns' or 'two communities in one town.' Mr. Hernandez testified that the north is characterized by larger, more expensive houses as compared to the south part of Dodge City. . . . Ms. Scoggins testified that 'North Dodge is a higher socioeconomic area north of Comanche. The homes are bigger. The streets are wider. The yards are bigger.' She also testified that the roads have better upkeep in North Dodge, and that there is more retail in North Dodge. . . . Mr. Rangel-Lopez testified that South Dodge City is lower income and that immigrants tend to live in the south east part of Dodge City. Mr. Hernandez confirmed that the majority of the Hispanic minority community is located in the poorer neighborhoods of South Dodge.").

[222] Doc. 212 ¶ 94 ("[T]he City is currently in the midst of a $15 million 'streetscape project in the downtown area[.]' The City has 'committed up to $5 million for improvements in the Downtown Historic Heritage Area.' . . . Also, the City has committed substantial amounts of resources and time to a 'complete reconfigur[ation] of the Wright Park area,' 'adding a water feature for [its] residents,' and 'redoing the Hoover Pavilion,' 'Friendship Park,' and the 'Beeson playground system.'").

[223] *Id*. at 97–98.

[224] Doc. 211 ¶¶ 437–438.

speculative and unconvincing. Indeed, Defendant itself acknowledges the narrow margin of victories in the current at-large system, including one race that came down to just two votes.[225] Defendant has not provided any rationale for the at-large election system that holds up to any level of scrutiny.

### B. Defendant Misconstrues the Legal Standards for the Senate Factors.

Defendant mischaracterizes the law governing nearly all of the Senate Factors at issue here. Defendant's claim that Senate Factor 1 requires an evidentiary showing that "historical events interact with Dodge City's at-large elections in a way that *causes* an inequality in the opportunities that Latinos enjoy today"[226] is incorrect. Both *Gingles* and *Sanchez* only confirm that determining how the challenged electoral structure "*interacts* with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives" is "the essence of a § 2 claim,"[227] which the Senate Factors together were designed to examine. This "interaction" language does not impose any sort of causation requirement under Senate Factor 1. Other language Defendant quotes on this point is similarly taken out of context.[228] Senate Factor 1 merely asks a Court to analyze "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to

---

[225] Doc. 212 ¶ 48.

[226] *Id*. at 90–91 (emphasis in original).

[227] *Gingles*, 478 U.S. 47; *Sanchez*, 97 F.3d at 1323 (internal citation omitted; emphasis added).

[228] Doc. 212 at 90; *see Uno*, 72 F.3d at 990 (noting that the court must focus on lack of opportunity "*at present*" in the context of discussing the rapidly changing political environment in the jurisdiction and, relatedly, the relatively lower probative value of older elections in racially polarized voting analysis under *Gingles* II and III).

register, to vote, or otherwise to participate in the democratic process."[229] As part of that analysis, probative evidence of discrimination impacting the right to vote includes lay witness testimony, statewide data applying to the jurisdiction, evidence of past voting rights lawsuits or settlements within the state and region in which the jurisdiction is located, and the existence of racially segregated schools and public facilities.[230] Finally, contrary to Defendant's suggestion, there is no bright-line rule as to when history is "too remote" in time to be considered under Senate Factor 1.[231] While contemporary examples may be more probative—and Plaintiffs have identified such contemporary examples[232]—even long-ago acts of official discrimination provide context for the analysis.[233]

With no citation to authority, Defendant erroneously argues that "Dodge City has no issues traditionally associated with violations of Senate [F]actor 3."[234] As discussed in Plaintiffs' Proposed Conclusions of Law,[235] at-large elections, off-cycle elections, and differential terms are three of the most longstanding and consistent election practices indicative of Senate Factor 3 that

---

[229] *Gingles*, 478 U.S. at 36–37.

[230] *See Rodriguez*, 964 F. Supp. 2d at 778–79; *Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 940 (8th Cir. 2018); *see also Blaine Cnty.*, 363 F.3d at 912–13; *Soto Palmer v. Hobbs*, No. 3:22-cv-05035-RSL, 2023 WL 5125390, at *7 (W.D. Wash. Aug. 10, 2023).

[231] Doc. 212 at 91, 95.

[232] Doc. 211 at 130–31.

[233] *See Cuthair*, 7 F. Supp. 2d at 1169 (citing "the history of Native Americans in Colorado and in the Montezuma County area over the last 150 years" in concluding that Senate Factor 1 was met).

[234] Doc. 212 at 91.

[235] Doc. 211 at 132–35.

exist in Section 2 case law.[236] Defendant has no answer to any of this overwhelming authority. Further, Defendant's contention that the at-large election system was adopted in Dodge City (and elsewhere) without discriminatory intent is legally irrelevant: Senate Factor 3 neither examines intent nor asks why an election practice was selected or utilized.[237] The correct inquiry is simply whether or not a subdivision *uses* a practice that has the effect of "enhanc[ing] the opportunity for discrimination."[238]

Contrary to Defendant's assertion,[239] Senate Factor 5 does not require Plaintiffs "to prove that racial discrimination or disparities caused, in whole or in part, depressed levels of minority political participation."[240] Defendant's interpretation that Senate Factor 5 requires a thorough examination of and a definitive link to historical discrimination would render Senate Factor 1

---

[236] *See, e.g.*, *Rogers v. Lodge*, 458 U.S. 613, 616 (1982) ("At-large voting schemes and multimember districts tend to minimize the voting strength of minority groups by permitting the political majority to elect *all* representatives of the district."); *Luna*, 291 F. Supp. 3d at 1135–36 ("[A]mong the most common [election schemes which enhance vote dilution] are at-large elections . . . ."); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1079–80 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018) ("[o]ff-cycle elections also enhance the opportunity for discrimination" against racial and ethnic minorities); *Wright v. Sumter Cnty. Bd. of Elections and Registration*, 301 F. Supp. 13d 1297, 1321–22 (M.D. Ga. 2018) (finding "staggered terms for . . . at-large seats" to be a voting practice that tends to discriminate against racial and ethnic minorities for purposes of Senate Factor 3), *aff'd* 979 F.3d 1282 (11th Cir. 2020); *Large v. Fremont Cnty., Wyo.*, 709 F. Supp 2d 1176, 1216–17 (D. Wyo. 2010); *Soto Palmer*, 2023 WL 5125390, at *7–8; *NAACP, Spring Valley Branch*, 462 F. Supp. 3d at 401–02 ("The District holds at-large, staggered, off-cycle elections with numbered posts, all of which have the effect of diluting minority votes."), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021); *United States v. Vill. of Port Chester*, No. 06-cv-15173-SCR, 2008 WL 190502, at *28 (S.D.N.Y. Jan. 17, 2008).

[237] *NAACP, Spring Valley*, 462 F. Supp. 3d at 402 (citing *Gingles*, 478 U.S. at 37, 45).

[238] *Id.*

[239] Doc. 212 at 93.

[240] *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1037–38 (D.S.D. 2004); *Marengo Cnty. Comm'n*, 731 F.2d at 1568–69.

superfluous.[241] Moreover, where defendants challenge causation with respect to depressed voter turnout under Senate Factor 5, "the burden is on those who deny the causal nexus to show that the cause is something else."[242] So even if any sort of causation requirement were necessary here—which the case law makes clear is not—Defendant bears the burden of showing that the cause of socioeconomic disparities in Dodge City between Latinos and whites was caused by something other than discrimination. It has not done so.[243]

The two non-binding cases that Defendant cites for its erroneous proposition that Plaintiffs must prove causation are directly contradicted by the overwhelming majority of case law on Senate Factor 5.[244] Courts, including the Tenth Circuit, routinely conclude that Senate Factor 5 is met without an express finding of causation between past discrimination and present socioeconomic inequalities.[245] For example, in *Sanchez v. State of Colorado*, the Tenth Circuit found that Senate Factor 5 weighed in favor of the plaintiffs given the "poverty, unemployment, school drop-out, housing, and alcoholism" that disproportionately affected the Hispanic community, along with a

---

[241] *See* Doc. 211 at 137–38.

[242] *Bone Shirt*, 336 F. Supp. 2d at 1038 (internal citation omitted); *Marengo Cnty. Comm'n*, 731 F.2d 1at 1569 ("[W]hen there is clear evidence of present socioeconomic or political disadvantage . . . the burden is not on the plaintiffs to prove that this disadvantage is causing reduced political participation, but rather is on those who deny the causal nexus to show that the cause is something else.").

[243] Doc. 212 at 89–94.

[244] *See, e.g.*, *Sanchez*, 97 F.3d at 1323; *Blaine Cnty.*, 363 F.3d at 914; *NAACP, Spring Valley*, 462 F. Supp. 3d  at 407–08; *Vill. of Port Chester*, 2008 WL 190502, at *29–30; *Montes*, 40 F. Supp. 3d at 1413; *Luna*, 291 F. Supp. 3d at 1137–38; *United States v. Osceola Cnty., Fla.*, 475 F. Supp. 2d 1220, 1234 (M.D. Fla. 2006); *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13-cv-0087-D, 2014 WL 4055366, at *22 (N.D. Tex. Aug. 15, 2014); *City of Euclid*, 580 F. Supp. 2d at 609–10; *Large*, 709 F. Supp. 2d at 1218–19; *Bone Shirt*, 336 F. Supp. 2d at 1037–38; *see also* Doc. 211 at 137 n.653.

[245] *Id.*

lower voter turnout rate.[246] The Court found that the relevant socioeconomic disparities between whites and Latinos existed, as did depressed Hispanic turnout, without *ever* referencing any "causal link" or establishing that any past discrimination caused such disparities.[247] Other courts have explicitly rejected arguments similar to the one Defendant makes here.[248] The weight of authority holds that (1) socioeconomic disparities between whites and the racial minority group in question and (2) depressed minority voter turnout alone are sufficient for the Court to determine that Senate Factor 5 weighs in Plaintiffs' favor.

Defendant misconstrues Senate Factor 7 by focusing on facts that have no bearing on whether this factor is met. Under Senate Factor 7, "[t]he core question posed in Factor 7 is whether [minority] candidates have historically been successful in the [jurisdiction], not whether individual [minority] candidates . . . could have run better campaigns."[249] Defendant irrelevantly highlights testimony related to Latinos running their own businesses and serving on civic boards in Dodge City,[250] evidence that courts have found are "neither relevant nor probative" of Senate Factor 7 and that "[have] no bearing on whether [an election scheme] dilutes [minority] voting strength or

---

[246] 97 F.3d at 1323–24.

[247] *Id.*

[248] *See Blaine Cnty.*, 363 F.3d at 914 (holding that socioeconomic disparities between Indians and whites in graduation, unemployment, and vehicle ownership rates, along with evidence of government discrimination, were sufficient to support a finding that Senate Factor 5 weighed in plaintiff's favor despite defendant county's contention that there was no causal link between discrimination and socioeconomic disparities); *Montes*, 40 F. Supp. 3d at 1413 (finding that Senate Factor 5 weighed in favor of plaintiffs over defendant's argument that socioeconomic disparities could not be attributed to discrimination).

[249] *Mo. State Conf. of NAACP*, 894 F.3d at 939.

[250] Doc. 212 at 98.

whether [minorities] have an equal opportunity to become involved in the political process."[251] Moreover, evidence "that very few Latinos have become candidates"[252] weighs in favor of Senate Factor 7, particularly where, as here, plaintiffs have put forward lay testimony regarding the barriers Latinos running political campaigns in Dodge City face.[253] Finally, Defendant erects a strawman about proportionality. Plaintiffs agree that "proportionality is not the law" for purposes of Senate Factor 7, or for Section 2 dilutive effect claims more broadly.[254] Yet the Senate Factor 7 inquiry analyzes rates of representation based on share of the population, and it is uncontested that the Latino rate of election to all levels of elected office is dramatically lower than their share of the population.

Lastly, Defendant's argument that an ongoing demographic change in Dodge City forecloses a Section 2 violation is meritless. Latinos are not currently a majority of the Dodge City population based on citizen voting-age population data, even using 2023 ACS 5-year estimates.[255] Even if they were, the Supreme Court has acknowledged "it may be possible for a citizen voting-age majority to lack real electoral opportunity" and still require the protection of the VRA.[256] And Latinos are not close to becoming a majority in terms of actual voters—Latinos make up just 30%

---

[251] *Bone Shirt*, 336 F. Supp. 2d at 1043; *see City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1560 (11th Cir. 1987).

[252] Doc. 212 at 98.

[253] Doc. 211 at 140.

[254] Doc. 212 at 99.

[255] Doc. 211 at 115.

[256] *LULAC v. Perry*, 548 U.S. 399, 428 (2006); *see also* Doc. 211 at 114–15.

of the City's actual voters, as compared to whites, who comprise 64% of the actual voters.[257] Defendant's "evidence" that Latinos will be able to elect candidates of choice in Dodge City Commission elections in the near future under the current at-large system stem from hopeful statements from two fact witnesses who offered no statistical, demographic, or political science analysis.[258] These speculative statements, aside from being legally irrelevant, cannot contend with the actual analysis from Plaintiffs' expert witnesses.

At the end of the day, Defendant's Senate Factors arguments rest to a large degree on an appeal to the "unity" at-large elections allegedly provide, as contrasted with the divisiveness that district elections would supposedly create. But in the face of the undisputed evidence of both past and current disparities in the treatment and socioeconomic condition of Latinos and whites in Dodge City, this appeal far more resembles a self-congratulatory slogan of the overwhelmingly non-Hispanic "in-crowd" than a description of the reality on the ground, where significant divisions in fact exist, in both electoral outcomes and across the whole range of other metrics presented by undisputed evidence. The totality of the circumstances shows, and as the satisfaction of the *Gingles* conditions itself strongly demonstrates, that the at-large system deprives Latino voters of the opportunity to elect candidates of choice. That those who benefit from an inequitable system perceive a level playing field as "divisive" and undesirable simply proves the need for equal democratic opportunity at the polls that Section 2 was enacted to protect.

---

[257] Doc. 211 ¶ 55.

[258] Doc. 212 ¶ 120.

IV. **PLAINTIFFS PRESERVE THEIR FOURTEENTH AMENDMENT CLAIM FOR APPEAL.**

Defendant argues that Plaintiffs failed to show a Fourteenth Amendment violation.[259] The Court already granted Defendant's Motion for Judgment on Partial Findings as to Plaintiffs' Fourteenth Amendment claim.[260] Out of respect for judicial economy, Plaintiffs stand on prior briefing and the oral arguments made on Defendant's motion to preserve the issue for appeal.[261]

V. **PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF.**

Defendant's argument that "Plaintiffs have failed to show that injunctive relief is warranted" pertains *only* to the request for relief in Plaintiffs' amended complaint to move Dodge City Commission elections from odd-numbered years to even-numbered years.[262] The Court already granted Defendant's Motion for Judgment on Partial Findings related to this specific request for injunctive relief.[263] Out of respect for judicial economy, Plaintiffs stand on the oral arguments made on Defendant's motion to preserve the issue for appeal.[264]

Of course, Defendant makes no argument that Plaintiffs' central request for injunctive relief—for the City to move from at-large to single-member district elections for the Dodge City Commission—is somehow contrary to law or unwarranted in any way.[265] There can be no doubt,

---

[259] Doc. 212 at 101–03.

[260] Order, Doc. 200; Trial Tr. Vol. III, 217:15-18.

[261] Trial Tr. Vol. III, 207:14–215:24; Pls.' Trial Br., Doc. 183, at 18–20.

[262] Doc. 212 at 103–05.

[263] Order, Doc. 200; Trial Tr. Vol. III, 217:15-18.

[264] Trial Tr. Vol. III, 215:25–217:12.

[265] Doc. 212 at 103-05.

and Defendant does not contest, that all of the other equitable factors for Plaintiffs' request for injunctive relief are met here.[266] It is axiomatic that "[a] restriction on the fundamental right to vote therefore constitutes irreparable injury."[267] "By definition, '[t]he public interest … favors permitting as many qualified voters to vote as possible"[268]; further, "the public has an interest in ensuring federal laws are followed, particularly when those interests relate to voting rights."[269] These fundamental rights vastly outweigh any hardship to Defendant by the issuance of an injunction.[270] To date, Defendant has identified no such hardship. All factors thus weigh in favor of granting Plaintiffs' request for a permanent injunction requiring Defendant to adopt district-based elections for its City Commission elections.

Similarly, Defendant does not contest that Plaintiffs are entitled to declaratory relief. To obtain declaratory relief in this case, Plaintiffs must succeed on the merits of their case, and the declaration sought must be prospective in nature—i.e., they cannot obtain a declaration that merely states that their rights were violated in the past.[271] Here, Plaintiffs are entitled to declaratory relief

---

[266] *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007).

[267] *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 464 F. Supp. 3d 587, 593 (S.D.N.Y. 2020) ("In a vote dilution case, [a] restriction on the fundamental right to vote . . . constitutes irreparable injury.") (internal citation omitted).

[268] *League of Women Voters of N.C.*, 769 F.3d at 247–48 (quoting *Obama for Am.*, 697 F.3d at 437 ("The public interest . . . favors permitting as many qualified voters to vote as possible.")).

[269] *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1006 (W.D. Mo. 2018).

[270] *See, e.g.*, *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016) (finding "no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by" election officials).

[271] 28 U.S.C. § 2201. Declaratory relief is traditionally considered prospective. *See Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 31 (2010); *Christian Legal Soc'y Chapter of the Univ. of Cal.,*

that Defendant's current at-large method of election for the Dodge City Commission violates Section 2 of the VRA because they have succeeded on the merits and such a declaration is prospective in nature.

## VI.    PLAINTIFFS' § 1983 CLAIM REMAINS AN ALTERNATIVE BASIS FOR RELIEF.

Once again in this litigation, Defendant baselessly claims that Plaintiffs have "abandoned" their claim under 42 U.S.C. § 1983.[272] Plaintiffs have now pled and defended their § 1983 cause of action claim at least *six* separate times in this case,[273] including several times in (and in the very first sentence of) their Proposed Findings of Fact and Conclusions of Law.[274] As the Court already ruled in denying Defendant's motion for summary judgment:

> [T]he Court in its order on Defendants' previous motion to dismiss clearly acknowledged § 1983 as merely an alternative vehicle for Plaintiffs' Section 2 claim. There is no indication that Plaintiffs have abandoned that claim.[275]

There was no reason for Plaintiffs to specifically "mention[]" the § 1983 cause of action at trial because (i) the Court has already ruled twice that § 1983 is a valid alternative cause of action for Plaintiffs' Section 2 claim,[276] and (ii) § 1983 serves merely as an alternative cause of action, so it

---

*Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 676 n.6 (2010) (lawsuit "seeks only declaratory and injunctive—that is, prospective—relief").

[272] Doc. 212 at 105.

[273] *See* Compl., Doc. 1; Am. Compl., Doc. 30; Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, Doc. 48; Pls.' Opp'n to Defs.' Mot. to Amend and Certify Order for Interlocutory Appeal and Mot. to Stay Proceedings Pending Appeal, Doc. 86; Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., Doc. 151; Doc. 211.

[274] Doc. 211 at 1 & n.1, 146.

[275] Mem. & Order, Doc. 159, at 12.

[276] *See* Mem. & Order, Doc. 71, at 10–12; Mem. & Order, Doc. 159, at 12.

had no bearing on the evidence being put forth at trial. There was and remains no basis to dismiss Plaintiffs' § 1983 claim.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court decline to adopt Defendant's Proposed Findings of Fact and Conclusions of Law, and instead adopt Plaintiffs' Proposed Findings of Fact and Conclusions of Law.

Dated: April 5, 2024                                     Respectfully submitted,

Chad W. Dunn*                                    By:  /s/ Kunyu Ching
Sonni Waknin*                                    Kunyu Ching KS 29807
Bernadette Reyes*                                **AMERICAN CIVIL LIBERTIES UNION**
**UCLA VOTING RIGHTS PROJECT**                   **OF KANSAS**
3250 Public Affairs Building                     10561 Barkley Street, Suite 500
Los Angeles, CA 90065                            Overland Park, KS 66212
chad@uclavrp.org                                 kching@aclukansas.org
sonni@uclavrp.org                                913-490-4100
bernadette@uclavrp.org
310-400-6019                                     Abena Mainoo*
                                                 Jonathan I. Blackman*
Jonathan Topaz*                                  Mijin Kang*
Sophia Lin Lakin*                                Katherine MacAdam*
Victoria Ochoa*                                  Isabella Masiello*
**AMERICAN CIVIL LIBERTIES UNION,**              **CLEARY GOTTLIEB STEEN &**
**INC.**                                         **HAMILTON LLP**
125 Broad Street, 18th Floor                     One Liberty Plaza
New York, NY 10004                               New York, NY 10006
jtopaz@aclu.org                                  amainoo@cgsh.com
slakin@aclu.org                                  jblackman@cgsh.com
vochoa@aclu.org                                  mkang@cgsh.com
212-549-2500                                     kmacadam@cgsh.com
                                                 imasiello@cgsh.com
Scott Fuqua*                                     212-225-2000
**FUQUA LAW & POLICY, P.C.**
P.O. Box 32015
Santa Fe, NM 87594
scott@fuqualawpolicy.com                         *Attorneys for Plaintiffs*
505-982-0961
                                                 * Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

Pursuant to D. Kan. R. 5.1(f), I hereby certify that on this 5th day of April 2024, a true and correct copy of the foregoing was served via the United State District Court's CM/ECF system on all parties or persons requiring notice, including upon attorneys for defendant:

FOULSTON SIEFKIN LLP
Anthony F. Rupp, KS #11590
Tara Eberline, KS #22576
Sarah E. Stula, KS #27156
7500 College Boulevard, Suite 1400
Overland Park, Kansas 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com
sstula@foulston.com

FOULSTON SIEFKIN, LLP
Clayton Kaiser, KS #24066
Samuel Walenz, KS #29114
1551 North Waterfront Parkway, Suite 100
Wichita, Kansas 67206
(316) 267-6371
(316) 267-6345 (fax)
ckaiser@foulston.com
swalenz@foulston.com

By: */s/ Kunyu Ching*
Kunyu Ching KS 29807
**AMERICAN CIVIL LIBERTIES**
**UNION OF KANSAS**
10561 Barkley Street, Suite 500
Overland Park, KS 66212
kching@aclukansas.org
913-490-4100